**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 3:15-CV-0401-N-BQ |
| GMAG LLC, MAGNESS SECURITIES LLC, GARY D. MAGNESS, and MANGO FIVE FAMILY, INC., IN ITS CAPACITY AS TRUSTEE FOR THE GARY D. MAGNESS IRREVOCABLE TRUST, | § § § § § § | |
| Defendants. | § § | |

---

**RECEIVER'S CONSOLIDATED SEALED RESPONSE TO THE MAGNESS DEFENDANTS' MOTIONS TO EXCLUDE OR LIMIT EXPERT OPINION TESTIMONY OF KARYL VAN TASSEL AND BILL POST, AND BRIEF IN SUPPORT**

---

TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................................ ii

Summary ................................................................................................................................. 1

Argument & Authorities ........................................................................................................ 1

    I.      Federal law favors the liberal admission of qualified expert testimony. ................ 4

    II.    Both Ms. Van Tassel and Mr. Post are qualified to provide expert testimony. ............................................................................................................. 5

    III.   The Receiver's experts' opinions are reliable, are the result of valid analyses, are supported by voluminous documentary evidence and witness testimony, and, therefore, are admissible. ............................................................ 10

    IV.   The Magness Defendants' relationships with and access to high-level Stanford employees and Stanford information are relevant to the affirmative defense of good faith, and the Receiver's experts should be allowed to testify concerning their opinions about such relationships and access. ............................................................................................................. 19

    V.    Ms. Van Tassel's opinions concerning market trends are relevant and admissible. ........................................................................................................ 23

Conclusion & Prayer ............................................................................................................. 25

Certificate of Service ............................................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank of Am., N.A. v. Fulcrum Enters, LLC,*
  20 F. Supp. 3d 594 (S.D. Tex. 2014) ......................................................................20

*Berkley Reg'l Ins. Co. v. Phila. Indem. Ins. Co.,*
  600 F. App'x 230 (5th Cir. 2015) ............................................................................22

*Browning Interests v. Allison (In re Holloway),*
  955 F.2d 1008 (5th Cir. 1992) ................................................................................20

*Calmes v. United States,*
  926 F. Supp. 582 (N.D. Tex. 1996) ........................................................................20

*Corus U.K., Ltd. v. Forest Lines,*
  No. 04-1553, 2005 WL 5974558 (E.D. La. Aug. 2, 2005) ......................................6

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993)..................................................................................4, 5, 17

*Flores v. Robinson Roofing & Constr. Co., Inc.,*
  161 S.W.3d 750 (Tex. App.—Fort Worth 2005, pet. denied) .................................20

*GE Capital Commercial, Inc. v. Worthington Nat'l Bank,*
  754 F.3d 297 (5th Cir. 2014) ..................................................................................12

*Hahn v. Love,*
  321 S.W.3d 517 (Tex. App.—Houston [1st Dist.] 2009, pet denied)......................20

*In re Wren Alexander Invs., LLC,*
  No. 08-52914-RBK, 2011 WL 748131 (Bankr. W.D. Tex. Feb. 23, 2011) ............20

*J. Michael Putman, M.D.P.A. Money Purchase Pension Plan v. Stephenson,*
  805 S.W.2d 16 (Tex. App.—Dallas 1991, no writ).................................................20

*Jackson Law Office, P.C. v. Chappell,*
  37 S.W.3d 15 (Tex. App.—Tyler 2000, pet. denied)..............................................20

*Janvey v. Alguire,*
  647 F.3d 585 (5th Cir. 2011) ....................................................................................8

*Janvey v. Brown,*
  767 F.3d 430 (5th Cir. 2014) ...............................................................................7-8

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
  712 F.3d 185 (5th Cir. 2013) ..................................................................................8

*Johnson v. Mead Johnson & Co., LLC*,
  754 F.3d 557 (8th Cir. 2014) .............................................................................4, 13

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) .................................................................................4, 5, 17, 18

*Maizoro, S.A. de C.V. v. Sea-Land Serv., Inc.*,
  No. CA 3-96-CV-2979-R, 1999 WL 1009092 (N.D. Tex. Oct. 20, 1999) .............................22

*Nunn v. State Farm Auto. Ins. Co.*,
  Civil Action No. 3:08-CV-1486-D, 2010 WL 2540754 (N.D. Tex. June 22,
  2010) .......................................................................................................5, 18

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
  751 F. Supp. 2d 876 (S.D. Tex. 2010) ......................................................................8

*Pipitone v. Biomatrix, Inc.*,
  288 F.3d 239 (5th Cir. 2002) ..............................................................................13

*Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*,
  625 S.W.2d 295 (Tex. 1981) .................................................................................22

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
  382 F.3d 546 (5th Cir. 2004) ...........................................................................4-5, 13

*Stein v. Duenas*,
  No. 01-14-00564-CV, 2015 WL 4760197 (Tex. App.—Houston [1st Dist.]
  Aug. 13, 2015, no pet.) .....................................................................................20

*Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*,
  80 S.W.3d 601 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ...........................................20

*Templeton v. O'Cheskey (In re Am. Hous. Found.)*,
  785 F.3d 143 (5th Cir. 2015) ................................................................................2

*Tow v. Pajooh (In re CRCGP LLC)*,
  Bankr. No. 04-31993, Adversary No. 07-3117, 2008 WL 4107490 (Bankr.
  S.D. Tex Aug. 28, 2008) ....................................................................................20

*United States v. Kuhrt*,
  788 F.3d 403 (5th Cir. 2015) .............................................................................4, 18

*United States v. Nacchio*,
  555 F.3d 1234 (10th Cir. 2009) ..........................................................................4, 13

Receiver's Consolidated Sealed Response to the Magness
Defendants' Motions to Exclude or Limit Expert Opinion
Testimony of Karyl Van Tassel and Bill Post, and Brief in Support                    iii

*Wren Alexander Invs., LLC v. IRS (In re Wren Alexander Invs., LLC),*
    530 F. App'x 302 (5th Cir. 2013) ............................................................................20

STATUTES

TEX. BUS. & COM. CODE ANN. § 24.002(7) (West 2015) ............................................20

TEX. BUS. & COM. CODE ANN. § 24.005(b)(1) ...........................................................19

OTHER AUTHORITIES

FED. R. EVID. 104 ........................................................................................................12

FED. R. EVID. 702 ...............................................................................................4, 12, 18

FED. R. EVID. 702 advisory committee's note to 2000 amendments ............................18

FED. R. EVID. 702 advisory committee's note to 1972 proposed rules .........................18

FED. R. EVID. 703 ...................................................................................................4, 5

RESTATEMENT (THIRD) OF AGENCY § 5.03 (AM. LAW. INST. 2006) ...........................22

Receiver Ralph S. Janvey (the "<u>Receiver</u>") hereby files his Consolidated Sealed[1] Response to the Magness Defendants' Motions to Exclude or Limit Expert Opinion Testimony of Karyl Van Tassel [*see* Docs. 128-130] and Bill Post [*see* Docs. 131-133], respectfully stating as follows:

### SUMMARY

Karyl Van Tassel and Bill Post are thoroughly qualified to express their expert opinions concerning the $88.2 million in transfers that the Magness Defendants received from SIB; the suspicious facts and circumstances concerning SIB of which the Magness Defendants were aware and could have discovered as a result of a reasonably diligent investigation; whether an investor in the position of the Magness Defendants would have been aware of SIB's fraud or insolvency; and facts and circumstances concerning the Magness Defendants' relationships with and access to high-level Stanford employees and Stanford information. The Receiver's experts' well-reasoned opinions are founded upon reliable, sound, and valid analyses and methodologies, and their testimony is admissible and relevant to whether the Magness Defendants received the transfers from SIB in good faith. The Magness Defendants' objections to the opinions of Ms. Van Tassel and Mr. Post amount essentially to cross-examination points and jury arguments. None of the arguments credibly relate to the issue of admissibility. For these reasons, which are fully briefed below, the Receiver requests that the Court deny the Magness Defendants' motions to exclude opinion testimony of Ms. Van Tassel and Mr. Post.

### ARGUMENT & AUTHORITIES

The sole remaining issue with respect to the Receiver's fraudulent-transfer claims is whether the Magness Defendants received their transfers from SIB in good faith. Good faith is

---

[1] The Receiver has filed this Consolidated Response and the Appendix in Support under seal pursuant to the Court's Protective Order [Doc. 28] because these filings contain or reference materials that have been designated by a party or parties as "Confidential," subject to later challenge pursuant to the provisions of that Protective Order.

a question of fact for the jury, and the Magness Defendants bear the burden of proving their good faith. The Magness Defendants cannot establish that they took the fraudulent transfers from Stanford in good faith if they had actual knowledge of SIB's fraud or insolvency *or* if they had information that put them on inquiry notice of SIB's fraud or insolvency and took the transfers without first conducting an investigation that would have allayed the suspicions of a reasonably prudent person. *See Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 164 (5th Cir. 2015) (the good faith test asks (1) "whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose" and (2) whether, having been put on inquiry notice, the transferee "satisf[ied] a 'diligent investigation' requirement" (internal quotation marks omitted)).[2] At trial, the Receiver intends to offer both fact and opinion testimony that is relevant to the jury's determination concerning that affirmative defense. Among other evidence, the Receiver intends to offer testimony from Karyl Van Tassel and Bill Post regarding relevant information that was uncovered in the course of their investigation of the Stanford Ponzi scheme and the transfers to the Magness Defendants, including their sound and reasoned opinions that resulted from such investigation. Ms. Van Tassel's and Mr. Post's expertise and opinions will assist the jury in understanding and assessing the evidence bearing on the Magness Defendants' affirmative defense of good faith.

In particular, Ms. Van Tassel will express her opinions concerning the existence and composition of the Stanford Ponzi scheme; the transfers from SIB that the Magness Defendants received; suspicious facts and circumstances regarding SIB and the other Stanford

---

[2]  In their motions to strike the Receiver's experts, the Magness Defendants argue what they believe to be the proper test for good faith. Rather than respond to each of their legal contentions regarding that test in this Consolidated Response, the Receiver incorporates herein his concurrently filed response to the Magness Defendants' motion for summary judgment, in which the applicable good-faith standard is analyzed and the Magness Defendants' contrary contentions are rebutted.

Entities of which the Magness Defendants were aware and that were otherwise publicly known and available; and facts and circumstances concerning the Magness Defendants' relationships with and access to high-level Stanford employees and Stanford information. *See* App.[3] at 017-064 (K. Van Tassel declarations). Mr. Post will also express his opinions that the SIB CD was significantly riskier than a U.S. CD issued by an FDIC-regulated bank; public information regarding regulatory investigations of SIB and the other Stanford Entities was available before the Magness Defendants received any transfers from SIB; the Magness Defendants had access to information and Stanford executives unavailable to the public and to most SIB CD investors, and they received atypical benefits from Stanford; the information regarding SIB to which the Magness Defendants were exposed and other information available to them would have been of concern to a reasonably prudent investor and would have caused such an investor to reach the conclusion that SIB was likely fraudulent, insolvent, and/or engaged in making transfers of a fraudulent nature; the Magness Defendants' conduct and actions taken with respect to SIB are consistent with those of an investor who should have or had likely concluded that SIB was fraudulent, insolvent, and/or engaged in making transfers of a fraudulent nature; and contrary to the Magness Defendants' claim that they had an aversion to selling Liberty stock (and thus looked to SIB rather than liquidation of their substantial stock portfolio for funds to satisfy allegedly urgent margin calls), the Magness Defendants had already decided to diversify their portfolio away from Liberty stock and had in the past sold Liberty stock to pay down margin debt. *See* App. at 068-134 (B. Post reports).

---

[3]     The abbreviation "<u>App.</u>" refers to the Sealed Appendix in Support of this Consolidated Response.

I.       **Federal law favors the liberal admission of qualified expert testimony.**

Expert testimony is admissible when it "will help the trier of fact to understand the evidence or to determine a fact in issue[.]" FED. R. EVID. 702.  To be relevant, "'expert testimony proffered in the case [must be] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *United States v. Kuhrt*, 788 F.3d 403, 419 (5th Cir. 2015) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). Federal courts resolve any doubts about the usefulness of expert testimony in favor of admissibility. *See Daubert*, 509 U.S. at 587-88 (discussing the Federal Rules' "liberal thrust," the "general approach of relaxing the traditional barriers to 'opinion' testimony," and liberal standards of relevance); *Kuhrt*, 788 F.3d at 419 ("The basic standard of relevance . . . is a liberal one."); *see also, e.g.*, *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (holding that district court violated the "liberal admission standards" for expert testimony by "resolving doubts in favor of keeping the testimony out and relying upon its own assessment of the correctness of the expert opinions"); *United States v. Nacchio*, 555 F.3d 1234, 1280 (10th Cir. 2009) ("[U]nder Fed. R. Evid. 702's codification of *Daubert*, the general rule of liberal admission of proper evidence is retained.  The role of the district court is that of a gatekeeper, a tender or monitor who liberally allows the entrance of proper evidence; it is not a portcullis, excluding qualified patrons for indeterminate reasons.").

"Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" *Kuhrt*, 788 F.3d at 419 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999)).  "Federal Rule of Evidence 703 provides for the admissibility of an expert's opinion if the sources underlying that opinion are of

a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (internal quotation marks omitted); *see also* FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the case . . . [i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject[.]").  There is no single test for determining admissibility: "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. . . . Too much depends upon the particular circumstances of the particular case at issue." *Kumho Tire*, 526 U.S. at 150.  Therefore, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."  *Id.* at 156; *see also Nunn v. State Farm Auto. Ins. Co.*, Civil Action No. 3:08-CV-1486-D, 2010 WL 2540754, at *3-4, 8, 12 (N.D. Tex. June 22, 2010 (reliability of expert opinion may be established by basis in the expert's knowledge and experience).

## II.      Both Ms. Van Tassel and Mr. Post are qualified to provide expert testimony.

Although the Magness Defendants assert that Ms. Van Tassel and Mr. Post conducted one-sided analyses and only reviewed selected information, there is simply no credible basis to argue that the Receiver's expert witnesses have provided their opinions based upon anything other than their substantial knowledge, experience, and expertise and their rigorous evidentiary analyses, and the Magness Defendants fail to explain how the bases of Ms. Van Tassel's and Mr. Post's opinions are deficient.  Given the overwhelming evidence in this case, it cannot be said that Ms. Van Tassel and Mr. Post engaged in speculation or lacked a sufficient factual basis for their opinions.  To reach their conclusions, they applied their vast expertise in extensively reviewing and rigorously analyzing the substantial body of relevant facts

and data available in this case, which were all of the type upon which experts in their fields typically rely. *See* App. at 018, 040-042, 045, 062-063 (Ms. Van Tassel's statements concerning such reliance and information she reviewed); App. at 071, 114-124, 133-134 (information that Mr. Post reviewed and reasonably relied upon). Ms. Van Tassel and Mr. Post are certainly competent to offer testimony reflecting their analyses of the extensive evidence in this case and the application of their specialized training, experience, and expertise to that evidence. Moreover, Ms. Van Tassel may also testify based on her personal knowledge of Stanford's financial and business records, which knowledge she acquired by overseeing the forensic accounting analyses and investigation that followed the collapse of the Stanford Ponzi scheme. *See, e.g.*, *Corus U.K., Ltd. v. Forest Lines*, No. 04-1553, 2005 WL 5974558, at *1 (E.D. La. Aug. 2, 2005) (refusing to strike witness who "may very well be both a fact and expert witness" and allowing the witness to offer both lay opinion testimony and expert opinion testimony). Among other things, Ms. Van Tassel can testify regarding Stanford records and documents that show the Magness Defendants' access to relevant information and to high-level Stanford executives. [*Cf.* Doc. 128 at 2-3 (the Magness Defendants admit that "Van Tassel has substantial factual information from review of extensive documentation related to Stanford").] To the extent that the Magness Defendants had access to information indicating that Stanford was a fraud, was insolvent, or was making transfers of a fraudulent nature, such evidence is clearly relevant to the jury's determination of good faith.

The principles and methodologies Karyl Van Tassel utilized in arriving at her opinions in this case are valid, reliable, and the same as those she has utilized in other cases involving the Stanford Ponzi scheme. Ms. Van Tassel's conclusions are based on reliable forensic accounting principles, her decades of experience in forensic accounting engagements

Receiver's Consolidated Sealed Response to the Magness
Defendants' Motions to Exclude or Limit Expert Opinion
Testimony of Karyl Van Tassel and Bill Post, and Brief in Support                6

and investigating financial improprieties, her several years spent investigating the Stanford enterprise, and the substantial evidentiary record in this case. As her expert declarations state and as her résumé shows, *see* App. at 001-064, Karyl Van Tassel is a managing director with Navigant Consulting, Inc. and is a Certified Public Accountant in the State of Texas. She has over 30 years of experience in providing a variety of audit, accounting, tax, litigation, valuation, investigation, and other financial advisory services and has undertaken nearly eight years of investigating SIB and the other Stanford Entities, including investigations of the facts and circumstances concerning transfers from Stanford to investors, employees, and others. Ms. Van Tassel has previously performed detailed investigations and financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud, and wrongful termination matters. In the litigation context, she has acted as an expert on a variety of economic damage claims and forensic accounting and investigation issues. In several cases alleging fraud and other wrongdoing, Ms. Van Tassel has traced funds for potential recovery, and she has also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties. The Magness Defendants argue that because Ms. Van Tassel is not a financial advisor, she cannot testify concerning troubling facts and circumstances about SIB; however, given that her decades of experience specifically include investigation of frauds and financial improprieties — including investigating the Stanford organization itself for nearly eight years — she is certainly qualified to testify about such facts and circumstances.

This Court, the District Court for the Southern District of Texas, and the Fifth Circuit have all credited the reliability of Ms. Van Tassel's expert opinions and have relied upon them in the context of the Stanford litigation — including in this very lawsuit. *See, e.g.*, *Janvey*

*v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 198-99 (5th Cir. 2013); *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011); *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 751 F. Supp. 2d 876, 880-81, 881 n.10 (S.D. Tex. 2010); [Doc. 22-21 at 17-18].  The standards set forth in the AICPA Statement on Standards for Consulting Services No. 1 are applicable to the work Ms. Van Tassel has performed and to the opinions she has reached in this matter, and she has fully complied with those Standards.  *See* App. at 057 (K. Van Tassel declaration acknowledging same).  Given the foregoing, Ms. Van Tassel is a qualified expert whose opinions and testimony concerning the Stanford Ponzi scheme and the import of suspicious facts and circumstances in the context of the Magness Defendants' affirmative defense of good faith are relevant, reliable, methodologically sound, and therefore, admissible.

Likewise, Bill Post's expert reports and résumé, *see* App. at 065-134, show that he is well-qualified to opine on the matters contained in his reports.  In particular, he has served as the Managing Director of a global forensic and dispute services practice and as the Chief Investment Officer, Chief Compliance Officer, Managing Director, and Co-National Practice Leader of an SEC registered investment advisor that manages investment accounts for institutional clients, state and local governments, foundations, endowments, and high-net-worth individuals.  Such investment accounts are comprised by certificates of deposit issued by United States domestic banks and insured by the FDIC.  Mr. Post is a member of the Chartered Financial Analyst Institute; holds series 7 and series 66 securities licenses; and has over twenty-three years of investment management and advisory experience, providing such services to high-net-worth individuals, their families, and their foundations and trusts, including

managing money for several individuals and families with investable assets in excess of $1 billion.

Mr. Post's investment management and advisory practice has included counseling clients on the organization of business entities, including trusts, family limited partnerships, limited partnerships, and limited liability corporations formed for investment purposes. In connection with that activity, he has served on the investment committees of trusts and investment entities owned by high-net-worth clients. Because of this experience, he is knowledgeable about the methods utilized in the management and monitoring of the investment methodologies and performance of asset managers on behalf of clients.

Mr. Post also has experience reviewing the documentation prepared by investment managers relating to fund performance, management fees, and limited partnership capital accounts and is experienced in managing the professional advisors for clients. By virtue of his career as an investment professional, Mr. Post has extensive experience in the determination of asset allocation strategies and the preparation of investment policies and procedures. He has also assisted in the preparation of private placement memoranda, including subscription and disclosure documentation provided to prospective investors.

Mr. Post has also served on the board of several organizations and understands the duties and obligations of the fiduciaries of those organizations, including the preparation and implementation of investment policies and guidelines and the hiring, retention, and monitoring of outside investment managers. His investment management and advisory experience includes serving as the President and Chief Investment Officer of a multi-family office with investable assets in excess of $450 million dollars. In those roles, Mr. Post was responsible for the selection of investment managers including, but not limited to, fixed income and equity

managers, hedge funds, private equity managers, and venture professionals.  He has experience overseeing the investment of clients' assets in a variety of fixed income products, including certificates of deposit, as well as in equities, real estate, venture, private equity, and hedge fund investments.

Mr. Post's investment management and advisory experience also includes serving in the role of portfolio manager of equities and fixed income with responsibility for investing client assets in individual stocks and fixed income valued at over $250 million.  In addition, Mr. Post also served as the managing partner of a hedge fund of funds, which required that he monitor the investment activities of thirty-two different hedge fund managers.  He has also served as the president and vice chairman of a national trust company, which managed several billion dollars of investable assets of high-net-worth individuals, their families, and their foundations.  In that capacity, he was responsible for producing periodic investment management reports on market conditions, the economy, and investment performance.  Mr. Post, therefore, is qualified to express his opinions based upon his extensive knowledge and experience in the securities and investment industry.

**III.    The Receiver's experts' opinions are reliable, are the result of valid analyses, are supported by voluminous documentary evidence and witness testimony, and, therefore, are admissible.**

As more particularly cited and discussed in the Receiver's response to the Magness Defendants' motion for summary judgment — which response has been filed concurrently herewith — the record is replete with evidence supporting the Receiver's experts' conclusions that the Magness Defendants were aware of suspicious facts and circumstances concerning SIB and had access to additional information from which they were or should have been aware of SIB's fraud or insolvency.  The facts are that the Magness Defendants were

concerned about SIB beginning as early as October 2007.  By October 1, 2008, their concern had grown to such a level that the Magness Defendants had decided to draw $25 million from SIB. By that time, one of the Magness Defendants' financial advisors, Ryan Bell, had called the Magness Defendants and told them to "get out" of SIB because it was "too good to be true." When the Magness Defendants requested the $25 million transfer, SIB refused their redemption requests and did so because "SIBL wanted to keep the asset value of the CDs on its balance sheet."   As a consequence of these revelations, the Magness Defendants reached the firm conclusion that there was a problem at SIB, and Gary Magness instructed Tom Espy to do what he could to get as much money out of SIB as possible and to continue to look for ways to reduce his risk to SIB.

Consistent with this evidence of actual knowledge, the following are several red flags that the Receiver's experts have identified with respect to Stanford, which red flags the Magness Defendants actually knew about or had access to: (1) SIB's investment returns were too good to be true, it was promising the improbable combination of low risk and a high rate of return, and it had a commission rate structure that was economically unsustainable; (2) SIB was an international bank located in a lax regulatory jurisdiction, was audited by a small Antiguan auditing firm, and had a board of individuals that lacked the experience and education necessary to manage SIB's purported financial enterprise; (3) information about SIB and its purported investment portfolio showed that SIB was an unusual investment that had characteristics that should have raised concerns for a prudent, sophisticated investor; (4) information about SIB's CDs and its purported investment portfolio was suspicious, and SIB's disclosure documents, marketing materials, and periodic reports contained numerous concerning, inconsistent, and misleading statements about SIB's investment allocations, risk profile, and regulatory oversight;

and (5) there were prior, public findings by the SEC and the NASD/FINRA that were concerning, and there were significant negative press articles concerning Stanford and the SIB CD. *See generally* App. at 017-064 (K. Van Tassel declarations); App. at 068-134 (B. Post reports).

The Court has repeatedly permitted the Receiver's expert witnesses to provide testimony at trial concerning these types of suspicious facts and circumstances present with respect to Stanford. [*See* Case No. 3:11-CV-0297-N-BG, Tr. of Pretrial Conference Hr'g at 24:8-24:14, 24:16-24:21 (permitting expert to testify concerning "subsidiary things that may go into a finding of good faith" and allowing expert opinions regarding "significant" facts and circumstances that "a person in [defendant's] position should have known about [] or should have paid attention [to]"); Case No. 3:10-CV-1973-N-BG, Tr. of Trial, Vol. 1 at 36:13-36:21, Vol. 2 at 208:16-209:3, 273:15-274:2, 276:18-277:2, 277:18-277:21, 278:11-278:17 (denying motion to exclude Ms. Van Tassel and permitting expert testimony — consistent with *GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297 (5th Cir. 2014) — about "industry practices and actions [that] were consistent or were not consistent with industry practices," about whether a person "should have known" about facts and whether those facts should have "raised their suspicions," about "the closely related subjects of things like business practices, whether people's conduct was consistent with business practices, [and] whether this would have caused a person of ordinary prudence to have concerns," and about "facts and circumstances regarding the transfers" that were inconsistent with good faith); *see also* Case No. 3:14-CV-2826-BG, Doc. 88 (denying motion to strike the Receiver's experts and holding that their testimony, including testimony about Stanford red flags, "satisfy the requirements of Federal Rules of Evidence 702 and 104(a)")]. The Court should hold the same here, where the

Receiver's experts are abundantly qualified to provide reasoned opinions about the import of suspicious Stanford facts and circumstances that were available to the Magness Defendants, and where the issue of the Magness Defendants' good faith is the primary remaining issue left to decide in this lawsuit.

The Magness Defendants spend much of their motions to strike discussing how red flags and suspicious facts and circumstances that the Receiver's experts identified with respect to Stanford were supposedly not actually troubling.  First, those points do not go to the admissibility of the expert opinions and, instead, simply constitute cross-examination points or jury argument.  Such contentions go to the weight of the evidence and are not ripe for determination when deciding the issue of whether to strike an expert's opinion: while it is the role of the Court to be a gatekeeper and admit only qualified and reliable expert opinions, it is up to the jury — not the Court — to weigh those opinions and decide whether and to what extent to accept them.  *See Johnson*, 754 F.3d at 562; *Nacchio*, 555 F.3d at 1280; *Primrose*, 382 F.3d at 562; *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).  Second, the Magness Defendants' contention that each individual red flag is purportedly not troubling is but a straw man.  Ms. Van Tassel and Mr. Post are not opining that the red flags and suspicious facts and circumstances are each — standing alone — definitive evidence of fraud, insolvency, or fraudulent purpose but, instead, are facts and circumstances that — especially when taken together — would be of a concern to a reasonable investor and would at least merit further investigation.  Third, the documentary evidence and witness testimony show that those red flags and suspicious facts and circumstances actually *were* troubling.

Indeed, the Magness Defendants' *own* experts and their *own* fact witnesses — namely, Ryan Bell, Tom Espy, Jeffrey Graves, Ray Sutton, Bob Armstrong, Steve Knudson, and

Gary Magness *himself* — have used the express descriptor of "red flag" with respect to Stanford or have admitted under oath that Stanford facts and circumstances were "suspect," while also admitting to having several other concerns about SIB.[4]   *See, e.g.*, App. at 180-181, 204, 208 (R. Bell deposition at 36:16-37:10, 131:18-132:8, and 148:7-148:13); App. at 244, 283-284, 344-345, 349 (T. Espy depositions at 82:18-83:3, 241:6-242:25, 483:21-484:3, and 500:14-501:13); App. at 406 (J. Graves deposition at 195:11-195:15); App. at 478-481, 517 (R. Sutton depositions at 240:15-240:22, 244:3-244:10, 244:12-244:16, 244:25-245:3, 251:2-251:3, 251:5-251:6, and 395:14-395:17); App. at 591 (B. Armstrong deposition at 183:1-183:3 and 183:5-183:17); App. at 647, 653-654, 702-703 (S. Knudson deposition at 121:25-122:3, 122:5-122:9, 122:11-122:13, 148:22-149:2, 149:4-149:8, 344:15-344:20, 344:22, and 345:25-346:3); App. at 708, 716, 772-773 (G. Magness deposition at 15:25-16:5, 45:21-46:5, and 272:14-273:20).   Where such admissions are already a part of the evidentiary record and where the Receiver's qualified expert witnesses reasonably relied upon those witnesses' characterization of "suspicious" facts and circumstances and "red flags" (along with other extensive evidence and testimony about troubling facts and circumstances), the Receiver's experts should not be precluded from testifying as to the importance and effect of them upon a reasonably prudent investor.   Ms. Van Tassel's and Mr. Post's testimony concerning such red flags and suspicious facts and circumstances pertains directly to the factual questions in this lawsuit and will assist the trier of fact with understanding whether the Magness Defendants were presented with, and should have recognized, troubling Stanford information.

---

[4]      The Receiver, in this Consolidated Response, does not undertake to address each and every one of the Magness Defendants' evidentiary good-faith arguments in their motions to strike, nor does he intend in this Response to set forth all evidence showing that there is a question of fact for the jury on that defense and, indeed, that the Magness Defendants lacked good faith.  Numerous citations to such evidence are, however, contained in the Receiver's response to the Magness Defendants' motion for summary judgment, concurrently filed herewith.

The Magness Defendants assert that although Ms. Van Tassel and Mr. Post opine about red flags and other troubling information with respect to Stanford, they purportedly have no evidence that the Magness Defendants had access to or possession of that information. The evidentiary record — including testimony from all of the Magness Defendants' witnesses cited above — simply does not support the Magness Defendants' position. The record is replete with examples of the Magness Defendants' access to and possession of troubling information about Stanford, including, but not limited to, public[5] alerts concerning SIB, as well as SIB's disclosure statements, financial information, marketing materials, and other information from high-ranking Stanford executives. *See, e.g.*, App. at 650, 696 (S. Knudson deposition at 134:2-134:9, 134:14-134:16, and 318:10-318:15, in which he admits to knowing from the outset that Antigua had lax regulatory oversight); App. at 454, 456, 459, 480, 488, 497, 508, 630, 661, 678, 695 (R. Sutton deposition at 142:3-142:10, 143:8-143:15, 149:2-149:7, 161:1-161:12, 247:12-247:17, 280:15-280:17, 315:4-315:11, and 358:16-358:25, and S. Knudson deposition at 55:3-55:18, 177:5-177:14, 245:5-245:9, 247:23-247:25, and 314:23-315:3, in which they admit to knowing that SIB's CD rates were higher and that the CDs were riskier); App. at 778-873 (Pl.'s Ex. 35, which is a PowerPoint presentation concerning SIB that was shown to the Magness Defendants in 2005); App. at 487-488, 490 (R. Sutton deposition at 275:6-275:11, 277:21-278:7, 285:3-285:10, 285:20-286:5, and 287:11-287:13, in which he admits to receiving the presentation at Pl.'s Ex. 35 and to the fact that SIB's purported returns in that presentation were "remarkably consistent" as compared to an otherwise volatile market); App. at 874-896 (Pl.'s Ex. 61, which is a SIB Disclosure Statement produced from the Magness Defendants' files); App. at 897-900 (Pl.'s Ex.

---

[5]     Although the Magness Defendants state that they purportedly were never aware of the July 3, 2008 Bloomberg article describing "illegal activities" at Stanford (*see* App. at 901-902) and were never aware of the FINRA AWC expressing concerns about Stanford (*see* App. at 978-1005), the Magness Defendants cannot simply turn a blind eye to such obvious, publicly available information and, thereby, satisfy their good-faith burden.

62, which contains March 6, 2008 meeting minutes reflecting information about SIB's business and finances that was presented to the Magness Defendants by the President of SIB); App. at 901-902 (Pl.'s Ex. 65, which is a publicly available July 3, 2008 Bloomberg article entitled "SEC Investigating Stanford Group Offshore CDs, Investments"); App. at 903 (Pl's Ex. 66, which is a Stanford document showing that Mr. Espy was with Mr. Magness on the day that the Bloomberg article was published); App. at 266-267 (T. Espy deposition at 173:9-174:3, in which he admits to knowing about the Bloomberg article and the "buzz" surrounding it); App. at 725 (G. Magness deposition at 83:12-83:16, 83:25-84:1, in which he admits that Mr. Espy was "squawking" at him in July 2008); App. at 904-977 (Pl.'s Ex. 138, which consists of SIB marketing materials, a Stanford Allocation Strategies Proposal, a SIB Disclosure Statement, a SIB Subscription Agreement and Investor Questionnaire, and a Due Diligence Report for SIB, which materials were received by B. Armstrong, the President of defendant Mango Five Family, Inc.); App. at 602 (B. Armstrong deposition at 227:4-227:18, in which he testified that he received Pl.'s Ex. 138); App. at 978-1005 (Pl.'s Ex. 188, which is a public notice of the November 2007 FINRA disciplinary action concerning SIB CDs); App. at 1040 (the Magness Defendants' answer to Interrogatory No. 8, in which the Magness Defendants admit that after they attempted to redeem their SIB CDs, they were told that "given the general market decline, SIBL wanted to keep the asset value of the CDs on its balance sheet"); App. at 107 (B. Post report, in which he states that this "balance sheet" statement "should have been yet another major red flag for the Magness Defendants" because "if SIB was as financially healthy as it continued to claim, it does not make sense that SIB needed the asset value of the Magness CDs badly enough to risk alienating one of its most valuable clients").

Ms. Van Tassel and Mr. Post, therefore, reasonably based their opinions on the evidence showing that the Magness Defendants had actual knowledge of troubling information. In addition, any red flags or suspicious facts or circumstances that were available and that the Magness Defendants reasonably could have obtained are relevant because, as shown in their motion for summary judgment, the Magness Defendants are attempting to show that a diligent investigation would not have revealed troubling information.

The Magness Defendants complain that the Receiver's experts did not identify a particular and definitive test used to determine whether these suspicious facts and circumstances would prove the existence of a fraud or Ponzi scheme to a reasonably prudent investor. However, there is no one single such test, nor do the Receiver's experts opine that the red flags they identified are the only ones that could indicate a fraud, an insolvent company, or a Ponzi scheme. Rather, the suspicious facts and circumstances appropriately identified and analyzed by Ms. Van Tassel and Mr. Post are areas that would — at a minimum — merit a further investigation by a reasonably prudent investor and which may put that investor on notice of a potential fraud, insolvency, or the fraudulent nature of a transfer. As the Supreme Court has explained, when determining whether an expert's opinion is admissible, all the factors of *Daubert* may not be pertinent, and because "[t]oo much depends upon the particular circumstances of the particular case at issue," "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire*, 526 U.S. at 150, 156. Such are the circumstances and the case here, where the Receiver's experts are qualified and experienced in forensic accounting, investigations of financial improprieties, and the securities and investment industry and where there is no particular "scientific" or "technical" test of what is and is not a red flag proving the existence of a Ponzi

scheme. FED. R. EVID. 702 (an expert's opinion may be based upon "other specialized knowledge," not just "technical" or "scientific" knowledge); FED. R. EVID. 702 advisory committee's note to 2000 amendments ("Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise. The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. . . . Nothing in this amendment is intended to suggest that experience alone--or experience in conjunction with other knowledge, skill, training or education--may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. . . . If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."); FED. R. EVID. 702 advisory committee's note to 1972 proposed rules ("The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but extend to all 'specialized' knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.' Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."); *see also Kumho Tire*, 526 U.S. at 150, 156; *Kuhrt*, 788 F.3d at 419; *Nunn*, 2010 WL 2540754, at *3-4, 8, 12.

Ms. Van Tassel and Mr. Post reasonably relied on their experience and knowledge in analyzing the overwhelming evidence of suspicious Stanford facts and circumstances possessed by or available to the Magness Defendants to support their well-reasoned expert opinions. As a result of the foregoing, the Receiver's experts' opinions are admissible, and the Magness Defendants' motions to strike should be denied.

### IV. The Magness Defendants' relationships with and access to high-level Stanford employees and Stanford information are relevant to the affirmative defense of good faith, and the Receiver's experts should be allowed to testify concerning their opinions about such relationships and access.

Next, the Magness Defendants argue that the Receiver's experts should not be permitted to testify as to whether the Magness Defendants were "insiders" with respect to SIB because "insider" status is purportedly irrelevant to this lawsuit. Section 24.005 of the Texas Uniform Fraudulent Transfer Act ("TUFTA") states that "whether . . . the transfer or obligation was to an insider" is one of the factors that may be analyzed when determining actual intent to hinder, delay, or defraud creditors. TEX. BUS. & COM. CODE ANN. § 24.005(b)(1) (West 2015). The Receiver agrees with the Magness Defendants that whether the Magness Defendants were "insiders" of SIB is not — in this particular case — germane to the issue of whether the transfers they received from SIB were *fraudulent* under TUFTA. That is because SIB's transfers are fraudulent *as a matter of law* for the reasons explained in the Receiver's fully briefed motion for partial summary judgment against the Magness Defendants. [*See* Docs. 90, 91.] In fact, the Magness Defendants have expressly conceded the same: "SIBL's actual intent to defraud is deemed established by the finding that Stanford was a Ponzi scheme. The Magness Parties do not dispute that Stanford was a Ponzi scheme, so the [sic] whether SIBL acted with fraudulent intent is not an issue in this case." [*See* Doc. 129 at 7; Doc. 132 at 8-9.] Whether the

$88.2 million that SIB sent to the Magness Defendants comprised fraudulent transfers is, therefore, not in dispute.

However, because TUFTA provides a non-exclusive definition of the term "insider," and because the Receiver believes that the Magness Defendants qualify as "insiders," their insider status is relevant to whether they received the fraudulent transfers from SIB in good faith, since insider transactions are subject to "heavy scrutiny."[6]  Nonetheless, as discussed in the Receiver's response to the Magness Defendants' "Motion in Limine Re: Insider Status Under TUFTA" [Docs. 126, 127], the Receiver does not intend to argue at trial that the Magness Defendants are "insiders" as defined in TUFTA, and the Receiver's experts will similarly not express an opinion regarding that question either.  Indeed, as Ms. Van Tassel testified, whether someone is an "insider" under TUFTA is a legal question.  This does not mean, however, that the Receiver's experts should be prevented from opining regarding the Magness Defendants' relationships with and access to high-level Stanford employees and Stanford information.  Those factual questions remain directly and inseparably relevant to the good-faith defense.

The Receiver's experts' conclusions concerning the Magness Defendants' Stanford relationships and access are based upon numerous documents exchanged between the parties, as well as witness testimony from the Magness Defendants' many witnesses — all of

---

[6]      *See* TEX. BUS. & COM. CODE ANN. § 24.002(7); *Wren Alexander Invs., LLC v. IRS (In re Wren Alexander Invs., LLC)*, 530 F. App'x 302, 306 (5th Cir. 2013); *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1010-11 (5th Cir. 1992); *Bank of Am., N.A. v. Fulcrum Enters, LLC*, 20 F. Supp. 3d 594, 604 (S.D. Tex. 2014); *Calmes v. United States*, 926 F. Supp. 582, 589 (N.D. Tex. 1996); *In re Wren Alexander Invs., LLC*, No. 08-52914-RBK, 2011 WL 748131, at *9 (Bankr. W.D. Tex. Feb. 23, 2011); *Tow v. Pajooh (In re CRCGP LLC)*, Bankr. No. 04-31993, Adversary No. 07-3117, 2008 WL 4107490, at *21 (Bankr. S.D. Tex. Aug. 28, 2008); *Stein v. Duenas*, No. 01-14-00564-CV, 2015 WL 4760197, at *5 (Tex. App.—Houston [1st Dist.] Aug. 13, 2015, no pet.); *Hahn v. Love*, 321 S.W.3d 517, 525 n.8 (Tex. App.—Houston [1st Dist.] 2009, pet denied); *Flores v. Robinson Roofing & Constr. Co., Inc.*, 161 S.W.3d 750, 756 (Tex. App.—Fort Worth 2005, pet. denied); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 609 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25-26 (Tex. App.—Tyler 2000, pet. denied); *J. Michael Putman, M.D.P.A. Money Purchase Pension Plan v. Stephenson*, 805 S.W.2d 16, 18, 20 (Tex. App.—Dallas 1991, no writ); *see also* [Case No. 3:11-CV-0297-N-BG, Tr. of Pretrial Conference Hr'g at 24:8, 26:3 (denying motion in limine seeking to exclude presentation of argument or evidence about defendant's insider status)].

which reveal that a close relationship existed between the Magness Defendants and the Stanford

organization; that the Magness Defendants had access to information other SIB investors did not;

and that the transactions between the Magness Defendants and Stanford were not at arm's length.

In particular, the Receiver's experts (who are qualified and experienced to express their opinions

for all of the reasons discussed in Section II, *supra*) have opined that:

- The Magness Defendants had a high level of access to information concerning SIB, SIB CDs, and the other Stanford Entities, including information that contained suspicious facts and circumstances. The Magness Defendants had access to highly concerning information and to Stanford executives unavailable to most SIB CD investors. For example, as discussed above, when SIB denied the Magness Defendants' attempt to redeem their SIB CDs, the Magness Defendants were told that "given the general market decline, SIBL wanted to keep the asset value of the CDs on its balance sheet." *See* App. at 1040. This very concerning disclosure was not generally available to the public or other SIB investors. The Magness Defendants were thus well-positioned to reach the conclusion that SIB was insolvent and engaged in fraudulent activity.

- The Magness Defendants received Stanford information from and attended several conference calls with SIB's President, Juan Rodriguez-Tolentino. The information the Magness Defendants received failed to answer the Magness Defendants' questions concerning SIB and revealed troubling inconsistencies in SIB's public pronouncements.

- There were special SIB CD rate cards for the Magness Defendants, which had been approved by Mr. Stanford himself. The Magness Defendants received premium rates over and above the standard SIB CD rates and were able to receive (on a shorter-term CD) the rates usually provided on a longer-term CD. The Magness Defendants' CD rates were always higher than the standard SIB CD rates and were guaranteed to rise if the standard rates rose and were guaranteed not to decrease if the standard SIB CD rates were reduced for other investors. This is a highly unusual arrangement because financial institutions or companies paying fixed income investments (including US banks selling CDs) need to be able to react to market forces in setting their rates. In addition, Gary Magness attempted to sell SIB CDs to other potential SIB investors, trying to entice them to invest through access to his higher SIB CD rate.

- Mr. Magness received sponsorships from Stanford, effectively partnering with Stanford to expose new investors to SIB CDs. Gary Magness and his affiliated company, Mango Racing, agreed to and did advertise for Stanford at a Baja race and received a monetary sponsorship from Stanford. Likewise, Mr. Magness's wife, Sarah, obtained a sponsorship from Stanford for a fashion show that she was

promoting and at which Stanford was able to market to additional potential investors.

- Gary Magness was an early and long-time SIB CD investor, and he and Tom Espy (his Stanford financial advisor) had unusually close relationships. In particular, Mr. Espy has been acquainted with Mr. Magness since at least 1993; he is the godfather of Mr. Magness's children; and he has gone on several trips with Mr. Magness, including to the Baja races discussed above. Mr. Magness was Mr. Espy's only client, and Mr. Espy maintained his SGC office within the Magness Investment Group's own offices. Mr. Espy had direct access to high-level executives within Stanford, and the close relationship between Mr. Espy and Mr. Magness afforded the Magness Defendants with additional information not made generally available to other SIB investors.[7]

*See* App. at 035-040, 046-057, 061 (from K. Van Tassel declarations); App. at 073, 085-087, 102, 125-127 (from B. Post reports). These sound conclusions — based upon voluminous analyzed evidence, upon Ms. Van Tassel's experience, training, education, and nearly eight years of investigating the Stanford companies to determine how they operated, and upon Mr. Post's decades of experience as an investment advisor who has assisted, among others, high-net-worth clients — are the result of rigorous expert analyses of myriad evidence and will assist the jury in determining whether the Magness Defendants received the transfers from SIB in good faith. The Receiver's experts' opinions are, therefore, both relevant and admissible.

Moreover, the Magness Defendants' own retained expert, Jeffrey Graves, has submitted three reports showing that he intends to express an opinion about the Magness

---

[7]     The Magness Defendants make a cursory argument that the Receiver's experts should be prevented from expressing an opinion that information known to Mr. Espy should be imputed to the Magness Defendants. As a preliminary matter, neither of the Receiver's experts have expressed that opinion. Nonetheless, because knowledge of an agent is imputed to its principal, facts that Mr. Espy (or other Magness agents) knew or had reason to know may be imputed to the Magness Defendants. *See, e.g., Berkley Reg'l Ins. Co. v. Phila. Indem. Ins. Co.*, 600 F. App'x 230, 235 (5th Cir. 2015); *Maizoro, S.A. de C.V. v. Sea-Land Serv., Inc.*, No. CA 3-96-CV-2979-R, 1999 WL 1009092, at *7 n.6 (N.D. Tex. Oct. 20, 1999); *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295, 300 (Tex. 1981); RESTATEMENT (THIRD) OF AGENCY § 5.03 (AM. LAW INST. 2006). Moreover, in light of the close and long-existing relationship among the Magness Defendants, Mr. Espy, and the Stanford organization, Stanford-related information in the hands of Mr. Espy was effectively in the hands of the Magness Defendants.

Defendants' relationships with and information received from the Stanford organization.[8]  *See*

App. at 135-147 (April 22, 2016 J. Graves report); App. at 148-155 (May 20, 2016 J. Graves

report); App. at 156-163 (June 6, 2016 J. Graves report).  It would be fundamentally unfair for

the Magness Defendants to present expert testimony on those subjects, while at the same time

precluding the Receiver from doing so — especially where the Receiver's experts are eminently

qualified to do so and where they appropriately relied upon the information and materials

exchanged in discovery to arrive at their opinions.  Because (1) the Magness Defendants'

relationship with respect to the Stanford enterprise and its executives and (2) their access to

Stanford's information are relevant to the jury's determination regarding good faith, the Court

should deny the Magness Defendants' motion to strike the Receiver's expert's opinions

regarding such relationship and access.

## V.   Ms. Van Tassel's opinions concerning market trends are relevant and admissible.

The Magness Defendants also argue that Ms. Van Tassel's opinions concerning

market trends during the time in which they were invested in SIB CDs should be stricken as

irrelevant, as improper expert opinion, and as prejudicial under Rule 403.  In support of that

position, the Magness Defendants erroneously contend that Ms. Van Tassel is assuming that the

they would have invested in the securities underlying the S&P or Dow as an alternative to

investing money in SIB CDs.

Ms. Van Tassel does not, however, reach or imply that conclusion, and that

contention is not reflective of the opinions contained in her declarations.  Being a CPA provides

Ms. Van Tassel with the necessary educational and experiential background to calculate rates of

---

[8]     The Magness Defendants have also identified Ryan Bell and Tom Espy as non-retained expert witnesses who were disclosed as persons who may provide opinion testimony concerning the relationship between the Magness Defendants and the Stanford organization and the benefits that the Magness Defendants received from Stanford.  *See* App. 164-169 (the Magness Defendants' April 22, 2016 disclosures of non-retained expert witnesses).

returns on investments, and it is an appropriate and useful exercise to compare the returns (or lack thereof) in the S&P and Dow equities markets to the returns from SIB CDs over the period of time during which the Magness Defendants owned such CDs.  *See* App. at 055-056 (K. Van Tassel declaration).

Ms. Van Tassel has concluded that during the period of time during which the Magness Defendants held SIB CDs and obtained positive above-market-rate returns, the stock market itself declined by between 12% to 34% (as illustrated by the Dow and the S&P trends). *See* App. at 029-031.   Those indices are both widely considered to be reflections of overall equity market trends.  Ms. Van Tassel has not opined that the Magness Defendants would have specifically invested the funds consistently with the broad equities markets, nor has she opined that the Magness Defendants would have made the decision to realize any losses they incurred in October 2008.  It is nevertheless useful for the jury to understand the market context in which the Magness Defendants made money with SIB.  The Magness Defendants received more money than they put into SIB, over a period in which the equity markets generally lost value. *See id.*

This context is useful for two reasons.  First, the Magness Defendants had been told that a majority of the underlying SIB investment portfolio was purportedly held in equity investments.  As a consequence, it is suspicious that SIB was purportedly growing the value of its equity investments during the time the Magness Defendants were invested in SIB.  Second, because of the equitable nature of the unjust enrichment claim, it is relevant for the jury to consider not only the absolute returns (of both principal and purported interest) that the Magness Defendants achieved through their investment in SIB, but also the beneficial returns they received relevant to the overall market.  The fact that Mr. Magness expressed a disinclination to invest in fixed-income products and that he primarily invested in equities makes the comparison

particularly apt.   *See* App. at 722-727 (Magness deposition at 70:6-70:18, 74:7-74:11, 78:23-80:9, 84:14-85:10, 90:9-90:15); App. at 1006-1026 (Pl.'s Ex. 181, which is the Magness Defendants' spreadsheet of assets as of September 30, 2008).   As a result, Ms. Van Tassel's testimony in this regard is relevant to the good faith inquiry, as well as to the Receiver's claim for unjust enrichment.

## CONCLUSION & PRAYER

Karyl Van Tassel and Bill Post are qualified and knowledgeable experts who have engaged in reliable and valid analyses to arrive at sound expert opinions.   For the foregoing reasons, the Receiver respectfully requests that the Court deny the Magness Defendants' Motions to Exclude or Limit Expert Opinion Testimony of Ms. Van Tassel and Mr. Post, and also requests that the Court grant the Receiver such other and further relief to which he may be justly entitled.

Dated: November 7, 2016

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Kevin M. Sadler*
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
Brendan A. Day
Texas Bar No. 24052298
brendan.day@bakerbotts.com
Ashley Allen Carr
Texas Bar No. 24082619
ashley.carr@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR
RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On November 7, 2016, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve all parties, through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

*/s/ Kevin M. Sadler*
Kevin M. Sadler