ORIGINAL



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY, IN HIS CAPACITY AS §
COURT-APPOINTED RECEIVER FOR THE §
STANFORD INTERNATIONAL BANK, LTD., §
ET AL., §
§
               Plaintiff, §
§
v. §        Case No. 3:15-CV-0401-N-BQ
§
GMAG LLC, MAGNESS SECURITIES LLC, §
GARY D. MAGNESS, and MANGO FIVE §
FAMILY, INC., IN ITS CAPACITY AS TRUSTEE §
FOR THE GARY D. MAGNESS IRREVOCABLE §
TRUST, §
               Defendants. §

---

## JOINT PRETRIAL ORDER

---

       Plaintiff Ralph S. Janvey, in his capacity as Court-appointed Receiver for the Stanford Entities (the "Receiver"), and Defendants GMAG LLC, Magness Securities LLC, Gary D. Magness, and Mango Five Family, Inc., in its capacity as Trustee for the Gary D. Magness Irrevocable Trust (collectively, the "Magness Defendants" or "Magness Parties"), by their respective undersigned attorneys, respectfully submit this Joint Pretrial Order pursuant to the Court's Scheduling Order [Doc. 11], as modified by the Court's Amended Scheduling Order [Doc. 89].

       Certain sections below have been submitted by, and represent the position of, only the party whose name or designation is indicated in the lead-in sentence to such sections. The signatures of counsel below do not constitute agreement with, or admission or adoption of, any portion of this Order submitted individually by another party to this action.

A.    SUMMARY OF THE CLAIMS AND DEFENSES OF EACH PARTY.

The Receiver provides the following summary of the claims and defenses asserted in this lawsuit:

1.     This case arises out the multibillion-dollar Stanford Ponzi scheme perpetrated by R. Allen Stanford and others through a network of approximately 130 Stanford Entities — including Stanford International Bank, Ltd. ("SIB" or "SIBL") — in 14 countries for at least two decades.  SIB issued fraudulent certificates of deposit ("CDs") and achieved and maintained a high volume of CD sales by promising above-market returns and falsely assuring investors that the CDs were backed by safe, liquid investments.  In reality, however, SIB and the Stanford Entities operated as a classic Ponzi scheme: SIB used funds from the sale of new CDs to make payments to existing CD investors.  The principals of the Stanford Ponzi scheme also diverted SIB CD proceeds to other unauthorized purposes, including making investments that were contrary to SIB's representations to investors and the public.  In order to perpetuate this massive worldwide fraud, all of the Stanford Entities operated as an integrated unit: each Stanford Entity either participated in, derived benefit from, or lent the appearance of legitimacy to the Stanford Ponzi scheme.  SIB was insolvent from at least 1999 forward.

2.     The Magness Defendants were sophisticated and experienced investors and collectively invested $79 million in SIB CDs between December 16, 2004 and October 31, 2006.  Gary Magness — who received premium SIB CD rates personally approved by R. Allen Stanford himself — was SIB's largest U.S.-based investor and is the beneficiary of and owns and controls the other Magness Defendants.  A close relationship existed between the Magness Defendants and the Stanford organization, and the Magness Defendants had access to information other SIB investors did not.  Mr. Magness and Tom Espy (his Stanford financial advisor) had a very close relationship.  In particular, Mr. Espy has been acquainted with

Mr. Magness since at least 1993; he is the godfather of Mr. Magness's children; and he has gone on several trips with Mr. Magness, including to Baja races in which Mr. Magness's racing team was sponsored by Stanford.  Mr. Espy's only clients were Mr. Magness and individuals and entities associated with Mr. Magness, and Mr. Espy maintained his Stanford Group Company ("SGC") office within the Magness Investment Group's own offices.  Mr. Espy had direct access to high-level executives within Stanford, and the close relationship between Mr. Espy and Mr. Magness afforded the Magness Defendants with additional information not made generally available to other SIB investors.

       3.    The Magness Defendants had a high level of access to information concerning SIB, SIB CDs, and the other Stanford Entities, including information that contained suspicious facts and circumstances and that was unavailable to other SIB CD investors.  For example, when SIB denied the Magness Defendants' attempt to redeem their SIB CDs in October 2008, the Magness Defendants were told that "given the general market decline, SIBL wanted to keep the asset value of the CDs on its balance sheet."  This alarming disclosure was not available to the public or other SIB investors, and indeed was contrary to SIB's public pronouncements that it was stable and profitable even when the world's financial markets were in significant turmoil.  Likewise, the Magness Defendants received information about SIB's operations directly from SIB's President, Juan Rodriguez-Tolentino.  The information the Magness Defendants received failed to answer the Magness Defendants' questions concerning SIB's investment performance and revealed troubling inconsistencies in SIB's public pronouncements.  With the knowledge the Magness Defendants possessed — *e.g.*, of SIB's unorthodox business model, the vagueness of its investment strategy, its payment of above-market interest rates, and the severity and widespread impact of the economic crash

starting in 2007 — the Magness Defendants knew or should have known SIB was insolvent and engaged in fraudulent activity.

4.     The Magness Defendants were clearly concerned about SIB by no later than October 2007 — a year before they received their $88.2 million in transfers from SIB. At that time, they recognized a need to "further investigate[]" SIB.  After they reached that conclusion, their concerns about SIB only grew.  The questions the Magness Defendants chose to ask of SIB were met with evasive, inconsistent, and nonsensical answers that failed to address the concerns they raised.

5.     Following closely on the heels of a July 3, 2008 Bloomberg article that discussed "illegal activities" alleged to be occurring at Stanford, on July 27th the Magness Defendants received a "Letter from the Chairman" in which SIB was claiming to be profitable in a market in which all major market indices were dramatically down, all while being managed by individuals without any significant banking experience.  Any reasonably prudent investor, but especially an investor with the Magness Defendants' experience and sophistication, would have recognized that the results SIB reported in the July 27th letter were not achievable by a portfolio invested as SIB purported to be.  Indeed, in September 2008, Ryan Bell (the Magness Defendants' Merrill Lynch financial advisor) called Tonya Dokken (who was Gary Magness's "alter ego") and told her that the Magness Defendants "need[ed] to get out" of SIB, that the returns SIB was claiming on its portfolio were "too good to be true," and "to hit the exit door" with respect to SIB.

6.     Before they received any of their transfers in October 2008, the Magness Defendants had reached the conclusion that the SIB CD was likely fraudulent and devised a plan to minimize their exposure to SIB in the event that SIB collapsed.  The Magness Defendants'

concern had grown to such a level that they had decided to make an early redemption of the accumulated "interest" credited to the Magness Defendants' accounts at SIB. SIB refused the redemption request and disclosed the fact that it was in the midst of a liquidity crisis. The Magness Defendants recognized this as a major red flag and executed a plan to get as much money out of SIB as possible through a series of loans.

       7.     Through the execution of this plan, the Magness Defendants collectively received $88.2 million in transfers from SIB between October 10, 2008 and October 28, 2008. Far from establishing the Magness Defendants' good faith, the evidentiary record indicates that the Magness Defendants knew, or at the very least should have known, that SIB was insolvent, was engaged in a fraud, or had fraudulent intent when it transferred $88.2 million to the Magness Defendants in October 2008.

       8.     The Magness Defendants claim that they took out the loans against their SIB CDs not due to any concern about SIB but because they needed liquidity to satisfy unanticipated and time-sensitive margin calls on their non-SIB stock portfolio. In fact, the evidence establishes that the Magness Defendants used the existence of some margin calls as a smokescreen to convince SIB to transfer as much money as possible to the Magness Defendants and that the Magness Defendants could have satisfied their margin obligations with other financial resources. Regardless of whether the Magness Defendants used some cash obtained from SIB to satisfy margin calls or to pay down margin debt, the evidence, including the Magness Defendants' own records, establishes that the margin calls were not the true reason the Magness Defendants endeavored to get their money out of SIB. The Magness Defendants' actions and efforts to get out of the SIB CD are, instead, the actions of investors who had concluded that SIB was a fraud.

9.      In the course of the Receiver's investigation, he discovered SIB's $88.2 million in transfers to the Magness Defendants that had occurred in October 2008.  The Receiver first filed claims against the Magness Defendants on July 28, 2009, and through this lawsuit, the Receiver seeks to recover these transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA") or, in the alternative, the doctrine of unjust enrichment.

10.     Under TUFTA, a creditor of a debtor can void a transfer between the debtor and a third party if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor" (herein, "fraudulent intent").  TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) (2015).  The Receiver is entitled to recover the $88.2 million in transfers the Magness Defendants received from SIB because — as this Court and the Fifth Circuit have held and as the Magness Defendants have conceded — SIB was a Ponzi scheme and, therefore, those transfers were made with fraudulent intent as a matter of law (and as a matter of law of the case).[1] *See, e.g., Janvey v. Brown*, 767 F.3d 430, 434-36, 438-39 (5th Cir. 2014); [Doc. 22-21 at 15-19]; [Doc. 103 at 2-3]; [Doc. 124 at 6, 12]; [Doc. 127 at 5, 7-8]; [Doc. 129 at 7]; [Doc. 132 at 8-9].  Because the Magness Defendants no longer dispute the fraudulent nature of the transfers from SIB, the question of whether the $88.2 million was transferred to the Magness Defendants with the requisite fraudulent intent under TUFTA is not an issue that needs to be determined by the jury.

11.     In order to avoid a judgment in favor of the Receiver on his TUFTA claims, the Magness Defendants have the burden of proving their affirmative defense of good

---

[1]      While the Receiver seeks a judgment holding that *all* of the $88.2 million in transfers were fraudulent, the Receiver is seeking a *net remaining recovery* of $79,684,042.86 (plus prejudgment interest, postjudgment interest, costs, and attorneys' fees), given that the Magness Defendants eventually returned their $8,515,957.14 in "net winnings" to the Receiver several months after the Fifth Circuit's *Brown* opinion was issued. Although the Magness Defendants ultimately returned their net winnings to the Receiver pursuant to this Court's Order that was affirmed by *Brown*, no settlement agreement was ever signed or negotiated, and that return of money was not in any settlement of the Receiver's claims in this lawsuit.

faith. *See* TEX. BUS. & COM. CODE ANN. § 24.009(a).[2]  The issue of the Magness Defendants' good faith will be tried before the jury.

12.     The ample evidence and testimony from fact and expert witnesses reveals that the Magness Defendants cannot establish their good faith because they took the $88.2 million in transfers from SIB when they actually or constructively knew of SIB'S fraud, insolvency, and/or fraudulent intent.  Given the facts, circumstances, and red flags discussed earlier in this section, the evidence shows that the Magness Defendants (including their agents, employees, directors, and officers) knew or should have known of SIB's fraud, insolvency, and/or fraudulent intent.  Because the Magness Defendants did not take the payments from SIB in good faith, the Magness Defendants are liable to the Receiver for the $88.2 million in fraudulent transfers they received and that were made for their benefit. *See* TEX. BUS. & COM. CODE ANN. § 24.008 (listing the several available remedies of creditors under TUFTA, including "avoidance of the transfer or obligation to the extent necessary to satisfy a creditor's claim"); *id.* at § 24.009(b) ("[T]o the extent a transfer is voidable in an action by a creditor under Section 24.008(a)(1) of this code, the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less.  The judgment may be entered against . . . the first transferee of the asset or the person for whose benefit the transfer was made[.]").

13.     Additionally, the Magness Defendants were unjustly enriched by the payments they received from SIB, which was a Ponzi scheme.  The evidence shows that the Magness Defendants knew that they were not getting their own money back and were aware that SIB was insolvent and a fraud at the time they obtained their loans from SIB.  The money the

---

[2]     The Receiver is not disputing "reasonably equivalent value" with respect to the net remaining recovery that he is seeking, and the Magness Defendants have not pled reasonably equivalent value as a defense [*see* Doc. 26]. For these reasons, no question concerning reasonably equivalent value should be presented to the jury.

Magness Defendants received did not constitute a return of their original investment, was simply other people's stolen money, and was the result of transactions that the Magness Defendants initiated after becoming suspicious of SIB. The Magness Defendants therefore unjustly retained a benefit to the loss of another; unjustly retained money of another against the fundamental principles of justice, equity, or good conscience; obtained money from SIB that in equity and good conscience they ought not to keep; obtained a benefit from another by fraud, duress, or the taking of undue advantage; and wrongfully secured a benefit or passively received one which it would be unconscionable to retain. Accordingly, and in the alternative to his TUFTA claim, the Receiver is entitled to recover SIB's payments to the Magness Defendants as a remedy to prevent unjust enrichment. The Receiver's unjust enrichment claim will be tried before the jury.

14.    The Receiver is also entitled to prejudgment and postjudgment interest. The Receiver is further entitled to recover his costs and attorneys' fees from the Magness Defendants under TUFTA. *See* TEX. BUS. & COM. CODE ANN. § 24.013. The awards of such prejudgment interest, postjudgment interest, costs, and attorneys' fees will be addressed via postjudgment briefing in accordance with the Federal Rules and will not be tried before the jury.

15.    Finally, for the reasons explained in the Receiver's Motions in Limine, which is incorporated herein and concurrently filed herewith, the following defenses pled by the Magness Defendants should not be submitted to the jury: law of the case [*see* Doc. 26 at 20, defense no. 5]; collateral estoppel/issue preclusion [*see id.*, defense no. 6]; judicial estoppel [*see id.*, defense no. 7]; Rule 11 [*see id.*, defense no. 8]; fraud and illegality [*see id.*, defense no. 9]; failure to mitigate [*see id.* at 21, defense no. 10]; unclean hands [*see id.*, defense no. 11]; *in pari delicto* [*see id.*, defense no. 12]; setoff/offset [*see id.*, defense no. 13]; 28 U.S.C. § 1927 [*see id.*, defense no. 14]; and TEX. BUS. & COM. CODE ANN. § 24.013 [*see id.*, defense no. 15].

**The Magness Parties provide the following summary of the claims and defenses asserted in this lawsuit:**

1.      Gary Magness is a businessman and entrepreneur who owns several companies, including GMAG, LLC and Magness Securities, LLC.  He also inherited family wealth, some of which is held in an irrevocable family trust called the Gary Magness Irrevocable Trust ("GMIT").  A family trust company called Mango Five Family, Inc. is the trustee for GMIT.

2.      The Receiver is attempting to claw back over $79 million the Magness Parties obtained in loans from SIB in October 2008 at the height of the 2008 financial crisis.  The Magness Parties obtained these loans in good faith to meet legitimate business needs in dire economic times.  The Magness Parties did not have any actual knowledge or constructive knowledge that SIB was fraudulent or insolvent at the time of the loans.  The Magness Parties assert a good faith defense to the Receiver's TUFTA claim.  Under the good faith defense, the Magness Parties do not have to pay the Receiver the amounts they received for the loan transfers if they can show they acted in good faith in obtaining the loans in October 2008.

3.      The Receiver has no evidence the Magness Parties had actual knowledge in October 2008 that SIB was insolvent or fraudulent.  Instead, he points to unclear deposition testimony taken out of context, speculation, and inferences to argue the Magness Parties should have known in October 2008 that SIB was insolvent or fraudulent.  The evidence at trial, however, will show the Magness Parties did not know facts or information in October 2008 that would have led a reasonable person to investigate more than the Magness Parties did about the stability of SIB.  Further, assuming a reasonable person did further investigate, any hypothetical investigation would have been futile and turned up nothing because SIB would have simply

continued to lie to cover up its Ponzi scheme and there was no other public information available from the SEC or other sources that would have led a reasonable person in October 2008 to conclude that SIB was insolvent or fraudulent. The circumstances surrounding the Magness Parties' loans show that they were made in good faith.

4.    In 2004 through 2006, GMIT, Magness Securities and GMAG deposited $79 million in SIB CDs as follows:[3]

| PURCHASE DATE | CD NUMBER | PURCHASER | AMOUNT | TERM (Mos.) | INTEREST RATE |
|---|---|---|---|---|---|
| 12/16/04 | 126028 | GMAG | $5MM | 12 | 6.75/6.98 |
| 12/16/04 | 126029 | GMAG | $10MM | 24 | 7.30/7.86 |
| 3/11/05 | 129187 | GMIT | $20MM | 60 | 8.378/10.39 |
| 6/22/05 | 133200 | GMIT | $5MM | 60 | 8.963/11.31 |
| 12/15/05 | 140392 | Magness Securities | $9MM | 60 | 9.148/11.6 |
| 10/27/06 | 154864 | GMIT | $10MM | 48 | 9.148/11.04 |
| 10/27/06 | 154866 | GMIT | $10MM | 48 | 9.148/11.04 |
| 10/27/06 | 155014 | GMIT | $10MM | 48 | 9.148/11.04 |

5.    The SIB CD deposits made up only a small part of the portfolios for each entity.  The remainder of the Magness Parties' portfolios contained other companies and investments, including a number of stocks.  A significant portion of the Parties' stock holdings consisted of Liberty Media stocks, which Mr. Magness inherited from his father, Bob Magness (the founder of TCI Cable).  The Liberty Media stocks represent a family legacy passed onto Mr. Magness from his father.  Because they are a family legacy and due to the size of the holdings and the nature of the markets in which they are traded, Mr. Magness' investment

---

[3] Gary Magness never individually invested in SIB CDs.

strategy was to try to keep the Liberty stocks as an investment and to avoid selling them. Because the Liberty Media stocks do not issue a dividend, the Magness Parties often took out margin loans to borrow against these stocks and other stocks to have money available to invest elsewhere or to put into Mr. Magness' other businesses. Some of the Magness Parties' advisors, including their Stanford broker, Tom Espy, have referred to this arbitrage (where the costs of borrowing on margin were less than the returns on the other investments) as creating a "synthetic dividend."

6.      During the financial crisis in 2008, the Magness Parties faced significant margin calls as the stocks pledged as collateral for margin loans fell in price. The Magness Parties needed to find cash quickly to pay off margin loans to avoid the brokerage firms from selling the stocks from out beneath them at low prices. Because Mr. Magness did not want to sell large volumes of Liberty Media stock at low prices in a crashing market, he obtained a $25 million loan from SIB on October 10, 2008, at an interest rate of 11.148% – two points higher than the highest rate on any one of the Magness Parties' CDs. The loan was fully collateralized by two of the SIB CDs that GMIT held. The Magness Parties immediately used the $25 million loan to cover a US Bank margin call.

7.      Within a few days, as the market continued to decline, the Magness Parties needed more funds to cover additional margin calls, including margin calls from the Stanford Group Company brokerage side of Stanford. Mr. Magness instructed Mr. Espy to redeem the CDs. Mr. Espy informed Mr. Magness that redemptions could take time and would result in penalties SIB would assess, that loans secured by the CDs would be easier and quicker and that, given the general market decline, SIB wanted to keep the asset value of the CDs on its balance sheet. SIB offered to loan the Magness Defendants 80% of total the face value of all the CDs.

However, SIB also informed Mr. Magness that he needed to discharge the existing $25 million before SIB would loan additional funds secured by GMIT's CDs. Accordingly, on October 14, 2008, Mr. Magness directed SIB to apply the total accrued interest on all of the Magness Defendants' CDs (approximately $24,238,664) to the loan balance. On October 20 and 21, 2008, GMAG, GMIT and Magness Securities each submitted paperwork for a loan from SIB secured by their respective CDs. On October 22, 2008, the Magness Defendants transferred the remaining loan balance of $761,336 to SIB by making a wire transfer from GMIT's US Bank account to Gary Magness' SIB account.

8.       In late December 2008 and January 2009, after the arrest of Bernard Madoff and the discovery of the large Ponzi scheme he was running, the Magness Parties became more concerned about the stability of their non-traditional investments, including the SIB CDs. In early February 2009, the Magness Parties requested to break their CDs, apply the CD balances to the outstanding loans, and to redeem the remaining CD balances. SIB applied the CD balances against the loans. The Magness Parties never received the $15.8 million remaining in their SIB CD accounts before the Receiver was appointed.

9.       The Magness Entities have already settled the "net winnings" issue with the Receiver by paying the Receiver a total of $11,477,509.22 (which figure includes "net winnings", attorneys' fees and interest), broken down by entity as follows: (1) GMAG: $4,238,424.39 ($3,144,779.91 of "net winnings plus $830,221.89 of pre-judgment interest and $263,442.58 of attorneys' fees and costs); (2) GMIT: $6,053,409.71 ($4,491,442.93 of "net winnings" plus $1,185,740.93 of pre-judgment interest and $376,225.85 of attorneys' fees and costs); and (3) Magness Securities: $1,185,675.12 ($879,734.30 of "net winnings" plus $232,249.85 of pre-judgment interest and $73,690.97 of attorneys' fees and costs).

10.     Through his TUFTA and unjust enrichment claims, the Receiver is seeking to claw back the actual principal the Magness Parties deposited with SIB for the CDs. The Receiver cannot prevail on his TUFTA claim because the Magness Parties will show they acted in good faith in obtaining the loan transfers.

11.     The Receiver cannot prevail on his unjust enrichment claim because it is not equitable to require the Magness Parties to disgorge amounts of principal that they obtained back from SIB. The Magness Parties did not withdraw more than they invested.  Instead, they lost millions of dollars in the Ponzi scheme – making the unjust enrichment claim inapplicable.

**B.**     STATEMENT OF STIPULATED FACTS.

**The Receiver and the Magness Defendants list the following statements of stipulated facts:**

1.     SIB was a Ponzi scheme and was insolvent from at least 1999 forward.[4]

2.     The Magness Defendants collectively invested $79 million in SIB CDs on the dates of deposit indicated below:[5]

| Date | Amount |
| --- | --- |
| December 16, 2004 | $  5,000,000.00 |
| December 16, 2004 | $10,000,000.00 |
| March 11, 2005 | $20,000,000.00 |
| June 22, 2005 | $  5,000,000.00 |
| December 15, 2005 | $  9,000,000.00 |
| October 31, 2006 | $10,000,000.00 |
| October 31, 2006 | $10,000,000.00 |
| October 31, 2006 | $10,000,000.00 |

3.     The Magness Defendants collectively received $88.2 million in transfers from SIB on the dates indicated below:[6]

---

[4]     *See Brown*, 767 F.3d 430, *passim*; [Doc. 22-21 at 16-19]; [Doc. 103 at 2-3]; [Doc. 124 at 6, 12]; [Doc. 127 at 5, 7-8]; [Doc. 129 at 7]; [Doc. 132 at 8-9].

[5]     *See* [Doc. 7 at 2-3]; [Doc. 22 at 2, 6-10]; [Doc. 124 at 8]; [Doc. 125 at 253].

| Date | Amount |
|---|---|
| October 10, 2008 | $25,000,000.00 |
| October 24, 2008 | $44,000,000.00 |
| October 28, 2008 | $12,000,000.00 |
| October 28, 2008 | $ 7,200,000.00 |

4.       The $88.2 million in payments that the Magness Defendants received from SIB are fraudulent transfers.[7]

By stipulating to the facts above, the Receiver and the Magness Defendants do not contend or agree that evidence concerning these issues is inadmissible at trial. The Receiver and the Magness Defendants contend that evidence concerning these matters may be necessary to give the jury context for the Receiver's claims or the Magness Defendants' defenses, to avoid confusing the jury, and to avoid unfair prejudice to the Receiver or to the Magness Defendants. The Parties are continuing to confer to try to reach a stipulation regarding additional facts.

C.       **LIST OF CONTESTED ISSUES OF FACT.[8]**

Listing a contested issue of fact in this section C of the Joint Pretrial Order does not constitute an agreement or admission that the contested issue of fact is relevant to the resolution of the case or that evidence concerning that issue is relevant or admissible. Listing a

---

[6]       *See* [Doc 26 at 16, ¶ 48 (admitting that "the Magness Defendants received $88.2 million of loans from SIBL in October 2008")]; [Doc. 103 at 2 (admitting that "[t]he Magness Defendants further acknowledge and agree that they collectively received $88.2 million in transfers from SIBL between October 10, 2008 and October 28, 2008")]; [Doc. 124 at 6, 9-10, 12 (admitting that "the Receiver has already proved . . . that SIBL made the $88.2 million loan transfers to the Magness Parties," that "In October 2008, SIBL Loaned a Total of $88.2 Million to the Magness Parties," that "[i]n total, SIBL transferred $88.2 million of loan proceeds to the Magness Parties in October 2008," and that "[t]he Magness Parties collectively received $88.2 million in loan transfers from SIBL between October 10, 2008 and October 28, 2008")].

[7]       *See Brown*, 767 F.3d at 434-36, 438-39; [Doc. 22-21 at 15-19]; [Doc. 26 at 20]; [Doc. 103 at 2-3]; [Doc. 124 at 6, 12]; [Doc. 127 at 5, 7-8]; [Doc. 129 at 7]; [Doc. 132 at 8-9].

[8]       If the Court finds that any of these contested issues of fact are more properly characterized as issues of law, the Receiver and the Magness Defendants respectfully request that they be considered issues of law. Further, by listing these items as contested issues of fact, neither party waives any right to argue, at the appropriate time during trial, that it is entitled to judgment as a matter of law on any issue in the case.

contested issue of fact also does not constitute an agreement or admission that it is a question of fact relevant to the proper legal standard.

**The Receiver lists the following contested issues of fact:**

1.     Whether the Magness Defendants took the $88.2 million in transfers from SIB in good faith.

2.     Whether the Magness Defendants had actual knowledge of SIB's fraud, insolvency, or fraudulent intent.

3.     Whether the Magness Defendants had constructive knowledge of SIB's fraud, insolvency, or fraudulent intent.

4.     Whether the Magness Defendants had knowledge of facts about SIB that would have excited the suspicions of a person of ordinary prudence and led that person to investigate.

5.     Whether the Magness Defendants had information that put them on inquiry notice of SIB's fraud, insolvency, or fraudulent intent.

6.     Whether the Magness Defendants took the $88.2 million in transfers from SIB without first conducting a diligent investigation that would have allayed the suspicions of a reasonably prudent person.

7.     Whether the Magness Defendants were unjustly enriched by the payments they received from SIB.

8.     Whether the Magness Defendants unjustly retained a benefit to the loss of another.

9.     Whether the Magness Defendants unjustly retained money of another against the fundamental principles of justice, equity, or good conscience.

10.     Whether the Magness Defendants obtained money from SIB that in equity and good conscience they ought not to keep.

11.     Whether the Magness Defendants obtained a benefit from another by fraud, duress, or the taking of an undue advantage.

12.     Whether the Magness Defendants wrongfully secured a benefit or passively received one which it would be unconscionable to retain.

13.     The sum of money that would fairly and reasonably compensate the Receiver for the amount of unjust enrichment obtained by the Magness Defendants from SIB.

**The Magness Defendants list the following contested issues of fact:**

1.     Whether the Magness Parties took the $88.2 million in transfers from SIB in good faith.

2.     Whether the Magness Parties had any actual knowledge of SIB's fraud, insolvency, or fraudulent intent.

3.     Whether the Magness Parties had any constructive knowledge of SIB's fraud, insolvency, or fraudulent intent.

4.     Whether the Magness Parties had any knowledge of facts about SIB that would have led a reasonably prudent person to investigate.

5.     Whether the Magness Parties had any information that put them on inquiry notice of SIB's fraud, insolvency, or fraudulent intent.

6.     Whether the Magness Parties repeatedly engaged in appropriate due diligence under the circumstances regarding their investments and deposits with the Stanford entities.

7.      Whether the Magness Parties conducted a reasonable investigation of SIB under the circumstances and concluded that it was legitimate.

8.      Whether the Magness Parties were unjustly enriched by the payments they received from SIB.

9.      Whether the Magness Parties unjustly retained a benefit to the loss of another.

10.     Whether the Magness Parties retained money of another against the fundamental principles of justice, equity, or good conscience.

11.     Whether the Magness Parties obtained money from SIB that in equity and good conscience they ought not to keep.

12.     Whether the Magness Parties obtained a benefit from another by fraud, duress, or the taking of an undue advantage.

13.     Whether the Magness Parties did not wrongfully secure a benefit or passively receive one which it would be unconscionable to retain.

14.     Whether the Magness Parties were insiders of SIBL.

15.     Whether the Magness Parties were unique in receiving information, special perks, access to higher ups, and sponsorships.

16.     Whether Magness Parties were unique in receiving above- "grid" rates, "family rates," or higher than standard rates on their fixed CDs.

17.     Whether the Magness Parties received similar treatment to other similarly situated investors in obtaining loans.

18.     Whether Pershing and Stanford Group Company made special exceptions to the loan-to-value ratio for other investors with large stock portfolios.

19.     Whether the Magness Parties had similar access to top SIBL representatives that other similarly situated investors had.

20.     Whether SIB made PowerPoint presentations for use with other similarly situated investors.

21.     Whether the Magness Parties' CD transactions were consistent with their historic business practices.

22.     Whether the interest rates offered and paid to the Magness Parties on their CD transactions with SIBL were consistent with the returns available to them on similar investments and investment offerings.

23.     Whether the Magness Parties' loan transactions with SIB and SGC were consistent with their relationships with other lenders.

24.     Whether the Magness Parties had compelling business reasons for the loans they requested and received from SIBL.

25.     Whether the Magness Parties had financial interest in other SIBL CDs that were neither redeemed nor used as collateral for borrowings before the SEC filed suit.

26.     Whether the SEC or FINRA or any other governmental or regulatory agency failed to expose the Ponzi scheme until months after the Magness Parties received the transfers in question.

27.     Whether there was public information available at the time of the loan transfers in October 2008 that would have made a reasonably prudent person making a diligent inquiry to conclude that SIBL was insolvent or acting with a fraudulent purpose.

D.      LIST OF CONTESTED ISSUES OF LAW.[9]

Listing a contested issue of law in this section D of the Joint Pretrial Order does not constitute an agreement or admission that the statement is a correct expression of the proper legal standard.

**The Receiver lists the following contested issues of law:**

1.      That the applicable standard for good faith in this case is the same two-prong test set forth by the Fifth Circuit in *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 164 (5th Cir. 2015), as follows: (i) "whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose"; and (ii) whether, having been put on inquiry notice, the transferee "satisf[ied] a 'diligent investigation' requirement" (internal quotation marks omitted).

2.      That there is no "futility exception" to the "diligent investigation" prong of the test for good faith.

3.      That the Magness Defendants cannot rely on preclusion doctrines (*i.e.*, judicial and collateral estoppel) to avoid application of the proper standard for good faith to the facts of this case.

4.      Whether the evidence establishes conclusively as a matter of law that the Magness Defendants did not take the transfers from SIB in good faith under TUFTA.

5.      Whether the evidence establishes conclusively as a matter of law (i) that Magness Defendants had actual knowledge of SIB's fraud, insolvency, or fraudulent intent or (ii) that the Magness Defendants had information that put them on inquiry notice of SIB's fraud,

---

[9]      If the Court finds that any of these contested issues of law are more properly characterized as issues of fact, the Receiver and the Magness Defendants respectfully request that they be considered issues of fact.

insolvency, or fraudulent intent and that they took the transfers without first conducting a diligent investigation, which investigation would not have allayed the suspicions of a reasonably prudent person.

6.      That the Receiver's unjust enrichment claim is not barred by the existence of an adequate legal remedy under TUFTA.

7.      That the Receiver's unjust enrichment claim should be tried before the jury.

8.      That the Receiver's claim for unjust enrichment is not limited only to the "profits" that the Magness Defendants received from SIB.

9.      Whether the evidence establishes conclusively as a matter of law that the Magness Defendants were unjustly enriched by the transfers they received from SIB.

**The Magness Defendants list the following contested issues of law:**

1.      Analysis and effect of actual knowledge of fraudulent purpose in determining good faith.

2.      Analysis and effect of inquiry notice of fraudulent purpose in determining good faith.

3.      Analysis and effect of actual or constructive knowledge of insolvency in determining good faith.

4.      Should the jury consider "futility", *i.e.*, whether a diligent investigation would have discovered the fraudulent purpose or insolvency, in determining good faith.

5.      Whether the Receiver is estopped under the doctrines of judicial and collateral estoppel from arguing the Magness Parties "could have known or discovered probative

evidence" of SIBL's fraudulent purpose before the Receiver investigated SIB's books and records at length and Davis confessed to SIB's fraudulent scheme in the summer of 2009.

     6.     Analysis and effect of unjust enrichment in a claim against an investor to claw-back amounts of principal that the investor received.

     7.     Whether TUFTA provides the Receiver with an adequate remedy of law precluding any recovery under the equitable doctrine of unjust enrichment.

**E.**     **ESTIMATE OF THE LENGTH OF TRIAL.**

     The Receiver estimates that trial will last seven (7) days.

     The Magness Parties estimate that trial will last nine (9) days.

**F.**     **ADDITIONAL MATTERS THAT MIGHT AID IN THE DISPOSITION OF THE CASE.**

     **The Receiver believes that resolution of the following will aid in the disposition of the case:**

     1.     The Receiver's Sealed Motion for Partial Summary Judgment Against the Magness Defendants [Docs. 90, 91], which should be granted for the reasons discussed in the Receiver's briefing in support thereof.

     2.     The Magness Defendants' Motion for *In Camera* Review and Protective Order [Doc. 118], which should be denied for the reasons discussed in the Receiver's response to that Motion.

     3.     The Magness Defendants' Motion for Summary Judgment [Docs. 123, 124], which should be denied for the reasons discussed in the Receiver's response to that Motion.

     4.     The Receiver's objections to the Magness Defendants' confidentiality designations with respect to exhibits, deposition testimony, and other information in this case.

5.      The Receiver's Motions in Limine, concurrently filed herewith, which should be granted for the reasons discussed in the Receiver's briefing in support thereof.

**The Magness Defendants believe that resolution of the following will aid in the disposition of the case:**

1.      Doc. 90 Receiver's Sealed Motion for Partial Summary Judgment Against the Magness Defendants

2.      Doc. 118 Magness Parties' Motion for *In Camera* Review and Protective Order

3.      Doc. 123 Magness Parties' Motion for Summary Judgment

4.      Doc. 126 Magness Parties' Motion in Limine Re: Insider Status Under TUFTA

5.      Doc. 128 Magness Defendants' Motion to Exclude or Limit Expert Opinion Testimony of Karyl Van Tassel

6.      Doc. 131 Magness Defendants' Motion to Exclude or Limit Expert Opinion Testimony of Bill Post

7.      The Magness Parties' Motions in Limine filed concurrently therewith.

SIGNED this _____ 4 _____ day of _____ Jan _____, 20 17.

_____
Hon. David C. Godbey
United States District Judge

Dated: December 9, 2016

**BALLARD SPAHR LLP**

By: /s/ Andrew J. Petrie
Andrew J. Petrie (*pro hac vice*)
petriea@ballardspahr.com
Lisa A. Lee (*pro hac vice*)
leela@ballardspahr.com
Rachel R. Mentz (*pro hac vice*)
mentzr@ballardspahr.com
1225 Seventeenth Street
Suite 2300
Denver, Colorado 80202-5596
303-292-2400
303-296-3956 (Facsimile)

- and -

**DYKEMA COX SMITH**
M. David Bryant, Jr.
Texas Bar No. 03281500
dbryant@dykema.com
1717 Main Street, Suite 4200
Dallas, Texas 75201
214-462-6400
214-462-6401 (Facsimile)

Mark J. Barrera
Texas Bar No. 24050258
mbarrera@dykema.com
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205-1521
210-554-5314
210-226-8395 (Facsimile)

**ATTORNEYS FOR GMAG LLC,
MAGNESS SECURITIES LLC,
GARY D. MAGNESS, AND
MANGO FIVE FAMILY, INC., IN ITS
CAPACITY AS TRUSTEE FOR THE
GARY D. MAGNESS IRREVOCABLE TRUST**

**BAKER BOTTS L.L.P.**

By: /s/ Kevin M. Sadler
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
Brendan A. Day
Texas Bar No. 24059928
brendan.day@bakerbotts.com
Ashley Allen Carr
Texas Bar No. 24082619
ashley.carr@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR
RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On December 9, 2016, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve all parties, through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler