IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., § § § § § | | |
| Plaintiff, § | | |
| § | | |
| v. § | Case No. 3:15-CV-0401-N-BQ | |
| § | | |
| GMAG LLC, MAGNESS SECURITIES LLC, GARY D. MAGNESS, and MANGO FIVE FAMILY, INC., IN ITS CAPACITY AS TRUSTEE FOR THE GARY D. MAGNESS IRREVOCABLE TRUST, § § § § § § | | |
| Defendants. § | | |

_____

**RECEIVER'S MOTION FOR JUDGMENT AS A MATTER OF LAW
AND BRIEF IN SUPPORT**
_____

The Receiver moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The Magness Defendants have not established and cannot prevail on their good faith affirmative defense under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). First, the Magness Defendants are estopped from asserting that they took the $88.2 million in undisputedly fraudulent transfers from Stanford International Bank, Ltd. ("SIB") in good faith because they admitted in sworn tax returns that they initiated those transfers due to concerns that their CD investments were "in jeopardy." Second, no rational jury could find from the evidentiary record that the Magness Defendants established their good faith affirmative defense. The evidence overwhelmingly shows that the Magness Defendants actually knew of SIB's fraud or insolvency when they received the transfers in October 2008. At a minimum, the evidence establishes that at the time of the transfers, the Magness Defendants had access to public and

RECEIVER'S MOTION FOR
JUDGMENT AS A MATTER OF LAW
AND BRIEF IN SUPPORT                                                                                                      1

nonpublic information that put them on inquiry notice that SIB was insolvent and that the transfers were being made with a fraudulent purpose. Judgment as a matter of law in favor of the Receiver is therefore appropriate.

## I. LEGAL STANDARD

A court may grant judgment as a matter of law against a party when the party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party. FED. R. CIV. P. 50(a)(1); *see Nobach v. Woodland Vill. Nursing Ctr.*, 762 F.3d 442, 446 (5th Cir. 2014). The Court should award judgment as a matter of law whenever "a reasonable jury would not have a legally sufficient evidentiary basis" to find in favor of one party. *Id.* (quotation marks omitted). "This occurs when the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary verdict." *Jacobs v. Tapscott*, 516 F. Supp. 2d 639, 643 (N.D. Tex. 2007) (Fitzwater, J.) (quoting *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004)). Judgment as a matter of law is appropriate where no more than a scintilla of evidence in the record favors the nonmoving party. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001); *see also Kilchrist v. Sika Corp.*, No. 3:10-cv-2567-B, 2012 WL 3599383, at *4 (N.D. Tex. Aug. 22, 2012) (Boyle, J.) ("To survive a Rule 50 motion, 'the party opposing must at least establish a conflict in substantial evidence on each essential element of their claim.'").

In ruling on the motion, the Court must consider all of the evidence in the record. *Jacobs*, 516 F. Supp. 2d at 643. The Court must not make credibility determinations or weigh the evidence. *Id.* It should give credence to "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Id.* (citation and quotation omitted).

## II.  ARGUMENT

As a matter of law, the Magness Defendants cannot prevail on their good faith affirmative defense. The Magness Defendants admitted in sworn tax returns submitted to the IRS that they took cash out of SIB through the October 2008 "loan" transfers because they were concerned that those funds were in jeopardy. Because that position is directly in conflict with the claim that they lacked actual or constructive knowledge of SIB's insolvency or fraudulent purpose at the time of the transfers, the Magness Defendants are estopped from contending that they took the transfers in good faith.

Moreover, no rational jury could find from the evidentiary record that the Magness Defendants established their good faith defense. The record evidence overwhelmingly shows that the Magness Defendants not only should have known, but actually did know that SIB was insolvent and that the purpose of the loan transfers they received was to further defraud SIB's investors. As such, the Magness Defendants cannot establish that they took the transfers in good faith.

### A.  It is undisputed that the Receiver is entitled to judgment unless the Magness Defendants establish their good faith defense.

It is stipulated that the Magness Defendants received $88.2 million in fraudulent transfers from SIB in October 2008. [*See* Pretrial Order [Doc. 225] at 13-14]; TEX. BUS. & COM. CODE ANN. § 24.005(a)(1); *Janvey v. Brown*, 767 F.3d 430, 438 (5th Cir. 2014) (holding that SIB was a Ponzi scheme and was insolvent as a matter of law, establishing fraudulent intent). Those transfers are thus avoidable under TUFTA, and the Receiver is entitled to recoup those funds on behalf of SIB's creditors unless the Magness Defendants can prove that they took the transfers in good faith. TEX. BUS. & COM. CODE ANN. § 24.008(a) (allowing avoidance of fraudulent transfer), *id.* § 24.009(a) (providing defense where transferee took in good faith and

for reasonably equivalent value); *Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (stating that good faith is an affirmative defense for which the transferee bears the burden of proof); [1/5/17 Tr. of Pretrial Conference at 7:15-21 (granting the Magness Defendants' motion to reorder trial presentation because "on everything that's left, they have the burden of proof").]

It is undisputed that a party who had actual knowledge of the transferor's insolvency or the fraudulent purpose behind the transfer does not take in good faith. [*See* Order [1465] at 16, in *Janvey v. Alguire*, Case No. 3:09-CV-0724-N (N.D. Tex. filed Apr. 20, 2009) ("*Alguire* Order")[1] ("[A] transferee who has objective actual knowledge of the transferor's fraudulent purpose cannot satisfy the good faith defense."); Brief in Support of Magness Defendants' Motion for Summary Judgment [Doc. 124] at 13; *see also Hahn*, 321 S.W.3d at 527 ("Actual notice results from personal information or knowledge . . . ."). Even if the party lacks actual knowledge, it does not take in good faith if it "had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose."[2] [*See Alguire* Order at 8 (quoting *In re Am. Hous. Found.*, 785 F.3d at 164).] A transferee is on inquiry notice if it has "knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature" of a transfer. [*See id.* at 8 (quoting *Hahn*, 321 S.W.3d at 527).] Constructive knowledge of such facts based

---

[1] Although the Receiver acknowledges this Court's recent articulation of the good faith test in *Alguire* for purposes of this motion, the Receiver does so without waiver of any objection he has regarding the *Alguire* Order and the appropriate good faith standard. [*See* Doc. 145 (Receiver's summary judgment response detailing the appropriate test for good faith); *see also* Doc. 178 at 7-8 (Receiver's proposed jury charge concerning good faith); Doc. 211 (Receiver's objections to the Magness Defendants' proposed jury charge concerning good faith).]
[2] Once on inquiry notice, the transferee must also meet a diligent investigation requirement. [*See Alguire* Order at 8 (citing *In re Am. Hous. Found.*, 785 F.3d at 164).] The Magness Defendants failed to present more than a scintilla of evidence showing that they satisfy this requirement. But because the Magness Defendants had both inquiry and actual notice as a matter of law as described herein, the Court need not reach that question.

on the objective circumstances can establish inquiry notice. [*Id.* (citing *Hahn*, 321 S.W.3d at 527).]

        **B.    The Magness Defendants are estopped as a matter of law from asserting that they took the transfers in good faith.**

Given the standards described above, the Magness Defendants can prevail on good faith only by showing that they lacked both actual and constructive knowledge that SIB was insolvent or that the transfers might be made with a fraudulent purpose when they withdrew their funds in the form of "loans" in October 2008. But the Magness Defendants' 2008 tax returns prove that their state of mind at the time of the fraudulent transfers is wholly incompatible with that required to show good faith. In two separate tax returns, signed under penalty of perjury, the Magness Defendants swore that "[d]ue to the investigation of Stanford that was active in 2008," they were "concerned" that their "CD principal was in jeopardy." [*See* PX 482, 483 (IRS forms 8275 at 5).][3] The Magness Defendants made these statements to avoid paying tax on nearly $25 million. [*See* 1/10/17 Trial Tr. (Vol. 2) at 186:9-187:1 (Magness testimony that purpose of these forms was to explain to the IRS why these funds were not taxable. Now they take a completely contrary position in an attempt to avoid the Receiver's TUFTA claims. Courts do not permit parties to engage in such bait-and-switch tactics, however. Parties cannot assert one position to a government agency, such as the IRS, when that is advantageous, and then also profit by asserting the *opposite* provision to a court when doing so becomes advantageous later. *See, e.g.*, *In re Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991); *Meyer v. Ins. Co. of Am.*, No. 97 CIV. 4678(AJP), 1998 WL 709854, at *10 (S.D.N.Y. Oct. 9, 1999). Under well-established estoppel doctrines, therefore, the Magness Defendants are

---

[3]     PX 482 is the 2008 tax return for the Gary Magness Irrevocable Trust. PX 483 is the tax return for Gary Magness and Sarah Siegel, which included Magness's "disregarded single member LLCs, GMAC, LLC . . . and Magness Securities, LLC . . . ." [*See* PX 483 (IRS Form 8275 at 5).]

estopped from disputing that they were concerned at the time of the transfers that their CD investments were in jeopardy, and accordingly, they cannot establish their affirmative defense of good faith.

The Magness Defendants' first position—the one they now disavow in this Court—came in their 2008 tax returns, where they disclosed the nearly $25 million in accumulated CD interest that they had received from SIB. [*See* 1/10/17 Trial Tr. (Vol. 2) at 50:15-19 (Magness testimony) (testifying the $25 million received in the first fraudulent transfers consisted of accumulated interest).] They sought to treat that cash as merely "a return of principal," and not as interest at all—and thus not taxable at all. [*See* PX 482, 483 (IRS forms 8275 at 5).][4] The Magness Defendants could not simply avoid tax on $25 million of accrued interest for the asking—they had to show *why* that amount could be recharacterized as returned principal. [*See* 1/10/17 Trial Tr. (Vol. 2) at 192:23-193:5 (Magness testimony).] To do that, the Magness Defendants openly stated that "[i]n October 2008, the Taxpayer received funds from Stanford as a loan secured by the CDs. Due to the investigation of Stanford which was active in 2008, *the Taxpayer was concerned that his CD principal was in jeopardy*." [*See* PX 482 (IRS form 8275 at 5) (emphasis added); PX 483 (same).] They cited legal authorities to support the proposition that they were asking the IRS to accept. [*See id.* (citing tax authorities).] The Magness Defendants' concern about the "jeopardy" of their CD investments at the time they received the loans, therefore, was an essential step in winning favorable tax treatment. At trial, Mr. Magness admitted that the tax returns were prepared from information the Magness Defendants provided, that he signed the returns under penalty of perjury, and that the IRS

---

[4] PX 482 is the 2008 tax return for the Gary Magness Irrevocable Trust. PX 483 is the tax return for Gary Magness and Sarah Siegel, which included Magness's "disregarded single member LLCs, GMAC, LLC . . . and Magness Securities, LLC . . . ." [*See* PX 483 (IRS Form 8275 at 5).]

accepted the positions stated therein. [*See* 1/10/17 Trial Tr. (Vol. 2) at 187:2-5, 188:23-189:2; 193:6-15, 197:23-25, 231:6-10 (Magness Testimony).]

The Magness Defendants' second position—the one they pursue to avoid the Receiver's TUFTA claim—is diametrically opposed to their first position. In this Court, the Magness Defendants have repeatedly stated, both in their filings and during trial, that as of October 2008, they were in fact not at all concerned that their CD investments were in jeopardy. [*See, e.g.*, Magness Defendants' Brief in Support of Motion for Summary Judgment [Doc. 6] at 34; 1/10/17 Trial Tr. (Vol. 2) at 184:13-18 (Magness testimony that, until December 2008, he felt "real confident about the bank," was not "worried about the bank", and "had no idea anything was wrong"); 1/11/17 Trial Tr. (Vol. 3) at 228:10-13 (Knudson Testimony that "[i]n October of 2008, we didn't have any concerns about Stanford").]

This convenient switch in position is impermissible as a matter of law. Courts long have recognized that a party who takes a position or makes a representation under oath to a government agency and who receives the resulting benefits is precluded from later taking a clearly inconsistent position or denying the representation. "One form of estoppel, 'quasi-estoppel,' forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." *Davidson*, 947 F.2d at 1297; *see also, e.g.*, *Long v. Turner*, 134 F.3d 312, 318-19 (5th Cir. 1998); *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). And although "judicial estoppel" most typically refers to prior statements made in court proceedings, "[j]udicial estoppel applies to sworn statements made to administrative agencies such as the Social Security Administration as well as to courts." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010); *see also Reed v. City of Arlington*, 650 F.3d 571, 573-74 (5th Cir. 2011)

(citing *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)) (outlining doctrine of judicial estoppel).

Unsurprisingly, courts likewise insist on holding litigants to statements made to the IRS. Regardless of any particular doctrinal label—judicial estoppel, quasi-estoppel, etc.—courts sensibly apply estoppel doctrines to a party's position made in tax returns, like those made by the Magness Defendants here. Where a party takes a position in a sworn tax return submitted to the IRS, courts repeatedly hold that the party is bound conclusively to that position in later judicial proceedings. *See, e.g.*, *Ginor v. Landsberg*, 159 F.3d 1346, 1346 (2d Cir. 1998); *Meyer*, 1998 WL 709854 at *8-11; *Zemel v. Horowitz*, No. 601073/03, 2006 WL 516798, at *5-6 (Sup. Ct. N.Y. County, Mar. 2, 2006); *Naghavi v. New York Life Ins. Co.*, 260 A.D.2d 252, 252, 688 N.Y.S.2d 530, 531 (1st Dept 1999).

The Fifth Circuit, for example, has held that a party was bound to the position that certain payments were alimony payments for bankruptcy purposes where he took tax deductions based on their characterization as alimony. *Davidson*, 947 F.2d at 1297 (citing federal and Texas applications of estoppel). Like the Magness Parties now, the litigant in *Davidson* found it advantageous to characterize the payments as alimony when filing tax returns (thus obtaining the financial benefits of avoiding tax on those amounts), but later switched his story when doing so would generate a new advantage (obtaining dischargeability of the payment obligations by treating them as a "property settlement" rather than alimony).

The Magness Defendants' effort to evade their prior position is, if anything, more objectionable. Far more than simply claim a deduction on a 1040—as the party did in *Davidson*—the Magness Defendants filed a special disclosure form for the sole purpose of explaining in detail their factual and legal position to the IRS. As with any tax form filed under

penalty of perjury, the Magness Defendants would have subjected themselves to criminal prosecution and jail time if they had willfully made false or incorrect statements in that disclosure. *See* 26 U.S.C. § 7206(1). Beyond that, the special disclosure form calls for a "relatively high standard of tax reporting" by which the taxpayer's position must have not merely an "arguable" but a "reasonable basis," and failure to meet that standard can result in additional penalties. *See* Treas. Reg. § 1.6694-2(a), (b)(1) (2009); INTERNAL REVENUE SERVICE, INSTRUCTIONS FOR FORM 8275 (2013) (same).

The contradiction between the Magness Defendants' candid statement to the IRS that they were concerned at the time of the transfers that their CD investments were in jeopardy and their claims at trial and in their pleadings that they lacked any such concern at the time they received the transfers is far more direct and detailed than the contradiction in *Davidson* (*i.e.*, merely taking a deduction, then later stating that the expenditures were just a property settlement after divorce, not alimony). And the Magness Defendants' sworn statements in the tax returns are diametrically opposed to their present claim that they received the loans without any actual or constructive notice of SIB's insolvency or the fraudulent nature of the transfers. If estoppel was warranted in *Davidson*, as the Fifth Circuit found, it must be even more clearly warranted here. To now allow the Magness Defendants to maintain their good faith defense and assert, as they attempt to do, that they were utterly unaware of the nature of the transfers that they purposefully solicited due to their concern that their investments were in jeopardy would allow the Magness Defendants to benefit from their dishonesty while unfairly depriving the Receiver and the SIB creditors of the rightful recovery of funds. *See, e.g.*, *Reed*, 650 F.3d at 573-74 ; *Davidson*, 947 F.2d at 1297.

As a matter of law and an application of the principle of equity, therefore, the Magness Defendants are estopped from claiming that they lacked actual and knowledge of SIB's insolvency and the fraudulent purpose of the transfers. Their good faith defense is thus necessarily precluded, and this reason alone justifies judgment as a matter of law for the Receiver.

### C. No reasonable jury could conclude the Magness Defendants have established their good faith defense.

Even if the Court declined to adopt the foregoing analysis, the Receiver is still entitled to judgment as a matter of law. It is clear that no reasonable jury could rule for the Magness Defendants on their good faith defense because the record overwhelmingly shows they had both actual and constructive knowledge of SIB's insolvency and the fraudulent purpose of the transfers at the time of the loans.

#### 1. The record taken as a whole establishes that the Magness Defendants received the transfers with actual knowledge of the Stanford's insolvency and fraudulent purpose.

Even beyond the open admission made in their tax returns, *see supra* Part II.B, evidence of facts surrounding the fraudulent transfers overwhelmingly shows that the Magness Defendants had actual knowledge that SIB was insolvent and made the transfers with a fraudulent purpose.

Mr. Magness admitted, and minutes taken of a December 2008 Mango Five meeting reflect, that at the beginning of October 2008 he sent Tom Espy, the Magness Defendants' Stanford advisor, to ask SIB for a redemption of their CDs. [*See* 1/10/17 Trial Tr. (Vol. 2) at 134:19-23 (Magness testimony); PX 92 (12/5/08 Meeting Minutes).] Rather than honor the request, SIB told Mr. Espy that due to declining market conditions, redemption was "not possible." [*See* 1/10/17 Trial Tr. (Vol. 2) at 134:19-23 (Magness testimony); PX 92

(12/5/08 Meeting Minutes).] Mr. Magness admitted that the reason given for denial was that SIB needed to keep him and his name "on the books." [*See* 1/10/17 Trial Tr. (Vol. 2) at 145:11-21 (Magness testimony).] This statement from SIB contrasted sharply with SIB's public claims of continued profitability and "strong " cash position. [*See, e.g.,* PX 474 (Q2 Report); PX 070 (July 2008 Letter from R. Allen Stanford); PX-435 (Q3 Report)]. In light of this contrast, the Magness Defendants had actual knowledge that SIB was making false claims about its financial health and stability and was likely fraudulent.

> **2. No reasonable juror could conclude from the record that the Magness Parties established that they lacked inquiry notice.**

The Magness Defendants have also failed to establish offered that they were not on inquiry notice of SIB's insolvency and fraudulent purpose. The Magness Defendants' evidence consists of testimony by Gary Magness and others that they were not actually aware of the available information or that they did not consider the information they received to be particularly suspicious. [1/10/17 Trial Tr. (Vol. 2) at 184:13-18 (Magness testimony); 1/11/17 Trial Tr. (Vol. 3) at 228:10-13 (Knudson Testimony).]

But determining good faith "requires an *objective* assessment of what the transferee 'should have known,' rather than a *subjective* inquiry into what he actually knew." *GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 312 (5th Cir. 2014) (citing *Hahn*, 321 S.W.3d at 527) (emphasis added); *see also In re Bayou Grp.*, LLC, 439 B.R. 284, 313 (S.D.N.Y. 2010). The Magness Defendants' claimed subjective awareness of, understanding of, and reaction to the information available to them is insufficient to establish that they lacked constructive knowledge of SIB's insolvency or fraudulent purpose. The evidence establishes that the Magness Defendants had knowledge of both public and nonpublic

information that would have excited the suspicions of a person of ordinary prudence and put him on inquiry of SIB's fraud or insolvency.

The evidence shows that Tom Espy was not just the Magness Defendants' Stanford advisor, but was Mr. Magness's close friend who even shared office space and support staff with the Magness Defendants. [*See, e.g.*, 1/10/17 Trial Tr. (Vol. 2) at 16:14-21, 130:24-131:1 (Magness testimony); 1/11/07 Trial Tr. (Vol. 3) at 26:5-27:7 (Dokken Testimony).] Mr. Magness admitted at trial that Mr. Espy served as the pipeline through which the Magness Defendants requested and received a high level of access to information about SIB directly from top SIB officers. [*See, e.g.*, 1/10/17 Trial Tr. (Vol. 2) at 16:14-21, 130:24-131:1 (Magness testimony).] For example, in February 2008, the Board of Directors of Mango Five requested that Mr. Espy prepare a report on the Stanford CDs in light of the sub-prime lending crisis occurring at the time. [*See* PX 56 (2/5/08 Email from Dokken to Espy); 1/11/07 Trial Tr. (Vol. 3) at 69:14-70:20, (Dokken Testimony).] In response, Mr. Espy promised a "thorough and detailed statement." [*See* DX 615 (2/5/08 Email from Espy to Dokken).] He arranged for SIB President Juan Rodriguez-Tolentino to report on the safety of SIB CDs. [*See* PX 62 (3/6/08 Meeting Minutes).] The minutes of a March 2008 Mango Five meeting reflect that Mr. Rodriguez-Tolentino reported that SIB "resembles a 'Swiss bank model'" and that although SIB generated its CD returns through investment in "a portfolio of investments ranging from equities, fixed income investments, precious metals, and other alternative investments," SIB differed from a hedge fund in that SIB had "regulatory oversight" and that its funds were "very liquid." [*See id.*]

Mr. Magness and his associates admitted at trial that Mr. Rodriguez-Tolentino's description of SIB's portfolio was essentially a generic sales pitch, that they did not understand

the term "Swiss bank model," or Mr. Rodriguez-Tolentino's distinction between SIB and a hedge fund, and that they had no appreciable understanding of how SIB was able to generate its returns. [*See* 1/10/17 Trial Tr. (Vol. 2) at 91:17-92:3, 94:6-16, 95:8-10, 97:4-8, 97:24-98:8, 106:20-25, 111:14-112:6 (Magness testimony); 1/11/17 Trial Tr. (Vol. 3) at 75:22-25 (Dokken Testimony).] Mr. Magness further admitted that these explanations differed from those he had previously received. [*See* 1/11/17 Trial Tr. (Vol. 2) at 109:17-25 (Magness Testimony).] Despite the opaque and unhelpful explanations that Mr. Rodriguez-Tolentino provided, Mr. Magness admits that neither he nor any of his advisors followed up to clarify. [*See id.* at 29:12-14.] Rather, Mango Five gave Mr. Magness the sole power to make decisions regarding the SIB CDs. [*See id.* at 107:8-13, 21-25.]

As discussed above, publications available to the Magness Defendants, SIB claimed unrealistic and uncannily consistent returns and incredible growth, even during times of historic tumult in the financial world. [*See, e.g.*, PX 474 (SIB Quarterly Update, 4/1/08-6/30/08); PX 492 (SIB Brochure).] For example, Mr. Rodriguez-Tolentino boasted in a companywide email received by Mr. Magness that in the first half of 2008, SIB achieved earnings of $16.2 million, historically large growth, and "increase in total assets"—all in spite of "turbulent world economic conditions, falling markets and unending news of collapsing financial institutions." [*See* PX 70 (7/27/08 Email from Espy to Dokken).] This information was not only in tension with the broader financial environment, it was also inconsistent with the information reported by Mr. Rodriguez-Tolentino directly to the Magness Defendants. For example, the March 2008 meeting minutes show that Mr. Rodriguez-Tolentino had told the Magness Defendants that SIB could leverage its portfolio by 15%. [*See* PX 62.] But SIB's publications disclosed no significant liabilities, and even claimed that the bank was not subject to any credit

risk. [*See, e.g.*, PX 492.] At trial, Mr. Magness admitted that even the information he personally received from SIB did not explain this obvious disconnect. [*See* 1/10/17 Trial Tr. (Vol. 2) at 130:13-16 (Magness Testimony).]

The evidence further shows that the SEC's investigation of SIB was public knowledge just months before the October 2008 transfers. On July 3, 2008, Bloomberg published an article entitled "SEC Investigating Stanford Group Offshore CDs, Investment" that disclosed that SIB was being investigated by the SEC for illegal activity in connection with its CD program. [*See* PX 65 (7/3/08 Bloomberg Article).] Though Mr. Magness denied knowledge of the article, he admitted that he knew before he invested in SIB that it had been investigated by the SEC. [*See* 1/10/17 Trial Tr. (Vol. 2) at 116:19-118:16 (Magness Testimony).] The allegations contained in the Bloomberg article would further raise the suspicions of an ordinary investor. [*See, e.g.*, 1/12/17 Trial Tr. (Vol. 4) at 171:5-172:25 (Bell Testimony) (testifying that the SEC investigation by itself would be concerning and reinforce his negative opinion of SIB).]

In light of these numerous red flags, the trial testimony unsurprisingly shows that the Magness Defendants had concerns about SIB long before the transfers at issue, and their suspicions grew as they received more information. [*See, e.g.*, 1/10/17 Trial Tr. (Vol. 2) at 255:8-13, 258:2-6 (Dokken Testimony) (testifying banks would not accept SIB CDs as collateral because they were offshore investments); 1/11/17 Trial Tr. (Vol. 3) at 21:12-22:7, 81:2-9 (Dokken Testimony) (testifying she was concerned about SIB from the outset and that the Magness Defendants remained concerned until they received the transfers); 1/12/17 Trial Tr. (Vol. 4) at 14:12-15:10 (Wilk Testimony) (testifying SIB CDs were inherently riskier than typical CDs); 1/12/17 Trial Tr. (Vol. 4) at 155:12-17 (Bell Testimony).]

In fact, Tonya Dokken, CFO of Mango Five Family, Inc. ("Mango Five"), and Ryan Bell, the Magness Defendants' Merrill Lynch investment manager, both testified that in weeks before the transfers, he told her that the returns SIB claimed were "too good to be true" and that the Magness Defendants needed to get their investments out of SIB. [*See* 1/11/17 Trial Tr. (Vol. 3) at 96:16-20 (Dokken Testimony); 1/12/17 Trial Tr. (Vol. 4) at 153:8-16, 160:15-162:11, 166:10-167:6 (Bell Testimony).]

The evidence thus establishes that the Magness Defendants had knowledge of facts that would excite the suspicions of a person of ordinary prudence and put him on inquiry of SIB's insolvency and the fraudulent nature of the transfers. True, the Magness Defendants attempt to refute this evidence by claiming that the October 2008 loan transfers were brought on by the need to pay margin loans held elsewhere, not by concerns about the safety of the SIB CDs. [*See* 1/10/17 Trial Tr. (Vol. 2) at 49:6-15, 52:4-8 (Magness testimony).] But no more than a scintilla of evidence supports this contention. The documentary evidence does not reflect any discussion of using the funds from SIB to address margin calls. Further, Mr. Magness himself acknowledged at trial that one reason to take out loans is to move funds from a risky investment into a safer investment. [*See id.* at 165:10-15.] And the evidence shows that Mr. Magness had access credit at significantly lower interest rates than the 11.148% rate for the SIB loans. [*See* 1/9/2017 Trial Tr. (Vol. 1) at 144:9-17 (Magness Testimony).] In light of the clear evidence that the Magness Defendants were aware of SIB's insolvency and of the fraudulent purpose behind the transfers in October 2008, Mr. Magness's margin-loan theory is at best an implausible post-hoc rationalization that no rational juror could credit.

## CONCLUSION & PRAYER

For the foregoing reasons, the Receiver requests that the Court enter judgment as a matter of law that the Magness Defendants did not receive the transfers at issue in good faith. The Receiver also seeks such other and further relief to which he may be justly entitled.

| | |
|---|---|
| Dated: January 13, 2017 | Respectfully submitted, |

          **BAKER BOTTS L.L.P.**

          By:  */s/ Kevin M. Sadler*
          Kevin M. Sadler
          Texas Bar No. 17512450
          kevin.sadler@bakerbotts.com
          Scott D. Powers
          Texas Bar No. 24027746
          scott.powers@bakerbotts.com
          Brendan A. Day
          Texas Bar No. 24052298
          brendan.day@bakerbotts.com
          Ashley Allen Carr
          Texas Bar No. 24082619
          ashley.carr@bakerbotts.com
          98 San Jacinto Blvd., Suite 1500
          Austin, Texas 78701-4039
          (512) 322-2500
          (512) 322-2501 (Facsimile)

          Timothy S. Durst
          Texas Bar No. 00786924
          tim.durst@bakerbotts.com
          2001 Ross Avenue
          Dallas, Texas 75201
          (214) 953-6500
          (214) 953-6503 (Facsimile)

          **ATTORNEYS FOR**
          **RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

        On January 13, 2017, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve all parties, through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

        *By:  /s/ Kevin M. Sadler*
        Kevin M. Sadler