# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 3:15-CV-0401-N-BQ |
| | § | |
| GMAG LLC, MAGNESS SECURITIES LLC, GARY D. MAGNESS, and MANGO FIVE FAMILY, INC., IN ITS CAPACITY AS TRUSTEE FOR THE GARY D. MAGNESS IRREVOCABLE TRUST, | § § § § § § | |
| | § | |
| Defendants. | § | |

---

## RECEIVER'S ALTERNATIVE MOTION FOR NEW TRIAL AND FURTHER ALTERNATIVE MOTION TO AMEND OR CORRECT THE JUDGMENT AND BRIEF IN SUPPORT

---

BAKER BOTTS L.L.P.

Kevin M. Sadler
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
Brendan A. Day
Texas Bar No. 24052298
brendan.day@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

ATTORNEYS FOR RECEIVER RALPH S. JANVEY

TABLE OF CONTENTS

Index of Authorities ............................................................................................................. iii

Procedural History ............................................................................................................... 2

Legal Standard ..................................................................................................................... 2

Argument ............................................................................................................................. 4

    I.     The jury charge erroneously based the question of good faith on notice "that Stanford was engaged in a Ponzi scheme." .................................... 4

    II.    The Court committed plain error by giving prejudicial instructions to the jury and by issuing a jury charge that the Court admitted was confusing. .......... 10

    III.   The Court erroneously admitted evidence from the defense witnesses concerning Mr. Magness's state of mind. ............................................................. 12

    IV.   The Court erred by admitting the deposition testimony of James Davis and Juan-Rodriguez Tolentino. .................................................................................... 14

    V.    During voir dire, the Court improperly struck a juror for cause *sua sponte*. ........ 19

    VI.   The Court's *sua sponte* reconsideration and grant of summary judgment on unjust enrichment was erroneous and precluded submission of crucial fact questions to the jury. ...................................................................................... 20

Alternative Motion to Amend or Correct the Judgment ................................................... 24

Conclusion & Prayer ......................................................................................................... 25

Certificate Of Service ....................................................................................................... 27

## Index of Authorities

**Page(s)**

### Cases

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000) ...................................................................................3

*Alamo v. Pueblo Intern. Inc.*,
  58 F.R.D. 193 (D.P.R. 1972) ......................................................................................16

*Allgeier v. United States*,
  909 F.2d 869 (6th Cir. 1990) .....................................................................................15

*Alvarado v. State*,
  822 S.W.2d 236 (Tex. App.—Houston [14th Dist.] 1991, pet. dism'd) ..................20

*Anchor Wall Sys v. Rockwood Retaining Walls, Inc.*,
  610 F. Supp. 2d 998 (D. Minn. 2009) .......................................................................13

*Bellard v. Gautreaux*,
  675 F.3d 454 (5th Cir. 2012) .....................................................................................12

*Bender v. Brumley*,
  1 F.3d 271 (5th Cir. 1993) ....................................................................................10, 12

*Cahn v. Nicholas*,
  408 F.2d 1 (5th Cir. 1969) .........................................................................................16

*Carson v. Polley*,
  689 F.2d 562 (5th Cir. 1982) .......................................................................................3

*Denton v. Quarterman*,
  No. 4:06-CV-282-Y, 2007 WL 846516 (N.D. Tex. Mar. 21, 2007) ........................20

*Ex Parte Fisher*,
  206 S.W.2d 1000 (Tex. 1947) ....................................................................................11

*Ganz v. Lyons P'ship, L.P.*,
  961 F. Supp. 981 (N.D. Tex. 1997) ............................................................................11

*GE Capital Commercial, Inc. v. Worthington Nat'l Bank*,
  754 F.3d 297 (5th Cir. 2014) ..................................................................................4, 23

*Harris Cty. v. MERSCORP, Inc.*,
  791 F.3d 545 (5th Cir. 2015) .....................................................................................21

*Heldenfels Bros. v. City of Corpus Christi,*
832 S.W.2d 39 (Tex. 1992)..................................................................21

*Hub v. Sun Valley Co.,*
682 F.2d 776 (9th Cir. 1982) ............................................................16

*In re Benjamin Moore & Co.,*
318 F.3d 626 (5th Cir. 2002) ..............................................................3

*Janvey v. Brown,*
767 F.3d 430 (5th Cir. 2014) ............................................................24

*Jauch v. Corley,*
830 F.2d 47 (5th Cir. 1987) ..............................................................15

*Jefferson Amusement Co. v. Lincoln Nat. Life Ins. Co.,*
409 F.2d 644 (5th Cir. 1969) ......................................................15, 16

*Jones v. Pate Rehab. Endeavors, Inc.,*
No. 3:14-CV-2218-L, 2017 WL 1832226 (N.D. Tex. May 5, 2017) .......................3

*Maddox v. Denka Chem. Corp.,*
930 S.W.2d 668 (Tex. App.—Houston [1st Dist.] 1996, no pet.) ..........................11

*Martin v. Texas Employers' Ins. Ass'n,*
193 F.2d 645 (5th Cir. 1952) ............................................................13

*Mayo v. Hartford Life Ins. Co.,*
220 F. Supp. 2d 714 (S.D. Tex. 2002), *aff'd,* 354 F.3d 400 (5th Cir. 2004) ........................22

*Nacogdoches Heart Clinic, P.A. v. Pokala,*
No. 12-11-00133-CV, 2013 WL 451810 (Tex. App.—Tyler Feb. 6, 2013, pet.
denied) (mem. op.)..........................................................................21

*Powertrain, Inc. v. Ma,*
88 F. Supp. 3d 679 (N.D. Miss. 2015) ..................................................16

*Roberts v. Wal-mart Stores, Inc.,*
7 F.3d 1256 (5th Cir. 1993) ............................................................11

*Smith v. Transworld Drilling Co.,*
773 F.2d 610 (5th Cir. 1985) ..............................................................3

*Sourcing Mgmt., Inc. v. Simclar, Inc.,*
118 F. Supp. 3d 899 (N.D. Tex. 2015) ..................................................22

*Taylor III v. Goucher,*
No. 1:14-CV-965-LY, 2015 WL 12746119 (W.D. Tex. July 23, 2015) ...............22

*Taylor v. Seton Healthcare,*
No. A–10–CV–650 AWA, 2012 WL 2396880 (W.D. Tex. June 22, 2012)............................3

*United States v. Joseph,*
892 F.2d 118 (D.C. Cir. 1989) ...............................................................................19

*United States v. Tucker,*
137 F.3d 1016 (8th Cir. 1998) ...............................................................................19

*Washington v. Dep't of Transp.,*
8 F.3d 296 (5th Cir. 1993) .....................................................................................12

*Whiteman v. Pitrie,*
220 F.2d 914 (5th Cir. 1955) ...................................................................................3

*Young v. Fontenot,*
888 S.W.2d 238 (Tex. App.—El Paso 1994, writ denied)...................................22

## STATUTE AND RULES

FED. R. CIV. P. 50(b) .................................................................................................2

FED. R. CIV. P. 59(a)(1)(A) ......................................................................................3

FED. R. CIV. P. 59(e) ...........................................................................................3, 25

FED. R. CIV. P. 60(a)...........................................................................................3, 25

FED. R. EVID. 602 ...................................................................................................12

FED. R. EVID. 802 ...................................................................................................12

TEX. BUS. & COM. CODE § 24.011 ..........................................................................22

## OTHER AUTHORITIES

COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY
CHARGES—BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT PJC 105.29
(2016 ed.) ...............................................................................................................4

As set forth in the Receiver's Renewed Motion for Entry of Judgment as Matter of Law and Brief in Support (the "Renewed Motion") filed on this date and in the Receiver's prior briefing as referenced therein, the Receiver is entitled to entry of judgment as a matter of law on his fraudulent-transfer claim. If the Court denies the relief requested in the Renewed Motion, however, the Receiver requests that the Court grant a new trial to remedy several fundamental trial errors.

The trial of the Receiver's claims against the Magness Defendants was fundamentally flawed in a number of ways. First and foremost, the Court improperly framed the good-faith question by limiting the jury's focus to the very narrow question of whether the Magness Defendants knew or should have known that Stanford was engaged in a *very specific type of financial fraud—a Ponzi scheme*. That is plainly not the correct question, and there is no authority to support submitting the good faith issue in that form. The correct question, as this Court recognized in the *Alguire* case in December 2016, is whether the Magness Defendants knew or should have known of the fraudulent nature of the transfers. The distinction is important because the evidence unquestionably would have supported a jury finding that the Magness Defendants knew or should have known of the fraudulent nature of their loan transactions with Stanford. Further, the Court's charge on the good faith question was unreasonably confusing because of its use of double negatives.

Second, the Court erred by improperly admitting inadmissible evidence that was substantially prejudicial to the Receiver. For example, the Court erred by allowing numerous defense witnesses to speculate about Gary Magness's state of mind. The error was substantial enough to warrant a new trial because the Court allowed numerous defense witnesses to offer improper testimony on the pivotal issue of good faith, in the form of speculative assertions that

Gary Magness, the central decision maker for all the Magness Defendants, did not have actual or inquiry notice of the Stanford fraud. The Court also erred in allowing the Magness Defendants to offer deposition testimony taken in other cases in which the Receiver had no reasonable opportunity or incentive to develop testimony relevant to this case. The Magness Defendants emphasized the testimony of these witnesses in their closing argument, highlighting the significance of the error in admitting the testimony.

Third, the Court erred by refusing to allow the jury to consider the Receiver's unjust enrichment claim despite there being sufficient evidence to support its submission.

These errors, individually and cumulatively, caused substantial prejudice to the Receiver, and a new trial is appropriate to allow the Receiver's claims to be fairly decided.

Finally, and in the further alternative to the request for new trial, the Court must amend the judgment to reflect that the Receiver received a partial summary judgment that allowed him to recover approximately $8.5 million in net-winnings from the Magness Defendants. Not only have the Magness Defendants not disputed the Receiver's entitlement to the $8.5 million award, but that judgment was affirmed by the Fifth Circuit and is therefore the law of the case. At a minimum, the final judgment must reflect that the Receiver is entitled to $8.5 million on his fraudulent transfer claims.

## PROCEDURAL HISTORY

The Receiver incorporates by reference the procedural history of this case as set forth in his Renewed Motion.

## LEGAL STANDARD

A movant may include an alternative or joint request for a new trial under Rule 59 in a Rule 50(b) renewed motion for judgment as a matter of law. FED. R. CIV. P. 50(b). The court may grant a new trial "for any reason for which a new trial has heretofore been granted in

an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A).  Those reasons include that the "verdict is against the weight of the evidence," that "the trial was unfair, or [that] prejudicial error was committed in its course." *Jones v. Pate Rehab. Endeavors, Inc.,* No. 3:14-CV-2218-L, 2017 WL 1832226, at \*2 (N.D. Tex. May 5, 2017) (citing *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985)) (footnote, citations, and internal quotations omitted).  The Court's exercise of discretion must ultimately be guided by "what is right and in the interests of justice." *Whiteman v. Pitrie*, 220 F.2d 914, 919 (5th Cir. 1955).

A court may grant a new trial for error in the jury instructions where the movant establishes that "(1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000) (citations omitted).  A court may grant a new trial for trial error, including erroneous admission of evidence, where the movant objected at trial and the error resulted in substantial prejudice to the movant.  *See Taylor v. Seton Healthcare*, No. A–10–CV–650 AWA, 2012 WL 2396880, at \*5 (W.D. Tex. June 22, 2012); *Carson v. Polley*, 689 F.2d 562, 570 (5th Cir. 1982).

A party may file a motion to alter or amend a judgment under Rule 59(e) within 28 days of entry of the judgment.  FED. R. CIV. P. 59(e).  A court may alter or amend a judgment under Rule 59(e) to correct a clear error or prevent manifest injustice.  *See In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002).  Under Rule 60(a), "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record.  FED. R. CIV. P. 60(a).

ARGUMENT

I.   **The jury charge erroneously based the question of good faith on notice "that Stanford was engaged in a Ponzi scheme."**

In submitting the question of good faith to the jury, the Court's instructions for Question No. 1 of the jury charge provided that "[t]he Magness Parties acted in good faith if they did not have actual notice or inquiry notice in October 2008 that Stanford was engaged in a Ponzi scheme." [Doc. 256 at 7; *see also* Doc. 252 at ¶¶ 2-4 (objecting to instruction to Question No. 1).]

The Court's instruction was erroneous. The proper test is whether the Magness Defendants were "on inquiry of *the fraudulent nature of an alleged transfer." GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 312 (5th Cir. 2014) (emphasis added); *see* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT PJC 105.29 (2016 ed.) (providing jury instruction based on notice of "whether the debtor had fraudulent intent"). These instructions are similarly erroneous under the *Alguire* Order, in which the Court stated that that "a transferee who has objective actual knowledge of the transferor's *fraudulent purpose* cannot satisfy the good faith defense." [Doc. 1465 in *Alguire*, Case No. 3:09-CV-0724, at 16 (emphasis added).] Further, neither party to the case requested an instruction narrowly framing the good faith questions with respect to whether the Magness Defendants were on notice of or could have discovered that Stanford was engaged in the specific type of criminal enterprise known colloquially as a "Ponzi scheme." [Docs. 178, 185, 217]

As the Court acknowledged, a Ponzi scheme is but one specific type of fraud. [Ex. G, Trial Tr. (Vol. 6) at 254:23-255:6, App. at 1348-49.] Consistent with that observation, the evidence that the Receiver elicited at trial was that a Ponzi scheme is "just a type of financial

fraud." [*Id.* at 96:16-97:4, App. at 1189-90 (Van Tassel testimony).]   The Court declined to instruct the jury according to the well-established legal standard, however, because it concluded, "I don't think the evidence in this case supports anything other than a Ponzi scheme."   [*Id.* at 254:23-255:6, App. at 1348-49.]

Respectfully, the Court's determination does not square with the evidence in the case, nor does it comport with law or logic.   Unquestionably, Stanford was engaged in a Ponzi scheme.   But to carry out that scheme, Stanford committed federal criminal offenses related to fraud—mail fraud and wire fraud—and his conduct certainly constituted common law civil fraud as well.   There is simply no basis in the law to require the jury to determine whether the Defendants had actual or inquiry notice of the specific type of fraud scheme Stanford was orchestrating.   No case authority in Texas, or the United States, stands for the proposition that good faith turns on whether the recipient of a fraudulent transfer knows or should know of the specific type of fraud scheme in which the debtor is engaged.

Limiting the jury's focus to the narrow question of "Ponzi scheme" is improper because it rendered irrelevant all other important evidence that would defeat good faith.

The transfers were fraudulent, for example, because Stanford was unquestionably insolvent.   [*See* Doc. 225, Joint Pretrial Order at 13 ("SIB was a Ponzi scheme and was insolvent from at least 1999 forward."); Ex. F, Trial Tr. (Vol. 5) at 201:16-202:6, App. at 1010-11 (Receiver testifying that Stanford had liabilities of $7.2 billion and less than $1 billion in assets).]

And Stanford also told numerous lies about the financial health, stability, and liquidity of Stanford International Bank other than failing to disclose the fact that it was a Ponzi scheme.   [*See, e.g.,* Ex. F at 198:14-201:9, App. at 1007-10 (Receiver reviewing Stanford's

marketing messages for the CD program and explaining that the marketing messages were false); Ex. G at 139:24-141:1, App. at 1233-35 (Receiver's forensic accountant testifying that Stanford was failing to disclose to the public the hole in its balance sheet and instead emphasizing liquidity); *id.* at 146:6-15, App. at 1240 (Receiver's forensic accountant testifying that balance sheet and liquidity misrepresentations continued in October 2008).]    A defendant who is on notice of the fact that a debtor is insolvent and in the midst of a liquidity crisis and is lying to cover up those financial problems, is on notice of the "fraudulent nature" of taking millions of dollars in "loans" from the debtor in such circumstances.   One cannot take millions of dollars from such a debtor in "good faith."  But under the Court's very narrow formulation of the good-faith question, such evidence is rendered unimportant because telling lies to cover up insolvency or a liquidity crisis does not prove that Stanford was running a "Ponzi scheme."

The evidence at trial was that in a financial fraud, "there has been some kind of false statement, and a company has to make that false statement because they're covering up a lie, either that there's assets that don't exist, there's sales that don't exist, maybe inventory, whatever that lie may be."  [Ex. G at 96:19-25, App. at 1190.]  The fact that one of the things being covered up is the fact that the fraudster is running a Ponzi scheme, does not mean that the defendant can take in good faith when it knows the transferee is lying about other aspects of its enterprise.  Under the Court's formulation of the good-faith question, Gary Magness could have confessed in open court to receiving the transfers knowing that Stanford was engaged in a fraud as long as he denied knowing that what Stanford was doing amounted to a "Ponzi scheme."  That cannot be the law, nor is there any reason to think that it is.

One of the core issues that Stanford lied about to the public in October 2008 was the liquidity of the bank.  [*See, e.g.,* Ex. G at 113:21-114:2, App. at 1207-08 (testimony of

Receiver's forensic accountant).]    And the evidence offered by the Receiver's forensic accountant, Karyl Van Tassel, established that the Magness Defendants had actual, subjective awareness of that lie:

> Q.    So at this point in time, if the public story is everything's fine, you want to redeem, redeem, you want a loan, have a loan, you want interest, have interest, the balance sheet is great, if that's the public story and the private story is you cannot redeem, not possible, we need the asset on our balance sheet, what are those facts setting forth about whether the bank is lying to everybody about its financial condition?

> A.    Well, it is lying to everybody. What Tom Espy and the Magness parties now have in front of them is this very specific difference between what they're telling the public and what the bank is telling them privately. And so that lie is being made to cover up the balance sheet problem.  It's — they told the Magnesses. The people who don't know are the general investors.

[Ex. G at 171:17-172:6, App. at 1265-66; *see also id.* at 165:3-169:1, App. at 1259-63 (Receiver's forensic accountant testifying that, by the Magness Defendants' written, sworn admission, lies concerning balance sheet were disclosed to the Magness Defendants in October 2008); 180:10-181:17, App. at 1274-75 (Receiver's forensic account testifying that Magness Defendants' broker and close personal friend of Gary Magness was exposed by October 11, 2008 to SIB continuing to lie publicly about its financial strength after privately being made aware of SIB's liquidity problems).]

By instructing the jury that the Magness Defendants needed to know that Stanford was concealing the existence of a specific criminal act known as a "Ponzi scheme," the Court dramatically lowered the Magness Defendants' burden of proof and allowed them to argue that they had good faith despite having *actual knowledge* that the Bank was in the midst of a liquidity crisis and that the Bank was *lying* to the public about it.  Under these circumstances, the Magness

Defendants sounded no alarm bells and conducted no investigation.  Instead, they grabbed as much money as they could and helped Stanford hide his fraud by leaving their CDs on the books of his fake Bank.  [*See* Ex. G at 207:5-208:25, App. at 1301-02 (testimony of Receiver's forensic accountant).]   That is the opposite of good faith, and the jury was entitled to be instructed properly on the law so that they could make an appropriate determination of whether the Magness Defendants had met their burden to show that they lacked actual and inquiry notice of the fraudulent nature of their transaction with Stanford.

By lowering the Magness Defendants' burden of proof, the Court's erroneous instruction substantially prejudiced the Receiver.  If there were any doubt about that fact, it is erased by a review of the Magness Defendants' closing argument.  Instead of having to come to grips with the fact that the Magness Defendants' were aware of Stanford's lies, the Magness Defendants' counsel focused on the assertion that only a few people knew that the Stanford fraud was a Ponzi scheme:

> We also know the evidence ranging from Ms. Van Tassel to Mr. Janvey is that only a handful of people knew that this was a Ponzi scheme. And it is quite literally a handful. It is Mr. Stanford; Mr. Davis; Ms. Pendergest-Holt, sometimes referred to as Ms. Holt; Mr. Kurtz, who we didn't hear a lot about; and Mr. Lopez. Those are the five individuals who knew what was going on.

[Ex. H, Trial Tr. (Vol. 7) at 26:6-12, App. at 1377.; *see also id.* at 30:9-15, App. at 1381 ("The second thing he contends is if that reasonable person with those facts had looked further, they would have been able to uncover that this was, in fact, a Ponzi scheme.").]

The Magness Defendants' counsel was also able to brush aside the critical fact that the Magness Defendants knew of Stanford's liquidity problems by arguing that the person who disclosed those problems claimed to be unaware that Stanford was engaged in a Ponzi scheme:

> And we know that [Juan Rodriguez Tolentino] testified he didn't know anything about the Ponzi scheme, and there's no evidence that he knew anything about the Ponzi scheme or could have shared anything with the Magness parties about the Ponzi scheme.

[Ex. H at 27:21-24, App. at 1378.]

Thus, as a direct result of the Court's legal error, the Magness Defendants were able to erroneously leave the jury with the impression that the central evidence in the case was irrelevant to their good faith determination. That is, that the Defendants' actual knowledge of Stanford's lie about the Bank's liquidity problems was somehow irrelevant to good faith. But as the evidence showed at trial, that lie is at the very heart of a financial fraud like the Stanford fraud:

> Q.   In terms of continuing to run a fraud like this, how important is it to keep quiet about, cover up the fact that you have a balance sheet problem?
>
> A.   It's very important. I mean, what they have to do is be presenting to the public that everything's fine, they create literature that shows that they're doing well, but inside there's something different happening. And that's kind of the don't-let-them-see-you-sweat kind of mentality. Behind the scenes something is happening that isn't—that is not good, but to the public they're presenting a different persona.

[Ex. G at 141:6-15, App. at 1235 (testimony of Receiver's forensic accountant).]

The Court's error was further compounded by the fact that the term Ponzi scheme was never defined by the Court, thus leaving the jury with inadequate guidance as to what constitutes a Ponzi scheme for purposes of making the determination of when one has been, or could be, revealed to exist.

If the Court had simply instructed the jury according to the appropriate legal standard, the jury could have determined whether the Magness Defendants had met their burden to show good faith notwithstanding the Receiver's evidence. And, of course, the Magness

Defendants did not even ask the Court to give the erroneous instruction, [*see* Docs. 178, 185, 217], though they ultimately acquiesced in and exploited the error, as described above.

Because the Court's instruction was erroneous, the Receiver objected to the instruction and requested a substantially correct instruction, [Doc. 252 at 2-3], the erroneous instruction prejudiced the Receiver, and the prejudice could have been cured by giving the Receiver's proposed instruction, the Court should order a new trial.

## II.   The Court committed plain error by giving prejudicial instructions to the jury and by issuing a jury charge that the Court admitted was confusing.

In presenting the good-faith question, Questions No. 1.a and 1.b of the jury charge instructed the jury to answer "Yes" or "No" for "no actual notice" and for "no inquiry notice," respectively.  [Doc. 256 at 7.][1]  In verbal instructions to the jury, the Court acknowledged that its formulation of the good-faith question was confusing and that neither the Receiver nor the Magness Parties approved of it.  [Ex. H at 6:17-20, App. at 1357 ("I'm in an odd circumstance here where I think pretty much all of the lawyers don't like the way I submitted 1-A and 1-B. They think it's confusing.  And I understand that. I acknowledge that."); Doc. 252 at 1 (objecting to questions as ambiguous).]

In an apparent attempt to resolve this confusion, the Court twice advised the jury to focus on how the parties wanted the questions answered:

> If you get lost in double or triple negatives, always remember [the Magness Parties are] looking for a yes and the Receiver is looking for a no.
>
> . . . .

---

[1] Receiver objected to the confusing and ambiguous jury instruction in its Objection to the Court's Charge to the Jury.  [*See* Doc. 252 at 1]; *see Bender v. Brumley*, 1 F.3d 271, 277 (5th Cir. 1993) (holding that error is preserved for appeal if party objects to jury charge "prior to the time when the court invites on-the-record objections to the charge.").

> If you get tangled up in the negatives, always remember the Magness parties with the burden of proof are looking for a yes, and the Receiver is looking for a no.

[Ex. H at 7, App. at 1358.]

The undisputedly confusing presentation all but guaranteed that the jury would in fact "get tangled up in the negatives," and, following the Court's instruction, would answer "Yes" or "No" based on the juror's identification with a Party rather than the juror's analysis of the evidence.  In the midst of this instruction, the Court also admonished the jury not to "decide who you think should win and then answer the questions accordingly" and to "answer each question based on the evidence."  [Ex. H at 7:4-8, App. at 1358.]  But this instruction simply conflicts with the Court's remember-which-party-wants-which-answer instruction, and does not change the fact that the Court instructed the jury to take an improper approach to its analysis of the evidence and only added to the sense of confusion.

Under Texas law, which Receiver believes is persuasive here, it is plain error for the judge to advise the jury of the "legal effect and result of their answers."  *Ex Parte Fisher*, 206 S.W.2d 1000, 1004 (Tex. 1947); *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex. App.—Houston [1st Dist.] 1996, no pet.).  This type of shortcut is neither necessary nor proper to explain the jury charge questions or the evidence, and it impermissibly encouraged the jury to answer the questions based on who they wanted to win at trial.  In this case, the Court influenced the jury to truncate their analysis of the facts and to answer the questions so as to pick their preferred party to win.

Under Fifth Circuit law, jury instructions "should have 'no tendency to confuse or mislead the jury with respect to the applicable principles of law.'"  *Ganz v. Lyons P'ship, L.P.*, 961 F. Supp. 981, 996 (N.D. Tex. 1997) (quoting *Roberts v. Wal-mart Stores, Inc.*, 7 F.3d 1256,

1258 (5th Cir. 1993)) (internal quotation marks omitted).  Where the charge as a whole leaves the court with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations the court should consider a new trial." *Bender v. Brumley*, 1 F.3d 271, 276-77 (5th Cir. 1993) (internal quotation marks and brackets omitted).  In this case, not only did the Court improperly advise the jury of the legal effect of its answers on the parties, the Court also drafted the jury charge that the critically important first question was unnecessarily confusing.

The confusing jury-charge instruction and erroneous verbal instructions are substantially prejudicial to the Receiver and merit a new trial.

## III.   The Court erroneously admitted evidence from the defense witnesses concerning Mr. Magness's state of mind.

The Court erred by admitting evidence from numerous defense witnesses concerning Gary Magness's state of mind.  As a defendant himself and as the principal decision-maker for all of the Magness Defendants, [Ex. C, Trial Tr. (Vol. 2) at 107:1-25, App. at 146 (Gary Magness testimony that SIB CD decisions were left to him)], Gary Magness's state of mind was exceptionally important to the determination of the good faith issue.  At the pretrial conference, the Court stated that the Receiver's expert witnesses would be precluded from testifying as to what was in the head of another witness.  [Ex. A, Pretrial Conf. Tr. at 25: 9-11, App. at 26 ("What I don't want is the clairvoyant witness saying, 'From this I can tell what was in their heads.'").]   And of course, that limitation makes sense because testimony from one witness about what was in the head of another person is classic speculation and hearsay and inadmissible under Federal Rules of Evidence 602 and 802.    See, e.g., Fed. R. Evid. 602, 802; *see also Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012); *Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993) ("Under the Federal Rules of Evidence, speculative opinion testimony by lay witnesses—i.e., testimony not based upon the witness's perception—is

generally considered inadmissible.").

Nevertheless, the Court turned around and allowed numerous defense witnesses to tell the jury what they thought was in Gary Magness' head.  The Defendants' witnesses were permitted to testify about what Gary Magness knew or thought or believed about Stanford and about his explanations for why he withdrew his money from Stanford.  [*See* Ex. D, Trial Tr. (Vol. 3) at 162:24-163:3, App. at 462-63 (what Gary Magness thought of Liberty stock); *id.* at 164:10-23, App. at 464 (why Gary Magness got money out of Stanford); Ex. E, Trial Tr. (Vol. 4) at 122:10-18, App. at 673 (Gary Magness's alleged lack of knowledge of the Ponzi scheme); Doc. 235 at 9, 18 (Gary Magness's alleged lack of knowledge of suspicious Stanford referral fees); Doc. 235 at 19-20 (Gary Magness's alleged lack of knowledge of the Ponzi scheme); Doc. 235 at 25-26 (Gary Magness's alleged belief that Stanford was a real business); Doc. 242 at 291-92 (that having Stanford described as a hedge fund was not a revelation to Gary Magness in 2008)].

The cumulative effect of this improper testimony undoubtedly gave the jury an erroneous impression about the strength of the evidence in support of the Magness Defendants' contention that Gary Magness lacked actual knowledge, or that he did not suspect or have reason to suspect, that Stanford was engaged in fraud.  *Cf. Martin v. Texas Employers' Ins. Ass'n*, 193 F.2d 645, 646 (5th Cir. 1952) ("The cumulative effect of the errors committed, we think, entitle the appellant to a new trial."); *accord Anchor Wall Sys v. Rockwood Retaining Walls, Inc.*, 610 F. Supp. 2d 998, 1016 (D. Minn. 2009) (a new trial should be granted under Federal Rule of Civil Procedure 59 where the "cumulative effect" of trial court's errors "is to substantially influence the jury's verdict.")

IV.     **The Court erred by admitting the deposition testimony of James Davis and Juan-Rodriguez Tolentino.**

Over the Receiver's objection, the Court allowed the Magness Defendants to offer into evidence the deposition testimony of Juan Rodriguez-Tolentino and James Davis.  Each of the depositions was taken in a prior, unrelated action, and no rule permitted the use of those depositions in this case.  The Magness Defendants could have sought the deposition of either of these witnesses at any time during the discovery period, but they chose not to do so.  Moreover, the Magness Defendants sought to re-open the discovery period to obtain the depositions of Mr. Rodriguez-Tolentino, [Doc. No. 112 at 20], and the Court denied that request.  [Doc. No. 140.] Admission of these depositions was improper and substantially prejudiced the Receiver.

James Davis and Juan Rodriguez-Tolentino were well known to the Magness Defendants long before this lawsuit was even filed.  The Magness Defendants interacted directly, both by phone and in person, with Mr. Rodriguez-Tolentino on multiple occasions during the time period at issue in this lawsuit.  Mr. Davis was the Chief Financial Officer of Stanford International Bank, and he met by phone with the Magness Defendants at least once during the time period at issue in this lawsuit.  If the Magness Defendants believed that these individuals had admissible testimony that would be helpful to their case, the Magness Defendants had no reasonable excuse for having failed to seek their depositions during the discovery period.

Further, in September 2016, the Magness Defendants asked the Court to re-open discovery, claiming that new document production made it necessary for them to take eight additional depositions, including the deposition of Mr. Rodriguez-Tolentino.  [Doc. 112 at 18-24.]  The Court permitted four two-hour depositions of Ralph Janvey, Karyl Van Tassel, Jason Green, and Tom Espy, but it denied the Magness Defendants' request to re-open discovery in any other respect.  [Doc. 140.]  The Magness Defendants' attempt to use the depositions of

witnesses from other cases was plainly an effort to end-run the Court's order, and should not have been allowed.

Additionally, each of the witnesses had a substantial connection with the Magness Defendants during the time period at issue in the case. The playing of testimony from these individuals at trial undoubtedly left the jury wondering why none of the individuals was testifying concerning the Magness Defendants specifically. Thus, the use of the collateral and irrelevant testimony from these witnesses only served to confuse the issues in this case and mislead the jury.

The prejudice is more evident based on the way the case was argued. In asserting their good faith, the Magness Defendants relied heavily on the testimony of James Davis and Juan Rodriguez-Tolentino. The Magness Defendants' counsel made it a core piece of his closing what those defendants knew and what they disclosed or were able to disclose to the Magness Defendants. [Ex. H at 26:6-28:17, 33:10-21, App. at 1377, 1384 (closing argument).] Of course, neither witness was ever asked about what they disclosed to the Magness Defendants, undoubtedly leaving the jury with the impression that they had nothing to offer on the subject.

The testimony of Mr. Davis and Mr. Rodriguez-Tolentino should have been excluded for the additional reason that a deposition taken in an earlier proceeding is inadmissible where the parties in the earlier proceeding are different, the issues are not substantially the same, and there was no motive in the earlier action to cross-examine the deponent on the issues involved in the present suit. *See Jefferson Amusement Co. v. Lincoln Nat. Life Ins. Co.*, 409 F.2d 644, 651 (5th Cir. 1969). The burden of showing that the deposition is admissible is on the party seeking to enter the deposition. *See Allgeier v. United States,* 909 F.2d 869, 876 (6th Cir. 1990) (citing *Jauch v. Corley*, 830 F.2d 47, 50 (5th Cir. 1987)).

If the prior suit and the current suit have different causes of action, the issues will be different enough to preclude the admissibility of the deposition.  *See Jefferson Amusement*, 409 F.3d at 651 (holding deposition regarding insured's drug use taken in divorce action not admissible in subsequent action to recover insurance policy proceeds); *Powertrain, Inc. v. Ma*, 88 F. Supp. 3d 679, 690 (N.D. Miss. 2015) (holding deposition of company's employees taken in intellectual property dispute not admissible in subsequent action involving EPA violations). Prior depositions are also not admissible where the subsequent suit raises issues not present in the earlier suit.  *See Cahn v. Nicholas*, 408 F.2d 1, 4 (5th Cir. 1969) (depositions taken before alter ego petition filed not admissible in subsequent proceedings); *Hub v. Sun Valley Co.*, 682 F.2d 776, 777-78 (9th Cir. 1982) (deposition taken in state court action that concerned events subsequent to alleged retaliation not admissible in federal retaliation case).

Even where one party is the same, "[d]ifferent parties and different issues are crucial circumstances that inevitably must alter the substance of the deposition taken." *Alamo v. Pueblo Intern. Inc.*, 58 F.R.D. 193, 195 (D.P.R. 1972). The nature of the deposition develops out of the individual circumstances of each case, and a change in either party or issues will alter the motive to develop testimony.  *Id.*

None of the cases in which the prior depositions were taken met the requirements to permit depositions taken in those cases to be played in this case.  Mr. Davis was deposed in an insurance coverage dispute.  *Certain Underwriters at Lloyd's of London v. Janvey*, Case No. 3:09-CV-1736.  Mr. Rodriguez-Tolentino was deposed in a fraudulent transfer case asserted against a member of Stanford's International Advisory Board.  *Janvey and Official Stanford Investors Committee v. Giusti*, Case No. 3:11-CV-292.  Mr. Rodriguez-Tolentino was deposed a second time, with the second deposition involving a claim that Osvaldo Pi breached his fiduciary

duty as a Stanford executive. *Janvey and Official Stanford Investors Committee v. Bogar, et al.*, Case No. 3:14-cv-03635.   None of the cases involved a fraudulent transfer claim against a Stanford investor, nor did they have anything to do with the Magness Defendants specifically. Indeed, none of the Magness Defendants are even mentioned in any of the deposition transcripts.

This Court decided that the transfers at issue are fraudulent as a matter of law. [Doc. 196.]  Thus, the only issue at trial concerning the Receiver's fraudulent transfer claims against the Magness Defendants is good faith.  Although good faith was presented as a defense in the *Giusti* case, the facts and circumstances of Mr. Giusti's good faith defense have little resemblance to the facts concerning the Magness Defendants' good faith defense.  Mr. Giusti was a consultant and member of the Stanford International Advisory Board, not an investor, and there is no evidence that Mr. Giusti ever interacted with the Magness Defendants.

Moreover, the question of whether the Magness Defendants acted in good faith ultimately comes down to the Magness Defendants' actual or constructive knowledge, which includes what facts the Magness Defendants knew that should have excited their suspicions *about the transfers being challenged.  See* Order at 8, *Janvey v. Alguire*, No. 3:09-CV-0724-N (December 21, 2016).  The depositions taken in the *Giusti* case shed no light on that issue because the deponents were never asked about the transfers to the Magness Defendants.  The Receiver had no motivation to develop testimony about any transfers to the Magness Defendants in the *Giusti* case, let alone a motivation similar enough to justify admission of the depositions taken in the *Giusti* case.

Further, the Receiver's incentive to contest the good faith issue in *Giusti* was not the same as it is in this case.  The Receiver could have prevailed (and in fact still may prevail as the *Giusti* case remains pending) by defeating the reasonably equivalent value element of Mr.

Giusti's fraudulent transfer defense.  With respect to Mr. Rodriguez-Tolentino, at the time his deposition was taken, Mr. Giusti had identified in interrogatory responses that he had "knowledge of the services and the value of the services Mr. Giusti rendered as a consultant." [Doc. 203-1, Ex. A, at 4.]  In the Rodriguez-Tolentino deposition, the Receiver's counsel advised Mr. Rodriguez-Tolentino that "we're not here today about the receiver or the lawsuit about you. We're instead here about the receiver's lawsuit against Mr. Luis Giusti."  [Doc. 203-1, Ex. B, at 10:17-21.]  The testimony in *Giusti* was not taken with regard to the Magness Defendants (nor any other investor), and the Receiver had no motive to fully develop testimony with regard to the actual or constructive knowledge of any person or entity other than Mr. Giusti.  Accordingly, it was unfair to admit in this case testimony on the basis that it may have had some bearing on the good faith issue in *Giusti*.

The Magness Defendants asked the Court to admit the depositions of Mr. Rodriguez-Tolentino and Mr. Davis based purely on the fact that the Receiver was represented at the depositions and that the depositions had something to do with the Stanford fraud.  But in a receivership with litigation involving hundreds of defendants, and hundreds of witnesses, such a ruling would mean that any deposition in which the Receiver asked questions could be offered by any defendant in any case.  Under such a rule, at any such deposition, the Receiver's counsel would be compelled to fully explore every single issue, with every deponent, that might conceivably be germane to any one of hundreds of cases.  Such a rule would be improvident, and it is not supported by any logic or legal authority.

Because the Court erred in overruling the Receiver's objection and admitting the deposition testimony of Juan Rodriguez-Tolentino and James Davis, [Doc. 202 (objections); Ex. E at 65:18-66:10, App. at 616-17 (overruling objections)], and further because that error

substantially prejudiced the Receiver and confused the jury, the Court should grant the Receiver a new trial in which such evidence is excluded.

## V.      During voir dire, the Court improperly struck a juror for cause *sua sponte*.

During voir dire, the Court struck Juror No. 12 for cause over the Receiver's objection that she had not disqualified herself.  Doing so was error that, particularly when taken cumulatively with additional error, mandates a new trial in this case.

During voir dire, Juror No. 12 indicated that she had previously been invested in a company that "bottomed out" and where certain investors "blacked us out, so we couldn't get our benefits as they did . . . [and] we could not get out at substantial amounts what we had, which was totally devastating to a whole lot of people."  [Ex. B at 68:9-69:23, App. at 35-36.]  Juror No. 12 stated that her situation was "not the same definition as to what's going on here," but the Court suggested that situation "certainly has some similarities" and asked "Do you think that circumstance would affect your ability to be fair?"  [*Id.*]  Juror No. 12 did not conclusively say that she could not be fair, but stated, "I'll say it had a big impact on me, so I don't know if I could totally be honest, because I don't know what would be mentioned, you know, what would be said to relate to, you know, what I saw in the past.  So I think that it would have some bearings on it, a lot of bearings on it really."  [*Id.*]

Based only on this equivocal and contingent statement and without motion by any party, the Court excluded Juror No. 12 for cause.  Though a trial judge has discretion to exclude jurors for cause, it is improper as a matter of federal law for the trial court to exclude jurors who hold "'some impression or opinion as to the merits of the case' but [are] able to 'lay aside his impression or opinion and render a verdict based on the evidence presented in court.'"  *United States v. Joseph*, 892 F.2d 118, 130 (D.C. Cir. 1989); *see United States v. Tucker*, 137 F.3d 1016, 1029 (8th Cir. 1998) (trial court should not exclude juror for cause unless there is "'actual

partiality growing out of the nature and circumstances of [the] particular case.'"). Such error is compounded where neither party has moved to strike the juror and, on the contrary, a party objects to the juror's exclusion by the court. This proposition harmonizes with Texas law, which provides that a trial judge has no authority on its own motion to excuse a prospective juror for cause unless that juror is "absolutely disqualified." *See Denton v. Quarterman*, No. 4:06-CV-282-Y, 2007 WL 846516, at *5 (N.D. Tex. Mar. 21, 2007) ("[A]s a matter of state law, a trial court should not, on its own motion, excuse a prospective juror for cause unless the juror is absolutely disqualified from serving on the jury" under relevant state statute); *Alvarado v. State*, 822 S.W.2d 236, 239 (Tex. App.—Houston [14th Dist.] 1991, pet. dism'd) (holding same).

As the Receiver stated in objecting to the dismissal, Juror No. 12 "didn't know whether her experience would match what she would hear from the evidence or would be totally different" and did not disqualify herself or state she would be unable to follow the Court's instruction to decide the case on the evidence." [*See* Ex. B at 71:3-21, App. at 37.] Juror 12's statements did not indicate she was so biased as to be unable to render an impartial verdict or otherwise render her "absolutely disqualified." This cumulative error contributed materially the overall un fairness of the trial.

## VI. The Court's *sua sponte* reconsideration and grant of summary judgment on unjust enrichment was erroneous and precluded submission of crucial fact questions to the jury.

In addition to avoidance of the transfers to the Magness Defendants under TUFTA, the Receiver sought disgorgement under the doctrine of unjust enrichment. The Magness Defendants moved for summary judgment on the Receiver's unjust-enrichment claims, and the Court initially denied that motion. [*See* Docs. 123, 196.] The Magness Defendants did not seek reconsideration of that ruling. But at the pretrial conference just four days before trial, the Court announced that upon reconsideration, it would grant summary judgment. [Ex. A at

4:18-6:14, App. at 5.]  The Court also granted the Magness Defendants' motion to reorder trial presentation so that they would present their case first.  [Ex. A at 7:15-21, App. at 8.]  With these rulings, the Court erroneously deprived Receiver of submission of the fact-intensive unjust-enrichment issue to the jury and forced him to rework his trial strategy just days before trial.

The Court's reason for granting summary judgment is its belief that "on these facts where the Magness Defendants essentially just got their own money back, there is no unjust enrichment as a matter of law," and that "the Texas Supreme Court under these facts would [not] extend any common law claim for unjust enrichment to encompass the Receiver's theory."  [Ex. A at 4:25-5:3, 5:15-17, App. at 5-6.]  This rationale is based on an unfounded interpretation of Texas unjust-enrichment law is unfounded, relies on erroneous and unsupported presumptions regarding central fact issues, and ignores the evidence in this case that would support a finding of unjust enrichment.

Under Texas law, a party is unjustly enriched when he obtains money that in equity and good conscience he ought not to keep.  *See Nacogdoches Heart Clinic, P.A. v. Pokala*, No. 12-11-00133-CV, 2013 WL 451810, at *19 (Tex. App.—Tyler Feb. 6, 2013, pet. denied) (mem. op.); *see also* Court's Charge to the Jury [Doc. 159 at 10] in *Janvey v. Romero*, Case No. 3:10-CV-0297-N (N.D. Tex., filed Feb. 15, 2011) (adopting similar language in jury charge).  "'A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.'" *Harris Cty. v. MERSCORP, Inc.*, 791 F.3d 545, 561 (5th Cir. 2015) (quoting *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)).  Recovery under unjust enrichment is not dependent on wrongdoing by the opposing party. *See Nacogdoches Heart Clinic*, 2013 WL 451810 at *19.

Further, as set forth in his Response to the Magness Defendants' Motion for Summary Judgment, TUFTA expressly provides that "the principles of law and equity . . . supplement its provisions," and federal courts have routinely recognized that unjust enrichment claims can be brought alongside fraudulent-transfer claims under the applicable version of the Uniform Fraudulent Transfer Act.  [Doc. 145 at 29-31 (citing TEX. BUS. & COM. CODE § 24.011 and case law).]  This Court has similarly recognized that a plaintiff may bring a claim for unjust enrichment alongside a TUFTA claim.  *See Sourcing Mgmt., Inc. v. Simclar, Inc.*, 118 F. Supp. 3d 899, 919-20 (N.D. Tex. 2015) (denying motion to dismiss TUFTA and unjust-enrichment claims); *see also Taylor III v. Goucher*, No. 1:14-CV-965-LY, 2015 WL 12746119, at *7 (W.D. Tex. July 23, 2015) (recommending denial of motion to dismiss both TUFTA and unjust-enrichment claim ).

As the Court acknowledged at the pretrial hearing, unjust enrichment "requires a fact-intensive determination by the Court." *Mayo v. Hartford Life Ins. Co.*, 220 F. Supp. 2d 714, 776 n.224 (S.D. Tex. 2002), *aff'd*, 354 F.3d 400 (5th Cir. 2004) (citing *Young v. Fontenot*, 888 S.W.2d 238, 242-43 (Tex. App.—El Paso 1994, writ denied); [Ex. A at 4:24-25, App. at 5 ("[A]s the Receiver correctly points out unjust enrichment claims are factually dependent . . . .").]  But the Court admitted, "I don't know the facts as well as you all do.  I have some idea about the facts, but I don't know them as well as you do."  [Ex. A at 3:19-21, App. at 4.]

This evidence—along with the fact of the Ponzi scheme itself—creates a fact issue as to whether the Magness Defendants "just got their own money back," as the Court presumed.  [*See* Doc. 225 at 13 (Joint Pretrial Order).]  Rather, the evidence shows that they took advantage of their status as a top SIB investor and carried out a plan to extract as much money as possible from an insolvent SIB to avoid dealing with the effects of insolvency and receivership.

- In October 2007, Mr. Knudson suggested that the SIB CDs might be at risk and formulated a two-step plan to (1) borrow loans from Stanford and (2) offset the Magness Defendants' CD balances against any such loans to avoid exposure to that risk. [Ex. D at 220:4-221:16, App. at 520-21 (Knudson testimony).]

- When SIB refused to redeem the Magness Defendants' CDs in October 2008, they instead took out $88.2 million papered as loans. [Ex. D at 217:6-217:12, 226:6-226:15, App. at 517, 526; Ex. G at 114, App. at 1208 .] At that time, the Magness Defendants were acutely aware of the risk and exposure to the SIB CDs. [Ex. I, App. at 1429; Ex. J, App. at 1435; Ex. D at 229:20-229:25, App. at 529.]

- Instead of paying off the loans in cash, the Magness Defendants had SIB offset $25 million with "interest" accrued from their CDs. [Ex. I, App. at 1429; Ex. J, App. at 1435; Ex. G at 197:12-19, App. at 1291 ).] The Magness Defendants used this transaction to seek a tax advantage. [Ex. I, App. at 1425-29; Ex. J, App. at 1431-35.]

- In December 2008, the Magness Defendants were advised that a loan would not offset the CDs and that a receiver might be appointed for SIB. [Ex. D at 230:12-232:24, App. at 530-32 (Knudson testimony, admitting receivership implies fraud and bankruptcy).]

The Court's erroneous last-minute reversal prejudiced the Receiver by depriving him of the opportunity to seek a jury finding on these fact issues and the opportunity to present additional evidence supporting his claim. In granting summary judgment, the Court stated that any resulting error "would be harmless because I don't think there's any possible circumstance where the Receiver could lose on its TUFTA claim yet prevail on its unjust enrichment claim." [Ex. A at 5:18-22, App. at 6.] This assertion ignores that the test for good faith under TUFTA and the question of whether the Magness Defendants were unjustly enriched are two distinct questions determined by different standards. Where good faith is a statutory exception determined under a specific judicial test (*i.e.*, whether the Magness Defendants were on inquiry of the fraudulent nature of the transfers, *see GE Capital*, 754 F.3d at 312), unjust enrichment is determined by the more general questions of whether the Magness Defendants took an undue advantage and whether they should in equity and good conscience keep the funds or return them to the Receivership for the benefit of all investors. These are questions for a jury.

The Receiver is further prejudiced by the fact that based on the dismissal of the unjust-enrichment claims, the Court reversed the trial order.  As a result, the Receiver was forced to rework his trial strategy in only a matter of days.  Additionally, the re-ordering of the trial presentation deprived the jury of hearing the full context of the Stanford fraud prior to the Magness Defendants offering their good faith evidence, which necessarily interfered with the jury's understanding of the issues.  The Receiver respectfully requests that the Court grant a new trial so that his unjust-enrichment claim can be submitted and without undue and unfair surprise.

### ALTERNATIVE MOTION TO AMEND OR CORRECT THE JUDGMENT

In the further alternative to the alternative request for new trial, the Receiver requests that the Court correct the judgment to reflect that the Court entered partial summary judgment for the Receiver on his claim to recover the Magness Defendants' net winnings.

As discussed in the Receiver's Renewed Motion, the Court granted summary judgment in favor of the Receiver concerning the $8,515,957.14 in "net winnings" that the Magness Defendants received.  [*See* Doc. 22-21 (Order of Partial Summary Judgment).]  The Fifth Circuit affirmed the Court's award, *see Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014), and the Magness Defendants returned their net winnings to the Receiver pursuant to those rulings.  [*See* Doc. 225 at 6, n.1 (Joint Pretrial Order).]

In its Final Judgment, the Court ordered "that Plaintiff takes nothing by his claim against Defendants, and the Court dismisses the claims with prejudice."  [Doc. 269.]  That order is inconsistent with the Court's partial summary-judgment order on the net-winner issue, which the Court is bound to uphold the as law of the case that has been affirmed by the Fifth Circuit.

To avoid any inaccuracy in the judgment with respect to the Receiver's rights to the net winnings, the Receiver requests that the Court correct the judgment to reflect that the

Receiver prevailed on his fraudulent transfer claim in at least the amount of the net winnings of $8,515,957.14.  *See* FED. R. CIV. P. 59(e), 60(a).

### CONCLUSION & PRAYER

For the foregoing reasons, and in the alternative to his request for entry of judgment as a matter of law as set forth in his Renewed Motion, the Receiver requests that the Court grant a new trial and reconsider its summary judgment ruling concerning unjust enrichment.  In the further alternative, the Receiver requests that the judgment be corrected to reflect that the Receiver obtained judgment on his claim to recover net winnings.  The Receiver also requests such other and further relief to which he may be justly entitled.

Dated: October 12, 2017

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By:  */s/ Kevin M. Sadler*
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
Brendan A. Day
Texas Bar No. 24052298
brendan.day@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR**
**RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On October 12 2017, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve all parties, through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

By:  /s/ Kevin M. Sadler
Kevin M. Sadler