**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 3:15-CV-0401-N-BG |
| GMAG LLC, MAGNESS SECURITIES LLC, GARY D. MAGNESS, and MANGO FIVE FAMILY, INC., IN ITS CAPACITY AS TRUSTEE FOR THE GARY D. MAGNESS IRREVOCABLE TRUST, | § § § § § § | |
| Defendants. | § | |

---

**APPENDIX IN SUPPORT OF RECEIVER'S RENEWED MOTION**
**FOR ENTRY OF JUDGMENT AS A MATTER OF LAW**

---

**TABLE OF CONTENTS**

| Tab | Document |
|:---:|---|
| A | Transcript of Pretrial Conference |
| B | Trial Transcript Vol. 1 |
| C | Trial Transcript Vol. 2 |
| D | Trial Transcript Vol. 3 |
| E | Trial Transcript Vol. 4 |
| F | Trial Transcript Vol. 5 |
| G | Trial Transcript Vol. 6 |
| H | Trial Transcript Vol. 7 |

| I | Plaintiff's Exhibit 482 |
|---|---|
| J | Plaintiff's Exhibit 483 |
| K | Plaintiff's Exhibit 81 |
| L | Plaintiff's Exhibit 93 |
| M | Plaintiff's Exhibit 65 |
| N | Plaintiff's Exhibit 474 |
| O | Plaintiff's Exhibit 492 |
| P | Plaintiff's Exhibit 70 |
| Q | Plaintiff's Exhibit 91 |
| R | Plaintiff's Exhibit 109 |

Dated: October 12, 2017                              Respectfully submitted,

                                                     BAKER BOTTS L.L.P.

                                                     By: */s/ Kevin M. Sadler*
                                                     Kevin M. Sadler
                                                     Texas Bar No. 17512450
                                                     kevin.sadler@bakerbotts.com
                                                     Scott D. Powers
                                                     Texas Bar No. 24027746
                                                     scott.powers@bakerbotts.com
                                                     Brendan A. Day
                                                     Texas Bar No. 24059928
                                                     brendan.day@bakerbotts.com
                                                     Ashley Allen Carr
                                                     Texas Bar No. 24082619
                                                     ashley.carr@bakerbotts.com
                                                     98 San Jacinto Blvd., Suite 1500
                                                     Austin, Texas 78701-4039
                                                     (512) 322-2500
                                                     (512) 322-2501 (Facsimile)

                                                     Timothy S. Durst
                                                     Texas Bar No. 00786924
                                                     tim.durst@bakerbotts.com
                                                     2001 Ross Avenue
                                                     Dallas, Texas 75201
                                                     (214) 953-6500
                                                     (214) 953-6503 (Facsimile)

                                                     ATTORNEYS FOR
                                                     RECEIVER RALPH S. JANVEY

### CERTIFICATE OF SERVICE

On October 12, 2017, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve all parties, through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

                                            */s/ Kevin M. Sadler*
                                            Kevin M. Sadler

# APPENDIX A

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3   RALPH S. JANVEY, IN HIS      (  CAUSE NO. 3:15-CV-401-N
     CAPACITY AS COURT-APPOINTED  )
 4   RECEIVER FOR THE STANFORD    (
     INTERNATIONAL BANK, LTD.,    )
 5   et al.,                      (
               Plaintiff,         )
 6                                (
     vs.                          )
 7                                (
     GMAG LLC, MAGNESS SECURITIES )
 8   LLC, GARY D. MAGNESS, and    (
     MANGO FIVE FAMILY, INC., IN  )
 9   ITS CAPACITY AS TRUSTEE FOR  (
     THE GARY D. MAGNESS IRREVOCABLE)  DALLAS, TEXAS
10   TRUST,                       (  JANUARY 5, 2017
               Defendants.        (  10:00 A.M.
11   _____

12

13

14   _____

15                    PRETRIAL CONFERENCE

16         BEFORE THE HONORABLE DAVID C. GODBEY
                 UNITED STATES DISTRICT JUDGE
17   _____

18

19

20

21

22           SHAWN M. McROBERTS, RMR, CRR
            1100 COMMERCE STREET, RM. 1654
23              DALLAS, TEXAS  75242
                 (214) 753-2349

24

25
```

1                          A P P E A R A N C E S

2          FOR THE PLAINTIFFS:   BAKER BOTTS, LLP
                                 98 SAN JACINTO BOULEVARD
3                                SUITE 1500
                                 AUSTIN, TEXAS  78701-4039
4                                (512) 322-2678
                                 BY:  MR. KEVIN SADLER
5                                     MR. SCOTT POWERS
                                      MR. BRENDAN DAY
6                                     MS. ASHLEY CARR

7          FOR THE DEFENDANTS:   BALLARD SPAHR, LLP
                                 1225 SEVENTEENTH STREET
8                                SUITE 2300
                                 DENVER, COLORADO 80202-5596
9                                (303) 292-2400
                                 BY:  MR. ANDREW PETRIE
10                                    MS. RACHEL MENTZ

11                               DYKEMA COX SMITH
                                 1201 ELM STREET, SUITE 3300
12                               DALLAS, TEXAS  75270
                                 (214) 698-7800
13                               BY:  MR. DAVID BRYANT

14         OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                 1100 COMMERCE STREET, RM. 1654
15                               DALLAS, TEXAS  75242
                                 (214) 753-2349

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Be seated.

 2       Good morning.  How's everyone?

 3              MR. SADLER:  Very well, thank you.  And yourself?

 4              THE COURT:  Pretty good.  I hope everybody had a

 5   nice holiday.

 6       So I've got some housekeeping things I want to go over.

 7   I'm going to then address I think all of the various motions

 8   that you-all have pending.  Then I will be happy to entertain

 9   any other subjects you-all want to talk about.

10       And my handy-dandy checklist that I keep up here to go

11   over pretrial matters is missing.

12              MR. DAY:  Your Honor, we have kind of a courtesy

13   copy of the pretrial materials, if that would help.

14              THE COURT, no this is my little checklist of things

15   that I like to tell you-all about.  The courtroom elves

16   appeared over the holidays and have hidden it.  We will try to

17   get by as best we can.  And I think I usually remember most of

18   this stuff.

19       First, I don't know the facts as well as you all do.  I

20   have some idea about the facts, but I don't know them as well

21   as you do.

22       Quick question for the Receiver or the Defendants.  The

23   money came out of the form of a loan?

24              MR. SADLER:  Several loans.  Yes, Your Honor.

25              THE COURT:  And were they non-recourse.
```

1          MR. SADLER:  They were demand loans.  There was a

2     set-off provision included in the terms and conditions, but

3     they were demand loans, interest only.  They were on demand

4     with a set-off.  That's the short version.

5          THE COURT:  And why did you not just sue on the

6     loans?  Was it because of the set-off provision?

7          MR. SADLER:  The complication was before the

8     Receiver took over, civil, with the agreement of the

9     Defendants, cancelled the CDs against the loan balance, and so

10    as of the time we took over the loans were -- did not exist,

11    so that's why we sued as fraudulent transfers.

12         THE COURT:  Okay.  So, although it wasn't directly a

13    redemption of the CDs, it essentially became a redemption of

14    the CDs.

15         MR. SADLER:  Yes.

16         THE COURT:  Okay.  Thank you.

17         MR. SADLER:  Sure.

18         THE COURT:  After going over the pretrial materials,

19    I have decided on reflection to reconsider the summary

20    judgment ruling on the unjust enrichment claim, and I'm going

21    to grant the motion for summary judgment by the Magness

22    Defendants on the unjust enrichment claim, and I just want to

23    very briefly explain my thinking about that.

24         First, as the Receiver correctly points out unjust

25    enrichment claims are factually dependent, and I think on

1    these facts where the Magness Defendants essentially just got

2    their own money back, there is no unjust enrichment as a

3    matter of law.

4        I understand the Receiver argues that it's not simply

5    that they got their money back; they got their money back

6    knowing that it was a Ponzi scheme, and that's what makes it

7    unjust.  I think extending the unjust enrichment doctrine to

8    that, and I believe it would be an extension under Texas law,

9    would be simply extending common law to duplicate a statutory

10   remedy.  And I understand the Receiver's argument that TUFTA

11   is cumulative of any existing law, and that may well be the

12   case, but I think here the Receiver is arguing for an

13   extension of common law rather than the Magness Defendants

14   arguing for an abrogation of common law, and I don't believe

15   the Texas Supreme Court under these facts would extend any

16   common law claim for unjust enrichment to encompass the

17   Receiver's theory.

18       I also take some comfort from the fact that I believe

19   under these facts any error in that decision would be harmless

20   because I don't think there's any possible circumstance where

21   the Receiver could lose on its TUFTA claim yet prevail on its

22   unjust enrichment claim.  And I think making this ruling will

23   streamline the trial and avoid what otherwise would be at

24   least a risk of potentially inconsistent rulings from the

25   jury.

6

1    My suspicion, and I don't need you-all to confirm or deny

2    it, my suspicion is the Receiver liked this claim because it

3    supported your argument that you should be able to open and

4    close, because I don't think it adds otherwise anything else.

5    It just gives you the same fact issues that are already in the

6    TUFTA case, except you would bear the burden of proof instead

7    of the Defendants.  So what I'm thinking why would you want

8    another claim that duplicates what's already in there but

9    shifts the burden of proof to you.  The right to open and

10   close is the only thing I can think of.

11   As I say, you don't need to confirm or deny that.  It's

12   just my speculation.  And I don't -- If that is, in fact, the

13   case, I don't fault you for making that argument.  If I were

14   clever enough to think of that, I would in your position have

15   done the same thing.

16   But I think for the reasons I said, I'm going to grant

17   the motion for summary judgment on unjust enrichment.

18   MR. SADLER:  Your Honor, may I address the Court

19   with just one brief question?

20   THE COURT:  Question, yes.

21   MR. SADLER:  Yes, sir.

22   I heard Your Honor's comments about the Magness

23   Defendants getting back their own money and why that factored

24   into your ruling, and I wanted to be very clear with the Court

25   that the Receiver is going to argue and we are going to

1    present evidence that they did not, in fact, get back their

2    own money; that they were paid --

3              THE COURT:  I understand that position.

4              MR. SADLER:  I just want -- That's why the question.

5    I didn't want to understand what you were saying as some sort

6    of ruling that would impact the TUFTA claim.

7              THE COURT:  Not at all.

8              MR. SADLER:  Thank you.

9              THE COURT:  Not at all.  I think, in fact, if you

10   looked into the Stanford bank accounts, the dollars didn't

11   have names on them.

12             MR. SADLER:  Understood.  Thank you.

13             THE COURT:  But you are welcome to -- And I know you

14   make that argument that it was the other investors' money.

15        So given that, I'm going to grant the Magness parties'

16   motion to reorder trial presentation because I think, on

17   everything that's left, they have the burden of proof.  I

18   don't necessarily disagree with what the Receiver said about

19   context and order of presentation for the jury to better

20   understand what's going on, but I think, since they have the

21   burden, they're entitled to go first.

22        So that brings us to some housekeeping things.

23        I assume if this were going to settle it would have done

24   so already, so I will skip over that part of my questions.

25        In view of those rulings, how long do you-all think this

```
 1   will take?

 2          MR. PETRIE:  Good morning, Your Honor.  I am Drew

 3   Petrie representing the Magness parties.

 4      We have a significant amount, unfortunately, of

 5   videotaped testimony.  The only good news about that, that

 6   gives you a set time that we all don't control.  We just know

 7   what the time it is.  So I'm thinking, given the change in

 8   order, and before there were some adjustments we were

 9   considering making in light of a lengthy meet and confer we

10   had yesterday, but I'm thinking we will probably take into

11   Friday, starting on Monday.  So at least four days.

12          THE COURT:  Okay.  And what does the Receiver think?

13          MR. SADLER:  I think I heard Mr. Petrie say his case

14   would take four days?

15      I didn't quite hear.  Is that right?

16          MR. PETRIE:  That was my estimate.

17          MR. SADLER:  For our case, including reasonable

18   estimates for cross examination time, we worked about a total

19   of about 16 hours of evidence.  So if he's talking about, you

20   know, 20 hours for him, it sounds like we are not exactly the

21   same, but we are in something of the ballpark.

22      I don't think Your Honor's -- I don't think Your Honor's

23   ruling on the unjust enrichment has shortened the case.  It

24   shortened the charge, but I don't think it shortened the

25   evidence at all.
```

1          THE COURT:  Confirming my views.

2      That sounds like seven trial days to me, roughly five

3  hours a day.  So what I'm going to do is give you essentially

4  the amount of time that you requested--35 hours divided by

5  two.

6      And so you understand the way I do this, I will give you

7  subsidiary limitations on opening and closing, so if you've

8  saved your time carefully and you've got ten hours left at the

9  end of the case, I'm not going to let you argue for ten hours.

10      And if you need to know ahead of time how much argument I

11  will give you, we can talk about that.  But for opening,

12  closing, direct, cross, half of 35 hours, 17 and a half hours.

13      And I will keep the time.  I know different courts do

14  this different ways.  I will keep the time.  I will give you a

15  count at the end of every day, if you will remind me.

16      And I do this sort of like a chess clock.  When one side

17  says, "Pass the witness," the clock goes over to the other

18  side.  So if you need time to set up and gather your notes and

19  prepare, help yourself, take all the time you want, but the

20  clock is running.  So I had some people not understand that,

21  and that's one reason sometimes if you keep independent time

22  counts, it may not match mine.  But mine basically is that any

23  time the jury is in the box the clock is running, typically.

24      If you have any questions about the time-keeping

25  procedures, feel free to ask, but I think that generally

10

1    explains it.

2        We typically don't get five hours the first day.  We may

3    hit five hours the second day, then after that we typically

4    run more than five hours.  So giving you 35 hours probably

5    means we'll argue it Wednesday morning, and that gives the

6    jury plenty of time to finish before the end of the week.

7        You'll recall Monday, not this Monday but the following

8    Monday, is a federal holiday, so we'll be off that Monday.

9    But we'll come back Tuesday, and it sounds like wrap up

10   testimony probably Tuesday and then argue it Wednesday.

11       I'll try to get you a draft charge by the end of this

12   week so that you can be thinking about that.  I know you've

13   already thought about it, but I'll try to give you at least my

14   thoughts about it.

15       Back to my missing checklist.

16       On jury selection, I'm going to seat seven.  I think we

17   are bringing in a panel of 24.  You'll each get three strikes.

18       I will endeavor to do what I think is a full examination

19   of the panel.  And I will certainly consider your requested

20   questions.  I will try to cover all the subject matter.  I'm

21   not going to read your questions verbatim off the submissions,

22   but I will at least look at them and try to cover the subject

23   matter.

24       At the end of my questioning I'll give each side 15

25   minutes with the panel.  At the end of your examination I will

1    bring in one by one any panel members who look problematic.

2    So if you think of your time as used to identify potential

3    problem panel members as opposed to establish challenges for

4    cause on potential problem panel members, it may not be quite

5    as limiting as it otherwise seems.

6        To bring a panel member in for individual questioning, I

7    require having heard something out of their mouths to make me

8    think there's a potential problem.  So if you say, "Panel

9    member 7 looked sad," that won't do it because I won't have

10   noticed that they looked sad.  So I just need to hear

11   something from them that tells me, yeah, we need to follow up

12   about this subject.

13       If you are in doubt about whether or not a person has

14   crossed that low threshold, feel free to ask me, and I would

15   suggest something along the lines of, "Judge, can we follow up

16   separately with this panel member?"  And if I think you are

17   over that very low threshold, I will say, "Yeah, let's follow

18   up separately."  If I think you are over the threshold and you

19   are still following up with the panel member, I'll probably

20   jump in and say, "Let's just visit separately with this

21   person" to avoid the risk of tainting the whole panel.

22       I don't like for you to ask leading questions of my poor

23   defenseless venire people.  The leading question tells me what

24   you would wish they would say, but it doesn't really tell me

25   what they say on their own without prompting.  And I find the

1    suggestive nature of leading questions so great that I

2    basically give zero weight to a response to a leading

3    question.

4        That's probably enough about jury selection.

5        When we get to witnesses, I need for you to question from

6    the podium, please, and the main reason is simply that we can

7    hear you better with the mics at the podium than we can from

8    counsel table.  It's not a huge courtroom, but the acoustics

9    are not great.  The sound system now is about a year old, but

10   we still have issues with fine-tuning it, and we find that

11   people have trouble hearing when I wouldn't think they did.

12   But we've just -- We've got still some residual issues, so it

13   is helpful for us if you can question from the podium.

14       If you need to approach the witness, please ask for

15   permission to approach.  Also it's helpful for me if you say

16   "Permission to approach the witness" so I know you want to go

17   there instead of coming over here to talk to me.  If you

18   forget and don't ask permission, nothing really bad is going

19   to happen to you.  I don't have a water gun.  Lightning is not

20   going to strike.  I'll just be sad.  And I may remind you,

21   "Please request permission to approach the witness."  I will

22   always grant you permission to approach the witness.  There's

23   not a one approach rule or anything like that.  I just like to

24   know what's going on out in the well of the courtroom and

25   that's something that helps me.

1    Two rounds of questioning per witness per side--direct,

2    cross, redirect, recross, thank you, sir, you may sit down.

3        Particularly when we're on the clock, as we will be, I

4    need for you to be sure we have enough witnesses to get

5    through the day.

6        And, by the way, our workday is 9:00 to 5:00.  And I

7    typically take lunch 12:30 to 1:30, and take a 20-minute break

8    halfway through the morning and halfway through the afternoon.

9    There may be circumstances where we have to adjust that, and

10   if so I'll try to give you as much advanced notice as I can.

11       But if we run out of witnesses at 4:00 and we're trying

12   to stay on schedule, that will make me unhappy.  I will

13   probably charge the time against whoever was on deck.

14       In terms of the daily schedule, I try to stay on the

15   schedule.  We can't always do that, I understand that, but

16   particularly I try to not have breaks go overly long.  And a

17   consequence of that is if it's 19 and a half minutes through

18   our 20-minute break and I come in and you guys say to me,

19   "Judge, we've got some things we need to talk to you about

20   before the jury comes in"  I will be in a very unreceptive

21   state of mind.

22       Now, I know things come up that we need to talk about.  I

23   understand that.  I'm saying tell me about that up front, not

24   at the end of a break.  I will make time to visit with you

25   about stuff, but I prefer to do that either when we're on the

1    break or before we start in the morning or after we stop in

2    the evening or during the lunch hour, but not when I walk in

3    ready to bring the jury back in.  So if there's something we

4    need to talk about, give me as much advanced notice about that

5    as you can and I'll be happy to find time to talk with you,

6    but don't spring it on me at the very end of the break or when

7    I'm ready to bring the jury in.

8         Carla remembers my checklist better than I do.  Don't

9    make speaking objections.  I'm happy for you to argue to me,

10   but don't make speeches in front of the jury in the guise of

11   objections.  That will make me fussy.  Usually one or two

12   words is enough for me to understand what the objection

13   is--for example, "Objection; leading."  Okay I'm with you.

14   I'm with you on that.  If I need a response, I'll invite one.

15   If I think we need to visit anymore than that, I'll invite you

16   up to the sidebar and we can chat, but don't make speeches in

17   front of the jury, please.

18        In depositions, you-all are taught to say "Objection;

19   form" now, and that's fine.  Unfortunately here that's not

20   sufficient to tell me what the form objection is.  There are a

21   variety of different form objections, as you know.  So the

22   equal and opposite rule of what I just said is don't just say

23   "objection; form" because I won't know what you mean, and I'll

24   just reflexively overrule it out of doubt; doubt and

25   uncertainty.

1    Before we finish here today, let's talk about -- In fact,

2   let me just ask you now, how long do you think you need for

3   openings?

4        MR. PETRIE:  I have to pause for a minute and think,

5   Your Honor, given the order.  In a perfect world, I know I

6   realize I don't live in one, I would say 30 minutes.

7        THE COURT:  Okay.  How about the Receiver?

8        MR. SADLER:  Thirty minutes is fine.

9        THE COURT:  Okay.  I think that's fine.  I've got

10  criminal docket Monday morning, and I think we're at around

11  five sentencings right now.  I've asked for the jury to be

12  available by 10:00.  Realistically I'm probably not going to

13  get through five sentencings in an hour.  I would like to, and

14  I'll try to, but I'm probably not.  So if it's 10:30 when we

15  start picking a jury, then we'll probably get to seating the

16  panel and instructing them and sending them out to lunch and

17  then come back from lunch and do openings.  So if everything

18  goes fast, maybe we can do openings before lunch, but my best

19  guess would be probably we will send them to lunch and then

20  come back and do openings.

21    I typically in my preliminary instructions use the

22  national preliminary instructions, and where there's the part

23  about instructions on the law, I usually just skip over that

24  because my experience has been I'm not confident enough about

25  what I'm going to charge the jury to tell them any preliminary

1    instructions then about the law.

2        I think in this case you-all have seen my order on the

3    affirmative defense, so you probably understand what my

4    thinking is about that.  I would encourage you to -- I know

5    you are going to be otherwise busy over the weekend, but I

6    would encourage you to think about whether you can agree on

7    any preliminary instructions on the law as it applies to the

8    case and, if you can, I would be happy to give those.  If

9    you-all are not in agreement, I'll just skip over it and we'll

10   sort through it at the jury charge.  But it occurs to me that

11   you may be able at this point to agree on some instructions to

12   the jury preliminarily about what they'll be asked to

13   consider.

14       I'm not saying you have to agree on a final jury charge,

15   because we'll talk about that, obviously, later in the case,

16   but you may be able at this point to reach agreement and say

17   "The issues you're going to be asked to decide are."  So think

18   about that, and if you are able to reach agreement on it I

19   will be happy to consider your proposed agreed language.  And

20   I think if you do agree, I almost certainly will give that.

21   But I otherwise don't usually give them instructions about the

22   substantive law in the preliminary instructions.

23           MR. SADLER:  Your Honor, may I ask a question about

24   that issue?

25           THE COURT:  Yes.

1          MR. SADLER:  Both sides I think have filed proposed

2    preliminary instructions.  I think both sides would be have to

3    be adjusted in light of the ruling.  Would you like us also to

4    come up with an agreed set of Plaintiff contends X, Defendant

5    contends Y, just in very condensed form, or were you planning

6    independently to just tell the jury something about just the

7    very bare bones of what's being contended here?

8          THE COURT:  If you have language you agree on, I'm

9    happy to consider that.  Otherwise, what I give them is sort

10   of the 50,000 foot overview--they have money and you want it;

11   maybe a little more specific than that.

12         MR. SADLER:  We will visit with the other side on

13   both of these issues, just an agreed set of here's what the

14   parties are contending, and then if we can some encapsulation

15   of the law.

16      And then would you -- if we can get that done by the end

17   of the day tomorrow would you like it, or should we just bring

18   it on the Tuesday morning?

19         THE COURT:  The sooner the better.

20      Monday.  You are a week ahead.

21         MR. SADLER:  Yes, sir.

22         THE COURT:  I may have skipped something, but I

23   think that's most of the checklist.

24      Let me run through briefly your motions.

25         MR. SADLER:  Your Honor may not have seen it since

1    it was filed last night.  We did file a stipulation as to some

2    of the Receiver's motion in limine, but there are some open

3    items as well, but I don't know if Your Honor has seen it.

4              THE COURT:  Briefly.

5              MR. SADLER:  You've seen the stipulation to let you

6    know what has already been agreed to.

7              THE COURT:  Yes.  It would have been helpful if it

8    had been yesterday morning instead of the end of the day,

9    but --

10             MR. SADLER:  Understood, Your Honor.  We were

11   working on resolving exhibit objections and deposition

12   designations, and that consumed quite a bit of the day.

13             THE COURT:  These are in the order I looked at them,

14   which is not necessarily the order that they were filed.

15        The Magness parties' motion regarding insider status,

16   which is Document 126, appears to me at this point to be

17   agreed.  The issue comes up somewhat in the motion regarding

18   experts, and I'll talk about it more when I get to that one.

19        The Magness parties' motion regarding evidence acquired

20   after October 2008, Document 170, is denied.

21        The Magness parties' motion regarding Exhibit DX 35 is

22   denied.

23        And on all of these I'm -- I come from the state court

24   background, and a motion in limine there is not a pre-ruling

25   on admissibility or non-admissibility; it's simply a ruling

1    that you need to approach if it's granted.  Likewise here, by

2    denying it I'm not saying I think Exhibit 35 is admissible.

3    I'm just saying I just want to hear the testimony, the

4    predicate in support of it.

5        So keep your powder dry.  Reserve your arguments on that

6    until we get to the point where it's offered.

7        The Magness parties' motion regarding Stanford investors'

8    hardships, No. 184, is denied.

9        And I want to talk about that for just a moment.  I'm

10   denying it based on what my experience with the Receiver in

11   other cases has been.  I don't expect to hear anything from

12   the Receiver about widows and orphans and being thrown out on

13   the cold hard streets before Christmas Eve.  What I've heard

14   in the past is just generally the Receiver talking about his

15   role as marshalling assets and distributing them to investors.

16       So given that understanding, I'm going to deny the

17   motion, but I would certainly sustain objections to the poor

18   widow lady or things like that.  But I don't anticipate that's

19   going to be an issue.

20       And I think that's all of the limines for the Magness

21   parties.

22       Turning to the Receiver's motion, Item No. 1, which is

23   Receiver's fees and expenses, I'm going to grant with the

24   following exceptions.

25       I think it's perfectly fine to point out that the

1   Receiver's fees come out of the estate--that they're an

2   expense an overhead expense for the estate.  But in terms of

3   let's add up all the Receiver's bills, I don't want to hear

4   that.

5       And also I think it's fair game on the retained experts

6   to ask them what their fees have been.  So Ms. Van Tassel, for

7   example, I think it's fair game on cross to ask her how much

8   she's been paid by the Receiver estate.

9           MR. SADLER:  May I ask Your Honor one question about

10  that point?

11          THE COURT:  Yes.

12          MR. SADLER:  We certainly understand testimony about

13  how much Ms. Van Tassel's firm has been paid on this

14  litigation.  Obviously Ms. Van Tassel, through a number of

15  firms, has been involved going back to 2009, and we don't

16  think it would be germane to talk about how much the various

17  firms she's worked for in the past that weren't working on

18  this case have been paid.  So if it's limited--perhaps that

19  was Your Honor's intent--to what she's been paid to work on

20  the Magness litigation, then that would be our request.

21          THE COURT:  No.  I think the amount that she's been

22  paid by the Receivership in the course of her work for the

23  Receivership is fair game in terms of potential bias.

24          MR. SADLER:  Including the amounts paid to firms

25  she's no longer working for.

21

1          THE COURT:  Correct.

2          MR. SADLER:  I just wanted to be clear about that.

3          THE COURT:  Sure.

4      Item No. 2, which generally is about other lawsuits or

5  claims that the Receiver has or has not paid, I'm going to

6  grant.

7      But I want to be a little more clear.  The Magness

8  parties say they want to be able to use statements by the

9  Receiver in other cases for impeachment or cross or as

10  admissions, and I think that's probably generally okay--"Isn't

11  it true that in this case the Receiver took the position that

12  blank?"  However they want to do it.  So in granting Item

13  No. 2, I'm not precluding the use of specific admissions or

14  statements, but I don't want to retry other lawsuits in this

15  case and I don't want to go into the details of other cases,

16  except as may be necessary to give context to the admissions.

17      Item No. 3 about TUFTA is unfair I believe is agreed at

18  this point.

19      No. 4 about discovery disputes, I'll grant.  And if you

20  think that somehow becomes relevant, approach and explain to

21  me why, but I need for you to approach before we get into

22  discovery disputes in front of the jury.

23      No. 5 is granted.

24      No. 6 I believe is agreed.

25      No. 7 and 8 I believe are agreed.

1        No. 9 about mediation is granted.

2        No. 10 about the deposition errata is denied.

3        And I'm happy for each side to say, "In the actual

4    deposition this is what he said, but then after the fact he

5    corrected it to say this," and the jury can make whatever they

6    want to out of that, but I'm not going to exclude the errata.

7    But I'm happy for the Receiver to identify it as a change made

8    after the fact.

9        MR. SADLER:  Your Honor, may I address that?

10   Because there's an agreement I think between the parties now

11   that we have your ruling.

12       Given that you are going to allow that, the process we

13   would propose, but it requires Your Honor's

14   involvement--that's why I'm addressing the Court--is that we

15   would play the video of both of the parts submitted by both

16   sides, and at the end of the video we would ask the Court to

17   give a little -- a two-sentence instruction to the jury to

18   advise them about what's about to happen, and then the what's

19   about to happen would be counsel for the Defendant would take

20   the errata sheet and identify by question and line what the

21   question was, what the former answer was, the change, and the

22   reason for the change.  But we think it appropriate for the

23   Court, rather than counsel, to say something to the jury about

24   what's about to happen, since it will be different from any

25   other deposition they will hear.

```
 1                  THE COURT:  That's fine.

 2                  MR. SADLER:  We will submit that instruction to Your

 3      Honor.

 4                  THE COURT:  Okay.

 5          No. 11 regarding the Jason Green depo is denied.

 6          No. 12 regarding reasonably equivalent value is granted.

 7          And I believe that's all the limines.

 8          The Magness parties' request for judicial notice, I will

 9      take judicial notice of the regulation, but I'm otherwise

10      going to deny that motion.

11          Now, next on my pile is the Magness parties' motions

12      regarding Ms. Van Tassel and Mr. Post.

13          And I think I need to get back to the insider issue.

14          I would like for the Receiver's experts to avoid the word

15      insider.  It just raises some issues I don't think we need to

16      get into, and I don't believe it's necessary.  I don't have

17      any problem with the experts saying, "In our opinion the

18      Magness parties had preferential access to information," or

19      something along those lines, but I don't want to hear them say

20      they were insiders, because it's a term of art and it just

21      raises some complexities I don't think we need to get into.

22          I understand the Receiver is not pursuing the argument

23      that the Magness parties avoided market losses that they would

24      have incurred and that that was a form of benefit to them, and

25      I think that's good.  I don't want to hear they obtained an
```

1    unjust enrichment by avoiding the declining S&P 500 during the

2    pertinent time frame.

3        I'm not precluding and I'm happy for you to put on

4    evidence that the Stanford CDs were offering returns in excess

5    of the market.  I understand that argument and I'm fine with

6    that.  But to say that these parties individually benefited by

7    being in the Stanford CDs instead of the market as a whole I

8    don't think you can do.

9        But the motion regarding Ms. Van Tassel is otherwise

10   denied.

11       With regard to Mr. Post, I don't know if the Receiver

12   intends to do this, but one of the issues raised in there was

13   Mr. Post testifying as to what I guess the Magness parties

14   knew, and I don't believe that that's a proper subject of

15   expert testimony.  I'm happy for him to say, "Based on this, I

16   believe they should have known or would have known," or

17   however you want to say it, but I don't think he's in a

18   position to say, "Based on what I reviewed they knew."  So I

19   don't know that that's a big distinction, but I think it is a

20   distinction.

21           MR. SADLER:  Your Honor, may I ask a question about

22   that briefly?

23           THE COURT:  Yes.

24           MR. SADLER:  And I understand Your Honor's ruling to

25   be the experts can certainly testify this information was

1    presented to the Magness Defendants, this information was made

2    available to them, and the jury can draw the conclusion

3    whether the Magness people read it and knew it, but I

4    understand Your Honor's ruling to allow that kind of

5    testimony.

6              THE COURT:  Yes.  And one step beyond that, "Based

7    on this I believe they should have known."

8              MR. SADLER:  Understood.

9              THE COURT:  What I don't want is the clairvoyant

10   witness saying, "From this I can tell what was in their

11   heads."

12             MR. SADLER:  Understood.

13             THE COURT:  And the motion as to Mr. Post is

14   otherwise denied.

15       This brings us to a variety of objections regarding

16   deposition testimony.  And here's what I would like for

17   you-all to do, and that is give me a copy of the depositions

18   for which there are objections.  Where there are objections,

19   put one of those little sticky things that sticks out so that

20   I can look at the outside --

21             MR. SADLER:  Your Honor, we did prepare something,

22   and if it meets -- The format, if you just want to take a

23   quick look and be sure the format is what you want.

24             MR. DAY:  What we're handing up are a couple of

25   depositions that should come up earlier in the case, but with

1   the reordering that may be different, but Sutton volumes one

2   and two and Tonya Dokken.

3           THE COURT:  Yeah.  This is fine, except what I would

4   like you to do is a little sticky where there's an objection

5   so that I don't have to flip through every page to see if

6   there's an objection; I can just turn to each page with the

7   sticky.  And there may be so many of them that I'm essentially

8   turning every page anyway.

9           MR. DAY:  We've eliminated the pages where there are

10  no objections, but we will put flags on it.

11          THE COURT:  Okay.  That would be helpful.

12      Are you-all familiar with what he just gave me?

13          MR. PETRIE:  Yes, Your Honor.  We met yesterday and

14  what we did was -- what was tendered is just the pertinent

15  blocks of testimony where there are objections that we

16  otherwise couldn't resolve among ourselves, and so that was

17  the pared-down presentation the parties prepared.

18          THE COURT:  Okay.  Good.  Then I will skip over

19  that.  If you can let me know probably first thing Monday

20  which order I need to go through those on, that will help me

21  prioritize, and I'll get those back to you as quickly as I

22  can.

23          MR. PETRIE:  When we went -- Excuse me, Your Honor.

24  When we went through the exercise yesterday, we were looking

25  at the order of the presentations as being different.  But

 1    nonetheless, Ms. Dokken's testimony, that the parties have

 2    distilled down to 11 unresolved objections, will come up

 3    fairly early in the reordered presentation, and we could leave

 4    that with you today if that's at all helpful.

 5              THE COURT:  Sure.

 6              MR. PETRIE:  Okay.  Thank you.

 7              THE COURT:  Yep.  That would be fine.

 8         Okay.  I'm done.

 9         Other things on the Magness side that we need to talk

10    about?

11              MR. PETRIE:  None.  Thank you, Your Honor.

12              THE COURT:  From the Receiver?

13              MR. SADLER:  Do we still get to sit here, Your

14    Honor?

15              THE COURT:  No.  Sorry.  But look, you get the extra

16    side table.

17         Anything else?

18              MR. SADLER:  No, Your Honor.  That's all from us.

19              THE COURT:  All right.  I didn't ask for you-all to

20    confirm my initial comment that I assume it's not settling.

21    Do you make that assumption as well?

22              MR. PETRIE:  We do, Your Honor.

23              MR. SADLER:  That's correct.

24              THE COURT:  Okay.  All right.  Good.  Then we know

25    what we'll be doing Monday.

1        Then have a very pleasant weekend, and we'll see you

2   Monday as close to 10:00 as I can make it.

3                        (End of hearing.)

1            I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts           01/06/2017

10     _____DATE_____

          SHAWN McROBERTS, RMR, CRR

11     FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX B

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3   RALPH S. JANVEY, IN HIS       (  CAUSE NO. 3:15-CV-401-N
     CAPACITY AS COURT-APPOINTED   )
 4   RECEIVER FOR THE STANFORD     (
     INTERNATIONAL BANK, LTD.,     )
 5   et al.,                       (
              Plaintiff,           )
 6                                 (
     vs.                           )
 7                                 (
     GMAG LLC, MAGNESS SECURITIES  )
 8   LLC, GARY D. MAGNESS, and     (
     MANGO FIVE FAMILY, INC., IN   )
 9   ITS CAPACITY AS TRUSTEE FOR   (
     THE GARY D. MAGNESS IRREVOCABLE)  DALLAS, TEXAS
10   TRUST,                        (  JANUARY 9, 2017
              Defendants.          (  11:30 A.M.
11   _____

12

13                            VOLUME 1

14

15   _____

16                      TRIAL ON THE MERITS

17            BEFORE THE HONORABLE DAVID C. GODBEY
                  UNITED STATES DISTRICT JUDGE
18                          and a jury
     _____

19

20

21

22              SHAWN M. McROBERTS, RMR, CRR
                1100 COMMERCE STREET, RM. 1654
23                 DALLAS, TEXAS  75242
                     (214) 753-2349
24

25
```

```
 1                    A P P E A R A N C E S

 2
        FOR THE PLAINTIFFS:   BAKER BOTTS, LLP
 3                            98 SAN JACINTO BOULEVARD
                              SUITE 1500
 4                            AUSTIN, TEXAS  78701-4039
                              (512) 322-2678
 5                            BY:  MR. KEVIN SADLER
                                   MR. SCOTT POWERS
 6                                 MR. BRENDAN DAY
                                   MS. ASHLEY CARR
 7
        FOR THE DEFENDANTS:   BALLARD SPAHR, LLP
 8                            1225 SEVENTEENTH STREET
                              SUITE 2300
 9                            DENVER, COLORADO 80202-5596
                              (303) 292-2400
10                            BY:  MR. ANDREW PETRIE
                                   MS. RACHEL MENTZ
11
                              DYKEMA COX SMITH
12                            1201 ELM STREET, SUITE 3300
                              DALLAS, TEXAS  75270
13                            (214) 698-7800
                              BY:  MR. DAVID BRYANT
14
        OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
15                            1100 COMMERCE STREET, RM. 1654
                              DALLAS, TEXAS  75242
16                            (214) 753-2349

17

18

19

20

21

22

23

24

25
```

# <u>INDEX</u>

**EXAMINATION**

**Witness Name**                                                              **Page**

GARY MAGNESS
   Direct By MR. PETRIE ........................................... 121

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

 1   Separate and apart from whatever the evidence might be, you

 2   are already favoring one side over the other?

 3           THE PANEL MEMBER:  Correct.

 4           THE COURT:  Okay.  That's all we needed to hear.

 5   Thank you, ma'am.

 6           THE PANEL MEMBER:  Thank you, sir.

 7       (Panel Member ▆▆▆▆ left the courtroom.)

 8       (Panel Member ▆▆▆▆ entered the courtroom.)

 9           THE COURT:  Come on down just right in front,

10   please, ma'am.  Just right here so we can talk without having

11   to yell at each other.  How are you doing today?

12           THE PANEL MEMBER:  I am wonderful.  Thank you.

13           THE COURT:  Good.  We appreciate your service.  At

14   the end I asked sort of a catch-all question, and according to

15   my notes, you were one of the folks who raised a hand on that.

16   Tell me what was on your mind about that.

17           THE PANEL MEMBER:  Well, I don't know if I missed

18   your question about investments.  You know, it don't have the

19   same definition as to what's going on here, but I was an

20   employee of ▆▆▆▆ and I invested big time into that.  And

21   when it bottomed, started bottoming out, well, what happened

22   was the higher people in the position knew when to get out and

23   what happened with the people in the lower entity, they didn't

24   have that option.  They blacked us out, so we couldn't get our

25   benefits as they did, the higher group, you know.

```
 1        So it was -- I said we invested, but we could not get out

 2   at substantial amounts what we had, which was totally

 3   devastating to a whole lot of people.  And just to say, you

 4   know, I don't know if you asked that question about

 5   investments or, you know, and I didn't get it or whatever.

 6   But I know it's not the same definition as to what's going on

 7   here.

 8             THE COURT:  But it certainly has some similarities,

 9   and I appreciate you bringing that to our attention.

10        Given that circumstance, do you feel like you can still

11   be fair to the parties involved here, or do you think that

12   circumstance would affect your ability to be fair?

13             THE PANEL MEMBER:  To be totally honest with you,

14   I'll say it had a big impact on me, so I don't know if I could

15   totally be honest, because I don't know what would be

16   mentioned, you know, what would be said to relate to, you

17   know, what I saw in the past.  So I think that it would have

18   some bearings on it, a lot of bearings on it really.

19             THE COURT:  Okay.  I appreciate your bringing that

20   to our attention.  I think that's all we needed to hear about

21   from you.  Thank you for mentioning that.

22             MR. SADLER:  Thank you, ma'am.

23        (Panel Member ████████ left the courtroom.)

24        (Panel Member ████████entered the courtroom.)

25             THE COURT:  Come on up, please, sir.
```

```
 1    you-all disagree and want to make a pitch to the contrary, I
 2    am happy to listen to you, but that was my perception of them.
 3            MR. SADLER:  From the Receiver, Your Honor, we agree
 4    with Your Honor on Juror No. 5 and Juror No. 7 and Juror No.
 5    11.
 6        With regard to ███████████ Your Honor, I would say two
 7    things.  I would -- I took note of her comment that she didn't
 8    know whether her experience would match what she would hear
 9    from the evidence or would be totally different, and I didn't
10    hear her disqualify herself, as I understand it.  I did hear
11    her say that that experience would have an impact.  What I
12    didn't hear her say is that she would be unable to follow the
13    Court's instructions that you would give to follow the
14    evidence and follow you and set that aside.  That's
15    instructions, of course, you give to the jury before they
16    begin hearing the case.
17        I think that, plus I do have a concern from the
18    standpoint that within -- certainly within striking distance,
19    she's the only African-American juror that we have that I
20    didn't hear the case made to dismiss her for cause, Your
21    Honor, and so we would not agree to dismiss her for cause.
22            THE COURT:  Okay.  Respectfully, I'm going to
23    overrule that.  I think given her personal financial loss and
24    the factual similarities, it is very understandable why she
25    responded the way she did, and I believe she was -- she said
```

```
 1    it would affect her, and I think that's enough.

 2              MR. SADLER:  Understood.

 3              THE COURT:  So the objection is noted and overruled.

 4              MR. PETRIE:  None.  Thank you, Your Honor.

 5              THE COURT:  Okay.  Let's just check our arithmetic

 6    here quickly.  I am going to seat seven.  You get three

 7    strikes each.  So seven plus six is 13, and I've excused four.

 8    So I believe that takes us up through Juror No. 17 at risk.  I

 9    say at risk.  In play maybe is a better way to say that.

10        Does that match you-all's arithmetic?

11              MR. SADLER:  It does.

12              THE COURT:  How long do you need for strikes?

13              MR. SADLER:  If we can have 15 minutes, Your Honor.

14              THE COURT:  Okay.  And I would suggest that one side

15    adjourn to the jury room, which I believe is through there

16    (indicating).  Right there, through there.

17              MR. SADLER:  They are closer, I suggest.

18              THE COURT:  Yes.  You guys, why don't you borrow the

19    jury room so you can have some privacy, and Carla will hunt

20    you down mercilessly in 15 minutes.

21                        (Brief recess.)

22              THE COURT:  I'm going to seat the panel, swear them

23    in, tell them to not talk about the case, and send them to

24    lunch, and we'll give them the long version later.

25              MR. SADLER:  Before we break for lunch, a couple of
```

# APPENDIX C

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION

3   RALPH S. JANVEY, IN HIS      (  CAUSE NO. 3:15-CV-401-N
    CAPACITY AS COURT-APPOINTED  )
4   RECEIVER FOR THE STANFORD    (
    INTERNATIONAL BANK, LTD.,    )
5   et al.,                      (
              Plaintiff,         )
6                                (
    vs.                          )
7                                (
    GMAG LLC, MAGNESS SECURITIES )
8   LLC, GARY D. MAGNESS, and    (
    MANGO FIVE FAMILY, INC., IN  )
9   ITS CAPACITY AS TRUSTEE FOR  (
    THE GARY D. MAGNESS IRREVOCABLE)  DALLAS, TEXAS
10  TRUST,                       (  JANUARY 10, 2017
              Defendants.        (  9:00 A.M.
11  _____

12

13                         VOLUME 2

14

15  _____

                       TRIAL ON THE MERITS
16

              BEFORE THE HONORABLE DAVID C. GODBEY
17                 UNITED STATES DISTRICT JUDGE
                          and a jury
18  _____

19

20

21

22            SHAWN M. McROBERTS, RMR, CRR
             1100 COMMERCE STREET, RM. 1654
23              DALLAS, TEXAS  75242
                  (214) 753-2349
24

25

2

1

$$\underline{A\ P\ P\ E\ A\ R\ A\ N\ C\ E\ S}$$

2

FOR THE PLAINTIFFS:   BAKER BOTTS, LLP
3                                              98 SAN JACINTO BOULEVARD
                                               SUITE 1500
4                                              AUSTIN, TEXAS  78701-4039
                                               (512) 322-2678
5                                              BY:  MR. KEVIN SADLER
                                                    MR. SCOTT POWERS
6                                                    MR. BRENDAN DAY
                                                    MS. ASHLEY CARR
7

FOR THE DEFENDANTS:   BALLARD SPAHR, LLP
8                                              1225 SEVENTEENTH STREET
                                               SUITE 2300
9                                              DENVER, COLORADO 80202-5596
                                               (303) 292-2400
10                                             BY:  MR. ANDREW PETRIE
                                                    MS. RACHEL MENTZ
11

                                               DYKEMA COX SMITH
12                                             1201 ELM STREET, SUITE 3300
                                               DALLAS, TEXAS  75270
13                                             (214) 698-7800
                                               BY:  MR. DAVID BRYANT
14

OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
15                                             1100 COMMERCE STREET, RM. 1654
                                               DALLAS, TEXAS  75242
16                                             (214) 753-2349

17

18

19

20

21

22

23

24

25

## <u>INDEX</u>

**EXAMINATION**

| Witness Name | Page |
|---|---|
| GARY MAGNESS, CONTINUED | |
| Direct By MR. PETRIE ........................................... 6 | |
| Cross By MR. MAGNESS ........................................... 64 | |

**EXHIBITS**

| Exhibit | Page |
|---|---|
| No. 55 Entered into Evidence | 23 |
| No. 384 Entered into Evidence | 173 |
| No. 100 Entered into Evidence | 208 |

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Are we ready?

 3              MR. PETRIE:  Yes, Your Honor.  I did want to hand

 4    up, if it's okay with you.  We have the agreed excerpts on

 5    Wilk that had some objections.  We are not going to need them

 6    today, but obviously the sooner we can get them to you the

 7    sooner we can undertake the deposition.

 8          May I approach?

 9              THE COURT:  Please.

10              MR. PETRIE:  Excuse me, Your Honor.  There's also --

11    the parties have filed their respective proposed instructions

12    regarding Mr. Sutton's testimony and the corrections.  I

13    thought I'd hand those up so you have them and don't need to

14    pull them electronically.

15              THE COURT:  Okay.  Sure.

16              MR. POWERS:  Your Honor, we filed one just a few

17    minutes ago.  We are bringing up a copy for Your Honor.

18              THE COURT:  Okay.

19              MR. PETRIE:  I apologize, Your Honor.  Two pieces of

20    paper.  I thought they were different pieces.

21              THE COURT:  Not a problem.

22          Anything else?

23              MR. PETRIE:  No.  Thank you.

24              MR. SADLER:  No, Your Honor.

25              THE COURT:  All right.  Let's bring them in.
```

1          (Whereupon, the jury entered the courtroom.)

2          THE COURT:  Be seated.

3       Good morning.  It's sort of nostalgic for me.  This was

4    my old courtroom for seven, eight years.  So I remember the

5    awful sight lines.  I remember the cramped space in the well.

6    It's just -- I repressed those memories until I got back here.

7          If you-all have any trouble seeing or hearing or anything

8    like that, please let us know and we will try to make

9    adjustment to fix that.  There's a built-in screen on the wall

10   there, and it's got lights in front of it.  If you are having

11   trouble seeing what's on the screen, again please let us know

12   and we can dim those lights to make it a little better.  I

13   just didn't want our witness to be sitting in the dark.  I

14   wanted you to be able to see him, so we have those turned on

15   now.  But as I say, if that becomes a problem for you, please

16   let us know and we will try to fix it.

17         I hate to say this, but I don't anticipate anything

18   peculiar today.  You never know.  But I think we're just going

19   to spend a good solid day here covering lots of testimony.

20      We'll go until about 10:30-ish and take our morning

21   break, and then lunch at 12:30.

22      Are the Magness parties ready to proceed?

23         MR. PETRIE:  Yes, sir.

24         THE COURT:  All right.  You may proceed.

25

6

```
 1                  GARY MAGNESS, CONTINUED

 2                   DIRECT EXAMINATION

 3   By Mr. Petrie:

 4   Q.   Mr. Magness, when we left off yesterday evening we were

 5   starting to talk about Mango Five and some of its business,

 6   and I wanted to pick up a little bit before we left off on

 7   some items that I thought we should go over for background.

 8        So can I ask you to look again, please, at Exhibit No. 41

 9   in your binder?  And it's also -- if it's easier for you, it's

10   on the screen behind you.  But, of course, the difficulty of

11   that is the jury is looking at the back of your head.

12        And if you will just let me know when you find 41.

13   A.   This is a different book than yesterday.

14            MR. PETRIE:  Okay.  May I approach, Your Honor?

15            THE COURT:  Yes.

16            MR. PETRIE:  I forgot, Your Honor, yesterday I

17   agreed I would identify these by PX or DX.  This is PX 41.

18   Q.   (BY MR. PETRIE)  Mr. Magness, if it's easier, too,

19   there's a small monitor in front of you.  You can see it

20   electronically if the notebook is too cumbersome.  And I

21   apologize for that confusion.

22        But looking at the first page of PX 41, there is a

23   reference there to Liberty Media and affiliates.  And in a

24   very general way, could you explain to the jury what Liberty

25   Media and affiliates is.
```

1   A.   It's the group of stocks that my parents put -- created,

2   founders of.  It's cable TV mainly.

3   Q.   And in this context talking about it as trust assets,

4   were these stocks in which GMIT, the Gary Magness Irrevocable

5   Trust, had an ownership interest?

6   A.   Yes.

7   Q.   Were these something that you generally discussed at each

8   of the meetings of the Mango Five board?

9   A.   Yes, it is.

10  Q.   There is then -- and it carries over -- it starts at the

11  bottom of this page, and item 2(b) talks about a report on

12  diversification plans.  Do you see that?

13  A.   Yes.

14  Q.   And can you tell the jury what was going on in February

15  of 2007, just a couple of months after the formation of Mango

16  Five, what was going on in terms of diversification plans?

17  A.   Diversification plans would have been, you know, trying

18  to get your stocks less piled into just certain things.  Like

19  cable TV is all related to cable TV.  You need to kind of be

20  spread out across the market.  And that's the thinking of, you

21  know, good finance.

22      But we had put money in different funds, and we bought

23  these CDs, we did real estate, we built into a company that's

24  Space Power Access.  It's a computer farm, if you will.  And

25  just trying to diversify a little bit.

1    Q.    And when you say that you need to diversify, what do you

2    mean by that?

3    A.    Well, we were -- probably 99 percent of the assets were

4    cable-related.

5    Q.    Okay.  And when you talk about space and power farm, what

6    is that?

7    A.    That's a data center, I guess another way to say it.

8    Q.    Is that the same thing we talked about as being Fortrust?

9    A.    Foretrust, yes.

10   Q.    If you could then look at the second page of the same

11   exhibit, and I'm still -- now I'm going to the top of the next

12   page and looking still at paragraph 2 of these minutes.

13   There's a lengthy discussion here, still under this heading of

14   diversification, but there's a discussion there about a

15   liability to HSBC of approximately $214 million.  Do you see

16   that?

17   A.    Yes.

18   Q.    And what is the source of ending up owing HSBC bank

19   $214 million as of February of 2007, or the trust owing that

20   money to HSBC?

21   A.    Well, lots of different loans associated with paying my

22   father's inheritance tax, a divorce of mine, building the

23   trust, taking control of my family ranches from both sides

24   of -- my brother's side and my side I finally bought all of

25   it.  So there was quite a bit of money.

1    Q.   And if we continue to look down that same page, page 2,

2    there's also a discussion about trying to reduce the amount of

3    the debt.  And if you look a little bit further down the page,

4    you'll see that there is a discussion here where someone makes

5    a motion to use $100 million of Liberty stock proceeds,

6    proceeds from sale to pay down an outstanding indebtedness.

7    Do you see that?

8    A.   Yes.

9    Q.   And was that something that you were agreeable to in

10   February of 2007?

11   A.   Yes.

12   Q.   Okay.  And if you would look again, continuing down that

13   same paragraph, there is a mention of SIB certificates of

14   deposit there.  It is in the paragraph that begins "Ray

15   indicated."  Do you see that?

16   A.   Yes.

17   Q.   Can you tell the jury, please, what was going on in

18   February of 2007 with respect to this discussion of the

19   Stanford International Bank certificates of deposit?

20   A.   Yes.  I believe what was surrounding this was the need

21   for an insurance to be paid for the people involved so that

22   they -- if they weren't prudent, that they couldn't be sued.

23   And I said, why don't we just change it so I'm the only one on

24   the investment committee.

25   Q.   Okay.  And --

10

1   A.   And they become consultants.

2   Q.   Consultants to you?

3   A.   Yes.

4   Q.   Okay.  There is, then --

5        MR. PETRIE:  and I misspoke earlier.  Let's go to

6   the next page, please, Austin.

7   Q.   (BY MR. PETRIE)  And if you could look at paragraph 3,

8   there is a discussion that begins -- there's two paragraphs at

9   the bottom of 3, both of which begin with the word "Gary."

10  Could you tell -- And there's a reference in there to the

11  Stanford international CDs.  Could you tell the jury what was

12  going on with this piece of the meeting?

13  A.   We suggested lending Steve and his wife 11 and a half

14  million dollars so they could purchase CDs from Stanford so

15  that that could, you know, at least give them some income

16  while we did our typical businesses.

17  Q.   And at this point in time, had your -- the belief you

18  told us about yesterday about the risk involved with the

19  Stanford certificates of deposit changed in any way, either up

20  or down?

21  A.   No.

22  Q.   At this point in time you're talking about a proposed

23  transaction.  Did this happen at some later date?

24  A.   Yes, it did.

25  Q.   And where this set of minutes goes through and talks

1    about the various assets of the trust, was that something that

2    happened at more than one meeting of Mango Five and its board?

3    A.    At every meeting.

4    Q.    And why did you do that at every meeting?

5    A.    We always assessed our position in the market and with

6    regards to risk and what we perceived as to go forward

7    investing in.

8    Q.    Okay.  And if you could look at the very last page of the

9    exhibit where there's a signature and a date on the document.

10   Just let me know when you have that.

11   A.    Yes.

12   Q.    And can you tell the jury, please, why on the minutes for

13   a February '07 meeting they're not dated until June of that

14   same year, so roughly a little less than four months later?

15   A.    Well, typically the minutes for the meeting are taken

16   down in notes and then rewritten before the next meeting and

17   put into paper so they can be approved.  A lot of times we

18   throw -- history that happened between those two meetings

19   sometimes gets plugged into these minutes.

20   Q.    Looking at that, then, does this tell us -- give us an

21   idea of possibly when the next meeting of the board was?

22   A.    June 21st.

23   Q.    Could you look, then, at Exhibit No. 132, please?  And

24   I'll ask you when you find that to look at the first paragraph

25   of 132.  And it will be on the -- No. 132 is actually an

12

1  agenda followed by minutes.  Let's go right to the minutes on

2  page 2.

3  A.   Okay.  I have it.

4  Q.   And do you see the date on that?  And then it talks about

5  approving meeting minutes from a previous meeting.  Do you see

6  that?

7  A.   Yes.

8  Q.   And that ties into the dating convention that you just

9  discussed.  Right?

10 A.   Yes.

11 Q.   Now, in this particular set of minutes, after the

12 approval in paragraph 2 you now have another discussion about

13 diversification of Liberty Media and affiliates stock.  Do you

14 see that?

15 A.   Yes.

16 Q.   And this report talks about roughly $150 million of stock

17 being liquidated and used to reduce that debt to HSBC.  Do you

18 see that?

19 A.   Yes.

20 Q.   And was that liquidation something that you were involved

21 in?  In other words, making the actual decisions as to when to

22 liquidate the stock and how much to liquidate and those types

23 of things?

24 A.   I would be -- you know, the buck would stop with me on

25 whether or not it was liquidated or not.  I believe in this

13

```
 1   particular time frame the stocks were devaluated by at least
 2   25 if not 35 percent.
 3   Q.   I'm sorry.  You said evaluated?
 4   A.   Devaluated.
 5   Q.   And why, if they were devaluated by 25 or 30 percent --
 6   or let me back up.  Did you agree in the time we're looking at
 7   in 2007, between February and June, to the liquidation of
 8   roughly $150 million of that stock?
 9   A.   Well, okay.  I was off a year on my thought process.  So
10   going back to '07, I would have been saying the stock was high
11   at that point.
12   Q.   Okay.  So did you agree with the --
13   A.   Yes, I did agree.
14   Q.   Okay.  I'm going to ask you to wait for me.  Sometimes
15   it's obvious where my question is going, but that way we don't
16   talk at the same time and don't drive the court reporter
17   crazy.
18   A.   Sorry.
19   Q.   This references now the outstanding debt to Hong Kong and
20   Shanghai Bank -- excuse me, HSBC being now at about $102
21   million.  Do you see that reference?
22   A.   Yes.
23   Q.   Was there any further discussion about continuing to try
24   and reduce that debt in the June of 2007 time frame?
25   A.   Yes.
```

14

1    Q.   And what was the discussion about continuing to try to

2    reduce that debt?

3    A.   We needed to sell stock.

4    Q.   Were you agreeable to doing that at that point in time?

5    A.   Yes.

6    Q.   Now, you mentioned earlier that your -- that the stock

7    was at least some earlier point in time roughly 99 percent of

8    the assets?

9    A.   Yes.

10   Q.   When you go through these sales, does that change?

11   A.   Not really.  The stocks change -- it changes just about

12   the same, I think.

13   Q.   And how if you are selling such a large dollar value of

14   stock, does it stay about the same?

15   A.   It's related to the stocks in general going up most of

16   the time and down some of the time.  So it varies.

17   Q.   But how does the variance in the stock price when you're

18   selling a large dollar volume of them leave you with roughly

19   the same percentage of your assets invested in that stock?

20   A.   It just sometimes does that.

21   Q.   Let's go look at the minutes for the next meeting, which

22   is in October of 2007, and look at Exhibit No. 133, please.

23   If you will let me know when you found that?

24   A.   I have that.

25   Q.   Okay.  And if you could skip over the agenda, which is

15

1    the first page, and look at the second page.  Let's just -- to

2    see if the system is the same, if you'd look at the first

3    paragraph, do you see that we have -- we start out with an

4    approval of the previous meeting minutes, the ones we just

5    looked at?

6    A.    Yes.

7    Q.    Okay.  And then let's go to the meat, so to speak, of the

8    minutes, and in particular if you could start with paragraph

9    2, which is again a continuing report on the diversification.

10        And here you reference both a report that you provided

11   and then something about the price of LINTA.  Do you see that?

12   A.    Yes.

13   Q.    And what is LINTA?

14   A.    It's one of the -- one the stocks in the company.

15   Q.    And when you make this report here that the price had

16   declined and you were waiting for the stock to recover, why

17   were you waiting?

18   A.    Usually a lucrative plan to wait.  If the stock goes

19   down, it always has come back up.

20   Q.    Did you have any assurance that it was going to come back

21   up at this point in time?

22   A.    No, I did not; just the history.

23   Q.    Let's turn, if we can, to the second page of the minutes,

24   which is the third page of your document.  And I'd like to

25   talk to you about the discussion here of the report on No. 7,

1    which is miscellaneous items.

2        And let's start with the very first sentence where

3    you -- it reports that you asked Ms. Dokken in turn to ask Mr.

4    Espy to prepare a report on the status of the certificates of

5    deposit.  Do you see that reference?

6    A.   Yes.

7    Q.   Why did you ask Ms. Dokken to ask Mr. Espy to prepare

8    that report?

9    A.   Well, the CDs in Antigua were basically not as easy to

10   follow as the stocks and the rest of the portfolio which you

11   could look on Bloomberg report and find out what the price of

12   the stock is.  You had to actually get somebody to prepare a

13   paperwork on what's going down in Antigua.

14   Q.   And why did you ask to have that information provided by

15   Mr. Espy?

16   A.   Because he was our -- our agent.

17   Q.   And when you say he was your agent, was he working for

18   you at Stanford Financial Group?

19   A.   Yes.

20   Q.   Or Stanford Group Company?

21   A.   Yes.

22   Q.   And when you say -- when you ask here for a full report,

23   did you give any specifics about what that would be, what a

24   full report would be?

25   A.   Well, from looking at this, I did not ask anything

1   particular about that.

2   Q.   Do you remember whether -- I understand that it's not

3   listed here.  Setting aside what is written down, do you

4   remember whether you give any specific requests for the type

5   of information?

6   A.   We had been following the news on, you know, the stocks,

7   the CDs, and so forth that were put together, certificates of

8   deposit and so forth, related to real estate mortgage-related

9   backed packages that were -- that were under pressure, and we

10  wanted to know if that affected their portfolio.

11  Q.   You then -- I'm sorry, not you, but the minutes then go

12  on to talk about an additional request that you made of Ms.

13  Dokken to ask Mr. Chuck Wilk as to how the certificate of

14  deposit program could be further investigated.  Do you see

15  that?

16  A.   Yes.

17  Q.   Had there already been some investigation by Mr. Wilk at

18  point in time into the certificate of deposit program?

19  A.   Yes, I do believe so.

20  Q.   And what do you believe was the investigation that he had

21  previously conducted?

22  A.   Well, he -- Chuck Wilk had other CDs that he could have

23  sold us that were in a program that they called Stay Rich,

24  which gave eight percent, and he looked -- he checked the

25  Stanford CDs and decided he could not compete with what was

1   going on in the Stanford CDs.  And he did not suggest we sell

2   those and buy his.

3   Q.   And by the time we get to this meeting in October -- of

4   the investment committee in October of 2007, why were you

5   asking to have Mr. Wilk investigate or further investigate the

6   Stanford CDs?

7   A.   Well, at this point we knew that he had done it before in

8   the past and would know how to look into it again.  And he was

9   paid by us, whereas Mr. Espy was paid by Stanford, so we

10  wanted our side looking at it also.

11  Q.   And did you give any specifics to Ms. Dokken to relay

12  through to Mr. Wilk about what you wanted him to look at?

13  A.   For the same things--you know, possible risk to certain

14  investments that we heard on the news.

15  Q.   Okay.  At this point in time had your belief as to the

16  risk of the Stanford International Bank CDs changed in some

17  way, either up or down?

18  A.   No, they had not.

19  Q.   There was also on October 1st a meeting of the board of

20  directors of Mango Five, and I'd like to look at those minutes

21  if you wouldn't mind finding exhibit PX 134, please.

22  Hopefully, it's the next one in order.

23  A.   I have it.

24  Q.   Okay.  And do you see, sir, that that's -- it's

25  got -- it's minutes of the meeting on the same day but of a

1    little different constituency, that it's the full board of

2    directors of the company.  Do you see that, sir?

3    A.    Yes, I do.

4    Q.    And then there's a notation there to having present by

5    invitation Ms. Dokken, the CFO of Magness Investments.  Do you

6    see that?

7    A.    Yes.

8    Q.    Why was she invited to participate in the board of

9    directors' meeting of Mango Five on October 1 of 2007?

10   A.    She was our financial officer and did all the books for

11   Magness investment group, and all the paperwork goes through

12   her office.

13   Q.    I'd like you to look at the second page of these minutes,

14   please, where there's a brief reference to Stanford.  It's

15   roughly about the top third of the page, third of the way down

16   the page.  Do you see that reference, sir?

17   A.    Yes.

18   Q.    And it begins by talking about negotiations with three

19   banks, HSBC, U.S. Trust, and Stanford -- excuse me, Sanford

20   for a new loan facility.  Do you see that, sir?

21   A.    Yes.

22   Q.    And were you aware at the time that those negotiations

23   were going on?

24   A.    Yes.

25   Q.    Were they taking place at your direction?

1    A.    Yes.

2    Q.    Now, why were you talking or negotiating with three

3    financial institutions in October of 2007?

4    A.    Well, I believe we no longer had Bankers Trust as a bank,

5    and we generally kept three to four different sources of

6    money.

7    Q.    And why did you generally keep three or four different

8    sources of money?

9    A.    So that we would negotiate the lowest interest rate which

10   was acceptable to ourselves, and we did not want a bank to

11   just keep ratcheting up.  So we'd have four -- four banks with

12   exactly the same paperwork.  If one tries to ratchet up, we

13   would just say either match it or send that loan to one of our

14   other banks.

15   Q.    And in the context of the negotiations that are

16   referenced in these minutes, were you personally having any

17   conversations with anyone at the Stanford International Bank

18   about a possible new loan facility?

19   A.    No.

20   Q.    If you could then look at the next paragraph underneath

21   this one that begins, "Mr. Knudson."  Do you remember having

22   or this conversation taking place in the meeting?

23   A.    Yes.

24   Q.    Was there at the point in time we're having the October

25   1st, 2007, board of directors' meeting, was there some concern

1    about the certificates of deposit with the Stanford

2    International Bank being at risk at that time?

3    A.    No.

4    Q.    Do you know why this topic came up in the board of

5    directors' meeting in October of '07?

6    A.    I believe it's just good business practice.

7    Q.    In what way, sir?

8    A.    Well, if you are looking at a loan, you think of all the

9    benefits, good and bad.

10   Q.    Did you have -- the other two banks here that the company

11   Mango Five is looking at at that time, HSBC and U.S. Bank, did

12   you have CDs with those banks so that they'd be in a similar

13   position to Stanford?

14   A.    No.

15   Q.    After October 1st, and we've seen there was at least a

16   report that these negotiations were going on, did Mango Five

17   enter into some sort of new loan facility with Stanford

18   International Bank?  And let's say between October 1st of '07

19   and mid March of '08, the next six months or so.

20   A.    We may have.  I don't know.

21   Q.    Okay.  We'll see if we can refresh your memory as we go.

22        Let's step away from the -- excuse me.  Let's look at the

23   next set of minutes, which is PX 55 from January 4 of 2008.

24   And if you will let me know when you've found 55, sir.

25        And, again, we have an agenda to start, so I'll ask you

1    to go right to the minutes on page 2.

2    A.    I go from PX 141 to PX 158.

3    Q.    Right.  You need to go the opposite direction and look

4    for not 155 but 55.

5              MR. SADLER:  I may be able to help.  It's not in

6    evidence yet.  That may be why it's not in his notebook.  PX

7    55, that's -- our notes, it's just not part of the stipulation

8    yet.

9              THE WITNESS:  Well, I've got a PX 055.

10             MR. PETRIE:  That's the one to look at.

11             MR. SADLER:  It's not in the stipulation.  So you

12   just need to offer it.

13   Q.    (BY MR. PETRIE)  I apologize.  It's -- you have PX 055.

14   A.    Right.

15   Q.    And can you tell the jury what PX 055 is?

16   A.    It's a minutes for January 14th of '08.

17   Q.    Minutes of what meeting?

18   A.    Of a Estate meeting, we call it, Mango Five Family.

19   Q.    And were these minutes prepared in generally the same

20   fashion that you've described for the previous minutes?

21   A.    Yes.

22   Q.    And were these minutes then kept as part of the business

23   records of Mango Five Family, Inc.?

24   A.    Yes.

25             MR. PETRIE:  Move to admit PX 055.

```
 1              MR. SADLER:  No objection.

 2              THE COURT:  It's admitted.

 3              MR. PETRIE:  May I then publish it to the jury?

 4   Thank you.

 5   Q.   (BY MR. PETRIE)  Mr. Magness, then if you could -- if you

 6   have the second page open, there is a report on paragraph 3

 7   concerning the loan negotiations, the topic that we were just

 8   discussing.  Do you see that?

 9   A.   Yes.

10   Q.   And does that provide you with any information, at least

11   as of the December -- excuse me, January 4th, 2008 meeting as

12   to whether Mango Five had entered into a new loan facility

13   with Stanford?

14   A.   It says she's engaged in negotiation.

15   Q.   And would that lead you to believe whether there was a

16   new loan facility with Stanford or whether there was still

17   talk?

18   A.   It looks like talk to me.

19   Q.   Okay.  Then I'd like you -- we are going to step away

20   just for a second from the minutes to put something in

21   context, and I'd like you to look please, if you would, at the

22   next document, PX 056.

23        And if we look at just the header on the email, there is

24   an email address there as a cc that is mangorace@gmail.com.

25   Do you see that?
```

24

```
 1    A.    Yes.

 2    Q.    Whose email address is that?

 3    A.    That's mine.

 4    Q.    And did you receive a copy of this email at some point

 5    after noon on February 5th of 2008?

 6    A.    Evidently I would have.

 7    Q.    And is this something that the board of directors of

 8    Mango Five authorized Ms. Dokken to send to Mr. Espy, the

 9    person to whom she's sending this?

10    A.    Yes.

11    Q.    And could you give the jury, please, a little history as

12    to what led the board of directors of Mango Five to want to

13    get the information that we will look at in just a second that

14    is referenced in this exmail to Mr. Espy?

15    A.    I'm sorry.  The question?

16    Q.    The question is, could you give the jury, please, a

17    little history as to why the board of directors was having Ms.

18    Dokken request this information from Mr. Espy?

19    A.    So we could keep track of our investments.

20    Q.    And was there something in particular in early February

21    of 2008 that led the board of directors of Mango Five to ask

22    for information from Mr. Espy?

23    A.    No.  It's just -- as I said before, it's hard to track it

24    without having a report made.

25    Q.    What kind of report are you talking about?
```

1    A.   Well, you have -- it's not like you can look it up on

2    Bloomberg or in the paper, you know, see their viability.

3    It's something you have to keep track of.  Every time we have

4    a meeting, we want to look at our investments, and this is how

5    we would look at the Stanford investment.

6    Q.   Did you treat the Stanford investment any differently

7    than the other investments when you have these quarterly

8    meetings?

9    A.   No, sir.

10   Q.   Let's look then at the text of what Ms. Dokken was asking

11   for.  Do you know what she's referring to on behalf of the

12   board when she references there the unprecedented write-offs

13   and charges that the financial community and companies have

14   incurred in the last six months related to high-yielding and

15   mortgage-backed instruments?

16   A.   Yes.

17   Q.   What was she referring to?

18   A.   As I was mentioning before, that the news had been

19   talking about a lot of these mortgage-backed securities were

20   faltering, and we wanted to know if they had invested in those

21   and in what quantity, if Stanford Antigua had invested in

22   those.

23   Q.   And did you not know what Stanford Antigua was invested

24   in in February of 2008?

25   A.   It's an -- investment companies tend to have just a

1    snapshot.  What you take a snapshot of today may not be the

2    snapshot you take tomorrow.

3    Q.    Did you-all get a response from Mr. Espy about this

4    request for information?

5    A.    Yes.

6    Q.    And what was the response?

7    A.    It led us to believe that everything was doing just fine.

8    Q.    Okay.  Setting aside the substance of the response, what

9    mechanism did the response come back?  For example, was it you

10   met somebody in an office building to talk about it, you got

11   something in writing, et cetera?

12   A.    I believe we talked to the president, Juan Rodriguez.

13   Q.    Did you -- did not you personally but did the board of

14   directors at Mango Five at any point in time ask to speak to

15   Mr. Juan Rodriguez from the bank?

16   A.    I believe so.

17   Q.    Did you ask to speak to him in connection with this

18   request for information?

19   A.    Yes.

20   Q.    Let's -- and what was the -- when you spoke to him, was

21   that a face-to-face conversation with him somewhere?

22   A.    No.

23   Q.    What type of conversation was that?

24   A.    On the phone.

25   Q.    And who participated in the phone call?

1    A.   I don't remember being there myself, but other

2    representatives were there.

3    Q.   Other representatives meaning who?

4    A.   Tonya, Steve, Ray Sutton.

5    Q.   If you could look, sir, at the next -- or the document in

6    your binder at PX 062, please.  And, hopefully, that is an

7    agenda and then, following on page 2, the minutes of a meeting

8    of the investment committee on March 6 of 2008.

9    A.   Yes, it is.

10   Q.   Okay.  And, again, starting with paragraph 1 just to tie

11   it into the stream, so to speak, do you see that that's --

12   first order of business is to approve the minutes from the

13   January meeting that we were just discussing?

14   A.   Yes.

15   Q.   Okay.  And then let's look, if you would, at the top of

16   the next page where there is item No. 5, a report on the

17   Stanford certificates of deposit.  Do you see that?

18   A.   Yes.

19   Q.   And looking through that report, does that help you to

20   remember whether you were present during the conversation with

21   Mr. Rodriguez that's referenced in this or in these three

22   paragraphs of the minutes?

23   A.   I would have been present at that meeting.

24   Q.   Okay.  And in terms of the -- did Mr. Rodriguez during

25   this meeting provide you any information responsive to the

1    early February request asking about mortgage and

2    mortgage-backed securities?

3    A.    Yes, he did.

4    Q.    And what type of information did he provide you about

5    that?

6    A.    That it was not a substantial portion of their

7    investments.

8    Q.    Okay.  And then the rest of this, do you see any

9    reference in there to the questions you asked about, about

10   mortgages, mortgage-backed securities, et cetera?

11   A.    Yes, it does have that.

12   Q.    Where do you see that?

13   A.    Where we're highlighting "the bank then invests these

14   funds in a portfolio of investments."

15   Q.    And in terms of that phrase about what the bank invests

16   in --

17   A.    Yes.

18   Q.    -- in which one or more of those categories did you

19   believe the mortgage instruments, to the extent they had any,

20   would have fallen?

21   A.    I don't think in any of those.

22   Q.    Okay.  So realizing now that those don't necessarily

23   refer to mortgages, do you see any reference in these three

24   paragraphs to the issue of mortgages or mortgage-backed

25   securities that might or might not be something in which

```
 1   Stanford International Bank had invested?

 2   A.   I don't see it.

 3   Q.   Okay.  When you had this telephone call with Mr.

 4   Rodriguez, did you ask essentially, why are you telling us all

 5   this stuff that we didn't ask about, or something to that

 6   effect?

 7   A.   You're asking me what?

 8   Q.   Well, if this is not talking about mortgages, did you ask

 9   him why we were talking about all this other stuff or

10   something to that effect?

11   A.   No, I did not.

12   Q.   Did you follow up with him after this and have any

13   questions about the information that he provided?

14   A.   I did not.

15   Q.   You heard that counsel for the Receiver referenced to the

16   bank providing you with gibberish.  Do you remember that in

17   his opening statement?

18   A.   Yes.

19   Q.   When you heard this information from Mr. Rodriguez, did

20   you consider it to be gibberish?

21   A.   I did not.

22   Q.   What was your reaction to hearing the information, at

23   least as it's reported in these minutes of the board, at the

24   time you heard it?

25   A.   I was comfortable with the investments that he reported.
```

1    Q.   And what was there about what he told you that made you

2    comfortable with the investments that he reported?

3    A.   It was the fact that he wasn't involved with the

4    mortgage-backed securities in any large number.

5    Q.   And at the board meeting, after you hung up the phone

6    with Mr. Rodriguez, was there any further discussion of the

7    information that he had provided?

8    A.   No.

9    Q.   Was there anybody tasked to follow up with him and get

10   any additional information based either on that phone call or

11   anything else, at least in the March of 2008 time frame?

12   A.   I don't believe so.

13   Q.   Now, at this point in time, Mr. Rodriguez having

14   discussed with you how the bank operated, was there anything

15   he told you about the bank's operations that struck you as

16   being new information from what you had previously not known?

17   A.   No.

18   Q.   Where was there anything about this information that he

19   provided that gave you some concern about the safety of the

20   money that you deposited in the CDs?

21   A.   No, it did not.

22   Q.   Did it change that risk calculus either way up or down

23   that you have described for us previously?

24   A.   No.

25   Q.   If you could look -- and I apologize for jumping around.

1   If you could look at the first page of the minutes and the

2   second page of exhibit PX 62, there is also a report under

3   item No. 3 about paydown of debt.

4   A.   Yes.

5   Q.   And we have a little different type of information here

6   where Ms. Dokken is reporting the total Magness-related debt.

7   Do you see that reference?

8   A.   Yes.

9   Q.   And do you know what she's referring to when she talks

10  about the total Magness-related debt in the context of these

11  minutes in March of '08?

12  A.   It's compiled all debt across all Magness entities--GMAG,

13  GMIT, and Mag Securities.

14  Q.   And was this debt at this point in time in March of 2008

15  spread across more than one lender?

16  A.   Yes.

17  Q.   What were the lenders involved with this debt in March of

18  2008?

19  A.   It would have been Merrill Lynch, HSBC, U.S. Bank.

20  Q.   Did you have any margin debt with Stanford Group Company

21  in March of 2008?

22  A.   Yes.

23  Q.   Was this included in this tally to the best of your

24  understanding?

25  A.   Yes.

1   Q.    Now -- we haven't really focused on this previously.

2   When did you open a securities account with Stanford Group

3   Company?  So I want to step away for a second from the

4   certificates of deposit and talk about the related company,

5   the broker-dealer.

6   A.    It probably was 2004, roughly.

7   Q.    And in that rough time frame of 2004, did you also

8   establish a margin account borrowing relationship with that

9   broker-dealer?

10   A.    Yes, I did.

11   Q.    And how did -- just in a very general way, how did you go

12   about setting up that relationship?

13   A.    Well, we first asked what the negotiation was with

14   respect to how much percentage would they loan you.  If you

15   had a hundred dollars' worth of stock, they would lend you $40

16   worth of cash that you could purchase other stocks.  That's

17   the margin account.

18       We don't have anybody that's that low.  All the ones we

19   have are 64 percent.  So $100, you could get $64 before you

20   had a margin call.  These guys upped that 40 percent to 50

21   percent to get our business.

22   Q.    And did you have any discussion with them as to how it

23   was that they upped that amount to try and get your business?

24   A.    No, I did not.

25   Q.    Did you have any understanding that they had made some

1    sort of special arrangement to accommodate or to try and win

2    your business?

3    A.   I knew nothing of it.

4    Q.   And going forward with that margin account arrangement

5    and the borrowing you indicated had taken place there, at any

6    point in time did you discuss with anyone on the Stanford

7    Group Company's side how that margin account was structured

8    for the lender?

9    A.   I did not.

10   Q.   Why not?

11   A.   It wasn't my side of the negotiation.

12   Q.   Let's go back now to Mango Five and the board minutes.

13   If you could look in your notebook, please, at PX 073, please.

14   If you will let me know when you find that.

15   A.   I have it.

16   Q.   I'm going to ask you to turn to the minutes piece on the

17   first page.  You've got that open.  And do you see that that

18   references in paragraph 1, sort of parallelling what we looked

19   at previously, approving the minutes from March 6th of 2008?

20   A.   Yes.

21   Q.   But this meeting is in October of 2008.  Right?

22   A.   Yes.

23   Q.   Was there not an intervening meeting sometime in the

24   summer of 2008?

25   A.   Apparently not.

1    Q.   Any particular reason why there was not a meeting?  That

2    we've looked at, they seem to be happening every quarter.  Any

3    particular reason why?

4    A.   Well, I think maybe we are trying to get it to be every

5    quarter, but it didn't always come out that way.

6    Q.   And if -- when there's a fairly or a little bit longer

7    period of, in this case, roughly six months, was -- did the

8    type of reporting change in terms of what we looked at going

9    through the various assets, et cetera?

10   A.   Like I said before, that sometimes the minutes reflect

11   the history also between the two dates.

12   Q.   All right.  But the fact that there's a longer period,

13   does it change just generally the basic nature of the

14   reporting?

15   A.   No.

16   Q.   Let's look then, start with paragraph 2, which is talking

17   more about diversification.  And here there's a reference to

18   you talking about not having present plans to sell the stock

19   of Liberty or its affiliates due to a significant decline in

20   prices.  Do you see that reference?

21   A.   Yes.

22   Q.   And when you talk about a significant decline in prices

23   in October of 2008, what are you referring to, either in terms

24   of dollars or a percentage?

25   A.   Well, I would think at that particular time the stock

35

 1   was, you know, 50 percent the value it was in March.

 2   Q.   If you have pressure from lenders, why would you not

 3   still sell the stock so you could address the loans?

 4   A.   You would sell some stock.

 5   Q.   Okay.  Here you say that you had no present plans to sell

 6   any stock of Liberty or its affiliates because of this

 7   significant decline.  Do you see that?

 8   A.   Right.

 9   Q.   But then Ms. Dokken points out that your covenants with

10   HSBC and U.S. Bank would require liquidation of the stocks if

11   trading prices fall below $10 per share.  Do you see that?

12   A.   Yes.

13   Q.   Was that news to you on October 1st of 2008?

14   A.   No.

15   Q.   Were you getting close to hitting the $10 figure that

16   she's identifying here for HSBC and U.S. Bank?

17   A.   I'd imagine that's exactly what that is.

18   Q.   At this point in time were -- what was the relative

19   amount of debt you had with HSBC and U.S. Bank?

20   A.   $200 million.

21   Q.   Were they your principal lenders at that time?

22   A.   Yes.

23   Q.   She then goes on to point out that GMIT was close to its

24   limit on borrowing capacity and that any further decline could

25   result in a margin call.  Do you see that?

36

1   A.   Yes.

2   Q.   And at the time was that -- did you believe that was an

3   accurate report that -- the thing that she was pointing out?

4   A.   Yes.

5   Q.   Did that lead you to think, gee, maybe I better start

6   selling some stock so that we're not so close to having a

7   margin call?

8   A.   It would have led me to find out what I had to liquidate,

9   if I had more stock to put in the bank to change the

10  percentage of loan to value, and I would look for liquid

11  assets or other assets I could encumber, which take -- I use

12  as collateral for another loan, and I would also look at the

13  Stanford CDs, because that's why we bought them in the first

14  place.

15  Q.   Had -- were you already getting margin calls as of

16  October 1 of 2008?

17  A.   It was soon.  If not in that same area, within a week.

18  Q.   We're going to talk about the loans in just a second, but

19  I want to digress for a minute and cover a couple of topics

20  with you.

21       When you were working up to this point in time, so let's

22  say up to October 1st of 2008, at any point in time did the

23  Stanford International Bank tell you that it was giving you

24  information that was somehow not available to other

25  depositors?

1  A.   No, they did not.

2  Q.   Did you ever, even if they didn't say something, ever

3  look at information and say, gee, I might be getting something

4  that is available to me but not available to somebody else?

5  A.   I did not think so.

6  Q.   Did you understand that you were in any way getting

7  special treatment from the Stanford International Bank?

8  A.   I did not.

9  Q.   Did you in any way -- I want to switch now to the SGC

10  side, the Stanford Group Company, the broker-dealer in these

11  negotiations that you already described for the margin

12  account.  Did you understand you were getting any special

13  treatment with respect to that?

14  A.   No.

15  Q.   Could you look, please, in your binder at Trial Exhibit

16  027.  And I apologize.  It's PX 27.  There's a tab in there

17  for 27.

18  A.   Just plain 27?

19  Q.   Just a plain 27.  And Exhibit 27, PX 27, is a letter from

20  Mr. Espy to you, dated September 26, 2006.  Right?

21  A.   Yes.

22  Q.   And in that letter -- first of all, about midway or a

23  little bit south of midway down the page, there is a reference

24  there to a group of six stock equity positions.  Do you see

25  that?

```
 1    A.    Yes.

 2    Q.    Can you tell the jury whether those six equity positions

 3    listed there are the same thing we've been referencing or

 4    whether they are different, from what we've been loosely

 5    calling the Liberty Media and affiliates' stocks?

 6    A.    This is some of them.

 7    Q.    And in his second bullet point, Mr. Espy is talking about

 8    charging you an equity position at the rate of a penny or one

 9    cent per share on all transactions for trades in those

10    positions.  Do you see that reference?

11    A.    Yes.

12    Q.    Did you understand that was some sort of special deal

13    that you were getting at the time?

14    A.    No.  It's comparable to all our deals.

15    Q.    Comparable to all of your deals meaning what?

16    A.    HSBC charged roughly that.  Merrill Lynch charged roughly

17    that.

18    Q.    Had you told Mr. Espy, here's what HSBC, here's what

19    Merrill Lynch charges, et cetera?

20    A.    I don't recall if I had at that point, but if that was

21    something that needed to be told or negotiated, I would have.

22    Q.    Okay.  Looking at the first bullet point, there is a

23    reference there to a rate grid and commission schedule in the

24    very first line.  Do you see that?

25    A.    Yes.
```

1    Q.    When you received this letter -- there's not an

2    attachment to it.  But when you received this letter, were you

3    provided with some sort of rate grid and commission schedule

4    when Mr. Espy sent this to you?

5    A.    Yes, I had seen them before, I believe.

6    Q.    And when he talks then in his first subbullet about the

7    Magness Family rate grid, do you see that reference?

8    A.    Yes.

9    Q.    Did you understand that you were getting a different --

10   the Magness family was getting a different rate grid than

11   perhaps other people who had made deposit?

12   A.    It would have made a rate grid that Tommy would have

13   negotiated for us so that he could sell it to us.

14   Q.    What do you mean, he could sell it to you?

15   A.    He was the agent for Stanford.

16   Q.    And what do you mean, when he could sell it to you?

17   A.    He would get a commission when he sold anything for any

18   Stanford program.

19   Q.    Did you know what his commission was?

20   A.    I did not know.

21   Q.    And did you understand that this was -- whatever he had

22   negotiated with you acting on behalf of Stanford, was

23   something that was different from what other depositors in the

24   Stanford International Bank CD program might get?

25   A.    I did not know.

```
 1    Q.   Did he talk to you about whether this -- what's discussed

 2    here about getting a particular rate that was tied to the

 3    dollar amount that you put into Stanford International Bank

 4    CDs?

 5    A.   Yes.

 6    Q.   And what did he talk to you about that?

 7    A.   The rate always got a little bit better if there was more

 8    money in.

 9    Q.   And in your experience is it unusual that, in dealing

10    with a financial institution, you get a better rate if you put

11    more money in?

12    A.   It's normal.

13    Q.   In your experience, is it unusual, when you're dealing

14    with a broker/dealer, to get a better commission structure if

15    you have more stock deposited with the dealer?

16    A.   That's true.

17    Q.   I want to talk to you about the last bullet point on the

18    dark bullets on this page, and I'm just going to read it to

19    you and ask you to tell the jury, please, what this is

20    referencing.

21         The third bullet says, "Magness agrees to advertise

22    Stanford private wealth management on the side of at least one

23    of Mr. Magness's pro trucks at the Baja 500 and 1000 during

24    the 2006-2007 race season."

25         So, first of all, if you could tell the jury in a very
```

```
 1   general way what this is referring to in terms of pro trucks?
 2   A.   Well, we have a team called Mango Racing in which we run
 3   off-road trucks, mainly for our entertainment.
 4   Q.   And when you say you run off-road trucks, are you the
 5   simply the sponsor or do you have some more active involvement
 6   in the racing?
 7   A.   I'm the main sponsor, but I also drive.
 8   Q.   And is that something that you just started in the
 9   September 2006 time frame that's -- that's the date of this
10   letter?
11   A.   No, sir.  I think we started that in 1994.
12   Q.   Okay.  Do you still do that today?
13   A.   I still do it today.
14   Q.   And then the reference here as to putting or advertising
15   on the side of at least one of those trucks at the Baja 500
16   and 1000, would you explain to the jury what that reference to
17   the Baja 500 and 1000 is?
18   A.   Stanford advertises, just like everyone else, and had
19   agreed to enter an advertisement plan with us.  It was, I
20   believe, he gave us $20,000 to put his logo on the back of our
21   truck.
22   Q.   And did you take the $20,000?
23   A.   Yes.
24   Q.   Did you put his logo on the back of the truck?
25   A.   Yes, I did.
```

1    Q.    Is that the only logo that was on the truck?

2    A.    No.

3    Q.    What -- give the jury, if you could, some feel for what

4    the truck looks like with the logos on it.

5    A.    Well, we have our Mango Racing right on the door.  On the

6    tail end of the truck, we put Stanford Group.  And where all

7    sponsors go is on the side below my racing.  On the same door

8    it says Mango Racing at the top, and then has a bunch of

9    stickers of whoever's, you know, sponsoring you at the bottom.

10   Q.    And I have to admit my experience is limited to watching

11   NASCAR on TV.  But is there a priority in terms of the best

12   place to have a label on the truck and a place that might not

13   be so good, at least from your perspective?

14   A.    The very first part of the door on the left-hand side

15   would be the lead-off person.

16   Q.    And is that where the Stanford logo went?

17   A.    No.

18   Q.    And where did it go again?

19   A.    It was on the rear fender.

20   Q.    And how does that relate in terms of the hierarchy of the

21   best spot on the truck to be, all the way down to what the

22   worst might be?

23   A.    Most people never put their logos on the very back.

24   Stanford logo was fairly big, and it really needed to be on a

25   big spot, and that was the only spot we had.

1    Q.   Why do you say most people never put it in that spot?

2    A.   Because everybody looks for the sponsors on the door.

3    Q.   As long as we're talking about Stanford giving you

4    something, in terms of the commission arrangement that we've

5    discussed, other than agreeing to charge you a penny a share

6    on the trades in these six stocks, was there anything else

7    Stanford gave you in terms of that broker/dealer stock

8    commission arrangement?

9    A.   No.

10   Q.   And then in terms of the rate grid that we discussed in

11   the Stanford CDs, other than giving you the rate that was

12   referenced in that grid and this letter, was there anything

13   else Stanford gave you in exchange for that?

14   A.   No.

15   Q.   The last question on this letter, sir.  The letter refers

16   to what will happen if you put in more money by December 31st

17   of 2006.  Do you see that?

18   A.   Yes.

19   Q.   And we saw yesterday when we looked at Exhibit No. 9,

20   that on October 31st of 2006 you put in $30 million from GMIT.

21   Do you remember that?

22   A.   Yes.

23   Q.   And were you doing that because of this type of offer

24   that Mr. Espy extended in September of 2006?

25   A.   Yes, because of that.

1    Q.   You heard Mr. Sadler talk about you having special access

2    to people in the bank.  Do you recall that in his opening?

3    A.   Yes.

4    Q.   Did anyone at the bank ever tell you that you were

5    getting special access?

6    A.   No.

7    Q.   Did anyone at Stanford Group Companies ever tell you

8    something to the effect you were getting special access that

9    no one else gets?

10   A.   They did not.

11   Q.   Okay.  Let's go to the loans.  And just to put a date

12   reference on it for you, if you could look, please, at PX 080

13   in your binder.  And do you see at the very top of this

14   document -- well, let's do this.  Is this document or these

15   documents marked as PX 80 documents?

16        Are these documents marked as PX 80, the loan documents

17   for the first loan obtained from Stanford International Bank?

18   A.   Yes.

19   Q.   And if you would look, sir, at the various signatures

20   there, they are -- there's one on the first page, one on the

21   second page, one on the third page, and I'm going to skip four

22   just because it's very, very faint, but are those your

23   signatures?

24   A.   Yes, sir.

25   Q.   And the documentation, let's look at the second page, for

```
 1    example.  That is the promissory note into which you entered

 2    with Stanford International Bank for that first loan for $25

 3    million.  Right?

 4    A.    Yes.

 5    Q.    Okay.  I wanted to give you this as a starting point to

 6    give you the date, and the date is October 10th.

 7    A.    Yes.

 8    Q.    Now, we looked before my digression there at the October

 9    1, '08 Mango Five minutes and talked about your views on

10    selling stock and Ms. Dokken's reports.  Do you remember that?

11    A.    Right.

12    Q.    Did something happen between October 1 when there was

13    that Mango Five meeting and October 10 that led you to a place

14    where you were borrowing $25 million from Stanford

15    International Bank?

16    A.    Yes.  The cable stocks that we had were trompled.

17    Q.    And did you -- when did that start?

18    A.    Roughly that first week in October.

19    Q.    Okay.  Was there -- just for those of us who are not in

20    the stock market a lot, was there something in particular that

21    you, as being a stockholder and a significant stockholder,

22    thought was the cause of the decline in the stocks?

23    A.    Yes.  The same people that had dropped the bank shares

24    and the builders' shares, they are called the shorts, the

25    shorts, finally looked over and looked at the cable companies,
```

1    and they all came in like a horde of locusts.

2    Q.   And when they all came in like a horde of locusts, did

3    that have any impact on the margin borrowing that you had

4    undertaken using that stock as collateral?

5    A.    When they put a short on your -- on your stock and enough

6    of them do it, it drops the price significantly.

7    Q.    And when the price drops significantly, does that impact

8    your margin borrowing?

9    A.    Pretty soon my percentage loan-to-value is upside down.

10   Q.    And in this period of time from October 1 to October 10

11   of 2008, were you starting to get margin calls?

12   A.    Yes, I was.

13   Q.    Did you have money to pay those margin calls?

14   A.    No, I did not.

15   Q.    Did you look at some of the -- and I'll go through -- let

16   me ask it this way.  Did you look, for example, at whether the

17   Fortrust asset was something you could use to generate money

18   to address margin calls?

19   A.    Fortrust did not have enough income to justify a loan.

20   Q.    Did you look at perhaps liquidating Fortrust to try to

21   get money to honor these margin calls?

22   A.    To try to liquidate Fortrust would take over a year.

23   Q.    Why did you say that?

24   A.    Because it's the largest asset.

25   Q.    Did you -- recognizing that there were those issues with

1    trying to get money out of Fortrust, did you look at getting

2    money out of the ranches that we see reported from time to

3    time here?

4    A.    Yes.

5    Q.    And what did you do in that regard?

6    A.    Just to get an appraisal would take 30 days, if not 60

7    days.

8    Q.    Did you have 30 days to come up with money to address the

9    margin calls?

10   A.    By the time they get ahold of you, you usually have two

11   days left.

12   Q.    And was that the case in early October with the ones you

13   were facing?

14   A.    I believe I had three days a few times and two days a few

15   times and 24 hours a few times.

16   Q.    Did you look at any of your other assets to see if --

17   A.    We looked at all the assets.

18   Q.    Did you look to see -- do you have stock, stock that is

19   not encumbered by a margin loan?

20   A.    We had no stock in a vault.  It is all in -- as

21   collateral somewhere.

22   Q.    And did you look at whether, just faced with a margin

23   call, best thing to do is either sell the stock or let the

24   bank take it but at least get the loan taken care of?

25   A.    Right.

1    Q.    And why not pursue that course?

2    A.    Can you ask the question again?

3    Q.    Sure.  Looking at an option of saying, we have this stock

4    that's collateral, maybe the best way to pay off the margin

5    loan is either let the bank take the stock or we sell it and

6    pay the bank?  Why did you not go that route?

7    A.    Well, it's -- you look at what your assets are and the

8    risk to -- to the upside.  The upside on stock, let's say the

9    stock was 50 percent down.  If it was $100, it's now $50, it

10   goes back to $100 are pretty great with the history that's

11   proven that, including this recent history; that if you -- if

12   you keep the stock, you have a chance of getting 100 percent

13   because you basically look at it as being worth $50 and it was

14   worth a 100, chances are it's going to go back to a hundred.

15        Whereas, the CDs, because that's where you're going with

16   the question, is the CDs were basically a nine percent gain.

17   No matter what you did, they were nine percent year after

18   year.  It'd take ten years to get that same position that you

19   probably are going to get back in a year, and which history

20   proved was a fact.

21   Q.    How did you go about then approaching the bank, Stanford

22   International Bank, excuse me, approaching SIB in the first

23   part of October about trying to get money?

24   A.    We sent Tommy in.

25   Q.    And --

1    A.   He negotiated for us.

2    Q.   Did you obtain any information during the process of that

3    negotiation there was some issue with the bank having money

4    available to lend to you?

5    A.   No.

6    Q.   When you organized the first loan, the $25 million loan,

7    setting aside the agreement to pay the loan and to repay it

8    with interest, did you give anything else to the bank in

9    exchange for that loan?

10   A.   I did not.

11   Q.   Did you receive anything from the bank other than

12   obviously the loan proceeds?

13   A.   No.

14   Q.   What did you do with the loan proceeds?

15   A.   I used it to pay down margin debt.

16   Q.   Going then to, let's say, October 11th, the next day, did

17   having the $25 million and having it to pay down margin debt

18   solve your financial issues?

19   A.   They just kept coming.

20   Q.   I'm sorry.  Who is the they?

21   A.   The problems just kept coming, the stock kept falling.

22   Q.   Okay.  And in response to having the stock keep falling,

23   did you take any action?

24   A.   We secured more loans.

25   Q.   Okay.  And when you secured more loans, how did you go

50

```
 1   about doing that?

 2   A.    With the CDs, the Stanford CDs.

 3   Q.    Okay.  Were you involved in conversations with the bank

 4   about conditions that it would need to extend loans for

 5   additional money?

 6   A.    I was not on the phone, but I was informed.

 7   Q.    Okay.  And in terms of being informed, what was the

 8   general structure of what you needed to do to get more money

 9   from the bank?

10   A.    Well, to get the complete large loan, we had to first pay

11   back the 25 that we already borrowed.

12   Q.    Okay.  Well -- okay.  Recognizing that the 25 you had

13   already borrowed had been paid the margin lenders, did you

14   have 25 million to pay back?

15   A.    We had 25 million of accumulated interest that had not

16   been paid to us in Stanford Bank, and we made paperwork to

17   allow that money to be used for the 25.  But it was short by

18   three-quarters of a million dollars that we had to borrow from

19   another source to facilitate that payment.

20   Q.    Why did you say you had to borrow that from another

21   source?

22   A.    To make 25 million, we needed 720,000 more.

23   Q.    Would you look, please, in the binder again, at PX 081?

24   You got that document, sir?

25   A.    Yes.
```

1    Q.   And it's actually three documents.  Excuse me, I

2    misspoke.  But could you tell the jury, please, what these

3    documents are?

4    A.   These are the CD numbers referenced in the loans.

5    Q.   And do you see that in the first sentence, the first

6    letter, as an example, it says, please transfer all of the

7    accrued interest to date to that particular account?

8    A.   Yes.

9    Q.   And are these the transactions you've just described more

10   generally to us about paying off the $25 million loan?

11   A.   They are.

12   Q.   Now, at this point in time, let's say October 14th of

13   2008, had you been provided any factual information that led

14   you to believe there might be some problem with the bank's

15   ability to loan you money?

16   A.   No.

17   Q.   Had you been given any information as of October 14,

18   2008, that led you to change that risk assessment that you

19   described for us --

20   A.   No.

21   Q.   -- in your view as to what the CDs were?

22   A.   No, they did not.

23   Q.   Did Mr. Espy relay any information to you, wearing his

24   Stanford Group Company hat as its employee, about what was

25   going on at the bank as it was addressing your request for

```
 1    money and your request that the bank pay off at least the big

 2    piece of the loan using accrued interest?

 3    A.    No.

 4    Q.    And what -- over what span of time did the shorts keep

 5    coming that forced you to require more cash to address margin

 6    calls?

 7    A.    Basically it was from the first week in October to the

 8    middle of December.

 9    Q.    Let's look, sir, if you would, please, at PX 092.  And

10    these are minutes.  I'd like to skip the agenda and start with

11    the second page, please.  Are you with us?

12    A.    Yes.

13    Q.    Great.  And if you could look, please, at item No. 4, and

14    let's start with the first paragraph.

15          In this paragraph, it begins with a report regarding Mr.

16    Espy at some point after October 1 trying to redeem the

17    certificates of deposit, and he says there that redemption

18    would not be possible at this time.  Do you see that?

19    A.    Yes.

20    Q.    Did that statement give you concern?

21    A.    No.

22    Q.    Why not?

23    A.    Well, the certificates had a life expectancy of whatever

24    was written on them.  Sometimes it's a maturity date, and

25    that's the only date that they have to pay you money back.
```

1    Any time before that date, they have -- it's up to their

2    discretion how they do it, but their -- their program that

3    they usually use is -- is a penalty for early -- early

4    redemption or a loan at 80 percent of the value of the CD or

5    they can just not do anything at this time.

6    Q.   In terms of this report in the minutes, the next thing

7    that is reported here after that statement is Mr. Magness

8    inquired how his risk could be reduced to the exposure of

9    these certificates of deposit.  Do you see that next sentence,

10   sir?

11   A.   Yes.

12   Q.   And would you tell the jury what you were saying there?

13   A.   Well, it is -- it is -- there is always a certain amount

14   of risk involved, and even after we had gotten the loans,

15   there was still 20 percent of our asset that was unused, which

16   was roughly $17 million, which relates to $34 million worth of

17   my collateral.

18   Q.   And that's footing back to the concept we discussed

19   yesterday that you borrowed the money for the CDs?

20   A.   Right.

21   Q.   This goes on to talk about Mr. Espy reporting that you

22   were able to borrow 80 percent of the face value of the

23   certificates or roughly $63 million.  Do you see that?

24   A.   Right.

25   Q.   Did that give you any comfort in dealing with the bank

1    that you got a payment of $63 million?

2    A.    Well, they paid the money immediately.

3    Q.    Was there any discussion with the bank about needing more

4    time to go find money to pay you?

5    A.    No.

6    Q.    Was there any delay in getting the money to you that

7    caused you any concern about, gee, there might be a problem

8    with the bank?

9    A.    No.

10   Q.    Was there anything about this conversation in the period

11   after October 1st of 2008 that gave you a concern that there

12   was something wrong with the bank?

13   A.    There was nothing.

14   Q.    When you asked here how your risk could be reduced to the

15   exposure to the certificates, did anybody offer you

16   suggestions as to how you could reduce your risk?

17   A.    No.

18   Q.    Did you task anyone, kind of like we saw earlier where

19   you asked Ms. Dokken to approach Mr. Espy and Mr. Wilk, did

20   you do that kind of approach to ask somebody else, see if

21   there was a way to do that?

22   A.    No.

23   Q.    Was there anything about this information provided to you

24   at least by the December 5, 2008 meeting for which these are

25   the minutes, that led you to think something to the effect of

1   I should follow up and ask more questions --

2   A.   No.

3   Q.   -- of the bank?  Did you at any point between October 1

4   and December 5 of 2008 ask the bank for additional information

5   about its operations or its investments?

6   A.   I don't think so.

7   Q.   Why not?

8   A.   I think we at that point were still trying to keep out of

9   the way of the margin calls.  I think we were pretty much done

10  paying margin calls by December, at least by the middle of

11  December.

12  Q.   If you could look, please, at paragraph No. 2 on the same

13  page of the minutes here where you report that there's been no

14  significant sales of stock since October 1 due to the severe

15  decline in prices.  Do you see that?

16  A.   Yes.

17  Q.   How does that dovetail with the -- excuse me.  Were there

18  any sales that took place that were not sales done by GMIT,

19  GMAG, or Magness Securities during this period?

20  A.   I believe there were sales.  This report refers to

21  diversification.  At that particular time we weren't trying to

22  diversify.

23  Q.   I see.  And is -- during the same time period from

24  October 1, '08 forward, were there sales of stock to address

25  margin calls?

1    A.    Yes, there were.

2    Q.    And what was -- how did those sales take place, just in a

3    general way, not on a sale-by-sale basis?

4    A.    I was usually asked to cure the margin call which

5    generally would be I would have the rights to try to sell my

6    stock, if I needed to sell stock, and if I didn't sell stock

7    fast enough to -- to justify prudence, they would step in and

8    sell it for me, whoever the facility was that was under the

9    margin call.

10   Q.    The lender, in essence.

11   A.    The lender.

12   Q.    Let's -- going forward again in time, sir, if you could

13   look at PX 114, please.  Excuse me for one second.

14        Again, if you could skip over the agenda and look at the

15   series of minutes from the April 9, 2009 investment committee

16   meeting of Mango Five, and let's just start by seeing if it

17   foots back on the first paragraph.  Do you see that your first

18   order of business was to approve the minutes from that

19   December 5, 2008 meeting.

20   A.    Yes.

21   Q.    So that tells us there wasn't likely an intermediate

22   meeting that took place between December and April.  Is that

23   fair?

24   A.    Yes.

25   Q.    Then if you could look at paragraph 2, please, which is

```
 1    now a report on diversification.  There is -- there are two

 2    statements here that I am hoping you can help us reconcile.

 3         Ms. Dokken -- and I'm going to paraphrase, not quote.

 4    Ms. Dokken begins by reporting, according to these minutes,

 5    that there had been no significant sales of Liberty and its

 6    affiliates' stock, given the depressed prices.  But then she

 7    goes on to say -- she indicated that approximately 150,000

 8    shares of Liberty has been sold during the reporting period

 9    and the proceeds had been used to pay down debt.

10         So first she says there's no sales, then she says there's

11    sales.  Can you help us understand what's going on here?

12    A.   It is the same diversification report where there was no

13    sales to diversify, but then she indicates 150,000 shares were

14    sold for margin call.

15    Q.   And in terms of those 150,000 shares, would that follow

16    the process that you just described for us where it might be

17    you, it might be the bank, but you were selling to address

18    margin?

19    A.   Yes, it would.

20    Q.   The discussion goes on to talk about the -- I'm still on

21    paragraph 2 -- the effects of the financial crisis in late

22    2008, but then follows with a recommendation about either stop

23    loss triggers, target prices, or options.  Do you see those?

24    A.   Yes.

25    Q.   Did you follow through on any of those recommendations
```

1    following the April 9, 2009 meeting?

2    A.    I don't think so.

3    Q.    By April of 2009, what was the status of Stanford?

4    A.    It had been in receivership.

5    Q.    And when was the first time you had factual information

6    that led you to believe there might be some sort of problem

7    with the Stanford International Bank?

8    A.    Constructively, it would have been the 18th of February,

9    '09.

10   Q.    And why do you pick that date?

11   A.    That's the date that the Receiver was put in.

12   Q.    Okay.  Well, before the Receiver was appointed, did you

13   at least have some concerns about Stanford International Bank

14   that popped up based on facts that you knew?

15   A.    Just from what we saw on TV, and I don't recall what the

16   actual dates were.

17   Q.    Can you give us a range of when you first started to

18   think there might be some issues with Stanford International

19   Bank?

20   A.    It would have been in, I think, basically January,

21   probably started thinking.

22   Q.    January of which year?

23   A.    Of '09.

24   Q.    And in January of '09, did you have any information that

25   led you to believe that Stanford International Bank was

1   insolvent?

2   A.   No.

3   Q.   In January of '09, did you have any information that led

4   you to believe that it was a fraud?

5   A.   No.

6   Q.   In January of 2009, did you have any information that led

7   you to believe you need to follow up and ask more questions

8   about whether it was insolvent?

9   A.   We did ask questions, and I don't remember if it was

10  about it being insolvent or not.  They did redeem one of our

11  associate's, Steve Knudson's, CDs in January of '09.

12  Q.   And what did that tell you about the bank in January of

13  '09?

14  A.   It was still paying out money.

15  Q.   Did or was the CD that was redeemed in January of '09,

16  the 11 and a half million dollar CD that we looked at, as

17  something that was arranged earlier in 2007?

18  A.   It was still in CDs form.

19  Q.   Okay.  At any point in time through, let's say, December

20  of 2008, did you give consideration to trying to cash in or

21  asking Mr. Knudson to cash in that 11 and a half million

22  dollar CD?

23  A.   It was discussed.  But at that point the most of the

24  bleeding had stopped, and it was my decision to just leave his

25  intact.

1    Q.   Did the discussion that you've referenced have anything

2    to do with concerns about the financial stability of the

3    Stanford International Bank?

4    A.   It did not.

5    Q.   When did you first learn that Stanford International Bank

6    was part of a Ponzi scheme?

7    A.   I didn't want it to be true even in February 18th of '09.

8    Q.   And was that the date that you first learned that it was

9    at least alleged to be a Ponzi scheme?

10   A.   That was the first date that it was said to be a Ponzi

11   scheme.

12   Q.   What did you mean when you said, you didn't want it to be

13   true?

14   A.   I hoped it was a downturn in the market and hoped it

15   would be identified one way or another, redeemed.

16   Q.   I'd like you to look in the binder again, sir, at two

17   documents, and let's start with the one that is PX 482.  It is

18   way in the back.  Let me know when you find that.

19   A.   I got it.

20   Q.   That is an abbreviated form of the tax return for GMIT.

21   Right?  As a matter of fact, let's look at your personal

22   return instead.  If you could look at 483.  It will just be

23   easier to walk around in.  Do you have 483?

24   A.   Yep.

25   Q.   And that is a copy of your and your wife Sarah's personal

```
1    income tax return.  Correct?

2    A.   Yes.

3    Q.   And if you could look, sir, at the very last page of the

4    document.  It would be page 97 if we had the whole beast, but

5    we are using an abbreviated version to make it easier for

6    folks to look at it.  Do you have that page, sir?

7    A.   Yes.

8    Q.   And this is part of your and your wife's federal income

9    tax return.  Correct?

10   A.   Yes.

11   Q.   And if you would look on that -- the information that's

12   typed on that page, in the third line -- excuse me, the fourth

13   line, it says, and I'm going to read you a sentence there

14   beginning with the word "due," it says, "Due to the

15   investigation of Stanford, which was active in 2008, the

16   taxpayer was concerned that his CD principal was in

17   jeopardy."  Do you see that reference?

18   A.   Yes.

19   Q.   What is the investigation of Stanford active in 2008

20   that's being referred to there?

21   A.   It's talking about the Receivership that actually is

22   about the month 2008, concerning the month 2008, and is still

23   underway by this time, which is probably October of 2008 or

24   '09, 2009 at the time of this signing of our IRS thing.

25   Q.   And I thought you told us the Receiver was --
```

```
 1    A.    Yes.

 2    Q.    -- February 18th of '09?

 3    A.    But this was written in '09.

 4    Q.    So how does the December '08 investigation tie into the

 5    Receivership in '09 from your perspective?

 6    A.    Well, it's all related to how we do taxes, and there's a

 7    question obviously how we do taxes for '08 since we took out

 8    loans reference -- I remember talking about quite a few times

 9    that did we take the interest payment at which point we would

10    owe taxes on the interest gained, the 25 million, we would owe

11    taxes if we took it as interest payment.  But if it was

12    principal, it would be just a return of principal.

13    Q.    I'd like to talk to you about one more brief topic, and

14    then I'm going to let Mr. Sadler ask you questions or the

15    Judge will allow Mr. Sadler to ask questions.

16          You heard Mr. Sadler in his opening refer to what

17    happened here as being a made-up story, did you not?

18    A.    Yes.

19    Q.    Is that accurate?

20    A.    I'm not a liar.

21    Q.    And have you made up any of this story in an effort to

22    try and pull one over on the Receiver or the Court?

23    A.    I have not.

24    Q.    He also told the jury that Stanford International Bank

25    provided you with facts that it was lying to cover up its own
```

1    fraud.  Do you remember hearing that?

2    A.    Yes.

3    Q.    Did to your knowledge, based on what you received from

4    the bank, did you ever get those types of facts?

5    A.    No.

6    Q.    Did Juan Rodriguez-Tolentino at any point in time in the

7    conversations that you had with that gentleman ever tell you

8    that he was lying, selling you a bill of goods?

9    A.    He did not.

10   Q.    And did you at any point in time, prior to the January of

11   2009 date that we've already discussed, have any factual

12   information that all of this was a cover-up of some sort of

13   huge financial fraud?

14   A.    I did not.

15   Q.    Thank you, Mr. Magness.

16            MR. PETRIE:  Thank you, Your Honor.  I have no

17   further questions.

18            THE COURT:  All right.  I think that brings us to

19   our morning break.  Let's take about 20 minutes and we'll see

20   you-all back.

21            (Whereupon, the jury left the courtroom.)

22            THE COURT:  Anything else we need to take up?

23            MR. SADLER:  I just, Your Honor, wanted to hand up

24   our copy of the proposed errata sheet instruction.

25            THE COURT:  Thanks.  Anything else?

```
 1            MR. SADLER:  No, sir.

 2            MR. PETRIE:  No, sir.  Thank you.

 3            THE COURT:  All right.  See you-all in 20.

 4                      (Brief recess.)

 5            THE COURT:  Are we ready for the panel?

 6            MR. SADLER:  Yes, sir.

 7            THE COURT:  Let's bring them in.

 8            (Whereupon, the jury entered the courtroom.)

 9            THE COURT:  Be seated.

10       We'll go till 12:30 and take our lunch break then.

11       The Receiver may proceed.

12            MR. SADLER:  Thank you, Your Honor.

13                      CROSS EXAMINATION

14   By Mr. Sadler:

15   Q.   Good morning, Mr. Magness.

16   A.   Good morning.

17   Q.   I have put in front of you, because we are going to be

18   referring to it, a small black binder are some exhibits and

19   then that's a copy of your deposition.

20   A.   Okay.

21   Q.   There's a couple of things we need to start with because,

22   as Judge mentioned briefly, this case started in a bit of an

23   unusual posture.  So I want to first start by asking some

24   things about you.

25        Now, as I understand it--I've read your deposition--this
```

1    investing that you have done and done very well at, you've

2    been doing that since the late '80s.  Is that right?

3    A.    Yes.

4    Q.    Borrowing money, using that money to buy stocks, make

5    other investments, and making some good decisions, and that's

6    grown very well for you.  Right?

7    A.    Yes.

8    Q.    And that's, whatever that is, 20-some-odd years really or

9    more.  Right?

10    A.    I guess so.

11    Q.    Or 30, I guess?

12    A.    Closer to 35.

13    Q.    And nothing wrong with it, but you have done very well,

14    sir.  You've made a lot of money.  Right?

15    A.    A bit.

16    Q.    Okay.  And there are some financial terms that have been

17    thrown around we are going to talk about some, but you know

18    your net worth, I'm sure, is in pretty good shape, isn't it?

19    A.    At this point.

20    Q.    And net worth--I know some other financial terms have

21    been thrown around--you know what that means.

22    A.    Yes.

23    Q.    It's whether -- it's just what are your assets, what are

24    your liabilities, and what does that come out, does that come

25    out positive or negative.  That's net worth.  Right?

```
 1    A.    Right.

 2    Q.    Now, in the time frame we've been talking about in the

 3    2008, period which is what I'm going to focus on, even during

 4    that period of time with all the market troubles and

 5    everything, you held assets that were worth hundreds of

 6    millions of dollars.  Right?

 7    A.    Yes.

 8    Q.    Okay.  And you understand -- you understood then, you

 9    certainly understand now, but you understood then more than

10    just the basics of finances.  I mean, you understand a lot

11    about high finance, don't you?

12    A.    Some.

13    Q.    Well, I mean, yesterday and today I wrote some of them

14    down.  I mean, I heard you talking about arbitrage, synthetic

15    dividend, short-selling bid and ask.  I mean, you are pretty

16    conversant with high finance, aren't you?

17    A.    Some.

18    Q.    All right.  Well, you are a pretty smart fellow and you

19    know how to ask intelligent questions about financial matters,

20    don't you?

21    A.    Not always.

22    Q.    Not always.  Now, also during this time period, as we've

23    seen from some of these meeting minutes we are going to visit

24    about, you not only held a lot of stock, but you had ranches,

25    you had companies, and you dealt with many different banks.
```

1    Right?

2    A.    Yes.

3    Q.    I mean, am I overselling you or is it fair to say you are

4    a smart, sophisticated businessman?

5    A.    I would say that I try to employ people that are.

6    Q.    Okay.  But I'm asking about you.  Do you consider

7    yourself an intelligent, sophisticated businessman?

8    A.    That and a little bit lucky.

9    Q.    Lucky.  All right.

10        Now, you mentioned advisors.  And thank you for that

11   because I was just about to ask you.  In the time frame I'm

12   going to focus on, which is October '07 to about October '08,

13   maybe a little after that, it's true that you had lawyers and

14   advisors helping you with these various financial things,

15   including the Stanford stuff.  Right?

16   A.    Yes.

17   Q.    Some of these people -- and we're going to be a little

18   bit more clear about who they are and what their roles were,

19   the Mr. Sutton, Ms. Dokken, Mr. Wilk, Mr. Armstrong, these are

20   all people that you hired to help you with all of your various

21   financial holdings in different ways.  Right?

22   A.    Yes.

23   Q.    Okay.  Now, being in the investing business for, you

24   know, going on 30 years, I take it you would agree with me

25   that having access to timely, accurate information about your

68

1    investments, about what the market's doing, that's pretty

2    important, isn't it?

3    A.   Yes.

4    Q.   Conditions can change rapidly in the market.  Right?

5    A.   Yes.

6    Q.   New information can come out that can, you know, send the

7    stock soaring or send it over the cliff or send it all sorts

8    of places.  You are familiar with that?

9    A.   Yes.

10   Q.   Okay.  So stale information, old information, this is

11   what the market was doing six months ago, maybe it's

12   interesting but it's not really the kind of information you

13   really want if you are making big decisions about a lot of

14   money, is it?

15   A.   Sometimes.

16   Q.   All right.  So that's a little bit about who you are.  I

17   want to be sure that we understand, as we go through the

18   evidence together, that we understand what this case is about.

19        Now, do you understand that the Receiver's claim against

20   you is for taking cash out of the bank in October 2008?  Do

21   you understand what this lawsuit is about?  Right?

22   A.   Yes.

23   Q.   All right.  So I take it you also understand you're not

24   being sued for making your investments back in '04 and '05.

25   You are not being sued for that.  You understand that.  Right?

1    A.   Yes.

2    Q.   Okay.  Okay.  And if I understand it correctly, and --

3    and, look, you've told us about, you know, trips back I think

4    you said 2002 was when you first went down to -- and met Mr.

5    Stanford, stayed at the villa?  Wasn't it about 2002?

6    A.   I believe so.

7    Q.   Okay.  And you made some trips, I just heard about, to

8    the racing, where there was some agreement with Mr. Stanford

9    about advertising on the racing.  You understand you're not

10   being sued for that.  Right?

11   A.   Right.

12   Q.   Okay.  This is about you taking cash out of the bank.

13   Are we clear on that?

14   A.   Yes.

15   Q.   Okay.  Now, you understand, I assume, that the way things

16   are right at this moment is the Court has already found that

17   the cash you took out of the bank, that those were fraudulent

18   transfers.  You understand that.

19   A.   Yes.

20   Q.   And you also understand that the Court's already found

21   that when the bank made those transfers to you, gave you that

22   cash, the bank did it with intent to defraud its creditors.

23   You understand that.

24   A.   I understand that.

25   Q.   Okay.  Okay.  And I want to be clear, you understand that

1    what the jury's here to judge is basically what you knew and

2    when you knew it at the time you took the cash out.

3    A.    Yes.

4    Q.    That's kind of the big question here.  Right?

5    A.    That's it.

6    Q.    Okay.  Okay.  Now, let's be clear about something else

7    that may be a little confusing.  You had two different

8    financial relationships with two different parts of the

9    Stanford organization.  You had the whole CD, you'd invested

10   the CDs with the bank which was down in Antigua.  Right?

11   A.    Yes.

12   Q.    And then you had another relationship with a company

13   called Stanford Group Company, which was the ordinary

14   broker/dealer like, you know, a Charles Schwab or Merrill

15   Lynch that was headquartered down in Houston.  Right?

16   A.    Yes.

17   Q.    All right.  And the CDs were not kept down in Houston.

18   Right?

19   A.    Correct.

20   Q.    So you had your CD relationship with his bank down in

21   Antigua, and then you had a stock trading margin account and

22   so forth with his broker/dealer that was headquartered in

23   Houston.  Two different things.  Right?

24   A.    Right.

25   Q.    So again, just to be clear, there was some discussion

1  that Mr. Petrie went through with you in the notes about a

2  loan facility with Stanford back in, I think it was, '07 and

3  all that.

4      That doesn't have anything to do with the CDs, does it?

5  A.   No.

6  Q.   All right.  That's all about having another margin

7  account, just like you had margin accounts at Merrill, HSBC,

8  U.S. Bank, and maybe some others I'm forgetting.  Right?

9  A.   Right.

10  Q.   Okay.  Let's focus on the first part of the year between

11  October '07 and October '08.  All right?

12          MR. SADLER:  So if we could pull up Plaintiff's No.

13  134.

14  Q.   (BY MR. SADLER)  And you have it there in your book.  And

15  you're welcome to look at the paper or the screen, whatever's

16  easier for you, Mr. Magness.  Just whatever's easier for you.

17      Okay.  And we skipped past the agenda, and we're now

18  looking at the minutes of your Mango Five board in October 1,

19  2007.  Are you with me?

20  A.   Yes.

21  Q.   Okay, sir.  Now, I want to go to the next page -- well,

22  actually hold on.  I got ahead of myself.  So let's first talk

23  about who is present.

24      Obviously you were present, Gary Magness.  We see that

25  there.  Ray Sutton is also present for this meeting.  Right?

1  A.  Yep.

2  Q.  And Ray Sutton is a lawyer that works for the Baker

3  Hostetler firm.  At this time he did.  Correct?

4  A.  Yes.

5  Q.  And you hired him and his firm as one of the people that

6  were going to help you with various aspects of your

7  investments.  Right?

8  A.  Wrong.

9  Q.  I'm sorry?

10  A.  He's an estate lawyer and an ex-lawyer litigator.  He's

11  not a finance guy.  He just is somebody uninterested in

12  selling me something.

13  Q.  And he is acting as one of your advisors sitting on the

14  Mango board.  Right?

15  A.  That's right.

16  Q.  Okay.  You took advice from him.  Right?

17  A.  Yes.

18  Q.  He showed up at, I think, every one of the meetings we're

19  going to talk about from October all the way from April '09.

20  He was at every one of them.  Right?

21  A.  Yes.

22  Q.  Okay.  And Mr. Knudson, he is the gentleman here in the

23  back of the room -- not back of the room but right here

24  (indicating).  Right?

25  A.  Yes.

1   Q.   Okay.  And Mr. Knudson has worked for you for a very long

2   period of time, has he not?

3   A.   Well, we've been partners a long time.

4   Q.   Okay.  More than ten years, 20 years?

5   A.   Yes.

6   Q.   Okay.  All right.  And then Ms. Dokken is at this

7   meeting.  And as you described her, she was your long-time

8   chief financial officer, I think just retired back in 2015.

9   Is that right?

10  A.   Yes.

11  Q.   Okay.  And then, finally, we have Mr. Armstrong.  Just so

12  we're clear who he is, he's another lawyer.  Right?

13  A.   Yes.

14  Q.   And he's got a little bit different job.  He is helping

15  you with -- I may use the wrong word so please correct me.

16  The fact that this trust is domiciled in Nevada, there are

17  certain legal requirements you have to meet, and he is helping

18  you with that piece of this.  Is that fair?

19  A.   Yes.  And he's also a trust attorney.

20  Q.   A trust attorney.  Right?

21  A.   Yes.

22  Q.   But, correct me if I'm wrong, I believe Mr. Armstrong, by

23  the contract you had with him, he's not being paid to give

24  investment advice, if I understand that right.

25  A.   That's right.

74

1    Q.    Okay.  Okay.  So now we know who's here.

2          Now, let's go then, if we could, to page -- and your

3    meeting -- one other question.  I'm sorry.  It says your

4    meeting at the Wynn resort that's, the big casino in Las

5    Vegas.  Is that right?

6    A.    That's right.

7    Q.    Did you guys rent a room, rent a conference room?  How

8    did that work?

9    A.    A big room.  It's a regular hotel room.

10   Q.    Like a hotel suite?

11   A.    Yes.

12   Q.    Where you had plenty of room to meet and stuff?

13   A.    Right.

14   Q.    So let's go to page 2 of this document, and I first want

15   to direct your attention to the very top paragraph.  So you

16   guys are meeting in October of 2007, and this is one of

17   several items on the agenda.

18         And what we're looking at at the top is Ms. Dokken is

19   giving you a report.  And she's reporting there, is she not,

20   that one of the things going on in this time is that you had a

21   margin loan with Merrill Lynch?  Right?

22   A.    Yes.

23   Q.    And you were using $50 million to reduce a debt you owed

24   to HSBC.  Right?

25   A.    Yes.

1    Q.   And I'm just using this as an illustration.  So you've

2    got 50 million in available credit, at least 50 million

3    available credit at Merrill Lynch, and for whatever reason

4    we'll talk about in a minute, you're just moving that over and

5    paying down your debt over at this other bank.  Right?

6    A.   That's right.

7    Q.   Okay.  And, I mean, this is kind of routine throughout

8    this time frame, isn't it?

9    A.   No.

10   Q.   Not routine?

11   A.   No.

12   Q.   I thought you told us, and maybe I misunderstood, that

13   from time -- you kept several banks -- margin accounts at

14   several banks.  And one of the things you would do is you

15   would negotiate better terms at this bank or that bank, and if

16   you could negotiate better terms, you might move money from

17   this bank to that bank.  Right?

18   A.   As I said, if they ratcheted us up, then we would talk to

19   them about taking us back down even with the other banks or we

20   would pay them off.  This is exactly that.  They are being

21   paid off because they refused to lower their interest rate,

22   which they did in about 50 days from this point.

23   Q.   Exactly.  Exactly.  So all you're doing, you've got the

24   50 million there, that's cash money.  Right?

25   A.   Right.

1    Q.   And you're moving that 50 million cash out of one bank to

2    another bank for good business reasons that you just

3    described.  Right?

4    A.   That's the only time we had to do it.

5    Q.   Okay.  Okay.  But certainly if you get better terms at

6    one bank than another bank, that might be a good reason to

7    move your business or move your cash from one bank to another

8    bank.  Right?

9    A.   Right.

10   Q.   Okay.  And I assume you would then agree with me, as a

11   good businessman, if you had two banks where you had money and

12   you came to think that one of those banks was an unsafe place

13   to have your money, you would move that money from the unsafe

14   bank to the safe bank, wouldn't you?

15   A.   I hadn't had any history of that, but that's a good idea.

16   Q.   Sure.  You'd do that, wouldn't you?

17   A.   I betcha I would.

18   Q.   Okay.  Now, we now need to go back and -- there was some

19   documents you and your colleague, your attorney, skipped over

20   a little too quickly, and I need to go back to them.

21        So let's look at Plaintiff's Exhibit No. 133.  Now, this

22   is the same date.  Right?  October 1 meeting in Las Vegas.

23   Right, sir?

24   A.   Yes.

25   Q.   And this wasn't entirely clear.  So I think the way this

1    worked--let me just say it and you tell me if you agree with

2    me--you guys would meet not exactly quarterly, but you would

3    meet close to that.

4        And when you would meet, you would have two separate

5    meetings that you then had two separate sets of minutes for.

6    You would have a board meeting, and then you would have an

7    investment committee meeting.  Have I got that basically

8    right?

9    A.    Yes.

10   Q.    Okay.  But it's the same group of people.  It's just you

11   do the board's business and then you adjourn and then you do

12   the investment committee's business and then you go do

13   whatever you are going to do.

14   A.    Exactly.

15   Q.    Okay.  And Mr. Sutton is there for both of those.

16   A.    Yes.

17   Q.    And you are obviously.  Right?

18   A.    Yes.

19   Q.    And Mr. Knudson for both?

20   A.    Yes.

21   Q.    Mr. Armstrong is there, sometimes participating, though,

22   by phone.  Right?

23   A.    Right.

24   Q.    And not always but frequently Ms. Dokken is invited.

25   Right?

1    A.    Yes.

2    Q.    And Mr. Espy is invited.  Is that right?

3    A.    Not always invited.  Sometimes he's present.

4    Q.    Okay.  And then there's another fellow that I've heard

5    the name--we're going to talk about him--Chuck Wilk.

6    Sometimes he is at these meetings?

7    A.    Right.

8    Q.    Okay.  Now, if we go to the next page -- and I guess

9    actually it's not the next page.  It's paragraph 3 -- page 3,

10   paragraph 7.  Excuse me.

11        So October '07, you and the members of the board, you

12   tell Ms. Dokken, go get Mr. Espy to prepare a full report that

13   we want to talk about at the next meeting on the CD program.

14   Right, sir?

15   A.    Yes.

16   Q.    And just to be crystal clear, the CD program in Antigua.

17   It doesn't say Stanford, but that's exactly what you're

18   talking about there.  Right?

19   A.    Yes.

20   Q.    Okay.  And I was interested in something that you said

21   about this next part.  You guys further requested Ms. Dokken

22   to inquire of Chuck Wilk as to how the certificate of deposit

23   program could be further investigated.  Do you see that?

24   A.    Yes.

25   Q.    Now, Chuck Wilk was also from time to time one of these

1    advisors, was he not?

2    A.    He is known as our paid pessimist.

3    Q.    And Mr. Wilk was asked to -- Ms. Dokken was asked to find

4    out from Mr. Wilk how to further investigate, and I think you

5    described for Mr. Petrie what that was all about.  Mr. Wilk

6    was involved in some other program, and he had some

7    information and this that and the other.

8          This is the stuff you talked about just about an hour

9    ago.  Do you recall?

10   A.    Yes.

11   Q.    Okay.  But it's interesting because, Mr. Magness, we

12   asked you about this very subject in your deposition in this

13   case that we took last February.  You remember sitting for

14   your deposition?

15   A.    Yes.

16   Q.    You showed up with your attorney, court reporter, you

17   answered questions from my colleague, Mr, powers about a lot

18   of the stuff we're going to talk about today.  You remember

19   doing that?

20   A.    Yep.

21   Q.    And do you remember, sir, a question was put to you, what

22   needed to be -- what was going on with this further

23   investigating?  Do you remember that subject coming up in your

24   deposition?

25   A.    I -- yes.

```
 1    Q.   And do you remember telling us then under oath that you

 2    couldn't recall what this further investigated was all about?

 3    Do you remember telling us that?

 4    A.   It's the word "investigation" that's different.  Just to

 5    investigate the asset is probably -- I didn't remember -- I

 6    don't know what I remembered last time, but I'm telling you

 7    what I remember now.

 8    Q.   Understood.  And -- fair enough.  And I think yesterday

 9    even in answering Mr. Petrie's questions, I mean, you had a

10    lot of trouble recalling specifics.  I counted probably a

11    dozen times where you just told him, "I don't recall."  And

12    that's fair.  A lot of this stuff happened a long time ago.

13    Right?

14    A.   Right.

15    Q.   All right.  Now, did Mr. Wilk have some specialty in

16    financial investigation?

17    A.   He's just a pretty bright individual.  He worked for a

18    group called Quellos Group, which was about a hundred of these

19    smart individuals, and so we relied on him to give us a

20    different story.

21    Q.   Okay.  And Mr. Wilk, I believe you understand, you guys

22    planned to call him as a witness in this case.  Right?

23    A.   Yes.

24    Q.   Okay.  And you understand that Mr. Wilk has had some

25    trouble with the law.  Right?
```

1   A.   Yes.

2   Q.   You understand that Mr. Wilk went to the federal

3   penitentiary for tax fraud.  Right?

4   A.   Yes.

5   Q.   After this.

6   A.   Yes.

7   Q.   Okay.  But to your recollection, he didn't have any

8   special financial investigative experience.  He was just a

9   smart guy.  Do I understand you right?

10  A.   Right.

11  Q.   Okay.  And one of the people you relied on?

12  A.   Yes.

13  Q.   All right.  Now, this request to Ms. Dokken that she ask

14  Mr. Espy to prepare a full report, that's what leads us to her

15  email to Mr. Espy about 90 days later in February asking Mr.

16  Espy for a full report.

17       Do you recall talking about that with Mr. Petrie.

18  A.   Yes.

19  Q.   Okay.  Well let's put that up because I've got a couple

20  of more questions about that.

21            MR. SADLER:  That's Plaintiff's No. 56, if we could.

22  Q.   (BY MR. SADLER)  And so there's this question about

23  mortgages.  And I was not understanding it, so I need to come

24  back and ask you something about mortgages.

25       The request, do you agree with me, that Ms. Dokken made

1    on your behalf to Mr. Espy -- and I keep calling him Mr. Espy.

2    You have referred to him a couple of times as Tommy.  Can I

3    just call him Tommy?

4    A.    You can.

5    Q.    Okay.  Ms. Dokken's request to Tommy was, you guys would

6    like to understand and review the strategies and investments

7    that the Stanford bank certificates of deposit were exposed

8    to.  Right there.

9    A.    Correct.

10   Q.    That was what you guys were interested in.  Right?

11   A.    Yes.

12   Q.    Doesn't say, tell me whether or not you're in the

13   mortgage business.  Doesn't say that, does it?

14   A.    No.  It says what their exposure, I believe.

15   Q.    Yeah.  You want to know -- and by this time you've

16   already made all your investments in the Stanford CDs by this

17   time, haven't you?

18   A.    Right.

19   Q.    And as you talked about, you invested over time $79

20   million and you let the interest accrue.  And by this time,

21   it's bound to be what?  90-something million.  At least that

22   by this time.  Right?

23   A.    I think so.

24   Q.    Yeah.  And so you've got a $90 million plus whatever the

25   exact number is investment, and it makes sense you would want

1    to know the strategies and investments that those certificates

2    of deposit were exposed to.  Right?

3    A.    Yes.

4    Q.    That's an intelligent question, isn't it?

5    A.    Yes.

6    Q.    Okay.  The part that I'm puzzled about is the stuff about

7    mortgages.  Now, I just need to ask you, have you ever had the

8    experience of buying a used car?

9    A.    Yeah.

10    Q.    Okay.  And not disparaging used car salesmen, but

11    sometimes they can be a little bit fast and loose, like you

12    might be asking about this shiny car on the lot and say, hey,

13    has that ever been in a wreck?  And the response is, oh, the

14    engine runs great.  And you ask them again, have you ever been

15    in a wreck with this car?  Oh, the engine runs great.

16         Have you ever had a kind of experience like that?

17    A.    I think so.

18    Q.    I think maybe we all have.  You are asking about this and

19    they are kind of answering about that.  You've seen people do

20    that.  Right?

21    A.    Yep.

22    Q.    Okay.  So the question is, tell me about your strategies

23    and investments, please prepare a report.  So that was the

24    question asked -- just to be crystal clear, that's the

25    question you guys were interested in as of February 5, 2008.

1    Right?

2    A.    Right.

3    Q.    Okay.  Now, this goes from Ms. Dokken to Tommy Espy.  And

4    I'm sure you're aware he acknowledged it.  He responded to her

5    email.  You've probably seen that before, haven't you?

6    A.    Yes.

7    Q.    Okay.  And you know one of the problems in communicating

8    about this is maybe sometimes people honestly misunderstand.

9    You know, you thought I was asking you about something, and

10   therefore when your answer came back, we just passed each

11   other.  I mean, look, it happens.

12        So we need to look at what Mr. Espy said in response to

13   getting this very specific question.  And in order to do that,

14   we're going to have to look at Defendant's Exhibit No. 615.

15   This isn't a document we've seen before.  That will be towards

16   the front of your book, or on the screen.  Again, whichever is

17   easier.

18   A.    Okay.

19   Q.    So this is Defendant's Exhibit No. 615.  And you'll see,

20   if we focus first at the top of it, same day, February 5, same

21   day as the email we just saw, and now Mr. Espy is replying

22   back to Tonya Dokken.  And he says, oh, I was just speaking to

23   Gary when your request came in.

24        Gary would be you, wouldn't it?

25   A.    Yes.

1  Q.   Yeah, of course.  And he says, You're not alone in this

2  request.  I'm going to send you the last statement we made on

3  this issue.  I will have a more thorough and detailed

4  statement and info prepared ASAP.

5       That was his response.  Right?

6  A.   Yes.

7  Q.   So he seemed to understand that the request was, tell me

8  about the investments and strategies that the certificates of

9  deposit were exposed to.  He seemed to understand what was

10  being asked of him, doesn't he?

11  A.   Yes.

12  Q.   Okay.  But curiously if we now focus on the bottom half,

13  he says he's forwarded some information.  And let's just focus

14  for a minute on this.

15       What he forwards to to Tonya Dokken is something from six

16  months earlier, which was forwarded to him, a message from

17  JRT.  You recognize JRT as that's is Juan Rodriguez-Tolentino.

18  He's the bank president.

19  A.   Okay.

20  Q.   And please take a moment, if -- if you need to, because

21  we haven't looked at this before.  Let's be sure -- I don't

22  want to -- I don't want to cut off anything.

23          MR. SADLER:  Mr. Jarrett, if you could be sure we're

24  seeing all of it.  Is that all of it or is there more?  Let's

25  just blow up all of it so we're not -- all the way down to

1    Juan Rodriguez-Tolentino so we're not missing any of it.

2    Well, that's not helpful.

3         Can the jury see that?  We're happy to blow it up.

4         Mr. Jarrett, why don't you just grab from message from

5    JRT below down to his signature just so we can focus on that

6    so we're not missing anything.

7    Q.   (BY MR. SADLER)  All right.  So Tonya Dokken, February 5,

8    says, please tell us, get us a report, what are the strategies

9    and investments underlying the CD.

10        Tom Espy says, got it, understand, you'll get it; in the

11   meantime, here's some info.

12        And this info, I grant you, is all about the mortgage

13   market and the subprime mortgage market risk, and there, sure

14   enough, was a problem with the subprime mortgage market in

15   this time frame, wasn't there?

16   A.   Yes.

17   Q.   Okay.  And so one thing Mr. Espy does, when he's asked

18   about strategies and investments, he says, well, here's some

19   information we put out six months ago.

20        That's his first response.  Right, sir?

21   A.   Right.

22   Q.   And if we go back to the top of the email and be sure we

23   focus in on that thorough detailed statement and info, you

24   never got that, did you, sir?

25   A.   I don't know.  If that was it, the letter from Juan

1    Rodriguez stated that it had less than five percent exposure,

2    which was our biggest concern.

3    Q.   Sure.  But --

4    A.   I think that's what he's referring to in the top line,

5    you are certainly not the only -- alone in this request.  I

6    think he's talking about exactly that.

7    Q.   That's right.  So the question is, tell me about your

8    investments and strategies.  And the answer is, well, we're

9    not in the subprime business.

10        We're kind of back to the used car guy.  You kind of ask

11   about this, and they give a little bit about that.

12   A.   He said he had less than five percent --

13   Q.   Okay.

14   A.   -- associated with that exact instrument.

15   Q.   Sure.  Now back to my question.  Isn't it true that you

16   never got the full report, the more detailed statement of

17   info, that you asked for?  Isn't that true?

18   A.   I think that seems to be a report in its own -- own right

19   there.  Our concern was exactly that.

20   Q.   So I'll direct your attention, and we can all look at it,

21   Mr. Espy says, I am forwarding the last statement made on this

22   issue from August.  That's what's below.  And then he says, I

23   will have a more thorough and detailed statement and info

24   prepared.

25        And let me just ask it one last time:  From your memory,

1    do you know of any thorough detailed statement that you

2    received responsive to the question you had, tell me about the

3    strategies and investments, after this.

4    A.    I don't think so.

5    Q.    Okay.  In fact, you know what you got.  You ended up

6    getting that phone call, that phone conference directly with

7    Juan Rodriguez-Tolentino on March 6th.  Right?

8    A.    Okay.

9    Q.    That's what happened.  Somehow we skipped over the

10   thorough detailed written report, and you just got a phone

11   call.  That's the sequence of events.  Right?

12   A.    Okay.  Yes.

13   Q.    Okay.  And what -- what's interesting -- again, just

14   to -- just to stay with mortgages for a minutes, because I

15   know you guys have focused on this, let's look at Plaintiff's

16   Exhibit No. 62.

17        Now, let's be sure -- if we go to the second page and

18   just enlarge the very top so we know what we're talking about.

19   All right.

20        So now this is March 6, 2008.  This is a month after Ms.

21   Dokken has sent to Tommy, please give me a full report on

22   strategies and investments.  He responds back.

23        There's no detailed report, but now you have a phone

24   call.  And this is the date that phone call took place, right,

25   March 6, 2008?  Is that correct?

1   A.   Correct.

2   Q.   And, again, let's set the stage on who is there.  So you

3   were there, Gary Magness, Mr. Sutton is there, Mr. Knudson is

4   there, Ms. Dokken was invited, and Tommy came as well.  Right?

5   A.   Right.

6   Q.   And we skipped over poor Bob.  He called in, but he was

7   present by phone.

8   A.   Right.

9   Q.   All right.  So now we -- and -- oh, and it's at the same

10  Wynn casino resort in Las Vegas.  Right?

11  A.   Yes.

12  Q.   Do you have a standing suite?  Were you having to make

13  reservations each time?  How did that work?

14  A.   We had to make it every time.

15  Q.   Make it every time.  Okay.  So let's go to the discussion

16  of Stanford, which I believe is at page 3, paragraph 5.  There

17  it is.  And I think we can all see it without it being

18  enlarged.

19       But this is what you just talked about a few minutes ago

20  with Mr. Petrie.  Is that correct?  This is the same document,

21  isn't it, Mr. Magness?

22  A.   Yes.

23  Q.   Okay.  Now, here it looks like the question that you guys

24  put to Mr. Rodriguez is, report to us on the safety of these

25  certificates of deposit.  That's what you asked him for on

1    this phone call.  Right, sir?

2    A.    Yes.

3    Q.    We're going to go over, and if I skip it, you catch me,

4    but I don't see, just staring at this three-paragraph summary,

5    two-paragraph summary of what he said, I don't see any

6    discussion of the mortgage market at all.  Do you?

7    A.    No.

8    Q.    And what's curious about that -- and we're going to have

9    to get out of this for just a minute and go to something else,

10   so just bear with me.

11          What's curious about the fact that there's no discussion

12   of mortgages or mortgage exposure here is I thought that's

13   what we were going to see.  And the reason I thought that is

14   because didn't your lawyer in opening statement say that the

15   whole purpose of having this call was to understand whether

16   the CDs were exposed to the mortgage market?  Do you remember

17   him saying that?

18   A.    Yes.

19   Q.    Okay.  And I guess then you were also right here when he

20   said -- and during this meeting, this phone call, Mr. Juan

21   Rodriguez-Tolentino said they only had a narrow exposure to

22   the mortgage market.  Do you remember your lawyer saying that?

23   A.    Yes.  I just read it a minute ago.

24   Q.    Well, we're looking at the minutes of what Mr. Rodriguez

25   said.  Do you see narrow exposure or exposure or anything

1    about the mortgage market in what was written down about what

2    he told you?

3    A.    I don't see it written here.

4    Q.    I don't see it written there, either.

5          Now, let's talk about what he told you, because I believe

6    what you told us just a little while ago is that with whatever

7    he told you and however you understood it, you felt good about

8    it.  Right?

9    A.    That's correct.

10   Q.    Didn't concern you a bit.  Fair?

11   A.    Correct.

12   Q.    Same stuff you had heard from them before when you'd gone

13   down to the island, met with this same gentleman, Mr.

14   Tolentino, and he explained to you how they make money.  It's

15   all the same.  Right?

16   A.    Pretty much.

17   Q.    Yeah, pretty much.  Okay.  Well, let's talk about these

18   things.  So the question is, tell us about the safety.  The

19   first thing he tells you is the nature of the bank resembles a

20   Swiss bank model.  Do you see that, sir?

21   A.    Yes.

22   Q.    And, of course, when we asked you about this at your

23   deposition last February, you couldn't recall what he meant by

24   the term Swiss bank model, could you?

25   A.    No.

1    Q.   And sitting here today, you have no idea what that means,

2    do you?

3    A.   No, I do not.

4    Q.   Okay.   And I'm sure you are familiar with the fact that

5    Mr. Sutton and Ms. Dokken and even Tommy Espy, all of whom are

6    at this meeting, they were all asked that same question in

7    their testimony in their depositions that were taken under

8    oath that we're going to hear about later in this case, they

9    were asked that same question, what did you understand Swiss

10   bank model to mean, and don't you know they all said just what

11   you did:  "I have no idea what he was talking about, I don't

12   know what he meant"?

13             MR. PETRIE:  Objection, hearsay, no foundation.

14             THE COURT:  I'll sustain the objection.

15   Q.   (BY MR. SADLER)  Let me ask the question this way.  After

16   this meeting, after you hung up the phone, did any of you look

17   at each other and say, what was all that stuff about Swiss

18   bank model?  I have no idea what he was talking about?

19        Did you guys have that kind of conversation?

20   A.   No.

21   Q.   So you didn't know what it meant.  We'll hear from the

22   others what they either knew or didn't know.  But let me ask

23   you now about this next one.

24        Mr. Rodriguez explained the regulatory oversight of the

25   bank in the country of Antigua.  Do you see that, sir?

1    A.    Yes.

2    Q.    Okay.  The regulatory oversight he was talking about was

3    not by the U.S. government, not by the Securities & Exchange

4    Commission.  He was talking about the regulations by that

5    little island down there in the Caribbean.  Right?

6    A.    Right.

7    Q.    Okay.  And you took comfort in that, that your at this

8    point 90-plus million dollar investment under the watchful eye

9    of regulators in some Caribbean country you visited twice, you

10   took comfort in that, didn't you?

11   A.    Yes.

12   Q.    He goes on kind of to get to -- he says here in the first

13   paragraph I'm pointing at here, Mr. Rodriguez explained the

14   nature of the certificates of deposit.  Do you see that

15   statement?

16   A.    Yes.

17   Q.    That really is kind of getting towards the answer to the

18   question Ms. Dokken asked a month earlier, tell us about the

19   strategies and investments that these certificates are exposed

20   to, just tell us what these things are.

21         That's kind of what he's getting ready to tell us about.

22   Right?

23   A.    Right.

24   Q.    And, of course, he says, you put your money in the bank

25   down in Antigua in exchange for a CD, and they pay you a high

1   interest rate.  And all that's true.  Right?

2   A.    Right.

3   Q.    I mean, that's kind of why you got in, because they were

4   offering an attractive interest rate.

5   A.    Correct.

6   Q.    Yeah.  Okay.  And then he says, well, the bank then takes

7   these funds, these funds meaning the funds you just put in.

8   Right?

9   A.    Right.

10  Q.    And he puts them in a portfolio of investments ranging

11  from equities to fixed income to precious metals, and other

12  alternatives.  That's what he told you guys.  Right?

13  A.    Yes.

14  Q.    Now, what he didn't tell you is exactly where or what any

15  of those things were, did he?

16  A.    I don't think so.

17  Q.    No.  He didn't tell you, oh, we have Apple, we have

18  Exxon, we are in German bonds.  He didn't -- he just gave you

19  exactly what's there--we are in a diversified portfolio of

20  equities and so on.

21  A.    That is right.

22  Q.    You've been in this investing business, moving money

23  around, since the late '80s.  How many times have you seen a

24  sales pitch or an ad for some bank, some hedge fund, some

25  investment advisor, saying, bring your money to us, we will

1    put it in a portfolio of investments ranging from equities to

2    fixed uncomes to alternatives and so forth?  You've seen that

3    a hundred times, I bet?

4    A.    I've seen it.

5    Q.    That is sort of a generic sales pitch by a lot of people

6    in this business.  Right?

7    A.    Yes.

8    Q.    It doesn't really tell you anything about exactly what

9    they are doing with your money, does it?

10   A.    No.

11   Q.    And then he goes on to say -- he was asked, well, okay,

12   tell me how this is different from a hedge fund?  Do you see

13   that?  Just right after what we were talking about after the

14   alternative investments?

15   A.    Yes.

16   Q.    So somebody said, well, wait a minute, how is this

17   different from a hedge fund?

18         Was that your question?  Do you think you asked that

19   question?

20   A.    I don't recall.

21   Q.    Okay.  But somebody did.  Somebody said, well, wait a

22   minute, if you're taking the money the depositors put in and

23   you're spreading it on whatever this equities and other stuff

24   is, how is that different from a hedge fund?  Somebody asked

25   that question.  You feel pretty comfortable about that.

96

1    Right?

2    A.    Yes.

3    Q.    And so let's pause here and talk about hedge fund.  You

4    know what a hedge fund is.  It's another one of these

5    financial terms.  Right?

6    A.    Right.

7    Q.    And, first of all, hedge funds come in all shapes and

8    sizes.  Right?

9    A.    Yes.

10    Q.    Can we agree that if you are a hedge fund, you are not a

11    bank?

12    A.    Right.

13    Q.    Okay.  So whatever they are, they are different from a

14    bank.  So let's start there.  Now, hedge fund, again, a lot of

15    different kinds, but isn't typically a hedge fund where

16    some -- you know, some rich guys get together and they

17    accumulate money and they invite people to come in, put their

18    money in, and then they go off and they invest in start-up

19    companies and new technologies?  Maybe they do buy some -- you

20    know, some mature companies, but it's kind of a long-term

21    investment idea, isn't it?

22    A.    Sometimes, yes.

23    Q.    Yeah.  I mean, typically when you are talking about hedge

24    fund, you are not talking about putting your money in on

25    Monday and get it out on Friday.

1    A.    Some are locked down.

2    Q.    Yeah, yeah.  Long-term investments?

3    A.    Yeah.

4    Q.    Okay.  And he says, well, we're not a hedge fund because

5    we have regulatory oversight.

6         That's the next statement.  You don't know what that

7    means, do you?

8    A.    Not in its entirety.

9    Q.    No.  And then -- well, let me pause there.  Over the

10   years, you started -- I think you said you bought your first

11   certificate of deposit back in '99.  Right?

12   A.    Right.

13   Q.    And then you cashed that in and there was a gap and then

14   you bought the other ones we are here to talk about a few

15   years later.

16        So over the years you and your folks, I'm sure, got a

17   stack of quarterly statements, annual reports, sales

18   literature, disclosure booklets.  You got a lot of literature

19   from Stanford over the years, didn't you?

20   A.    I don't know.

21   Q.    Well, I'm not saying you read it, but I mean you're

22   confident you guys got it.  Right?

23   A.    I presume.

24   Q.    Okay.  Whatever you took the time to look at, do you ever

25   recall seeing that Stanford was advertising to the public that

```
1    it was kind of like a hedge fund, had characteristics of a

2    hedge fund?  Did you understand that was part of their public

3    sales pitch?

4    A.   No.

5    Q.   Okay.  Because if you are calling yourself a bank but you

6    say we are really kind of like a hedge fund, that's kind of

7    confusing, isn't it?

8    A.   Yes.

9    Q.   So let's look at this next one.  Mr. Rodriguez stated

10   that the bank can leverage the portfolio by a factor of 15

11   percent.  That's kind of in the middle of this paragraph.

12   This is another one of these things.  Leverage, that's another

13   financial term.  Right?

14   A.   Yes.

15   Q.   And you'd agree with me that just means borrowing,

16   doesn't it?

17   A.   Yes.

18   Q.   And it's -- margin borrowing is a form of leverage, is it

19   not?

20   A.   Yes.

21   Q.   You have some kind of asset, whether it's stock or

22   something else, and you borrow money pledging that as a

23   collateral, you then take that money and invest it in

24   something else.  Right?

25   A.   Yes.
```

1    Q.    And presumably the something else you invest it in, kind

2    of like the way you did with the Stanford CD, is you borrow at

3    a low rate and you hope the money you take will return a

4    higher rate.  Right?

5    A.    Exactly.

6    Q.    Otherwise, there's really not much point doing it, is

7    there?

8    A.    Right.

9    Q.    So he says the bank can leverage the portfolio by a

10   factor of 15 percent.  Now, that means, isn't he telling you,

11   we can borrow--we, the bank--can borrow up to 15 percent of

12   our entire investment portfolio?  Isn't that what he was

13   telling you?

14   A.    Yes.

15   Q.    Now, that wasn't part of the public sales pitch either,

16   was it?

17   A.    I do not know.

18   Q.    Well, sir, in all the annual statements that came out, if

19   we look at '99 all the way up through -- I think the last one

20   was 2007, because they never got around to a 2008 for reasons

21   that are obvious, don't you know that the bank never listed

22   any kind of significant debt on its balance sheet?  Don't you

23   know that?

24   A.    I don't know.

25   Q.    You have an expert witness who's designated to testify in

1    this case on your behalf.  Is that one of the things he ever

2    looked at?

3    A.    I don't know.

4    Q.    If the bank was able to give you the kind of returns you

5    and the rest of the investors who put money in, that it was so

6    proud of, nine percent and so forth, and they were saying,

7    well, we can do that because we can borrow up to 15 percent of

8    our portfolio, wouldn't you think that would be something that

9    would be in the public disclosures?

10   A.    Yes.

11   Q.    And, in fact, we have one.  And, in fact, why don't we

12   just take a look at it here.  I believe it's Plaintiff's

13   Exhibit No. 492.

14           MR. SADLER:  Let's put that up.

15   Q.    (BY MR. SADLER)  And this is one of -- tell me when you

16   got it.  This is one of many examples of kind of the Stanford

17   sales pitch literature from Stanford International Bank that

18   just kind of gives you the 95,000-foot level view of the

19   program.

20   A.    Well, it didn't show up, but I can see it over here.

21   Q.    I'm sorry that is not in your book.  We kind of edited

22   that at the last moment.  Look on the screen or your screen.

23           So this is just the cover page so let's go to the next

24   page, kind of see what we're looking at.

25           MR. SADLER:  And let's just blow that up just to be

```
 1    sure we know what we're looking at here.  It may be helpful.

 2    Q.   (BY MR. SADLER)  But, I mean, you can see here that this

 3    is -- this is just kind of Stanford Financial Group, we're a

 4    great company, and we're involved in -- it's just kind of

 5    sales talk.  Right?

 6    A.   Yes.

 7    Q.   Nothing specific about their investments on this page, is

 8    there?

 9    A.   No.

10    Q.   Okay.  All right.  So let's skip over that.

11         MR. SADLER:  Go to the next page.  And we can skip

12    that.  And now they're -- let's blow up that bottom piece

13    there, Mr. Jarrett, just so --

14    Q.   (BY MR. SADLER)  This is kind of in six bullets the basic

15    sales pitch for the Stanford CD, wasn't it?  Your deposits are

16    secure, we pay higher rates, you can get access, we can have

17    some other services, five-star personal service, and we do

18    innovative stuff.

19         I mean, again, it's kind of their sales pitch to you,

20    wasn't it?

21    A.   I suppose.

22    Q.   Yeah.  All right.

23         MR. SADLER:  Let's look at the next page.  And this

24    talks about depositor security.  Let's just blow all that up

25    so we can see what we're talking about here.
```

1    Q.    (BY MR. SADLER)  And this is Stanford sales pitch to the

2    public.  Right?  And they're talking about liquidity and

3    investment time horizons.  Do you see that, sir?

4    A.    Yes.

5    Q.    Let me focus your attention on liquidity.  Do you have

6    that?

7    A.    Yes.

8    Q.    Liquidity, that is another financial term.  You agree

9    with me that, in terms of talking about assets, liquidity

10   means it's either cash or you can turn it into cash right

11   quick.  Is that a pretty good definition?

12   A.    Yeah, that's saying you can turn it into cash.

13   Q.    Yeah.  So, for example, real estate, that's not liquid.

14   A.    Not as liquid.

15   Q.    No.  If you own some corporation, that's not liquid,

16   either.

17   A.    Stock may be.

18   Q.    Exactly.  If you own the stock, if it's traded on a

19   public market, you can go sell it.  But if you own a building

20   or if you own railroads, you know, that's not liquid, is it?

21   A.    No.

22   Q.    Okay.  So what they're telling the world, and I'm sure

23   they told you as part of their sales pitch to you, they are in

24   a well-diversified portfolio of securities, stable

25   governments, and it's very liquid.  You understood that was

1   part of their sales pitch to you.  Right?

2   A.   I think so.

3   Q.   Yeah.  And this is part of their sales pitch, not just to

4   you personally but basically to everybody.  Right?

5   A.   Right.

6   Q.   Put your money here, we keep it liquid.  That's the

7   pitch.  Right?

8   A.   Right.

9        MR. SADLER:  Let's go to the next page.  We can skip

10   that.  Well, hold on.  Let's go back.

11   Q.   (BY MR. SADLER)  Now, this woman here, you've met her

12   before right.  You know who she is?

13   A.   I think so.

14   Q.   That's Laura Pendergest-Holt?

15   A.   I think so.

16   Q.   She was the chief investment officer for Stanford

17   Financial?

18   A.   Yes.

19   Q.   Also one of the criminals convicted and sent to the

20   penitentiary when all of this was shut down by the government?

21   A.   Yes.

22   Q.   Okay.

23        MR. SADLER:  Let's skip over here.  All right.  So

24   now let's blow this up right here so we can see what they're

25   talking about.

1    Q.   (BY MR. SADLER)  Now, here we get back to this leverage

2    of the portfolio comment.  You see there where it says no

3    credit risk?  Do you see that, sir?

4    A.   Yes.

5    Q.   So what Stanford bank consistently told the public was,

6    hey, we're not exposed to any kind of commercial loan problem.

7    The only lending we do is to people like you, investors,

8    people who have put money in our bank.  That's what they were

9    telling the public.  Right?

10   A.   Yes.

11   Q.   Okay.  You'd agree with me, sir, that what's described

12   here, this is not describing leveraging a portfolio to make

13   high returns, is it?

14   A.   I don't believe so.

15   Q.   In fact, isn't this saying the opposite of that--we're

16   not into lending, we're not into borrowing.  Right?

17   A.   I'm not sure it says that.

18   Q.   Okay.  All right.

19        MR. SADLER:  Well, let's go back to Plaintiff's

20   Exhibit No. 62, which is where we just were, and go back to

21   the paragraph -- the highlighted paragraph we were discussing

22   and blow that up so we can go back to it.

23   Q.   (BY MR. SADLER)  So you would agree with me, sir, that if

24   the bank actually was doing what the bank president told you

25   on that phone call in March of 2008 that they were, in fact,

1   borrowing as much as 15 percent of their entire portfolio,

2   that was not part of the public sales pitch, was it?

3   A.   I don't know.

4   Q.   Now, if we go on to this next one, we get back to the

5   hedge fund.  He says, well, I admit the CD has some

6   characteristics of a hedge fund, but it's very liquid.  Do you

7   see that?

8   A.   Yes.

9   Q.   Isn't he telling you your CD can be returned to you in

10   cash, it is very liquid?  That's what he's telling you, isn't

11   it?

12   A.   Yes.

13   Q.   Okay.  And, in fact, he goes on to say, well, 60 percent

14   of the bank's portfolio was in U.S. dollar denominated

15   investments.  Do you see that?

16   A.   Yes.

17   Q.   Does that tell you anything about where he has put the

18   money you and thousands of others have given to that bank?

19   Does that tell you anything about that?

20   A.   Yes.

21   Q.   Does it tell you where, what companies, what stocks, what

22   bonds, what investments?  Does it tell you anything about

23   where that money is?

24   A.   No.

25   Q.   No.  Of course not.  It just says they use dollars to buy

1   it, whatever it is.  Right?

2   A.   Right.

3   Q.   Okay.  And that's it, because the next comment is you

4   guys just thanked him, and that was it.  And I assume he just

5   disconnected on his end of the line, and you guys continued

6   your meeting.  Right?

7   A.   Right.

8   Q.   So you'd agree with me, sir, that if the question that

9   leads to this whole phone call is, we want to understand the

10  strategies and investments the CD is exposed to, he really

11  hadn't told you anything, has he?

12  A.   I think that we were more concerned with the CDs'

13  exposure to the mortgage securities --

14  Q.   Okay.

15  A.   -- risk.

16  Q.   You were -- what you're telling the jury is you were

17  concerned about the one topic that is not discussed in the

18  document you're looking at?

19  A.   It's not written in this document.

20  Q.   Correct, sir.  But I want to be clear.  All this stuff,

21  diversified portfolio, hedge fund, leverage, characteristics

22  of a hedge fund, that doesn't tell you anything about where

23  they've taken the money that you and thousands of others have

24  put in and what they've done with it, does it?

25  A.   No.

1    Q.    Now, as this meeting ends, you guys at the meeting, you

2    make a decision about these Stanford CDs, and the decision you

3    make right here is what we're looking at.

4         I don't know if we can highlight that or blow it up, but

5    the decision by the committee, which is you, Ray Sutton, Steve

6    Knudson, and Bob Armstrong -- did I leave anybody else or is

7    it those four?  It's them?

8         What you guys decide is, after hearing all this, the

9    committee says, well, any more investments or any more

10   withdrawals or any withdrawals of the CDs, that's now Mr.

11   Magness' decision.  You made that decision at the meeting.

12   Right?

13   A.    Yes.

14   Q.    And these other folks, not you, but if we're talking

15   about Ray Sutton, Ray Sutton had no involvement in your

16   decision to invest in the first place in these CDs.  Right?

17   A.    Correct.

18   Q.    Bob Armstrong, same thing, no involvement in that.

19   Right?

20   A.    Correct.

21   Q.    But now the decision is, okay, Mr. Magness has these CDs,

22   and whatever he's going to do with them, it's not up to the

23   committee, it's now been delegated to him.  You guys made that

24   decision at this meeting.  Right?

25   A.    Right.

1   Q.   Okay.  From your memory, and I realize I'm asking you

2   about something that happened a few years ago, but after this

3   phone call when you heard all this stuff directly from the

4   bank president, did you guys, that is, all of you who were

5   assembled at the meeting, including Ms. Dokken, including

6   Tommy Espy, did you guys have a discussion along the lines of,

7   we haven't heard anything, we have no idea what they're doing

8   with my money?  Did you have any discussion like that at all?

9   A.   No.

10  Q.   All right.  Let's go back just so we -- and I think --

11              MR. SADLER:  Do we have a slide where we can just

12  focus on the particular terms?  I think it's kind of a

13  scatter-shot or cull-out slide.  If we can just focus on these

14  things.

15  Q.   (BY MR. SADLER)  Now, we just have been through this, and

16  this was his explanation of the nature of the bank and the CD.

17  We've just been through this.

18       But you would agree with me, sir, that whatever

19  this -- even if we don't understand what this is, whatever

20  this is, this is different than what the same bank president

21  told you how the bank made money when he first explained it to

22  you when you went down to the island.  Right?  It's different.

23  A.   There is a billion dollars involved, and I think there's

24  a lot of different things they were doing with the money.

25  This is what's written down after that meeting.  It's not a

1    recording.

2    Q.   I understand, sir.  But it was Mr. Sutton's job to take

3    these minutes.  Correct?

4    A.   Correct.

5    Q.   This was important business you did at these

6    almost-quarterly meetings.  Right?

7    A.   Correct.

8    Q.   Some of these things you are talking about, moving

9    millions of dollars here to there, selling that, buying that,

10   this is important stuff, isn't it?

11   A.   It is.

12   Q.   And you'd agree with me, Mr. Sutton took his job

13   seriously?

14   A.   Yes.

15   Q.   All right.  He's a lawyer at a reputable firm, isn't he?

16   A.   Correct.

17   Q.   Okay.  So the best record of what we have of what Mr.

18   Tolentino explained to you in March 2008 about how the bank

19   made money, it's this, isn't it?

20   A.   It's what he says he has his money in.

21   Q.   Yeah.  But, sir, that's different from what you

22   understood from your earlier conversations with Mr. Tolentino

23   about how the bank made money.  You had been given a different

24   explanation earlier, hadn't you?

25   A.   I had been given a different explanation, yes.

1   Q.   Yeah.

2   A.   But I didn't think it was in the complete, you know,

3   total of all the investments they had.  They had investments

4   in airlines, investments in hotels, investments in Florida

5   property, condominiums.  They had lots of investments, and I

6   said I didn't want to be in those.

7   Q.   Understood.  So you were told--I want to be clear--not at

8   this meeting but this is part of the earlier explanation.  Is

9   that what you're talking about?

10  A.   Right.

11  Q.   Yeah.  Okay.  So in the earlier explanation that you got

12  from Tolentino, one of things he said is, we've got

13  airlines-as you said--hotels, real estate, things like that.

14  Right?

15  A.   Yes.

16  Q.   Now, did he -- did he tell you at this earlier time when

17  you first heard from him how the bank was making money, that

18  when they took in investor money in the form of CD purchases,

19  that they used that money to buy airlines, buy hotels, buy

20  real estate?

21  A.   That's some of -- they showed me some of their

22  investments, yes.

23  Q.   Did you -- again, I know you didn't look at maybe not

24  much of it, but do you think that if we looked at all the

25  sales literature over the years from Stanford International

1    Bank, that we might find anywhere where they're telling the

2    public, that they're taking the public's money in when they

3    buy these CDs, and they're using it to buy things like hotels

4    and real estate and airlines?  Do you think we would ever find

5    anything like that in their public sales literature?

6    A.    Maybe.

7    Q.    All right.  All right.  But whatever you were told before

8    by Tolentino, compared to whatever you were told here and

9    whatever it means, it left you not really understanding and

10   knowing how the bank made money to pay you the kind of return

11   they paid you.  Isn't that fair?

12   A.    I'm not sure if I -- either way.  It didn't affect me

13   either way.

14   Q.    It's not a question whether it affected you.  I'm asking

15   you, sir, isn't it true that whether we're talking about the

16   explanation he gave you when you first went down and visited

17   the bank or the explanation -- the different one he gave you

18   here in 2008, either one of those, you didn't understand how

19   this bank was claiming to make the kind of money to pay the

20   kind of return they were paying you.  You just didn't know how

21   they were doing it, did you?

22   A.    I didn't know the daily workings, no.

23   Q.    Well, again, it's not about the daily workings.  You just

24   didn't have any understanding of how they were able to do

25   this, did you?

 1    A.   I had, you know, information from them in the history of

 2    their payments and so forth.  I guess that's all I had.

 3    Q.   Okay.

 4    A.   What they said they were doing.

 5    Q.   Who knows?  Right?

 6    A.   Yeah.

 7    Q.   Okay.  Now, when we asked you in your deposition a little

 8    bit more about the earlier explanation, not this one, but the

 9    earlier explanation, you remember one of the things you told

10    us was that you understood from talking to Mr. Tolentino, the

11    bank president, that Stanford was actually a lot like you,

12    that it was all about arbitrage.

13         Do you remember telling us that?

14              MR. PETRIE:  Objection, hearsay.

15              MR. SADLER:  I'm asking the witness about his own

16    testimony, Your Honor.

17              THE COURT:  Overruled.

18              THE WITNESS:  I believe it was like -- the way I

19    said that, answered that question to you, it was a little

20    different than the way you took it.  But I consider what I did

21    was arbitrage.  I borrowed for five percent and made nine.

22    They paid nine and made 12-plus.  That's an arbitrage that

23    they would be doing.

24    Q.   (BY MR. SADLER)  Well -- and, yes, that's exactly right.

25    And it's the making 12 part that we're focusing on.

```
 1        You thought how Stanford was able to make the high rates

 2   so that it could pay you your high rates was they were into

 3   arbitrage just like you.

 4   A.    They were -- that was an arbitrage.  They borrowed from

 5   me at nine percent.  They tried to make money.  Anything more

 6   than nine percent is called profit

 7   Q.    Okay.  But how they were making more than -- because they

 8   had to pay you nine.  Right?  That's what they promised to pay

 9   you.

10   A.    Right.

11   Q.    And fair assumption that Stanford organization, not just

12   nationwide but worldwide, they've probably got some expenses,

13   too.  Right?

14   A.    Right.

15   Q.    So they got to make more than just nine percent on the

16   money you put in just to pay you.  Right?

17   A.    Right.

18   Q.    And they got expenses, who knows what those are.  So

19   somewhere they've got to go out there and make a lot more than

20   nine percent just to be able to pay you nine percent.  Right?

21   A.    Right.

22   Q.    Okay.  And the problem was, whatever they were claiming

23   they were doing to go off and make their 12 percent so they

24   could pay you your nine percent, it wasn't the same thing that

25   they had told you before.  Right?
```

1    A.   It -- I didn't know that they still weren't doing that.

2    They did lots of things.  Like I said, they are $8 billion.

3    So they could have been in lots of different facets of

4    business, and they were.

5    Q.   And even though you understood that you heard one

6    explanation from Mr. Tolentino at one time and another

7    explanation here on March 8th, different explanations for how

8    the bank was making money, you didn't ask him to explain, for

9    instance, well, when did you guys change strategies?  You

10   didn't ask him a question like that?

11   A.   I didn't see that the actual strategy had changed.  I

12   think that this is a shot of what they're invested in that

13   day.

14   Q.   You're telling us that you thought that this whole

15   explanation that you got on March 6th, 2008, he was just

16   giving you a snapshot in time, this is what we're in today, we

17   might have been doing something different yesterday, and we

18   might change our minds and do something different tomorrow?

19   A.   In some cases, yes.

20   Q.   Let's assume that's what he was trying to convey to

21   you--that we change our investment strategy daily, weekly,

22   monthly, whatever he was trying to convey to you.

23        You've seen a lot of the public literature.  Do you think

24   that was what Stanford was telling the other investors

25   publicly--give your money to us; today we might do this with

 1    it; tomorrow we might do something else; and yesterday we

 2    can't even remember what we did?

 3        Are you saying that was part of their sales pitch to the

 4    public?

 5    A.   I think that they relied on their past performance to

 6    sell their customers.

 7    Q.   Which is another way of saying is, as long as the

 8    interest payments kept coming, as long as you could redeem

 9    without a problem, nobody asked questions?  Is that kind of

10    what you are saying?

11    A.   It is kind of like, yeah, most funds.

12    Q.   All right.  So this is March of 2008.

13            MR. SADLER:  Let's take this down.

14    Q.   (BY MR. SADLER)  Now, Mr. Petrie spoke with you briefly

15    about a Bloomberg story, and you mentioned Bloomberg a couple

16    of times here today.  Right?

17    A.   Yes.

18    Q.   And maybe everybody knows, but let's just be very clear.

19    Bloomberg is not Michael Bloomberg, the former mayor of New

20    York, is he?  That's not what you were talking about.  Right?

21    A.   No.

22    Q.   Bloomberg is the worldwide, renowned, reputable,

23    financial news service.  That's what we're talking about.

24    Right?

25    A.   Right.

1    Q.    They've been around for years.  They are -- in terms of

2    financial news, financial reporting, they are one of the

3    biggest ones.  Right?

4    A.    Right.

5    Q.    So Bloomberg, as we saw -- and, in fact, let's just go

6    ahead and put it up so we're reminded.

7           MR. SADLER:  Plaintiff's Exhibit No. 65.  So let's

8    just grab the top.

9           MR. PETRIE:  Your Honor, this is beyond the scope.

10           THE COURT:  Overruled.

11   Q.    (BY MR. SADLER)  So Bloomberg came out with a story July

12   3rd that pretty plainly says, the SEC is investigating sales

13   of certificates of deposit down at Stanford, including its

14   offshore bank.  Do you see that?

15   A.    Yes.

16   Q.    And I think you said, to your memory you never saw this

17   news story.  Right?

18   A.    That's right.

19   Q.    But you did tell us yesterday -- I think I have this

20   right -- well, I don't want to be wrong.  I think you told us

21   yesterday that on one of your trips down to Antigua, you

22   actually saw SEC investigators running around down there.

23   Right?  Didn't you tell us that?

24   A.    Yes.

25   Q.    Okay.  And so let's pull up the trial transcript from

1    yesterday just to be really clear on what you said.  And it's

2    at page 126, line 22.

3        And Mr. Petrie was asking, "How did you know that the SEC

4    had been investigating them?"  The them is you were talking

5    about Stanford.  Right?

6    A.   Yes.

7    Q.   This is just yesterday.  You understand what we're doing

8    here.  This is testimony you gave yesterday, Mr. Magness.  You

9    understand that?

10   A.   Yes.

11   Q.   Okay.  And then in the first you say, "They told me" --

12   and to be very clear, you're saying the Stanford people that

13   you met with, including Tolentino, when you went down to visit

14   the bank and stayed at Jumby Bay, "They told you the SEC had

15   been down there investigating them."  Right?

16   A.   They have been investigating them before I put money in

17   the bank.

18   Q.   Right.  We're talking about -- this is before --

19   A.   They investigated them three or four times.

20   Q.   Understood.  I just want to be very clear what you were

21   describing to the jury yesterday --

22   A.   Yeah.

23   Q.   -- is that when you were down on the island, the Stanford

24   people told you, oh, the SEC has not only been investigating

25   us, that they were there while you were there.

1  A.   They pointed at them and said, "There they are."

2  Q.   They said, there's two guys over there -- what, dressed

3  in suits?  How were they dressed?

4  A.   In suits --

5  Q.   Suits?

6  A.   -- but island hot.

7  Q.   Island hot suits.

8  A.   Well, you know, they just -- I think they had the tops

9  off, had their ties on still.

10 Q.   I see.  Were they actually at the bank?

11 A.   Yes.

12 Q.   At the bank.  Okay.  And you saw them.

13 A.   They were pointed out to me.

14 Q.   And the Stanford people said, "Those are SEC guys

15 checking us out right there."

16 A.   Right.

17 Q.   And I think you said you kind of didn't want to go over

18 there and meet them because they kind of looked like CIA guys.

19 Right?

20 A.   Right.

21 Q.   That's a pretty cool story.  I mean --

22 A.   Yeah.

23 Q.   But, you know, in your deposition that we took, which is

24 in front of you, we covered this same topic.  Do you remember

25 that?

1    A.    No.

2    Q.    Don't you remember we asked you, how did you come to

3    think that the SEC had been investigating Stanford even before

4    you put your money in?  Don't you remember us asking you?

5    A.    Yes.

6    Q.    -- some questions about that?

7    A.    Yes.

8    Q.    And you told us in your deposition, Stanford people told

9    me.

10   A.    Correct.

11   Q.    And then we asked you, well, did you ever see any

12   documentation that the SEC had been down there investigating?

13   And do you remember what you told us?

14   A.    They're not required to give you that.

15   Q.    Right.  Right.  So you told us in your deposition -- and,

16   again, let's just -- let's look at page 125, line 14 to 18,

17   and you have it right there, sir, if you want to look on with

18   me.

19   A.    Okay.

20   Q.    So this is from your deposition where you were testifying

21   in response to our questions, what gave you the impression

22   that the U.S. government had been investigating the bank in

23   Antigua.  And you said, Stanford's people told me.  Right,

24   sir?

25   A.    Yes.

1    Q.   And then I think --

2              MR. SADLER:   And let's just go to the full

3    transcript, because I think we just need to see all of page

4    125 to make sure we are not missing something here.   Yeah.

5    Okay.   So if we could blow up lines 14 through the bottom,

6    because that's where we were here just a second ago.

7    Q.   (BY MR. SADLER)   So we just saw this, what gave you the

8    impression?   Do you see the question there, sir?

9    A.   Yes.

10   Q.   And then we asked you, "Did you ever see any

11   documentation?"

12        And there's your answer, "No, not that I know of."

13        Maybe I missed it, but where in here is the story about

14   seeing the SEC guys that looked like CIA agents.

15   A.   I left it out.

16   Q.   All right, sir.

17             MR. SADLER:   Now, let's go back briefly to

18   Plaintiff's Exhibit No. 65.

19   Q.   (BY MR. SADLER)   And so after this story broke, the story

20   I think you told us you never saw, in fact weren't you

21   traveling with Tom Espy when this story came out?

22   A.   I usually spend the month of July in upstate New York,

23   and that's where I was.   I did not have my satellite TV in

24   '08, but I've had it ever since, in Upstate New York.

25   Q.   Okay.   Thank you for that.   And I'm sorry if my question

 1    wasn't clear.

 2        My question was, weren't you traveling with Tom Espy

 3    about this time?

 4    A.   I think so.

 5    Q.   Okay.  You guys were together in upstate New York --

 6    A.   Yes.

 7    Q.   -- with wives and his girlfriend, kind of like the

 8    earlier trip?

 9    A.   Yes.

10    Q.   Or was it his wife by then?

11    A.   I think it was he and his kids.

12    Q.   Kids.  Okay.  No wife, no girlfriend, just Tom and his

13    kids?

14    A.   Yeah.

15    Q.   Okay.  Okay.  And you're telling us the subject of this

16    Bloomberg story when you and Tom are in upstate New York just

17    never came up.

18    A.   I -- I don't believe so.  I have heard of it, and the

19    aspect of it, and it states right here, that it was two

20    disgruntled employees.  But I also know that nothing ever came

21    of -- of this so-called investigation.  If it was an

22    investigation, how did they even know, because the FBI, the

23    CIA, the SEC, never tells anybody about an investigation.

24    Q.   Well, sir, we -- we know what came of this investigation

25    of the certificates of deposit of the offshore bank.  What

 1   came of that investigation is Mr. Janvey got appointed and

 2   several people went to jail.  That's what came of it.  Right?

 3   A.   I don't know that that's where that came from.

 4   Q.   Oh.  So your thought was maybe this was some other

 5   information of Stanford that's not the investigation that led

 6   to the bank being shut down just seven months later?

 7   A.   Well, it's pretty hard to say that somehow Bloomberg had

 8   information that the SEC was investigating anything.  If they

 9   don't come out and say they're investigating, nobody is

10   supposed to know.

11   Q.   So you're saying it's unusual that there would be

12   published reports of a government investigation at a time when

13   the government says, we're not going to comment on whether

14   there's an investigation or not.  You say that's unusual?

15   A.   I think it is, yes.

16   Q.   Can you think of another time that that's happened?

17   A.   Probably every other time.

18   Q.   But you know from talking to Mr. Espy and understanding

19   his testimony, that he said this was all the buzz around the

20   Stanford offices.

21   A.   I don't remember, you know.

22   Q.   You're saying he never talked to you about this subject

23   which he described as a buzz all around the Stanford offices.

24   He never brought it up to you?

25   A.   It would have been nice if the SEC would have brought it

1    up to me.

2    Q.   So let's talk about right in this same time frame the

3    kind of messages and statements that the Stanford

4    International Bank is putting out to all its investors, and

5    all of its investors includes you in this time, you're all in

6    these CDs right now.  Right?

7    A.   Right.

8    Q.   Okay.  So let's look at that.

9           MR. SADLER:  Let's look at Plaintiff's Exhibit No.

10   70.  And let's first just focus enlarge the top so we can kind

11   of see who's kind of getting what here.

12   Q.   (BY MR. SADLER)  All right.  So this is July 27, 2008,

13   and Tommy is sending something to Tonya Dokken.  All right.

14   Now let's look at what he's sending.

15          MR. SADLER:  If we can just kind of grab all of

16   that.  Yeah, perfect.

17   Q.   (BY MR. SADLER)  Okay.  So Mr. Espy is getting some

18   information from SIB, Stanford International Bank, and he's

19   sending it on to your chief financial officer.  And on behalf

20   of the chairman --

21          MR. SADLER:  we need to see who sent this, who is

22   the on behalf of.  Let's go to the next page so we know what

23   we're talking about.  Somebody is saying I am speaking on

24   behalf of.  Go to the next page.  Oh, there he is.  Okay.

25   Right here.  Blow that up.

1    Q.   (BY MR. SADLER)  There's that JRT again.  You recognize

2    that as Juan Rodriguez-Tolentino.  That's the president of the

3    bank.  Right?

4    A.   Yes.

5         MR. SADLER:  So let's go back to the first page and

6    let's see what he's saying.

7    Q.   (BY MR. SADLER)  So Mr. Juan Rodriguez-Tolentino has sent

8    this message out, which has been shared with not only you but

9    all the investors, on behalf of the chairman, pleased to

10   report -- you see that largest sustained growth?  Do you see

11   that at the top there?

12   A.   Uh-huh, yes.

13   Q.   So I presume that you were aware from talking to Tonya

14   Dokken in this time frame that, as far as she was hearing,

15   Stanford International Bank was doing just great.  That's the

16   information that you were hearing from the public side,

17   weren't you?

18   A.   Yes.

19   Q.   In fact, they acknowledge right there, "In the midst of

20   turbulent world economic conditions."  You'd agree that was

21   probably maybe a little hype, but things were kind of

22   turbulent there in the middle of the summer 2008, weren't

23   they?

24   A.   Yes.

25   Q.   Markets had already -- they hadn't taken that big drop,

1    but they had taken some big drops already, hadn't they?

2    A.    A lot of the sectors of the market had.

3    Q.    Absolutely.  And he talks about there's been news of

4    financial collapse and so forth.  But in the middle of that,

5    he is saying that the bank has achieved a 14.8 percent

6    increase in assets and met their most optimistic expectations.

7    Do you see that, sir?

8    A.    Yes.

9    Q.    And they go on to say they've added 4,000 new accounts.

10   Do you see that?

11   A.    Yes.

12   Q.    Uses terms like record-setting six months.  Do you see

13   that?

14   A.    Yes.

15   Q.    So you'd agree with me, sir, that--and this is just a

16   couple of months after you've had this phone call with him

17   where he's explaining to you what the bank is all about and

18   how it does what it does--he is telling you and the rest of

19   the investors, yeah, things are turbulent, but we're not only

20   doing good, we're doing great.

21        That's the message he's sending out, isn't it?

22   A.    Right.

23   Q.    Whatever else is going on in the market, he is saying,

24   not affecting us.  That's the message he's sending out.

25   Right?

1    A.    Right.

2    Q.    And, in fact, he then talks about, you know, we're going

3    to send you our quarterly update here in just a couple of

4    days.

5          MR. SADLER:  And let's take a look at that.  That's

6    Plaintiff's Exhibit No. 474.  And let's just blow up that top

7    part so we can see what we're talking about.

8    Q.    (BY MR. SADLER)  I'm sure you have seen these before.

9    For years Stanford International Bank, before it shut down by

10   the government, they put out these quarterly reports that

11   talked about world market conditions and how they're doing.

12   I'm sure you've seen these before.

13   A.    Okay.

14   Q.    And this one particularly is from this time frame we were

15   talking about, April to June 2008.  Do you see that date?

16   A.    Yep.

17   Q.    All right.

18         MR. SADLER:  Now we're going to skip the market

19   recap because--you're just going to have to trust me--it's

20   just a bunch of stuff about how everything is just going to

21   hell in a hand basket everywhere else, and let's just go to

22   the last page where they're talking about how they're doing.

23   Let's go to that very last page.

24         All right.  Let's start first with those pretty-looking

25   colored pie charts.

1    Q.   (BY MR. SADLER)  Now, Mr. Magness, let's look at the one

2    at the top left.  Does this sort of look like what Mr. Juan

3    Rodriguez-Tolentino was describing to you in your March phone

4    call that says, we are in equities and fixed incomes and

5    alternatives and that sort of thing?

6    A.   Yes, it looks a little like that.

7    Q.   We put some percentages to it, but it is kind of the same

8    thing in a pretty pie chart.  Right?

9    A.   Yes.

10   Q.   Same thing, it doesn't tell you exactly where they are.

11   It just kind of tells you at a high level.  Right?

12   A.   Yes.

13   Q.   Yeah.  And they say they're in equity.  And, equity, you

14   agree with me, they're talking about stocks?

15   A.   Right.

16   Q.   And they're saying they're 51 percent at this point in

17   time in stocks.  Right?

18   A.   Right.

19   Q.   And let's talk about fixed income.  You know about fixed

20   income.  Fixed income, that's not stocks.  That's low-risk,

21   low-yield, like government bonds, that kind of stuff.  Right?

22   A.   Right.

23   Q.   Very high quality corporate bonds would also be an

24   example.  Right?

25   A.   Yes.

1    Q.   Yeah.  This is -- fixed income is not speculative real

2    estate or oil and gas futures or stuff like that, is it?

3    A.   No.

4    Q.   Okay.  All right.  So they're telling everybody, this is

5    where we are.  This is where we, the bank, have put all the

6    money, just kind of by a sector.

7        All right.  Now let's go to the bottom, and let's see how

8    the bank is telling everybody they are doing.  So let's first

9    look at what they say about how everybody else is doing.

10        Now, you'd agree with me that, I mean, these percentages,

11    maybe they're not to the -- to the last decimal, but the stock

12    market was having a real tough time in the middle of the

13    summer 2008, wasn't it?

14   A.   Well, this is at June 1st.  Right?

15   Q.   End of June, right there, 6/30/2008.  All the major

16   indexes are way down, and that's consistent with your memory,

17   isn't it?

18   A.   Yes.  There was the banks, I think, and the builders

19   which were pretty good sized parts of the Dow.

20   Q.   Yeah.  And the S&P -- let's talk about this a moment.

21   The Dow Jones industrial average, that's made up of a group of

22   about 100 blue chip stocks.  Right?

23   A.   Right.

24   Q.   The S&P 500 is just a bigger group, 500 stocks across a

25   whole bunch of other sectors.  Right?

1    A.   Right.

2    Q.   Whether you're talking about one or the other, they are

3    all down pretty significantly.  Right?

4    A.   I don't remember what they are down.  Is there a graph

5    here somewhere?

6    Q.   Well, there's percentages right there, sir.  The Dow

7    Industrial is down 14 percent.  The S&P is down almost 13

8    percent.  Do you see those?

9    A.   Yes.

10   Q.   And that's consistent with your memory.  There was a lot

11   of problems in the stock market in the middle of the summer

12   2008, wasn't there?

13   A.   Right.

14   Q.   But yet if we look down here at Stanford, they're saying,

15   wow, we've actually made money.  Do you see that?

16   A.   Yes.

17   Q.   Do you have -- based on everything that you know at that

18   time, do you have any explanation of how it is that the bank

19   was making money at a time when every other index in every

20   other financial market was going in the totally opposite

21   direction?

22   A.   One of their assets may have -- a lot of their assets may

23   have matured and they cashed them out and made money, which

24   would change the way their outcome looks for that year or that

25   six months, and --

1    Q.   But, of course, you really don't know that, do you?

2    A.   No, I don't know that, and I don't know that there wasn't

3    also kind of safe harbors basically.  Even my stock seemed to

4    be a safe harbor until October.  And if they were jumping off

5    of a one -- a bank stock into one that's a -- you know, a

6    place where it's a safe harbor, other people would be

7    following suit which would drive the price of the safe harbor,

8    up which is another way they could look good.  There's a lot

9    of luck involved with all that.

10   Q.   So it might have been luck and it might have been a

11   secret strategy.  We just don't know, do we?

12   A.   No.

13   Q.   And certainly, based on what Mr. Tolentino had told you

14   in the March phone call, that wouldn't explain how they are

15   able to do this, would it?

16   A.   It did not.

17   Q.   Right.  Okay, sir.  Now, we saw that Ms. Dokken got this

18   information.  She's your CFO.  Was she kind of the collection

19   point for the paperwork that flew back and forth?

20   A.   That's the head office.

21   Q.   Okay.  Between Stanford on the one hand and your

22   organization on the other hand?

23   A.   Right.

24   Q.   And the pipeline for that information was Tommy Espy.

25   Right?

1    A.    In some cases, yes.

2    Q.    Well, okay.  And you said he is the gentleman that worked

3    for SGC, and SGC is the company that sold the certificate of

4    deposit for you on behalf of the bank.  That's how you

5    understood it?

6    A.    Yes.

7    Q.    Okay.  In this time frame, did you talk with Ms. Dokken

8    about, you know, has anybody ever really explained how

9    Stanford bank is able to do so much better than the rest of

10   the market?  Did you ever look into that?  Did you have that

11   kind of discussion with her?

12   A.    I don't believe so.

13   Q.    I remember the mention of Chuck Wilk was at some point

14   supposed to talk about further investigated.  At this point in

15   time, was he looking into this or had he gone off to the

16   penitentiary by then?

17   A.    I don't think he'd gone to the penitentiary.

18   Q.    That was later?

19   A.    Yes.

20   Q.    Okay.  In your travels, your meetings, whatever you were

21   doing with Tommy Espy, did you ever in this time frame, after

22   you've heard the explanation from Mr. Tolentino, did you ever

23   ask Tommy, you know, how are you guys doing so well when the

24   rest of the market is doing so poorly?  Did you ever ask that

25   question?

1    A.    I presume we did.  I don't remember asking it, but, you

2    know, it's -- we're always checking the risk of all

3    investments always, you know, so somehow that would have to

4    come up.

5    Q.    It would have to come up.  And if somebody had been asked

6    to look into it in this time frame on behalf of the investment

7    committee, we probably would see a record of that in your

8    investment committee minutes, wouldn't we?

9    A.    Right.

10   Q.    Okay.  And so we're kind of between -- if we're talking

11   about June 30, we're kind of between meetings.  Right?

12   A.    Right.

13   Q.    We've just had the one in March where Mr. Tolentino said

14   all the things he said, and then the next one is not until

15   October 1.  Do I understand you right?

16   A.    Right.

17   Q.    And I think we have those October 1 minutes for 2008.  I

18   believe it's Plaintiff's Exhibit No. 114.

19          MR. SADLER:  And I'm being told no, so somebody give

20   me the correct exhibit number and we will go on to something

21   else.

22          THE COURT:  We are getting close to lunch break time

23   if you could let me know when we're at a good stopping point.

24          MR. SADLER:  This is a good stopping point since we

25   need to find that exhibit.  So thank you, Your Honor.

 1              THE COURT:  All right.  We will take our lunch break

 2    now, and let's see you-all back at 1:30.  1:30.

 3              (Whereupon, the jury left the courtroom.)

 4              THE COURT:  Here's the Wilk depo for you-all.  And I

 5    believe I overruled all the objections except one for

 6    narrative, non-responsive towards the end.

 7          In terms of the instruction regarding Sutton, I think I'm

 8    inclined to give about the first half of the Receiver's

 9    proposed instruction, which is very consistent with the

10    Magness parties' proposed instruction.

11          The part that I'm omitting is just the part that would

12    reiterate to the jury that they are the judges of the facts

13    and all of that stuff.  And I think they know that, and if

14    not, I will remind them again at the end.

15          Anything else we need to take up right now?

16              MR. SADLER:  No, sir.

17              MR. PETRIE:  No.  Thank you, Your Honor.

18          THE COURT:  Okay.  We'll see you-all back at 1:30.

19                        (Lunch recess.)

20          THE COURT:  All set?

21              MR. SADLER:  Yes, sir.

22              MR. PETRIE:  Yes, sir.

23          THE COURT:  How much longer do you think?

24              MR. SADLER:  About 90 minutes or so.

25          THE COURT:  That will take us right up to afternoon

1    break then.

2         Let's bring them in.

3             (Whereupon, the jury entered the courtroom.)

4             THE COURT:  Be seated.

5         We're still trying to sort through some of our equipment

6    issues with regard to camping out down here.  And I understand

7    the lawyers at least have decided they like it pretty well

8    down here and don't want to move, so we may just stay here for

9    the duration.

10        So is the Receiver ready to proceed?

11            MR. SADLER:  I am, Your Honor.  May I proceed.

12            THE COURT:  Please.

13   Q.   (BY MR. SADLER)  Mr. Magness, I now want to turn to a

14   very critical time period in this case, which is October 2008.

15   Again, you still have your exhibit book up there with you?

16   A.   Yes.

17   Q.   Now, I want to see if we can first get this sequence

18   correct of what happened in October of 2008.

19        It's true, isn't it, that the sequence is you sent Tom

20   Espy to ask for a redemption of the CDs, and the bank first

21   said, no, redemption is not possible, and he reported that

22   back to you.  Is that the first part of the sequence?

23   A.   I think so.

24   Q.   Okay.  And it's only after those first two things

25   happened, no redemption, not possible, Tom Espy reports that

1    back, then the discussion turns to a loan.  Right, sir?

2    A.    Yes.   That is probably the same time.

3    Q.    Yes, sir.  Well, let's look at Plaintiff's Exhibit No. 92

4    just to understand the sequence a little bit better.

5          And Plaintiff's Exhibit No. 92, we've looked at this

6    before, the December 5 meeting minutes.  Let's now go to the

7    paragraph we want to focus on, which is paragraph 4 on page 2.

8          And, again, just to confirm, the sequence is Mr. Espy had

9    approached Stanford bank regarding the redemption of both Mr.

10   Magness's and the GMIT certificates of deposit.  He was told

11   redemption would not be possible.  You then asked how this

12   risk could be reduced.  He responded that, after the bank

13   advised the redemption was not possible, then the loan came

14   up.

15         Is that the sequence as you remember it?

16   A.    I'm not sure how -- what amount of time is involved

17   there.

18   Q.    And in this sequence of going to the bank, asking for the

19   redemption, being told no, reporting back to you, and then it

20   turns to the loan, you're in communication with Tom Espy.  Tom

21   Espy is in communication with the bank president, Mr.

22   Tolentino.  That's who's involved here.  Right?

23   A.    Right.

24   Q.    Okay.  And you're involved in terms of getting this first

25   loan, we're talking about the $25 million loan, you're

1    involved basically in real time.  You're sending Tom to go do

2    this, he's reporting back to you, you're not hearing about it

3    weeks later.  You are hearing about it as it's happening.

4    Right?

5    A.    I believe so.

6    Q.    Okay.  And you would agree with me, sir, that with all of

7    what you understood, were told in the sales pitches and the

8    sales literature about the CDs, that the fact that the bank

9    told you, no, you can't have a redemption, that was a big red

10   flag, wasn't it?

11   A.    No.  It was their choice whether to redeem, loan, or do

12   nothing.

13   Q.    You know Mr. Sutton said to him that was a big red flag.

14   You know that, don't you?

15            MR. PETRIE:  Objection, Your Honor.  Same basis as

16   before--hearsay, no foundation.

17            THE COURT:  Sustained.

18   Q.    (BY MR. SADLER)  Mr. Magness, you are aware that

19   Mr. Sutton has given sworn testimony that is going to be

20   offered in this case.  You're aware of that, aren't you?

21   A.    No.

22   Q.    You're not aware Mr. Sutton is going to be a witness in

23   this case?

24   A.    That I'm aware of.

25   Q.    Are you aware in Mr. Sutton's testimony, he was asked

```
 1    about this very same subject, what was the consequence of

 2    being told you couldn't redeem the CD?  Don't you know that

 3    was discussed with him?

 4            MR. PETRIE:  Same objections.

 5            THE WITNESS:  No.

 6            THE COURT:  Can you-all come up for just one moment?

 7            (Discussion at the bench, out of the hearing of the

 8            reporter.)

 9            MR. SADLER:  May I proceed, Your Honor?

10            THE COURT:  Please.

11    Q.   (BY MR. SADLER)  So we got interrupted but let me go back

12    to that.  Just to understand you, so to you, when Mr. Espy

13    reported back that Mr. Tolentino on behalf of the bank had

14    said redemption is not possible, to you that was not a big red

15    flag.

16    A.   No.

17    Q.   Is that what you're telling us.

18    A.   No.

19    Q.   It is not a big red flag.

20    A.   No.

21    Q.   And to you wasn't this a sign that maybe, contrary to

22    what the bank was telling the public, they might be kind of

23    strapped for cash?  Was that not a red flag on that issue to

24    you?

25    A.   We obtained a loan immediately, and we obtained three
```

 1   more of them relatively soon after that.  All of them were

 2   paid in full immediately.

 3   Q.   Well, let's be sure who we're talking about being paid in

 4   full.  The bank did transfer over the four different loans

 5   about $88 million to you.  Right?

 6   A.   Yes.

 7   Q.   But in the course of getting those loans, you promised to

 8   pay them back and pay them back quickly.  You know that, don't

 9   you?

10   A.   Yes.

11   Q.   And, in fact, Tom Espy, when he first raised the issue

12   with the bank president, Mr. Tolentino, he said you needed the

13   loan just for a week and were going to pay it back in a week.

14   You know that, don't you?

15          MR. PETRIE:  Objection, hearsay, no foundation.

16          THE COURT:  Overruled.

17   Q.   (BY MR. SADLER)  Isn't it true, sir, that in order to get

18   these loans from the bank, your people promised that these

19   would only be short-term loans and that the cash would

20   come -- be repaid right back to the bank as soon as you guys

21   could sell securities?  Isn't that true?

22   A.   No.

23   Q.   That's not true.  All right.

24          Well, at the moment before you hear from Tom Espy, after

25   you've sent him to go get the redemption and right before he

1    reports back redemption not possible, Mr. Magness, isn't your

2    mindset these CDs are just like cash, I can get the cash any

3    time I want?

4    A.    You're asking if that's how I felt before?

5    Q.    Yes.  Right before -- I'm asking you -- yes?

6    A.    I knew that they didn't have to give you cash until the

7    maturity date.  I knew that they did redeem early redemption,

8    but it was with penalty and would require some negotiation.

9    Q.    Well, the penalty was right in the paperwork.  It's three

10   months interest.  That's the penalty, isn't it?

11   A.    I think so.

12   Q.    Yeah.  And, in fact, Ms. Dokken, at one point she had a

13   CD.  You know that, don't you?

14   A.    Yes.

15   Q.    She cashed it out early, in fact right about the time she

16   sent that February 2008 email.  You know that, don't you?

17   A.    I think -- I -- I don't remember when I knew it, but I

18   did know that.

19   Q.    Yeah.  And, in fact, don't you know that not only was she

20   able to cash out her CD early, the bank waived the penalties

21   for her.

22   A.    That's good.

23   Q.    Yeah.  So back to the point in time right before you hear

24   Tom Espy saying no redemption, isn't it true you thought if

25   you wanted the cash, you could get it.  If you had to pay an

1   early withdrawal penalty, three months' interest, so what.

2   Wasn't that your mindset at that point?

3   A.   I think that there's always the possibility that you

4   might make a negotiation one way or another.

5   Q.   Yeah, exactly.  I mean, at this point in time, Mr.

6   Magness, when you go and you sent Tommy Espy to get that

7   redemption, aren't you sitting on almost $25 million of

8   accrued interest on your CDs?

9   A.   Yes.

10  Q.   So if you have to pay a three-months' interest penalty,

11  that is actually not a big deal, is it?

12  A.   I don't know.

13  Q.   Well, instead of doing the redemption, what you ended up

14  doing is taking out these loans at 11 percent interest.

15  Right?

16  A.   Correct.

17  Q.   So as you take out these loans, you're now in a situation

18  where you have borrowed money twice against the same CD.

19  Right?

20  A.   No.

21  Q.   Didn't you have -- didn't you tell us that you borrowed

22  the money to buy these CDs at five percent from HSBC?

23  A.   And I used some of our stock to do so, not the CDs.

24  Q.   So the loan that you had originally taken out from HSBC,

25  you had paid that off.  And so as of October 2008, you didn't

1    owe anybody anything on these CDs.  I just want to be sure I

2    understand you.

3    A.    The way I got the money to buy the CDs was by taking some

4    of our stock, Liberty Media stock, in to HSBC and putting it

5    as collateral.

6    Q.    For a loan?

7    A.    For a loan, at which point I took and bought the CDs.

8    Q.    Yes, sir.

9    A.    The CDs then became the collateral for the loan that

10   you're talking about in October of '08.

11   Q.    I don't believe that's correct, sir.  Isn't it true that

12   no bank, none of your banks, in fact, would lend you money on

13   these Stanford CDs?

14   A.    At that time I believe that's correct.

15   Q.    Yeah.  So when you borrow the money from Stanford to get

16   back what you think your own cash is, now you've got two loans

17   against the same CDs.  Right?

18   A.    No, sir.  You're -- okay.  Can I explain for you?

19   Q.    Well, I want the jury to understand this and I'm

20   struggling to understand it, so maybe I skipped a process?

21   A.    You can only use a collateral once.

22   Q.    True.

23   A.    Where do you see I'm using it twice?

24   Q.    No, sir.  I'm not suggesting you're using any collateral

25   twice, and I want to focus on this now.  I've understood you

```
 1    to tell us that the cash to buy the CDs originally came from a

 2    margin loan at HSBC.  Do I understand that right?

 3    A.    Correct.

 4    Q.    Okay.  Now we fast forward, so now when you're trying to

 5    redeem and you're told no, you took out a new loan, this time

 6    not from HSBC but from Stanford.

 7    A.    Correct.

 8    Q.    Right?  So you've got one loan at HSBC where the

 9    collateral is your Liberty stock.

10    A.    Right.

11    Q.    You've got another loan at Stanford where the collateral

12    is your CD.  Right?

13    A.    Correct.

14    Q.    But it's all to get the same money out from the Stanford

15    bank.  Right?

16    A.    Yes.

17    Q.    Okay.  That's what I'm talking about.  All right.  So

18    you've got two loans.

19          Now, you had originally thought it was a good idea to

20    borrow the money from HSBC, take that cash, buy the Stanford

21    CDs, because of the spread between the two.  Right?

22    A.    Right.

23    Q.    Okay.  But now you're having to take out another loan to

24    get this same cash out.  That's not making as much sense, is

25    it?
```

```
 1   A.    No.

 2   Q.    And these loans, they're basically demand loans.  They

 3   can -- I think they say, don't they, on their face that, you

 4   know, they can demand full payment any time, don't they?

 5   A.    I'm not sure.

 6   Q.    All right.  Well, we're going to look at one.

 7   A.    Okay.

 8         MR. SADLER:  Let's look at Plaintiff's Exhibit 84.

 9   Q.    (BY MR. SADLER)  All right.  So Plaintiff's Exhibit 84,

10   this is one of the four loans.  It happens to be the $44

11   million loan, but I think all the terms are exactly the same.

12   All right.

13       So this is the cover letter.  This is the cover letter on

14   your new loan, the $44 million loan.  That was the second of

15   the two loans, wasn't it, sir?

16   A.    Yes.

17   Q.    Okay.  And so let's look at the actual note.

18         MR. SADLER:  If we could -- I believe it is page 2.

19   And we need to just capture that top part that includes the

20   date and come all the way down to about the middle, additional

21   charges.  There we go.

22   Q.    (BY MR. SADLER)  So this is the note, and I believe they

23   all had the same terms.  Where it says, for value received, I

24   promise to pay you, the I is you, the borrower.  Right?

25   A.    Yes.
```

1    Q.    Promise to pay you, the bank, Stanford bank.  Right?

2    A.    Yes.

3    Q.    And the amount is $44 million.  That was one of the

4    loans.  Right?

5    A.    Yes.

6    Q.    Okay.  And it says, on your order or demand.  Do you see

7    that language?

8    A.    Yes.

9    Q.    You're familiar with what a demand note is, aren't you?

10   A.    Yes.

11   Q.    Yeah.  It means you're not on some kind of amortized

12   five-year repayment program.  It is just that they can demand

13   it at any time.  Right?

14   A.    Yes.

15   Q.    All right.  And you have to pay -- in order to get cash

16   that you think is your cash, you've got to pay the bank a

17   total of 11 percent, which is about two percent over what

18   they're supposed to be paying you?

19   A.    Exactly.

20   Q.    Okay.  And this process here of having to sign a demand

21   note and an interest rate that is above what they're paying

22   you, you had to do the same thing for each and every one of

23   those notes.  Right?

24   A.    Yes.

25   Q.    Okay.  So let's now focus -- and we can look at

1    Plaintiff's Exhibit 80.  Actually hold that for just a second.

2    Hold that for just a second.

3         All right.  So the sequence is, you ask for a redemption;

4    Mr. Espy reports back, after talking to the bank president, no

5    redemption; the discussion turns to a loan.

6         But in those conversations, Mr. Magness, isn't it true

7    that the bank's reason that they didn't want to redeem the CDs

8    was communicated to you?  You learned why they didn't want to

9    do the redemption, didn't you?

10   A.   I'm not convinced that I did.  I'm not sure when.

11   Q.   Well, isn't it true, sir, that you have signed under oath

12   written testimony in this case in which you swore that what

13   Mr. Espy reported back to you, after being told no redemption,

14   was that, given the general market decline, the bank wanted to

15   keep the CD on its balance sheet?  Isn't that what he reported

16   back to you?

17   A.   I think maybe he did something like that about, you know,

18   losing me as, you know -- having me redeem was, you know,

19   probably not the best thing for everybody else to see, me

20   cashing out.  You know, the guy -- maybe they wanted me on the

21   books as a client.

22   Q.   So let's talk about that because one of the things that

23   is probably an open question here is, if you had access to

24   this as a redemption, all you had to do is pay an early

25   withdrawal penalty, why do the loans?  And so now I want to

1    talk to you about that subject--why do the loans.

2        Now, from your perspective, why the loan is, they told

3    you you couldn't have the redemption but you can have a loan.

4    So that's why you did the loan.  Right?

5    A.    Yes.  I needed the money immediately.

6    Q.    Sure.  But from the bank's perspective, it makes sense to

7    do a loan if they're having a balance sheet problem and they

8    want to keep your CD on their balance sheet.  It makes sense

9    in that circumstance from their perspective, doesn't it?

10   A.    I don't know what they really wanted, but it was their

11   prerogative, not mine.

12   Q.    Well, sir, during this time frame, October 2008, very

13   turbulent times in the financial markets.  Right?

14   A.    Right.

15   Q.    But don't you know, sir, that just as they had done in

16   the summer, Stanford International Bank was telling the

17   public, we're going strong, we're going this way while

18   everybody else is going this way, and we got plenty of cash.

19       Don't you know that's what they were telling the public?

20   A.    That's what they told them.

21   Q.    Yeah.  But you, they said, Mr. Magness, no redemption

22   because, given the general market decline, we need to keep

23   your CD on our balance sheet.

24       Didn't that cause you to wonder, what does the general

25   market decline have to do with their balance sheet?  I thought

```
 1    they were doing fine even with the general market decline.

 2        Did that question occur to you?

 3    A.   Not in that way.

 4    Q.   Would it make sense that if they had been going around as

 5    we've seen in the summer and even into the fall, saying, our

 6    balance sheet is great, our net worth is growing, we've got

 7    plenty of cash, everybody else is doing terrible, would it

 8    make sense that then they'd say, yeah, but we -- we need to

 9    keep our depositors' assets on our balance sheet?

10        Would that make sense to you?

11    A.   You know, it was their prerogative.  I just needed the

12    money immediately.

13    Q.   Yeah.  Now, this information that you got via Tom Espy

14    from the bank president, did you ever see in the time frame

15    Stanford International Bank in October 2008 putting out a

16    letter, putting out one of these market reports letter, to

17    investors, email, whatever it was, any kind of public

18    statement that said, we are not allowing redemptions?  We will

19    make you a loan, but we're not allowing redemptions because we

20    need to keep everybody's CD on our balance sheet?

21        Did you ever see a public statement like that?

22    A.   No, I did not.

23    Q.   Wouldn't that be kind of an alarming public statement for

24    the bank to put out?

25    A.   Not so much.
```

1  Q.   Don't you think that that basically would have triggered

2  a run on the bank if that had gotten out publicly?

3  A.   I know that it was their prerogative whether to let any

4  of the money out before the maturity date.  That's what it

5  states on the CD.

6  Q.   Yeah.  And I'm asking you a little bit different

7  question.  But let's add that.

8       Let's suppose in this time frame the bank had put out a

9  public statement that says, you know what, it's our

10  prerogative to let you have your money, but just in case you

11  were wondering, don't bother coming to ask for redemption, you

12  can't have it, we might loan it to you, but in the meantime we

13  need to keep that CD of yours on our balance sheet.

14       Did you ever see a public statement like that?

15  A.   No.

16  Q.   You think many people would have stayed invested in the

17  bank if they had seen that publicly in 2008?

18  A.   I do not know.

19  Q.   And if we look at these loans, the sequence is $25

20  million, then $44 million, and then 12 and 7.2 million pretty

21  much the same day.  And those are your four loans.  Right?

22  A.   Yes.

23  Q.   And if you had gone to the bank, never brought up the

24  subject of a redemption, but instead of saying, Tommy, go get

25  me a redemption, you say, Tommy go get me a loan, your

1    understanding was you could get 80 percent of your CD balance.

2    Right?

3    A.    Yes.

4    Q.    And at that time your CD balance was about 102 million,

5    wasn't it?

6    A.    Right.

7    Q.    Yeah.  So 80 percent of that is right at about 81, 82

8    million, isn't it?

9    A.    I guess so.

10   Q.    Yeah.  But the way you did this was a little differently.

11   The way you did this was you first got the $25 million loan.

12   And two days after the cash came in, you said, well, instead

13   of paying you back cash, Mr. Bank, let's just kind of call it

14   pretty much even Steven with my accrued interest.  I need to

15   send you little more cash to top it off, but let's just kind

16   of do it that way.

17        That was the deal you worked out.  Right?

18   A.    Yes.

19   Q.    So at that point you basically get a hundred percent of

20   your accrued interest out.  Not 80 percent but 100 percent?

21   A.    I paid back that loan, yes.

22   Q.    Well, you paid back the loan with $24 million of interest

23   that was just words on the paper of the bank.  Right?  You

24   didn't come up with $24 million in cash to pay them back.

25   A.    We used the accrued interest, yes.

1    Q.   Right.  So the bank gave you cash on a Friday, Friday,

2    October 10th, and the following week what you gave back was

3    $24 million in paperwork, plus about $750,000 of real cash.

4    Right?

5    A.   Right.

6    Q.   Yeah.  And that cleared the way for the rest of the

7    loans.

8    A.   Correct.

9    Q.   And so once you do that, you then borrow 80 percent of

10   the rest that's remaining, and you end up with this grand

11   total of not 82 million, now you got about 88.2 million out.

12   Right?

13   A.   Yes.

14   Q.   Okay.  So you figured out a way to take out cash in the

15   form of loans, but get even more than the 80 percent that the

16   bank's rules allowed.  Right?

17   A.   I think we got 63,000 against that, but we kept part of

18   our accrued interest, yes.

19   Q.   And you said thousand.  I'm sure you meant million, 63

20   million?

21   A.   Million.

22   Q.   Okay.  Now let's look at -- I just want to be sure we've

23   seen them.  Let's look at -- we need to look at Plaintiff's

24   Exhibit No. 80 now.  And these pages are a little out of

25   sequence.

1      What we are looking at first is your assignment, and that

2  is my first question.  Every time you did one of these loans,

3  you signed a security agreement pledging your CD back to the

4  bank as collateral.  Right?

5  A.    Is this like 80?

6  Q.    Yes, sir.

7  A.    Somewhere between 73 and 81?

8  Q.    It should be.

9  A.    There's nothing in my book.

10  Q.    There seems to be a consistent problem here.  Let's look

11  on the screen or on the monitor, if you would.

12  A.    Okay.

13          MR. SADLER:  So let's go to the next page.  And if

14  we could grab the top part just so we know what we're talking

15  about.

16  Q.    (BY MR. SADLER)  So you agree with me, sir, other than

17  the amount is different, 25 million, this is just like the 44

18  million loan we looked at a minute ago with the other exhibit.

19  Right, sir?

20  A.    Yes.

21  Q.    I promise to pay on demand, et cetera, all the terms

22  exactly the same, nothing's changed except the interest rate

23  and which CD is being pledged as collateral.  That's the only

24  difference here.  Right?

25  A.    Right.

1  Q.   Okay.  And so this is the first loan, the $25 million

2  loan.

3       Now, there are some documents that have been provided in

4  this case that I need to ask you about concerning this first

5  $25 million loan.

6            MR. SADLER:  And let's look now at Plaintiff's

7  Exhibit 223.  And if we could just enlarge the top half,

8  please, so we see what we're talking about all the way down.

9  There you go.

10 Q.   (BY MR. SADLER)  So this is October 10, and we just saw

11 the date of the note for the $25 million was October 10.  Tell

12 me if you are there.  I don't want to get ahead of you.  223,

13 are you there?

14 A.   Yeah.

15 Q.   Okay.  So Tonya Dokken, that's your CFO.  Beverly Jacobs,

16 she's the person that handles paperwork down at the bank.

17 Right?

18 A.   Yes.

19 Q.   And Tonya and Beverly, they'RE just processing the

20 paperwork at this point.  The loan's already agreed to and

21 done.  Right?

22 A.   Yes.

23 Q.   Okay.  But what Ms. Dokken is saying, after she talks

24 about getting him, meaning you, to sign the paperwork, is

25 we're using the proceeds to pay down a loan at U.S. Bank.

```
 1    Right?

 2    A.    Yes.

 3    Q.    Okay.  Then she says, "They will release the collateral

 4    and we plan to sell the underlying stock and use the proceeds

 5    to repay the loan."  Do you see that?

 6    A.    Yes.

 7    Q.    Okay.  And that's what she said on October 10, 2008,

 8    before the cash had actually arrived.  Right?

 9    A.    Right.  Okay.

10    Q.    Well, you say okay --

11    A.    Yes.  I mean, that's what it says right here.

12    Q.    Right.  Well -- and you haven't signed the loan at this

13    point.  Right?

14    A.    I haven't signed it.

15    Q.    Right.  They're certainly not going to send you the cash

16    before you signed the promissory note.  So you hadn't gotten

17    the cash at this point yet, had you?

18    A.    It doesn't appear.

19    Q.    Yeah.  Okay.  And what's interesting is she's talking

20    about, okay, we're going to borrow 25 million, we're going to

21    pay down a loan at U.S. Bank, and -- and remember when we

22    started talking earlier I talked about -- we looked at another

23    exhibit where you had decided to use one loan to pay down

24    another loan to the tune of $50 million.  Do you remember that

25    discussion we had?
```

1   A.    Yes.

2   Q.    That's really not very different than what's going on

3   here, is it, sir?  You are borrowing $25 million of cash from

4   Stanford, and you're just moving it over to pay down a loan at

5   U.S. Bank.  Right?

6   A.    We are doing that, but it's not the same.

7   Q.    You're doing it, but it's not the same.  Okay.

8   A.    Right.

9   Q.    "We plan to sell the underlying stock and use the

10  proceeds to repay the loan."  Before you got this loan, Mr.

11  Espy was also involved, as we've talked about, and there's a

12  document that he wrote that I need to ask you about, and

13  that's Plaintiff's 218.  Yeah.  So let's look at this.

14       So now we've backed up a day.  We're now on October 9.

15  We were just on Friday, October 10, when Ms. Dokken and Ms.

16  Jacobs were doing the paperwork.  But now we've backed up a

17  day, and Mr. Espy is writing to Mr. Juan Rodriguez-Tolentino,

18  the bank president.  Do you see that?  Do you see that, sir?

19  A.    Yes.

20  Q.    Okay.  And he mentions U.S. Bank, right, right there, and

21  he's asking about would it be possible to take out an $18

22  million loan.  Do you see that?

23  A.    Yes.

24  Q.    Sir, wasn't it your understanding that if you needed as

25  much as $80 million at this point, you could get it from the

1    bank even as a loan?  Right?

2    A.    Only if you have collateral.

3    Q.    Well, the collateral are your CDs.  Right?

4    A.    Yes.

5    Q.    Yeah.  So there shouldn't be any question about borrowing

6    18 if, under the bank's rules, you can borrow up to 80.  That

7    shouldn't even be a question.  Right?

8    A.    Right.

9    Q.    And he talks about finding out that securities had gone

10   under $10.  And you remember, I think you talked about that

11   with Mr. Petrie, that on October 1st at your Mango Five

12   meeting, it's reflected in the minutes that Ms. Dokken was

13   predicting that the stock, you know, was falling and you were

14   pretty close at that point to margin territory.  Right?

15   A.    Yes.

16   Q.    Okay.  And he's asking for a loan.  But right there, and

17   we just skipped over it, see there in the top line, $18

18   million loan against a couple of our CDs for a week to satisfy

19   a problem.  Do you see that, sir?

20   A.    Yes.

21   Q.    So Mr. Tom Espy is saying, hey, just give us this money,

22   we'll get it back to you in a week, and then he goes on to

23   say, well, maybe even just a couple of days to cure the

24   problem.  Do you see that, sir?

25   A.    Yes.

1   Q.   Now, was the bank, to your understanding, did it have

2   some written requirement that it would only loan money if

3   depositors agreed to pay it back in a week?

4   A.   This email isn't between me and Tom.  It's between Tom

5   and -- and Juan.

6   Q.   That wasn't my question, sir.

7   A.   Yeah, well --

8   Q.   Let me re-ask my question.

9   A.   Okay.

10   Q.   Was it your understanding that, under the bank's rules,

11   you could borrow money against your CD, but in order to do so,

12   you had to promise to pay it back in as little as a week?

13   A.   No.

14   Q.   Of course not.  Wouldn't make sense to do that, would it?

15   A.   No.

16   Q.   So this is October 9.  Mr. Espy says, we need 18.  I

17   guess at some point, it flipped from 18 to 25.  Right?

18   Because 25 is what you got.

19   A.   Correct.

20   Q.   And October 10, as we just saw, you're finalizing the

21   paperwork; Ms. Dokken is saying, we're going to sell stock,

22   release the collateral, use the proceeds, pay you back.  But

23   that's not how it worked.  Right?

24        What you ended up doing is just using the interest to pay

25   off the loan.

1    A.    Right.

2    Q.    And we can see that on Plaintiff's Exhibit 227.

3          MR. SADLER:  All we need to do is just focus on that

4    bottom part.

5    Q.    (BY MR. SADLER)  So let's kind of get fixed here.  We

6    just looked at October 9.  Mr. Espy writes to Mr. Tolentino,

7    $18 million for a week.  Will pay you back.

8          October 10, we just looked at, Ms. Dokken says, we're

9    going to sell stock, use that money to pay you back.

10         But here on the following Monday -- we've just gone from

11   Thursday, Friday, to Monday.  On Monday, now Mr. Espy is

12   communicating, well, what we'd really like to do is just use

13   the paperwork of the accumulated interest to take care of the

14   CDs.

15         And my question to you, sir, is, you authorized this.

16   Right?

17   A.    I -- I would have.

18   Q.    Yeah.  I mean, all the stuff we're talking about, this is

19   your money, this is your decision.  Right?

20   A.    Right.  I'm not -- I'm not doing all the juggling, but

21   I'm needing to pay margin calls.

22   Q.    Understood.  Tom Espy is doing what you asked him to do.

23   A.    I think so.

24   Q.    Yeah.  Tonya Dokken is asking what you asked her to do.

25   A.    Yes.

1    Q.   Right?  These are people who are doing the things you

2    asked them to do.

3    A.   Right.

4    Q.   Okay.  So we have looked -- I have looked in the trial

5    exhibits here, and maybe I've overlooked something, I don't

6    see anything in the papers that explains how you went from we

7    only need the money for a week, we're going to sell some

8    stock, use that money to pay you back, to over the weekend,

9    now it's never mind, let's just cancel out the interest.

10        Are you aware of a piece of paper in all the exhibits

11   that are being admitted here that explains how that changed

12   from Friday to Monday?

13             MR. PETRIE:  Object to the preamble as facts not in

14   evidence.

15             THE COURT:  Overruled.

16             The WITNESS:  I don't know.

17   Q.   (BY MR. SADLER)  Because, of course, it can't have been a

18   change in the -- in the market.  Your stock had already

19   dropped below 10, and, of course, the market's closed on the

20   weekend anyway.  Right?

21   A.   Right.

22   Q.   So somebody changed their mind about the plan to get the

23   cash, put it over at U.S. Bank, release collateral, use that

24   cash to pay back Stanford bank, because that was Friday's

25   plan.  But somebody changed their mind about that between

1    Friday and Monday.

2         And my question is, wasn't that you?  It's your decision.

3    A.    I had no idea we had to pay back anything, nor do I

4    remember seeing it written where we had to pay back anything

5    immediately.

6    Q.    Except we've just seen the emails where Ms. Dokken is

7    saying that's exactly what you're going to do.

8    A.    I hadn't seen the emails.

9    Q.    And this is the $25 million loan.  Let's talk about the

10   $44 million loan.

11        Just one -- one thing.  I do think you have this.  You

12   have Plaintiff's Exhibit 81 in your book.  I just don't want

13   there to be any doubt about this.

14             MR. SADLER:  Let's go to Plaintiff's Exhibit 81.

15   Q.    (BY MR. SADLER)  And Plaintiff's Exhibit 81, sir, is a

16   series of three letters, all dated October 14th, in which you

17   personally sign that you have approved this idea of taking

18   this interest, which only exists on paper, and instead of

19   paying the bank cash, you pay them with the interest, and you

20   signed all three of these letters.

21        Can you confirm that for us, sir?

22   A.    Yes, sir.

23   Q.    Okay.  All right.  Let's now move on to -- and I think we

24   can talk about all of these, the 44, the 12, and the 7.2,

25   because they're -- I don't think there's any difference here.

1    But let's talk about them.

2              MR. SADLER:  Let's look at Plaintiff's Exhibit 85.

3    We haven't seen that before.  And just the top part, if we

4    can, what we're talking about.

5    Q.   (BY MR. SADLER)  All right.  Plaintiff's Exhibit 85 is

6    the paperwork for your $12 million loan, right, sir?  Do you

7    see that?

8    A.   Yes, I see.

9    Q.   We just flip one page, we see, I think, the promissory

10   note.  Same thing other than the dates and the amounts.  It's

11   the same kind of note, same kind of terms, no different.

12   Right, sir?

13   A.   Yes.

14   Q.   Okay.  And then we go now to the next note, which would

15   be the $7.2 million loan, Plaintiff's Exhibit 86.  Similar

16   thing--it's your new loan.  There's the amount, 7.2 million.

17        We go to the next page.  We can just confirm, similar

18   kind of note.  The only thing that's different is, of course,

19   the date and the amount.  But, otherwise, it's a demand note

20   and you're promising to pay at an interest rate that's higher

21   than they're paying you.  It is all the same.  Right, sir?

22   A.   Correct.

23   Q.   Now, what's all the same is the written communications

24   that went to the bank about these next three loans also

25   describe them as short term and also describe that what the

1    plan is is that, once you get the cash from Stanford Bank,

2    you're going to use it to do something else at another bank

3    and pay Stanford Bank right back.

4         You know those communications were made, don't you?

5    A.    I do not know.

6    Q.    Well, let's look at --

7              MR. SADLER:  Let's look at Plaintiff's Exhibit 232.

8    And let's look at the top part.  Just get everybody in there

9    so we're not leaving anything out.

10   Q.    (BY MR. SADLER)  So now we've come forward in time about

11   ten days, and this is now Tom Espy communicating with the bank

12   and Ms. McGowan.  She was one of the folks that worked with

13   Mr. Espy.  Right?  Pam McGowan, did you know her?

14   A.    I don't think so.

15   Q.    You didn't know her or you didn't know what she does.

16   A.    I see that she's CCed here.

17   Q.    Okay.  So Mr. Espy here is talking about the loan request

18   for 7.2 million and 12 million, and he's saying again, these

19   loans are short term and the source of repayment is going to

20   be cash from existing accounts and future sales of securities.

21   Do you see that?

22   A.    Yes.

23   Q.    But, of course, we know that never happened.  Right?

24   A.    That's right.

25   Q.    And just to be sure we haven't skipped over any, if we go

```
 1   to, I think, the bottom of this string, we can see that this

 2   whole email string is picking up -- well, let me stop here.

 3   Let's pick up the purpose of the loan, right here.  This is

 4   the information the bank is asking about there at the bottom

 5   of the first page of 232 --

 6           MR. SADLER:  If we could just enlarge that.

 7   Q.   (BY MR. SADLER)  Do you see that, Mr. Magness?

 8   A.   Yes.

 9   Q.   What the bank is asking about, tell us the purpose and

10   tell us the source of repayment.  And that's what Mr. Espy has

11   just provided.

12       But if we go back a little bit further in the document,

13   we can see that they are not only talking about the $72

14   million loan and the $12 million loan, they're also talking

15   about the $44 million loan.

16       Can you find the reference to the $44 million loan, sir?

17   I think Mr. Jarrett can help us out by finding the reference.

18   A.   I was trying to get away without doing it.

19   Q.   Do we have it yet?  There it is.  We're staring right at

20   it.  It was right in front of us.

21   A.   Okay.

22   Q.   Loan request for the $44 million loan.  So in this whole

23   email string, Mr. Espy is advising the bank that for the three

24   other loans, very similar to what he told the bank on your

25   behalf for the first loan, these are all short term, we're
```

```
 1    going to take this money, and we're going to get the money

 2    right back by selling securities and raising cash.

 3         That's what was communicated to the bank.  Right, sir?

 4    A.   I -- I don't see where that's communicated.

 5    Q.   Well, let's go back just to be sure we haven't missed

 6    anything.  We talked about it just a second ago.  Go back to

 7    the first page of 232.  Let's go back to the first page of the

 8    exhibit.  Right there at the top, Mr. Espy tells the folks at

 9    the bank the loan is short term, and the source of repayment

10    will be cash from existing accounts and future sales of

11    securities.  Do you see that?

12    A.   Yes.

13    Q.   Okay.  But that didn't happen, did it?

14    A.   No, it did not.

15    Q.   Now, I want to ask you about this cash from existing

16    accounts.  What's going on here, right, Mr. Magness, is cash

17    is coming out of the Stanford bank to you.  Right?

18    A.   Right.

19    Q.   And what Mr. Espy is saying is, we're going to repay it,

20    but we're going to repay it from cash from our existing

21    accounts and selling stock in the future.  You see he's

22    communicating that?

23    A.   Right.

24    Q.   That doesn't seem to make a lot of business sense, does

25    it, to take out a loan at such a large interest rate and
```

1    saying, well, we're going to pay it back by taking cash from

2    somewhere else?  That doesn't make a lot of sense, does it?

3    A.   In some future date, you'd need to pay back the note.

4    You have two ways of doing so.  You wait for the maturity,

5    which was 2010 on one of these pieces of paper.  You wait for

6    the maturity or you wait for your stocks to go up to where

7    they don't look like they're going to go up that much more and

8    you might sell and pay it off, if you chose that you wanted a

9    nine percent CD.

10   Q.   Yeah.  The only thing you didn't mention is the fact that

11   because these are demand notes, before any of that stuff

12   happens that you just described, the bank could wake up one

13   morning and say, cash needs to come back, we need to be

14   repaid.  That's what a demand note is, isn't it?

15   A.   Right.

16   Q.   Okay.  So I'm sure that the idea that you had now just

17   signed on the dotted line for $44 million, $12 million, $7.2

18   million in demand notes, it must have been on your mind, wow,

19   what if we get two or three weeks down the road, and instead

20   of being short term, I really need to take more time to pay

21   them back.  What if the bank just sends me a letter demanding

22   the money?  Surely that must have been on your mind.

23   A.   What -- at that point what was really on my mind was

24   taking care of the margin call.

25   Q.   And what you did here with the 25 million--the 44, the

```
 1    7.2, and the 12 million--you took that cash out of one bank,

 2    Stanford International Bank, and you spread that cash over a

 3    bunch of different banks--HSBC, Merrill, U.S. Bank.  Right?

 4    A.   Right.

 5    Q.   Okay.  Again, like we talked about, you're taking big

 6    wads out of cash out of one bank and for reasons you're

 7    putting it in different places.  That's what's going on here.

 8    Right?

 9    A.   Similar.

10    Q.   Yeah.  And as we talked about earlier, one good reason to

11    move a whole bunch of cash out of one bank and into some other

12    banks is if you figure out the first bank is an unsafe place

13    to have your cash.  That would be a really good reason to move

14    that cash out of it, wouldn't it?

15    A.   That could be.  But that's not what happened

16    Q.   We're here in October 21st.  The last loan gets funded,

17    you know, later this month, about October 28.  Right?

18    A.   Right.

19    Q.   Somewhere right in there.  The next meeting that you have

20    of the investment committee is that December 5 meeting.

21    Right?

22    A.   Correct.

23    Q.   Yeah.  Which is, I don't know, five weeks later, a little

24    more than a month.  Right?

25    A.   Right.
```

1    Q.   And one of the things you do, as we've already seen a

2    little bit at this meeting, is you guys kind of pause and

3    reflect on kind of here's what's been going on in this very

4    busy time the last couple of three months since we last met.

5    Right?

6    A.   Right.

7    Q.   Okay.  Let's go to Plaintiff's Exhibit 92.  And if we

8    could go to the discussion, which we've seen for other

9    reasons, but go to the discussion about the Stanford

10   certificates of deposit.

11            MR. SADLER:  It's paragraph 4.  Blow that all up.

12   A.   (BY THE WITNESS)  Wait a second here.

13   Q.   (BY MR. SADLER)  Yeah.  Just take your time.

14   A.   Okay.  I'm on exhibit --

15   Q.   It should be 92, sir.  It should be in your book.

16   A.   I've got 482.  Just plain 92?

17   Q.   092.  Yes, sir.  And it's on -- if you skip the agenda --

18   we looked at this before.  It's on the first page.

19   A.   Okay.  Yes.

20   Q.   Okay.  And it's not very long.  We can all look at it.

21   And in a minute we'll go over to the next page just to be sure

22   we're not missing anything.

23        But in the first two paragraphs here, you will agree,

24   first, there is no discussion here about repaying the loans

25   that you had just taken out to Stanford International Bank.

1    That's not discussed anywhere in here, is it?

2    A.    No.

3    Q.    And I guess you'd agree with me that at the--this is the

4    very next investment committee meeting after you've taken all

5    these loans out--there is no discussion in here in these

6    minutes that say that the reason you took the loans out was

7    you needed to pay down margin calls.  That's not discussed

8    here, either, is it?

9    A.    No.

10   Q.    And let's go to the next page just to be sure that we're

11   not missing any language.  So let's go one page over and grab

12   those last couple of sentences at the top.  This mentions

13   something about a significant infusion of capital.  That

14   doesn't have anything to do with you paying back loans, does

15   it?

16   A.    No.

17   Q.    Okay.

18             MR. SADLER:  So let's go back to the first page

19   where we were and blow that up again.

20   Q.    (BY MR. SADLER)  Now, sir, I think you covered this with

21   Mr. Petrie, but let's just be sure we understand this process.

22        The minutes we're looking at were approved not on

23   December 5.  They were approved at the next meeting, which was

24   April.  Right, sir?

25   A.    The '05 -- or 12/5 meeting would have been in April,

1    yeah.

2    Q.    So at the April meeting --

3    A.    Yes.

4    Q.    -- that's when these minutes were approved.  And you're

5    aware, sir -- and you attended the meeting.  We talked about

6    this.  Right?

7    A.    Let's see.  Okay.  The minutes of the '05

8    meeting -- well, it's not on this page, I don't think.  This

9    is the minutes for the 08 October.

10   Q.    Yes.  So what we need to do is we need to look at the

11   minutes of the April meeting which talk about approving these

12   things we're looking at.  So let's do that now, Plaintiff's

13   Exhibit 114.

14   A.    Okay.

15         MR. SADLER:  We just captured item No. 1.  Mr.

16   Jarrett, if you could take that down so we are capturing the

17   whole top plus item No. 1, please.  Go back to the first page.

18   Q.    (BY MR. SADLER)  So we're looking at the April minutes,

19   and the first order of business is approve the minutes of the

20   December 5 meeting.  Are you with me?

21   A.    Yes.

22   Q.    Okay.

23         MR. SADLER:  Now let's go to the second page of this

24   document, and if we just highlight or enlarge that whole top

25   section, including paragraph numbered 1.  I want paragraph

 1   numbered 1, please.  Thank you.

 2   Q.   (BY MR. SADLER)  Just, again, to talk about this is the

 3   meeting where you're there, we've got Sutton, we've got

 4   Knudson, we've got Dokken, we've got Tommy Espy, we've got

 5   that fellow Chuck Wilk, and we've got Bob Armstrong.

 6   Everybody is there, and the first order of business is to

 7   approve those minutes that we just looked at, which are

 8   Plaintiff's Exhibit 92.  Are you with me?

 9   A.   Yes.

10   Q.   Okay.  And that's what -- that's the normal order of

11   business.  First order of business, approve the written record

12   of what happened at the last meeting.  That's the way you guys

13   did it.

14   A.   Right.

15   Q.   Okay.

16          MR. SADLER:  Now, if we could go over in this

17   document to the discussion -- specific discussion of Stanford,

18   and let's go to the next page.  I think it is -- let's go to

19   the second page, please.  Yeah, report on Stanford, item No.

20   3.  If we could enlarge item No. 3.

21   Q.   (BY MR. SADLER)  Now, let's again keep the timing

22   correct.  What we're now looking at are the minutes of what

23   you guys discussed in April 2009.  Are you with me?

24   A.   Yes.

25   Q.   Okay.  By this time the bank has already been shut down

1   by the government, Mr. Janvey is already on the job as the

2   Receiver in the Receivership.  You know that.  Right?

3   A.   Yes.

4   Q.   Okay.  And, in fact, what's talked about here -- I guess

5   first let's establish nothing's being discussed here about we

6   took loans to pay down margin calls.  That doesn't appear

7   anywhere in here, does it?

8   A.   No.

9   Q.   What does appear is that the loans had been paid not with

10  cash, but you had just had them set off again against the

11  certificates, just kind of like you did with your accumulated

12  interest.  That was discussed here.  Right?

13  A.   Right.

14  Q.   Okay.  But nothing in here about taking out the loans in

15  the first place for margin calls.  That's just not discussed

16  here, is it?  Nothing here about that, is there, sir?

17  A.   No.

18  Q.   So let's go to the first page and TO the first numbered

19  paragraph.  Let's talk about approval of these December 5

20  minutes.

21       What happens, sir, is that at this meeting Mr. Sutton

22  showed up with a draft copy of the December 5 minutes.  And

23  you were there; you know that happened.  Right?

24  A.   I don't know that happened, no.

25  Q.   You don't know that Mr. Sutton showed up with a draft set

1    of the minutes from the December meeting?

2    A.   I -- I -- I think he -- he came with one.  He came with

3    three, I think.

4    Q.   Yeah.  Okay.

5    A.   But that's just because of what I know now.

6    Q.   All right.  Well, so you know now that what Mr. Sutton

7    did is he showed up at the meeting not with signed minutes but

8    with draft minutes.  And the first order of business was

9    discussing what should go in the minutes before they're

10   signed.  Right?

11   A.   Right.

12   Q.   And you know, do you not, sir, that one of the things you

13   guys discussed is that Mr. Sutton had put some things in the

14   draft minutes that were not in the final minutes.  You

15   discussed that.

16   A.   I know that now.

17   Q.   Yeah.  And it's not admitted yet so we won't put it up on

18   the screen.  Would you look at Plaintiff's Exhibit 384 in your

19   book?  Just tell me when you have Plaintiff's Exhibit 384.

20   A.   I have it.

21   Q.   You have it.  Okay.  And can you identify for us that

22   Plaintiff's Exhibit 384 states that it is the December 5, 2008

23   minutes of the annual committee of the investment committee of

24   Mango Family Five, Inc., listing you and the others we have

25   discussed in attendance, but it is on the third page not

1    signed?

2    A.    Correct.

3    Q.    And this is one of the drafts that was discussed at the

4    meeting.

5    A.    What I have here is for the meeting of December 5.

6    Q.    Yes, sir.

7    A.    And it's approving the minutes of October 1.

8    Q.    Yes, sir.

9    A.    That's what you're asking?

10   Q.    What I'm asking is, approval of December 5 minutes, that

11   occurred at the April meeting we've been discussing.  Right,

12   sir?

13   A.    How could it be?

14   Q.    Listen to my question, sir.

15   A.    Okay.

16   Q.    Approval of the December 5 minutes is what you guys

17   discussed at the April meeting.  Right?  That's the sequence.

18   A.    Yeah, but I don't see -- I don't see the paperwork in

19   front of me about the April meeting.

20   Q.    No, sir.  I'm not asking you --

21   A.    Okay.  All right.

22          MR. SADLER:  I think, Your Honor, at this point

23   because I have some more questions about these draft minutes,

24   I'll offer 384.  You ruled on it in connection with the Sutton

25   deposition.

1          THE COURT:  I'm sorry.  Remind me what 384 is.

2          MR. SADLER:  Plaintiff's Exhibit 384 are the draft

3    minutes of the December 5 meeting that Mr. Sutton testified

4    about.

5          THE COURT:  Any objection?

6          MR. PETRIE:  I don't think there's foundation from

7    this witness, Your Honor.  No foundation.

8          THE COURT:  Well, let's see if he recognizes them.

9    Q.   (BY MR. SADLER)  Mr. Magness, I think you just told us

10   that Mr. Sutton showed up at the meeting with three drafts of

11   the minutes.  You told us that just a minute ago?

12   A.   I know that now.  I did not know that three days ago.

13   Q.   Okay.  And isn't it true, sir, that the document in front

14   of you is at least one of the versions of the draft meeting

15   minutes that you guys discussed at the April meeting?

16   A.   I guess that's what it says.  Okay?

17          MR. SADLER:  Offer 384.

18          THE COURT:  It's admitted.

19   Q.   (BY MR. SADLER)  And the reason we're going on and on

20   about these December 5 minutes, Mr. Magness, is you know that

21   there are things in the draft minutes that you're looking at,

22   384, that never made it into the final minutes, Plaintiff's

23   92.  You understand that's what I'm talking about.

24   A.   Yes.

25   Q.   Okay.  And the reason these things, which we're about to

1    talk about, didn't make it into the final signed minutes is

2    because when Mr. Sutton showed up with the draft minutes,

3    somebody objected to a couple of things he put in the minutes.

4    You remember that from the meeting?

5    A.   That's what I know of now.

6    Q.   Okay.  And, of course, if there were objections to

7    something in the minutes, you guys would have to resolve that

8    and then vote to approve whatever the final version was.

9    Right?

10   A.   Right.

11   Q.   Okay.

12          MR. SADLER:  So let's go back to Plaintiff's 92.  Go

13   to the last -- this is the December 5 minutes.  Go to the last

14   page.  Blow that up for us.

15   Q.   (BY MR. SADLER)  So Plaintiff's 92, just to be crystal

16   clear, this is what ultimately got signed and approved on

17   April 9, 2009, signed Ray Sutton.  This is what finally got

18   approved.  Right?

19   A.   Yes.

20   Q.   Okay.  Now, we have created a slide just to make it easy

21   on all of us because it's kind of hard to get the whole

22   exhibit side by side, but we need to look at what's different

23   about these minutes as that relates to Stanford.

24       So if we could put up the comparison slide that just

25   takes the language from 384, the draft minutes that have just

 1    been admitted, and compare it to 92, the signed minutes.

 2        Are you able to see that on your screen, sir?

 3    A.    Yes.

 4    Q.    So what we're looking at on the left is the signed

 5    minutes.  What we're looking at on the right is the draft

 6    minutes.  And we're focusing on the paragraph that's already

 7    been discussed, report of Stanford certificates of deposit.

 8    Do you see that?

 9    A.    Yes.

10    Q.    And we see -- and we've highlighted it just to make it

11    easy for everybody to focus on.  We've highlighted two

12    sentences that are in the draft minutes but never made it into

13    the final minutes.  Do you see the highlighted sentences?

14    A.    Yes, I do.

15    Q.    And what's in the draft minutes of what you guys talked

16    about on December 5, 2008, is Mr. Sutton is making some

17    comments there.  Do you see his comments?

18    A.    Yes, I do.

19    Q.    And isn't it true, sir, it's right in front of us, that

20    what the draft minutes reflect, first, is that Mr. Sutton is

21    advising that if the bank -- if the bank went into

22    receivership, you couldn't use the loans to offset the

23    certificates.  The loans wouldn't offset them.

24        That's what he's commenting on in the first highlighted

25    part.  Right?

```
1    A.    That's correct.

2    Q.    Okay.  And this is a comment that comes right after what

3    we've already discussed, which was as we can see it there,

4    this is you asked Mr. Espy to go get a redemption.  After the

5    bank said no, you got the loans.  That's his last comment on

6    that section.  You see it there?

7    A.    Right.

8    Q.    And then the next comment that is different from the

9    draft minutes to the signed minutes is Mr. Sutton says if the

10   bank went into receivership under United States law, GMIT, the

11   Trust, you'd have to pay back that $25 million you took out.

12   Do you see that?

13   A.    Yes.

14   Q.    And this is Mr. Sutton, who's part of your advisor group,

15   the lawyer at Baker and Hostetler.  That is who is making

16   those comments.  Right, sir?

17   A.    Correct.

18   Q.    And, of course, what's interesting about the fact that

19   you guys would be talking about this in December of 2008 is,

20   of course, Mr. Janvey doesn't come on the screen for another

21   three months.  You know that.

22   A.    Right.

23   Q.    Yeah.  And certainly you'd agree with me, there wasn't

24   anything in the public not being published, Bloomberg, pick

25   your news service, anywhere, that there was any thought,
```

```
 1    concern, worry, suspicion, that the Stanford International

 2    Bank was about to go into receivership.  That wasn't public

 3    knowledge, was it?

 4    A.   Not in 5 December of '08.

 5    Q.   That's right.  But you guys were already talking about

 6    that three months before Mr. Janvey came along, three months

 7    before the government shut down the bank, and that's because

 8    you already knew the bank was in financial trouble.  Isn't

 9    that true?

10    A.   That's not true.

11    Q.   Isn't it true, sir, that by this time you knew the bank

12    had been lying to cover up its balance sheet problem?  You

13    knew it by this time, didn't you?

14    A.   No, sir.

15    Q.   It's interesting because I believe I heard your lawyer

16    suggest that kind of what was a real sort of, you know,

17    light-bulb moment for you guys didn't come until December, and

18    it was when this Ponzi scheme or Bernie Madoff was arrested.

19    Do you remember him talking about that yesterday?

20    A.   I -- I believe he talked about that.

21    Q.   Yeah.  And that somehow that changed your view and

22    changed everybody's view of the world.  Do you remember him

23    making statements like that?  And I'm paraphrasing, that's not

24    a quote, but you remember what he said.  Right?

25    A.   Yes.
```

1    Q.    Yeah.  But, of course, as of December 5, there wasn't

2    anything in the newspapers about Bernie Madoff.  He hadn't

3    been arrested.  His Ponzi scheme had not been exposed, had it?

4    A.    It had not.

5    Q.    Right.  So somehow you guys sitting around the Wynn

6    casino on December 5th talking about what you did back in

7    October, somehow you guys knew that this bank, Stanford bank

8    that you had gotten $88 million from, was about to go into

9    receivership.  You guys knew that.

10   A.    No, we did not.

11   Q.    Well, let's examine the possibilities.  Are you telling

12   this jury that your lawyer, your advisor Mr. Sutton, just

13   dreamed this stuff up and wrote it down in the draft minutes?

14   A.    No, but he'd slept quite a few months before he found

15   that out.

16   Q.    He slept quite a few months before he found that out.

17   Let me ask you about that.

18        I think what you're trying to suggest -- correct me if

19   I'm wrong.  But I think what you're trying to suggest is

20   somehow Mr. Sutton confused his meetings, and I think what

21   you're trying to suggest is you guys talked about receivership

22   and all that stuff in April after Mr. Janvey was appointed,

23   but you didn't talk about it in December.  Is that what you're

24   suggesting to us?

25   A.    Yes.

1   Q.   Ahh.   Okay.   Well, you realize, sir, there's -- there's a

2   little fly in the ointment of your theory here, because if you

3   look at what Mr. Sutton says twice, he's talking about if the

4   bank went into receivership.   That sounds like it hadn't

5   happened yet, doesn't it?

6   A.   It does.

7   Q.   Yeah.   But, of course, if your theory, oh, he's confusing

8   April with December is true, well, by April the Receivership

9   is already there.   It's been going on for six weeks.   This

10   thing is nationwide news by April.   Right?

11   A.   Yes.

12   Q.   Nobody--nobody--would be sitting around in April talking

13   about if Stanford Financial went into receivership because it

14   had already been in receivership for six weeks by that point.

15   Right?

16   A.   I'm not sure.

17   Q.   You are sure because you told us not two hours ago, in

18   response to your counsel's questions, that February 18th when

19   the government shut down Stanford, that was a date you

20   remembered.   Right?

21   A.   Yes.

22   Q.   February 18th is prior to April, isn't it?

23   A.   Yes.

24   Q.   Okay.   So when you guys are sitting around the Wynn

25   casino in April of 2009, this is all over the news, Mr. Janvey

1    has been appointed, it is no secret, this is a big deal.

2    Right?

3    A.   Right.

4    Q.   And let's be clear.  When this happened in February 2009,

5    you recall, sir, this was nationwide news when the SEC filed a

6    lawsuit, shut down Stanford, and appointed a Receiver.  It was

7    all over the news.  Right?

8    A.   I knew that they shut it down.  I don't know if that's

9    the same day that they got Janvey for the receivership.

10   Q.   Okay.  Well, Mr. Janvey can talk about the day he came

11   in.  Just trust me, it was right there around February 17th.

12        So going back to this, Mr. Sutton is talking about things

13   not that have already happened; he's talking about what's

14   about to happen and he's doing that in December in a room at

15   the Wynn casino with you and the others.  That's when this

16   discussion is happening.

17   A.   These are draft notes that he made before the meeting

18   that never were signed or approved at that meeting.  These are

19   his thoughts, not ours or mine.

20   Q.   Okay.  And you're right they weren't approved, because

21   somebody told him, take those sentences out before we finalize

22   the minutes.  That's how they were removed.  Somebody told

23   him, take those out.  Right?

24   A.   Right.

25   Q.   Yeah.  And if we go back to the -- and that happened.

```
 1    Take those statements out of the draft minutes, that decision

 2    was made at the April meeting, wasn't it?

 3    A.    Yes.

 4    Q.    Yeah.

 5    A.    Or thereabouts.  Could have been the day before.

 6    Q.    Could have been the day before.  But it wasn't back in

 7    January.

 8    A.    No.

 9    Q.    No.  Let's go back to 114, which I hope I guessed

10    correctly are the April minutes.

11              MR. SADLER:  There it is.  So go back to paragraph

12    one, which is one page over, approval of the minutes.

13    Q.    (BY MR. SADLER)  First order of business, approval of the

14    minutes.  Let's remind ourselves, right above that, who was

15    there because I need to ask you about that specifically.

16    A.    Okay.

17    Q.    Let's just take them one by one.  Was it Mr. Armstrong,

18    Robert E. Armstrong, the trust lawyer who objected to those

19    sentences being in the minutes and said, hey, guys, we ought

20    to take those out?  Was that his suggestion?

21    A.    I do not know.

22    Q.    What about Charles Wilk?  He hadn't gone to prison by

23    now.  Was it his idea?

24    A.    I seriously doubt it.

25    Q.    What about Tommy Espy?  Was it his idea to take those
```

```
 1    sentences out?

 2    A.    No.

 3    Q.    What about Tonya Dokken?  Was it her idea to take those

 4    sentences out?

 5    A.    Maybe.

 6    Q.    Well, we can probably agree on one thing:  It probably

 7    wasn't Mr. Sutton's idea to take them out because he's the one

 8    that put them in.  Right?

 9    A.    That I can't tell you, either.

10    Q.    Okay.  Well, we've kind of run out of people until we get

11    to you, Mr. Magness.  Was it basically your idea, your

12    instruction, to take those things out?

13    A.    No, sir.

14    Q.    So I think what you're telling us is somebody objected,

15    they were taken out, but you can't tell this jury whose idea

16    it was to take them out.

17    A.    I don't think we discussed it at the meeting.  I

18    think -- I don't -- maybe he showed those to somebody at the

19    meeting and so therefore we decided that we weren't going

20    to -- we needed to rewrite them, because the fact is that he's

21    messing up history with -- with fact, and it needed to be

22    fixed.

23    Q.    Needed to be fixed.  He was messing up the history that

24    you guys wanted to leave --

25    A.    No, no.
```

1    Q.    -- in your written records.

2    A.    No.  What went down between December 5th and April was

3    what he was -- he was writing down, saying that we thought

4    about it in December, was not correct.  Therefore it was not

5    signed.

6    Q.    Seems like the one thing you are sure about is somebody

7    disagreed -- let's go back to the comparison just to be sure

8    we know what we're talking about.

9         Somebody disagreed with having those two sentences in the

10   final signed minutes, and they were taken out.  Are we agreed

11   on that?

12   A.    Right.

13   Q.    And, of course, if, in fact, you guys were talking about

14   what Mr. Sutton says you were talking about in December 2008,

15   three months before the Receiver comes on board, then the

16   story that you've told this jury, both of those can't be true,

17   can they?

18   A.    Which part are you talking?

19   Q.    Well, sir, I heard you say just a couple of hours ago in

20   response to questions from Mr. Petrie, you know, February,

21   that's -- that's kind of when I saw and maybe I knew something

22   in January that something might be wrong.  Well, that story

23   can't be true at the same time this is true, can it?

24   A.    Yes, it can.

25   Q.    You can both know about it in December and not know about

1    it in December?

2    A.   Because the 15th of December when Bernie Sanders (sic)

3    was brought in light, that didn't -- that didn't make us think

4    greatly of our position.  It made us wonder possibly, but it

5    didn't say, by the way, we have a Ponzi scheme.  It's the

6    first time we'd ever heard of a Ponzi scheme.

7    Q.   And I think we came to an understanding a few minutes ago

8    that if we're talking about the December 5 meeting, the

9    December 5 meeting, Madoff hadn't come to light as of --

10   A.   Correct.

11   Q.   Right.  That was later.

12   A.   Correct.

13   Q.   But let me ask you about that since you brought it up.  I

14   think you were pretty clear with Mr. Petrie that up until the

15   moment of Madoff, you felt real confident about the bank.  You

16   weren't worried about the bank.  You had no idea anything was

17   wrong.  Is that your testimony?

18   A.   Correct.

19   Q.   Okay.  So setting aside all the words we're seeing here

20   and now just focusing on -- on madoff, so Madoff comes out and

21   the headline is New York banker Bernie Madoff arrested in

22   Ponzi scheme scam.

23   A.   Right.

24   Q.   And your first thought is, huh, I wonder if Stanford's

25   also a Ponzi scheme?

1    A.    It wasn't my first thought, but there was people that

2    speculated.

3    Q.    Yes.  Yes.  And, of course --

4    A.    And it wasn't Ray Sutton.

5    Q.    Oh, it wasn't Ray Sutton.

6    A.    It was not.

7    Q.    Oh, okay.  Let me eliminate all possibilities.  Ray

8    Sutton is a lawyer.  Right?

9    A.    Correct.

10   Q.    Is he a fortune teller?  Can he see the future?

11   A.    No.

12   Q.    Okay.  Now, let's take this document down.  It was a

13   very, very important document that you and Mr. Petrie talked

14   about just right before lunch and I need to go back to that,

15   because it is a document I have some questions for you about.

16        2008 you get all this cash out of the bank.  Right?  I

17   need an answer, sir.

18   A.    Yes.

19   Q.    2009 you have to like everybody else in the world in the

20   United States at least, you've got to prepare your taxes

21   talking about money and things that happened in 2008.  That's

22   the sequence.  Right?

23   A.    No.

24   Q.    In 2009 you and your advisors and tax professionals

25   prepared your return for the tax year 2008.

1    A.   We asked for extensions in April and file them in

2    October.

3    Q.   I think we're going to see you filed them in September

4    but can we agree on the year?  You filed your '08 return in

5    2009.

6    A.   Perfect.

7    Q.   Okay.  That's all we're getting so far.

8    A.   Okay.

9    Q.   Now, part of what you were doing and you mentioned this a

10   little bit is when you filed your tax return for 2008, you had

11   to explain to the IRS something about that first 25 million

12   that came out in cash from the bank.  You had to --

13   A.   Yes.

14   Q.   -- tell them a story about that, what happened.  And it's

15   because.  Right?  If it's taxable you are going to owe them

16   taxes on it.

17   A.   Correct.

18   Q.   And you know, taxes on 25 million I'm sure you are kind

19   of in a high bracket.  What is that?  Like 7, 8 million

20   dollars you might owe?

21   A.   It would be quite a bit.

22   Q.   Yeah, quite a bit.  So part of the preparation of that

23   return was to explain to the IRS what happened, how you got

24   that cash, and why it's not taxable.  That's part of what

25   you're doing?

1    A.    Correct.

2    Q.    Okay.  So we need to look at your returns.  And I think

3    this is clear but let's just be crystal clear.  You signed

4    those tax returns you know under penalty of perjury.  Right?

5    A.    Yes.

6    Q.    And maybe it's just perjury but you know people can go to

7    prison for lying on their taxes.  Right?

8    A.    Yes.

9    Q.    Apparently Mr. Wilk found that out.

10   A.    Right.

11   Q.    So let's look at Plaintiff's Exhibit No. 483.  And this

12   was -- I think it is -- There are actually two of these I

13   think only one of them but we actually need to talk about both

14   of these.  You recognize Plaintiff's Exhibit No. 483.  This is

15   your personal income tax paperwork for the tax year 2008.

16   A.    Right.

17   Q.    There's a separate document you know exists that's the

18   tax return for the same year.

19   A.    Correct.

20   Q.    Two separate documents.  Okay.  And we're going to look

21   at it in just a second, sir, but I just -- I need to ask you

22   this question.  Didn't you tell the Internal Revenue Service

23   in your tax filing that the reason you took the loans was bec

24   you believed your investment at Stanford International Bank as

25   of October 2008 was in jeopardy?  Isn't that what you told the

```
 1   IRS?

 2   A.   No.

 3   Q.   All right.  Let's look and see what you actually said.

 4   Let's go to the next -- Well, let's hold on.  Let's blow this

 5   up just to see what we're looking at because it's kind of hard

 6   to see.  So let me first ask you, Ahrhardt, Keefe, Steiner and

 7   Hottman, PC.  Are those your tax lawyers the people signing

 8   this cover letter?

 9   A.   Yes.

10   Q.   Okay.  And all we're looking at is they are sending you,

11   Gary, and your wife I assume.  Right?

12   A.   Yes.

13   Q.   Sarah, they filed your tax return they're just sending

14   you a copy.  Right?

15   A.   Correct.

16   Q.   Okay.  So what we're about to look at is the filed return

17   they are just sending you a copy here.  Right?

18   A.   Correct.

19   Q.   Let's look at the next page let's capture the top to see

20   watt we are talking about here.  So that's your 2008 1040

21   there you are Gary Magness?

22   A.   Yep.

23   Q.   Okay.  Let's go to the next page and let's see who signed

24   off on it down there.  Now, it was prepared obviously by your

25   professionals but you had to sign it and right there as we all
```

1    know it says you're signing under penalty of perjury.  Right?

2    A.    Yes.

3    Q.    Okay.  Pretty serious business wouldn't you agree with

4    me?

5    A.    Yes.

6    Q.    Okay.  I need to ask you about this.  So (Hottman) when

7    you tell the IRS here you don't tell them your occupation is

8    investor.  Your occupation is ranch manager?

9    A.    Yes.

10   Q.    Okay.  But your wife is also an investor.

11   A.    Yes.

12   Q.    Okay.  So this tax return had a whole bunch of stuff in

13   it if we were to look at the whole thing it is 70 to 80 pages.

14   Right?

15   A.    Some amount of pages.

16   Q.    But you had to file a very specific form to explain to

17   the IRS what happened with that $25 million.  Right, sir?

18   Specific form that deals with that.

19   A.    I presume.

20   Q.    Let's look at it.  Let's go to the next page.  And let's

21   enlarge that at the top so we can see what we're talking

22   about.  So what you filed and presented to the IRS for

23   consideration was what's known as form 8275 disclosure

24   statement.  And there you are.  That's your name Gary Magness.

25   Right?

1    A.    Yes.

2    Q.    Okay.  And you are identifying to them cash that you have

3    received from Stanford International Bank and as we're going

4    to see you broken it out between these two different returns

5    but this tax return deals with 8.8 million of the 25 million.

6    Do you see that?

7    A.    Yes, sir.

8    Q.    Okay.  And so this form is the form you used to explain

9    to the IRS here's where this cash came from and here's why I

10   shouldn't have to pay taxes on it.  That's kind of the general

11   idea of this form.  Right?

12   A.    Yeah it's for my tax preparers to figure it out yes.

13   Q.    It's not that wasn't my question.  My question is, this

14   is the document you use to tell your story to the IRS to avoid

15   paying taxes on that money.  Right?

16   A.    I don't use it.  They used it.  I sign it and pay my

17   taxes.

18   Q.    You sign it swearing that it's true?

19   A.    Correct.

20   Q.    Okay.  And you want the IRS to believe the story you put

21   in this form.  Right?

22   A.    Yes.

23   Q.    Okay.  Of course.  Because you don't want to have to come

24   up with an extra seven, eight million in taxes, do you?

25   A.    Correct.

1    Q.    So let's look at what the story is you told the IRS on

2    the next page.  Let's enlarge everything so we can see it all

3    and not leave anything out.  Let's take it pretty much line by

4    line.  All right.  Here is your explanation.  You see there at

5    the top, sir?

6    A.    Yes.

7    Q.    Explanation.  Starts off with taxpayer that's you.

8    Right?

9    A.    Right.

10    Q.    And then it has this language about disregarded single

11    member LLCs.  That's just referring to the companies that were

12    involved in purchasing the various certificates of deposit.

13    Right?

14    A.    Correct.

15    Q.    Yeah.  And it says these taxpayer through these companies

16    bought Stanford CDs in 2004 and 2005 and that's absolutely

17    true, isn't it?

18    A.    Correct.

19    Q.    Sure.  That's some of the CDs we were talking about in

20    this lawsuit, isn't it?

21    A.    Correct.

22    Q.    Yeah.  And then you pick out the particular one for GMAG

23    that's one of your single member LLCs, and say the face amount

24    was 15 million and then the face amount for the mag security

25    CDs was 9 million.  Both of those are true statements, aren't

1    they?

2    A.    Yes.

3    Q.    Okay.  And then let's look now where it gets a little

4    interesting.  It says in October 2008, the taxpayer received

5    funds from Stanford as a loan secured by the CDs."  Also a

6    true statement, isn't it?

7    A.    Yes.

8    Q.    Yeah.  And then it says, "Due to the investigation of

9    Stanford which was active in 2008, the taxpayer--that's

10   you--was concerned his CD principal was in jeopardy."  Also a

11   true statement.  Right, sir?

12   A.    I'm not sure what all that means.

13   Q.    Well, let's break it down.  First let me ask you, is it a

14   little troubling that you signed a statement to the IRS under

15   penalty of perjury and now you don't really know what it

16   means?  Is that troubling to you?

17   A.    Yes.  I -- You know, it says I'm talking about an

18   investigation in '08 as though this was in '08 when it was

19   filed it wasn't it was October of '09.  Possibly another one

20   of these rearranging of history, but nevertheless, exactly

21   true do you really want to pay interest on or pay income tax

22   on interest earned when you never got fully all your principal

23   back in the first place.  So it's how you treat your taxes how

24   you file your taxes.

25   Q.    I understand we're clear on why you're doing this.  You

```
 1   don't want to have to pay taxes on this cash.  Right?

 2   A.   Yeah, because it's not due.  It's not due if it's only

 3   principal.

 4   Q.   Okay.

 5   A.   Returned.

 6   Q.   Okay.  But the important part here is you talk about you

 7   signed the statement submitted to the IRS which let me ask you

 8   just to be clear.  Did they reject this?  They accepted it,

 9   didn't they?

10   A.   As far as I know.

11   Q.   Yeah.  Well you'd know if they came back at you and sent

12   you a bill for seven, eight million dollars?

13   A.   My life's fairly complicated.

14   Q.   Somebody would have brought that to your attention?

15   A.   I think so.

16   Q.   Yeah.  So this investigation of Stanford which was active

17   in 2008, the only investigation that any of us have talked

18   about is that investigation that the SEC was doing.

19   A.   Yes.

20   Q.   Yeah.  And the taxpayer was concerned his principal was

21   in jeopardy.  You understand what in jeopardy means it means

22   it's at risk it's about to be lost.  That's what that means?

23   A.   I don't know what that referred to.

24   Q.   Do you understand what the word jeopardy means?

25   A.   Yes.
```

1    Q.   And I'm not talking about the game show.  What does it

2    mean to you?

3    A.   Well, I do know that I left 20 percent --

4    Q.   No, sir I'm asking you a specific question.  What does

5    the word jeopardy mean to you?

6    A.   At risk.

7    Q.   Yeah.  You were concerned your CD was at risk in October

8    2008 which just so happens to be the time you took out the

9    loans.  Right?

10   A.   It's -- It can be misconstrued.

11   Q.   Misconstrued.  Okay.  Now, you know, sir, that you filed

12   two returns but you know, don't you, that you gave the IRS

13   almost word for word the exact same explanation on your other

14   tax return.  You know that, don't you?

15   A.   Yes.

16   Q.   Okay.  Well let's look at it to be sure.  So let's take

17   this down and look at Plaintiff's Exhibit No. 482.  Gary

18   Magness Irrevocable Trust.  This is their income I say their

19   this is your trust's income tax return.  Right?

20   A.   Yes.

21   Q.   And if we look at the bottom it's prepared by the same

22   firm of professionals same as the ones we just saw.  Right?

23   A.   Yes.

24   Q.   Then let's look at the next page.  Let's look at the

25   letter.  And once again, the return's been filed, you

```
 1   professionals are just sending you a copy showing that it's

 2   been filed.  Right?

 3   A.   Yes.

 4   Q.   Yeah.  Okay.  So let's look at the first page I'm sorry

 5   the first page of the tax return.  Thank you.  A little bit

 6   different numbering because this is a trust but this is the

 7   tax return for the trust and there is your trust right there

 8   Gary Magness Irrevocable Trust that's the same trust we've

 9   been talking about today, isn't it?

10   A.   Yes.

11   Q.   And this fiduciary here that's the same Mango Five Family

12   that we've been talking about here today.  Right?

13   A.   Yes.

14   Q.   Okay.  And let's go to the next page and go down to the

15   signature.  Go back one page, please.  Blow that up.  Similar

16   to what we just saw, you signed as fiduciary under penalty of

17   perjury this tax return, didn't you?

18   A.   Yes.

19   Q.   Okay.  So now let's look at the next page and now we see,

20   if we can enlarge it, the same form, form 8275 disclosure

21   statement just like what we looked at a minute ago.  The same

22   form, isn't it, sir?

23   A.   Yes.

24   Q.   What's different is taxpayer up here isn't you.  Now it's

25   this GMIT trust one of the entities that held the CDs.
```

```
 1   A.   Right.

 2   Q.   And you're having to explain to the IRS about cash

 3   received from Stanford International Bank.  That's part of

 4   what you're doing here.  Right?

 5   A.   Right.

 6   Q.   And now the number's different because this is the other

 7   part of the 25 million.  This is about 15 and a half million.

 8   Right, sir?

 9   A.   Yes.

10        (Begin part 13, ljr)

11   Q.   The 25 million is composed of this figure we're looking

12   at here, the figure we just looked at on the other tax return,

13   plus that cash you tossed in.

14   A.   Right.

15   Q.   That totals to 25 million to the penny.  Right?

16   A.   Right.

17   Q.   Okay.  Now let's look and see what you told the IRS a

18   second time on the next page.

19        MR. SADLER:  And let's blow up all of that.

20   Q.   (BY MR. SADLER)  Taxpayer, this time it's not you

21   personally, it's you as fiduciary for the Trust.  That's your

22   role here.  Right?

23   A.   Right.

24   Q.   And let's look at it.  You invested through the Trust in

25   the Stanford CDs, '05 and '06.  True statement.  Right?
```

1   A.   Right.

2   Q.   And for the Trust, the face amount was 55 million.  Also

3   true statement.  Right?

4   A.   I think so.

5   Q.   Yeah.  But here's this next sentence.  In October 2008,

6   "The taxpayer--meaning the Trust, your Trust--received funds

7   from Stanford as a loan secured by the CDs."  Also true.

8   Right?

9   A.   Correct.

10  Q.   Okay.  But now here comes this same sentence, and you'd

11  agree with me it's word for word what we just looked at, "Due

12  to the investigation of Stanford which was active in 2008, the

13  taxpayer was concerned that his CD principal was in

14  jeopardy."  That's what you told the IRS on this form.

15  A.   Yes.

16  Q.   So on two different tax returns, you made the same

17  statement to the IRS.  Right?

18  A.   Yes.

19  Q.   Using the same language, saying the same thing in October

20  2008, you thought your CD principal was in jeopardy.  That's

21  what you told the IRS.

22  A.   Correct.

23  Q.   And you wanted the IRS to accept this and they did accept

24  it, didn't they?

25  A.   I think so.

```
 1            MR. SADLER:  If we could, Mr. Jarrett, could we just

 2    highlight this taxpayer jeopardy sentence?

 3    Q.   (BY MR. SADLER)  And, Mr. Magness, you'd agree with me,

 4    this statement, it's true and it makes sense because when you

 5    went to get your redemption, the excuse that they gave you for

 6    not giving you a redemption didn't line up with what they'd

 7    been telling the public or telling you previously.  Isn't that

 8    right?

 9    A.   No, it was basically the same.

10    Q.   It was basically the same.  Are you telling us that

11    sometime previously, you had asked for a redemption previous

12    to October '08, they told you no and had told you no because

13    we need to keep your CD on our balance sheet?

14    A.   No.  It was their discretion what to do if you asked for

15    early redemption.

16    Q.   Those words that you just spoke, it was their discretion?

17    A.   Yes.

18    Q.   So you'd agree with me, first, that's not what you told

19    the IRS.  Right?

20    A.   This is -- the IRS, in filing your taxes, I understand is

21    how you treat it yourself.  Sometimes it's not exactly as it

22    went down.  It's how you're treating it.  And we did not get

23    our interest payment because we really didn't get all of our

24    principal back.

25    Q.   Yeah, and you certainly didn't tell the IRS that you took
```

```
 1    the loan to pay down margin debt.  You don't say that anywhere

 2    here, do you?

 3    A.    I don't think it's a problem of theirs.

 4    Q.    You don't say that on your tax return, do you?

 5    A.    I don't -- no.

 6    Q.    On either one of these?

 7    A.    No.

 8    Q.    Because telling the IRS, I took the loans to pay down

 9    margin debt, that wouldn't really help you win your tax case

10    with the IRS, would it?

11    A.    It just might.

12    Q.    It just might.  If you took money out of the bank just to

13    pay off some other bank, wouldn't that be treated as just

14    income that you need to pay taxes on?

15    A.    It's how you treat it, and you have to be somewhat

16    correct and honest about it.

17    Q.    Right.  Correct and honest.

18    A.    Exactly.

19    Q.    Yeah.  And the correct and honest thing is you took the

20    loans because you thought if you didn't, you'd lose your

21    chance to get the cash out.  That's why you took the loans.

22    A.    No, sir.

23    Q.    You took the loans because you knew if you didn't -- if

24    you didn't move that money from an unsafe bank to a bunch of

25    safe banks, it wasn't going to be there very long.  That's why
```

1    you took the loans.

2    A.   No, sir.

3    Q.   We looked -- we have looked at several of your meeting

4    minutes from your Mango Five group, and I want to be sure we

5    haven't left one out.  But can you think of any, any written

6    meeting minutes from any of these Mango Five meetings you guys

7    had, wherever at the Wynn Casino or anywhere else, where you

8    guys wrote down, wrote down, we took these loans to pay off

9    margin debt?

10        Is that anywhere in any of your meeting minutes in any

11   time period?

12   A.   I do not know.

13   Q.   If that were true, if you had really done that, if you

14   had really taken that cash out of the bank to pay down margin

15   debt, wouldn't that be something we would find reflected in

16   the minutes of the meetings of the investment committee?

17   Wouldn't we find that in there?

18   A.   Sometimes you don't see everything on the minutes.

19   Q.   Yeah.  And if the plan really was that these loans were

20   really short term, that you only needed the cash for, as Mr.

21   Espy said, a week, or Ms. Dokken wrote, just a short term, and

22   you were going to pay them back with cash, wouldn't we have

23   seen that whole plan discussed somewhere in the meeting

24   minutes of the committee if that, in fact, was the real plan?

25   Wouldn't we see that?

```
 1   A.    I -- I think that all we have is the signed documents.

 2   Q.    Right.  Now, this -- this issue of margin calls --

 3             THE COURT:  If we're changing subjects --

 4             MR. SADLER:  Yes, sir.

 5             THE COURT:  -- we're due for a break somewhere.

 6             MR. SADLER:  Now is perfect.  Now is perfect, sir.

 7             THE COURT:  Okay.  Let's take our afternoon break

 8   now, and we'll see you-all back in 20 minutes.

 9             (Whereupon, the jury left the courtroom.)

10             THE COURT:  Be seated.

11        I just wanted to recap the discussion that we had up at

12   the sidebar, and the issue was use of a deposition of one

13   witness to impeach the live testimony of a different witness.

14             MR. SADLER:  Yes, sir.

15             THE COURT:  And my recollection, Mr. Sadler, is you

16   were arguing that Rule 32(a)(2) provides for that, and that

17   has the contradict or impeach the testimony language?

18             MR. SADLER:  Yes, Your Honor, that's the language.

19             THE COURT:  And I think if you look at that, and you

20   might want to do that during the break, it specifically limits

21   it to the testimony of the deponent.

22             MR. SADLER:  I understand, Your Honor, and I have a

23   different reading of the rule.  But as a practical matter,

24   we're past this, and so it's -- it's not going to come up

25   again.
```

```
 1              THE COURT:  Okay.  That's the only one?

 2              MR. SADLER:  Yes, sir.

 3              THE COURT:  Well, then never mind.

 4              MR. SADLER:  Yes, sir.

 5              THE COURT:  Anything else we need to take up?

 6              MR. SADLER:  No, sir.

 7              MR. PETRIE:  No, sir.

 8              THE COURT:  Okay.  We'll see you back in 20 minutes.

 9                      (Brief recess.)

10              THE COURT:  All set?

11              MR. SADLER:  Yes, sir.

12              MR. PETRIE:  Yes, sir.

13              THE COURT:  How much more you think?

14              MR. SADLER:  Oh, not very much at all, Your Honor.

15    Maybe 15 or 20 minutes.

16              THE COURT:  Okay.

17              (Whereupon, the jury entered the courtroom.)

18              THE COURT:  Be seated.

19         Receiver may proceed.

20              MR. SADLER:  Thank you, Your Honor.

21    Q.   (BY MR. SADLER)  Mr. Magness, there was a comment you

22    made towards the end of when Mr. Petrie was asking you

23    questions.  It went by really fast and I needed to come back

24    to it.

25         Remember you were telling him, I think before the lunch
```

```
 1    break, that it wasn't until January that you started to have

 2    suspicions about Stanford, that general subject.  That's what

 3    I'm talking about.  Do you remember talking about that?

 4    A.    It could be the end of January area.

 5    Q.    Okay.  And then you mentioned something about sending a

 6    letter, and I think I know what you're talking about, but

 7    that's what I want to focus on now.

 8          In the middle of January, about January 13, Mr. Espy

 9    worked with Mr. Knudson to draft a letter to send to the bank,

10    and the letter was a series of questions.  Do you know what

11    I'm talking about?

12    A.    Yes.

13    Q.    Okay.  Is that the letter you were thinking about?

14    A.    I believe so.

15    Q.    Okay.  We have that.  I know you guys didn't put it up,

16    but I'm going to put it up.

17          MR. SADLER:  Plaintiff's 98.  First let's just kind

18    of see what we're talking about.  Let's grab the top down to

19    Mr. Rodriguez.  Right there's fine for now.

20    Q.    (BY MR. SADLER)  And so this is a letter, dated January

21    13, 2009, from Mango Five to Mr. Rodriguez.  And then if we go

22    to the bottom, we can see who signed it.  I believe it's

23    signed by Mr. Knudson.  But can you confirm that?

24    A.    Yes.

25    Q.    Okay.  Signed by Mr. Knudson.  And then let's just get
```

1    the text of the three paragraphs before we get to the

2    questions, just to understand what we're talking about.

3         So Mr. Knudson is writing to Mr. Rodriguez.  We're now

4    already into January.  Right?  January time frame.

5    A.   Yes.

6    Q.   Okay.  And he identifies who he is, and says it's his job

7    to evaluate the assets of the Trust from time to time.  And

8    that's at your direction.  I guess that's basically true.

9    Right?

10   A.   Yes.

11   Q.   Okay.  And then he identifies that they own CDs, and

12   that's true.  And then he says it's imperative that they have

13   as much knowledge as to the viability, value, and safety.  You

14   see that?

15   A.   Yes.

16   Q.   And so this list of questions --

17        MR. SADLER:  and let's go ahead and put up these

18   list of questions.

19   Q.   (BY MR. SADLER)  These are questions that Tom Espy and

20   Mr. Knudson came up and then they were put in this letter and

21   then this letter was sent to the bank president.  Right?

22   A.   Yes.

23   Q.   Okay.  And we can probably spend a lot of time that we

24   don't need to talking about questions 1 through 5.  I just

25   want to focus your attention on question 6.

```
1         This is Mr. Knudson, after he's worked with Mr. Espy to

2    come up with this question, Given the product, sector,

3    currency and alternative investment strategies, how is it that

4    SIBL is only down one percent through November.  Do you see

5    that?

6    A.   Yes.

7    Q.   And to be clear, SIBL, that's Stanford International

8    Bank, Ltd.  Right?

9    A.   Right.

10   Q.   Now, we talked about this letter in your deposition, so

11   I'm sure you remember it.  These questions, these are all

12   questions that you guys could have put to the bank the week

13   before, two months before, six months before, I guess except

14   for Madoff.  Right?

15   A.   I think that they mirror a letter from somebody to Madoff

16   also, I think where they got some of this.

17   Q.   Yeah.  And the idea was you were going to send these

18   questions on January the 13th, and then there was a phone call

19   set up for January the 27th to get the answers, and you guys

20   ended up having that phone call.  Right?

21   A.   Yes.

22   Q.   Yeah.  But the truth of the matter is, before you ever

23   got to the phone call to get the answers to the questions, as

24   you've testified in your deposition, you already pretty much

25   made up your mind by that time you were going to try to get
```

1    everything else out of the bank that you could.  Right?

2    A.   I think we probably were thinking about it.  I don't know

3    what exactly was happening at that exact second.  I do know

4    that we were going forward real soon after that.

5    Q.   Okay.  And let me be clear with my question.  If you sent

6    the letter on the 13th, expecting to get the answers to your

7    questions in a phone call two weeks later on January the 27th,

8    isn't it true that before the phone call ever happened, you

9    pretty much made up your mind that you weren't going to wait

10   for the answers; you were going to try to get anything else

11   you could in the way of cash out of the bank by redemption?

12   A.   I don't really recall really.

13   Q.   You don't recall.

14   A.   I know that Steve asked for his CDs to be redeemed right

15   after this.

16   Q.   All right.  Well, let me --

17   A.   But I did also right after he got his redeemed.

18   Q.   Okay.  So to put it in context, let me show

19   you -- actually I can't show it to you because it's not

20   admitted, but let me have you look at it.

21        Look at Plaintiff's Exhibit 100 in your book, if you

22   would, please, sir.  And tell me when you have it.

23   A.   Okay.  I have it.

24   Q.   All right.  And can you identify for me that Plaintiff's

25   Exhibit 100 is a series of redemption letters for the CDs and

1    they are draft letters, unsigned, dated January 15, 2009?

2    A.   Yes.

3    Q.   And these letters were prepared at your direction on or

4    about January 15, 2009?

5         MR. PETRIE:  Excuse me, Your Honor.  This is a

6    document not in evidence, and he's already just admitting

7    everything about it.

8         MR. SADLER:  I'm laying the foundation to offer it.

9    I have to establish that he's familiar with it.

10        THE COURT:  Overruled.

11   Q.   (BY MR. SADLER)  These letters, these draft letters dated

12   January the 15th, you directed these letters to be drafted on

13   or about that date, did you not?

14   A.   I do not know that I did.

15   Q.   Okay.

16        MR. SADLER:  Your Honor --

17        THE WITNESS:  I did not sign it.

18   Q.   (BY MR. SADLER)  Understood.

19        MR. SADLER:  May I approach with the deposition?

20        THE COURT:  Yes.

21        MR. SADLER:  Thank you.

22   Q.   (BY MR. SADLER)  I think this will -- if you could -- Mr.

23   Magness, you recall having your deposition taken --

24   A.   Yes.

25   Q.   -- last February under oath?

```
 1   A.    Right.

 2   Q.    Okay.  And I'm showing you on page 272 at line 14, and

 3   I'm just going to read the question.  If you'll read along

 4   with me.  "Let me show you Plaintiff's Exhibit 100.  These are

 5   draft letters from you, dated January 15, 2009, asking for the

 6   immediate liquidation of all the CDs."

 7         And what was your answer?

 8   A.    "Yes."

 9   Q.    And then my next question was, "Did you direct these

10   letters to be drafted?"

11         And what was your answer?

12   A.    I said yes.

13   Q.    And the next question was, "And did you direct it on or

14   about January the 15th?"

15         And what was your answer?

16   A.    "That's what it says."

17              MR. SADLER:  I offer Plaintiff's 100.

18              MR. PETRIE:  No objection.

19              THE COURT:  It's admitted.

20              MR. SADLER:  So if we could just put it up.

21   Q.    (BY MR. SADLER)  We just looked at a letter, signed

22   letter, that went from Mr. Knudson to the bank, which was the

23   letter you mention in discussions with Mr. Petrie that you

24   guys were going to ask some questions that you wanted answers

25   for from the bank.
```

```
 1          But here we see that, before the phone call where you

 2     were supposed to get the answers and just two days after the

 3     letter, you've already started the process of preparing the

 4     paperwork to try to get the rest of the money out of the bank.

 5     Isn't that true?

 6     A.   Yes.

 7     Q.   Okay.  And isn't it true that you did that because, at

 8     least by your own admission by this time, you'd made up your

 9     mind this bank was a fraud and you wanted to get out.

10     A.   Not necessarily.

11     Q.   Not necessarily.  Isn't it true, sir, you testified in

12     your deposition that by this time you were by your own

13     admission fairly suspicious of what was going on at the bank?

14     A.   Yes.

15     Q.   Okay.  And what you were fairly suspicious of is not that

16     they were just bad business people, but they were crooks and

17     running a fraud.

18     A.   I'm not sure the fraud part, but, you know, at that point

19     there's a lot of things going on, but I don't know because I

20     can't remember exactly when the TV was all lit up with people

21     trying to get their monies out of Stanford.  I don't know when

22     that exactly happened.  But they were still in business clear

23     up till the 17th, 18th of February.

24     Q.   True enough.  But in your letter --

25          MR. SADLER:  Let's go back to the exhibit we just
```

1    looked at, Plaintiff's Exhibit 98.

2    Q.   (BY MR. SADLER)  And I say your letter.  From Mr. Knudson

3    but on your behalf.

4    A.   Yes.

5    Q.   You weren't waiting to get answers to these questions

6    before you tried to do whatever you could to get as much money

7    out that was left on your behalf.  You weren't waiting for the

8    answers to the questions, were you?

9    A.   I don't know.

10             MR. SADLER:  Your Honor, I'll pass the witness.

11             MR. PETRIE:  Thank you, Your Honor.

12                       REDIRECT EXAMINATION

13                        By Mr. Petrie:

14   Q.   Mr. Magness, I'm going to bounce around a bit because I'm

15   going to be covering topics you just finished discussing with

16   Mr. Sadler.

17        I'd like to start by taking you back to the earlier part

18   of Mr. Sadler's questioning of you, and during those questions

19   he showed you some of the marketing materials from the bank

20   that are marked as Plaintiff's Exhibit 474.  Do you remember

21   looking at that color brochure?

22   A.   Yes.

23   Q.   Just waiting for it to pop up on the screen.

24   A.   Okay.

25   Q.   And can you tell me whether these were the types of

1   materials that you looked at quarterly from the bank?

2   A.   I do not know.

3   Q.   Did other people that worked for you look at these types

4   of materials quarterly from the bank to your knowledge?

5   A.   It's quite possible.

6   Q.   Is the information contained in here the type of

7   information that was being provided fairly regularly to

8   you-all as depositors in the CD program?

9   A.   Yes.

10  Q.   Was it your understanding that this information was

11  somehow being specially prepared for GMIT, GMAG, and Magness

12  Securities?

13  A.   As opposed to everybody?

14  Q.   Yes, sir.  Exactly.

15  A.   No, I did not know if it was made just for us.

16  Q.   You also had a chance -- I'm going to come back to this

17  document in a minute, but you also looked at a brochure that

18  had pictures of, for example, Laura Pendergest-Holt.  She was

19  specifically pointed out in that brochure.  It was kind of

20  green brown, a little tough to read.  Do you remember that?

21  A.   Yes.

22          MR. PETRIE:  And let's pull up Exhibit 492 and look

23  at that.

24  Q.   (BY MR. PETRIE)  And you walked through a lot of the

25  pages of this with Mr. Sadler on his direct examination, in

1  addition to the picture of Ms. Pendergest-Holt.  Do you

2  remember doing that?

3  A.   Right.

4  Q.   Now, when you go to other financial institutions like the

5  Merrill Lynches, the HSBCs, the U.S. Banks, do they also have

6  marketing materials that they provide to you?

7  A.   Yes.

8  Q.   And how -- in terms of the level of information that's

9  provided in the marketing materials, how did the Stanford

10  marketing materials compare?  Were they more information, less

11  information, or about the same type level of information?

12  A.   Very similar.

13  Q.   By the way, did you receive these marketing materials

14  from Stanford, the ones Mr. Sadler went through?

15  A.   Not personally.

16  Q.   Did you ever see these before you sat down on the witness

17  stand?

18  A.   I don't remember seeing these, but I usually like

19  subliminally read stuff like this.

20  Q.   I know it's getting late in the day and you're probably

21  anxious to have me stop asking questions, but if you will

22  please wait for me to finish.

23  A.   Sorry.

24  Q.   That way if we are not talking at the same time, we won't

25  make the job unduly hard for the court reporter.  Okay?

1    A.    Okay.

2    Q.    Thank you.

3          Now, in the marketing materials that you've seen, have

4    you also seen marketing materials for the hedge fund

5    investments that you made and that we saw in those minutes of

6    the investment committee meetings?

7    A.    Yes.

8    Q.    And in those types of materials, do they provide detailed

9    information about the types of investments in which they're

10   involved?

11   A.    Sometimes not.

12   Q.    Now, you talked some with Mr. Sadler about the -- at some

13   length about the March 6th, 2008 investment committee meeting.

14   That's the one that discusses the telephone call with Juan

15   Rodriguez-Tolentino.  Do you remember that?

16   A.    Yes.

17   Q.    Let's pull up that document and look at Exhibit 92.  And

18   we'll pull it up on the screen, too, if that's faster for you.

19   A.    Okay.

20   Q.    And let's skip the agenda page and go right to the

21   paragraph about -- on the third page of the document that

22   talks about Mr. Rodriguez-Tolentino.

23          MR. PETRIE:  I'm sorry, I misspoke.  If we could

24   look, please, not at December 5, Exhibit 92, but instead look

25   at Exhibit 62.  Forgive me.  And, again, the top of the third

1   page, please.

2   Q.   (BY MR. PETRIE)  This is the information you were

3   discussing with Mr. Sadler in terms of this conference call

4   where Mr. Juan Rodriguez-Tolentino participated.  Right?

5   A.   Yes.

6   Q.   And he went through with you some of the various things

7   that were told to you during the course of that conference

8   call.  Do you recall that?

9   A.   Right.

10  Q.   Now, when the information was provided that the bank had

11  some of the characteristics of a hedge fund, do you recall

12  discussing that with Mr. Sadler?

13  A.   Yes.

14  Q.   When Mr. Rodriguez-Tolentino told you that in March of

15  2008, was that a surprise?

16  A.   No.

17  Q.   And why not?

18  A.   It's typical.

19  Q.   What do you mean?

20  A.   He told us that -- what we're talking about, explain

21  yourself.

22  Q.   My -- my question?

23  A.   Yeah.

24  Q.   My question is, when it says in -- let's see if we can

25  look in the second paragraph of this paragraph 5, and towards

1    the bottom it says, while admitting that the investment has

2    some characteristics of a hedge fund.  Do you see that?

3    A.    Yes.

4    Q.    And then you also see that a little further up from that

5    it says, Mr. Rodriguez was asked how this differs from a hedge

6    fund, and he responded that it is different because the bank

7    has regulatory oversight.  Do you see that?

8    A.    Yes.

9    Q.    Now, when he told you that, first of all, was it news to

10   you that the bank had regulatory oversight?

11   A.    No.

12   Q.    And do you remember discussing with Mr. Sadler the

13   distinction between regulatory oversight by the FDIC or SEC

14   versus a regulatory agency in the island or governings active

15   in the island of Antigua?

16   A.    Correct.

17   Q.    And was that something you had known from the beginning

18   of your investment, that the regulatory structure was

19   something local and not governed by a U.S. regulator?

20   A.    Yes.  It was, you know, like an English Commonwealth

21   country, so it was more associated with British law.

22   Q.    And when he told you that the bank had regulatory

23   oversight in March of 2008, was that a new piece of

24   information for you?

25   A.    No.

1    Q.    And when he told you that -- when asked how it differs

2    from a hedge fund, and he told the group that it is different

3    from a hedge fund because the bank has regulatory oversight

4    but otherwise had characteristics of a hedge fund, was that

5    news to you?

6    A.    No.

7    Q.    Now, if we take Mr. Sadler's premise that there are items

8    in here that were not publicly available -- and he asked you

9    about that.  Do you remember that?

10   A.    Yes.

11   Q.    When you had this information in March of 2008, did you

12   do anything with it?

13   A.    No.

14   Q.    Did you share it with anyone outside of the group of

15   people participating in this phone call?

16   A.    No.

17   Q.    Did you make any decisions with respect to the CDs based

18   on any one of these items of information?

19   A.    No.

20   Q.    Did this information provided in March of 2008 play any

21   role in the decisions you made in October of 2008 with respect

22   to the four loans that you discussed with Mr. Sadler?

23   A.    No.

24   Q.    Now, let's go back to 474, which is the other

25   marketing -- the quarterly, I'm going to call it a bulletin.

1    Let me call it a quarterly update since that's the title on

2    it.  And it's on the screen, but -- if that's easier for you

3    to look at it that way.

4    A.   Yes.

5    Q.   However's easiest for you.

6    A.   It's not in the book, so go ahead.

7    Q.   Then let's go with the screen.  If you could look,

8    please, at page 4 that Mr. Sadler took you to.

9    A.   Okay.

10   Q.   And you remember he skipped over all the other stuff

11   saying essentially that was just history about what was -- a

12   report on what was going on in the market.  Do you remember

13   that?

14   A.   Yes.

15   Q.   And then you see at the very top of the page--we don't

16   need to blow it up because it's very small print and fairly

17   detailed--there is portfolio adjustments that's talking about

18   things that are going on with Stanford International Bank.

19   Right?

20   A.   Right.

21   Q.   And then he talked to you about this product allocation

22   pie chart, which is the one in the upper left-hand corner of

23   the four.  Correct?

24   A.   Right.

25   Q.   And had you seen information like this talking about

1    these types of allocations previously?

2    A.   That's what he took care of during the phone call.

3    Q.   And do you see, if we can quickly check the date on this,

4    that this information, this update document, do you see the

5    date on the first page covers what is essentially the third

6    quarter -- excuse me, the second quarter of 2008, from April

7    1, '08 through June 30, '08?

8    A.   Correct.

9    Q.   Okay.  And now let's look at page 4, which is the

10   information Mr. Sadler was discussing with you.  But I want to

11   focus on the lower-most left-hand box, which is the SIBL data.

12   And that has the date August 30 of '08.  Do you remember

13   looking at that information with Mr. Sadler?

14   A.   Yes.

15   Q.   Okay.  Do you see where this references the investment

16   portfolio--and I'm going to round it--$8 billion?

17   A.   Yes.

18   Q.   Do you see that, sir?  The last item there?

19   A.   Yes.

20   Q.   And it shows then year-to-date earnings on that portfolio

21   of--and, again, I'm going to round it--roughly $16 million.

22   Do you see that?

23   A.   Yes.

24   Q.   And do you understand that $16 million is two-tenths of a

25   percent of the value of that portfolio?

219

1    A.    Yes.

2    Q.    In your experience, is that a really good return on the

3    portfolio for the year-to-date that's being discussed here?

4    A.    It doesn't look very large.  But as I look at it now, I

5    think the same thing, it's kind of small.

6    Q.    Okay.  And then you also discussed with Mr. Sadler in

7    this same portion of the document the index returns.  Remember

8    he was discussing with you the Dow Jones and the S&P?

9    A.    Right.

10   Q.    Let's go back and look at those.  Let's take the S&P just

11   because it's at the bottom of the stack and easy to spot.

12   That shows a return of negative 12.8279 percent, and that

13   shows that being as of June 30 of '08.  Do you see that?

14   A.    Right.

15   Q.    Is it your understanding -- what's the time period that

16   is measuring the drop?  In other words, is it --

17   A.    That is from the first of the year.

18   Q.    Okay.  And is that in your experience in the marketplace

19   a major drop in the S&P index to have almost 13 percent drop

20   over the first six months of the year?

21   A.    That can happen in one day to two days.

22   Q.    Well, irrespective of the speed with which it happens, is

23   that a significant drop in your experience?

24   A.    No.

25   Q.    Now I'd like to turn to some of Mr. Sadler's questions

```
 1    this afternoon as compared to this morning if that helps you

 2    place them in the continuum.

 3         He went through with you the two -- he talked to you

 4    about two loans, one loan to buy the CDs and then another loan

 5    from Stanford International Bank on the CDs.  Do you remember

 6    that fairly lengthy conversation?

 7    A.   Yes.

 8    Q.   And he asked you a question to the effect of having the

 9    two loans in the manner you describe for him as, to use his

10    phrase, not making much sense.  Do you remember that?

11    A.   Yes.

12    Q.   And you agreed with him that it didn't make much sense.

13    Right?

14    A.   Yes.

15    Q.   If it didn't make much sense, why did you do it?

16    A.   I needed the money immediately.

17    Q.   And when you say immediately, how fast?

18    A.   The next day.

19    Q.   The very next day?

20    A.   Yes.

21    Q.   Now, he asked you some questions also then about the

22    statements that were being made in borrowing the money, about

23    how the plan was to pay the money back in fairly short order

24    by the sale of stock.  Do you remember that?

25    A.   Yes.
```

1   Q.   Was that statement true?

2   A.   I don't recall that ever happening.

3   Q.   Well, it may not have happened.  Was it the statement was

4   the plan at the time to try and pay back that loan in fairly

5   short order from the sale of stock?

6   A.   It wasn't -- it wasn't what I -- I thought.

7   Q.   What did you think you were going to do to pay that back?

8   A.   I would have had -- you know, it was going to take a

9   little longer than a couple of days, I could tell that, or a

10  week or a month.

11  Q.   And why would it take that period of time?

12  A.   Because if I'm waiting for my stocks to appreciate back

13  where they were before, it's not going to happen overnight.

14  Q.   Now, you also discussed with him some the forms of the

15  promissory notes.  Do you remember that, the notes that you

16  signed for the four loans from SIB?

17  A.   Yes.

18  Q.   And let's look at one of those.  Let's pull up Exhibit

19  84.  And let's look at the third page of exhibit -- excuse me,

20  second page of Exhibit 84.  That was the promissory note that

21  you looked at with or one of the promissory notes you looked

22  at with Mr. Sadler.  Correct?

23  A.   Yes.

24  Q.   And do you remember discussing with him the fact that

25  this is a standard form from the bank into which the bank has

1    put in information that is a few specific parts for you,

2    meaning the date, the dollar amount, checking the box for how

3    the money's being given out and what the collateral is.

4    A.    Right.

5    Q.    Otherwise, this is all standard.  Right?

6    A.    Correct.

7    Q.    Now, he had talked to you about the phrase there about

8    how it was a demand note.  Remember that?

9    A.    Correct.

10   Q.    And he pointed out the language that says, it is payable

11   back to the bank on your, meaning the bank's, order or demand.

12   Right?

13   A.    Correct.

14   Q.    Now, at any point in time between -- and let's say from

15   when you took out the loans in October to the day before

16   Madoff was revealed, say mid December of the same year of '08,

17   did Stanford International Bank ever come back to you and

18   say -- make a demand for repayment for all or part of any of

19   those promissory notes?

20   A.    No.

21   Q.    Now, Mr. Sadler also asked you some questions about your

22   understanding of this 80 percent borrowing program that was in

23   place at Stanford.  Do you recall that?

24   A.    Yes.

25   Q.    First of all, did you have any understanding as to

```
 1    whether you had a right to borrow 80 percent of the CDs by

 2    some agreement or otherwise with Stanford International Bank?

 3    A.    It was at their discretion.

 4    Q.    And did you understand that in determining what that 80

 5    percent would be, what the dollar amount of it would be, that

 6    you would include both your principal and any interest that it

 7    accrued to whatever date you were seeking a loan?

 8    A.    Yes.

 9    Q.    Now, Mr. Sadler asked you a question.  And I apologize.

10    I'm going to paraphrase it because I'm not a very good

11    stenographer, but something to the effect of you had figured

12    out a way to get more than 80 percent out of Stanford

13    International Bank.  Do you recall that question -- a question

14    to that effect?

15    A.    Yes.

16    Q.    Was this series of four loans something where at some

17    point before October 10th, you-all planned to take out the

18    four loans as you ended up doing?

19    A.    No.

20    Q.    How did that come about that you ended up having one

21    loan, a loan repaid, and then three more loans after?

22    A.    The market was crashing daily.  Margin calls, we needed

23    to pay margin calls immediately.

24    Q.    And did you have any forewarning of some sort that these

25    market calls -- margin calls, excuse me, would be coming?
```

1    A.   Had a little warning, but, I mean, not that you expected

2    it to be as bad.

3    Q.   Now, you were also asked very recently, towards the end

4    of Mr. Sadler's questioning, about whether any of the minutes

5    of the investment committee of Mango Five had references to

6    margin loans.  Do you remember discussing that with him?

7    A.   Yes.  All our loans are margin loans.

8    Q.   Okay.  So when you and I went through and talked about

9    all the various debts that were outstanding and/or being

10   repaid, are there any of those that were not margin loans?

11   A.   No.

12   Q.   Is there a reason why you don't use the word "margin" in

13   the Mango Five minutes?

14   A.   No, because it's all the same thing.

15   Q.   Let's look at exhibit -- Plaintiff's Exhibit 227 that you

16   discussed with counsel for the Receiver.  Do you still have

17   that in the binder?

18   A.   It doesn't seem to be here.

19   Q.   Well, you can look on the screen if that helps.  That is

20   the October 13 email.  Do you remember discussing that with

21   Mr. Sadler?

22   A.   Yes.

23   Q.   Okay.  Now, if we look at the top email --

24        MR. PETRIE:  We can start with that one, Austin.

25   That's fine.

```
 1    Q.   (BY MR. PETRIE)  Mr. Espy.  We've talked a little bit

 2    about how he's the financial advisor you worked with at

 3    Stanford Group Company, but we didn't talk about where he

 4    worked, what city he worked in.  What city did he work in?

 5    A.   He worked in Denver.

 6    Q.   Okay.  And so working in Denver, when he sends out this

 7    email on October 13th at 14:35, that means it's 2:35 in the

 8    afternoon.  Right?

 9    A.   Right.

10    Q.   And that would be Mountain Time.  Correct?

11    A.   Correct.

12    Q.   And what time would that be Eastern Standard where the

13    markets are open?

14    A.   It would be 16.

15    Q.   And what does that mean in non-military time?

16    A.   Okay.  4:00.

17    Q.   4:30?

18    A.   Yes.

19    Q.   And are the markets still open at 4:30?

20    A.   No.

21    Q.   They'd been open all day, though, prior to when they

22    close for the day.  Correct?

23    A.   Yes.

24    Q.   And so when Mr. Sadler asked you about how there was not

25    any time for things to change because of the intervening
```

1    weekend, that's not accurate, is it?

2    A.    That's right.

3    Q.    And do you remember what was happening in the market on

4    Monday, October 13th?

5    A.    No.

6    Q.    Well, if you were asking for more money on the CDs, do

7    you remember if you were still under any pressure from margin

8    calls?

9    A.    It was pressure all the time.

10   Q.    All the time meaning over what span?

11   A.    For two months.

12   Q.    You were asked a question by Mr. Sadler--and, again, I'm

13   going to have to just paraphrase it--to the effect of whether

14   spreading the cash around, one of the reasons to do that would

15   be or a really good reason to do that would be is if you

16   thought you had cash in an unsafe bank.  Do you remember that?

17   A.    Yes.

18   Q.    And you had a fairly adamant answer.  You said to him

19   that could be, but that's not what happened here.

20   A.    Right.

21   Q.    Why did you say that?

22   A.    Because it wasn't -- the banks weren't getting paid off

23   because one was bad or one was charging too much.  They were

24   getting paid off because of margin call.  The reason we paid

25   off all those banks is we had already moved the stock around

1    to where it was all at 50 percent loan-to-value.  So every

2    bank -- when it got a margin call, every bank lit up red.

3    Q.   Was there a difference -- we talked some about the terms

4    of the margin loans and Ms. Dokken reporting about a $10

5    amount that would kick in things at HSBC and U.S. Bank.

6        Did you have that same $10 amount that was one of the

7    terms on which you were able to borrow on margin from Merrill

8    Lynch?

9    A.   Merrill Lynch was a little better.

10   Q.   And when you say a little --

11   A.   Yeah.  Some of them were -- were $10.  It doesn't work.

12   Some were less than $10.  The government will not let you

13   margin under $3.  So it depends on negotiations with your

14   lender how far they'll allow the stock to go down.

15   Q.   And did you undertake those types of negotiations with

16   Merrill Lynch as part of this process?

17   A.   Yes.

18   Q.   Now, you were asked a question by -- and let's pull up

19   the document first.

20       MR. PETRIE:  Pull up Exhibit 92, please, if you have

21   that handy.

22   Q.   (BY MR. PETRIE)  Hopefully, that's -- if you look at the

23   second page of 92, that should be the December 5, '08 minutes

24   of Mango Five investment committee?

25   A.   Yes.

1    Q.   And you discussed with Mr. Sadler at some length

2    paragraph 4, which starts the bottom part of that page and

3    then carries over a bit to the top of the next.  Do you

4    remember discussing that with him?

5    A.   Yes.

6    Q.   And he talked to you about that there was no discussion

7    in that paragraph 4 -- and he went through the whole paragraph

8    and then looked at the top of the next page and talked to you

9    about how there was no discussion about the reason for some of

10   these borrowings as being for the paydown of margin calls.  Do

11   you remember discussing that with him?

12   A.   Yes.

13   Q.   Because that is not stated here, it doesn't say we

14   borrowed the money to pay down margin calls, does it mean it

15   didn't happen?

16   A.   No, it does not mean it didn't happen.

17   Q.   How much of this money went to address margin calls at

18   other financial institutions?

19   A.   All of it.

20   Q.   He also asked you a question about the bank, meaning

21   Stanford Bank -- I'm going to have to paraphrase it very

22   loosely.  But his question was essentially asking you about

23   how the loans were paid off not with cash but set off against

24   your CDs.  Do you recall a question to that effect?

25   A.   Yes.

```
 1   Q.   And when the loans were set off against the CDs, was that
 2   still cash that you'd put into the bank?
 3   A.   Yes.
 4   Q.   And so is there a distinction between having those paid
 5   off with cash or having them set off against your CDs?
 6   A.   The same thing.
 7   Q.   You also discussed with Mr. Sadler this draft of the
 8   minutes for the December 5 meeting.
 9   A.   Yes.
10   Q.   Do you recall that?  And you talked to him about those
11   two items that Mr. Sutton had in a draft but that didn't
12   appear in the final.  Do you recall that?
13   A.   Yes.
14   Q.   Was there any discussion at the December 5 meeting about
15   those topics?
16   A.   No, there was not.
17   Q.   Did the word "receiver" ever get brought up during the
18   course of that?
19   A.   Never.
20   Q.   And why are you so definite about that?
21   A.   Didn't even really know what a receiver was.
22        MR. PETRIE:  Let's, if you could, please, pull up
23   one of the tax returns.  Let's do 482.  And if you could
24   start --
25   Q.   (BY MR. PETRIE)  Do you have that document yet, sir?
```

1    A.   Yes.

2    Q.   If you could start by looking at the second page of 482.

3    You were asked a question by Mr. Sadler as to whether these

4    were attorneys who represented you on tax matters.  Do you

5    recall a question to that effect?

6    A.   Oh, yes.

7    Q.   And do you see that underneath the name of this firm

8    Erhardt, et cetera, up in the top left corner, what it says is

9    that's a firm of CPAs and advisors?

10   A.   Yes.

11   Q.   And so these were not attorneys; these were your CPAs?

12   A.   CPAs.

13   Q.   Now, Mr. Sadler also showed you, if you go to page 6 of

14   this document, the signature block for the return.  Do you

15   remember discussing that with him?

16   A.   Yes.

17   Q.   Okay.  And in particular he referred you to that

18   little--I shouldn't say little--the two-line script that

19   appears over the sign here thing.  Correct?

20   A.   Yes.

21   Q.   And what that says is, under penalties of perjury I

22   declare that I've examined this return, including accompanying

23   schedules and statements, and to the best of my knowledge and

24   belief it is true, correct, and complete.  Do you see that

25   reference?

```
 1   A.    Yes.

 2   Q.    And what was the knowledge and belief that you had that

 3   led you to sign this return as being true, correct, and

 4   complete sometime in the fall of 2009?

 5   A.    It was put together by EKS&H, our accountants.

 6   Q.    And any other information that you had that led you to

 7   believe that this was true, correct, and complete at the time

 8   you signed it?

 9   A.    It was based on information we gave them to compile our

10   taxes.

11   Q.    Okay.  Did you give the Erhardt Keefe firm, EKS&H,

12   information about an investigation that was taking place in

13   2008?

14   A.    I did not.

15   Q.    Did you have any knowledge at any point in time in 2009

16   of an investigation of Stanford International Bank that took

17   place in 2008?

18   A.    No.

19            MR. PETRIE:  Thank you, Your Honor.  Those are all

20   the questions I have.

21            THE COURT:  Recross?

22            MR. SADLER:  No further questions, Your Honor.

23            THE COURT:  Thank you, sir.  You may step down.

24            MR. PETRIE:  Our next witness, Your Honor, is Tonya

25   Dokken, who is a deposition.
```

1          THE COURT:  All right.

2          MR. PETRIE:  I think I'm going to need to move the

3     microphone from my desk closer to my speakers so everyone can

4     hear.

5          THE COURT:  Help yourself.

6          MR. PETRIE:  Thank you.

7        May we just start when ready, Your Honor?

8          THE COURT:  Please.

9          MR. PETRIE:  Thank you.

10          TONYA DOKKEN, BY VIDEO DEPOSITION,

11    Q.  Good morning, Ms. Dokken.  Can you please state your name

12    for the record?

13    A.  Tonya Dokken.

14    Q.  I represent Ralph Janvey, the Plaintiff in this case.

15    He's the Receiver for the Stanford International Bank and

16    other related entities and persons.  Do you understand that?

17    A.  Yes, I do.

18    Q.  Okay.  And you understand who Mr. Janvey is as the

19    Receiver?

20    A.  Yes.

21    Q.  Okay.  And you're here today pursuant to a subpoena that

22    the Receiver issued to you.  Correct?

23    A.  Yes.

24    Q.  We're here on a case related to Gary Magness.  Are you

25    familiar with Mr. Magness?

```
 1   A.   Yes.

 2   Q.   How do you know Mr. Magness?

 3   A.   I first met him while I was working for the CPA firm that

 4   handled his father's business affairs.  And I worked with he

 5   and his brother, and then he hired me to go to work for him

 6   personally.

 7   Q.   About what year was that?

 8   A.   1989.

 9   Q.   Are you a CPA?

10   A.   No.

11   Q.   Do you have education beyond high school?

12   A.   Yes.

13   Q.   And what is that?

14   A.   I have a business degree from the University of Montana.

15   Q.   Do you have any other education beyond your business

16   degree at the University of Montana?

17   A.   Various workshops and seminars and that sort of thing.

18   Q.   Okay.

19   A.   But no higher education than that.

20   Q.   Do you have any licenses or certifications?

21   A.   No.  I have a driver's license.

22   Q.   Did you go to work for Mr. Magness in 1989?

23   A.   No.  I worked at the CPA firm for five years.  Then I

24   went to work for him in 1994.

25   Q.   And what was your position when you went to work for him
```

1    in 1994?

2    A.    It was vague.  He liked working with me at the CPA firm.

3    I was hired there to be an oil and gas specialist.  So I

4    didn't go through the whole CPA circuit of sitting at the

5    cubicles and that sort of thing, so I was able to meet with

6    clients right away.  There's a lot of oil and gas in and

7    around Denver at that time, still is, and so they had some

8    holdings.  And that's how I met him.

9         Then I started doing his work personally.  I did all of

10   his personal accounting for him, went to his house, opened his

11   mail, and he just decided that he wanted to hire me.  I was

12   planning on leaving the CPA firm.

13   Q.    Okay.  Let me just make sure I break that down and

14   understand which -- who some of those pronouns apply to.  So

15   you were hired as an oil and gas specialist at the CPA firm?

16   A.    Yes.

17   Q.    Okay.

18   A.    And so when I was planning to leave there, he offered me

19   a job and he just sort of said he wanted to have all of my

20   knowledge and experience and that sort of thing.

21        And I worked from home at first.  At that time he was

22   building a casino, so I did a lot of work, accounting work,

23   and pro formas, and that sort of thing associated with the

24   casino and several other businesses that he was involved in.

25        And then not too long after I went to work for him, his

```
 1    father died.  And so there was an acrimonious, I don't know,

 2    prenup fight with his stepmother, and so he wanted me to take

 3    over the Magness operation, which necessitated us getting an

 4    office downtown and hiring more people and that sort of thing.

 5    Q.   Okay.  When did his father pass?

 6    A.   '96.

 7    Q.   So going back to 1996 and then moving forward, was there

 8    a time at which you had a more formal title or designation

 9    within the Magness organization?

10    A.   Gary called me his secretary for years and years until we

11    finally had a $10,000 penalty every time he introduced me as

12    his secretary to someone.  So somewhere along the line, I

13    became the controller.

14    Q.   Well --

15    A.   And then sometime later I became the chief financial

16    officer.

17    Q.   Do you know approximately when those two things happened,

18    controller and then CFO?

19    A.   I would say controller was probably around 2000 maybe.

20    And CFO, probably, I don't know, 2005 or later.

21    Q.   You are now retired?

22    A.   Yes.

23    Q.   And when did that -- when did you take retirement?

24    A.   In August of last year.

25    Q.   So that's August of 2015?
```

1    A.    Yes.

2    Q.    Okay.  And was there any particular reason for your

3    decision to retire, to leave the Magness organization?

4    A.    Yes.

5    Q.    What was that?

6    A.    I just had joint replacement surgery and needed more time

7    off than I could take because it's -- the job was really

8    intense, and I had some really severe high blood pressure

9    problems.  And I just decided I didn't want to die there.

10   Q.    Are you still in touch with Mr. Magness?

11   A.    No.

12   Q.    I want to focus on the period from 2005 to 2009 now.  Do

13   you recall which entity or entities you were employed by at

14   that time?

15   A.    I was employed at that time by the Magness Investment

16   Group.  They were my official employer.  They work -- it was

17   formed as a company to basically hold the employees of all of

18   Gary's businesses so that everybody got the same benefits and

19   that sort of thing.

20   Q.    What's the Cherokee Lending Company, LLC?

21   A.    Cherokee Lending Company was a vehicle that lent money to

22   various entities, and it also was involved in the building of

23   the casino and the parking garage associated with it.  We had

24   bondholders involved in the parking -- involved in the casino.

25   Q.    Now, when you say it lent money to various entities, are

```
 1    those Magness entities or other entities outside of the
 2    Magness entities?
 3    A.   It was mostly Magness entities.  It was also to other
 4    people, friends of Gary's.
 5    Q.   Anybody besides friends that you can think of just as a
 6    category?
 7    A.   No.
 8    Q.   What was your understanding, skipping a few bullets,
 9    GMAG, LLC, what was your understanding of that entity?
10    A.   GMAG, LLC, originally came from stock that was owned by
11    Gary's -- Gary's mother and outside of his father's death in a
12    certain trust that flowed through.  His mother passed away
13    before his father did, and so he wanted to keep -- keep the
14    stock that he received from various ways clear in his mind,
15    and so GMAG, LLC, was formed to hold specific stock.  It's
16    owned a hundred percent by Gary Magness.
17    Q.   The stock was or the entity?
18    A.   The entity and the stock, everything.  But he didn't want
19    it in his personal name because he already had personal stock
20    before his father passed away.  So he wanted to know what that
21    was, then know what he got from other -- in other ways.
22    Q.   So did the entity -- once the stock was in the entity's
23    control, was it in the ownership of the entity or in the
24    ownership of Gary Magness?
25    A.   Well, he was the sole manager and member of the LLCs.
```

1    Q.   And from your understanding was there a business reason

2    to keep those sources of the stock separate from one another

3    or was that a personal decision?

4    A.   It was a personal decision.  It was just the way he

5    wanted it.  Magness Securities, for example, came from stock

6    owned by his mother, and Kim and Gary each got their

7    individual pieces of that.  And so that was another way of

8    keeping track of a different component of everything that he

9    had inherited.

10   Q.   You said Magness Securities.

11   A.   Further down the list.  I'm just using that as an

12   example.

13   Q.   Sure.  I just want to make sure I understood.  We were

14   talking about GMAG, LLC, and I thought you had said that that

15   was stock from his mother.  Was that not --

16   A.   And father.

17   Q.   I see.

18   A.   Came -- it came personally to Gary as opposed to Gary

19   through his father's trust.

20   Q.   So what is Magness Securities then?

21   A.   His mother's stock.

22   Q.   Solely his mother's stock?

23   A.   Yes.

24   Q.   Okay.  And GMAG, LLC, is through both of them?

25   A.   Yes.

1    Q.   Okay.  And I don't see it on this list, but are you

2    familiar with something called the Gary Magness Irrevocable

3    Trust?

4    A.   Right.  It hadn't been distributed to Gary yet, and

5    that's why it's not on this list.  It was at this point in

6    time called the Estate of Bob Magness.

7    Q.   Does it cover funding margin calls, et cetera?  Can you

8    tell us what a margin call is?

9    A.   A margin call is when the price of the stock dips below

10   the value of the required -- or the debt.  So if you added 50

11   percent release on the stock and it went below $10, which

12   would allow you to get the 50 percent release, if it went to

13   $9, then you had to put in more stock or money to cover that

14   to get it back up in the ratios that it needed to be.

15   Q.   So help us understand a little bit about what the

16   stock -- the origin of the stock and the debt in this scenario

17   you just described.  Why is it that you would have debt that

18   would give rise to the need to do one of these margin calls?

19   A.   So he didn't sell the stock until he was absolutely

20   totally forced to.  And in order to live and to fund all these

21   entities, he borrowed against it.  So he had huge, huge margin

22   loans for much of the time that I worked for him.

23   Q.   And what stock are we talking about?

24   A.   TCI-related stock.  It was all TCI-related Liberty stock.

25   There were a dozen spin-offs, or more than a dozen probably,

1    but it still was in the Liberty family of stock, everything

2    that he owned.

3    Q.   And TCI and Liberty are media-related companies?

4    A.   Yes.

5    Q.   And so I just want to make sure I understand.  Rather

6    than selling the stock to have cash to meet just daily needs,

7    Mr. Magness would borrow against the value of that stock?

8    A.   Yes.

9    Q.   And he would do that on margin?

10   A.   Yes.

11   Q.   Is that what that's called?

12   A.   Yes.

13   Q.   Okay.

14   A.   Or he would have a line of credit.  But it was still the

15   same thing because the line of credit was backed by the

16   collateral of the stock.  So he could have straight-out

17   margins or he could have guaranteed borrowing, but in the end

18   it didn't matter if the stock price went down in the

19   line -- the letter of credit that he had.  It said that he had

20   to bring it back to, you know, the percentage that it needed

21   to be.  So it was -- it was sort of all margin anyway.

22   Q.   And what was your understanding of what would happen if

23   Mr. Magness failed to meet one of these margin calls?

24   A.   They sold him out.

25   Q.   Meaning they sold the stock that was collateral?

1    A.    Yeah.  Without him having a say in it.

2    Q.    As much as they had or was it just enough to get him back

3    to the appropriate level of debt-to-value?

4    A.    To get him back to the appropriate level of

5    debt-to-value.

6    Q.    Over the time that you're with Mr. Magness, is the

7    occurrence of margin calls a regular thing?

8    A.    There were periods of time where they were a regular

9    thing.  The tech bust, the market -- all markets went down

10   then, and some banks sold him out.  And then he would never

11   use whoever it was again who did that without -- the way it

12   once worked was that if the price was $10 and that was the

13   floor of what it should be, if it went down to $9.75 but cured

14   the next day and was back up over 10, they wouldn't consider

15   that to be a margin call because it had self-cured.

16        But as time went on, if it went to $9.75, it was just a

17   straight-out margin call and there was no self-curing anymore.

18   So 2008 obviously was the worst time, and he was sold out of a

19   huge position of his stock at that point in time.

20   Q.    Just thinking back over the time period that you were

21   with Mr. Magness or when you were working for Mr. Magness,

22   what were the different kinds of strategies that he employed

23   to satisfy margin calls?

24   A.    Well, he moved whatever money around that he had, if he

25   had any, but he at that point in time was not really a

1    believer in cash, so he didn't hold onto a lot of cash.  So it

2    was then the next choice, if there wasn't money, was to put in

3    a higher value of stock, transfer it from one bank to another,

4    one entity to another, so that that would bring the ratio up.

5    Or if he wasn't having a margin call at one particular place,

6    he would transfer a lot of that stock that may have a higher

7    ratio to whichever bank it was that he was having -- where he

8    was having the margin call.

9    Q.   And let's just say 2007 and before or before 2007, did he

10   deal with margin calls ever by selling stock himself rather

11   than being sold out, that you can recall?

12   A.   No.

13   Q.   You said, I think, that he was not a believer -- a big

14   believer in cash at that time.  About what time were you

15   referring to?

16   A.   Well, really most of the time that I worked there.  He --

17   he was adamantly opposed to selling his stock.  He wanted to

18   follow John Malone, who was the head of Liberty Media, and his

19   father had hired John Malone, and so he -- they tried to sell

20   out the stock in the estate of Bob, the original trustees, and

21   Gary and his brother sued them to try to undo that and they

22   were successful.

23       And so they had this drag-along, tag-along agreement for

24   a while that they were able to do exactly what John Malone was

25   doing.  And when that ended, Gary just decided that he would

```
 1   just follow what it was that Malone was doing.  So if Malone

 2   was buying -- Malone really never sold either.  So Gary was

 3   determined to wait until Doctor Malone unleashed the value of

 4   the stock.

 5   Q.   What's your background or what was your background in

 6   investing at the time you went to work for Mr. Magness?

 7   A.   None.

 8   Q.   And you mentioned, you know, doing some seminars and

 9   those kinds of things.  Did any of those relate to investing?

10   A.   Some, yes.

11   Q.   What -- if you could just give us a general sense of what

12   kinds of seminars you might have attended regarding investing?

13   A.   We belonged to the -- I'm trying to think of the name of

14   it -- Private Investors of America, or something like that,

15   organization for high net worth individuals, and they had

16   workshops and seminars in New York every year, and San

17   Francisco and Chicago.  And so I went to a number of things

18   like that.

19        But I mostly just learned on the job and got, you know,

20   Derivatives for Dummies and that sort of thing and studied.

21   Q.   Self-study.

22   A.   Yes.

23   Q.   Aside from stock investments in Liberty stock and related

24   companies, what was your observation about the kinds of

25   investments that Mr. Magness appeared to prefer, roughly from
```

1    2000 to 2009?

2    A.   Well, they put together this big land assemblage for

3    the -- for the casino and the parking garage and built that.

4    They ended up having to sell that after Gary's brother's,

5    Kim's, death in 2003 because no one on Kim's side wanted to

6    get a gaming license.

7         Gary was interested in other real-estate kind of deals

8    and some oil and gas.  We had a big oil and gas drilling

9    program in Texas for a while.

10        He had a cattle operation, a big cattle ranch in Weld

11   County, which he still has.  And at one point from his father

12   there were 900 Arabian horses, but his stepmother in the end

13   took those.

14   Q.   What about mutual fund investments?

15   A.   Well, he was not at all a fan of those sorts of things,

16   but one of his brokers talked him into them, and he ended up

17   losing his shirt in 2008 on the real estate mutual funds that

18   he was in.

19   Q.   What was the name of that broker?

20   A.   Tom Espy.

21   Q.   Do you recall the name of the investment?

22   A.   Well, a lot of the investments were through this company

23   called Prairie Capital.  I can't -- there was a number of

24   them.  And they weren't exactly mutual funds.  They were

25   private equity sort of things.  And he lost money in all of

```
 1   them and then vowed that he would never do that again.

 2   Q.   What about just more mainstream mutual funds?

 3   A.   No.

 4   Q.   What about fixed income products?

 5   A.   No.

 6   Q.   What about hedge funds?

 7   A.   Well, some of these private equity things were hedge

 8   funds.

 9   Q.   The things related to real estate you described?

10   A.   Yeah.  There were several of them that were related to

11   real estate, you know.  One of them was just real estate in

12   the U.S.  Another big one was real estate in Europe.  That was

13   bad.

14   Q.   Any other hedge funds you recall Mr. Magness getting

15   involved with?

16   A.   No, just the ones through Prairie Capital.  He kind of

17   invested in them all at the same time.

18   Q.   You talked about moving money between accounts to satisfy

19   margin calls, or, sorry, not money, securities between

20   accounts to satisfy margin calls.  Would those sometimes

21   involve moving securities from the account of one entity to

22   the account of another entity?

23   A.   Yes.

24   Q.   And how would that work from a bookkeeping perspective?

25   A.   Well, because there were lots of entities, you could only
```

1    move from like entity to like entity, and that was part of the

2    problem.  So if Gary wouldn't have had the entities that he

3    had, if it would have all been in one pool, it would have been

4    easier to allocate.  But we could only move GMAG stock to a

5    like GMAG account.

6        So if Gary personally had more stock of one sort or

7    another, that didn't help.  He couldn't move from Gary

8    personal to GMAG, or GMAG to Magness Securities or any of the

9    stockholding entities.

10   Q.   I see.  So if he -- if he had for GMAG, if he had an

11   account at HSBC and he had an account at --

12   A.   Merrill Lynch --

13   Q.   -- Merrill Lynch --

14   A.   -- let's say.

15   Q.   -- he could move a GMAG stock from HSBC to Merrill Lynch.

16   Is that right?

17   A.   Correct.

18   Q.   Were there -- DO you recall instances where he actually

19   moved money from a GMAG HSBC account to just, for example, a

20   Magness Securities HSBC account?

21   A.   No, never.

22   Q.   Do you recall situations where there were other kinds of

23   intercompany transfers between different legal entities and --

24   and how that was accounted for?

25   A.   There could be loans.  So GMAG could loan Magness

1    Securities money if it had it.  So sometimes there were loans

2    on the books.

3    Q.    Would that only occur if there was a movement of cash?

4    A.    Yes.  We never loaned stock.

5    Q.    Okay.  If there was a loan of cash, would it be typical

6    to have paperwork documenting the loan aside from just an

7    accounting book entry?

8    A.    Sometimes.  If we thought it was going to be paid off in

9    the current period, in the period of the monthly financials,

10   then we wouldn't necessarily do paperwork.  We would consider

11   it current and we would just pay it off.

12   Q.    And if you didn't think it was going to be paid off in

13   the current period, what would you do?

14   A.    Well, most of those loans happened through the estate of

15   Bob because that's where the -- the -- you know, the big money

16   was.  Gary -- in relationship, Gary didn't have, you know,

17   that much money.  So the estate of Bob would loan the entities

18   what they needed, and there would be notes associated with

19   that through the Estate at that time.

20   Q.    And then those -- those debts, I assume, would be

21   serviced on a monthly or quarterly or other periodic basis?

22   A.    They were -- it was accrued.  So accrued interest.  And

23   then all of that was settled in the flow-through of the Estate

24   to the Gary Magness Irrevocable Trust.

25   Q.    Around 2003 or 2004 or '5, somewhere in that period?

1    A.    Yeah.

2    Q.    Again, looking at the period of 2007 and prior, did Mr.

3    Magness's margin debt sort of inexorably increase or was -- or

4    did it go up and down from time to time?

5    A.    No.  It just increased.

6    Q.    And I take it the interest rates over time just

7    fluctuated with the interest rates in the market that were

8    available at banks?

9    A.    Correct.

10   Q.    Okay.  So in Plaintiff's Exhibit 118 you explained why

11   the Gary Magness Irrevocable Trust is not listed.  Once that

12   came into being, were you the chief financial officer for the

13   Trust as well?

14   A.    Oh -- yes, in a sense, but the Trust was -- was run by

15   Gary's trust company, Magness Family Five, Inc., and there

16   were trustees.  And so all business was enacted through the

17   board and through the trustees.  So I didn't -- I wasn't a

18   trustee nor was I a board member.  So I did not have control

19   over that in any sense of the word.

20   Q.    Were you responsible for managing the books of the Trust?

21   A.    Yes.

22   Q.    Okay.  Mango Family Five, does that sound right as far as

23   the company?

24   A.    Yes.

25   Q.    For a period of time -- well, let me ask you this.  Are

1    you aware that Mr. Magness was the trustee of the Gary Magness

2    Irrevocable Trust for a period of time?

3    A.    Yes.

4    Q.    And then he resigned, and then this entity Mango Family

5    Five became the trustee?

6    A.    Correct.

7    Q.    Do you know why that was?

8    A.    Because it was a Nevada trust corporation.

9    Q.    And what's the significance of that?

10   A.    Trust companies don't pay state income taxes in Nevada.

11   Q.    I should ask, which entity was a Nevada trust company?

12   A.    MFFI.

13   Q.    Mango Family Five.

14   A.    Yes.

15   Q.    And Mr. Magness, at the time he resigned, was a resident

16   of what state?

17   A.    Colorado.

18   Q.    So it's your understanding that Mango Family Five became

19   the trustee for tax reasons?

20   A.    Yes.

21   Q.    Okay.

22   A.    And estate planning and some other reasons the lawyers

23   thought it best to move there.

24   Q.    Aside from managing its books, what other

25   responsibilities did you have for the Gary Magness Irrevocable

1    Trust?

2    A.   Well, we did what we called a net worth analysis where we

3    put all of the stock and all of the entities on several

4    different spreadsheets to show the concentration of the

5    position.  So we put all of the stock together from all

6    entities to show how much Liberty Media stock we may own.

7         Then we had all of the individual entities, and it was

8    interactive with the prices of the stock so we could see what

9    the gain/loss was.

10        And then we had all of those entities set up on a

11   sophisticated margin call analysis sheet that put in all of

12   the factors that might trigger margin calls so that we would

13   know where we were at any given time.  So that was one of the

14   things.

15        I talked to the attorneys often about the other things

16   that the Trust owned and decisions that might need to be made

17   about the other businesses within the Trust; talked to Gary

18   about stock matters or just, you know, regular business

19   matters often.

20   Q.   You were not, though, an employee of the Trust.

21   A.   No.

22   Q.   And then I take it on some occasions, the time that you

23   spent as an employee of Magness Investment Group, LLC, was

24   billed to the Trust on a cost basis?

25   A.   Until -- until we became -- until it became MFFI, and

1    then there was just a set amount that was billed every year.

2    But we still kept track of the hours to see where we were on

3    it.

4    Q.    I just want to make sure I understand the shorthand

5    you're using.  You said MFF Five?

6    A.    MFFI, Mango Five Family, Inc.

7    Q.    I see.  MFFI.

8    A.    Yes.

9    Q.    Okay.  Got it.  So when MFFI got involved and it was done

10   on an annual basis, was that just for you or for a variety of

11   people at Magness Investment Group?

12   A.    No.  We didn't -- we didn't pay anybody else out of our

13   portion.  It was just for ease of -- of I think for the Trust

14   company in Nevada for the way they liked to handle things.

15   Q.    And do you know approximately what the arrangement was as

16   far as what MFFI paid to Magness Investment Group for your

17   services?

18   A.    It was perhaps $700,000 or $800,000, somewhere in that

19   range, a year.  It was the main -- it was more than 50 percent

20   of the time -- way more than 50 percent of the time that we

21   spent on anything else, our time managing the -- the trust.

22   Q.    When you say our, you're talking about the Magness

23   Investment Group?

24   A.    The Magness Investment Group.

25   Q.    And the seven- to $800,000 a year, is that just your time

1   or does it also include the time of your subordinates?

2   A.   It includes everybody's time, the rent, the benefits, the

3   parking, the -- everything.

4   Q.   And did you have people working for you at Magness

5   Investment Group during the time that Mango or MFFI was

6   operating?

7   A.   Yes.

8   Q.   About how many people?

9   A.   Oh, it varied.  Six to eight.

10  Q.   Let me hand you Plaintiff's Exhibit 181.  You mentioned

11  the net worth spreadsheets, and I just want to see if

12  Plaintiff's Exhibit 181 is an example of what you were

13  describing.

14  A.   Yes.  But there were a number -- I mean, there were quite

15  a number more than are included in this.  But this is the

16  overall net worth, if you will.  So it has all the stock, it

17  has all the debt.

18  Q.   Now, I understand there are a lot more dates that these

19  were generated for, but are you saying there are different

20  kind of reports than what we're seeing in 181?

21  A.   Yes.  There was a fair market value.  There was a

22  different Schedule C -- or a Schedule B that was all of the

23  stocks put together.  So it just had how -- how many shares it

24  was that he had of Liberty Media or LTBYA or whatever.  And

25  then there were all the individual banks margin calculations.

```
 1    But they were really not printable because they were just all

 2    formulas.  They were -- you know, I mean, it was printable at

 3    that point in time to show where you were, you know, you were

 4    okay or you were getting close or whatever.

 5    Q.   Okay.  Well, let's back up and just tell us what is

 6    Plaintiff's Exhibit 181.

 7    A.   Well, it's what we call the net worth analysis.

 8    Q.   And it's the net worth of who or what?

 9    A.   It's the net worth of everything that Gary owned.  So

10    GMIT is on here.  We never -- we use -- always just referred

11    to it as GMIT, not GDMIT.

12    Q.   And GMIT is the Gary Magness Irrevocable Trust --

13    A.   Yes.

14    Q.   -- we've been discussing?

15    A.   Yes.

16    Q.   Okay.  And Gary Magness is Gary Magness, looking at page

17    one, individually?

18    A.   Yes.

19    Q.   And GMAG, LLC, is the entity we discussed earlier?

20    A.   Correct.

21    Q.   And Magness Securities, LLC, is one of the securities we

22    discussed earlier.

23    A.   Yes.

24    Q.   So we looked earlier --

25    A.   So if you look here on the last page of Schedule A, you
```

1   can see that his net worth was $636 million, and his debt was

2   $283 million.

3   Q.   You're looking at page 14255.004?

4   A.   Correct.

5   Q.   And the $636 million number is the very last line on that

6   page?

7   A.   Yes.

8   Q.   And the 283 million debt number is just above that?

9   A.   Yes.  And that's alarming to look at, because the margin

10  debt is so close to 50 percent, and in some cases these stocks

11  were excluded from even being marginable.  So this was a

12  really bad time.

13  Q.   Now, his assets are worth $920 million at this time.  Am

14  I reading this correctly?

15  A.   Yes.  But we're looking at taking out -- taking away the

16  margin.  So by this time they had changed the availability

17  from 50 percent down to like 30 percent or whatever.  So with

18  it being 900 and nearly 300, none of these funds -- at one

19  point someone put mutual funds on here, but they're really

20  funds.  They're like hedge funds or whatever, all of these

21  things.  Tontine, that was -- that's the one that was

22  particularly bad.

23  Q.   Uh-huh.

24  Q.   Well, so was Quinlan.  Actually they all were.

25       At any rate, those were not -- you couldn't borrow

1    against those.  You couldn't borrow against the Stanford

2    International Bank CD.  So there's 150 million right off the

3    bat that's out of there.  This -- this HSBC derivative, you

4    couldn't borrow against that, either.

5         So a lot of stocks that are in here don't have

6    marginability.  So his position as being marginable is much

7    worse than it looks.

8    Q.   So let me ask you -- and we'll come back to Stanford.

9    But since you brought it up, why couldn't you borrow against

10   the Stanford International Bank CD?

11   A.   Because no banks would accept it as collateral.

12   Q.   And what was your understanding of why that was so?

13   A.   Because it was an offshore investment.

14   Q.   Did there ever come a point in time where you had

15   discussions with Mr. Magness or anybody else within the

16   Magness entities about the possibility of using the Stanford

17   International Bank CD to secure the margin loans?

18   A.   Yes.  We talked to HSBC.

19   Q.   When was that?

20   A.   Probably before this period of time.

21   Q.   Before September 30th, 2008?

22   A.   Yes.

23   Q.   Do you think it was months before, years before?  Just

24   give me a ball park.

25   A.   I think probably a few years before.  Probably a year

1    before, anyway.

2    Q.    And who -- you said we.  Who is we?

3    A.    Gary and I.

4    Q.    And was that an in-person meeting?

5    A.    It could have been.  We went to New York quite a bit to

6    visit bankers.  And also, after Kim died, we had a big

7    settlement of -- of kim's estate assets, dividing it all up so

8    that they had no more -- no joint ownership of anything.  And

9    that was all in New York.  So we were there for weeks, it

10   seemed like, waiting because it -- we thought it was done, but

11   it wasn't.  Lawyers.

12   Q.    And your HSBC contacts were in New York.

13   A.    Yes.

14   Q.    Okay.  Tell me what you recall HSBC saying about the

15   possibility of using the Stanford International Bank

16   investment to secure the HSBC margin debt?

17   A.    Well, I mean, they basically said that it was an offshore

18   investment, it was risky.  But it wasn't necessarily even

19   that.  It was Gary had already borrowed too much money from

20   them.  He had all the same kind of stock, so everything in his

21   portfolio was Liberty stock.  And before 2005 they had the

22   super voting shares, Kim and Gary, and -- and you couldn't

23   borrow against those.  Those weren't marginable because they

24   had to offer them to Doctor Malone first to be able to buy

25   them.

```
 1          So somewhere in 2005 we had the settlement with the

 2    estate of Kim, and then Gary was able to get that all himself,

 3    sell his super voting shares and at least get to a point where

 4    he, you know, had A shares as opposed to B shares.  But he

 5    still was highly concentrated, and he was highly leveraged,

 6    and so banks didn't -- HSBC, who was our main lender, didn't

 7    necessarily feel comfortable about enabling him to borrow any

 8    more money in any fashion.

 9    Q.    And was there -- or let me ask it this way.  Did you-all

10    try to persuade HSBC that they should accept the Stanford

11    International Bank investment as something that should support

12    the loans to Mr. Magness --

13    A.    I --

14    Q.    -- or did you just take their denial?

15    A.    I didn't.  Tom Espy could have talked to them again, but

16    I took their no to be no.

17    Q.    Do you recall talking to Mr. Espy about the discussion

18    with HSBC?

19    A.    He and Gary talked directly to each other, and they

20    didn't include me often in their conversations.

21    Q.    Do you recall any further discussion between yourself and

22    Mr. Magness about the discussion with HSBC concerning

23    Stanford?

24    A.    Well, he was angry about it because things were bleak,

25    looking -- getting bleak, but it wasn't an option, so we
```

1    pressed on.

2    Q.   What was your understanding of the significance of

3    Stanford being an offshore investment from HSBC's investment

4    as it was communicated to you?

5    A.   Well, I think that just made it riskier or certainly less

6    easy to -- to talk to people about.

7    Q.   Beyond the discussion on risk and being an offshore bank,

8    do you recall any other comments from HSBC that were

9    communicated to you or Mr. Magness about the Stanford

10   investment?

11   A.   No.

12   Q.   Did you talk to any other banks besides HSBC about using

13   the Stanford investment as collateral for loans to Mr.

14   Magness?

15   A.   Not that I know of.  HSBC was pretty much it for us at

16   that point in time.

17            THE COURT:  Are we finished or just pausing for the

18   end of the day.

19            MR. PETRIE:  We are just pausing for the end of the

20   day, Your Honor.  We can stop or go on.

21            THE COURT:  How much more do you have?

22            MR. PETRIE:  This is a long one.  There is still a

23   couple of hours.

24            THE COURT:  Then, yeah, let's stop for the day.

25         So have a very pleasant evening, a safe trip home and

1    back.  We'll see you tomorrow at 9:00.

2              (Whereupon, the jury left the courtroom.)

3              THE COURT:  So a little housekeeping issue.  On the

4    depos, are you-all going to tell me how to allocate the time

5    since I understand we're running both sides' designation

6    straight through?

7              MR. PETRIE:  Yes, we will do that.

8              MR. SADLER:  We are keeping track of that and

9    splitting 50/50 anything that's double-designated.

10             THE COURT:  Okay.  Then pending that today, I show

11   Magness parties at 124 minutes and the Receiver at 204

12   minutes.  And there's about 47 minutes worth of Dokken that

13   we'll need to split up.

14        Anything else for today?

15             MR. SADLER:  No, sir.

16             MR. PETRIE:  No, thank you.

17             THE COURT:  Okay.  Have a good evening.  See you

18   tomorrow.

19             (The proceedings were concluded at 5:00 p.m.)

20

21

22

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2        CORRECT TRANSCRIPT FROM THE RECORD OF

3        PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4        I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5        FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6        COURT AND THE JUDICIAL CONFERENCE OF THE

7        UNITED STATES.

8

9        S/Shawn McRoberts        01/10/2016

10       _____DATE_____
         SHAWN McROBERTS, RMR, CRR

11       FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX D

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3   RALPH S. JANVEY, IN HIS       (  CAUSE NO. 3:15-CV-401-N
     CAPACITY AS COURT-APPOINTED   )
 4   RECEIVER FOR THE STANFORD     (
     INTERNATIONAL BANK, LTD.,     )
 5   et al.,                       (
              Plaintiff,           )
 6                                 (
     vs.                           )
 7                                 (
     GMAG LLC, MAGNESS SECURITIES  )
 8   LLC, GARY D. MAGNESS, and     (
     MANGO FIVE FAMILY, INC., IN   )
 9   ITS CAPACITY AS TRUSTEE FOR   (
     THE GARY D. MAGNESS IRREVOCABLE)  DALLAS, TEXAS
10   TRUST,                        (  JANUARY 11, 2017
              Defendants.          (  9:00 A.M.
11   _____

12

13                            VOLUME 3

14
     _____
15
                        TRIAL ON THE MERITS
16
              BEFORE THE HONORABLE DAVID C. GODBEY
17               UNITED STATES DISTRICT JUDGE
                          and a jury
18   _____

19

20

21

22            SHAWN M. McROBERTS, RMR, CRR
             1100 COMMERCE STREET, RM. 1654
23              DALLAS, TEXAS  75242
                  (214) 753-2349
24

25
```

A P P E A R A N C E S

```
FOR THE PLAINTIFFS:    BAKER BOTTS, LLP
                       98 SAN JACINTO BOULEVARD
                       SUITE 1500
                       AUSTIN, TEXAS  78701-4039
                       (512) 322-2678
                       BY:  MR. KEVIN SADLER
                            MR. SCOTT POWERS
                            MR. BRENDAN DAY
                            MS. ASHLEY CARR

FOR THE DEFENDANTS:    BALLARD SPAHR, LLP
                       1225 SEVENTEENTH STREET
                       SUITE 2300
                       DENVER, COLORADO 80202-5596
                       (303) 292-2400
                       BY:  MR. ANDREW PETRIE
                            MS. RACHEL MENTZ


                       DYKEMA COX SMITH
                       1201 ELM STREET, SUITE 3300
                       DALLAS, TEXAS  75270
                       (214) 698-7800
                       BY:  MR. DAVID BRYANT

OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                       1100 COMMERCE STREET, RM. 1654
                       DALLAS, TEXAS  75242
                       (214) 753-2349
```

# <u>INDEX</u>

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| ROBERT ARMSTRONG | |
|    Direct By MR. BRYANT ........................................... | 140 |
|    Cross By MR. DAY .............................................. | 171 |
|    Redirect By MR. BRYANT ........................................ | 195 |
| STEVE KNUDSON | |
|    Direct By MR. PETRIE .......................................... | 198 |
|    Cross By MR. DAY .............................................. | 216 |

**EXHIBITS**

| **Exhibit** | **Page** |
|---|---|
| 90, 108, 109 Entered into Evidence | 118 |
| No. 292 Entered into Evidence | 167 |
| NO. 292-A Entered into Evidence | 195 |

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

4

P R O C E E D I N G S

1

2      THE COURT: Good morning. All set?

3      MR. PETRIE: Just a logistical question. Would you

4   like us to have our eye out, say, towards 10:30 for the

5   stopping point when we hit a break place?

6      THE COURT: You think the deposition has got more

7   than an hour and a half.

8      MR. PETRIE: I know it does, sir.

9      MR. SADLER: It will run close to the lunch break.

10      THE COURT: Yeah. 10:30, 10:40, close to that

11   range. I don't really care but in that range.

12   Are we ready for the panel?

13      MR. SADLER: Yes, sir.

14      MR. PETRIE: Yes, sir.

15      (Whereupon, the jury entered the courtroom.)

16      THE COURT: Be seated.

17   Good morning. How's everyone doing? Good. I anticipate

18   our normal schedule today. I understand from the lawyers that

19   the completion of the video deposition is likely to go most of

20   the morning, so we're going to go till somewhere around 10:30

21   or so and take a morning break there, and then wrap that up.

22   And if it doesn't go quite till 12:30 we will start with the

23   next witness and lunch break at 12:30.

24   So that's our plan. We will see if it actually works out

25   that way.

1          Are we ready to proceed?

2               MR. PETRIE:  Yes, sir.

3               THE COURT:  All right.

4               TONYA DOKKEN, BY VIDEO DEPOSITION, continued,

5     Q.    Turning back to Plaintiff's Exhibit 181, we have three

6     entities listed and then Gary Magness himself.  When we looked

7     at the earlier exhibit, there was quite a long list of

8     entities.

9          My question is, how were these three entities in

10    particular chosen to be on the net worth analyses that 181 is

11    an example of?

12    A.    Are you talking about the stocks?

13    Q.    No.  Why are the entities --

14    A.    Oh.  These were the --

15    Q.    On the net worth statement, why are the entities --

16    A.    Oh.  These are the entities that hold stock.

17    Q.    I see.

18    A.    These are the only entities that held stock, sort of

19    defined by where it came from.  Gary's shares were his earlier

20    gifted or whatever from his family.  Magness Securities was

21    strictly his mother.  GMAG was a compromise of things, and

22    GMIT was his father's estate.

23    Q.    The entities -- if you could turn back to Plaintiff's 118

24    for a moment.  Are the entities that are listed there entities

25    in which Mr. Magness had an ownership interest?

1    A.   Well, it would depend on how you looked at it.  I mean,

2    obviously he has an ownership interest in all of these.  But

3    many of them are owned by the Trust, which is -- I mean, he is

4    the trustee of the Trust, but the Trust was funding all of

5    those entities then, so the data center, the land and cattle

6    operation, those sorts of things.

7         So a lot of these things that are in here are actual

8    ranching operations, just under various names.  So the Trust

9    would fund those as well.

10   Q.   I see.  So if the Trust had an interest in one of these

11   entities that are listed on Plaintiff's Exhibit 118, and those

12   entities had some contributory value to Mr. Magness's net

13   worth, we would see them listed on a report like Plaintiff's

14   181.  Is that fair?

15   A.   I think in the back, like this -- we didn't -- we didn't

16   put them on.  We tried -- you could never know what they were

17   worth, let's put it that way.  So the summary provided for

18   U.S. Bank, that was just stock and that sort of thing, things

19   that were quantifiable where you got a value from someone.

20        But the net worth of all entities back here included some

21   valuations, some guesstimates, I guess that you would say, of

22   what some things were worth.  Like this has his houses on it,

23   for example.  It has --

24   Q.   Could you just tell us for the record what pages you are

25   looking at?

1    A.    I am looking at 014255.018.

2    Q.    Okay.

3    A.    And going on then to .019.

4    Q.    So .19, for example, you see Mango Racing, which I think

5    was one of the entities on 118.  Right?

6    A.    Yes.

7    Q.    Okay.

8    A.    And so you'll notice on here a lot of the costs are the

9    fair market values, like Mango Racing, for example.  We had no

10   idea how much his collector cars were worth.  Other ones we

11   could kind of guess what they might be worth from -- you know,

12   like the housing market in Colorado having gone up, for

13   example.  The Mitch Oil and Gas investments, they were pretty

14   much at cost, just a little above cost.  He ended up losing

15   all of that money.

16   Q.    So at pages 017 through 021 in Plaintiff's Exhibit 181,

17   the title page or the title of each page says net worth of all

18   assets, Forbes analysis.  What does that mean?

19   A.    Well, we didn't ever have to give financial statements to

20   anyone for any reason except for the banks, and the banks

21   didn't care about any of the rest of these assets.  They only

22   cared about the stock.  So they would never have taken the

23   data center in lieu of, you know, a payment when they -- you

24   know, they only wanted to go after the stock.

25          But we did this -- we had to do this for Forbes for him

1   to be able to be on Forbes.  So we did this kind of for

2   ourselves as well to figure out what the actual net worth of

3   things were, including the assets.  So the data center on here

4   was at the time valued at $120 million.  Magness Land

5   Holdings--that's a cattle ranch--was valued at $40 million.

6   That's mostly the water rights.  Bye Bye School was a house

7   that they bought through the Trust for some reason, and

8   Camelback was a condo they inherited down here from his

9   parents, his dad.

10  Q.   Down here being Phoenix?

11  A.   Yes.

12  Q.   And when you say including the assets, you mean including

13  the nonliquid assets?

14  A.   Yes.

15  Q.   And what did you mean by to be in Forbes?

16  A.   The Forbes 400, the Forbes billionaire list, you had to

17  prove to them what it was that everything was worth.  It

18  was -- it's an arduous process.

19  Q.   I see.  And so were you making a submission to Forbes,

20  the magazine, to show what Mr. Magness' net worth was at

21  various points in time?

22  A.   At various points in time, and then they would discount

23  however they thought it should be discounted, and sometimes he

24  was on the list and sometimes he wasn't.  They never took it

25  at face value, except for the stock.  The stock was

1    quantifiable.

2    Q.    Right.  Okay.  So let's just, if we could, briefly walk

3    through the other schedules.  I just want to make sure I

4    understand what each of them reflects.

5         So what is the purpose of Schedule A on Plaintiff's

6    Exhibit 181?

7    A.    Schedule A lists every entity with a cost basis and the

8    current price at the date on the top, price per share, and it

9    calculates also the gain/loss.  If you go to the end, it shows

10   you the unrealized gain/loss.  And then it also lists the

11   associated margin with the entity.  So U.S. Bank, their value

12   was $120 million.  Their debt was $67 million on page 1.

13   Q.    Okay.

14   A.    Stanford Group, not to be confused with Stanford Bank,

15   they had $121 million in assets, $14 million in debt.  Merrill

16   Lynch had $180 million in assets and $57 million in debt.  And

17   HSBC had the biggest debt, $143 million against $324 million

18   in assets.

19   Q.    Okay.  And then there's a section referring to stocks in

20   safekeeping.  What is that?

21   A.    That was before Kim died, and they had this TCIP stock

22   that -- it was a preferred stock for TCI.  It paid nine

23   percent, and so they get the nine percent on that every

24   quarter.

25   Q.    And who held that stock?  Who held the certificates?

1    A.    We did in a safe.

2    Q.    In a safe?

3    A.    Yeah.

4    Q.    Okay.

5    A.    And it was broken down in the -- the shares here.  So

6    everybody had some.  And then everybody got this -- this

7    income, all of the companies, and Gary allocated to them.

8    Q.    All right.  On page 004, there's a line for Stanford

9    International Bank CD, and that's simply how much is listed on

10   the books of Stanford at this given time?

11   A.    Yes.

12   Q.    And then J.P. Morgan Chase/HSBC derivative, what does

13   that refer to?

14   A.    Gary bought a derivative from HSBC for J.P. Morgan.  So

15   it was a $10 million derivative, and it was going to pay, I

16   think, 12 percent interest or something like that.  But before

17   he really had a chance to realize any interest from it to

18   speak of, he was forced to sell it for the margin calls.

19   Q.    Do you know when he sold it?

20   A.    I would imagine a day or two after this.

21   Q.    And do you know when he got into that investment?

22   A.    I believe it was during this month.  He had a big

23   penalty, if not the month before, but right at this same time.

24   He did not have it very long.

25   Q.    All right.  And then the funds that are listed, these are

1   the hedge funds or private equity type investments that you

2   described?

3   A.   Right.  Right.

4   Q.   All right.  And then Schedule B, the difference between

5   Schedule B and Schedule A is what, that they're -- that the

6   cost basis is included here?

7   A.   No.  This is the one I'm talking about where it's just

8   the stock, as you can see, so it's -- if you look at the end,

9   you can see how much it is that he has in value in LINTA, what

10  the basis was and what the unrealized gain/loss was.

11  Q.   So not broken down by bank?

12  A.   No.  It is just broken down by -- by stock and entity.

13  Q.   Okay.

14  A.   And this was, you know, what we would look at, so if Gary

15  were to sell something, the problem with being sold out on

16  this stock is that because he received it through his father's

17  estate, he had very little basis in it.  So being sold out,

18  even if it's gone down to half the price, still results in a

19  huge -- huge tax consequences, which requires even more money

20  when you're selling.

21  Q.   All right.  And what is reflected on Schedule C at 006 to

22  007?

23  A.   Oh, this is just trying to show what industry it is that

24  you might be in so that we could say that we just really

25  weren't in -- completely and totally in, you know, the cable

1   industry or whatever, but they didn't really look at it this

2   way so much.

3   Q.   Who is they?

4   A.   Banks.

5   Q.   And then what is reflected at Schedule D and 008 and 009?

6   A.   Oh, well, this shows what the stock was in any given

7   year, so that you could see what the -- whether it's gone up

8   or not.  So if you look at the bottom of this Schedule D,

9   .009, then you can see that his debt basically over this

10  period of time increased.  In 2007 it went down a little, but

11  then it was back up in 2006, and down slightly in 2004 and

12  back up in -- you know, as you go along.

13  Q.   Okay.  So just reading right to left --

14  A.   2008 it was 283.  And the reason, because of that, in

15  September these sell-offs had already started.  So it was

16  paying down the margin from its high.

17  Q.   Now, out of the schedules that we looked through or the

18  schedules that -- in the remaining pages, which were the ones

19  that you used most heavily?

20  A.   A and B, and then the ones that aren't on here were the

21  individual calculations of the -- of the loan collateral

22  positions, which showed us what the -- what the triggers were,

23  that there was a 35 percent release of only four stocks, and

24  the floor was $3 or $5 or whatever it might have been, and the

25  release was whatever, and it was kind of a long, complicated

1    formula so we could know how close we were.

2    Q.    But that analysis of the loans and the triggers, that's

3    not within Plaintiff's 181?

4    A.    No.

5    Q.    Plaintiff's 5 is in the notebook in front of you.  I

6    wonder -- can you please turn to Plaintiff's Exhibit 5?

7    A.    Yes.

8    Q.    Okay.  Now, this is the minutes of the organizational

9    meeting of the directors and voting shareholder of Mango

10   Family -- Mango Five Family, Inc.  Correct?

11   A.    Yes.

12   Q.    And if you turn to the third page of the exhibit, Magness

13   002887, there is a section regarding election of officers.  Do

14   you see that?

15   A.    Yes.

16   Q.    Okay.  And Mr. Robert Armstrong is the president.  Who is

17   Mr. Robert Armstrong?

18   A.    He is our Nevada trust company trustee and the president

19   of MFFI.

20   Q.    How long have you known Mr. Armstrong?

21   A.    Probably since this date, I would imagine.

22   Q.    And what's Mr. Armstrong's profession?

23   A.    He's an attorney.

24   Q.    Do you know if he has any special investment expertise?

25   A.    It would appear that he does from conversations, but I

```
 1   don't know.

 2   Q.   And what makes you say that it appears that he does from

 3   conversations?

 4   A.   Because he's very bright and knowledgeable about

 5   investments.

 6   Q.   Mr. Steve Knudson is listed as the vice president.  How

 7   long have you known Mr. Knudson?

 8   A.   Probably since 1989 or '90.

 9   Q.   And how do you know him?

10   A.   He is a friend of Gary's and also an attorney and an

11   employee and the vice president and the head of Fortrust, our

12   data center.

13   Q.   He was an employee of what entity?

14   A.   Magness Investment Group.

15   Q.   Did you sometimes refer to Magness Investment Group as

16   MIG?

17   A.   Yes.

18   Q.   Okay.  And Mr. Knudson, did he have any special expertise

19   in investing that you know of?

20   A.   Well, I think he had, you know, some experience and

21   probably learned a lot more as time went on.  When I first met

22   him, he was an attorney -- you know, an attorney for real

23   estate transactions primarily.

24   Q.   He was eventually running Fortrust?

25   A.   Yes.  I think he still is.
```

1    Q.   And Fortrust is a -- what kind of company?

2    A.   A data center.

3    Q.   The fourth name is Raymond L. Sutton, Jr.  He's listed as

4    the secretary.  When did you meet Mr. Sutton?

5    A.   I probably met him when I first started working for Gary

6    individually around '95 maybe.

7    Q.   And what's Mr. Sutton's occupation?

8    A.   He's an attorney, a trust attorney.

9    Q.   Where was he based at this time?

10   A.   Baker Hostetler.

11   Q.   In Colorado?

12   A.   Yes.

13   Q.   And did he have any special expertise in investing that

14   you knew about?

15   A.   Well, I guess his expertise in investing was from the

16   trust side of estate planning or whatever.  I don't really

17   know his personal background.

18   Q.   How often did the Mango Five Family, Inc., meet?

19   A.   Quarterly, but sometimes not that often, depending on

20   what was happening.

21   Q.   And did you always attend the meetings?

22   A.   Yes.

23   Q.   Aside from yourself and the officers of the -- of the

24   mango Five Family, were there other regular attendees at those

25   meetings?

A.    There were no regular attendees per se, but from time to

time we would call in various brokers or bankers or other

advisors or different people from our office who were talking

about certain things that were an issue or under discussion.

Q.    And at those meetings, were there any audio or visual

recording?

A.    No.

Q.    Did people take notes?

A.    Mr. Sutton was the secretary, and he took the notes that

ended up being these documents.  I always took notes myself,

and then just compared them against his final version, and

then I would just get rid of my notes.  Sometimes I would file

them.  I would sort of make a to-do list based on what it was

that we had decided.

Q.    Let me talk to you about Stanford.  When did you first

hear about the Stanford Financial Group or Allen Stanford?

A.    Probably in '98, '97, '98, somewhere around in there.

Q.    And how did you come to hear about Stanford?

A.    We had proceeds from the casino bond issuance and wanted

to make some money on those.  We're looking for the best

interest rate to, you know, make on that while we waited to

pay the bond money back, before we had to make our first bond

payment.  And Tom Espy and Steve Knudson found Stanford.  I

think Tom was maybe working there then.  I'm not sure.  And so

either KMM Parking or Cherokee Lending, one or the other of

1    those entities, bought a CD.

2    Q.    Who is Tom Espy?

3    A.    He was Gary's broker and friend.

4    Q.    And how far does that -- how far back was Mr. Espy Gary's

5    broker, as far as you know?

6    A.    Certainly in the '90s, I think.

7    Q.    So what was your understanding how Mr. Espy and Mr.

8    Knudson found Stanford and what did they tell you about it, if

9    anything?

10   A.    They didn't tell me anything about it.  They cut me out

11   of it completely and went directly to Gary and then only told

12   me about it when they had to spend the money.

13   Q.    Tell me about that, they had to spend the money.  What

14   does that mean?

15   A.    They had to get the money to pay for it, you know, the

16   CD.  It had to be transferred, so -- I could never draw on any

17   of Gary's lines of credit or borrow on his LLCs, but I was

18   able to transfer money between accounts.  So they needed the

19   money to be in a particular account so that they could buy the

20   CD.

21   Q.    I see.  And so the money needed to be wired from the

22   Magness Group to Stanford?

23   A.    Yes.

24   Q.    And that is the point at which you got involved?

25   A.    Well, it wasn't the Magness Group.  It was KMM Parking or

```
 1    whatever, whichever entity it was, and, yes, that's when I got

 2    involved.

 3    Q.   Is Mr. Espy somebody you knew well at the time, 1997 or

 4    1998?

 5    A.   No.

 6    Q.   Did you come to understand that Mr. Espy worked for

 7    something called Stanford Group Company?

 8    A.   Yes.  And he -- he probably was working for them then,

 9    but Gary's initial broker at the Stanford Group Company was

10    Gary Hamilton, who had been his broker before at a different

11    entity.

12    Q.   Do you know when Mr. Hamilton started working at Stanford

13    Group Company?

14    A.   When they opened their offices in Denver.

15    Q.   What kind of investments did Mr. Hamilton handle for Mr.

16    Magness at the beginning with Stanford Group Company?

17    A.   Just the personal investments that Gary wanted to make,

18    aside from any Liberty-related stock, so all these little

19    companies that you see on here that have no balances or

20    nothing in them or whatever, some of those probably.  Gary

21    would buy a few hundred shares of something and play the

22    market, wait for it to go up, sell it, you know, then buy

23    something else.

24         So he traded individually with Gary Hamilton.  And then

25    at some point, Gary Hamilton left, and I don't remember where
```

1    he went.  And Tom Espy started working there, and so Gary

2    started working with Tom.

3    Q.   And when you were referring to the entities that are

4    listed on the piece of paper, are you referring to Plaintiff's

5    181?

6    A.   Yes, but these probably weren't the stocks back in those

7    days.  But these stocks that all have zeros on them, they were

8    little stocks.  He never bought very many of them, or it was

9    never worth very much money.

10   Q.   And did Gary Magness have a relationship with Gary

11   Hamilton going back before Stanford Group Company that you

12   knew about?

13   A.   Yes.  He was his broker prior, and he and his wife were

14   friends with Gary and his then wife Shelley.

15   Q.   And do you know if Gary Hamilton, what happened to him

16   after he left Stanford Group Company?

17   A.   He went to another brokerage firm.

18   Q.   And did Mr. Magness continue to work with Mr. Hamilton

19   after he left Stanford Group Company?

20   A.   Not that I recall.

21   Q.   And did Mr. -- I think you said this, but I just want to

22   make sure.  Mr. Espy was Mr. Magness' broker prior to the time

23   he was at Stanford Group Company?

24   A.   I don't think so.  He was a broker with someone, but I

25   don't think that Gary had done business with him until he went

1    to Stanford.

2    Q.    Okay.  Do you know if Mr. Espy had ever been a broker for

3    any of Mr. Magness' other family members prior to the time he

4    was at -- he was working with Mr. Magness at Stanford Group

5    Company?

6    A.    I'm pretty sure he wasn't.

7    Q.    Was not?

8    A.    Was not.

9    Q.    Okay.  Can you please take a look at Plaintiff's Exhibit

10   12?

11   A.    It was KMM.

12   Q.    Well, let me -- let me give you two to look at.

13   A.    Okay.

14   Q.    There's Plaintiff's 11 and 12.  Just take a quick look at

15   both of those.

16   A.    Oh, it was Cherokee and KMM.  No wonder I thought it was

17   one or the other.  It was both.

18   Q.    Well, and that's part of my question, is whether you know

19   if it was both or one is a correction of the other?

20   A.    I'm pretty sure one is a correction of the other.  Oh, at

21   this point in time I was still a controller.  I think it

22   started out we're closing in on the dates.  I think it started

23   out being in Cherokee but ended up having to be in KMM because

24   of the way the bond proceeds or something happened.

25   Q.    Okay.

1   A.   I'm not sure.  But it definitely is -- these are

2   duplicates of each other.

3   Q.   All right.  So if it's -- it started out with Cherokee,

4   that's Plaintiff's Exhibit 11, so let's look at that first.

5   A.   Okay.

6   Q.   The paperwork at Plaintiff's Exhibit 11, if you'll turn

7   to the last two pages, it looks like it -- this is all signed

8   around January 28th, 1999?

9   A.   Uh-huh.

10   Q.   Okay.  Is that yes?

11   A.   Yes, it is.

12   Q.   Okay.  And then you are -- your information is listed

13   here as, as you said, as controller of Cherokee lending

14   company and then Mr. Knudson is listed as manager.  Is that

15   right?

16   A.   Correct.

17   Q.   Okay.  And the amount of the CD is four and a half

18   million dollars?

19   A.   Yes.

20   Q.   Okay.  When you found out about this transaction, did you

21   have any reaction to whether this was a good or bad use of

22   these funds?

23   A.   Oh, I myself am very conservative.  I'm always the person

24   who tells Gary he should sell stock to pay off the margin as

25   opposed to borrowing, so I would imagine that I was concerned.

1  Q.   What would you imagine you were concerned about?

2  A.   I didn't know anything about them, and I was probably

3  miffed that they had cut me out of any conversations in the

4  first place, so it was probably more that than anything.

5  Q.   You said you didn't know anything about them, meaning the

6  bank or --

7  A.   The bank.

8  Q.   Okay.  And you were miffed that Mr. Espy and Mr. Knudson

9  had cut you out of the conversation?

10  A.   Yes.

11  Q.   Okay.  What did Mr. Knudson and Mr. Espy tell you about

12  the investment at the time they told you they needed the

13  money?

14  A.   That it was a good way to make the arbitrage on -- you

15  know, make more interest on this than -- than they could make

16  anywhere else, make, you know, make that up, be able to have

17  more money to be able to pay off the bondholders when the time

18  came.

19  Q.   And what did they tell you about the bank?

20  A.   That it was based in Houston, and they had great returns

21  and that sort of thing.

22  Q.   Did they tell you anything about its relationship--that

23  is, the bank's relationship--with the island of Antigua?

24  A.   I don't recall them telling me that then, no.

25  Q.   Did you review any materials in connection with the

1    investment aside from the documents you signed in Plaintiff's

2    Exhibit 11?

3    A.    No, I never saw any materials at all.  They gave them

4    directly to Gary.

5    Q.    You said signed.  Did you mean read?

6    A.    Read, saw.

7    Q.    Okay.  Did you review the materials that are on

8    Plaintiff's Exhibit 11?

9    A.    Yes, probably.

10   Q.    Do you recall anything standing out to you in particular

11   when you reviewed Plaintiff's Exhibit 11?

12   A.    Not really.

13   Q.    On page 140513, there is an accredited investor

14   certification.

15   A.    Uh-huh.

16   Q.    Are you familiar with what an accredited investor is?

17   A.    Well, it's basically that you're a person who has so much

18   money and is able to do this, is what I recall of it.

19   Q.    On this particular form, the box for -- the box is

20   checked for the depositor being an organization described

21   under 501(c)(3) of the Internal Revenue Code --

22   A.    An LLC.

23   Q.    -- a corporation, or similar trust or partnership, with

24   total assets in excess of $5 million.  Is that right?

25   A.    Yes.  It was an LLC.

```
 1    Q.    It was an LLC.

 2    A.    Which falls under the partnership tax section.

 3    Q.    It was not a charitable organization, I assume?

 4    A.    No.

 5    Q.    And it did have total assets in excess of $5 million?

 6    A.    Yes.

 7    Q.    Okay.  Turning to Plaintiff's Exhibit 12, this is then

 8    the correction or the -- or the change of entity so that now

 9    the CD will be held by KMM Parking rather than Cherokee

10    Lending.  Is that right?

11    A.    Correct.

12    Q.    Okay.

13    A.    Still one LLC.

14    Q.    And, again, did you ever discuss this investment in

15    Stanford International Bank with Mr. Magness himself?

16    A.    Oh, I'm sure I did.

17    Q.    What do you recall about that?

18    A.    Mostly that I was, you know, miffed that I didn't know

19    anything about it and that I felt that he should have at least

20    included me in the conversation or let me see the documents or

21    something before.

22    Q.    Do you recall what he said?

23    A.    Screw you or something like that, probably; I can do

24    whatever I want.

25    Q.    Do you recall discussing with him the nature of the
```

 1    investment, whether it involved any undue risk?

 2    A.    No.

 3    Q.    So looking from 1999 forward, did Mr. Magness continue to

 4    work with Mr. Espy making investments through Stanford Group

 5    Company?

 6    A.    Yes.  At some point after this date Gary Hamilton left

 7    and then Gary Magness worked with Tom Espy there.

 8    Q.    And aside from this one investment in the CD, were those

 9    investments largely just stocks, stock investments?

10    A.    Uh-huh.  Yes.

11    Q.    When was the next time you recall anybody, whether it's

12    Mr. Espy or Magness or some other person, raising the

13    possibility of the Magness entities investing in a Stanford

14    International Bank CD?

15    A.    I imagine -- it seems like maybe 2002 or 2003.  I don't

16    know.  I wish I had a directory of exhibits and I could tell

17    you.

18    Q.    Well, what do you recall about how it came up?

19    A.    That the KMM Parking thing had gone well, and now the

20    interest rate was higher or maybe it was the same.  I don't

21    know.  Anyway, it was a good -- a good investment.

22          Gary needed income, and so the idea was that he could

23    borrow the money to invest in Stanford and make a higher

24    interest rate from Stanford to be able to pay off the debt

25    that he had for the money that he borrowed and have some

     1    operating income on top of it.

     2         However, that didn't really come to pass because he

     3    decided to let the interest accrue rather than getting it paid

     4    out monthly or quarterly or annually.

     5    Q.   Whose idea was it originally to create that arrangement?

     6    A.   I would imagine Tom Espy's.

     7    Q.   Well, and how was it communicated to you that that had

     8    come up as a possibility?

     9    A.   Well, it was the same sort of thing in those early days

    10    where Gary and Tom were best friends.  Gary had been best

    11    friends with Steve, but now he kind of changed his affection

    12    to Tom.  He was in the process of getting a divorce from his

    13    wife, and Tom was divorcing his wife as well, and so they were

    14    hanging out together a lot.

    15         And they talked all the time about things.  So anything

    16    that was ever decided about what they were going to do was

    17    told to me after the fact, and it was never, you know, what do

    18    you think of this.  It's just, this is what we're doing.

    19    Q.   You said Mr. Espy worked for Stanford Group Company, but

    20    was there ever a point from 2000 to 2009 where he worked

    21    directly for the Magness entities?

    22    A.   He didn't work for the Magness entities, but he worked in

    23    our office.  We had an office that had been -- it was another

    24    office suite that was adjoined to ours from time to time, so

    25    the wall would come down or the wall would go up depending on

```
 1   whether we had that space or not.

 2        Originally, our casino people worked in there when they

 3   were doing all of the prep to get the casino up and running.

 4   And so we still had it under sublease at some point, and Tom

 5   moved in there with his secretary, who was Debbie Brush.  And

 6   we paid half of her salary.  She did half of her work for us

 7   and half of her work for Stanford, and Stanford paid Tom.

 8   Q.    Do you recall approximately what her -- what half of her

 9   salary amounted to?

10   A.    Maybe 20,000.

11   Q.    Per year?

12   A.    Yeah.

13   Q.    What was the time frame of this arrangement?

14   A.    Well, she was there in 2003.  Oh, it's third of office

15   time then.  But she was also good -- you know, the primary

16   receptionist, whatever, all kinds of other things.

17   Originally, I think it was half-and-half and she was working

18   for Stanford.  But then Stanford closed their offices in

19   Denver or something.  I don't exactly remember.  But Tom came

20   to be with us.

21   Q.    Just to be clear, Mr. Espy was never on the payroll of

22   Magness -- of any Magness entity as far as you know?

23   A.    No.  He received a finder's fee from putting together the

24   data center deal, but that was never -- it was never payroll.

25   So he was never on Magness Investment Group payroll.
```

```
 1    Q.   And how did the finder's fee come about?

 2    A.   He hooked up the guys with the idea with us for the data

 3    center.  They all worked for a Level Three at the time, which

 4    is a -- they had dark fiber.  Tom knew them, put the deal

 5    together.

 6    Q.   And he did that outside of Stanford Group Company?

 7    A.   I believe so.

 8    Q.   Okay.  And the finder's fee was paid outside of any fee

 9    of Stanford Group Company?

10    A.   Yes.  It was paid by the data center to him.

11    Q.   Okay.  And do you know approximately what the finder's

12    fee was?

13    A.   $400,000.

14    Q.   Was that paid out over time or all in a lump sum?

15    A.   One lump sum, I believe.

16    Q.   And approximately when was that?

17    A.   2001 maybe or 2002.  So Tom Espy had taken over a major

18    role as an advisor to Gary at that point in time when they

19    were such close friends.

20    Q.   Going back to the KMM Parking investment, at the time

21    that investment was made, were you aware that Stanford Group

22    Company and Mr. Espy were going to receive a referral fee from

23    Stanford International Bank?

24    A.   Absolutely not.

25    Q.   After Mr. Espy and Mr. Magness returned from their first
```

1   visit to Antigua, did either of them tell you anything about

2   what they had learned about the bank or the island?

3   A.    They talked a lot about Jumby Bay, how beautiful it was,

4   how much fun it was.  And they met Juan Rodriguez, I think was

5   his name, and they thought he was smart.

6   Q.    What was your understanding of what Mr. Rodriguez's role

7   was with respect to the bank?

8   A.    I think he was the president of the bank.

9   Q.    Did they tell you anything about what it was that the

10  bank did for itself?  In other words, it pays money and

11  interest to investors, but how does the bank itself make

12  money?

13  A.    They -- they talked about how they had invested in

14  everything, that there was noncorrelation between their

15  investments so that if commodities were up, stocks might be

16  down and vice versa, but they had enough offsetting

17  investments to negate, you know, there ever being a total drop

18  in their investments, and that they were in a lot of different

19  places, which then made them secure and safe because they were

20  here, there, and everywhere, China and everywhere.

21  Q.    So, in other words, the bank took the money from the

22  investors and invested it in a portfolio of a bunch of

23  different things?

24  A.    Yes.

25  Q.    Okay.

```
 1    A.    In a bunch of different places.

 2    Q.    And they avoided risk by diversifying into a bunch of

 3    different places and different market sectors and so forth.

 4    Is that what you understood?

 5    A.    Correct.

 6    Q.    Did they say anything to you about the bank being

 7    involved in some kind of a timing scheme--that is, it would

 8    make money by investing in stocks and then selling the stocks

 9    very quickly and taking advantage of market timing, for

10    example?

11    A.    I don't recall that specifically.

12    Q.    Did anybody suggest to you that Stanford International

13    Bank was making money and was able to do so because it was

14    involved in some kind of a day-trading scheme?

15    A.    No.

16    Q.    Anything similar to a day-trading scheme?

17    A.    No.

18    Q.    What else did they tell you about the bank, if anything?

19    A.    I think after that first trip, that was about it.

20    Q.    What was your impression of the bank, having heard what

21    you did after the first trip that Mr. Magness and Mr. Espy

22    took?

23    A.    Well, it seemed like a good strategy.  It was the sort of

24    the same strategy that a lot of people who came to pitch to

25    us, which happened all the time, said that they used, broadly
```

31

1    diversified and noncorrelated markets, you know, the same

2    thing.  So it seemed -- we'd had a successful investment with

3    them before, so, you know, at that point in time there was

4    really no -- no warning bells.

5    Q.   Did you have any concerns of any kind about the bank at

6    that time?

7    A.   No.

8    Q.   Was there any due diligence effort undertaken with regard

9    to the bank, other than the visit that took place to Antigua?

10   A.   Yes.  We had some advisors who did some research and that

11   sort of thing, talked about it.  We talked to our other

12   brokers.  We had, you know, various other brokers at this time

13   and asked their opinions.

14   Q.   Who are were the advisors or brokers that you recall

15   talking to?

16   A.   There was a group called Quellos out of Seattle,

17   Washington.

18   Q.   And who at Quellos do you remember talking to about the

19   CD?

20   A.   Chuck Wilk.

21   Q.   Who else at Quellos, if anyone?

22   A.   There's a whole bunch of people.  I can't remember all of

23   their names.

24   Q.   Do you recall the other Eric's last name?

25   A.   No, I don't.  I can see his face, but he was just like a

```
 1   junior associate.  He's the one who ran all the numbers, but

 2   Eric Lindquist was the primary banker person.

 3   Q.   Okay.

 4   A.   So Gary was trying to approximate his TCIP stock that

 5   paid a nine percent dividend.

 6   Q.   I take it at this time he didn't have any stocks that

 7   were paying a similar dividend?

 8   A.   None.

 9   Q.   Okay.  So I just want to make sure I understand the

10   approach.  If Mr. Magness wanted to put a million dollars into

11   the Stanford CD, he could borrow a million dollars from one of

12   these other banks.  Then that would be secured by his stock?

13   A.   Yes.  So he borrowed on the margin, borrowed all the

14   money on the margin, and paid that interest, and then invested

15   in the Stanford CD and made a differential of a few points, a

16   couple of points, three points, whatever.  The interest rates

17   were kind of high back then for borrowing money.

18   Q.   And so a million dollars borrowed, he would have to have

19   what, $2 million worth of stock, roughly?

20   A.   Yes.

21   Q.   And he would borrow it at approximately what percentage

22   in the early 2000s?

23   A.   Oh, it was LIBOR plus how many basis points then.

24   Probably two, LIBOR plus two, so it was sometimes seven

25   percent, five percent.
```

```
 1    Q.   So --

 2    A.   I mean, LIBORs run the gamut of being all over the place,

 3    but it was always LIBOR based.

 4    Q.   So then the goal was to make the spread between five or

 5    seven and nine?  Is that right?

 6    A.   Well, try -- yeah, try to make -- try to get up to nine,

 7    which is where -- what he was making these other things, so he

 8    was hoping to get, you know, some percentage like that.

 9    Q.   But if he had to borrow at five or seven percent and he

10    can only get nine or ten from Stanford, he was going to make

11    net what, a couple, three points?

12    A.   Yes.

13    Q.   And in doing so, he was going to put a million dollars'

14    worth of his stock at risk.  Right?

15    A.   Two, in essence, if you think about the doubling.

16    Q.   Sure.  But, I mean, if he -- if he lost the million,

17    let's say --

18    A.   Yeah.

19    Q.   -- and he had to pay the bank back, he could sell a

20    million of his stock and he would pay the bank back in full.

21    A.   Yeah.

22    Q.   Anybody in your group suggest or talk about whether that

23    made sense as a strategy, trying to make two or three percent

24    and putting that much stock at risk?

25    A.   Well, many of us for a long time had felt that his debt
```

1    was risky, just his general debt.  He was up to over 400

2    million at one point.  That's a lot.  So it wasn't about

3    necessarily the Stanford transaction.  It was just his general

4    reluctance -- reluctance to sell stock and only wanting to

5    borrow to support his lifestyle and his other businesses.

6    Q.   Was there something in particular in 2002, 2003, leading

7    into 2004, that led Mr. Magness to wanting to put money into a

8    fixed income investment rather than buying more stock and then

9    just continuing to leverage through this margin strategy?

10   A.   I think it was probably the -- the bubble in 2002 or

11   whenever it was where the stock went down and he had some

12   stock called away.  He always thought of that eventual hundred

13   million that he had there as being completely accessible and

14   for him to be able to get it back to pay down margins if he

15   ever needed to.

16   Q.   The hundred million at Stanford --

17   A.   Uh-huh.

18   Q.   -- at the bank in Antigua?

19   A.   Yes.

20   Q.   And at the early time before the first investment, was

21   there any discussion about the risk associated with the bank

22   being an offshore bank?

23   A.   HSBC talking to them was the first time that I heard

24   anybody really talk about that being an issue.

25   Q.   And that was around 2007 or 2008, sometime in that time

 1   frame?

 2   A.   It might have been earlier.  I don't remember.

 3   Q.   Okay.  What did Mr. Bell say about the Stanford

 4   International Bank that you can recall?

 5   A.   That Gary should put his money with him.

 6   Q.   With Mr. Bell?

 7   A.   With Mr. Bell or, alternatively, not borrow money to make

 8   the investment.

 9   Q.   What would be the alternative to borrowing?

10   A.   Selling, which was never, ever an option.

11   Q.   Did you make any recommendations to Mr. Magness in

12   connection with the decision to invest in Stanford

13   International Bank CDs starting in 2004 and going forward?

14   A.   The only thing that I really recall about that period of

15   time was sometime after 2004, so it must have been late 2005,

16   Tom wanted Gary to invest more money because if he invested up

17   to a certain threshold, he would be able to get a better

18   interest rate.

19        And Gary thought that Stanford was such a great

20   investment that he wanted his ex-wife and his brother's

21   estranged wife to have the opportunity to invest, too.  So

22   they put on a big dog-and-pony show at Baker Hostetler's

23   office, and Laura -- whatever her last name was --

24   Q.   From Stanford?

25   A.   From Stanford.

1   Q.   Was it Laura Pendergest?

2   A.   Pendergest.  All I could think of was Hildebrandt.

3   Pendergest was there and other people, Tom Espy, and they

4   declined to invest.  But at that point in time I decided that

5   I would take the friends and family rate that was offered, and

6   I invested $100,000 in January of '06.

7   Q.   Is this -- this is a few months after the dog-and-pony

8   show, as you described it?

9   A.   Yeah, probably a month or so.  Shortly thereafter.

10  Q.   Was Mr. Rodriguez at the presentation at Baker and

11  Hostetler?

12  A.   I believe so.

13  Q.   Was that like an -- was that an all-day meeting, was it a

14  couple of hours, or what do you recall about the amount of

15  time of that meeting?

16  A.   It was no more than a couple of hours.

17  Q.   And were there written materials distributed in advance

18  of the meeting?

19  A.   Not in advance, but when you got there, then they had a

20  big PowerPoint presentation of their noncorrelation to the

21  market and all of their investments and their sectors and

22  their places and all of that stuff.

23  Q.   What kind of written materials were available at the

24  meeting?

25  A.   Performance documents that showed, you know, how well

1    they had done every year.

2    Q.    Anybody from Stanford other than Ms. Pendergest and Mr.

3    Rodriguez that you can remember?

4    A.    I think it was just them and Tom.

5    Q.    What was your impression of Ms. Pendergest?

6    A.    She's great.  She had every statistic, every whatever

7    completely at her fingerprints.  She was sharp.  She was

8    bright.  She was attractive.  She was the best salesperson in

9    the world.

10   Q.    What about Mr. Rodriguez?

11   A.    He was sincere.  He was kindly.

12   Q.    And do you recall getting any materials or written

13   materials about the Stanford investment after the meeting,

14   about -- about stanford International Bank?

15   A.    No.

16   Q.    In connection with any of the investments that Mr.

17   Magness or his entities made in 2004 and 2005 or your own

18   investment in January 2006, did anybody ever disclose to you

19   that Stanford Group Company was receiving a referral fee for

20   those investments?

21   A.    No, I had no idea.

22   Q.    Did you know that Mr. Espy was receiving a referral fee

23   in connection with those investments?

24   A.    No.

25   Q.    Did Mr. Magness ever tell you whether he knew that

1    Stanford Group Company or Mr. Espy were receiving a referral

2    fee in connection with the investments?

3    A.    Fairly certain that he didn't think he was, that Gary

4    Magness didn't think that anybody was getting a referral fee.

5    Q.    When was the first time you learned that Stanford Group

6    Company and Mr. Espy were receiving a referral fee in

7    connection with the Stanford International Bank investments?

8    A.    After the demise of the whole thing.

9    Q.    Did -- did Mr. Magness ever tell you when he learned that

10   Mr. Espy and Stanford Group Company were receiving a referral

11   fee in connection with Stanford International Bank

12   investments?

13   A.    I thought that he learned after the fact, too, but I

14   don't know if he learned any sooner than that.

15   Q.    Do you recall anybody within the Magness organization

16   making any study of the Stanford International Bank annual

17   reports prior to the Magness entities' investments starting in

18   December 2004?

19   A.    I think that all of the discussions, or most of the

20   discussions at that time, were between Tom Espy and Gary

21   Magness.  Tom would go to Gary's house, and they would have

22   their meetings there.

23   Q.    And you were not a party to those discussions?

24   A.    No.

25   Q.    Do you recall anything specific about the investigation

 1   that anybody from the Magness side made of Stanford

 2   International Bank annual reports or other Stanford marketing

 3   materials?

 4   A.   I don't think that anybody really paid attention verbally

 5   to it until after MFFI was formed, and then it always was a

 6   topic of conversation as a due diligence item on the checklist

 7   of things to talk about.

 8   Q.   And how did that come up, that it became a topic of

 9   discussion after MFFI was formed?

10   A.   Well, because by that point they all -- the people on

11   your list were directors and trustees, and they had personal

12   liability to some degree about reporting things.  And so every

13   investment was a part of the conversation.  We talked about

14   the cattle ranches and about the data center and everything

15   specifically.

16   Q.   What's the first time you recall Stanford International

17   Bank being discussed by people associated with MFFI?

18   A.   At the first meeting, I would imagine.  I mean, it was

19   discussed before then, but it wasn't discussed as regularly.

20   Q.   And how was it discussed before the first meeting?  In

21   other words, what was said about it and by whom?

22   A.   Well, we would have conference calls, various conference

23   calls among people.  I think at that point in time there

24   wasn't any really serious issues with anything.  It was only

25   after the market crash started and all of the margin calls

```
 1    started happening that it became more of a focus as a

 2    potential source of money to pay off margin calls.

 3    Q.   Going back to the first meeting, do you recall anybody in

 4    particular raising questions or asking -- asking questions

 5    about Stanford International Bank, anybody associated with

 6    MFFI?

 7    A.   Well, as I recall, the first meeting was two days, and

 8    there was a lot of just general business to conduct as far as

 9    all of those organizational documents and reviewing them all

10    and getting the authorization to get everything transferred

11    into the name, the proper names, you know, and change the

12    venue and that sort of thing.  So a lot of that first meeting

13    was organizational more so than anything.  I believe then we

14    just kind of touched on the assets that were held, like the

15    Schedule A, to familiarize Bob primarily with what Gary was

16    involved in so that he could, you know, know what he was

17    watching out for.

18    Q.   And Bob is Bob Armstrong?

19    A.   Yes.

20    Q.   And did Mr. Armstrong raise any questions or have any

21    concerns when it was first described to him?

22    A.   Not that I recall.

23    Q.   Let's take a look at Plaintiff's Exhibit 32.  Now, this

24    is an email from Chuck Wilk, who we talked about earlier, and

25    this is to Tonya@Magness.net, which is your email address.
```

```
 1   Correct?

 2   A.    Uh-huh.

 3   Q.    Yes?

 4   A.    Yes.

 5   Q.    And then it's sent on May 22nd, 2006.  Right?

 6   A.    Yes.

 7   Q.    And so at this point the Magness entities have invested

 8   tens of millions in Stanford?

 9   A.    Correct.

10   Q.    And you have personally invested $100,000?

11   A.    Yes.

12   Q.    Okay.  Now, Mr. Wilk is forwarding an article from

13   Bloomberg dated May 17th, 2006.  Do you recall getting this

14   email?

15   A.    Yes.

16   Q.    And did you talk to Mr. Wilk about it?

17   A.    I'm sure I did.

18   Q.    Do you remember what you talked about?

19   A.    Well, I think we just talked primarily about the fact

20   that he wasn't -- that he had kind of had been purporting

21   himself to be associated or descended from the Stanford

22   University family of Stanfords, and he wasn't, and just the

23   investment in general.  And, you know, this was perhaps the

24   first time that we had any idea that there was something

25   afoot, I guess.  But this isn't -- I mean, it doesn't really
```

1   say anything necessarily bad, just that he's not associated

2   with Stanford University.

3   Q.   Did you read the article at the time Mr. Wilk sent it to

4   you?

5   A.   I'm sure I did.

6   Q.   At the bottom of page 13512 in the last paragraph --

7   A.   Uh-huh.

8   Q.   -- it starts, "That's where he ran into problems with

9   U.S. investigators."  Do you see that?

10   A.   Yes.

11   Q.   And it says, "'In 1999 Stanford Financial tried to take

12   over Antiguan International Business Corp., which regulated

13   offshore companies on the island,' said Jonathan Weiner, who

14   was then a deputy assistant Secretary of State."

15        Did I read that correctly?

16   A.   Uh-huh.

17   Q.   It says, "State Department cables sent from the U.S.

18   Embassy described a 'power grab' and criticized the company's

19   hiring of U.S. consultants to revise Antigua's offshore

20   banking rules."  Correct?

21   A.   Yes.

22   Q.   And then finally it says, "'The high-powered legal and

23   investigative hired guns from the U.S. are likely being tasked

24   with cleansing the files to make sure there is nothing in them

25   that could damage or implicate the American offshore banker,'

43

1    one cable read."

2    A.   Correct.  But then it goes on to say that the warning was

3    lifted about Antigua after they took steps to fight

4    money-laundering, so I didn't really see anything in this that

5    was alarming, per se.

6    Q.   Did you discuss the State Department cables with Mr. Wilk

7    that you can recall?

8    A.   I don't know that we necessarily discussed this -- the

9    State Department cables.  We knew that there had been trouble

10   before, but it's kind of hard to know in retrospect.  I mean,

11   obviously everything came out afterwards and then you know

12   everything.  So now going back on this, it's hard to read it

13   freshly, I guess.

14   Q.   Do you recall discussing the article or your conversation

15   with Mr. Wilk with either Mr. Magness or Mr. Espy?

16   A.   I didn't really ever have very many conversations with

17   Mr. Espy.  He always went directly to Gary, and their meetings

18   were always at Gary's house as opposed to the office.  Gary

19   would come to the office from time to time, but that was more

20   coincidental than anything.  He didn't come to the office for

21   meetings.  Everybody went to him.  So Gary could have had a

22   number of conversations about this with Chuck or with whoever,

23   but I'm -- I didn't talk about it with Gary.

24   Q.   Or Tom?

25   A.   Or Tom.

1   Q.   After receiving the email approximately four months after

2   your first investment of $100,000, did it give you any pause

3   about the safety or security of that investment?

4   A.   No, because I always figured that I would get out before

5   Gary ever did anyway.  It was a very temporary investment for

6   me.  He had so much more money in there, I figured there would

7   never be a problem for me to get my $100,000 out.

8   Q.   I don't think I asked you this.  Why did you decide to

9   invest in the Stanford CD?

10  A.   Because it was paying a good interest rate.  I got Gary's

11  interest rate, so it seemed like something that would give us

12  interest income.

13  Q.   You said it was short term, though.  I mean, were you

14  looking for someplace to put money for a short time period

15  until you could use it for something else?

16  A.   Well, basically my husband and I were building a cabin in

17  Grand Lake, and we wanted to buy the property next door, which

18  was .2 acres, small lots.  So we had tried to buy it, but the

19  woman wouldn't sell it to us originally.  She wanted to hold

20  on to it.

21       And then she unexpectedly died, and I had nothing to do

22  with that, and her son -- her son needed money to pay taxes.

23  And so we were the logical people to buy it, and he came to us

24  and asked if we wanted to buy it, and we did.  And so we got

25  out of the Stanford CD so we could buy the lot.

```
 1   Q.   But at the time you made the investment, was it -- did

 2   you anticipate that it would be a short-term investment, or

 3   did it just turn out that way?

 4   A.   No, I always expected that it was going to be certainly

 5   more short term than long term.

 6   Q.   But did you have any particular reason to think that it

 7   would be the time horizon that it ended up being?

 8   A.   Well, we were, as I said, building our cabin and trying

 9   to buy -- we had been trying to buy the lot, so it just seemed

10   a good place to put the money and make some interest until we

11   could hopefully convince this old crazy woman to sell it to

12   us.  And then she died.

13   Q.   When you received the article from Mr. Wilk, did you or

14   Mr. Wilk make any further investigation of the things that

15   were described in the article or really anything else about

16   Stanford as a consequence of seeing the article?

17   A.   I think that Mr. Wilk did, went on and did some research

18   and found out as much as he could find out.  And I believe

19   that he talked to Laura Pendergest and Juan, and I'm sure they

20   gave him the whole noncorrelated in everything.  It sort of by

21   the end became -- when we would have conference calls with

22   them, which we did more as -- you know, as it got towards the

23   end, they -- they said exactly the same thing.

24        And then that was -- that was what was more alarming.  It

25   wasn't alarming at the beginning that they said these things.
```

1    That seemed brilliant.  But when they then said the same thing

2    when we knew that that wasn't possible when the market was

3    crashing the way it was in -- you know, in late 2008, that was

4    when it was more alarming.

5    Q.   Please turn to Plaintiff's Exhibit 45.  Now, this is an

6    email from you to Mr. Magness and Mr. Espy, dated June 18,

7    2007.  Is that correct?

8    A.   Uh-huh.

9    Q.   Is that a yes?

10   A.   Yes, it is.

11   Q.   Thank you.  And mangorace@gmail.com, that's Mr. Magness'

12   email address?

13   A.   Correct.

14   Q.   Okay.  And Tom Espy is Tom Espy.

15   A.   Right.

16   Q.   Now, you're advising them, that is, Mr. Magness and Mr.

17   Espy, on the sales of some stock and the reduction of Mr.

18   Magness' debt on the 309 million to 136 million.

19   A.   Correct.

20   Q.   Okay.  So 136 million is a relative low point, I assume,

21   for his debt during the time period we've been looking at.

22   A.   Yes.

23   Q.   And then I think we saw toward the end of 2008, it crept

24   back up to 280 or -90 million.

25   A.   Yes.

1  Q.   Okay.  What was the impetus for -- well, first, let me

2  ask, how was it that the debt was reduced so significantly

3  from 309 million to 136 million in this time period?

4  A.   Well, we went through all of the junk stocks that he had

5  bought over the course of all of the years, the ones that he

6  was trading specifically with Tom Espy and prior to that with

7  Gary Hamilton.  And he had a lot of lost positions in that

8  stock, and we wanted to take those losses.

9       So he was finally able to decide that he would part with

10  that so that we could use those losses on the tax returns for

11  whatever income thing it was that we had going on in 2007.  I

12  don't remember what it was, but it was primarily income tax

13  driven.  But then it resulted in, obviously, a lot of cash

14  that came in from getting rid of other positions.

15  Q.   So was it a -- was it a combination of selling the

16  Liberty stock and taking gains and selling this what you

17  described as junk stock and taking losses to balance it all

18  out?

19  A.   Yes, but he had gains from other entities that he was

20  trying to offset, and like I said, I can't remember what it

21  was in 2007 that was the gain that we were -- we were looking

22  to try to -- to cover.

23       But he would also sell his Liberty stock to -- and buy it

24  back in 30 days to step up the basis, because, remember, it

25  was zero basis stock.  So if he was selling the losses, then

1    he, you know, could have sold the gains as well and then

2    bought it back in the following period.

3    Q.    And how far back was he going through this kind of a

4    process--that is, sell Liberty stock, buy it back, and then

5    step up the basis?

6    A.    From when I very first started working for him in '89.

7    He had way less stock to do it with then, but he always had

8    the zero basis problem or the very, very low basis problem.

9    Q.    Okay.  So he had an excess or he had -- not an excess.

10   He had a lot of cash and -- as he's making these sales as you

11   described, and so then I suppose he has a choice.  He could

12   buy more assets or he could pay down debt.  At this time it

13   appears there's a lot of paying down of debt.  Is that what's

14   happening?

15   A.    Correct.  So MFFI, the board was always concerned about

16   the level of debt, and so paying down debt was the first

17   option.  Buying back more stock at this point in time was not

18   as -- you know, was not what the board wanted him to do.  They

19   wanted him to get the debt down to some reasonable fashion.

20   But I imagine, because the debt went right back up, that he

21   did, in fact, buy back the stock and step up the basis.

22   Q.    On Plaintiff's Exhibit 45, this illustrates for us that

23   one of the ways that he can pay down his debt is to sell

24   stock.  You can sell stock and that will give him cash

25   sufficient to bring his debt down to a lower level.

1   A.   Yes, but it's not a net win if he buys the stock back.

2   Q.   Right.  But if he finds himself in a position where he's

3   got, say, $309 million in debt, he can sell stock that he has

4   and reduce that in this case to 136 million.

5   A.   Yes.  But keep in mind that the stock that he's selling

6   has no basis and what he's making is a lot of capital gain,

7   which necessitates a lot of tax.  So, you know, a third of it

8   went away.  If he was just going to sell his stock, a third of

9   it goes away or more than a third of it goes away to begin

10  with to pay the IRS.

11       So he didn't ever have that many losses to be able to

12  harvest to offset the gain of selling his stock.  So it was

13  completely selling stock to pay down the margin only, to pay

14  down the margin was really not his personal favorite thing to

15  do.

16  Q.   And yet that's what he did in 2007 through the influence

17  of the board of Mango Five.

18  A.   Yes.  But I'm certain that he bought the stock back

19  that -- the Liberty stock back that he sold.

20  Q.   Even if he was doing the step-up basis strategy, that

21  still involves paying taxes.  Right?

22  A.   Well, he harvested a lot of losses at the same time so he

23  was able to offset as much as possible.  But then when he buys

24  the stock back, he borrows on the margin to buy the stock

25  back, so then the margin goes up again.

1    Q.    Just take a look at Exhibit 132, Plaintiff's Exhibit 132,

2    which is in the notebook in front of you.  Plaintiff's Exhibit

3    No. 132, this appears to be an agenda and minutes of the

4    regular meeting of the investment committee of Mango Five

5    Family for a meeting on June 21st, 2007.  Is that right?

6    A.    Yes.

7    Q.    Okay.  And on item two, there's a report on the

8    diversification of Liberty Media and affiliate stock.  Is that

9    right?

10   A.    Yes.

11   Q.    Okay.  And it looks like you were doing some reporting in

12   this section of the meeting.  Right?

13   A.    Uh-huh.

14   Q.    And it says that you --

15   A.    Yes.

16   Q.    You reported -- thank you.  You reported on the

17   continuing liquidation of Liberty Media and its affiliate

18   stock in accordance with the plan approved by the investment

19   committee on at (sic) February 26, 2007 meeting.

20   A.    Yes.

21   Q.    Is that consistent with your recollection?

22   A.    Yes.

23   Q.    Okay.  And Liberty Media and its affiliates, that's

24   different from what you call the junk stocks that Mr. Espy was

25   trading.  Right?

1   A.   Yes.  Gary never bought any junk stock in the Trust.  He

2   only bought it in GMAG and himself personally.

3   Q.   And you reported at the meeting that approximately $150

4   million of stock had been liquidated, and I'm assuming that

5   that refers to Liberty Media and its affiliate stock.  Is that

6   right?

7   A.   Yes.

8   Q.   Okay.  And that amount was used to reduce the debt of the

9   Gary Magness Family Irrevocable Trust to HSBC by approximately

10  $150 million.  Is that right?

11  A.   Yes.

12  Q.   Okay.  And so at this time the Trust owed about $102

13  million.

14  A.   Correct.

15            MR. PETRIE:  Excuse me, Your Honor.  Austin stopped

16  simply because it was 10:30, and it seemed like a convenient

17  break place.

18            THE COURT:  Okay.  Close enough.

19       Let's take our morning break now.  We'll see you-all back

20  in 20 minutes.

21            (Whereupon, the jury left the courtroom.)

22            THE COURT:  Anything else we need to take up?

23            MR. SADLER:  No, sir.

24            MR. PETRIE:  No.  Thank you.

25            THE COURT:  Did you all lose Mr. Bryant today?

```
 1              MR. PETRIE:  No.  He's coming back shortly.

 2              THE COURT:  Oh, okay.  Just wondering.  All right.

 3    We'll see you back in 20 minutes.

 4              MR. PETRIE:  Thank you.

 5                         (Brief recess.)

 6              THE COURT:  All set?

 7              MR. SADLER:  Yes, sir.

 8              MR. PETRIE:  Yes, sir.

 9              THE COURT:  All right.  Let's bring them in.

10              (Whereupon, the jury entered the courtroom.)

11              THE COURT:  Be seated.

12         Let's proceed.

13           TONYA DOKKEN, BY VIDEOTAPE DEPOSITION, continued,

14    Q.    So out of the hundred -- well, we were just there.

15    A.    The rest of it was spread among the other entities.

16    Q.    So looking at -- I said Plaintiff's Exhibit 133, but why

17    don't we start with 134 because these are the minutes of the

18    board meeting.  We'll just take them in chronological order.

19         So do I understand it right on October 1st, 2007, the

20    first meeting that would have been -- that would have taken

21    place was the one that was described in Plaintiff's Exhibit

22    134?

23    A.    Yes.

24    Q.    Okay.  And there's a discussion at No. 5, again about

25    liquidation of Liberty stock, and Mr. Magness -- and at this
```

1    time we're talking about his personal investments rather than

2    the Trust.  Right?

3    A.    Right.  That's where all the little stocks were.

4    Q.    Okay.  Why is there a discussion at a trust meeting about

5    what GMAG is doing with its investments?  I'm not saying

6    there's anything wrong with it.  I'm just wondering why that

7    would be.

8    A.    Because we always included all of Gary's investments when

9    we were talking about his personal net worth and that sort of

10   thing, which is why GMAG and he and Magness Securities are all

11   on these schedules, because they affected each other.  So if

12   GMAG arbitrarily sold everything it had, it could affect the

13   price of stocks at another entity, for example.

14   Q.    Is that because the amount of stock that they have?

15   A.    Right.

16   Q.    Okay.

17   A.    So it was just -- it was what we always did.  Gary always

18   wanted to know his overall net worth, and he really never, I

19   don't know, distinguished between where it was that he owned

20   the money, stock.  He did in the early days.  That was when he

21   was so obsessed about keeping it all straight, but then later

22   on, it just kind of became him.

23   Q.    It was all his -- it was all his stocks.

24   A.    It was all his stocks, it was all his money.  He was the

25   sole beneficiary of the Trust.  He's the, you know, sole owner

```
 1   of these LLCs, so it really is just one pocket and another

 2   pocket.

 3   Q.   Okay.  All right.  Now, on the next page, we're still on

 4   the same section, we're at BH000538, there's a discussion of a

 5   loan facility that the Trust has at Merrill Lynch.

 6   A.   Yes.

 7   Q.   And -- and am I understanding correctly that the

 8   discussion is that there's a $50 million margin loan that's

 9   outstanding, and the discussion is where to move that loan?

10   Is that right?

11   A.   Right.  So he borrowed from Merrill Lynch to -- or used

12   the proceeds from sales at Merrill Lynch --

13   Q.   Okay.

14   A.    -- to pay down HSBC.

15   Q.   Oh, I see.  Okay.  And then the question is, are you

16   going to renew the loan facility at HSBC?

17   A.   Yes, we were.  But HSBC was getting really worried about

18   Gary's loan indebtedness overall.

19   Q.   Okay.

20   A.   And so they wanted, you know, them to lower -- Gary to

21   lower his indebtedness with them.

22   Q.   Okay.  And it says, Ms. Dokken--that's you--reported that

23   talks are ongoing with HSBC as to whether the Trust will renew

24   its loan facility.  And I assume on what terms.  Is that

25   right?
```

```
 1   A.   Well, correct.  We were negotiating for more money,

 2   trying to find a better release rate to be able -- so we were

 3   talking to different banks.  I don't think the intention was

 4   at this point in time to leave HSBC, but to get them to change

 5   their -- their ratios, their release ratios and their floors.

 6   Q.   This is the loan-to-value ratio.

 7   A.   Yes.  Yes.

 8   Q.   Okay.  And you -- you told the group that you were

 9   negotiating not only with HSBC but also U.S. bank and Stanford

10   for a new loan facility.  Is that right?

11   A.   Yes.

12   Q.   Okay.  Now, there's an observation from Mr. Knudson that

13   one advantage of borrowing from Stanford would be the

14   possibility for legal offset in the event that the Trust's

15   significant investment in certificates of deposit in Antigua

16   were at risk.  Do you recall that discussion?

17   A.   Yes.

18   Q.   What do you recall about that discussion?

19   A.   Well, it's sort of like -- Stanford and Stanford

20   International Bank are like Gary and GMAG in a sense, that you

21   couldn't use the proceeds from one -- or maybe Gary and GMIT

22   might be better.  You couldn't take the assets from one and

23   move them into the other very easily, nor could you -- unless

24   you actually guaranteed, you know, GMIT against GMAG or

25   whatever.  It's not the same entity.
```

```
 1        And so my observation, which I don't think is in here,

 2   was that that probably wouldn't work because they were

 3   different entities entirely, so that if Gary had money at

 4   Stanford Bank and he had indebtedness at Stanford Brokerage,

 5   those aren't offsetting entities in my -- in my opinion.

 6   Q.   Did you make any investigation or anybody else from Mango

 7   Five make any investigation about whether it was possible to

 8   secure a margin loan at Stanford?

 9   A.   Stanford wouldn't do it.  They wouldn't give Gary the

10   marginability on the Stanford CDs.

11   Q.   And in point of fact, if you were borrowing from

12   Stanford, you were really borrowing from Pershing.  Isn't that

13   right?

14   A.   Correct.

15   Q.   Pershing wouldn't do it.

16   A.   No.

17   Q.   I guess the question, even before we get to whether

18   that's feasible, why the discussion of the certificates of

19   deposit in Antigua being at risk.  How did that come up?

20   A.   Well, I think 2007 was the beginning of the housing

21   demise, and things were -- I don't know, investments seemed

22   riskier than they had before the housing crisis.  I think

23   everything kind of seemed more at risk when you -- when you

24   looked at it.  But I don't know that anybody really thought

25   that they were at risk.
```

```
 1          I truly -- this is what I think, and this is only what I
 2     think.  Steve and Tom were really good friends, and Steve was
 3     always trying to steer things Tom's way.  And we ended up
 4     finding out later that Tom made commissions or cuts or
 5     whatever on some of the investments.  I don't know that --
 6     that Steve knew that.  I don't think he did, but I think he
 7     was just trying to get more business to Tom, because Tom was
 8     his friend and Tom would talk to him and tell him what was
 9     going on.
10          Merrill Lynch, Ryan Bell, Mary Penn at HSBC, weren't as
11     eager to fill Steve in on certain aspects of Gary's
12     investments.  So it was just --  you know, Steve would say,
13     yeah, let's go with Stanford because maybe this other reason
14     will pan out.
15     Q.   Did anybody at the meeting tell Steve that they thought
16     the certificates of deposit in Antigua were not at risk in
17     response to his comment?
18     A.   Oh, I don't think that was what the point -- that wasn't
19     the point.
20     Q.   But did that -- but I'm --
21     A.   No.
22     Q.   Did anybody say that, they're not at risk?
23     A.   No.  No.  Every -- anybody said you can't correlate the
24     two.  You know, they're different entities.  You're not -- you
25     know, this wouldn't -- this isn't a good reason.
```

1    Q.    Did anybody say to Mr. Knudson in response to his comment

2    here that -- well, let me ask it a different way.

3          I mean, was the comment about the certificates of deposit

4    in particular being at risk just completely out of left field

5    from your perspective, or was that something that had been

6    discussed before?

7    A.    I think it was completely out of risk -- I mean, out

8    of -- you know, not on the point of this discussion that we

9    were having here about borrowing facilities.  So -- we were

10   discussing the possible banks and the interest rates

11   primarily, but more than that, the release, being able to get

12   a better release.

13         U.S. Bank, for example, had a $10 floor, which, you know,

14   is -- was exceedingly high and very alarming with LINTA down

15   to like $11 or whatever.  So it was looking at getting out of

16   places where we would be able to get into places that had

17   better releases, you knows, higher ratios, that sort of thing.

18   Q.    Okay.  So by this point, that is, the board meeting

19   October 1st, 2007, did you have any awareness of people

20   internally at Mango Five Family talking about the risk --

21   A.    No.

22   Q.    -- associated with the Stanford International Bank CD?

23   A.    I think that we probably talked about risk of things from

24   time to time, even, you know, I mean, overall exposure risk

25   for Gary's highly concentrated position.  That was the main

```
 1    risk that everybody saw at that point in time was that his

 2    position was highly concentrated.  And so if that industry

 3    went down, it was going to take him out completely because he

 4    didn't have any fallbacks, you know.  He didn't have that

 5    non-correlated investment to the market that, you know,

 6    Stanford had, seemingly.

 7         So we were more concerned about that as a risk than

 8    pretty much anything else in Gary's life at that point in

 9    time.

10    Q.   Okay.  Let's take a look at the investment committee

11    meeting minutes, Plaintiff's Exhibit 133.  Now, this is the

12    meeting that would have taken place immediately after the

13    board meeting.  Correct?

14    A.   Yes.

15    Q.   Okay.  Are you at 133?

16    A.   Yes.

17    Q.   Okay.  And actually it's -- the agenda is on the first

18    page, and then the next two pages are the minutes.  Correct?

19    A.   Yes.

20    Q.   Okay.  And at section 7, there's a discussion of some

21    miscellaneous items.

22    A.   Yes.

23    Q.   And it says that Mr. Magness -- Mr. Magness asked you to

24    request that Mr. Espy prepare a full report for the investment

25    committee's next meeting, discussing the status of the
```

```
 1    certificate of deposit program in Antigua, and further

 2    requested that you inquire of Mr. Wilk as to how the

 3    certificate of deposit program could be further investigated.

 4        Now, how did this discussion come about?  Well, first,

 5    let me ask you, do you recall that was the discussion?

 6    A.   I'm just trying to make sure this is the same -- the same

 7    date.  So this is the regular board meeting, and this is the

 8    investment committee meeting.

 9    Q.   Right.

10    A.   I'm sure that we just talked about -- we'd had this big

11    sell-off, you know, trying to reduce the debt.  The debt was

12    really on everybody's mind, and so I'm sure that -- I'm sure

13    that at some -- I mean, oftentimes during the meetings we had

14    reports on Stanford, and that's when Tom actually came to the

15    meetings was when he was supposed to deliver whatever report

16    it was that he was delivering.  So I imagine this is at the

17    time that Chuck Wilk is involved in the whole thing.

18    Q.   So let me first ask you, is what's reflected at item 7 on

19    page BH000491, is that accurate as far as your recollection is

20    concerned about what happened at the meeting?

21    A.   I'm sure it is.  As -- as I mentioned earlier, as time

22    went on and we would have conversations with Juan at the bank

23    or Laura or whatever, they would say exactly the same things

24    that they said, you know, in 2002 or '5 or whenever it was.

25    And so they didn't say anything different, and that was what
```

```
 1    as -- when time went on, that kind of made us concerned was

 2    that they were still saying the same things, especially at

 3    this point in time when there had been problems with the

 4    market.

 5        So the market problems were starting here.  They just got

 6    worse.  And so I'm sure that that was -- was the impetus

 7    behind wanting to have more information.

 8    Q.   Okay.  And so as of October 1st, 2007, the investment

 9    committee, and I assume you, are recognizing a need to do some

10    further investigation of Stanford International Bank --

11    A.   Yes.

12    Q.   -- because of the disconnect between what they were

13    saying and what you're observing in the market.

14    A.   Correct.

15    Q.   And it refers to Mr. Wilk conducting a further

16    investigation.  Do you know what investigation proceeded

17    October 1st, 2007, by Mr. Wilk?

18    A.   I don't think the sentence means that.  I think further

19    investigation as in to looking into it, you know, kind of

20    thing.  I don't think that it's saying that he should take it

21    farther than whatever investigation he had had before.

22    Q.   Did you have a discussion with Mr. Wilk after the October

23    1st, 2007 meeting that you can recall?

24    A.   I'm sure.

25    Q.   Do you remember anything about it?
```

1    A.    No.

2    Q.    Do you know if you talked to him on the phone,

3    corresponded by email, or had some other form of

4    communication?

5    A.    We talked on the phone a lot.

6    Q.    Did you continue to talk to Mr. Wilk on a regular basis

7    throughout the remainder of this time period--that is, from

8    October 1st, 2007 to February 2009?

9    A.    No.  At some point it became unnecessary to talk to him

10   anymore about it.

11   Q.    Well, not about Stanford, but just in general.

12   A.    Oh.  He -- I'm not exactly sure when he left Quellos, so

13   things in our relationship kind of changed.

14   Q.    After he left Quellos?

15   A.    Yes.

16   Q.    Okay.  Did he leave Quellos in connection with his

17   indictment by the Department of Justice?

18   A.    I believe so.  And then he went to jail.  That hindered

19   our communication.

20   Q.    Okay.  Ms. Dokken, can you please take a look at

21   Plaintiff's Exhibit 71?

22   A.    Yes.

23   Q.    Now this is a Stanford International Bank market recap

24   and outlook covering the last quarter of 2007.  Do you see

25   that?

```
 1    A.    Yes.

 2    Q.    Have you seen Plaintiff's Exhibit 71 before?

 3    A.    Not necessarily this particular issue, but I've seen a

 4    quarterly update before.

 5    Q.    And a quarterly update from Stanford International Bank?

 6    A.    Yes.

 7    Q.    Okay.  And in what context do you recall seeing one of

 8    these quarterly reports?

 9    A.    They would arrive at our office, and we would -- you

10    know, we would read them --

11    Q.    Okay.

12    A.    -- or someone would email it to me or something.

13    Q.    Would you make any study of them for any particular

14    reason?

15    A.    Well, just as I would generally for all of investment

16    information that we had.  This looks like the same thing, you

17    know.  They're all over the place, and they're in everything.

18    Q.    And you are alluding to the description of Mr.

19    Rodriguez-Tolentino and Ms. Holt -- sorry, Ms. Pendergest?

20    A.    Yes.  Exactly.

21    Q.    Did you discuss any of these quarterly reports with Mr.

22    Magness or Mr. Espy?

23    A.    I'm certain that we did at -- you know, and we talked

24    about Stanford often, I mean, probably at every board meeting.

25    We wouldn't necessarily talk about it in conjunction with a
```

1    quarterly report specifically, but this was -- I mean, this

2    was always the story basically of what they were telling

3    us--that they were in all kinds of different sectors, all

4    kinds of different places, all kinds of different currencies.

5    Q.    And when you say this, you're referring to the four pie

6    charts that are on the last page of the exhibit?

7    A.    Correct.

8    Q.    So if you look at the product allocations, they're in a

9    mix of equity, meaning stocks, right, and fixed income,

10    meaning bonds --

11    A.    Correct.

12    Q.    -- and then metals, cash and equivalents, and alternative

13    investments?

14    A.    Yes.

15    Q.    Did you have an understanding of what alternative

16    investments referred to?

17    A.    Well, I sort of thought that was like real estate kind of

18    things maybe or something like that.

19    Q.    And how did you come to that understanding?

20    A.    Because I knew that Allen -- I knew that Stanford owned

21    real estate holdings.

22    Q.    And then on the currency allocations, it reflects 60

23    percent U.S. dollar and then 40 percent other.

24    A.    Correct.

25    Q.    Okay.  And -- and these descriptions that you see at the

1    last page of Plaintiff's 71, that's consistent with what you

2    saw over time.

3    A.    Yes.

4    Q.    Okay.  Even going back to the very first time you saw

5    anything about Stanford?

6    A.    This was always what we understood it to be comprised of.

7    Q.    We at the Magness entities?

8    A.    Yes.

9    Q.    Okay.  All right.  So I want to turn -- I want your

10   attention to Plaintiff's Exhibit 57.  This is an email on

11   January 10th, 2008, from yourself to Tom Espy and Pamela

12   McGowan.  Do I have that right?

13   A.    Yes.

14   Q.    Who is Pamela McGowan?

15   A.    She was his assistant, Tom's assistant.

16   Q.    So she worked for Stanford Group Company?

17   A.    Yes.

18   Q.    Okay.  And it appears that here on January 10th, 2008,

19   you are asking to cash in your Stanford CD and to pay the

20   penalty associated therewith.  Is that right?

21   A.    Yes.

22   Q.    And is that to make the Grand Lake investment that you

23   described earlier?

24   A.    Yes.

25   Q.    That is to purchase a piece of neighboring property?

1   A.   Correct.

2   Q.   When did you buy the piece of property that this was

3   adjoining to?

4   A.   We bought it before this, but we just took out a loan and

5   we wanted to pay that off.  We bought it maybe in December

6   of -- right before this, right before Christmas.

7   Q.   Okay.  And then you bought the adjoining property or the

8   neighboring property in December 2007?

9   A.   Yes.

10  Q.   And you did that with a loan?

11  A.   We just borrowed on the -- on our margin at our -- at

12  Merrill.  We have our stock at Merrill Lynch as well, so we

13  just borrowed on the margin.  But I didn't believe in margins,

14  so I wanted to sell -- you know, to cash out the CD to be able

15  to pay for it.

16  Q.   Why did you sequence it in steps like that?  Why didn't

17  you simply cancel the Stanford CD back in November or December

18  of 2007?

19  A.   Because it was year end and it's a really busy time or

20  was a really busy time, and my personal finances always fall

21  to the bottom when I'm working that hard.  So after the first

22  of the year when all of the year-end transactions were done

23  and everything that needed to be done was done, then I could

24  figure out how to do it, you know, to have time to write the

25  letter and -- I didn't know how long this was going to take or

67

1    what this was going to entail.

2    Q.   Did the decision to withdraw from Stanford International

3    Bank and retire your margin loan have anything to do with your

4    concern over the risk of the Stanford International Bank CD?

5    A.   It was more just the timing of us wanting to buy this

6    property.  As I mentioned before, I never expected that I was

7    going to be in the Stanford CD program for that long.  So it

8    wasn't specifically that I was more or less concerned about

9    the risk associated with Stanford; it was just the timing of

10   needing the money.

11   Q.   So the question is, if the mortgage rates were less than

12   the stated rate of the Stanford CD and you had to pay a

13   penalty to get the money out of Stanford, why did you opt to

14   pay the penalty and get out of Stanford rather than simply get

15   a secured loan from a bank?

16   A.   Well, if you -- you really can't get a loan on

17   undeveloped property.  They don't really like to loan on that.

18   They will only loan 50 percent of the value on your second

19   home to begin with.  So -- so, you know -- but they

20   won't -- you can't just -- as far as I knew, know, get a loan

21   on a piece of property that has nothing on it and, you know,

22   that you're not building on or whatever.

23        So I don't think I ever even felt that it was an option

24   of, you know -- if it was the 50 percent thing, then that

25   would only have given me $40,000 on the value anyway, and I

1    needed to -- you know, I wanted the whole thing.

2    Q.   Okay.   But if you had maintained the margin loan with

3    Merrill, that rate was lower than the stated rate of the

4    Stanford CD, was it not?

5    A.   Yes.

6    Q.   And the -- and part of getting the money out of Stanford

7    was paying the penalty to Stanford.

8    A.   I didn't ever have to pay the penalty.

9    Q.   Did they waive the penalty?

10   A.   Yes.

11   Q.   You were prepared the pay the penalty.

12   A.   Yes.   I just wanted to pay off my debt, my debts with

13   myself.   I mean, with, you know -- the market was iffy at that

14   point in time, and I didn't know what was going to happen.   So

15   I felt that it was, you know, it would be better for me not to

16   have any other debt other than my -- my mortgage debt.   And I

17   thought that real estate was going to be a secure investment.

18   Not so much.

19   Q.   And were you also influenced in the decision about how to

20   deal with the margin debt and Stanford by the discussion that

21   had been taking place just a couple of months prior about the

22   risk of Stanford and the need to do a further investigation of

23   Stanford?

24   A.   I'm sure it might have influenced my decision to some

25   degree, but that wasn't the driving factor whatsoever.   It

1    was, you know, this lot, building this house in Grand Lake.

2    Q.    And did you have any discussion with Mr. Magness or Mr.

3    Espy about your decision -- well, obviously Mr. Espy, but with

4    Mr. Magness about your decision to sell your Stanford CD?

5    A.    No.

6    Q.    Was he aware that you had a Stanford CD?

7    A.    Yes.  But I don't know that I ever told him that I sold.

8    He was -- he felt that Stanford was a good investment and a

9    good interest rate return, and he continued believing that

10   until the end.  So he wouldn't have ever wanted me to sell.

11   Q.    Was that why you did not talk to him about selling it?

12   A.    Oh, there's only so much you can argue with him about.

13   He argues about everything.

14   Q.    Let me ask you about Plaintiff's Exhibit 56.  It's in the

15   notebook in front of you.  Do you recognize Plaintiff's

16   Exhibit 56?

17   A.    Yes.

18   Q.    And this is an email from you to Mr. Espy, dated February

19   5th, 2008, with a copy to Ray Sutton, Bob Armstrong, Steve

20   Knudson, and Mr. Magness.  Correct?

21   A.    Yes.

22   Q.    Now, you're asking Mr. Espy for some information about

23   the Stanford Bank certificates of deposit.  Right?

24   A.    Yes.

25   Q.    And the Mango Five investment committee, in your words,

1    would like to understand and review -- well, actually let me

2    take that back.  It's signed by Mango Five Family, Inc.,

3    board of directors, and then your signature block is below

4    that.  Who is this from?

5    A.    I sent this out on behalf of the board.

6    Q.    Okay.

7    A.    But this is just my email thing that comes up on

8    everything.

9    Q.    Okay.  So "The Mango Five investment committee would like

10   to understand and review the strategies and investments that

11   the Stanford Bank certificates of deposit have exposure to so

12   that we can better understand the underlying assets."

13        Is that right?

14   A.    Yes.

15   Q.    Okay.  Now, is this consistent with what you talked about

16   earlier, which is that you needed to gain an understanding --

17   a better understanding of how Stanford International Bank was

18   invested and how that could make money in the market

19   conditions you were seeing?

20   A.    Exactly.

21   Q.    Now, do you recall sending letters similar to this about

22   any other investments that the Magness entities were involved

23   with?

24   A.    We sent similar emails to Quinlan, which was the European

25   real estate investment thing that we had 20-odd million

 1   dollars in, that was a disaster, and the other -- some of the

 2   other hedge funds that we had invested in, trying to find out

 3   what was going on with them, had conference calls with the

 4   Quinlan people for them to explain why their real estate

 5   holdings were so upside down and how, you know, they were

 6   never going to get their money back and they had all these

 7   bank loans that came due and whatnot.

 8        So Stanford wasn't necessarily singled out at this point

 9   in time.  We were looking at everything and trying to get a

10   feel for what it was, what it comprised, what sectors it was

11   in.

12   Q.   Would you agree with me that Stanford stands out in the

13   board meeting minutes from 2007 through the time that Stanford

14   was taken over by the SEC?

15   A.   Yes.

16   Q.   And you asked for some materials to be prepared, so --

17   excuse me -- the board asks for some materials to be prepared

18   and sent to you for inclusion in the investment committee

19   package for the upcoming meeting.  Right?

20   A.   Correct.

21   Q.   All right.  So let's turn to -- turn to tab 60 or

22   Plaintiff's Exhibit 60.  This is February 14th, 2008, about

23   nine days later.  There is a discussion between -- or

24   involving Mr. Espy and Ms. McGowan and another person named

25   Misty Presley.  Do you know who she is?

1    A.    No.

2    Q.    There's a reference to six SIB disclosure booklets for --

3    for use with Magness Trust board members.  Do you recall

4    whether you received any SIB disclosure booklets from Mr. Espy

5    in connection with the meeting that was being planned in

6    February 2008?

7    A.    So I didn't know what it was that he was bringing before

8    he went to the meeting, and I can't say positively that he

9    actually brought these with him or not.

10   Q.    Will you take a look at Plaintiff's Exhibit 61, which is

11   the next one in your binder?  And this is a disclosure

12   statement for the U.S. accredited investor certificate of

13   deposit program from Stanford International Bank.

14        Does this look familiar to you as one of the documents

15   that Mr. Espy brought to the spring -- or I guess late winter,

16   early spring 2008 investment committee meeting?

17   A.    Yeah, I -- I imagine it probably is.  He didn't bring as

18   much with him as I thought he would have.

19   Q.    What do you recall him bringing with him?

20   A.    Well, he just mostly talked as opposed to having

21   documentation that substantiated anything that he said.

22   Q.    Was that a concern to you?

23   A.    Well, how do I put this?  Tom Espy was always a concern

24   to me from the very beginning.

25   Q.    And why do you say that?

```
 1   A.   Because he just made it a point of always going to Gary

 2   personally, meeting Gary at his house, getting Gary into

 3   trouble with drinking and whatnot.  And, you know, he just, I

 4   felt, was a bad influence in Gary's life in general.  So

 5   anything that he did, I would be skeptical of.

 6   Q.   Okay.  Well, so the board has made a rather pointed

 7   request for information related to the Stanford International

 8   Bank and asked for materials to be prepared in advance, and I

 9   think what you're telling me is -- or, excuse me, given to you

10   in advance, and I think what you're telling me is he did not

11   do that.

12   A.   He brought them to the meeting himself.

13   Q.   All right.  So he did not do as -- he did not comply with

14   the first request, which is to provide you with information in

15   advance of the meeting.

16   A.   I don't remember that he did.

17   Q.   And then the second problem is he came to the meeting

18   with limited materials.  Were they responsive to what you had

19   requested on behalf of the board?

20   A.   Well, I would have liked to have seen a complete

21   breakdown of what it was that they were invested in, you know.

22   Like if they were invested in equities, what were those?  That

23   would -- that would have been what I would have wanted.  So we

24   didn't get anything like that, that specific.

25   Q.   And what was your sense, based on what you observed
```

1  through your interactions with the board, about what the board

2  was interested in seeing from Mr. Espy same as your --

3  A.   I think they wanted the same thing.  I mean, this was

4  during -- 2008 was the time when the market was, you know,

5  really starting to fall apart and was -- you know, the market

6  in general seemed very risky, anything having to do with the

7  market.  So every investment was under scrutiny and we were

8  concerned about it.

9      So we wanted people to be more responsive to us.  And in

10  many cases they were, you know.  Quinlan gave us a list of

11  every single holding that they had and what the debt was

12  against it and that sort of thing.  And so we wished that we

13  could have had something more.

14      But they said that for them to disclose anything more was

15  to disclose their strategy, their investment strategy, and

16  they weren't going to do that because that was their bread and

17  butter, you know, their individual strategies involved in all

18  of this.

19  Q.   Was that a concern to you that they were not disclosing

20  the kinds of things they were invested in?

21  A.   Yes, but I'm -- I'm generally unhappy about a lot of

22  those sorts of things.  Let's put it that way.

23  Q.   But Stanford stood out against the other investments that

24  Magness entities were in by refusing to disclose --

25  A.   Only because it was --

```
 1    Q.   -- information?

 2    A.   And because it was bigger.

 3    Q.   It was bigger and you had less visibility.

 4    A.   Right.

 5    Q.   Please take a look at Plaintiff's Exhibit 62, which are

 6    the minutes of the meeting of the Mango Five Family investment

 7    committee on March 6, 2008.  So I gather this meeting spilled

 8    over into March rather than happening in February.  Is that

 9    right?

10    A.   Yes.

11    Q.   And there's a report on Stanford certificates of deposit

12    at the top of page 2.  Do you see that?

13    A.   Yes.

14    Q.   And Mr. Rodriguez appeared by phone at this meeting?

15    A.   Correct.

16    Q.   And he was asked to report on the safety of the Trust

17    certificates of deposit.  Correct?

18    A.   Yes.

19    Q.   And he was asked to report on the safety because there

20    had been concerns about the risks to the CD.  Is that right?

21    A.   Yes.

22    Q.   And it says, Mr. Rodriguez spent a few minutes discussing

23    the nature of the bank, which resembles a, quote, Swiss bank

24    model, end quote.  Do you know what that means?

25    A.   No.
```

76

```
 1   Q.    Was there any discussion or questioning of Mr. Rodriguez

 2   about what a Swiss bank model is?

 3   A.    Possibly.

 4   Q.    Do you remember any?

 5   A.    No.

 6   Q.    And then it says Mr. Rodriguez also explained the

 7   regulatory oversight of the bank in the country of Antigua.

 8   Do you recall what he said about that?

 9   A.    That they were audited regularly, there was oversight

10   with the Antiguan banking commission or something or other.

11   Q.    Did anybody ask him any questions about that?

12   A.    I think a lot of people asked a lot of questions.  I

13   don't specifically remember the individual questions that were

14   asked.

15   Q.    All right.  And the next paragraph, it refers to Mr.

16   Rodriguez being asked about how Stanford International Bank

17   differs from a hedge fund, and he said it was different

18   because the bank has regulatory oversight.  Does that sound

19   right?

20   A.    Yes.

21   Q.    And do you have any understanding of why that would

22   explain how the bank can perform well in a down market given

23   its investment portfolio?

24   A.    No.  I think it just -- I think that what we took it to

25   mean was that they had certain liquidity requirements that
```

1    they were -- needed to be met, and that that made it safer

2    because of that regulatory oversight than a hedge fund, which

3    can just go to zero in an instant, because they were, you

4    know, required to have certain things --

5    Q.   So --

6    A.   -- because they were a bank.

7    Q.   -- because of the liquidity requirement, it can't go all

8    the way to zero but certainly it could go down.  And if it

9    had -- if it was -- had too small of a margin between assets

10   and liabilities, they could be insolvent, right, even if it's

11   not zero?

12   A.   But I'm certain that he explained why that would never

13   happen or come to pass or how -- the precautions they had in

14   place about that sort of thing.

15   Q.   Do you remember what he said about that specifically?

16   A.   No.  I do feel that we were all reassured, though, after

17   this particular meeting.

18   Q.   And reassured by what exactly?

19   A.   That they were doing things correctly, that they weren't

20   a hedge fund.  I think we were all concerned that they were a

21   hedge fund.  That was one of the concerns, because many of

22   those hedge funds, Tontine in particular, had gone to zero

23   that Gary had been invested in.

24   Q.   What do you -- what do you recall that he said about the

25   capital requirement?

```
 1    A.    I don't remember specifically.

 2    Q.    But the difference between hedge fund and Stanford is

 3    Stanford can go down 20 percent but nevertheless still has to

 4    pay its eight, nine, ten percent to its investors, doesn't it?

 5    A.    Yes.

 6    Q.    Isn't that kind of a recipe for disaster in a down

 7    market?

 8    A.    Well, keep in mind, though, they were invested in all

 9    nonmarket correlated things, and they were in China, and they

10    were wherever, and that was the whole key to their success,

11    that they could be in this situation that nobody else was in

12    because they were so strategic and smart and their --

13    Q.    Even though -- I'm sorry.

14    A.    -- their individual -- so they had all these individual

15    money managers that were working for them in whatever these

16    locations were, and they were the most brilliant people in the

17    world, and that sort of thing.

18    Q.    Even though 60 percent of their investments, as you saw

19    from the materials they sent you, were in U.S. denominated

20    investments.  Right?

21    A.    Yes.

22    Q.    Plaintiff's Exhibit 72, can you please turn to that?

23    This is a Stanford International Bank quarterly update from

24    the third quarter of 2008.  Do you recall seeing this one in

25    particular?
```

1    A.    I don't know.  They were similar to each other.  So I

2    don't remember seeing this one specifically, but I most likely

3    did.

4    Q.    Okay.  Do you recall any discussion within the Magness

5    group about how Stanford could be invested in the kind of

6    portfolio allocation described in the last page of the exhibit

7    but not be exposed to the kinds of market losses that are

8    reflected by the index returns listed on that page?

9    A.    Well, our -- our concentration really at this point in

10   time at the end of September here was in an entirely different

11   direction because the markets in general were melting down and

12   the margin calls, the daily margin, calls were happening.

13        And so we were focused completely on trying to figure out

14   what to sell, how to cover, what to transfer, what to do, how

15   to get money to cover the margins.  We actually had soft music

16   and lavender candles playing in our office at this time

17   because it was so stressful.

18        So any individual report like this was probably not

19   something I was concentrating on.  I was working 12 hours a

20   day with the banks trying to keep Gary from being sold out.

21   Q.    But the Stanford investment at this point is

22   approximately $100 million.  Right?

23   A.    Correct.

24   Q.    And that's as of end of September 2008.  That's got to be

25   what, one-seventh of Mr. Magness' net worth?

1    A.    Yes.  But our -- our dealings I think at that point in

2    time was -- was borrowing, was making the loans on the CDs to

3    be able to get the money to pay down margin calls.

4    Q.    Right.  But my point is or my question is, the safety and

5    the security of something that is now become one-seventh of

6    Mr. Magness' net worth surely was still on your mind.

7    A.    Well, not when they gave us 80 percent.  I mean, when we

8    wanted 80 percent, they gave us 80 percent, and so we were

9    able to get, you know, much of the money out.  That was very

10   reassuring that they had that money to be able to send -- they

11   wired it immediately when -- when we requested it.

12        So we were able to use that money to pay down the other

13   margins or whatever.  So that didn't become our focus anymore,

14   this viability of Stanford.  It was whether or not Gary was

15   going to actually make it through.

16   Q.    Right.

17   A.    I mean, at one point it looked like he was going to go to

18   zero.

19   Q.    But once you -- understanding once you got $88 million

20   out of Stanford International Bank, the risk profile

21   associated with that necessarily reduced dollar for dollar.

22   My question is, before you did that, surely that continued to

23   be a focus of the Magness group, is this a safe place for our

24   money?

25   A.    Well, I think that we got the money out at this period in

1    time, the $80 million, the 80-odd million.

2    Q.   Prior to getting it out, my question is, did it continue

3    to be a concern, the safety and security of the Stanford

4    International Bank investment, in which you had $100 million?

5    A.   Well, it was a concern up until the point where he got

6    the money out, but they always had assured him that he would

7    be able to get his money out, that that was never going to be

8    an issue if he wanted it, and he really felt it was important

9    to have that interest rate in place.

10        So he wasn't interested in getting rid of the Stanford

11   CDs because he wanted to preserve the interest rate so that he

12   could continue having that investment, you know,

13   income-generating investment.  So he wanted -- so when he

14   borrowed against the CDs, he paid interest on the money that

15   he borrowed against the CDs, and he continued to earn interest

16   on the CDs.

17        So that money that he borrowed was at, you know, kind of

18   the same rate that he was borrowing from other places.  It was

19   just kind of moving the money around between who needed it the

20   most.

21   Q.   But when he got it out of the bank in Antigua -- well,

22   let me -- let me come back to that.

23        In October 1st 2008, there was an investment committee

24   meeting again of the Mango Five Family, yes?  Can you please

25   take a look at Plaintiff's Exhibit 73?

1          Is Plaintiff's Exhibit 73 the October 1st, 2008 minutes

2     of the investment committee of Mango Five Family?

3     A.    Yes.

4     Q.    Now, at -- at point No. 6, it says, "Report on Stanford

5     Certificates of Deposit," and it says, "GMIT continues to hold

6     the Stanford certificates of deposit, and there have been no

7     redemptions of certificates of deposit during the reporting

8     period."  Do you see that?

9     A.    Yes.

10    Q.    And it doesn't say anything else about the certificates

11    of deposit in these minutes.  Right?

12    A.    Correct.  That's because there were way more pressing

13    issues to be talked about at that point in time.  In here we

14    were talking about seeing if we could sell the water rights,

15    for example.  So it was really trying to figure out how to

16    come up with -- with money.

17    Q.    Let me show you Plaintiff's Exhibit 164.  This is an

18    email exchange between you and Ray Sutton on October 2nd,

19    2008.  I'm assuming most of it is blocked out because Mr.

20    Sutton is an attorney, but I want to ask you about the part

21    that's not blacked out.

22         In your email to Mr. Sutton, on the morning of Thursday

23    October 2nd, you said, "Gary was pleased with the meeting yet

24    and so was I.  I was especially relieved that he agreed to at

25    least take out the interest accrual portion of the SIB notes

 1    when they mature.  I've been hammering on that point and it

 2    seems it finally hit home."

 3         Now, that was discussed in one of the meetings with the

 4    Mango Five Family the day before?

 5    A.   Well, I talked to him about it all the time, that he was

 6    letting the interest ride.  So he was just accruing the

 7    interest and not receiving the interest.  So he really was not

 8    making the -- the arbitrage, you know, the difference between

 9    the loan pay -- the pay-down of the margin loans that he

10    borrowed the money against and the money that he was receiving

11    from Stanford, because he wasn't taking it out.

12         And so I -- I said the only way that this even makes

13    sense is if you realize that income so that you can use it and

14    take it out and, you know, get out what interest has already

15    accrued to date so we can pay down certain lines of credit and

16    then continue taking it out as time went on.

17    Q.   But my question is, was the decision to take out the

18    interest accrual portion, was that discussed during the

19    meeting, or was it a conversation that took place outside the

20    meeting?

21    A.   Both.

22    Q.   So it was discussed in the meeting?

23    A.   I think.  I'm not sure, but it could have not been

24    discussed in the meeting.

25    Q.   And I take it it was a -- it was a -- excuse me -- it was

1   of significance to you because you say you were especially

2   relieved about it.  My question is, why wasn't it in the

3   meeting minutes?

4   A.   Because many of the meeting -- much of the meeting took

5   place in the bar after the meeting, so we would then sit down

6   and talk about what transpired or whatever, and -- and it

7   would just be like Gary and Ray and I or whoever, you know.

8   And then we -- Gary would have had time to think about what it

9   was that he said or whatever, and then he would agree to

10  proposals later or at breakfast the next morning.  So these

11  things would happen not necessarily during the scope of the

12  meeting, but there was a lot of things that were decided after

13  the  meeting.

14  Q.   So -- but this one was discussed during the meeting, and

15  it was decided after the meeting is what I hear you saying.

16  Is that right?

17  A.   I don't remember.

18  Q.   And so just to take your example --

19  A.   It could have happened on the -- on his airplane on the

20  way back.

21  Q.   Okay.  So the meeting could have taken place on the 1st,

22  you adjourn the meeting, and then there's a follow-up

23  discussion among some group or subgroup during which it's

24  decided, for example, that he would take out of the interest

25  part of the Stanford CD.  Right?

85

1    A.    Yes.  At this time he had huge, huge expenses other than

2    the margin debt.  He was making a movie that had -- and

3    Fortrust had a lot of capital requirements, so there was a lot

4    of money going out, and I was really concerned about what it

5    was that we were going to do about that.

6    Q.    And what --

7    A.    And once I threatened to open the plane doors and, you

8    know, jump if he didn't do something or other -- I can get

9    rather dramatic.

10   Q.    So in October -- if you will turn to page -- I'm sorry,

11   Plaintiff's Exhibit 80, please.  Do you have one?

12   A.    Yes.

13   Q.    So on the 10th, as reflected in Plaintiff's Exhibit 80,

14   Mr. Magness took out a $25 million loan from Stanford

15   International Bank.  Right?

16   A.    Yes.

17   Q.    And he assigned certain -- or he assigned the deposits of

18   the Trust to get that loan from Stanford.  Right?

19   A.    I don't know.  This one was always really confusing

20   because he signed one as himself and then he signed as the

21   Trust, so this was cleared up later in the subsequent loans

22   that were taken out.  This one was just kind of a general one.

23   We needed the money desperately that very day, and so they

24   said, okay, we'll wire you the money; sign this; we'll fix it

25   later.

```
 1   Q.   Ms. Dokken, I've handed you Plaintiff's Exhibit 166,

 2   which is an email from you to Beverly Jacobs.  Do you see

 3   that?

 4   A.   Yes.

 5   Q.   And Beverly Jacobs is an employee at Stanford

 6   International Bank.  Is that your understanding?

 7   A.   Yes.

 8   Q.   And you're telling Ms. Jacobs that the proceeds of the

 9   loan that you-all were from Stanford International Bank will

10   be used to pay down a loan at U.S. Bank.  Did I read that

11   correctly?

12   A.   Correct.

13   Q.   And then U.S. Bank is going to release some collateral

14   which you-all will sell the underlying stock and use the

15   proceeds to repay Stanford's loan.  Is that right?

16   A.   Yes.  That was the plan.  It didn't work that way.

17   Q.   And why didn't it work that way?

18   A.   Because the markets kept going down.  So we broke the $10

19   floor at U.S. Bank, and we had to pay off the margin there to

20   be able to get them to release all of the collateral, which

21   was double, you know.  So then we had to -- rather than being

22   able to do something with that collateral, we had to send it

23   to other banks, and then they eventually sold it --

24   Q.   Excuse me.

25   A.   -- much of it in the ensuing days after this.  So every
```

1   day after this just got worse and worse.

2   Q.   Did you literally break the $10 floor that day on Friday,

3   October 10th?

4   A.   If it wasn't that day, it was -- I mean, yes, it was.

5   That was the desperation day.  It was LINTA.  LINTA went below

6   $10.  You could look up whenever that happened, but it was

7   right around here.

8   Q.   And, ultimately, rather than repaying Stanford

9   International Bank --

10  A.   We needed more money from them.

11  Q.   -- you used the accumulated interest within Stanford to

12  repay that first loan.  Correct?

13  A.   And we had to wire them $759,000, which was very hard to

14  come by.

15  Q.   And if you look at Plaintiff's Exhibit 81, the

16  transaction, this -- Plaintiff's Exhibit 81 reflects the

17  transactions where the interest from other accounts were used

18  to repay all but $700,000 of that loan.  Correct?

19  A.   Yes.

20  Q.   And that happened on October 14th, which I gather is

21  Tuesday following your email.  Correct?

22  A.   Yes.

23  Q.   And then if you look at Plaintiff's 84, 85, and 86, these

24  reflect three additional loans beyond the 25, for a total of

25  63.2.  Correct?

1   A.   Yes.

2   Q.   So 63.2, plus the original 25, is 88.2.  And that all

3   came out of Stanford International Bank in October of 2008.

4   A.   Correct.

5   Q.   All right.  So I'm handing you Plaintiff's Exhibit 171.

6   And this is an email exchange between you and Pamela McGowan

7   at Stanford.  Right?

8   A.   Yes.

9   Q.   And your email to Ms. McGowan starts on the bottom of the

10   page, and on October 23rd, you say to Ms. McGowan, "I'm

11   plotting how best to spend the $44 million that's coming in

12   tomorrow.  It looks like the Gary account might be close to a

13   margin call.  Can you give me specifics on Gary and GMAG when

14   you get a chance?"

15        Is that right?

16   A.   Yes.

17   Q.   "Also I'm planning to send $2 million to pay down Magness

18   Securities."  And then she gives you -- she responds with some

19   information about positions in an account.  Right?

20   A.   Yes.

21   Q.   And those are at Pershing?

22   A.   Yes.

23   Q.   Okay.  All right.  If you could look back in the

24   notebook, please, at Plaintiff's Exhibit 88.  You'll see a

25   Merrill Lynch report for a GMAG nonpurpose loan account.  Do

1  you recognize that?

2  A.   Yes.

3  Q.   And it reflects that there is a net cash flow in this

4  period of $12 million.  That is the period ending October

5  31st, 2008.  And if you'll turn to page 5 of the exhibit, that

6  comes in the form of a wire transfer in.  Do you see that?

7  A.   Yes.

8  Q.   And then on page 5 also we see the purchase of a money

9  fund, a Merrill Lynch government fund, for $12 million on

10 October 24th.  Am I reading that right?

11 A.   Yes.

12 Q.   Okay.  So the GMAG loan that came out, as reflected in

13 Plaintiff's Exhibit 85, of $12 million, was that intended to

14 be used to purchase a Merrill Lynch government fund?

15 A.   Well, it was just parking the cash there basically, so

16 that's what we did was we put the cash there awaiting further

17 margin calls so we would know where it is that we should

18 transfer it to.

19 Q.   So at that particular time he did not have a margin call

20 associated with this $12 million that was pending.

21 A.   No, not with that particular $12 million.  This was a

22 separate account altogether.

23 Q.   And why did you put it in the government fund as opposed

24 to a money market or something else?

25 A.   Because it was the most "cash-in-able."  It could be

1    wired out instantly.

2    Q.   You're saying this particular government fund did not

3    require a hold period of --

4    A.   Yes.

5    Q.   -- any time.

6    A.   Any time.

7    Q.   So it was --

8    A.   So it was basically put here to be able to use to pay

9    margin calls in other -- other places.

10   Q.   And who brought this particular opportunity to your

11   attention?

12   A.   It wasn't an opportunity.  It was just a place to put

13   money temporarily.

14   Q.   Well, I understand.  But, I mean, who suggested Merrill

15   Lynch -- this particular Merrill Lynch government fund as

16   opposed to anything else in the world?

17   A.   They were then -- at that point in time, Merrill Lynch

18   was cooperating with us, and no one else was.  HSBC was

19   selling us out.  Our relationship with U.S. Bank had

20   terminated completely, I think, by that point in time.  But

21   Merrill went above and beyond to try to lower the floor and

22   extend as much as they possibly could, so we wanted to park

23   the funds there while we figured out what to do with them.

24   Q.   And the person you worked with at Merrill was Ryan Bell.

25   Correct?

```
 1   A.   Yes.

 2   Q.   Plaintiff's Exhibit 90, could you please take a look at

 3   that.  It should be in your notebook.  Is Plaintiff's Exhibit

 4   90 a document you created?

 5   A.   Yes.

 6   Q.   And the name of the file that's is running along the

 7   right side of the page, that reflects this is coming from the

 8   P drive of the Magness Investment Group?

 9   A.   Yes.

10   Q.   And you -- I take it what you're doing here is analyzing

11   where the proceeds came from that were used to pay down margin

12   loans during October 2008.  Is that right?

13   A.   Well, it wasn't even that.  It was what the margin loans

14   were at the beginning of the month, what we were able to use

15   to pay down some of them, and where the margin still was at

16   the end of the month.

17   Q.   Right.  And so on -- what's reflected here is as of the

18   10th, $81 million is being used to pay down margin from

19   Stanford International Bank, and as of the end of the month 77

20   million is coming from the sale of securities.  Correct?

21   A.   Yes.

22   Q.   So it was roughly 50/50.

23   A.   Yes.  These were forced sales.

24   Q.   In other words, the bank took it?  Yes?

25   A.   Yes.  The bank initiated it and the bank took it.  Banks.
```

92

 1    Q.    All right.  And please take a look at Plaintiff's Exhibit

 2    92.  Plaintiff's Exhibit 92 is a meeting of the

 3    investment -- minutes of a meeting of the investment committee

 4    of the Mango Five Family on December 5th, 2008.  Correct?

 5    A.    Correct.

 6    Q.    Now, on page 2 of the exhibit, the first page of the

 7    minutes, there's a report on the Stanford certificates of

 8    deposit.  Yes?

 9    A.    Yes.

10    Q.    And it says, "Mr. Espy reported that he had approached

11    Stanford International Bank after the October 1st meeting

12    regarding the redemption of Mr. Magness and GMIT certificates

13    of deposit and that redemption would not be possible at this

14    time."  Is that right?

15    A.    Yes.

16    Q.    And was that the discussion at the meeting on December

17    5th?

18    A.    Correct.

19    Q.    And then it says, "Mr. Magness inquired how his risk

20    could be reduced to the exposure of these certificates of

21    deposit."  Do you recall that discussion?

22    A.    Yes.  This was shortly after the -- the Madoff disaster

23    happened.

24    Q.    Well, Mr. Madoff was arrested on December 11th, 2008, was

25    he not?

```
 1    A.    Oh.  Well, it was at the bleakest of times, and we no

 2    longer had faith in anything, and Mr. Magness was finally

 3    thinking that he wanted to get out of it.

 4    Q.    Of course, it reflects that "Mr. Espy approached Stanford

 5    International Bank after the October 1st meeting and was told

 6    he could not get out of the CDs at that time."  That's what

 7    the minutes say.

 8    A.    Yes, but that he could take loans against them.

 9    Q.    Right.  And, in fact, Mr. Espy responded to the comment

10    about risk by saying that money was borrowed against the

11    bank -- or from the bank against the certificates of deposit

12    up to the amount you described, the 80 percent.  Right?

13    A.    Yes.

14    Q.    Okay.  And you recall that discussion happening at the

15    meeting on December 5th.

16    A.    Yes.  And we were all reassured by the fact we were able

17    to get out that 80 percent, but Gary was still in a very bad

18    financial position and really needed the rest of the money

19    still.

20    Q.    Okay.  And then on Plaintiff's Exhibit 98, if you could

21    please turn to that, there is a letter signed by Steve Knudson

22    to Mr. Juan Rodriguez-Tolentino, asking certain pointed

23    questions about this SIBL portfolio.  Correct?

24    A.    Correct.  So this is the post-Madoff time frame now, and

25    everybody's very concerned about what's happening.
```

1  Q.   And I gather a couple of weeks after this letter on

2  January 13th, 2009, there was a conference call involving Mr.

3  Juan Rodriguez-Tolentino and Ms. Pendergest?

4  A.   Correct.  And, coincidentally, they said the same exact

5  things that they had always said.

6  Q.   The things they had said at the first meeting and at the

7  subsequent following meetings?

8  A.   Yes.  And we hung up the phone and said, you know, this

9  is crazy.

10  Q.   Please take a look at Plaintiff's Exhibit 106.  This is

11  an email from you to Steve Knudson, dated February 12th, 2009,

12  and you say to Mr. -- Well, it's addressed to Gary and Steve.

13  Was Gary BCCed or did he just get left off of this one or do

14  you know?

15  A.   Well, I don't know.

16  Q.   Okay.  And it says, "Stanford has hit the major

17  publications now.  These are articles from Bloomberg and

18  BusinessWeek about the SEC investigation and potential Ponzi

19  scheme."

20  A.   And I believe by this time, we'd asked them for the rest

21  of our money and they said no --

22  Q.   Okay.

23  A.   -- officially.

24  Q.   Where did you come up with the use of the term "Ponzi

25  scheme" in the context of Stanford as of February 12th, 2009?

1    A.    It was probably in these articles, I would think, which

2    were probably forwarded to me from someone.

3    Q.    Plaintiff's Exhibit 107, I'll just tell you, is -- well,

4    let's see.  107 and Plaintiff's 108, these are two articles

5    that were in the production from the Magness side to our side

6    in this case.  Are these the articles that you recall seeing

7    and then forwarding to Mr. Knudson?

8    A.    Yes, I imagine so.

9    Q.    Are you aware at this time it would be another five days

10   before the SEC's lawsuit against Mr. Stanford was filed?

11   A.    I don't know what the actual timeline was.  I just know

12   it was around this time.

13   Q.    When was the first time anybody within the Magness

14   organization referred to Stanford as a possible Ponzi scheme?

15   A.    Oh, certainly not until 2009.

16   Q.    But before the SEC filed its lawsuit obviously.  Yes?

17   A.    Well, I don't know that we ever actually did, but other

18   people, other advisors, were saying, you know, Madoff was a

19   Ponzi scheme, could Stanford be a Ponzi scheme?  That was

20   really the first time Ponzi ever came into our lexicon.

21   Q.    And it came into your lexicon before the SEC filed its

22   lawsuit.

23   A.    Right, because we tried to get the money out, I believe,

24   in January.

25   Q.    Plaintiff's Exhibit 109, will you please take a look at

1    that?  This is an email exchange.  The top email is an email

2    from you to Mr. Espy on February 12th, 2009.  Correct?

3    A.    Uh-huh.

4    Q.    Is that yes?

5    A.    Yes.

6    Q.    And you're forwarding an email from Ryan Bell, dated

7    February 12th, 2009, in the afternoon.  Is that right?

8    A.    Correct.

9    Q.    Mr. Bell says, "Just got to Mexico and my hotel, but saw

10    this email and wanted to forward.  I think we all had this

11    fear unfortunately.  I hope it wasn't a Ponzi scheme and

12    hopefully the money is somewhere."

13         Did you ever discuss with Mr. Bell that Stanford

14    might have been a Ponzi scheme prior to February 12th, 2009?

15    A.    No.

16    Q.    Did you ever discuss with Mr. Bell prior to February

17    12th, 2009, that Stanford might be too good to be true?

18    A.    Oh, certainly when they wouldn't give us our money back.

19    But he was very involved in the loan process or whatever

20    because he was the recipient of a lot of the proceeds.

21    Q.    But Mr. Bell, going all the way back to 2004 and 2005,

22    was trying to convince you and others within the Magness Group

23    that you should have your money with him and not with

24    Stanford.  Right?

25    A.    Well, that's the role of every broker, though.  It wasn't

97

```
 1   Stanford specific.  It was do business with me specific.

 2   Q.   Right.  But if he had concerns and legitimate arguments

 3   why you should be out of Stanford, I'm sure he would have

 4   shared those with you because he was trying to get your money.

 5   A.   Correct.

 6   Q.   Okay.

 7   A.   But there were no smoking guns per se that, you

 8   know -- he sent me these articles during this time frame when

 9   it was all kind of people found out about it in Venezuela

10   first, it seemed like.  They were trying to get their money

11   out and they couldn't, so he would send me articles about what

12   was happening in Venezuela --

13   Q.   Right.

14   A.   -- in those countries.

15   Q.   But the people -- so people like Mr. Bell and Ms. Penn

16   and the Erics at U.S. Bank, they all had every incentive to

17   share with you at the Magness organization bad news about

18   Stanford because that would mean you would be more likely to

19   move away from Stanford and towards them?

20   A.   Yes.

21   Q.   Their financial incentives were aligned with moving away

22   from Stanford?

23   A.   Correct, but they never had any documentation or anything

24   that ever said anything, and they, you know, only suggested,

25   you know, once or something that we go with them and they
```

```
 1    would do something for us.  It wasn't persistent.  It wasn't
 2    ongoing.  We didn't have ongoing conversations about it.
 3         The ongoing conversations, especially at this point in
 4    time, was, you know, how much stock is left, how much debt is
 5    left, what, you know -- and we left U.S. bank entirely at that
 6    time because they were -- they wouldn't help us out whatsoever
 7    in any capacity.
 8    Q.   Ms. Dokken, I'd like to start with a little bit of
 9    background information.  In terms of today's event, you and I
10    have talked some on a number of occasions about the -- the
11    scheduling and the location of today's event, have we not?
12    A.   Yes.
13    Q.   Have we talked about the substance of any of your
14    testimony at any point in time since you left your employ at
15    Magness Investment Group?
16    A.   No.
17    Q.   I thought we'd skip that because you said I can't ask
18    about your birthday.
19         I'd like to go back and talk to you some about your
20    purchase of the CD.
21    A.   Yes.
22    Q.   And I -- I believe you told Mr. Powers that you purchased
23    that shortly after the presentation that you referred to as a
24    dog-and-pony show.
25    A.   Yes.
```

1  Q.   And at the point in time you made that investment, was

2  $100,000 -- that was the amount you invested.   Right?

3  A.   Yes.

4  Q.   Was that a significant amount of money to you?

5  A.   Yes.

6  Q.   Did you have any inkling that you were somehow putting

7  your hundred thousand dollars into an investment that was a

8  fraudulent scheme?

9  A.   None whatsoever.

10  Q.   At the point in time you made that investment, you -- I

11  believe you told Mr. Powers that one of the reasons you did so

12  was because there was a good interest rate.

13  A.   Correct.

14  Q.   Was that interest rate one you looked at, you thought,

15  gee whiz, this rate has to be too good to be true?

16  A.   No.

17  Q.   In the, what you referred to as the dog-and-pony show,

18  was there any discussion of the specifics of the investments

19  that Stanford was making that was any more than the sort of

20  pie chart presentations that you discussed with Mr. Powers?

21  A.   No, but they were more verbose about it.   They, you know,

22  were able to put together a very exciting presentation about

23  how the risk was covered through all of these different

24  things.

25  Q.   And what did they -- if you recall, what did they tell

1    you about how the risk was covered through these things?

2    A.    Oh, the noncorrelation to the market, that they were in

3    all of these different things, that if one went up, the other

4    would -- you know, wouldn't necessarily go up.  If one went

5    down, the other wouldn't necessarily go down.  And because

6    they had these specific money managers in all of these areas,

7    that they were -- you know, had the pulse of the market and

8    that sort of thing.  So it was a very believable, dynamic

9    presentation.

10   Q.    Did they tell you who these various money managers were?

11   A.    No.

12   Q.    Did you ask?

13   A.    We asked if we could know, and they said that that was

14   part of their strategy; you know, that they, you know, were

15   sort of proprietary secrets or whatever.

16   Q.    Did that alarm you at all when they said that this part

17   of our strategy, part of our proprietary secrets?

18   A.    No, because it's that way with a lot of investments.

19   Q.    During the, again, what you've referred to as the

20   dog-and-pony show, was there any discussion at that point in

21   time about what sort of regulatory environment the Stanford

22   International Bank did or did not operate under?

23   A.    Well, we knew that it was regularly audited and regulated

24   by the banking authorities, so there was regulation to some

25   degree that they discussed.

1    Q.   Did they talk about who was doing those regular audits

2    during the dog-and-pony show, once again?

3    A.   I don't know that they mentioned a specific company; just

4    that there was, you know, a recognized auditor.

5    Q.   What do you mean a recognized auditor?

6    A.   Well, certified, I guess is what I'm, you know, looking

7    for.

8    Q.   At some point in time, did you learn who the auditor was

9    for the Stanford International Bank?

10   A.   Yes, but I'm not sure that I learned that before or after

11   the demise.

12   Q.   Do you remember the context in which you learned that?

13   It might help us put a time frame on it.

14   A.   Well, there were audited financials that came through as

15   part of the reports or whatever, and the name of the auditing

16   company may have been on those.

17   Q.   Did -- when you -- did you look at the audited financials

18   that would come through on some of the reports?

19   A.   Yes.

20   Q.   Did you ever -- did the identity of the auditor, if it

21   was contained in those reports, ever cause you any concerns

22   about the money that you'd invested?

23   A.   No.

24   Q.   Are you aware of anyone else in the group of Magness

25   investment committee, either members or advisors, who ever

1    expressed any concern about the auditor who was working on the

2    Stanford International Bank?

3    A.    No.

4    Q.    Was there -- again, back to the dog-and-pony show since

5    that's the basis for your personal investment, at that point

6    in time was there any discussion of this concept of a Swiss

7    bank model?

8    A.    No.

9    Q.    Was there any discussion at that point in time of whether

10   the Stanford International Bank engaged in commercial lending

11   of any sort?

12   A.    I don't recall that being part of the conversation.

13   Q.    In the dog-and-pony show, was there any discussion that

14   compared the proposed rates that Stanford was talking about

15   during that presentation and rates from U.S. financial

16   institutions?

17   A.    Yes.

18   Q.    Was there any discussion of how it was that Stanford

19   could offer the higher rate?

20   A.    Because of their brilliant money managers, that they did

21   things differently, that they were able to get higher yields

22   on their investments.

23   Q.    Now, you in explaining your background to Mr. Powers told

24   us that essentially you were working for Mr. Magness for well

25   over two decades.  Did I do the arithmetic right there?

1   A.    Yes.

2   Q.    And over that period of time, did you find that because

3   of the large sums of money that he had to deposit or to

4   invest, that he would get better terms than say, for example,

5   someone like you or me with significantly lower amounts of

6   money would have?

7   A.    Oh, absolutely.  He got better terms on everything.  He

8   paid lower interest rates than mankind in general, made more

9   money on his investments.  He got a lot of preferential

10  treatment because he was a billionaire.

11  Q.    And in your at least two decades of experience with Mr.

12  Magness, did he generally try and adhere to those two

13  principles from his father?

14  A.    Absolutely.

15  Q.    There was some discussion in the minutes that you looked

16  at with Mr. Powers about Mr. Espy preparing an asset

17  allocation model.  Do you remember saying that?

18  A.    Correct.

19  Q.    Did he ever present one?

20  A.    Well, not what I would consider to be an appropriate

21  asset allocation model.  It was probably drawn on paper as

22  opposed to on Excel or something.

23  Q.    Why don't we start then, I'll ask you, what would you

24  consider an appropriate -- in that time frame obviously, not

25  today, but when you were an advisor to the investment

1    committee participating in these meetings, what would you have

2    considered an appropriate asset allocation model?

3    A.   Well, it would have had charts and graphs and, you know,

4    pie charts probably or whatever of what the appropriate -- or

5    what the accepted asset allocation was or what the recommended

6    asset allocation was between cash and stocks and bonds and

7    other sorts of things.  And his didn't include that much

8    detail.

9    Q.   And did anyone follow up with him to say, Mr. Espy, what

10   you've presented is not fulsome or a complete asset allocation

11   model or something to that effect?

12   A.   Well, I'm certain that someone other than me said

13   something about it, but it's important to recognize the fact

14   that Gary is the head of the investment committee solely.

15   He's the one who makes all of the decisions, and Tom was a

16   very good friend of his.  So it was unwise to disparage Tom in

17   front of Gary without -- and you could do it in a certain way,

18   but then Gary would just get -- would just tune it out and

19   wouldn't listen to you anymore.  So you had to be very careful

20   to pick your battles.

21   Q.   Was there -- in the course of the review of the very

22   investments that were involved in Mr. Magness' portfolio, was

23   there ever any discussion of the amounts of compensation that

24   was being paid to Mr. Espy for handling some of Mr. Magness'

25   investments?

1    A.   He was paid on commission through Stanford, and I did an

2    analysis at one point of how much it was that he was making in

3    commissions on Gary's account from the brokerage

4    statement -- you know, the confirms, shows what the commission

5    is that -- that's being paid.

6        And so I did an analysis of that, because Tom was the one

7    who was trading in GMAG, for example, all of those little

8    stocks and -- and doing a lot of -- a lot of trading on those

9    little stocks.  And so I showed Gary how much Tom was making

10    on that part alone.

11    Q.   On the GMAG part alone?

12    A.   No, on the commission part, just how much he was making

13    overall on commissions, which was hundreds of thousands of

14    dollars.

15    Q.   Mr. Powers asked you a series of questions at varying

16    intervals in time about whether you knew anything about a -- I

17    think he referred to it as a referral fee that was paid to Mr.

18    Espy?

19    A.   Correct.

20    Q.   Do you remember that?

21    A.   Yes.

22    Q.   Was there any paperwork that you're aware of, whether it

23    was aware at the time or after the trouble began with the

24    Receivership, that showed any sort of referral fee to Mr.

25    Magness that he was paying to Mr. Espy for the CDs?

1  A.  No.  The only way we found out about it was reading a

2  pleading that said that the brokers had been paid, or that the

3  Receiver was coming after the brokers for this amount of money

4  for one of them and this amount of money for the other for the

5  referral fees that they were paid, and that was when we saw

6  what Tom Espy had made.

7  Q.  As you were going through the various minutes with Mr.

8  Powers, and I'm going to give you -- ask you to look at two of

9  them just to use as sort of placeholders, so if I could first

10 get you to look at the March 6th set of investment committee

11 minutes marked as Exhibit 62.  And actually exhibit -- when

12 you look at Exhibit 62, you'll see there is an agenda which is

13 the first page.

14 A.  Yes.

15 Q.  And then you have three pages that are actually the

16 minutes.

17 A.  Yes.

18 Q.  And then, if you would, do you see that the minutes are

19 signed and do you recognize the signature of the person

20 signing them?

21 A.  Yes.  Ray Sutton.

22 Q.  And do you see that they're dated?

23 A.  Correct.

24 Q.  And what is that date?

25 A.  10/1/08.

1    Q.    And was there a practice that you-all followed in terms

2    of having the secretary -- by you-all, I mean the persons who

3    were attending these investment committee meetings -- was

4    there a practice you-all followed in terms of when Mr. Sutton

5    as secretary would sign and date the minutes?

6    A.    Yes.  At the next meeting.

7    Q.    And so does this tell us that there was not a meeting in

8    between March 6th of 2008 and October 1st of 2008?

9    A.    Correct.

10   Q.    Do you know why that was?

11   A.    I would imagine because there was so much going on during

12   that period of time, that there wasn't time to have a meeting.

13   Q.    And by "so much going on," what do you mean?

14   A.    Well, 2008 was the year of the big market crash, sort of

15   ongoing.  And there was a lot that was happening every single

16   day, a lot of decisions to be made.  I would talk to Gary for

17   hours on the phone about what we should do about whatever, not

18   relating to anything that was specific to the board, just the

19   stock.

20   Q.    Were the various margin call transactions things that

21   required the specific involvement of the board or the

22   investment committee?

23   A.    No.  It only involved Gary.

24   Q.    And when did the situation where the margin calls started

25   to mount and there became an issue with having sufficient

1  funds to address them, when did that first really start coming

2  up?

3  A.   I would say probably in the middle of 2008, but certainly

4  as it got into the fall, that was when the crisis was -- was

5  worse.

6  Q.   And can you -- when you say in the fall, can you

7  attribute a month or a --

8  A.   Well, October was a huge disaster, but so was September,

9  and everybody thought the markets were going to continue to

10  correct, but they just continued going down instead of ever

11  really making a correction and going the other way.

12  Q.   Ms. Dokken, Mr. Powers has graciously handed you a

13  document marked as Exhibit D1.

14  A.   Yes.

15  Q.   And you had talked to him about the time frame on which

16  the LINTA stock had declined in value.  Do you remember

17  discussing that with him generally?

18  A.   Yes.

19  Q.   And this particular document refers to Liberty Media

20  Interactive in the upper left-hand corner.  Do you see that?

21  A.   Yes.

22  Q.   And that's the stock you referenced by the acronym LINTA.

23  Right?

24  A.   Yes.

25  Q.   And do you see there that that shows that between

1    September and November of 2008, the price of that stock went

2    from somewhere around $14 a share down to about $2 a share?

3    A.    Yes.  I remember it well.

4    Q.    And is this part of the economic events that were putting

5    the pressure on Mr. Magness and his margin situation in the

6    September-October time frame of 2008?

7    A.    Correct.

8    Q.    In the -- that same time frame, you -- Mr. Powers showed

9    you a document--let me get the number for you--which

10   was Deposition Exhibit 90, 9-0.  Could you find that again for

11   me, please?

12   A.    Yes.

13   Q.    And you described for him what this meant, and I'm not

14   going to reinvent that wheel.  But on this document is it

15   correct that it shows Mr. Magness being able to reduce his

16   debt over this month-long period for the month ending October

17   31st of 2008 from -- and I'm going to use round numbers --

18   roughly 309 million to roughly 151 million?

19   A.    Correct.

20   Q.    And did Mr. Magness have the assets on hand in his stock

21   portfolio to reduce that 151, roughly, million dollar debt any

22   further in that time frame?

23   A.    Well, just if you look at this, if LINTA's $2, he's not

24   making much if he sells his entire holdings in LINTA because

25   the stock price -- all of the stock prices were so depressed

1    at that point in time.

2    Q.   And does he still have the zero basis issue that you

3    discussed with Mr. Powers on at least the GMIT stock?

4    A.   Correct.  So everything that he was selling here as this

5    was going down, he was having to pay capital gains on that as

6    well.

7    Q.   Mr. Powers asked you some questions about a -- some $12

8    million that got placed into that government fund account at

9    Merrill Lynch.  Do you remember that?

10   A.   Yes.

11   Q.   What happened to that money going forward in time after

12   October?

13   A.   Well, it was -- it was the money that was used for

14   continuing operations.  So we wanted there to be cash

15   regardless of what was happening outside of -- of just that

16   one account for capital calls.  He was still doing this movie

17   and he had capital calls and he had ongoing capital call

18   obligations in some of these other things that he was involved

19   in, plus just being able to pay all the salaries of the ranch

20   people and the data center people and everybody else.  This

21   was the money that was the -- the money that was going to be

22   able to get him through no matter what else happened

23   for -- until the end of the year basically.

24   Q.   Okay.  And let's -- let's walk through the transactions

25   in October, if I may.  You discussed with Mr. Powers the first

1    transaction, which was a $25 million loan.

2    A.    Yes.

3    Q.    And what was the reason for taking out that loan?

4    A.    That was approximately the amount of accrued interest

5    that we had in all of the accounts, and so we thought at that

6    point in time if we were able to pay down what we owed to U.S.

7    Bank, we could get our stock out of U.S. Bank and put it

8    somewhere else that had less than a $10 floor, and that would

9    take care of our whole situation.  But as you can see from

10   that perspective, October 1st is kind of in the middle of this

11   cliff.

12   Q.    And you're referring to D1 when you talk about the cliff?

13   A.    Yes.

14   Q.    And in the context of that $25 million, what was the debt

15   you were looking to take care of at U.S. Bank?

16   A.    Lines of credit.

17   Q.    What was the outstanding balance on those lines of

18   credit?

19   A.    I could probably intuit that from one of the things he

20   showed me once, maybe this first one.  What's the date of

21   this?

22   Q.    I think that's September, is it not?

23   A.    September 2008.  Let's just see what we have here.  Well,

24   there's $67 million owed to U.S. Bank as of September 30th,

25   2008.

```
 1    Q.    Okay.  And from September 30 of 2008 until you were all

 2    able to arrange that loan on October 10th, do you know what

 3    happened to the loan balance at U.S. Bank?

 4    A.    Well, we had to pay a significant amount of it off.  If

 5    you look on this, for example, LINTA is at 12.76, was $25

 6    million.  It was one of the big positions there, so you can

 7    imagine when that went to 2, that that didn't provide very

 8    much collateral for this $67 million worth of debt.

 9    Q.    So when you referenced 12.76, you are referring to

10    $12.76?

11    A.    A share.

12    Q.    And what is the exhibit you're looking at for that?

13    A.    At the first exhibit that he gave me, 181.

14    Q.    And when you-all received the $25 million from Stanford

15    on that first loan, did you, in fact, pay that money to U.S.

16    Bank?

17    A.    Yes.

18    Q.    When you -- and then in what period of time did you-all

19    realize that the $25 million wasn't enough money, you needed

20    to borrow more?

21    A.    A couple of days probably.  Not very long.

22    Q.    And -- and you described for Mr. Powers the circumstances

23    by which you-all paid back roughly 24.25 million and

24    then -- and had to come up with another 750,000 or so in cash?

25    A.    Yes.
```

1   Q.   Where did you get that 24.25, roughly, million dollars?

2   A.   We borrowed from other places.

3   Q.   What other places did you borrow from?

4   A.   Probably Merrill Lynch.  So the $24 million just offset,

5   that was an offset.  We didn't have to pay that back.  They

6   considered that to be our accrued interest, so they used that

7   as the offset of paying it back, and did an internal

8   bookkeeping kind of thing.  But we owed them $759,000, which

9   was hard to get out of anywhere, $759,000 at that point.

10  Q.   I see.

11  A.   Probably we got it from Merrill Lynch.

12  Q.   So it's only that roughly $750,000 -- I say only in

13  quotations.

14  A.   Yes.

15  Q.   That $750,000 that was actually paid back to Stanford,

16  the rest being just a book transaction against --

17  A.   Correct.

18  Q.   -- interest?

19  A.   Correct.

20  Q.   And then the second loan that was the roughly $63

21  million --

22  A.   Yes.

23  Q.   -- what happened to the proceeds from that loan?

24  A.   Well, they all came -- it all came in, if you look at 91

25  or 90, whichever this is, 90, it came in and it was allocated

1    to the entities and then used to pay down whichever banks of

2    the entities was having the margin calls at that particular

3    time.  Everybody, I think, was at HSBC, and they were -- they

4    were the toughest one to try to deal with.

5    Q.    The -- the number shown here for Stanford proceeds used

6    to pay down margin is $81,363,000.  Right?

7    A.    Yes.

8    Q.    You mentioned in response to one of Mr. Powers' questions

9    earlier today that there was some concern in this general time

10   frame about whether Mr. Magness would make it through the

11   market downturn at all.  Do you remember words to that effect?

12   A.    Yes.

13   Q.    And can you describe for us, please, with a little more

14   detail what exactly you meant by that, how that circumstance

15   came about?

16   A.    Well, just using this graph again as -- as the

17   possibility, if it never made this upturn, it was over for

18   him.

19   Q.    And what do you mean by "over for him"?

20   A.    He wouldn't -- he would have had to continue paying his

21   margins and he wouldn't have had any money left.  He would

22   have had the cattle operation, but it costs $5 million a year

23   to run that operation, for example.  The data center was

24   losing money hand over fist.

25         The movie "Precious" was still being filmed and was way,

```
1    way, way over budget, and they had no choice but to put money

2    into it.  But they, you know, had actually tried to sell it to

3    Oprah Winfrey at one point to be able to get out from under

4    that obligation so that they wouldn't have to put any more

5    money into it for postproduction.

6         So if it would have stayed here, he -- all of his stock

7    would have most likely been gone.  He would have been left

8    with his other assets.  He wouldn't have been able to -- to

9    fund them.

10   Q.   Okay.  At the point in time of these two borrowings, the

11   first on October 10th and the second one roughly October 14th

12   of 2008, did you have -- you personally -- have any

13   understanding that the Stanford International Bank was part of

14   some sort of fraudulent scheme?

15   A.   No.  I was so happy they sent us the money.

16   Q.   Did you have any suspicion that there might be some sort

17   of fraudulent scheme going on --

18   A.   Not at all.

19   Q.   -- at that point in time?

20   A.   No.

21   Q.   Did anyone on the -- who was a member or advisor to the

22   investment committee at that point -- as of that point in

23   time, say a latter date, October 14th of 2008, had ever voiced

24   the thought that the Stanford International Bank might be some

25   sort of fraudulent scheme?
```

```
 1    A.    No.  And I think that October really, really ratified

 2    everybody's belief that it was a secure investment because we

 3    were able to get 80 percent out instantly.  I mean, they

 4    weren't dragging their feet or stalling us or whatever.  They

 5    were processing the requests as soon as we gave them to them.

 6    Q.    Prior to the -- Mr. Madoff's arrest in or on December

 7    11th of 2008, would there have been any discussion in the

 8    context of any Magness investments -- or I should say -- let's

 9    say Mango Five Family, Inc., monitored investments that they

10    might be Ponzi schemes?

11    A.    No.  I don't think anybody ever discussed a Ponzi scheme

12    or said the word "Ponzi" until Madoff.  And Madoff happened

13    and no one necessarily thought that -- that it was a Ponzi

14    scheme at that point in time.  I think that Gary still doesn't

15    believe it was a Ponzi scheme.  I think that he thinks that if

16    Stanford would have been able to continue, it would have

17    pulled out.

18    Q.    Pulled out meaning recovered financially?

19    A.    Yes.

20    Q.    When -- or I should say, after the roughly $63 million

21    loan on October 14th of 2008, did any of the Magness, the

22    three entities you've been talking about all day with Mr.

23    Powers and a little bit with me, did any of those three

24    entities get any more money from Stanford International Bank?

25    A.    No.
```

 1                    MR. PETRIE:  It's just a convenient breaking place,

 2     Your Honor.

 3                    THE COURT:  How much more is left?

 4                    MR. SADLER:  I think it's about ten minutes.

 5                    MR. PETRIE:  I can check for sure, Your Honor.

 6                    THE COURT:  Oh, why don't we go ahead and go to

 7     lunch.

 8                    MR. PETRIE:  Okay.

 9                    THE COURT:  Let's see you-all back at 1:30, please.

10     1:30.

11                    (Whereupon, the jury left the courtroom.)

12                    THE COURT:  And do you know how much is getting

13     charged to the Receiver?

14                    MR. PETRIE:  I have that agreed allocation, Your

15     Honor.

16                    THE COURT:  Okay.

17                    MR. PETRIE:  Would you like me to hand up the little

18     Post-it?

19                    THE COURT:  Or just tell me how much of it.

20                    MR. PETRIE:  Of this, the allocation we calculated

21     from the total, not -- just to this point but to end --

22                    THE COURT:  Right.

23                    MR. PETRIE:  -- would be for the Receiver, 55

24     minutes; for the Magness parties, three hours and 24 minutes.

25                    THE COURT:  Okay.  Anything else?

1          MR. SADLER:  Yes, Judge.  We just have some exhibit

2    housekeeping.  Aside from the rather glaring violations of at

3    least two parts of your orders in limine, we have three

4    exhibits that were shown to the jury that weren't admitted and

5    need to be admitted.  Plaintiff's Exhibit 108 and 109 need to

6    be offered.  And Plaintiff's Exhibit 90, there was an

7    objection that you overruled when you reviewed the deposition.

8    That third exhibit needs to be offered.  So offering 108, 109,

9    and 90.

10          THE COURT:  Okay.  Any objections other than the one

11   that I've already overruled?

12          MR. PETRIE:  That was not our objection, Your Honor.

13   I assumed it was addressed by your ruling, and no objection to

14   the other two.

15          THE COURT:  Okay.  They're admitted.  Anything else?

16          MR. SADLER:  No, Your Honor.

17          MR. PETRIE:  No.  Thank you.

18          THE COURT:  No?  Okay.  We'll see you back at 1:30.

19                    (Lunch recess.)

20          THE COURT:  I understand you-all want to talk about

21   something oh so very briefly.

22          MR. SADLER:  Very briefly, Your Honor.  And Mr.

23   Petrie and I have conferred on this.

24       Just before the break we saw some testimony go by from

25   Ms. Dokken where she was talking about what somebody else knew

```
 1    or thought or believed.

 2         We're going to have live witnesses later this afternoon,

 3    and for limine purposes Mr. Petrie and I have agreed that

 4    before either of us try to elicit testimony from anybody on

 5    the stand about what they think somebody else knew or thought

 6    or believed, we would talk to Your Honor about it first, since

 7    that's probably inadmissible anyway.  But for limine purposes,

 8    I wanted to address that since it went by with Ms. Dokken's

 9    testimony, and that just alerted me that we may have the same

10    issue with live witnesses.

11              THE COURT:  Okay.  All right.  I think we're ready.

12              (Whereupon, the jury entered the courtroom.)

13              THE COURT:  Be seated.

14         How are you-all doing?

15              SEVERAL JURORS:  Good.

16              THE COURT:  Everyone had a nice lunch?

17              SEVERAL JURORS:  Yes.

18              THE COURT:  Good.  Well, I think we're ready to go.

19    We'll go until about 3:00 or 3:10 and take an afternoon break,

20    and then wrap up until 5:00.

21         Are we ready to proceed?

22              MR. PETRIE:  Yes, sir.

23              THE COURT:  All right.

24              VIDEO DEPOSITION OF TONYA DOKKEN, CONTINUED

25    Q.   You mentioned in response to some questions from
```

1    Mr. Powers that there came a time when the investment

2    committee of the Mango Five Family, Inc., or MFFI--I will use

3    the acronym--was looking at all of the investments that it had

4    made, including things like Tontine, and you mentioned that

5    British real estate fund, et cetera.  Do you remember that?

6    A.    Yes, quinlan.

7    Q.    Thank you very much.  And in looking at Quinlan and

8    Tontine, was there ever any discussion of whether those

9    investments were some sort of fraudulent scheme having lost

10   all that money there?

11   A.    I don't think anybody thought it with Tontine because he

12   was very direct right off the bat that he -- you know, all of

13   the rest of his hedge funds had always made money and this was

14   the only one that didn't, and he had invested in real estate

15   and he was stupid and he threw himself on everyone's mercy and

16   said he, you know, deserved to die or something, and so we

17   genuinely felt sorry for him.

18        Quinlan, they were able -- you know, they showed that

19   they owned all the properties, and then they showed all of the

20   bank debt that they had taken out to leverage all of the

21   properties that they bought.  And they were trying to

22   negotiate with the banks to lower the debt to what the value

23   of the buildings currently were, and they weren't wanting to

24   do that, so they were upside down.

25        Gary still is involved in that.  They are trying to sell

```
 1    properties or whatever, but he couldn't get out of it.  They

 2    were coming after him if he didn't continue making the capital

 3    calls that he had committed to.  And we tried to sell that

 4    investment to other investors and they were trying to sell to

 5    us.

 6         So pretty much everybody wanted to be out of that thing

 7    and nobody could be out of it.  So they're just trying to

 8    settle whatever debt they can, sell the properties for

 9    whatever they can sell it for, and be done with it.

10    Q.   Okay.  And the "they" that are trying to settle the

11    obligation --

12    A.   The Quinlan people.

13    Q.   If you could look at the October 1st, '08 investment

14    committee minutes, and they're marked as deposition Exhibit

15    73.  If you'll just let me know when you've retrieved those or

16    found them in your binder.

17    A.   I've got it.

18    Q.   Thank you.  In this set of investment committee minutes

19    that -- where the nuts and bolts of it are essentially the

20    first two pages, setting aside the no further business and

21    signature on the third page, is there any discussion in here

22    that you can point us to that talks about addressing calls

23    from margin borrowings, margin loans?

24    A.   Well, report and diversification of Liberty and

25    affiliates talks about that $10 floor, the covenants in the
```

1  HSBC and U.S. Bank loan docs require liquidation of some

2  stocks if trading prices fell below $10 a share.  So having an

3  actual loan is more onerous than just having a margin debt

4  because of the floor that they would set.

5      You know, they -- the -- if you -- at that point in time

6  I think the floor was $5 a share for just any kind of stock

7  that you bought.  If it fell below $5 a share, it wasn't

8  marginable any longer.  At one point it was $3 a share, so I

9  don't remember exactly where it was.  But their floors were

10  $10 a share.

11  Q.  Okay.

12  A.  Making it harder than to come up with enough collateral

13  if the stock fell below that.

14  Q.  Okay.  And when the stock, as we've seen, the LINTA stock

15  dropping below $10 -- let's pick a nice round number, and say

16  the stock's at 9, so it is under the floor.

17  A.  Yes.

18  Q.  What does that mean in this type of loan structure?

19  A.  Well, it could mean that they could call the entire loan.

20  So if you break a covenant of the loan docs, then the entire

21  loan is at risk and they could call the whole thing.  So if we

22  owed HSBC $200 million, they could make the whole $200 million

23  due in three days.

24  Q.  Does -- is there also a structure in the loan where once

25  you go beneath that floor, the lender has rights against the

1   stock that it holds collateral, even though it's below the

2   floor?

3   A.   Yes.

4   Q.   And in a very sort of 50,000 foot view, what are those

5   types of rights?

6   A.   Well, they can sell it, and they don't have to sell the

7   stock that is the one that triggered the -- the floor problem.

8   So whatever is in the portfolio that they hold, they could

9   sell whatever they want to be able to come up with the number

10  that they need.

11       So if you are particularly certain that not LINTA, a

12  different stock, Comcast, was going to go up, they could just

13  arbitrarily decide to sell Comcast and they don't have to let

14  you know what they're going to sell.  They just sell whatever

15  they feel like.

16  Q.   Sorry.  I didn't mean to interrupt?

17  A.   Okay.

18  Q.   Were your banking transactions structured so that the

19  banks would only be authorized to sell back up until they get

20  to the floor, or can they sell to liquidate the entire loan?

21  A.   Well, they theoretically could have liquidated the entire

22  loan, because when you break a covenant, that makes the entire

23  loan kind of null and void.  So they could have done that.

24  But they worked with us to try to sell in an orderly manner,

25  HSBC did.  They were very good about it.

1   Q.    Did U.S. Bank work with you?

2   A.    No, they did not.

3   Q.    Is there a reference in here in these December 5 minutes

4   marked as Exhibit 92 to paying down those margin loans that

5   you can identify for us?

6   A.    Well, it -- I mean I guess this report on asset

7   allocation, he said at the present time it was impractical to

8   recommend an asset allocation plan until GMIT had paid down

9   its debt.  That the only practical way to prepare an asset

10  allocation model would be would be to diversify the

11  concentration of Liberty and it's affiliates, but given

12  current marking -- market conditions, that wasn't acceptable

13  to Mr. Magness.

14  Q.    Had the market improved by this point in time from what

15  we were talking about in October?

16  A.    Somewhat, but it was still -- I mean, it was at the

17  bottom of the bottom on December 5th if you look here on our

18  LINTA chart.

19  Q.    On D1 again?

20  A.    On D1 again.  So right there, December is this point

21  right here at the end.  So it hadn't really improved, but it

22  had, in a certain sense, stabilized because we had met all of

23  the margin requirements.  So unless something worse was going

24  to happen, we were at least treading water.

25  Q.    And in terms of the transactions that happened in

1    October, so after the October 1st meeting but before December

2    5, is there a reason why they're not discussed on December 5

3    in these investment committee minutes?

4    A.    The margin calls?

5    Q.    Yes.

6    A.    Well, I think they probably were discussed at length

7    through this.

8    Q.    This being one of your Schedule As?

9    A.    This being the schedules, all of the different schedules

10   which then, you know, show whatever.  I think that probably it

11   was just not recorded in the minutes as a -- I mean, we never

12   put in the minutes we discussed Schedule A, B, and C.  You'll

13   never find that in the minutes anywhere, but it was always

14   something that happened.

15   Q.    Okay.  And recognizing, then, that you at every meeting

16   discussed Schedule A, B, and C, would that, then, be the

17   amended C you discussed with Mr. Powers where the additional

18   information you stopped including because it wasn't helpful to

19   folks?

20   A.    We really never talked about the other assets because it

21   just always really was about the stock portfolio.

22   Q.    Okay.

23   A.    The investments.

24   Q.    And the Schedule A that you discussed at every one of the

25   investment committee meetings, was it a Schedule A that

```
 1    covered the entire period from the last meeting?

 2    A.   I would bring the Schedule As of the last meeting.  And,

 3    you know, we did it monthly, so depending on what we wanted to

 4    do, and every once in a while I'd do like a chart or a graph

 5    or whatever that showed where he was, assets versus

 6    liabilities kind of thing.

 7    Q.   Were the Schedule As some sort of hand-out that you

 8    provided to the various members, or the, I should say,

 9    Mr. Armstrong, Mr. Sutton, Mr. Knudson, Mr. Magness for each

10    of the investment committee meetings?

11    A.   Yes.  So I would have an assemblage of all the documents.

12    So if we were doing a document on Fortrust I would have

13    Fortrust financials, and whatever other information it was

14    that I thought was necessary to the meeting all put together

15    and rubber banded together and handed out to everyone.

16    Q.   Going forward, then, to the dog and pony show

17    presentation that preceded your personal investment, was there

18    any discussion in that dog and pony presentation about the

19    bank's willingness to make loans to CD depositors on terms

20    that would be 80 percent loan to value and some interest rate?

21    A.   Yes.  It was two percent, though, instead of this one

22    percent by that point in time.

23    Q.   At that point in time was it your understanding that that

24    was available to you on your $100,000 CD, if you wanted to go

25    that route?
```

```
 1   A.   I don't know that I ever felt it was available to me.  It

 2   was available to Gary, and on his $100 million, but my

 3   $100,000 paled in comparison.

 4   Q.   And did you know it was available to Gary prior to the

 5   October '08 time frame when he actually borrowed money using

 6   the CDs as collateral?

 7   A.   Yes.

 8   Q.   And how did you know that?

 9   A.   Well, we talked about it, Tom talked about it, about how

10   that was an option.  Tom obviously wanted that to happen more

11   so than Gary cashing out of the CDs when he really needed the

12   money.  He wanted Gary to take the loans rather than cash out.

13   Q.   And did Mr. Espy give you-all any reason why Mr. Magness

14   should take the loans versus just cashing out and getting 100

15   percent?

16   A.   To preserve the great interest rate that he was making,

17   because when this all settled out he would be happy to be

18   making that interest rate.

19   Q.   And what at -- when what all -- what is all?

20   A.   The market, the abysmal market situation that was going

21   on.  Tom is really an optimist.

22   Q.   Mr. Powers asked you some questions about SEC

23   investigations of Stanford entities.  Do you recall discussing

24   that generally?

25   A.   Yes.
```

1    Q.    At any point in time prior to October 15th of 2008, did

2    you become aware of the existence of an SEC investigation into

3    the Stanford International Bank?

4    A.    I don't really recall that.

5    Q.    Was there any discussion among the members of the

6    investment committee about any sort of pending or threatened

7    investigation of -- by the SEC of the Stanford International

8    Bank in the same time frame?

9    A.    Not that I recall.

10   Q.    When you were discussing in October with Mr. Espy trying

11   to get money out of Stanford International Bank, did anyone

12   suggest to Mr. Espy that, irrespective of his views, he should

13   go back to the bank and say you-all should get -- you should

14   break the CDs and get 100 percent of what you were -- thought

15   you were entitled to?

16   A.    I don't -- I don't think that anybody actually said that

17   to him at that point in time.

18   Q.    At any point in time in 2008, was there that kind of

19   conversation with Mr. Espy about let's just get all of our

20   money out of Stanford International Bank?

21   A.    I think maybe at the very, very end of 2008.

22   Q.    Why do you think it happened in that time frame?

23   A.    Because that's when everything was just really falling

24   apart as far as the markets and other sorts of things.  And we

25   knew that Gary still needed more money, and so it seemed the

```
 1    logical thing to do is to just get the balance out.

 2    Q.   Between October 14th of 2008 and December 31st of 2008,

 3    did you obtain anymore information, either positive or

 4    negative, from Stanford International Bank about its business?

 5    A.   Well, I think that Tom was -- Tom said that he was

 6    concerned about what was happening.

 7    Q.   And when did he say that?

 8    A.   At the end of 2008, in December.

 9    Q.   In the December 5 minutes that we looked at before we

10    took our short break, there was a reference to a capital

11    infusion--at least it was being reported in the investment

12    committee that there had been a capital infusion to the

13    bank--of $481 million.

14    A.   Yes.

15    Q.   How -- did you-all have some reaction to that piece of

16    news that Mr. Espy provided?

17    A.   Well, we think that that was what enabled them to lend

18    Gary the money that he needed, or partly enabled them for Gary

19    to be able to get the money that he needed.

20    Q.   Did you-all follow up with Mr. Espy and ask for some sort

21    of demonstration of that capital infusion or proof of that

22    capital infusion of $481 million?

23    A.   No, I don't believe so.

24    Q.   Why not?

25    A.   Well, I think because we -- our level of anxiety over how
```

1    we were going to pay these margin calls and what was going to

2    happen with Gary's life was lessened when we got this money

3    out from Stanford, the 80 percent.  And the markets were sort

4    of starting to stabilize at that point in time.  They weren't

5    coming back, but they were stabilizing.

6        So it was also a year-end.  We were doing huge tax

7    calculations to try to figure out what the tax liability was

8    going to be from all these sales and all of this stuff that

9    had happened.  So there was just a lot of other things that

10   were going on right then.

11       We were concerned about Stanford in relationship to

12   Madoff, because that's all anybody was talking about at that

13   point in time, and how many other Madoffs were there out

14   there, and, you know, how do you really know and that sort of

15   thing.  So there was anxiety in general about all investments,

16   other than, of course the Liberty investments, which he's

17   going to hold onto until the day he dies.

18   Q.   So you're talking now about the period after December 11

19   when Mr. Madoff was arrested?

20   A.   Yes.

21   Q.   Did you have any information about Mr. Madoff and his

22   business prior to the announcement of his arrest in --

23   A.   No, I had no idea who he was.  I don't think anybody did

24   in the group.

25   Q.   Could you take out Defendants' Exhibit 1?  That is the

```
 1   chart.

 2   A.   Oh, the chart.  Sorry.  Yes.

 3   Q.   In your testimony, you were pointing out that if the

 4   sharp downward line that we see from October to November of

 5   2008 had continued down to zero, that that would essentially

 6   have zeroed out Mr. Magness' net worth.  Correct?

 7   A.   Yes.

 8   Q.   If -- now, that's true certainly if Stanford

 9   International -- if the Stanford International Bank holdings

10   of $100 million were taken out and Liberty went down to zero,

11   then he would have been left with nothing.  Right?

12   A.   Well, he would have had his tangible assets.

13   Q.   Sure, he would have had --

14   A.   But -- but no way to really fund them.  He would've had

15   to sell off some of those eventually.

16   Q.   He would've had the ranches and those sorts of things?

17   A.   Yes.

18   Q.   But if you looked at the portfolio you had of securities

19   and the Stanford investments, if he had kept the Stanford

20   investments, thinking that Liberty was going to zero, if

21   Liberty had gone to zero he would have been left with $100

22   million as far as he was concerned?

23   A.   Yes.  But that would never have been an option because he

24   prizes the Liberty stock among -- above pretty much everything

25   else.
```

1    Q.   I understand.  But the choices on the table in October of

2    2008 were let go of more Liberty stock or cash in the Stanford

3    CDs is what your testimony was.

4    A.   Well, the Stanford CDs were always going to be $100

5    million, let's say.  But Liberty had the potential if it was

6    worth, let's just say, $500 million, it had the potential of

7    being worth billions of dollars.  And that's what subsequently

8    happened.

9         Malone did do exactly what Gary's dad said he was going

10   to do, you know.  It just took him lots longer than anybody

11   thought possible, spun it all off into actual companies, like

12   D-TV that merged with AT&T, and his stock portfolio has risen

13   dramatically.  Stanford would only have ever been worth $100

14   million.  So, you know, it's back to Gary's lack -- or his

15   appetite for risk.  He was totally willing to risk everything

16   on the Liberty stock.

17   Q.   And he was not willing to risk everything on -- well, he

18   was not willing to risk on Stanford, as we saw from the

19   meeting minutes as of the latter half of 2008.  Correct?

20   A.   No.  He wanted -- he needed the cash to be able to keep

21   his position in Liberty.  So when it came down to a choice of

22   keeping -- staying in Stanford or keeping Liberty, there was

23   no question what he would do.

24   Q.   And we know now -- I mean, we knew now and we knew then

25   that Liberty was a real business all along.  Right?

```
 1    A.   Well, it wasn't a very good business at that point in

 2    time.  There wasn't -- it stayed stagnant for years and years

 3    and years and years and years.

 4    Q.   I mean, you see a pretty dramatic increase from November

 5    2008 even through the middle of 2009, don't we?

 6    A.   Yes, but you see it still never came back up to where it

 7    was before.

 8    Q.   And Liberty --

 9    A.   -- in this -- this time frame.  This is 2010.

10    Q.   Right.  But Liberty is a real business with public

11    financials that you can understand.  Right?

12    A.   But it wasn't that.  It's the emotional attachment he has

13    to his dad's company.  That was the most important thing for

14    him.

15    Q.   I understand.  But it is true, is it not, that Liberty

16    was a public company whose financials you could look at and

17    understand?

18    A.   Yes.

19    Q.   And Stanford International Bank was not a public company,

20    and it turns out it was not a real business after all, as we

21    know today.

22    A.   Well, I guess that -- you know, it depends on your

23    position.  I think Gary thinks it could have still been a

24    business.  But that was never -- the way that you're putting

25    it was never anybody's thought.  No one ever thought that
```

1  way--stay with Liberty Media or stay with Stanford.  That was

2  never the choice, because if Gary was -- he would have -- he

3  would have gone to zero rather than selling a single share if

4  he could have.

5      He still has not forgiven the banks that sold him out,

6  and he's not doing business with any of them anymore.  He

7  moved away from all of them.  And he used to make me keep a

8  chart and graph thing for years that showed where he would

9  have been had they not sold him out.  So it -- not selling was

10  his focus, not anything else at this period in time.

11  Q.   Let me ask you about Plaintiff's Exhibit 166.  That

12  was -- I don't think it's in the notebook.  I think it's in

13  your stack.

14  A.   Yes.

15  Q.   You told me that the plan changed with regard to how you

16  were going to repay the Stanford loan on the 10th when LINTA

17  went below $10.  Did I understand that correctly?

18  A.   No.  LINTA had already gone below $10, but everybody

19  thought that they were going to stabilize, so we needed to pay

20  -- pay the loan at U.S. Bank to solve the $10 floor problem.

21  But we thought that that was going to stabilize and come back

22  up above $10, and then we would be able to sell stock, do

23  whatever, repay the loan, or borrow more money from someone

24  else or whatever.  But that didn't happen because from October

25  10th on down the stock kept going down.

Q.   I see.  So it wasn't that it went below ten on the 10th.

It had already gone below 10, and it just didn't come back up

at a point at which he could repay the loan?

A.   Yeah.  I don't know if we can discern from this when it

actually went to 10.

Q.   Would it surprise you to learn that it went down below 10

on the 8th and then again on the 9th?

A.   Yeah.  So it was already triggered.

Q.   And it started below 9 on the 10th.

A.   Yeah.  So it was triggered.  We had to pay it off.  They

had to send us the money instantly so that we could avoid a

sellout there.

Q.   But, I mean, you decided on the 13th to go ahead and pay

it with accumulated interest.  In other words, you did not

wait very long for it to stabilize.

A.   We couldn't.  When you get a sellout notice you only have

five days.

Q.   Well, I understand that.  So you took the loan and

you -- you took the money and you repaid the loan, but you

paid back the loan to Stanford --

A.   No.

Q.   -- within two business days.

A.   No.  They used the accrued interest as the -- and they

considered that a payment.

Q.   Right.  That's -- which is my point.  On the 10th you

1    told Stanford you were going to use it -- you were going to

2    use sale proceeds from outside of Stanford, but very quickly

3    you came to the conclusion that you were going to use

4    accumulated interest.  Or was that the plan all along?

5    A.    Things were happening so fast that I'm not sure what the

6    plan was.  But the plan became clearer the day after, or

7    whatever, that we needed that accumulated interest to be a

8    payout and nothing else.

9    Q.    Were you worried that if you told Stanford that you were

10   going to pay back the loan with accumulated interest that

11   Stanford would not give you the loans?

12   A.    No, I don't think it was even a consideration.

13   Q.    I just want to ask you about one more exhibit, and that's

14   Plaintiff's 92.  And I'm looking at point No. 4 on the first

15   page of the meeting minutes.  You were asked some questions

16   about whether anybody contradicted Mr. Espy's recommendation

17   and told him that you should just sell out of the CD; not take

18   the loan but sell out of the CD.

19   A.    Which we did in December, but not before that.

20   Q.    Which you did in January.  Right?  After the meeting with

21   Mr. Rodriguez-Tolentino?

22   A.    Yes.  But we were talking about just trying to, you know,

23   get -- see if it was possible to get it out.

24   Q.    And Plaintiff's Exhibit 92, what is reported is that

25   Mr. Espy reported that he had approached Stanford

```
 1   International Bank after the October 1st meeting regarding the

 2   redemption of Mr. Magness and GMIT certificate of deposits,

 3   and that redemption would not be possible at this time.  That

 4   is what the meeting minutes say.  Correct?

 5   A.   Well, I don't know when after the October 1st meeting he

 6   approached them.  It could have been December 4th.

 7   Q.   Is that your recollection that it was closer to December

 8   5th than October 1st, or do you recall?

 9   A.   That's my recollection.  By this meeting in December, Tom

10   Espy was a wreck.  He was just totally a mess, drinking and

11   whatever, and he didn't really give us any reassurance about

12   anything.

13   Q.   Now, the third -- excuse me, the -- yeah, third sentence

14   of this paragraph, however, says, Mr. Espy responded that

15   after the bank had advised that redemption would not be

16   possible at this time, GMIT borrowed from the bank against

17   these certificates, et cetera et cetera.  So it must have been

18   before mid October that he had that conversation with

19   Stanford.  Would you disagree?

20   A.   I don't remember it.  I really don't remember it being

21   anybody's intention at that time to cash them in, except for

22   possibly theoretically, you know, that we were going to

23   theoretically need all the money and cash them in.  But I do

24   remember Gary and Tom specifically wanting to hold onto them.

25   And once they took out 80 percent, that seemed to stabilize
```

```
 1    things, and nothing happened for a while.

 2        And then sometime in December of '08 into January of '09

 3    it was decided that we should just get out of it altogether,

 4    and I think we sent letters in January or February or

 5    something.  We wanted to have a call with Juan Rodriguez, and

 6    that took a while to set up, for whatever reason.

 7    Q.   I just want to make sure I understand your position with

 8    regard to what's reflected in the minutes.  Are you saying

 9    that what's reflected in the minutes is inconsistent with your

10    recollection, or that you just don't recall whether this was

11    said?

12    A.   Well, keep in mind that I was cut out of the loop of a

13    lot of these things.  Gary and Tom would talk to the bank.

14    Gary and Tom would do whatever.  They were still meeting at

15    Gary's house.  Gary was gone a lot also during this time.  He

16    had a place in -- I don't think he bought the place in L.A.

17    yet, but they were filming the movie.  They were on location.

18    They were whatever.  Stupid movie.

19        So it was really, really difficult.  No one was around.

20    No one was in the same location as each other.  And so you got

21    the news third hand from someone else or whatever, you know.

22    No one sent out group emails at that point in time to keep

23    you-all apprised of what the situation was.  Someone called

24    someone to talk to someone else and the conference someone

25    else in.  They'd think that they talked to everybody, but then
```

1    so-and-so wouldn't know anything that was going on.  So I

2    can't really say what -- I felt that the -- you know, that the

3    goal was to borrow against them.

4    Q.   But as far as -- for the reasons you described, you're

5    unable to contradict what is described in the minutes.  That

6    may very well have been what Mr. Espy did.

7    A.   Yeah.

8            MR. PETRIE:  That's the end of that, Your Honor.

9            THE COURT:  All right.  Who's next?

10           MR. BRYANT:  Your Honor, the Magness parties will

11   call Robert Armstrong, who is just outside in the hallway.

12           THE COURT:  All right.

13       Go ahead and have a seat, please, sir.  Could you raise

14   your right hand, please?

15           (Whereupon, the oath was administered by the Court.)

16           THE COURT:  The Magness parties may proceed.

17           MR. BRYANT:  Thank you, Your Honor.

18                   ROBERT ARMSTRONG,

19   testified on direct examination by Mr. Bryant as follows:

20   Q.   Please state your name for the record.

21   A.   Robert E. Armstrong.

22   Q.   What's your current business address?

23   A.   My current business address is 100 West Liberty Street,

24   Reno, Nevada, 10th floor.

25   Q.   And what's your occupation or profession?

1    A.   I'm a practicing lawyer.

2    Q.   And could you describe for the jury your education past

3    high school?

4         THE COURT:  Could you get the microphone a little

5    closer to you?  We are having --

6         MR. BRYANT:  Sure.  And I will get closer to it as

7    well.

8         THE COURT:  It's not you.  It's the witness.

9         THE WITNESS:  I attended Santa Clara University, got

10   my Bachelor of Science in commerce and accounting.  After that

11   I went to Georgetown University Law Center.  I got a juries

12   doctorate there in 1979.  And then in 1980 I graduated from

13   New York University and got an LLM in taxation at that

14   institution.

15   Q.   And in what states or jurisdictions are you currently

16   licensed to practice law?

17   A.   I'm currently licensed in Nevada and the District of

18   Columbia.

19   Q.   Are you also or have you been a certified public

20   accountant?

21   A.   Yes.  I've been a certified public accountant since 1980,

22   and I am still in good standing.

23   Q.   Okay.  So about how long at this point have you been a

24   licensed attorney?

25   A.   As an attorney I was -- passed the bar in 1979, so about

1    37 years, give or take.

2    Q.   And what have been your main areas of law practice over

3    your career?

4    A.   My main areas have been tax transaction planning, or tax

5    transactions, estate, estate planning, trust and estates, and

6    some minor employment law.

7    Q.   And I don't want to embarrass you with this, but I'm

8    going to ask you whether or not at one time or another you

9    have been named as one by Best Lawyers of America recognized

10   as -- in trust and estate law and other areas?

11   A.   Yes.  I've been named I think since 1993 in civil

12   practice areas, and I think I currently am as well.

13   Q.   In 2016 have you been recognized by Best Lawyers of

14   America in four areas--real estate law, tax law, corporate

15   law, and trusts and estates law?

16   A.   Yes, I was.

17   Q.   Okay.  What law firm do you practice with?

18   A.   I practice with the law firm of McDonald, Carano and

19   Wilson.

20   Q.   And how long have you been a partner in that law firm?

21   A.   Since 1984.

22   Q.   For most of the time that you've been a partner with that

23   law firm have you been involved with trusts and estates and

24   with investments that are made by trusts and estates?

25   A.   Yes.

1    Q.    During your several decades of law practice in Nevada,

2    have you seen any Ponzi schemes or frauds?

3    A.    Yes.

4    Q.    What generally have you seen over the years in that

5    regard?

6    A.    Well, primarily in the local area mortgage lending where

7    people were sold investment participations in mortgages and

8    sometimes secured by property that either didn't exist or was

9    overcollateralized and the promoter was -- sometimes absconded

10   with the money.

11   Q.    As a result of your experience, have you tried to be

12   alert in your law practice to the possibility that your

13   clients might be making investments in something that looked

14   good but turned out to be a Ponzi scheme or a fraud?

15   A.    Oh, I try to be aware of what they're investing in and

16   who they're investing with.

17   Q.    Have you ever represented Gary Magness or his related

18   entities or trusts?

19   A.    Yes.

20   Q.    When did you first represent Mr. Magness or his related

21   entities or trusts?

22   A.    In 2006 I was introduced to Mr. Magness by Ray Sutton,

23   who is his legal counsel, to establish a family trust company

24   in Nevada and move trusts to Nevada for trust administration.

25   Q.    And, in general, during what period of time since 2006

1    have you been involved in representing Mr. Magness or his

2    related entities or trusts?

3    A.   Well, the primary representation was Ray Sutton.  I did

4    local Nevada work when called for, and I've been continuing

5    representing in that area representing him since -- from 2006

6    to the present day.

7    Q.   Okay.  At the -- during that time that you represented

8    Gary Magness, have you also represented many other clients?

9    A.   Yes.

10   Q.   Have you ever been in any way heavily dependent on Gary

11   Magness or his legal business for your living?

12   A.   No.

13   Q.   And have you ever had any other business relationships

14   outside your law practice with Gary Magness or any of his

15   entities?

16   A.   Other than we house his family trust company at our

17   offices and supply an office to him, no.

18   Q.   Okay.  And I'll ask you about that in a second.

19        When did you first personally meet Gary Magness?

20   A.   I think in 2007.

21   Q.   So at this time you already had been practicing law over

22   25 years?

23   A.   Yes.

24   Q.   And in late 2006 or early 2007, what role did you take in

25   connection with Mr. Magness' trusts and his investment

1    entities?

2    A.    Right.  Basically two elements.  One, we represented

3    Mr. Magness and his trusts in moving them from Colorado to

4    Nevada, and getting the family trust company approved for

5    serving as a fiduciary of those trusts.  And then after that

6    we would attend meetings of the trust company periodically.

7         And on the day-to-day, we maintain offices for the trust

8    company, file cabinets, documentation, and set up -- establish

9    bank accounts and maintain business licenses for the family

10   trust company.

11   Q.    We've heard references to Mango Five.  Could you describe

12   what that is?

13   A.    Mango Five Family, Inc. is the Nevada corporation that is

14   acting as the family trust company for the Magness family.

15   Q.    So when you referred to the trust company in the previous

16   answer, was that a reference to Mango Five?

17   A.    That's a reference to Mango Five Family, Inc.

18   Q.    Okay.  Were you either a member of or an advisor to the

19   Mango Five investment committee from early 2007 into at least

20   2009?

21   A.    Yes.

22   Q.    During that whole time period from early 2007 to at least

23   2009, did you participate in all, or nearly all, of the

24   meetings of the investment committee of Mango Family?

25   A.    Yes, I did.

1    Q.    Okay.  In all of those meetings, did you personally make

2    handwritten notes as you participated in the meetings?

3    A.    Yes, I did.

4    Q.    And did you do your best at that time to write down what

5    you regarded to be the significant topics --

6    A.    Yeah.

7    Q.    -- In the meetings?

8    A.    Yeah.  I try to write down topically what was important

9    or noteworthy.

10   Q.    Did you make those notes right at the time that you were

11   last participating in the meeting as opposed to weeks or

12   months later?

13   A.    I did them contemporaneously.

14   Q.    And did you ever change our alter your handwritten notes

15   after the fact, weeks or months or years later?

16   A.    No.

17   Q.    After this lawsuit was filed, did you provide all of your

18   handwritten notes of the Mango Five investment committee

19   meetings to lawyers so they'd be available in connection with

20   this lawsuit?

21   A.    Yes.

22   Q.    Now, do you recall that there came a time in September or

23   October of 2008 when the financial crisis in the United States

24   was quite severe?

25   A.    I remember it well.

1    Q.   In the nearly four decades that you've been a lawyer,

2    have you ever seen as severe a financial crisis as existed

3    right in or around October 2008?

4    A.   I've never experienced anything like that otherwise.

5    Q.   Did you see any affects of that financial crisis at that

6    time, not only in the newspapers and on TV, but in your own

7    legal practice?

8    A.   Yes.

9    Q.   Could you describe generally what occurred at that time

10   as -- with respect to the clients in your legal practice?

11              MR. DAY:  Objection, Your Honor, relevance.

12              THE COURT:  Overruled.

13              THE WITNESS:  What occurred during that period of

14   time was clients who were invested in the stock market had

15   margin accounts which they borrow money against, and so they

16   could retain their securities and still have some liquidity

17   either to pay bills or do other investments.  And at that time

18   clients that were under -- with the market decline, stock

19   market declines, the margin requirements required the clients

20   to put in -- put up additional collateral in order to avoid

21   the sale of those securities in a declining market, thus

22   triggering a tax, a capital gains tax in most cases with

23   regard to those securities.

24   Q.   Do you recall that one of the largest financial firms in

25   America, Bear Stearns, nearly failed and was taken over in the

```
 1    first half of 2008?

 2    A.    I remember that, yes.

 3    Q.    Do you recall that another one of the very largest

 4    financial firms in America, Lehman Brothers, actually filed

 5    bankruptcy in September of 2008?

 6    A.    Yes.

 7    Q.    Do you recall that the United States government assumed

 8    control of AIG, the largest insurance company in the world, in

 9    September of 2008?

10    A.    Yes.

11    Q.    Do you recall that Bank of America announced the

12    acquisition of Merrill Lynch, one of the largest investment

13    firms in the world, because of financial troubles also in

14    September 2008?

15    A.    Yes.

16    Q.    And do you recall that another major U.S. bank,

17    Washington Mutual, or WaMu, failed and had to be acquired by

18    another bank in that same September-October time frame of

19    2008?

20    A.    I did.

21    Q.    Do you recall that yet another major U.S. bank, Wachovia,

22    was in severe financial trouble and had to be acquired in that

23    same time frame?

24    A.    I did.

25    Q.    And finally, do you recall that in late September 2008,
```

1    Congress passed the Troubled Asset Relief Program, or TARP, to

2    provide hundreds of billions of dollars to banks and other

3    firms that were potentially failing as a result of that

4    financial crisis?

5              MR. DAY:  Objection, Your Honor, leading.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8    Q.  (BY MR. BRYANT)  Thank you.

9         Now, Mr. Armstrong, as far as you know or was publicly

10   reported, were any or all of those major financial

11   institutions that failed or were in severe trouble later

12   discovered to be Ponzi schemes or frauds.

13   A.   Not that I'm aware of.

14   Q.   So was Bear Stearns that failed a Ponzi scheme or fraud?

15   A.   I don't believe so.

16   Q.   Was Lehmann Brothers a Ponzi scheme or fraud?

17   A.   I don't believe so.

18   Q.   Was AIG a Ponzi scheme or fraud?

19   A.   I don't believe so.

20   Q.   Was Merrill Lynch a Ponzi scheme or fraud?

21   A.   I don't believe.

22   Q.   So was Washington Mutual, or WaMu, a Ponzi scheme or

23   fraud?

24   A.   I don't believe so.

25   Q.   Was Wachovia a Ponzi scheme or fraud?

1   A.   I don't believe so.

2   Q.   So if you had seen evidence of a bank or financial firm

3   in October 2008 that appeared to be experiencing some kind of

4   financial stress, did you immediately conclude that it must be

5   a Ponzi scheme or fraud?

6   A.   No.

7   Q.   Did you, in fact, see changes in the behavior of banks

8   and financial institutions that you and your clients dealt

9   with in October of 2008 as compared with a year or two

10  earlier?

11  A.   Yes, I did.

12  Q.   What did you observe in that regard?

13  A.   The availability of credit was restricted.  If you were

14  able to get credit, it was on substantially more restrictive

15  terms, and typically more capital requirements were required

16  in order to even obtain those loans from those lenders who

17  were lending at that time.

18  Q.   Did you see and observe that banks and financial firms

19  were making a time -- an effort during that September and

20  October 2008 to hold on to cash or liquidity?

21  A.   Yes.

22  Q.   What were some of the ways that banks and financial firms

23  tried to preserve their cash and liquidity during that October

24  2008 time frame that you observed?

25          MR. DAY:  Objection, Your Honor.  Calls for expert

1    testimony, lack of foundation.

2           MR. BRYANT:  I'm asking him what he personally

3    observed.

4           THE COURT:  Overruled.

5           THE WITNESS:  Could you repeat the question?

6    Q.  (BY MR. BRYANT)  What are the ways that the behavior that

7    you saw from banks and financial firms during that period

8    that -- in which they tried to preserve their cash and

9    liquidity that maybe they wouldn't have done a year or two

10   earlier?

11   A.   Well, one, they wouldn't make loans, and they enforced

12   the loans that they had in place to the letter.  So if they

13   could encourage early repayment of loans, they did that.  And

14   they were very careful about advancing money on existing loans

15   without a review of compliance with loan covenants and

16   generally being careful about who their new clients were,

17   doing significant due diligence on them.

18   Q.   Now, let's leave aside Stanford for a second.  Did any of

19   those firms that you observed doing the best they could to

20   preserve their cash or liquidity at that time turn out to be

21   Ponzi schemes later?

22   A.   No.

23   Q.   And are most of those banks and financial firms still

24   around today?

25   A.   Most of them.  There have been a degree of consolidation.

1    Q.   Okay.  Now, aside from Gary Magness and Mango Five, did

2    you personally have other clients who were under severe

3    financial stress and pressure in September and October of

4    2008?

5    A.   Yes.

6    Q.   Without naming the names of your clients, did you have

7    other clients who were the subject of margin calls during that

8    period?

9    A.   Yes.

10   Q.   Now let's go back to earlier in 2008 before that

11   financial crisis period in the fall.  As of March of 2008, how

12   long had you been a member of or advisor to the Mango Five

13   investment committee, roughly?

14   A.   Just a little over a year.

15   Q.   Okay.  And during that year or so, had you gotten a good

16   general understanding of the investments of Mr. Magness and

17   his trusts and entities?

18   A.   Yep.  I was still learning them, but yes.

19   Q.   Okay.  Could you give the jury a general description of

20   how those investments and his finances were structured at that

21   time?

22   A.   Well, typically in Mr. Magness' case, he would either use

23   direct investments where he personally or his trusts would

24   directly invest or through investment entities that he's

25   formed, family-controlled entities, like LLCs, that would

1    invest a pool of money on behalf of the family in a wide range

2    of investments.

3    Q.   And what could you describe generally the range of

4    investments that he had at that time?

5    A.   Well, the most significant one was his holding of Liberty

6    stock and affiliates' marketable securities, significant

7    investment in a data center called Fortrust, and involved in

8    private equity investments, and the investment in CDs with the

9    Stanford International Bank.

10   Q.   Generally, what were the major topics of discussion in

11   the Mango Five investment committee in 2007 and early 2008 as

12   to the direction that his investments should move from where

13   they were?

14   A.   Yeah.  And I wanted -- also, there's a significant ranch

15   investment that was also part of it.  But the -- because of

16   the sizable holdings of Liberty Media stock and affiliates,

17   there was a need to diversify strategically into other

18   investments so that an adverse event affecting Liberty would

19   not -- would be reduced by being invested in other assets to

20   balance off the risk exposure presented by that concentrated

21   position.

22   Q.   And was Mr. Magness always eager to diversify out of his

23   Liberty Media stock during that period?

24   A.   Mr. Magness took a dim view of diversification of the

25   Liberty stock.

1    Q.    And from what you observed, did he have a belief in the

2    economic future of the Liberty companies?

3    A.    Yeah.  As I understood the dynamics of the Liberty

4    holding and his -- understanding John Malone's managing of

5    those entities and being an extraordinarily savvy manager of

6    those assets, I think Mr. Magness was very confident in the

7    management of the Liberty holdings and its future.

8    Q.    From your observance -- from your observation, was there

9    also some emotional or family attachment that Gary Magness had

10   to the Liberty Media stockholdings?

11   A.    Yes.

12   Q.    What was that?

13   A.    Well, I think that Gary, not unlike several of my clients

14   who received stock or have stock in family entities that --

15   that blossom and bloomed into other entities, they have an

16   affinity to retain that stock.

17   Q.    Now, in general, was there also discussion in the Mango

18   Five investment committee in 2007 and early 2008 of a need for

19   Mr. Magness and his entities to reduce debt levels?

20   A.    Yes.

21   Q.    What discussion do you recall of that in general?

22   A.    Well, the -- in general, given that the financial

23   environment was changing, it was clear that debt reduction

24   might be a good thing to do to avoid the potential for future

25   margin calls.

1  Q.   And, in general, was the goal of reducing the Magness

2  debt levels actually accomplished before the financial crisis

3  hit in September and October of 2008?

4  A.   Only in part.

5  Q.   In that period, did you -- you mentioned that you were

6  aware of Mr. Magness' investments in CDs issued by Stanford

7  International Bank?

8  A.   Yes.

9  Q.   Did you have any prior relationship with or knowledge of

10  Stanford or Stanford International Bank before you went on the

11  Mango Five investment committee?

12  A.   I did not.

13  Q.   Now, did there come a time in the first half of 2008 when

14  the Mango Five investment committee wanted to learn more about

15  the Stanford International Bank and the Stanford CDs that the

16  Magness entities owned?

17  A.   Yes.

18  Q.   Do you recall a meeting of the investment committee when

19  the president of Stanford International Bank, Juan Rodriguez,

20  addressed the committee?

21  A.   Yes.

22  Q.   Okay.  Let's look at Plaintiff's Exhibit 62.  And the

23  first page is an agenda.  Do you generally recognize that

24  first page?

25  A.   Yes.

1    Q.    Okay.  Let's look on to the second page.  Is this a

2    meeting in which you personally participated?

3    A.    Yes, by telephone.

4    Q.    Okay.  Where were you physically at the time?

5    A.    I was at my law offices in 100 West Liberty Street, Reno,

6    Nevada.

7    Q.    And where were the other members of the committee

8    physically located at the time?

9    A.    I understand them to be at the Wynn resort in Las Vegas,

10   Nevada.

11   Q.    And what was your understanding as to where Juan

12   Rodriguez, the president of Stanford International Bank, was

13   located during the meeting?

14   A.    I believe he called in from Antigua.

15   Q.    Now, as that meeting went on, did you personally write

16   down handwritten notes of what occurred during the meeting

17   that you thought was a significant topic?

18   A.    Yeah.  Interesting or noteworthy, yes.

19   Q.    Okay.  We'll look at those in a second.  Now, according

20   to the minutes, when did that meeting on March 6, 2008 begin?

21   A.    It began at 10:45.

22   Q.    And according to those minutes, when did it end?

23   A.    I think that might be on the next page.

24   Q.    I believe it is, or the last page.

25   A.    Yeah, or the last.  The minutes indicate 12:20 p.m.,

1    Pacific Standard Time.

2    Q.    So is that consistent with your recollection it was

3    roughly an hour-and-a-half meeting?

4    A.    That's approximately correct.

5    Q.    And about, again, roughly how much that meeting was taken

6    up with the discussion of the Stanford CDs with Mr. Rodriguez?

7    A.    I would estimate about half the time.

8    Q.    Okay.  Now, looking at the portion of Plaintiff's Exhibit

9    62 that describes that discussion, I believe it's paragraph 5

10   on the second page of PX 62, that looks like there's just

11   roughly a couple of paragraphs, a little more, of discussion.

12       Is that a summary of what you -- what you think was about

13   a 30-, 45-minute discussion?

14   A.    Yeah.  I think a general summary, yes.

15   Q.    Okay.  So is -- is what's shown in those minutes a full

16   description of the discussion that occurred on that occasion?

17   A.    In a general context, yes.

18   Q.    Okay.  During that discussion that involved Mr.

19   Rodriguez, was it just a one-way presentation by Mr. Rodriguez

20   or was there a lot of discussion and questions and answers

21   going back and forth?

22   A.    As I recall, he did an introduction, and then there was

23   question and answers or question-and-answer session after some

24   initial discussion and presentation by him.

25   Q.    Okay.  Let's go to your handwritten notes, which is PX

 1   143, and looks like you took four different pages of notes

 2   during that meeting.  Is that consistent with your

 3   recollection?

 4   A.   I think that looks correct, yes.

 5   Q.   Okay.  I know you don't have a paper copy in front of

 6   you, but let's see if we can get the portion of the -- your

 7   notes that pertain to the discussion with Mr. Rodriguez.  I

 8   believe that begins on the second page.

 9        Let's see if we can blow up that part and --

10   A.   That's perfect.  Thank you.

11   Q.   Your handwriting is challenging for me, so I would

12   like --

13   A.   My mother wished I was a doctor.

14   Q.   So I would like for you, if you could, to do your best to

15   read to the jury what you wrote regarding that discussion with

16   Mr. Rodriguez on March 6th, 2008.

17   A.   Interview with Juan Rodriguez, president of Stanford

18   International Bank.  President, 27 years, Scotia Bank of

19   Boston.  16 years with Stanford, Antigua, Miami, International

20   Bank.  Specialty private bank, Antigua, and low tax

21   jurisdiction.  Charter and license for banking, international

22   private banking.  BOD.  (B), I believe.  (F)(4).  And the last

23   one I can't make out.  FSC, Antigua.

24        I don't -- so -- yeah, hold it.  Okay.  Great.  Let's

25   see.  I still can't make -- Country.  It's a constitutional

1   monarchy.  It's a British monarchy, so Queen Elizabeth is --

2   the Queen of England is the monarch.  The representative

3   government is a governor general who -- and it looks like --

4   again, I can't make that out.  I apologize.  Parliament.  And

5   it looks like they were elected in '04.  Peaceful election.

6        Primarily commercial, I would -- there's an International

7   Business Act and meets B-A-S-L, BASL 1.

8   Q.   What is BASL 1 mean to you?

9   A.   It means to me it's an international compact with

10  participating countries with regard to qualifications in

11  international transactions and that sort of thing generally.

12  I'm not a BASL expert by any stretch.

13  Q.   Okay.  Please continue.

14  A.   Two locations in Antigua and Montreal, Canada.  Eleven

15  other countries.  Affiliated group.  Enhanced fixed income

16  relationships.  136 clients.  7.2 billion in total assets.

17  Investment portfolio versus loan management.  Not commercial

18  accounts.  Swiss bank model.  Investment activities.

19  Q.    Okay.  Let's look at the next page of the exhibit.

20  A.   Yeah.

21  Q.   Did this also pertain to the discussion with Mr.

22  Rodriguez?

23  A.   I believe it did, yes.

24  Q.   Okay.  Could you please continue and do your best to --

25  A.   24 SCM.  Money managers.  Toronto, Sogen, Credit Suisse.

1    Investments well balanced, globally diversified.  10 to 20

2    percent in cash.  17 percent fixed income.  70 percent of the

3    fixed income -- well, 70 percent investment grade paper, 50

4    percent portfolio on equities, and 20 percent precious metals.

5         The asset classes were value, growth, small cap, large

6    cap, leverage at 15 percent, economic sectors, currency, and

7    one is U.S., and I can't make out the other two legs there.

8         Geographic diversity.  Stanford Financial Group is

9    management of portfolio.  Memphis, Tupelo, I believe St.

10   Croix, and Zurich.  Hedge fund and regulation portfolio.  No

11   insurance requirement.  Overlaid.  Cash not invested.  Zero

12   taxation.  SIPC.  Qualified bank exceeds local ceiling.

13   Insurance coverage, capital requirements.  DO insurance, EO

14   insurance.  17 percent concentration.  Custody.  Five percent

15   in capital to total assets.  12.  60 percent U.S. dollars, 53

16   percent BOD 20 basis -- 200 basis point privilege.  .4 to 69

17   million.  Venezuela, geopolitical risk, petroleum Caribbean,

18   cheap oil in region.

19   Q.   And does that conclude your handwritten notes -- let's

20   look at the next page.

21   A.   If you could go to the next page, I can --

22   Q.   On just of the portion of the meeting where Mr. Rodriguez

23   was present.

24   A.   Yeah.  I believe it ended right above the status of

25   Fortrust, so that --

1    Q.   So if you can go ahead and read that portion on the

2    fourth page of the notes that relates to Mr. Rodriguez's

3    discussion with the committee.

4    A.   Yes.  Question Brazil own real estate.  Repatriation

5    profits.  Currency controls, free no levies, exempt -- and I

6    can't -- Matthew Bean.  Subprime and indirectly holding of

7    bank financials, less than 20 percent, move out 200 financial.

8    Trouble spots is healthcare.  CD rates 9.11 rate.  Five years.

9    11.07 compounded.  $100 million.  A question, I think receipt

10   CD is as collateral.

11   Q.   Now -- thank you very much.  You made these notes almost

12   nine years ago.  Do you have much detailed recollection of the

13   specific discussion at that time?

14   A.   Just a general recollection, yes.

15   Q.   Okay.  Now, is it fair to say that your notes provide a

16   lot more detail about the discussion of the committee with Mr.

17   Rodriguez than the official minutes do?

18   A.   Yes.

19   Q.   Does that surprise you?

20   A.   No.

21   Q.   Why not?

22   A.   Well, typically when you craft minutes, they're of -- you

23   try to get the general discussion.  Otherwise, the minutes

24   were -- you might as well take a transcript.  So it's

25   a -- they're -- minutes are typically summaries of what goes

1   on, and principally records motions or resolutions either

2   undertaken by the board or committee.

3   Q.   Now, as a result of that presentation that you heard on

4   the telephone on March 6, 2008, were you personally suspicious

5   that Stanford International Bank was or might be a Ponzi

6   scheme?

7   A.   No.

8   Q.   Why not?

9   A.   Well, I thought the presentation was credible by Mr.

10  Rodriguez.  He was able to respond to a number -- the

11  questions that were posited by the members of the committee.

12  And we had Tom Espy, who was a representative of an affiliate,

13  at the meeting.  So I didn't -- you are -- I was comfortable

14  that we got a fair presentation and he was not evasive with

15  the answer -- with the questions or -- we posited to him.

16  Q.   Now, was the quality or detail level of that presentation

17  by Mr. Rodriguez significantly different than that in

18  presentations that you've been a party to before and since

19  then from investment firms?

20  A.   No.  It's more of a kind of an introductory client

21  briefing of -- of a general nature.  No.

22  Q.   Now, let's move on back to the period of October 2008.

23  Do you recall whether in October 2008 Mango Five and the

24  Magness entities were facing themselves what you would regard

25  as a financial crisis?

A.    Yeah, I generally remember that.

Q.    Okay.  Let's look at PX 73.  Do you recognize those as
the minutes of an investment committee meeting of Mango Five
that occurred October 1st of 2008?

A.    Yes.

Q.    Okay.  I would like -- were you a participant in that
meeting?

A.    I was -- I believe I attended by telephone call.

Q.    Okay.  Looking down at paragraph 3 of the first page of
PX 73, do you see that kind of where the debt level of the
Magness entities stood as of October 1st, 2008?

A.    Ms. Dokken reported that the debt level was $283,651,997
[sic].

Q.    And as you sat there listening on the phone of that
meeting on October 1st, was that right in the middle of the
financial crisis, the most severe one that you've been an
attorney for?

A.    Yeah.  The market was in decline, steep decline, during
that period of time, and so that was the time we were -- at
the time of our meeting.

Q.    Now, you see in paragraph 2 that about the middle where
it begins Mr. Magness?

A.    Yes.

Q.    Do you recall any discussion in that meeting regarding
Mr. Magness' desire or determination to hold on to the Liberty

1   Media stock despite the stock market conditions that occurred

2   at that time?

3   A.   Yes.  I believe he thought it was undervalued.

4        MR. DAY:  Objection.  Speculation.

5        THE COURT:  Overruled.

6   Q.   (BY MR. BRYANT)  Now, during the rest of October of 2008,

7   after that meeting, were you personally involved in any of the

8   actions that Gary Magness or the Magness entities took to deal

9   with that crisis that they were involved in?

10  A.   No.

11  Q.   Did you have an understanding as a result of information

12  that you received at a later time that they had faced margin

13  calls during that time period?

14  A.   Yes.

15  Q.   And what did you understand would have been the adverse

16  consequences for Gary Magness and the entities had they not

17  been able to deal with the margin calls they faced during

18  October 2008?

19  A.   It would have required the sale of the collateral -- the

20  stock that was collateralizing the margin.

21  Q.   And would have -- did you understand that that would have

22  any significant tax consequences for Mr. Magness and the

23  entities?

24  A.   Yes.

25  Q.   What consequences would have been experienced?

1    A.    My understanding was it was low basis stock, which meant

2    that any difference between what they ultimately sold the

3    stock for and the family's tax basis would trigger a capital

4    gain and a tax would ensue.

5    Q.    Now, I understand you weren't personally involved in the

6    actions that occurred during that period, but were you advised

7    that the Magness entities had in fact been able to access over

8    $80 million of cash from Stanford during October 2008?

9    A.    Later in the year I became aware of that, yes.

10   Q.    Based on everything that you learned later, including all

11   of your conversations with Mr. Magness, with anybody on the

12   Mango Five investment committee, all the way up into today, do

13   you have any reason to believe that those loans were taken out

14   from Stanford in October of 2008 for any other reason other

15   than an urgent need to meet margin calls and shore up

16   financial positions?

17   A.    The primary --

18          MR. DAY:  Objection, Your Honor.  Calls for hearsay

19   and speculation.

20          THE COURT:  Overruled.

21          THE WITNESS:  I think the primary motivation was to

22   gain -- obtain cash to pay debt and get in a stronger cash

23   position.

24   Q.    (BY MR. BRYANT)  There's been discussion in this case

25   that getting the -- that the need to meet margin calls was

1    just a made-up excuse to get money out of Stanford in October

2    of 2008.  Have you ever heard or seen anything that would tend

3    to support that?

4    A.    I did not recollect anything in that regard.

5    Q.    In all of your dealings with Gary Magness and the members

6    of the Mango Five investment committee before October of 2008,

7    during October of 2008, and after 2008 up to the present, have

8    you ever seen or heard anything that made you believe that

9    Gary Magness knew or believed Stanford was a Ponzi scheme in

10   October of 2008?

11   A.    No.

12   Q.    Now, let's look at Plaintiff's Exhibit 92.  And this

13   refers to a meeting of the Mango Five investment committee

14   that occurred on December 5th, 2008.  Let's look at the very

15   back page since there are multiple drafts of this document.

16       Do you see, based on the last page of Exhibit 92, that

17   these are the official minutes of that meeting?

18   A.    Yeah.  These are signed by Mr. Sutton.

19   Q.    Okay.  Now, do you recall participating in the meeting of

20   the Mango Five investment committee on December 5th, 2008?

21   A.    Yes, I do.

22   Q.    Did anything that you heard during that meeting suggest

23   to you that Gary Magness or anybody else at the meeting then

24   believed that Stanford was or might be a Ponzi scheme or

25   fraud?

1   A.   No.  They were insecure about the CDs.  There was a

2   discussion about the CDs.

3   Q.   Okay.  We'll talk about that.

4        Do you recall any discussion whatsoever in the December

5   5th, 2008 meeting of the Mango Five investment committee about

6   the possibility that Stanford might be put into a receivership

7   sometime in the future?

8   A.   I have no recollection.

9   Q.   Okay.  Did you make handwritten notes of that meeting

10  just as you did of the other meetings?

11  A.   Yes, I did.

12  Q.   Let's look at PX 292.

13           MR. DAY:  Objection, Your Honor.  This is not in

14  evidence.

15           MR. BRYANT:  I'll offer it.

16           MR. DAY:  Objection, Your Honor.  Incomplete, Rule

17  403.  May I approach to discuss?

18           THE COURT:  No.  What part is missing?

19           MR. DAY:  Several parts of this document are missing

20  and blacked out.

21           THE COURT:  Do you mean redacted?

22           MR. DAY:  I do.

23           THE COURT:  Is it just the redactions you are

24  concerned about?

25           MR. DAY:  Yes, Your Honor.

```
 1              THE COURT:  I'll overrule the objection and admit

 2    the exhibit, and you're welcome in cross to go into the

 3    redactions.  And if we need to complete them, we can do that

 4    at that time.

 5              MR. BRYANT:  Okay.  So let's -- so that's admitted?

 6              THE COURT:  The exhibit is admitted.

 7              MR. BRYANT:  Thank you, Your Honor.

 8    Q.  (BY MR. BRYANT)  And, Mr. Armstrong, can you identify PX

 9    292 as your handwriting?

10    A.   Yes, it's my handwriting.

11    Q.   Okay.  I'd like for you to look at the second page of

12    your handwritten notes.  Do you see the portion there that

13    refers to Stanford?

14    A.   Okay.  Yeah.  Under Stanford International Bank, down

15    five to six percent for the year.  No leverage.  One billion

16    in cash, 480 million in additional capital.

17    Q.   Looks like you underlined a portion of that.  What did

18    you underline?

19    A.   I underlined no leverage.

20    Q.   Do you recall any other discussion of Stanford during

21    that meeting?

22    A.   There may have been a little bit more, but I don't have a

23    specific recollection.

24    Q.   Okay.  I'd like for you to take the time to look at page

25    1 and page 2 of your notes, and then I'd like for you to tell
```

1    us whether or not there is any reference whatsoever to a

2    possible receivership or what might happen in the event of a

3    receivership in your handwritten notes.

4    A.    I don't see any reference to receivership.

5    Q.    Based on your practices in preparing those handwritten

6    notes, had there been any discussion of a receivership of

7    Stanford in that meeting, would you have recorded it?

8    A.    Most likely I would have, yes.

9    Q.    Now, there's been discussion of some draft official

10   minutes of this December 5th meeting that were prepared by Ray

11   Sutton at some point in time that mention a possible

12   receivership of Stanford.  Do you personally recall seeing any

13   such drafts?

14   A.    No.

15   Q.    Given that the next meeting of the Magness Mango Five

16   investment committee was not until four months later in April

17   of 2009, when would you have first have seen or received any

18   draft official minutes for the December 5th meeting that had

19   been prepared by Mr. Sutton?

20   A.    Generally we'd see them maybe a month to two weeks before

21   the next meeting.

22   Q.    So for a meeting in April of 2009, about when would those

23   drafts have been prepared and circulated by Mr. Sutton?

24   A.    I would say sometime around March, mid March.

25   Q.    Of what year?

1    A.    2009.

2    Q.    Was that time period after, there actually had been a

3    receivership created for Stanford because it had been

4    requested by the SEC.

5    A.    My -- my understanding, yes.

6    Q.    Now, do you recall any personal concern about the

7    possibility that Stanford was a Ponzi scheme or fraud at any

8    time before the SEC actually sued to get a receivership in

9    February of 2009?

10   A.    No.

11   Q.    Based on all your dealings with Gary Magness and the

12   Mango Five investment committee members, do you have any

13   reason to believe that they knew or believed Stanford was a

14   Ponzi scheme or fraud prior to the lawsuit being filed for a

15   receivership by the SEC in February in 2009?

16   A.    No.  I think they were deeply concerned about the bank,

17   but they never reference Ponzi scheme or fraud to me.

18             MR. BRYANT:  I pass the witness.

19             THE COURT:  Do you want to go until about 3:10 or do

20   you want to break now?

21             MR. DAY:  Why don't we break now, Your Honor.

22             THE COURT:  All right.  We'll take our afternoon

23   break now and see you back in 20 minutes.

24             (Whereupon, the jury left the courtroom.)

25             THE COURT:  Anything else?

1            MR. SADLER:  I just have one quick question for Your

2    Honor.  Based on Your Honor's rulings during Mr. Armstrong's

3    direct, do I now understand that witnesses are going to be

4    free to testify to what other people think or believe or know

5    about other things?  That's -- that's my interpretation of the

6    Court's ruling so I just wanted to be clear about that.

7            THE COURT:  If they were there and heard things that

8    allowed them to conclude what another person was thinking,

9    that's okay.  If it's psychic powers, I don't think so.

10            MR. SADLER:  So the difference -- I'm not

11    questioning, Your Honor.  I'm just trying to understand.  It

12    sounds like the difference is a witness has to be present,

13    hear somebody say something, and then that can be the basis

14    for the opinion I think Fred knew this or I think Fred thought

15    that.  Is that what you're telling us, Your Honor?

16            THE COURT:  What I'm telling you is there has to be

17    a foundation for the testimony.

18            MR. SADLER:  I understand now.  Thank you, Your

19    Honor.

20            THE COURT:  Okay?

21            MR. SADLER:  Yes, sir.

22            THE COURT:  Anything else?

23            MR. SADLER:  No, sir.

24            THE COURT:  You-all are good?  All right.  We'll see

25    you in 20 minutes.

1           (Brief recess.)

2                THE COURT:  All set?

3                MR. DAY:  Yes, Your Honor.

4                THE COURT:  All right.  Let's bring them in.

5                (Whereupon, the jury entered the courtroom.)

6                THE COURT:  Be seated.

7        The Receiver may proceed.

8                MR. DAY:  Thank you, Your Honor.

9                          CROSS EXAMINATION

10   By Mr. Day:

11   Q.   Hi, Mr. Armstrong.

12   A.   Good morning.

13   Q.   How are you doing today?

14   A.   I am doing fine.

15   Q.   I want to start off with a preliminary matter your

16   counsel didn't get into.  You mentioned you've been the

17   attorney for Mr. Magness and his company for several years.

18   Right?

19   A.   Yeah.  In the Nevada law matters, right.

20   Q.   Right.  And that goes back to, I think you said, 2006 or

21   so, maybe 2007?

22   A.   It's right at the end of 2006.

23   Q.   Okay.  You don't do that work for free, I'm sure.  Right?

24   A.   Uh-huh.  That's correct.

25   Q.   So what is your hourly rate?

1    A.    Currently it's $525 an hour.

2    Q.    Okay.  Is that how much you're being paid to be here

3    today?

4    A.    Yes.

5    Q.    Okay.  Does that include your travel time as well to get

6    here?

7    A.    Yes.

8    Q.    All right.  And then going back to 2006 with Mr. Magness,

9    how much would you say you've been paid to be his attorney?

10   A.    From my role, probably 20-, 25,000.

11   Q.    Now, you mentioned you're the president of Mango Five.

12   Correct?

13   A.    Yes.

14   Q.    But your duties and responsibilities are actually limited

15   by contract, aren't they?

16   A.    Yes.

17   Q.    And you are also the trust officer for Mango Five?

18   A.    Yes.

19   Q.    And I think that means that you're there to help Mango

20   Five make sure it's following Nevada trust law.  Right?

21   A.    Generally speaking, yes.

22   Q.    Now, you testified here earlier that Mr. Magness had

23   investments.  Right?

24   A.    Yes.

25   Q.    They performed certain ways up or down.  Right?

1    A.    Yes.

2    Q.    You testified about his strategies with respect to

3    investments?

4    A.    Yes.

5    Q.    And what he thought was good or not good?

6    A.    Yes.

7    Q.    But you actually agree with me that you were specifically

8    not involved with investments or related activities, so your

9    role with Mango Five was limited.  Right?

10   A.    On the day-to-day, yes.  They put me on the investment

11   committee, but my day-to-day role was very limited.

12   Q.    You were -- your role specifically excluded investments

13   and related activities.  Right?

14   A.    Yes.

15   Q.    So it did not come within your review to look at Magness

16   Trust's existing Stanford International Bank CDs and determine

17   what that was all about.  Right?

18   A.    Generally, yes.

19   Q.    And Mr. Magness did not take counsel from you because you

20   had a very limited role and he didn't know you very well.

21   Right?

22   A.    Yes.

23   Q.    Now, prior to the formation of Mango Five, you did not

24   know Mr. Magness and you never met him.

25   A.    Yes.

1    Q.   And you're president, but you're not a board member, are

2    you?

3    A.   No.

4    Q.   In fact, you have never provided counsel to Mr. Magness

5    concerning the SIB CDs.  Correct?

6    A.   No.

7    Q.   First time you ever heard about Stanford International

8    Bank CDs was at the Mango Five meetings?

9    A.   Correct.

10   Q.   And you attended most of those meetings via phone as

11   opposed to being in person.

12   A.   Yes.

13   Q.   Okay.  I just want to go through some of the ones that

14   the jury and we have seen during trial so far.

15        MR. DAY:  So, Mr. Jarrett, if you could pull up

16   Plaintiff's Exhibit 134.

17   Q.   (BY MR. DAY)  You'll see these are from October 1st,

18   2007.  Correct?

19   A.   Yes.

20   Q.   All right.  Let's see.  There's your name right there.

21   It looks like at this meeting you participated via telephone

22   call.  Right?

23   A.   Yes.

24   Q.   Okay.  Let's look at another set of minutes from that

25   same day, Plaintiff's Exhibit 133.

```
 1              MR. DAY:  You can go to the next page, Mr. Jarrett.

 2    Q.   (BY MR. DAY)  You see this document, Mr. Armstrong?

 3    A.   Yes.

 4    Q.   And I believe if we blow up that first paragraph?  Let me

 5    just read it real quick.  A lot of names.  Oh, there you are.

 6    Mr. Armstrong participated by a conference call, right --

 7    A.   Yes.

 8    Q.   -- which makes sense.  It was the same day?

 9    A.   Right.

10    Q.   Let's look at March 6, 2008, Plaintiff's Exhibit 62.  And

11    you recognize this is the one where Mr. Tolentino, also

12    Rodriguez -- same guy, right?

13    A.   Yes.

14    Q.   -- presented information concerning the SIB CDs?

15    A.   Yes.

16              MR. DAY:  If you can go to the next page, Mr.

17    Jarrett, and blow up that top paragraph.

18    Q.   (BY MR. DAY)  Mr. Armstrong participated by conference

19    call.  So we see a pattern here.  Right?

20    A.   Yes.

21    Q.   And let's look at December 5th just to make sure since

22    that came up in your direct testimony.  That's Plaintiff's

23    Exhibit 92.

24         All right.  Same paragraph.  Participating by telephone

25    was Mr. Armstrong.
```

1    A.   Yes.

2    Q.   And I believe if you go to Plaintiff's Exhibit 114, which

3    didn't come up in your direct but it's about this same topic,

4    go to the next page here, we'll see that you participated by

5    telephone.  Right?

6    A.   Yes.

7    Q.   So of all of these minutes we've seen so far, you've just

8    dialed in.

9    A.   Attended by phone.

10   Q.   You dialed numbers on the phone and dialed in?

11   A.   Yes.

12   Q.   Okay.

13           MR. DAY:  And, Mr. Jarrett, could you go to the next

14   page?  If you could blow up from 3 to here.

15   Q.   (BY MR. DAY)  So in this report of Stanford, I see right

16   after it, you left the meeting.  Right?

17   A.   Yes.

18   Q.   So you hung up the phone?

19   A.   Yes.

20   Q.   And the meeting continued without you?

21   A.   Yes, I was in Augusta, Georgia.

22   Q.   And so you wouldn't know from your personal knowledge

23   anything that happened after you left.  Right?

24   A.   That is correct.

25   Q.   And so since you attended all of these meetings via

1    phone, if there were any meetings that happened before you

2    dialed in or after you dialed in or after you excused

3    yourself, you wouldn't know anything about that.  Right?

4    A.    Correct.

5    Q.    Now, you mentioned in your testimony that you had heard

6    of Ponzi schemes before.  Right?

7    A.    Yes.

8    Q.    And, in fact, you had heard of Ponzi schemes before the

9    Madoff scandal even hit the news.  Right?

10   A.    Yes.

11   Q.    So you knew to keep an eye out for Ponzi schemes, fraud,

12   and crime in your role with Mango Five.

13   A.    Generally.  You need to be aware of the activities, yes.

14   Q.    You knew to keep an eye out for that stuff, didn't you?

15   A.    Well, in my role as -- in my role at Mango Five,

16   typically much of the investment activity was done through the

17   family office.

18   Q.    So was it a part of your role at Mango Five to keep an

19   eye out for Ponzi schemes, fraud, and crime?

20   A.    You know, if I saw it, I would have raised it.

21   Q.    I'll ask you one more time.

22   A.    Okay.

23   Q.    Was it part of your role to keep an eye out for Ponzi

24   schemes, fraud, or crime?

25   A.    On my contract I am limited to basically doing trust

1   administrative services in Nevada as a trust officer and

2   making sure they are complying Nevada law.

3   Q.   Do you remember we met at your deposition?

4   A.   Yes.

5   Q.   Yes.  And at that deposition this topic came up.  Right?

6   A.   Yes.

7   Q.   And you swore to tell the truth then?

8   A.   Yes.

9   Q.   As you did today?

10   A.   Yes.

11   Q.   Okay.  So if you could please turn to the notebook in

12   front of you, which has your transcript.

13          MR. DAY:  And, Mr. Jarrett, if you could pull up

14   page 27.

15   Q.   (BY MR. DAY)  And I'll wait, Mr. Armstrong, until you get

16   to the page?

17   A.   I'm at the page.  Thank you.

18          MR. DAY:  I want to start at line 15, so if you

19   could blow up that bottom half.

20   Q.   (BY MR. DAY)  Okay.  So going back to my questions, "In

21   your role as fiduciary, trust officer, president, member and

22   advisor to Mango Five, you knew it was important to do

23   appropriate due diligence.  Right?"  And you said --

24   A.   "Yes."

25   Q.   Let me finish.  "Well, I believe it's important to do

```
 1   appropriate due diligence when you're operating a company."
 2        And I asked you, "And so you knew to keep an eye open for
 3   potential Ponzi schemes.  Right?"
 4        And then your answer was, "Yes."
 5        Right?
 6   A.   I don't -- I mean, it's in my DNA to -- if there's
 7   something wrong, I'll raise it.
 8   Q.   So you knew to keep an eye out for Ponzi schemes?
 9   A.   Yes.
10   Q.   So you knew to keep an eye out for fraud.  Right?
11   A.   Yes.
12   Q.   And you knew to keep an eye out for crime.  Right?
13   A.   Yes.
14   Q.   Now, you understand that a Ponzi schemes starts out with
15   a group of investors that are promised larger returns and they
16   get paid back with new investors' money.  Right?
17   A.   Yes.
18   Q.   And eventually the Ponzi scheme house of cards has to
19   fall.
20   A.   Yes.
21   Q.   Over the last 20 to 25 years in your area of Nevada,
22   there have been about five Ponzi schemes that have been
23   home-grown there.  Right?
24   A.   That's what I recall, yes.
25   Q.   And there's been a significant uptick in the number of
```

1    Ponzi schemes since about 2006.  Right?

2    A.    In Nevada or just --

3    Q.    From your recollection.

4    A.    Yes.

5    Q.    And the Ponzi schemes in Nevada generally involved

6    investors in deeds of trusts with higher interest rates?

7    A.    Yes.

8    Q.    And you were aware of all of those Ponzi schemes in

9    Nevada.  Correct?

10   A.    I was aware of the Ponzi -- I don't know if I was aware

11   of all of the Ponzi schemes.

12   Q.    But you were aware of several in Nevada.

13   A.    Yes.

14   Q.    So, to you, what the Stanford International Bank CDs

15   started to look like were those real estate investments in

16   Nevada that turned out to be frauds or Ponzi schemes.  Right?

17   A.    At what time?  Is there -- could you rephrase the

18   question?

19   Q.    To you, the Stanford International Bank CDs -- you know

20   what I'm talking about, the CDs.  Right?

21   A.    Yes.

22   Q.    Over time they started to look more like those Ponzi

23   schemes with deeds of trusts that turned out to be frauds or

24   Ponzi schemes that you already knew about.

25   A.    When you say over time, that's kind of -- I mean,

```
 1    obviously today we know that it was a Ponzi scheme.  And until

 2    February of 2009, I wasn't aware -- I was concerned but not

 3    aware that it was -- there was allegations that it was a Ponzi

 4    scheme.

 5    Q.   So I just want to make sure I understand your testimony

 6    correctly.  Is it your testimony to the jury today that these

 7    Stanford International Bank CDs did not start to look like the

 8    real estate investments in Nevada that turned out to be frauds

 9    and Ponzi schemes?

10    A.   Over -- when you say over time, you -- it was -- it was

11    not a gradual thing.  We got specific facts at specific points

12    in time that created a concern about the Stanford CDs.

13    Q.   So you got specific facts at a specific point in time

14    that made you concerned about the CDs.  Right?  I think I just

15    heard that?

16    A.   I think that's a correct characterization.

17    Q.   And so the Stanford International Bank CDs started to

18    look like those real estate investments in Nevada that turned

19    out to be frauds and Ponzi schemes.

20    A.   They ultimately, economically, they -- yes, they had the

21    same result.

22    Q.   Now, you're aware that Stanford International Bank

23    marketed the CD as if it were an actual certificate of

24    deposit.  Correct?

25    A.   Yes.
```

1    Q.   But you found out that the Stanford International Bank CD

2    was not what was commonly understood to be a CD.  Right?

3    A.   Yes.

4    Q.   And that was because the underlying investments were

5    supposedly in equities as opposed to loans.  Right?

6    A.   A combination of equity and debt but not commercial

7    loans.

8    Q.   It wasn't like a commercial bank, was it?

9    A.   No.

10   Q.   And that caused you concern, didn't it?

11   A.   Yeah.  It recharacterized the character of the

12   investment.

13   Q.   It caused you concern.  Right?

14   A.   Yes.

15   Q.   And because -- that's because to the extent a portfolio

16   is in stocks or bonds, if there's a dip in the market, then

17   that creates exposure.  Right?

18   A.   Yes.  But commercial loans can do the same thing if

19   there's a dip in the real estate market or particular

20   business.

21   Q.   I understand that, but my focus is on what we're talking

22   about here, which is stocks and bonds.  If a company is

23   invested in stocks and bonds instead of the loans like a

24   normal commercial bank, there's a dip, that can create

25   exposure.  Right?

1   A.   Yes.

2   Q.   And you're aware that Stanford International Bank

3   marketed its CDs in comparison to United States CDs.  Right?

4   A.   Yes.

5   Q.   But once you opened the hood and got under there with

6   respect to SIB, and you saw what SIB said its CD was,

7   comparing United States CDs to Stanford International Bank CDs

8   was like comparing apples and oranges, wasn't it?

9   A.   Yes.

10  Q.   All right.  Let's go back to Plaintiff's Exhibit 62,

11  please.  We've already talked about these, but before this

12  call with Mr. Rodriguez-Tolentino, you had questions about the

13  safety of the Stanford International Bank CDs.

14  A.   They told me that they had made an investment.  So, yeah,

15  I didn't know enough about them.

16  Q.   So you had concerns about the Stanford International Bank

17  CDs prior to this call?

18  A.   I was -- it sounded like an investment I needed to think

19  more about, yes.  I don't know if I was concerned.

20  Q.   So is your testimony today that you were not concerned?

21  A.   Well, I mean, I just am skeptical on investments, so I

22  would say I would have skepticism.

23  Q.   So you were skeptical of the Stanford International Bank

24  CD?

25  A.   Skeptical of a lot of things.

1  Q.   Were you skeptical about the Stanford International Bank

2  CD?

3  A.   I really didn't know much about the Stanford

4  International Bank.  I was just recently added or associated

5  with the company, so I really was at a fairly general

6  knowledge base.

7  Q.   So you were skeptical about it, weren't you?

8  A.   I am skeptical about everything, yes.

9  Q.   You were concerned about that Stanford International Bank

10  CD, weren't you?

11  A.   I was not -- I don't believe I was concerned.

12  Q.   Okay.  Let's look at your deposition one more time,

13  Plaintiff's exhibit -- not Plaintiff's exhibit.  Turn to page

14  250, please.  Let me know when you're there, Mr. Armstrong.

15  A.   Okay.  I'm there.

16  Q.   All right.  Let's start at line 21.

17  A.   Yes.

18  Q.   And I'm just going to read this and let me know if I get

19  anything wrong.  And like we've already will talked about

20  today, Mr. Tolentino attended via phone.  Right?

21  A.   Yes.

22  Q.   And your answer was, "Correct."

23       And it specifically acknowledges that he was asked to

24  report on the safety of certificates of deposit -- and we'll

25  flip to the next page -- purchased through SIB.  Right?

     1          And the answer was, "Uh-huh, yes."

     2          Right?

     3     A.   They were asked to report on the safety of the

     4     certificate of deposit, and my answer was, "Uh-huh, yes."

     5     Q.   And you had questions about the safety of the SIB CDs

     6     before this call.  Correct?

     7     A.   I don't know if I did, but maybe members of Mango did.

     8     Q.   And it even says, "I think we were investigating."

     9     Right?

    10          MR. DAY:  You can take that down, Mr. Jarrett.

    11     Q.   (BY MR. DAY)  You were never presented with actual SIB

    12     performance numbers that were something you could rely upon

    13     completely, were you?

    14     A.   No.

    15     Q.   And that was concerning to you, wasn't it?

    16     A.   Yeah.  We -- we had basically marketing materials and --

    17     that were provided to us.  In fact, you provided them to me.

    18     Q.   And you said that you were never provided with actual SIB

    19     performance numbers that you could not rely upon completely.

    20     You just said that?

    21     A.   Other than what was reported by Tom Espy during the

    22     course of a meeting with Mango Five Family, Inc.

    23     Q.   And you would agree with me that that was concerning.

    24     Right?

    25     A.   Excuse me?

1   Q.   You would agree with me that that was concerning.  Right?

2   A.   Yes.

3   Q.   And, in fact, you perceived a conceptual difficulty when

4   you were presented with SIB information saying the CD was like

5   a bond, but the underlying portfolio was something different.

6   Right?

7   A.   Yeah.  I -- I had to gain understanding of it, yes.

8   Q.   And it was that conceptual difficulty that was part of

9   the conversation that Mango Five had with Mr. Tolentino in

10  March 2008.  Right?

11  A.   Yes.

12  Q.   Because you wanted to get under the hood and see how is

13  it SIB is generating these purported returns.  Right?

14  A.   Yes.

15  Q.   Now, I believe you testified earlier that, and tell me if

16  I'm wrong, that after the call in March 2008 with SIB's

17  president, you felt more comfortable with the bank?

18  A.   Well, we got more information about what was under the

19  hood, yes.

20  Q.   So you did feel more comfortable with the bank?

21  A.   A little bit, yes.

22  Q.   But you've told me before that after the call, you had an

23  increased awareness of risk.  Right?

24  A.   Yes.

25  Q.   Absolutely you did?

1   A.   Yes.

2   Q.   And that increased awareness of risk caused you to be

3   concerned about the SIB CDs.  Right?

4   A.   Well, we now knew what kind of investment it was.  I

5   was -- thought initially it was a conventional CD.

6   Q.   So you had an increased awareness of risk.

7   A.   Yes.  And recalibrate what the type of investment it was,

8   yes.

9   Q.   And that meant you were more concerned about the SIB CD.

10  A.   It was more risky -- it was a more risky investment than

11  a conventional CD, yes.

12  Q.   So, yes, you were concerned?

13  A.   Well, I was concerned about risk, yes.

14           MR. DAY:  And if you could put up, Mr. Jarrett,

15  Plaintiff's Exhibit 143 --

16  Q.   (BY MR. DAY)  -- which were your March 2008 handwritten

17  notes.  We're just going to flip through this one page at a

18  time.  I'm not going to make you read the whole thing.

19       So we can see all the text there.  Correct?  There's

20  nothing hiding, any text.

21  A.   No.

22  Q.   Okay.

23           MR. DAY:  Can you go to the next page, please?

24  Q.   (BY MR. DAY)  Same thing here.  Right?

25  A.   Yes.

188

1   Q.   You, in fact, read much of this toward the bottom half?

2   A.   Yes.

3           MR. DAY:  And go to the next page, please.

4   Q.   (BY MR. DAY)  Again, we can see all your handwriting.

5   Correct?

6   A.   Yes.

7           MR. DAY:  The final page, please.

8   Q.   (BY MR. DAY)  And this is the last page, and we can read

9   all of this?

10  A.   Generally, yes.

11  Q.   There's nothing obscuring the text.  Correct?

12  A.   No.

13          MR. DAY:  And let's go back to the second page, Mr.

14  Jarrett.  Right there at the bottom, this paragraph.

15  Q.   (BY MR. DAY)  Now, you saw on Plaintiff's Exhibit 62 the

16  phrase Swiss bank model in quotes.  Right?

17  A.   Yes.

18  Q.   And there it is right there in your handwritten notes.

19  Right?

20  A.   Yes.

21  Q.   Now, you agree with me that Mr. Rodriguez-Tolentino just

22  threw this phrase out at you.

23  A.   Yes.

24  Q.   And to you Swiss bank model means secret and not like a

25  commercial bank.  Right?

1   A.   Yes.

2   Q.   So let's go to Plaintiff's Exhibit 62 one more time.

3   This is the typed minutes by Mr. Sutton.  Correct?

4        MR. DAY:  Next page, please, Mr. Jarrett.

5        THE WITNESS:  Yes.

6        MR. DAY:  Let's go to section 5, I believe, on the

7   next page and grab all three paragraphs there.

8   Q.   (BY MR. DAY)  We've already seen this during trial, but I

9   want to focus on the last paragraph.

10       So after you heard about Swiss bank model, the Mango Five

11  investment committee basically just said, Gary, you can decide

12  what to do with this CD.  Right?

13  A.   Yeah.  They delegated authority to Mr. Magness, yes.

14  Q.   Anything about investments or withdrawals became:  Mr.

15  Magness, it's up to you.  Right?

16  A.   Yes.

17  Q.   Let's talk about December 5th, 2008.  Do you remember a

18  meeting happened that day?  Right?

19  A.   Yes.

20  Q.   And you testified on direct that, gosh, these meetings

21  were eight, nine years ago.  Right?

22  A.   They occurred eight or nine years ago, yes.

23  Q.   Right.  And so your memory today isn't as good as maybe

24  what the minutes say?

25  A.   I think that would be a fair characterization.

```
 1    Q.    But you testified on direct examination that you didn't

 2    recall Mr. Sutton saying anything about a receivership or

 3    owing any money to a receiver.  Right?

 4    A.    No, I don't recall that.  Yeah.  Today.

 5    Q.    But it's been eight or nine years?

 6    A.    It's been nine years, yes.

 7    Q.    And I think you also testified that sometimes there's

 8    conversations that happen before you even dial into the

 9    meetings?

10    A.    I think that would be -- I would imagine that to be the

11    case, but I don't know that to be.

12    Q.    You wouldn't know what was said at those.  Right?

13    A.    No, I would not know that.

14    Q.    And, likewise, if you dial out or leave early, you

15    wouldn't know about anything that was said after that.  Right?

16    A.    That's correct, yes.

17    Q.    So your recollection of whether Mr. Sutton said anything

18    about a receiver or owing a receiver money is limited by the

19    amount of years past.  Right?

20    A.    Yes.

21    Q.    The fact that you were not a secretary of this

22    organization?

23    A.    Yes.

24    Q.    It was not your job to take notes?  Correct?

25    A.    Yes.
```

 1    Q.   And you may not have even been there when the statements

 2    were said.

 3    A.   Possibly, yes.

 4    Q.   Let's look at your handwritten notes from December of

 5    2008.

 6              MR. DAY:  Plaintiff's Exhibit 292, please.

 7    Q.   (BY MR. DAY)  I see something different on this page.

 8    And do you agree with me it is this big black box?

 9    A.   Yes.

10    Q.   And before you came to testify today, did you read what

11    was behind that big black box?

12    A.   I believe I did, yes.

13    Q.   You did.

14    A.   Yes.

15    Q.   Did you testify today based upon what was behind that

16    black box?

17    A.   No, I don't believe I did.

18    Q.   Are you aware that this is the version that was produced

19    to the Receiver where we don't get to see what's behind that?

20    A.   I understand it was a redaction, yes.

21    Q.   And you're aware that the jury can't see what's behind

22    that box, either.

23    A.   That is correct, yes.

24    Q.   The next page, I see two more black boxes.  Do you?

25    A.   Yes.

```
 1              MR. DAY:  Let's blow up from that top box to that

 2   bottom box.

 3   Q.   (BY MR. DAY)  I see the word Stanford International Bank

 4   in between those boxes.  Do you?

 5   A.   I do, yes.

 6   Q.   It talks about cash that it has and additional capital.

 7   Right?

 8   A.   Yes.

 9   Q.   And it says it's down five to six percent.  Right?

10   A.   Yes.

11   Q.   But we can't read behind these boxes, can we?

12   A.   No.

13   Q.   We don't know what's behind there, do we?

14   A.   You don't know, yes.

15   Q.   I don't know.

16   A.   That's correct.

17   Q.   The jury doesn't know, either, do they?

18   A.   That's correct.

19              MR. DAY:  Pass the witness.

20              THE COURT:  All right.  I think I need to give a

21   short explanation here.

22        The parties exchange information before trial so that we

23   don't have the fun Perry Mason moment of ah-ha where the

24   witness breaks down and confesses.  In real life it doesn't

25   work that way.  They exchange information ahead of time,
```

1    including documents.

2        Under the law, one side is not entitled to receive

3    attorney/client communications from the other side.  So you're

4    entitled to talk with your attorney and be candid and the

5    attorney can be candid back and not run the risk that it will

6    show up on a big screen in the middle of a trial.  So there's

7    what's called an attorney/client privilege.

8        Sometimes a person who is an attorney may act in a

9    business capacity where they're serving a business function,

10   for example, as the president of a company.  They may also

11   give legal advice.  They can have two different hats.  So it's

12   not unusual in circumstances like this for a party to take the

13   position that "these statements were made in my capacity as

14   the president of a company, these statements were made in my

15   capacity as offering legal advice."  And when that happens,

16   it's customary for them, if the document reflects both of

17   those, to black out the part that they believe is legal advice

18   and to produce the rest of it.  It's called redaction.

19       So it's not unusual in litigation like this when you have

20   a person who has both a business capacity as president and

21   also as a lawyer for there to be redactions in documents where

22   some of it is business matters and some of it reflects legal

23   advice.

24       So I am operating under the assumption that that's why

25   the redaction was.  If the Receiver can test the validity of

1    the redaction, they had the opportunity before trial to raise

2    that issue and sort it out.  So at this point we assume that

3    that's a valid assertion of legal privilege.

4         MR. BRYANT:  Your Honor, the Magness parties have no

5    objection to, as long as it doesn't waive anything else,

6    providing the unredacted version of that document to -- for

7    the jury to see, for the opposing party to see.  So we make

8    that offer at this point, and there's nothing to -- nothing to

9    hide here.

10        MR. DAY:  Your Honor, may we approach to discuss?

11        THE COURT:  Oh, so briefly.

12        (Discussion at the bench, out of the hearing of the

13        reporter.)

14        THE COURT:  I understand the Receiver is going to

15   accept the offer of production of that with the understanding

16   that it doesn't constitute any waiver of any other claim of

17   attorney/client privilege.

18        MR. BRYANT:  Your Honor, could we go ahead and mark

19   this as an exhibit?

20        THE COURT:  That's fine if you want to offer it.

21        MR. BRYANT:  Okay.

22        MR. DAY:  Do you have an extra copy I can see?

23        MR. BRYANT:  I don't believe we have one, but you

24   are welcome to see it.

25        Your Honor, I don't know whether we have an exhibit

1    sticker or -- thank you.

2        Your Honor, I've marked the unredacted version of the

3    handwritten notes of the December 5th, 2008 meeting of the

4    Mango Five investment committee as Defendant's Exhibit 292-A,

5    if that's okay, and I would like to present that to the

6    witness.

7            THE COURT:  All right.  Are you offering it at this

8    time?

9            MR. BRYANT:  I am offering it at this time.

10           THE COURT:  Any objection?

11           MR. DAY:  No, Your Honor.

12           THE COURT:  It's admitted.

13           MR. BRYANT:  May I present this to the witness?

14           THE COURT:  Yes.

15                        REDIRECT EXAMINATION

16   By Mr. Bryant:

17   Q.   Mr. Armstrong, are the -- is everything, including the

18   unredacted portion of Exhibit 292-A, in your handwriting?

19   A.   Yes, it is.

20   Q.   Okay.  I'd like to ask you to look at the second page of

21   the document.  We already talked about the portion of that

22   document that refers to that page that refers to Stanford

23   International Bank.

24       Could you do your best to read the portion just below the

25   portion that refers to Stanford International Bank?

1   A.   For the year arrowed and no leverage, one billion in

2   cash, 480 million in additional capital, very solvent,

3   liquidity quickly.

4   Q.   Okay.  Is that the portion of the redacted document that

5   you saw unredacted yesterday?

6   A.   Yes, it is.

7   Q.   Okay.  Now, counsel for the Receiver asked you about

8   whether or not it was your contractual duty with Mango Five to

9   report if you saw some evidence of Ponzi schemes among the

10  investments of Mango Five.  Do you recall that?

11  A.   Yes.

12  Q.   And is it correct that you didn't have a contractual duty

13  to do that?

14  A.   That's correct.

15  Q.   Had you seen ever, in your functions with Mango Five

16  investment committee or Gary Magness, evidence that he was

17  invested in a Ponzi scheme, would you have made Mr. Magness

18  and the other members of the committee aware of your belief?

19  A.   I believe I would, yes.

20           MR. BRYANT:  Pass the witness.

21           MR. DAY:  No further questions, Your Honor.

22           THE COURT:  Thank you, sir.  You may step down.

23           THE WITNESS:  Thank you.

24           MR. BRYANT:  May this witness be excused?

25           THE COURT:  Any objection?

```
 1              MR. DAY:  No, Your Honor.

 2              THE COURT:  That's fine.

 3              MR. PETRIE:  Call Steve Knudson.

 4              THE COURT:  Go ahead and have a seat, please, sir.

 5              THE WITNESS:  Yes, Your Honor.

 6              THE COURT:  Could you raise your right hand, please?

 7              (Whereupon, the oath was administered by the Court.)

 8              THE COURT:  The Magness parties may proceed.

 9              MR. PETRIE:  Thank you, Your Honor.

10        Mr. Knudson, would you do me a favor and pull the mic

11   closer to you?  That way we won't have a problem listening to

12   you.

13              THE WITNESS:  Is this better?

14              MR. PETRIE:  Much.  Thank you.

15        May I approach the witness with a binder of exhibits,

16   Your Honor?

17              THE COURT:  Yes.

18              MR. PETRIE:  Thank you.

19                      STEVE KNUDSON, SWORN,

20                      DIRECT EXAMINATION

21   By Mr. Petrie:

22   Q.   Mr. Knudson, understanding that your name has been

23   bandied about quite a bit the last couple of days, could you

24   just as basic background explain to the jury, please, what

25   your roles are with respect to the Mango Five Family, Inc.,
```

```
 1   entity?

 2   A.   Yes.  I'm vice president of Mango Five Family, Inc., and

 3   I'm also a board member of Mango Five Family, Inc.

 4   Q.   And we've also seen a series of minutes several times for

 5   these investment committees.  Were you involved over the

 6   course of, let's say, from formation of Mango Five in late

 7   2006 through, say, the middle of 2009 just as a benchmark with

 8   those investment committees?

 9   A.   Yes, I was.

10   Q.   What was your involvement over that time frame?

11   A.   I attended meetings for the quarterly meetings for MFFI,

12   if I may use that.

13   Q.   Certainly.  Now, you have also been sitting in the

14   courtroom throughout the proceedings thus far as a

15   representative of the company.  Correct?

16   A.   Correct.

17   Q.   And you've heard some of the factual assertions that

18   counsel for the Receiver made in his opening statement.

19   Correct?

20   A.   Correct.

21   Q.   Did you -- do you remember his comments to the effect

22   that the Magness parties have concocted this -- their version

23   of the events and have made up a story?

24   A.   I heard that, yes.

25   Q.   And what's your reaction to that assertion that the
```

1    Receiver is making?

2    A.    It's untrue.

3    Q.    The Receiver also made the assertion that the folks at

4    Stanford International Bank had said things to Mango Five

5    Family, Inc., and its representatives that the representatives

6    of Mango Five knew were false.  Do you recall that?

7    A.    Yes.

8    Q.    And is that an accurate statement?

9    A.    I don't believe so.

10   Q.    Now, during the course of the time that you were acting

11   as a vice president and a board member of MFFI, did you at any

12   point in time from, let's say, November of '06 through mid or,

13   let's say, through the end of October of 2008 learn any facts

14   that led you to believe that information Mango Family Five had

15   been provided by Stanford International Bank was false?

16   A.    No, I did not.

17   Q.    During that same time frame, were you provided with any

18   information, any factual information, that led you to believe

19   that Stanford International Bank was running out of cash?

20   A.    No, I did not.

21   Q.    Now, we've heard some about KMM Parking very briefly, and

22   I don't want to replow any ground that's already been covered,

23   but what was, in a very general way, your involvement with KMM

24   Parking?

25   A.    Well, I was a partner with Gary and his brother, and we

```
 1    were developing a parking garage and casino up in the
 2    mountains.
 3    Q.    Okay.  And you are the K in KMM, are you not?
 4    A.    I am.
 5    Q.    And if you would look at the binder in front of you,
 6    could you please look at Exhibit 12-A.  The first page is not
 7    tremendously helpful, so if you look at the second page, you
 8    see, sir, that beginning with the second page and carrying
 9    through the remainder of this document, you have faxed
10    information coming over from Stanford that relates to the KMM
11    Parking transaction about which we've heard some testimony.
12    A.    Yes.  That's correct.
13    Q.    Okay.  I'd like you to focus, if you would, please, and
14    starting on page 29 of that packet that's 12-A.  And the
15    easiest way to steer around in the document is there are some
16    bold letters in the bottom right-hand corner that end and look
17    for the one ending in 29?
18    A.    We're talking about the February 5th Stanford Group
19    letter?
20    Q.    Yes, sir.  And is that a letter that you had a copy of at
21    some point in February of 1999 when you're working on the KMM
22    Parking transaction with Stanford?
23    A.    Yes.
24    Q.    And, by the way, had you had any business dealings with
25    Stanford International Bank prior to the KMM Parking
```

291

1    transaction?

2    A.    No.

3    Q.    Then if you could also look at the previous page, which

4    is Exhibit 28.  Excuse me.  It's Exhibit 12-A.  It's page 28.

5    I misspoke.  Do you have that, sir?

6    A.    Yes, I do.

7    Q.    Okay.  And on that page -- I'm not going to try and

8    pronounce the gentleman's name, but there is another February

9    5, 1999 letter addressed to someone at the Stanford

10   International Bank.  Do you see that, sir?

11   A.    Yes, I do.

12   Q.    On the letter, is that your signature there above the

13   name Steve Knudson?

14   A.    Yes, it is.

15   Q.    Okay.  Is this a letter that you prepared?

16   A.    No.

17   Q.    How was this letter prepared?

18   A.    Well, I believe Stanford in their standard form or

19   whatever, this looks like their typeset, their standard deal.

20   Q.    Okay.  Had you asked the folks at Stanford in connection

21   with the KMM Parking transaction to extend to the KMM Parking

22   entity a loan credit facility based on a CD deposit?

23   A.    I believe they offered this as an extra benefit.

24   Q.    And was that a benefit of which KMM Parking took

25   advantage during the time period it was transacting business

```
 1    with Stanford International Bank?

 2    A.    No, we did not.

 3    Q.    The point in time when you were transacting business with

 4    Stanford International Bank on behalf of KMM Parking, did you

 5    have any reason to believe that there was something amiss with

 6    that financial institution, the bank?

 7    A.    No.

 8    Q.    I'd like to jump forward then and talk to you some about

 9    your involvement with MFFI and focus in on some very specific

10    items that have been alluded to during the course of the case

11    thus far.

12        And I'd like to start by talking to you about a October

13    1st, 2007 board meeting, not the meeting of the investment

14    committee, but of the board.  And in that context, could you

15    look, please, at Exhibit 134 in your binder.  Have you found

16    that, sir?

17    A.    You said 34?

18    Q.    134.  Hopefully, it's the last document in your binder.

19    A.    Yes, I got it.

20    Q.    Okay.  And if you would look, please, at paragraph 5, it

21    starts at the bottom of the first page and then carries over

22    to roughly the first half of the second.  And it's probably

23    easier, because it does straddle two pages, if you would just

24    start with a hard copy, and then if you would, turn, once

25    you've oriented yourself in the document, to the top of the
```

```
 1    second page of these minutes.  And I'd like to ask you a
 2    couple of questions here.
 3    A.    Okay.
 4    Q.    Do you have that second page, sir?
 5    A.    Yes.
 6    Q.    Okay.  There is reported in these minutes a statement
 7    that you had--and I'm going to read from the minutes--noted
 8    one advantage of borrowing from Stanford would be the
 9    possibility for legal offset in the event that the Trust's
10    significant investment in certificates of deposit in Antigua
11    were at risk.  Do you see that reference?
12    A.    Yes.
13    Q.    Would you explain to the jury the context?  First of all,
14    was that a statement you made at this board meeting?
15    A.    Yes.
16    Q.    And what was the context in which you made that, sir?
17    A.    Well, you know, it's been in my experience as an attorney
18    that when you're dealing with banks, you use legal tools like
19    offset, cross collateral, cross default, curing provisions,
20    and this was a discussion about that in a general way, is what
21    it was.
22    Q.    Is there a reason why your reference to that possibility
23    for legal offset is only in the context of Stanford and not
24    for the other banks that are referenced in the preceding
25    paragraph, HSBC and U.S. Trust?
```

1    A.    Well, yes.

2    Q.    Why is that?

3    A.    At Stanford we had a CD investment program, and so that

4    was different than the other banks where we -- we didn't have

5    CDs.  So that possibility, that theory, you know, wouldn't

6    apply.

7    Q.    At this point in time when you were speaking to -- when

8    you were providing this comment to the board on October 1st of

9    2007, did you perceive there was an existing risk with the

10   certificates of deposit?

11   A.    No.

12   Q.    Why did you use the phrase here about "if they were at

13   risk"?

14   A.    It's just -- I guess it's my legal training.  I didn't

15   perceive there was any actual risk.

16   Q.    And if you could then look at Exhibit No. 133, the one

17   immediately preceding, and hopefully that is the agenda

18   followed by the minutes of the investment committee meeting

19   that same day.

20   A.    Yes.

21   Q.    And if you could look, please, at the item in paragraph 7

22   that has the heading Miscellaneous Items.  You were present

23   when these requests were made.  Correct?

24   A.    Yes.

25   Q.    And as a participant in this meeting, did you have an

1    understanding as to what the context was in which these

2    requests for additional information were being made?

3    A.    You know, as you can see from these minutes, we would

4    request reports and discussions about all the assets.  And Mr.

5    Espy was to prepare a report, and we also asked Mr. Wilk to

6    also look into it.

7    Q.    Was there some particular -- was there anything in

8    particular going on with respect to the certificates of

9    deposit that from your perspective led the investment

10   committee to seek this additional information?

11   A.    No, not that I'm aware of.

12   Q.    Then if you would, would you -- I'd like to jump forward

13   in time and have you look at Plaintiff's Exhibit 62, please.

14   And if you can pass over the first page, which is an agenda,

15   and go right to the minutes of the March 6th, 2008, conference

16   call.

17        Setting aside what's in the minutes, do you have any

18   independent memory of that call?

19   A.    Could you ask that again?

20   Q.    Yeah.  Without looking at the minutes, do you have any

21   independent memory of having a conference call with Juan

22   Rodriguez or Juan Rodriguez-Tolentino at some point in early

23   2008?

24   A.    Just generally, generally speaking.

25   Q.    And in terms of your general memory of that call, was

1    there any discussion in that call that somehow Mr.

2    Rodriguez-Tolentino was providing the investment committee of

3    MFFI with information that wasn't available to the public?

4    A.    No, not at all.

5    Q.    Was there any discussion there about this being an

6    unusual circumstance that he as the president of the bank

7    would be speaking to someone who had deposited a lot of money

8    in certificates of deposit?

9    A.    No.

10   Q.    Did you-all have any thoughts to the effect that this was

11   unusual that you would be speaking to the president of the

12   bank in which Mr. Magness and his companies had deposited $79

13   million?

14   A.    No.  I think this was an accommodation because we were --

15   you know, we were a good client.  That's all.

16   Q.    Now, obviously you've been sitting in the courtroom and

17   had an opportunity to see the discussion about the topics

18   reported in these minutes.  Right?

19   A.    Yes.

20   Q.    Was there anything about the information that was

21   provided at this time that caused any concern for you when you

22   heard Mr. Rodriguez-Tolentino provide it?

23   A.    Well, I think overall it was, you know, it was -- it was

24   a feel-good meeting.  It was a feel-good discussion.  There

25   wasn't anything of major concern to me, so --

1  Q.   In or as of, I should say, March of 2008, did you have a

2  certificate of deposit or certificates of deposit at Stanford?

3  A.   I did.  I had two of them.

4  Q.   And for the benefit of the jury, what in approximate

5  numbers were the amounts of certificates of deposit you had at

6  the bank?

7  A.   A little over two million and a little over 11 and a half

8  million.

9  Q.   And we've seen other information about the 11 and a half

10  million so I'm not going to replow that ground.  But could you

11  tell the jury what the source of the funding was for the

12  smaller certificate of deposit for two and some odd million

13  dollars?

14  A.   Well, that was a loan against my house.

15  Q.   Okay.  When you heard the information that Mr.

16  Rodriguez-Tolentino provided to you on March 6th of 2008, did

17  you have any concerns about the security of that CD from which

18  you -- or that you obtained the money to deposit from the

19  mortgage on your house?

20  A.   No.

21  Q.   After this meeting, did you feel any need, whether for as

22  a member of the investment committee or simply because of the

23  two CDs that you had in your own name, to follow up with Mr.

24  Rodriguez-Tolentino and obtain any additional information

25  based on what he told you?

1   A.    No.

2   Q.    Was this information something after March 6th of 2008

3   that you were using in your going-forward work, either as an

4   officer of MFFI, as a board member of MFFI, or as a member of

5   the investment committee?

6   A.    Could you ask me that again?

7   Q.    Let me break it down for you.  That was a mouthful.  I

8   apologize.

9         Going forward in time from March 6th of 2008, did any of

10  the information that Mr. Rodriguez-Tolentino provided in this

11  meeting, was that information something that you used going

12  forward as a member of the investment committee?

13  A.    I'm not sure I understand what you mean by going forward.

14  Q.    Well, from March 7th, 2008 into the future, was this

15  information that was something you used in connection with

16  your activities on the investment committee?

17  A.    Well, it just made us feel fairly comfortable as we moved

18  forward, and we didn't act on it.  We didn't do anything about

19  it.

20  Q.    When you heard this information and, as you said, it --

21  it was this feel-good meeting, did you have any sense, to use

22  Mr. Sadler's word, that what you were being given was

23  gibberish?

24  A.    No.  It was -- it was -- he talked about the sectors and

25  the markets and liquidity and what kind of debt they had

```
1    and -- you know, it was basic decent information.

2    Q.   Now, were you -- you personally, were you involved at all

3    in the transactions that we've been hearing about that took

4    place in October of 2008 involving the loans --

5    A.   No.

6    Q.   -- from Stanford?

7    A.   I wasn't.

8    Q.   But you were involved in later investment committee

9    meetings that talked about the existence of the loans?

10   A.   Yes.

11   Q.   At any point in time, was there a discussion of those

12   loans as somehow being a mechanism that was put in place to

13   try and get more money out of the bank than you were otherwise

14   entitled to?

15   A.   No.

16   Q.   To use Mr. Sadler's term, was this -- were these loan

17   arrangements, as later discussed in investment committee

18   meetings where you were present, things that were what you

19   understood to be a sham?

20   A.   No, not at all.

21   Q.   How were these discussed in later meetings when you were

22   present?

23   A.   Well, Gary--Mr. Magness--was under, you know, a whole lot

24   of pressure to, you know, either come up with money or sell

25   stock to satisfy the banks, and if he didn't, then you know
```

1    they'd sell the stock for him, and they were doing that from

2    time to time, and he was under a lot of pressure, so they got

3    money from Stanford quickly.

4    Q.   I'd like to jump forward again in time to December of

5    2008 and ask you to look, please, at Exhibit 92.  And, again,

6    if you'd skip the agenda, which is the first page of the

7    document.

8         And can you just confirm for me that these--we've looked

9    at them several times during the course of the trial--are the

10   December 5, 2008 minutes for a meeting at which you were

11   present?

12   A.   Yes.

13   Q.   And at this meeting where you were present, were you

14   present when Mr. Espy made a report to the effect that

15   redemption would not be possible at this time, and at this

16   time meaning in December of '08?

17   A.   Yes.

18   Q.   Was there any follow-up to what he meant by that with Mr.

19   Espy at this time?

20   A.   Well, I mean, the bank wasn't doing -- wasn't going

21   redeem and we had gotten a loan.  So that's the -- that's what

22   I remember.

23   Q.   When you heard this information, recognizing that you

24   weren't involved in the loan process, but you received this

25   information about redemption and the loans, et cetera, as a

1    member of the investment committee, did that cause you any

2    concern?

3    A.    No.

4    Q.    Why not?

5    A.    Because banks have the right to -- you know, they have

6    the right to allow you to -- to not allow you to redeem or

7    penalize you if you try or not do -- not do anything.

8    Q.    I probably should have asked this earlier in asking you

9    questions, sir, but could you -- we've heard a little bit from

10   others, but I'd like to hear it from you about the area of law

11   in which you practiced when you were in the practice of law?

12   A.    Real estate, corporate.

13   Q.    And in connection with your experience practicing in the

14   area of real estate and corporate, did you become familiar

15   with the concept of what a receiver is?

16   A.    Yes.

17   Q.    And did you have that general familiarity and

18   understanding of what a receiver was in December of 2008?

19   A.    Yes.

20   Q.    Was there any discussion the December 5, 2008 meeting

21   that you attended about the potential or the possibility of a

22   receiver in the context of talking about Stanford?

23   A.    No.

24   Q.    Is that something that you would have understood at the

25   time to be a significant fact?

1   A.   Yeah.  That would have stuck out like a sore thumb.

2   Q.   And why is that?

3   A.   Because that's a big deal.

4   Q.   Why is that a big deal?

5   A.   Because that means the companies could be on the verge of

6   bankruptcy, could be significant problems.  It's -- receiver

7   means somebody is taking over the company, the bank, entity.

8   Q.   As of December 5th, as a member of the investment

9   committee, did you have any facts that led you to believe the

10  Stanford International Bank was somehow on the verge of

11  bankruptcy or insolvency?

12  A.   No.

13  Q.   And the last area that I'd like to talk to you about,

14  sir, is a letter you sent out in January of 2009.  And to that

15  end, could you please look at the binder under -- at Exhibit

16  98, which is tab 98?

17       And let's just start by looking at the date of

18  the -- you're familiar with this letter.  Right?

19  A.   Yes.

20  Q.   Your signature.  Right?

21  A.   Yes.

22  Q.   How was this letter prepared, put together?

23  A.   Well, Tom Espy came over or brought this, the basics of

24  this letter and these -- these bullet points to me, and we

25  drafted a letter -- a letter together to send to Stanford

1    International Bank.

2    Q.   And what was the reason for, at this point in time, you

3    sitting down and working with Mr. Espy to prepare this letter?

4    A.   Well, Madoff had come to public knowledge and, you know,

5    the investment and finance world was abuzz with Madoff.  And

6    so these points were basically a -- a road map, if you will,

7    as to what the things you need to look at for -- for a Ponzi

8    scheme.

9         You know, the word "Ponzi" or the concept of it was,

10   frankly, new to me.  And so these particular points we just

11   outlined because it was a -- it was a road map that came from

12   the Madoff situation.

13   Q.   At this point in time, based upon the facts available to

14   you, did you have some concern that Stanford might be a Ponzi

15   scheme?

16   A.   Yes, we did at this time, yeah.

17   Q.   And what was there that led you at this time to have some

18   concern that it might be a Ponzi scheme?

19   A.   Well, I mean, they came out with an investment report I

20   think in December or the end of December, something, and they

21   weren't making very much money or -- it just didn't -- it

22   didn't feel right.  This was after Madoff came to pass, and we

23   just -- you know, all our antennas were up.

24   Q.   When you say that this report came out at the end of

25   December and it just didn't feel right, how did that report

1    come to your attention?

2    A.    I think Mr. Espy showed it to us.

3    Q.    Did you ever get an answer to this letter?

4    A.    There was a phone call late January where they addressed

5    some of this.

6    Q.    And who is the they?

7    A.    The people at Stanford.

8    Q.    Do you remember specifically the people at Stanford who

9    were addressing it?

10   A.    It might have been Juan Rodriguez and the lady, Laura

11   Pendergest.

12   Q.    And why do you say it might have been?

13   A.    I am trying to remember who was on the phone and I don't.

14   Q.    And in that phone call, did they address the various

15   questions that you had asked?

16   A.    Whatever it was, it didn't make a whole lot of sense.

17   Q.    In terms of the phone call providing information in

18   response to this, who else was present from the Magness

19   parties, if anyone else besides yourself?

20   A.    I think Tonya Dokken was, and Ray Sutton might have been

21   involved.  Bob Armstrong might have been -- you know, I -- I

22   don't remember, specifically.

23   Q.    After that phone call, did you have any further

24   communications with the folks at Stanford International Bank

25   about the topics of this letter?

```
 1   A.   Did I?

 2   Q.   Yes, sir.

 3   A.   No.

 4   Q.   Did you have any further communications with the folks at

 5   Stanford International Bank about any sort of information

 6   concerning the bank's operations of the certificates of

 7   deposit?

 8   A.   I don't believe so.

 9   Q.   Okay.

10        MR. PETRIE:  I have no further questions, Your

11   Honor.  Thank you.

12        THE COURT:  The Receiver may proceed.

13        MR. DAY:  Thank you, Your Honor.

14        THE WITNESS:  Is this water?

15        THE COURT:  Probably.  I just wanted to make sure it

16   wasn't coffee.

17        MR. DAY:  Your Honor, may I approach the witness?

18        THE COURT:  Yes.

19                    CROSS EXAMINATION

20   By Mr. Day:

21   Q.   Exhibits and then your deposition transcript.

22        Mr. Knudson, are you ready?

23   A.   Yes.

24        MR. DAY:  May I proceed?

25        THE COURT:  Yes.
```

1    Q.   (BY MR. DAY)  Mr. Knudson, you've known Mr. Magness since

2    the 1980s.  Correct?

3    A.   Correct.

4    Q.   And you would say that you have a close relationship and

5    are good friends with Mr. Magness.  Right?

6    A.   Yes.

7    Q.   You race with Mr. Magness in those Baja races he

8    testified about?

9    A.   Unfortunately, yes.

10   Q.   And you currently work at Fortrust.  Correct?

11   A.   Correct.

12   Q.   And that's the computer center we heard Mr. Magness

13   testify about before.  Right?

14   A.   Yes.

15   Q.   It's one of his assets?

16   A.   Yes.

17   Q.   I'm sorry.  I can't hear you.

18   A.   Yes.

19   Q.   Thank you.

20   A.   Sorry.

21   Q.   No problem.  It's my understanding that you're vice

22   chairman, president, and chief executive officer of Fortrust?

23   A.   Yes.

24   Q.   And so you're a pretty smart businessman.  Right?

25   A.   How do you want me to answer that?

1    Q.    Truthfully.

2    A.    Yes.

3    Q.    Now, you know the Magness defendants invested $79 million

4    into Stanford International Bank CDs.  Right?

5    A.    Yes.

6    Q.    And you're aware that in October 2008, Gary Magness and

7    his companies received $88.2 million in fraudulent transfers

8    from Stanford International Bank.  Right?

9    A.    Yes.

10   Q.    And you know the Magness defendants took that money out

11   in the form of purported loans.  Right?

12   A.    Loans, yes.

13   Q.    Let's talk about Mango Five and how it is involved in

14   this process.  So that's the trustee that oversees Mr.

15   Magness' trusts.  Correct?

16   A.    Yes.

17   Q.    And since Mango Five was formed in 2006, you've been vice

18   president, a member of the board, and on the investment

19   committee.  Right?

20   A.    Yes.

21   Q.    And the role of the investment committee is to evaluate

22   the assets of the Trust and decide whether to keep them, sell

23   them, buy other assets, or invest in other deals.  Right?

24   A.    It depends.  The investment committee?

25   Q.    Yes.

```
 1    A.    Correct.

 2    Q.    Mango Five not only provided services to the Trust but it

 3    also provided services to Mr. Magness himself and to his

 4    companies.  Right?

 5    A.    Sometimes.

 6    Q.    Sometimes?

 7    A.    Yes.

 8    Q.    And Mango Five's investment committee members advise Mr.

 9    Magness on what he thought he should do.  Is that fair?

10    A.    The investment committee would.

11    Q.    Would?

12    A.    Yes.

13    Q.    So let's talk about Stanford International Bank CDs.  You

14    had questions about the Stanford International Bank CDs.

15    Right?

16    A.    When?

17    Q.    You had some for Tom Espy, didn't you?

18    A.    I'm sorry?

19    Q.    You had some questions about the SIB CDs for Mr. Espy?

20    A.    When?

21    Q.    Did you have questions for the SIB CDs with Mr. Espy?

22    A.    I don't understand the question.  I had questions with

23    Mr. Espy about the CDs?

24    Q.    Yes.

25    A.    When?
```

```
 1    Q.    Did you have --

 2    A.    1999 or 2009?

 3    Q.    Well, you were asking questions about SIB to Mr. Espy

 4    when the world entered an economic downturn in 2007.  Right?

 5    A.    Yes.

 6    Q.    And you were worried then so that's why you asked those

 7    questions.

 8    A.    Yes.

 9    Q.    Is that a yes?

10    A.    Yes.

11    Q.    And, in fact, your concern level about Stanford

12    International Bank increased over time.

13    A.    What time frame?

14    Q.    Did your concern level about Stanford International Bank

15    increase over time?

16    A.    Yes, that's a fair statement.

17    Q.    Now, we've heard the name Ray Sutton a few times in this

18    trial so far.  Correct?

19    A.    Correct.

20    Q.    And you understand that as Mango Five secretary, Ray

21    Sutton is responsible for taking meeting minutes and preparing

22    them.  Correct?

23    A.    Yes.

24    Q.    And although you were a member of Mango Five, it was not

25    your job to take notes.  Right?
```

1    A.   Right.

2    Q.   That was Ray Sutton's job.

3    A.   Yes.

4    Q.   Well, let's look at some of those notes.  We're going to

5    look at Plaintiff's Exhibit 134.  And this is the board of

6    directors' meeting from this day.  Correct?

7    A.   Yes.

8    Q.   There's also an investment committee meeting that happens

9    this day?

10   A.   Yes.

11   Q.   Okay.  Let's start with the board of directors' meeting.

12   And I believe you were present.  Right?

13   A.   Yes.

14        MR. DAY:  Let's go to the next page, Mr. Jarrett and

15   Mr. Knudson, and I'm going to look at that same paragraph one

16   more time.

17   Q.   (BY MR. DAY)  So it says Mr. Knudson noted the one

18   advantage of borrowing from Stanford would be the possibility

19   for legal offset in the event that the Trust's significant

20   investment in certificates of deposit in Antigua were at risk.

21   Right?

22   A.   Right.

23   Q.   And I believe you said on direct that you in fact said

24   this at the meeting?

25   A.   Yes.

 1    Q.    Yes?

 2    A.    Yes.

 3    Q.    So, in sum, we've got borrowing from Stanford,

 4    possibility for legal offset if they're at risk.  Right?

 5    Those are the two parts of this?

 6    A.    Yes.

 7    Q.    Is that a yes?  I'm sorry.

 8    A.    Yes.  I'm sorry.

 9    Q.    Now, Mr. Sutton's minutes are correct, aren't they?

10    A.    Yes.

11    Q.    And so according to these minutes, you suggested in

12    October 2007 that the SIB CDs could be at risk.

13    A.    Could you rephrase that for me?

14    Q.    According to these minutes, you suggested that Stanford

15    International Bank CDs could be at risk?

16    A.    Yes.

17    Q.    Let's turn to Plaintiff's Exhibit 133, which is the

18    investment committee from the same day.  And if you could turn

19    to -- it's the page that ends with the numbers 491.  So a

20    couple of pages in.

21    A.    Yes.

22    Q.    We're going to look at miscellaneous items one more time.

23    A.    Okay.

24    Q.    And we've seen this before so I'm not going to read it

25    verbatim, but we say here that Mr. Magness requested for a

1   further investigation.  Right?

2   A.   Yes.

3   Q.   And so Mr. Magness had a desire to investigate the

4   Stanford International Bank CD.

5   A.   Yes.

6   Q.   And, in fact, on October 1st, 2007, he ordered that they

7   be further investigated.

8   A.   Yes.

9   Q.   So, again, Mr. Sutton's minutes are correct.

10  A.   Yes.

11  Q.   And I just want to bridge this concept.  We've got two

12  minutes.  On the same day that you say the Stanford

13  International Bank CDs might be at risk, Mr. Magness says go

14  investigate.  Right?

15  A.   Yes.

16  Q.   And this October 1st, 2007 meeting was not the last time

17  that Mango Five talked about Stanford International Bank and

18  its CDs.  Right?

19  A.   Right.

20  Q.   In fact, you had continuing questions about Stanford

21  International Bank following this meeting.

22  A.   What do you mean by questions?

23  Q.   You know what a question is?

24  A.   Yes.

25  Q.   Did you have questions about Stanford International Bank

1    and its CDs following this meeting?

2    A.   We had discussions, yes.

3    Q.   And questions, didn't you?

4    A.   Point them to me.  I'll look at them.

5    Q.   I'm sorry.  I can't hear you.

6    A.   Point them to me, I will tell you if they were questions

7    or not.  We had questions about Stanford for years.  Every

8    meeting.

9    Q.   So is your testimony that after October 1st, 2007, you

10   had no questions about Stanford International Bank or that you

11   had some questions?

12   A.   I'm sure we did, yeah.

13   Q.   Well, let's discuss those continuing questions.  Turn to

14   Plaintiff's Exhibit 62, please.

15   A.   What number?

16   Q.   No. 62, 062.  And you've sat here this whole trial.

17   You've seen these before.  Correct?

18   A.   Yes.

19   Q.   And you recognize these minutes as the ones where

20   Stanford International Bank's president, Mr. Rodriguez or

21   Rodriguez-Tolentino, was asked to give a report on the safety

22   of the bank.  Right?

23   A.   Yes.

24   Q.   And go to the second page, please.  You were at this

25   meeting.  Right?

```
 1   A.    Yes.

 2   Q.    Let's go to that paragraph that talks about the Swiss

 3   bank model just so you have it handy.

 4              MR. DAY:  Go to the next page, please.  Blow up all

 5   of 5.

 6   Q.    (BY MR. DAY)  So we've seen this "Swiss bank model"

 7   phrase in quotes over the past few days.  Right?

 8   A.    Right.

 9   Q.    You have no idea what a Swiss bank model is, do you?

10   A.    I don't -- I don't know what he's referring to here,

11   right.

12   Q.    The phrase "Swiss bank model" makes no sense, does it?

13   A.    I -- I didn't say that.  I said I don't know what it is

14   in reference to.

15   Q.    Oh, it's not your testimony that the phrase "Swiss bank

16   model" doesn't make any sense?

17   A.    I don't know what it means.

18   Q.    It doesn't make any sense, does it?

19   A.    I don't know what it means.

20   Q.    Mr. Knudson, if you could --

21   A.    Sure.

22   Q.    -- turn to your transcript, please.  You remember that I

23   took your deposition a few months ago.  Correct?

24   A.    Yes.

25   Q.    And at that deposition you swore to tell the truth.
```

1   Right?

2   A.   Yes.

3   Q.   All right.  And you remember we talked about Swiss bank

4   model at that deposition.  Correct?

5   A.   Yes.

6   Q.   So if you could turn with me to page 312.

7   A.   312?

8   Q.   312.  So it's going to spread over a couple of pages.

9   A.   Okay.

10        MR. DAY:  And so, Mr. Jarrett, if you could get out

11   of that real quick, please.  We'll just do it like this.

12   Q.   (BY MR. DAY)  I asked you, "What is a Swiss bank model?"

13        And you said, "That's the first time I've seen these in a

14   long time.  I don't -- I don't remember.  I don't remember

15   what that means or what it -- I don't know what that is."

16        And then I asked you, "It doesn't make any sense, does

17   it?"

18        And you just answered, "No."

19        Right?

20   A.   Right.

21   Q.   And so the phrase "Swiss bank model" does not make sense,

22   does it?

23   A.   No.

24        MR. DAY:  You can take that down, Mr. Jarrett.

25   Q.   (BY MR. DAY)  So going into this call with Mr.

1    Rodriguez-Tolentino, you had existing concerns about the

2    safety of Stanford International Bank, and after this call,

3    you realized the Stanford International Bank CD was riskier

4    than a usual CD, didn't you?

5    A.    Yes.

6    Q.    Let's look at Plaintiff's Exhibit 92 now.  These are the

7    minutes and agenda from December 5th, 2008.  Right?

8    A.    Yes.

9    Q.    Let's look at section 4.  So Mr. Espy reported that

10   redemption would not be possible.  Right?

11   A.    Yes.

12   Q.    And so you agree, obviously, that after October 1st,

13   2008, Mr. Magness was told he couldn't get his CDs out.

14   Right?

15   A.    Yes.

16   Q.    And I believe I heard Mr. Magness testify yesterday that

17   before October 10th, 2008, he had no plans to take out loans

18   on the Stanford International Bank CDs.  Right?  Did you hear

19   him say that?

20   A.    I don't -- I don't remember.

21   Q.    You don't remember?

22   A.    No.

23   Q.    Well, actually this borrowing concept you came up with in

24   October 2007, didn't you?

25   A.    We were talking to many banks in 2007.

```
 1   Q.   This was actually the first step in executing the plan
 2   that you came up with in October 2007 of borrowing against the
 3   CD and offsetting if there's risk.  Right?
 4   A.   There wasn't a plan.
 5   Q.   Well, let's look back at Plaintiff's Exhibit 134.
 6        MR. DAY:  The next page, please.
 7   Q.   (BY MR. DAY)  Let's look at that paragraph one more time.
 8   You had an idea at this meeting, didn't you, about borrowing
 9   an offset.  Right?
10   A.   As I said before, that's a -- that's a legal term and
11   that's a philosophy you go in when you negotiate with banks.
12   That is what you do.
13   Q.   But it was your idea.
14   A.   I was a trained attorney.  That's what you think about.
15   You think about cross collateralization.  You think about cure
16   provisions.  You think about all kinds of stuff to make sure
17   you're protected with the bank.
18   Q.   That's right.  And --
19   A.   That's right.
20   Q.   And you thought of this, didn't you?
21   A.   I think of that all the time.
22   Q.   So you thought of possibly borrowing from Stanford and
23   possibly offsetting if there was risk.  Right?
24   A.   Yes.
25   Q.   And then a year later Mr. Magness borrowed from Stanford.
```

1    Right?

2    A.    Yes.

3    Q.    And Mr. Magness took all of his loans out at a time when

4    he was acutely aware of his risk and exposure to the SIB CDs.

5    Correct?

6    A.    He took out loans because he was having the margin calls.

7    Q.    You would agree with me that Mr. Magness took these

8    millions of dollars in loans out when he was acutely aware of

9    his risk and exposure to the Stanford International Bank CDs.

10   A.    In October of 2008, we didn't have any concerns about

11   Stanford.  We had concerns about the market and how to keep

12   the stock and not have the bank sell us out.  That's what we

13   were acutely aware of.

14   Q.    So is it your testimony today that Mr. Magness was not

15   acutely aware of his risk and exposure to the SIB CDs when he

16   took out his loans?

17   A.    I think Mr. Magness was aware of his risks in all of his

18   investments.  Some are riskier than others, but you

19   characterizing it as acutely aware, I -- I don't know what

20   that -- I don't think that's right actually.

21   Q.    Well, let's look at your deposition one more time.

22   A.    Sure.

23   Q.    If you could turn with me to page 340.  And we're going

24   to read a lot of this page so bear with me.

25                MR. DAY:  Maybe just blow up the half of the screen.

1    Q.   (BY MR. DAY)  So here's my question to you.  Mr.

2    Magness is -- are you with me on that page?

3    A.   Yes.

4    Q.   "Mr. Magness is told he can't redeem his CDs, so he does

5    two things:  He takes out $63 million in the form of loans to

6    get money out of that bank and he takes out 25 million in

7    accrued interest to get even more money out of that bank.

8    Right?"

9         And you said, "That's what it says."

10        Right?

11   A.   That's what it says.

12   Q.   That's what you said.  Right?

13   A.   Yes.

14   Q.   "All of the time, Mr. Magness was acutely aware of his

15   risk and exposure to the CDs.  Right?"

16        That was my question?

17   A.   Yes.

18   Q.   And your answer was, "Yeah.  I guess so."

19   A.   Yes.

20   Q.   So I ask you again, when Mr. Magness took his loans out,

21   he was acutely aware of his risk and exposure to the CDs.

22   Right?

23   A.   Yes.

24   Q.   Yes?

25   A.   Yes.

1   Q.   In fact, one of the investment committee members at the

2   December 5th meeting, Ray Sutton, who you already testified

3   about, said that a receiver might be appointed for SIB.

4   Correct?

5   A.   I heard that, yes.

6   Q.   And yesterday we put up a comparison that was a little

7   hard for me to see between the signed minutes and the draft

8   minutes that had the two sentences that you know I'm talking

9   about.  Right?  So I want to put up just the minutes with

10  those two sentences.  Okay?

11  A.   Sure.

12  Q.   Let's put up Plaintiff's Exhibit 384.

13  A.   Is that in this?

14  Q.   If it's not, I can -- you can look on the screen or I can

15  approach and help you find it in a book.

16          MR. DAY:  So let's flip to the last page, Mr.

17  Jarrett.

18  Q.   (BY MR. DAY)  And you see these are the ones we're

19  talking about.  They don't have the signature.  Right?

20  A.   Okay.

21  Q.   Right.  But it's by Mr. Raymond Sutton?

22  A.   Yes.

23  Q.   Okay.  So I want to zoom in on and highlight the two

24  sentences.

25          MR. DAY:  So, Mr. Jarrett, if you could pull those

1    out.  All right.  Let's go to the prior page.  Let's blow up

2    this right here.  We'll do it one sentence at the time.

3    Q.   (BY MR. DAY)  So you recognize the sentence that's in

4    these minutes but weren't in Plaintiff's Exhibit 92 is Mr.

5    Sutton advised that, under United States law, if the bank --

6    and we know the bank means Stanford International Bank.

7    Right?

8    A.   Yes.

9    Q.   -- went into receivership, the loan would not offset the

10   certificates.  It says that right there.  Right?

11   A.   Yes, that's what it says.

12   Q.   And then I want to show you the other sentence that

13   spills onto the next page.

14          MR. DAY:  So, Mr. Jarrett, if you could go to the

15   next page, just this top section.

16   Q.   (BY MR. DAY)  Talking about borrowing against the

17   certificates.  Right?  We've been talking about that today?

18   A.   Uh-huh.

19   Q.   That sentence that's new, though, is, Mr. Sutton advised

20   that if the bank went into receivership, under United States

21   law, GMIT would likely have to repay the $25 million.

22          You know GMIT is the Trust.  Right?

23   A.   Correct.

24   Q.   So you see that sentence there that Mr. Sutton wrote?

25   A.   I do.

1   Q.   And you agree with me, earlier on the other minutes we

2   saw from Mr. Sutton, that those were correct.  Right?

3   A.   Yes.

4   Q.   It was his job, not yours, to take minutes at these

5   meetings.  Right?

6   A.   Yes.

7   Q.   And they are official business.  That's what he's

8   supposed to do?

9   A.   Yes.

10   Q.   And wouldn't you agree with me that Mr. Sutton is in the

11   best position to type in what he said at a meeting where he's

12   the secretary?

13   A.   Best position as compared to who?  Yes.

14   Q.   And I believe I heard you just testify that knowing about

15   a receiver -- you know about receivers.  Right?

16   A.   Yes.

17   Q.   You knew about them before a receiver was appointed in

18   Stanford.  Right?

19   A.   Yes.

20   Q.   That's a big deal, isn't it?

21   A.   Yes.

22   Q.   That portends fraud, bankruptcy, a lot of bad things.

23   Right?  Right?

24   A.   Yes.

25   Q.   That is exactly why Mango Five people at that meeting or

1    Mr. Magness said, take these two sentences out, because that's

2    a bad word.  Right?

3    A.   I never saw this draft.

4    Q.   Let's turn to your letter that you sent to Stanford

5    International Bank --

6    A.   Sure.

7    Q.   -- in January 2009.

8         MR. DAY:  Plaintiff's Exhibit 98, please.

9    Q.   (BY MR. DAY)  We've seen this before.  Correct?

10   A.   Yes.

11   Q.   I'm sorry.  Am I ahead of you in your notebook?

12   A.   The January 13th letter?  I'm there.

13   Q.   Thank you.  And we see that you signed the letter.

14   Right?

15   A.   Yes.

16   Q.   And Mr. Magness testified that Tom Espy, who worked at

17   Stanford, drafted these questions for you to send back to

18   Stanford.  Right?

19   A.   Correct.

20   Q.   All right.  So you sent -- let's look at the first

21   paragraph.  You noted that you're vice president and trustee

22   and that it was part of your responsibilities to evaluate

23   assets.  Right?  Right?

24   A.   Yes.

25   Q.   I mean, that was true.  Right?

```
 1    A.    In part.

 2    Q.    But this wasn't just some ordinary review.  Right?

 3    A.    We had some concerns, yes.

 4    Q.    So you -- let's look at the six questions.

 5    A.    Okay.

 6    Q.    This is January 13th.  Right?

 7    A.    Yes.

 8    Q.    Okay.  So I see that you asked a number of questions.

 9    Fund managers is coming up, auditor.  Right?

10    A.    Yes.

11    Q.    We've got more fund managers.  Right?  Bank officers.

12    Board members.  You see those questions.  Right?

13    A.    Yes.

14    Q.    Let's talk about the sixth question.  It says, given the

15    product, sector, currency and alternative investment

16    strategies, how did Stanford International Bank investments

17    only decline less than one percent through November 30th,

18    2008.  Right?

19    A.    Right.

20    Q.    You asked that question.  Right?

21    A.    Yes.

22    Q.    This question reflects that it was very suspicious to you

23    that Stanford's investments had only declined that little.

24    Right?

25    A.    Yes.
```

1    Q.   But, in fact, these six questions were questions that you

2    could have asked and may have even asked prior to sending this

3    letter.

4            MR. PETRIE:  Object to the form.  Speculation, no

5    foundation.

6            THE COURT:  Overruled.

7            THE WITNESS:  Yes.

8    Q.   (BY MR. DAY)  In fact, you had already asked about

9    investment strategies in Stanford's investments about a year

10   earlier.  Right?

11   A.   Yes.

12   Q.   That was the whole reason for the March 2008 meeting,

13   wasn't it?  Yes?

14   A.   Yes.  Yes.

15   Q.   What's interesting, I heard about your CD investments.

16   Right?  You had a two million CD and an 11 and a half million

17   dollar CD?

18   A.   Yes.

19   Q.   Okay.  Now, before you ever sent this letter January

20   13th, you had already asked to cash out your $2 million CD.

21   A.   Yes.

22   Q.   If you could turn to Defendants' Exhibit 630.

23   A.   630?

24   Q.   Yes.

25           MR. DAY:  There we go.  Blow that up a little bit

1    more, please.  Now we can read it.

2    Q.   (BY MR. DAY)  This shows this is about a CD liquidation

3    request.  Correct?

4    A.   Yes.

5    Q.   And it was January 12th, 2009.  Right?

6    A.   Yes.

7    Q.   That's before the letter you sent to Stanford

8    International Bank.  Right?

9    A.   Yes.

10   Q.   And it says, we are sending the liquidation request down

11   to SIB today for Steve's smaller CD.  That's your $2 million

12   CD.  Right?

13   A.   Yes.

14   Q.   But you had already authorized this redemption, this full

15   liquidation, before January 12th, hadn't you?

16   A.   Yes.

17   Q.   And, in fact, you had signed your redemption request for

18   that CD on January 7th.  Right?

19   A.   Yes, right.  I don't have the letter in front of me, but

20   that sounds about right.

21   Q.   That's your recollection?

22   A.   Something like that, yes.

23   Q.   Yes.

24   A.   Yes, yes.

25   Q.   And, indeed, on the same day, January 7th, 2009, nearly a

1   week before you would send this letter to Stanford, you signed

2   a redemption request for your 11 and a half million dollar CD,

3   didn't you?

4   A.    It happened a little later, yes.

5   Q.    I'm sorry.  What?

6   A.    When did you say the date was?

7   Q.    You signed your redemption request for the 11 and a half

8   million dollar CD on January 7th, didn't you?

9   A.    I might have.

10  Q.    Okay.  Well, let's look at it together.

11  A.    Okay.

12        MR. DAY:  It's my understanding Plaintiff's Exhibit

13  111, there are no objections?  We offer Plaintiff's Exhibit

14  111 into evidence.

15        MR. PETRIE:  No objection.

16        THE COURT:  It's admitted.

17        MR. DAY:  Please publish it to the jury.

18  Q.    (BY MR. DAY)  Do you have that document in front of you,

19  Mr. Knudson?

20  A.    Yes.

21  Q.    We're going to start toward the end of the document.

22  Turn to the eleventh page.  The numbers in the bottom right

23  corner should end in 376.

24  A.    Did you say the last page?

25  Q.    Toward the back.  It's the eleventh page.

1          MR. DAY:  May I approach, Your Honor?

2          THE COURT:  Yes.

3          THE WITNESS:  376.  Okay.  Okay.  Is this it?

4    Q.   (BY MR. DAY)  Got it.  Yes.

5    A.   Okay.

6    Q.   So you see that this is a letter dated January 7th, 2009.

7    Right?

8    A.   Yes.

9    Q.   And you're asking to redeem your bigger CD.  Right?

10   A.   Yes.

11   Q.   So your two redemption requests had happened on January

12   7th?

13   A.   Yes.

14   Q.   Before you sent the letter to Stanford International

15   Bank.

16   A.   Yes.

17   Q.   Okay.  Now let's look at the other documents in this

18   Plaintiff's Exhibit 111.  I want to start on the first page.

19   So let's see what this document contains.

20        I see Gary Magness' name and his company several times,

21   and I believe that's your CD.  Right?  At the bottom.

22   A.   Yes.

23   Q.   And so all of these are requests for immediate full

24   liquidation.  Right?

25   A.   Yes.

```
 1              MR. DAY:  And let's turn to the next page, Mr.

 2   Jarrett --

 3   Q.   (BY MR. DAY)  -- and Mr. Knudson.  And you recognize this

 4   letter as from Ms. Dokken?

 5   A.   Do I recognize this letter?

 6   Q.   You see it is from Ms. Dokken?

 7   A.   I see -- yes, I see that's from Tonya Dokken, yea.

 8   Q.   Yes.

 9              MR. DAY:  And if you could zoom in just to this

10   part.

11              THE WITNESS:  Is that in my book here?

12              MR. DAY:  May I approach, Your Honor?

13              THE WITNESS:  Okay.  Thank you.

14   Q.   (BY MR. DAY) Yes.  Now do you have that letter in front

15   of you?  Do you see that there is a request to break them

16   immediately, all of these CDs?  Right?

17   A.   Yes.

18   Q.   And then it says, use the proceeds to pay off the loan

19   principal and send any proceeds, any extra, back to us.

20   Right?

21   A.   Yes.

22   Q.   Let's move past this letter, and I want to kind of move

23   through quickly the next few just so you have a chance to see

24   them.  But let's look at the next page.

25        This is one of those letters that Mr. Magness signed.
```

1    Right?

2    A.   Yes.

3    Q.   And he's saying, cash this CD out and offset it against

4    my loan.  Right?

5    A.   Yes.

6    Q.   And if you could just flip through, let's -- let's just

7    see if they're all Mr. Magness.  There is Mr. Magness on the

8    next page.  Right?

9    A.   Yes.

10   Q.   So you've gone through all of them, and they're all Mr.

11   Magness?

12   A.   Yes.

13   Q.   And they're all dated January 21st, 2009.  Right?

14   A.   Yes.

15   Q.   But it wasn't until January 23rd that Juan

16   Rodriguez-Tolentino even acknowledged receiving your letter.

17   Right?

18   A.   I -- I don't know.

19   Q.   Let's look at Defendant's Exhibit 806.

20   A.   806?

21   Q.   That's correct.

22        MR. DAY:  May I assist, Your Honor?

23   Q.   (BY MR. DAY)  I apologize for it not being in the

24   notebook.  You can look at the screen in front of you or on

25   the big board.

```
 1          So you see that this is from Mr. Juan

 2    Rodriguez-Tolentino.  Right?

 3    A.    Yes.

 4    Q.    And it's January 23rd, 2009.  Right?

 5    A.    Okay.

 6    Q.    So before the bank president even said, hey, I got your

 7    letter, you've already signed your two redemption requests,

 8    and Mr. Magness has already pre-signed his redemption

 9    requests.  Right?

10    A.    So before the -- you said before the -- could you resay

11    that?

12    Q.    I can repeat it, yes.

13    A.    Thank you.

14    Q.    So we're agreed that Mr. Tolentino acknowledged your

15    letter on January 23rd.  Right?

16    A.    Yes.

17    Q.    It talks about thank you for your letter of January 13.

18    A.    Yes.

19    Q.    Okay.  So we're on the same page there.  And we also

20    agree that you had already signed two redemption requests on

21    January 7th.  Right?

22    A.    Yes.

23    Q.    And we just saw a whole series of redemption requests

24    that Mr. Magness signed on January 21st.  Right?

25    A.    Yes.
```

1    Q.   So I just want to get the timeline right.  You signed

2    something saying, I want to cash out; then you send a letter;

3    then Mr. Magness pre-signs redemption requests; then the

4    president says, hey, I got your letter; and only then after

5    that do you have a call with Mr. Rodriguez-Tolentino.  Right?

6    A.   Right.

7    Q.   I want to look at Plaintiff's Exhibit 114, please.  These

8    are the agenda and minutes from the April 2009 meeting of the

9    investment committee.  Do you recognize those?  Do you

10   recognize this document?

11   A.   Yes.  I'm sorry.

12        MR. DAY:  Can you go to the next page, please?

13   Q.   (BY MR. DAY)  So you were present at that meeting.

14   Correct?

15   A.   Yes, I was.

16   Q.   And let's go to the next page.  Let's look at section 3

17   again, report of Stanford.  The first sentence says Mr.

18   Magness reported that Mr. Espy confirmed that GMIT's loan from

19   Stanford bank had been paid in full by setting off the

20   Stanford certificates of deposit placed with the bank.  Right?

21   A.   Yes.

22   Q.   So we have these redemption and setoff letters that you

23   and Mr. Magness signed, and we have an acknowledgement in the

24   minutes that, look, there was offset.  Right?

25   A.   Yes.

1    Q.   This offset was the second step of your idea that you

2    came up with in October 2007, wasn't it?

3    A.   Yes.

4    Q.   You and Gary just wanted to get as much money out of the

5    bank as possible.  Isn't that right?

6    A.   No.

7    Q.   It's not right?

8    A.   No.

9    Q.   Did you ever see any emails or minutes saying, hey, I

10   plan on paying back Stanford with cash outside of the bank?

11   You didn't, did you?

12   A.   I don't recall.

13   Q.   It was always going to be offset, wasn't it?

14   A.   I don't know that.

15            MR. DAY:  Pass the witness.

16            THE COURT:  All right.  I think unless you just have

17   two minutes, we probably ought to reserve the redirect for the

18   morning.

19            MR. PETRIE:  I can't promise two minutes, Your

20   Honor, so I think we better recess.

21            THE COURT:  All right.  Then this is what you call

22   close enough for government work.  We're close enough to 5:00

23   to quit for the day.  So you-all have a very pleasant evening,

24   a safe trip home and back.  We'll see you-all tomorrow at

25   9:00.

244

 1          (Whereupon, the jury left the courtroom.)

 2          THE COURT:  Be seated.

 3     Bear with me for just a minute.

 4     (To the witness)  And you can step down.

 5     Let me do some arithmetic here quickly.  For the Magness

 6     parties through today, I show you at 501 minutes.  For the

 7     Receiver, 235.  And it's awkward for me to try and give you a

 8     daily total for yesterday or today because we've got 55

 9     minutes that got transferred, and I just transferred all of

10     that on today's ledger.  But some of it probably should have

11     been on yesterday's, but it nets out the same.

12     So anything else we need to take up?

13          MR. SADLER:  Yes, Your Honor.  First, we'd like an

14     instruction from the Court that that Mr. Knudson, who is in

15     the middle of testimony, not visit with counsel overnight

16     about his testimony.  We would ask the Court to make that

17     instruction.

18          THE COURT:  I don't normally do that.  I know some

19     people do, but I don't think he should be prohibited from

20     consulting with his lawyers if he wants to.

21          MR. SADLER:  Thank you.  So that request is

22     overruled then, I take it.

23          THE COURT:  Yes.

24          MR. SADLER:  Thank you.  We just also need to get a

25     ruling on -- apparently there was -- we need to get a ruling

1   on the record for the sidebar earlier.  Perhaps Mr. Day ought

2   to address that since --

3         THE COURT:  That's fine.  I don't think that there

4   was a ruling particularly.

5         MR. DAY:  Your Honor, may I?

6         THE COURT:  Uh-huh.

7         MR. DAY:  Your Honor, when we talked about sidebar,

8   it was about 292-A, which was not admitted at that point and

9   had removed the redacted boxes.  I objected because that had

10  not been timely produced in discovery, and they had prepared

11  their witness with it without disclosing it to us.  And to

12  spring it on us in the middle of trial because of cross-

13  examination about something that they brought up and they

14  prepped their witness with is objectionable.  And I just

15  wanted to make clear that was my objection.

16      I understand that you disagreed and overruled that.  I

17  wanted to get that on the record and was also why I said I had

18  no objection to offering because that had already been

19  decided.

20        THE COURT:  Okay.  I don't quite recall it that way.

21  I know you were unhappy about the timing of the production of

22  that, and I said it was my opinion that it was invited from

23  your examination of the witness suggesting that they were

24  trying to conceal something, and I didn't think there was any

25  issue with the timing because of that.

```
 1              MR. DAY:  Your Honor --

 2              THE COURT:  If that amounts to an objection and

 3    overruling it, then maybe that's what it was.  But my

 4    recollection is that your concern was it hadn't been

 5    previously produced, and I didn't think they needed to

 6    previously produce it because it was a claim of privilege that

 7    you-all could have but didn't apparently challenge pretrial,

 8    and they had no reason to believe that you would try to

 9    insinuate before the jury that that was somehow underhanded or

10    that they were trying to hide something.

11         And I thought in response to that line of questioning, it

12    was a fair response for them to offer to waive the privilege

13    at that time.

14              MR. DAY:  And just for the record, that was my

15    objection and you're overruling that?

16              THE COURT:  If the objection was it was wrong for

17    them to make that offer when they did, yes, that objection is

18    overruled.

19              MR. DAY:  Thank you, Your Honor.

20              MR. BRYANT:  Your Honor, I'd like to note on the

21    record also that the Magness parties made the offer to put

22    that Exhibit 292-A into evidence, that the Court allowed the

23    Receiver to either accept that offer or to decline that offer.

24    Had they declined that offer, it would not have been admitted

25    into evidence.  They accepted it, and any possible objection
```

```
 1    that they made in the view of the Magness parties was waived

 2    at that point.  So we'll just note that as of record.

 3              THE COURT:  Noted.

 4         Anything else?

 5              MR. SADLER:  No, sir.

 6              THE COURT:  Okay.  I am, with some trepidation,

 7    hopeful that I can get you a draft charge tomorrow.

 8              MR. SADLER:  I beg your pardon.  We do have

 9    depositions with some briefing to hand up.  That's the only

10    other matter for today.

11              THE COURT:  Okay.  You said with briefing.  Do you

12    mean --

13              MR. SADLER:  This is the issue, Your Honor, of

14    they're offering the depositions taken in other receivership

15    cases that they want to use here.  We have an objection that's

16    been briefed by both sides to that happening at all, and then

17    there are page and line objections if they overcome our

18    objection to doing it at all.

19         That's the briefing I was speaking of.

20              THE COURT:  Okay.  I'll be happy --

21              MR. SADLER:  I can hand that up.

22              THE COURT:  Yeah.  Please do.

23              MR. SADLER:  Your brief as well as ours.

24              THE COURT:  And when is this likely to come up?

25              MR. PETRIE:  It would -- well, first of all, Your
```

1    Honor, they haven't met and conferred with us about this.  I

2    thought we already addressed this in limine as well.

3        But setting aside those two hurdles, this is the first

4    that this issue has reappeared, but it would come up,

5    ballpark, say, late tomorrow morning or early tomorrow

6    afternoon.  We have -- we need to finish with Mr. Knudson

7    tomorrow, we have a deposition from Mr. Wilk, videotaped

8    again.  I believe about an hour Mr. Wilk's deposition, it's

9    about an hour.  And then we'd be coming up on those.

10            THE COURT:  Okay.  I will try to be educated in time

11    to address that.  Honestly, I don't recall personally having

12    been aware of this as an issue earlier.  And I'm not saying

13    you didn't file it timely or anything.  For whatever reason,

14    it hadn't crossed my radar.

15            MR. SADLER:  They were filed sometime ago, Your

16    Honor.  This is not new.

17            THE COURT:  Yeah.  I'm not fussing at you.  I'm just

18    confessing.  I'm baring my soul, saying I just however,

19    whatever the reason, missed this amongst the various papers.

20            MR. PETRIE:  In that case, I apologize to counsel,

21    Your Honor.  If it's the old motion, we have responded to it,

22    it's been fully briefed, and our brief is in the record,

23    although I don't have a copy to hand up to Your Honor.

24            MR. SADLER:  I handed him both our brief and your

25    brief.

1              MR. PETRIE:  Oh, thank you.

2              MR. SADLER:  That's what I handed up.

3              THE COURT:  Yeah.  They're both here.

4      Okay.  Anything else?

5              MR. PETRIE:  Not from us.  Thank you.

6              MR. SADLER:  Not from the Receiver.

7              THE COURT:  All right.  You-all have a good evening.

8  We'll see you in the morning.

9              MR. PETRIE:  Thank you.

10             MR. SADLER:  Thank you, Your Honor.

11             (The proceedings were concluded at 5:10 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              01/11/2017

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX E

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3   RALPH S. JANVEY, IN HIS       (  CAUSE NO. 3:15-CV-401-N
     CAPACITY AS COURT-APPOINTED   )
 4   RECEIVER FOR THE STANFORD     (
     INTERNATIONAL BANK, LTD.,     )
 5   et al.,                       (
              Plaintiff,           )
 6                                 (
     vs.                           )
 7                                 (
     GMAG LLC, MAGNESS SECURITIES  )
 8   LLC, GARY D. MAGNESS, and     (
     MANGO FIVE FAMILY, INC., IN   )
 9   ITS CAPACITY AS TRUSTEE FOR   (
     THE GARY D. MAGNESS IRREVOCABLE)  DALLAS, TEXAS
10   TRUST,                        (  JANUARY 12, 2017
              Defendants.          (  9:00 A.M.
11   _____

12

13                           VOLUME 4

14

15   _____

                          TRIAL ON THE MERITS
16
                 BEFORE THE HONORABLE DAVID C. GODBEY
17                   UNITED STATES DISTRICT JUDGE
                             and a jury
18   _____

19

20

21

22              SHAWN M. McROBERTS, RMR, CRR
                1100 COMMERCE STREET, RM. 1654
23                 DALLAS, TEXAS  75242
                      (214) 753-2349
24

25
```

1

<u>A P P E A R A N C E S</u>

2

3       FOR THE PLAINTIFFS:   BAKER BOTTS, LLP
                             98 SAN JACINTO BOULEVARD
                             SUITE 1500
4                            AUSTIN, TEXAS  78701-4039
                             (512) 322-2678
5                            BY:  MR. KEVIN SADLER
                                  MR. SCOTT POWERS
6                                 MR. BRENDAN DAY
                                  MS. ASHLEY CARR

7

8       FOR THE DEFENDANTS:  BALLARD SPAHR, LLP
                             1225 SEVENTEENTH STREET
                             SUITE 2300
9                            DENVER, COLORADO 80202-5596
                             (303) 292-2400
10                           BY:  MR. ANDREW PETRIE
                                  MS. RACHEL MENTZ

11

                             DYKEMA COX SMITH
12                           1201 ELM STREET, SUITE 3300
                             DALLAS, TEXAS  75270
13                           (214) 698-7800
                             BY:  MR. DAVID BRYANT

14

        OFFICIAL REPORTER:   SHAWN M. McROBERTS, RMR, CRR
15                           1100 COMMERCE STREET, RM. 1654
                             DALLAS, TEXAS  75242
16                           (214) 753-2349

17

18

19

20

21

22

23

24

25

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| CHARLES WILK | |
| RYAN BELL | |
|    Direct By MR. BRYANT........................................ | 98 |
|    Cross By MR. POWERS........................................ | 130 |
|    Redirect By MR. BRYANT.................................... | 174 |
|    Recross By MR. POWERS.................................... | 178 |
| JUAN RODRIGUEZ-TOLENTINO | |
| JAMES DAVIS | |
| TOM ESPY | |

**EXHIBITS**

| Exhibit | Page |
|---|---|
| No. 109 Entered into Evidence | 128 |
| No. 308,310,318,323,324 Entered into Evidence | 256 |
| No. 126 Entered into Evidence | 256 |

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
 1                    P R O C E E D I N G S

 2                      JANUARY 12, 2017

 3              THE COURT:  Good morning.

 4         All set?

 5                MR. SADLER:  Yes, sir.

 6                MR. PETRIE:  Yes, sir.

 7              THE COURT:  All right.

 8              (Whereupon, the jury entered the courtroom.)

 9              THE COURT:  Be seated.

10         Good morning.  How's everybody?

11                SEVERAL JURORS:  Fine.

12              THE COURT:  Good.  We are just anticipating another

13    busy day, covering lots of ground.  I think we're on our

14    regular schedule today, as far as I know, so we'll plan to go

15    until about 10:30, 10:40, and take our morning break and lunch

16    at 12:30.

17         So where were we?

18                MR. PETRIE:  I believe, Your Honor, we were about to

19    start the redirect of Mr. Knudson.

20              THE COURT:  Okay.  Then let's proceed.

21                MR. PETRIE:  Thank you.

22                   STEVE KNUDSON, PREVIOUSLY SWORN,

23                      REDIRECT EXAMINATION

24                        By Mr. Petrie:

25    Q.   Mr. Knudson, I would like to discuss with you this
```

1    morning several of the topics that Mr. Day talked with you.

2        Before we do that, I was having trouble hearing you

3    yesterday.  So what I'd like to do, and just tell me if this

4    doesn't work as we go along, is work with you using the screen

5    to your right.  And if you would make sure to pull that mic

6    close to you, I won't have the notebook creating that

7    interference with you being able to have the mic close to your

8    mouth.  Okay?

9    A.    Is this -- is this better?

10   Q.    That is much better.  Thank you.

11   A.    Thank you.

12   Q.    And if -- if you need to, I think you can move the mic a

13   little bit to your right as well if you need to look at things

14   on the screen.  So with that preamble, let's look at Exhibit

15   134 that Mr. Day discussed with you and, in particular, look

16   at page 2 of Exhibit 134.

17       Do you remember he asked you a bunch of follow-up

18   questions concerning the -- it will be the fourth paragraph on

19   that page concerning your notation about potential advantages

20   to borrowing from Stanford.  Do you recall discussing that?

21   A.    Yes, I do.

22   Q.    I'd like to put that in a little more context, Mr.

23   Knudson.  Let's look at the paragraph immediately above that,

24   the one that talks about the negotiations for loans.  Do you

25   see that paragraph, sir?

1    A.    Yes.  Yes, I do.

2    Q.    Okay.  Now, in that paragraph where it discusses the

3    negotiations or the continuing negotiations with HSBC, U.S.

4    Trust, and that's Sanford there for new loan facility.  What

5    type of loans in October of 2007 were being negotiated with

6    these three lenders?

7    A.    These were all -- all margin loan facilities.

8    Q.    And when there's a reference to Sanford there or Stanford

9    in your next paragraph, which one of the Stanford entities is

10   that referring to in the context of these new margin loan

11   facilities that were being discussed?

12   A.    Well, that would be the Stanford Group Companies, the

13   brokerage side of the deal.

14   Q.    And in terms of the -- what was going on in October 1 of

15   2007, was there a -- what type of plan was there, if any,

16   about negotiating margin loans with the Stanford Group

17   Company, the brokerage?

18   A.    There wasn't a plan then.

19   Q.    Before the October 1st, 2007 meeting, had you discussed

20   this notation that you made -- that Mr. Sutton reported you

21   made here about a potential advantage to borrowing, had you

22   discussed that with Mr. Magness before October 1, 2007?

23   A.    No.

24   Q.    Had you discussed that with any of the other members of

25   the investment committee of Mango Five prior to October 1 of

```
 1    2007?

 2    A.    No.

 3    Q.    Had you discussed with them generally the concept of

 4    legal offset in terms of borrowing prior to October 1 of 2007?

 5    A.    No.

 6    Q.    Now, at this point in time, as of October 1 of 2007, did

 7    you have any factual information that led you to believe at

 8    that point in time that the certificates of deposit from the

 9    bank in Antigua were at risk?

10    A.    No.

11    Q.    Again, focusing in on October 1, 2007, was there any plan

12    at that point in time for borrowing against those certificates

13    of deposit in Antigua?

14    A.    No.  This was talking about margin loans.

15    Q.    And in -- let me take the time period.  From -- we talked

16    about KMM Parking a little bit yesterday afternoon.

17    A.    Yes.

18    Q.    So that time frame, let's talk, say, February of '99 up

19    to right before October 1st of 2007.  Do you have the time

20    frame in mind I'm asking you about?

21    A.    Yes.

22    Q.    Okay.  In that time frame, had there been any discussions

23    that you participated in about potential borrowings against

24    Stanford International Bank certificates of deposit?

25    A.    Not that I'm aware of, no.
```

1  Q.   Was there something about the transaction that KMM

2  Parking had engaged in in the 1999 time frame with Stanford

3  International Bank that led you personally to believe there

4  was some issue about certificates from that institution being

5  at risk?

6  A.   No.

7  Q.   Did you have any facts as of October 1, 2007 there might

8  be some sort of issue with certificates of deposit issued by

9  that international bank in Antigua?

10  A.   No.

11  Q.   During your tenure on the investment committee, and let's

12  focus from its inception in late 2006 through, say, mid 2009,

13  over that time frame was there ever any discussion at the

14  investment committee about going to Stanford International

15  Bank and talking about margin loans?

16  A.   I believe there was, yes.

17  Q.   And what discussion do you believe there was with the

18  Stanford International Bank over that time frame about

19  potential margin loans?

20  A.   Stanford International Bank?

21  Q.   Yes, sir.

22  A.   Stanford Group Companies about margin loans.

23  Q.   Okay.  I'm sorry.  I moved away from Stanford Group

24  Companies, and I -- I apologize.

25  A.   They are two separate --

1    Q.   Please lean forward so you speak in the mic.

2    A.   Oh, I'm sorry.  I'm sorry.

3    Q.   Not the Stanford Group Company.  So during the window

4    from when Mango Five was formed in late '06 to, let's say, mid

5    '09, you have that time frame in mind --

6    A.   Yes.

7    Q.   -- was there any discussion at the investment committee

8    about going to Stanford International Bank and talking to it

9    about margin loans?

10   A.   No.

11   Q.   At the point in time October 1st of 2007, and we don't

12   need to look at the minutes, but the ones we just looked at --

13   A.   Yes.

14   Q.   -- as of that point, did you already have in place the

15   deposit of two-plus million dollars of your money that you

16   obtained by mortgaging your home?

17   A.   Yes.

18   Q.   And at that point in time when you were making the

19   comment here about a potential that there might be -- the

20   certificates might be at risk, were you concerned that your

21   personal certificate of deposit in some way might be at risk?

22   A.   No.

23   Q.   Would you have continued on with the money that you

24   borrowed as against your home in that certificate of deposit

25   if you thought it was at risk?

10

1    A.    No.  No, I wouldn't have.

2    Q.    Why not?

3    A.    Because my home could be at risk.

4    Q.    Again, looking at this October 1, 2007 time frame, did

5    you also have in place the 11 and a half million dollar

6    certificate of deposit that was providing you with income

7    while you were working on the start-up of Fortrust?

8    A.    Yes.

9    Q.    And at that point in time, did you have any concerns that

10   the income on which you were relying while you were working on

11   Fortrust was somehow susceptible to some sort of risk because

12   it was derived from that certificate of deposit?

13   A.    No, no, I didn't.

14   Q.    Looking again at that same time frame of October 1, 2007,

15   do you remember yesterday Mr. Day was asking you questions to

16   the effect of whether the CDs, quote, might be at risk, end

17   quote?

18   A.    Yes, I remember that.

19   Q.    Okay.  And do you remember he also asked you a question

20   about whether the CDs could be, I use that in quotes, at risk?

21   A.    Yes.

22   Q.    Did you have either one of those thoughts in the October

23   2007 time frame?

24   A.    No.

25   Q.    Mr. Day asked you some questions yesterday about what was

1    essentially whether you had continuing questions about the

2    certificates of deposit from Stanford International Bank, not

3    in the context of your own, but he was talking about the CDs

4    that were the deposits to GMIT, Magness Securities, and GMAG.

5    Do you remember discussing that generally?

6    A.    Yes.

7    Q.    Could you, for the jury, give us a short chronology of

8    any questions that you had about the CDs that fall on that

9    continuum about which he was asking you?

10         And let's start with KMM just for background.  Did you

11   have questions about the CDs way, way back in 1999 when you

12   did that first certificate of deposit transaction.

13   A.    Well, in 1999, we did a six-month CD for four million,

14   four and a half million, I believe, and it worked fine.  They

15   paid us interest, they paid us on time, and we used it to

16   build the parking garage.  So to us it was a good -- you know,

17   it worked out fine.

18   Q.    Did you, in that context back in 1999, ask any questions

19   about what the bank was doing with the KMM Parking money for

20   the term of that CD?

21   A.    No.

22   Q.    Why not?

23   A.    It was -- you know, we -- Stanford looked like a

24   legitimate deal and we had friends in the company and they --

25   we relied on them to, you know, help us through that.

1    Q.    Then let's move forward on the continuum, using that

2    October 1, 2007 date as just a benchmark.

3    A.    Sure.

4    Q.    From November of '06, when MFFI or Mango Five was formed,

5    through that October meeting, did you have any continuing

6    questions about those certificates of deposit?

7    A.    Not that I remember.

8    Q.    Then going forward from 2007, can you tell the jury,

9    please, when was the next time you had any question about

10   those certificates of deposit?

11   A.    Well, when MFFI was formed, you know, those were an

12   asset, and we just, you know, had questions about what it was.

13   Q.    Okay.  And did you -- when you talk about having

14   questions about what it was, of who or what were you asking

15   those questions?

16   A.    I think we asked Tom Espy, and that was pretty much it.

17   Q.    Did you get answers at that time?

18   A.    In October of '07?

19   Q.    Well, at any point from November, when MFFI was formed,

20   through October?

21   A.    I don't -- I don't remember.

22   Q.    Do you have any memory that there were questions you had

23   asked that went unanswered?

24   A.    No.

25   Q.    Okay.  Then going, again just as sort of an arbitrary

1    benchmark, but because there's a meeting there from October 1,

2    2007 or maybe we should say October 2, 2007, going forward,

3    when was the next time you had any questions of any sort about

4    the Stanford International Bank CDs?

5    A.    Well, we understood that, you know, that there were some

6    loans put against the CDs and -- but Gary did that because he

7    needed -- you know, he needed to do quick margin calls.

8    Q.    And those are the loans we've talked about at some length

9    in October of '08.  Is that right?

10   A.    Right.

11   Q.    And were there any questions -- so in that roughly

12   year-long span from October of '07 to October of '08, did you

13   have any questions about the CDs in that year-long period?

14   A.    Well, we -- we -- you know, Tonya Dokken had inquired in

15   early '08, and we had some questions and talked to them in mid

16   '08, March of '08, about the program.

17   Q.    Okay.  And were -- we looked earlier -- and I'm not going

18   to pull it up right this moment, but during the course of

19   trial we looked at an email that Ms. Dokken sent on behalf of

20   the -- the board.  Do you recall that?

21   A.    Yes.

22   Q.    And was that email something that you as a board member

23   were on board with her going out and trying to obtain that

24   information?

25   A.    Yes.

1    Q.   Okay.  Let's look, then, at what we have about -- in your

2    discussion with Mr. Day yesterday, about that March '08 board

3    meeting, and the minutes of that were at Exhibit 62.

4         And we're going to skip the agenda again and turn to the

5    top of the next page of the minutes and look at that report on

6    what happened at the March 2008 board meeting.

7              MR. PETRIE:  Next page, please.  Top of the next

8    page.

9    Q.   (BY MR. PETRIE)  And I'm just having that shown to you,

10   Mr. Knudson, for context.

11   A.   Okay.

12   Q.   Do you remember in your conversations with Mr. Day

13   yesterday, you talked about how that at this point in time you

14   understood that this was riskier than, and I think what you

15   said was, a usual CD?

16   A.   Yes.

17   Q.   Do you recall that?

18   A.   Yes.

19   Q.   And when you referred to a usual CD yesterday with Mr.

20   Day, what did you mean?

21   A.   Well, than a U.S. CD from a U.S. bank.

22   Q.   And why was it that you had at this point in time the

23   perception or the understanding that this was more risky than

24   or a riskier proposition than a CD from a U.S. bank?

25   A.   Well, the U.S. CDs are from a -- you know, U.S. banks,

1   and U.S. banks are -- you know, they do commercial loans.

2   This particular CD, the -- what the banks did was these

3   investments that they talked about in -- in their portfolio,

4   such as -- such as precious metals and other investments,

5   equities, so forth.  So it was different.

6   Q.   And what is there about that type of investment or those

7   types of investments that from your view made this a more

8   riskier proposition than a U.S. CD?

9   A.   Well, it's just a little more risky.  That was our

10  perception.

11  Q.   And I apologize.  I maybe should have asked you this

12  first.

13  A.   Sure.

14  Q.   You told us yesterday that you were not involved in the

15  actual deposits that were the basis for these eight CDs.  Is

16  that right?

17  A.   Right.

18  Q.   Can you tell the jury, please, over -- and let's pick the

19  same year-long period we were talking about from October 1,

20  '07 to October 1, '08, what you were doing in

21  connection -- or, if anything, in connection with the CDs over

22  that period.

23  A.   I wasn't doing anything.

24  Q.   What were you doing, if not having some involvement with

25  the CDs during that same period?

1  A.    Yeah.  Gary and Gary's brother and I had started a

2  company called Fortrust, which is a data center company, and I

3  was working full-time there the whole time.

4  Q.    Were you consulted at all about the loan transactions

5  that you've referred to as taking place?

6  A.    No.

7  Q.    When was the first time you heard anything about the loan

8  transactions?

9  A.    At our board meetings.

10  Q.    Okay.  Let's look then at the minutes of the board

11  meeting that -- or the board meeting that most immediately

12  followed the loans in October of 2008.  And this is Exhibit 92

13  that you discussed with Mr. Day yesterday.

14       And we'll skip the agenda again and look at the report on

15  the Stanford certificates of deposit.  And this carries over

16  from page to page.  There's a few trickle-over lines on the

17  next page.  But I want to focus in on something that Mr. Day

18  asked you.

19       Do you remember he did that thing where he showed you a

20  copy of the minutes and then he showed you a copy of draft

21  minutes and asked you to look at the -- the changes from the

22  draft to the official minutes that were signed?  Do you

23  remember that discussion?

24  A.    Yes.

25  Q.    And he asked you a question -- and I'm going to use his

```
 1   words, at least in part.  I can't repeat the question

 2   verbatim.  But he asked you a question to the effect of

 3   whether some of the words were removed from the draft minutes

 4   because they were, quote, bad words, end quote.  Do you

 5   remember that?

 6   A.    Yes.

 7   Q.    Can you tell the jury, from your experience as a member

 8   of the investment committee and then as an advisor to the

 9   investment committee, what the process was that you went

10   through when at each of those first items you'd review the

11   minutes from the last meeting and approve them?

12   A.    Well, we don't -- you know, we don't alter them or amend

13   them or anything like that.  We don't change them.

14   Q.    What do you do when you go -- if you go through and

15   review them, what are you reviewing them for?

16   A.    Just for accuracy.

17   Q.    And I believe you told Mr. Day that you didn't remember

18   having seen that draft.  Is that correct?

19   A.    That's correct.

20   Q.    Do you have any reason to believe, based on your

21   participation on the investment committee, that those words

22   were removed to try and hide something from someone?

23   A.    No, not at all.

24   Q.    And I apologize for skipping around, but if you could,

25   then -- I'm going to ask Austin to pull up Exhibit 111 that
```

1    you also discussed with Mr. Day.

2        And, in particular, just to put this in context, do you

3    remember discussing with him the page further back that had a

4    letter that you had prepared to the bank about redeeming your

5    CDs way back on page 11 of this document?  Do you remember

6    discussing that with him.

7    A.   Yes.

8    Q.   And he asked you a bunch of questions about this letter

9    that was dated January 7 of '09.  Right?

10   A.   Yes.

11   Q.   And it's signed by both you and your wife, Rita.  Right?

12   A.   Yes.

13   Q.   Now, when you look at all of the exhibit, not just the

14   pieces, parts, that he showed you, does it provide you with

15   any information about when you and Mrs. Knudson actually had

16   that letter delivered to the bank?

17   A.   We sent that in in February 4th.

18   Q.   And let's look at the second page of this exhibit.  Well,

19   let me change it.  Let's look at the first page of this

20   exhibit.

21   A.   Sure.

22   Q.   Okay.  Do you know who Heather Strauss is?

23   A.   She was an assistant at the Magness Investment Group

24   office.

25   Q.   And do you see at the top of this document, there

```
 1    is -- it's got a bunch of information about an office and a,

 2    quote, pouch number.  Do you see that?

 3    A.    I do, yeah.

 4    Q.    And then it has a date.  Right?

 5    A.    Yes.

 6    Q.    And the date is February 4 of '09?

 7    A.    Correct.

 8    Q.    And then, in particular, do you see there's a FedEx

 9    number up there that is -- and I'm just going to use the last

10    for digits so that we don't have an enormous numerical

11    mouthful.  But you see it ends there in 5396?

12    A.    Yes, I see that.

13    Q.    Then let's look and see if there's a FedEx air bill or

14    waybill in the materials provided.  Do you see one in here?  I

15    know you -- I know you're not -- I know you don't have a hard

16    copy because I'm trying to keep you close to the mic.  Thank

17    you.

18    A.    Okay.  On this page.

19    Q.    Yes.  And do you see that this is a Federal Express

20    international airway bill from Ms. Strauss to the Stanford

21    International Bank?

22    A.    Yes.

23    Q.    And would you tell us what the air bill number is in the

24    lower right-hand corner there, at least the last four digits?

25    A.    It's 5396.
```

20

1    Q.   Okay.  And the -- the date on this is also February 4 of

2    '09.  Right?

3    A.   Yes.

4    Q.   And did you, sir, at any point in time prior to providing

5    this information to Ms. Dokken, in any way communicate to the

6    Stanford International Bank that you wanted to redeem that CD

7    that's referenced in the January 7, '09 letter?

8    A.   No.

9    Q.   What's the reason for the delay between, if you prepared

10   a letter on January 7th, for not sending it out or not having

11   someone else send it out until February 4?

12   A.   Well, we were waiting for them to talk to the Stanford

13   people and see what was going on.

14   Q.   And why were you waiting to talk to them and see what was

15   going on?

16   A.   To make a final decision on what to do here.

17   Q.   What was the information you were expecting them to

18   provide that would allow you or permit you to make a final

19   decision?

20   A.   Well, we sent in a letter and we wanted to talk to them

21   about a number of issues.

22   Q.   Let's look again at Ms. Dokken's letter --

23   A.   Okay.

24   Q.   -- that went in with this Federal Express package.

25             MR. PETRIE:  If we could look at the second page of

1    Exhibit 111, please.  And if you could blow up just -- that

2    will be fine.  Thanks.

3    Q.    (BY MR. PETRIE)  And this letter, dated February 4th of

4    2009, comes from the office of the -- the business office of

5    the Magness entities in Denver.  Right?  That's that Tabor

6    Center office?

7    A.    Yes.  Yes.

8    Q.    Is that where you officed when you're working for

9    Fortrust?

10   A.    No.

11   Q.    Where was your office in relation to this address?

12   A.    My offices are in north Denver.  This is downtown Denver.

13   Q.    Then let's look at the text of Ms. Dokken's letter to the

14   bank on February 4th of 2009.  Do you see in that letter she

15   is asking for an application of the proceeds from the CD to

16   pay off the loans--principal, estimated interest, and any

17   penalties.  Do you see that?

18   A.    Yes, I do.

19   Q.    And then she says, please use the existing wire

20   instructions to transfer proceeds to GMIT, or GDMIT, Magness

21   Securities, and GMAG.  Do you see that reference?

22   A.    Yes, I do.

23   Q.    And she has then done this arithmetic and has what's

24   called estimated net and shows a number there of about 15.9

25   million.  Do you see that reference?

1    A.    Yes.

2    Q.    Did you-all receive the $15.9 million delta, in other

3    words, the difference between the amount of the CDs applied to

4    pay off the debt and the total amount of the CDs at that time?

5    A.    Not that I'm aware of, no.

6    Q.    Did -- has Stanford International Bank advised the

7    companies, the holders of the certificates of deposit, at any

8    point in time that it was taking, and let's say from here

9    until the next couple of months, that it was taking that $15.9

10   million and doing something else with it?

11   A.    Not that -- not that I'm aware of.

12   Q.    Was there any discussion of a set-off in that time frame?

13   A.    Of this $15 million?

14   Q.    Yes, sir, or 15.9, yes.

15   A.    Not -- not that I'm aware of.

16   Q.    The last topic I want to talk to you about that you went

17   over with Mr. Day was those meeting minutes from April 9 of

18   2009.  And those are the ones marked as Exhibit 114.

19         Wait until we get these up.  We'll skip the agenda.

20         Do you remember discussing these with Mr. Day?

21   A.    Yes.

22   Q.    Okay.  And in particular, he directed your attention to

23   paragraph 2 and some of the comments there.  Do you remember

24   discussing that with him?

25   A.    Yes, I do.

1   Q.   And in that paragraph in particular, you discussed with

2   him the -- I'll call it a report that -- I'm sorry.  I'm in

3   the wrong paragraph.

4          MR. PETRIE:  Austin, let's go the paragraph above,

5   the CDs, please, the next page.  That will be paragraph 3,

6   please.

7   Q.   (BY MR. PETRIE)  Sorry about that Mr. Knudson.  I had you

8   in the wrong place.

9        This is what you discussed with Mr. Day yesterday about

10  Stanford and what was going on at this April 9, 2009 meeting.

11  Right?

12  A.   Yes.

13  Q.   And in there, remember he was asking you questions about

14  the GMIT loan from Stanford Bank that had been paid in full by

15  setting off.  You remember he was focusing on that?

16  A.   Yes.

17  Q.   Is the loan that's being talked about here a margin loan

18  like the one you were talking about in October of '07?

19  A.   No.

20  Q.   Had -- as you sit here today, when did this setoff

21  transaction take place?

22  A.   In -- apparently in February.

23  Q.   Why do you say apparently in February?

24  A.   Well, it was -- that was the time that Tonya sent in the

25  letter that talked about all that.

```
 1    Q.   Do you have any knowledge that it actually happened in

 2    February?

 3    A.   No, I do not.

 4    Q.   Okay.  Did you receive any -- not you personally.  As a

 5    member of the investment committee, was there any sort of

 6    written paperwork that you were provided that talked about

 7    whether Stanford International Bank had effected this setoff

 8    to pay the loans in full?

 9    A.   I don't remember.

10    Q.   Thank you.

11              MR. PETRIE:  Those are all the questions I have,

12    Your Honor.  Thank you.

13              THE COURT:  Recross?

14              MR. DAY:  We have no further questions for Mr.

15    Knudson.

16              THE COURT:  All right.  Thank you, sir.  You may

17    step down.

18         Can I speak with counsel for just one second?  This is

19    just a housekeeping matter.

20              (Discussion at the bench, out of the hearing of the

21              reporter.)

22              MR. PETRIE:  Our next witness, Your Honor, is by

23    deposition.  It is Charles Wilk, and I am going to need a

24    second just to rearrange the microphone closer to the

25    speakers, if I may.
```

```
 1              CHARLES WILK, BY VIDEOTAPE DEPOSITION,

 2   Q.   Good morning.  Can you please state your name for the

 3   record?

 4   A.   Charles Wilk.

 5   Q.   And my name is Scott Powers, and I represent the

 6   Receiver, Mr. Ralph Janvey.  Are you familiar with the

 7   Stanford Receivership?

 8   A.   No, not really.

 9   Q.   Are you familiar with the Stanford International Bank?

10   A.   Again, not really.  I mean, I know them by name.  That's

11   it.

12   Q.   Can you tell us where you live, please?

13   A.   1212 Federal Avenue, Seattle, Washington.

14   Q.   And how long have you lived there?

15   A.   About 14 years.

16   Q.   Did you meet with anybody to prepare for this deposition

17   today?

18   A.   Yes.

19   Q.   Who did you meet with?

20   A.   Lisa.

21   Q.   And when was that?

22   A.   Yesterday.

23   Q.   And how long did you meet with Ms. Lee yesterday?

24   A.   An hour, hour and a half maybe.

25   Q.   Is that the only time you've met with the attorneys for
```

1    the Magness Defendants in connection with this case?

2    A.    Correct.

3    Q.    Are you -- do you understand that we are here on a

4    lawsuit between Mr. Janvey, the Receiver, Gary Magness, and

5    some Magness entities?

6    A.    Yes.

7    Q.    Okay.  And what did you talk about with Ms. Lee?

8    A.    Generally she helped me try to put some dates because

9    there were different periods and I was not crystal clear on

10   the first period versus the second period that I was involved

11   with the Magness Group.  And we looked at one or two

12   documents.  One was just a spreadsheet with a timeline that

13   helped out.  That was about it.

14   Q.    Tell me more what do you mean when you say, there were

15   two different periods.

16   A.    Well, can I just say Magness and we all know that it

17   means, et al.?  Is that okay?

18   Q.    Yes.  That's fine.

19   A.    So Magness was a client of the Quellos group for a period

20   of time, and I was an employee and partner of the Quellos

21   group.  And then that relationship came to an end, and there

22   was a period of time where we had -- I had no contact Quellos,

23   had no contact with the Magness group in a formal way.

24        And then in early-ish '09, we had already sold Quellos,

25   so I was just kind of kicking around.  I took a consulting

```
 1    engagement with the Magness group for a period of time
 2    starting in '09.  So there was a two-plus year period of time
 3    where I didn't really have any working relationship with the
 4    Magness group from the time the Quellos relationship ended and
 5    the time that my consulting arrangement began.
 6    Q.   And then how long was your personal individual consulting
 7    relationship with the Magness group?
 8    A.   Probably -- I don't know the actual dates.  I'm going to
 9    guess slightly less or right at two years, maybe 18 months.
10    Q.   What's your current occupation?
11    A.   I'm doing -- well, actually I guess now I'm actually an
12    employee.  I started as sort of a consultant.  I'm an employee
13    with Harmony Capital.
14    Q.   And what do you do with Harmony Capital?
15    A.   It's a family investment office of somebody I've known
16    for a long time, and so I help him with, you know, various
17    investments, family-related issues, that's primarily it.  We
18    have some real estate -- or he has real estate investments,
19    some operating businesses, and I'm involved in those.
20    Q.   Did you attend college?
21    A.   Did I?
22    Q.   Yes.
23    A.   Yes.
24    Q.   And where did you attend?
25    A.   University of Texas-Austin.
```

1    Q.    And what did you study?

2    A.    A hodgepodge, but my degree is a BA in biology.

3    Q.    And when was your biology degree?

4    A.    1979.

5    Q.    And then you attended some postgraduate education,

6    school?

7    A.    Yeah.  I went to Fordham Law School, and then I went to

8    NYU after that.

9    Q.    And you have a JD from Fordham?

10   A.    A JD from Fordham and an LL.M from NYU.

11   Q.    And what is your -- what was your course of study for

12   your LL.M?

13   A.    Tax.

14   Q.    Did you go straight from the JD to the LL.M?

15   A.    Yes.

16   Q.    And what was your first employment after your LL.M?

17   A.    Fulbright Jaworski in your hometown.

18   Q.    In Houston?

19   A.    Yep.

20   Q.    How long were you with Fulbright?

21   A.    Oh, boy.  Let's see.  Going way back in time.  Let's see.

22   I guess I don't have to be exact.  Two plus years, two maybe

23   and a half.  I don't remember the start and finish date.

24   Q.    Okay.

25   A.    Actually may have been closer to three, now that I think

 1   about it, because I left and I went -- because that's the next

 2   question -- I went to PricewaterhouseCoopers after that.

 3   Q.    Okay.  So after you left Fulbright & Jaworski, you went

 4   to PricewaterhouseCoopers?

 5   A.    Yes.

 6   Q.    At Fulbright you were a practicing tax attorney?

 7   A.    Correct.

 8   Q.    What did you do at PricewaterhouseCoopers?

 9   A.    Technically really the same things, even though obviously

10   you're not practicing law in a accounting firm, but we did a

11   lot of different tax work.

12       I did a lot of consulting work with private clients,

13   either from the Coopers side or from the Price Waterhouse

14   side, because the year I went was the year that Price

15   Waterhouse and Coopers merged.

16   Q.    And you were consulting on tax issues?

17   A.    Not all.  Some of it was estate planning, some was tax,

18   some of it was just, you know, basic family issues.

19       The actual practice was called -- let's see if I can

20   remember what it was called.  Wealth transfer solutions?  I

21   don't know.  It had a strange name.  Basically something akin

22   to family wealth management, I guess would be.

23   Q.    I should have asked, you did you go straight from the

24   University of Texas to Fordham?

25   A.    No.

1    Q.    What did you do between?

2    A.    I did a bunch of different things.  When I got out of

3    Austin, I worked for Best Products, and then a company called

4    American Fence for a couple of years.  I left that to go

5    compete in the America's Cup.

6    Q.    Sailing competition?

7    A.    Yep.  And then when that was over, I took a job running a

8    sailboat for the Watson family, which was out of New York.

9    And ultimately they transferred me out of being a boat captain

10   to moving me to New York.  And I worked for the Watson family

11   office for about 13 years.  And then I went to law school.

12   Q.    Who are the Watsons?

13   A.    They started IBM.

14   Q.    And what did you do for the Watson family office?

15   A.    It's kind of more what did they do for me.  They

16   basically gave me my de facto MBA.  They were kind enough to

17   bring me up to New York, thought I had a good head on my

18   shoulders, introduced me to some of the best investment

19   business.  You know, the family had been wealthy for years and

20   years and years and had a pretty substantial presence.

21        And it was -- I worked at varied and different positions

22   at Watson Enterprises over the years.  At the end, I was the

23   president of Watson Enterprises.

24        But it was basically, as I said, my sort of de facto MBA.

25   I spent 13 years getting a great education on a whole bunch of

 1   different investment business, legal, tax.

 2   Q.   You -- I take it at the end of your legal education, you

 3   received a law license from Texas?

 4   A.   First from New York, and then I had to take the Texas

 5   Bar, correct.

 6   Q.   Are either of those licenses active today?

 7   A.   No.

 8   Q.   Do you have any other professional certifications or

 9   licenses?

10   A.   No, not today.

11   Q.   Have you had any others?

12   A.   Sure.

13   Q.   And what are those?

14   A.   I had a -- oh, boy, I'm not going to remember them all.

15   A 7 -- let's see.  What are all the numbers?  Series 7, Series

16   3.  Basically a bunch of security licenses.  But when we sold

17   Quellos, you have a period of time, I think it's two years, to

18   reattach the licenses or else they expire, and I didn't

19   reattach them to another broker-dealer, so they just expired.

20   Q.   When did you first get your securities licenses, or at

21   least when did you get the first couple?

22   A.   Let's see.  I went to work for Quellos in '99, so without

23   trying to dig up records, maybe '00 or '01, but that's -- I'm

24   guessing, but somewhere in the first two or three years of

25   being at Quellos.

1    Q.    And did you go straight from PricewaterhouseCoopers to

2    Quellos?

3    A.    I did.

4    Q.    Okay.  What is Quellos?  Or what --

5    A.    What was Quellos.

6    Q.    -- was Quellos?

7    A.    Yeah.  It was fund of fund hedge funds, was its basic

8    business.

9    Q.    All right.  Well, let's unpack that.  So what is a fund

10   of fund hedge funds?

11   A.    Hedge funds?  And there are still some that exist today.

12   Most of them are inside banks.  So we're turning the hands of

13   time back, right, to like the mid '90s.

14        I knew about hedge funds primarily through my work at the

15   Watsons, because they had investments with different hedge

16   fund managers, both liquid, semiliquid, and illiquid, all the

17   way to private equity.

18        But it was somewhat of a still not really super well

19   known investment class.  And hedge fund is kind of a

20   ubiquitous term.  Right?  Hedge funds do everything.

21        But they're private investment partnerships, in probably

22   the simplest form.

23        So what Quellos, and at the time it was called Quadra,

24   but what they realized was that while different groups,

25   pensions, endowments, et cetera, wealthy families wanted

1   access to the hedge fund world, it wasn't investments they

2   weren't real familiar with technically, and how you mix and

3   match the different investment strategies is kind of important

4   in the portfolio.

5       So essentially what a fund of fund -- or at least what

6   Quadra and Quellos did, was identify different managers that

7   did different kinds of strategies, and then try to come up

8   with a mix of those, a weighting or a mix of those different

9   managers, that would give you sort of the risk-reward

10  parameters that you may be looking for, and build it into a

11  fund.

12      So it was a fund, like a mutual fund, if you would, that

13  an investor could invest in, but that mutual fund was made up

14  of a whole bunch of hedge funds.  So it was a fund of hedge

15  funds.  And how you built was that sort of the -- the sauce.

16  Q.   So an ordinary mutual fund might just invest in a basket

17  of stocks and bonds and that kind of thing?

18  A.   And they're almost always long only.  Right?  They don't

19  short.  I mean, there's some now that do, but back in those

20  days essentially you go into a mutual fund; if it's small

21  caps, they're buying small caps.  If it's a government bond

22  fund, they are buying government bonds.  Nobody's really

23  shorting or hedging or doing anything with the portfolio,

24  you're just sort of going for a long ride.

25      The hedge fund guys were doing risk arbitrage, merger

1   arbitrage, stat arbitrage, yield curve trading; all kinds of

2   different, more esoteric strategies, long and short, so you

3   kind of make money in the ups and downs.  And the name hedge

4   from the idea that you were hedging out some of the risk.

5       And, you know, today the industry has gone through all

6   kind of machinations.  But in those days the Yales, the

7   Harvards, the big college endowments, a lot of the pension

8   funds, were making outrageous returns in the hedge fund area

9   because it was new, it wasn't fully developed; there was still

10  a way to exploit a lot of inefficiencies in the market.

11      So what we did at Quellos we built fund of funds for, you

12  know, insurance companies, pension funds, college endowments,

13  wealthy families who said, I really want to be in this class,

14  but I sure don't want to try to build the expertise to

15  understand what's going on in the hedge fund world, so I'd

16  rather give you guys the money and let you guys build the

17  expertise.

18  Q.   So what else did Quellos do besides run the fund of

19  funds?

20  A.   Well, that was the biggest part of our business.

21      We had another section of the business, because we had a

22  lot of -- well, in the early days it was primarily wealthy

23  families that gave us money.  In the later days it was -- we

24  were more institutional than we were families.

25      But a lot of those families were incredibly successful

1    wealthy families, and they would ask for, you know, can you

2    help with?  And so we sort of built a multifamily family

3    office.

4        Now, that's -- that's a real simple way to sort of group

5    what that business did.  It was called Quellos Financial

6    Advisors.  But we would consult with family offices, help them

7    with best practices, accounting procedures, maybe work with

8    their law firm, their accounting firm.  We did tax returns

9    in-house for some families.

10       We would consult on all kinds of things, whether it's,

11   you know, planes, NetJetss, structuring aircraft deals, boats,

12   vacation homes, I mean, the sort of the gamut of what you

13   would think a family office would do.  We would offer that in

14   sort of an a la carte way to families that were our investment

15   clients.

16       It wasn't -- it was an interesting part of our business,

17   but it wasn't the driver or the horsepower of the business.

18   That was the fund of funds that really drove the business.

19   Q.   And what was your role at Quellos?

20   A.   In the beginning I was just, you know -- I think there

21   was 40 employees or 35 employees, so, you know, it was a

22   little bit, you know -- you wore, again, a lot of different

23   hats.

24       So I learned a lot more of the investment business from

25   our chief investment officer by going to hedge fund meetings,

```
 1   meeting with managers, you know, sitting in meetings on how we

 2   were going to build the portfolio with the analysts.

 3         I learned a lot about IT, because one of the things we

 4   did was built out an incredible computer database system and

 5   risk tool for the hedge fund industry.

 6         Later -- and then -- I'm not going to remember the exact

 7   order.  I also became a principal in the firm, '01 or '02.

 8   I'm not sure about the date.  Ultimately I also ran that

 9   private client side of the business for the last -- I don't

10   know -- probably last three or four years that we had that, I

11   ran that private client business that we had.

12   Q.   When did you first meet Gary Magness?

13   A.   Wow.  Good question.  When did I first meet Gary Magness?

14   You know, I really don't know.  I take a wild guess and say

15   maybe around '04.  If I looked at maybe the original

16   engagement letter or something, it may give me a better frame.

17         One of my partners at Quellos had worked with Tom Espy, I

18   don't remember where, Salomon Brothers maybe, maybe Bear

19   Stearns, and Tom was working with the Magness family, and

20   through my partner -- I don't remember if we met with Tom,

21   talked to Tom on the phone, but that was the introduction to

22   Gary.

23   Q.   Okay.  So the introduction to Gary was while you were

24   with Quellos?

25   A.   Oh, yes.  Yes.
```

1  Q.   And as a consequence of your relationship with Quellos?

2  A.   Yeah.  Correct.

3  Q.   Okay.  So there was -- the first one looks like ongoing

4  strategic consulting.  Do you recall that becoming part of

5  Quellos' engagement with the Magnesses?

6  A.   Yeah.  I mean, I think in sort of broad strokes it's --

7  it's probably pretty descriptive.  My biggest point person was

8  Tonya on the engagement.

9  Q.   Okay.

10  A.   So if she was in tax return mode, it could be that there

11  was a question about something on a tax return.  That didn't

12  actually happen a lot, because that was an area she was real

13  comfortable in.  But a ranch expense or something like that,

14  maybe we'd have a discussion.  Primarily it was Fortrust,

15  which is a data center.

16      This is not in order.  It was the estate -- early on the

17  estate of Bob Magness, which is really something that Ray

18  Sutton and his law firm were heavily involved in.  But given

19  that I had a state tax background, and the fact that Ray and I

20  had a nice working relationship, there were definitely a lot

21  of conversations about that in that time.  There was a lot of

22  work going on between the IRS and Ray's firm on trying to

23  settle Bob Magness' estate.

24      There was the general idea of what to do with the

25  portfolio.  Gary had a fairly significant amount of leverage

 1    against the -- what became the Liberty Media positions.  At

 2    that point there -- Liberty was Liberty.  It hadn't spun out

 3    and splintered as much as it is today.  So there was a little

 4    talk about that.

 5        I think -- I haven't read all of this other exhibit,

 6    which is a report, but my memory was Deutsche Bank was the

 7    bank that was involved in the early days, because I remember

 8    going to meetings, and they were squeezing Gary pretty hard

 9    over the leverage against the Liberty positions.  And had a

10    couple of not, in my mind, brilliant ideas of what Gary could

11    do.  Ultimately, without really thinking it through, we did a

12    bunch of stuff, paid down a bunch of Deutsche Bank debt, and

13    ultimately left Deutsche Bank.

14        Where did we go next?  I don't really remember --

15    Q.    When you suggested liquidating some of the stock and

16    retiring some of the debt, did you get any pushback on that

17    suggestion?

18    A.    Oh, sure.

19    Q.    And what was that?

20    A.    You know, Gary's pretty comfortable -- I mean, I don't

21    want to speak for him today, but he was pretty comfortable

22    living with debt against the portfolio.  He was a -- is and

23    probably -- or was and probably still is and to some extent

24    justifiably so, a John Malone fan.  John's done a great job

25    with that company.  John was, you know, his dad's partner, and

1   he had a lot of faith that John would make the right moves

2   with Liberty and ultimately the debt would seem insignificant

3   as Liberty became a more and more valuable company.  So he was

4   willing to ride it.

5        The problem is the bank wasn't really willing to play

6   that game -- or that particular bank wasn't, and was making

7   life pretty difficult for him.

8   Q.   You mentioned Mr. Malone being a partner of Mr. Magness'

9   father.  Was your impression that his judgment about keeping

10  the Liberty stock was -- was a business judgment, or an

11  emotional judgment, or something else?

12  A.   I would say it was a -- well, probably all three.  Yeah,

13  there's differently an emotional component because it was a

14  business his dad started.  Right?  John was an employee who

15  then ultimately -- John Malone was ultimately an employee who

16  eventually ran the operation because of Bob's health and

17  untimely demise, but -- which actually preceded me.  I never

18  got to meet Bob.

19       But a lot of it was because he really believed in John's

20  acumen and, you know, obviously with hindsight, absolutely

21  smart.  I mean, John is a great businessman, has done a great

22  job with Liberty.

23  Q.   Did you ever hear Mr. Magness refer to you as his paid

24  pessimist?

25  A.   Not specifically, but Lisa brought -- I mean, I --

1    probably some version of that, but Lisa brought that up

2    yesterday.

3    Q.   Did -- well, does it -- does it ring true?  You said

4    there's some version of that.

5    A.   Yeah.  Well, I think I maybe learned this at the Watson

6    family or along my lines of practicing attorney, and at PwC,

7    and then at Quellos, it just kind of ring true.

8         For the most part, the type of private clients that we

9    were dealing with didn't really want to hire yes people.  That

10   doesn't really serve them a lot of purpose.  So there's a

11   little bit of my feeling was I always needed to be the yin to

12   the yang.  If they wanted to go long, I needed to be arguing

13   short.  If they wanted to go short, I needed to be arguing

14   long.  If they needed a hundred-foot airplane, I needed to

15   argue for an 80-foot airplane.  If they needed an 80, I needed

16   to argue for a hundred.

17        In other words, what I thought what we were being paid

18   for is to try to probe the other side.  And so if that makes

19   me primarily a pessimist, that's probably because a lot of

20   these successful people are optimists.

21   Q.   When did you first hear about the Stanford International

22   Bank investment that the Magness people had?

23   A.   Well, I have a little bit better clarity now that I can

24   line up dates.  So I don't actually know the date, but based

25   on time lines, as I see it now, it would have been during my

1    stint at Quellos.  And I remember being sent -- it could have

2    been by email, because I don't really mean snail mail, it

3    could have come by snail mail, but I think it was by email --

4    a kind of broad brush outline of what the CD structure was,

5    probably from Tonya, even though I couldn't swear it came from

6    her, but I'm pretty sure that's probably who it came from.

7    And they said, you know, what do you think of this?  Can you

8    look at the structure of the CDs?

9    Q.    Like a marketing document?

10   A.    Yeah.  Unfortunately it was more marketing than it really

11   was substantive.  My memory was, you know, I looked at it, I

12   had to make some assumptions, because it wasn't -- I used the

13   word yesterday, what I call open kimono.  It wasn't like a

14   full, Here, we're going to show you everything in the secret

15   sauce, the names of the underlying managers, the structures.

16   But basically kind of described -- and why they used the

17   terminology CD, don't really know -- but basically describe

18   what I would call a note structure, where the performance of

19   the note was directly or indirectly derivatively related to

20   the -- to an underlying basket of investment managers.

21        The best I could tell from the information provided,

22   those investment managers were primarily -- I'm in the U.S. so

23   I'm saying offshore investment managers, non-U.S.-based --

24   well, could have been U.S.-based investment managers, but they

25   were running nonU.S.-based funds.

1      And so the performance of this note was you had -- and

2   this is what I explained to Gary.  You sort of have all the

3   downside risk of that portfolio, but your upside of that

4   portfolio was capped at whatever the cap was on the interest

5   rate, and I don't remember, 9, 10, 11 percent, whatever.  So

6   it was sort of a little asymmetric.

7      If these managers knocked the cover off the ball, you

8   were limited on the upside.  But if they struck out, you took

9   all the downside, which was fine.  I mean, that's -- there are

10   other note structures out in the marketplace; that wasn't

11   unique.

12      And I basically said to them, Look, if it's really -- if

13   having hedge funds exposure is important to you, there is --

14   you could get it directly.  If having offshore hedge fund

15   exposure is important to you, this may be -- this type of

16   structure may be how you have to access it, and then you have

17   to decide whether you're willing to take this sort of the

18   asymmetric performance risk, which is essentially their fee,

19   to have this exposure.

20      But they -- But I remember that there wasn't real full

21   disclosure of, like, you know, it's Joe Blow investment

22   manager in Argentina who's doing longshore.  It's, you know,

23   so-and-so investment manager in the Cayman Island doing

24   risk arb.

25   Q.   I asked you if it was a marketing document.  Do you think

1    what you were looking at was something that was produced by

2    the Stanford people?

3    A.    Yes, I do think it was that.

4    Q.    And do you recall whether it was a small handful of pages

5    brochure or a big annual report or something else?

6    A.    It was not voluminous in that I didn't get a hundred-plus

7    pages, but I do think there were some financials in there

8    also.  I mean, not -- again, not a full-blown, you know,

9    60-page audit, but I think there was some, at least, tables

10   and maybe a few pages.  And they may have been more

11   performance-related than actual accounting-related, you know,

12   underlying-management performance related.

13        But it was -- it definitely wasn't -- you know, I don't

14   really remember sitting here today, but I doubt it was 35

15   pages.  Ah, I guess it could have been 35 pages, but not much

16   more than that, and probably less than that.

17   Q.    And other than this one document you've described to me

18   that was sent to you, do you recall looking at anything else

19   about the bank?

20   A.    No.

21   Q.    And as best as you can recall, can you tell me the

22   sequence of events; that is, you received something, and then

23   what happened next?  How did the communications you described

24   unfold?

25   A.    Yeah.  I mean, I remember documents.  I remember looking

 1    at them.  I remember they're not -- you use the right word,

 2    more marketing.  It wasn't -- it wasn't as if -- and I guess

 3    maybe this is -- to answer your question, I probably assumed

 4    they hadn't made the investment yet, because I was thinking --

 5    or probably would have assumed, if they had made the

 6    investment and they had gotten the first or second or third

 7    quarterly report, it would be a much more involved report.

 8         You know, there's a difference between what somebody will

 9    show you as a marketing tool versus what they show you when

10    you're finally an investor.  This looked more like what you

11    would see as a marketing tool.  So I may have leapt to that

12    conclusion, and it may not have been true.

13         And I don't remember how I reported back to Magness,

14    whether I -- whether it was to Gary or to Tonya or some

15    combination, whether it was an email, whether it was written,

16    whether it was a telephone call.

17         But I do remember saying, look, it's -- you can call it a

18    CD, it's a note structure.  It's basically the full faith and

19    credit of Stanford Bank, the performance of which is

20    derivatively linked to a pool of underlying managers which

21    appear that they could be offshore hedge fund managers, which

22    wouldn't be surprising because UBS was doing it, Credit Suisse

23    was doing it.  There were lots and lots of banks out offering

24    that kind of similar product.

25         And if it's important -- if you -- if you feel it's

1    important to have exposure to offshore hedge fund managers,

2    you're probably going to have to use some kind of structure

3    like this to get to them because you can't get to them

4    directly.

5    Q.   So let me ask you that, because that comes back to some

6    question I have about the way that Stanford advertised itself

7         What made you think that Stanford was involved in those

8    complicated structures and those kind of risky --

9    A.   I think --

10   Q.   -- structures?

11   A.   -- you had to kind of piece it -- again, I'm looking at

12   more of a marketing than an investment thing.  I think I just

13   sort of pieced it.  I clearly had to make some assumptions,

14   right, because I didn't have some Stanford guy sitting in

15   front of me I could drill down.

16        But I made some assumptions, and it looked like, and they

17   led you to believe in their materials, that they weren't just

18   buying long only stocks in South America, they were actually

19   investing with investment managers that were exercising hedge

20   fund type strategies in these locations.  Whether it was 14

21   managers or 40 managers or 16 managers, that was really hard

22   to ascertain how diversified that portfolio was.

23        I think they -- again, I'm doing this from memory of,

24   what, now 10, 12 years ago, that it was more like 20 to 40

25   total managers.  Whether your CD had eight of them or 16 of

1   them or 42 of them in that portfolio, wasn't clear.  But they

2   had a pool, and how they utilized that pool --

3        Like, I guess taking it back to Quellos, we had probably

4   60 to 80 different managers in our pool.  That doesn't mean

5   all 80 managers was in every fund to funds we built because to

6   us what percentage of risk are versus long shore versus direct

7   lending, that was really important to the parameters, so how

8   many dollars to each different manager and how you spread them

9   out.

10       Unfortunately none of the Stanford material I saw gave me

11  any of that what I kind of call the secret sauce idea.  It was

12  just we build a portfolio of what essentially looked like

13  nonU.S. managers, and the performance of that portfolio is

14  really what's driving the return on your CD.

15  Q.   Did you -- you made a reference to not having a Stanford

16  person in front of you.  Do you recall ever talking to any

17  Stanford people about what this product was so that you could

18  get any questions answered?

19  A.   No, I do not remember, no.  I -- I -- my memory is I

20  didn't, but I don't remember speaking to anybody from

21  Stanford.

22  Q.   Did you look at -- did you ask for or look at any other

23  materials other than what you described to me?

24  A.   Well, this goes back to why I had assumed they hadn't

25  made an investment at the time they were asking me to look,

1   because when I did report back, and I have a feeling it was to

2   Tonya, but it could have been to Gary also, or simultaneously,

3   I said, do you want -- I said, I -- other than -- and you did,

4   too, because you live in Houston -- other than if -- depending

5   on where you live in Houston, you drove drive by that building

6   on -- over by the Galleria that was Stanford Bank.

7       I said, other than the fact that I drove -- actually I

8   don't think it said Stanford Bank but said Stanford something.

9       Other than having driven by the bank, I had really no

10  familiarity with Stanford.  What I could see was it was a bank

11  in Antigua, and it -- I don't know, was a -- maybe BB minus or

12  B or, you know, it wasn't AAA-rated bank, so you were taking

13  the full faith and credit of something less than AAA or AA.

14      And I said, do you -- you know, do you want to go any

15  further?

16      And they said, no, this is, you know, good enough for

17  now.  We'll let you know if we need more.

18  Q.  What made you think it was a BB rated?

19  A.  Oh, I'm just pulling that out.  I mean, it wasn't A AAA

20  rated.  Stanford Bank wasn't a AAA-rated bank.

21      I mean, at that point, I think UBS and AIG were the only

22  two AAA, besides the U.S. government, which isn't anymore, was

23  the only AAA-rated banks in the world that I even remember.

24  Q.  What did you know about Antigua?

25  A.  I did a lot of sailboat racing there, but that's about

1    it.

2    Q.   Does it have a good reputation as being a financial

3    center?

4    A.   It's okay.  You know, it's -- it is a banking center.  I

5    don't know how it became a banking center.  At least at that

6    time period I was way more familiar with the Cayman Islands.

7         The Caymans at that point were a much larger center of

8    hedge fund work.  A lot of our offshore hedge fund managers

9    were Cayman-based, so much more familiar with Cayman than

10   Antigua.  But I knew they had a banking sector.

11   Q.   Did you have an overall recommendation to Mr. Magness and

12   Ms. Dokken --

13   A.   You know --

14   Q.   -- about this?

15   A.   No.  I mean, I didn't say don't put any money in this and

16   I also didn't say put any money in it.  I said, look, it looks

17   to be a relatively expensive way to get exposure to a basket

18   of offshore fund of funds.  If it's important to get that

19   exposure, you know, if you feel like, you know, you really

20   want that exposure, you're probably going to have to get it

21   derivatively, meaning a note, a CD, a swap, something like

22   that.  You could use Swiss, you could use Credit Suisse, you

23   could use UBS, you could use Stanford Bank.  There's a

24   handful -- more than a handful of different financial

25   institutions that were happy to be the intermediaries to do

```
 1   that.  But just beware you do have the downside risk and your

 2   upside is capped, because of the interest rate on the note,

 3   and left it at that.

 4   Q.   Do you recall -- when do you recall next discussing

 5   Stanford International Bank with any of the Magness people?

 6   A.   In -- I think it's like April, now that I've seen the

 7   timeline, like April of '09.

 8        Tonya had asked me if I would be willing to come to a

 9   board meeting they were having in Las Vegas -- well, actually

10   that's probably somewhat false, sorry.  She probably called

11   me -- because I think the meeting was in April, so she

12   probably called me in March, you know.  I know there wasn't a

13   lot of time, maybe three weeks or something, you know, would I

14   be willing to come?

15        I said, sure, you know, I'd come to the meeting.  So I

16   went to the meeting and sat there and at that point --

17   Q.   This was after the Stanford Bank was in receivership.  Am

18   --

19   A.   Yes.

20   Q.   -- I right?

21   A.   That's true.

22        And you know what?  So -- and that's a good point.  When

23   I saw an article or articles about the bank when it was

24   unwinding, and obviously there was a ton of press, I sent one

25   or two of those articles to Tonya.
```

1      I didn't know the extent of Magness' exposure to Stanford

2   at the time--and that will become relevant in a moment--but I

3   knew Tom had been at Stanford Bank, or either -- and maybe

4   still was at the time I sent those articles.  And so I just

5   sent on some articles to Tonya.  I figured she had probably

6   seen them, but I sent them anyway.

7      And that may have been what precipitated her calling me

8   and saying, hey, can you come to this board meeting,

9   because -- I don't know.  You guys know this off the top of

10  your head.  When did that whole Stanford thing go down?

11  Q.   Let me show you Plaintiff's Exhibit 123.  This is a

12  brochure for the Stanford International Bank.  I just want you

13  to take a quick pass through it to see if you recognize this

14  is something you've seen before, or if you've seen anything

15  like it before.

16  A.   Is this -- is anybody -- I hate to ask, and maybe I need

17  new reading glasses, is it kind of not super clear or --

18          MS. LEE:  It's a little blurry.

19  A.   Thank you.  I was just like, wow, I'm really needing to

20  up my -- I haven't quite admitted that I'm so old that I have

21  to wear reading glasses all the time.

22  Q.   I think it is a black-and-white copy of a colored

23  document, which is why --

24  A.   Oh, okay.

25  Q.   -- the blurriness.

51

1   A.   Wow.  I can't say that I didn't see this.  I can't say,

2   though, that it rings a whole lot of bells.  And it's

3   not -- it isn't what -- I mean, even if I had it, it isn't

4   what I was looking at at the time in whatever, 0 whatever 5,

5   whenever they asked me to look at this potential investment.

6   This isn't what I was doing my analysis off of.  It was more

7   involved than this.

8   Q.   Okay.  What about -- let's talk about some of the

9   marketing messages, and I want to see if they're consistent

10  with what you were --

11  A.   Okay --

12  Q.   -- looking at.

13  A.   -- sir.

14  Q.   So if you can turn the page, at the bottom right you see

15  120346?

16  A.   Yeah, 0346.  Okay.

17  Q.   Well, actually let's go back one page, 120345.

18  A.   Okay.

19  Q.   Depositor Security.  It says, "Nothing is more important

20  than peace of mind concerning the security of your money."

21      In what you were looking at, did you see discussion or

22  emphasis of capital preservation or depositor security?

23  A.   I don't know if this answers the question.  I don't

24  remember like a written dialogue paragraph of this.  But the

25  CD, the concept of the CD was -- or the concept of a CD is,

1    you know, you buy a thousand-dollar CD, you get -- you know,

2    at maturity you get the interest on the CD plus your thousand

3    dollars.

4        However, the Stanford CD was that it was indexed to the

5    performance of this basket of investment managers, so there

6    was a risk that you couldn't -- I don't actually -- let me

7    back up a second.

8        I don't know that they explicitly stated this, but if you

9    looked at it and peeled the onion, there was an implicit deal

10   that you could lose principal.

11       You know, typically if you go to JPMorgan Chase and buy a

12   CD -- well, obviously if JPMorgan -- bad example because we

13   have FDIC.

14       If you didn't have a government insurance on a CD and the

15   bank bit the dust, you could lose your principal.  But you

16   sort of figure JPMorgan Chase, as my example, AA-rated bank,

17   or whatever it is today, you're probably okay, you'll get your

18   money back; maybe you don't get your interest back or you get

19   something.

20       Anyway, with this, implicitly, as you sort of peeled the

21   onion and looked at some of the materials a little closer, you

22   could lose principle if the underlying investment performance

23   was really bad; in addition to the fact, as with any CD, you

24   have the risk of the balance sheet of the bank.

25   Q.   So in the materials that you looked at, did Stanford

1    International Bank emphasize that it focused in its portfolio

2    on capital preservation to minimize the risk you just

3    described?

4    A.    Well, clearly they tried to emphasize, or not clearly,

5    but implicitly, and maybe explicitly, they were trying to

6    emphasize their investment acumen in this portfolio to

7    preserve the capital.

8         Whether they actually wrote something that says we're

9    minimizing -- and how they would do that would be a better

10   question, you know minimizing your risk to this underlying

11   portfolio, I don't remember seeing anything like that.

12   Q.    And why is that a better question?  You said, how would

13   they do that is a better question?

14   A.    Yeah.  Well, I mean, what are they doing, buying puts

15   against the portfolio?  I mean, if your CD is really linked to

16   the performance of these underlying managers, how are

17   they -- besides prudent investment manager selection and, you

18   know, all the other buzz words in the investment world, you

19   know, two thou -- you know, markets collapse.  Right?  You get

20   Brexit and, you know, things happen.

21        So the only way to truly protect against that, would be

22   if you actually owned a put on the underlying -- from a

23   reputable counterparty on the portfolio, so that if it did go

24   south, you could collect on the put and hold yourself back to

25   even.  And I don't know anybody -- that's not true.  For

1    enough money anybody will write the put, but -- in those days.

2    But you'd have to find a counterparty that was willing to

3    write the put, and my guess is it would be incredibly

4    expensive.

5    Q.   And in -- and if you have investment managers who are

6    involved in the kind of creative hedge fund strategies you

7    described, that's not -- those aren't conservative capital

8    preservation type strategies.  Right?

9    A.   No, I wouldn't -- actually I wouldn't say that.  I would

10   say for the most part they actually are, relatively speaking,

11   conservative strategies.

12        The way they enhance their return on those -- because

13   they're trying to make little bits of money on movements, and

14   they hedge away some of the risk.  Depending on the strategy,

15   they'll hedge away the interest rate risk or the idiosyncratic

16   risk, or whatever they are trying to hedge away to try to make

17   it so they're just focusing on a certain variable, but they're

18   really making pennies.

19        But the way they enhance the pennies is with leverage, so

20   they're using two to one, three to one, four to one, eight to

21   one, ten to one, some of them get -- would even get higher

22   than that, leverage to enhance their return portfolios.

23        And as a matter of fact, if you look at most well-run

24   fund of fund of hedge funds, they underperform the S&P in a

25   bull market, but they outperform in a bear.

1     In other words, when the markets crashed in '07, '08, and

2     the markets were down 50 to a hundred percent, hedge funds

3     were down 30 percent.  So you don't get whacked as hard on the

4     down, because they do do a better job at that.

5     But when the S&P is up 35 percent one year, or 25 percent

6     one year, they may only be up 16 or 18.

7     So what happens is you give away, for the protection of

8     having a more -- potentially more minimized downside risk, you

9     give up a little of the upside in a traditional S&P type

10    portfolio.  That's really the way hedge funds have looked for

11    25 plus years.

12    Q.   Let me ask you to turn to page 120346.

13    A.   Okay.

14    Q.   You see the paragraph that begins liquidity?

15    A.   Yes.

16    Q.   And it says, "Stanford International Bank [sic] has

17    traditionally emphasized the importance of maintaining the

18    highest degree of liquidity as a security factor for its

19    depositors."

20    Did you see a message like that in the materials you

21    reviewed?

22    A.   I -- well, I don't know.  Highest degree.  I don't think

23    so.  And the reason is the CDs had liquidity constraints.

24    Q.   All right.  So what this is referring to -- well, let me

25    just -- let's go to the top of the page.  It says, "The

1   following factors help ensure that your money is preserved for

2   future generations," right?  It's talking about the money

3   that's at Stanford International Bank.

4       And then it says, the "bank has traditionally emphasized

5   the importance of maintaining the highest degree of liquidity

6   for its depositors."

7   A.   Uh-huh.

8   Q.   It goes on to say, "The Bank's assets are invested in the

9   well-diversified portfolio of highly marketable securities

10  issued by stable government, strong multinationals, and major

11  international banks."

12  A.   Uh-huh.

13  Q.   So the question was, did you see something about the

14  bank's assets being invested in a highly liquid portfolio?

15  A.   I mean, I may have actually seen this and just not really

16  remember it, so then yes, I probably did.

17      I mean, I kind of hate to say this, go grab any bank and

18  you are probably going to see some version of that paragraph,

19  because they're all trying to make you believe they're

20  prudently shepherding their balance sheet.

21      Because, I mean, at the end of the day, taking the FDIC

22  out of it for a moment, or the SPIC, at the end of the day

23  you're banking on the bank management running a good bank,

24  because you're putting your -- you know, that's why there's a

25  run on banks; people get nervous that there's not going to be

```
 1    enough liquidity, and everybody wants to be the first one to

 2    get their money out and, you know --

 3    Q.   So if the bank, Stanford International Bank, is saying

 4    its portfolio is invested in a liquid portfolio, is that

 5    consistent with the hedge fund understanding that you have?

 6    A.   Well, there's a difference.  The bank's balance sheet may

 7    or may not have been invested in that stuff, but your CD's

 8    performance wasn't linked to the bank's specific balance

 9    sheet.  The CD's performance was linked to a basket of

10    underlying managers that they had picked.

11         Now, I'm not saying some of those managers may not have

12    been in this thing, but they're -- they're not the same.  I

13    mean, it's saying -- let's see if I can give you an analysis.

14    Q.   The next paragraph, after the one we were reading, says,

15    "By investing depositors' funds and" --

16    A.   I'm sorry, same page?

17    Q.   Yes, same page.

18    A.   Okay.

19    Q.   "By investing depositors' funds and the majority of its

20    equity, the Bank maintains liquid assets well in excess of the

21    depositor liability."

22    A.   Uh-huh.

23    Q.   Now, that doesn't sound consistent with what you

24    described, which is having -- taking the money from the

25    investor and putting it into these hedge fund type
```

```
 1    investments.
 2    A.   No, it does.  It says, "By investing depositors' funds,"
 3    which you can say is CDs, if you want, for the sake of ours
 4    and whatever equity the bank actually has --
 5    Q.   Right.
 6    A.   -- to maintain -- in excess of the depositor liability --
 7    liquid assets in excess of depositor's liability.
 8    Q.   Right.  So I guess it depends what you mean by liquid
 9    assets.
10    A.   Right.
11    Q.   I thought you said --
12    A.   Exactly.
13    Q.   -- earlier the types of investments you were describing
14    would not be described as liquid investments.
15    A.   You know, liquid is a -- is a time horizon.  Typically
16    illiquid investments are real estate, private equity,
17    essentially closed end funds, because you actually have no
18    redemption terms in those.
19         I mean, you know, you invest in Kleiner Perkins private
20    equity fund, and ten years from now you get what you get.
21    Right?
22         Hedge funds were sometimes called semi-liquid, sometimes
23    they were called liquid, because typically they were anywhere
24    from, you know, 90 days' notice quarterly, 90 days' notice
25    semi-annually, some were even 30 days' notice.  So they
```

1    were -- they weren't daily liquidity, but they were, you know,

2    liquidity in a, you know, 90 days quarterly.  Give notice by

3    December 31st and you had your money by March 31st.

4    Q.    Was that the highest degree of liquidity you could have?

5    A.    No.  You can have daily liquidity, sure.

6    Q.    Okay.  Okay.  So we're back to Plaintiff's Exhibit 32,

7    which is an email from yourself to Tonya Dokken, dated May

8    22nd, 2006, and I'd asked if you recognized it.

9    A.    Okay.  Do I remember the email?  No.  But does it -- does

10   sending an email to Tonya surprise me?  No, not at all.

11   Q.    Do you know how -- we'll look at the article here in a

12   second, but did you have any kind of a news alert request

13   related to Stanford?

14   A.    No, I don't think so.

15   Q.    Do you recall whether you read the article at the time?

16   A.    I probably -- I mean, if I sent it to her, I must have

17   read, if not all of it, most of it because otherwise if I

18   didn't think it was worthwhile, I wouldn't have sent it to

19   her.

20   Q.    Okay.  Did you see -- directing your attention to the

21   bottom of page 13152, do you recall seeing the following

22   statement?  This is the last paragraph on the page.

23        "'That's where he ran into problems with U.S.

24   investigators.  In 1999, stanford Financial tried to take over

25   Antiguan International Business Corp., which regulated

1    offshore companies on the island,' referring to Antigua," said

2    Jonathan Weiner, who was then a deputy assistant Secretary of

3    State."

4         Do you recall seeing that?

5    A.    No.  I mean, if I read the article, clearly I did, but I

6    think the article was more interesting because he -- I think,

7    if I remember, he donated money to Stanford on the proposition

8    that he thought he had a link to Stanford, and Stanford didn't

9    really think he had a link to Stanford.  But I have to look at

10   this and see if my memory's correct.

11   Q.    Unquestionably that's a part of the article.  But did

12   you -- but if you -- my question is, would it have been

13   significant to you that Mr. Stanford and his entity was trying

14   to regulate essentially his own company?

15   A.    No.  Because, you know, just from the looks -- just from

16   reading the article, it was 1999, and we're already in 2006,

17   and it sounds like he didn't succeed.

18   Q.    Did you make any further investigation about those

19   allegations or what may have come --

20   A.    No.

21   Q.    -- of it?

22        Did Ms. Dokken ask you to make any further investigation?

23   A.    No, not that I remember.

24   Q.    Did you suggest to Ms. Dokken that she should make any

25   further investigation?

1    A.   Not that I remember.  Oh, yeah, it says the whole thing

2    was over in '01.

3    Q.   Did you -- and you're referring to which page?

4    A.   It says the -- the next page, 13153.  It says

5    U.S. -- "The U.S. advised financial institutions to be

6    suspicious of transactions with Antigua banks, a warning that

7    was lifted in August 2001" -- oh, that's just about -- fight

8    money laundering.  Oh, it didn't mention Stanford

9    specifically.

10   Q.   So that's not referring to Stanford when it talks about

11   the --

12   A.   Well --

13   Q.   -- advisory being lifted?

14   A.   -- it doesn't say it is or isn't.  Yeah, it's sort of

15   silent.

16   Q.   And the follow-up question I had was with respect to did

17   you do any investigation.  Was there any reason you could not

18   have done an investigation at the time that you were aware of?

19   A.   That I couldn't have?

20   Q.   Right.

21   A.   I have no idea.  It would probably be dependent upon what

22   public versus private rules Antigua has on this kind of stuff.

23   Q.   Well, but any investigation in the press, in the popular

24   press or anything that was available from the --

25   A.   No --

```
 1   Q.    -- Department of State?

 2   A.    -- not that I remember.

 3   Q.    Did Mr. Magness or any of his representatives ask you to

 4   keep tabs on the Stanford International Bank?

 5   A.    Not that I remember today, no.

 6   Q.    Let me ask you about the conclusion of the relationship

 7   between Quellos and the Magness group.  Let me show you

 8   Plaintiff's Exhibit 318.

 9         This is a termination agreement dated March 31st, 2007,

10   between Quellos Capital Management and Quellos Financial

11   Advisors, on the one hand, and Gary Magness Irrevocable Trust

12   on the other hand.

13   A.    Okay.  So we're missing a document.

14   Q.    What are we missing?

15   A.    Let me see where it is again.

16   Q.    Oh, the February 18th, 2005 agreement?

17   A.    Yeah, February 18, 2005, because you showed me an '03,

18   and I said is there -- was this continuous or not.  And this

19   represents something that was signed in '05, which we haven't

20   seen yet.

21   Q.    Uh-huh.

22   A.    So this one must have terminated or never got executed,

23   one of the two.

24   Q.    The draft was June 2001.  That was Plaintiff's Exhibit

25   314.
```

```
 1   A.    Okay.  So maybe we don't have a signed engagement letter

 2   from Gary until '05.

 3   Q.    Okay.  And so there's -- in this reference to Plaintiff's

 4   Exhibit 318, there is some kind of an agreement between

 5   Quellos and the Magness Trust from February 18, 2005.

 6   A.    Right.

 7   Q.    And this termination agreement dated March 31st, 2007, is

 8   terminating that agreement.

 9   A.    Correct.

10   Q.    Let me just ask it this way.  Do you think the

11   relationship between Quellos and the Magness group continued

12   on in any respect after March 31st, 2007?

13   A.    No, I don't think it continued on.

14   Q.    So why -- what --

15         MR. PETRIE:  It goes on for a while, Your Honor.  We

16   just saw it was 10:30.  That's why we stopped.

17         THE COURT:  Okay.  We'll take our morning break now

18   and see you-all back in 20 minutes.

19         (Whereupon, the jury left the courtroom.)

20         THE COURT:  Recapping what I mentioned at sidebar, I

21   have to confess I made a large and embarrassing arithmetic

22   mistake at the end of the day yesterday in the Receiver's time

23   as of the end of the day which I told you was 235 and in fact

24   it's 335.  I think you indicated my error was of such a large

25   magnitude, that you were already aware of it.
```

 1              MR. SADLER:  And what does Your Honor have for the

 2   Defendants?

 3              THE COURT:  501, for a total of 836.

 4              MR. SADLER:  We have, if I'm reading this correctly,

 5   547 for Plaintiff and 824 for Defendant.

 6              THE COURT:  That's not possible.  The total that I

 7   have cumulative is 836, and if you look at -- I was predicting

 8   five hours a day, and we were nowhere close the first day, and

 9   we've been doing about six hours a day since then.  So we're

10   about an hour off pace as of the end of the day yesterday,

11   which is consistent with 836.  And if you -- I'm sorry.  What

12   were your two numbers again?

13              MR. SADLER:  And I want to be sure I'm reading this

14   correctly, but what we have down is the total through --

15   through yesterday is five hours and 47 minutes for the

16   Plaintiff, eight hours and 24 minutes for the Defendant.

17              THE COURT:  Okay.  I misunderstood your -- I just

18   did mine in total minutes --

19              MR. SADLER:  I see.  I see.  Okay.

20              THE COURT:  -- instead of hours and minutes.

21              MR. SADLER:  Are we --

22              THE COURT:  So this -- you're at 347 minutes and I

23   have you at 335 minutes, so we're about ten minutes off.

24              MR. SADLER:  Okay.

25              THE COURT:  And you show the Magness parties at 507,

```
 1    and I show them at 501.  So we're a little bit off, but we're

 2    in the ballpark, though I claim the prerogative of being the

 3    official clock.

 4              MR. SADLER:  Understood, Your Honor.  Understood.

 5              THE COURT:  And you're welcome to look at my time

 6    tally if you want to.  But we're pretty close.

 7              MR. SADLER:  It sounds like we're back in the

 8    ballpark.

 9              THE COURT:  Yeah.  Is that consistent with you-all's

10    numbers?

11              MR. PETRIE:  I couldn't find them as I scrambled

12    here, but I'll check them.

13              THE COURT:  Okay.  My apologies.  I added two plus

14    one and got two.

15              MR. PETRIE:  I have a question, if I may, Your

16    Honor.

17              THE COURT:  Yes.

18              MR. PETRIE:  So that we can structure the rest of

19    our day, we have the open issue about the other depositions.

20              THE COURT:  Yes.  I've reviewed those and reviewed

21    the motions.  And I think, on reading the transcripts and

22    thinking about the cases, I believe the Receiver had a

23    sufficiently adequate incentive to cross that I'm going to

24    permit them.  And I've got rulings on the objections noted

25    here that I'll deliver to whoever wants them.
```

```
 1                MR. PETRIE:  Thank you, sir.

 2                MR. SADLER:  So may I, just for the record, so our

 3      motion to exclude those depositions is denied.

 4                THE COURT:  Correct.

 5                MR. SADLER:  Thank you.

 6                THE COURT:  And I think it certainly was an attempt

 7      to evade the Court's ruling, but on the other hand that's what

 8      good lawyers do.  They work around courts' rulings  So --

 9                MR. SADLER:  It happened yes.

10                THE COURT:  There you go.

11                MR. SADLER:  I was right there to see it.

12                THE COURT:  There you go.  Anything else we need to

13      take up?

14                MR. SADLER:  No, sir.

15                MR. PETRIE:  No.  Thank you.

16                THE COURT:  We'll see you, I guess, in 18 minutes.

17                          (Brief recess.)

18                THE COURT:  All set?

19                MR. SADLER:  Judge, there is a technical issue we're

20      trying to work out that the documents are not coming up as --

21      as they should, but I -- he's in the middle of trying to fix

22      that right this minute.

23                MR. PETRIE:  Well --

24                MR. SADLER:  Oh, I'm sorry.

25                MR. PETRIE:  -- it's not that simple, Your Honor.
```

1    We've been exchanging clip reports.  The clip reports are

2  the -- you know, what bits and pieces of the deposition of

3  people are going to show, and on them showed the cull-out for

4  exhibits.

5    Now we've had a request to add in exhibits when they've

6  had the clip report and not given that to us.  And so it

7  creates to say a scramble would be polite.  And some of them

8  haven't been admitted, and it's a new issue that's now just

9  been presented to us.  And so I understand we're about to come

10  up on some of these exhibits in the testimony, so it creates a

11  bit of a clog.

12    THE COURT:  Well, we may have to proceed without

13  them.  How much longer is it going to take to fix this?

14    MR. PETRIE:  Well, I'd have to ask, Your Honor.  The

15  problem is that there's also evidentiary issues with some of

16  the documents that haven't been addressed because they weren't

17  teed up as ones that were going to be culled out in this

18  gentleman's testimony.

19    THE COURT:  Okay.  Let's just proceed as is then.

20    MS. MENTZ:  We are trying to accommodate so we put

21  as many in as we could in the last ten minutes.

22    MR. PETRIE:  I am sure Your Honor heard, in order to

23  try and accommodate that request, we've put in as many as we

24  could over the break, but we haven't completed that.  So it's

25  half un -- we're half fixed, if that's a fix.  But --

1      THE COURT:  Okay.  Let's go with half fixed.

2      MR. POWERS:  And, Your Honor, we're prepared to

3  proceed on that basis.  Thank you.

4      THE COURT:  Okay.  Let's bring them in.

5      (Whereupon, the jury entered the courtroom.)

6      THE COURT:  Be seated.

7  Let's proceed.

8   CHARLES WILK, BY VIDEOTAPE DEPOSITION continued,

9  Q.   So why -- what is the reason for the termination of the

10  relationship between Quellos and the Magness people on March

11  31st, 2007?

12  A.   Well, I -- I don't actually know.  It could have been

13  that Gary decided he was done, but it would have coincided,

14  plus or minus a couple of months, with McCutchen taking his

15  group and Andy taking his group, because I think they did that

16  by May-June-July, June-July-August of '07.

17  Q.   So in this time frame Quellos was getting some negative

18  publicity around its tax shelter business.  Right?

19  A.   I don't know.  I'd have to go back.  Probably.  I mean,

20  could have been.  I don't know.  I'd have to look at --

21  Q.   Let me show you --

22  A.   -- current articles.

23  Q.   Let me show you Plaintiff's Exhibit 324, which is a *New*

24  *York Times* article dated August 1st, 2006, entitled Tax Cheats

25  Called Out of Control.  Is this something that you've seen

69

1   before?

2   A.    I'm sure I did back in those days.

3   Q.    Okay.  And just looking at the second page, there's a

4   reference to, the third paragraph, it's referring to a Senate

5   report, and it says, "The report details how the Quellos

6   Group, a tax shelter boutique based in Seattle, 'concocted a

7   tax shelter' using $9.6 billion 'worth of fake securities

8   transactions that were used to generate billions of dollars of

9   fake capital losses.'"

10        Is that -- do you recall those kinds of allegations --

11  A.    Oh, sure.

12  Q.    -- being available in the public in the fall of 2006?

13  A.    Sure.

14  Q.    Did you ever discuss any of these allegations with the

15  Magness group?

16  A.    I could have.  Don't -- I mean, do I remember a specific

17  conversation?  No.  But easily could have because we were

18  happy to talk about it.

19  Q.    Did it have anything to do with the decision to terminate

20  the agreement between Quellos and the Magness people?

21  A.    I don't have a clear recollection of whether Gary wanted

22  to terminate or whether we were terminating.

23        The timing happens to coincide with when we were winding

24  down the family pri -- the family -- Quellos Financial

25  Advisors, and Matt was taking his group and Andy Robbins was

1    taking his group.  So -- and we had to have a conversation

2    with tons of clients.

3         And if Gary said, I really don't want -- and actually it

4    would have made sense, because Gary primarily dealt with me

5    and a little bit with Conrad Gehrmann.  Conrad Gehrmann had

6    left Quellos a year and a half before or something like that.

7         So it may have been that Gary just said, well, I don't

8    really know Matt and I don't really know Andy, so I'm happy to

9    just end the engagement.

10        It had to do one or the other.  Either clients needed to

11   go with Andy or go with Matt, or -- well, in all cases we

12   terminated everybody's agreement.

13        But the clients, we'd either do a very nice hand-off to

14   Andy or a very nice hand-off to Matt, if that's what the

15   clients wanted.  But if they just wanted to terminate and go

16   do their own thing, then we just terminated the agreement and

17   they just went off and did their own thing.

18   Q.   Let me show you Plaintiff's Exhibit 323.  And this refers

19   to a federal -- federal prosecutors conducting a criminal

20   inquiry into Quellos in April of 2007.  Do you recall whether

21   you alerted Mr. Magness to the criminal inquiry related to

22   Quellos?

23   A.   Oh, this is the KPMG stuff.  Yeah.  It's both, I guess.

24   No.  Hold on a second.  This is primarily Flip and Opis, it

25   looks like.  Okay.  So anyway -- I'm sorry.  What was the

1    question?

2    Q.   So the question was, do you recall discussing the fact

3    that Quellos was under criminal investigation in April of 2007

4    with Mr. Magness?

5    A.   I mean, I don't remember, like having a formal

6    conversation with him, but we never hid any of this stuff that

7    was in the press and we were always happy to talk to clients

8    about it.

9         So, I mean, could have talked to him, could have talked

10   to Tonya, could have talked to Steve.  Actually did talk

11   to -- but he's not an employee.  Did talk to Ray Sutton

12   because Ray was kind of interested and had seen the articles.

13   Q.   And when was that?

14   A.   Oh, I don't remember specifically.  I talked to Ray all

15   the time.

16   Q.   You said he was interested in seeing the articles?

17   A.   He is interested because he had seen the articles.

18   Q.   Oh, he had seen the articles.

19   A.   Yeah.

20   Q.   And he had asked you questions about it.

21   A.   Yeah.

22   Q.   Okay.  Was this approximately -- from a timing

23   standpoint, is this toward the time these articles came out --

24   A.   Oh --

25   Q.   -- or much later?

1    A.    Don't have a -- I don't have a clear enough recollection.

2    Q.    But he had seen some articles about this issue, this --

3    this investigation of Quellos, and he had asked you questions

4    --

5    A.    Well, and I actually remember Tom Espy had asked some

6    questions because he had seen some articles.  Yeah.

7          I mean, this had been going -- well, because if you look

8    at whatever this last one was, 323, this Flip and Opis stuff

9    was stuff that Quellos had done with KPMG and

10   PricewaterhouseCoopers, those transactions, so those were like

11   '97.

12   Q.    But, in any event, you do recall at some point Mr. Espy

13   and Mr. Sutton asking you about the press around these issues?

14   A.    Uh-huh.

15   Q.    And these issues meaning the issues that are identified

16   in Plaintiff's Exhibit 323 and 324?

17   A.    Yep.

18   Q.    I have a couple of things that might help on the question

19   about Bob Armstrong and when he came on board, so let me show

20   you Plaintiff's Exhibit 41, which is a Mango Five Family

21   meeting dated February 26, 2007.  You are listed as one of the

22   attendees.

23   A.    Oh, okay.

24   Q.    Turning back to the first page, we have a discussion of

25   Liberty Media and affiliates.  And the first sentence talks

```
 1    about a report from Gary about the stock performance of

 2    Liberty Media and its affiliates, and that you offered

 3    comments and affirmed your agreement with Mr. Magness'

 4    continuing activities to reduce the concentration of all the

 5    trusts' positions in Liberty stock.

 6        Do you remember that discussion?

 7    A.   I don't remember that specific discussion, but you -- if

 8    you could find my notes, you'll probably see that in 80

 9    percent of my correspondence with Gary.

10    Q.   Agreeing with his --

11    A.   Well --

12    Q.   Go ahead.

13    A.   Egg or chicken.  Him agreeing with me or me agreeing with

14    him, but, yeah.

15    Q.   Encouraging him to diversify.

16    A.   Yeah.  Yeah.  Now, the truth is John Malone helped him a

17    lot because John essentially diversified that concentrated

18    Liberty position by all the splintering that went on, LBTYA,

19    LINTA, DirecTV, blah, blah, blah.  Albeit, and this was my

20    argument, it still was all in the media sector.  So it wasn't

21    like they went and got in the medical and technology, you

22    know.  So it was more diversified, but still all within the

23    media sector.

24    Q.   But he was using -- he was definitely doing some

25    liquidation of his Liberty stock in this time period.
```

1    A.    Yeah.   I mean, you'd to go back and look at the trail.   I

2    don't know that it's going to be massively substantial.   He

3    was -- he was a reluctant seller.   You know what?   With

4    hindsight, which is 20/20, he was right.   Right?   The stock

5    has been a very good performer, John's a great steward of

6    shareholder equity, and Gary wasn't a huge fan of liquidating

7    big positions, so --

8    Q.    So would him selling over $100 million of Liberty stock

9    in 2007, would that be surprising to you?

10   A.    Not without -- I mean, no, because I'd actually have to

11   look at what were the -- '07.   I don't know if it was at HSBC

12   yet.   But if it was, you know, I'd have -- oh, and Merrill,

13   too.   I'd have to look at the debt levels and stuff like that.

14        Because, honestly, he could easily and did run 300 plus

15   million dollar credit facilities.   So a hundred million,

16   that's a third of the debt.   And if he paid down the debt, you

17   know, that would have been prudent.   So -- because he drew

18   up --

19   Q.    I didn't --

20   A.    -- the debt and --

21   Q.    -- mean for it -- I didn't mean to suggest it would be

22   shocking or unwise --

23   A.    Oh.

24   Q.    -- but just whether, when you said you didn't think he

25   would sell that much, I was just wondering if -- what you

1    meant by that.

2    A.   Oh, oh, I'm sorry.

3         Yeah.  Well, going back earlier in our day, like Deutsche

4    Bank wanted, I don't remember the exact number, it could have

5    been $400 million of debt, and Liberty wasn't as valuable

6    then.  I mean, they were talking about 400 million.  I mean,

7    that was -- I don't remember, but it could have been 30, 40,

8    50 percent of the Liberty.  I mean, that was -- this would

9    have been a hundred million, he probably had at least 800

10   million, I would bet, in Liberty stock.  So, you know, it's an

11   eighth.  It's not --

12   Q.   It's not nothing.  I mean, a hundred million dollars is a

13   lot of money.

14   A.   Well, it is, but it's one-eighth.  Right?  It's 12

15   percent of your holdings.  It's not -- it all seems -- when

16   you -- you know, the -- and I remember when I started in this

17   business, you know, $10,000 seems like a big number if I've

18   got to go home and pay my bills.  $5,000 seems like a big --

19        But, you know, when you're talking about, you know, a

20   hundred million on a billion-three, you know, you've kind of

21   got to put it in percentage terms or otherwise it just seems

22   mind-boggling.

23   Q.   All right.  Let me show you Plaintiff's Exhibit 133.

24   These are meetings of the investment committee of Mango Five

25   dated October 1st of 2007.

```
 1        I would direct your attention -- I'd note first you are

 2   not listed as an attendee.

 3   A.    Oh, I'm not?

 4   Q.    But then I'll direct your attention to paragraph 7,

 5   Miscellaneous Items, which reads, "Mr. Magness asked Ms.

 6   Dokken to request that Mr. Tom Espy prepare a full report for

 7   the investment committee's next meeting discussing the status

 8   of the certificate of deposit program in Antigua, and further

 9   requested that Ms. Dokken inquire of Mr. Chuck Wilk as to how

10   the certificate of deposit program could be further

11   investigated."

12        Does that ring any bells?

13   A.    Not really, no.  I mean, she may -- I don't know.  How

14   the certificate progam could be further investigated.  I mean,

15   she may have called.

16        My guess is, if she called, I would have said, well, can

17   you get me more information?

18   Q.    What kinds of information would you have wanted her to

19   get if you -- if she had made that phone call?

20   A.    You know, how is the CD program going?  What does the

21   balance sheet of the bank look like today versus when you

22   invested in it?  How have the underlying -- have they finally

23   told you what the underlying in managers were?

24        Because, again, I -- what I looked at, it looked more

25   like marketing, so it didn't have manager names or weighting
```

1    or descriptions of their strategies or anything like that.

2    So, you know, what you got now?  Because from what I'm

3    learning or what I'm remembering, they've had the CDs for,

4    what, almost two years by October of '07?

5    Q.    Yes.

6    A.    Yeah.  So I mean --

7    Q.    Or more.

8    A.    -- you know, what other -- huh?

9    Q.    Or more, yes.

10   A.    Or more.  So, you know, what do you got?  I mean, you

11   want to investigate it, what do you got that, you know, we can

12   look at?

13   Q.    What else?  I mean, what are the kinds of things you

14   would have done if you, just as an investment advisor and you

15   -- somebody comes to you and says, I've got this investment

16   you've never heard of, what are the kinds of things you look

17   at?

18   A.    If I'm buy -- there's at least two components.  I'm

19   buying a note or a CD from a bank, so what does the bank look

20   like, right?  Because, in essence, that's your first line.

21   Right?  Because they're just -- it's essentially an unsecured

22   obligation of the bank.

23        The second is the performance, though, of that CD is

24   linked to the performance of this investment pool, so what

25   does the investment pool look like, and how has the investment

1    pool been doing.

2         And something that we were always careful of at Quellos,

3    and it came to -- to bear fruit for the firm -- actually by

4    then that was BlackRock -- is, are they offering -- is the

5    bank offering you terms, and primarily liquidity terms, that

6    differ significantly from what the underlying managers are

7    offering the bank.

8         That make sense?

9    Q.   So those are the kinds of things you would want to know

10   if you had been asked to investigate?

11   A.   Right.

12   Q.   And what if you just hit a brick wall, you just got no

13   more information than the information you got when you first

14   heard about it?  What would your advice have been to the

15   Magness people?

16   A.   Well, let me -- let me try to see if I got your question

17   right.  When you say hit a wall, hit a wall I couldn't get it

18   from Magness or hit a wall I couldn't get it from Stanford

19   Bank?

20   Q.   Either one.

21   A.   Okay.  Well, if I can't get it from the client, then,

22   okay, well, then, you know, you guys are kind of -- I can't

23   give you any feedback --

24   Q.   Sure.

25   A.   -- because I've got no information.

79

```
1     If they said, we'll put you in contact, or, here, we'll
2   introduce you to them, or however you do it, so it -- because
3   the first thing the bank should say is, we don't know you from
4   Adam, we're not sharing anything.
5     But if I got the proper introductions, and then as I'm
6   asking the questions of whoever it is is the appropriate
7   person, and, you know, we're not going to tell you who the
8   managers are, but we'll disclose what their strategies are?
9   Okay.
10    We won't tell you what the managers are, and we won't
11  disclose the strategies, and we won't give you the weighting,
12  and we won't give you the liquidity terms, and we won't share
13  our balance sheet, and on and on and on, I mean, eventually I
14  gotta go back to Tonya and say, hey, they're not providing
15  anything, I can't do any due diligence on this thing.
16  Q.   So what's the consequence of that?
17  A.   Well, I mean, the consequence is they got to decide.  I
18  mean, you know, I -- I didn't have the -- and then we never
19  did.  I don't have discretion over the client's assets.  I
20  don't make the investment decision.  I can only give them
21  advice.
22    And, you know, you used the name, Gary thought I was the
23  paid pessimist, so I guess he assumed I was going to give him
24  the negative advice, which is fine because I think that's part
25  of my job.
```

80

1       Ultimately Gary has to say, I trust Chuck's instincts, or

2   I trust him but I'm going to overrule him, or I think he's too

3   pessimistic all the time and I'm going to overrule him.

4   Q.   Plaintiff's Exhibit 56 is an email from February 5th,

5   2008, from Tonya Dokken to Tom Espy.

6   A.   Okay.  Well, actually this isn't even signed until

7   January of '08, so maybe it was in response to this, but I'll

8   read it.  Oh, I see.  Okay.

9       Okay.  I mean, I'm making a link, but it looks consistent

10  with this paragraph 7.

11  Q.   So did you -- you don't recall knowing about this

12  request?

13  A.   No.

14  Q.   There was a meeting scheduled with Juan

15  Rodriguez-Tolentino by phone that took place in March of 2008,

16  so just a little over a month after this.

17      Do you recall being on that phone call?

18  A.   I don't.

19  Q.   Also, so do you recall being on a phone call with any of

20  the Mango Five people in March of 2008 --

21  A.   No.

22  Q.   -- with Mr. Rodriguez-Tolentino?

23  A.   No.  I don't remember ever speaking to this guy.  Matter

24  of fact, of the names you rattled off, it was the one that

25  didn't even ring a bell.

```
 1    Q.   Plaintiff's Exhibit 62.   These are the minutes of a

 2    meeting of the investment committee of Mango Five.   The

 3    meeting was held March 6, 2008.   And if you can see the

 4    discussion with Mr. Rodriguez-Tolentino referenced at

 5    paragraph 5 --

 6    A.   Okay.

 7    Q.   -- on page 3.

 8    A.   Okay.   I can speculate, but that's probably all --

 9    Q.   Well, so I just -- all I really want to know is if that

10    rings any bells that suggests that you were actually on this

11    call.

12    A.   Oh, no, it doesn't ring any bells, no.

13    Q.   Okay.   No, I don't -- I don't need you to comment on what

14    happened.   I just wanted to make sure --

15    A.   Oh, okay.

16    Q.   -- you weren't there.

17    A.   Oh, I'm sorry.

18    Q.   That's fine.

19    A.   No.   As a matter of fact, it makes me more certain I

20    wasn't on the call.

21    Q.   Leading up to February 2009, there were some decisions

22    that the Magnesses made regarding getting money out of

23    Stanford and what to do with the investments and addressing

24    some of their margin debt situations.

25         Did you have any involvement with that as it was
```

1    happening?

2    A.    No.

3    Q.    Nobody consult -- from Magness consulted with you on any

4    of those issues?

5    A.    No.

6    Q.    I'll show you Plaintiff's Exhibit 114.

7    A.    Oh.  So March really became April.  Okay.

8    Q.    Yeah.

9    A.    It appears --

10   Q.    Let me ask you about the discussion about Stanford, that

11   says there was a report of Stanford, and the first line says,

12   "Mr. Magness reported that Mr. Espy confirmed that GMIT's loan

13   from Stanford Bank had been paid in full by setting off the

14   Stanford certificates of deposit placed with the bank."

15        And then it says, "Mr. Wilk, Mr. Espy, and Mr. Sutton

16   reported on their findings with respect to the status of the

17   Stanford receivership."

18        Do you recall making any investigation of the Stanford

19   receivership?

20   A.    Not other than what I read in the public press.

21   Q.    What do you recall saying, if anything, about the

22   Stanford receivership at this meeting?

23   A.    I -- there couldn't have been much that I could add, I

24   mean, other than what was in the press.  I mean, I didn't have

25   any -- the only -- and this is huge speculation -- is a

1    Quellos client had also been a Madoff investor, because Madoff

2    blew up before Stanford.

3         And the only thing could have been that I said, well, I

4    don't have a lot of experience, but we have a client who got

5    -- who's involved in the Madoff mess, and if anything, you

6    know, this will probably be an equal mess.

7    Q.   What did Mr. Magness tell you about, if anything, about

8    his thoughts about what had happened with Stanford?

9    A.   I don't remember Gary espousing much about -- this

10   was -- I'm reading this.  But -- yeah.  No, I don't remember

11   anything -- you know, any -- yeah.  No, nothing that I

12   remember from Gary.

13   Q.   Well, did anybody during the time that you were

14   consulting, starting in April of 2009 and going forward until

15   about 2011 -- do I have that right?

16   A.   I think so.

17   Q.   Okay.  In any time in that window, did anybody from the

18   Magness group talk to you about when they became concerned

19   about Stanford potentially being fraudulent or insolvent?

20   A.   No.  Our discussions were all about -- well, the first of

21   the discussions were getting me sort of up to speed.

22   They -- and I'm doing this off the top of my head.  They tried

23   to redeem.  Stanford called back and said, can we make it a

24   loan.  I don't remember all that transpired there.  Then they

25   made it a loan.  Then ultimately it turned to a redemption,

1    blah, blah, blah.

2         But by the time I'm back in the picture, they've got most

3    all, some--I don't know that I remember--of the cash.   Then

4    the receiver is appointed.   I don't remember what date that

5    is.

6    Q.   I asked you before about some of the negative press

7    around Quellos.   I need to ask you about this -- this plea

8    agreement and criminal conviction.

9    A.   Uh-huh.

10   Q.   This is Plaintiff's Exhibit 308.   Is this your plea

11   agreement with the U.S. government?

12   A.   Without reading it, probably.

13   Q.   Just take a moment, please.

14   A.   Oh, yeah.   I mean, I -- yeah, it looks, essentially

15   without really bothering just to read every single page of it,

16   but yes.

17   Q.   Is that your signature on the last page of the exhibit?

18   A.   Yes.

19   Q.   And looking at the first page, what you are pleading

20   guilty to is conspiracy to defraud the United States and

21   aiding and assisting in the filing of a false return?

22   A.   Yes.

23   Q.   And turning to page 5, which has the Statement of Facts,

24   looking at -- starting at line 18, you agreed to the following

25   facts:   "To accomplish the objective of this conspiracy,

1   Jeffrey Weinstein and Charles Wilk worked with individuals at

2   European American Investment Group to create fictitious losses

3   through the purported purchase and sale of 'synthetic' stock

4   with a paper value exceeding $9.6 billion between two Special

5   Purpose Vehicles, Isle of Man businesses, Jackstones, Ltd.,

6   and Barnville, Ltd.,  which had no assets."

7        Is that right?

8   A.   Yes.

9   Q.   And then the next sentence, "In truth there was no actual

10  stock; no purchase and sale of actual stock; no payment for

11  actual stock, and no basis in stock."

12       Is that accurate?

13  A.   Yes.

14  Q.   So this is dated September 10th, 2010.  When -- when was

15  the first time, if ever, that you discussed any of the matters

16  that are described in the Plea Agreement with Mr. Magness?

17  A.   Oh, just what was in the Plea Agreement or the

18  transaction that led to the Plea Agreement?

19  Q.   The transaction that led to the Plea Agreement.

20  A.   Oh, probably by -- for sure by '09, maybe even -- oh,

21  let's see.  '09, '07, 08 -- yeah, for sure by '09, or sometime

22  in '09.  I'd have to go back and figure out exactly when I

23  started dealing with the prosecutor.

24  Q.   When did you first become aware that you were personally

25  under investigation criminally?

1    A.    I don't remember the date.

2    Q.    Was it 2009, 2010, or was it farther back in --

3    A.    No.  It was like around, like -- I don't remember.  It

4    could have been late -- I don't even know if that's right.

5    Could it have been late '08?  Probably more like '09, '10.

6    When was this signed?  September of '10.  All of '10.  Oh,

7    yeah, so probably '09, yeah.

8    Q.    2009?

9    A.    But, yeah, Gary knew during the whole time that I was

10   consulting.

11   Q.    The time you were consulting individually.

12   A.    Yeah.  Because that was about the time frame.  Maybe it

13   was slightly before, but yeah.

14   Q.    And did he know -- does any of this refresh your

15   recollection about whether he knew that Quellos was being

16   investigated back while you were with Quellos?

17   A.    Oh, I'm sure he did, sure.

18   Q.    That Quellos was being investigated.

19   A.    Yeah.  Because there was a lot of press and -- and we

20   sort of proactively talked to our clients about it.

21   Q.    And the Isle of Man is an island in --

22   A.    Off the British coast.

23   Q.    Off the British coast.  And there was some involvement

24   also with entities in the Cayman Islands.  Is that right?

25   A.    Yeah, that may be right.  I'd have to think about that.

 1    I'm not sure.

 2    Q.    This Plaintiff's Exhibit 310, this is -- this is a copy

 3    of your -- the judgment in your criminal case finding --

 4    A.    Yeah, probably.

 5    Q.    -- or entering judgment on the defenses we just

 6    described?

 7    A.    Yeah.  I think so, yeah.

 8    Q.    And sentencing you to a term of 50 months imprisonment --

 9    A.    Yep.

10    Q.    -- which I take you've completed.

11    A.    Yep.

12    Q.    Just to make sure I understand, you did agree to the

13    Statement of Facts that is described in the plea agreement in

14    308, Plaintiff's Exhibit 308?

15    A.    I signed the document.

16    Q.    And you accepted responsibility for the conduct that's

17    described in the document.

18    A.    Absolutely.  And I lived up to my part of the bargain.

19    Q.    In your discussions with Mr. Magness about Stanford, did

20    the subject of Stanford being in an offshore -- in an offshore

21    jurisdiction ever come up?

22    A.    Well, yeah, it's an Antigua bank.  So, yeah, clearly we

23    knew it wasn't a domestic bank.

24    Q.    But did that come up as a source of concern, that it was

25    an offshore jurisdiction?

1    A.    Concern.  I mean, I definitely said, you know, not that

2    I'm a banking expert anyway, but I'm clearly not an Antigua

3    banking expert, so I don't know the rules and regulations in

4    Antigua.

5         I do remember saying, you know, if it was CDs issued at a

6    U.S. bank, right, we've got the FDIC and, you know, whether

7    you believe in the full faith or credit of the U.S.

8    government, you've got the FDIC.

9         My guess is there's no version of the FDIC in Antigua,

10   but I didn't know that.  I mean, that kind of was the point,

11   was we don't really know all the ins and outs of Antiguan law.

12   Whereas if we were buying a U.S. CD, we'd probably feel --

13   even then, honestly, most people don't know all the in and

14   outs of the banking laws and regulations, but they feel like,

15   you know, they got some protection.

16   Q.    And one of the -- one of the risks associated with being

17   in one of these offshore jurisdictions, whether it's the Isle

18   of Man or the Caymans, or maybe less of the Caymans, but

19   Antigua, there's a fraud risk associated with being in one of

20   those jurisdictions.

21   A.    Yeah, it's a fraud risk being domestic.

22   Q.    Right.

23   A.    I mean, you know, you can -- every -- well, not so much

24   these days it seems, but there was a period where, you know,

25   every third article seemed to be about some guy in Florida or

1    some guy in Ohio or some guy somewhere who, you know, was

2    running money for somebody, but really wasn't and was living

3    the high life and blah, blah, blah.

4        So, yeah, domestic, foreign, it doesn't seem to make a

5    difference.

6    Q.   Well, certainly there's -- whether there's a zero risk in

7    one jurisdiction or another, would you agree that if you're in

8    a more lightly-regulated jurisdiction, that the fraud risk is

9    greater?

10   A.   You know, maybe arguably.

11       But, you know, you know, if you -- if you think about

12   Madoff, which was probably one of the biggest ones, that guy

13   was sitting in New York.  So, you know, honestly that kind of

14   disproves that theory.  It's sort of like, you know, if

15   somebody's going to do it, they can do it from anywhere.

16   Q.   So from your perspective, you would be indifferent to

17   the -- to the idea that -- you would say there's no greater

18   fraud risk in the United States versus in Antigua versus any

19   other place?

20   A.   Yeah.  I mean, honestly, I think it's kind of borne out

21   by the facts, too.  It doesn't really seem that the -- that

22   it's isolated to a jurisdiction or offshore versus -- I mean,

23   Madoff was huge.  Stanford, even though if it was an Antigua

24   bank, had U.S. presence.  You've got all these smaller, quote,

25   Ponzi schemes or bad investment schemes that have popped up in

1    different states.  But you also have some that are not U.S.

2         So I don't know.  I think it would be hard to draw a

3    conclusion that it makes it any riskier.

4         Probably what it may make it is harder to chase them

5    after the fact.  But whether it makes it easier or harder to

6    do, I don't know.  That would be -- the facts I'm not sure

7    bear that out.

8    Q.   Earlier today you testified that there were investment

9    vehicles with similar characteristics to what you saw from the

10   bank.  In particular you mentioned UBS and Credit Suisse?

11   A.   Uh-huh.

12   Q.   Can you describe those investment vehicles for me?

13   A.   Sure.  And actually -- yeah, investment vehicles,

14   investment products.  There was a decent business that could

15   be done by the non-U.S. banks, even if they had a U.S. bank

16   presence, by being an intermediary to allow derivative

17   exposure to assets that were complicated for -- well, it

18   didn't have to be U.S. taxpayers, but complicated for

19   investors to get.  So we'll talk about U.S. taxpayers, and we

20   didn't earlier.

21        If a U.S. taxpayer, and taxpayer being the key because if

22   you were not tax -- you know, if you were a pension or an

23   endowment, you didn't care -- but a U.S. taxpayer wanted to

24   access some offshore fund of funds, more than likely they

25   weren't going to take that investor's money because they don't

1    keep tax books--we already talked about, U.S. tax books--so

2    you couldn't make your QEF election on your PFIC.

3         But you could enter into a contract with UBS.  It could

4    be a note, it could be a swap -- I don't -- I never saw

5    something denominated as a CD but maybe it was out there --

6    where UBS would say, okay -- you could do it a couple ways --

7    UBS say, fine, you give me $10 million, I'll give you a note

8    for $10 million.  The economic performance of that $10 million

9    would link to this offshore fund of funds that you wanted

10   exposure to anyway, but you're facing UBS.  And so you, the

11   U.S. taxpayer, have the full faith and credit of UBS, so

12   you're facing this entity.

13        Whether UBS does or doesn't hedge their risk is up to

14   them.  As a U.S. investor, I think you're hoping they do, and

15   typically they did.

16        So the $10 million would go to UBS, UBS would take --

17   would turn around and invest it in whatever that fund of funds

18   was, which is called a Delta One hedge because they'd invest

19   all $10 million in it.  And that way the fund goes up or down,

20   when it matures, they could just liquidate from the fund and

21   you get your proceeds.

22        And they charge obviously a spread for that.  So it's a

23   great business for them.  They're essentially renting their

24   balance sheet.  As a matter of fact, that's what they used to

25   call it is renting their balance sheet.  You could do it in a

1   swap, you could do it in a note, you could do it in other

2   ways.

3       There were also -- we -- we focused earlier on just U.S.

4   taxpayers, but there were -- German investors had issues.  UBS

5   did a pretty good business with Germany because German

6   investors had a system colloquially called Black, Gray, and

7   White.

8       So they had black investments, gray investments, white

9   investments.  White were taxed in Germany, the most friendly.

10  Black, the least friendly.  And, again, the derivative

11  exposure to UBS would mean it was taxed as a note, which

12  typically would be white or gray instead of black if it was a

13  hedge fund, but you got hedge fund exposure.

14      There were -- insurance companies had regulatory tier

15  capitals, it would be the same thing, because UBS or Credit

16  Suisse -- I don't think Credit Suisse was AAA; they probably

17  AA-plus or something.  UBS was AAA.  So you had a AAA note,

18  albeit it was linked to the performance of a less than AAA

19  asset.

20      So there were lots of ways these products were sold to

21  give derivative exposure to assets.  And it didn't have to

22  be -- I've always focused, and Mr. Powers and I focused, on

23  hedge funds, but it literally could be you wanted exposure to

24  oil or a real estate asset, or anything.  You could get that

25  exposure derivatively from these banks.

1   Q.   And this may be an obvious question with an obvious

2   answer, but where is Credit Suisse located?

3   A.   Switzerland.

4   Q.   And UBS?

5   A.   Switzerland.  I mean, that's their home is Switzerland.

6   Q.   How would you describe Mr. Magness' investment

7   philosophy?

8   A.   You know, I think Gary -- I don't know if he'd agree with

9   this, but I think Gary took a lot of his investment acumen

10  from his dad.  And, you know, his dad started TCI -- he was a

11  rancher.  Right?  And he started TCI because he wanted cable

12  at his ranch.  And Gary has sort of that kind of pioneering

13  spirit in him.

14       And I thought it was funny to hear him call me his paid

15  pessimist, but he's an optimist.  Right?  He's a -- he's a

16  believer.  He saw what his dad literally could do with his

17  bare hands and the kind of business that could be built.

18       And he -- he appreciated -- you know, there's a word that

19  gets bandied around unfortunately, I think, incorrectly, which

20  is risk.

21       And risk -- everybody thinks risk is a bad thing.  Risk

22  can be a good thing.  I mean, risk can go either way.  There

23  can be a risk that an investment goes up faster than you

24  thought it could or -- or more steeply or for reasons -- or

25  the market compresses, whatever.  Risk kind of goes --

1    Gary has kind of -- not a studied but kind of an innate

2    appreciation of risk.  And when I would say things like, you

3    know, most people in America get rich by concentration, by

4    owning a business or a single, but you stay rich by

5    diversification, he understood that, but he believed in the

6    Liberty companies.  He believed in what his dad had built.  He

7    believed in what John Malone was doing with it.  And he was

8    really willing to ride that.

9         And, again, as Mr. Powers alluded to, I'm sure some of it

10    was emotional, but some of it is he just had that firm belief

11    in it.  So he would be reluctant sometimes to take advice that

12    I was giving him or suggestions and diversify more than maybe

13    I would have done, but he was content with it.  He could sleep

14    at night.  And I think that's the important part.

15         If you're -- if you're running your portfolio, no matter

16    how wealthy you are and you can't sleep at night, then it's

17    not very worthwhile, and he could sleep at night, so --

18    Q.   How would you describe Mr. Magness' tolerance for risk?

19    A.    He -- at least in the discussions we had, he appreciated

20    the risk that I would identify.  And to me, there's sort of

21    the known risk, then there's the unknown risk, the known

22    unknown risk, and then there's the unknown unknown risk.

23         And the only one that actually bothers me is the last

24    one, because if it's a known risk, it's a known risk, and you

25    can do something about it, or choose not to.  And if it's an

 1    unknown known risk, it's you still know about it, it's just an

 2    unknown known risk, like wars and pestilence and all that

 3    stuff.

 4        The unknown unknown, with the stuff you just can't know

 5    to know, that's kind of scary.

 6        So he understood that.  But he would tolerate -- first

 7    off, he's a very wealthy gentleman, so he could tolerate a

 8    risk level that most of us -- I mean, you know, Mr. Powers

 9    said, you know, would it surprise you to know he had a hundred

10    million dollars?  Well, I mean, if you talk to the average

11    person, a hundred million dollars, none of us expects to have

12    a hundred million dollars.  But that's just a percentage of

13    his net worth.

14        So he could correctly corral in his mind that if he was

15    risking some percentage of his net worth for a realistic

16    upside, he could take that risk and, like I said, he could

17    sleep with it.  Even though in absolute dollar amounts, it

18    would seem staggering.

19        I mean, I remember negotiating these bank things and

20    we're talking 3-, $400 million of debt, which honestly it's

21    kind of frightening to me, and I deal in this stuff all the

22    time.

23        But he understood what that was as a percentage of his

24    net worth.  He understood kind of what he would have to do in

25    worst case.  And he could get content that the leverage --

1    that he would use the leverage effectively.  You know, whether

2    he really was or wasn't, that's -- you only know that with

3    20/20 hindsight.

4    Q.    Let me ask you this.  You worked at Quellos helping Mr.

5    Magness from around 2003 or 2005 to 2007.  Right?

6    A.    Uh-huh.

7    Q.    Through March 2007.  In that time is it fair to say Mr.

8    Magness had at least a couple of hundred million dollars of

9    margin debt throughout the entire time period?

10   A.    I mean, there could have been a time it was lower, but

11   I'd say that's pretty fair.

12   Q.    Okay.  In that entire time period, did Mr. Magness -- and

13   I take it you encouraged him throughout the time period to

14   retire that debt or at least kind of keep it --

15   A.    Yeah, not --

16   Q.    -- under control.

17   A.    I didn't care if he took it to zero, but yeah.

18   Q.    And did you ever encourage him to use any money that he

19   had at Stanford to retire margin debt?

20   A.    Well, I don't think so, because I didn't know how much

21   money he had at Stanford.

22   Q.    So just so I understand, in that situation you just

23   described, you were able to work with the bank to elongate the

24   repayment period or the cure period.

25   A.    Yeah.  My memory is we stroked down some amount, I don't

1    remember what it was, 20 million, 15 million, I don't

2    remember, and investigated some of the ideas that they wanted

3    to implement.

4        So I said, okay, well, send me your stuff, I'll meet with

5    the guys.  We did all that stuff.  But a lot of it was done

6    with an eye towards I've got a feeling the stock is going to

7    rebound pretty significantly pretty quickly.  Because it was

8    just -- you know, there wasn't any reason that a stock like

9    Liberty should get clobbered in the tech bubble burst, it's

10   not a tech stock, and it did.

11       And as soon as it rebounded, and it probably -- I'd have

12   to go back and look at a calendar, 120, 150 days or something,

13   and all of sudden Deutsche was like, oh, you know what, we

14   don't have a margin issue anymore.  You've paid down enough

15   and the stock's back up and the collateral looks fine.

16       Gary had a pretty bad taste in his mouth from the way he

17   was treated by them, and ultimately we had found a new home

18   for the loan subsequently.  But yeah.

19   Q.   Would you have found that same to be true in the downturn

20   of 2008, that a bank would be willing to negotiate once you

21   were under a margin call?

22   A.   You know, it probably depends on your relationship, how

23   -- I mean, a big part of it is how deep are you.  Right?

24       You know, Gary, in the Deutsche Bank thing, we were in

25   it, but we weren't buried in it, you know.  Because if a 20

1   percent bounce isn't going to get you out, you know, I don't

2   know that that strategy makes a lot of sense.

3        But if a 10 or 15 percent bounce may get you out, or a

4   five to seven will get you out, then probably the bank may

5   play.  But if it's 20, 30, 40, they're not going to say, well,

6   what's the chance the stock in the next 90 days is going up 25

7   percent.

8        MR. PETRIE:  That's the end of the clip, Your Honor.

9   I'm turning over the helm to Mr. Bryant.

10        MR. BRYANT:  Your Honor, Magness parties will call

11   as their next witness Ryan Bell.

12        THE COURT:  If you could step up here, please, sir,

13   and have a seat.

14        THE WITNESS:  Okay.  Could you raise your right

15   hand, please?

16                    RYAN BELL,

17                DIRECT EXAMINATION

18   By Mr. Bryant:

19   Q.   Please state your name.

20   A.   Andrew Ryan Bell.

21   Q.   And what's your current business address?

22   A.   Let's see.  300 Crescent Court, Suite 1300, Dallas,

23   Texas.

24        THE COURT:  Sir, if you could get a little closer to

25   the microphone, that will help us hear you.  Thank you.

1    Q.   (BY MR. BRYANT)   Mr. Bell, who do you currently work for?

2    A.   Merrill Lynch.

3    Q.   And what's your current position or title with Merrill

4    Lynch.

5    A.   I am a financial advisor.

6    Q.   And could you describe for the jury generally what you do

7    in that position as a financial advisor at Merrill Lynch?

8    A.   I help families, wealthy families, manage their money,

9    manage their assets; so work with about 50, 60 clients, all

10   individual families.

11   Q.   Okay.  And is one of your clients Gary Magness and/or his

12   related entities and trusts?

13   A.   It is.

14   Q.   Do you hold any professional licenses?

15   A.   Yes.  I have a series --

16   Q.   What are those?

17   A.   Series 7, Series 63, 65, and a Series 3.

18   Q.   And generally could you describe for the jury what those

19   licenses authorize you to do?

20   A.   Sell stocks, bonds, commodities, currencies to clients.

21   Q.   Could you describe your education past high school?

22   A.   I went to undergraduate at Southern Methodist University,

23   and that's it--graduated.

24   Q.   All right.  After you finished your college education,

25   what was your first full time job?

1    A.    Let's see.  Suntrust Bank for a brief period, in Atlanta.

2    Q.    What did you do next after that?

3    A.    I worked with Goldman Sachs for six years.

4    Q.    Generally what did you do at Goldman Sachs?

5    A.    Same thing I do with Merrill Lynch, which is advise

6    wealthy families.

7    Q.    And what job did you take next after your five years or

8    so at Goldman Sachs?

9    A.    It was the same job but just at Merrill Lynch.

10   Q.    Okay.

11   A.    Same general business, covering families.

12   Q.    So how long have you been with Merrill Lynch at this

13   point?

14   A.    Let's see.  I think we're going on -- It will be 14 years

15   in March.

16   Q.    Okay.  Have you always been based in Dallas during your

17   time at Merrill Lynch?

18   A.    I have.

19   Q.    Okay.  And could you describe what Magness entities or

20   trusts are currently clients of yours at Merrill Lynch?

21   A.    Let's see.  GMAG; GMIT, which is an irrevocable trust;

22   Gary Magness personally; several children's accounts; Magness

23   Securities; Magness Foundation; Mango Trading; Mango Trading

24   2; Magness group 401(k).  That's pretty much all of them.  I

25   mean, there's a number of different trusts for the children,

1    and UTMA or minors' accounts.

2    Q.    Okay.  How long have you personally known Gary Magness?

3    A.    Let's see.  Probably -- I think the relationship began

4    maybe in 2002, I believe, so my math is sometimes bad, but,

5    you know, roughly 14 years --

6    Q.    Okay.  And --

7    A.    -- give or take.

8    Q.    Could I ask you to get closer to the microphone or speak

9    up a bit?

10   A.    Sorry.

11   Q.    Because I can hear you, but I'm not sure the jury can.

12   A.    Yeah.

13   Q.    When did you first provide investment services to Gary

14   Magness or his related entities?

15   A.    I believe it was in 2002.

16   Q.    Now, and you've continually provided services to

17   Mr. Magness and his entities up until today?

18   A.    Yes, sir.

19   Q.    Okay.  And, generally, are you compensated at Merrill

20   Lynch based on the amount of investment business you bring in

21   and keep at the firm?

22   A.    Yes.

23   Q.    So is it fair to say the more Mr. Magness' business you

24   bring in and keep the better your compensation tends to

25   become?

1    A.    I'd say that's fair.

2    Q.    Okay.  Now, over the period that you have done business

3    with Mr. Magness at Merrill Lynch, has Mr. Magness and his

4    related entities' business with you, in general, grown?

5    A.    I would say as far as assets that we currently hold at

6    Merrill Lynch, yes.

7    Q.    So just in rough terms, about how much money did

8    Mr. Magness and his entities invest through you at Merrill

9    Lynch at the beginning of the relationship in 2003, let's say?

10   A.    You know, we left firms.  We went from Goldman to

11   Merrill, and we brought some of the accounts with us, so it

12   would be hard to say what the exact amount was.

13   Q.    Yeah.  Do you have just a rough ballpark?  Is it closer

14   to a million than ten million or a hundred million?

15   A.    I think it would be closer -- somewhere between ten and a

16   hundred million.

17   Q.    Okay.  And roughly -- moving forward to 2008, roughly

18   about how much in assets did Mr. Magness and his entities have

19   invested with you at Merrill Lynch?

20   A.    I would say it's closer to well over a hundred, maybe

21   300.  I'm not positive on a figure.

22   Q.    When you say a hundred or 300, do you mean 100 million or

23   300 million?

24   A.    Yes, 100 to 300 million.

25   Q.    Is it fair to say that in 2008 that Mr. Magness was a

1   very important client for you?

2   A.   Yes.

3   Q.   Now, as of 2008, were you aware that Mr. Magness had only

4   a portion of his assets invested with you at Merrill Lynch?

5   A.   Yes.

6   Q.   And did you know in 2008 that he also had a substantial

7   amount of assets at HSBC?

8   A.   I did.

9   Q.   Did you also know in 2008 that he had a substantial

10  amount of his assets at U.S. Bank?

11  A.   I did.

12  Q.   And did you know in 2008 that he had a significant amount

13  of his assets at a brokerage firm called Stanford Group

14  Company?

15  A.   I was aware, yes.

16  Q.   Okay.  And did you also know in 2008 that Mr. Magness or

17  his related entities had around a hundred million dollars in

18  CDs from Stanford International Bank?

19  A.   I didn't know the exact figure, but I knew it was a

20  substantial figure close to that.

21  Q.   Okay.  Now, were these other institutions that I just

22  mentioned, HSBC, U.S. Bank, and Stanford, in some way

23  competitors of yours with respect to Mr. Magness' assets?

24  A.   Yes, sir.

25  Q.   And so specifically Stanford International Bank was a

1  competitor of yours with respect to Mr. Magness' assets in

2  2008?

3  A.   Yes.

4  Q.   If you'd been able to persuade Mr. Magness to move some

5  of his assets from Stanford to Merrill Lynch, would that have

6  been of financial benefit to you?

7  A.   It would.

8  Q.   As a result of those competitive factors, did you always

9  tend to be skeptical and critical of Mr. Magness' investments

10  at your competitors?

11         MR. POWERS:  Your Honor, I object to the leading.

12         THE COURT:  Overruled.

13         THE WITNESS:  I'd say that's a fair statement.  I

14  mean, I don't --

15  Q.   (BY MR. BRYANT)  And was -- did there come a time when

16  you were specifically skeptical and critical of the investment

17  products offered by Stanford International Bank?

18  A.   At some point, yes.

19  Q.   Okay.  Now, do you recall the financial crisis that the

20  United States went through and faced generally in September

21  and October of 2008?

22  A.   I do.

23  Q.   Do you recall that during that specific time period many

24  of the leading financial institutions in America were

25  financially stressed?

1    A.    Very much so.

2    Q.    Do you recall that Lehman's, one of the largest

3    investment banks in the country, went bankrupt in September

4    of 2008?

5    A.    I do.

6    Q.    Do you recall that AIG, the largest insurance company in

7    the world, was taken over by the U.S. government to avoid

8    failure in September 2008?

9    A.    I do.

10   Q.    Do you recall that even Merrill Lynch was financially

11   stressed during that same period and was acquired by Bank of

12   America?

13   A.    Very much so.

14   Q.    And did that acquisition of Merrill Lynch by Bank of

15   America affect you personally?

16   A.    It did.

17   Q.    Do you recall also that Washington Mutual, or WaMu,

18   failed and was acquired by another bank in September or

19   October of 2008?

20   A.    I do recall.

21   Q.    Do you recall that another major bank, Wachovia, was

22   financially troubled and was acquired by another major bank

23   in September or October 2008?

24   A.    I do.

25   Q.    Now, to the best of your knowledge, were any of those

106

1  financial institutions, that failed or had to be acquired in

2  September or October of 2008, ponzi schemes or frauds?

3  A.   Not to my knowledge.

4  Q.   To the best of your knowledge, were a very significant

5  percentage of the financial institutions and banks in America

6  experiencing some financial stress in October of 2008?

7  A.   Yes.

8  Q.   So if you heard that a bank was showing some signs of

9  financial stress in October of 2008, would you immediately

10 conclude that it must be a Ponzi scheme or fraud?

11 A.   No.

12 Q.   Why not?

13 A.   Banks use a lot of leverage, and they were overlevered at

14 the time, so I just knew that, you know, banks were failing,

15 not because necessarily a fraud; it was just because they had

16 too much debt and not enough capital.

17 Q.   Now, you described that you did business with Mr. Magness

18 beginning in 2002 roughly, and certainly through 2008 and

19 beyond.

20      Do you recall that during a significant period of time

21 Mr. Magness had those CDs at Stanford International Bank?

22 A.   I don't remember the dates, but yes, I knew he had CDs.

23 Q.   Now, during all of those years all the way up through the

24 end of 2008, did Gary Magness ever express to you any concern

25 about Stanford being a possible Ponzi scheme or fraud?

1    A.    No, he did not.

2    Q.    During all of those years, all the way through the end of

3    2008, did you ever hear even from other people associated with

4    Mr. Magness that Gary Magness was concerned about Stanford

5    being a Ponzi scheme or fraud?

6    A.    No.

7    Q.    Did Gary Magness ever indicate to you or state to you or

8    in your presence that he had gotten any preferential

9    information about Stanford or Stanford International Bank or

10   those CDs that was not available to most other CD investors?

11   A.    Not that I'm aware of.

12   Q.    And did you ever see anything or hear anything that

13   indicated that he had any kind of special preferential

14   information about Stanford or the Stanford CDs that was not

15   available to other CD investors?

16   A.    Not to my knowledge.

17   Q.    Okay.  Let's focus in on October 2008.  Could you

18   generally describe the assets that Gary Magness and his

19   entities had at Merrill Lynch the beginning of October 2008?

20   And I'll show you some statements in a minute and get more

21   specific.

22   A.    It was primarily just stockholdings.  Most of those are

23   media stockholdings, very low basis stock that I think had

24   been in the family for a while.  And he also had margin debt

25   also.  He had a loan against those stocks.  So those stocks

1    were his collateral and he borrowed money against it.

2    Q.   Okay.  I'd like, if we could, to show you what's been

3    admitted as Defendant's Exhibit 1.

4         MR. BRYANT:  If we can get that up.

5    Q.   (BY MR. BRYANT)  Can you see that okay on your monitor,

6    Mr. Bell?

7    A.   I can, yes, sir.

8    Q.   Okay.  Can you describe what this chart depicts?

9    A.   I can't see the exact years, but it looks like 2008

10   starting in maybe April, and it's a stock price.  The chart

11   is -- the dollar prices are on the far right.  And it just

12   shows the performance, what happened.  Kind of at the end of

13   September it looks like it fell off a cliff down to the, I

14   don't know, $2 range, maybe.

15   Q.   And what stock did this chart pertain to?

16   A.   This is Liberty Media Interactive, LINTA.

17   Q.   Is that one of the stocks that Merrill Lynch or that

18   Mr. Magness or his entities had at Merrill Lynch during that

19   2008 period?

20   A.   Yes, sir.

21   Q.   Now, in general, when that stock price fell off the cliff

22   for Liberty Media Interactive around October 2008, did it also

23   suffer severe -- did the other media stocks that he held at

24   that time at Merrill Lynch also suffer major declines?

25   A.   Yes, sir.

1  Q.   And I think you mentioned that he had margin debt at

2  Merrill Lynch at the time.  Is that right?

3  A.   Correct.

4  Q.   And what effect did the dramatic drop in those stocks

5  have on his situation with his margin debt at Merrill Lynch in

6  October 2008?

7  A.   Well, the way margin works is you use the collateral as

8  the stock so you can borrow up to a certain percentage versus

9  the stock price.  And as the stock price goes down, your

10  borrowings look like you have a lot more borrowed against that

11  collateral, so the collateral becomes worth less and less, and

12  so at some point you'll get a margin call, which means you

13  need to either pay it down with cash or sell the stock to get

14  it back in line.

15  Q.   Did Gary Magness and his entities face margin calls at

16  Merrill Lynch in October 2008?

17  A.   I believe so.  I mean, I know he did have margin calls at

18  Merrill Lynch.  I think it was October.  I mean, I'm assuming.

19  Q.   Okay.

20  A.   It may have started in September, but he definitely

21  received margin calls.

22  Q.   Now, did Gary Magness and his entities also face margin

23  calls at other institutions during that same September and

24  October 2008 time frame?

25  A.   Yes, sir.

1    Q.   And had Mr. Magness and his entities not been able to

2    come up with significant amounts of cash very quickly to meet

3    those margin calls, what would have been the result, at least

4    with respect to his assets at Merrill Lynch?

5    A.   He'd have to sell stock to pay Merrill Lynch back.  So he

6    borrowed money, so effectively they would have to sell stock,

7    either he would or, if he chooses not to, then the bank takes

8    matters into their own hand and sells stock, or whatever the

9    collateral is used against it.

10   Q.   Did you personally have a role in helping Gary Magness

11   and the Magness entities deal with the financial situation

12   that they faced in October of 2008?

13   A.   I did.

14   Q.   Could you describe generally what that role was?

15   A.   Well, I knew that, you know, we were having margin calls,

16   but specifically they were having margin calls at U.S. Bank

17   and I believe HSBC.  And at the time Merrill Lynch had more

18   favorable terms for Mr. Magness, so based on the stock price

19   he would get a better loan against his stock at Merrill Lynch

20   versus HSBC, and I believe versus U.S. Bank.

21       So I remember being on the phone with U.S. Bank, you

22   know, assuring them that if they transferred it we would pay

23   them the cash.  And we kind of had to meet in the middle of

24   the night kind of deal, like here's the cash and here's the

25   stock, because they wanted to be made whole on their loan.  So

111

1    there was a lot of coordination involved in that.  So.

2    Q.    In general, did some assets and/or debt move from other

3    firms to Merrill Lynch during October 2008?

4    A.    Yes, sir.

5    Q.    Could you describe, as best you recall, what occurred in

6    that regard?

7    A.    Well, like I said, I think our terms were a little more

8    favorable than the other firms, and, you know, rather than

9    selling assets to pay down the margin calls, it's better to

10   not have to sell if you think it's going to rebound quickly.

11   So that was, I think, my understanding of what they wanted to

12   do was not sell unless they were forced to.

13   Q.    They being whom?

14   A.    The Magness Group.

15   Q.    Okay.

16   A.    And so with respect to U.S. Bank, maybe not as big of a

17   coordinated Wall Street-type firm, so it was a little bit more

18   cumbersome to coordinate with them to transfer assets.

19   Because transferring of assets between two banks on Wall

20   Street is fairly easy.  It's very seamless.  And U.S. Bank was

21   maybe not well-equipped in that, so it was a little more

22   cumbersome.

23        But that's what we were doing is just trying to give him

24   better terms so that he didn't have as many margin calls as

25   maybe U.S. Bank or HSBC would do at the time.

1    Q.    Let's take a look at Exhibit PX 341.  Mr. Bell, you see

2    the first page of PX 341.  We may look at some other pages as

3    well.  Could you generally describe what that document is?

4    A.    This is a monthly statement.

5    Q.    And is it specifically a Merrill Lynch monthly statement

6    that you -- in the form that you typically send to your

7    clients?

8    A.    Yes, sir.

9    Q.    And what particular client does this statement pertain

10   to?

11   A.    This is the irrevocable trust, or GMIT.

12   Q.    Sometimes -- Have you ever referred to it as G-M-I-T?

13   A.    Yes, sir.

14   Q.    And from what period of time does this statement -- what

15   period of time does it cover?

16   A.    This is the month of September in 2008.

17   Q.    Okay.

18   A.    Or August 30th to September 30th.

19   Q.    There's a reference on the left side of the page to the

20   Russell Group.  What is that?

21   A.    Oh, sorry.  No, It's Russ/Bell.  It's --

22   Q.    Oh, Russ/Bell.  Excuse me.

23   A.    It's -- my partner's a guy named Mike Russ, and I'm Ryan

24   Bell, so they make us put a group name, so it's pretty

25   clever--Russ/Bell.

1    Q.   Okay.  Based on the information on that first page of

2    exhibit -- Plaintiff's Exhibit 341, could you describe

3    generally what happened to the Gary Magness Irrevocable Trust

4    account at Merrill Lynch during September 2008?

5    A.   Well, the overall net portfolio value goes down quite a

6    bit.  Let's see.  Yes.  I was just -- yeah.  The market went

7    down or his marketable investments went down $11,576,000.

8    Q.   Just in September of 2008.

9    A.   Correct.

10        MR. BRYANT:  Okay.  Could we look at the second page

11   of that exhibit?

12   Q.   (BY MR. BRYANT)  Now, this second page indicates the top

13   five portfolio holdings in that account for that month.  What

14   were they?

15   A.   Liberty Media, Liberty Media Corp Entertainment, Liberty

16   Global Series A, Liberty Global Series C, Comcast Class A.

17   Those are just, like you said, five stocks.

18   Q.   And just those five stocks, their current value, at least

19   at some point in that month, was roughly about what?

20   A.   Well, it looks like it's -- let's see.  It was about 86

21   percent of the portfolio value, so I don't know.  What would

22   that be?  Like close to 40 something million, 50 million.

23        Excuse me.  Just the values.  I'm sorry.  Yeah.  So 50,

24   60, I don't know, 75 million, 77 million, something like that.

25   Q.   Now, let's look at Exhibit PX 342.  Could you describe

1    for the jury what Plaintiff's Exhibit 342 is?

2    A.    This is a margin call.

3    Q.    And who did the margin call go to?

4    A.    This one's going to Gary Magness.

5    Q.    And who sent that?

6    A.    Merrill Lynch.

7    Q.    Now, the date on the right is October 13th, 2008.

8             MR. BRYANT:   Can we look at the rest of that page?

9    Q.    (BY MR. BRYANT)   It looks like there's an origin date

10   listed of October 10th, 2008.

11   A.    Yes.

12   Q.    What does the origin date refer to?

13   A.    I think that's -- refers to the day that he technically

14   goes into a margin call where he's -- needs to post more

15   collateral.

16   Q.    And there's a reference to an account number ending in

17   0396, account type CMA for trust.  Can you tell what account

18   specifically that margin call referred to?

19   A.    That's the irrevocable trust, the GMIT.

20   Q.    So is that the same account for which we just saw the

21   September statement?

22   A.    Yes, sir, I believe so.

23   Q.    Does this tell you that between the end of September

24   shown in that statement and October 10th that that account had

25   reached the point where Merrill Lynch had to do a margin call?

A.    Yes, sir.

Q.    And what amount of money was Merrill Lynch demanding or requiring at that point to deal with the margin call?

A.    Well, in this case, if he posted cash it would be $6,043,321, but if he satisfied it by selling stock it would be closer to $18 million that he would have to sell.

Q.    Explain why that is so.

A.    Because you only get a certain release on -- if your stock is being used as the collateral for the loan and the value goes down, in order to get back to where it's 50 percent, it's a technical situation, but ultimately you'd have to sell three -- A little more than three times the stock or of your stocks to pay down 6 million.  That's to get the account in line.

Q.    So one of the options that Mr. Magness would have had to have to meet that call was to sell some of his Liberty stocks, but he would have had to sell $18 million worth at that point where it was declining dramatically?

A.    Roughly.

Q.    And if he could come up with about $6 million cash, he could also alternatively deal with the margin call just by putting roughly one third of the amount in cash?

A.    Correct.  Or he could post another asset that had value, so in that case it would be like $12 million of a stock.  So if he had $12 million of stock at another firm, he could bring

1   that over and that would satisfy it.

2   Q.   Do you recall whether you were personally involved in

3   dealing with the Magness folks in connection with this margin

4   call?

5   A.   Yes.

6   Q.   Okay.  Let's take a look at Exhibit PX 378.

7        Now, this is actually a two-page email, but there's

8   almost nothing on the second page, so let's look at the first

9   page.  And take a second if you need to to read that.

10  A.   Okay.

11  Q.   What was the date of this email?

12  A.   That's October 10th.

13  Q.   And what amount of money was Mr. Magness or his entities

14  dealing with in terms of a margin call that's discussed in

15  this email?

16  A.   So that would be from the night prior, so this is before

17  the market opened, so he had a current call of $781,000 in

18  10396.

19  Q.   That's quite a bit different than the $6 million amount

20  that we saw I believe with the same origin date of October

21  10th, 2008 in the previous exhibit.

22  A.   Right.

23  Q.   Do you have any -- can you explain why there's that

24  difference between about $781,000 and over $6 million on the

25  same day?

1   A.   That's how bad the market was declining.  So a call from

2   781 went to 6 million by the end of the day.

3   Q.   Let's look at what's been marked as Exhibit PX 344.  Can

4   you describe what Exhibit PX 344 is?

5   A.   This is a margin call for the same account ending in 396,

6   and it's a call of $77,067.  October 24th was the date.  Due

7   on October 28th, but I just remember in that time they were

8   due upon the call.  I think the -- I think in that email it

9   stated these were not normal times and so they wanted the

10  calls met immediately, as opposed to typically you'd give

11  clients a few days to come up with collateral or sell stock.

12  But it was not normal times, so they were demanding that you

13  satisfy your margin call that day, or at least tell them what

14  your plan is to satisfy that call.

15  Q.   I'm not going to take you through, you know, all of the

16  detail of what occurred during October of 2008 with respect to

17  these margin calls, but, in general, what's your recollection

18  as to how Mr. Magness and his entities survived that month in

19  terms of their -- the margin calls at Merrill Lynch?

20  A.   I think, you know, some assets were clearly sold.  I

21  think the assets that were sold maybe weren't his core assets.

22  He didn't want to sell -- this is what we discussed several

23  times was he didn't really want to sell something to meet a

24  margin call and then owe tax on it the next year, because that

25  was kind of, you know, not a great idea.  But certainly he had

1   to sell lots of stocks to pay down the debt.

2   Q.   When you refer to Mr. Magness' core assets in your

3   answer, what are you referring to?

4   A.   Just those stocks that we saw; mostly Liberty Media type

5   of entities that all stem from one old investment in TCI.  I

6   mean, Comcast was probably maybe not as core, the way I

7   understood it.  I'm maybe misspeaking, but the way I thought

8   of his core assets were anything Liberty, et al., which was

9   all of his -- all of these Liberty entities, all of these

10  Liberty stocks.

11  Q.   Were all of those Liberty stocks ones that had been owned

12  by Mr. Magness' father?

13  A.   Yes.

14  Q.   Or the original companies that turned into the Liberty

15  stocks?

16  A.   Correct.

17  Q.   Okay.  Now let's look at Exhibit PX 346.

18       Could you describe what, again, just from the first page,

19  what PX 346 is?

20  A.   This is an account statement for the month of October.

21  Q.   And which account does that pertain to?

22  A.   It looked like it was the same thing--the GMIT or

23  irrevocable trust.

24  Q.   And is this the one that has the number ending in 0396?

25  A.   Yes, sir.

1  Q.  Okay.  So this is the same account for which we saw the

2  September statement, but now this is the October statement?

3  A.  Yes.

4  Q.  And based on that first page, can you describe the

5  changes that occurred in that account during the month of

6  October 2008?

7  A.  We received a number of assets from another firm, or

8  maybe multiple firms, that net contributions shows that

9  $49,801,000 was moved into the account.  But the market went

10  down 43 million.

11  Q.  So when you say the market went down 43 million, are you

12  referring to the values of those same stocks that we looked at

13  earlier, the Liberty stocks and Comcast and other ones that

14  you had in that account in September?

15  A.  Plus the assets that came in.  So the overall portfolio

16  went down 43 million, but he started the month with 37

17  million, and then added 49 million, and the market was down 43

18  million, so he ended up with only 44 million even though he

19  brought in 49.8 million.

20  Q.  Almost $50 million right there?

21  A.  Correct.

22  Q.  Okay.  Let's look at the second page of Exhibit 346.

23  It looks like, you know, roughly some of the same stocks

24  are indicated there as his portfolio holdings?

25  A.  Yes, sir.

1    Q.    The top five?

2    A.    Uh-huh.

3    Q.    And roughly what was the value of those at the end of

4    October 2008?

5    A.    Let's see.  66, 68, somewhere in there.

6    Q.    Do you recall whether there were other Magness accounts

7    at Merrill Lynch where you had margin calls in October 2008?

8    A.    Yes, sir.

9    Q.    Let's look at Exhibit PX 374.

10         This is exhibits of like a five-page email string.  Just

11   let's look at the first page right now.

12         Can you describe what margin call -- what Merrill Lynch

13   margin call that email pertained to.

14   A.    This is for GMAG ending in 7010.  And the margin call was

15   $1.714 million.

16   Q.    This looks like another email at 7:00 in the morning.

17   What date was that?

18   A.    October 21st, 2008.

19   Q.    And was this -- do you happen to recall how Mr. Magness

20   and his group dealt with that margin call?

21   A.    I don't recall.  I think this one we may have -- this one

22   was U.S. Bank was going to be transferring over some assets.

23   Q.    Now, do you -- did you become aware during October 2008

24   that Mr. Magness or his entities had received loans from

25   Stanford International Bank secured by its CDs there?

1    A.    I don't know the timing on when I knew, but I knew that

2    they had received a loan.

3    Q.    And were part of the loan proceeds from those loans at

4    Stanford International Bank on the CDs actually deposited in

5    one or more Merrill Lynch accounts during that month?

6    A.    Yes.

7    Q.    What do you recall about how that came about?

8    A.    I don't remember, again, the timing.  If you say it was

9    October.  But I did have a conversation with his CFO at the

10   time, or his chief investment officer, because at the time we

11   were not in any kind of margin calls or -- we were in a couple

12   of margin calls, but it was limited amount.  And I think they

13   had substantial cash coming over.  And one of the ideas was to

14   put it into a -- into one of the accounts to just hold it in

15   cash and not to pay down margin debt with it.  That's about

16   all I can remember from the Stanford funds.

17   Q.    Do you recall about how much that deposit was that went

18   into the Merrill Lynch accounts during that period?

19   A.    I don't remember the total amounts, but it was, you know,

20   north of 10 million for sure.

21   Q.    Okay.  And do you recall what that money was actually

22   used for at some point by the Magness folks?

23   A.    I don't remember what -- initially we put it into just a

24   money market fund and didn't pay down margin because we

25   weren't in a call, and it was kind of earmarked for using it

```
 1    to pay down margin calls either with Merrill or at HSBC.

 2    Q.    And was it ultimately used for that purpose?

 3    A.    I'm assuming so, yes.

 4    Q.    Okay.  Now, during all of the dealings and interactions

 5    that you had with the Magness parties during the course of

 6    this crisis in September and October of 2008, did Gary

 7    Magness, or anyone else, express to you the belief that

 8    Stanford or Stanford International Bank was a Ponzi scheme?

 9    A.    No.

10    Q.    Do you have any reason to believe, either from what

11    anything you've ever heard or seen from the Magness folks, any

12    reason to believe even today that at the time of the loans in

13    October 2008 Gary Magness knew or believed that Stanford was a

14    Ponzi scheme or fraud?

15              MR. POWERS:  Objection, Your Honor; testifying to

16    somebody else's beliefs.

17              THE COURT:  Overruled.

18              THE WITNESS:  I don't believe.

19    Q.    (BY MR. BRYANT)  Now, we talked about the fact that you

20    tend to be skeptical or critical of your clients' investments

21    at your competitors.  Did you ever express any skepticism or

22    criticism of the Stanford International Bank CDs to Gary

23    Magness?

24    A.    Not to Gary directly.

25    Q.    Okay.  And did you ever -- well, to whom did you express
```

1    any skepticism or criticism of the Stanford or the Stanford

2    CDs?

3    A.    I would say Tonya Dokken, who was his investment officer

4    at the time.

5    Q.    And can you pinpoint exactly when you may have expressed

6    skepticism or criticism of the Stanford international CDs to

7    Tonya Dokken?

8    A.    I don't recall the exact timing.  I believe it was -- I

9    couldn't say --

10   Q.    Okay.

11   A.    -- to be honest.

12   Q.    Do you know for sure whether it was before or after

13   October of 2008?

14   A.    My guess is it --

15   Q.    I would not ask you to guess.  If you have an estimate --

16   A.    No, I don't know.

17   Q.    Okay.  Regardless of when you expressed skepticism or

18   criticism of the Stanford International Bank CDs, or Stanford

19   in general, to Tonya Dokken, do you have any knowledge that

20   Tonya Dokken ever relayed that criticism to Gary Magness?

21   A.    No.

22   Q.    Did you ever express any skepticism or criticism of

23   Stanford or the Stanford International Bank CDs to Tom Espy?

24   A.    Not to my knowledge.

25   Q.    Was Tom Espy somebody you dealt with in connection with

1    the Magness accounts at times?

2    A.    Yes, sir.

3    Q.    Did you ever express any skepticism or criticism of

4    Stanford or the Stanford International Bank CDs to Steve

5    Knudson?

6    A.    Not to my knowledge.

7    Q.    Now, do you recall that there came a time in mid December

8    2008 when there were an arrest and revelations pertaining to a

9    Bernie Madoff?

10   A.    I remember, yes.

11   Q.    And was that after the time of the loans that the Magness

12   entities had gotten from Stanford?

13   A.    Yes.

14   Q.    About how many months?

15   A.    I think October was roughly the time that they got it,

16   maybe before, so two or three months.

17   Q.    Now, as a result of the Madoff Ponzi scheme becoming

18   public in mid December 2008, did you observe additional

19   concern in the investment community about possible investment

20   frauds and Ponzi schemes?

21   A.    Oh, yes.

22   Q.    Could you describe what happened at that time in terms of

23   everybody's consciousness of Ponzi schemes being changed?

24   A.    Yes.   I think -- so Bernie Madoff was, you know, quote

25   unquote, well-respected, well-regarded, and to find out that

1    he had a Ponzi scheme, a lot of people thought his returns

2    were too good to be true, and in the crisis it appeared that

3    that was correct; it was too good to be true.

4       And so I think after that revelation, people started to

5    really scratch the surface on any investment that maybe went

6    through that tough difficult period without any kind of

7    hiccup.  So I think there was a lot of skepticism with any

8    kind of investment that was opaque, or that wasn't black and

9    white; it was, you know, investing in lots of different

10   entities or different investments, et cetera.  So any hedge

11   fund or kind of more sophisticated investment, people were

12   skeptical of it.

13   Q.   Let me show you a document dated February 13th, 2009.

14   It's Exhibit DX 209, I believe.

15           THE COURT:  How long, Mr. Bryant, are you going to

16   be talking about that one?

17           MR. BRYANT:  I'm guessing five or ten minutes.

18           THE COURT:  Why don't we save that for after lunch.

19           MR. BRYANT:  It might be a good time to break.

20           THE COURT:  Let's do that.  We'll take our lunch

21   break now and see you all back at 1:30.  1:30.

22           (Whereupon, the jury left the courtroom.)

23           THE COURT:  Do you all know offhand how much of Wilk

24   gets charged to the Receiver?  If you don't know it right now,

25   you can let me know at the end of the lunch break.

```
 1              MR. SADLER:  We will report back, Your Honor.

 2              THE COURT:  Okay.  That will be great.

 3         Anything else we need to take up?

 4              MR. SADLER:  No, sir.

 5              THE COURT:  All right.  See you-all at 1:30.

 6                         (Lunch recess.)

 7              THE COURT:  All set?

 8              MR. SADLER:  Yes, sir.

 9         Did you want the Wilk times now or later?

10              THE COURT:  Now's good.

11              MR. SADLER:  One hour 16 minutes for the Defendant;

12    23 minutes for the Plaintiff.

13              THE COURT:  Okay.  Thank you.

14              MR. PETRIE:  We also, Your Honor, have three volumes

15    of deposition testimony that we'd ask for your attention.

16              THE COURT:  Okay.  Sure.

17              MR. PETRIE:  If I may?

18              THE COURT:  Are we otherwise ready?

19              MR. SADLER:  Yes, sir.

20              THE COURT:  And do we have our witness?

21              MR. SADLER:  Yes.

22              (Whereupon, the jury entered the courtroom.)

23              THE COURT:  Be seated.

24         How's everyone doing?

25              SEVERAL JURORS:  Good.
```

```
 1              THE COURT:  Good.

 2         We anticipate just our normal schedule this afternoon.

 3    So we'll go until about 3:00 or 3:10 and take an afternoon

 4    break, and then wrap up at 5:00.

 5         So please proceed.

 6              MR. BRYANT:  Thank you, Your Honor.

 7    Q.   (BY MR. BRYANT)  Mr. Bell, before the lunch break you had

 8    talked to us about how after the Bernie Madoff story came out

 9    in mid December 2008 financial community awareness of Ponzi

10    schemes kind of was heightened.

11         I'd like for you to look at what has been marked as

12    Exhibit PX 109, which I misdescribed before the break, so this

13    is what I was referring to.

14         Mr. Bell, can you identify Exhibit PX 109?  Can you tell

15    us what that is?  Do you have that on your monitor?

16    A.   I do not.

17              MR. BRYANT:  Can I approach the witness?

18    Q.   (BY MR. BRYANT)  Let me hand you what has been marked as

19    PX 109.  Take your time to identify it, and tell us what it

20    is.

21    A.   It's a Bloomberg article referring to the "Stanford firm

22    said to face U.S. probe of CD sales."

23    Q.   And what was the date of that?

24    A.   This is February 12th, 2009.

25    Q.   Does your name appear on that exhibit?
```

1   A.   It does.

2   Q.   And what was your connection with that exhibit?

3   A.   I forwarded it to Tonya Dokken at Magness.  I said, "Just

4   got to Mexico" --

5   Q.   You don't need to read it RIGHT now.  Just tell us, is

6   this an email that you forwarded to Tonya Dokken?

7   A.   Yes, it is.

8   Q.   Okay.

9        MR. BRYANT:  I'd offer PX 109 into evidence.

10       MR. POWERS:  No objection, Your Honor.

11       THE COURT:  It's admitted.

12  Q.   (BY MR. BRYANT)  Now, I believe we can put it up on the

13  screen and I can borrow this back from you, with the Court's

14  permission.

15       Mr. Bell, is there a portion of this PX 109 that you

16  authored?

17  A.   Yes, sir.

18  Q.   Okay.  And could you go ahead and just read that out for

19  the jury?

20  A.   Sure.  "Just got to Mexico and my hotel, but saw this

21  email and wanted to forward.  I think we all had this fear

22  unfortunately.  I hope it wasn't a Ponzi scheme and hopefully

23  the money is somewhere."

24  Q.   Okay.  And when did you forward that to Tonya Dokken?

25  A.   The afternoon of February 12th, 2009.

1    Q.   Okay.  And about how many months after the October 2008

2    loans to Gary Magness did this article come out describing an

3    investigation of Stanford?

4    A.   I guess about five.

5    Q.   And about how many months after Bernie Madoff's Ponzi

6    scheme became public was it when this article came out and you

7    forwarded it to Ms. Dokken?

8    A.   I think it's about the same time.

9    Q.   Well, about how many months had it been from the Bernie

10   Madoff disclosure, which was mid December?

11   A.   Okay.  Mid December?  I'm sorry.  So two -- two months.

12   Q.   Okay.  Now, in this email you indicated that this news,

13   you said, "I think we all had this fear unfortunately."  What

14   did you mean by that?

15   A.   My recollection is just kind of going through what we

16   went through in 2008, seeing what happened to Bernie Madoff,

17   and, again, just things appeared to be too good to be true, so

18   that was my fear that there was something amiss.

19   Q.   Okay.  I think you also said, "I hope it wasn't a Ponzi

20   scheme."  As of February 12th, 2009, did even -- did you know

21   even then that Stanford was a Ponzi scheme?

22   A.   I did not.

23   Q.   Now, Mr. Bell, had you believed that Stanford was a fraud

24   or Ponzi scheme at any time prior to this February of 2009

25   time period, knowing that Gary Magness had tens of millions of

1    dollars in Sanford CDs, would you have told Gary Magness that

2    Stanford was a Ponzi scheme in your view?

3    A.    I would have if I -- but I never did.

4    Q.    And had you done so and he'd taken his money from

5    Stanford and moved it to Merrill Lynch, you would have

6    benefited.  Right?

7    A.    Yes, sir.

8    Q.    And despite that potential -- that interest that you

9    might have had in doing so, you never thought that was the

10   right thing to do to express any view to Gary Magness that you

11   thought Stanford was a Ponzi scheme?

12   A.    I didn't.

13            MR. BRYANT:  I pass the witness.

14            MR. POWERS:  Your Honor, may I approach the witness?

15            THE COURT:  Yes.

16                    CROSS EXAMINATION

17   By Mr. Powers:

18   Q.    Good afternoon, Mr. Bell.

19   A.    Good afternoon.

20   Q.    We had the opportunity to meet at your deposition.

21   Correct?

22   A.    Yes.

23   Q.    And I had the opportunity to ask you some questions and

24   you provided some testimony under oath.

25   A.    I did.

```
 1    Q.   We have not otherwise met or talked.

 2    A.   Correct.

 3    Q.   Okay.  Now, you just had a chance to visit with

 4    Mr. Bryant.  I saw that you walked in the courtroom with him.

 5    I take it you had an opportunity to visit with him before the

 6    proceedings today?

 7    A.   I did.

 8    Q.   And before the deposition, I think you had the

 9    opportunity to visit by phone twice with Mr. Petrie.  Is that

10    true?

11    A.   Either once or twice, yes.

12    Q.   Right.  And you gave him some information that you

13    thought might be helpful to Mr. Magness and his case.  Is

14    that correct?

15    A.   Yes.

16    Q.   Okay.  Now, Mr. Magness has been a client of yours since

17    2002.  Did I understand that correctly?

18    A.   Yes.

19    Q.   And Mr. Bell, is it a fair summary that you reached out

20    to Mr. Magness in hopes of starting a business relationship

21    with him?

22    A.   Originally?  Yes.

23    Q.   And you were successful in doing so.

24    A.   Yes.

25    Q.   Now, when you reached out to Mr. Magness, you didn't know
```

1   a lot about him, other than his wealth, essentially.  Correct?

2   A.   Correct.

3   Q.   And when you reached out to him, he was having some kind

4   of a margin loan situation with Citibank.  Is that right?

5   A.   That's correct.

6   Q.   And in that margin loan situation, he wasn't able to get

7   the types of margin lending terms that he wanted, and Merrill

8   Lynch was able to -- or, excuse me, Goldman at the time.

9   Right?

10  A.   Yes.  It was Goldman.

11  Q.   Goldman was able to help him with that margin lending

12  situation, wasn't it?

13  A.   Correct.

14  Q.   And through addressing that margin lending situation to

15  his satisfaction, that's the way you were able to get him on

16  as a client?

17  A.   Correct.

18  Q.   And at that time he brought over what?  About $10 million

19  or so in securities?

20  A.   I think that's about right.  Yes, sir.

21  Q.   By the time the Stanford situation came flying apart in

22  February 2009, you had, I think you said earlier, SOMETHING

23  like $300 million in securities.

24  A.   Yeah.  I don't know what the actual number was, but it

25  was over a hundred for sure.

```
 1    Q.    And I heard some references to -- through the testimony

 2    that Mr. Magness has continued to do pretty well, so I assume

 3    you have even greater assets under your management even today.

 4    A.    Yes.

 5    Q.    Now, you are on a commission basis with Mr. Magness.

 6    A.    I am.

 7    Q.    Can you just estimate for the jury how much you have made

 8    through the Magness accounts or how much Merrill Lynch has

 9    made through the Magness accounts over the years he's been a

10    client of yours?

11    A.    I wouldn't have an idea.

12    Q.    Could you ballpark it in any way?

13    A.    I'd say it's on a per trade basis, so my guess is

14    anywhere from 25,000 a year to 150,000 a year.

15    Q.    Mr. Magness and his entities, I assume, are important

16    clients of yours.

17    A.    Yes.

18    Q.    All things being equal, you would prefer to be helpful to

19    your client than unhelpful.  Isn't that true?

20    A.    Yes.

21    Q.    Nevertheless, here you are today in court, and you

22    recognize, Mr. Bell, that you have an obligation to answer

23    the questions under oath truthfully and completely.

24    A.    A hundred percent.

25    Q.    And you recognize that you had that same obligation at
```

1    your deposition just a few months ago.  Correct?

2    A.    Correct.

3    Q.    So we heard some testimony from you just a few minutes

4    ago about margin calls, and I want to address that topic with

5    you.  Okay?

6    A.    Okay.

7    Q.    Fair enough?

8          The fact that Mr. Magness had margin debt in 2008, that's

9    not new in 2008, is it?

10   A.    Pardon me?

11   Q.    The fact that Mr. Magness had margin debt in 2008, that

12   wasn't a new phenomenon.

13   A.    Meaning he had it prior?

14   Q.    Right.

15   A.    Yes.

16   Q.    And he had it all the way back to when you first started

17   working with him.

18   A.    Correct.

19   Q.    And, in fact, October 2008 was not the first time

20   Mr. Magness ever had a margin call, is it?

21   A.    No, not to my -- I mean, maybe not with us, but -- I

22   don't recall if he had one with us prior to that or not, but

23   I'm sure he's had one, given the relationship with Citi.

24   Q.    Right.  He had a difficult situation with Citi that you

25   helped him out with, so --

1    A.    Correct.

2    Q.    -- the concept of dealing with a difficult margin

3    situation, that was not a new phenomenon in October of 2008.

4    A.    No.

5    Q.    Now, you went through some particular margin calls, and I

6    just want to see if I can recap it.

7          You said there was a $6 million margin call.  Do you

8    recall that one?

9    A.    Yes.

10   Q.    There was a $1.7 million margin call.  At least there was

11   an email about that.

12   A.    Yes.

13   Q.    Now on that one --

14         MR. POWERS:  Can we pull that one up?  That is

15   Plaintiff's Exhibit 374.  And can we get the second email in

16   the chain?

17   Q.    (BY MR. POWERS)  Now, this one is just an email.  Right?

18   A.    Correct.

19   Q.    We didn't see one of these formal margin call forms like

20   we saw for the other two, did we?

21   A.    I didn't see one.

22   Q.    And, in fact, the second sentence says somebody named

23   Chris Meditz -- is that a Merrill Lynch person?

24   A.    It is.

25   Q.    Is checking a Comcast concession.  Do you want to tell

1    the jury what that means, please?

2    A.    So since he has concentrated positions, he's got a large

3    number of shares, typically they will only initially loan off

4    of maybe 25,000 shares.  That's just kind of the standard

5    default.  So in order to get a bigger release on more shares,

6    you have to do what's getting concession; make sure that all

7    shares are being used as collateral.

8    Q.    And, in fact, this is one of those situations where you

9    have gotten a special arrangement with Mr. Magness, and so he

10   has a better deal with you than he might just by the default

11   rules, isn't it?

12   A.    No.

13   Q.    This Comcast concession is not?

14   A.    No.

15   Q.    But -- and do you have any idea, based on the documents

16   that you've seen today, whether this margin call actually

17   resulted in a formal notice like the ones we saw in

18   Plaintiff's Exhibit 342 and Plaintiff's Exhibit 344?

19   A.    I don't know.

20   Q.    And we can't see it based on the documents that you

21   reviewed with Mr. Bryant just a few minutes ago.

22   A.    I didn't see it.

23   Q.    Okay.  Now -- and then the last one was Plaintiff's

24   Exhibit 344.

25             MR. POWERS:  Can we pull Plaintiff's Exhibit 344 up?

1  And can we blow up the middle portion that shows the amount of

2  the maintenance call, the amount due?

3  Q.   (BY MR. POWERS)   And the amount due on this one is

4  77,000.   Right?

5  A.   It is.

6  Q.   It's not 77 million.   77,000.

7  A.   Correct.

8  Q.   Okay.   And we saw some accounts with Gary Magness on your

9  testimony with Mr. Bryant where he had 40, 50, 60, 60, 80

10  million in accounts.   Right?

11  A.   Yes.

12  Q.   So let's suppose for the sake of argument that the

13  $1.7 million call is really, in fact, a call, and we have the

14  $6 million call, and we have the $77,000 call.   All told,

15  that's less than $8 million.   Right?

16  A.   Correct.

17  Q.   And I think I heard Mr. Bryant say something about

18  wanting to skip over some details, but I want to ask you about

19  that.

20      Were there any details about margin calls that

21  Mr. Magness experienced in October 2008 at Merrill Lynch that

22  you wanted to provide?

23  A.   I don't know what you're asking.   Specific details like?

24  Q.   Well, we've seen two or maybe three.   Right?

25  A.   Uh-huh.

1   Q.   And so my question is, do you have details regarding any

2   additional margin calls that Mr. Magness had in October of

3   2008 at Merrill Lynch?

4   A.   I don't have any details.

5   Q.   Now, when you get one of these margin calls, I think you

6   described there are a number of ways you can deal with it.

7   True?

8   A.   Correct.

9   Q.   One of the ways you can deal with a margin call is to

10  simply sell some of the stock.

11  A.   Correct.

12  Q.   That is securing the loan, and you can pay down the loan.

13       And I assume you must know that Mr. Magness sold some of

14  his stock in the fall of 2008 to address some margin calls and

15  some margin loan situations.

16  A.   Yes.

17  Q.   And another way -- I think you may have talked about

18  this.  Another way to address a margin call would be to move

19  more stock into an account.

20  A.   Yes.

21  Q.   All right.  Let's see if we can look at an example.  And

22  I think we've seen this one.  This is Plaintiff's Exhibit 378.

23  I wanted to ask you about this one.

24       Now, if we go to the bottom email, this is the October

25  10th email that I think you reviewed with Mr. Bryant.

1           Linda Shaw is a Merrill Lynch person?

2    A.    Yes.

3    Q.    And she is sending you this email -- or, excuse me,

4    sending David Stutsman this email in the early morning on

5    October 10th.  Is that right?

6    A.    Yes.

7    Q.    7:50 a.m.

8    A.    Correct.

9    Q.    And now she has copied you.  Is that correct?

10   A.    Yes.

11   Q.    Now, it says, "Please be advised that Mr. Magness has a

12   current call of 781,000 in the above account."  So that's the

13   margin call you're dealing with in the early morning on

14   October 10th.  Right?

15   A.    Correct.

16   Q.    All right.  Let's look at your response.

17         Would you agree with me you sent your response just five

18   minutes later?

19   A.    I would.

20   Q.    And you have very quickly decided apparently that you're

21   just going to move stock over from 0197.  I take it that's

22   another one of Mr. Magness' accounts at Merrill Lynch?

23   A.    It is.

24   Q.    And then you asked the question, "Please let us know what

25   we need to move over to satisfy the call."

```
 1   A.   Correct.

 2   Q.   Now, you gave some testimony about how much stock you

 3   might have to sell if, for example, you had a $6 million call,

 4   just a few minutes ago, and I think you gave the number 18

 5   million.

 6   A.   Yeah.  I think the calculation comes to 3.33 times --

 7   Q.   Okay.

 8   A.   -- actually.

 9   Q.   But it wouldn't work the same in this context--that is,

10   where you're just moving more stock into the account, would

11   it?

12   A.   No.

13   Q.   And so let's go to the next email and see how much stock

14   you would have to move into the account to solve this

15   particular $700,000 problem.

16        And what's the number to solve it?

17   A.   In this case it's $1,116,900.

18   Q.   All right.  So that's an example of Mr. Magness moving

19   more stock into an account to address a margin call.  Right?

20   A.   Correct.

21   Q.   And this is happening on October 10th, 2008.

22   A.   Correct.

23   Q.   Now, another way to deal with a margin call would be for

24   Mr. Magness to borrow money from another bank where he had a

25   line of credit and pay back some of the loan.  Right?
```

1   A.   Yes.

2   Q.   And you had some experience with Mr. Magness taking money

3   from Merrill Lynch and paying it to other banks.  I think you

4   testified about some of it.

5   A.   Yes.

6   Q.   Let's take a look at Plaintiff's Exhibit 134, and it

7   should be in the notebook in front of you.  You can also look

8   at the screen.

9   A.   All right.

10  Q.   Now, this is the minutes of a regular board meeting of

11  Mango Five Family, Inc. on October 1st, 2007.  Do you see

12  that?

13  A.   I see that.

14  Q.   And let's look at the top two paragraphs and let's see if

15  we can see whether you are present at this meeting.  There are

16  a number of people in the first paragraph who are on the board

17  of directors.  Do you see those names?  Mr. Magness,

18  Mr. Sutton, and Mr. Knudson.  And then there's Ms. Dokken.

19  Right?

20  A.   Yes.

21  Q.   And then we have Mr. Armstrong who has called into this

22  meeting.  Do you see that?

23  A.   Yes.

24  Q.   Now, you have been to some of these meetings in the

25  past--that is these Mango Five meetings.

1    A.    Yes.

2    Q.    In the recent past, sometimes when you go to like a

3    Christmas party or something and then there's a meeting that

4    happens contemporaneously, you've been to some of the

5    meetings.

6    A.    Yes.

7    Q.    But correct me if I'm wrong, but I haven't seen your name

8    on any of the meetings that we've been looking at in this case

9    from October 2007 to April 2009.  It doesn't appear that you

10   attended any of those meetings, does it?  Or do you know?

11   A.    I can't recall.

12   Q.    Okay.  You're not at this one in particular anyway.

13   A.    I don't think so.

14   Q.    Okay.  There is something about Merrill Lynch in this

15   document, and I want to ask you about it.

16            MR. POWERS:  And Mr. Jarrett, can you please turn to

17   the second page?  And let's look at the first two paragraphs

18   on the second page where I think Merrill Lynch is mentioned.

19   Q.    (BY MR. POWERS)  And it says that the trust has an

20   outstanding margin loan with Merrill Lynch in the amount of

21   $50 million, and apparently what has happened is the trust

22   borrowed $50 million from Merrill Lynch and used it to satisfy

23   indebtedness to HSBC.  Is that right?

24   A.    Yes.

25   Q.    And do you recall that situation?

A.   Vaguely, yes.

Q.   And the second paragraph says that Ms. Dokken indicated she was negotiating with U.S. Bank, HSBC, and Stanford for a new loan facility.  Is that right?

A.   Yes.

Q.   And that's not uncommon, is it--that is, for Mr. Magness and his entities to negotiate with banks to move around his lines of credit from one bank to another?  You've had experience with that.

A.   Yes.

Q.   And the same thing happened in October 2008 where Mr. Magness took his entire line of credit at U.S. Bank and moved it over to Merrill Lynch.

A.   Yes.  Or I don't know if it was the entire, but there was accounts moved over.

Q.   And it was pretty substantial; tens of millions of dollars, wasn't it?

A.   Yes.

Q.   And he did that right around the time he was getting these purported loans from Stanford International Bank.  That is in October 2008.

A.   Okay.

Q.   And I'm sure you would agree that one of the things Mr. Magness would be interested in when he's having these negotiations is, where can I get the best interest rate.

1    A.    Yes.  Part of it, absolutely.

2    Q.    Because he's borrowing tens of millions of dollars.

3    Right?

4    A.    Sure.

5    Q.    And every percentage point counts if you are borrowing

6    tens of millions of dollars.

7    A.    Yes.

8    Q.    Now, by the end of October 2008, the evidence has been

9    that Mr. Magness has taken purported loans of $88.2 million

10   from Stanford International Bank.  Are you aware of that?

11   A.    I didn't know the number.

12   Q.    The evidence is that he borrowed $88.2 million at 11.148

13   percent.  Did you know that?

14   A.    I did not.

15   Q.    Let's take a look at Plaintiff's Exhibit No. 85 just so

16   you don't have to take my word for it.

17           MR. POWERS:  And can we go -- this is -- can we go

18   to the second page, please?  And if we can blow up the top

19   half of the page.

20   Q.    (BY MR. POWERS)  We can see this is a promissory note.

21   And do you see, Mr. Bell, that this relates to a promissory

22   note for $12 million?  And you can see the interest rate of

23   11.148 percent right there in the middle of the page.  Do you

24   see that?

25   A.    Yes.

```
1    Q.   And if we get back out of this and go to the first page

2    and we look at the address block, you can see that this is the

3    $12 million that went to GMAG, LLC.  Do you see that?

4    A.   I do.

5              MR. BRYANT:  Your Honor, I am going to object at

6    this point.  It is just the attorney testifying and questions

7    aren't being asked.  Mr. Bell's already said he doesn't know

8    about the specifics of the Stanford loan.

9              THE COURT:  Overruled.

10   Q.   (BY MR. POWERS)  Now, to find out what kind of available

11   credit Mr. Magness had at Merrill Lynch as of the end of

12   October 2008, we could look at his Merrill Lynch account

13   statements, could we not?

14   A.   Say that again.  I'm sorry.

15   Q.   Sure.  We looked at some Merrill Lynch account

16   statements --

17   A.   Right.

18   Q.   -- earlier.  Just with Mr. Bryant you looked at those?

19   A.   Yes.

20   Q.   And if we look at those account statements, we can figure

21   out what Mr. Magness' line of credit was at Merrill Lynch as

22   of the end of October 2008.

23   A.   What he was drawing down on, yes.

24   Q.   And what available credit he still had.

25   A.   Oh, yes.  On some of them, yes.
```

```
 1    Q.   And so there was, I gather, some jostling among accounts,

 2    from U.S. Bank to HSBC to Merrill Lynch to Stanford, but if we

 3    wanted to know where everything settled at the end of October

 4    2008 we could look at these Merrill Lynch account statements.

 5    A.   We received some of this, yes, absolutely.

 6    Q.   And we could see what was the status of his available

 7    credit at Merrill Lynch as a consequence of all of this

 8    movement.

 9    A.   You definitely could see the amount he's drawn down.  I

10    don't know if you could see the absolute available credit

11    offered to him on a statement.

12    Q.   Okay.  Well, let's take a look at it and see if we can

13    sort it out.  Please take a look at Plaintiff's Exhibit 346,

14    if you would.  And this is an account for, if you look at the

15    top left corner, the Gary Magness Irrevocable Trust.  Right?

16    A.   Yes.

17    Q.   And if we look in the top middle of the page we can see

18    it's for account 0396.  Right?

19    A.   Yes.

20    Q.   And if we look on the right hand side of the page, we can

21    see this is for the month ending October 31st, 2008.  Do you

22    see that?

23    A.   Correct, yes.

24    Q.   Now, if we turn to the third page of the exhibit, which

25    is 0259 in the bottom right corner, what do we see on the left
```

```
 1   hand side of the page at the bottom of the column?

 2   A.    It does show the margin available credit.

 3   Q.    Okay.  So in this particular account we have margin

 4   available credit of almost $13 million.  Would you agree with

 5   that?

 6   A.    Yes.

 7   Q.    And if we turn to page 7, which is 0263, and we look in

 8   the bottom section of the page in the middle column under

 9   description, we can tell how much he's being charged in

10   interest for whatever he's got outstanding in this account,

11   can we not?

12   A.    Yes.

13   Q.    And that interest in this account is 4.17 percent.

14   Right?

15   A.    Yes.

16   Q.    So if he wanted to borrow $13 million at the end of

17   October 2008 to do whatever he wanted to do with, he would

18   borrow it at approximately this interest rate.

19   A.    I don't know if that's correct.

20   Q.    That's what's reflected on the statement.

21   A.    Well, so -- oh, this is for 9/30 through 10/30.  Yes.

22   I'm sorry.  I thought that was 9/23.  I'm mistaken.  Yes, that

23   would be correct--4.17.

24   Q.    Let's look at a couple of other accounts.  Please turn to

25   Plaintiff's Exhibit 345.
```

1      All right.  Now, this is an account in the name of GMAG,

2   LLC.  And this is the same one that borrowed the $12 million

3   from Stanford at 11.148 percent.  Right?

4   A.   Correct.

5   Q.   And this is account number 7010 at the top of the page.

6   A.   Yes.

7   Q.   And on the top right we see this is for the month ending

8   October 31st, 2008, do we not?

9   A.   Yes.

10  Q.   All right.  Let's take a look at the third page of the

11  exhibit labeled 0071.  And we have that same margin available

12  credit.  What's the margin available credit in this account?

13  A.   $12.3 million.

14  Q.   Let's come back to it.  I tell you what.  There's a

15  notebook right in front of you.  If you turn to Plaintiff's

16  Exhibit 345 in the notebook and turn to the third page of the

17  exhibit.

18  A.   Okay.

19  Q.   And what's the margin available credit on the third page

20  of the exhibit?

21  A.   $12,371,000.

22  Q.   So almost 12.4 million.

23  A.   Yes.

24  Q.   And if you would turn to page 8 of the exhibit, 0076 in

25  the bottom right corner, what interest rate is Mr. Magness

1    being charged in this account?

2    A.    3.2.

3    Q.    3.2 percent.

4    A.    Yes.

5    Q.    All right.  Let's take a look at one more statement.

6    Please turn to Plaintiff's Exhibit 368 in your notebook.

7    Do you have Plaintiff's Exhibit 368?

8    A.    I do.

9    Q.    And this is an account in the name of Gary D. Magness.

10   Correct?

11   A.    Correct.

12   Q.    And we have 368 up on the screen, and we can see Gary

13   Magness' name in the top left hand corner.  And this is

14   account number 0423.

15   A.    Yes.

16   Q.    And this is for the month ending October 31st, 2008.

17   Right?

18   A.    Yes.

19   Q.    And if you would turn with me, please, to the fifth page

20   of the exhibit--this will be labeled 00311--we see the margin

21   available credit in the bottom left.  And what is the margin

22   available credit on this one?

23   A.    $3,835,589.

24   Q.    All right.  And if you could look with me to page 9 of

25   the exhibit, what interest rate is Mr. Magness being charged

1    on this line of credit?

2    A.    3.82 percent.

3    Q.    So would you agree with me that the end of October of

4    2008 that Mr. Magness and his entities had lines of credit at

5    Merrill Lynch of just about $29 million?

6    A.    Yes.

7    Q.    And the interest rate to borrow against those lines of

8    credit would be between 3.2 percent and 4.17 percent.  Right?

9    A.    Correct.

10    Q.    So he has enough credit at this time at Merrill Lynch to

11    borrow 29 plus million dollars at three to four percent, and

12    repay that $12 million loan we saw and then some, doesn't he?

13    A.    The $12 million loan?

14    Q.    The $12 million at Stanford.

15    A.    Oh, yes.

16    Q.    And he had another $7.2 million loan.  That would have

17    covered that one, too, wouldn't it have?

18    A.    Yes.

19    Q.    Let me talk to you about one more account, which is an

20    account in the name of GMAG.  And I think you talked to

21    Mr. Bryant about this one.

22             MR. POWERS:  Can we pull Exhibit 88, please?

23    Q.    (BY MR. POWERS)  Now, I think you gave the testimony that

24    you took some Stanford proceeds and put it into a money market

25    account at Merrill Lynch.  Right?

1    A.    Correct.

2    Q.    And this is the account where you put it.  Right?

3    A.    Yes.

4    Q.    And GMAG, LLC is the entity on the top left hand side of

5    the page.  And this is account number 2098.  And this is for

6    the month ending October 31st, 2008.  Right?

7    A.    Correct.

8    Q.    And we can see -- if we look at the middle column under

9    October 31st, we can see that there's net cash in-flow into

10   this account of $12 million.

11   A.    Yes.

12   Q.    And that's the $12 million that came out of Stanford

13   International Bank.

14   A.    Yes.

15          MR. POWERS:  All right.  Let's back out of this, and

16   we'll stay on the exhibit, but if you would turn to page 4,

17   Mr. Jarrett.

18   Q.    (BY MR. POWERS)  We see on the left hand side of the page

19   that ML government fund.  That's the money market account you

20   were talking about?

21   A.    Yes.

22   Q.    And if we go all the way to the right of the page, we can

23   see the estimated annual yield for that money market, can we

24   not?

25   A.    Yes.

1  Q.  And the estimated annual yield for this money market

2  account is 1.79 percent.  That's true.

3  A.  That's what it says, yes.

4  Q.  Now, Mr. Bryant suggested that the $12 million that was

5  in this account was used for margin calls some point in the

6  future, and I believe you said yes, I assume so.

7  A.  I did say that.

8  Q.  And, in fact, you don't actually know whether it was used

9  for margin calls or not.

10 A.  I can't recall exactly what the funds were used for.

11 Q.  As far as you know, none of it was used for margin calls.

12 A.  Correct.

13 Q.  So when Mr. Magness borrowed $12 million from Stanford at

14 11.148 percent, he did so for the privilege of putting it at

15 Merrill Lynch where it earned 1.79 percent.

16 A.  Yes.

17 Q.  Now, if Mr. Magness still believed at this time what

18 Stanford was telling the public, which is everything's fine

19 this is a great bank, that doesn't make a lot of sense, does

20 it?

21 A.  No.  Depends on what you mean.

22 Q.  Well, it would make sense if he didn't believe in

23 Stanford and he wanted to get his money out of an unsafe place

24 and put it into a safe place, then you could trade a

25 percentage like that.  That would make sense.

1   A.   I mean, there's lots of reasons to borrow money at

2   different percentage rates is all I would say.

3   Q.   Well, I want to talk about some specific reasons

4   Mr. Magness may have done that.

5        Now, Ms. Dokken testified yesterday --

6             MR. POWERS:  Mr. Jarrett, can we pull up that

7   testimony?  It's Volume 3, page 96, line 16 through 20.

8   Q.   (BY MR. POWERS)  She was asked, "Did you ever discuss

9   with Mr. Bell prior to February 12th, 2009 that Stanford might

10  be too good to be true?"

11       Her response was, "Oh, certainly, when they wouldn't give

12  us our money back.  But he"--meaning you--"was very involved

13  in the loan process or whatever, because he was the recipient

14  of a lot of the proceeds."

15       That's true testimony, is it not?

16  A.   Yes.

17  Q.   All right.  Let's see if we can get the context for that

18  statement.

19             MR. POWERS:  Mr. Jarrett, you can pull that down.

20  Q.   (BY MR. POWERS)  I want to first talk to you about when

21  you first heard of Stanford International Bank.

22       Now, this was back in '99 or 2000 when you were at

23  Goldman.  Right?

24  A.   Yes.

25  Q.   And around that time Stanford opened an office in

1    Memphis.

2    A.    Correct.

3    Q.    And you were working in Memphis?

4    A.    I was.

5    Q.    At that point you had not heard of Stanford or Allen

6    Stanford.

7    A.    I had not.

8    Q.    And what is it that you heard about Stanford when you

9    were working in Memphis?  Do you recall?

10   A.    Well, they were new, they had really nice offices, and

11   they competed for, you know, high net worth clients.  So I

12   think some of our clients at the time in Memphis had visited

13   their offices, or maybe even done business with them.  I don't

14   know.

15   Q.    And the office that was in -- just to make sure we're

16   clear.  The office that was in Memphis was Stanford Group

17   Company, the brokerage.

18   A.    It was Stanford is all I knew it by.  I don't know the

19   Stanford -- I don't know the actual term, but Stanford is what

20   I knew.

21   Q.    And at that time you didn't know anything about the

22   certificate of deposit product.

23   A.    I did not.

24   Q.    And the next time you heard about anything to do with

25   Stanford or the Stanford International Bank was through your

```
 1    work with the Magness Defendants.

 2    A.    Correct.

 3    Q.    And you heard about it in the context of a discussion of

 4    the Magness Defendants' portfolio, just here's where we are

 5    and here are the things we have and this is one of the things.

 6    A.    Right.  And also Tom Espy I think had worked for him, so

 7    I knew that it had come up for sure in portfolio discussion,

 8    et cetera, yes.

 9    Q.    And you had met Tom Espy.  He was a very close friend of

10    Gary's?

11    A.    I had, yes.

12    Q.    And you heard about Stanford International Bank at some

13    point before 2007.

14    A.    Yes.

15    Q.    And to be frank about it, you never really thought very

16    highly of Stanford International Bank, did you?

17    A.    That's correct.

18    Q.    You didn't really trust it, did you?

19    A.    You know, I don't know about the bank, but the caricature

20    that ran it maybe is what I had skepticism about.

21    Q.    The caricature.  Tell me what you're referring to,

22    please.

23    A.    Just reading articles.

24    Q.    Do you recall discussing this with me at your deposition

25    about your level of trust of Stanford?
```

```
 1    A.    I mean, I don't remember specifics, no.

 2    Q.    Do you recall telling me that you had talked to your

 3    business partner Mr. Sands?

 4    A.    No, my business partner's Mike Russ.

 5    Q.    Excuse me.  Mike Russ.  We will get to Mr. Sands.

 6    A.    Okay.

 7    Q.    You talked about it to Mr. Russ?

 8    A.    Yes, I am sure I have.

 9    Q.    So take a look at your deposition.  There's a notebook

10    underneath the notebook that you've got with the exhibits.

11    And turn with me to page 131 of your deposition.

12    A.    Okay.

13    Q.    All right.  Let's take the first 12 lines.

14          And you were asked, "When was the first time you remember

15    talking to Mr. Russ"--

16          That's your business partner?

17    A.    Yes.

18    Q.    "...about Stanford International Bank?"

19          And so you talked about the context in which you first

20    heard about it, and we talked about that.

21          And you ultimately said, "So probably the first time I

22    mentioned something was when I first knew that they were

23    making investments there or that Tom Espy was working there."

24          Similar to what you just said.  Right?

25    A.    Yes.
```

```
 1    Q.   All right.  Let's back out of that and let's look at
 2    lines 13 through 17.
 3         You were asked, "And did Mr. Russ express any views about
 4    Stanford International Bank to you?"
 5         And you said, "No.  I think we had a similar-type feel
 6    for it."
 7         And the question was, "And what was that?"
 8         And your answer was, "Didn't really trust it."
 9    A.   Yes.
10    Q.   And that was your testimony?
11    A.   Yes.
12              MR. POWERS:  All right.  Mr. Jarrett, we can take
13    that down.
14    Q.   (BY MR. POWERS)  Isn't it true that early on somebody
15    showed you a pitch book for Stanford that had investment
16    returns described?
17    A.   Yes.  I don't know what the date was, but yes.
18    Q.   And what you saw looked like not fixed CD returns, but
19    actually the returns of an investment portfolio.
20    A.   Yes.  That's what it appeared to be.
21    Q.   And the investment portfolio wasn't just any investment
22    portfolio; it was the investment portfolio for Stanford
23    International Bank, wasn't it?
24    A.   I believe so.
25    Q.   And I asked you at your deposition what you thought of
```

```
 1    this returns, and I think you said they were solid returns.
 2    That's what you said.  Right?
 3    A.    Yes.
 4    Q.    And when I asked you about that, I think you kind of
 5    chuckled a little bit.  Do you remember that?
 6    A.    I probably did.
 7    Q.    You probably did?
 8          You were skeptical of those returns when you saw them,
 9    weren't you?
10    A.    Yes.
11    Q.    And you notice that in the returns that you saw there
12    were back-to-back years where returns were identical two years
13    in a row all the way out to a hundredths of a percentage
14    point.  Do you remember that?
15    A.    I do.
16    Q.    And I think you told me it would be highly improbable on
17    a portfolio of hundreds of millions or billions of dollars to
18    get that kind of a result.  That would be statistically rare,
19    would it not?
20    A.    Correct.
21    Q.    I mean, one way it could happen is if you were just
22    making up the returns.  Right?
23    A.    Sure.
24    Q.    And it turns out that's what they were doing.  Do you
25    agree with that?
```

1    A.    Yes.

2    Q.    And I think you may have been alluding to this earlier,

3    but one other thing that was concerning to you was some pretty

4    flamboyant behavior by Mr. Stanford.  Right?

5    A.    Yes.

6    Q.    For example, flying clients to the Caribbean and taking

7    them to lunch in Antigua.  That's one of the things that

8    concerned you.

9    A.    Yes.

10   Q.    I think you also saw a situation where Mr. Stanford had

11   purportedly placed $20 million into a plexiglass box and

12   dropped it onto a cricket field.  Right?

13   A.    Yes.

14   Q.    And cricket is some kind of sport that is closely

15   analogous to baseball.  Right?

16   A.    Yes.

17   Q.    Or maybe it's more of a distant cousin.

18   A.    Right.

19            MR. POWERS:  So let's put the money box picture on

20   the screen.

21   Q.    (BY MR. POWERS)  This is what you saw, isn't it?

22   A.    Yes.

23   Q.    Mr. Bryant was asking you some questions about

24   competitors and how it's in your interest to talk down

25   your competitors.  Do you recall that line of testimony?

```
 1   A.   I do.

 2   Q.   Have you ever seen a picture of the CEO of JPMorgan

 3   looking like that?

 4   A.   I haven't.

 5   Q.   No.  What about HSBC?

 6   A.   No.

 7   Q.   Deutsche Bank?

 8   A.   I don't think so.

 9   Q.   And when you saw this picture, you thought it was notable

10   enough to share this with Ms. Dokken and make a sarcastic

11   comment about it.  Right?

12   A.   Probably.

13            MR. POWERS:  All right.  Mr. Jarrett, we can take

14   that down.

15   Q.   (BY MR. POWERS)  Now, we saw some video from Ms. Dokken

16   before you came in the courtroom.  This was yesterday and the

17   day before.  She is also a client of yours.

18   A.   Was, yes.

19   Q.   She was at the time of the events in question.

20   A.   Correct.

21   Q.   And she had been a client of yours going back from before

22   the time the SEC shut down Stanford International Bank.

23   A.   Correct.

24   Q.   At the time she was a client of yours, she had her own

25   SIB CD.
```

```
 1   A.   Yes.

 2   Q.   And you knew that she had an SIB CD at the time she had

 3   it?

 4   A.   I did.

 5   Q.   And she testified that she invested in SIB in January

 6   2006.  Do you have any reason to dispute that?

 7   A.   I don't.

 8   Q.   And she also testified that she redeemed her SIB CD in

 9   January 2008.  Do you have any reason to dispute that?

10   A.   I don't.

11   Q.   Now, at your deposition you testified that you talked to

12   her about her CD investment vehicle while she still had it and

13   you told her that she should sell it, didn't you?

14   A.   I did at some point, yes.

15   Q.   Tell her she should sell it.

16   A.   Or -- yes.

17   Q.   And you told her to sell the CD because you thought it

18   was too much of an allocation to something that was not easily

19   explained.

20   A.   Yes.  That's probably correct.

21   Q.   And what you were concerned about was that you never got

22   a full explanation of what the CD was.  Right?

23   A.   I didn't.

24   Q.   And when you asked Ms. Dokken or Mr. Espy what SIB was

25   invested in, you never got a clear answer, did you?
```

1   A.   I was just told it was like a hedge fund of funds type of

2   investment.

3   Q.   But what you told me is whenever you would ask, you never

4   got a clear answer.

5   A.   Okay.

6   Q.   You never got an answer that was satisfactory to you, did

7   you?

8   A.   No.

9   Q.   And as a consequence of that, you advised Ms. Dokken to

10   redeem her CD, and that's what she did.

11   A.   Yes.

12   Q.   Now, in your response to your advice to her, she told you

13   she was redeeming her CD, didn't she?

14   A.   At some point, yes.

15   Q.   And do you recall her giving you any other reason for

16   having redeemed her CD other than the advice that you gave

17   her?

18   A.   I never asked.  I don't recall, to be honest.

19   Q.   Now, the financial markets in March 2008 were in pretty

20   bad shape.  Wouldn't you agree?

21   A.   March of '08?

22   Q.   March of '08.

23   A.   Yes.  I would guess so.

24   Q.   I mean, for example -- and I think you gave some

25   testimony about major financial institutions that failed or

1    got bought out in 2008.

2    A.    Yes.

3    Q.    And the financial institution du jour in March 2008 was

4    Bear Stearns.  Right?

5    A.    If you say so.  I knew it was prior to Lehman for sure.

6    Q.    And the markets continued to deteriorate into July of

7    2008, didn't they?

8    A.    Yes.

9    Q.    Let's look at a quarterly report for SIB in the second

10   quarter of 2008.

11          MR. POWERS:  Mr. Jarrett, would you pull up

12   Plaintiff's Exhibit 474?

13   Q.    (BY MR. POWERS)  I assume you didn't receive these SIBL

14   quarterly updates.

15   A.    No.

16   Q.    I just want to look with you at this.  This is the SIBL

17   quarterly update.  And if you see at the bottom right hand

18   side, this is for the quarter ending June 30th, 2008.  Do you

19   see that?

20   A.    I do.

21   Q.    And if we turn to the last page of the exhibit, which I

22   think is page 4, let's look at the index returns at the

23   bottom.

24          For the first six months of the year the Dow is down 14

25   and a half percent.  Do you see that?

```
 1   A.    I do.

 2   Q.    The Dow Jones Stoxx 50 in Europe is down over 20 percent.

 3   Is that right?

 4   A.    Yes.

 5   Q.    The NASDAQ 100 stock index is down almost 12 percent.  Is

 6   that right?

 7   A.    Yes.

 8   Q.    S&P 500 is down almost 13 percent.  Correct?

 9   A.    Yes.

10   Q.    And without holding you to the specific, you know,

11   thousandths of a point here, or ten thousandths of a point,

12   this is pretty consistent with your recollection of where the

13   market was in the summer of 2008, isn't it?

14   A.    Yes.

15   Q.    And this is a pretty big deal that the market is this far

16   off in the first six months of the year.  Right?

17   A.    Sure.

18   Q.    And it's only going to get worse from here, as we know.

19         MR. POWERS:  Now, Mr. Jarrett, you can take that

20   down.

21   Q.    (BY MR. POWERS)  I think you testified on direct that in

22   September 2008 Lehman collapsed.

23   A.    Yes.

24   Q.    They filed for bankruptcy.  And are you aware that that

25   was September 15th, 2008?
```

1    A.    I was not aware of that.

2    Q.    Willing to take my word for it?

3    A.    I am.

4    Q.    Now, when that happened--that is, Lehman collapsed--that

5    was kind of a big deal, too.  Right?

6    A.    Very much so.

7    Q.    From your perspective, there was no safe place any longer

8    in the market other than U.S. treasuries and gold.

9    A.    For the most part, yes.

10   Q.    And it would be fair to say that it was common knowledge

11   for investors and brokers in September 2008 that the market

12   was extremely distressed.

13   A.    Correct.

14   Q.    And it was certainly well known to the Magness Defendants

15   as one of the consequences of this market volatility and, you

16   know, market drop, steep market drop, they had to move things

17   around and deal with their margin lending from various

18   institutions.  Right?

19   A.    Yes.

20   Q.    And this is something that you personally participated

21   with them in dealing with.

22   A.    Correct.

23   Q.    Fair to say that in September of 2008 and early October

24   2008 you and Ms. Dokken were talking quite a bit?

25   A.    Yes.

1    Q.   Because some margin calls were coming up, and even margin

2    calls, when they were not coming up, you were trying to

3    anticipate where margin calls might appear.  Right?

4    A.   Correct.

5    Q.   And by October 1st, 2008, it had become clear, had it

6    not, that margin calls might be coming because some of the

7    Liberty stock might fall below a $10 floor.  Do you recall

8    that happening?

9    A.   Yes.

10   Q.   And, of course, by this point Lehman has collapsed and

11   she's talking to you about those issues, too--the state of the

12   markets in general.  Right?

13   A.   Yes.

14   Q.   Fair to say there was pretty constant communication at

15   the beginning of October and the end of September 2008?

16   A.   I would say so.

17   Q.   And at this point in time you thought Stanford was too

18   good to be true, didn't you?

19   A.   Probably, yes.

20   Q.   And so as an investment advisor with your clients' best

21   interests at heart, naturally you conveyed that information to

22   Ms. Dokken.  You told her Stanford is too good to be true,

23   didn't you?

24   A.   Probably, yes.

25   Q.   And Mr. Bell, it had to have come up at that point.  You

1   must have said something to her like, you see what's happening

2   everywhere else in the market--here at Merrill Lynch, at HSBC,

3   everywhere--and Stanford is doing fine.  Something doesn't add

4   up.  You must have told her something just like that.

5   A.   I mean, I don't know exactly what I said, but yeah,

6   something.

7   Q.   Well, let's see what you said at your deposition.

8        MR. POWERS:  Mr. Jarrett, let's pull up the video

9   clip from page 39, line 21 to page 40, line 13.  52-010.

10        "What was it that made you call her to advise that they

11   get out because the returns were too good to be true?

12        "Because the markets were in severe stress and it just

13   seemed like it's too good to be true.

14        "But what stood out for Stanford International Bank on

15   your mind in particular?

16        "Because I knew she had -- for her individually she had a

17   large allocation of her net worth in it.  So, you know, we

18   were having discussions a lot at that time.  You know, Gary

19   had significant loans with Merrill Lynch.  He was having

20   margin calls, not just with us but with, you know, I knew his

21   other providers, HSBC, U.S. Bank, anywhere where he had margin

22   debt, so there was constant communication that I think, you

23   know, had to have come up at that point, like you see what's

24   happening everywhere and here it's going great.  Something

25   doesn't add up."

```
 1   Q.   (BY MR. POWERS)  And so what you told her was that
 2   Mr. Magness needed to hit the exit door.  That's what you
 3   told her, isn't it?
 4   A.   Probably, yes.
 5   Q.   And that was around the time of the Lehman collapse or,
 6   just a little bit after, wasn't it?
 7   A.   I would guess so, yes.
 8   Q.   And when you told her that, Mr. Magness had not yet
 9   gotten any money out of Stanford, as far as you were aware.
10   A.   Not that I was aware.
11   Q.   And, of course, as we know, you were part of receiving
12   the proceeds from Stanford, so you would have reason to know
13   when they got money out of Stanford, wouldn't you?
14   A.   Yes.
15   Q.   And when you got the money out, she didn't say, no, don't
16   worry, everything's fine, we got $88 million out.
17   Everything's going to be okay.  She didn't tell you that, did
18   she?
19   A.   No.
20   Q.   So you know that you told them it was too good to be true
21   and you needed to hit the exit door, and that's exactly what
22   they did.
23   A.   Again, I don't know what hitting the exit door meant
24   specifically, but yes, I thought it was time to sell that CD
25   if they could.
```

```
 1    Q.   So you wanted them to get out as much money as they

 2    possibly could, and that's what they did.

 3    A.   Yes.

 4    Q.   Now, in this trial we've heard the term Ponzi scheme a

 5    number of times, and I think you've used the term Ponzi

 6    scheme, and you answered some questions about the term Ponzi

 7    scheme from Mr. Bryant.

 8         The term Ponzi scheme did not originate with Bernie

 9    Madoff, did it?

10    A.   No.

11    Q.   It's not called a Madoff scheme, is it?

12    A.   No.

13    Q.   No.  It's called a Ponzi scheme.  That term's been around

14    for a really long time, hasn't it?

15    A.   Yes.

16    Q.   And you would agree with me that you have known what a

17    Ponzi scheme was since 1999, 2000?

18    A.   For sure, yes.

19    Q.   Yeah.  You'd agree with me that Ponzi schemes often offer

20    fictitious returns?

21    A.   Yes.

22    Q.   And fictitious returns that are too good to be true?

23    A.   Yes.

24    Q.   Ponzi schemes work until everybody wants to hit the exit

25    door, don't they?
```

1    A.    Yes.

2    Q.    Fair to say, you've had that understanding that we've

3    just discussed all the way back to '99 and 2000, each of those

4    elements.

5    A.    Yes.

6    Q.    Now, let's fast forward to February 2009.  I want to talk

7    to you about that Plaintiff's Exhibit 109.

8    A.    Okay.

9         MR. POWERS:  And if we could pull that document up.

10   Q.    (BY MR. POWERS)  I just want to make sure we have the

11   timeline right.  Let's look at your email, the from, sent and

12   to.

13        February 12th, 2009.  This is before the SEC files a

14   lawsuit against Stanford to shut it down.  Right?

15   A.    If you say so.

16   Q.    And the subject is you're forwarding a Bloomberg news

17   article entitled "Billionaire Stanford firm said to face U.S.

18   probe of CD sales."  Do you see that?

19   A.    Yes.

20   Q.    And, of course, this is not the first time Bloomberg has

21   reported on Stanford facing a probe by regulators in the U.S.,

22   is it?

23   A.    I don't know.  I can't remember.

24   Q.    Well, let's take a look at Plaintiff's Exhibit 65 and see

25   if that refreshes your recollection.

```
 1    A.    Okay.
 2          MR. POWERS:  And let's focus in on the top two
 3    paragraphs and the title -- let's get the title of the
 4    article, too.
 5    Q.    (BY MR. POWERS)  This is a July 3rd, 2008 Bloomberg
 6    article.  Correct, sir?
 7    A.    Yes.
 8    Q.    And it's entitled "SEC investigating Stanford group
 9    offshore CDs and investments."
10    A.    Yes.
11    Q.    Now, I think you told me at your deposition you had not
12    recalled seeing this when it came out.  Is that right?
13    A.    I don't think so.
14    Q.    But if you had seen it, you thought this would be
15    something that would be of concern to you as a financial
16    advisor that the SEC is probing Stanford International Bank.
17    A.    Yes.
18    Q.    And it would have reinforced your already negative
19    opinion about Stanford, would it not have?
20    A.    Yes.
21    Q.    And it says that in the beginning of the second
22    paragraph, "The SEC issued subpoenas yesterday to two former
23    Stanford Group employees asking for information about the CD
24    sales by its offshore bank, Stanford International Bank,
25    Limited."
```

```
 1            Now, if the SEC is getting involved and sending subpoenas

 2     to people, that's kind of a big deal.  Right?

 3     A.    It is.

 4     Q.    That would be significant to you as a financial

 5     professional.  You would definitely want to ask more questions

 6     about what is going on here in Antigua.

 7     A.    Sure.

 8            MR. POWERS:  All right.  Let's go back to

 9     Plaintiff's Exhibit 109, and go to the second page where we

10     have the article itself.  And let's take from the title, which

11     is highlighted, down to "routine exam" and let's take a look

12     at that.

13     Q.    (BY MR. POWERS)  And, again, we see some discussion about

14     the fact that the SEC is looking into the Stanford

15     International Bank.

16            And then look at the bottom of that section.  It's

17     talking about the returns of the Stanford International Bank

18     investment portfolio being consistently between 10.3 percent

19     and 15.1 percent every year from 1995 until 2008.  Do you see

20     that?

21     A.    I do.

22     Q.    That's the kind of returns that you thought were

23     improbable when you first were exposed to this bank, aren't

24     they?

25     A.    Yes.
```

```
 1   Q.   And according to Mr. Burke Files, the principal of

 2   financial examinations and evaluations, he says, "These

 3   returns fall outside the bell curve of probability."  And

 4   that's what you thought, too.

 5   A.   Yes.

 6   Q.   Now, if you could, take a look at Plaintiff's Exhibit 109

 7   in the notebook in front of you.  The article goes on for

 8   about -- the bottom half of this page and then another page.

 9            MR. POWERS:  May I approach, Your Honor?

10            THE WITNESS:  So it's tab 1?

11   Q.   (BY MR. POWERS)  Yes.

12   A.   All right.

13   Q.   And take a look at the article.  And take your time if

14   you need to, but I'd like for you to point out to the jury any

15   place in that article where it says that Stanford is or might

16   be a Ponzi scheme.

17   A.   I don't see it.

18   Q.   It doesn't say that, does it?

19   A.   No.

20   Q.   Nevertheless, after seeing the article --

21            MR. POWERS:  And let's go back to the email, 109.

22   Q.   (BY MR. POWERS)  What you wrote to Ms. Dokken was, "I

23   hope it wasn't a Ponzi scheme, and hopefully the money is

24   somewhere."  That's what you wrote.

25   A.   Right.
```

1    MR. POWERS:  Your Honor, pass the witness.

2                REDIRECT EXAMINATION

3    By Mr. Bryant:

4    Q.    All right.  Mr. Bell, part of your testimony on cross

5    examination pertained to the amounts of money that were in

6    various Magness accounts at Merrill Lynch at the end of

7    October.  Do you remember that?

8    A.    I do.

9    Q.    And I'm not going to ask you to remember all of the

10   numbers precisely, and I'm not going to bring up each one of

11   those accounts.  But as I recall, the total amount in those

12   accounts was about $12.4 million, plus 3.8 million, plus 2.9

13   million, and then there was the 12 million that had come in

14   from Stanford.  So that --

15   A.    Thirty.

16   Q.    Seems like we had, you know, 30 million or 40 million

17   total available in the Merrill Lynch accounts against which

18   there could be borrowing as of the end of October.  And that

19   was after you recall that we'd seen $50 million come into the

20   account from other banks.  Was that mainly HSBC?

21   A.    I can't recall if that was HSBC or U.S. Bank.

22   Q.    Okay.  And because of the difference in interest rates,

23   there was a suggestion that maybe the Magness entities should

24   have paid back money at that point to Stanford so that they

25   would eliminate borrowing at that 11 percent rate.  Do you

1    recall that?

2    A.    Sure.

3    Q.    Well now, at the end of October 2008, did you know how

4    much more the stocks in those Magness accounts at Merrill

5    would go down?

6    A.    No.

7    Q.    And did the Magness folks have any way of knowing how

8    much more margin capability they would need to survive the

9    month of November?

10   A.    No.

11   Q.    Do you recall whether or not, in fact, those Liberty

12   stocks had stabilized and flattened out by the end of October?

13   A.    I don't recall.

14            MR. BRYANT:  Okay.  Let's look at Exhibit DX 1.  And

15   I don't know if this is possible, but let's blow it up.

16   Q.    (BY MR. BRYANT)  So looking at that, did those Liberty

17   stocks that were in the Merrill Lynch accounts for the Magness

18   entities suddenly plateau and start going back up or even

19   plateau at the end of October?

20   A.    No.

21   Q.    As a matter of fact, doesn't look like even they've

22   gotten halfway in that severe decline that you described.

23   A.    Right.

24   Q.    And so as a result of that, even though the Magness

25   entities may have had $40 million worth of ability to borrow

1    at the end of October, were they in any position to pay any

2    money back on those Stanford loans to save a little bit of

3    interest?

4    A.    Looking at November, no.

5    Q.    And, in fact, did all or a large part of that borrowing

6    capacity get used up in November?

7    A.    It did.

8    Q.    Okay.  There was also testimony regarding a portion of

9    your deposition that you gave about six months ago on July

10   11th, 2016, and that was from page 39 and 40 of your

11   deposition.  And you describe your recollection of a time when

12   you told Ms. Dokken that you thought Stanford was too good to

13   be true and it was time to hit the exit door.

14   A.    Right.

15   Q.    And this is -- you're not sure when that precisely

16   occurred.  Is that right?

17          MR. POWERS:  Objection to leading, Your Honor.

18          THE COURT:  Sustained.

19   Q.    (BY MR. BRYANT)  Was that your testimony that you weren't

20   precisely sure when that occurred?

21   A.    I believe so.

22   Q.    Okay.  And so what we do know is that you testified it

23   was at a time when you personally felt she had too much of her

24   net worth allocated to Stanford CDs.  Do you recall that?

25   A.    I think I did say that.

1    Q.   Okay.  And now, Mr. Powers told you, and you agreed, that

2    she redeemed those CDs in January of 2008.  Do you recall

3    that?

4    A.   I heard that, yes.

5    Q.   Okay.  And so whenever that conversation happened, it

6    must have been at or about the time that she redeemed the CDs,

7    because she told you, yeah, I'm redeeming them.  Is that

8    right?

9              MR. POWERS:  Objection to the leading, Your Honor.

10             THE COURT:  Sustained.

11   Q.   (BY MR. BRYANT)  Is it correct that you now think that at

12   the time that conversation happened -- what's your best

13   estimate of when it occurred?

14   A.   Well, given that she had redeemed, and hearing my

15   testimony about it later, yeah, probably wasn't completely

16   clear on when it happened.

17   Q.   Okay.

18   A.   Because I didn't -- I didn't remember in my testimony

19   that she had redeemed prior to the Lehman collapse.

20   Q.   Okay.  So as you sit here today, are you still unsure as

21   to when that conversation occurred?

22   A.   Yes.

23             MR. BRYANT:  I pass the witness.

24             MR. POWERS:  Your Honor, just briefly.

25                       RECROSS EXAMINATION

1   By Mr. Powers:

2   Q.   Mr. Bell, I just want to ask you about the testimony you

3   gave regarding November 2009 and all the credit getting used

4   up.

5   A.   Okay.

6   Q.   We just talked about that?

7   A.   Yes.

8   Q.   Let's look at Plaintiff's Exhibit 348.  And this is

9   account 7010 in the name of GMAG, LLC for the month ending

10  November 28, 2008.  Right?

11  A.   Yes.

12  Q.   And I think we turned to the third page.  What's the

13  margin available credit in 7010 at the end of November 2008?

14  A.   $12 million.

15  Q.   $12,135,000.

16  A.   Yes.

17  Q.   So that one's not all used up, is it?

18  A.   No, it's not.

19         MR. POWERS:  Plaintiff's Exhibit 349, please.

20  Q.   (BY MR. POWERS)  This is the irrevocable trust account

21  0396.

22  A.   Yes.

23  Q.   And this is month end November 28, 2008.  Correct?

24  A.   Yes.

25         MR. POWERS:  And the third page, please.

179

```
 1    Q.   (BY MR. POWERS)  Margin available credit, if you would.

 2    A.   $9,578,000.

 3    Q.   So, again, not all used up.  Correct?

 4    A.   Correct.

 5              MR. POWERS:  Pass the witness.  Or I guess that's

 6    all for Mr. Bell.  Thank you, Your Honor.

 7              THE COURT:  Thank you, sir.  You may step down.

 8              MR. BRYANT:  Your Honor, I believe Mr. Bell has some

 9    obligations tomorrow.  Could he be excused from his subpoena?

10              THE COURT:  Any objection?

11              MR. POWERS:  No objection.

12              THE COURT:  That's fine.

13              MR. PETRIE:  Sorry, Your Honor.  We have deposition

14    testimony from Juan Rodriguez-Tolentino.

15              JUAN RODRIGUEZ-TOLENTINO, BY VIDEO DEPOSITION,

16    Q.   And I take it you understand that we're not here today

17    about the Receiver's lawsuit against you.  We're instead here

18    about the Receiver's lawsuit against Mr. Luis Giusti.  You

19    understand that?

20    A.   Yes.

21    Q.   So starting in 2001, what was your role at the Stanford

22    entities?

23    A.   2001 I was the chief operating officer for Stanford

24    International Bank.

25    Q.   And, just briefly, could you explain to the jury what it
```

1    is that a chief operating officer for Stanford International

2    Bank does?

3    A.    I handled the operations of the bank on a day-to-day

4    basis at its headquarters Antigua, West Indies.

5    Q.    And did you actually live in Antigua at that time?

6    A.    I did.

7    Q.    And what aspects of the operations were you in particular

8    in charge of?

9    A.    The operations that were at the headquarters building,

10   customer service, operations, mail, the general accounting for

11   Antigua.

12   Q.    Were there any other --

13   A.    HR.   HR.

14   Q.    About how many people worked at the bank at that time?

15   A.    2001, I'm guessing probably around 80.

16   Q.    And were those all people that worked at the bank in

17   Antigua, that is, in the bank building in Antigua, the 80 that

18   you mentioned?

19   A.    Yes.  Yes, sir.

20   Q.    And did SIBL have any other employees at any locations

21   besides the bank in Antigua at that time?

22   A.    Not that I recall.

23   Q.    Did you have any other positions with any Stanford

24   entities from 2001 until February of 2009?

25   A.    Yes.  Yes.

1   Q.   And what was the next position after chief operating

2   officer?

3   A.   I was appointed president of the bank.

4   Q.   And when was that?

5   A.   Probably around 2005.  I don't recall a specific date.

6   And I was also the regional director in 2008, actually, for

7   Stanford.

8   Q.   What entity were you the regional director for?

9   A.   I was under Stanford Financial, but there was a

10  structural change to put the Caribbean as a, quote unquote,

11  region, so that several managers would come together by

12  geographical area.

13  Q.   When you became regional director, did you still have any

14  role or function within Stanford International Bank?

15  A.   Yes.  I was still the president of the bank.

16  Q.   Okay.  When you became president, as opposed to chief

17  operating officer, what changed about your duties and

18  functions for the organization?

19  A.   Really not much.  I kept the same responsibilities I had

20  before.

21  Q.   Can you think of anything substantial that you took on

22  that you didn't already have as chief operating officer in

23  terms of responsibilities?

24  A.   Not really.

25  Q.   And did you continue to reside in Antigua from 2005 on to

```
 1   February 2009?

 2   A.    Yes.

 3   Q.    When was the first time you heard of any SEC

 4   investigation or subpoena of any Stanford entity?

 5   A.    Around February 2009.

 6   Q.    You didn't hear about any SEC subpoena in 2005?

 7   A.    No, sir.

 8   Q.    When was the first time you heard that Stanford either

 9   was or might be operating a Ponzi scheme?

10        Let me rephrase it.  When was the first time you heard

11   the allegation that any Stanford entity was operating a Ponzi

12   scheme?

13   A.    February 2009.

14   Q.    Was it -- was it common for financial advisors to reach

15   out directly to you with questions about Stanford

16   International Bank?

17   A.    Not common.

18   Q.    And why does Mr. Giusti -- Luis Giusti, Jr. reaching out

19   directly to you as opposed to going to some person at a lower

20   level of responsibility?

21        MR. STANLEY:  Objection; form.

22   A.    I can only give you a general example.  I mean, if they

23   needed a document, a statement, an account statement, and

24   they've gone through customer service and the manager and the

25   VP and it's -- they're not getting the answer, they would have
```

```
 1    come to me to make it happen.  So they're just escalating

 2    primarily customer service issues.

 3    Q.   And they're doing that because they're not getting the

 4    help they need from somebody at a lower level in the

 5    hierarchy?

 6              MR. STANLEY:  Objection; form.

 7    Q.   Is that your understanding?

 8    A.   Yes, pretty much.

 9    Q.   Is there any other particular reason why Luis Giusti, Jr.

10    had access to you specifically, whereas other financial

11    advisors may not have had such access?

12    A.   Every financial advisor had access to me.  They had my

13    direct number, my cell number, because customer service was a

14    key.  So if there was a customer service issue that needed to

15    be escalated, they could find me.

16    Q.   And is Exhibit 7 a true and correct copy of the cover

17    page of the senior investment officer resource manual and

18    excerpts from that manual?

19    A.   Yes, sir.

20    Q.   When was the first time that the position of senior

21    investment officer came into existence?

22    A.   I don't recall specifically the date.

23    Q.   Was it around the middle 2000s?  Is that a fair estimate?

24    A.   Middle -- middle -- Well, middle to late 2000s, I would

25    say.
```

1    Q.    And is it your understanding that Ms. Laura Holt's title,

2    at least from 2005 forward, was chief investment officer?

3    A.    I know that her title changed, yes, to chief investment

4    officer.  I don't recall when.

5    Q.    Was she the chief investment officer of Stanford

6    International Bank?

7    A.    She was for all the companies.

8    Q.    How did the role of senior investment officer relate to

9    her role as chief investment officer?

10   A.    The senior investment officer would report to her.

11   Q.    And who did she report to?

12   A.    James Davis.

13   Q.    And did Mr. James Davis report directly to Mr. Allen

14   Stanford?

15   A.    Yes.

16   Q.    What was your role in that hierarchy between senior

17   investment officer up to Laura Holt to Mr. Davis to

18   Mr. Stanford?  Were you anywhere in that hierarchy?

19   A.    I reported directly to Mr. Stanford.

20   Q.    But you didn't have any role in the investment side of

21   Stanford International Bank?

22   A.    No, sir.  I mean, I had administrative supervision over

23   the SIO in terms of, you know, his -- whether or not he was in

24   office or not, but not his investment activities.

25   Q.    And what was the purpose of creating the role of senior

1   investment officer?

2   A.   The CFO wanted to have a more local presence of the

3   investment function in Antigua and someone who could interact

4   with financial advisors and answer questions as necessary.

5   Q.   Was it -- did the senior investment officer have any role

6   in setting investment policy?

7   A.   Not policy.  Not that I'm aware of, no.

8   Q.   Was the setting of policy delegated to a committee of the

9   board?

10  A.   There was an investment committee of the board, yes.

11  Q.   And who was on the investment committee of the board?

12  A.   James Stanford, Allen Stanford, James Davis, and I

13  believe Sir Courtney Blackman was on the committee.  And Laura

14  Pendergest-Holt would interact with them.

15  Q.   Was she on the committee herself?

16  A.   I don't know that she was a board -- a committee member.

17  Because she was not a board member.  She might have been.

18  Q.   Could you please explain to the jury who Mr. James

19  Stanford is?

20  A.   James Stanford was, yes, Allen Stanford's father, and

21  former entrepreneur out of Mexia, Texas.

22  Q.   And who is Mr. Courtney Blackman?

23  A.   Sir Courtney Blackman is a Ph.D. in economics and a

24  former governor of the Central Bank of Barbados.

25  Q.   As far as you are aware, are those the four -- the four

1   individuals you mentioned, were they on the investment

2   committee of the Stanford International Bank in 2005 and 2006?

3   A.   Yes, I believe so.

4   Q.   Could you tell me the circumstances of how you learned

5   about the bank fraud?  Where were you and, if you can recall,

6   when was that?

7   A.   Well, in February of 2009, there were some meetings held

8   in Miami in preparation to come before the SEC.  And in those

9   meetings Mr. Davis, James Davis, presented a financial

10  statement on the screen that was not in line for -- with

11  everything that we had seen -- I had seen over my tenure at

12  the bank.

13  Q.   Okay.

14  A.   And that was the first indication that there was

15  something wrong.

16  Q.   All right.  Let me break that down a little bit.  Do you

17  recall that the meeting in Miami was sometime during the first

18  week of February?

19  A.   The first week of February 2009.

20  Q.   And at that meeting, or in attending that meeting, was

21  that when you first became aware of the SEC investigation that

22  you were asked about earlier today?

23  A.   That's correct, sir.

24  Q.   Prior to that, did you receive any communications or

25  information that told you there was an SEC investigation going

1    on with the company?

2    A.    There was a late January meeting indicating to us that we

3    would meet in February to prepare to present to the SEC.

4    Q.    Okay.  Now, the late January meeting, was that, then, the

5    first time that you understood that the SEC had some questions

6    about Stanford?

7    A.    Yes.  Well, it was the first time that they were talking

8    about the SEC having questions about the CD product.

9    Q.    Okay.  Now, you had -- by that point.  Let's see.

10   1990 -- of 2009 you had been with the bank in one fashion or

11   another for roughly --

12   A.    It was coming up on 17 years.

13   Q.    Seventeen years.

14   A.    Yes, sir.

15   Q.    And in the 17 years that you had worked at the bank, what

16   was your understanding of what the CD product was?

17   A.    Well, the CD product was what the name says--a

18   certificate of deposit where the clients would place their

19   money and get a set rate of return for it.

20   Q.    Okay.  And up until this January of 2009 meeting, had

21   anyone suggested to you that the United States Security and

22   Exchange Commission had any concerns or questions regarding

23   the CD at your bank?

24   A.    Not concerns.  Questions that -- we have had questions in

25   the past, but in the course of the operation.

1    Q.   The questions that you had in the past, were those from

2    regulators?

3    A.   Yes.  They could come from regulators.  The bank sold the

4    CD product in many countries, and in the U.S. it was sold

5    through a Reg D filing, so it -- I mean, there was a disclose

6    there that the Government had in their hands.  So from my

7    standpoint it's asking questions to clarify.

8    Q.   Okay.  Was there anything that struck you as unusual

9    about the questions that had been asked by regulators over the

10   years?

11   A.   No.

12   Q.   Were they the type of questions that you would expect

13   regulators to ask in the course of their oversight of the

14   bank?

15   A.   Yes.

16   Q.   And so they would wire it to those banks we've been

17   discussing.  Where SIB maintained an account, it would go into

18   the SIB account at Toronto Dominion.  Right?

19   A.   Right.

20   Q.   Okay.  Mr. Rodriguez-Tolentino, just before the break we

21   were talking about this Miami meeting in which various heads

22   of different aspects of the company were brought together.

23   And in the course of this meeting, did you learn that one of

24   the things the SEC wanted to know about was how the money was

25   invested?

1    A.    Yes.

2    Q.    During that meeting, did Mr. Davis, as the chief

3    financial officer, make a presentation to let you and others

4    know how many was invested?

5    A.    Yes, he did.

6    Q.    Okay.  Could you describe for me what Mr. Davis showed

7    you and what your reaction was when you saw it?

8    A.    Well, he put a PowerPoint presentation on the screen

9    showing the financials and the investment portfolio, and it

10   did not conform to anything I had seen before.  It included

11   investments in real estate, other investments that I couldn't

12   recognize in terms of categories.  And it was just a shock.

13   Q.    How did you feel when you saw it?

14   A.    Awful.

15   Q.    Why?

16   A.    Because that's not what we represented to clients.

17         Can we take a break?

18   Q.    When Mr. Davis put his presentation up, was it a pie

19   chart?

20   A.    It was a pie chart, and at the bottom there was a

21   break-down of names and amounts.

22   Q.    Of how the money was invested?

23   A.    Of line items and categories where the money was at.

24   Q.    Did you have a sick feeling in your stomach when you saw

25   that?

1    A.   I stood up and asked them to clarify.  I told them that

2    if that was true, I would not be part of the presentation with

3    the SEC.  They needed to clarify what was on the screen; they

4    meaning be Mr. Stanford and Mr. Davis.

5    Q.   Did anyone ask Mr. Davis how the investments were made in

6    the way he was showing you when, in fact, they'd been

7    represented differently to investors?

8    A.   I don't recall the specific -- anyone asking the specific

9    question, but there was a lot of upset people and crying

10   people in that meeting.

11   Q.   What was Danny Bogar's reaction?

12   A.   Oh, Danny broke out.  Danny started crying.  Danny Bogar

13   started crying in the meeting.

14   Q.   To you did it appear that this was new information to

15   him?

16   A.   It would appear that way.  Everybody -- I mean, my

17   feeling is we were -- I was shocked to see what was on the

18   screen.

19   Q.   What was Lena Stinson's reaction?

20   A.   It was disbelief, pretty much.

21   Q.   And what about Mauricio Alvarado?

22   A.   Mauricio seemed shocked.  But, I mean, he -- I don't know

23   that he reacted the same way everyone else did.

24   Q.   Okay.  Did Mr. Davis offer any explanation as to how the

25   financial records had been kept?

1    A.    No, he didn't.  He just said that that was it, what he

2    was showing on the screen, and it is what it is, and -- which

3    wasn't, because those were not the numbers in our financial

4    reports.

5    Q.    And during this Miami meeting, was that the first time

6    you'd learned this information that the numbers were

7    inaccurate in all the literature you had passed out?

8    A.    Correct.

9    Q.    And I'm not saying you personally, but literature or --

10   as investors came to the bank and presentations were made.

11   A.    Information on our brochures, on our filings under Reg D,

12   and everything else we had done over the years.

13   Q.    Now, you've probably asked yourself this over the years.

14   How did this get by you as the president of the bank?  Were

15   there things that validated the whole process in your mind up

16   to that point in February?

17   A.    Well, you had -- you had annual audits, you had the

18   Financial Services Regulatory Commission visiting you, you had

19   the SEC granting licenses to affiliate offices to continue

20   opening, you had the company opening offices in Zurich, in

21   Panama, all of them regulated, in Venezuela a commercial bank,

22   and so, you know, it never occurred to me that there was

23   something amiss.  Well, we -- the company was growing, and

24   then we were right in front of all the regulatory bodies

25   around the world.

```
 1    Q.   And besides regulatory bodies, was -- were there audits

 2    done on the company?

 3    A.   Yes.  Well, the annual -- the annual audit for the -- for

 4    the bank was conducted, and then every other entity around the

 5    world had their own set of auditors.

 6    Q.   There were dozens of operating companies around the

 7    world, were there not?

 8    A.   Correct.

 9    Q.   To the best of your knowledge, were they also audited and

10    did they maintain books?

11    A.   Yes.

12    Q.   The broker/dealer, Stanford Group Company, or SGC, was

13    subject to the SEC in the United States, was it not?

14    A.   Yes.

15    Q.   And was there a public accounting firm that was in charge

16    of auditing SGC?

17    A.   I believe so.  I'm not -- I don't recall the name, but I

18    believe so.

19    Q.   Okay.  Mr. Powers mentioned a private company that was

20    involved with SGC named Pershing.  Do you remember that?

21    A.   Uh-huh.

22    Q.   What was Pershing's role with SGC?

23    A.   Pershing was their clearing agent.

24    Q.   All right.  Did Pershing come to the bank as part of

25    their due diligence process in getting involved with SGC?
```

```
 1   A.   Yes, they did.

 2   Q.   Do you remember that when they came to Antigua?

 3   A.   Yes, I do.

 4   Q.   Did you believe at the time that Pershing was a very

 5   large organization?

 6   A.   Yeah, they were.

 7   Q.   Large clearing firm?

 8   A.   I believe so.

 9   Q.   Okay.  And do you remember who came to the bank?

10   A.   I don't remember specifically.  A couple of people.  I

11   know Danny Bogar was there when they went.

12   Q.   Okay.  Well, we're going to visit with Danny soon.  We'll

13   ask him more details about that.

14        Do you remember giving access to any information about

15   the bank to Pershing's as part of their due diligence?

16   A.   Yeah.  We gave them a presentation.  We gave them copies

17   of financials, I believe.

18   Q.   Was it validating to you that a large firm like Pershing

19   would spend a lot of time doing due diligence and then getting

20   business with Stanford Group Company?

21   A.   Yes, but it was not unusual.  I mean, we had

22   correspondent banks come through periodically and other

23   entities just come see us.

24   Q.   Did Toronto Dominion come out and visit?

25   A.   Toronto Dominion came out and visit.  CFSB came out and
```

1  visit.  Trustmark came out and visit.  Southwest Bank of Texas

2  came out and visit at different times.

3  Q.   Did that give you comfort that companies that are bigger

4  and more powerful than you would take a look at the

5  organization and continue to do business with it?

6  A.   Yes.

7  Q.   All right.

8  A.   Yes.

9  Q.   Let me ask you about the returns.  Okay?  There were some

10  questions about the returns earlier.

11      Did you believe that the returns being offered on the CD

12  were reasonable?

13  A.   They were reasonable based on the -- I mean, based on the

14  disclosures and the financials that we had, they were

15  reasonable.

16  Q.   Let me ask it a little more pointedly.  There has been

17  suggestions that the returns were too good to be true, which

18  we've heard in hindsight.  Let me try to get your head back as

19  to where it was when you were the president of the bank.

20  A.   Uh-huh.

21  Q.   The returns that your bank was offering investors, did

22  you believe that they were too good to be true back at the

23  relevant time?

24  A.   No.  No, I didn't.

25  Q.   Okay.  How in your mind was it possible that the bank

1    could offer returns that were more than in the U.S. but

2    somewhat less than in other Latin American countries?

3    A.   Well, the comparison to the U.S. always came to the

4    table, and they were two completely different banking systems.

5    I mean, when you're looking at a commercial bank in the U.S.

6    and their make-up and where they invest and the prevailing

7    interest rates and the overhead and the currency in which they

8    invest and all that's completely different to what SIB had in

9    its investment policy and then, in turn, on the financials.   I

10   mean, you could get returns around the world that were

11   completely different and higher than those in the United

12   States.

13   Q.   How did the types of returns your bank offered compare to

14   other Latin American companies?

15   A.   Well, they were lower than Latin America.

16   Q.   All right.   Now, when you talk about how the process

17   works and what the U.S. offers, you have some background in

18   banking in the United States, do you not?

19   A.   Yes, I do.

20   Q.   What was your job before coming to work for Stanford?

21   A.   I was doing some sales work.   Before I came to Stanford I

22   was doing sales work for Technology Management Resources.   But

23   prior to that I was a banker with Banco Nacional.   I was a

24   cashier for the bank.   Cashier, not as in teller, but the

25   cashier, vice president of operations and cashier.   I worked

1    for Bank of Boston, and I worked for the Bank of Nova Scotia.

2    Q.    How many years did you spend working in the banking

3    business?

4    A.    I started in '81.

5    Q.    Okay.  And so with the exception of the one company you

6    mentioned that wasn't --

7    A.    Technology Management.

8    Q.    Technology Management.  You had about a decade of banking

9    experience.

10   A.    Banking experience.

11   Q.    All right.  So you were familiar with what U.S. CD

12   products were?

13   A.    Absolutely.

14   Q.    And Bank of Nova Scotia is a very large international

15   bank, isn't it?

16   A.    Correct.

17   Q.    And so you are also familiar with how international bank

18   products functioned?

19   A.    Yes, sir.

20   Q.    All right.  So let's go back, now, to your time at

21   Stanford.

22        As the president, was there anything unusual in your

23   mind, given your background, about a CD sold through an

24   offshore bank that was two points -- two percentage points

25   higher than a U.S. CD?

```
1    A.   No, sir.

2    Q.   Okay.  And as best you can, just explain to the jury why

3    that did not strike you as unusual.

4    A.   Well, the -- when you compare the CD to the domestic U.S.

5    rate, you're comparing, to a certain degree, apples and

6    oranges, because the international CD program, not only what

7    was done at Stanford but at other banks, if you were investing

8    in the Cayman Islands or the Isle of Man or the Channel

9    Islands, any of these--even Switzerland--any of these

10   jurisdictions, their product mix on the other side of the

11   investment, on the other side of the CD -- on the one side you

12   have the account the money, that the client gives you, and

13   then the bank will turn around and do something with it.  In

14   commercial banking in the U.S. it's typically loans, real

15   estate loans or commercial loans, and what they share with the

16   client in terms of a spread is minimal.  Whereas on the

17   international side of the business, if you go to any of these

18   jurisdictions, the bank has more leeway to invest, as long as

19   they disclose to their clients, in different types of products

20   and get a higher return and share a higher return with their

21   clients.  So no, it would not have been strange.

22   Q.   All right.  Now, in hindsight we believe that it wasn't

23   being invested as -- you were told that in that meeting it

24   wasn't being invested the way you thought it was.  Correct?

25   A.   Correct.
```

1  Q.   But your belief while you were the president was it was

2  invested in a certain way and it could reasonably generate the

3  returns that your bank was offering.  Is that fair?

4  A.   That's correct.

5  Q.   That loan was not cash collateralized was it?

6  A.   Well, sir, that loan was never disclosed, so if --

7           THE COURT:  We're getting towards break time, so

8  let's pause and we'll finish up after the break.

9       Let's go ahead and let you-all take about a 20-minute

10  break, and we'll see back right around 3:30.

11           (Whereupon, the jury left the courtroom.)

12           THE COURT:  I want to give you Espy back.

13       I had a question about one objection that I believe was

14  made by the Magness parties to several different designations,

15  and it typically looked to me like it was directed primarily

16  at the cross designations, and it said FRE 106, fairness and

17  completeness.  And I'm not entirely sure what you-all meant by

18  that.

19           MR. PETRIE:  I'd be happy --

20           THE COURT:  And if you want to look at it and answer

21  that question at the end of the break, I'm happy for you to do

22  that.

23           MR. PETRIE:  I can do that, or I can discuss with

24  you conceptually.  It's whatever you prefer.

25           THE COURT:  Right now would be preferable.

1        MR. PETRIE:  Okay.  What we did when we put the FRE

2    106 objection was to say that there are other parts of the

3    testimony that need to be read with it, and we just designated

4    the other parts.  The ones that remained open, so-to-speak,

5    that we tabbed for you-all, my recollection--and I, of course,

6    would invite my colleagues across the aisle to join in--of

7    that was that then within the bit that we designated there

8    were objections to that, so that --

9        A lot of these we resolved by us saying you ought to add

10    this, and the other side agreeing and vice versa.

11        THE COURT:  Okay.

12        MR. PETRIE:  But if there was not an agreement on

13    the addition, we left in the FRE 106 piece.

14        THE COURT:  For example, there would be a block

15    designated by you, and then a gap, and a block designated by

16    you, and they would have come in and cross-designated the gap

17    part, and then you would object--FRE 106, fairness and

18    completeness.

19        MR. PETRIE:  A little bit different than that, if I

20    may.  They would designate a piece.  We would say you need to

21    designate more, and add that piece, but in the addition there

22    would then be an objection.  And because the objection was in

23    the addition, we left in the FRE 106.  So --

24        THE COURT:  For example, and this is just a random

25    example--there were quite a few--we've got blue, we've got

1   blue, then they come in and cross-designate green, and you've

2   got objection, FRE 106, fairness and completeness, and there's

3   no objection to anything in the surrounding blue.

4         MR. PETRIE:  Then I had better look at those, Your

5   Honor.  I'm sorry.  I apologize.

6         THE COURT:  Okay.  Based on my read, I've overruled

7   most all of -- not just those, but most all of the objections,

8   but there were a few in there that I sustained.

9      Just a curiosity question -- Well, never mind.  I don't

10  need to scratch that itch.

11     Let me let you-all go have a break.

12     Is there anything else we need to take up right now?

13        MR. SADLER:  No, sir.

14        MR. PETRIE:  No.  Thank you.

15        THE COURT:  All right.  We'll see you-all at 3:30.

16                  (Brief recess.)

17        THE COURT:  All set?

18        MR. PETRIE:  Yes, sir.

19        MR. SADLER:  Yes, sir.

20        (Whereupon, the jury entered the courtroom.)

21        THE COURT:  Be seated.

22     Let's proceed.

23     JUAN RODRIGUEZ-TOLENTINO, BY VIDEOTAPE DEPOSITION,

24  Q.  That loan was not cash collateralized, was it?

25  A.  Well, sir, that loan was never disclosed.  So if you're

```
1    mentioning a loan that was disclosed on a -- on a wall and

2    never explained?

3    Q.    Yes.

4    A.    Then that statement that you are making would be true.

5    That was never disclosed to anybody at the bank.

6    Q.    It was not disclosed to anybody in the public or the

7    bank.

8    A.    To anybody in the bank.  To me in particularly as

9    president of the bank.

10   Q.    While you were the president of the bank, were you privy

11   to the account statements for SIB and Toronto Dominion?

12   A.    No, I did not review the account statements for Toronto

13   Dominion or any other correspondence.

14   Q.    So you were not aware that money was flowing out of SIB

15   cash accounts in the amounts of hundreds of millions of

16   dollars to other Stanford entities.

17   A.    No, sir.

18   Q.    And if SIB was sending money to other Stanford entities

19   who then lent that money to the government of Antigua and

20   other entities, you would have no knowledge of that.

21   A.    No, sir.

22   Q.    And at some point, I believe you testified earlier it was

23   2005, you became president of the bank.  Is that right?

24   A.    Yes.  I may have the dates off, but yes.

25   Q.    Roughly.  How did your job responsibilities change when
```

1    you became president?

2    A.   Not much.  I mean, I then was in charge of HR and also

3    had accounting report to me.

4    Q.   Okay.  Other than being in charge of HR and accounting

5    and other operational aspects, what other kinds of things did

6    you do as part of your job as president of Stanford

7    International Bank?

8    A.   Well, I would -- I would be -- I would receive clients

9    coming to the bank to visit, clients and prospects.

10   Q.   And what do you mean, receive them?

11   A.   Well, they would come to visit the bank in Antigua, so we

12   would give them a tour of the bank, of the island, the

13   operation, talk to them about the -- the operations of the

14   bank.

15   Q.   Now, in all of what we've just described, including when

16   you were assistant operations manager back starting in 1992,

17   when you were director of corporate security, when you were

18   chief operating officer, during that entire time period you

19   did not have any input into the investments of the Stanford

20   International Bank CD portfolio.  Correct?

21   A.   None whatsoever.

22   Q.   Okay.  And that did not change when you became president.

23   Correct?

24   A.   That's correct.

25   Q.   So the entire period of time that you were president at

1   Stanford International Bank, you had no input into the

2   investments in the CD portfolio.

3   A.   That's correct.

4   Q.   Though you didn't have input, did you have visibility

5   into what the investments were of the CD portfolio?

6   A.   Not a detailed level.  We only got summaries from

7   investment side.

8   Q.   So does it strike you as peculiar that the president of

9   the bank has no say in how the CD proceeds are invested that

10  come from its product?

11  A.   Not in the -- the way that Stanford was structured,

12  organized.  The president of the bank was -- I was running the

13  operational side of the house, not the investment side of the

14  house.

15  Q.   Had you worked anywhere else where you observed a similar

16  circumstance where the top officer of a bank did not have

17  knowledge or input into how the bank's assets were invested?

18  A.   No.  I had never worked for an offshore bank before, sir.

19  Q.   Have you ever worked for any bank before?

20  A.   Yes, I worked for commercial banks.

21  Q.   Okay.

22  A.   At branch level.

23  Q.   All right.  So tell us about your experience in working

24  for commercial banks before you worked for Stanford.

25  A.   I worked for a small community bank in the operational

 1    and controllership areas, and I worked for the Bank of Boston

 2    as the operations manager.  And I worked for Bank of Nova

 3    Scotia, which is where I started my career.  And I worked from

 4    branch level, was a management trainee, and I was an

 5    operations manager for several branches.

 6    Q.    And in any of those positions, were you involved in how

 7    those banks invested their assets?

 8    A.    No, sir.

 9    Q.    Were there other people at those banks who were in charge

10    of those things?

11    A.    Yes, sir.

12    Q.    And did the people at those banks report to the top

13    officers of the bank?

14    A.    Yes, they would.

15    Q.    Okay.  Did anybody who was involved in the investment of

16    the SIB CD portfolio report to you as the top officer of

17    Stanford International Bank?

18    A.    Michael Zarich as SIO briefly.

19    Q.    Okay.

20    A.    Physically in the building.

21    Q.    So he reported to you, and what does that mean to you?

22    A.    That he was there, that he was on island, in the office,

23    but I didn't have day-to-day reporting from him.

24    Q.    Okay.  Did you have input into how he did his job?

25    A.    No.

```
 1    Q.   Did you have any supervisory responsibilities over him?

 2    A.   Basically confirm that he was there.

 3    Q.   Okay.  But on a substantive level did you have any

 4    supervisory responsibilities over Mr. Zarich?

 5    A.   No, sir.

 6    Q.   So as the president of the bank, you had no one reporting

 7    to you who was involved with the investments on the CD

 8    portfolio.

 9    A.   That's correct.

10    Q.   And that did not strike you as peculiar because of how

11    Stanford functioned.

12    A.   That's correct.

13    Q.   So you talked about receiving clients.  Let's talk about

14    that a little bit more.  When you would give clients or

15    prospective clients tours of the bank facilities, what kind of

16    things were you talking to them about?

17    A.   We would talk to them about the jurisdiction, Antigua as

18    a country, the -- the legal framework under which the bank

19    operated, the compliance, and how the bank invested its money

20    at high level.  I mean, just sort of tiers I, II, III, what

21    the investment policy was.  Nothing that wasn't in published

22    material.

23         And clients or prospects would get a tour of the facility

24    and tour the island, dinner, and they would be on their way.

25    Q.   Other than yourself, who was involved in giving those
```

1  tours?

2  A.   The operations senior VP, Miguel Pacheco, would cover

3  part of it.  Michael Zarich would cover part of it.  Pedro

4  Rodriguez would cover compliance.  I mean, there was a team

5  of -- of officers at the bank.

6  Q.   In the tours that you gave, did you talk with customers

7  or prospective customers about private equity investments that

8  the bank was making?

9  A.   I don't think so.  I don't remember that the question was

10  posed.

11  Q.   Okay.  Well, did you volunteer that the bank was

12  investing in private equity?

13  A.   No, sir.  I simply stated the policy.

14  Q.   Okay.  Which I presume it's the same, but in terms of the

15  policy that you communicated to customers about SIB's

16  investment philosophy, what did you tell them?

17  A.   Tiers I, II, III that we've discussed earlier, cash and

18  equivalence, equities and the long-term with stocks, bonds,

19  and currencies, et cetera.

20  Q.   Tell us how the loans worked.

21  A.   Well, the bank would lend up to 80 percent of the value

22  of a CD that was placed on the -- at the bank, and we would

23  charge 200 basis points over the CD rate as an interest rate

24  for it.

25  Q.   And the collateral that -- that the bank relied on was

1    the actual CD.  Correct?

2    A.    That's correct.

3    Q.    Did Antiguan law require the bank to be truthful in its

4    communications about the CDs?

5    A.    I would say yes.  I mean, not expressly, but yes.

6    Q.    All right.  And did Antiguan law require the bank to be

7    truthful about what it communicated to customers about the

8    investment portfolio?

9    A.    Sure.

10   Q.    At least as regards to the investment portfolio, how did

11   you make sure that what you were communicating to customers

12   was truthful?

13   A.    I don't think I had a way of communicating -- I mean, of

14   making sure other than the fact that I had external auditors

15   and I had the regulators come in once a year.

16   Q.    Okay.  And the external auditors, who were they?

17   A.    C.A.S. Hewlett and Associates.

18   Q.    Okay.  And who did you interact with there?

19   A.    Mr. Hewlett from time to time, but Mr. Davis managed the

20   relationship.

21   Q.    Okay.  So did the Hewlett folks actually come on site and

22   perform audits?

23   A.    They would come on site, and they would go to Memphis.

24   Q.    Okay.  As part of that audit process, were you involved

25   in transmitting information to Hewlett?

```
 1    A.   Operational information, yes.

 2    Q.   Okay.  Were you involved in transmitting any investment

 3    portfolio information to Hewlett?

 4    A.   No, sir.

 5    Q.   So, again, all of the information about investments was

 6    flowing from Mr. Davis' office and you never saw that as

 7    president of the bank.

 8    A.   That is correct.

 9    Q.   And you did not think that was peculiar.

10    A.   Not at the time, sir.

11    Q.   So the investment of those proceeds, those decisions --

12    A.   Uh-huh.

13    Q.   -- that wasn't on your radar.

14    A.   It was not in my purview.

15    Q.   It was not in your purview.  But at the same time, you

16    were, in fact, making representations to customers about what

17    was contained in that investment portfolio.  Right?

18    A.   I was communicating to them what the board of directors

19    had approved, what the regulators had seen, what we had filed

20    on Reg D filings, what the company filed in every single

21    country it operated.  I had no reason to believe that what

22    represented was true.  So I was basically going through the

23    stated policy for the company.  I had no reason to believe

24    that any of this was not true.

25    Q.   So you were reciting policies that were given to you by
```

1    others, and you never once even asked to see the support for

2    the underlying investment portfolio.  Correct?

3    A.    No.  And there was no reason for me to doubt, given that

4    we had auditors and bank regulators and other countries,

5    including ours in the USA, approving what we were doing.

6    Q.    Mr. Rodriguez, at your time -- during your time at

7    Stanford International Bank, was there ever a time when you

8    assisted in the preparation of a letter to be signed by Leroy

9    King to any regulatory agency?

10   A.    Yes.

11   Q.    Okay.  Tell me about that.

12   A.    There was a time when Mr. King requested information

13   regarding the trust company actually, not the bank, and a

14   draft was prepared by our legal counsel in Houston and sent to

15   him with some general information that he eventually used.

16   Q.    Okay.  Do you recall what regulatory agency that was to?

17   A.    I believe it was the State of Louisiana.

18   Q.    Okay.  And was that a -- was there a draft of a letter

19   that you commented on?

20   A.    No.  I received the request, I sent it to Houston, they

21   sent it back, and it went to him.

22   Q.    Okay.  Any other times that you can recall?

23   A.    No, sir.

24   Q.    All right.  Take a look at Exhibit No. 11.  Mr.

25   Rodriguez, can you describe what this Exhibit No. 11 is?

1    A.    It's a -- it's an exchange of emails from Mauricio

2    Alvarado -- between Mauricio Alvarado, Yolanda, and myself.

3    Q.    And remind us, Mauricio Alvarado was who?

4    A.    Legal counsel.

5    Q.    And Yolanda Suarez was who?

6    A.    She was chief of staff or lead counsel.  I don't know

7    what she was at that date.

8    Q.    And what is this email exchange about?

9    A.    A letter to the Eastern Caribbean Central Bank, a draft.

10   Q.    Okay.  What is the Eastern Caribbean Central Bank?

11   A.    The supervisory entity that looked over Bank of

12   Antigua -- well, commercial banks in the Caribbean, the

13   eastern Caribbean and Antigua.

14   Q.    And Bank of Antigua was another bank owned by Mr.

15   Stanford.  Correct?

16   A.    That is correct.

17   Q.    And it was part of the Stanford Financial Group of

18   companies?

19   A.    That is correct.

20   Q.    And in what it appears to attach is a draft of a letter

21   with a signature line for Leroy King.  Correct?

22   A.    That is correct.

23   Q.    And Leroy King was with the FSRC?

24   A.    That is correct.

25   Q.    Down at the bottom of the first page, it's an email from

1    Mauricio Alvarado saying --

2    A.    Uh-huh.

3    Q.    -- this to you and Yolanda Suarez, saying, "Please see

4    attached document --"

5    A.    Uh-huh.

6    Q.    "-- and my proposed draft response.  Please let me know

7    what you think.  I would appreciate your response ASAP as I am

8    supposed to provide our proposed draft later tonight."

9          Did I read that right?

10   A.    Yes, you did.

11   Q.    Do you remember this email exchange?

12   A.    I don't.

13   Q.    Okay.  You have no recollection whatsoever.

14   A.    I don't -- I don't recall this email exchange.

15   Q.    Okay.  And the next email in the chain is directed to you

16   from Mr. Alvarado --

17   A.    Uh-huh.

18   Q.    -- and it says, "Have you had a chance to review the

19   documents per my email below?"

20   A.    Right.

21   Q.    And then another email where Mr. Alvarado is forwarding

22   it to you and Ms. Suarez, saying, "I'm attaching the latest

23   version of the document containing some further changes that I

24   have incorporated.  Please let me know what you think.

25   Thanks."

```
 1          And then what is -- what's the next email on the chain?

 2     It's an email from you to Mr. Alvarado --

 3     A.    Right.

 4     Q.    -- and Yolanda Suarez.  Correct?

 5     A.    That's correct.

 6     Q.    And what -- what does that have in it?

 7     A.    It has a sentence.

 8     Q.    Okay.  Read that for us.

 9     A.    "We are supportive and in agreement with the need for

10     effective supervision of affiliated companies of financial

11     institutions.  We believe your agency should place reliance in

12     the result of our continued monitoring and examination of

13     entities under our supervision."

14     Q.    Does reading that refresh your recollection at all about

15     what this is about?

16     A.    It still doesn't.

17     Q.    Okay.  Was this supposed to be a comment or revision to

18     the letter?

19     A.    I don't recall the context.  And I see the letter, but I

20     don't recall the context or how this all started.

21     Q.    Okay.  Well, this -- so this -- but this was something

22     that you were emailing to them.  Correct?

23     A.    To Mauricio.

24     Q.    Right.  Let's -- let's look at the attachment for a

25     moment, if we could, just so we're clear on what it is.  It
```

```
 1    says "draft" on it.  It appears to be a draft letter.

 2              MR. HASBUN:  I'm just going to make an objection for

 3    the record.  This email, this Exhibit 11, the email, the

 4    attachment that's to -- to this exhibit, I don't know if

 5    there's any basis for knowing that it's actually related to

 6    this email.

 7    Q.   All right.  So take a look at the attachment.  It's a

 8    July 31st, 2006 draft letter.  Correct?

 9    A.   Yes.

10    Q.   I'm sorry.  Did you answer?  I didn't hear.

11    A.   Yes.  You said July 31, 2006.

12    Q.   Yes, sir.

13    A.   Yes.

14    Q.   And it's addressed to Mr. Niguel Streete.  Right?

15    A.   Uh-huh.

16    Q.   And says here that he's the director, bank supervision

17    department of Eastern Caribbean Central Bank.  Right?

18    A.   Correct.

19    Q.   And the first line says, "We are in receipt of your

20    letter dated July 11, 2006," meaning I guess the Eastern

21    Caribbean Central Bank's letter.

22    A.   Uh-huh.

23    Q.   And it goes on to discuss, you know, what the content of

24    it was.  And then at the very end, there's a signature line

25    for Leroy King.  Correct?
```

1   A.   That's correct.

2   Q.   Okay.  Have you had a chance to review the content of

3   this letter, this draft letter?

4   A.   Yes, I have.

5   Q.   Okay.  And after reviewing that content, do you have any

6   further recollection of what this was about?

7   A.   No, sir.

8   Q.   Let's take a look at what has been marked as Exhibit No.

9   12.

10  A.   Do you have a stapler?

11  Q.   This appears, does it not, to be a different draft of

12  basically the same letter to Mr. Niguel Streete from Leroy

13  King?  Correct?

14  A.   Yes.

15  Q.   Okay.  And at the very end --

16  A.   Uh-huh.

17  Q.   -- if you would, read the last paragraph.

18  A.   "Nonetheless, we are supportive and in agreement with the

19  need for effective supervision of affiliated companies of

20  financial institutions.  We, however, believe your agency

21  should place reliance on the result of our continued

22  monitoring and examination of entities under our supervision."

23  Q.   Okay.  So with -- if you look back at the top email in

24  Exhibit 11 --

25  A.   Uh-huh.

1    Q.    -- which was your email --

2    A.    To Mauricio.

3    Q.    -- the content of the new paragraph in the draft letter

4    in Exhibit 12 matches almost exactly what you suggested in

5    your email.  Correct?

6    A.    Yes.

7    Q.    So it's fair to say that, in this instance, you were

8    assisting in drafting letters on behalf of Leroy King to other

9    regulatory agencies.  Correct?

10            Mr. Hasbun:  Objection, form.

11   A.    No.  I assisted.  It seems like they asked for my

12   opinion, and I provided that to Yolanda and to Mauricio.

13   Q.    Okay.  Is it -- was it typical for you to provide input

14   on letters from your regulating agency to other governmental

15   entities?

16            Mr. Hasbun:  Objection to form.  Assumes facts not

17   in evidence.

18   A.    I don't know what typical is, but no, it wasn't typical.

19   I mean, they -- I don't know how this flowed, sir, so I don't

20   know how this got to here and it got to me for an opinion.

21   Q.    Is it your -- well, do you believe it's appropriate for

22   the president of a regulated bank to be drafting letters on

23   behalf of its regulator to other regulating agencies?

24            Mr. Hasbun:  Objection to form.  Assumes facts not

25   in evidence.  Foundation.  Lack of foundation.

1    A.    I don't know how to answer that.

2    Q.    So you don't know how to answer whether or not helping

3    draft such a letter from a regulatory agency is appropriate?

4          Mr. Hasbun:  Objection.  Mischaracterizes his prior

5    testimony.

6          The Witness:  Well, sir --

7          Mr. Hasbun:  No foundation.

8          The Witness:  -- the --

9          Mr. Hasbun:  Assumes facts not in evidence.

10   A.    The regulatory structure in Antigua under the FSRC sort

11   of resembled the NASD model where members were part of the

12   process.

13         So, I mean, this -- asking me for an opinion, and

14   everything in here is factual as far as I can read, I didn't

15   find -- I wouldn't find anything objectionable with sharing my

16   thoughts.

17   Q.    Okay.  Do you think it's odd that the FSRC would be

18   asking for Stanford International Bank's assistance in writing

19   letters to the Eastern Caribbean Central Bank?

20         Mr. Hasbun:  Objection.  Assumes facts not in

21   evidence.  Speculation.  Lack of foundation.

22   A.    Again, in the context of what I have in front of me, I

23   don't find this strange.

24   Q.    Okay.  And at the time, this did not raise a red flag

25   with you about how Stanford International Bank was being

```
 1   regulated, did it?

 2           Mr. Hasbun:  Objection.  Lack of foundation.

 3   Assumes facts not in evidence.  Mischaracterizes prior

 4   testimony.

 5   A.   I don't know how to answer that, sir.  No.  I -- you

 6   know.

 7   Q.   Did it raise a concern in your mind about anything?

 8   A.   No.  That doesn't -- that doesn't raise a concern in my

 9   mind --

10   Q.   So even sit --

11   A.   -- with what I have there.

12   Q.   So sitting there today, your view is that having Stanford

13   International Bank personnel assist in writing letters on

14   behalf of its regulating agencies --

15           Mr. Hasbun:  Objection.  Lack of foundation.

16   Assumes facts not in evidence.  Asks for speculation.

17   A.   Again, sitting here today, after everything -- you know,

18   it's passer rush on Monday morning, sir.  I apologize, but

19   it's -- with the way that the regulatory environment was in

20   every single country, including the United States, where the

21   company was looked at, I had no reason to believe that there

22   was something wrong.

23   Q.   Did you ever participate in writing any letters on behalf

24   of the SEC?

25   A.   I think I answered that, sir.
```

1    Q.    So the answer is what?

2    A.    The answer was no and continues to be no.

3    Q.    You ever write any letters on behalf of the NASD?

4    A.    The who?

5    Q.    The entity you referred to a minute ago, the NASD.

6    A.    Right.  No.  But I don't know why the NASD -- no.  The

7    answer is no.

8    Q.    Have you ever heard of entities that are regulated by the

9    SEC or NASD writing letters on behalf of those agencies?

10          Mr. Hasbun:  Objection.  Assumes facts not in

11   evidence.

12   A.    No, sir.

13   Q.    Have you ever heard of that?

14   A.    No.

15   Q.    Now, as part of your job as president, you received the

16   annual examination reports from the FSRC.  Correct?

17   A.    That is correct.

18   Q.    Okay.  Did you ever receive drafts of those reports for

19   comment prior to when they were formally issued?

20   A.    I believe every institution got drafts before

21   they -- yes, and I believe every institution got a draft

22   before the final.

23   Q.    When you say "every institution," what do you mean?

24   A.    In Antigua, sir.

25   Q.    Okay.

1    A.    They would circulate a draft and then go to final.

2    Q.    Okay.  And what is -- when you say you believe every

3    regulated entity in Antigua received such drafts, what is your

4    basis for that?

5    A.    That was the standard process for FSRC in Antigua.

6    Q.    But how do you know that?

7    A.    Because I know other bank presidents in the country.

8    Q.    And they told you they were receiving --

9    A.    Yeah.

10   Q.    -- draft reports?

11   A.    They always received draft reports, yes, sir.

12        MR. PETRIE:  That's the end of that, Your Honor.

13        Our next witness is Mr. Davis, again by videotape.

14        JAMES DAVIS, BY VIDEOTAPE DEPOSITION,

15   Q.    Could you please state your name for the record?

16   A.    James Davis.

17   Q.    Let me ask you just a few things about your background.

18        You attended Baylor University undergraduate.  Is that

19   correct?

20   A.    Yes.

21   Q.    And you began your work with the Stanford entities at

22   Guardian International Bank in Montserrat.  Is that correct?

23   A.    Yes.

24   Q.    And you were controller?

25   A.    Yes.

1    Q.    Was that your -- did you start in Montserrat or were you

2    in the U.S. and -- and relocated there?

3    A.    Started in the U.S., relocated.

4    Q.    And when you started in the U.S., were you

5    initially -- what was your initial position in the

6    Stanford -- the first Stanford entity, the Guardian

7    International Bank?

8    A.    I was an employee of Stanford Financial Group Company.

9    Q.    And where were you based?

10   A.    Houston, Texas.

11   Q.    And do you recall when you relocated to be controller at

12   Guardian International Bank?

13   A.    Summer of 1988.

14   Q.    And how long did you remain in that position?

15   A.    That's been 26 or -7 years ago.

16   Q.    Does 1990 sound about right?

17   A.    It was three or four years, maybe.

18   Q.    And then were you next controller at the Stanford

19   International Bank, Limited?  Were you ever controller for

20   Stanford International Bank?

21   A.    Yes.

22   Q.    And were -- was that -- was that when the bank was based

23   in Antigua?

24   A.    In Montserrat.

25   Q.    Oh, it was initially in Montserrat, and then it

1   relocated to --

2   A.   That's correct.

3   Q.   What were your duties as controller of Stanford

4   International Bank?

5   A.   As controller, I was over the financial statement

6   process, the scorekeeping, the bookkeeping.

7   Q.   And you eventually became chief financial officer at

8   Stanford International Bank.  Is that correct?

9   A.   Yes.

10  Q.   And did your duties change, or was it just a change of

11  title?

12  A.   At that time, a change in title.

13  Q.   And when did you become CFO at Stanford International

14  Bank?

15  A.   1992.

16  Q.   Now, at some point you became chief financial officer at

17  Stanford Financial Group Companies.  Correct?

18  A.   Yes.

19  Q.   And can we call that SFGC or is there another acronym or

20  another --

21  A.   SFG.

22  Q.   Okay.  SFG?  And when did you become CFO at SFG?

23  A.   The same time as Guardian International Bank.

24  Q.   In that connection, did you work closely with Allen

25  Stanford?

1   A.   Yes.

2   Q.   I want to focus on the time period of about '93, '94,

3   subsequent to your taking on the role of chief financial

4   officer at SFG.  Were you based in Houston?

5   A.   At that time, yes.

6   Q.   And at that time, '93 and all subsequent times.  Correct?

7   A.   Yes.

8   Q.   Now, you subsequently testified in another -- in a couple

9   of different circumstances about -- about the nature of the

10   Stanford Financial Group and its practices.  Correct?

11   A.   Yes.

12   Q.   Is it fair to say that the Stanford Financial Group from

13   at least 1992 forward was what was -- what is popularly

14   referred to as a Ponzi scheme?

15   A.   Yes.

16   Q.   And by that I mean it was taking in investors' money, not

17   investing it for the purposes that was stated, and when

18   redemptions were made, it was taking investors' money -- other

19   investors' money and giving it to the people redeeming their

20   CDs.  Correct?

21   A.   Yes.

22   Q.   And this was something that I think you've testified that

23   Mr. Stanford communicated to you he was aware that it was a

24   Ponzi scheme in this way.  Correct?

25   A.   Yes.

1    Q.    I'm going to hand you what's been marked as Exhibit 2 for

2    purposes of identification.  And this is actually the plea

3    agreement that you executed.  And if you could just look, I

4    believe, on the -- let me find the page -- the 23rd page of

5    Exhibit 2, that is your signature, is it not?

6    A.    Yes.

7    Q.    And attached I suppose as an exhibit to Exhibit 2 is a

8    letter setting forth your plea agreement with the Department

9    of Justice.  Is that correct?

10   A.    Yes, sir.

11   Q.    Okay.  So let me ask you a few specific questions.  It

12   states -- and -- and bear with me.  I don't want to -- I'm

13   going to try not to bog down too much in the document, but I

14   do want to ask you some specific questions.

15        It states in paragraph C that Stanford's -- that Stanford

16   Bank's primary investment product was referred to as a

17   certificate of deposit which Stanford International Bank would

18   solicit to potential investors in the United States and

19   elsewhere through SFG broker-dealers, sometimes referred to as

20   financial advisors, FAs.

21        That's correct, isn't it?

22   A.    Yes, sir.

23   Q.    And it states that -- later in that paragraph, Stanford

24   Davis and their conspirators promoted Stanford International

25   Bank's investments as being well-managed, safe and secure,

 1    claimed that Stanford International Bank's investment strategy

 2    was to minimize and achieve liquidity, and falsely touted in

 3    Stanford International Bank's annual reports beginning in at

 4    least 1999 an almost year by year percentage and dollar

 5    increase in the purported dollar of Stanford International

 6    Bank's earnings, revenue, and assets.

 7         Based on your personal knowledge, is that a correct

 8    statement?

 9    A.   Yes, sir.

10    Q.   Paragraph F states, Stanford, Davis, Chief Investment

11    Officer Laura Pendergest-Holt, and others created and

12    perpetuated the false impression to investors, potential

13    investors, and the majority of Stanford Financial Group

14    employees that Holt was responsible for overseeing and

15    monitoring Stanford International Bank's entire portfolio of

16    noncash assets and that she managed all of those assets

17    through a global network of money managers.

18         Based on your personal knowledge, is that a correct

19    statement?

20    A.   Yes.

21    Q.   Paragraph G states, Unknown to investors, Stanford,

22    Davis, Holt, and other conspirators internally segregated

23    Stanford International Bank's investment portfolio into three

24    investment tiers:  A, which was cash and cash equivalents,

25    tier one; B, investments with outside money managers,

```
 1    sometimes also referred to as outside portfolio managers.

 2    That was just tier two.  And other assets, T3 or -- tier

 3    three.

 4         Is that a correct statement based on your personal

 5    knowledge?

 6    A.   Yes, sir.

 7    Q.   And then it states that, in fact, Holt's management of

 8    Stanford International Bank assets was confined to those

 9    assets contained in tier two, which by 2008 made up only 10

10    percent of Stanford International Bank's entire portfolio.

11         Is that correct?

12    A.   Yes, sir.

13    Q.   In fact, by 2008 approximately 80 percent of Stanford

14    International Bank's investment portfolio was made up of

15    illiquid investments, including grossly overvalued real and

16    personal property that Stanford International Bank had

17    acquired from Stanford-controlled entities that falsely

18    inflated prices.

19         Is that a true and correct statement based on your

20    personal knowledge?

21    A.   Yes, sir.

22    Q.   It goes on to say, At least $2 billion of undisclosed,

23    unsecured personal loans from Stanford International Bank to

24    Stanford -- Allen Stanford were concealed and disguised in

25    Stanford International Bank's financial statements as
```

```
 1    investments.

 2          Is that a correct statement?

 3    A.    Yes, sir.

 4    Q.    And it states in paragraph K that you, as CFO, would

 5    extrapolate from the values attributed to a portion of

 6    Stanford International Bank's investment portfolio, which was

 7    monitored by Holt and managed by money managers, but that you

 8    would multiply those actual values by artificial percentage

 9    factors necessary to equal the value for deposit or

10    liabilities.

11          Is that also a true and accurate statement?

12    A.    Yes.

13    Q.    Let me go back to the plea agreement, if we could, to

14    paragraph W on page 16.

15    A.    Okay.

16    Q.    It states, On September 25, 2006, King provided to

17    Stanford SFG Attorney A, who you have identified as Mauricio

18    Alvarado, and Stanford International Bank Executive A another

19    confidential letter he had received from the SEC wherein the

20    SEC, again, sought records and information regarding Stanford

21    International Bank's CD investment portfolio.

22          Do you see where I read that?  I just want to ask you one

23    question about that.

24    A.    I see this, yes.

25    Q.    Okay.  Was Stanford International Bank Executive A Mr.
```

1    Tolentino, the president of Stanford International Bank?

2    A.    Yes.

3    Q.    Okay.  And based on your personal knowledge it is true

4    and correct that Mr. King, Lee King, provided Stanford,

5    Mauricio Alvarado, and Mr. Tolentino a confidential letter he

6    received from the SEC inquiring about Stanford.  Correct?

7    A.    Yes.

8    Q.    And then it states Stanford, Davis, Stanford

9    International Bank Executive A--Tolentino--and SFG Attorney

10   A--Mr. Alvarado--would then propose various responses designed

11   to mislead the SEC that King would be requested to insert into

12   the FSRC's response to the SEC's confidential letter.

13        Is that a true and correct statement?

14   A.    Yes.

15   Q.    You were concerned in 2005/2006 that the SEC would

16   discover that the CDs were fraudulent investments and that the

17   entire operation would be shut down and claims would be made

18   against Stanford.  Correct?

19   A.    I was concerned, as I said earlier a couple of times,

20   throughout that whole period of time that, if the scheme were

21   known by the SEC or any other regulator that was bona fide, it

22   would be the end of the line.

23   Q.    Yeah.

24   A.    At that time and the time -- or the '90s up to the --

25   through 2008, I believed that Mr. Stanford and his close

1    associates, outside individuals that they hired to help -- I

2    believed that they would, as they had previously, do what was

3    necessary to keep hiding it.

4        So specific 2005, I didn't have a rise in anxiety level.

5    I was under that for a decade and a half.  It just keep --

6    keep going forward and did what I was told.

7    Q.   And there were a number of facts and circumstances that

8    you were concerned that, if they were disclosed to the SEC, it

9    would result in the immediate shutdown of Stanford.  Correct?

10   A.   That would happen, yes.

11   Q.   And numerous claims would be asserted against Stanford

12   for fraud.  Stanford officers and Stanford the company.

13   Correct?

14   A.   As a consequence.

15   Q.   And some of those circumstances were -- the most

16   important which was that there weren't assets to back the CDs

17   as represented.

18   A.   That's correct.

19   Q.   Another circumstance was that Stanford was working with

20   the regulator that had oversight over it to prepare responses

21   to the SEC.  Correct?

22   A.   Yes.

23   Q.   Another circumstance was that bribes were being paid to a

24   regulatory official.  Correct?

25   A.   That was one, yes.

1   Q.   And these -- any one of these circumstances might have

2   been enough to bring about, in your view, the shutting down of

3   Stanford and the assertion of fraud charges.  Correct?

4   A.   Yes.

5   Q.   And when you say that for 15 years you were concerned

6   about this, it is because it was the policy and practice of

7   Stanford Financial, Stanford International Bank, as approved

8   by yourself and Allen Stanford, to sell CDs based on false

9   representations that were not backed by the investments that

10  they were represented to contain.  Is that correct?

11  A.   Yes.

12  Q.   And that was the policy from at least the 1990s until the

13  time it was shut down.

14  A.   Yes.

15  Q.   Now, the loan to shareholder -- well, tell me what that

16  was and how it came to be, if you recall.

17  A.   These were monies that were authorized by Mr. Stanford to

18  be expended on certain projects that he initiated and

19  consummated.

20  Q.   And when you say monies, you're -- and consummated, those

21  were using monies that came into the bank SIB and that were

22  used to fund other projects of Mr. Stanford's?

23  A.   That's correct.

24  Q.   All right.  And that was contrary to what the investors

25  were told.  Isn't that right?

1    A.   Yes.

2    Q.   And it was also contrary to what the financial advisors

3    selling the CDs were told as well.  Is that right?

4    A.   Yes.

5    Q.   In other words, I want to understand how this money got

6    diverted and how you-all were able to keep everyone from

7    talking about it.  Okay?

8         This loan to shareholder ultimately was about $2 billion

9    by the -- by the time the companies were shut down.  Right?

10   A.   A little south of that, yes, sir.

11   Q.   I mean, it grew over time.  Is that right?

12   A.   It did.

13   Q.   And during the course of your time at Stanford, did you

14   tell both investors and financial advisors that the funds that

15   came into the bank were being invested abroad as -- consistent

16   with these statements?

17   A.   Yes.

18   Q.   The problem was not all the money was being invested as

19   the investors and the brokers were being told, was it?

20   A.   Yes.

21   Q.   And so it's a fact that there were real investments with

22   real money managers, but some of that money had been diverted

23   as we saw on the Amadio spreadsheet?

24   A.   Yes.

25   Q.   Okay.  And when did those diversions start such that not

1  all of the money was invested as you explained it to investors

2  and employees?

3  A.   Early '90s.

4  Q.   At any point during your time with Stanford up until the

5  very end in 2009, did you discuss with any investors the fact

6  that not all of the money was in Europe or other accounts but

7  that upwards of $2 billion had been diverted?

8  A.   No.

9  Q.   Okay.  Did you have that discussion with any of the

10  brokers that were there?

11  A.   No.

12  Q.   Did you stand before the body of financial advisors at

13  various meetings throughout the world?

14  A.   Yes, I did.

15  Q.   Okay.  And at those meetings, did you stand up and

16  represent to them how the bank portfolio was performing

17  consistent with the representations and the annual reports?

18  A.   Yes, I did.

19  Q.   When you -- when you stood in front of them, did it

20  bother you that you were telling them something that would

21  lead to misleading them and ultimately their investor clients?

22  A.   As I've said earlier in my testimony, it bothered me the

23  full tenure that I was with the company.

24  Q.   Okay.  A lot of the financial advisors had questions of

25  you as to how the bank can generate the returns, did they not?

1    A.    That's correct.

2    Q.    Did you use your best efforts to give them explanations

3    that would address those concerns?

4    A.    I gave them -- yes.

5    Q.    Tell me kind of in general what you would try to explain

6    to the financial advisors so they could go out and sell CDs to

7    the investors.

8    A.    The response was -- and it was formalized in what was

9    called a Stanford investment model -- was that it was a

10   diversified portfolio by product and country and currency, and

11   that the corpus was managed by a number of financial advisors

12   from 15 to 20 different companies, and that the product mix

13   was bonds and equities, currencies, metals, and some hedge

14   fund type of investments.

15   Q.    Did you use other resources of the company like Ms. Holt

16   to convince the brokers and the investors that the monies were

17   invested consistent with the published literature?

18   A.    Yes.  Ms. Holt and her department was instrumental in

19   presenting those pictures.

20   Q.    Okay.  And when you say "those pictures," there were

21   actual slides put up, showing how the --

22   A.    Well, the pictures and the explanations, yes, at various

23   times year to year.

24   Q.    At any point during your time with Stanford, did you tell

25   the financial advisors that those pictures were inaccurate

1     that you presented to them?

2     A.    Inaccurate?

3     Q.    Yeah.

4     A.    No.

5     Q.    And the -- the pictures or the disclosures in the annual

6     reports for SIBL were also inaccurate, were they not?

7     A.    Yes.

8     Q.    I guess, let's kind of piece this together.

9           Because the money wasn't invested completely the way it

10    was represented, those funds weren't generating the returns

11    necessary to grow and to make the payoff.  Is that right?

12    A.    Correct.

13    Q.    Because the investments aren't all out there, as you say,

14    generating returns, you have a small amount, maybe 10 or 15

15    percent, that's actually working to get a return.  Right?

16    A.    Yes.

17    Q.    But you have to make it look like you've got enough money

18    off of the whole 100 percent of investments.  Right?

19    A.    Yes.

20    Q.    And so there were people in your organization on the

21    accounting side that were involved in generating a fake

22    revenue entry that would get incorporated into the financial

23    disclosures.

24    A.    Yes.

25    Q.    Is that right?

1    A.    Correct.

2    Q.    What was the commission structure for these -- for the

3    advisors who sold these CDs both initially and the trailing

4    commission?  Do you remember?

5    A.    The finite points of the agreement were that they

6    received one percent of the amount of the CD if that CD or

7    that money stayed with the bank a certain amount of time.

8    Q.    Uh-huh.

9    A.    And then there was the structure in addition to

10   compensate the financial advisor for the time that the CD

11   actually stayed.

12   Q.    So one percent the first year, and then one percent a

13   year for the following four?

14   A.    Whatever the percentage was, yes.  There was a payout.

15   Q.    And that would be separate and apart from whatever

16   percentage -- management fees or whatever that Stanford would

17   charge in connection with managing these assets against the

18   CDs.  Correct?

19   A.    There were management fees between companies --

20   Q.    Uh-huh.

21   A.    -- yes.

22   Q.    Okay.  So if I understand, you were involved from an

23   operational standpoint in more of the day-to-day operations of

24   the money flows for these companies.  Right?

25   A.    Yes.  Plus, I was the best liar that he could have ever

```
 1    hired.  Everybody in the whole world would have wished they
 2    had a friend like Jim Davis who was Allen Stanford-style
 3    entrepreneur.  Unfortunately, many tears later, sorrows.
 4    But --
 5    Q.   When it came to --
 6    A.   -- that's the way it worked.
 7    Q.   When it came to moving the monies, you had authority; and
 8    from time to time, you would direct the monies to be directed
 9    from SIB to the various entities.
10    A.   Those bank accounts where the funds were held, yes.
11              MR. PETRIE:  We now have the beginning, Your
12    Honor-we won't finish by the close of today's business--of
13    Mr. Espy's testimony.  And unless you have a different
14    direction, we're aiming to find the most convenient stopping
15    place near 5:00 and will stop then.
16              THE COURT:  That's fine.
17              MR. PETRIE:  Thank you.
18              THOMAS ESPY, BY VIDEOTAPE DEPOSITION,
19    Q.   Can you please state your name for the record?
20    A.   I'm Thomas Espy.
21    Q.   And, Mr. Espy, my name is Scott Powers.  I represent
22    Ralph Janvey.  He's a court-appointed Receiver in the
23    matter -- the SEC matter involving the Stanford International
24    Bank.
25              Are you familiar with Mr. Janvey?
```

1    A.   I know who he is.

2    Q.   Okay.  And you're familiar with the receivership

3    proceedings that are based in Dallas, Texas, in federal court?

4    A.   I am.

5    Q.   Okay.  And what is your occupation?

6    A.   I am with Wiley Bros.-Aimtree Capital, which is an

7    investment firm here in Nashville, Tennessee.

8    Q.   And what do you do with Wiley Bros.-Aimtree Capital?

9    A.   I am president of Aimtree asset management, which is a

10   division of Wiley Bros.-Aimtree Capital.

11   Q.   And what do you -- what does that division do, the asset

12   management division?

13   A.   We -- it's a new division, and we are catering to high

14   net worth individuals.

15   Q.   What kinds of things do you do for the high net worth

16   individuals?

17   A.   Asset management, strategic asset allocation, municipal

18   bonds, things of that nature.

19   Q.   And as president, do you directly advise people, or you

20   just handle -- manage the department or --

21   A.   I manage the department.

22   Q.   Okay.  And how long have you been with Wiley Bros.?

23   A.   Three years approximately.

24   Q.   Did you attend college?

25   A.   Yes, I did.

```
 1    Q.    Where did you attend college?

 2    A.    St. Lawrence University.

 3    Q.    And do you have a degree from St. Lawrence?

 4    A.    I do, a BA in history.

 5    Q.    Do you have any postgraduate education?

 6    A.    I do not.

 7    Q.    Do you hold any certificates or licenses today?

 8    A.    Yes.  Series 7, 66, and I believe the 63.

 9    Q.    Those are FINRA licenses?

10    A.    I believe so.

11    Q.    So you now work at Wiley Bros.-Aimtree Capital, and you

12    once worked at Stanford Group Company.  Is that correct?

13    A.    That's correct.

14    Q.    And you are aware that the Receiver, Mr. Janvey, has sued

15    you personally.

16    A.    Yes, I am very aware of that.

17    Q.    Let me ask you this.  What brought you to be interested

18    in the Stanford Group Company job?

19    A.    My choice.

20    Q.    Well, what -- what is it that brought it to your

21    attention, that it was a possibility?

22    A.    Because I knew a number of people over there.

23    Q.    Were you recruited to go to Stanford Group Company?

24    A.    Don't remember.

25    Q.    What was attractive to you about the Stanford Group
```

1   Company opportunity?

2   A.    The upfront money, the payout, and the office space.

3   Q.    Let's take those in pieces.  What do you mean when you

4   say the up-front money?

5   A.    Well, in our business, if you're willing to move your

6   client base from one firm to another, they pay you a -- a -- a

7   bonus, as it were, to come over.

8   Q.    Before you moved to Stanford Group Company, what did you

9   know about the Stanford group of entities?

10  A.    They were based out of Houston, they were opening an

11  office in Denver and other cities, and they were considered

12  a -- a company on the move.

13  Q.    I didn't ask you about the payout.  Can you explain what

14  you mean by the payout?

15  A.    The payout was attractive, as I recall.  A little higher

16  than you would have received at, say, Prudential.

17  Q.    And what do you mean by -- what does payout refer to?

18  A.    Payout refers to the percentage of the actual gross

19  commission you get to keep.

20  Q.    And the gross commission refers to the commission that

21  the brokerage house receives?

22  A.    That's correct.

23  Q.    So at Stanford Group Company, as compared to Prudential,

24  the percentage that the broker -- individual broker received

25  from the brokerage house's commission was higher.

1    A.    Slightly higher, yes.

2    Q.    And what did you mean when you referred to the office

3    space being attractive?

4    A.    It was a very attractive, A class office space.

5    Q.    When you moved over to Stanford Group Company, had you

6    heard of the Stanford International Bank?

7    A.    No.

8    Q.    Did you talk to Gary Hamilton about Stanford before you

9    came over to Stanford Group Company?

10   A.    Yes.

11   Q.    What was his role at Stanford Group Company?

12   A.    I believe he was the manager of the office.

13   Q.    Did he tell you anything about the Stanford CD product

14   before you came over?

15   A.    Don't remember, but I didn't get involved in the CD

16   product until later.

17   Q.    When did you first meet Gary Magness?

18   A.    When I first moved to Denver.

19   Q.    Was that social or business?

20   A.    Social.

21   Q.    When did you first explore the possibility of working

22   with Mr. Magness?

23   A.    I believe I inherited Gary's account when Gary Hamilton

24   left Stanford.

25   Q.    And when did Gary Hamilton leave Stanford?

1   A.   Sometime when I was there.

2   Q.   Were you familiar with Mr. Magness taking margin loans

3   against the value of his brokerage accounts while you were

4   working with him?

5   A.   I would say he -- when I -- even when I didn't have his

6   account, I think he had a margin loan always against his

7   account since -- since I'd known him.

8   Q.   He had that at Stanford Group Company, and he had it at

9   HSBC and other banks?

10  A.   Don't know.  I can only speak of what he had at -- since

11  I was with him.

12  Q.   Right.  But while you were with him, you knew that he had

13  accounts at HSBC and Merrill Lynch and U.S. Bank?

14  A.   Oh, yeah.

15  Q.   Right.  And he had margin loans at all those?

16  A.   Yes.

17  Q.   Okay.  Because you didn't just work with him as his

18  broker at Stanford Group Company; you also advised him outside

19  of that.  Correct?

20  A.   That's correct.

21  Q.   Okay.  So in a given year, if you had clients in Stanford

22  International Bank CDs in the amount of $20 million, in that

23  year, you would get $200,000 in commissions?

24  A.   Best of my knowledge.

25  Q.   Okay.  Now, with respect to these commissions, do you

1   recall disclosing to Mr. Magness that you were receiving

2   commissions in connection with the sale of Stanford

3   International Bank CDs?

4   A.   I don't recall.

5   Q.   If you could take a look at your deposition again at page

6   83, line 25.  You were asked:  "And as I understand your

7   testimony, you made all of this -- as far as your fees and

8   bonuses and commissions, you made that information available

9   to Mr. Magness?

10      "Answer:  Yes.

11      Did I read that correctly?

12  A.   Well, my memory was a lot more fresh then.  So this is

13  what I said, yes.

14  Q.   You have no reason to disagree with what you said in the

15  SEC transcript?

16  A.   No.

17  Q.   And the follow-up question was:  "Before he invested in

18  the CD?"

19      And your answer was, "Yeah, Gary knew what I was making

20  all the time.  Everything is a negotiation with Mr. Magness."

21      Is that correct?

22  A.   Yes, that's absolutely true.

23  Q.   What do you mean by everything is a negotiation with Mr.

24  Magness?

25  A.   Gary is -- is a businessman, and he wants to get the best

1   possible deal he can get, like any good businessman.

2   Q.   And I take it you would not have been making money off of

3   his investments as a registered financial advisor without him

4   knowing about it.

5   A.   Not necessarily.

6   Q.   Okay.  In this particular circumstance, this is something

7   that you made sure to bring to his attention.

8   A.   You know, I don't recall.  You're asking me to make -- I

9   can't make -- I can't say that because I can't remember.

10  Q.   In 2009, you told the SEC that that was true.

11  A.   And that -- that's probably true.  But you're asking me

12  today which is nine --

13  Q.   From 2001 to the end of 2004, you worked for Mr. Magness

14  separately outside of Stanford Group Company.  Isn't that

15  right?

16  A.   Detail that question, because I'm not sure what you mean

17  I worked for Mr. Magness outside of the outside of -- I don't

18  know what you mean.

19  Q.   Okay.  Well, take a look, if you would, at page 36 of

20  your deposition with the SEC, line 16.

21       You were asked:  "Have you ever received any compensation

22  from any entity other than Stanford Group Company?"

23       And your answer was, "Yes."

24       And the question was, "Okay.  And what entity is that?"

25       And then you said, "At the early I worked -- actually I

1    guess I should give you lineage of where I worked.  I worked

2    at Gary's office for a number of years when I first started at

3    Stanford, which kind of give you an idea of what I actually

4    did for Gary."

5         Do you see that?

6    A.    I'm not sure.  Where are you?  What page are you on?

7    Q.    Bottom of 36.  Of the transcript.

8    A.    Gotcha.  Now where are you?

9    Q.    So take a look at line 16 through 25.  Does this refresh

10   your recollection about whether you worked directly for Mr.

11   Magness and received compensation from him outside of

12   Stanford?

13   A.    Received direct compensation from him?

14   Q.    Yes.

15   A.    I don't recall.  I received -- I mean, I did a lot of

16   things for Gary, but most of what I did was not directly

17   compensated by Gary.  It was because of an investment that I

18   was paid on.  Whether -- that's my best recollection.

19   Q.    All right.  So take a look at page 37 of the transcript,

20   page 10 of the document.

21   A.    Uh-huh.

22   Q.    Lines 13 through 18.

23   A.    13 through 18.

24   Q.    You were asked, "How large were your consulting fees you

25   received from Gary Magness?"

```
 1          And the answer was, "It all depended.  It depended on
 2    what we were doing.  But, you know, I think the salary was --
 3    you know, the consulting fee was 150 a year for two or three
 4    years."
 5    A.   You know what?  You're right.  I recall that.
 6    Q.   Okay.  So --
 7    A.   Don't remember what I did, but I do recall it.
 8    Q.   But he was paying you consulting fees of $150,000 a year?
 9    A.   As best -- as best I can recall, yeah.
10    Q.   Is it accurate that the time period you were working for
11    Mr. Magness was in the -- around the 2003 to 2005 time frame?
12    A.   I don't remember.
13    Q.   You told the SEC that it was 2003 to maybe the end of
14    2005.  Do you have reason to think that's not -- do you recall
15    how it came up that you were paid this consulting fee by Mr.
16    Magness?
17    A.   No.
18    Q.   Was that consulting fee disclosed to Stanford Group
19    Company?
20    A.   I don't remember.
21    Q.   Well, let me ask it this way.  Was your first trip to
22    Antigua a trip with Mr. Magness?
23    A.   I believe so.
24    Q.   Please take a look at tab 126, Plaintiff's Exhibit 126.
25    All right.  This is an email document with an attachment, and
```

1    the attachment reflects some information about trips on

2    Stanford Aviation, LLC.

3    A.    Uh-huh.

4    Q.    I'd like you to please turn to page 12 of the attachment.

5    A.    Okay.

6    Q.    And there's some information reflecting a flight --

7    actually four flights in April of 2002 between Denver and St.

8    John's, Antigua.

9    A.    Uh-huh.

10   Q.    Do you recall taking a trip with Mr. Magness to Antigua

11   in April of 2002?

12   A.    Yeah, if that's the right date.  I mean, I don't remember

13   the date, but I remember taking the trip.

14   Q.    Okay.  And the passengers who are listed, you are the

15   lead passenger, and then there is a Maria Kamihira, Gary

16   Magness, and Sarah Siegel.

17         Who are those individuals?

18   A.    Well, Sarah is now Gary's wife.  And who was I with?  Oh,

19   yeah.  Maria Kamihira?  She must have been the girl I was

20   dating at the time.

21   Q.    Okay.  And it reflects that you took a -- I guess you

22   stopped in Miami on the way down there.

23   A.    That's correct.

24   Q.    And do you recall going to a Stanford International Bank

25   board meeting while you were in Miami?

1    A.    That is correct.

2    Q.    What happened there?

3    A.    Just walked in, met everybody, and left.

4    Q.    And I take it the board was there at the board meeting?

5    A.    That is correct.

6    Q.    Was anybody else there that you can remember other than

7    the members of the board of directors?

8    A.    Allen Stanford, the board of directors, and that's as far

9    as I can recall.

10   Q.    Did you have to leave the airport to get to the board

11   meeting, or were they meeting somewhere close to the --

12   A.    No, we had to leave.  It was -- we -- we left, took a car

13   there, and then came back to the airport.

14   Q.    Was there any substantive discussion about the bank at

15   all while you were at the board meeting?

16   A.    Not that I recall.

17   Q.    And what was the purpose of leaving the airport to go

18   visit the board before you went on to St. John's?

19   A.    Allen Stanford wanted -- wanted me to bring Gary over.

20   Q.    How did this trip in 2002 get arranged in the first

21   place?

22   A.    I don't recall.

23   Q.    Why were you going to Antigua?

24   A.    To -- to meet -- to do due diligence on the bank, from my

25   point of view.  I hadn't been there either.

```
 1   Q.   So at this point in 2002, was Mr. Magness considering an

 2   investment in the Stanford International Bank CD product?

 3   A.   No.  I think it was more me.  It was more related to me

 4   introducing Gary to the bank.

 5   Q.   From your perspective with the -- with the goal being

 6   that if it was acceptable that he would invest in the product?

 7   A.   If it was acceptable, then he would entertain the idea.

 8   I'm a salesman.  It was my job to do these things, so --

 9   Q.   And what do you recall doing in Antigua once you arrived?

10   A.   We went to Jumby Bay.  At that time there was a

11   corporate, I think, condo there, so we stayed in two condos

12   next to each other.  We met with -- as I recall -- I don't

13   recall even going to the bank really.  I remember having a

14   lunch with Franz Vingerhoedt and -- what was his name -- and

15   some other gentleman at the bank.  It's Juan Rodriguez.  We

16   may have gone to the bank.  I don't recall.

17   Q.   And did they give you a presentation about -- anything

18   about the bank or how the bank made money or what its

19   investment strategies were?

20   A.   I don't remember.

21   Q.   Did you meet with any regulators, government regulators,

22   that is?

23   A.   No.

24   Q.   From this document it appears that you were there from

25   April 2nd, 2002, to April 8th, 2002.  Did you do anything
```

1    besides bank-related activities?

2    A.   I think I went water-skiing.  I -- I don't recall what we

3    did, but we were at Jumby Bay for, I think, three or four

4    days.

5    Q.   And Jumby Bay is a resort?

6    A.   That is correct.

7    Q.   I'm just trying to get a sense of was most the time spent

8    on due diligence activities related to the bank, or was most

9    of it leisure?

10   A.   Most of it was leisure.

11   Q.   And you don't recall whether you went to the actual bank

12   building?

13   A.   Do not remember.

14   Q.   Do you recall whether you asked to see any documents

15   about the bank or the CD product or strategies around it?

16   A.   Don't remember.

17   Q.   Outside of the commissions you made for selling the

18   Stanford International Bank CD product, did you have any other

19   appreciable commissions coming in from Stanford Group Company?

20   A.   Yeah, for trading.  Trading -- you mean outside

21   of -- outside of Stanford?

22   Q.   Outside of the Stanford International Bank CD

23   commissions, were you --

24   A.   No, no.  There was a lot of trading commissions --

25   Q.   Okay.

1    A.    -- or trading securities.

2    Q.    Were you doing a lot of trading of securities?

3    A.    Yes.

4    Q.    Okay.  Did you have any other clients besides Mr. Magness

5    for whom you were trading securities?

6    A.    Yes, but not -- he was primarily my -- he would be 90

7    percent of what I did.

8    Q.    Okay.

9    A.    He was a full-time job.

10   Q.    Compared to the CD commissions, if you could just put it

11   in relative terms, were -- was most of your money, starting in

12   2005 forward, coming in from Stanford International Bank CD

13   commissions or trading commissions?

14   A.    I would say more coming from the -- the CD.

15   Q.    What kinds of information about the bank did Mr. Magness,

16   or GMAG, LLC, receive prior to making this investment in

17   December of 2004?

18   A.    I don't recall.  With the exception of the subscription

19   documents, I don't recall.

20   Q.    You recall that there was a disclosure statement, an SIBL

21   disclosure statement?

22   A.    Yes.

23   Q.    And was it your practice to provide the disclosure

24   statement prior to investment?

25   A.    Yes.

1    Q.   And do you recall that there were SIBL annual reports?

2    A.   I don't recall.

3    Q.   Do you recall that there was an SIBL rate card?

4    A.   Yes.

5    Q.   And did you show the SIBL rate card as a matter of

6    practice before SIBL investments?

7    A.   I don't recall.

8    Q.   Okay.  Do you remember ever seeing the SIBL annual

9    reports?

10   A.   Yeah, I think so.  Oh, yeah, absolutely.  Yeah.  I

11   remember seeing the annual reports.

12   Q.   Do you recall that the SIBL annual reports had things

13   like assets and liabilities of the bank and income statements

14   and those sorts of things?

15   A.   I don't remember what -- what it had in it at this point.

16   Q.   Okay.

17   A.   But I remember seeing the reports.

18   Q.   What about the Stanford Eagle magazine?  Is that

19   something you ever interacted with?

20   A.   The Stanford --

21   Q.   Stanford Eagle magazine?

22   A.   I think they did -- I think I was -- I recall -- I think

23   I was in it one time.  I don't remember, but I remember

24   something about being featured in it or something, or at least

25   a picture of me.

1    Q.    In connection with the Baja Racing?

2    A.    Oh, yes.

3    Q.    Yes?

4    A.    Maybe.  Yeah, that might have been it, yeah.

5    Q.    What are the kinds -- so December 2004, Gary Magness is

6    looking to put $15 million in the Stanford International Bank.

7    What are the kinds of things as a financial advisor you would

8    want him to know before doing that?

9    A.    I don't recall.

10   Q.    From your perspective, was there any heightened due

11   diligence required of the bank as a consequence of the bank

12   being an offshore bank in the Caribbean?

13   A.    That's the reason why we went down to visit it.

14   Q.    And what reason, if any, do you recall was it that it was

15   over two and a half years from the time of the visit to the

16   time of the investment?

17   A.    I don't recall.

18   Q.    And that trip in 2002 was mostly leisure and involved a

19   short visit or a lunch visit with Mr. Vingerhoedt and Mr.

20   Rodriguez.  What other due diligence did you do or conduct in

21   connection with the investment in the bank?

22   A.    I don't remember.  I'm sorry.

23   Q.    What did you get from the visit to Antigua that was

24   useful?

25   A.    I don't recall.

1    Q.   Do you recall anything about that visit that gave you

2    greater comfort with the bank than you had before you went on

3    the visit?

4    A.   You know, all I remember about that trip was having lunch

5    with Franz Vingerhoedt at Jumby Bay.  We may have gone over to

6    the bank.  I don't remember.  And on that trip -- I'm sorry,

7    that's all I remember except for having a good time.

8    Q.   In the leisure portion of the trip, you had a good time.

9    A.   Yes.

10   Q.   Before December 2004, what information about the bank did

11   you have that made you comfortable advising Mr. Magness to get

12   involved with it?

13   A.   I can tell you that I became more comfortable with the

14   bank over time because the bank was growing.  I can also tell

15   you that it was my idea that I presented to Mr. Magness the

16   bank and said I felt comfortable with it at this point based

17   off of my peers and the growth of the company as far as I

18   could tell.

19   Q.   Anything else that you can recall sitting here today?

20   A.   Not right now, no.

21   Q.   So Plaintiff's Exhibit 123 is a Stanford International

22   Bank brochure.

23   A.   Yes.

24   Q.   Do you recall seeing brochures like this while you were

25   working at Stanford Group Company?

```
 1    A.    I do.

 2    Q.    Do you recall sharing them with Mr. Magness?

 3    A.    I don't recall sharing them with Mr. Magness, but I'm

 4    sure I did.

 5    Q.    On page 120348 --

 6    A.    120348, yes.

 7    Q.    -- which is also page 5 of the brochure, there is some

 8    messaging about Stanford International Bank CDs outperforming

 9    U.S. bank CDs by an average of 4.7 percent.  Do you see that?

10    A.    Yes.

11    Q.    Would you say this was a fairly consistent message that

12    the Stanford International Bank gave out to the people who

13    were investing in and considering investing in the bank?

14    A.    I would say that's accurate based off what I'm looking

15    at, yes.

16    Q.    And the comparison to the U.S. bank CDs, that was a theme

17    in the marketing of this CD in the U.S., was it not?  A

18    consistent theme?

19    A.    Yes.

20    Q.    What was your understanding about what Stanford

21    International Bank did with the money once it was invested in

22    the bank?

23    A.    Well, what they told us and what their marketing

24    information consistently said, that it was a well -- it was a

25    fully -- I mean, it was really set up, in my view and the way
```

1   it looked at it, as a single purpose investment bank, no

2   different really than a portfolio.  If it was run the way they

3   said it was run, it was a fully-diversified global portfolio

4   designed to essentially be more like a -- it was more like a

5   hedge fund than it was anything else.

6       I mean, the idea was through -- if they did -- and it was

7   guaranteed by the bank, by Allen Stanford for the most part,

8   but we never looked at it any other than what it was really

9   was, which was a way for us to try and put money that wasn't

10  at work to work and earn an arbitrage off what we could borrow

11  it against, what we could put it out.

12      We never looked at it as, you know, a -- anything other

13  than what it was, which was a CD product, offshore, lower

14  cost, and we could do the arbitrage.  That's why we were

15  invested in it.

16           MR. PETRIE:  If that works, Your Honor, it's at a

17  stopping place.

18           THE COURT:  That's perfectly good stopping place.

19      That takes us to the end of the day.  You-all have a very

20  pleasant evening, a safe trip home and back.  We'll see you

21  tomorrow at 9:00.

22           (Whereupon, the jury left the courtroom.)

23           THE COURT:  Do you-all know how much of Rodriguez

24  and Davis get charged to the Receiver?

25           MR. SADLER:  We'll have to report back, Judge.

1           THE COURT:  Okay.

2           MR. SADLER:  We don't have it at our fingertips.

3           THE COURT:  The Magness parties are keeping tabs on

4    time, I trust, because you're a good way into your 1050-minute

5    budget.

6           MR. PETRIE:  Yes, Your Honor.

7           THE COURT:  Okay.  It's normal as the party with the

8    burden of proof for you to use more time up front, but I just

9    want to be sure you're thinking about cross-examining Mr.

10   Janvey, for example, or having some time for closing argument.

11          MR. PETRIE:  We thought we would save some time for

12   that, Your Honor.  We're very cognizant of the limit.  Thank

13   you.

14          THE COURT:  Okay.  Good.  I just want to be sure.

15          MR. SADLER:  Your Honor, we do have some exhibits

16   that need to be admitted that came in through the Wilk depo.

17          THE COURT:  Okay.

18          MR. SADLER:  And I can just on the record, Judge,

19   Plaintiff's 323, 324, 303, 310, and 318.  Those all came in

20   through the Wilk deposition, and those need to be admitted.

21   I'm sorry.  I misspoke.  Let me just read those again.

22   Plaintiff's Exhibit 323, 324, 308, 310, and 318.  So move to

23   admit those.

24          THE COURT:  Any objection?

25          MR. PETRIE:  Sorry, Your Honor.  I'm just catching

1   up.

2           THE COURT:  Okay.

3           MR. PETRIE:  We have no objection, Your Honor.

4           THE COURT:  They're admitted.

5           MR. SADLER:  And then Plaintiff's 126 came in

6   through the -- through Mr. Espy's testimony so far.

7   Plaintiff's 126, it's not yet admitted.  We'd move for that

8   document to be admitted.

9           MR. PETRIE:  No objection, Your Honor.

10          THE COURT:  It's admitted.

11          MR. SADLER:  That's all.

12          THE COURT:  Anything from the Magness folks?

13          MR. PETRIE:  No.  Thank you, Your Honor.

14          THE COURT:  Okay.  If you-all could come up.  I have

15  something for you.  And, otherwise, we are in recess.

16          (The proceedings were concluded at 5:05 p.m.)

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts                    01/12/2017

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX F

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3   RALPH S. JANVEY, IN HIS      (  CAUSE NO. 3:15-CV-401-N
     CAPACITY AS COURT-APPOINTED  )
 4   RECEIVER FOR THE STANFORD    (
     INTERNATIONAL BANK, LTD.,    )
 5   et al.,                      (
               Plaintiff,         )
 6                                (
     vs.                          )
 7                                (
     GMAG LLC, MAGNESS SECURITIES )
 8   LLC, GARY D. MAGNESS, and    (
     MANGO FIVE FAMILY, INC., IN  )
 9   ITS CAPACITY AS TRUSTEE FOR  (
     THE GARY D. MAGNESS IRREVOCABLE)  DALLAS, TEXAS
10   TRUST,                       (  JANUARY 132017
               Defendants.        (  9:00 A.M.
11   _____


12

13                            VOLUME 5

14

15   _____


16                      TRIAL ON THE MERITS

17          BEFORE THE HONORABLE DAVID C. GODBEY
                 UNITED STATES DISTRICT JUDGE
18                          and a jury
     _____

19

20

21

22              SHAWN M. McROBERTS, RMR, CRR
                1100 COMMERCE STREET, RM. 1654
23                 DALLAS, TEXAS  75242
                      (214) 753-2349

24

25
```

```
 1                      A P P E A R A N C E S

 2
          FOR THE PLAINTIFFS:   BAKER BOTTS, LLP
 3                              98 SAN JACINTO BOULEVARD
                                SUITE 1500
 4                              AUSTIN, TEXAS  78701-4039
                                (512) 322-2678
 5                              BY:  MR. KEVIN SADLER
                                     MR. SCOTT POWERS
 6                                   MR. BRENDAN DAY
                                     MS. ASHLEY CARR
 7
          FOR THE DEFENDANTS:   BALLARD SPAHR, LLP
 8                              1225 SEVENTEENTH STREET
                                SUITE 2300
 9                              DENVER, COLORADO 80202-5596
                                (303) 292-2400
10                              BY:  MR. ANDREW PETRIE
                                     MS. RACHEL MENTZ
11
                                DYKEMA COX SMITH
12                              1201 ELM STREET, SUITE 3300
                                DALLAS, TEXAS  75270
13                              (214) 698-7800
                                BY:  MR. DAVID BRYANT
14
          OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
15                              1100 COMMERCE STREET, RM. 1654
                                DALLAS, TEXAS  75242
16                              (214) 753-2349

17

18

19

20

21

22

23

24

25
```

## INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| THMAS ESPY | |
| JEFFREY GRAVES | |
|    Direct By MR. PETRIE............................................... | 141 |
|    Cross By MR. POWERS................................................ | 166 |
|    Redirect By MR. PETRIE............................................ | 177 |
| RALPH JANVEY | |
|    Direct By MR. POWERS.............................................. | 186 |
|    Cross By MR. PETRIE............................................... | 221 |
| RAYMOND SUTTON | |

**EXHIBITS**

| Exhibit | Page |
|---|---|
| No. 71, 72, 77, 83, 84, 86 Entered into Evidence | 140 |

**EXHIBITS**

| Exhibit | Page |
|---|---|
| No. 35, 95, 217, 221, 242 Entered into Evidence | 140 |
| No. 470 Entered into Evidence | 279 |

## Motion For Judgment

| Motion For Judgment | Page |
|---|---|
| | 181 |

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
 1              P R O C E E D I N G S

 2                  JANUARY 13, 2017

 3              THE COURT:  Good morning.  How are we doing?

 4     Anything we need to talk about?

 5              MR. PETRIE:  Just minor adjustment, Your Honor.  The

 6     way the software works when we do those transcripts, it

 7     clipped off two bits on two of them.  They are only a question

 8     or two long, and so we thought we -- we went in, manually

 9     tweaked them, thought we would replay them, and just wanted to

10     let you know so you didn't think we were backtracking.  But it

11     is necessary to give the completeness.

12              THE COURT:  That's fine.  Do you want to tell them

13     that, too, or do you want me to say something?

14              MR. SADLER:  Maybe it's better for the Court.  The

15     witness' answer was cut off.

16              MR. PETRIE:  If they think back to yesterday, they

17     may just think it is a hiccup.  But other than that, we are

18     all set.

19              THE COURT:  All righty.

20              (Whereupon, the jury entered the courtroom.)

21              THE COURT:  Be seated.

22         Good morning.  How are you-all doing?

23              SEVERAL JURORS:  Fine.

24              THE COURT:  Good.  We are set, I think, to just

25     power on through into the three-day weekend.
```

1        The lawyers have told me that there were kind of some

2    editing glitches in part of the last video that we saw, so

3    they're going to have to back up a little bit and replay some

4    of it because little bits were cut off.  I don't think it's a

5    whole bunch, and we're not going to be wasting your time, but

6    they wanted to be sure you heard the full questions and

7    answers.  So if it sounds familiar, it probably is.

8        Sufficient?

9            MR. SADLER:  Yes, sir.

10           MR. PETRIE:  Yes, sir.  Thank you.

11           THE COURT:  Let's go.  Thank you.

12       THOMAS ESPY, BY VIDEOTAPE DEPOSITION, continued,

13   Q.   From 2001 to the end of 2004, you worked for Mr. Magness

14   separately outside of Stanford Group Company.  Isn't that

15   right?

16   A.   Detail that question, because I'm not sure what you mean,

17   I work for Mr. Magness outside of the -- outside of -- I don't

18   know what you mean.

19   Q.   Okay.  Well, take a look, if you would, at page 36 of

20   your deposition with the SEC, line 16.  You were asked, "Have

21   you ever received any compensation from any entity other than

22   Stanford Group Company?"

23       And your answer was, "Yes."

24   A.   Yes.

25   Q.   And the question was, "Okay.  And what entity is that?"

1      And then you said, "At -- at the early, I worked --

2   actually, I guess I should give you a lineage where I worked.

3   I worked at Gary's office for a number of years when I first

4   started at Stanford, which kind of give you an idea of the

5   personal kind of -- what I actually did for Gary."

6      Do you see that?

7   A.   Yeah.

8         Mr. Petrie:  Same objection.

9   Q.   What was your -- you said it is a well-diversified

10  portfolio, is what Stanford International Bank described.

11  A.   That's correct.

12  Q.   Portfolio of what?

13  A.   Stocks, bonds, commodities, short positions, some real

14  estate.  It was global.  It was supposed to be invested with

15  managers that they had long-term outstanding relationship

16  throughout the world, both long and short.

17      So it was running a portfolio, the idea being that if it

18  earned 12 percent, it could pay out five or six percent.  And

19  the bank made money, and the clients were able to get a higher

20  rate of return.  Much the same as a hedge fund doe.

21  Q.   And --

22  A.   Much the same as a hedge fund does.

23  Q.   Right.  Are you familiar or do you know of any hedge

24  funds that would pay guaranteed rates of returns to its

25  investors?

```
 1   A.    Not to my knowledge.

 2   Q.    Like in a hedge fund, if the hedge fund makes 20 percent,

 3   the hedge fund manager is going to make some percentage, and

 4   then you're going to share in the return --

 5   A.    That's right.

 6   Q.    -- right?  And if the hedge fund loses 20 percent, you're

 7   going to share the loss.  Right?

 8   A.    Uh-huh.

 9   Q.    Is that yes?

10   A.    That's correct, yes.  Sorry.

11   Q.    And so if you are invested like a hedge fund -- or you're

12   invested in a hedge fund, you have to have some expectation

13   that the hedge fund can take losses.  Right?

14   A.    Yes, and we had no -- it wasn't -- we had no reason to

15   believe that the bank couldn't lose money, too.

16   Q.    And what would happen if the bank lost money?

17   A.    The -- it says in the -- in the documents that the -- and

18   if you -- when you read the document as -- and we've looked at

19   this, that the bank is only guaranteed to its ability to pay.

20   So it was a guaranteed rate.  But if the bank did make money,

21   it wouldn't be able to pay you, so -- we understood that.

22   Q.    And when did you come to that understanding?

23   A.    From the very beginning.

24   Q.    It's true, isn't it, that Stanford International Bank

25   never disclosed the identity of its money managers to the
```

1    investing public?

2    A.    That is -- that is my recollection.

3    Q.    And, likewise, Stanford International Bank did not

4    disclose its investment strategies to the investment public --

5    invested.

6    A.    Best of my knowledge, they did not.  They disclosed the

7    portfolio mix.  As I recall, there was a pie chart saying --

8    like most -- you know, as you see in a lot of those things,

9    this sector, that sector, that sector, that sector.

10   Q.    So take a look at Plaintiff's Exhibit 22.  Okay.  22 is

11   the Stanford International Bank 2005 annual report.  Do you

12   recall seeing documents like this while you were working at

13   Stanford Group Company?

14   A.    Yes.

15   Q.    And at 58255, just a couple of pages later, there's an

16   income statement and balance sheet for the bank?

17   A.    Uh-huh.  It was 256 or 255.  Which one are you looking

18   at?

19   Q.    That was at 255.

20   A.    Okay.

21   Q.    All right.  And then at -- if you proceed a few more

22   pages, we get to 58264.

23         We have a pie chart describing financial assets in the

24   left-hand side of the page?

25   A.    Uh-huh.

1    Q.   Is that what you were talking about in terms of pie

2    charts?

3    A.   Yeah, that's what I'm talking.

4    Q.   So here we have equity a little over 50 percent?

5    A.   Uh-huh.

6    Q.   So that -- your understanding of that would be it would

7    -- is stocks in publicly held companies?

8    A.   Uh-huh.

9    Q.   Is that yes?

10   A.   Well, you know, I don't know.  What it -- it refers to

11   equities, yes.

12   Q.   Okay.

13   A.   So I would assume public company.

14   Q.   Okay.  And then we have fixed income of something a

15   little over 20 percent.

16   A.   Right.

17   Q.   And that would be things like bonds?

18   A.   That would be my understanding, yes.

19   Q.   Corporate bonds --

20   A.   Right.

21   Q.   -- or government bonds?

22   A.   Corporate, government, high yield, whatever, yeah.

23   Q.   Precious metals, do you have an understanding what

24   precious metals would refer to?

25   A.   Yes, sure.

 1   Q.    That would be gold and silver, those kinds of things?

 2   A.    Gold, silver.

 3   Q.    Then we have alternatives?

 4   A.    Correct.

 5   Q.    And the alternative part of the portfolio, that's where

 6   the bank would be doing a long and short trading?

 7   A.    That's my understanding, right.

 8   Q.    Okay.

 9   A.    Or hedging options, whatever -- whatever goes into the

10   alternative.

11   Q.    So in the fixed income part of the chart, for example,

12   the bank has bought a government bond or a corporate bond, and

13   it's just making dividends off of those bonds or income off of

14   those bonds -- off the coupon, I guess.

15   A.    Maybe.  Could be trading high yield bond and -- whatever

16   it is, it's in fixed income.

17   Q.    Did anybody at Stanford ever say, The way Stanford

18   International Bank makes money is that it -- it can trade in a

19   variety of different locations, and it can make money to small

20   gains between the bid and the ask, and you add those together

21   over time and they can make 12 percent?

22   A.    Not -- not -- I don't recall ever hearing that.

23   Q.    Do you recall anybody ever saying that Stanford

24   International Bank could make money because you could trade

25   stock in one country and then trade it again in a different

1   country minutes later, and then you could just make little

2   gains like that over and over?

3   A.   I never heard anything to that effect.

4   Q.   Did anybody ever say anything about Stanford

5   International Bank make -- Stanford International Bank

6   employing something called a put and call strategy?

7   A.   I don't recall.

8   Q.   Did you ever discuss any of those concepts for the last

9   three questions with Gary Magness that you can remember?

10  A.   Not that I can remember.

11  Q.   Going back to 2004, 2005, and 2006 when the investments

12  were being made in the first place, did anybody at Stanford

13  tell you that Stanford International Bank was invested in real

14  estate?

15  A.   I recall that they told us, with the exception of the

16  bank, there were no real estate investments; that the only

17  investment -- the only real estate investment, as far as I

18  recall, was the building itself.  Everything else were liquid

19  investments across the world.

20       Now, Allen Stanford owned other things, but that was

21  outside of what the bank owned, to the best of my knowledge.

22  Q.   And then what about private equity investments?  Did you

23  have an understanding about whether the bank was in private

24  equity investments?

25  A.   My recollection that they were all liquid securities.

1    The first -- the first hint that private equity was involved

2    was a big red flag, and that was at the very end.  That came

3    from Juan Rodriguez, said in a call, and this was, I

4    think -- when did the -- you'll have to refresh my memory.

5        When did they close the bank?

6    Q.   February 2009?

7    A.   February 2009?  I believe this call was, like, in

8    December, and it was a call that I think I set up because

9    I -- that was the first time I had ever even heard private

10   equity.

11   Q.   Before advising Mr. Magness to invest with Stanford, did

12   you make any investigation of who was on the board of

13   directors?  I understand you met them, but who they were?

14   A.   Not really.  Not that I recall.

15   Q.   We -- we looked at the pie charts, and you knew about

16   what the pie charts look like.

17       But in -- but beyond that, did you know which particular

18   securities were in the various parts of the portfolio?

19   A.   No.  That I recall, no.

20   Q.   Is that something that you would have wanted to know?

21   A.   Something I asked Jim Davis if he would give us more

22   clarity into what the investments were.

23       The answer from Jim Davis was, you know, we've had these

24   relationships for many years, and you wouldn't ask -- I just

25   remember this comment, You wouldn't ask a bank on -- what

1   they're investing in; you know, a commercial bank isn't going

2   to tell you all their investments; we're not going to tell you

3   ours, because then it gives up our ability to be competitive,

4   which made sense.

5   Q.   Did you feel comfortable in recommending the investment

6   in the Stanford International Bank CD despite not knowing what

7   was in its portfolio?

8   A.   Yes, I did.

9   Q.   And why was that?

10  A.   From my due diligence of visiting the bank, you know,

11  visiting -- I mean, for every -- for all intents and purposes,

12  everything we saw looked ex -- very above board.

13  Q.   And this is at the time you're making the investments in

14  2004, 2005, 2006?

15  A.   Correct.

16  Q.   Did you have any Stanford International Bank customers

17  outside of the Magness umbrella?

18  A.   I did not.

19  Q.   Let me show you Plaintiff's Exhibit 89.  We talked

20  earlier about a Stanford Eagle magazine?

21  A.   Uh-huh.

22  Q.   Is this an example of one of the Stanford Eagle

23  magazines?

24  A.   I believe so.

25  Q.   And were these magazines available to financial advisors

1    to share with investors and potential investors?

2    A.    I believe so.

3    Q.    All right.  Take a look at page 49.  You mentioned that

4    you were in one of these Stanford Eagle magazines.

5    A.    Yeah, I -- well, let me see 49.  I thought I was.  Oh,

6    yeah, this is -- yeah, this--this sounds right.

7    Q.    And on page 49, there's a picture of you and Mr. Magness,

8    Mr. Knudson, and somebody named Rob Kittleson?

9    A.    Rob Kittleson, yeah.

10   Q.    Who is Rob Kittleson?

11   A.    Rob was the race manager for Mango Racing.

12   Q.    Okay.  And then there's a picture of a Mango Racing truck

13   with a Stanford Group Company logo on the back.

14   A.    That is correct.

15   Q.    And Mr. Magness owned the Mango Racing team?

16   A.    That is correct.

17   Q.    And he advertised Stanford Group Company on his trucks

18   from -- on -- on at least one occasion.

19   A.    It -- I think for one -- one year maybe.

20   Q.    Okay.  For one race season?

21   A.    One race season.

22   Q.    And this is something that he did at the request of you

23   or somebody at Stanford?

24   A.    At my request.  At this point, Stanford was sponsoring,

25   you know, the yachting -- the big yachting events.  They would

1    sponsor -- at a later time, I even -- Stanford sponsored a --

2    you know, race across America.

3        So I went to Gary.  Gary would have never taken

4    advertising, but we needed new race suits.  So I said, Hey,

5    let's -- let's see if Allen will -- or Stanford Group will

6    sponsor us.  So I think they sponsored us to the tune of

7    like -- I shouldn't say, but maybe 50- or $60,000.

8    Q.   Please take a look at Plaintiff's Exhibit 32, which I

9    believe should be in your book.

10   A.   You want that?

11       32 is here.

12   Q.   This is an email from Chuck Wilk to Tonya@Magness.net,

13   who I think is Tonya Dokken.  Is that right?

14   A.   I believe so, yeah.  Not I believe so.  Yes.

15   Q.   And the -- the date of the email is May 22nd, 2006, and

16   it forwards an attached article from Bloomberg dated May 17th,

17   2006.  Do you see that?

18   A.   Yes.

19   Q.   And if you turn to the next -- the second page of the

20   exhibit, I believe you'll see the actual Bloomberg article,

21   and it is -- the article is entitled Stanford Financial's

22   Family Ties -- Family Tie Fails to Impress University.

23   A.   Uh-huh.

24   Q.   Do you remember seeing this article in Bloomberg?

25   A.   I do.

16

1   Q.   And there was some discussion about whether Stanford

2   actually had a connection to Stanford University.

3   A.   Right.

4   Q.   I want to direct your attention to the bottom of the

5   first page of the article.  The second sentence of the first

6   paragraph says, "'In 1999, Stanford Financial tried to take

7   over Antiguan International Business Corp., which regulated

8   offshore companies on the island,' said Jonathan Weiner, who

9   was then a deputy assistant Secretary of State."

10       Do you recall any discussion or knowing about that

11   allegation?

12   A.   I don't recall it, no.  I remember -- what I recall was

13   the -- the -- the Stanford trying -- Allen Stanford trying to

14   do something with Stanford University having to do with

15   refurbishing some house or something like that.  It was some

16   accusation that he wasn't Stanford -- wasn't that Stanford.

17   Q.   If you were aware of an allegation that Stanford had made

18   an effort to take over the regulation of its own bank in

19   Antigua, would that have been a concern to you?

20   A.   Probably.

21   Q.   Would you have investigated it further if you heard about

22   it?

23   A.   I don't know.  I can't say what I would have done.  I

24   mean, it's easy to say what you would do now.  I'm not sure

25   what -- what I knew then or what I would have done.

17

1    Q.   But it would have been a concern to you.

2    A.   It may have been at the time, yeah.  I don't -- but I

3    don't recall -- I don't recall it at this point.

4    Q.   But it is true that Mr. Stanford was telling people that

5    one of the things that made the bank lower risk is that it was

6    regulated by government authorities in Antigua.

7    A.   That was his statement, yes.

8    Q.   And implicit in that is those regulatory authorities are

9    independent of Stanford.

10   A.   That was my understanding, yes.

11   Q.   Okay.  Let me show you Plaintiff's Exhibit 200 and ask

12   you if you recall Stanford making a donation to some kind to a

13   fashion show that Ms. -- Mrs. Magness was associated with?

14   A.   Yeah.

15   Q.   Do you recall -- you recall that happening?

16   A.   Uh-huh.

17   Q.   And that was about $60,000?

18   A.   Yeah.  That may have been the 60K I remember.

19   Q.   And in that -- what do you know about what that fashion

20   show was about or why Mr. Magness was interested in it?

21   A.   Well, Mr. Magness wasn't; his wife was.  And it was a

22   fashion show that was held in -- in New York that Sarah was

23   somehow associated with, and I was asked by Sarah to see if

24   Allen Stanford would do something to this.

25       And I actually spoke to Allen Stanford on this.  And he

1    asked me, Why are we doing this?

2        And I had said to him, you know, Gary's a big client of

3    the bank and I think it's in our best interest, and that I

4    think that everything that we do to help Gary helps us.

5    Q.   And what was Mr. Stanford's response?

6    A.   He said yes.

7    Q.   Now --

8    A.   This is one of the few times -- I only spoke to him about

9    five times, I think, in my whole career, so --

10   Q.   And this was one of those times?

11   A.   This is one of those times.  This was an email, but I

12   actually spoke to him.  And at my urging, he decided, Okay, I

13   will invest in this.

14   Q.   And did he communicate that to you on the phone and then

15   follow up with an email?

16   A.   Wait a minute.  What's this -- yes.  I think I may have

17   emailed him first, and then he -- and then we actually spoke

18   on the phone on this one.

19   Q.   I see.  And Plaintiff's Exhibit 200 is Mr. Stanford's

20   email to you, and it's dated September 5th, 2006.  Correct?

21   A.   I believe so, yes.

22   Q.   Please take a look at 27 -- Plaintiff's Exhibit 27 in

23   your book.

24   A.   Hang on.

25   Q.   Plaintiff's Exhibit 27 is a letter from yourself to Mr.

1    Magness dated September 26, 2006.  Is that right?

2    A.    That is -- I would imagine so, yeah.  That's what it says

3    here.

4    Q.    Okay.  And this reflects a proposal whereby Mr. Magness

5    would make at least $25 million in investments in the bank,

6    that is Stanford International Bank, by the end of the year

7    and then he would get certain things in return --

8    A.    Yeah.

9    Q.    -- like an improved rate card?

10   A.    I think this had to do not so much with -- wait.  Let me

11   see.  Wait a minute.  I got to read it first.

12        Yeah.  This was more or less related to -- because Gary

13   had -- I was making enough money in the bank that I was

14   negotiating now commissions.  So I would reduce our -- my

15   commission rate to virtually -- I think it's to a penny or

16   something like that.

17   Q.    Oh, I see.  So on the -- but on the first half of this

18   letter, this refers to --

19   A.    Yeah.

20   Q.    -- you're going to have --

21   A.    Yeah.  Okay.

22   Q.    -- this rate grid that's never going to go down as long

23   as you keep $50 million in the bank.

24   A.    Yeah.  This was, once again, when I'm trying to work out

25   the best deal I could for Gary.

```
 1   Q.   Right.  And then the next part is what you described,

 2   which is the -- the commissions on certain stocks in which Mr.

 3   Magness was heavily invested would be a penny a share?

 4   A.   That's correct, because these were legacy positions, and

 5   so if Gary bought or sold or -- mostly sold, then -- then he

 6   would -- I would agree to do it at one cent, which was well

 7   below market rate.

 8   Q.   Okay.  And then the last bullet point is, "Mr. Magness

 9   will advertise Stanford private wealth management for one of

10   the race seasons."

11   A.   Exactly.

12   Q.   Okay.  And did you -- how did you -- how did it come

13   about that you were able to get this deal for Mr. Magness?

14   A.   Because I'm pretty good at what I was doing.

15   Q.   Well, I know.  But, logistically, what did you have to do

16   within Stanford?

17   A.   I can't remember if this went to -- who this -- I don't

18   remember who I negotiated this with.  It may have been Jason

19   Green, who -- whoever -- it wasn't -- I don't recall it

20   being -- it may have gone up to Allen.  I don't know.

21        But, you know, I -- I was constantly trying to negotiate

22   something better for Gary.  It was good for me; it was good

23   for Gary.  And -- but I was at -- this was, you know, my

24   negotiation.

25        I would -- I would think these things up, go to Gary and
```

1    say, This is what I'm thinking about doing; what do you think?

2         You know, he'd tell me, go do what you think is best.

3    Q.   Okay.  But, I mean, what you got here for him was a

4    really good deal.  This isn't like just garden-variety broker

5    or garden-variety client gets a deal like this.  This is

6    something you were able to work out.

7    A.   This is something I worked out.

8    Q.   Right.

9    A.   Yes.

10   Q.   And I think, as you said, the commission rate -- the

11   trading rate, for example, on the securities was -- this is

12   well below market rates.

13   A.   Well, this was a good deal for Gary.  It was also a fair

14   deal for Gary, because these were very large positions that he

15   had held in his family.  We didn't know what we were going to

16   do with them, but these were his family positions, so -- yes,

17   it was a good deal for all.

18   Q.   And did you know of any other individual investor or

19   groups of investors in Stanford International Bank that had

20   one of these special rate grids like you had negotiated for

21   him?

22   A.   I don't know.  I mean, I -- I only negotiated for Gary,

23   so I have no idea what else was going on.

24   Q.   You just don't know one way or the other?

25   A.   I have no -- no clue.  What -- what anybody else did

```
 1    is -- was, you know, very confidential amongst financial

 2    advisors.

 3    Q.    Handing you Plaintiff's Exhibit 204.  Do you recognize

 4    204 as an email from Allen Stanford to yourself dated October

 5    27, 2006?

 6    A.    Okay.

 7    Q.    Do you recognize the email?

 8    A.    No, but I'm -- it came to me, so -- do I recollect it?

 9    No, but --

10    Q.    Do you -- so at the end of 2006 -- I think on Halloween

11    2006, Mr. Magness invested $30 million over three CDs --

12    A.    Uh-huh.

13    Q.    -- through the Trust?  Do you remember that?

14    A.    Uh-huh.

15    Q.    Yes?  Is that a yes?

16    A.    Yes.  I'm sorry.

17    Q.    And Mr. Rodriguez is -- in the first email in the chain

18    is confirming that he has agreed to apply the rate as if these

19    were five-year fixed CDs when in fact they were four-year

20    fixed CDs.  Is that right?

21    A.    That's correct.  That's what it says here.

22    Q.    Is that --

23    A.    I don't really remember why we negotiated that.  But I

24    have a feeling -- well, I can't remember, but, yeah, that's

25    what it says here.
```

```
 1    Q.   Okay.  You don't have any reason to doubt that that's

 2    what happened?

 3    A.   What's that?

 4    Q.   You don't have any reason to doubt that is --

 5    A.   No, not at all.

 6    Q.   And that was an unusual request such that the president

 7    of the bank had to sign off on it.

 8    A.   That's correct.

 9    Q.   And then your response to Mr. Rodriguez-Tolentino was to

10    thank him for his help, and then you're confirming when the

11    wire is going to go through.

12    A.   That's what it says here, yes.

13    Q.   All right.  And Mr. Stanford's response, it says, "Tom,

14    tell Gary thanks for his business and that we will always go

15    the extra mile for him."  Is that right?

16    A.   That's what it says here, yeah.

17    Q.   I mean, in your experience well up until the end, did

18    Stanford always go the extra mile for Mr. Magness?

19    A.   As far as I know, he went the extra mile for me, which

20    was for Mr. Magness, which all made sense at the time.

21    Q.   Please take a look at Plaintiff's 56, which is -- should

22    be in your notebook.

23    A.   Okay.

24    Q.   This is an email from Ms. Dokken to yourself dated

25    February 5th, 2008, and it's making an inquiry about the
```

```
 1   Stanford CD program.

 2        Do you recall receiving this email?

 3   A.   I don't recall it, but it -- it -- and obviously I read

 4   it.  But I think this was related to the -- or the earlier

 5   comment that -- now we're getting into February of 2008, and

 6   things were getting -- I say -- as I recall, the next month's

 7   when Bear Stearns went down.

 8   Q.   Right.

 9   A.   So there were a lot of write-offs and there was a lot of

10   more -- and the Bear Stearns II mortgage-backed funds I think

11   had already gone under at this point, so there was a lot of

12   consternation related to investments.

13   Q.   And one of the things -- well, not only those things

14   happened -- so the general state of the economy has --

15   A.   Now, kind of --

16   Q.   -- gone in a southward direction?

17   A.   Yeah.  Yeah.

18   Q.   But this also follows on the inquiry you got following

19   the October 2007 meeting.

20   A.   That's what I would -- that's what I would -- when was

21   that?  When was that, two thousand --

22   Q.   October 1st, 2007.

23   A.   Right.  So this is February.  That would make sense.

24   Q.   Okay.  So it's -- is it fair to infer from the events

25   that you experienced that not only is this motivated by the
```

1    southward trajectory of the markets, but it's also motivated

2    by the inquiries that were made in October 2007?

3    A.    I would agree with that, yes.

4    Q.    And one of the things that it says the Mango Five

5    investment committee would like to know is, they would like to

6    understand -- and I'm focused on the end of the first

7    paragraph.

8         They would like to understand and review the strategies

9    and investments that the Stanford Bank certificates of deposit

10   have exposure to so that we can better understand the

11   underlying assets.

12   A.    Correct.

13   Q.    What did you do in response to this email from Ms.

14   Dokken?

15   A.    Well, as I recall, that's when I reached out to the bank

16   to Jason Green and said this -- this inquiry has come in.  And

17   the thought was that they were going to present at the next

18   board meeting.

19   Q.    Let me show you Plaintiff's Exhibit 157, which is

20   your -- which is a brief response that you had to Ms. Dokken

21   to her email dated February 5th, 2008.  Do you recognize that

22   response?

23   A.    Let's see.  Yeah, that's -- when was this?  This was

24   February?  Okay.

25   Q.    You say, "You are certainly not alone in this request."

```
1    A.    Uh-huh.

2    Q.    What did you mean by that?

3    A.    Well, at this point with the markets going down, you

4    know, every -- you had heightened concern.

5          Gary wasn't alone, and no one was alone in wanting to

6    know more detail about how -- how the -- how -- how the -- the

7    portfolio was being run, because it wasn't -- it wasn't -- you

8    didn't have perfect clarity into it.

9          So the request came in, and I agreed that we would try to

10   push to find out more about what the -- what the underlying

11   investments were and their strategies, is my -- my guess.

12   Q.    And did you hear from someone else that other customers

13   of the bank were concerned about its portfolio?

14   A.    You know, I can't say that specifically.  But I think it

15   was universal amongst any investments, given the environment

16   where we were at, people were concerned, I think, universally.

17   Q.    And I believe if we look back at -- well, you can stay on

18   that exhibit because her email's in that same exhibit.

19         She asked for a report on the status of the CDs and --

20   and that it should be sent to Tonya Dokken for inclusion in

21   the next investment committee package, and that is for the

22   next meeting.

23   A.    That makes -- yeah, that's what I recall.

24   Q.    And do you recall what it was that you sent to her?

25   A.    I do not.
```

1  Q.   All right.  And then in March 6, 2008, if you'll turn to

2  Plaintiff's Exhibit 62, we have minutes of an investment

3  committee meeting, which I think you'll agree you were present

4  for.

5  A.   I think so, yes.

6  Q.   Okay.  And at page 2 of the minutes, there is a

7  report -- there's a section entitled Report on Stanford

8  Certificates of Deposit.

9       What's reflected in Section 5 on page 2, is that

10 consistent with your recollection of what was discussed at the

11 meeting regarding Stanford?

12 A.   To the best of my knowledge, yeah -- yes.

13 Q.   Do you have any idea what Mr. Rodriguez-Tolentino meant

14 when he referred to Stanford being -- or resembling a Swiss

15 bank model?

16 A.   I have no idea what that means.

17 Q.   Did you have any understanding of -- of what the

18 significance of regulatory oversight was when the question was

19 raised whether Stanford was similar to a hedge fund?

20 A.   I'm specu -- I mean, I don't really remember that -- that

21 part of the conversation, but what I -- but I think he's

22 referring to the fact that there was a -- a bank regulatory

23 body in the Caribbean or maybe in Antigua that was overseeing

24 the bank.

25 Q.   Right.  And if the implication of the question was, you

1    know, we're worried because hedge funds can go up and down,

2    and this bank to stay in business has to only go up, what

3    difference does it whether it's regulated by a government or

4    not?

5    A.    Your guess is as good as mine.

6    Q.    The next sentence just after the one we were talking

7    about, says that "Mr. Rodriguez stated that the bank had

8    leveraged the portfolio by a factor of 15 percent."

9    A.    No.  And I don't even know what that means.

10   Q.    I mean, if you're going to leverage the portfolio,

11   doesn't that mean that you're borrowing against the assets in

12   the portfolio?

13   A.    That -- that may be what he means, yeah.  It's possible.

14   Q.    That would be the way you would leverage something?

15   A.    Yeah, potentially.

16   Q.    All right.  So if it -- if it were true that the bank was

17   leveraged against its own assets, you would expect that its

18   reports would reflect that it had some indebtedness to

19   somebody.

20   A.    Possibly.

21   Q.    And Stanford in its annual reports, I think as we saw

22   earlier today, included statements of its assets and

23   liabilities, did it not?

24   A.    It did.

25   Q.    And did anybody go and look to see whether or not it

```
 1   reflected any liabilities to anybody other than customers?

 2   A.   Not to my knowledge.

 3   Q.   Somebody could have done that.

 4        Mr. Petrie:  Object to the form.

 5   A.   Well, any -- yeah, anything's possible.

 6   Q.   Well, I don't mean it in that sense.  I just mean the

 7   annual reports were available to you.

 8   A.   That's correct.

 9   Q.   Okay.  So somebody could have picked up the annual

10   reports that were available to you and made that

11   determination.

12   A.   It's -- yeah, anybody could do that.

13   Q.   Yes.

14   A.   That's correct.

15   Q.   What was the reaction of the group to Mr. Rodriguez's

16   presentation as far as you can recall?

17   A.   When was this again?

18   Q.   This is in March 2008.

19   A.   When did -- I -- there was another meeting, so I'm trying

20   to remember.  I think every -- I think the meeting went okay.

21   I think every -- everybody at this point was -- I think.  I

22   can't remember.  I don't want to speculate because there

23   was -- you know, going forward from here, it gets real dicey.

24   Q.   Okay.  Plaintiff's 65, can you please turn to that one?

25   That should be in your notebook.
```

```
1          This is an article from Bloomberg dated January -- or,

2    excuse me, dated July 3rd, 2008, and the title of the article

3    is SEC Investigating Stanford Group Offshore CDs, Investments.

4          Do you see that?

5    A.   I do.

6    Q.   Do you recall hearing about this article concerning an

7    SEC investigation of Stanford in July of 2008?

8    A.   I don't know if I remember it in July, but I do remember

9    it was -- that Ronald O'Brien and whatever the --

10   Charles -- or Tidwell were all -- this came up at some point,

11   and it was a buzz amongst -- in the firm.

12   Q.   And approximately when do you think that was happening?

13   Close in time to this article?

14   A.   I -- I can't remember.  This is July of '08, so could be.

15   Q.   And in -- in what -- how did the buzz within the firm

16   manifest itself?

17   A.   Well, the article came out, and people were talking about

18   it --

19   Q.   Right.

20   A.   -- and speculating on whether or not it was -- the -- as

21   I recall, at least what we heard was that these -- these two

22   gentlemen were fired for cause within the firm, and this is

23   spilt milk.  That's -- that was the -- that was the -- as I

24   recall, the -- what was coming out of management.

25   Q.   They were disgruntled ex-employees and --
```

1    A.    Yes, exactly.

2    Q.    -- sour grapes.

3    A.    Sour grapes.

4    Q.    Did you look at the article when you looked at it?

5    A.    I don't remember.

6    Q.    Did you -- did you mention anything relating to the

7    article to Mr. Magness at any point?

8    A.    I don't remember.

9    Q.    And do you recall one way or the other about whether you

10   discussed the Bloomberg article that came out the same day you

11   were with Mr. Magness apparently in New York?

12   A.    No.  And I'm -- and I don't even remember the article.  I

13   just remember the buzz in the office.  So my -- I would say it

14   would be completely unrelated.

15   Q.    Let me hand you Plaintiff's Exhibit 76.

16         Plaintiff's Exhibit 76 is an email from yourself to Jane

17   Price dated August 25th, 2008.

18         Do you know who Jane Price is?

19   A.    No.

20   Q.    The first email says, "Jane, Gary's wife did not get home

21   until it was too late to attend.  He would like to see Mr.

22   Stanford, if possible, while he is in town."

23         Mr. Stanford was in town in August 2008 for the

24   Democratic National Convention?

25   A.    Yes, I remember this now.

1  Q.   Okay.  And Mr. Magness asked to see Mr. Stanford while he

2  was in town?

3  A.   I don't recall.  I don't believe he ever -- I didn't see

4  Mr. Stanford, so I don't think -- Gary -- I don't think -- if

5  he did, I can't remember.

6      What I recall about this was I did not see Mr. Stanford.

7  And I had lunch with Juan Rodriguez and -- and a couple of

8  other people.

9  Q.   But Mr. Magness wanted to see -- whether you saw him or

10  not, Mr. Magness had asked to see Mr. Stanford.  Is that

11  right?

12  A.   I don't recall, you know.  I mean, it may have been me

13  saying, you know, Gary would like to see him if he -- you

14  know -- but I don't recall that Gary ever requested to see Mr.

15  Stanford.  That could have been just my take on it.

16  Q.   Okay.  And let me show you Plaintiff's Exhibit 215.

17  A.   Thank you.

18  Q.   This is an email exchange between you and Mr.

19  Rodriguez-Tolentino dated August 25th, 2008.

20      Does this refresh your recollection that you and Mr.

21  Rodriguez-Tolentino arranged to have lunch in Denver?

22  A.   Yeah.  This is what I was talking about.  So I did miss

23  Stanford.  He was gone.  And then we had lunch, as I recall.

24  Q.   Okay.  And then you were following up with Mr.

25  Rodriguez-Tolentino in the middle email, asking if Mr.

1    Rodriguez-Tolentino had seen Mr. Stanford.

2    A.    Possibly, yeah.  That's what I said, asked.

3    Q.    RAS is Mr. Stanford?

4    A.    Yeah.  Yes.

5    Q.    Okay.  Did you have any specific reason for wanting to

6    see Mr. Stanford?

7    A.    No.  He was in town, and I'm in Denver, so --

8    Q.    Let me show you the next -- let's go to the minutes of

9    the December meeting, because I think you were there.

10   A.    That one I was at.

11   Q.    Okay.

12   A.    When did they take -- when did the Receiver come in?  Was

13   that '09?

14   Q.    February 2009.

15   A.    Okay.  Now it's getting dicey.

16   Q.    Now it's getting dicey.  In October of 2008?

17   A.    No, in December at that meeting.  There was a -- this one

18   we started to ask some questions.

19   Q.    Okay.  Please take a look at Plaintiff's Exhibit 92.

20   A.    Okay.

21   Q.    These are minutes of an investment committee meeting on

22   December 5th, 2008.  Do you see that?

23   A.    Yes.

24   Q.    And in attendance are the members of the committee as

25   well as Ms. Dokken and yourself.  Right?

```
 1    A.    Correct.

 2    Q.    And there's a section reflecting the reports of

 3    Stanford -- Stanford certificates of deposit.  And I'd like

 4    you to first just read it to yourself, and then I want to know

 5    if this is consistent with your recollection of what was

 6    discussed.

 7    A.    Okay.

 8    Q.    Is -- are Section 4 of the minutes, which are on pages 1

 9    and 2 of the minutes, consistent with your recollection of

10    what was discussed regarding Stanford certificates of deposit?

11    A.    That is correct.

12    Q.    There are some statements attributed to you.

13    A.    Uh-huh.

14    Q.    Are those statements attributed to you consistent with

15    your recollection of what you said during the meeting?

16    A.    As far as I can see, yes.

17    Q.    So there's a reference to what happened after the October

18    1st meeting.  Do you recall whether somebody who was in the

19    October 1st meeting called you to talk about what happened in

20    the October 1st meeting?

21    A.    I don't -- I don't recall.  I do know that at this point

22    the market had crashed, and we were getting margin calls

23    across the board that were, I mean, significant margin calls,

24    which required us -- at one point we -- we had -- we had -- I

25    think it was U.S. Bank, we found out that the covenants didn't
```

1    -- wouldn't allow for margin under $10 if the security went

2    under $10.

3         So because of that, we had a margin call, and we were

4    scrambling to go find any money that we could find.

5         So I approached the bank to say, Listen, we may have

6    to -- we may have to get out of this; we -- we don't have a

7    choice; this is the only place we have any money, because we

8    were under margin calls.

9         So that's my recollection that I think this relates to.

10   Q.   I just want to make sure I understand about the margin

11   calls.  You say you didn't have any choice.

12        One possible reaction or response to a margin call is to

13   simply let the bank take and then sell the securities that are

14   securing the margin loan.  Right?

15   A.   Yeah, but that would be your last resort.  A lot of these

16   were legacy stocks.  So if you had any other opportunity to

17   try to stave off a margin call, that's what you would do.

18   Q.   But in point of fact, Mr. Magness had previously used the

19   sale of the stock that was securing the margin loans to pay

20   down margin debt.

21   A.   We -- we -- I know what you're getting at, but you have

22   to understand the situation at the time.

23        If -- these were legacy stock.  We had to sell some.  We

24   didn't have a choice.  We were keeping -- we had margin calls

25   coming in every single day, so we were scrambling not only to

```
 1    sell stock but to sell as little as possible and to go

 2    anywhere we could in order to see if we could stave off the

 3    margin calls.

 4         Once the stock is gone, it doesn't matter if it goes back

 5    up because it's gone.  And there were big -- there are big tax

 6    issues with that.

 7    Q.   So are you disputing that in the -- in the calendar year

 8    preceding this, 2007, that the Magness entities sold

 9    substantial amounts of stock --

10    A.   Yeah.

11    Q.   -- in excess of $100 million of stock --

12    A.   Sure.

13    Q.   -- to pay off the margin debt?

14    A.   I don't recall whether it was margin debt or -- or -- I

15    remember being involved in selling at my -- at my -- we -- I

16    think it was Liberty -- oh, geez.  It was one of the Liberty

17    stocks, Liberty Interactive, I believe.  And we had a number

18    of millions of shares.

19         And I think we started selling at 26, but it wasn't for

20    margin.  It was -- we decided that that was -- whatever

21    reason, that we wanted to lighten some of that up.

22         You know, you've got a billion-dollar portfolio.  You

23    sell and buy all the time, so -- I'm not sure what your point

24    is.

25    Q.   Well, I think I was just asking a question, which is,
```

1   isn't it true that in the prior year, in 2007, that

2   substantial amounts of Liberty stock were -- were sold, in

3   excess of a hundred million dollars' worth, and then -- and

4   then that was then applied to paying down margin loans?

5   A.   I don't recall.

6   Q.   But in any event, whether it's the last resort or

7   whatever, you said there was no choice.

8        And my only question is, isn't it true that there was a

9   choice?  One choice is to grab the cash from Stanford

10  International Bank, and another choice is to just let go of

11  the stock that is backing whatever particular debt is yielding

12  the margin call?  That's a possibility.

13  A.   There are a lot of possibilities.

14  Q.   Those are the two most obvious, aren't they?

15  A.   You know, those are two possibilities, yes.

16  Q.   And, in fact, in this time period, that is in October of

17  2008, the sale of Liberty stock or other stocks was used to

18  pay down on tens of millions of dollars of margin debt?

19  A.   Yes.

20  Q.   So to make sure I understand, the person who was in

21  charge of evaluating the margin calls and -- and determining

22  the strategy for addressing them, that was not you?

23  A.   If it were related -- well, if it was -- if it was part

24  of Stanford Group Company or Pershing account, if a margin

25  call came in, that would come in to Pam McGowan.

1          This was U.S. Bank.  I had nothing to do.

2     Q.   Right.  And that was my point, is the margin calls that

3     you have been describing are U.S. Bank margin calls?

4     A.   No. -- well, for the first 25.

5     Q.   Okay.  That was the U.S. Bank margin call, meaning the

6     decision to address whatever margin call was associated with

7     that, that was through Ms. Dokken and Mr. Magness.  That was

8     on their side.

9     A.   No.  Actually when -- when the margin call came in, it

10    was at my -- then I said -- well, we didn't have the money,

11    so -- I mean, we were getting margin calls from the bank.

12    Gary didn't want to sell stock.

13         I said, Well, let's go -- I said, Let's go down to the

14    bank and see if we can borrow money against our CDs, which was

15    in the documents that you could do that.  You could borrow up

16    to 80 percent of the value of your CD in order to pay -- to

17    pay down -- or you could borrow it up to 80 percent of what

18    the loan value was.

19         At this time, though, Gary had had a -- $25 million in

20    profit, so we were just borrowing against what we had.

21    Q.   And then after this $25 million loan, there were

22    a -- there were -- there were three additional loans that

23    totaled approximately $63 million.

24         Do you recall that that same month?

25    A.   That sounds about right.

1   Q.   And was it Mrs. -- Ms. Dokken who was responsible for

2   determining what the cash needs were for the Magness entities

3   and how to apply those funds from those loans, or were you

4   involved in that?

5   A.   That -- that wouldn't involve me, as far as I know.

6   Q.   October 1st, 2008, what was the -- what was the state of

7   the market?

8   A.   It was -- as I recall, it was a disaster.

9   Q.   Lehmann was already down by then.  Right?

10  A.   I think Lehmann went down in September.  As I recall, our

11  worst position was in November is when we were

12  getting -- October, November was absolutely the worst for us.

13  Q.   For the Magness entities?

14  A.   For the Magness entities.

15  Q.   Whenever the part of your market you were invested in was

16  hitting the rock bottom, that's when it was, October,

17  November.

18  A.   October, November, in my recollection, that's when his

19  concentrated legacy positions got hit the worst.

20  Q.   But just sort of looking on a market-wide basis, by the

21  end of September 2008, the market was already down well over

22  double digits.

23  A.   As far as I recall, yeah.

24  Q.   Do you know who Ryan Bell is?

25  A.   Uh-huh, Ryan -- yes, I do.

40

1   Q.   Who is Ryan Bell?

2   A.   Ryan Bell was the broker of record at originally Goldman

3   Sachs, transferred to Merrill Lynch, and reported -- and had

4   a -- a great -- I think he had more assets over there than we

5   had at Stanford.

6   Q.   Did you ever talk to Mr. Bell about the Stanford

7   International Bank CD?

8   A.   I don't recall.

9   Q.   Turning back to Plaintiff's Exhibit 92, which we touched

10  on before, in the Section 4, we were talking about the third

11  sentence says that Mr. -- or, excuse me, the second sentence

12  says, "Mr. Magness inquired how his risk could be reduced to

13  the exposure of these certificates of deposit"?

14       Do you see that?

15  A.   Yes.

16  Q.   And your response was that "after the bank advised that

17  redemption would not be possible at this time, GMIT," meaning

18  the trust, "borrowed from the bank against these certificates

19  in the approximate amount of 80 percent of their face value or

20  $63 million."   Right?

21  A.   That's what it says, yes.

22  Q.   And that's the $63 million worth of loans that were taken

23  in the second half of October 2008.

24  A.   Yes.

25  Q.   And that happened after you approached the bank and were

1    advised by the bank that redemption of the CDs was not

2    possible.

3    A.   My recollection of this was that they -- that we had two

4    choices.  You know, you could either break the CD and get out

5    of it, or you could borrow against it.  And quite frankly, I

6    didn't care which way we went.

7        Gary wanted to borrow against it because he liked the

8    rate and didn't want -- and if, in fact, the market came back,

9    he could replace -- he could pay back the loan and keep his

10   CDs.

11   Q.   Now, you'd agree with me that the minutes don't reflect

12   anything like that.

13   A.   I'm just telling you what I remember.

14   Q.   Sure.  Understood.  But you would agree with me that

15   that's not reflected in the minutes.

16   A.   That may not be what's reflected in here, but that's what

17   I remember.

18   Q.   Right.  And, in fact, after the discussion about we got

19   some of the money out, 80 percent of the money out, the next

20   sentence says Mr. Magness indicated that he would continue

21   working with you to investigate how to reduce the trust's

22   risks from these certificates of deposit.

23       Would you agree that's the opposite of he liked the CDs

24   and wanted to stay in them?

25   A.   Scott, I'm just telling you, this is what I remember.

1    What's reflected in here is not the discussion I had with

2    Gary.  This is what they're producing, so I can't tell you --

3    and I don't remember ever -- I mean, I've never seen these as

4    far as I know.

5    Q.   What they are producing, you mean the Mango Five people.

6    A.   Well --

7    Q.   Right?

8    A.   Yeah.

9    Q.   You mentioned in response to one of Mr. Powers' questions

10   that Mr. Magness was your best friend.  Do you recall that?

11   A.   Yes.

12   Q.   And you also mentioned that at one point -- and forgive

13   me for not having the exact context -- that Mr. Magness and

14   his companies would have been roughly 90 percent of your

15   business at one point?

16   A.   I would say that's a fair estimate, yes.

17   Q.   Were they a hundred percent of your business on the

18   Stanford International Bank CD side?

19   A.   Yes.  As it related, every CD I had was somehow related

20   to the Magness entities.

21   Q.   At any point in time, did you understand that you were --

22   in terms of marketing the Stanford International Bank CDs, did

23   you understand that you were putting Mr. Magness and his

24   companies into an investment that was too good to be true?

25   A.   No.

```
1    Q.    Did you receive -- at the point when you're putting him

2    into these investments, did you have any information that

3    would lead you to suspect that that was the case?

4    A.    No.

5    Q.    At that point in time did you have any knowledge that you

6    were putting Mr. Magness and his entities into an investment

7    with a bank that was insolvent?

8    A.    No.

9    Q.    Did you have any information in hand that would lead you

10   to suspect that the bank might have been insolvent?

11   A.    No.

12   Q.    During the same period of time, did you have any

13   information that there was some risk that the bank was part of

14   a Ponzi scheme?

15   A.    No.

16   Q.    Did you know what a Ponzi scheme was?

17   A.    Yes.

18   Q.    Had you ever discussed with Mr. Magness what a Ponzi

19   scheme was?

20   A.    No.

21   Q.    Do you have any information in hand at that point in time

22   that would have led you to suspect that the bank was somehow

23   involved in a Ponzi scheme?

24   A.    No.

25   Q.    Did you have any belief at all that you were putting Mr.
```

1   Magness and his entities at risk of losing the entire

2   investment they were making?

3   A.   No.

4   Q.   Was this an investment that you perceived as being

5   without risk altogether?

6   A.   No.

7   Q.   What was the nature of the risk that you perceived at the

8   time?

9   A.   I think my perception of the risk was -- I think if it

10   was run properly as it was fed is -- with market risk, had a

11   greater degree of safety because it was guaranteed by the full

12   faith of the bank, which was also guaranteed by Stanford, who

13   we believed to be a -- a very upstanding person.

14       But we -- and that's the reason why we had eight or nine

15   percent of his total net worth in the bank.  So I never

16   thought there was any -- I'd never put my best friend or any

17   friend or any client, I don't care if they were an enemy, in

18   anything that I didn't think was solvent or -- or a good

19   investment.

20   Q.   And I -- when you say that you would never do that, is

21   that also the case irrespective of the compensation that you

22   were able to obtain by virtue of putting a client into a

23   particular investment?  In other words, it didn't matter how

24   much you were going to personally make as a commission or

25   otherwise.

1    A.    Look, commissions were good, but I would never put an

2    investment -- I would never put any client in an investment

3    that I didn't think was sound.

4    Q.    Did you ever personally purchase an SIBL certificate of

5    deposit?

6    A.    No.

7    Q.    Why not?

8    A.    I didn't really have the money to do it, and I -- most of

9    the money I had, when I had a lot of it, was -- was -- I

10   traded with, because I thought I could make a lot more.  I

11   wasn't looking for income.

12   Q.    When you say you traded, meaning you were buying and

13   selling securities?

14   A.    Buying and selling securities.

15   Q.    Did you -- at any point in time when you had that money

16   and you were buying and selling securities, did you have any

17   concerns about the safety of buying an SIBL certificate of

18   deposit?

19   A.    No.

20   Q.    Could you look at Exhibit 27, please?  Hopefully that is

21   the September 26th, '06, letter that you discussed with Mr.

22   Powers.

23   A.    Wait a minute.  Okay.

24   Q.    In the initial paragraph of your letter to Mr. Magness,

25   you say that these proposals went all the way up to Mr.

```
 1   Stanford.

 2       Do you see that reference?

 3   A.   Yeah.  Yes, I do.

 4   Q.   Did -- is this one of the things -- you mentioned you had

 5   maybe a handful of conversations with Mr. Stanford.

 6       Did you actually discuss these proposals with him?

 7   A.   No, not with Allen Stanford.  This went through the

 8   chain -- the chain of command.

 9   Q.   And what -- what was the next step up from you in the

10   chain of command in September of 2006?

11   A.   It would have gone to Jason Green, probably to Danny

12   Bogar, then to Juan Tolentino.  You know, then -- if they

13   discussed it with Allen, I don't know.  I mean, I would -- I

14   can't remember if they did or they didn't, but I'm sure it

15   would come through them, not me.

16   Q.   And then you go on to say, "He has a great respect for

17   you and your business," referring to Mr. Magness.

18   A.   Yeah.  Yes, they do.

19   Q.   I'm sorry, he referring to Mr. Stanford, you referring to

20   Mr. Magness.  Have I interpreted that correctly?

21   A.   Sure, yes.

22   Q.   And where did you get that information?

23   A.   Where did I get the information that Allen Stanford had a

24   great deal of respect?

25   Q.   Yes.
```

1   A.   From me.

2   Q.   What do you mean from me?

3   A.   Well, in other words, you know, whenever we

4   would discuss -- whenever Allen Stanford would say something,

5   he's say -- of course, he respected Gary's business.  I mean,

6   he was a big customer, so I was just highlighting that in this

7   letter.

8   Q.   One last group of questions about Exhibit 27, sir.

9        In the first bullet point, there's a reference to a

10  Magness family rate grid.  Do you see that reference?

11  A.   Yes.

12  Q.   Is that different from the -- a rate grid that was

13  provided to you as a financial advisor for all of the

14  customers in the institution?

15  A.   Yeah.  This was specifically put together by me and

16  negotiated with the bank so that as Gary grew in assets, that

17  he could earn a higher rate with more money going in.

18  Q.   Did that rate grid show any sort of difference between a

19  rate that was being given to the group, so to speak, versus

20  someone else with a comparable CD deposit?

21  A.   I don't know.  I mean, I -- all I know is that I

22  negotiated this grid on behalf of Gary, and he wasn't -- he

23  didn't even have really much knowledge of it.

24       As we started to grow, I went back to Juan -- and who I

25  negotiated this with was Juan Rodriguez-Tolentino saying that,

1   you know, we need to give Gary a better rate if he's putting

2   more money in.

3   Q.   At any point in time in your employment with SGC, was

4   there ever any pushback about giving better terms to Mr.

5   Magness because of the size of either his securities holdings

6   with the firm or his deposits into SIBL for CDs?

7   A.   Pushback from who?

8   Q.   Anybody internal to the institution.

9   A.   Well, it was always a negotiation.  I mean, they would

10  --well, there were two sides of it.  I mean, I'm negotiating

11  for Gary; they're negotiating for the bank.  Then we came to a

12  -- to a -- an understanding.  But no one else in the firm knew

13  anything about it because it was very confidential.

14  Q.   You related to Mr. Powers a conversation you had where

15  someone--I think you said it was Mr. Davis--had said to you

16  something to the effect of, I'm not going to disclose to you

17  who the investment managers are because you wouldn't get that

18  from a commercial bank, and it would -- we would lose our

19  competitive advantage?

20  A.   Yeah.  I think his -- his point was that when -- if

21  you're looking at a commercial bank CD, how do they -- how do

22  they generate their returns?  Do you -- does anybody really

23  know?  And that was his point.

24       And he said, Look, over the back -- the relationships

25  that we have with the money managers that we deal with, it

1    gives us a competitive advantage.  If we tell what's in there,

2    what's to stop anybody else from doing it.

3        So it's very confidential to us, and, therefore -- you

4    know, it's a CD product, and we're guaranteeing it.  So they

5    never disclosed what -- the actual positions or who held them.

6    Q.   Did that make sense to you at the time he said that?

7    A.   At the time, it did, yes.

8    Q.   And do you -- when -- I think you used the phrase "things

9    started to get dicey in 2008."  Was there any information

10   distributed to you about additional capital being put into the

11   SIB, the Stanford International Bank?

12   A.   There was.  There was -- I can't remember the exact date,

13   obviously, but there was a -- a report that came out that

14   Allen Stanford had put in X amount of money to bring the

15   capital requirements up for the bank during this downturn.  I

16   can't remember the number.

17       But that was distributed and disseminated amongst all of

18   the people at Stanford Group Companies.

19   Q.   And when that was distributed, did you ask for any proof

20   that that had in fact taken place?

21   A.   No.

22   Q.   Why not?

23   A.   Well, because I believed in Allen Stanford.  I mean, if

24   it was said and was said throughout the whole channels, I

25   believed that that was the case.

1    Q.   Did -- did you ever look at the -- the returns that the

2    bank advertised and have a -- a thought that those returns

3    were not realistic?

4    A.   No.

5    Q.   Did you have -- have something against which you could

6    compare those returns to form an assessment as to whether they

7    were or were not realistic?

8    A.   Well, you could compare them to what was going on in the

9    S&P or the Dow or, you know, emerging markets, which were all

10   these things that they were in.

11        In some years when -- as I recall, you know, the market

12   was up 25 percent; he was up -- the bank was up 14.  Some

13   years -- and these were pretty -- pretty heady years.  There

14   were a lot of hedge fund managers making a lot of money, so

15   it -- it seemed very reasonable.

16   Q.   When you -- you told Mr. Powers that your view of the

17   SIBL structure was that it was, in essence, another type of

18   hedge fund.

19   A.   That's the way I viewed it, and I think that's the way

20   Gary viewed it, which is -- you know, it was essentially more

21   of, like, a fund of funds where these individuals that were

22   managing the funds were using outside managers that were very

23   liquid and -- to -- whether it was long, short, precious

24   metals, high yield.  It was a variety of different managers.

25   Collectively how many, I don't know.  But that's -- and so it

```
 1   was more of a fund of funds.

 2   Q.   Do you recall there was a range of investments --

 3   A.   Yeah.  I mean, with the -- and it was -- it was -- it was

 4   subjective.  We were talking about subjective, objective.  And

 5   the fact is, it was my interpretation of where the risk would

 6   fall.

 7        So, you know, if you were to look at treasuries and --

 8   and high-grade investment bonds, it would -- the risk of

 9   the -- at the bank would fall below -- would -- would be

10   less -- would be more risky than that but not as risky

11   as -- or not have as much risk as, say, high yield bonds or

12   equities.

13        So it was in that range.  Not as safe as treasuries, not

14   as safe as, say, AAA corporates but safer than high yield and

15   safer than certainly equities.  But that was my

16   interpretation.

17   Q.   I -- I understand.

18        And you told Mr. Powers that there was not any sort of

19   standardized rating systems like a triple B bond rating that

20   would be applied to this particular investment.

21   A.   These CDs were not rated.  These certificates of deposit

22   were not rated.

23   Q.   Did you do -- did you have any concerns of the fact that

24   the bank was located in Antigua?

25   A.   No, because there's -- I mean, Antigua, Bahamas, Caymans,
```

1    there are all kinds of offshore banks.

2    Q.   Did you undertake any investigation as to the soundness

3    of the Antiguan banking system before discussing with Mr.

4    Magness' his proposed CD deposit?

5    A.   I don't recall.

6    Q.   While you worked at SGC, were you aware of any SGC

7    employees getting into disputes with the company and taking

8    those disputes to what would have then been NASD arbitration?

9    A.   The only one I was aware of that was published was a --

10   was Tid -- Tidwell and -- whoever the other gentleman was.

11   Q.   Were you aware during your tenure at SGC of the SEC

12   conducting any manner of investigation, not audit but

13   investigation, into the SGC company?

14   A.   I don't recall.

15   Q.   You referenced in your conversation with Mr. Powers when

16   you were talking about the February 2008 email from Ms.

17   Dokken.  And perhaps we should pull that up as a point of

18   reference.  If you can find Exhibit 56, please.  Have you

19   found 56?

20   A.   Yes.

21   Q.   And I believe you told Mr. Powers that it was only a

22   month later that Bear Stearns went under?

23   A.   I believe -- 2008?

24   Q.   Yes, sir.

25   A.   I believe so.

1    Q.   Okay.  You also told Mr. Powers that you thought or you

2    believed that as of February of '08, two Bear Stearns mortgage

3    funds had already zeroed out.

4    A.   Or were under extreme duress or they had shut down, yes.

5    Two mortgage-backed funds.

6    Q.   Ms. Dokken's February 5, 2008 note says, and I'm looking

7    at the end of the first line and reading from there, quote, in

8    light of the unprecedented write-offs and charges that the

9    financial community and companies have incurred in the last

10   six months related to high-yielding and mortgage-backed

11   instruments, the Mango Five investment committee would like to

12   understand and review the strategies and investments that the

13   Stanford Bank certificates of deposit have exposure to so that

14   we can better understand the underlying assets.

15        Do you see that reference?

16   A.   Yes.

17   Q.   Do you remember looking at the board minutes where Mr.

18   Juan Rodriguez was participating and explaining that the bank

19   operated like a hedge fund?

20   A.   Yes.

21   Q.   And is it correct, sir, that that was not a revelation to

22   you and Mr. Magness?

23   A.   No.

24   Q.   You had all figured that out sometime before that.

25   A.   Yes.

```
1    Q.   And so because that was not a revelation to you, did that
2    cause you any concern that he would say that the bank was
3    essentially a regulated hedge fund?
4    A.   No.
5    Q.   Did you have any different perception of the risk of
6    investing in the SIBL CDs in light of Juan Rodriguez's
7    comments that it was essentially operated as a regulated hedge
8    fund?
9    A.   No.
10   Q.   Well, did -- are you aware of Mr. Magness undertaking
11   some effort to say, I'm just going to take as much money out
12   of SIBL as I possibly can?
13   A.   No.
14   Q.   You -- you sort of looked at me like that's a crazy
15   question.  Why did you give me that look?
16   A.   I mean, at what point -- I don't even know the frame of
17   reference at what point -- you know, it was -- I don't
18   know -- the only -- the only thing I -- I can tell you is that
19   we were taking or borrowing money from those CDs to pay off
20   margin calls.
21   Q.   And the -- when did the margin calls reach a level where
22   it became a -- at least from your perception, a cash crunch
23   for Gary Magness and the companies?
24   A.   I'd say starting in the end of Sep -- after Lehmann, so
25   late September, October, November.
```

```
 1    Q.    And Mr. Powers asked you a bunch of questions about,
 2    couldn't you just sell stock and avoid having to dip into the
 3    CDs in some way.
 4          Do you remember discussing that topic generally?
 5    A.    I do, but it was our -- it was -- it was our estimation
 6    that this would not last, so the last thing we wanted to do,
 7    as I stated before, was to sell stock for two reasons:  one,
 8    it's gone, never has a chance to go back up; and, two, the tax
 9    implications for Gary were -- were severe.
10    Q.    I know this will sound a little perverse.
11          But as the price of the stock drops, don't the tax
12    implications lessen?
13    A.    Not when you've got a penny -- not when you're -- not
14    when you're -- yes, it does.  But when you -- when the cost
15    basis on a lot of these stocks were $1, it's got drop to $1
16    before it doesn't become an issue.
17    Q.    Was there any point in time when there was a discussion
18    internal to SGC about how the Securities and Exchange
19    Commission was looking at the commission structure for the CDS
20    and saying this doesn't make sense?
21    A.    I don't -- I don't recall that.
22    Q.    Anyone ever come to you and say, The commissions you're
23    receiving on the Stanford International Bank CDs that Mr.
24    Magness and his entities had deposited funds into didn't make
25    seasons financially?
```

```
 1   A.    No, not that I'm aware of -- or not that I recall,

 2   anyway.

 3   Q.    Now, on your securities side of the house when you're

 4   buying and selling stocks for a customer, is it correct that

 5   on the customer's statement there is an actual disclosure of

 6   the commission charge on any particular securities

 7   transaction?

 8   A.    Yes.

 9   Q.    Is there a similar type of disclosure that takes place on

10   the financial reporting for the Stanford International Bank

11   CDs?

12   A.    Not that I'm aware of.

13   Q.    And did you ever -- on behalf of any one of the Magness

14   entities that had deposited funds into the certificate of

15   deposit, did you ever ask Stanford International Bank to

16   somehow deviate from its policies and procedures to

17   accommodate a need that any one of those entities had?

18   A.    Not that I'm aware of.

19   Q.    Are you aware of whether Stanford International Bank ever

20   did deviate from its policies and procedures to establish

21   loans with any of those three entities?

22   A.    Not that I'm aware of.

23   Q.    Did anyone at the bank ever say to you, Gee, we're kind

24   of shortcutting some of our policies, or words to that effect?

25   A.    No, never.
```

1    Q.   We were talking some about Prairie Capital and the

2    fund-of-funds concept.  One of the funds in which Mr. Magness

3    or one of his entities had invested was something called

4    Tontine.

5    A.   Yeah.

6    Q.   Do you recall that?

7    A.   Tontine Partners.

8    Q.   So that is something you remember.

9    A.   Oh, yeah.

10   Q.   That was not a good investment, was it?

11   A.   It was a disaster.

12   Q.   Okay.  One of the funds in which Mr. Magness or one of

13   his entities had invested was something called Tontine.

14   A.   Yeah.

15   Q.   Do you recall that?

16   A.   Tontine Partners.

17   Q.   So that is something you remember.

18   A.   Oh, yeah.

19   Q.   That was not a good investment, was it?

20   A.   It was a disaster.

21   Q.   Okay.  Does that refresh your memory as to whether you

22   made any effort to redeem funds from Tontine because of the

23   disastrous experience there?

24   A.   Well, I mean, from -- the -- they were all -- they all

25   had lockups, so it didn't -- as I recall, we -- we would have

```
 1   tried to get money anywhere we could.

 2        But we were -- they locked up so you couldn't get to

 3   them.

 4   Q.   But you at least tried to withdraw --

 5   A.   Oh, we've tried -- we tried everywhere to get money

 6   anywhere we could, but everything was locked up, to the point

 7   Gary would never darken another hedge fund's door.

 8   Q.   And this -- and when you talk about trying to get funds,

 9   are you still referring to the October-November time frame

10   when the market was --

11   A.   To the best of my recollection.  I mean, to that point,

12   we even -- we closed out a fund at HSBC to retrieve money from

13   that.  I think we had 10 million in that.  We went after a

14   real estate fund that Prairie Capital had us in.  We -- we

15   went the gamut.

16   Q.   Take a moment and look at Exhibit D-19 and confirm for me

17   that that's an email Beau Wehrle of Prairie Capital sent to

18   you on December 14th of 2007.

19   A.   Okay.

20   Q.   I'm hoping you can help me with the sentence that

21   immediately follows the chart, box, whatever we want to call

22   it.  It says, I'll quote, "As you can see, the entire

23   portfolio has outperformed each major relative index YTD,"

24   meaning year-to-date -- right?

25   A.   Uh-huh.
```

1  Q.   Is that a yes?

2  A.   Yes.

3  Q.   "-- with less downside volatility for the month of

4  November largely due to the downside attribution associated

5  with the hedge fund allocation."

6       Can you tell me what that means in layperson-speak?

7  A.   Let me read it again.

8  Q.   Of course.

9  A.   Well, I think what he's talking about here is that, you

10  know, hedge fund managers, by nature of what they do, hedge

11  their portfolio.  So if they're hedged, you would expect that

12  manager or the hedge fund managers or that allocation of hedge

13  fund managers to outperform the S&P, which is not hedged.

14  Q.   Are you aware of any allegations that Tontine was a fraud

15  or a Ponzi scheme of some sort?

16  A.   No.

17  Q.   Are you aware of any allegations that Prairie Capital was

18  in those categories?

19  A.   Absolutely not.

20  Q.   Did you have any conversations with Mr. Wehrle or anyone

21  else at Prairie Capital about what specifically Tontine had

22  done in order to obtain a year-to-date performance, as shown

23  here, that exceeded or outperformed each of the major relative

24  indices?

25  A.   No.  Not that I recall, anyway.

60

1    Q.   So it's fair to say you understood that would not be

2    information that the hedge fund would necessarily share?

3    A.   No.

4    Q.   No, that wasn't your understanding?

5    A.   No.  I mean, I -- I have no recollection of ever knowing

6    exactly what Tontine was doing.

7    Q.   Did you make any effort to find out exactly what Tontine

8    was doing?

9    A.   I don't recall.

10   Q.   Did you have an understanding that that information was

11   something Tontine would provide if you had asked for it?

12   A.   I don't recall.

13   Q.   Is it true that for most of the hedge funds in which you

14   were investing, that you didn't know what the funds were

15   investing in?

16   A.   That would be a fair statement.

17   Q.   And that that information, even if you had asked, was not

18   information that was available from the hedge funds?

19   A.   For the most part, that is true.

20        MR. PETRIE:  That's the end of this volume, Your

21   Honor.  I see that we are close.  We can either start the next

22   one or pause here.

23        THE COURT:  Oh, why don't we keep going another ten

24   minutes or so.

25        MR. PETRIE:  Certainly.  Thank you.

```
 1    Q.   And you will recall that when we were in the October 2008

 2    time frame, that's when the Magness defendants were taking

 3    these loans against their Stanford CDs.  Do you recall that?

 4    A.   Yes.

 5    Q.   And then you obviously played a role in that process.

 6    A.   I did.

 7    Q.   And could you explain to me in Plaintiff's Exhibit 217

 8    what it is they were looking at?

 9    A.   (Reviewing)

10    Q.   And to put it in context, as of October 10th, 2008,

11    that's when the first $25 million loan was taken by the

12    Magness defendants.

13         Is it -- is it fair to infer that you're having an email

14    exchange with Mr. Juan Rodriguez-Tolentino on October 7, 2008

15    about setting up that loan?

16    A.   I have no idea what this is about.  I have no

17    recollection.

18    Q.   Sure.  What did you do to facilitate the first $25

19    million loan to the Magness defendants?  What steps did you

20    take?

21    A.   As I recall, I was actually in the office of Tonya

22    Dokken, and we were discussing the problem that had just

23    arisen with U.S. Bank.  We had come to the knowledge that the

24    securities that were held there were -- were not marginable

25    under $10.  So -- which we thought we had a $6, just as you
```

```
 1   would at any securities firm, but in the covenants that were

 2   written, it was a $10.  So we had a very large margin call.

 3        And at that time it dawned on me, I said, you know, we

 4   can borrow from the bank, let me make a call, which I called

 5   Juan Tolentino, and he had indicated that they had reserves at

 6   the Bank of Toronto -- Toronto-Dominion, and that he would see

 7   what he could do to facilitate a loan to Gary to

 8   cover -- well, he didn't know what the reason was, but we

 9   needed the money.  So that's the conversation that I recall.

10   Q.   You said he said there were some reserves at the bank at

11   Toronto-Dominion.  What would be the relevance of the

12   existence of reserves at Toronto-Dominion?

13   A.   Which would mean that he had cash on hand that he could

14   facilitate the loan -- an immediate -- I mean, this wasn't

15   something that we were trying to get over two weeks.  This was

16   something that we needed the next day if we could get it.

17   Q.   The bank routinely advertised in its annual reports that

18   it had several hundred million dollars sitting in cash at any

19   given time.  Right?

20   A.   I do not recall.

21   Q.   And, in any event, the bank's consistent advertising was

22   that the bank was highly liquid.  Right?

23   A.   With securities, yes.

24   Q.   Okay.  So was it surprising to you that Mr.

25   Rodriguez-Tolentino wanted to especially note for you that the
```

1    bank had liquidity right at that moment, that it could fund a

2    $25 million loan?

3    A.    No.

4    Q.    It did not surprise you.

5    A.    Didn't surprise me, no.

6    Q.    Did Ms. Dokken say anything about that?

7    A.    No.  Well, she was happy.

8    Q.    Let me show you Plaintiff's Exhibit 221.

9          This is an email exchange between yourself and Mr.

10   Rodriguez-Tolentino dated October 9th, 2008, the day before

11   the loan documents were executed and the money was wired.

12         Do you recognize it?

13   A.    No, I don't recognize it.

14   Q.    Mr. Rodriguez-Tolentino says he's going back to Treasury

15   and he cannot commit, and the subject line is "25 million."

16   Do you see that?

17   A.    I do.

18   Q.    And then your email back to Mr. Rodriguez-Tolentino, you

19   say, "Are we still good on the 18 million?"  Do you know what

20   that's about?

21   A.    I believe 18 million was our margin call.

22   Q.    I see.  And you were going to take the $25 million --

23   A.    Because the next day we probably would have another one.

24   Q.    So if we take the -- the previous email that's dated

25   October 7th -- right?  That is the email --

1    A.    October 7th, yes.

2    Q.    And now on -- on October 9th the bank is trying to

3    determine whether it has the resources to fund a $25 million

4    loan.  We're -- we're now 48 hours ahead in the timeline, just

5    doing the math.  That's right?

6    A.    Uh-huh.

7    Q.    Yes?

8    A.    I -- I suppose so, yes.

9    Q.    Okay.  Does it strike you as odd that a billion-dollar

10   or, excuse me, a $7 billion bank would have to deliberate so

11   heavily on a $25 million loan?

12   A.    No, not at all.  This was a special -- this was something

13   that we needed immediately.  How long does it take you to get

14   a loan?  I mean, it's a little different.  So, no, it didn't.

15   It didn't surprise me at all.

16   Q.    Now, let's -- just to be clear, this is a loan that is

17   secured by cash assets that Mr. Magness and his entities had

18   already put into the bank.  Right?

19   A.    That's correct.

20   Q.    So when the $25 million is coming out, that is secured

21   against a CD that is already sitting at the bank.

22   A.    That's correct.

23   Q.    So this is not like a situation where a stranger shows up

24   to the bank and says, I'd like to take a $25 million loan.

25         This is a different situation.

```
 1    A.   That's correct, but this is also, you know, trying to get
 2    it in 48 to 72 hours, which is by -- is Herculean in -- in
 3    anything that we do in my industry.
 4    Q.   And so the bank -- what you're saying then is the bank
 5    was going above and beyond what is normal for this kind of
 6    loan.
 7    A.   I'm saying that they -- they went to -- they went to the
 8    -- they -- they were able to facilitate loaning against our
 9    securities timely, which was in our best interest at the time.
10    Q.   And you found that to be extraordinary, that they were
11    doing that on such a short time frame.
12    A.   I found it to be very -- I found it to be very
13    accommodating.  Let's put it that way.
14    Q.   Which is why, in both of these exhibits we have seen,
15    you've referred to Mr. Rodriguez-Tolentino twice as
16    "superman."
17    A.   That would be correct.
18    Q.   And if there was an issue at the -- at the U.S. Bank
19    regarding these Liberty C -- Liberty shares and there being a
20    $10 floor as opposed to, I think what you described as a more
21    normal $6 floor, is another way that you could have dealt with
22    the margin call situation to move those Liberty shares to
23    another brokerage house.
24    A.   Yeah, probably, but not in a timely fashion.  I mean, if
25    you even -- if you want to do ACAT shares --
```

1    Q.   Yes.

2    A.   -- it'd take you five -- and particularly in this

3    environment, it could take five to ten days.  And you had to

4    also, because of the size of those positions and the

5    concentration in those positions, there -- it would

6    be -- they'd have to be -- they'd have to be vetted and agreed

7    upon before even moving because of concentrated position

8    problems.  So --

9    Q.   What do you recall about the circumstances that led to

10   the $63 million in loans that took place in the latter half of

11   October 2008?

12   A.   Well, our margin calls were continuing to pour in.  Now

13   they were powering in from other areas, and what I recall was

14   that there was a discussion -- I was a part of some of it, not

15   all of it.

16        Some of the discussion was that, you know, we still could

17   borrow from the bank on our 80 percent loan-to-value or

18   borrow-to-value.  And it was decided, not by me but by Tonya

19   Dokken, to go ahead and -- and -- and inform the bank that we

20   were going to -- we were going to borrow up to the limit that

21   we were allowed to.

22   Q.   I think you do have a Plaintiff's Exhibit 95 --

23   A.   Yes.

24   Q.   -- do you not?  This is an email from yourself to Tonya

25   Dokken and I think Gary Magness dated December 23rd, 2008.  Is

1    that right?

2    A.   Looks that way.

3    Q.   And you're forwarding a copy of the Stanford

4    International Bank monthly report from December 2008.  Is that

5    correct?

6    A.   Well, I guess.  I don't know.

7    Q.   Take a look at the second page and tell me if that looks

8    like that's what that is.

9    A.   Uh-huh.

10   Q.   And, historically, Stanford International Bank had sent

11   quarterly reports.  Is that right?

12   A.   I don't recall.

13            MR. PETRIE:  The next one's long.

14            THE COURT:  Okay.  Then we'll take our morning break

15   and see you back at five till 11:00.

16            (Whereupon, the jury left the courtroom.)

17            MR. PETRIE:  Move to admit Exhibit 95.  It hasn't

18   been addressed yet.

19            MR. SADLER:  No objection.

20            THE COURT:  It's admitted.  Did you-all --

21            MR. SADLER:  Yes, on the time?

22            THE COURT:  -- figure out on the time?

23            MR. SADLER:  Yes.  So for the two, Tolentino and the

24   Davis, all together it's 55 minutes for the defendants and 27

25   for the Plaintiff for those three.

```
 1                    THE COURT:  For both of them?

 2                    MR. SADLER:  Well, there were -- yeah.  So all of

 3      Tolentino and all of Davis.

 4                    THE COURT:  27.

 5                    MR. SADLER:  27, plaintiff.  55, defendant.

 6                    THE COURT:  Okay.  Good.  Anything else we need to

 7      take up?

 8                    MR. PETRIE:  No.  Thank you.

 9                    MR. SADLER:  No, sir.

10                    THE COURT:  How much more of Espy do we have?

11                    THE VIDEO TECHNICIAN:  It will take us through

12      lunch, Your Honor.

13                    THE COURT:  Through lunch?

14                    THE VIDEO TECHNICIAN:  Right up to -- right up to

15      12:30.

16                    THE COURT:  Okay.

17                    THE VIDEO TECHNICIAN:  Maybe a little bit beyond,

18      but not much.

19                    THE COURT:  Okay.  Very good.  We'll see you-all

20      back at five till.

21                              (Brief recess.)

22                    THE COURT:  All set?

23                    MR. SADLER:  Yes, sir.

24                    MR. PETRIE:  Yes, sir.

25                    (Whereupon, the jury entered the courtroom.)
```

```
 1              THE COURT:  Be seated.

 2         I understand we've got enough to go a little past 12:30

 3    to finish this deposition, so I think it's better to push

 4    lunch back a little bit and wrap it all up.  So the lunch

 5    break is probably going to be a few minutes later than 12:30

 6    today.

 7         So let's proceed.

 8          THOMAS ESPY, BY VIDEOTAPE DEPOSITION, continued,

 9    Q.   Do you recognize Plaintiff's Exhibit 98?

10    A.   I don't recognize it, no -- oh, wait a minute.  Excuse

11    me.  Let me read it.

12         Yes, I recog -- I definitely recognize this because I

13    wrote it.

14    Q.   Okay.  So this is a letter dated January 13th, 2009.

15    It's signed by Steve Knudson, Trustee of Mango Family Five,

16    and it's --

17    A.   That's correct.

18    Q.   And it's addressed to Mr. Juan Rodriguez-Tolentino.

19    A.   That's right.

20    Q.   Okay.  Now, you wrote this letter.

21    A.   I did, and I had Steve sign it.

22    Q.   Tell me what led to the crafting of this letter.

23    A.   Well, this was in January.  There were two things going

24    on:  One, we were headed -- there was a -- whatever they

25    called it, their big conference meeting or quarterly
```

1    conference meeting that was being held in, I believe,

2    Scottsdale, Arizona.

3        And I hand-delivered this letter to Juan Rodriguez

4    because, at this point in our meeting in December and

5    subsequent conversations, I became concerned that we didn't

6    have -- we weren't getting the visibility that we needed, we

7    weren't -- so we really were grilling down on -- and

8    particularly I was, because I was very -- I was -- you know,

9    everybody wanted visibility in the markets, and we

10   weren't -- and now we wanted to know what's going on, what's

11   -- what is the company invested in?

12       There was -- and so this was delivered to --

13   hand-delivered to Juan at the meeting.

14   Q.   And what particular -- what in particular was concerning

15   you about the lack of visibility, at this time, that led you

16   to generate the letter of January 2009?

17   A.   Well, at this point Gary and I had already been -- we

18   were -- there was two things that happened.  There was

19   something that came out from the -- there was a report from

20   the bank saying it was down $110 million, which didn't make

21   sense to me.  I -- so Gary -- I hadn't had a chance -- I had

22   missed it for a month or two.  I don't -- I don't remember

23   exactly when I saw it, but I think it was early, mid -- might

24   have been mid December.  And so that made me question.  The

25   only way that could happen is that they had to have a short

1    position.

2         So Gary and I were in the Bahamas -- or in Mexico for --

3    for Christmas, and I had said to Gary, I said, Gary, you know,

4    I'm concerned about this.  We need to -- I want to see if we

5    can get more visibility into the bank.

6         And this meeting was coming up, so I sat down with Steve

7    and said, Here are the questions and the concerns I had

8    and -- and I'd like to see it, in which everybody said, Good,

9    go see if we can find out.

10   Q.   So I just want to make sure I understand.  What you --

11   what you did at this time to generate this list of questions,

12   you were comparing Stanford's results with the returns in the

13   market and you were seeing a disconnect.

14   A.   I was -- I was -- well, I mean, the disconnect, we -- you

15   know, there was a lot of talk about they had short funds and

16   all these other -- the only way this could have worked out

17   that they were only down 110 million by this time is that they

18   had to have -- they had to have short funds or something in

19   that portfolio, because we couldn't look into the portfolio.

20   So this was the reason for the letter.

21   Q.   I mean, by this time if you're only down $110 million --

22   A.   It didn't make sense.

23   Q.   The market's down 40 percent.

24   A.   It didn't make sense at this -- at this point when they

25   reported that and I discovered it, then it was -- then my

```
 1   radar went up, which I immediately started to report to the
 2   Mango Five.
 3        And we had already had a -- I think we had had our
 4   December meeting, which we were all pretty proud of Stanford
 5   at that point.  But, you know, by the end of December, I
 6   started to get worried when I -- when I saw returns that
 7   didn't make sense.
 8   Q.   I mean, you probably have to be short in the entire
 9   market, like your entire portfolio is shorted.
10   A.   When -- when I finally saw the hundred million, I said,
11   this doesn't make sense, we need -- we need to explore this
12   further.  And you got to remember, at this point we're two
13   months before the place shut down.  So I did my best to
14   try -- like I said, I hand-delivered this letter, and Juan
15   said to me, We will look into it.
16        You know, he -- he kind of gave me the runaround, so --
17   Q.   So what you -- the -- the thing that you did, that is,
18   compare market returns to the type of portfolio that was
19   explained by Stanford to the public, would it be fair to say
20   you could have done that same exercise in September or in June
21   of 2008?
22   A.   I didn't.
23   Q.   You did not do that.
24   A.   I didn't have the returns until December, so I didn't
25   know what -- what they were -- what they were purporting to be
```

1   down until December.  So there isn't -- there was no way for

2   me to -- to compare them.

3   Q.   But if you had had the returns, if you had had Stanford's

4   returns available to you at earlier times in the process, you

5   have -- you could have done that same exercise, that is, you

6   could have compared the state of the market to what Stanford

7   was claiming.

8   A.   But I didn't.

9   Q.   You did not do that.

10  A.   I did not.

11  Q.   If you had that information available to you --

12  A.   I'm not going to answer that question, Scott, because I

13  know where you're going with it and it's -- I did not look at

14  it, did not know what the returns were until December.  So

15  it's a moot question.

16  Q.   That's Plaintiff's Exhibit 70.

17  A.   Okay.

18  Q.   This is an email you're forwarding to Tonya Dokken and

19  Brian Kaufman July 27, 2008.  Correct?

20  A.   Right.

21  Q.   And this email says that it's sent on behalf of the

22  chairman and the board of directors of the Stanford

23  International Bank.  Do you see that?

24  A.   Yes.

25  Q.   And the report from the chairman and the board is that

```
 1   the bank has sustained the largest half-year growth in its

 2   history.  Do you see that?

 3   A.   Yes.

 4   Q.   Now, by July 2008, the markets hadn't bottomed out, but

 5   they were certainly going in the wrong direction.  Would you

 6   agree with that?

 7   A.   They were under stress, yes.

 8   Q.   The first -- the first line of the email from the

 9   chairman and the board of directors recognizing that there are

10   "...turbulent world economic conditions --"

11   A.   Right.

12   Q.   "-- falling markets, and unending news of collapsing

13   financial institutions..."

14   A.   Uh-huh.

15   Q.   And that's what that email says.

16   A.   Yes.

17   Q.   And there's even a reference to a capital contribution,

18   if you look at the third -- the line -- the third from the

19   bottom of the second paragraph --

20   A.   Yes.

21   Q.   "...an injection of $35 million of capital in February

22   2008."  Do you see that?

23   A.   I do.

24   Q.   And then the very next line says that the bank had

25   positive earnings for the first six months of the year,
```

1    totaling $16.2 million.  Right?

2    A.   Yes.

3    Q.   And turn to the very last page of the exhibit.  And I

4    want to focus your attention on the financial and economic

5    highlights --

6    A.   Okay.

7    Q.   -- at the bottom of the page.  And if you look the -- the

8    bottom left corner, you see year-to-date earnings.  What are

9    the year-to-date earnings there?

10   A.   A loss of 110 million.

11   Q.   Right.

12   A.   Right.

13   Q.   So what I'm just trying to correlate between Plaintiff's

14   95 and Plaintiff's Exhibit 70, we see year-to-date earnings in

15   both places.  The kind of reporting that was important to you

16   in Plaintiff's Exhibit 95 is the kind of reporting you had in

17   Plaintiff's Exhibit 70.  I understand the results are

18   different, but you had the same kind of reporting available to

19   you in July --

20   A.   One's a letter.  This is in the --  they're different

21   reporting.  One's a letter, and this is in a financial

22   economic data.  And whether I looked at this, my mood in -- in

23   July was much different than my mood in December.

24   Q.   What you're getting in Plaintiff's Exhibit 95 is a

25   reporting of year-to-date earnings.  Correct?

```
 1    A.    I suppose.

 2    Q.    Okay.  And what you're getting in Plaintiff's Exhibit 70

 3    is a reporting of year-to-date earnings.

 4    A.    Yeah.

 5    Q.    Okay.  That's -- that's what I wanted to know.

 6          They're in different forms.  One is in a chart, and the

 7    other one is in text, but it's the same type of information.

 8    A.    I suppose, yeah.  I don't know what your point is, but --

 9    Q.    All right.  Let's turn back to Plaintiff's Exhibit 98,

10    which is the letter that you drafted and that Mr. Knudson

11    signed.

12    A.    Okay.

13    Q.    There is a list of six questions.  How did you come up

14    with the questions?

15    A.    I don't recall.

16    Q.    Well, let's go through each of the questions, and I just

17    want to ask why they were important to you.

18          So the first one was:  "What are the current number of

19    fund managers that comprise SIBL's portfolio?"

20          What was -- what was the importance of that question?

21    A.    We wanted to know -- I think at the time I wanted to know

22    how many portfolio managers were in the fund.

23    Q.    Do you remember if you had gotten any information about

24    that in the past?

25    A.    I hadn't.
```

1   Q.   The second one is:  "Given the Madoff scandal, is there

2   any plans to publish those fund managers?"

3        What was the importance of that question?

4   A.   Well, obviously, I think my point was that, you know,

5   Madoff had already broke, and that was, you know, something

6   that was on everybody's mind, including the people at this

7   -- that, you know, of my group, you know.

8        The way to -- the way to dispel any -- any -- any

9   problems with the Madoff thing is, was publish the -- publish

10  -- let's publish the fund managers.  If you have short

11  managers, you have long managers, who are they,

12  let's -- let's -- let's do -- we need visibility and

13  visibility into what is actually in the fund.

14  Q.   The third question is:  "Does CAS Hewlett and Company

15  physically meet with the overseas fund managers to reconcile

16  funds on behalf of SIBL?"

17       Who is CAS Hewlett and Company?

18  A.   I thought that was the -- the accountant or the auditor

19  of the --

20  Q.   And why would you want to know whether the auditor was

21  meeting?

22  A.   I read somewhere, as it related to Madoff, that -- that,

23  you know -- there -- there was some article that I read where,

24  you know, that -- that independent -- you could have

25  independent fund managers to meet this, and you had to go

1    physically meet them and do their due diligence.  So that's

2    why I was asking the question.

3    Q.    And when did you read that article?  Was it close in time

4    to this letter?

5    A.    I have -- I have no recollection.  I just I remember that

6    in some fashion.

7    Q.    And then the next question is:  "Does SIBL require

8    outside fund managers to appoint independent administrators to

9    their operations?"

10   A.    That was from the same article.

11   Q.    The next question is:  "What individuals at SIBL have

12   investment authority, be it bank officers and/or SIBL board

13   members?"

14   A.    I don't remember.  It sounded like a good question at the

15   time.

16   Q.    And the last question is:  "Given the product sector

17   currency and alternative investment strategies, how did SIBL

18   investments only decline less than one percent through

19   November 30th, 2008?"

20   A.    Well, that's obvious.  That came from -- once I figured

21   out that -- once they reported and I saw that they had only

22   lost a hundred million, the only way that could happen is that

23   they would have had to have substantially short managers in --

24   in -- in the portfolio.

25   Q.    I think in the last deposition, you -- you talked to Mr.

```
 1   Petrie about the idea that you would not have gotten a friend

 2   or a client or even an enemy into an investment that you

 3   thought was unsound --

 4   A.   That's correct.

 5   Q.   -- or with an institution that was insolvent.

 6   A.   That's correct.

 7   Q.   Can we infer that if you felt like you had gotten

 8   somebody into an investment that was unsound or insolvent,

 9   that you would do everything you could to get that person out

10   of that investment?

11   A.   Yes.

12   Q.   So did you ever receive any written response to this

13   letter, that is, Plaintiff's 98?

14   A.   Nothing, that I recall anyway.

15   Q.   And there was a phone call set up about two weeks later

16   for -- it was set up earlier, but then it took place two weeks

17   later with Mr. Rodriguez-Tolentino and Mr. Davis.  Correct?

18   A.   Yeah.  Concern -- I -- we didn't -- I don't remember any

19   correspondence, but this letter.  Then we set up a special

20   call.

21   Q.   And what do you recall about what happened on that call?

22   A.   Well, on that call it was -- it turned out that -- I

23   believe on that call, if my memory serves me correct, it was

24   Juan, and interestingly -- what was Davis' name, first name?

25   Q.   Was it Jim Davis?
```

1   A.   Jim Davis.  Jim Davis was on the call and I think Laura

2   Pendergest might have been on the call, which we -- we didn't

3   know that they were going to be on the call.  The call was

4   supposed to be, I thought, just Juan trying to answer some of

5   the questions that kind of we had asked for out of this

6   letter.

7        We're -- and, I mean, it was -- actually, it was, I mean,

8   a fairly convincing call, to the point where I think Gary was

9   satisfied, Ray Sutton was satisfied, Tonya was satisfied, and

10  I was not satisfied.

11  Q.   Why were you not satisfied?

12  A.   Because, you know, it was my job to, really to try to,

13  you know, to watch it a lot more closely than these guys did.

14  And when he told me that there was a private equity in an

15  island, as I recall, that was involved in now the makeup of

16  the bank, at which time after the conversation, after the

17  conversation, I made calls to Ray and said, we -- this

18  doesn't -- this isn't flying, this is not right.  This isn't

19  working right.  This isn't the way it's supposed to be.  Did

20  anybody hear this?  I think we need to get everything out of

21  the bank.

22  Q.   What -- what is it that makes you say that Gary and Ray

23  and Tonya were all satisfied?

24  A.   Because no one made -- no one raised any questions after

25  the -- after the call.  I -- I did.  I mean, Gary's position

 1   was he loved having that -- he liked getting his CD rates.

 2   And one of the reasons why he borrowed and versus breaking the

 3   contracts, because he fully intended --

 4        You got to understand where we were in our thought

 5   process.  Nobody knew the market was going to melt down like

 6   it was going to.  So, you know, the thought was, this

 7   will -- this, too, will bounce back, I'll pay off the -- I'll

 8   pay off the CDs, or I'll pay the loans back and my CDs are

 9   still in place.

10        So, you know, at this point, now we're really -- I'm

11   nervous, anyway, and that's when I brought it to their

12   attention, well, this is not -- this is -- we've got an island

13   in private equity in something that's not supposed to be

14   there.

15   Q.   Let me ask you about that concept of not wanting to break

16   the CDs because he likes the rate and so forth.

17        Isn't it true that he had a signed agreement from

18   Stanford saying that his rates would never go down?

19   A.   I don't recall that.  Well, I mean, for the life of the

20   CD?

21   Q.   That he would -- that he would have this fixed grid.  You

22   recall that?  He'd put in another $30 million into the bank --

23   A.   Yeah, of course, but --

24   Q.   -- to secure this fixed grid, they would never go down?

25   A.   It would never go down as long as the -- until the CD

82

1    matured.

2    Q.   As long as he has $50 million in the bank, he's secured

3    on this grid.  Right?

4    A.   No.  He's secure on the grid until the CD matures.  So

5    when the CD matures, then we start all over again.

6    Q.   The proposal is, on Plaintiff's 27, in the second hollow

7    bullet point, "The rate grid will be guaranteed to never go

8    down as long as the Magness family or its affiliates, trust or

9    foundations, in aggregate, have deposits on hand at Stanford

10   International Bank in excess of $50 million."

11   A.   Where do you see this?

12   Q.   This is the second subbullet point.

13   A.   Maybe I'm on the wrong page.

14   Q.   Which exhibit are you on?

15   A.   I'm at 27.

16   Q.   You're on Defendants' 27.  I'm sorry.  Take that notebook

17   off, and I think it should be in the notebook that that

18   notebook was on top of.

19   A.   Okay.

20   Q.   This is the letter dated September 26, 2006, regarding

21   the Magness family proposal that dealt with the rate grid and

22   advertising in the Baja racing season.  Do you recall our

23   discussion about it?

24   A.   Uh-huh.

25   Q.   And the second subbullet under "proposal" begins, "The

1    rate grid"?

2    A.    Yeah.   That was obviously a mistake because that's not

3    what the intention was.   As long as the CDs were there -- I

4    wrote this, so that's my -- my mistake.

5        Now, this isn't -- I mean, I don't recall -- I mean, as

6    long as they had -- because market conditions change.   As long

7    as they had 50 million in it, his rates won't go down while he

8    has the CDs in place.   So if the CDs were to be broken and

9    under 50 million, of course, the rates -- the rate will change

10   to whatever it was.

11       So that's a misinterpretation.

12   Q.    The words on the page say:   "The rate grid will be

13   guaranteed never to go down as long as the Magness family or

14   its affiliates, trust or foundations, in aggregate, have

15   deposits on hand at Stanford International Bank in excess of

16   $50 million."

17       That's --

18   A.    Right.

19   Q.    -- what it says.

20   A.    While -- while the CDs are current.   So what -- what

21   you're reading is something I wrote, but that -- that

22   doesn't -- that doesn't mean at all that if they pulled the

23   CDs or the CDs matured -- I mean, once they're matured, then

24   it's a different rate schedule.

25       So I wrote this.   I just didn't write it accurately.

1    Q.    So what you're saying is --

2    A.    That's what the whole grid was --

3    Q.    -- Gary Magness --

4    A.    That's what the grid was set up for.  So once he reached,

5    you know, 50 million -- now, if he pulled out 50 -- if, say,

6    well, all right, so the CDs are in excess of 50 million and he

7    decides to break a CD, because they're all five-year CDs, and

8    he goes below 50 million, then there -- it would change.

9    Q.    Sure.  But if he kept at least $50 million in some CD or

10   collection of CDs, the very next CD --

11   A.    Would be completely different.

12   Q.    It would be on this rate grid.

13   A.    Well, you're -- this is in -- this was for the time that

14   the CDs were in play.  What -- we had bought -- this is --

15   when was this written?

16   Q.    September 26, 2006.

17   A.    September 26.  Right.  So the grid was there for a

18   reason, which is saying we're going to get you this rate as

19   long as you have 50 million in place.

20   Q.    Right.

21   A.    But that's only for the life of the CD.  So when the CDs

22   all matured, it would be -- at least my understanding of it

23   was that it wouldn't be -- it would be a different

24   negotiation.

25   Q.    So what's -- what is then special about this deal?

1    Because --

2    A.    What's special about this deal is that we were getting a

3    higher rate because of the volume we had in it, so --

4    Q.    All right.  But --

5    A.    -- for the life of the CD.

6    Q.    But the way the CD is structured, this is a fixed income

7    product.

8    A.    For five years.

9    Q.    Yes.   And so --

10   A.    And we were very tight.

11   Q.    It's guaranteed to never go down as a consequence of the

12   CD product --

13   A.    Right --

14   Q.    -- not --

15   A.    -- for five years.

16   Q.    -- not as a consequence of this agreement.

17   A.    Well, for five -- well, for five years whatever -- when

18   we put all this in, the -- the idea was the grid -- the idea

19   was that Gary -- I mean, Gary -- I was negotiating the best

20   rate I could for Gary.  So as long as he had X amount of money

21   over $50 million, he would -- you know, he wouldn't have to

22   worry about his rate changing.

23   Q.    Sure.  But he wouldn't have to worry about his rate

24   changing because he has a CD that has a rate that's on the

25   face of the CD.

```
1    A.   Well, I don't know.  I mean, you may be right, you may be
2    wrong, but I'm just telling you what I thought.
3    Q.   Let me show you Plaintiff's Exhibit 242.  This is an
4    email with Mr. Green, Jason Green.
5    A.   Right.
6    Q.   Can you just remind us who Mr. Green is?
7    A.   He was president of Stanford Group Companies.
8    Q.   And you -- you told Mr. Green that Mr. Magness remains
9    committed to Stanford but he's going to withdraw the CDs.
10   A.   Right.
11   Q.   And you'll call him to explain --
12   A.   Right.
13   Q.   -- the details.  What -- do you recall the discussion
14   with Mr. Green?
15   A.   No.
16   Q.   Was it true that the Magness entities were still
17   committed to Stanford at this point in time?
18   A.   No, it's not true, but I wanted to get what I wanted, so
19   I'm obviously going to say they are.
20   Q.   So tell me more about that.
21   A.   Well, at this point, I mean, we're into February.  We're
22   not getting -- I mean, there's a lot of different things that
23   have gone on.  I don't know the sequence, but at this point we
24   wanted out of the bank and -- and there were a -- we weren't
25   getting the answers we wanted.
```

1   Q.   Well, why did you feel the need to tell him something

2   that was not true to get what you wanted?   I mean, what were

3   you worried about that might happen if you told him the truth?

4   A.   Well, it's an obvious question and it's an obvious

5   answer.   The idea is you get much -- you get much more with

6   sugar than you do with vinegar.   So this was my way of saying

7   we're committed to Stanford, and if everything worked out, we

8   would be.   But we were not -- at this point, we were not

9   confident that Stanford -- and I -- I would have to say, to

10   make the point more clear, there was a conference call held

11   that Allen Stanford led that, if I knew when that was, that

12   might explain this letter.

13   Q.   Understanding your point about sugar and vinegar, this is

14   an arm's length commercial relationship where you have a

15   depositor at a bank who is simply wanting to withdraw his

16   funds.   Why do you need --

17   A.   Not that simple.

18   Q.   -- a special accommodation?

19   A.   Because it's not that simple.

20   Q.   Why not?

21   A.   Because the bank -- it's at the discretion of the bank to

22   allow you to break your CDs.   It's not at the request of the

23   client.   It's at the request -- it's at the acceptance of the

24   bank.   It's up to them to decide whether or not they will

25   allow you to break the CDs, which they did not.

1    Q.   Is the same true of the loan situation, that is, when you

2    want to make a loan or take a loan against your CD, is that at

3    the discretion of the bank?

4    A.   I believe that is a right of the -- of the -- that -- I

5    believe -- I -- well, I don't want to say "yes" or "no," but I

6    believe that it was, you were allowed to under the agreement

7    to borrow up to 80 percent of the -- of the CD.

8    Q.   Let me show you Plaintiff's Exhibit 243.  This is an

9    email from Mr. Rodriguez-Tolentino to you dated February 9,

10   2009, advising that the CDs don't mature until the following

11   year end, stating that the bank would not consent to the

12   request.

13   A.   Right.

14   Q.   And it -- it's in reference both to the Magness CDs and

15   to Mr. Knudson's CD.

16   A.   Okay.

17   Q.   Did you have a discussion with Mr. Rodriguez-Tolentino

18   about this note?

19   A.   I don't recall.

20   Q.   I think you have Plaintiff's Exhibit 110 in your

21   notebook.

22   A.   I do.

23   Q.   All right.  This is a letter from Mr. Magness to you

24   dated February 11, 2009, and he is asking you to deliver

25   certain securities to HSBC.  And if you turn to the second

1    page, there's a listing of shares.

2    A.    Uh-huh.

3    Q.    Can you -- do you recall what was going on here?

4    A.    No.  What the -- what was the date?

5    Q.    February 11th, 2009.

6    A.    Well, as I said before, if you can refresh my memory on

7    when -- when Allen Stanford gave a speech to all the -- the

8    group members, I can speak to things a lot better.

9    Q.    Well, that I'm not sure about, but I just -- I want to

10   see if I can establish something a little more basic.

11        If you're transferring securities -- if he's transferring

12   securities to HSBC here, and we see the list of securities,

13   does this particular transaction relate directly to Stanford

14   International Bank or not?

15   A.    No, this -- I'm -- I'll just give you -- there is a very

16   important point that you need to know.

17   Q.    Okay.

18   A.    Somewhere in February, I think, and it should be of

19   record somewhere in the SEC testimony, it's probably much

20   clearer then than it is now, but there was a conference call

21   held by -- at the request of Jason Green and -- because

22   everybody -- we weren't getting any answers, people were not

23   showing up to -- for -- for calls.  Allen Stanford had gone

24   missing in action, and there was a call set up where Allen

25   Stanford -- and -- made everybody on the call say their name.

1    He was paranoid.  He wasn't making any sense.

2        And at that point Pam McGowan and I were in the meeting,

3    along with I believe Heather Strauss was there.  We left the

4    meeting -- I left that conference before it was over, grabbed

5    Pam.  We went to Gary Magness' office, who was not there.

6    Tonya was there and I said, we need to transfer everything out

7    of Stanford as fast as possible.

8    Q.   Not just the bank but all securities.

9    A.   Everything.  All assets, we need to get them all out of

10   there.  And then the conversation was by Tonya, well, we don't

11   have to worry about Pershing.  That doesn't have anything to

12   do with -- with Pershing's -- Pershing doesn't have anything

13   to do with the bank, and so Pershing's separate is -- is -- is

14   a good entity.  I just said, Look, I just -- to be safe,

15   something -- the man's lost his mind is my -- my -- what I

16   said.  And it was very clear from that.

17       So what we see from that conversation, I saw with Pam,

18   who -- Pam and I just left and went down to that offices -- at

19   my request, said get everything out.

20   Q.   I show you should have Plaintiff's Exhibit 109 in the

21   notebook in front of you.

22       This is an email from Tonya Dokken to yourself dated

23   February 12th, 2009.  And she is forwarding an article that

24   came from Ryan Bell.  Do you see that?

25   A.   I do.

```
1    Q.   Are you still friends with Mr. Magness?

2    A.   I would consider us friends, yes.

3    Q.   Was there a point at which Mr. Magness or one of his

4    entities made any loans to you personally?

5    A.   Yes, they did.

6    Q.   And what was the nature of those loans?

7    A.   Oh, God, they go back a long way.  Given our relationship

8    and -- and a divorce, he had loaned me money.  For a house he

9    loaned me money, and I paid him back when I could.  And, yes,

10   so we'd had a number of loans.

11   Q.   Just approximately what were the value of those loans in

12   the aggregate?

13   A.   I don't recall, but -- I have -- depending on interest

14   and everything else, a couple of hundred, 300-, 400,000, and

15   then some -- some loans were -- one loan he gave me because I

16   was going to a closing on a house and the -- my -- my -- my

17   financing didn't come through, so he loaned me a million

18   dollars.  And then I paid him back as soon as the loan came

19   through.

20        So the nature of our relationship, Gary was one of my

21   closest friends.  And because of this situation, he no longer

22   is.

23   Q.   Do you presently owe him any money under any of your

24   loans?

25   A.   I do.
```

1    Q.    How much money do you owe him today?

2    A.    I'd -- and I had -- you'd have to go look.  I don't know

3    that he hasn't written it off or whatever, but I can't pay it,

4    so -- after this debacle, it broke me.  So --

5    Q.    Is it six figures, seven figures?

6    A.    I don't know.  You have -- you probably know.

7    Q.    I don't.  That's why I'm asking.

8    A.    I think it would be at least still over a hundred

9    thousand dollars, but he'll never see it again, I don't think,

10   unless I do something incredible.

11   Q.    When was the last time you had any kind of correspondence

12   or discussion with anybody from the Magness entities,

13   including Mr. Magness himself, about that particular loan?

14   A.    Oh, it's been since I sold my house in Denver, so that

15   would be four -- three, three-and-a-half years ago.

16   Q.    And what was the discussion about that loan at that time?

17   A.    Well, I had sold my house.  I had some equity in my

18   house, of which -- because I needed money to live, Gary was

19   gracious enough to let me keep some of it, and then the rest

20   went back to him to continue to pay off the loan.  And that

21   was the last discussion.

22   Q.    And what was -- did he express any expectation at that

23   time about whether the remainder of the loan would be repaid

24   and under what terms?

25   A.    I think the last thing I said to him is, hopefully I'll

1    get back on my feet and I will be able to pay the rest of it

2    off, which has not transpired yet.

3    Q.   And you've not heard from him about that loan since that

4    time?

5    A.   No.  He's a billionaire.

6    Q.   In connection with the CD investment, while the Magness

7    entities were in those investments, that is, from December

8    2004 to 2009, you were being -- or, sorry, through October

9    2008, you were being compensated against the full value of

10   those CD investments.

11   A.   I was -- I was compensated the full value of those CDs

12   until such time that we took the loans out of the bank, and

13   then what -- and then that wasn't considered in the bank.  So

14   whatever we had left after taking out our loans is what I was

15   being compensated against until they shut down the firm.

16   Q.   And then in some years that was over a million dollars in

17   compensation.

18   A.   That's correct.

19   Q.   What were you personally doing in connection with that

20   investment, in other words, during that time period that those

21   investments were fully in the bank?

22   A.   I don't understand your question.

23   Q.   I mean, were you monitoring the investments?  Were you

24   looking after what was going on at Stanford International

25   Bank?  What kinds of activities were you engaged in with

1    respect to the investments?

2    A.    In the bank?

3    Q.    Yes.

4    A.    Well, as long as the bank was doing fine, there wasn't a

5    whole lot we had to do.  We'd go to quarterly meetings.  They

6    would tell us how the bank was doing.  From all the reports,

7    everything looked fine.

8    Q.    But, I mean, were you looking at those reports is -- I

9    guess is my point or my question.

10   A.    Sometimes, so -- I don't recall.

11   Q.    In connection with either of the two depositions, the one

12   today or the one we had on April 20th, what, if anything, did

13   you do to prepare for the depositions?

14   A.    What did I do?  Zip.  Nothing.

15   Q.    Have you talked to -- or when was the last time you

16   talked to Mr. Magness?

17   A.    Probably a week ago.  He was in Baja, and he texted me a

18   picture of the truck, and I called back to see how he was

19   doing.  So --

20   Q.    Did you talk to him about the depositions at all?

21   A.    I said to him I completed my deposition.

22   Q.    Was there a time when there was a concern, at least as

23   you understood it, from the Magness group as to whether there

24   would be enough money to address the margin calls at all?

25   A.    Well, yeah.  That's why we started addressing -- oh,

```
 1    there's no question.  That's why we -- we -- we started

 2    looking at every place, every rock that we could to try to

 3    meet some of these margin calls.

 4         But you got to remember, it was a progression.  No one

 5    believed it was going to get as bad as it did.  So every day

 6    was a -- was an interesting day.

 7    Q.   And when you say no one believed it was going to get as

 8    bad --

 9    A.   Right.

10    Q.   -- as it did, who are you referring to --

11    A.   I'm talking about --

12    Q.   -- as no one?

13    A.   -- the public.  I mean, I think if you went back in that

14    time frame and said to everybody, we're going to be down 30 or

15    40 percent, people wouldn't -- people wouldn't have believed

16    it.  That's why everybody got caught.  It was a crash of

17    un -- I mean, this is -- this is the biggest crash since the

18    Depression.

19    Q.   Now, in discussing with Mr. Powers the mid January letter

20    that you drafted and Mr. Knudson signed --

21    A.   Right.

22    Q.   -- there was a reference in there to -- and if -- if you

23    want to have the letter --

24    A.   No, I know --

25    Q.   -- it's 98.
```

1    A.    Yeah, I know what the letter is.

2    Q.    Okay.  There was a reference in there to Madoff.

3    A.    Yes.

4    Q.    So we at least -- last time you were a little uncertain

5    as to when the Madoff news broke.  It obviously means that by

6    mid January, Madoff had broken.  Correct?

7    A.    Oh, yes.

8    Q.    And was there a change in the industry that you saw as a

9    result of the Madoff revelations when they broke?

10   A.    Yeah, I would say everybody became much more leery of

11   what -- of -- of anything that, you know, you couldn't look

12   into.

13   Q.    If -- again, for context, Mr. Powers is asking about

14   Deposition Exhibit 232, which is one of the loose ones again.

15   And that is the email, October 21, 2008 from yourself to Ms.

16   Mendes.  I think it's "Ms."

17   A.    Yeah, I don't know who Ms. Mendes is.

18         Wait a minute.  You sure it's in here?  239 -- there it

19   is.

20   Q.    Found it?

21   A.    Yes.

22   Q.    And in that context he was asking you about the purpose

23   that you stated about wanting to borrow the money for, "to

24   excess insure capital in case of emergency."

25         Do you see that reference?

```
 1    A.    Yes.

 2    Q.    What does that mean?

 3    A.    Well, I would imagine it means margin calls.

 4    Q.    Did anyone from the Stanford International Bank ever tell

 5    you that that was not a proper purpose --

 6    A.    Well, it doesn't matter.  It was a -- as I recall, I

 7    mean, I may have said that, but we were able to borrow up to

 8    80 percent of the loan-to-value, so --

 9    Q.    Did you at any point in time have a policy of some sort

10    that told you on what basis the Stanford International Bank

11    would or would not agree to loan money, as much as 80 percent

12    of the amount deposited in a CD?

13    A.    Well, the only -- the -- the -- as I recall, you could

14    borrow up to 80 percent of the value of the CD at either one

15    or two points above the rate, so -- that you were -- so we --

16    you know, it was going to be 11 percent money, but we did it

17    because we -- at this point, we didn't think the world was

18    coming to an end and we figured we'd pay back the 25 million

19    we got and keep our CDs intact, you know, in a month or so.

20    That was the idea.

21    Q.    Okay.  Setting aside what you just told me about the

22    amount of borrowing and the interest rate, did you have any

23    other information about the parameters Stanford International

24    Bank would look at in terms of whether to make that type

25    of loan?
```

1    A.    No.

2    Q.    Was there a time in October of 2008, when you were

3    working through these requests for loans and the making of

4    these loans, that anyone on the Magness side ever asked you to

5    make some sort of arrangement that was outside of the policies

6    and procedures --

7    A.    No.

8    Q.    -- of Stanford International Bank?

9    A.    No.

10   Q.    Did anyone at -- on the Magness side ever indicate to you

11   that they had some knowledge that what they were asking for

12   from the Stanford International Bank was somehow outside of

13   its policies and procedures?

14   A.    No, because I handled that.  I mean, it was, you know, we

15   can borrow up to 80 percent, let's go get it, you know.  I

16   mean, it wasn't -- this -- this was in the documents, so, you

17   know, and this was good for anybody.  It wasn't just for us.

18   I mean, anybody that had a CD, theoretically, could have done

19   the same thing we did.

20   Q.    Why do you say "theoretically"?

21   A.    Well, because that's what was in the documents.  So, as

22   far as I know, in the documents -- and I -- and I don't have

23   any knowledge of anybody else doing it, but anybody under the

24   loan -- under the documents that we signed, could borrow up to

25   80 percent of the value of their CD.

1        So we were operating under what the documents said.  So

2   it wasn't anything that was out of the ordinary.  From my

3   recollection.

4   Q.    If you could -- again, I believe it's in the loose

5   documents, the ones not in the binder -- find Exhibit 147,

6   please.  And that was Ms. McGowan's email.

7   A.    Well, it's in here.

8   Q.    And do you recall discussing that loan request that Ms.

9   McGowan made as to the Knudson CD in February of 2009?

10  A.    Not really.

11  Q.    Well --

12  A.    I mean, I remember -- I -- I don't -- I mean, I can't

13  tell you what I -- but I can -- I can -- supposition is that,

14  well, we -- they denied -- they denied the request to break

15  the CD, so maybe they wouldn't deny the request to borrow

16  against the CD.  I don't know.

17  Q.    So as -- as you look at that today, your -- your thinking

18  is that if, having been turned down on getting all of the

19  money out, at least you could try?

20  A.    Right.

21  Q.    -- and get 80 percent?

22  A.    Let's try -- let's try option 2.

23  Q.    Today you returned briefly with Mr. Powers to that

24  meeting that took place at the Holland & Hart law firm in

25  Denver and you -- of course, you talked about it last time,

1    too.

2    A.    The meeting.

3    Q.    Do you remember that?

4    A.    Where?

5    Q.    The -- the meeting that took place in Denver where

6    Juan --

7    A.    Oh, yeah, yeah.

8    Q.    -- Rodriguez-Tolentino came?

9    A.    Yeah, sure.  Okay.  Yeah.

10   Q.    And in that meeting, was it your understanding that any

11   information was provided to the persons attending that was not

12   generally available to the public?

13   A.    Not to my knowledge.

14   Q.    Is there any information that was provided to the

15   attendees at that meeting -- first of all, were they

16   accredited investors?

17   A.    Everybody in the room was, yeah.

18   Q.    Was there any information provided to that group of

19   accredited investors that was not otherwise available to any

20   other accredited investors?

21   A.    No, it was all the same.  It was -- it was -- it was

22   almost a standard -- or the same kind of presentation that

23   they would give -- except it was specifically for the

24   Magnesses and their -- and the umbrella, the same stuff they

25   gave us at the TCPs.  I mean, it's just going over what they

 1    do.

 2    Q.   During your tenure at SGC -- and let me -- let me narrow

 3    that.

 4         Let's take from when you started at the company, Mr.

 5    Hamilton -- when Mr. Hamilton was still there, all the way

 6    through, let's say, November, say, Thanksgiving of 2008 --

 7    A.   Uh-huh.   Yes.

 8    Q.   -- were you at any point in time aware of SEC

 9    investigations taking place that were looking at SGC and its

10    business?

11    A.   Not to my knowledge -- or recollection, for that matter.

12    Q.   At any point in time -- during that same time span, did

13    you make any effort to see whether, for whatever reason, the

14    SEC was looking at SGC or its operations?

15    A.   No.

16    Q.   Is there a reason why?

17    A.   There wasn't any reason to.

18    Q.   By the way, Mr. Powers has made both last time and today

19    reference to the fact that the Receiver has sued you

20    personally.

21    A.   That is correct.

22    Q.   Does the fact of that lawsuit impact the accuracy of your

23    testimony in any way?

24    A.   Of course not.

25    Q.   Does it affect the truthfulness of your testimony?

1   A.   Of course not.  The truth is the truth.

2   Q.   And you discussed with Mr. Powers briefly in our last

3   conversation the fact that for a time, you had an office in

4   the Tabor Center where the Magness Investment Group office was

5   located?

6   A.   That is correct.

7   Q.   And was that something that was run through the

8   Compliance area at SGC?

9   A.   That it was.

10   Q.   And were there any particular parameters Compliance put

11   on your operations in that space?

12   A.   Yes.  One, it had to be a separate office with -- which

13   it was; all of -- all the documents, all correspondence,

14   communications, everything was the same as if I was at the

15   office over on -- at Republic Plaza.

16   Q.   And what do you mean it was "the same as"?

17   A.   I mean, every -- all the same standards as if I was at

18   the Republic Plaza's office was -- had to maintain there.

19   Q.   Did the Magness Investment Group or any of the Magness

20   entities obtain additional information about SGC or SIBL by

21   virtue of you having that office?

22   A.   No.

23   Q.   Do you see, sir, that that's a July 1st, 2008, email from

24   yourself to Sir Allen Stanford with a cc to a Laura Barlow?

25   A.   Yeah.  I don't -- I don't know who she is, but --

1    Q.    But this -- this is your email.

2    A.    Yeah.  Right.  Sir Allen.

3    Q.    And this is talking about housing for him in the -- for

4    the upcoming DNC, which is --

5    A.    Right.  Okay.

6    Q.    That's the Denver -- excuse me, the Democratic National

7    Convention --

8    A.    Yes.

9    Q.    -- that took place in Denver in the summer of '08?

10   A.    Right.

11   Q.    And there you talk about options in terms of offering him

12   your house or Mr. Magness' house.

13   A.    Right.

14   Q.    But say they're both located, essentially, out of the

15   inner core of downtown Denver.  Right?

16   A.    Let's see.  (Reviewing)

17   Q.    You say, "We both live in the suburbs"?

18   A.    Right.

19   Q.    And then you talk about renting a friend's --

20   A.    Yes.

21   Q.    -- corporate apartment downtown?

22   A.    Right.

23   Q.    Do you know whether that happened?

24   A.    No.  None of this happened.  It was just -- you know, it

25   was a nice gesture.

104

```
 1    Q.    Was there anything about this gesture that allowed the

 2    Magness group to obtain some sort of preferable treatment from

 3    the Stanford entities?

 4    A.    No, of course not.  No, this was just me being my -- my

 5    charismatic self, just trying to be accommodating to our

 6    chairman who was going to be in town.  No, I don't think he

 7    even answered this letter.

 8    Q.    Was there anything about the Mango racing arrangement

 9    that you've discussed for us previously, about the sponsorship

10    and the labeling on the truck, that allowed the Magness

11    defendants to get some sort of preferred terms from the

12    Stanford entities?

13    A.    Of course not.

14    Q.    Did it allow them to get some sort of information that

15    was not available to other depositors generally?

16    A.    No.

17    Q.    You also discussed with Mr. Powers the arrangement by

18    which one of the Stanford entities contributed some money to a

19    fashion show at Sarah Siegel's request?

20    A.    That is correct.

21    Q.    That is Mrs. Magness?

22    A.    Mrs. Magness.

23    Q.    Was there anything about that contribution that obtained

24    for the Magness defendants some sort of favorable terms from

25    Stanford?
```

```
 1   A.   No.

 2   Q.   Was there anything about that that provided -- that by

 3   making that contribution to this fashion show, that the

 4   Magness defendants obtained information that was not generally

 5   available to depositors in the CD program?

 6   A.   No.

 7   Q.   Can you think of anything the Magness defendants did that

 8   provided them with access to information about any Stanford

 9   company that was not available to any other accredited

10   investor?

11   A.   No.

12   Q.   From your experience, the experience you related to Mr.

13   Powers about the various entities that you've worked with or

14   for since you graduated from St. Lawrence, how did SGC stack

15   in terms of the tightness of its operations?

16   A.   Best -- best-run firm I've ever worked for, the highest

17   quality people, under the SPC.

18   Q.   And what is there, just if you can give us some examples,

19   of what in your view made it the best-run firm that you've

20   ever worked, for other than the quality of the people you've

21   already identified?

22   A.   Their ability -- their trading -- their trading

23   capabilities, the trading -- the trading floors, they -- the

24   actual trading desks they brought in, the quality of people

25   they brought in, the level of response and liaisoning with
```

1    Pershing.  They had a very highly -- in my view, a very

2    well-run company.

3    Q.   Are you including the group in Memphis that was in charge

4    of making investments in that group of people?

5    A.   No.  I'm including the people in Houston and the SGC

6    operation.

7    Q.   Was there any -- again prior to November 1st of 2008, any

8    TPC meeting that you attended in which you came away with the

9    thought that there was something that didn't quite track with

10   what you were being informed about what was going on at the

11   bank?

12   A.   No.

13   Q.   All of that came in --

14   A.   After.

15   Q.   -- in the December time frame and beyond?

16   A.   It all came after November, December, when everything was

17   melting.  It really came -- the biggest question came when I

18   read 110 million was all they lost.  And then that's when all

19   the red flags and bells and whistles went off.

20   Q.   And at that -- that's when you started asking these

21   questions.

22   A.   That's when the letter was written.  That's when we

23   started asking for conference calls.

24        I mean, mind you, to the day we -- to the day they showed

25   up, the FBI showed up at everybody's office but mine, we -- we

1    -- we thought the company was fine.  We thought there were

2    some issues obviously related to what was going on with Allen

3    Stanford because he was acting weird, but we didn't have any

4    clue that they were going to shut down the -- the company.

5    Q.   Was there -- you've discussed a little bit today and more

6    so in our first meeting with Mr. Powers of this arrangement

7    with Pershing.

8    A.   Yes.

9    Q.   And in connection with that arrangement, was there any

10   sort of quid pro that you asked of the Magness parties to --

11   A.   No.

12   Q.   -- justify that arrangement?

13   A.   No.  The only reason for putting that in place was to

14   make us -- so that -- it was my own selfish -- it was selfish

15   for me, really.  I mean, I was going to lose $250 million in

16   assets under management because Pershing's margin requirements

17   were not competitive with Merrill Lynch or HSBC.

18   Q.   Is it correct, sir, that your experience with the hedge

19   fund investments is that they don't have clarity about what

20   the funds are investing in?

21   A.   That would be a correct statement.

22   Q.   Is it also correct, sir, that generally the way those

23   work, is you give them the money and they give you the

24   returns and you don't know --

25   A.   That's exactly right.  And -- and like, with Tontine, for

 1   example, you know, he had concentrate -- that's what killed

 2   him, he had concentrated positions.  So, you know, you want to

 3   keep those concentrated positions and what you're doing fairly

 4   quiet because you don't want other people knowing what you're

 5   doing.

 6   Q.   You ever heard a hedge fund refer to those positions as

 7   being proprietary trading?

 8   A.   Not in particular, but --

 9   Q.   Have you ever asked a hedge fund to disclose that --

10   A.   Yeah.

11   Q.   -- type of information?

12   A.   I haven't, but they typically don't, so --

13   Q.   Why do you say they typically don't?

14   A.   Well, because, you know, if everybody know's what you're

15   doing in the hedge fund world, then you -- their -- then

16   they can -- somebody else can do what you're doing.  It's the

17   idea of, you know, you're picking your positions because you

18   have a reason to believe, with your research, that this is,

19   you know, undervalued or overvalued if you're shorting it, and

20   you don't necessarily need everybody else to know what you're

21   up to.

22   Q.   And when you told Mr. Powers that you-all understood that

23   essentially Stanford International Bank was operating like a

24   hedge fund in a regulated structure?  Right?

25   A.   That is correct.

1  Q.   And so in that context, did it strike you as unusual that

2  the bank would not be disclosing its positions and who its

3  investment managers were?

4  A.   No, not -- not at the way I -- not at the way we looked

5  at what the -- Stanford International Bank was a -- it was

6  basically a single-purpose bank which was hedge fund that was

7  doing the arbitrage, paying rates out, and keeping the profit.

8  And as long as they were profitable, the bank would stay in

9  business and could pay higher rates.

10  Q.   You mentioned some to Mr. Powers, and I think in response

11  to something I had asked you earlier, about vacationing with

12  Mr. Magness in Mexico in --

13  A.   December.

14  Q.   -- the year-end holidays of '08?

15  A.   Yeah.

16  Q.   And at that point in time, had at least some of the

17  turmoil in the markets slowed down?

18  A.   Some, yes.  I mean, we -- for us, we had stabilized.

19  Q.   Okay.  And did that provide you with an opportunity,

20  having, at least as to Mr. Magness' portfolio, some

21  stabilization, did it provide you with an opportunity of

22  breathing room to talk about what was going on?

23  A.   Yes.

24  Q.   And this, again, was based on the 110 --

25  A.   This is based on a hundred million loss made no sense to

1    me.  And that -- I said, Look, we -- I don't know if the

2    TP -- well, I knew the TPC was coming up.  I said, Look, we're

3    going to -- this is what -- the conversation I had with him, I

4    said, I don't know that at this point we're -- we're -- you

5    know, because the bank had -- I think Juan had asked me when I

6    was going to pay -- when we were going to pay these loans

7    back, and I pushed him off because I said, Listen, you know,

8    we need some answers here.

9          So that was -- that was the conversation.  I remember

10   exactly where I was when I had the conversation.  I was

11   sitting in the pool with Gary, I mean, when I had this

12   conversation with him.

13         And from there he said, Okay, well, what do you want to

14   do?

15         And I said, I'm going to draft a letter with Steve.  This

16   is when I said -- I don't know if I said I was going to draft

17   a letter.  I just said, I'm going to sit down.  We're going to

18   -- we're going to ask questions at the TPC.

19         So when I got back, there was a number of different

20   things that went, but that -- that's when we -- we knew we had

21   a problem.

22   Q.   And this TPC, the Phoenix meeting --

23   A.   Right.

24   Q.   -- was in mid January?

25   A.   Yeah, early January.  It was early January.

1   Q.   Well, the letter was dated January 13.  Right?

2   A.   Right.  So maybe it was -- whatever it was, it was before

3   that.  So it was early January, mid January, but the letter

4   was written and hand-delivered to Juan.  I remember where he

5   was standing to.

6   Q.   Okay.  But so the hand delivery took place at the

7   meeting?

8   A.   At the TCP.

9   Q.   And meeting took place after the date of the letter.

10  A.   That's correct.

11  Q.   So the meeting would be after January 13th?

12  A.   Yeah, after January 13th.

13  Q.   Why wait, from a conversation with Mr. Magness when

14  you're in the pool over the Christmas holidays, until roughly

15  the middle of January to raise this?

16  A.   Well, because it was -- I mean, because it wasn't any of

17  huge concern, but it was a concern that we wanted to get

18  answers for.  And we -- we didn't get back until -- in January

19  because I think we were there through -- it was after

20  Christmas, through, you know, through New Year's.  So, you

21  know, it was a week -- you know, a week, you know, then we

22  worked on it that week and so I was going to deliver it the

23  next week.  So it wasn't that long.

24  Q.   Based on what you've told us about the 110 million and

25  the discrepancies, why do you say that wasn't a huge concern?

1   A.   Well, at the time it was something that deserved an

2   answer.  So -- you know, we didn't think the bank was, you

3   know -- we didn't -- we thought that the bank was well run, we

4   thought that it was a legitimate, you know, enterprise, but it

5   was a red flag.

6       So, I mean, do we ever think that the bank was fraudulent

7   in any way?  No.  We just wanted answers to why -- how they

8   did this.  And the thought was, and I remember discussing it,

9   Well, it was a dynamic portfolio, as any, as we saw it, hedge

10  fund could be.  So if they had a number of short managers

11  within that portfolio, which we didn't know that they did or

12  they didn't, but if they did, it could account for why it

13  wasn't down any further.  And we wanted to know that answer.

14  We wanted visibility in -- more visibility into the bank.

15      And that was the reason for the letter being put forth,

16  and that was the reason why we scheduled that call with the

17  bank -- I guess it was in February or end of January.

18  Q.   And -- and recognizing that the people who may end up

19  watching your deposition testimony may not be experienced in

20  the securities industry, is it a fair, high-level view that

21  when you talk about whether there were managers with shorts in

22  their portfolio, a short position is where you bet on the fact

23  that a stock will decline in value.  Is that correct?

24  A.   That's correct.

25  Q.   And that's why you're saying that if the market declined,

 1   if there was some short positions in the portfolio, that could

 2   potentially explain things?

 3   A.   That's right.  And -- and -- and the managers, which were

 4   Jim Davis and Laura Pendergest, if they had seen the markets

 5   in this turmoil and decided to go with short managers, because

 6   we'd already determined, at least they had said, there weren't

 7   any CMOs or CDOs, which is really what killed a lot of the --

 8   I mean, it took out Lehmann Bros., it took out Bear Stearns,

 9   it almost bankrupt Morgan Stanley.  I mean, it almost took

10   down Goldman.  I mean, these were the big boys.

11        So we didn't have any CMOs or CDOs, according to them, so

12   there is -- there was a plausible -- there was a plausible

13   idea that they might have had some short managers that

14   compensated for the downdraft in the world markets.

15   Q.   Is it -- is it accurate, sir, that from your perspective,

16   things didn't go haywire until February?

17   A.   That's correct -- well, I will say it went haywire for me

18   after that conference call with Allen Stanford, and that would

19   have been early February.

20   Q.   You were talking about that you had some questions, and

21   that led to the January 2009 letter, the January 13th letter.

22   A.   Yep.

23   Q.   But, in fact, there were questions before that time

24   period, and you recall we went over a February 2008 email,

25   from Mango Five to you, asking questions about how the bank

1   was invested and what are -- what are -- what's the exposure,

2   what are the underlying assets.  Do you recall that?

3   A.    Uh-huh, yeah, somewhat, yeah.

4   Q.    Okay.  And so that was an investigation of Stanford

5   International Bank by Mango Five --

6   A.    Right.

7   Q.    -- almost a year before --

8   A.    Correct.

9   Q.    -- January 13th, 2009.

10  A.    Uh-huh.

11  Q.    And so there was some reason, evidently, to question what

12  was going on at Stanford for quite a long time before you sent

13  the letter January 13th, 2009.

14  A.    No, because that was basically -- that had to do with the

15  trust obligations, I think, coming from Bob Armstrong.  He

16  said, well, this is what we should be asking.  And we, I

17  think, answered them, or at least the bank answered them, so

18  they were satisfied.

19  Q.    And, in fact, that led to a phone call with Juan

20  Rodriguez-Tolentino in March of 2008.

21  A.    Might have.

22  Q.    Okay.  And we'll look at that in a second.  But those

23  weren't just run-of-the-mill questions.  This was a -- this

24  was to the point where the president of the bank had to get on

25  the phone with the trustees.  Right?

```
 1    A.    No.  The president -- whenever we talked to anybody, we

 2    talked to the president of the bank.  I mean, there wasn't --

 3    you mean about Juan?  No, we always talked to Juan.

 4    Q.    Right.

 5    A.    From the beginning.

 6    Q.    So we had questions that -- the Mango Five had questions,

 7    what do they do?  They talk to the president of the bank?

 8    A.    That's correct.

 9    Q.    Every accredited investor get that kind of treatment?

10    A.    I don't -- I can't tell you.  I don't know.

11    Q.    You were asked some questions about whether the Magness

12    defendants got information that other accredited investors did

13    not have access to?

14    A.    That's correct.

15    Q.    In point of fact, you don't know what kinds of

16    information other accredited investors got beyond what's in

17    the disclosure statements and annual reports.

18    A.    Well, I can tell you that from what was -- what we would

19    be reported to at the TPCs, which is in front of 250 people,

20    we never got any information that was ever provided anything

21    that wasn't disseminated in those.  So I can pretty much say

22    yes.

23    Q.    The people -- so let's -- let's take that in steps.

24          The people at the TPC meetings, those are not investors.

25    Correct?
```

1   A.   That is correct.

2   Q.   Those are financial advisors.

3   A.   That's correct.

4   Q.   And they're not just any financial advisors, they're the

5   financial advisors who sell the most Stanford International

6   Bank CDs.  Right?

7   A.   Arguably.

8   Q.   But that's who they were.  That's how you got into the

9   TPC, right, selling the most CDs?

10  A.   Yeah.

11  Q.   Okay.  So these are the people who have the most

12  personally invested, in compensation and professionally, in

13  the success of the Stanford International Bank CD program.

14  Right?

15  A.   Well, I -- if you're looking at it from the -- I mean,

16  that almost sounds like you're asking me, are they --

17  everybody in this place is in collusion because we're selling

18  something.  No.  I mean, this is what they standardly would

19  talk about.

20       Now, are we the ones that are relaying it to the -- to

21  the investors?  Yes.

22  Q.   Right.  I just want to make sure it's clear for the

23  record who is there.  So when you say --

24  A.   They were --

25  Q.   -- this is the same stuff that all the investors are

1    told, I want the jury to understand whether the investors are

2    at the meeting or not.

3    A.    No, they are not.

4    Q.    They are not at the meeting.

5          And the information that is disclosed in the meeting, I

6    assume much of that is private Stanford information where you

7    wouldn't just go out and relay everything that you were told

8    at the meeting to an investor.  You wouldn't expect people to

9    do that, would you?

10   A.    No.

11   Q.    No, of course not.

12   A.    Yeah.

13   Q.    So in terms of what was relayed to investors, the only

14   thing you could speak to with personal knowledge is the

15   information that's available in the disclosure statements and

16   the annual reports and the quarterly reports and those kinds

17   of things.  Right?

18   A.    That's correct.

19   Q.    So let's look at Plaintiff's Exhibit 35, which is the

20   one -- the lengthy document that you looked at over the break.

21   A.    Yes.  Wait a minute.  Where is that?  Over here, I

22   believe?

23   Q.    I believe that's in -- you're in the right notebook.

24   A.    Yeah, there we go.  Okay.

25   Q.    Okay.  And I think, starting with page 2, you established

```
1    that all of the pages in this document are marked "For

2    internal use only."

3    A.    That's correct.

4    Q.    Fair to say that Mr. Magness was, in terms of dollars

5    invested, was the number one investor in North America in

6    Stanford International Bank CDs in the 2005 to 2008 time

7    frame?

8    A.    I would say probably.

9    Q.    And he got special rates.  You know about that.

10   A.    Yes.

11   Q.    He got -- he had endorsement deals with Stanford through

12   the Baja racing?

13   A.    I don't think that has any bearing on anything, Scott.

14   Q.    So my question to you is -- is:  Do you really believe

15   that he did not get information -- that he didn't get

16   information that other people were not getting?

17   A.    Not to my knowledge.

18   Q.    He got a presentation in March 2008 from the president of

19   the bank on the telephone to his trustee committee.  Correct?

20   A.    Yeah, at my request.

21   Q.    And -- and the president of the bank and Jason Green and

22   the chief investment officer flew all the way to Colorado in

23   2005 to make an extended presentation, and are you saying they

24   did that to just disclose the same kind of information they

25   disclosed to other people?
```

1    A.    I would say, yes, and I would say also -- I mean, what --

2    because what you're asking is the same question that could be

3    asked of any bank.  Would Donald Trump get a -- would Donald

4    Trump get a presentation from the chairman of the board of

5    Chemical or Citicorp if it was -- if it was requested?  Of

6    course he would.

7         I mean, it's the same -- it's -- you know, or would he

8    get -- would he have the same access as the guy that's got a

9    million-dollar investment?  Of course, he's going to get -- I

10   mean, that's -- we live in a world where, you know, where the

11   most important people are the wealthiest and they get access

12   where other people wouldn't.

13   Q.    Right.  And I'm not making a moral judgment about whether

14   he should or he shouldn't, but I'm just -- I just want to make

15   sure the record is clear.  Mr. Magness clearly got

16   information --

17   A.    I'm not going to say that he clearly got information that

18   nobody else got, Scott.  I don't know that answer.  He had a

19   presentation at my request and Gary's request because he

20   believed in the CD product.

21        So, you know, you can take inference from that, but there

22   is no inference as far as I'm concerned except for he was a

23   valued client to both Stanford International Bank and Stanford

24   Group Companies.

25   Q.    No ques -- how about this?  Can we agree on this:

1    There's no question when he wanted answers, he was able to get

2    answers?

3    A.    At my request.

4    Q.    At your request --

5    A.    Yes.

6    Q.    -- absolutely.

7    A.    He was able to get answers, yeah.  Well, that would

8    be -- well -- well, that's when -- let me back up.

9         Because do we get the answers we wanted?  No.  When we --

10   when we asked for -- when we asked for answers, we got an

11   interview.  What we got out of the interview was something

12   that we weren't expecting, which was, we're in -- we own an

13   island and we own -- and we -- we have private equity, which

14   was never supposed to be in that portfolio.  That was a

15   question that they volunteered that we took as there's an

16   issue here.

17   Q.    The -- you're referring to the January 27, 2009

18   conversation.  I want to take you back for a second to

19   Plaintiff's Exhibit 62, which are the notes of the

20   conversation with Mr. Rodriguez-Tolentino in March of 2008.

21   A.    Okay.

22   Q.    And if you could turn to page 3 of the exhibit, please,

23   you'll see the report on the Stanford certificates of deposit.

24   A.    Page 8?

25   Q.    Page 3.

1    A.    Page 3.

2    Q.    Let's see.  I'm sorry.  It's page 3 of the document, but

3    it's page 2 of the notes.  So I apologize.

4    A.    Okay.

5    Q.    See Section 5?

6    A.    Yeah.

7    Q.    Now Mr. Rodriguez talked about the bank resembling a

8    Swiss bank model.  Do you ever recall seeing anything like

9    that in any of the public disclosures about Stanford

10   International Bank?

11   A.    No, and I don't even know what the Swiss bank model is.

12   Q.    Right.  And then Mr. Rodriguez, in the second paragraph,

13   was asked how the bank differed from a hedge fund.  And he

14   responded it was different because the bank has regulatory

15   oversight.

16   A.    Okay.

17   Q.    And I think you've discussed that you always thought it

18   was -- thought of it as a hedge fund.

19   A.    Yeah, that's how we looked at it.  It's not how the bank

20   talked about it.

21   Q.    Right.  Did you have an understanding that the bank, from

22   the bank's perspective, it was kind of a no-no to talk about

23   the bank as a hedge fund or a mutual fund?

24   A.    Yeah.  I mean, I -- I do recall that that was -- we

25   weren't supposed to refer to the -- to the -- the bank as a

1    hedge fund.

2    Q.    And then Mr. Rodriguez tells the group that the bank can

3    leverage the portfolio by a factor of 15 percent.

4    A.    Right.

5    Q.    Do you recall that being disclosed in these Stanford

6    marketing materials?

7    A.    I do not.

8    Q.    And as far as this -- this next statement, it says:  "60

9    percent of the portfolio's allocation is in U.S.

10   dollar-denominated investments."  Was something you saw

11   disclosed in public marketing materials?

12   A.    I don't recall.

13   Q.    In 2007, the Magness parties had already purchased CDs

14   from the bank.  Correct?

15   A.    That is correct.

16   Q.    Was there in 2007 any issue of which you were aware with

17   the solvency of the bank, the bank's ability to honor the

18   repayment of the amounts deposited in the CDs?

19   A.    No.

20   Q.    Was there at any point in time in 2008 an issue that you

21   saw with the bank's ability to repay the amounts that had been

22   deposited by the Magness parties in the CDs?

23   A.    Not to my recollection.

24   Q.    Was the source of your information about the bank limited

25   to what you learned from the bank itself and from Stanford

1    Group Companies?

2    A.   Yes.

3    Q.   Was there -- over that holiday weekend in 2008, was there

4    any discussion in which you participated about some article in

5    Bloomberg addressing the Stanford International Bank?

6    A.   Not to my recollection.

7    Q.   Was there any discussion over that same weekend among

8    people who worked at Stanford Group Companies concerning

9    whether there had been a -- an uptick in people wanting to

10   withdraw their money from Stanford International Bank on

11   account of having read some media report about the bank?

12   A.   Not to my recollection.

13   Q.   Can you recall any point in time when you were working at

14   Stanford Group Companies up through, let's say, mid December

15   of 2008, where there was a -- an uptick in withdrawal of funds

16   from certificates of deposit on account of media reports?

17   A.   Not to my recollection.  Most of all of that all started

18   in December and through January or when we had that final

19   meeting in Arizona.

20   Q.   That's the TPC meeting?

21   A.   The TPC meeting in January.

22   Q.   Did you have any information about the requirements of

23   the Stanford International Bank for borrowing against CDs,

24   whether in a manual or in some other source?

25   A.   Yes.

1    Q.   What was the source of the information that you had?

2    A.   Directly from -- when -- if I was -- I would deal with

3    Juan Tolentino, who was president of the bank.  It was very

4    widely known that you could borrow up to 80 percent against

5    the CD value.

6    Q.   And when you say "it was very widely known," very widely

7    known by whom?

8    A.   By any of the advisors that were participating in the

9    bank CD product.

10   Q.   Did you ever discuss with the other advisors the

11   mechanics of putting in place one of those loans?

12   A.   Not with another advisor.  I discussed it with the bank

13   when it became necessary to do it.

14   Q.   Did you discuss it with anyone other than Mr. Tolentino?

15   A.   I probably did.  I probably talked with Jason Green or

16   somebody else, but I just don't remember.

17   Q.   Was Jason -- Jason Green was not at the bank, however,

18   was he?

19   A.   No, but he was the head -- he was the head of -- he was

20   president of whatever the advisors were.

21        But all I recall is, when I needed to do it, it was very

22   quick because we were under duress.  So, you know, I'd known

23   about that ability.

24        I think it was widely known among anybody that was

25   participating in the bank CD program that -- because it was --

```
 1    you know, it was the -- it was widely talked about in these

 2    TPC meetings, which were related to the bank.

 3    Q.   What led you to be talking to Mr. Tolentino about the

 4    loans as contrasted with anyone else who worked for --

 5    A.   Because I needed to --

 6    Q.   -- the bank?

 7    A.   -- we needed to put it in play, so he would be the

 8    logical person to talk to as president of the Stanford

 9    International Bank.

10    Q.   In the TPC meetings, was there any discussion of using or

11    contacting Mr. Tolentino as the way to start the process of

12    getting a loan in place?

13    A.   No.

14    Q.   How did you determine to reach out to Mr. Tolentino?

15    A.   He's president of the bank.

16    Q.   Did Mr. Tolentino, when you reached out to him, give you

17    any indication that he considered it unusual or out of the

18    chain of command for you to reach out to him about the loan?

19    A.   No.

20    Q.   Did he -- did he, Mr. Tolentino, when you spoke to him,

21    give you any information about the mechanics that you'd need

22    to go through in order to get that loan put in place?

23    A.   I don't recall.  I know that Tonya Dokken -- we had --

24    and Pam McGowan, we were all on board -- we were all in

25    discussions of what needed to get done in order to facilitate
```

1    the loans.

2    Q.   When you say "we were all in discussions," are you

3    talking about discussions where it was Mr. Tolentino,

4    yourself, and Ms. Dokken?

5    A.   And Tonya.  Yeah.  I mean, we would all be -- as I

6    recall, there would be conference calls, we had to get

7    paperwork, there was all kinds of different things, and we had

8    to do it quickly, so -- and then Tonya basically, once -- once

9    that was set up, that was -- that wasn't my job anymore; that

10   was really Tonya, working with Pam, to facilitate getting it

11   done.

12   Q.   And Pam was the --

13   A.   Pam McGowan was my assistant.

14   Q.   In the course of your conversations with Mr. Tolentino,

15   did you ask him for any sort of special treatment of the

16   Magness parties in connection with these loans?

17   A.   No.  I mean, it was standard -- it was widely and

18   standardly known that you could borrow up to 80 percent, and

19   that's what we did.

20   Q.   You talked -- and I'm -- I'm paraphrasing, I'm not

21   repeating what you said -- but essentially about needing to

22   get that done in a hurry?

23   A.   Yeah.

24   Q.   Did Mr. Tolentino express to you any concerns that

25   getting it done in a hurry was somehow out of the regular

1    course of the way the bank operated?

2    A.   No.

3    Q.   It's actually a series of documents that are the

4    attachments, and they're -- they're clipped together because

5    they are -- I believe they're related from the manner in which

6    they're produced.

7         Do you see the -- let's start with D71 --

8    A.   Yes.

9    Q.   -- before we get to the lengthy D72.  You see that has --

10   A.   I do.

11   Q.   -- the most recent email, an email from Mr. Wehrle to

12   yourself?

13   A.   Yes.

14   Q.   And he is passing on an information about a PCM fund --

15   A.   Yes.

16   Q.   -- which is listed a little further down the page as

17   being a "long/short equity hedge fund of funds."  Do you see

18   that reference?

19   A.   I do.

20   Q.   What does that mean in layspeak, if you --

21   A.   Well --

22   Q.   -- can tell us?

23   A.   -- Prairie Capital had set up a fund in order -- and it's

24   a long/short fund, so it is a series of advisors or hedge

25   funds that they put into this fund, some would, you know, that

 1   could go long or short to hedge portfolios.  So it was offered

 2   by them, managed by them, with a proposed return.

 3   Q.    If -- how does -- just generally in the industry, based

 4   upon your knowledge and your work with Prairie Capital, how

 5   just in a very conceptual way does Prairie Capital manage this

 6   fund when there are all these other managers involved?

 7   A.    Well, it's a fund of funds, so they are the ones that

 8   have -- back in that day and age, the best hedge fund managers

 9   often were closed.  So Prairie Capital had relationships with

10   these managers.  They would actually pick the managers, would

11   have access to the managers.  The managers would charge their

12   fees, which were 2 and 20 mostly, two percent management --

13   two percent management fee, 20 percent of the profits.

14        Then they would charge anywhere from one to

15   one-and-a-half on top of that in order to manage those

16   portfolios.

17   Q.    Okay.  So let's -- that's a lot of information there.

18   Let's unpack it a little bit.

19        When you say the fund -- the underlying funds were

20   closed --

21   A.    Some of them were, yes.

22   Q.    -- what does that mean?

23   A.    It means no -- unless you had a previous or an ongoing

24   relationship with that fund manager, they were not taking any

25   new outside capital.

129

1    Q.   Well, let's -- let's look at Exhibit D72, or at least

2    parts of it.

3         Now, first of all, the Prairie Capital management

4    product, fund of funds, was something in which you were

5    interested.  Correct?

6    A.   That is correct.

7    Q.   And this would -- was an email that contained materials

8    that you were interested in.

9    A.   That's correct.

10   Q.   And at the time, is it accurate that you would have

11   looked at these materials?

12   A.   That is correct.

13   Q.   The last two sentences of the same paragraph of the

14   disclaimer state -- and I'll just read them to you.  You can

15   read along with me:  "This presentation is confidential and is

16   intended solely for the information of the person to whom it

17   has been provided.  It is not to be reproduced or transmitted,

18   in whole or in part, to third parties, without the prior

19   consent of the fund."

20        Do you see that reference?

21   A.   I do.

22   Q.   Do you know why it's -- this -- these materials are

23   restricted in that way?

24   A.   Because they're for accredited people only.

25   Q.   And do you know why -- what's the connection between

1    having the materials being for accredited people only and this

2    type of restriction, as you understand it?

3    A.   Because this is a private offering.  It has different

4    rules and regulations.

5    Q.   Okay.  When you talk about different rules and

6    regulations, are you talking about rules and regulations that

7    existed --

8    A.   Under the Securities Act and all that.

9    Q.   So you're not talking about something specific to

10   Stanford Group Companies?

11   A.   No.

12   Q.   Okay.  Then if you could look and I'm -- if you will see

13   in the bottom right-hand corner, there are page numbers here?

14   A.   Yes.

15   Q.   Okay.  If you could look at page 7, and then if you look

16   at pages 7 through -- I think it goes all the way through 31.

17   Do you see that those pages are descriptions of hedge fund

18   managers?

19   A.   That is correct.

20   Q.   Do you see anything on the -- any of these descriptions

21   of hedge fund managers between pages 7 and 31 where it gives

22   the specific identity of the hedge fund manager?

23   A.   I do not.

24   Q.   Is that something in your experience that fund of fund

25   managers typically provide?

1    A.    No, because, I mean, once you -- they don't want to give

2    up the golden goose, which is their group that they're

3    investing in, or otherwise everybody -- all their competitors

4    would be able to say, hey, oh, we love the guys that you're

5    investing with; we're going to try to invest with them.

6         So in this type of forum, I can't recall whether or not

7    we knew who they were once we were invested, but for

8    presentation purposes, they didn't give up the names.

9    Q.    If you could look at the preceding page, which is number

10   33.  And that -- again, it's a summary of principal terms, but

11   this is talking about a number of items.  It starts with the

12   fund and the general partner and goes on from there.

13        Do you see that?

14   A.    I do.

15   Q.    There's -- the last reference on that page is talking

16   about withdrawals.  Do you see it?

17   A.    I do.

18   Q.    And I'm hoping you can decipher for us what it means

19   where it says:  "Annual, upon 95 days' notice, following a

20   12-month lock-up."  Do you know what that means?

21   A.    Yeah.  You're -- you're locked into your investment.  You

22   can't -- you can't get out of your investment within the first

23   12 months.

24   Q.    And then when it says:  "Withdrawals:  Annual, upon 95

25   days' notice," does that mean --

1    A.    So after that 12 months or prior to the 12 months, you

2    can give notice that after the lockup, you want -- you have to

3    give them a 95-day notice that you want to be -- you want to

4    get out of the fund.

5    Q.    So your understanding, and correct me if I'm misstating

6    what you're telling me, is then that if -- that you could give

7    the 95 notice -- the 95-day notice in that one-year period as

8    long as the last day fell outside of the one year?

9    A.    That's my understanding.

10   Q.    All right.  Then if you look on the second page, there is

11   a -- I guess, a chart, for lack of a better term, on the

12   bottom half of the page --

13   A.    Yes.

14   Q.    -- discussing 24, if my reading of Roman numerals is

15   correct, funds there?

16   A.    Correct.

17   Q.    Here again, there's no identification of what the

18   particular funds are.

19   A.    That is correct.

20   Q.    Is that the "golden goose" concept that you described for

21   us earlier?

22   A.    Yeah.  They're not going to tell who their -- who their

23   -- well, at least Prairie Capital and others I've seen don't

24   readily tell you who their -- who their managers are.

25   Q.    So looking at D77 --

1    A.    Uh-huh.  Yes.

2    Q.    -- that's a February of 2006 memo from Mr. Green to

3    SGC-Superstars, SGC-Superstars-STAFF.

4          Do you see that?

5    A.    Yes.

6    Q.    And was it the practice at the TPC meetings that you

7    attended to receive presentations about the financial

8    condition of the Stanford International Bank?

9    A.    You mean as far as the presentation?

10   Q.    Yeah, something along the lines of the PowerPoint that's

11   attached --

12   A.    Yes.

13   Q.    -- to D77?

14   A.    Yeah.  We had a whole section on the bank.

15   Q.    And was there an opportunity at the TPC for the persons

16   attending to ask questions about the information that was

17   being presented?

18   A.    Yes.

19   Q.    Were there ever any questions presented about the

20   statements of financial condition for Stanford International

21   Bank at the TPC Superstars meetings that you attended?

22   A.    The last one.

23   Q.    Okay.  At any time prior to the last one that we

24   discussed?

25   A.    Not -- not to my recollection.

```
 1    Q.    Do you remember at any TPC meeting -- and, again, setting

 2    aside the last one that we've already discussed at some

 3    length -- was there ever any sort of controversy going on in

 4    the TPC about the financial reporting on Stanford

 5    International Bank?

 6    A.    No.

 7    Q.    There's a reference in the bottom half of the first page,

 8    and it carries over to the top half -- thank you -- of the

 9    second page, to things that were going on in the financial

10    markets in September of 2008.  Do you see that?

11    A.    Yes.

12    Q.    And there's a -- there's sort of a -- a dotted line that

13    breaks the page roughly at the midpoint.  Do you see that?

14    A.    No.

15    Q.    The very first page, do you see --

16    A.    Oh, the dotted line.  Okay, yeah.

17    Q.    And using that as a reference point, if you look

18    underneath it, there's -- there's a reference to AIG tumbling

19    61 percent --

20    A.    Yes.

21    Q.    -- pushing the Dow to a 500-point decline?

22    A.    Yes.

23    Q.    Do you recall that happening in September of 2008?

24    A.    Yes.

25    Q.    And do you see there on September 15th, 2008, the report
```

1    is that the stock market suffered the worst daily plunge of

2    the year?

3    A.    Yes.

4    Q.    Monday is the bankruptcy of Lehman Bros. Holdings?

5    A.    Yes.

6    Q.    We were having some trouble remembering exactly when

7    Lehman Bros. failed, for lack of a better term.  Does this

8    help refresh your memory as to when that took place as being

9    mid September of '08?

10   A.    Yes, I remember it well.

11   Q.    So looking at D83 and D84, I believe you'll find that

12   D83, the text, tracks much of what's contained in D84 that was

13   attached.  And then you'll see the attachment was listed as

14   "Did you know" and then a bunch of PDF images?

15   A.    Uh-huh.

16   Q.    And do you see that D84 is called "Did you know?" and has

17   a bunch of pages that follow it?

18   A.    Okay.

19   Q.    And you see the email January 5th of 2009 is addressed to

20   "SFGC Global-All Employees"?

21   A.    Yes.

22   Q.    And then that's the Stanford Financial Group company?

23   A.    I would assume.

24   Q.    For emails addressed to SFGC Global-All Employees, would

25   that encompass you in the list of recipients?

```
 1   A.    I think it would encompass everybody --

 2   Q.    Okay.

 3   A.    -- including me.

 4   Q.    Okay.  Do you see that the cover email talks about this

 5   attachment being for internal use only?

 6   A.    Yes.

 7   Q.    And then let's look at the attachment.  The -- do you see

 8   anything on the attachment D84 that was not public

 9   information?

10   A.    No.

11   Q.    Do you know why this was for internal use only?

12   A.    I think they mark everything in our industry "For

13   Internal Use Only."

14   Q.    Why do you think that?

15   A.    I have -- for -- for -- I don't -- I mean, I have no

16   idea.  I'm not an attorney.  But it's been -- it's pretty

17   widely used.  Everything I get in every firm I've been with is

18   "For Internal Use Only."  Not everything, but a lot of things.

19   Q.    Was there any accompanying instruction with these

20   materials that you were not to share this type of information

21   with clients, whether existing or prospective?

22   A.    I don't recall.

23   Q.    Do you see anything about the information that would have

24   caused you to hesitate providing it -- when I'm looking at

25   Exhibit D84, providing that information or these pictures to
```

1    clients, whether existing or prospective?

2    A.    There's nothing in here that would -- that would -- that

3    looks -- that looks, you know, financially -- there isn't in

4    here I can see that looks like it's some kind of -- something

5    that would be confidential, no.

6    Q.    Now I'm going to hand you, sir, a new document marked as

7    D86.  If you could take a moment, look at D86 and tell me

8    whether this is a document that you received as a -- as one of

9    the recipients of one of these "SFGC Global-All Employee"

10   emails.

11   A.    I might have.  I don't recall it.

12   Q.    Do you recall that --

13   A.    This was printed out of Forbes, it looks like.

14   Q.    Yes.  Do you recall that Mr. Stanford was listed among

15   the Forbes 400 richest people in America in September of 2008?

16   A.    I do.

17   Q.    And obviously there's -- there's nothing confidential

18   about the --

19   A.    No.

20   Q.    -- the reprinting of a Forbes article, is there?

21   A.    No.

22   Q.    All right.  So the first thing I just want to ask you,

23   you were asked about you had no indication that Stanford had

24   liquidity problems in 2008.  Do you recall talking about that?

25   A.    As far as I recall.

1    Q.   Okay.  You -- you were asked to redeem -- to look into

2    redeeming the Stanford CDs in October 2008.  You do recall

3    that.  We talked about that at your last deposition.

4    A.   As best I recall.

5    Q.   Yes.  And -- and Mr. Rodriguez-Tolentino told you that

6    there could not be a redemption at that time, and then you

7    looked into the loan process.  Do you recall that?

8    A.   I don't recall it that way.

9    Q.   You did -- looking at Plaintiff's Exhibit 221, which was

10   just the one-page email that we looked at before, there was a

11   discussion about you wanted an $18 million loan, you got

12   approval for that, then you went back for $25 million.  Right?

13   A.   That's correct.

14   Q.   And you had to go to Treasury to make sure that could

15   happen.  Right?

16   A.   I don't recall who we went to, but that -- yes, we got an

17   $18 million --

18   Q.   Right.

19   A.   -- and a $25 million.

20   Q.   Right.  $18 million was approved first, and then you

21   asked for 25 million.

22   A.   Yes.

23   Q.   That required some effort.  He had to go to Treasury and

24   there was back-and-forth.

25   A.   Maybe, yeah.

```
 1   Q.   And there was debate about whether that could happen or

 2   not because they didn't know whether they had liquidity to do

 3   it.

 4   A.   I don't recall it that way.  Wait.  I don't have time

 5   right now because I have to make this meeting, so the two

 6   hours is up, and I've got to go.  So you're -- you're getting

 7   me at the end when I've got to go and you're trying to ask me

 8   things that you've already asked me.

 9   Q.   All right.  And I'm just trying to clarify the timeline

10   of you were asked in 2008 broadly --

11   A.   Then look at --

12   Q.   -- when did you know there were liquidity problems?

13   A.   -- my deposition, Scott, because I've already talked

14   about this.  I'm not going to talk about it again today.

15            MR. PETRIE:  That's the end of Mr. Espy's testimony,

16   Your Honor.

17            THE COURT:  All right.  That brings us to our lunch

18   hour.  Let's see you-all back at 1:30.  1:30.

19            (Whereupon, the jury left the courtroom.)

20            THE COURT:  For yesterday, I show the Magness

21   parties at 256 minutes for a total of 757 and the Receiver at

22   106 minutes for a total of 441.  And there was a half hour of

23   Espy, and some of that may have been the Receiver's and we'll

24   adjust for that today.

25            So there may be some overstatement, but I can't -- I
```

```
 1   can't do that until we do to total for Espy so it will be

 2   reflected on today's total.

 3           MR. PETRIE:  And we were going to give you Espy as a

 4   total for the complete run, if that works with your

 5   arithmetic.

 6           THE COURT:  Yes.

 7           MR. PETRIE:  Before we part --

 8           THE COURT:  Yes.

 9           MR. PETRIE:  -- I'd move to admit DX 71, 72, 77, 83,

10   84, and 86, all of which were just referenced in Mr. Espy's

11   testimony.

12           MR. SADLER:  There's no objection, and we have some

13   that need to be offered as well.

14           THE COURT:  Okay.  Those are admitted.

15           MR. SADLER:  From Espy Volume One, Plaintiff's

16   Exhibit 215, Defendants' Exhibit 19.  Espy Volume Two,

17   Plaintiff's Exhibit 217, 221, 95, 242, and 35.  Offer those.

18           MR. PETRIE:  I think we've covered 95 already unless

19   I'm mistaken, but I believe that one's in.  But certainly no

20   objection to 95.  It will take just a second, Your Honor.  No

21   objection.

22           THE COURT:  They're admitted.  Anything else?

23           MR. SADLER:  No, sir.

24           MR. PETRIE:  No.  Thank you.

25           THE COURT:  All right.  We'll see you at 1:30.
```

```
 1                      (Lunch recess.)

 2              THE COURT:  All set?

 3              MR. PETRIE:  Yes, sir.

 4              (Whereupon, the jury entered the courtroom.)

 5              THE COURT:  Be seated.

 6         We're ready to go, and we'll go until about 3:00 or 3:10

 7    and take our afternoon break.

 8              MR. PETRIE:  Thank you, Your Honor.

 9         We call Jeffrey Graves.

10              THE COURT:  Go ahead and have a seat, please, sir.

11              THE WITNESS:  Thank you.

12              THE COURT:  Could you raise your right hand, please?

13              THE COURT:  You may proceed.

14              MR. PETRIE:  Thank you Your Honor.

15                   JEFFREY GRAVES, SWORN

16                   DIRECT EXAMINATION

17    By Mr. Petrie:

18    Q.   Mr. Graves, could you please tell the jury where you

19    work?

20    A.   First Financial Equity Corporation.

21    Q.   And what do you do there, sir?

22    A.   I am president and CEO.

23    Q.   And how long have you been president and CEO?

24    A.   Thirteen days.

25    Q.   Prior to becoming president and CEO roughly two weeks
```

1    ago, where did you work?

2    A.    Also at First Financial Equity Corporation in the role of

3    executive vice president.

4    Q.    And what is the business of First Financial Equity?

5    A.    We are a financial services wealth management firm,

6    broker-dealer, and a registered investment advisory firm.

7    Q.    Okay.  And in those four things that you've just

8    described, do you have a role in each of them?

9    A.    I supervise or manage all four of them.

10   Q.    Okay.  Let me backtrack some and ask you, could you

11   please tell the jury what your educational background is after

12   high school?

13   A.    Yes, sir.  I have a BS from Arizona State University, and

14   participated in executive programs at the Wharton School of

15   Business University of Pennsylvania.

16   Q.    And in connection with your profession, do you hold any

17   professional licenses?

18   A.    I do.  I hold the 3, the 63, the 65, the 7, the 8, and

19   the 24, all licenses by FINRA.

20   Q.    Okay.  And could you -- first of all, what's FINRA?

21   A.    FINRA's the self-regulatory agency that oversees

22   broker-dealers.

23   Q.    Okay.  And we've heard some about licenses before, but I

24   don't think anybody has helped us with a brief explanation.

25   When you say you have a 3 and a 7 a and a 60, could you walk

1    the jury through those and give us just a very, if it's

2    possible, a nice, simple explanation of what those licenses

3    mean?

4    A.    I'll try and make it as simple as possible.  The 7, the

5    Series 7 is your general representative license.  That allows

6    a person to sell stocks, bonds, mutual funds, to individuals

7    or institutions, and for that you receive a commission.

8         Series 3 allows you to sell commodities, options, and

9    futures to that same category of people, either institutions

10   or people.

11        An 8 is a supervisory license that allows you to

12   supervise over those folks.

13        A 24 is also a supervisory license, but allows you to

14   also supervise correspondence and advertising that is to be

15   used with the public.

16        I think I missed one.  65 is the registered investment

17   advisory firm.  That allows you to act in the fiduciary

18   capability, which means acting in a client's best interest,

19   and charge a fee instead of a commission for those services.

20        And a Series 63 allows you -- to easily allow you to sell

21   across state lines without having to reapply in every single

22   state.

23   Q.    And --

24   A.    I think that was all of them, sir.

25   Q.    I think it was, too.  Thank you.

```
 1         When did you graduate from college.
 2    A.    1985.
 3    Q.    And have you been employed ever since you graduated from
 4    college in '85?
 5    A.    I have.
 6    Q.    Could you give the jury, please, a brief sort of CV of
 7    what you've done from '85 up through the present?
 8    A.    I will.  1985 right out of school in Sarasota, Florida I
 9    first worked for John Hancock Financial Services.  That was
10    only for six months.
11         Then I was employed by at the time Dean Witter Reynolds
12    as a registered representative.  That was from 1986 to 1991.
13         In 1991, still with Dean Witter Reynolds, I relocated to
14    New York.  I was in the role of what they call an MTA.  Quite
15    simply that was -- I was the person in charge of training all
16    advisors for Dean Witter.  I had that position for two years.
17         After that I went into branch management, again also at
18    Dean Witter.
19         From New York I went to Boise, Idaho, ran that complex.
20    And a complex in those days was one main branch where most of
21    the representatives handled, and then we had little satellite
22    branches around there.  They may have anywhere from 2 to 12
23    brokers and staff that worked there.  So that was the Boise
24    complex.
25         I then moved from Boise to Fort Worth, Texas with Dean
```

1    Witter at the time, and did the same thing except out of Fort

2    Worth; bigger office, more representatives.  And at that time

3    they merged with Morgan Stanley.

4         When they merged with Morgan Stanley, right after that I

5    went to Denver and I was manager of the Denver complex.  That

6    also was for two years.

7         Then I moved back here to Dallas and I ran the Dallas

8    complex for Morgan Stanley Dean Witter.  That was the third

9    largest branch I think in their system.  And then they were

10   looking for somebody to run the private wealth management

11   group out of Morgan Stanley.  And that, quite simply, was --

12   Morgan Stanley was more of an investment bank.  Dean Witter

13   was more of a retail brokerage firm.  And when they merged,

14   they had a legacy sales force over on the Morgan Stanley side,

15   so I ran that from Dallas to the West Coast, not including

16   California.

17        That entire career with Dean Witter/Morgan Stanley lasted

18   about 17 years.

19        I was then recruited to go over to Bank of America

20   Securities.  At Bank of America, this was prior to Merrill

21   Lynch acquisition, and I was the national brokerage executive

22   there for three years; a little over three years.  I'm sorry.

23        And then that was about -- ten years ago I joined First

24   Financial--almost 11 now--First Financial Equity Corporation

25   out of Dallas.  I currently have offices in Dallas and spend

1    half my time now, effective as of January 1, in Scottsdale,

2    Arizona where we're headquartered.

3    Q.   And based on that background and experience that you've

4    outlined us from 1985 through present, are there any

5    particular areas of the security industry in which you believe

6    you have particularized knowledge that would be helpful to

7    share with the jury?

8    A.   Yes, especially as it relates to this case.  Since I was

9    both an advisor and a supervisor, I feel like I'm fairly

10   confident that I can give you guys as much of my opinion as

11   how the business works, both from the sales side and the

12   supervision side.

13        In my current role at First Financial, we are a little

14   bit unique because we handle both retail clients and

15   institutional clients, and we have quite a big space in the

16   FDIC insured investment cash management side.  And all that

17   means is we manage money for large corporations, high net

18   worth individuals, only as it relates to FDIC money.  That is

19   a part of our business, and I'd say it's about 20 to 25

20   percent of our revenue.

21   Q.   Before I get to actually asking you some of your thoughts

22   about what may be issues in the case, I want to do a little

23   additional background.  You mentioned that you had spent some

24   time in Denver.

25   A.   I did.

1  Q.   And since a bunch of us do come from Denver, have you

2  ever met any of us before becoming engaged in connection with

3  this case?

4  A.   I have not.

5  Q.   Did you have, prior -- again, prior to becoming engaged

6  to assist us in this case, have you had any dealings with one

7  of the Stanford Financial Group companies, anyone of them?

8  A.   I have not, other than being so long in the business I do

9  know representatives that worked for Stanford at one time or

10 another.

11 Q.   And is there anything -- have you ever had an opportunity

12 to talk to those people about their work with Stanford that

13 would somehow bear on any opinions you might provide in this

14 case?

15 A.   No, sir, I did not.

16 Q.   And are you being reimbursed for your time you spend

17 here?

18 A.   I am.

19 Q.   And have you been reimbursed for the other time that

20 you've been consulting with us and assisting us in this case?

21 A.   I have been, because this project takes me away from my

22 day job.

23 Q.   And what is the -- how much are you compensated for your

24 time, sir?

25 A.   $500 an hour.

1   Q.   Do you recall, sir, that we asked you to look at

2   Mr. Magness' and the three Magness parties' securities

3   positions and their securities holdings that they had over the

4   time periods at issue in this case, and to look at margin loan

5   transactions with respect to those holdings?

6   A.   Yes.

7   Q.   And did you do that?

8   A.   I did.

9   Q.   And in a very general way, what did you do to look at

10  that?

11  A.   As it relates to this scenario, I looked at the number of

12  positions, the size of the positions, how often they use

13  margin, and when the margin was utilized and/or possibly paid

14  down.

15  Q.   And was there anything about the nature of the holdings

16  here -- and I'm going to address them all in one lump, unless

17  you tell me that that creates an inaccuracy--so GMIT, Magness

18  Securities, and GMAG.  Do their securities holdings in the

19  Liberty Media companies, in your opinion, create any issues

20  about efforts to try and liquidate or reduce those holdings?

21  A.   Yes, they did.  The Magness, et al., was highly

22  concentrated, even though it was multiple positions, but all

23  under, let's say, one family, or that were derived from

24  original investment, being Liberty.

25  Q.   And we've heard sort of nibbles around the edges about it

1   being a highly concentrated position.  What does that mean for

2   someone who is holding a highly concentrated position and then

3   tries to go liquidate a significant portion of it?

4   A.   It's kind of like having your eggs all in one basket.

5   And the problem with it when you are one of the largest

6   shareholders out there, you control most of the shares that

7   are out in the public, and so when you go and try and sell

8   large blocks of those positions all at once, it may have a

9   consequence of lowering the price.

10       So, in other words, if somebody was selling ten shares

11  every single day, that's not a big deal.  But when all of the

12  sudden they have to sell 200 shares and the street looks at

13  that, the other buyers, they kind of know that, well, maybe we

14  can get this price a little bit better.  I don't want to use

15  the word fire sale, but that's probably a good analogy.

16  Q.   Changing topics on you, do you recall that we also asked

17  you to look at the terms that the Magness parties were

18  receiving from the broker-dealer and the bank in connection

19  with this case and to provide us with your advice, your

20  opinions, as to how their treatment might relate to other high

21  net worth individuals with -- the treatment of which would be

22  something that you're familiar with?

23  A.   Yeah.  I would say the treatment of the margin loans were

24  very consistent with most other high net worth individuals

25  that are valuable to a firm.

1  Q.   And what is there about the treatment that leads you to

2  opine that it is fairly consistent in that respect?

3  A.   When you have a client that's very important to your

4  firm, it's just like any other business--they're a customer of

5  yours and you want to keep them happy.  You want to earn not

6  only the business you have, but the business possibly of

7  increasing.

8       So brokerage firms will -- and their advisors will do

9  quite a few things.  They will discount out shares of it's

10 sales, so give them a better price than they would a person of

11 my stature.  On margin lending they'll get a better rate for

12 their loans.  So if I was charging four percent to the

13 average, that would be my stated rate.  As a broker-dealer, we

14 have the capability in most cases of discounting that rate to

15 our best clients.  So instead of getting four, you could get

16 charged three.

17      I'd say it's very similar, maybe, if somebody was going

18 into a Ford dealership and buying one truck they may get one

19 rate, but if all of the sudden they're buying a hundred

20 trucks, they're probably going to get a little better rate on

21 those hundreds.  So there's a couple of examples.

22 Q.   Lacking at the margin loan kind of features, one of the

23 things we've heard some testimony about is a release rate.  Is

24 there any room to adjust the release rate in that type of

25 relationship, in your experience?

1   A.    Barring regulatory levels that you have to keep, there is

2   some room possibly on the release rate, which just means, you

3   know, how much can you borrow.  But when you have concentrated

4   positions, it also can work in the other way.  Some firms may

5   limited the amount of loans they will give, thereby reducing

6   your risk as the business, being clearing firm or the

7   broker-dealer.

8   Q.    Okay.  So who in that scenario is getting their risk

9   reduced?

10  A.    That would -- in that scenario it would be the

11  broker-dealer.

12  Q.    Okay.  And why is that a reduction of risk when you're

13  talking about one of these concentrated positions?

14  A.    Well, again, if all your eggs are in one basket and I'm

15  loaning against a big position and that one position goes

16  down, I may be on the hook for it.  So I, therefore, don't

17  want to release as much.

18  Q.    Now, you mentioned that a significant part of your firm's

19  business involves FDIC insured products.

20  A.    Right.

21  Q.    Do any of those include things that are certificates of

22  deposit?

23  A.    Yes; two programs.  Certificates of deposit, which in our

24  business we call those time deposit.  That means there's a

25  starting point and there's an ending point.  And that can be

1    anywhere from generally 28 days to five years, and in some

2    rare cases up to ten years on some of those CDs, certificates

3    of deposit.

4        We also do demand deposits.  And demand deposits are,

5    quite simply, just like you think, it's like a savings

6    account.  You can go in and get your money the next day.  So

7    there is no length of time associated with those, and we deal

8    in them both.

9    Q.   I'd like to focus on the time deposits rather than the

10   demand deposits.

11   A.   Sure.

12   Q.   And in your experience, sir, what are the variables that

13   go into determining the return, just in a general sense, that

14   one gets on a time deposit?

15   A.   Well, here in the United States the length of time, so

16   the farther you go out in the willingness to lock your money

17   up, the higher the return.  And with some institutions, the

18   greater money that you deposit allows you also to get a higher

19   return.

20   Q.   And when we are talking about margin loans and

21   flexibility there, you talked about--we didn't really delve

22   into it--you talked about some sort of regulatory constraints

23   that might exist.  Do you recall that?

24   A.   Yes.

25   Q.   Are there any sort of similar -- I shouldn't say similar.

1    Are there regulatory constraints on what a financial

2    institution could do with a time deposit, in your experience?

3    A.    Could you explain?

4    Q.    Well, for example, is there something about being an

5    institution -- And let's take an FDIC insured institution,

6    even though we're not dealing with one here.  But is there

7    something about being an institution of that type that would

8    limit your ability to structure a CD, either in terms of an

9    interest rate or the term that you've described?

10   A.    No.  I guess the way you're asking it, Mr. Petrie, no.  I

11   wouldn't say there was necessarily, as long as you're falling

12   within the constraints of capitalization obviously of the

13   bank, those type of regulations, and you fall within FDIC

14   guidelines and your premiums for that FDIC insurance are paid

15   up and paid according to what type of deposits.  It gets a

16   little bit more complicated in that area, but there are some

17   constraints.

18   Q.    Did we also ask you to look at, in the pertinent time

19   frames for the various -- the eight CDs that were involved

20   here, did we also ask you to look at the interest rates that

21   were being provided on those CDs?

22   A.    Yes, you did.

23   Q.    And did we ask you to assess whether those interest rates

24   were inordinately high or, in the sort of the parlance of this

25   case, too good to be true?

```
 1   A.   Apples to oranges.  Within the time deposit world, if we

 2   were considering that that was an FDIC CD just like it was in

 3   the United States, it would be extraordinarily high at those

 4   time frames.  But these are not necessarily the same.  They

 5   were backed on the full faith and credit of the bank, not the

 6   U.S. government, so they were significantly higher, yes.

 7   Q.   Okay.  And is that something that, in your experience, is

 8   unusual, that a bank that is not in the United States might

 9   have a different rate structure along the lines you've

10   described?

11   A.   No, in my experience and my opinion I would say, yes, if

12   you're -- for the most part, if you're outside the United

13   States, offshore banks will pay you a higher rate.

14   Q.   And was there anything about the interest rate, in your

15   opinion, that when you looked at it you thought it might be an

16   indicator that there was some sort of issue with fraud

17   involved with the institution providing that certificate of

18   deposit?

19   A.   No, not especially if I put myself back in that time

20   frame, just the interest rate alone wouldn't have constituted

21   fraud, in my opinion.

22   Q.   Why do you say especially if you put yourself back in

23   that time frame?

24   A.   Well, I think all of our judgment could be clouded by

25   what we now know, so -- in today's current interest rate
```

1    compared to where it was anywhere up to ten years ago.  So I

2    try and -- I tried to look at it from the eyes of being in

3    that same time period.

4    Q.    Okay.  And in that time period, in your opinion, sir, in

5    dealing with an offshore bank and looking at these interest

6    rates, do you have an opinion as to whether a reasonably

7    prudent investor would look at it and ask more questions about

8    the institution in light of the rate?

9    A.    Yes.

10   Q.    And what is your opinion, sir?

11   A.    My opinion is that they would have looked at it, they

12   should have looked at it as well, and ask questions of why is

13   this higher.

14   Q.    Is -- did we also ask you to look at the risks and

15   rewards of investment--and I'm paraphrasing some of these--the

16   risk and rewards of investments that are not with FDIC insured

17   banks?

18   A.    You did.

19   Q.    And did you do that?

20   A.    I did.

21   Q.    And, by the way, in doing your analysis, what information

22   did you look at, just in a very general way?

23   A.    Everything that's available to me on a daily basis, so

24   from Bloomberg, to my clearing firm, to just my general

25   experience through the internet, et cetera.  Wherever I would

1    normally look to question investments, I'd look to these the

2    same way.

3    Q.   Did you also look at information that was specific to the

4    relationship between the Magness parties and either Stanford

5    Group Companies or the Stanford International Bank?

6    A.   Yes.  I was provided a lot of exhibits and a lot of

7    information that were drawn for either the depositions and/or

8    the information requested from either side.

9    Q.   And when you say drawn from the depositions, have you

10   actually reviewed some of the deposition testimony?

11   A.   I have reviewed the depositions, yes.

12   Q.   And can you explain to the jury, or do you have an

13   opinion as to whether there is a relationship between the risk

14   that you saw in these particular -- if any, in these

15   particular certificates of deposit, and whether there is some

16   indication from that of either an insolvent institution or an

17   institution that has some sort of financial issue that could

18   go all the way up to being a fraud?

19   A.   No.  The rates of return alone, as I think I previously

20   testified, wouldn't necessarily judge me to consider it a

21   fraud.  There are plenty of money managers that have above

22   benchmark returns, which means they're beating the market,

23   so-to-speak, and just that fact alone wouldn't mean it was

24   fraud.

25   Q.   Is the fact that you have an instrument provided by a

1    financial institution, in this case an offshore bank, that

2    then invests in a securities market in some way an indicator

3    of insolvency or fraud, in your opinion?

4    A.    It would not be an indicator just because of that, no.

5    Q.    Are those products that you've seen in the marketplace

6    over the course of your experience?

7    A.    I have.

8    Q.    By the way, as part of your work history from 1985

9    through present, and when acting as a financial advisor, do

10   you undertake from time to time to investigate particular

11   either investments or ideas that a client might have on behalf

12   of your client?

13   A.    I did, yes.

14   Q.    Okay.  And in that context, I just have a small question

15   that we addressed with you in the context of your supplemental

16   report.

17        Do you have any personal experience with reaching out to

18   a company that you're looking at investing in and trying to

19   reach that company's auditor and speak -- or auditors and

20   speak to those individuals or to that company?

21   A.    When I was an advisor, no, I would never -- NO.  I mean,

22   I don't know a broker that actually reached out to an auditor.

23   Now, once I got into management, and we're audited all the

24   time in our business, as an owner of the business or as an

25   employee of the business, even when we're being audited, I

1    can't get answers until the audit is complete.

2    Q.    I'm sorry.  My question was a little different, so let me

3    come back to that thought in just a moment.

4         If you're looking, either on your own initiative or at a

5    client request, at a company, XYZ, Inc., and you're examining

6    whatever information you can locate, and you find the name of

7    XYZ, Inc.'s auditor, is that someone you reach out to to

8    attempt to obtain information about XYZ, Inc.?

9    A.    In the normal course of business, no, I wouldn't have.

10   Q.    And why not?

11   A.    A similar reason.  I mean, I wouldn't expect them to give

12   me information that wouldn't be necessarily public, unless it

13   was published in the annual report.  So no, I wouldn't have

14   reached out to them.

15   Q.    Have you ever done that?

16   A.    No, sir, I have not.

17   Q.    Okay.  Then let's come back around.  You were talking

18   about an auditor of your company.

19   A.    Uh-huh.

20   Q.    What were you referring to when you were addressing that?

21   A.    Sure.  Any of the three companies I've worked at in the

22   brokerage world--Morgan Stanley -- Dean Witter Morgan Stanley,

23   Bank of America, or now First Financial--we are audited quite

24   frequently, at least every three years now.  Quite often,

25   though, in reality, depending on the size of the firm, it's

1   every year.  And I have a lot of experience with auditors

2   sitting in our offices for days, or weeks, or in the case of

3   Bank of America, it quite often seemed like they had a

4   permanent office in our headquarters.  So the audits are

5   frequent, they are lengthy, they are thorough.

6       And the auditors generally--this is my opinion--don't

7   want to play their cards, so you don't even know really what

8   they're looking for.  You can make a guess based on the

9   information that they're asking for.  But I have asked

10  blatantly, well, if you tell me what you're looking for or

11  what you're trying to find out, maybe I can help speed this

12  process, and they said, no, please just give us the

13  information.  They don't relay that to you what they're

14  looking for.

15  Q.   And when you talk about auditors in that context, who are

16  you talking about?

17  A.   I'm talking about--I'm sorry--FINRA and the SEC.

18  Q.   And is that two separate sets of audits, an SEC audit and

19  a FINRA audit?

20  A.   They are.  The FINRA audit generally is only asking for

21  stuff on the broker-dealer side, so that's -- back how I

22  explained that a Series 7 allows you to do commissions and not

23  be charging a client for advice, in that world that's kind of

24  what FINRA oversees.

25      The SEC, while it purveys over FINRA in some cases, they

1    are generally looking at the registered investment advisory

2    firm.  However, they can and will sometimes deal into the

3    broker-dealer side as well.  But their general focus is on the

4    RIA, or registered investment advisory side.

5    Q.   Now, are you familiar with SEC investigations?

6    A.   I am.

7    Q.   And what is, just for the benefit of our jury--we haven't

8    really talked about this--the difference between, say, an SEC

9    audit and an SEC investigation?

10   A.   An investigation generally steps it up a level,

11   so-to-speak.  A lot of times SEC investigations -- there are

12   two different channels, two different parts of the SEC.  A lot

13   of times what will happen is you will have an audit, and

14   they'll find something wrong, it could be minor, it could be

15   major, and they will find something wrong and they will turn

16   it over to the investigative side, and then possibly turn it

17   over to the enforcement side after that.  So there's actually

18   different people, depending on what the auditors find.  The

19   investigation side can also pop in right away if they suspect

20   something is wrong, null and void of an audit.

21   Q.   Null and void meaning you don't go the audit step first?

22   A.   Yeah.  It doesn't necessarily mean the audit will come

23   first.

24   Q.   Okay.  And in your -- based on your background, training,

25   and experience, if the SEC is conducting an investigation, is

1    there a way to obtain information about that SEC investigation

2    wile it's ongoing?

3    A.    From the public I am not aware of any way -- I mean, I

4    think they would say to the effect of there -- we have an

5    investigation, but that's it; no comments after that.

6    Q.    Okay.  In connection with your work, did you read the

7    July 3rd, 2008 Bloomberg article about the employee lawsuit

8    against the Stanford brokerage?

9    A.    Not at that time.  I did see it as part of this

10   engagement.

11   Q.    Thank you.  You cleared up a bad question when I didn't

12   put a time bound on it.

13   A.    That's okay.  I didn't know it was that bad.

14   Q.    And in that review, did you see the statement in there

15   from the SEC representative that wouldn't either -- would not

16   either confirm or deny the existence of an investigation?

17   A.    I vaguely recall that.

18   Q.    And, in your experience, is that consistent with the way

19   the SEC approaches inquiries from the public or the media into

20   ongoing investigations?

21   A.    Yes.  That would be consistent.

22   Q.    Okay.  While we were speaking earlier briefly about the

23   treatment of a high net worth client, I omitted to ask you

24   about some things that I'm going to loosely refer to as perks.

25   A.    Perks?

1    Q.    Perks, yes, sir.  Are you familiar, from your experience

2    in the business, with having things you provide to clients;

3    anywhere from, say, tickets to the Cowboys game this weekend,

4    to something perhaps a little more splendiferous, if I'm

5    allowed to say that there is such a thing?

6    A.    Well, I don't know if you were hinting if I had Cowboys

7    tickets, which I do not, but yes, I am familiar with that

8    practice.  And it doesn't happen as much in a smaller firm of

9    our size, but in a larger firm it happens all the time.

10    Q.    Okay.  And did you see in this case the discussion with

11    the Magness parties about having this arrangement by which

12    they agreed to put a banner on the back panel of the Mango

13    Five Racing truck and receive $20,000 from one of the Stanford

14    companies for that?

15    A.    Yes, I did read about that.  And as coincidence has it, I

16    have had a very personal experience along the same lines, so I

17    was familiar with how that would have worked.

18    Q.    Okay.  What was your -- if you don't mind my intruding,

19    what was your personal experience?

20    A.    No.  In the late '80s I raced and was familiar with

21    racing offshore power boats growing up in Florida, and the

22    local Dean Witter office at the time sponsored one of those

23    boats with a sticker on the side of the boat for Dean Witter

24    at the request of myself as an advisor for one of my larger

25    clients.  It could have been my largest client at the time.

1   Q.   Is that something where there was some sort of internal

2   process to approve it, or were you doing that on your own?

3   A.   Yes.  No, I went to my branch manager at the time.  He

4   would have had, I'm assuming, go to a regional director to get

5   approval, but it was a request and a check was cut to the race

6   team to cover that.

7   Q.   Did you also see in the materials you looked at very

8   brief or very limited pieces of paper that talked about this

9   $60,000 contribution to a fashion show at the request of Sarah

10  Siegel Magness?

11  A.   I did see that.

12  Q.   And do you have any information about whether there was

13  even a Stanford company--and I'm using that as a generic for

14  the Stanford entities--banner or any sort of marketing done in

15  connection with that?

16  A.   I did not notice.

17  Q.   Did that strike you as being an unusual type of

18  sponsorship for an organization that had several thousand

19  financial advisors?

20  A.   It did not.  It did not.  I noticed when I was leafing

21  through I think it's been referred here as the Eagle magazine,

22  their internal publication, or maybe it was external as well,

23  I noticed quite a few pictures of different sponsorships I

24  don't recall seeing in that magazine, though.

25  Q.   And I apologize.  I'm having trouble -- I know you

1    weren't here for all the testimony in the trial.  Were you

2    here for the picture that showed the group of people standing

3    in front of the big plexiglass cage filled with $20 million

4    cash?

5    A.    Yes, I was.

6    Q.    Okay.  And is that the type of sponsorship that is

7    something within your area of -- or something you've seen

8    before?

9    A.    No.  I've never seen $20 million in one place ever.

10   Q.    Okay.  Did you -- in the Stanford Eagle materials that

11   you were shown, did you see other types of sponsorships that

12   were of a greater dollar expense to the Stanford companies

13   than the $20,000 Mango Racing and the $60,000 for the fashion

14   show in New York?

15   A.    To be honest, I don't recall if there was something more

16   or less.

17   Q.    Do you remember seeing the materials about the St. Jude

18   golf tournament conducted in Memphis?

19   A.    I seem to recall that, yes.

20   Q.    Okay.  And do you remember seeing materials about

21   sponsoring cricket -- other than the $20 million thing, but

22   sponsoring cricket things?

23   A.    I did see the cricket team, yeah.

24   Q.    And did you see materials having -- more recently, so in

25   December of 2016, seeing materials that had to do with

```
 1    sponsoring polo matches?

 2    A.   No.

 3    Q.   Okay.  Looking at the questions that you were asked to

 4    look at and the various aspects of the relationship between

 5    the Magness parties and either of the Stanford Group Company

 6    or the Stanford International Bank, did you see anything, as

 7    someone who works in this industry, see any facts that would

 8    lead you to believe, lead you to opine that there was anything

 9    about this relationship that afforded the Magness parties with

10    access to information that was not generally available to the

11    public?

12    A.   No.  There's been nothing presented to me in any shape or

13    form that would suggest they had preferential treatment as far

14    as inside information.

15    Q.   Okay.  And the same -- looking at the same background of

16    information, did you see anything in all of the materials that

17    you reviewed that lead you to form any opinion that the

18    Magness parties in some way received inappropriate benefits

19    from either the Stanford Group Company or from the Stanford

20    International Bank in connection with those business

21    relationships?

22    A.   No, I didn't notice anything during that time period that

23    would have fallen into that category.

24    Q.   Thank you, sir.

25         MR. PETRIE:  I pass the witness, Your Honor.
```

```
 1              MR. POWERS:  May I proceed, Your Honor?

 2              THE COURT:  Please.

 3                       CROSS EXAMINATION

 4   By Mr. Powers:

 5   Q.    Good afternoon, Mr. Graves.

 6   A.    Mr. Powers.

 7   Q.    Congratulations on your promotion.

 8   A.    Thank you.

 9   Q.    Must be a busy time of year for you.

10   A.    It's a little busy.

11   Q.    You have been with us today and yesterday.  Is that

12   right?

13   A.    That is correct.

14   Q.    You were not here for the testimony that began on Monday.

15   A.    I was not.

16   Q.    And you were not here for the testimony on Tuesday.

17   A.    I was not.

18   Q.    Okay.  And I'd like to make sure we have an understanding

19   of your role in the case.

20         You have no firsthand knowledge of the transactions

21   between the Defendants and the Stanford entities.  Is that

22   correct?

23   A.    That is correct.

24   Q.    And you did not learn anything about those transactions

25   until well after the fact.
```

```
 1    A.    That is correct.

 2    Q.    Sometime within the last year or so.

 3    A.    Yes, sir.

 4    Q.    And you came to be involved in this case, after being

 5    contacted by counsel for the Defendants, to serve as an expert

 6    witness.

 7    A.    That's true.

 8    Q.    And just so we're clear, it's your understanding that you

 9    are not here to take the jury's role as fact-finder; you're

10    here to offer your views, and the jury will decide what to do

11    with those.

12    A.    Yes, sir.

13    Q.    Mr. Petrie mentioned that you are being compensated $500

14    an hour for your time in this engagement.

15    A.    Yes, sir.

16    Q.    And is that $500 an hour paid to your firm, or is that

17    paid to you individually?

18    A.    It's paid to me individually.

19    Q.    And, just approximately, how many hours have you spent

20    working on this engagement, if you could just ballpark it for

21    us?  Two weeks?  Three weeks?

22    A.    In my deposition you had asked the same question, so I

23    wish I would have been prepared.  I don't have the exact

24    number.  I'm sure Ballard Spahr could give that to you.  But

25    it's in excess of 40 hours.
```

1    Q.    In excess of 40 hours.

2    A.    Yes, sir.

3    Q.    Do you think it's in excess of 80 hours?  I'm just trying

4    to get a sense.  Did you send one working week on this?  Two

5    working weeks?

6    A.    Well, I've been working in pieces, so half hour here,

7    hour there, two hours there.  My time, just by definition,

8    I've been here two days now, so I would say 60 or 80 might be

9    doable.

10   Q.    Okay.  So if you had consolidated it, maybe two full

11   weeks, you know, beginning to end.

12   A.    Including testimony, I think that would be fair.

13   Q.    Okay.  So because it's important --

14   A.    I'm guessing.

15   Q.    Sure.  And you gave some opinions about, I didn't see

16   this or I didn't see that.  You would agree it's important for

17   the jury to understand how much time you spent looking at

18   things so they can evaluate the value of you not seeing

19   something.

20   A.    Yes.

21   Q.    Okay.  Now, so you weren't here on Monday or Tuesday, so

22   you didn't see the testimony of Mr. Magness?

23   A.    I did not.

24   Q.    And you did not see the testimony of Mr. Knudson.

25   A.    I think he spoke Thursday morning, briefly.

1    Q.   You saw Mr. Knudson briefly on Thursday morning?

2    A.   Yes.

3    Q.   For 30 minutes or so.

4    A.   I wasn't keeping track.

5    Q.   All right.  I want to talk to you about the work that you

6    did to develop your opinions in the case.

7         Just in general terms, what you did was review documents

8    that had been supplied by counsel for the Defendants.

9    Correct?

10   A.   That is correct.

11   Q.   And you had conversation with counsel for the Defendants.

12   A.   That is correct.

13   Q.   You did not, before developing your opinions in this

14   case, meet with Mr. Magness.

15   A.   I did not.

16   Q.   You did not meet with Ms. Tonya Dokken.

17   A.   I did not.

18   Q.   You did not meet or talk with Ray Sutton.

19   A.   I did not.

20   Q.   Nor Bob Armstrong?

21   A.   No, sir.

22   Q.   Nor Steve Knudson?

23   A.   That is correct.  I have not.

24   Q.   Nor Tom Espy?

25   A.   No, sir.

1    Q.   Nor Ryan Bell, who testified in court just yesterday.

2    A.   I had not.

3    Q.   I think the only other thing you told me you did was you

4    had reviewed general market conditions at relevant time

5    periods.

6    A.   Correct.

7    Q.   And did I leave anything else out?

8    A.   I don't think so.

9    Q.   I did leave something out.  Did you talk to or meet with

10   Chuck Wilk?

11   A.   No.

12   Q.   You did not.  Okay.

13        And you mentioned that you knew some people back in the

14   2000s who had worked at Stanford International -- or, excuse

15   me, Stanford Group Company, the brokerage in the United

16   States.  Is that right?

17   A.   That is correct.

18   Q.   And I think it's fair to say you didn't know back then

19   what Stanford International Bank was.

20   A.   Could you repeat that?

21   Q.   Yeah.  So you knew people that worked at the

22   brokerage--that is Stanford Group Company --

23   A.   Correct.

24   Q.   -- but you did not know what Stanford International Bank

25   was.

1   A.   I do not know when I first came to the realization about

2   the bank.

3   Q.   Well, do you recall me asking you at your deposition what

4   you knew about Stanford Group Company, other than that you

5   knew people that worked there?

6   A.   I don't recall exactly, no.

7   Q.   And --

8           MR. POWERS:  Mr. Jarrett, can you pull up

9   Mr. Graves' transcript at page 29, line 7 through 10?

10  Q.   (BY MR. POWERS)  And I asked you, "Prior to February

11  2009, what did you know about Stanford Group Company, other

12  than that you may have known some people that worked there?"

13          And your answer was, "That's literally about it."

14  A.   That's correct.  But, like I said, I just didn't know the

15  date of when I first heard of the bank.

16  Q.   Okay.

17          MR. POWERS:  All right.  We can pull that down.

18  Q.   (BY MR. POWERS)  Prior to February 2009, I think you had

19  heard of Allen Stanford.

20  A.   I believe so, yes.

21  Q.   But you didn't know really anything about him.

22  A.   No.

23  Q.   Okay.  And you had not worked with Mr. Magness or his

24  affiliated entities at any point, I think you said, in

25  response to some of Mr. Petrie's questions.

1    A.    That's correct.

2    Q.    You've never been to Antigua?

3    A.    I have not.

4    Q.    And you have no experience with investments in Antigua.

5    A.    I have no personal experience with investments in

6    Antigua.

7    Q.    So because you didn't really know anything of substance

8    about Stanford before 2009, I think it's fair to say you

9    cannot give the jury your personal recollection about how you

10   felt about Stanford prior to 2009 with respect to whether the

11   investment was good, bad, or indifferent.

12   A.    Well, I was given information about the investment, so my

13   opinion is based on the information that I was given about the

14   investment in particular.

15   Q.    Understood.  But what's happening is you're taking

16   information you're given now and you're developing an opinion

17   about it in the context of this lawsuit.  Correct?

18   A.    That is correct.

19   Q.    What you're not doing is giving the jury a recollection

20   of how you felt then.  This is how you feel now based on the

21   review of information in the context of this lawsuit and being

22   retained by Defendants' counsel.  Correct?

23   A.    That is correct.

24   Q.    You talked a little bit about the concept that if you

25   sold a -- let's call it a substantial amount of a concentrated

1   position, there is some possibility that there could be a

2   decrease in price for that particular stock.  Did I have that

3   right?

4   A.   Generally I'd say yes.

5   Q.   And did you see in this courtroom any testimony from any

6   witness where the witness suggested that avoiding a decrease

7   in the price of stock was a motivation to not sell any

8   particular stock position?

9   A.   I did not see any testimony to that, no.

10  Q.   And I think you would agree with me that you personally

11  never gave any advice to the Magness Defendants about whether

12  they should or should not sell any particular stock position

13  in 2008.

14  A.   I did not give any advice to Mr. Magness nor his

15  entities, no.

16  Q.   And back in 2008, I'm sure you are aware that the Magness

17  Defendants sold some of their concentrated positions.

18  A.   Yes, I am.

19  Q.   And you're aware that in 2007 they sold more than $100

20  million in some of their concentrated positions.

21  A.   Yes, I am.

22  Q.   And that they used those sales to pay down some of their

23  margin debt in 2007.

24  A.   From what I read, yes.

25  Q.   And in February 2008, in response to margin calls, they,

```
 1   again, sold some of their concentrated positions to pay margin

 2   calls.

 3   A.   I did read that.

 4   Q.   You talked a little bit with Mr. Petrie about a number of

 5   factors that I think you said by themselves would not be an

 6   indicator of fraud.  Do you recall that?

 7   A.   I do.

 8   Q.   You were -- just to make sure I understand, you're not

 9   suggesting to the jury that Stanford International Bank was

10   not a fraud, are you?

11   A.   No, I'm not suggesting that.  I -- the question was was

12   the rate alone a reason to believe that it was fraud, and I

13   believe my testimony said no, the rate alone was not reason

14   for me to call it a fraud.

15   Q.   Sure.  But we can all agree that Stanford International

16   Bank was, in fact, a fraud.

17   A.   Yes.

18   Q.   And it was a fraud for a whole number of factors other

19   than the rate alone.

20   A.   Yeah; in hindsight, absolutely.

21   Q.   Well, you added in hindsight, but let me just ask you.

22   You were here for Mr. Bell's testimony.

23   A.   Most of it, yes.

24   Q.   Yes.  And you saw that, just for example, he had sent an

25   email to Tonya Dokken five days before the SEC filed the
```

1    lawsuit against the Stanford Defendants in which he suggested

2    Stanford might be a Ponzi scheme, didn't he?

3    A.    I saw that testimony.

4    Q.    Now, you talked about SEC investigations.  And it's true,

5    isn't it, that the SEC needs -- that you need an actual formal

6    order from the Commission itself to start an enforcement

7    proceeding, don't you?

8    A.    To be honest with you, I don't -- I can't say that 100

9    percent for sure that I know that.

10   Q.    Okay.  And that's the only way that you get to issue

11   subpoenas--that is, not you; the only way the SEC gets to

12   issue subpoenas.  You know that.

13   A.    I don't know that for a fact, no.  I'm sorry.

14   Q.    And I think you said the SEC would confirm there was an

15   investigation.  Were you sure about that one either?

16   A.    Well, I think what I said, is it's my experience and my

17   opinion that they wouldn't.

18   Q.    That they would not confirm the existence of the

19   investigation.

20   A.    No.  One way or -- I didn't think they'd give you any

21   information.  I mean, I've heard them say there's an--I read

22   about it, too--that there's an investigation, but we're not

23   going to comment on it.

24   Q.    And you were speaking about the Bloomberg article,

25   Plaintiff's Exhibit 65?

1    A.   I wasn't speaking about anything in particular, I don't

2    think, in my testimony, but that was one example.

3    Q.   Right.  I think that one was brought up to you.  Maybe

4    that wasn't what you were referring to, but that one was

5    brought up in your testimony.

6         MR. POWERS:  Can we have Plaintiff's Exhibit 65?

7    And let's just take the first two paragraphs.

8         THE WITNESS:  Thank you.

9    Q.   (BY MR. POWERS)  And you're aware that Bloomberg is a

10   trustworthy financial news publication.  Right?

11   A.   I am aware of Bloomberg, yes.

12   Q.   And the beginning of the second paragraph says that the

13   SEC issued subpoenas to Stanford Group employees asking for

14   information.

15   A.   Okay.

16   Q.   So my question is, don't you agree that one way an SEC

17   enforcement proceeding can come to light is if witnesses who

18   receive subpoenas disclose those subpoenas to the public?

19   A.   Sure.

20   Q.   And because SEC enforcement proceedings are normally

21   non-public, information about an SEC enforcement proceeding

22   would be particularly noteworthy, wouldn't it?

23   A.   It could be, yes.

24   Q.   Almost as noteworthy as a man standing behind a

25   $20 million plexiglass box.

1    A.    Is there a question there?

2    Q.    Sure.  That was noteworthy, wasn't it?

3    A.    It was an interesting picture.

4    Q.    Yes.

5              MR. POWERS:  Pass the witness, Your Honor.

6              MR. PETRIE:  Brief redirect, if I may, Your Honor?

7                      REDIRECT EXAMINATION

8    By Mr. Petrie:

9    Q.    You were asked some questions about witnesses' testimony

10   of which you were or were not aware.  Did you review

11   deposition testimony --

12   A.    I did.

13   Q.    -- that was taken prior to trial?

14   A.    I did.

15   Q.    Did you review deposition testimony from Ms. Dokken?

16   A.    I did.

17   Q.    You've been in the courtroom for Mr. Espy's deposition

18   testimony.

19   A.    I was.

20   Q.    Were you in the courtroom the preceding day for

21   Mr. Rodriguez-Tolentino's testimony?

22   A.    I was.

23   Q.    Were you in the courtroom for Mr. Davis' testimony?

24   A.    I was.

25   Q.    Have you looked at the deposition testimony of

```
 1    Mr. Magness?

 2    A.    I did.

 3    Q.    Did you look at the deposition testimony from

 4    Mr. Armstrong?

 5    A.    I did.

 6    Q.    Did you look at the deposition testimony from Mr. Sutton?

 7    A.    I believe so, yes.

 8    Q.    Mr. Powers asked you some questions about your awareness

 9    of the entities and kind of changed gears on you.

10          The Stanford Group Company entity, the broker-dealer, is

11    that one that you had at least heard of by virtue of people

12    who had worked there at some point prior to this engagement?

13    A.    Yes.

14    Q.    Okay.  And that was the one, remember, he showed you the

15    deposition on the screen.

16    A.    Yes.

17    Q.    You understand that the Stanford International Bank, at

18    least during the time period we're looking at, was held out as

19    being a separate entity.

20    A.    Yes.

21    Q.    And did you at any point in time before becoming involved

22    in this engagement, had you ever heard about the Stanford

23    International Bank, that separate entity?

24    A.    Like I said, I'm pretty sure I did.  I just couldn't nail

25    down when.
```

1   Q.   In the context of your opinion about selling concentrated

2   positions, Mr. Powers asked you about the fact that there have

3   been in the course of this case showings of sales of stock

4   that took place historically over time.  Correct?

5   A.   Correct.

6   Q.   And he didn't ask you anything about the timing of those

7   sales of the stock.  Right?

8   A.   He didn't ask me anything about the timing, nor the

9   volume, nor when they occurred or --

10   Q.   Well, he at least asked you about the dollar amount,

11   which would give you at least some harbinger of volume.

12   Right?

13   A.   He did, in general time frames.

14   Q.   Okay.  I mean, we could do the arithmetic if we had

15   prices at the time and figure out the volume from there.

16   Right?

17   A.   We could.

18   Q.   In the information that you reviewed, did you look at

19   whether the sales to which he's referring that took place in

20   the 2007 time frame were sales that took place in very short

21   order, as would be the case with a margin call?

22   A.   I did not.

23   Q.   Was your testimony referring to sales in the context of

24   the relatively short windows that would be the case if one

25   were to face a margin call?

```
 1    A.    Yeah.  When I reviewed those I was looking in that
 2    circumstance at that time.
 3    Q.    Okay.  Now, looking at an SEC investigation--this will be
 4    the last topic I'll discuss with you, sir--is it your
 5    understanding that if the -- if the sec is investigating you,
 6    if an entity, a broker-dealer, for example, that the
 7    broker-dealer must have done something wrong?
 8    A.    No; quite to the contrary.
 9    Q.    What's to the contrary?
10    A.    I've seen it where you've been found that you weren't
11    doing anything wrong.
12    Q.    So, in your opinion, does the fact of an investigation
13    necessarily communicate to somebody that there's something
14    wrong here?
15    A.    No, it's just an investigation.  At that point they have
16    not made a decision.
17    Q.    Thank you.
18          MR. PETRIE:  Those are all the questions I have,
19    Your Honor.
20          MR. POWERS:  No further questions, Your Honor.
21          THE COURT:  Thank you, sir.  You may step down.
22          THE WITNESS:  Thank you.
23          MR. PETRIE:  With that, Your Honor, we rest.
24          THE COURT:  All right.  We need to do a little bit
25    of paperwork at this point, so I'm going to ask you-all to
```

1   step back to the jury room for a couple of minutes, and we'll

2   be back with you shortly.

3             (Whereupon, the jury left the courtroom.)

4             THE COURT:  Be seated.

5       Mr. Sadler?

6             MR. SADLER:  Yes, Your Honor.

7       There are two matters that we need to take before the

8   jury comes back, and I'll speak to the first one which is our

9   motion that we bring now under Federal Rule of Civil Procedure

10  50(a)(1) for judgment as a matter of law, now that the

11  Defendants have been fully heard on their affirmative defense.

12      I am mindful of the time, so with Your Honor's position I

13  would like to address in about three minutes the two issues,

14  and with the Court's permission we will file a full and

15  complete written motion later this afternoon, if that's

16  appropriate.

17            THE COURT:  That's perfectly good.

18            MR. SADLER:  Thank you, Your Honor.

19      I want to hand a case up to Your Honor, if I may.  And

20  I'll have a copy for counsel.

21      Your Honor, we bring a motion for judgment as a matter of

22  law on two points.  One is an estoppel point, which I'll

23  address momentarily, and the second is the point provided

24  under the rules that there's not legally sufficient evidence

25  that the Defendants lacked actual notice or that they lacked

1   inquiry notice.  And the reasons for the second point will be

2   fully -- more fully set forth in our brief.

3        Your Honor, I want to bring to you this very important

4   legal point that has arisen from the evidence in the case.

5   The case I have now put before you is the *In Re:  Davidson*

6   case, which is a Fifth Circuit case that addresses the

7   following circumstance which we have in our case.

8        In *Davidson* a party made a statement to the Internal

9   Revenue Service on a tax return, and then in later legal

10  proceeding the party took the diametrically opposite position

11  in that case--it was a bankruptcy case--to try to achieve a

12  different result.  And although the bankruptcy court said that

13  was okay and the district court said that was okay, the Fifth

14  Circuit said that's not okay, and that the party was estopped

15  from changing positions.

16       Why is that relevant here?  In this case we have

17  testimony, as Your Honor has heard, both from Mr. Magness and

18  from Mr. Knudson--Mr. Knudson is president of Mango Five who's

19  a fiduciary of one of the Defendants--that they were

20  completely unconcerned about Stanford International Bank in

21  October 2008.

22       And if I may just very quickly put Plaintiff's Exhibit

23  482, and go to the last page, if we can, and blow that up for

24  Your Honor to see on the screen -- on your monitor.  In tax

25  returns filed with the Internal Revenue Service, and as

1     Mr. Magness testified, they were filed, they were accepted by

2     the Service, so he accepted the benefits of this tax filing,

3     they took the diametrically opposite position.  They said they

4     were unconcerned in this tribunal in front of this jury, but

5     to the IRS they said just the opposite--that they were

6     concerned about their investment in the Stanford International

7     Bank.  And we submit under the *In Re:  Davidson* case they are

8     completely, conclusively estopped from taking a different

9     position in this case, and we would be entitled under the

10    estoppel theory for judgment as a matter of law on the

11    affirmative defense.

12      I want to be mindful that the jury is waiting, Your

13    Honor.  I could say more.  Let's save that for another time,

14    with the Court's permission.  But those are the bases I wanted

15    to be clear for our motion.

16       THE COURT:  All right.  If the Magness parties want

17    to respond to the written motion, I would be happy to look at

18    that tomorrow, or some other time.

19       MR. PETRIE:  I'm not sure when we're going to get

20    it, so I may be unwise to agree to tomorrow until I know the

21    delivery time, but certainly we would like to respond.

22      And if I may sort of address with the same brevity the

23    estoppel point, since I'm not sure if that's coming in the

24    papers or we're supposed to consider it independently.

25       THE COURT:  I understood it would be in the papers.

1          MR. SADLER:  Yes, sir.  Yes, sir.

2          THE COURT:  In that case we can just respond to the

3    papers.  Or can respond now, if you prefer it.

4          THE COURT:  No, I would prefer a written response

5    after reflection, to the extent you feel it's needed.

6          MR. PETRIE:  Thank you.  Appreciate it.

7          THE COURT:  And when were you guys going to file?

8          MR. SADLER:  It should be filed by 6:00 p.m.  We

9    will make sure it's filed by 6:00.

10         THE COURT:  Okay.  And if you-all need more time to

11   respond to that, that's fine.  There's nothing magic about

12   tomorrow morning.

13         MR. PETRIE:  Okay.

14         THE COURT:  Don't kill yourself, in other words.

15   You've got other stuff to deal with.

16         MR. PETRIE:  I will try not to.  Perhaps if when we

17   see what the nature of the beast is at 6:00, or relatively

18   shortly thereafter, I can advise you tomorrow morning as what

19   I propose as to a response time?

20         THE COURT:  What about Tuesday morning.

21         MR. PETRIE:  That's fine.  That is doable under any

22   circumstance.

23         THE COURT:  Okay.  Let's just say Tuesday, because I

24   know that you-all are busy with other stuff.

25         MR. PETRIE:  I appreciate it, Your Honor.  Thank

 1    you.

 2              MR. POWERS:  Your Honor, if I may, briefly.

 3              THE COURT:  Yes.

 4              MR. POWERS:  We are about to call Mr. Janvey.  And I

 5    am mindful of Your Honor's ruling about the motion in limine

 6    concerning statements in other cases for inconsistency or

 7    impeachment.  My concern is that Mr. Janvey may be asked on

 8    the stand about whether he has said in certain cases a certain

 9    category of injury is inherently undiscoverable.  I think Your

10    Honor has addressed that in the *Alguire* order and said that's

11    a different issue, and so I'm seeking the Court's

12    clarification about Mr. Janvey being asked about the inherent

13    undiscoverability issue which the Court has already concluded

14    is a separate issue from whether these particular Defendants

15    could have reasonably discovered the fraud based on the

16    information that was available to them.

17              THE COURT:  I think that's something that you can

18    address in redirect, and I'm happy for you to do that.

19              MR. POWERS:  Thank you, Your Honor.

20              THE COURT:  Anything else?

21              MR. SADLER:  No, Your Honor.

22              THE COURT:  Okay.  Let's bring them in.

23              (Whereupon, the jury entered the courtroom.)

24              THE COURT:  Be seated.

25         The Receiver may proceed.

```
 1              MR. POWERS:  Thank you, Your Honor.

 2         We call Ralph Janvey.

 3              THE COURT:  Could you raise your right hand, please,

 4    sir?

 5              THE COURT:  The Receiver may proceed.

 6              MR. POWERS:  Thank you, Your Honor.

 7                        RALPH JANVEY, SWORN,

 8                        DIRECT EXAMINATION

 9    By Mr. Powers:

10    Q.   Mr. Janvey, can you please introduce yourself to the

11    jury?

12    A.   Yes.  My name is Ralph Janvey.  I've lived in Dallas for

13    over 30 years.  I'm an attorney by trade.  And I was an

14    adjunct law professor at SMU Law School for over 20 years,

15    teaching corporate and securities law.

16    Q.   And can you please explain your role in this case?

17    A.   I'm the Receiver appointed by a court over Allen Stanford

18    and the Stanford Group of Companies.

19    Q.   Mr. Janvey, do you still have a law practice?

20    A.   I do.  I still practice law full time.

21    Q.   And what's the name of your law firm?

22    A.   The name of my law firm is Craig and Janvey, LLP.

23    Q.   And can you tell us a little bit about your law practice?

24    A.   The law practice consists of representing clients in

25    areas of federal and state securities laws, helping them
```

1    comply with the law.  I represent broker-dealers, investment

2    advisors, help companies raise capital, and I also have done

3    hedge fund work over the years.

4    Q.   Now, before being appointed as the Receiver for Stanford,

5    had you previously served as a receiver in other cases?

6    A.   Yes, I have.

7    Q.   And tell us a little bit about your experience in that

8    regard.

9    A.   I've been a receiver in approximately three other cases.

10   For example, one involved in investment advisory fraud

11   involving residents of Mexico and the United States.

12   Q.   And I should have asked you, perhaps, to start with this,

13   but can you just explain to the jury what is a receiver

14   exactly?

15   A.   A receiver is a person who is appointed by a court when a

16   business is being run where the creditors are endangered.

17   Q.   And once the receiver is appointed, what is it that a

18   receiver does?

19   A.   A receiver, under the terms of a court order, takes

20   control of the businesses and runs those businesses, or really

21   takes control of the assets with the benefit of what's going

22   to make the maximum distribution to the creditors.

23   Q.   Now, how is it that a receivership actually begins in the

24   first place?

25   A.   It starts with the filing of a lawsuit.  In this case, a

```
 1   federal agency, the SEC, filed a lawsuit and asked a federal
 2   court to appoint a person to take over control of the assets
 3   of Allen Stanford and the Stanford Group of Companies.
 4   Q.   And so is there an order of the court appointing you as
 5   the Receiver for the Allen Stanford enterprises?
 6   A.   Yes.  There is a court order that appointed me to be the
 7   Receiver over Allen Stanford and the Stanford Group of
 8   Companies.
 9   Q.   All right.  Let's take a look at Plaintiff's Exhibit
10   459 on the screen.  And is Plaintiff's 459 the order
11   appointing you as sever?
12   A.   Yes, it is.
13   Q.   All right.  We won't go through every provision of the
14   order, but I want to ask you about some of the provisions.
15   Please take a look at paragraph 1.
16          MR. POWERS:  And Mr. Jarrett, if we could scroll
17   down so we can get all of paragraph 1 on the screen.
18   Q.   (BY MR. POWERS)  what does paragraph 1 provide?
19   A.   Paragraph 1 provides that the Court takes exclusive
20   jurisdiction over all the assets that are owned by Allen
21   Stanford and the Stanford Group of Companies, and they come
22   under the control of the Court itself.  That includes all
23   physical assets, all books, records, computers, financials,
24   everything that's related to the Stanford Group of Companies.
25   Q.   Okay.  And the Receivership assets and the Receivership
```

1   records, is that what's referred to as the Receivership

2   estate?

3   A.   Yes.  That's defined in paragraph 1.  And that's

4   Receivership assets and records, and that's known as the

5   Receivership estate.  That's correct.

6   Q.   So everything Allen Stanford and his companies owned.

7   A.   That's correct.

8        MR. POWERS:  All right.  Let's take a look at

9   paragraph 2.  If you could just scroll down a little bit more.

10  Q.   (BY MR. POWERS)  And what does paragraph 2 provide?

11  A.   Paragraph 2 provided that I have been appointed the

12  Receiver over the Receivership estate, and have all the powers

13  of Receiver that are set forth in the order, with the basic

14  primary power to make distribution to claimants who file

15  claims in the Receivership.

16  Q.   Now, as Receiver, if you're managing all of the assets

17  and you have control over all of the records, does that mean

18  that you are essentially running Mr. Stanford's securities

19  businesses?

20  A.   No.  When I took over, the Court took control of those

21  companies.  And Stanford was a fraud.  Stanford lived by

22  stolen money.  So we took over the Stanford companies under

23  the Court jurisdiction.  There was no viable business to keep

24  ongoing, so the business was shut down.

25  Q.   Now, at a high level, what are the general categories of

1    work that you started doing once you were appointed to be

2    Receiver?

3    A.    Broken down to the following categories:  Basically take

4    control of the Stanford company, its books, records, assets;

5    examine those, and determine how we liquidate the assets in

6    the Receivership for the benefit of the creditors; investigate

7    various transactions to see who has money which should belong

8    back to the Receivership, as well where certain money may be

9    located around the world; and finally, to work with federal

10   and state agencies to help them prosecute various people who

11   may have committed either crimes or civil problems.

12   Q.    Let me just ask you a couple of questions, follow-up

13   questions about some of that work.

14        You said taking control of the Stanford businesses.  Just

15   give us a sense what was the scale of the operations that you

16   had to take over when you were first appointed?

17   A.    When I was first appointed, we took over the following,

18   basically.  Stanford had approximately 130 companies, did

19   business in 13 countries, and had over 3,000 employees.  He

20   also had offices under Stanford Group Company in various

21   cities around the United States.  He had houses.  He had

22   airplanes.  He had yachts.  He had locations in St. Croix.  He

23   had assets in England, Switzerland, Montreal, and other

24   countries.  And one of my duties as Receiver was to get

25   control of all that so we could liquidate the assets for the

 1   benefit of the creditors.

 2   Q.   All right.  Now, taking the work that you just described

 3   and the general categories of work, are there specific

 4   provisions in the Receivership order that address or explain

 5   your duties as Receiver?

 6   A.   Yes, there are.  It's basically paragraphs 4 and 5.

 7            MR. POWERS:  All right.  Let's go to those.  If we

 8   could turn to the next page and look at paragraph 4.

 9   Q.   (BY MR. POWERS)  Can you tell us what paragraph 4

10   provides?

11   A.   Yes.  Paragraph 4 basically says that I as the Receiver

12   have the completely and exclusively control and power and

13   custody of the Receivership estate and, just as importantly,

14   assets that are traceable to the estate, which means money has

15   gone out which I believe belongs back to the Receivership

16   estate.

17            MR. POWERS:  All right.  And let's look at

18   paragraph 5.  It has some sub paragraphs under it.

19   Q.   (BY MR. POWERS)  What is generally covered by

20   paragraph 5?

21   A.   Paragraph 5 says that I am specifically directed and

22   authorized to perform the following duties that are enumerated

23   in paragraph 5.

24   Q.   All right.  And, again, we won't look at every single

25   one, but I want to ask you about a few of them.

1    MR. POWERS:  Can we turn to the next page and look

2    at paragraph (c), please?

3    Q.   (BY MR. POWERS)  Can you explain to the jury what

4    paragraph (c) is about?

5    A.   Yes.  Basically paragraph (c) says I have the right to

6    bring lawsuits to recover assets back to the Receivership.

7    Q.   And this lawsuit would be an example of that.

8    A.   That's correct.

9    MR. POWERS:  Let's take a look at the next page, and

10   I want to look at paragraph 5(j).

11   Q.   (BY MR. POWERS)  And can you tell us what paragraph 5(j)

12   is about?

13   A.   Yes.  Paragraph 5(j) sets forth my primary mandate, which

14   is to make distributions to claimants, the people who have

15   lost money in the Stanford fraud, the assets I recover.  My

16   duty is to disburse to them the money that we collect.

17   Q.   Now, have you handled the Receivership tasks and duties

18   all by yourself?

19   A.   No.  I've had a team of people to assist me.  To give you

20   some -- again, the background, we're dealing with a worldwide

21   receivership, so I had to hire a group of people to assist me,

22   a team of people to assist me in taking control of the assets,

23   winding them down, investigating various causes of action,

24   being involved in liquidating various assets for the benefit

25   of the creditors.  So it's a whole team of professionals that

1    I had to engage to assist me in that.

2    Q.   Well, is there something in the Receivership order that

3    deals with hiring professionals to assist you and

4    administering the Receivership estate?

5    A.   Yes, there is.  I believe it's on the next page.

6         MR. POWERS:  Can we zoom out of that and look at

7    paragraph 5(h)?

8         THE WITNESS:  Paragraph 5(h) authorizes me to employ

9    agents, consultants, lawyers, and investigators to assist me

10   in performing my duties, which is set forth in paragraph 5 of

11   the order.

12   Q.   (BY MR. POWERS)  And is there a provision in the order

13   that addresses compensation of the professionals that you

14   hire?

15   A.   It's paragraph 5(m), like in Mary.

16        MR. POWERS:  All right.  Can we take a look at that?

17   I believe it's on the top of the next page.

18   Q.   (BY MR. POWERS)  And what does paragraph 5(m) provide?

19   A.   5(m) provides for a process where I, as the Receiver,

20   file with the Court applications to pay professionals.  It's a

21   rather detailed process.  The Court then reviews it.  And if

22   the Court's satisfied that the fees are reasonable, the Court

23   will then approve the payment of those fees.  I only pay those

24   fees after the Court's made an assessment the fees are

25   reasonable.

1    Q.   And where does the money come from that pays the fees

2    that are approved by the Court as reasonable?

3    A.   The Receivership estate.

4              MR. POWERS:  All right.  And if we could turn to the

5    last page of the exhibit, please.

6    Q.   (BY MR. POWERS)  And the Court order was signed on what

7    date?

8    A.   February 16th, 2009.

9    Q.   And who was it signed by?

10   A.   It was signed by Judge Reed O'Connor, who appointed me in

11   paragraph 2 to be the Receiver over Stanford and the Stanford

12   Group of Companies.

13   Q.   All right.  I want to talk to you a little bit about the

14   investigation tasks that you described.

15        Did you hire somebody specifically to assist you with the

16   investigation of the Stanford fraud?

17   A.   Yes.  I hired a person by the name of a Karyl Van Tassel,

18   who was with FTI Consulting.  You'll hear from her later in

19   this trial.  She is my lead investigator and primary forensic

20   accountant.  And she and a team of people have analyzed the

21   Stanford transactions for the past eight years assisting me in

22   performing my duties under paragraph 5.

23   Q.   Before this receivership order was entered, can you tell

24   us the circumstances under which you were approached about the

25   possibility of serving as Receiver?

1  A.    In February 2009 I was giving a speech at the Dallas Bar

2  Association, and I was approached by an official of the SEC,

3  and he asked me if I've ever heard of Stanford.  And I said,

4  "Do you mean Stanford University?"

5       And he said no.  He said Stanford Financial.

6       And I said, "I've never heard of it, no."

7  Q.    So what happened next?

8  A.    He then asked me -- they were going to be a receivership

9  order against Stanford Financial the following week, and would

10  I be interested in being a receiver.  Since I've been a

11  receiver for the SEC a few times before, I said I would

12  certainly work for them in doing that.

13  Q.    I gather the SEC ultimately filed the lawsuit and that

14  led to the receivership order being entered.

15  A.    That's correct.

16  Q.    We've heard a few different dates, and so I wonder if you

17  could just help us get it all sorted out.

18       The order was signed on the 16th, I think Mr. Magness

19  said the 18th, and I think we may have heard the 17th.  So

20  just help us get sorted out how the days worked.

21  A.    Sure.  The order was signed on February 16th, which I

22  believe is a Monday.  I think it was Presidents holiday.  We

23  put together a group to come into the Stanford Group of

24  Companies on February 17th, which is Tuesday.  And we came in,

25  and it was sort of like a task force because, remember,

```
 1    Stanford had offices all around the country.  He Had offices

 2    in Memphis.  He had offices in Baton Rouge.  He had offices in

 3    Houston.  So we put together a team, along with U.S. Marshals,

 4    where we hit all the Stanford offices that morning and some

 5    the next day, and we took control of all the offices, all the

 6    books and records under the terms of the receivership order.

 7    Q.   In addition to the proceedings that the SEC brought, and

 8    any other proceedings that you may have brought pursuant to

 9    the authority of the receivership order, have there been other

10    court proceedings relating to the Stanford fraud?

11    A.   Yes.  The Department of Justice has brought criminal

12    cases against various people in connection with the Stanford

13    Ponzi scheme.

14    Q.   And who has the Department of Justice prosecuted?

15    A.   They prosecuted Allen Stanford, James Davis, Laura

16    Pendergest-Holt, Mark Kuhrt, and Gil Lopez.

17    Q.   And is there anyone else who was indicted in connection

18    with this fraud?

19    A.   Yes.  They also indicted a gentleman by the name of Leroy

20    King, who was the primary regulator for the agency that

21    regulated Stanford International Bank in Antigua, but he's

22    still sitting in Antigua waiting to be extradited.

23    Q.   Now, we've obviously heard about Mr. Stanford, and we've

24    heard some -- well, we saw Mr. Davis testify.  Right?

25    A.   Yes, we did.
```

1    Q.   And he was testifying from prison?

2    A.   Yes.  He was in prison at the time he testified.

3    Q.   And we've heard about Ms. Pendergest-Holt.

4         Who are Mr. Lopez and Mr. Kuhrt?

5    A.   They were the two chief accountants who assisted Davis

6    and Stanford in perpetrating the fraud over the years that it

7    was engaged in.

8    Q.   And what was the outcome of the proceedings against

9    Mr. Stanford, Mr. Davis, Ms. Pendergest-Holt, Mr. Lopez, and

10        Mr. Kuhrt?

11   A.   They all either pled guilt or they were found guilty by a

12   jury of criminal violations.

13   Q.   And were they sentenced to prison time?

14   A.   Yes.

15   Q.   What was Mr. Stanford's sentence?

16   A.   Mr. Stanford was sentenced to 110 years in the federal

17   prison, in which he's currently serving.

18   Q.   We've talked about the criminal proceedings and the SEC's

19   civil proceeding.  How is it that the SEC came to be looking

20   at Stanford in the first place?

21   A.   Well, the SEC had been looking at Stanford over a number

22   of years, but they finally brought a formal proceeding in 2005

23   where they investigated what actions Stanford was taking,

24   especially Stanford Group Company, and they filed the lawsuit

25   in 2009.

1    Q.    Okay.  I want to change gears a little bit and talk to

2    you a little bit about the SIB or Stanford International Bank

3    fraud, and just at a very general level, without getting into

4    too much detail, how it worked.

5         Let's look at Plaintiff's Exhibit 123.  And Mr. Janvey,

6    if you could try to look at it on the screen, and if that's

7    not working let me know and I'll give you a copy.

8    A.    That's fine.

9    Q.    This is one of the marketing brochures that was used by

10   Stanford.  I think we've seen this before.  Do you recognize

11   it?

12   A.    I do.  And that's a picture of the bank in Antigua on the

13   cover page.

14   Q.    All right.  Can you describe for us generally what it is

15   that Stanford International Bank told the investing public

16   about its CD program?

17   A.    He told the investing public that it was a liquid asset

18   investing in diversified category of marketable securities.

19   So liquidity and marketable securities were the key points he

20   made in his marketing materials.

21   Q.    Did you see the testimony of Mr. Wilk yesterday where he

22   claimed that the CDs' performance was linked to the

23   performance of I think he called it a basket of money

24   managers, and how it was somehow disconnected from the bank's

25   own balance sheet?  Did you see that testimony?

1  A.   I did see that testimony.

2  Q.   Have you seen any marketing materials from Stanford that

3  line up with that characterization?

4  A.   No.  Stanford's never published any materials either

5  being hedge fund or acting like a hedge fund in any of their

6  marketing materials.  It was always basically a CD, liquidity,

7  and diversified portfolio of marketable securities.

8  Q.   And I think you referenced hedge fund.  I think Mr. Espy

9  said that they received some information or they thought of

10 the investment as a hedge fund.  You're saying that's not the

11 way it was characterized to the investing public.

12 A.   No.  A hedge fund is an illiquid, long-term investment as

13 a general rule.  This was marketed as a liquid investment with

14 marketable securities that could be marketed and sold fairly

15 quickly.  That's almost the opposite of a hedge fund.

16       MR. POWERS:  All right.  Well, let's look at

17 Plaintiff's Exhibit 123 at page -- we'll start at page 5 of

18 the exhibit, which will have number 120346 in the bottom right

19 corner.

20 Q.   (BY MR. POWERS)  And can we see any of the messages

21 regarding liquidity that you've described for the jury?

22 A.   Yes.  That page says the highest degree of liquidity, and

23 the bank's assets are invested in the well-diversified

24 portfolio of marketable securities issued by stable

25 governments, strong multinationals, and major international

1    banks.

2         MR. POWERS:  All right.  Let's take a look at the

3    next page, 120347, if we could.

4    Q.  (BY MR. POWERS)  And what is the bank messaging here on

5    page 7 about the source of the bank's earnings?

6    A.  The bank's saying its earnings -- primary source of

7    earnings are from global investments.  It's also saying the

8    bank does not make loans.  It's not a commercial bank.  So

9    it's saying we make our money from making investments, which

10   they talk about on the prior page about well-diversified

11   marketable securities.

12   Q.  And what does it say about how interest rates are set or

13   determined?

14   A.  It states that interest rates are reviewed -- are set and

15   reviewed quarterly by the board of directors of the bank.

16   Q.  And when the board of directors sets the rates, what is

17   it that the rates are based on?

18   A.  They're based on what the board believes they need to set

19   the rates to to market the CDs to the public, and they --

20   that's what they look at.

21   Q.  Now, was SIB actually operated in the way described in

22   the brochure?

23   A.  No; absolutely not.

24   Q.  How was SIB operated?

25   A.  SIB was operated -- it was a fraud.  It took money from

1   new investors, it stole it, and it used it to do a number of

2   things--first of all, paying prior investors their rates of

3   return, redemptions, maturities.

4        It also used it to support Allen Stanford's lifestyle.

5   And you have to remember Allen Stanford portrayed himself as a

6   billionaire, and he used the money from investor CDs to enable

7   him to do it.

8        It also used money to continue marketing the CDs to the

9   public so they could keep on operating a Ponzi scheme.

10  Q.   For context, can you describe how big the Stanford fraud

11  was in a historic sense?

12  A.   The Stanford fraud, from the number of victims, is the

13  largest Ponzi scheme in U.S. history.  And I mean by that

14  there are 18,000 victims.  That is the largest Ponzi scheme in

15  the U.S.

16  Q.   At the time you were appointed Receiver, approximately

17  how much was reflected on the books of Stanford International

18  Bank in deposits?

19  A.   Approximately $7.2 billion.

20  Q.   And when you took over, did you find $7.2 billion, or

21  something close to $7.2 billion in assets?

22  A.   Nowhere near that.  When we came in we found less than

23  $1 billion of assets worldwide, which means there was a hole

24  between 7.2 billion and the less than 1 billion we found.

25  Q.   So if you found less than a billion dollars and $7.2

1    billion had come into the bank at some point, where did all

2    the money go?

3    A.   The money all went to perpetrate the fraud.  It went to

4    run the Ponzi scheme, to support Allen Stanford's lifestyle,

5    to pay old investors' return on their money, and to continue

6    marketing the CDs to perpetrate the fraud.

7    Q.   Mr. Stanford was the owner of the bank.  Is that right?

8    A.   Yes.

9    Q.   Did he have a functional role within the bank?

10   A.   He was known as chairman of the board.

11   Q.   Was there somebody at the bank who ostensibly was in

12   charge of the day-to-day operations of the bank?

13   A.   Yes.  That was Juan Rodriguez-Tolentino, and he was the

14   president of the bank.

15   Q.   And that's who we saw testify yesterday here in court.

16   A.   That's correct.

17   Q.   And, of course, we saw Mr. Davis testify as well?

18   A.   Yes, we did.

19   Q.   All right.  Mr. Davis, he pled guilty.  Is that right?

20   A.   He did.  He pled guilty to a number of crimes under a

21   plea agreement.

22   Q.   And I think we saw part of his plea agreement yesterday.

23   It was a little small because we had the split screen, so I'd

24   like to put it up.  And we aren't going to rehash old ground,

25   but there are a couple of things in there I want to ask you

1    about.  Is that all right?

2    A.   Okay.  Sure.

3         MR. POWERS:  Can we look at Plaintiff's Exhibit 467.

4    Q.   (BY MR. POWERS)  So is Plaintiff's Exhibit 467 the James

5    Davis plea agreement?

6    A.   Yes, it is.

7         MR. POWERS:  All right.  Let's take a look at page

8    11.

9    Q.   (BY MR. POWERS)  And what's the section that begins here

10   on page 11?

11   A.   Well, in the plea agreement Davis agreed to certain facts

12   which he said were true and accurate in connection with

13   pleading guilty to his crimes, and they are listed in the

14   following few pages, and that's his factual basis for his

15   guilty plea.

16   Q.   All right.  Well, let me ask you about some of

17   sub-paragraphs under the factual basis for the guilty plea.

18        MR. POWERS:  Let's look at page 13, paragraph (i),

19   please."

20   Q.   (BY MR. POWERS)  And what's set forth in paragraph (i) on

21   page 13?

22   A.   Well, it basically it says that since at least 2002

23   Davis, at the request of Stanford, would have the two

24   accountants I mentioned previous, Lopez and Kuhrt, create

25   fictitious investment reports which they would provide to the

 1    Antiguan primary regulator of SIB on a quarterly basis, and

 2    they would falsify the value of SIB's investments.  They would

 3    send those documents to the regulator and, as it states, SIB

 4    Executive A would execute those documents.  We know from

 5    Davis' testimony that was Juan Rodriguez-Tolentino.

 6    Q.   And based on the records that you have collected and

 7    observed as Receiver, have you observed that

 8    Mr. Rodriguez-Tolentino was, in fact, the executive who signed

 9    the documents that went to the regulator?

10    A.   Yes, our records indicate that.

11          MR. POWERS:  All right.  Let's take a look at

12    paragraph (aa), which is on the bottom of page 17 and the top

13    of page 18.

14    Q.   (BY MR. POWERS)  And can you tell us what paragraph (aa)

15    provides?

16    A.   Yes.  Paragraph (aa) says that for a period of four

17    years, 2005 to at least February 2009, Stanford, Davis and

18    Holt, and Executive A, who we know is Mr. Tolentino, would

19    attend investor conferences and other meetings, which are

20    called the Top Producer Club, which I believe Mr. Espy talked

21    about this morning, where they would falsely tout the assets

22    and earnings of the bank, falsely tout the investment

23    strategy, and deceive the FAs, as well as investors, about the

24    role that Holt played in the management of the portfolio.  So

25    they were going to the seminars and lying to the FAs about

1    what was going on.

2          MR. POWERS:  All right.  Now, if you could, let's

3    turn to paragraph (r) on page 15.

4    Q.  (BY MR. POWERS)  And what is explained in paragraph (r)

5    on page 15?

6    A.  Paragraph (r) goes to 2003 where Stanford and Tolentino

7    went to Leroy King, who, remember, is the primary regulator

8    for SIB, complaining that two examiners are getting too

9    aggressive and suspicious about SIB.  Stanford reassured both

10   Davis and Tolentino, don't worry about it because I have -- he

11   calls it a brotherhood, but it's called a blood oath with

12   Leroy King.  We basically share blood, and I bribed him over

13   the years, and he's going to make sure these two examiners

14   don't bother you.  And they were reassigned and replaced

15   because of the bribes and the agreement with King.

16   Q.  And so the Davis plea agreement shows that

17   Mr. Rodriguez-Tolentino was advised of this blood oath that

18   you described and these bribes?

19   A.  Yes.  That's correct.

20   Q.  All right.  You've been talking a little about Antigua.

21   You mentioned the bank is in Antigua.  Can you tell us just a

22   little bit about the island nation of Antigua?

23   A.  Yeah.  Antigua is a Caribbean island.  When we took over

24   it had about 80,000 people was among its population.

25   Q.  What kind of impact did Stanford have on the island

1    nation of Antigua when his businesses were in operation, you

2    know, in the '90s and through the 2000s?

3    A.   He basically controlled the island.  What do I mean by

4    that?  When Stanford first came to Antigua from Monserrat, one

5    of the requirements was that he had to bail out something

6    called the Bank of Antigua to get SIB's offshore bank license.

7         He also pumped millions of dollars into the economy in

8    Antigua.  He loaned the government of Antigua millions of

9    dollars.  And he became the largest private employer on the

10   island of Antigua.  As a matter of fact, a prime minister who

11   was opposed to Stanford told the *Wall Street Journal* in an

12   article that Stanford basically had a lien on the island

13   because of his influence through money on the island itself.

14   Q.   And you're saying that the quote from the prime minister,

15   that was in the *Wall Street Journal*?

16   A.   Yes.  That's correct.

17   Q.   All right.  I want to talk to you a little bit about

18   having -- with that background, I want to talk to you a little

19   bit about the Magness defendants.

20        Can you tell us first -- and I think we have the

21   demonstrative that will help us.

22              MR. POWERS:  Can with we have Demonstrative 651?

23   Q.   (BY MR. POWERS)  When did the Magness Defendants purchase

24   their SIB CDs?

25   A.   Well, as it's shown on the screen, between December 16th

1    2004 and October 31st, 2006, in the total amount of

2    $79 million.

3    Q.   Was $79 million a fairly typical amount for investors to

4    invest in SIB CDs?

5    A.   No.  From the review of the records, the average investor

6    invested $250,000 into the bank.

7    Q.   So investing this much money and so much more than the

8    average investor, did the Magness Defendants receive higher

9    rates as a consequence?

10   A.   They did get higher rates because of the amount of

11   investments they put in the bank.  That's correct.

12        MR. POWERS:  All right.  Let's take this down.  And

13   can we call up Plaintiff's Exhibit 470?

14   Q.   (BY MR. POWERS)  And can you identify Plaintiff's Exhibit

15   470 for the jury?

16   A.   Yes.  That's a standard grid rate published by the bank

17   as of May 1st, 2001, and it lists the fixed CDs and the

18   maturity on the left side from 1 month to 60 months, and it

19   goes in the dollar amounts from $10,000--and they are all

20   fixed--from $10,000 on the left side all the way over to

21   $2 million to $10 million.  And the fixed amounts and the

22   rates increase accordingly depending on how much you put in

23   and how long you held the maturity.

24   Q.   All right.  Well, let's look at the one that would have

25   been in effect on the last investment.  I think the last one

1    we saw was October 31st, 2006.  Is that right?

2    A.    That's correct.

3          MR. POWERS:  All right.  So let's turn to page 11 of

4    the exhibit, which I think has 195362, and if we could blow

5    that up.

6    Q.    (BY MR. POWERS)  All right.  So the types of CDs that the

7    Magness Defendants had, were those fixed CDs, as we see on the

8    top of the page?

9    A.    Yes, they were.

10   Q.    All right.  And so on this one, if we look at the left

11   most column, we have a what?  $10,000 CD?

12   A.    That's on the left side.  That's right.  That's the

13   lowest amount is $10,000.

14   Q.    So 10,000 up to the 50,000 on the left side, all the way

15   over to 5 to 10 million on the right side?

16   A.    That's correct.

17   Q.    All right.  And so just illustrate for us, using the

18   percentage rates that are here, the concept that you describe

19   based on the amount of the investment.

20   A.    Well, the more you put in, the longer the maturity, the

21   higher rate of return.  So if you put in a CD for, let's say,

22   $10 million, you would get a rate of 8.775 percent; versus if

23   you put in a CD of $50,000 for the same 60 months, you get a

24   rate of 8.025 percent.  So the more you put in, the more you

25   got in the rate of return on the grid rate.

1    Q.    And I notice that on the -- in the rows, the numbers get

2    bigger as you go from top to bottom.  And can you explain why

3    that is?

4    A.    Yes.  The longer you held it to maturity, the longer you

5    invest it to maturity, the higher the rate became.  So if you

6    bought a one-month CD, for example, $10,000, you get 4.25.  If

7    you bought a one-month CD, $10,000, for 60 months, you get 7.9

8    percent.  So, again, the longer you signed up for the

9    maturity, the higher the rate would go.

10   Q.    All right.  So this rate card that was in effect in 2006,

11   it topes out at $10 million, and so how were the Magness

12   Defendants' interest rates handled?

13   A.    Well, the Magness Defendants, we saw, had a letter

14   agreement with Stanford where, because of the size of the

15   investments they put in, they get a higher rate.

16   Q.    All right.  And You found correspondence about that

17   agreement in the records?

18   A.    Yes.

19             MR. POWERS:  Let's pull up Plaintiff's Exhibit 27.

20   Q.    (BY MR. POWERS)  And I think we saw Mr. Espy provide some

21   testimony about this.  And we'll try not to repeat it, but it

22   was -- again, it was small, and there are a couple of

23   additional things I want to ask you about.

24   A.    Okay.

25   Q.    So this is dated September 26, 2006.

1    A.   That's correct.

2    Q.   And the subject matter of the letter is what?

3    A.   CD rate grid and commission proposal.

4    Q.   All right.  And I think we saw earlier in this first

5    section that Mr. Stanford -- or that this agreement went up to

6    Mr. Stanford.  Is that right?

7    A.   That's what the letter says; that it went all the way up

8    to Allen Stanford.

9    Q.   Okay.  And then there was some discussion about these

10   rates here at this first bulleted section.  Do you see that?

11   A.   Yes, I do.

12   Q.   Okay.  And the first two lines of this section, what do

13   they provide?

14   A.   Basically providing that if the Magness family put in, in

15   this case, an unlimited dollar amount, they would get a higher

16   rate on their CDs.

17   Q.   And the first -- if they were to do that, what is the

18   first provision that they get the benefit of just under the

19   very first bullet?

20   A.   The grid rate was guaranteed to never to go down as long

21   as long as the Magness family or its affiliates had deposits

22   on hand with SIB in excess of $50 million.

23   Q.   And I'm sorry.  I'm at the one just above that one.  The

24   Magness family rate grid shall be extended from $50 million to

25   an unlimited dollar amount.

1    A.    That was part of the letter.  That's correct.  It was an

2    unlimited dollar amount.

3    Q.    And at the time this letter was written, how much did the

4    Magness Defendants have on deposit at Stanford International

5    Bank in principal?

6    A.    $49 million.

7    Q.    All right.  And then I think you told us about the next

8    one, which is the rate grid will be guaranteed to never go

9    down?

10   A.    Yes.  That's correct.

11              MR. POWERS:  If we could turn back to Plaintiff's

12   Exhibit 123 for just a minute.  And let's go to page 6, if we

13   could.  And if we could highlight prudent investments, that

14   paragraph.  I'm Sorry.  Blow it up.

15   Q.    (BY MR. POWERS)  Now, when we were looking at this

16   before, it says here that interest rates are paid to

17   depositors based upon prudent investment return expectations.

18   Do you see that?

19   A.    I do.

20   Q.    And what does that mean exactly?

21   A.    That the board of directors will decide what interest

22   rates to be paid the depositors based upon revealing the

23   investments and the expected rate of return.

24              MR. POWERS:  And so if we go back now to Plaintiff's

25   Exhibit 27.  And if we could zoom in again.

1  Q.    (BY MR. POWERS)  Here we have a promise essentially

2  coming from Mr. Stanford to the Magness Defendants that their

3  personal rates will never go down.  I assume that must be

4  irrespective of market conditions?

5  A.    Yes.  And I think that's guaranteeing Mr. Magness that

6  the rates will never go below his guaranteed rate of return,

7  as long as he held $50 million with the bank.

8  Q.    All right.  So let's take a look at the next provision.

9  And Mr. Espy I think talked about this.  He said that there

10  would be an equity commission rate of a penny a share on this

11  certain family of equity positions.  Do you recall that?

12  A.    I do.

13  Q.    And I think Mr. Espy said that that was well below

14  market.

15       And the question I have for you is, does this only apply

16  to shares that are sold out of Stanford Group Company, or does

17  it include other banks as well.

18  A.    No, it specifically provides for shares that are held at

19  other investment banks.  So it's not just Stanford; it's any

20  other investment bank, including Pershing, Bear Stearns, HSBC,

21  Merrill Lynch, et cetera.  So wherever these securities are

22  held, if they're sold one cent share commission will be

23  applied.

24  Q.    And since we're here and you mentioned Pershing, can you

25  just explain what Pershing's relationship is to Stanford Group

1    Company?  Because we've heard the name Pershing a lot, but I

2    don't think we've ever heard an explanation of who they are.

3    A.    Pershing was Stanford's clearing firm.  What that means

4    is Stanford Group Company had a license where they didn't hold

5    securities or cash for customers.  It was held by an entity

6    called Pershing which has a license to be a custodian.  And

7    Pershing was Stanford Group Companies custodian or clearing

8    firm.

9    Q.    So I want to ask you one more thing about the rates --

10   the rate grid that the Magness Defendants had.

11         This document talks about an attachment with a rate grid.

12   Did you find the attachment among the records of Stanford?

13   A.    No, we did not find the attachment among the records at

14   all.

15   Q.    So how do you know whether the Magness Defendants' rates

16   that they received were better or worse than the standard

17   rates?

18   A.    I think we know because, first of all, the letter implies

19   it.

20         Secondly, we know the rates that Mr. Magness got once he

21   put in his $30 million extra were at a higher rate than the

22   grid rate sheet, so you get the higher rates.

23              MR. POWERS:  All right.  Can we go back to

24   Plaintiff's Exhibit 470?  This was the standard rate grids.

25   And if we can turn to page 11, please.  And let's zoom in on

1    the rate grid.

2    Q.   (BY MR. POWERS)  What's the highest available rate on

3    this rate card?

4    A.   For $10 million held for 60 months, it's 8.775 percent.

5    Q.   And that's here in the bottom right?

6    A.   That's correct.  It's on the 60 months on the right side

7    on the last column, rate 8.775 percent.

8    Q.   And at this point in time--that is, after the Magness

9    Defendants made the additional deposit required by the

10   agreement--what was the rate that they received on their CDs?

11   A.   9.148 percent.

12   Q.   And did you find any other documentation of Mr. Magness

13   receiving special consideration with respect to certificate of

14   deposit rates?

15   A.   Yes, we did.

16        MR. POWERS:  All right.  Let's pull up Plaintiff's

17   Exhibit 204.  And if we could look, please, at the bottom

18   email from Mr. Rodriguez-Tolentino.

19   Q.   (BY MR. POWERS)  And what's explained in Plaintiff's

20   Exhibit 204?

21   A.   Well, it's explaining that they expect $30 million more

22   from Mr. Magness.  They've agreed to offer him a special rate.

23   On a four-year fixed CD they'd give him a five percent rate,

24   which is known from the grid rate that's a higher rate.  So

25   they're saying if he buys a four-year fixed CD, we will give

1    him a five-year rate.

2    Q.    And so that -- does that mean that he is then getting a

3    higher rate than is even reflected on the special rate sheet?

4    A.    It appears that way, yes.

5             MR. POWERS:  And if we could look at the top email.

6    Q.    (BY MR. POWERS)  There's an email from Mr. Stanford.  And

7    what does Mr. Stanford have to say about all this?

8    A.    He's telling Mr. Espy, "Tell Gary thanks for his

9    business.  We will always go the extra mile for him.  RAS."

10            MR. POWERS:  All right.  Now, if we could, go back

11   to Plaintiff's Exhibit 27.

12   Q.    (BY MR. POWERS)  I want to ask you about the final bullet

13   in the agreement.

14       We heard from Mr. Espy about this Baja Racing

15   sponsorship?

16   A.    Yes.

17   Q.    And that's the last -- that's addressed in the last

18   bullet of this agreement?

19   A.    That's correct.  It's the last bullet at the bottom.

20            MR. POWERS:  And let's look at Plaintiff's Exhibit

21   89, which I think we saw kind of on the small right hand side

22   of the page.  If we could just get that in full on the screen.

23   Q.    (BY MR. POWERS)  This is that Stanford Eagle magazine

24   that had the picture of the Baja Racing?

25   A.    Yes.  That's correct.

1          MR. POWERS:  All right.  Please turn to page 49.  If

2     we could blow up the picture of the truck.

3     Q.   (BY MR. POWERS)  You see Stanford Group Company's name

4     right there on the -- just above the wheel?

5     A.   I do see that.

6     Q.   Just to the left of that, what is that insignia or decal?

7     A.   That is a Stanford eagle.  Stanford required that

8     everyone who worked for him put on their lapel something

9     called the Stanford eagle, and that's what that is.  It's a

10    Stanford eagle, which is a symbol of Stanford.

11         THE COURT:  We are getting close to break-time.  If

12    you could let me know when you are at a good stopping point,

13    please.

14         MR. POWERS:  This would be perfect.

15         THE COURT:  Okay.  Great.  I was hoping you would

16    say that.

17         Let's take our afternoon break.  We'll see you back in 20

18    minutes at 3:30.

19              (Whereupon, the jury left the courtroom.)

20         THE COURT:  Anything else?

21         MR. PETRIE:  Not from me.  Thank you.

22         MR. POWERS:  Not at this time.

23         THE COURT:  Okay.  See you at 3:30.

24                   (Brief recess.)

25         THE COURT:  All set?

1        MR. SADLER:  I showed this to Mr. Petrie.  I thought

2   I would hand up to the Court.

3        The last time Your Honor told us where you were on times,

4   it just sounded, again, like we were kind of off, so I thought

5   I would hand up to the Court our sheet.

6        THE COURT:  Uh-huh.

7        MR. SADLER:  And it may be I just heard Your Honor

8   wrong.

9        THE COURT:  Okay.  I'll look at it.

10       MR. SADLER:  Yes.  That's all.  I just wanted you to

11  have the benefit of that.

12       THE COURT:  How much more do you have?  Through the

13  end of the day?

14       MR. POWERS:  No.  About ten minutes, Your Honor.

15       THE COURT:  Ten minutes?

16       Okay.  Let's bring them in.

17            (Whereupon, the jury entered the courtroom.)

18       THE COURT:  Be seated.

19       The Receiver may proceed.

20       MR. POWERS:  Thank you, Your Honor.

21  Q.   (BY MR. POWERS)  Now, Mr. Janvey, before we broke we were

22  looking at the picture of the Stanford Eagle magazine, and

23  specifically we were looking at the picture of the Mango

24  Racing truck.  I want to ask you about the text that appears

25  in the Stanford Eagle next to the picture of the Mango Racing

1    truck.

2              MR. POWERS:  Can we go to that text and blow that

3    up?

4    Q.  (BY MR. POWERS)  And tell us what is explained by the

5    text next to the picture of the truck.

6    A.   Well, it says two things:  number one, that Stanford made

7    a generous donation and Stanford was a lead sponsor; and that

8    the monetary contribution was not the only thing Stanford was

9    involved in--that Tom Espy was also a lead driver for the

10   Mango Racing team.

11             MR. POWERS:  All right.  And then if we could look

12   at the picture that is just below this text, if we could back

13   out of that.

14   Q.  (BY MR. POWERS)  And then on the second from the left,

15   who is pictured there?

16   A.   That's Mr. Knudson.

17   Q.   All right.  And that's Mr. Knudson who's in court here

18   today?

19   A.   Yes.

20   Q.   And next to him is Mr. Espy?

21   A.   That's correct.

22   Q.   And we saw him testify this morning.

23   A.   Yes.  That's correct.

24   Q.   And then next to him, who is that?

25   A.   That's Mr. Magness.

1    Q.    Mr. Magness, the Defendant in this case?

2    A.    That's correct.

3    Q.    Did you find other Stanford records relating to promotion

4    in connection with this Baja race?

5    A.    Yes, we did.

6    Q.    Are you familiar with Plaintiff's Exhibit 49, which is a

7    video disk?

8    A.    I am familiar with that.

9    Q.    And what is that?  What is Plaintiff's Exhibit 49?

10   A.    It's a video disk that Mr. Magness is talking about the

11   Mango race and how it works and what the sponsorship is.

12   Q.    All right.  Let's look at a couple of selections from the

13   video, if we could.

14          MR. POWERS:  Mr. Jarrett, can you please play

15   Baja 1?

16          (Whereupon, Baja 1 of Plaintiff's Exhibit No. 49 was

17          played in open court.)

18   Q.    (BY MR. POWERS)  Now, we heard Mr. Espy speaking in that

19   video, and he talked about feeling fortunate to be a part of

20   Stanford, and also fortunate to be a part of Magness.

21          Did you see any information in the Stanford records

22   relating to Mr. Espy having a relationship with the Magness

23   Defendants?

24   A.    Yes, I did.

25   Q.    And in a relationship other than simply being their

1    broker?

2    A.    Yes, I did, as far as assisting in getting sponsorships

3    and other things.

4    Q.    And where is it that Mr. Espy worked throughout the time

5    that he was with Stanford Group Company?

6    A.    He worked in Stanford Group Company offices, but he also

7    had an office in Mr. Magness' office, too, with his secretary.

8    Q.    You said with his secretary.  What does that mean?

9    A.    Mr. Espy's secretary worked in the office also.

10   Q.    In the Magness office?

11   A.    Yes, in the Magness office.

12   Q.    Let's take a look at the second segment of video.  This

13   is Baja 2.

14            MR. POWERS:  Mr. Jarrett, can you please play Baja

15   2?

16            (Whereupon, Baja 2 of Plaintiff's Exhibit 49 was

17            played in open court.)

18   Q.    (BY MR. POWERS)  Now, in that selection Mr. Magness said

19   that Mr. Stanford had helped with some expenses.  Did you find

20   any documentation that the Stanford Group of Companies paid

21   any money to the Mango Racing team?

22   A.    Yes, we did.

23   Q.    And what was the amount of that payment?

24   A.    $20,000.

25   Q.    Okay.

1       MR. POWERS:  Thank you, Your Honor.  I pass the

2  witness.

3                    CROSS EXAMINATION

4  By Mr. Petrie:

5  Q.    Mr. Janvey, let's start by going back to Exhibit PX 470

6  that you were discussing with Mr. Powers.

7       MR. PETRIE:  And Mr. Jones, if you could turn back

8  to page 11 that we're looking at, please.

9  Q.    (BY MR. PETRIE)  You recall discussing this with

10  Mr. Powers just a few moments ago.  Correct, sir?

11  A.    I do.

12  Q.    And what you were doing was you were comparing this

13  information, which is the grid as of March 30, 2006, and

14  applying that to the last three CDs, or comparing it to the

15  last three CDs that the Magness parties purchased on Halloween

16  of 2006.  Right?

17  A.    That is correct.

18  Q.    And you were not able to find any different rate grids

19  that were in place between March 30 of '06 and October 31 of

20  '06.  Correct?

21  A.    No, we could not.

22  Q.    Now, you understand that what Mr. Magness did through

23  GMIT -- you understood that was the October 31 depositor.

24  Right?

25  A.    I do.

1    Q.    On October 31, what he deposited was $30 million.  Right?

2    A.    Yes, sir.

3    Q.    He just happened to do that mechanically in three

4    $10 million CDs.  Correct?

5    A.    I remember that from the schedule, it was $30 million

6    total.  That's Correct.

7    Q.    You were in the courtroom when we looked at Exhibit 9.

8    Right?

9    A.    That's correct.

10   Q.    And that's one of the places, among many, where we can go

11   find the interest rates.  Right?  We look on the face.

12   A.    Correct.

13   Q.    Okay.  And you understood that if we were to take this

14   grid and take -- take your pick.  Whether it's 60 months, five

15   years, or 48 months, four years, and extend that out to

16   address $30 million, it would be a significantly higher

17   interest rate than the 8.775 percent, just extrapolating.

18   Right?

19   A.    I think I testified that the more you put in the higher

20   rate you would get.

21   Q.    Well, my question is little more refined than that.  If

22   we take that term, pick whichever one you want, whether it's

23   48 or 60, and you go from the top here, which is just the

24   dollar underneath $10 million, and let's go out to a dollar

25   underneath $30 million, your rate is going to be much higher

1    than either the 8.625 or 8.775.  Right?

2    A.    I agree it would be higher, yes.

3    Q.    It would be higher, sir, would it not, than 9.148

4    percent, if we just extrapolate it out?

5    A.    I believe it was 9.148 percent.

6    Q.    That was the rate that was paid.  If you extrapolate this

7    grid out, you're going to get higher than 9.148, aren't you.

8    A.    I don't know the answer.  I'm not very good at

9    extrapolating.

10   Q.    I want to talk some about the money here.  What you're

11   seeking to recover from the Magness parties is the total sum

12   of $79,684,042.86 before we account for any sort of interest

13   pre- or post-judgment or fees.  Right?

14   A.    No.    We're seeking $88.2 million.

15          MR. PETRIE:  May I approach the witness, Your Honor?

16          THE COURT:  Yes.

17   Q.    (BY MR. PETRIE)  Mr. Janvey, if you would look just in

18   the notebook for the moment at the second tab, which is the

19   joint pretrial order filed in this case.

20   A.    Okay.

21   Q.    Do you have that document in front of you, sir?

22   A.    I do.

23   Q.    And this was a document that was filed by your lawyers at

24   Baker Botts, or submitted to the Court by your lawyers at

25   Baker Botts in conjunction with the lawyers for the Magness

1   parties.  Right?

2   A.   That is correct.

3   Q.   And then Judge Godbey signed this order earlier this

4   month to govern this case going forward.  Correct?

5   A.   That is -- that's what it shows on page 22.  That's

6   correct.

7   Q.   And if you would look, sir, please, at -- let's start at

8   page 2 of the Court's joint pretrial order.  There is at the

9   very top in bold on page 2 something called --

10       Before we go there, let me ask you this.  You don't have

11   any reason to dispute the contentions that your lawyers made

12   in this document, do you?

13   A.   No, I do not.

14          MR. PETRIE:  Your Honor, may I publish this document

15   to the jury?

16          MR. POWERS:  Your Honor, 402, 403.

17          THE COURT:  Overruled.  You can publish.

18   Q.   (BY MR. PETRIE)  Now, Mr. Janvey, if it's easier on the

19   screen, obviously feel free to look at it there.  Let's look

20   at the top of page 2, sir.

21       Okay.  And so you see that beginning at the top of

22   page 2, under the summaries of claims and defenses we have the

23   Receiver provides the following claims and defenses asserted

24   in this lawsuit.  Correct?

25   A.   I do see that.  That's correct.

1    Q.   You understand this is the section that sets forth your

2    position as advanced by your lawyers.  Correct?

3    A.   I understand this is the document filed with the Court

4    which sets forth my claims and defenses.  That's correct.

5    Q.   And let's look, sir, if you would --

6         MR. POWERS:  Your Honor, I have a limine question.

7    I have a limine issue to address.

8         (Discussion at the bench, out of the hearing of the

9         reporter.)

10   Q.   (BY MR. PETRIE)  Mr. Janvey, it is true, sir, is it not,

11   that, in fact, what you're seeking to recover in this case is

12   principal, only the principal, no interest, on the amounts

13   that the Magness parties paid in?

14   A.   That is --

15        MR. POWERS:  Objection; 402, 403.

16        THE COURT:  Overruled.

17        THE WITNESS:  We're seeking to cover the principal.

18   That's correct.

19   Q.   (BY MR. PETRIE)  And there's no dispute, is there, that

20   the Magness parties deposited in Stanford International Bank

21   $79 million over that span of time we've been looking at from

22   the fall of '04 through the Halloween of '06.

23   A.   Yes.  That's correct.

24   Q.   And there's no dispute--there's been a little bit of

25   wiggle about the number--but that over $700,000 was also paid

1    in addition to zero out that initial loan.  Right?

2    A.    Yes.  Mr. Magness did pay an additional 700 something

3    thousand dollars.  That's correct.

4    Q.    Now, you mentioned in describing this Ponzi scheme the

5    numbers you gave the jury.  And correct me if I got these

6    wrong.  I believe you said 130 companies in the --

7    A.    Approximately 130.

8    Q.    Thank you.  Approximately 130 companies.

9    A.    That's correct.

10   Q.    Operating in 13 countries?

11   A.    That's my understanding.  That's correct.

12   Q.    Okay.  And, again, approximately 3,000 employees?

13   A.    Yes.  That's correct.

14   Q.    Do I have that correct?

15   A.    That's correct, approximately.

16   Q.    Now, let's look at what Stanford was telling people

17   towards the end of the ongoing business of the company; in

18   other words, shortly before you were appointed Receiver.

19        Let's look at in your binder, please --

20           MR. PETRIE:  Excuse me.  We have admitted it, so

21   let's look at Plaintiff's Exhibit 95.

22   Q.    (BY MR. PETRIE)  And it will come up on the screen if

23   that is easier for you to read.

24        You were in the courtroom this morning when this document

25   was brought in under Mr. Espy's testimony.  Correct?

1    A.    Yes, I was.

2    Q.    Okay.  And you understand that this is the first and only

3    edition of a monthly update that was prepared by Stanford

4    International Bank.  Right?

5    A.    I assume that's the first edition, and it was in December

6    of 2008.  That's correct.

7    Q.    And you understand this was the last edition as well.

8    A.    I have no reason to doubt that.

9    Q.    We haven't seen a January or February, have you?

10   A.    I have not.

11   Q.    And you certainly haven't published a monthly update.

12   Correct?

13   A.    We have not.

14   Q.    We meaning you, the Receiver.

15   A.    The Receivership.  That's correct.

16   Q.    Can I ask you to lean forward into the mic?

17   A.    Sure.

18   Q.    Thank you.

19          MR. PETRIE:  Now let's look at the last page of

20   exhibit 95 and see what the schemers said about this.

21   Q.    (BY MR. PETRIE)  If you look at the text --

22          MR. PETRIE:  As a matter of fact let's backtrack a

23   page, Mr. Jones, and if you would pull up the -- Sorry.  Bad

24   eyesight.  Let me pull it up.  Okay.  If you'd scroll down,

25   Mr. Jones, please, to the discussion of the company.  There

1    you go.  That will certainly catch it.

2    Q.   (BY MR. PETRIE)  Do you see in the paragraph on the right

3    hand column, the bottom side, says 30,000 clients according to

4    the company in December of '08.  Right?

5    A.   That's what that says.  That's correct.

6    Q.   Okay.  And at that point in time represents that there's

7    8 and a half billion in assets in the company at that point in

8    time.  Correct?

9    A.   That's what this document says.  That's correct.

10   Q.   But by the time we get to mid February, February 16th,

11   its to the reduced numbers that you've talked about.  Correct?

12   A.   That's correct.

13   Q.   In any case, whether we use the company's numbers or your

14   numbers, it's one of the largest Ponzi schemes that's ever

15   happened.  Right?

16   A.   That's correct.

17   Q.   It was not as big as Madoff.  Right?

18   A.   More victims in Madoff; not as large dollar-wise.

19   Q.   Okay.  So more people hurt but not as much money in it.

20   A.   That's correct.

21   Q.   Now, you understand, sir -- when you responded to a

22   question from Mr. Powers, you said the company when it was

23   operating--in other words, pre-receivership--didn't make

24   loans.  Do you remember saying that?

25   A.   I believe the literature says they did not make loans.

1  Q.  Okay.  Well, you are also aware their literature said

2  that what the company did do was that it only made cash

3  secured loans.  Isn't that right?

4  A.  That's correct.  It did say that.

5  Q.  Because what it would do is loan the money back to the

6  people who made the deposits.  Right?

7  A.  Yes.  The context when I said it didn't make loans was in

8  connection with the paragraph in the marketing document that

9  says we do not make commercial loans.

10  Q.  Okay.  But what it also says is we do make cash secured

11  loans, if we went back and looked at 123.  Correct?

12  A.  I agree with that.

13  Q.  And the loans were structured along the general

14  parameters that were discussed by the other witnesses you've

15  heard, which was this 80 percent of the amounts deposited.

16  Correct?

17  A.  That was what they represented.  That's correct.

18  Q.  And you understood that wasn't a right that a depositor

19  had, but the depositor had, then, the ability to go to the

20  bank and say, will you loan me money not to exceed that

21  amount.

22  A.  I think the depositor went to the bank and asked to

23  borrow 80 percent.  That's correct.

24  Q.  Let's look, sir, if we can, back at the order by which

25  you were appointed.

```
1    A.    Okay.

2    Q.    And we'll pull that up.  It's 459.

3          And I want to make sure we understand.  Let's look at the

4    first paragraph, Mr. Janvey.

5          This is the February 16, 2009 order you discussed with

6    Mr. Powers.  Correct?

7    A.    Yes, it is.

8    Q.    So you're coming up now on your eight-year anniversary,

9    so-to-speak.  Right?

10   A.    That is correct.

11   Q.    Now, this order appoints you as the Receiver not only

12   over companies, but over Mr. Stanford as an individual.

13   Correct?

14   A.    That is correct.

15   Q.    And over Mr. Davis as an individual.  Correct?

16   A.    That is correct.

17   Q.    And over Ms. Pendergest-Holt as an individual.  Right?

18   A.    Yes.  They are all defined as Defendants.

19   Q.    Okay.  And you understand that the case in which this was

20   brought is a case brought by the Securities and Exchange

21   Commission.  Correct?

22   A.    Yes, I do understand that.

23   Q.    And you were appointed at the behest of -- you described

24   for us the Dallas bar association first encounter that you had

25   with someone from the SEC.  Correct?
```

1    A.   Yes.  That's correct.

2    Q.   So you were appointed at the request of the SEC, and then

3    this Court--not Judge Godbey, but another judge in this

4    building--signed the order.  Right?

5    A.   That's correct.

6         MR. PETRIE:  Now, let's look at paragraph 1 of the

7    order.  And just look at the -- If you can scan that up,

8    please.  Or blow it up.  Sorry.

9    Q.   (BY MR. PETRIE)  I want to make sure we understand

10   exactly what you were discussing with Mr. Powers about this.

11        Among the other things that you get here is the Court has

12   assumed jurisdiction of the books, records, et cetera,

13   essentially all of the pieces of paper and electronic media of

14   everybody in the receivership.  Correct?

15   A.   That is correct.

16   Q.   And by virtue of the Court having jurisdiction of that,

17   you had access to all of that information as soon as you were

18   able to gather it.  Correct?

19   A.   As the Receiver.  That's correct.

20   Q.   All of my questions are to you as Receiver, not as

21   Mr. Janvey, civilian.  Okay?

22   A.   Okay.

23        MR. PETRIE:  Then let's look at paragraph 5(d), as

24   in David.  The second one from the top.  Thank you.

25   Q.   (BY MR. PETRIE)  That's among the elaborated things that

1    you were authorized or empowered to do under this order.

2    Right?

3    A.    Yes.  That's correct.

4    Q.    And what this provides is that simply by giving this

5    order, by presentation of this order, you have the authority

6    to have people turn over books and records to you.  Correct?

7    A.    That's correct.

8    Q.    And further, if you need to, you can compel the

9    appearance of a person or a company--here it says entity--to

10   be examined, meaning to give testimony under oath.  Right?

11   A.    Yes.

12   Q.    Or to produce documents.  Right?

13   A.    That's correct.

14   Q.    And that rule there is the federal rule -- you understand

15   what that rule is.  Right?  Rule 45.

16   A.    I depend on my lawyers to tell me what those rules mean.

17   Q.    Okay.  So You're not aware that Rule 45 is a federal rule

18   governing subpoenas to compel attendance of people?

19   A.    I know we've issued subpoenas.  If it's Rule 45, that's

20   what it is.

21   Q.    Okay.  Then irrespective of the rule, you're fully aware

22   that you had subpoena power as part of your tools to use to

23   gather assets.  Right?

24   A.    Correct.

25   Q.    Or to investigate what had happened.  Correct?

1    A.    That's correct.

2    Q.    Now, this Ponzi scheme with the approximately 130

3    companies, operating in 13 countries, with approximately 3,000

4    employees, was complicated, wasn't it?

5    A.    Yes, it was.

6    Q.    It was a very complex scheme.  Correct?

7    A.    It was very -- it was a two-decades-run Ponzi scheme.

8    That's correct.

9    Q.    And the entire design of it was to conceal what was

10   really going on from the depositors.  Right?

11   A.    That's correct.

12   Q.    And from the general public.  Correct?

13   A.    That's correct.

14   Q.    From the Securities and Exchange Commission?

15   A.    I agree with that.

16   Q.    From FINRA?

17   A.    I agree with that.

18   Q.    And, with the possible exception of Mr. King, from

19   regulators elsewhere.  Right?

20   A.    I agree with that.

21   Q.    Now, you mentioned in response to a question from

22   Mr. Powers that the SEC had been looking at Stanford over a

23   period of years.  Correct?

24   A.    Yes.  That's correct.

25   Q.    You have looked at the Office of Inspector General report

1    that deals with what the SEC did or did not do regarding

2    Stanford.  Isn't that correct?

3    A.   I looked at it a while ago.  Yes, I did read it.

4    Q.   Well, you're aware that the number of years over which

5    the SEC was looking at Stanford dates back into the late

6    1990s, are you not?

7    A.   Yeah.  My recollection is about 1997.

8    Q.   Okay.  And from 1997 through July 2nd of 2008, there's

9    not a peep anywhere in the public domain that the SEC was

10   looking at this company or these companies.  Isn't that right?

11   A.   I don't agree with that.  I think there were people who

12   believed the SEC was looking at it.  I think the article we

13   saw, subpoenas were issued so people knew the SEC was looking

14   at it.

15   Q.   I'm sorry.  I stopped in July 2nd of '08, which was

16   immediately before that article?

17   A.   I think other people did know about it, though.  Over the

18   years people complained to the SEC, people complained to

19   FINRA, they thought it was a fraud, they sent letters.  Now,

20   the SEC didn't bring an action until 2005.

21   Q.   And the SEC didn't respond to those people and say, we're

22   bringing an action.  Right?

23   A.   I'm not the SEC, but they did what they did.  I don't

24   know if they responded.

25   Q.   Well, you have access to material that the SEC developed

1    in connection with this is this.  Correct?

2    A.    That's correct.  But we're talking about decades of SEC

3    doing work.  I can't say for sure the SEC didn't respond.

4    They may have.

5    Q.    Okay.  You also have access to SEC materials that other

6    people don't have access to.  Right?

7    A.    Up to a point.  That's correct, yes.

8    Q.    And those are materials that the SEC provided to you to

9    assist you in your investigation.  Correct?

10   A.    That's true.

11   Q.    Now, you told Mr. Powers that when you were appointed,

12   that this was a fraud.  Right?

13   A.    Yes.  That's correct.

14   Q.    Well, as soon as you were appointed, one of the things

15   you started to do was to investigate whether this was a Ponzi

16   scheme.  Correct?

17   A.    No.  One of things we first did was get control of the

18   entities.  We believed it was a fraud from the time we walked

19   in.  The question was how did it work and how did it operate.

20   We knew pretty early on it was a Ponzi scheme, because that's

21   really what it could have been was a Ponzi scheme.  It was a

22   Ponzi scheme.  I'm not sure what else it would be.

23   Q.    Okay.  And what you did was you spent a significant

24   amount of time and money making sure that you were able to

25   prove that it was a Ponzi scheme.  Correct?

```
 1   A.   Well, I think in connection with that we spent a lot of

 2   time and money getting control of the assets, making sure we

 3   could sell the assets properly, and investigating what

 4   happened.  That's correct.

 5   Q.   And my question was you spent a significant amount of

 6   time and money investigating and trying to prove concretely

 7   that this was a Ponzi scheme.  Is that accurate?

 8   A.   No, I don't think that was my role as a receiver.  My

 9   role as a receiver was to bring actions that I thought people

10   should be sued for.  But the SEC brought the action against

11   Stanford saying it was a Ponzi scheme.

12   Q.   So you didn't view it as your role at all to investigate

13   and prove whether this was a Ponzi scheme.  Is that correct?

14   A.   Oh, no.  We did investigate and we did prove it was a

15   Ponzi scheme.  That's what --

16   Q.   You spent a lot of time doing that.  Right?

17   A.   Yes, we did.  That's correct.

18   Q.   And spent a lot of money.

19   A.   We did spend both.

20   Q.   Now, you-all understood, even when you went in, that

21   there was -- that this bank that you were now looking at as

22   part of these 130 companies was not operated as a typical

23   commercial bank.  Right?

24   A.   Yes.  That's correct.

25   Q.   And you understood that essentially it had one product,
```

1    which was these certificates of deposit.

2    A.    That's correct.

3    Q.    And that the one source -- essentially one source of

4    funds was, then, all the people depositing money on these CDs.

5    Right?

6    A.    That's correct.

7    Q.    And that the two principal activities that, then, the

8    bank or the scheme operated in were to -- first, would be

9    selling the CDs, marketing them.  Right?

10   A.    Yes.  Through a company called Stanford Group Company.

11   That's correct.

12   Q.    Okay.  And then once you received the money, I was going

13   to say applying it, but essentially putting it to whatever

14   uses, whether they are legitimate or not, that the monies were

15   put to?

16   A.    Yes.  They would disburse it the way they wanted to

17   disburse it.  That's correct.

18   Q.    Okay.  And all of that activity was directed and

19   controlled from the United States.  Correct?

20   A.    The headquarters, while the bank building was Antigua, it

21   was operating control from Houston.  That's correct.

22   Q.    Okay.  And there was no meaningful management of those

23   activities in Antigua.  Correct?

24   A.    No.  Mr. Tolentino was a figurehead.  The fraud was run

25   out of Houston and out of Memphis.  That's correct.

```
 1   Q.   And so when you look at Mr. Davis' plea and

 2   Mr. Tolentino's involvement as Executive A, that's part of his

 3   figurehead role.  Correct?

 4   A.   Mr. Tolentino was responsible for misleading the Antiguan

 5   regulator who helped lie to the SEC.

 6   Q.   Okay.  So you have this gentleman who I think you said

 7   was awaiting extradition.  Is that right?

 8   A.   Leroy King is awaiting extradition for years.  That's

 9   correct.

10   Q.   Okay.  Lied to the SEC.  Correct?

11   A.   Yes, he did.

12   Q.   Certainly was not someone a reasonable investor could

13   expect, if you approached him and asked him questions, you'd

14   get the straight skinny.  Right?

15   A.   Mr. King lied.  That's correct.

16   Q.   Well, and if you were an investor approaching the

17   regulatory authorities, you would expect him to lie to you

18   just the same, wouldn't you?

19   A.   I would expect so.

20   Q.   And he was actually -- he was taking bribes, wasn't he?

21   A.   Yes, he was.  Stanford was paying him bribes out of a

22   secret bank account in Switzerland.

23   Q.   And there's no way anybody could detect money coming out

24   of a Swiss bank account being paid to a government official.

25   Correct?
```

```
 1    A.   Not until we took over as the Receivership.  That's
 2    correct.
 3    Q.   Because that's -- you could foot it, then, through the
 4    Swiss account and track where it went.  Right?
 5    A.   That's correct.
 6    Q.   The investment side of the business, or maybe the
 7    mis-investment might be a better term to use --
 8         Let me break it down.  There were funds that were
 9    actually invested.  A small amount.  Right?
10    A.   Yes, a small amount was invested.  That's correct.
11    Q.   And by small, we're talking still hundreds of millions of
12    dollars.  Right?
13    A.   It was hundreds of millions of dollars, but in comparison
14    to how much they had on deposit it was a small amount.
15    Q.   Okay.  And that small amount that was invested, those
16    investments were controlled through Mr. Davis and
17    Ms. Pendergest-Holt in Memphis.  Correct?
18    A.   That's correct.
19    Q.   Then the diversion of the rest of the dollars, that was
20    something that was controlled by the five people you mentioned
21    to Mr. Powers.  Correct?  The two accountants, Mr. Stanford,
22    Mr. Davis, and Ms. Pendergest-Holt.
23    A.   That's correct.
24    Q.   Those are the people at the top who knew what was going
25    on.  Correct?
```

1    A.    That's the people -- those are the people who were

2    indicted and went to prison.  That's correct.

3    Q.    And they're the only ones who have been indicted and went

4    to prison.  Correct?

5    A.    Except for Mr. King.  That's correct.

6    Q.    Well, yes.  Mr. King has not been indicted but not

7    imprisoned.

8    A.    Yes.  They're the only ones who have gone to prison.

9    That's correct.

10   Q.    Okay.  So, for example, Mr. Tolentino--no indictment.

11   Right?

12   A.    That's correct.  He's not been indicted.

13   Q.    Okay.  Now, those five people, in turn, lied to the

14   remainder of management in the company.  Correct?

15   A.    They did lie.  That's correct.

16   Q.    They concealed what they were doing from management.

17   Correct?

18   A.    They did conceal.  That's correct.

19   Q.    And by virtue of having lied to management, then, the

20   next step down, those financial advisors, they were all lied

21   to about what was going on.  Correct?

22   A.    They did lie to the FAs.  That's correct.

23   Q.    Okay.  And they lied to the Securities and Exchange

24   Commission when it would come in and conduct -- when it would

25   look at the company, without giving a formal label of what it

1    was doing.  Right?

2    A.    Yes.  They did lie to the SEC.  That's correct.

3    Q.    Okay.  These folks had no compunction about lying to

4    anybody.  Right?

5    A.    I think that's a fair statement.

6    Q.    And there wasn't anything you saw in all the books and

7    records you reviewed that they somehow were more truthful with

8    the Magness parties than they were with all those other folks.

9    Correct?

10   A.    I did not see -- well, I did not see that.  That's

11   correct.

12   Q.    Okay.  One of the things that kind of cemented your

13   investigation was Mr. Davis' plea.  Right?

14   A.    It certainly gave us a key fact to how things operated

15   and how Davis was responsible with Stanford in performing

16   certain actions.  Yes.  That's correct.

17   Q.    And you said key fact.  It gave you key facts, plural.

18   Correct?

19   A.    Definitely facts.  The plea agreement had a number of

20   facts in it.

21   Q.    Okay.  And those were facts that were crucial to the work

22   that you've done since then.  Correct?

23   A.    They are very important to our work.  That's correct.

24   Q.    And he was -- do I have the chronology correct that he

25   was the first of those five people to finally start telling

1    the truth in a way that was specific and concrete in the form

2    of that statement of facts in support of his plea?

3    A.   Either he did or Ms. Pendergest-Holt was about the same

4    time.  But he certainly came forward pretty quickly.

5    Q.   Well, Ms. Pendergest-Holt, her indictment was for lying

6    to the SEC.  Right?

7    A.   Obstruction of the SEC investigation.  That's correct.

8    Q.   And that had to do with the sort of the run-up to the

9    appointment of the Receiver.  Correct?

10   A.   Correct.

11   Q.   And then she continued to tell fairy tales afterwards.

12   Right?

13   A.   That's correct.

14   Q.   Now, when you refer to Mr. Tolentino as being a

15   figurehead, what he essentially did was -- his principal

16   functions were to market -- I'm going to give you a couple of

17   them, so I'm not giving you exclusive ones.  But were, for

18   example to make marketing pitches to investors.  Right?

19   A.   I agree with that.

20   Q.   He also was essentially the tour guide when you would

21   come to Antigua if you were either an existing investor or a

22   prospect?

23   A.   He was a meet and greet person.  That's correct.

24   Q.   Okay.  And he would occasionally go out and do roadshows

25   with folks.  Correct?

1    A.    Yes.   And he would go to the Top Producer Clubs and talk

2    to the FAs.   That's correct.

3    Q.    Okay.   The Top Producer Club we know is folks internal to

4    the 130 companies.   Right?

5    A.    The Top Producer Clubs were the FAs who worked for

6    Stanford Group Company who sold the CDs.

7    Q.    Okay.   So -- but externally -- let's look at his external

8    functions.

9    A.    Okay.

10   Q.    His external presentations were the three we just talked

11   about.   In addition, you heard him testify that when other

12   financial institutions would visit or conduct due diligence

13   with the bank, he was also the frontsman for that.   Right?

14   A.    That's correct.

15   Q.    And when Pershing would come and do its due diligence

16   because, as the clearing broker it needed to know what was

17   going on, he was also the frontman for that.   Correct?

18   A.    That's correct.

19   Q.    And he was not involved in making any of the investment

20   decisions.   Correct?

21   A.    No, but he was involved in assisting Davis and Stanford

22   in lying to the regulators.

23   Q.    Yes.   I -- he was lying through his teeth when he was

24   talking to anybody who was a regulator.   Right?

25   A.    Correct.

1    Q.   But in terms of actually deciding where the funds either

2    were applied in the couple of hundred million dollars, or

3    misapplied, he wasn't involved in that at all.

4    A.   No.  I don't think he had any decision-making in

5    investment authority.  That's correct.

6    Q.   Okay.  Well, you can't even say that he had any

7    involvement at the time in where those funds were going, be

8    they a proper purpose or an improper purpose.

9    A.   I don't disagree with that.

10   Q.   Now, in this case, you retained an expert witness as a

11   testifying expert who hasn't -- is not scheduled to testify.

12   Correct?

13             MR. POWERS:  Objection; 402, 403.

14             THE COURT:  Overruled.

15             THE WITNESS:  Are you talking about Mr. Post?

16   Q.   (BY MR. PETRIE)  I'm talking about Mr. Post.

17   A.   It's my understanding he was hired as an expert.  That's

18   correct.

19   Q.   Okay.  And you've looked at the materials that Mr. Post

20   prepared talking about his opinions, have you not?

21   A.   I did a while ago.  That's correct.

22   Q.   Okay.  And you did that because one of your duties as

23   Receiver is to stay on top of things that are happening in

24   this litigation.  Correct?

25   A.   That's correct.

1   Q.   You're the client of Baker Botts.  Right?

2   A.   I am the client.  That's correct.

3   Q.   And so you, at least in the past, have been familiar with

4   the opinions that Mr. Post provided.  Correct?

5   A.   Many, many months ago; not recently.  I haven't read it

6   in a long time.

7   Q.   Well, you know he had a negative opinion about the role

8   that Mr. Espy played in terms of whether he properly served

9   the Magness parties.  Correct?

10          MR. POWERS:  Objection, Your Honor; hearsay, 402,

11   403.

12          THE COURT:  Sustained.

13          MR. PETRIE:  May we approach?

14          THE COURT:  Yes.

15          (Discussion at the bench, out of the hearing of the

16          reporter.)

17   Q.   (BY MR. PETRIE)  Let's move on to a different topic.

18       You spoke with Mr. Powers about the letter that was

19   marked as 27.  That's the September '06 letter that talks

20   about the three offers or --

21   A.   Yes, I see that.  I remember the letter.

22   Q.   Okay.  The first one -- we've already talked some about

23   the rates.  Right?  We don't need to talk about that again.

24   Okay?

25       The second part, the second bullet that you discussed

```
 1    with Mr. Powers, what you told him was that if there was a

 2    stock sold from another entity, like HSBC, that Stanford Group

 3    Company would charge this commission rate?  Is that correct?

 4    A.    No.  I think it says in the language, what I meant to

 5    say, is that Stanford would charge a commission rate of one

 6    cent on all shares of the stocks listed below the Magness

 7    family holds, regardless of where there're held, whether it's

 8    at Pershing or Bear Stearns or HSBC.

 9    Q.    I see.  So you're making a distinction between the broker

10    who's selling versus the custodian who's actually holding the

11    shares.

12    A.    Yes.

13    Q.    Okay.  Then the third bullet point is the Mango Racing

14    deal that you discussed with Mr. Powers.  Correct?

15    A.    That's correct.

16    Q.    And the videos we saw.

17    A.    That's correct.

18    Q.    Okay.  And you're not aware of any benefits to the

19    Magness parties other than the $20,000, the sticker and the

20    fact that Mr. Espy was available to be a driver, at least at

21    some point, to the extent that's a gimme.

22    A.    And the benefit, if it's a benefit, of advertising in the

23    Stanford Eagle that Stanford sponsored the Mango Racing team.

24    I presume they put that in the Stanford Eagle for a reason.

25    Q.    Well, it wasn't Magness that put that in the Stanford
```

1    Eagle, was it?

2    A.    I understand that.  But it was a benefit to Stanford.

3    Q.    Okay.  And the benefit to Stanford from having that in

4    the Stanford Eagle doesn't generate benefit for the Magness

5    parties, does it?

6    A.    Not directly, no.

7    Q.    Well, and it doesn't do it indirectly either.

8    A.    That's probably correct.

9    Q.    Okay.  You wouldn't want to sponsor the Madoff racing

10   team today, would you?

11   A.    Absolutely not.

12   Q.    Now, you also talked some about the office that Mr. Espy

13   had in the same building as the Magness parties office.

14   Correct?

15   A.    I mentioned that briefly.  That's correct.

16   Q.    Okay.  And in your brief mention, you talked about how

17   something--and I'm just going to paraphrase--that they had an

18   office with Magness and shared a secretary.  Did I paraphrase

19   that correctly?

20   A.    No, what I think I said was Mr. Espy had an office at

21   Magness and his secretary -- Mr. Espy's secretary worked in

22   the office.

23   Q.    Okay.  Well, you don't have any idea how the physical

24   layout of the office was, except as you may have heard

25   testimony from others in this courtroom.  Correct?

1    A.    Yeah.  What I heard this morning from Mr. Espy is what I

2    know about how it supposedly worked.

3    Q.    Well, you also heard Ms. Dokken's testimony.  Correct?

4    A.    That's true.  And I believe I saw the lease agreement a

5    while ago as an exhibit.

6    Q.    Well, you know that that entire set-up--because you've

7    seen the books and records--was set up through the compliance

8    department of the Stanford Group Companies.  Correct?

9    A.    That's very standard.  That's correct.  To have an office

10   like that, it would have to be -- compliance would have to

11   approve it.

12   Q.    Because what you want to do is you want to make sure that

13   you still have the ability to properly supervise your

14   employees when you're a broker-dealer.  Correct?

15   A.    Yes.  The compliance department wants to make sure the

16   books and records are kept separately from Mr. Magness and

17   that the people who have access to those are people who are

18   properly licensed.

19   Q.    Okay.  And what you saw was an entire set of procedures

20   that were developed to ensure by the compliance people at

21   Stanford Group Companies to ensure that that satellite office

22   established in the Tabor Center was properly run and the books

23   were properly kept for whatever Stanford Group Companies

24   decided was appropriate.

25   A.    I have no reason to disagree with that.

1    Q.   Okay.  You also know that that office set-up ended before

2    the first CD was bought.  Correct?

3    A.   I don't know when it was ended.

4    Q.   You didn't look at the term for which that arrangement

5    was in place?

6    A.   Not sitting here today I could not tell you the term.

7    Q.   You didn't see any testimony that discussed that being

8    done by 2004?

9    A.   There may be some, but I've looked at so much testimony I

10   can't tell you that.

11            MR. PETRIE:  If I may have a moment, Your Honor.

12   Thank you.

13   Q.   (BY MR. PETRIE)  Last -- what I believe is the last

14   topic, there will be several questions, but last topic.

15        You told Mr. Powers that -- or you confirmed to

16   Mr. Powers what we all have been talking about, which is the

17   Magness parties were a significant client of the Stanford

18   International Bank.  Correct?

19   A.   Yes.  That's correct.

20   Q.   And you heard in opening that your lawyer said they were

21   the largest client, if you aggregated them, treated them as

22   one, so-to-speak, the largest North America client of that

23   institution.  Correct?

24   A.   I did hear that in opening.  That's correct.

25   Q.   Okay.  So you believe it.

1    A.    I certainly do believe it.

2    Q.    Okay.  You also understand that the Magness parties were

3    significant clients of the broker-dealer side of the house.

4    Correct?

5    A.    I do understand that.

6    Q.    They're what you call in the industry a whale.  Right?

7    A.    I'm not in the industry, but I've heard that term before.

8    Q.    Well, you represent the industry.  Right?

9    A.    I have people in the industry I represent.  That's

10   correct.

11   Q.    And the people in the industry that you represent, that's

12   a term they use.  Correct?

13   A.    Some brokers do, yes.  That's correct.

14   Q.    And that's a very large, important client.  Correct?

15   A.    That's correct.

16         MR. PETRIE:  Thank you, Your Honor.  Those are all

17   the questions I have.

18         MR. POWERS:  No further questions, Your Honor.

19         THE COURT:  Thank you, sir.  You may step down.

20         MR. SADLER:  Our next witness will be, Your Honor,

21   Mr. Ray Sutton.  We call Mr. Ray Sutton by videotaped

22   deposition, and we are prepared to start that at this time.

23         THE COURT:  All right.

24         MR. SADLER:  Thank you.

25

```
 1              RAYMOND SUTTON, BY VIDEOTAPED DEPOSITION

 2   Q.   Good morning, Mr. Sutton.

 3   A.   Good morning, Brendan.

 4   Q.   What's your profession?

 5   A.   I'm an attorney.

 6   Q.   But you view Gary Magness as a sophisticated investor?

 7   A.   He is the capable investor.  I don't really -- you know,

 8   I wasn't much involved with Gary's investment activities, so

 9   it would be presumptuous, I think, for me to comment on the

10   sophistication of his investment ability.

11   Q.   Now, let's hold on a second.  You were on the investment

12   committee with Gary Magness.  Right?

13   A.   I was.

14   Q.   So you have some knowledge about his investment

15   capability.  Right?

16   A.   I do, yeah.

17   Q.   And tell me about that.

18   A.   I sat with Gary on the investment committee for the

19   private trust company, but that committee made no investment

20   decision related to the Stanford CDs.  Those had been

21   purchased many years earlier, and were investments of the

22   trust when we created the private trust company.

23   Q.   And what is your view of whether Gary is sophisticated or

24   just capable?

25   A.   I would say he's capable.
```

1    Q.    Why do you draw that distinction?

2    A.    Because when you asked me to form a basis on that, I

3    think about advisors and family offices that I work with

4    across the country, and I can kind of categorize where they

5    fall in terms of investment acumen and what they bring to bear

6    in terms of advisors to the table, et cetera.

7    Q.    Okay.  And so where does Gary fall in that strata?

8    A.    Probably at the mid level.

9    Q.    So of your clients, you said Gary was kind of the middle

10   of sophistication of investments.  Right?

11   A.    Yes.

12   Q.    And tell me why you think that.

13   A.    If I was to say offices -- family offices A, B, and C

14   were very sophisticated, I would see an office of at least ten

15   people, one or more exclusively devoted to being a chief

16   investment officer.

17          Beneath that sort of apex there would be a family office

18   structure that relied on an independent investment company.

19   There's a handful of those around the country that are -- that

20   cater to high net worth, and they look at every investment

21   made by the family office, and they measure it and report on

22   the performance on a quarterly basis.  Those two models are a

23   level of sophistication beyond what Mr. Magness' office had.

24   Q.    Did you ever recommend to Mr. Magness or his office or

25   his entities that they should adopt a structure more like what

1    you're talking about?

2    A.    I can't recall that I ever gave a direct recommendation.

3    I would be asked to say what others is doing as benchmarking.

4    Q.    Uh-huh.  Do you recall ever having advised them to

5    increase their capabilities?

6    A.    No, not at a board meeting.

7    Q.    What about outside of a board meeting?

8    A.    I don't have an exact recollection of it.  For a number

9    of years after the private trust company was formed, there was

10   a very highly regarded -- I had a high record for Chuck Wilk,

11   who attended our board meetings and used to work with a high

12   net worth consulting firm based out of Seattle called Quellos,

13   which also ran a hedge fund.

14       Chuck's background, I think he was Fulbright Jaworski, he

15   was a tax lawyer.  And Quellos had assembled a consulting

16   group of tax lawyers from large firms and large accounting

17   firms, and Chuck's firm was hired, I believe -- I believe he

18   was hired shortly before Kim Magness died, and Kim would have

19   died in 2003.

20   Q.    Okay.

21   A.    And Chuck had sold it under a number of matters.  We

22   hadn't settled the estate tax controversy in Bob Magness'

23   estate.  We were going to need financing in order to close the

24   deal with the IR -- I mean, he just was involved in a number

25   of financial and investment related activities.

1    Q.    Including with the IRS, you said?

2    A.    He -- no, he was not involved with the IRS.  I mean,

3    that -- that was our firm.

4    Q.    Okay.

5    A.    But we knew we might have a financing need to settle with

6    the IRS.

7          We knew we were going to have a financing need to --

8    after Kim Magness died to -- we knew we were going to have to

9    have a financing need to, you know, pay the estate tax, clean

10   up the debt with the estate, and so Chuck was very involved in

11   dealing with the bankers at that.

12         And then when the estate of Bob Magness closed in 2005,

13   then Chuck continued with Gary on a number of matters.  And

14   Chuck and Gary would have, you know, conversations that I

15   wasn't a party to.  Tonya was very involved in those

16   discussions.  And usually there were finance and investment

17   related activities.

18   Q.    You said that you had a tremendous respect for Chuck

19   Wilk?

20   A.    I did.

21   Q.    Do you still?

22   A.    I do.

23   Q.    And what do you know about his involvement with the

24   federal sentencing?

25   A.    I know -- I know he spent some time.

```
 1   Q.    Where?

 2   A.    In jail.

 3   Q.    Federal or state?

 4   A.    I -- I think it was federal.

 5   Q.    And what was that in relation to?

 6   A.    I -- I think it was in relationship to the hedge fund and

 7   some aggrieved investors, but that's all I really know about

 8   it.

 9   Q.    In one of -- as you're an attorney yourself, one of your

10   primary areas that you practice in is tax.  Right?

11   A.    Right.

12   Q.    Did you know that Chuck Wilk was indicted for tax fraud?

13   A.    No.  I mean, I knew that Quellos was promoting some of

14   these tax shelters, but I didn't know the nature of the fraud

15   that Chuck was indicted on.  I know that from the Magness side

16   we never looked at any of those tax shelters.  He never

17   offered any.  At least to my knowledge he never offered any.

18   Q.    So you do know there were tax shelters involved.

19   A.    I do know Quellos generally had some tax shelters

20   involved.

21   Q.    And it was your understanding that that was part of why

22   he was sentenced to prison?

23   A.    Yes.

24   Q.    And so you knew he was sentenced to prison relating to

25   tax shelters.  Right?
```

1   A.   Right.

2   Q.   And I'm representing to you today that he was indicted

3   for tax fraud.

4        If those three things are true, do you still have a

5   tremendous respect for him today?

6   A.   Yes, I do.

7   Q.   Why is that?

8   A.   Because I think he was a high integrity guy, and I think

9   he may have erred in his judgment.  I don't know.  There are a

10  lot of good people that got involved in the tax shelter

11  business, including most of the Big 4 accounting firms, one of

12  which was pretty much brought down by it, KPMG.

13  Q.   But KPMG's still practicing today.

14  A.   Yeah, but they don't have a tax -- they don't have a

15  department anymore.  As part of their settlement on the tax

16  shelters that they promoted, they -- they had to abandon their

17  tax consulting business.

18  Q.   Does Quellos still exist?

19  A.   I don't know.  I haven't heard about Quellos for years.

20  Q.   If somebody came to you today and said I need -- I need

21  an investment advisor --

22  A.   Uh-huh.

23  Q.   -- would you ever consider recommending Chuck Wilk to

24  them?

25  A.   I would.

1    Q.    Would you tell them that he spent time in prison for tax

2    fraud?

3    A.    Yeah, I would, yep.

4    Q.    So you just absolutely trust Chuck Wilk, a guy who went

5    to prison for tax fraud.

6    A.    I trust his judgment.  The judgment that he exhibited at

7    the meetings that I attended was always spot on, I thought;

8    good analysis.  Never once did I hear in all the years that I

9    was in meetings with Chuck anything about a tax shelter.

10   Q.    Over the course of time when you were secretary for Mango

11   Five, when you created typed minutes --

12   A.    Uh-huh.

13   Q.    -- was there only ever one version of those minutes

14   before signature, or were there sometimes edits in additional

15   versions?

16   A.    The process would be that I would dictate the minutes

17   usually once after the meeting or weeks after the meeting as

18   the next meeting was approaching, and then those minutes would

19   be in draft form and they would be sent to Tonya.  And then if

20   she had any additional recollections that we wanted in the --

21   or if she had any corrections, then we would make them at that

22   point.  And then we would take them, obviously, to the board

23   and ask the board to comment on any minutes.

24   Q.    How long have you been an attorney?

25   A.    Since 1976.

1    Q.    And that was at which firm?

2    A.    That was -- my first two years I practiced in northern

3    Michigan in a small firm.

4    Q.    And you said there was insurance dispute issues?

5    A.    We, as small firm, did everything in a small town, and

6    we -- the partners represented insurance companies and auto

7    accidents, et cetera, and so the associates would do some of

8    the minor subrogation cases.

9    Q.    And then after that law firm where did you go?

10   A.    I moved with my wife, who was from Denver, and I met her

11   when I was at the University of Colorado law school, and moved

12   back to Denver in 1978, and took a year and a half to get a

13   tax degree, and then stayed in Denver after that.

14   Q.    You said a tax degree?

15   A.    Yes.

16   Q.    What is that?

17   A.    It's a Master's in tax.  It's a year study, year and a

18   half study, depending on if you have to work part time like I

19   did.

20   Q.    And so it's not a legal degree.  It's like a --

21   A.    No, it is a legal degree.  It's a Master's of law in

22   taxation.

23   Q.    What's your primary area of practice?

24   A.    Primary is tax, and when I say tax it's really trust and

25   estate planning.

1    Q.   Anything else?

2    A.   No.

3    Q.   And how long has that been you primary area of practice?

4    A.   Probably since -- well, primary, it's been my primary

5    area really since 1981 or '82.

6    Q.   What investment experience or training do you have?

7    A.   None.

8    Q.   You have no investment experience?

9    A.   I manage my own investments.  Sometimes that's a good

10   experience and sometimes it's not.

11   Q.   Have you received any training on investments?

12   A.   No.

13   Q.   But you did sit on the investment committee of Mango

14   Five.

15   A.   Yes.

16   Q.   Do you sit on any investment committees of any of the

17   other family offices that we talked about earlier?

18   A.   No.

19   Q.   So that was the one exception on investments?

20   A.   Yes.  I did chair the investment committee for a

21   non-profit, Metropolitan State College, for a handful of

22   years.

23   Q.   Did they provide you with any training?

24   A.   No.

25   Q.   So earlier when we were talking about the Magness parties

 1   and Gary Magness' capability of investments, that's based off

 2   of your role with other family offices?

 3   A.   Yes, and experience.

 4   Q.   But you didn't sit on any investment committees for any

 5   of those other offices?

 6   A.   No.

 7   Q.   And you have no investment training or experience?

 8   A.   No.

 9   Q.   So what is the basis of your statement that Gary is

10   capable but not sophisticated when it comes to investments?

11        You can answer.

12   A.   I can answer?

13   Q.   Yeah.

14   A.   What is my basis on that?  In my experience on investment

15   committees for non-profits, investment committees for family

16   offices, it's not typical that you would have that populated

17   with a majority, let's say, who have deep investment

18   credentials and experience.  You hire those people.

19        So, for example, if you have an investment committee of

20   family members and a few outside advisors, then you hire

21   investment consultants, and it's a process of going through

22   and vetting the different alternatives that are available.

23        And so when I say that Mr. Magness was capable but he

24   didn't approach the sophistication of some of my other

25   clients, it's because some of my other clients went through a

```
1    vetting process and they would actually have an investment

2    consulting firm that would be on retainer with the office.

3    Q.   What vetting process are you talking about?

4    A.   Interviewing.  A recent example, a large client, we over

5    a period of probably six months vetted five to six different

6    investment management firms that actually came to the family

7    office and made, you know, a several-hour presentation apiece.

8    I mean, that's the sort of vetting that I would put in the

9    category of a sophisticated investment process.

10   Q.   So it's the vetting process that -- that Magness was

11   missing?

12   A.   It was the openness to having a vetting process.

13   Q.   So he was -- he, they, meaning the Magness parties,

14   weren't open to the idea of having a vetting process for an

15   outside investment advisor?

16   A.   It was never considered.

17   Q.   What about Chuck Wilk?  How does he fit into this?

18   A.   Well, Chuck became sort of the lead voice in the

19   investment -- in the investment world.  I mean, he was the

20   voice of people, because he was -- I mean, I don't know that

21   he was, you know, a certified planner.  I don't know what his

22   credentials were.  But in his capacity as a member of the

23   Quellos -- I don't know if he was a principal of Quellos or if

24   he was just a key employees, but in that capacity I would say

25   that his primary duties were -- where if my primary duties are
```

```
 1    trust and estate planning, his primary duties were dealing

 2    with investments.

 3    Q.    So Gary Magness had an advisor on investments.  Right?

 4    A.    Yes.

 5    Q.    There just wasn't a vetting process.

 6    A.    Right.

 7    Q.    And he also had outside brokers advising him as well?

 8    A.    He did.

 9    Q.    And he also had investment committee advising him.

10    Right?

11    A.    Right.

12    Q.    And would you say that Gary Magness is intelligent?

13    A.    Yes.

14    Q.    And capable of understanding investments?

15    A.    Yes.

16    Q.    Risks --

17    A.    Yes.

18    Q.    -- in those investments?

19    A.    Yep.

20    Q.    Rewards of investments?

21    A.    Yes.

22    Q.    Would he have an understanding of what stocks are?

23    A.    Certainly.  I mean, that's primarily --

24    Q.    Certificates of deposit in the U.S.?

25    A.    I don't know if he had an understanding of that or not,
```

```
 1    to be honest with you.  I don't recall that I ever saw a

 2    certificate of deposit -- a U.S. certificate of deposit in

 3    Gary's investment.

 4    Q.   But you know what U.S.-based certificates of deposit are.

 5    A.   Yeah.  And I'm sure he knows what that is.

 6    Q.   I'm not asking if he had  one or not.

 7    A.   Yeah.

 8    Q.   I'm just saying he can understand what they are.

 9    A.   Oh, yeah.

10    Q.   And he can understand what a hedge fund is.

11    A.   Yes.

12    Q.   And he can understand what a private equity investment

13    is.

14    A.   Yeah.  I would say yes.  I mean, his data center, for

15    example, is a private equity investment.

16    Q.   And his advisors that he had, Wilk or otherwise, would

17    certainly understand those concepts --

18    A.   Certainly.

19    Q.   -- that we just talked about?

20    A.   Right.

21    Q.   And all those advisors, were they just advising Mango

22    Five, or were they advising Gary and his -- his entities?

23    A.   I -- I would say they were advising Gary and his

24    entities.

25    Q.   So on the sophistication front, I just want to make sure
```

```
 1    I understand your full testimony, that what differentiated

 2    Gary from being capable to sophistication was the retention

 3    through a vetting process of investment advisors.

 4    A.    Yes.

 5    Q.    Anything else?

 6    A.    No.

 7    Q.    And as a member of the investment committee, which you

 8    were.  Right?

 9    A.    Right.

10    Q.    For Mango Five?  You have a fiduciary duty to Mango Five.

11    Right?

12    A.    Yes.

13    Q.    And did it ever concern you that Mango Five and

14    Mr. Magness' entities or himself were not sophisticated enough

15    to understand investments?

16    A.    No.

17    Q.    Do you advise clients yourself on investment matters?

18    A.    No.

19    Q.    Not even in your capacity as being involved with either

20    on the board or as an attorney for those other family offices?

21    A.    Let me tell you what I do do and maybe that will help

22    you.  I do not give investment advice for compensation because

23    I'm not a registered investment advisor.  What I do provide my

24    family offices is a prospective of what other family offices

25    are doing in terms of best practices, and I can recommend any
```

1    number of potential investment advisors for them to interview

2    and vet.  So that's what I do.  If that's investment advice --

3    Q.   Did you ever do any of what you just testified about with

4    respect to Gary Magness or his entities?

5    A.   So long as Chuck Wilk was the principal advisor in sort

6    of the investment arena, no.

7    Q.   So you were satisfied that Gary Magness and his entities,

8    including the Magness parties, had the resources they needed

9    to be sophisticated investors.

10   A.   Unquestionably they had the resources.

11   Q.   What your understanding about insolvency?

12   A.   My understanding is that the balance sheet test,

13   liabilities exceed assets on a balance sheet test.  I only

14   know that from the tax standpoint, because there's an

15   insolvency exception when debt is discharged to a debtor, and

16   that is generally income when there's debt discharged.  But

17   there are two or three exceptions to the general rule that

18   that debt has to be taken into income, one of which is

19   bankruptcy, and the other of which is insolvency.  And I have

20   dealt with that probably half a dozen times in my career.

21   Q.   And I believe you told me earlier that you were managing

22   partner of the Denver office of Baker Hostetler?

23   A.   I was, uh-huh.

24   Q.   And you stepped down from that when?

25   A.   In December 31st of 2015.

1    Q.    And the reason for that was what?

2    A.    Turned out by age.  I turned 64 in October, and our

3    partnership agreement requires our partners to step out of the

4    equity at 64, and, hence, you have to be an equity partner in

5    order to be a managing partner.

6    Q.    Did you ever tell Gary Magness that you were no longer a

7    partner at Baker Hostetler?

8    A.    No.

9    Q.    So if he testified that you were no longer a partner

10   there, he was just wrong?

11   A.    He must -- might have misunderstood a communication I had

12   with him.

13   Q.    What did you tell him about your partnership?

14   A.    I didn't have a conversation with him.  I had an email

15   where I resigned my positions in December.  I can't recall

16   what I said, other than I was transitioning and I'm getting

17   down to a handful of clients and I'm transitioning.

18   Q.    And you sent that to whom?

19   A.    I would have sent that to Gary and Steve and Bob

20   Armstrong.

21   Q.    So you resigned from being director --

22   A.    Right.

23   Q.    -- on Mango?

24   A.    Right.

25   Q.    And you resigned from being on the investment committee

1    of Mango?

2    A.    I wasn't on the investment committee at that point.

3    Q.    When did that change?

4    A.    There was a change in the bylaws early on after the

5    formation of the private trust company where the bylaws were

6    amended to provide that Gary could serve as the sole member of

7    the investment committee and that he could appoint advisors.

8    So at that point in time Steve and I were advisors on the

9    investment committee.  And maybe Armstrong.  I can't recall if

10   he's an advisor on the investment committee.  He is -- I don't

11   know if he's on the distribution committee either.  But the

12   bylaws changed, which you probably have.  You should have the

13   bylaws of the private trust company.

14   Q.    When did that happen?  I do have bylaws, but I don't know

15   about this amendment that you're talking about.

16   A.    The amendment happened within a year or two of the

17   formation of the private trust company.

18   Q.    And go through that.  But in any case, you were at times

19   a member of the investment committee?

20   A.    I was.

21   Q.    And you were at times an advisor to the investment

22   committee?

23   A.    Right.

24   Q.    So you were an investment advisor to the investment

25   committee?

```
 1   A.   Right.  I was an -- well, I wouldn't say I was an

 2   investment advisor.  I was an advisor to the investment

 3   committee.

 4   Q.   Okay.  When did you stop being an advisor to the

 5   investment committee?

 6   A.   That would have been coterminous with my resignation in

 7   December as the director.  And I was a member of the

 8   distribution committee at that time, and I resigned that

 9   position as well.

10   Q.   So you were an attorney for Gary Magness and his

11   affiliated entities.  Right?

12   A.   Right.

13   Q.   When did that representation cease?

14   A.   In the middle of December.  I mean, I resigned all

15   relationship with the Magness entities at that point.

16   Q.   And why did you do that?

17   A.   I was giving a lot of thought in December as to which

18   clients that I was going to continue on after the first of the

19   year, and I had some criteria in mind.  And given that

20   consideration, it just didn't make sense for me to continue.

21   Q.   Now, you know I can't just let you say criteria without

22   saying what criteria, so tell me about the criteria.

23   A.   Well, the fun factor, the people I was working with

24   within the client.

25   Q.   You say the fun factor?
```

1    A.    Yeah.  I like -- I like to enjoy my clients.  I like -- I

2    particularly enjoy working with people in the family offices

3    that I represent.  And I knew I was going to have to get down

4    to a smaller number of clients because I'm working a fairly

5    reduced schedule these days.  My typical year was in excess of

6    3,000 hours, and I'm down to about a thousand hours.

7    Q.    So you've got the fun factor, and you've got a need to

8    reduce the number of clients.

9    A.    Uh-huh.

10   Q.    What were your other criteria?

11   A.    Just, you know, the time commitment it was going to take,

12   the -- you know, the enjoyment of working with the people that

13   were surrounding the client.  I mean, there's only -- you

14   know, when you work with these type of clients, there's

15   usually 5 to 15 people that you're working with.

16   Q.    Was there anything about this fun factor that made you

17   drop Gary Magness and his entities as a client that had

18   anything to do with Stanford?

19   A.    No.

20   Q.    This litigation?

21   A.    No.

22   Q.    When we talked earlier about your resignation as a board

23   member, advisor, and member of the distribution committee.

24   Right?

25   A.    Correct.

```
 1    Q.    And then you also terminated the attorney/client

 2    relationship between all Gary Magness entities and him.

 3    Right?

 4    A.    Yes.

 5    Q.    Why -- if I understood your testimony earlier, after

 6    Tonya Dokken resigned, you saw most of those responsibilities

 7    probably going to be handed to you.  Right?

 8    A.    No.  No.

 9    Q.    Okay.

10    A.    Those responsibilities are unique to running the family

11    office, and they were going to need to -- they were going to

12    need to replace her at that level.  But whoever was going to

13    come in at that point in time was going to have to draw more

14    time from me because I was the only one left with any of the

15    20-year history.

16    Q.    Okay.  And so I see you having the -- you wear the

17    attorney hat at times and you wear the board member hat at

18    times.  Right?

19    A.    Right.

20    Q.    You wear the advisor hat at times.  Right?

21    A.    Yeah.

22    Q.    The investment committee?

23    A.    Yeah.  Yeah.

24    Q.    You wear the distribution committee member hat sometimes.

25    A.    Uh-huh.
```

1   Q.   Why terminate your attorney/client relationship instead

2   of just terminating your relationship with Mango Five as a

3   board member, advisor, and investment committee member?  I

4   mean -- I'm sorry.  Distribution committee member.

5   A.   It -- it -- they all went together.  I don't know how you

6   could reasonably separate it.  I mean, you can't be part in

7   and part out.

8   Q.   So he's in control of Magness Securities.

9   A.   He's in control, yeah.

10  Q.   And he's in control of GMAG?

11  A.   Yes.

12  Q.   Is he also in control of Gary Magness Irrevocable Trust?

13  A.   Revocable.

14  Q.   Irrevocable trust.

15  A.   Irrevocable?  No.

16  Q.   Who's in charge of that one?

17  A.   Mango Five Family, Inc. is the trustee.

18  Q.   All right.  Let's go to the Mango Five Family, its board,

19  its role, the committees.  We already talked about some of it.

20  But just from broad perspective, what -- what is the purpose

21  of Mango Five Family, Inc.?

22  A.   It is stacked as a private family trust for the Magness

23  family.

24  Q.   And when you say Magness family, what does that

25  encompass?

```
 1   A.    It means Gary, his wife, and their descendents, and

 2   future descendents.

 3   Q.    What about other relatives of Gary?

 4   A.    No.

 5   Q.    So that's when the relationship between you and Gary

 6   Magness started?

 7   A.    I was -- I was -- I was interviewed by Gary and Kim

 8   within a month of their father's death.  His father -- their

 9   father died in November of '96.

10   Q.    Okay.

11   A.    I was interviewed at the recommendation of one of the law

12   firms in town here who represented John Malone and TCI.

13   Q.    Prior to that interview in late 1996, had you ever

14   interacted with Gary Magness?

15   A.    No.

16   Q.    Kim Magness?

17   A.    Nope.  Didn't know them.  Didn't know Bob Magness.

18   Q.    Had you heard of them, though?

19   A.    Oh, yes.  I mean, I -- I knew that Bob Magness was a rich

20   guy, but that was it.  I always thought John Malone was the

21   driver of TCI, and so I was surprised when I was interviewed

22   and then engaged that Bob Magness actually was a more

23   substantial shareholder than John Malone.

24   Q.    So in that either that initial interview or early in your

25   relationship with Gary Magness and Kim Magness and the
```

1    entities and the estates, when was Stanford first discussed?

2    And when I say Stanford, I mean broadly either Stanford

3    International Bank, Stanford Group Company, Allen Stanford,

4    any of that kind of big umbrella of the Stanford organization.

5    A.   It was never discussed, in my presence anyway, when Kim

6    was alive, and Kim died in 2003.  And before Kim's death I

7    probably spent -- you know, if I was -- if I -- I was probably

8    spending 1500 a year just on the Magness representation in

9    those years, and I would tell you probably 75 percent of those

10   hours were with Kim.

11   Q.   Okay.

12   A.   Okay?  It was only at Kim's death that I started really

13   working closely with Gary.  And the reason for that was that

14   -- that Kim was -- was a board member of TCI, and so the stock

15   of Liberty and TCI was really kind of in his sphere of

16   influence, and Gary was in charge of the ranches.

17   Q.   Okay.

18   A.   And my -- my task was, you know, over here, which was the

19   stock and watch that.  I -- I didn't know anything about the

20   ranches really.

21   Q.   Was -- is -- was Kim older than Gary, or vice versa?

22   A.   By a year or two.

23   Q.   Okay?

24   A.   Kim was a year or two older.

25        So on Stanford, when Kim died, you know, now we've really

1    got a lot going on, because we're right in the middle of the

2    estate of Bob in the heat of an estate tax examination.  There

3    was a lot of debt in the estate at the time.

4        And I didn't hear of Stanford -- as best I recall, I

5    never heard of Stanford until the private trust company was

6    formed.  That was a -- an investment that Gary did with Tom,

7    and would have done it with Tonya's knowledge.  I only became

8    aware of it when we formed the private trust company and I

9    became an investment committee member, and we were going to

10   review all of the investments of the trust to determine, you

11   know, what assets should be retained.  And that's what a

12   trustee does on an annual basis is it reviews your portfolio

13   and makes decisions to retain or dispose.  And so that's the

14   first that I recall I became aware of the Stanford CD.

15   Q.   And so when you became aware of the Stanford CD, as scope

16   of the trustee you don't decide whether to retain or dispose

17   of assets.

18   A.   Right.

19   Q.   And so what -- what questions did you ask about the

20   Stanford CD when you first heard about it?

21   A.   The questions that -- that I raised concerned the

22   transparency of the investment.  One of my family offices

23   that's larger than the Magness had counseled me for years --

24   they never invested in hedge funds.  And I wondered why,

25   because back then hedge funds were kind of somewhat of the

1    rage.  And the answer was lack of transparency.  So I kind of

2    had a criterion of what is the transparency of this

3    investment.

4        The second thing that I observed was that I thought it

5    was a disproportionately large investment given the holdings.

6    Q.   What do you -- what do you mean by

7    that--disproportionately large investment given the holdings?

8    Whose holdings?

9    A.   Well, I was concerned with the trust.

10   Q.   Okay.

11   A.   I mean, that was my responsibility.  And I was being

12   becoming a fiduciary for the trust.  And I took that job very

13   serious.  I mean, I've been involved in unforeseen charges

14   against trustees years later when you think everything's

15   copacetic and somewhere along the line, let's say, there's a

16   divorce, and one of the kids brings an action against the

17   trustees who now include me, or as director of the private

18   trust company, for an imprudent investment.  So I took it very

19   seriously.

20   Q.   So you had an incentive to ask a lot of questions about

21   the Stanford International Bank CD.

22   A.   I had a lot of incentive to ask a lot of questions about

23   it.

24   Q.   And you did ask a lot of questions about it?

25   A.   I did ask a lot of questions about it.

1    Q.   So you mentioned transparency, the disproportionately

2    large investment given the trust's holdings.

3    A.   Right.

4    Q.   What other questions did you ask?

5    A.   I didn't necessarily ask -- I mean, Chuck Wilk was doing

6    a lot of the labor on this.

7    Q.   On what?

8    A.   On the Stanford investment.

9    Q.   What aspects of the Stanford investments?

10   A.   I think his reservations were registered at the meetings.

11   Q.   So Chuck Wilk had reservations about the Stanford

12   International Bank CD?

13   A.   Certainly what lack of transparency.  We had no idea what

14   this was.

15   Q.   So Chuck Wilk had reservations about the transparency of

16   the --

17   A.   About the lack of information at that point in time about

18   what it was, and he wanted to drill down into it.

19   Q.   Okay.  So at that point when -- right after the Mango

20   Five committee is formed or the Mango Five entity is formed --

21   A.   Right.

22   Q.   -- Chuck Wilk has reservations about the SIB CD.

23   A.   Oh, I don't know what the timing of.  I mean, right

24   after -- I don't know.  But I do know in meetings we -- we --

25   we looked at the Stanford investments at every meeting.

1    Q.   What other -- so you had concerns about the transparency?

2    A.   Uh-huh.

3    Q.   Did you also have concerns about the transparency?

4    A.   Oh, yeah.  I had concerns about the transparency, and I

5    had concerns about the magnitude of the investment.

6    Q.   And we're talking about the investment being the SIB CD.

7    A.   Right.

8    Q.   So the magnitude, the transparency.  What other

9    reservations or concerns did you have about the SIB CD?

10   A.   Tom Espy.

11   Q.   What else?

12   A.   That was it.

13   Q.   So when you first became aware of the SIB CD, you had

14   three issues--transparency, the magnitude of the investment,

15   and Tom Espy.

16   A.   Right.

17   Q.   What about Chuck Wilk?  What reservations or concerns did

18   he express?  You mentioned transparency.  What else?

19   A.   Beyond that, I -- I can't recall what his reservations

20   are, and I don't want to, you know, speak for him on that.

21   Q.   But you know that one of his reservations was the

22   transparency of the SIB CD.

23   A.   I may be imposing a word on him --

24   Q.   Sure.

25   A.   -- but I think it was trying to get our arms around what

1    this thing was.

2    Q.   Because the information you had available at that time

3    was inadequate?

4    A.   Well, the only information we had was the CD.

5    Q.   What about Ms. Dokken?

6         MR. SADLER:  This still has a ways to go, Your

7    Honor.

8         THE COURT:  Okay.

9         MR. SADLER:  So it might be a good time to break.

10        THE COURT:  That sounds like a good time.

11   So don't come down Monday.  We'll be closed.  As far as

12   I'm concerned, though, you're still on jury duty Monday, so

13   take from that whatever you want to.

14        This is unrelated to the case, but I just feel compelled

15   to say this.  Go Cowboys.  I'll be watching.

16        So have a very pleasant long weekend.  Come back

17   refreshed.

18        We're getting closer to the end.  I think -- checking

19   with the lawyers, I think we're still pretty much on schedule

20   to get the case to you Wednesday.

21        So, as I say, have a great weekend.  We'll see you

22   Tuesday at 9:00.

23            (Whereupon, the jury left the courtroom.)

24            THE COURT:  Do you-all have the Receiver's share of

25   Espy handy?

```
 1            MR. SADLER:  I think I do.  If Your Honor will give

 2    me just a moment.

 3            MR. SADLER:  I apologize.  I had it in email, Your

 4    Honor.

 5            MR. PETRIE:  Your Honor, we have -- looking at total

 6    both days, we had 143 for the Magness parties, 67 for the

 7    Receiver.

 8            MR. SADLER:  And that's exactly what we had.

 9            THE COURT:  Minus 67 and plus 67.

10            MR. SADLER:  67 minutes for the Receiver, 143

11    minutes for the Magness Defendants.

12            THE COURT:  Okay.

13            MR. SADLER:  We have one exhibit also we have to

14    offer.

15            THE COURT:  Go ahead.

16            MR. SADLER:  Plaintiff's 470.  It was one of the

17    documents discussed during Mr. Janvey's testimony, and it

18    looks like it just never got on the stip, so we offer

19    Plaintiff's 470.  It's the rate thing.

20            MR. PETRIE:  No objection to the rate chart.  Thank

21    you, Your Honor.

22            THE COURT:  It's admitted.

23        My timing on the depos may be a little bit different than

24    yours, because to the extent there is slippage, I'm charging

25    that against the party calling the witness by depo, and I'm
```

1    just subtracting the share of the other party from whatever

2    the time was actually on the clock according to my clock.  It

3    should be pretty consistent, but if there are technical issues

4    and you can't get it to run for a couple of minutes, that's

5    your problem, not mine.  I'm going by the clock as opposed to

6    the numbers you-all have agreed to, except I'm subtracting out

7    the amount you say is the opposing party's.

8         I've looked at your numbers and compared them to my

9    numbers, and I think there are a couple of potential issues.

10   One is that, as I told you, I do this like a chess clock, and

11   when one side says pass the witness, their time stops and the

12   other time starts.  So I was -- it's not when the lawyer gets

13   to the podium and asks the first question.  It's when the side

14   says pass the witness.  So I was seeing probably on half of

15   the blocks you-all were running one minute short relative to

16   mine.

17        MR. SADLER:  I see.  I see.

18        THE COURT:  And, you know, over the course of the

19   day that may add up to six or seven minutes.

20        The other thing where I found the only significant

21   difference was on Bell direct.  And I think I know what the

22   issue is.  Bell had 50 minutes before lunch and 7 minutes

23   after lunch, and you guys show the direct as 49, and I think

24   what happened is you didn't include the 7 minutes after lunch.

25   Because your 49 is pretty consistent with my 50 before lunch,

 1   but in the aggregate you're nine minutes short.

 2          MR. SADLER:  We had -- for Bell we had 49

 3   Defendants' direct, 53 Plaintiff cross, 6 minutes redirect.

 4          THE COURT:  Yeah.  And what I'm telling you, what I

 5   have for Bell direct is 50 minutes before lunch, which matches

 6   up pretty well with your 49 --

 7          MR. SADLER:  I see.

 8          THE COURT:  -- and 7 minutes after lunch, which I

 9   think you-all just forgot.

10          MR. SADLER:  Oh, okay.

11          THE COURT:  So when you add all those up, there's a

12   16-minute difference between my tally and your tally.

13          MR. SADLER:  If I may ask, what does Your Honor have

14   the total through the end of the day yesterday?

15          THE COURT:  Total total?

16          MR. SADLER:  Well, for each side, obviously.

17          THE COURT:  I think I mentioned this.  I show

18   Magness at 757 and Receiver at 441, although --

19          MR. SADLER:  Those are minutes?  I apologize.

20          THE COURT:  Minutes.

21          MR. SADLER:  757 and then 441.

22          THE COURT:  Yep.  The 757 may be a little bit high,

23   because I haven't deducted the Espy time for the Receiver.

24          MR. SADLER:  On that last little bit?

25          THE COURT:  On that last little bit.

1           MR. SADLER:  I see.

2           THE COURT:  But it will come off on today's total.

3           MR. SADLER:  Understood.

4           THE COURT:  In other words, some of the 67 minutes

5    for the Receiver may well have been in the half hour at the

6    end of the day Thursday, but I don't know how to allocate the

7    67 between Thursday and Friday, so I'm just taking it all off

8    on Friday, but the net bottom line should be the same.

9           MR. SADLER:  And I apologize, Your Honor.  757

10   minutes for the Defendants, 441 minutes for the Receiver?

11          THE COURT:  Correct.  And as I say, you-all are

12   welcome to look at my time sheet whenever you want.

13       And I'll be happy to return your time sheet to you.

14       Anything else we need to take up today?

15          MR. SADLER:  No, Your Honor.

16          THE COURT:  Okay.  Enjoy the weekend, and we'll see

17   you Tuesday at 9:00.

18          MR. SADLER:  Yes, sir.  And we anticipate a formal

19   charge conference sometime Tuesday afternoon?  Was that the

20   timing?

21          THE COURT:  Yeah.  Are you going to take up all day

22   Tuesday?

23          MR. SADLER:  So we have about an hour and 40-ish

24   minutes of Mr. Sutton, and then we have the direct and, of

25   course, the cross of Van Tassel, and then that's all the

 1    Receiver has.

 2           THE COURT:  Are the Magness folks contemplating any

 3    rebuttal.

 4           MR. PETRIE:  Not at present, but they have a fair

 5    piece to go yet.

 6           THE COURT:  Understood.

 7           MR. SADLER:  I certainly think the evidence will end

 8    by the afternoon.

 9           THE COURT:  Yeah, that's what it sound like.  And I

10    would anticipate as soon as the evidence ends that we'll have

11    an informal charge off the record, and then when we're done

12    with that we'll go back on the record and do that and be ready

13    to argue first thing Wednesday.

14           MR. SADLER:  Understood.

15           THE COURT:  Anything else?

16           MR. SADLER:  Not from the Receiver.

17           MR. PETRIE:  No, sir.  Thank you.

18           THE COURT:  Have a good weekend.

19           MR. SADLER:  Thank you.

20           MR. PETRIE:  Thank you, Your Honor.

21           (The proceedings were concluded at 5:07 p.m.)

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              01/14/2017

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX G

1

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3   RALPH S. JANVEY, IN HIS        (  CAUSE NO. 3:15-CV-401-N
     CAPACITY AS COURT-APPOINTED    )
 4   RECEIVER FOR THE STANFORD      (
     INTERNATIONAL BANK, LTD.,      )
 5   et al.,                        (
               Plaintiff,           )
 6                                  (
     vs.                            )
 7                                  (
     GMAG LLC, MAGNESS SECURITIES   )
 8   LLC, GARY D. MAGNESS, and      (
     MANGO FIVE FAMILY, INC., IN    )
 9   ITS CAPACITY AS TRUSTEE FOR    (
     THE GARY D. MAGNESS IRREVOCABLE)  DALLAS, TEXAS
10   TRUST,                         (  JANUARY 17, 2017
               Defendants.          (  9:00 A.M.
11   _____

12

13                             VOLUME 6

14

15   _____

                         TRIAL ON THE MERITS
16
                BEFORE THE HONORABLE DAVID C. GODBEY
17                  UNITED STATES DISTRICT JUDGE
                            and a jury
18   _____

19

20

21

22              SHAWN M. McROBERTS, RMR, CRR
                1100 COMMERCE STREET, RM. 1654
23                 DALLAS, TEXAS  75242
                      (214) 753-2349
24

25
</pre>

1

A P P E A R A N C E S

2

FOR THE PLAINTIFFS:    BAKER BOTTS, LLP
3                                              98 SAN JACINTO BOULEVARD
                                               SUITE 1500
4                                              AUSTIN, TEXAS   78701-4039
                                               (512) 322-2678
5                                              BY:  MR. KEVIN SADLER
                                                    MR. SCOTT POWERS
6                                                   MR. BRENDAN DAY
                                                    MS. ASHLEY CARR
7

FOR THE DEFENDANTS:    BALLARD SPAHR, LLP
8                                              1225 SEVENTEENTH STREET
                                               SUITE 2300
9                                              DENVER, COLORADO 80202-5596
                                               (303) 292-2400
10                                             BY:  MR. ANDREW PETRIE
                                                    MS. RACHEL MENTZ
11

                                               DYKEMA COX SMITH
12                                             1201 ELM STREET, SUITE 3300
                                               DALLAS, TEXAS   75270
13                                             (214) 698-7800
                                               BY:  MR. DAVID BRYANT
14

OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
15                                             1100 COMMERCE STREET, RM. 1654
                                               DALLAS, TEXAS   75242
16                                             (214) 753-2349

17

18

19

20

21

22

23

24

25

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| RAYMOND SUTTON | |
| KARYL VAN TASSEL | |
|     Direct By MR. SADLER........................................... | 92 |
|     Cross By MR. PETRIE........................................... | 216 |

**EXHIBITS**

| **Exhibit** | **Page** |
|---|---|
| No. 85 Entered into Evidence | 175 |

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
 1              P R O C E E D I N G S

 2                  JANUARY 17, 2017

 3          THE COURT:  Good morning.  I understand you-all

 4  think you have something you want to talk about?

 5          MR. SADLER:  Just first, Your Honor, we're -- we

 6  need another moment to solve a computer communicating with the

 7  projector problem, but we've almost got that solved.

 8      The second is a scheduling question or issue.  We've got

 9  about an hour and 55 minutes of this videotaped deposition,

10  and then we have Ms. Van Tassel, and then of course the

11  Receiver will rest at that point.  We have cut back

12  substantially what we plan to do with Ms. Van Tassel, and we

13  anticipate that even with their cross, we'll probably be

14  through with the evidence right around 3:00.

15      And so the question is, would Your Honor like to get this

16  case to the jury today.  We'd be happy to do it.

17          THE COURT:  I don't think so --

18          MR. SADLER:  All right, sir.

19          THE COURT:  -- unless -- unless everybody thinks the

20  charge is almost perfect like it is.

21          MR. SADLER:  We have a couple of minor questions

22  about it, but, you know, we're only talking about one question

23  so I'm not sure how long that would necessarily take us.

24      We've got some comments these aren't our formal -- but if

25  Your Honor would care to review them, I'm happy to hand them
```

1    up.

2              THE COURT:  Sure.

3              MR. SADLER:  A copy for counsel.

4              THE COURT:  You know what I think is probably

5    better, even if the charge is practically perfect, is to send

6    the jury home and argue first thing in the morning.  Because

7    when you argue at 3:00, they hear the argument and go home and

8    then come back, and then they may have forgotten all of what

9    you wanted to say.

10             MR. SADLER:  I just wanted to make Your Honor aware

11   of that so we'd have the option but certainly understand.

12             THE COURT:  You guys get a vote, too.

13             MR. PETRIE:  I vote with you.

14             THE COURT:  Okay.  All right.  Are we ready to go?

15             MR. PETRIE:  It's two matters that are interrelated,

16   and they relate to Mr. Sutton, what we're going to be viewing

17   this morning.

18        We had spoken some last week about proposed instructions.

19   You gave us your initial inclination as to how you were

20   inclined to proceed, but I don't think we ever got your final

21   take on how you wanted to deal with that.

22             THE COURT:  Yes.  What I propose to do is read the

23   first four sentences of the Receiver's proposed instruction,

24   which I think tracks very closely with your proposed

25   instruction.

```
 1            MR. PETRIE:  So -- okay.  I understand, Your Honor.

 2       The second question then related to that is actually how

 3   we then feather in the errata, because we did some further

 4   research on this, and this Court in the Riley versus TXU case,

 5   and I have these cases if you'd like me to hand them up,

 6   followed the Northern District of Illinois which essentially

 7   directs you have an in-line process where you have the errata

 8   inserted with the question.

 9       Obviously, it becomes a little more of a mechanical

10   challenge when we're talking about a videotape which is not --

11   does not have accompanying videotaped errata.  The errata are

12   done in the old school way, you know, a sheet attached to the

13   back of the deposition.

14            THE COURT:  If you think you can stop and do it in

15   line, that's fine with me.  I think that's likely to be just

16   physically challenging.

17            MR. PETRIE:  Well, I mean, I think it's really a

18   question of then someone will have to then read the corrected

19   statement into the -- into the record at each of those breaks.

20   I mean, we could -- we could do that.  It would require me to

21   coordinate some with the Receiver's technical side, in other

22   words, to get those -- those breaks in place, but we could do

23   that.

24            THE COURT:  I think it's probably better to do the

25   corrections all at the end--just read the question, the
```

 1   original answer, and the corrected answer.

 2           MR. PETRIE:  And I guess the -- the issue with that,

 3   Your Honor, is the repetition.

 4           THE COURT:  I think it's unavoidable.

 5           MR. PETRIE:  Okay.

 6           THE COURT:  What else?

 7           MR. PETRIE:  That was it for me.  Thank you.

 8           THE COURT:  All right.  Let's bring them in.

 9           (Whereupon, the jury entered the courtroom.)

10           THE COURT:  Be seated.

11       Good morning.

12           SEVERAL JURORS:  Good morning.

13           THE COURT:  How's everyone doing?

14           SEVERAL JURORS:  Fine.

15           THE COURT:  Good.  Our poor Cowboys.  I think the

16   less said about that, the better.

17       I managed to catch cold over the weekend, so I will try

18   to not cough into the microphone or anything like that.  But I

19   apologize if my voice is hard to hear.  If you're having

20   trouble hearing me, please let me know and I'll do best to

21   speak up.  Fortunately, I don't have much of a speaking role

22   today.  This is about it.

23       I visited with the lawyers some this morning, and they

24   tell me they're ahead of schedule.  So it sounds like probably

25   we'll finish with the evidence sometime this afternoon.  We

 1   may send you home a little bit early today while we do some

 2   paperwork, and then we'll be ready to start, I believe,

 3   tomorrow morning first thing with the closing arguments.

 4        So I know you-all are curious about that, and I try to

 5   share with you the most current information I have, and that's

 6   it.  And I think that's enough from me.

 7        Are we ready to proceed?

 8             MR. SADLER:  Yes, Your Honor.  We'll continue with

 9   the videotaped deposition of Mr. Ray Sutton at this point.

10             THE COURT:  Very good.

11             RAYMOND L. SUTTON, JR., BY VIDEOTAPE DEPOSITION,

12   Q.   What about Ms. Dokken?  She would attend at times.

13   Right?

14   A.   Right.

15   Q.   Did she have any reservations or concerns about the SIB

16   CD?

17   A.   Well, I know for a fact that she did purchase a CD

18   herself, so --

19   Q.   Right.  But did she ever express any reserves --

20   reservations or concerns about the SIB CD?

21   A.   In the early years?

22   Q.   Yes.  Let's start with that.

23   A.   No.  I mean, she -- she had an investment in there.  And

24   for her, it was a sizable investment.

25   Q.   What about in later years?  Did she express any concerns

1    about the SIB CD?

2    A.   The only thing that I -- I know she got out of the

3    investment at some point.  I don't know when she got out of

4    the investment, and I don't know why she got out of the

5    investment.  But the only -- the only thing I recall her

6    saying was that -- that Tom was making a lot of money on the

7    investments.

8    Q.   Was that -- and we'll go through each of these concerns,

9    but is that part of your Tom Espy concern criteria, or is

10   that --

11   A.   No.

12   Q.   -- different?

13   A.   That's different.

14   Q.   Did the amount that Tom Espy was making also kind of

15   cause a concern, a reservation, from your perspective?

16   A.   I didn't have any idea what Tom was making until I heard

17   what he was making, I don't know, in 2009 or 2010.  I -- I

18   never knew.

19   Q.   What was your reaction to Ms. Dokken saying, Tom's making

20   a lot of money off of this?

21   A.   It wasn't surprising to me.

22   Q.   Why's that?

23   A.   Tom promoted a lot of investments to Gary over the years.

24   GMS@Lightspeed was the first one I became aware of, and Tom

25   was very active, involved in that.  He had -- you know, Steve

1   is running it now, but Tom was pretty much running it at the

2   time.  Introduced the investment to Gary.  It was a real

3   estate deal, a building and whatever, and he got a commission.

4   Q.   Okay.  Let's go to -- well, so we talked a lot about

5   initial reservation and concerns.  Right?

6   A.   Uh-huh, right.

7   Q.   What about over the course of time?  Between when you

8   first heard about SIB CDs and the date that the Receiver was

9   appointed, what other reservations or concerns arose in your

10  mind?

11  A.   The only one that I recall clearly was a board meeting

12  that we had in Las Vegas.  You've seen the minutes.  It's a

13  March board meeting, and I don't recall the year.  It was a

14  meeting that Wilk was present and Espy was present.  I believe

15  Espy was present.  He was on the phone if he wasn't present,

16  but I think he was present.  And we actually had a call with

17  Juan Rodriguez.  There may have been others on the phone, but

18  he was the principal one that did the talking.

19       And the purpose of the call was to talk to Rodriguez

20  directly, and Wilk and I did most of the questions.

21  Q.   Wilk and yourself?

22  A.   Right.

23       And we wanted to know what this explanation was for this

24  investment.  You know, what -- was this a traditional U.S.

25  bank that was taking in deposits and then, you know, paying

1    the depositor and then taking the money and lending it?  Was

2    that what was going on?

3        And the explanation that we got was that was not what was

4    going on and that the reason that this was located offshore

5    was that it could act more like a -- an old English merchant

6    bank, whatever that is.

7    Q.   Is that what he said, Juan Rodriguez?

8    A.   Yeah, a merchant bank.

9    Q.   Old English merchant bank.

10   A.   Right.  And I didn't understand what that meant.  But

11   what was described was that this wasn't a traditional deposit

12   and then the bank would lend and make two or three points on

13   the arbitrage, but that -- by being offshore, that they could

14   do things that they could not have done onshore.  And what he

15   then described was making investments in a whole myriad,

16   commodities, real estate.

17   Q.   He being Rodriguez?

18   A.   Rodriguez.

19   Q.   Go ahead.  I'm sorry.  Investing in --

20   A.   Investing in nontraditional assets.  I don't know if that

21   was the exact description, but as he went down this laundry

22   list.  So when we got off the phone, Chuck kind of talked a

23   little bit about what we had just heard, and what I formulated

24   in my mind, and I'm sure I articulated it at the meeting, was

25   that I thought that Gary had bought a preferred instrument,

1   like -- like preferred stock, that was going to pay a capped

2   but attractive rate of return in what was an offshore hedge

3   fund.

4   Q.   And what did you say about that?

5   A.   I said that if you analyze -- not verbatim, but my

6   feeling was that if you analyze it as an investment in a hedge

7   fund that had underlying assets, as any hedge fund has, as

8   Gary had United States hedge funds that Tom had sold him, that

9   if you looked at that, that was probably overweighted in the

10  overall portfolio for where hedge funds should be.

11  Q.   Because it was riskier?

12  A.   I just -- I just tagged the name hedge fund.  We

13  were -- you know, we were -- we were trying -- Gary has great

14  faith in -- in the TCI -- TCI stock was gone, but the

15  Liberty-related stocks, he had a great concentration in that

16  and a great confidence that over time those assets will

17  outperform everything else.

18       So that was some of us that felt, well, if you want to

19  ride the horse on that and not diversify out, then there ought

20  to be a significant part of your portfolio that was very

21  conservative, whether it was in T-bills or cash or under your

22  mattress.  But that's my conservative nature.

23  Q.   And so hedge funds are not conservative investments?

24  A.   In my view, if -- if -- if -- when I looked at the

25  portfolio if Gary was going to ride the fast horse, which is

1    what he always called Liberty, you're going to ride the fast

2    horse, then you ought to have a mule somewhere in the

3    portfolio, and I just didn't see where -- and I remember

4    premising it on, hey, this could be -- this could be a great

5    investment.  I certainly never had reason to believe it wasn't

6    an investment.  Okay?  But given the decision was made not to

7    diversify on an extremely concentrated portfolio, it was -- it

8    was my view, anyway, and it was Chuck Wilk's view, that there

9    ought to be some part of the portfolio that was just

10   absolutely as safe as it could be.

11   Q.   And so this -- after this March, whenever it was, meeting

12   in Las Vegas, and we'll -- help me identify it when we go

13   through the minutes later, your view was that the SIB CD was

14   not as safe of an investment as what Gary needed.

15   A.   As what Gary needed.  That's correct.

16   Q.   And the safe -- once you heard from Mr. Rodriguez what

17   the purported assets were in which the bank invested --

18   A.   Uh-huh.

19   Q.   -- how did that compare with what you had been told

20   before and what your understanding was before about the SIB CD

21   portfolio?

22   A.   I never had been told anything that -- all I knew was it

23   was a CD, it was paying a high rate of interest.  The

24   conclusion I had after my call with Rodriguez was, well, this

25   kind of looks like a Warren Buffet, you know, preferred

1    investment where he's getting a capped return.  I just thought

2    Gary was a preferred equity investor.

3    Q.    What is a preferred equity investor?

4    A.    It's -- in private equity circles it would be referred to

5    as mezzanine debt.  When private equity gets put together,

6    there's a -- sort of a middle ground of mezzanine debt that

7    provides financing, and they get a pretty high rate of

8    interest, and oftentimes they get a warrant to convert into

9    the equity, which is at the bottom of the -- of the ladder.

10         You'll recall when Warren Buffet financed Goldman Sachs,

11   for example, that's what he got.  He got a high coupon rate,

12   and then he got a warrant to convert.  And he did that with a

13   number of companies that got stressed in those financial

14   times.

15         That's what I thought Gary had, was sort of the

16   equivalent of mezzanine debt.

17   Q.    Did this phone call alleviate the issues that you had

18   with respect to SIB CDs, or did it just cause you to ask more

19   questions?

20   A.    It -- it in my mind placed the investment in a category

21   of a portfolio wheel.  In other words, if you take an

22   investment portfolio and you've got your equities, you've got

23   your fixed income, you've got your private equity, you've got

24   your real estate sliver, and in my mind what it did was it was

25   definitely an investment.  It was an investment in a hedge

1    fund.  It was not an investment that up to that conversation I

2    had expected.

3         I wasn't questioning the underlying assets or the

4    underlying investments.  I had no knowledge of that.  I don't

5    know that anybody had ever seen what the alleged underlying

6    investments were.

7         I just come back to what I said earlier.  I -- I -- once

8    I understood that this was not a CD going to a bank that's

9    regulated that then got lent out to borrowers at a higher

10   rate, this was a hedge fund.  And I just felt that make

11   your -- make your investment decision based on full knowledge

12   that this is not a CD.

13   Q.   And so Stanford International Bank described this

14   investment instrument as a certificate of deposit.  Right?

15   A.   Right.

16   Q.   And your view was, this is not a certificate of deposit.

17   Right?

18   A.   Right.

19   Q.   And I think you testified earlier you had every incentive

20   to ask questions about this SIB CD?

21   A.   Yep.

22   Q.   And so you asked what it was?

23   A.   Right.

24   Q.   Right?  And you got told it was a CD?

25   A.   Right.

1    Q.    And that Gary was happy with it?

2    A.    Right.

3    Q.    And you asked no further questions at that point?

4    A.    I don't -- I mean, you know, this is probably 2006 or

5    2007.  I can't remember what questions.  But it did

6    become -- I did have a discussion with Gary, and probably the

7    others, that, look, I mean, we were going along with Liberty

8    and we were very concentrated in Liberty, and Gary made it

9    very clear he wasn't going to sell Liberty.

10         And at that point in time, I started -- and this was

11   early on in the trust.  I said, look, Gary, you're going to

12   make the investment decisions.  There's no reason to call this

13   a committee.  Okay?  So why don't you make them, and I still

14   want to have advisors because I want to show for Nevada

15   purposes that we were meeting with a purpose in Nevada.  That

16   was important for our situs or our location of the trust

17   company.  So we amended the bylaws relatively early on to

18   dispense with the investment committee and just create

19   advisors.

20   Q.    So let's start with the disproportionately large

21   investment given the trust's holdings.

22   A.    Right.

23   Q.    You had that feeling day one of your involvement with

24   Mango Five.  Right?

25   A.    Early on.

1    Q.    Yeah.  So it had an exposure to the SIB CD, SIB CD that

2    was larger to expect from a trust perspective?

3    A.    Yes.

4    Q.    Explain that to me.

5    A.    I just thought that if you were feeling -- and at that

6    time I still believed it was fixed income, but I just thought

7    to have all of your fixed income allocation tied up in one

8    investment was a risk.

9    Q.    From a diversification perspective?

10   A.    Right.  Right.

11   Q.    So even before you understood that it was actually kind

12   of like a hedge fund, you thought that the trust was too

13   concentrated in Liberty and it was too concentrated in

14   Stanford.

15   A.    Yes.

16   Q.    Anything else about this disproportionately large that I

17   haven't heard about today?

18   A.    No.

19   Q.    Did that change over time, your -- your concern and

20   reservation on that --

21   A.    No.

22   Q.    -- perspective?

23         What about after that March meeting?

24   A.    The only thing that changed was that I did not see that

25   as fixed income.

```
1    Q.   Still a lack of diversification.

2    A.   Right.

3    Q.   Still proportionately too large.

4    A.   Right.

5    Q.   But now riskier.

6    A.   Right.  In my mind.

7    Q.   And actually riskier.  Right?

8    A.   Right.

9    Q.   Transparency.  Tell me about why that was a concern with

10   respect to the SIB CD.

11   A.   Transparency was a concern because from the U.S.

12   standpoint, if it had been a U.S. certificate of deposit, you

13   would know that it was -- it was a contract between the

14   depositor, and then the depositor understood that the bank was

15   going to go out and lend, and that there would be a spread.

16   Okay?

17        We didn't know what Stanford or who Stanford was lending

18   to or whatever, but, I mean, that's as far as my knowledge was

19   on this CD when I first saw it on the balance sheet.

20   Q.   So you saw a certificate of deposit on the balance sheet?

21   A.   Right.

22   Q.   And you just assumed that it was like other certificates

23   of deposit in that the bank makes money off of loans to its

24   customers or others and then makes money, keeps a spread, and

25   pays back its certificate of depositors.  Right?
```

1    A.    I think that's what I assumed --

2    Q.    Yeah.

3    A.    -- based on my understanding of --

4    Q.    And so then you wanted to see proof of that?

5    A.    No.

6    Q.    No?  Okay.  So what's this transparency issue then?

7    A.    I just -- I just registered -- I mean, I just kind of

8    thought that we would see more.  But, no, I didn't start

9    asking for the Stanford presentations that Gary -- I mean,

10   Gary had made this decision years earlier.

11   Q.    But you still have an obligation as a member of this

12   board to view --

13   A.    Monitor --

14   Q.    -- monitor --

15   A.    Monitor the trust's investments.

16   Q.    -- and look into the trust's investments?

17   A.    Right.

18   Q.    What did SIB being offshore as opposed to a domestic

19   company matter to you?

20   A.    I don't have an opinion on that.

21   Q.    I'm not asking for your opinion, though.  At the time you

22   heard about this --

23   A.    Uh-huh.

24   Q.    -- and you knew it was a foreign entity --

25   A.    Right.

1    Q.    -- issuing certificates of deposit and didn't have the

2    transparency that you would have wanted.  Right?

3    A.    Right.

4    Q.    What about it being in Antigua mattered from your

5    perspective when evaluating this SIB CD?

6    A.    It didn't raise any more red flags than being located in

7    I guess Bermuda or Guernsey or Jersey or Guernsey or Jersey,

8    you know, traditional banking havens.  I didn't know anything

9    about it.

10   Q.    Right?

11   A.    But in my world, having bank havens in places like

12   Antigua didn't strike me as being a red flag.

13   Q.    But offshore banks -- I mean, tell me if you agree or

14   not:  Offshore banks are typically riskier than domestic U.S.

15   banks.  Right?

16   A.    Not -- I don't have any reason to believe that one way or

17   another.

18   Q.    Okay.

19   A.    I say that because I've dealt with banks in Guernsey and

20   Jersey and Isle of Man over the years, and I have -- they're

21   very strong banks that deal there.

22   Q.    After you first became aware of SIB CDs and asked your

23   questions and got told Gary liked it, did you continue to ask

24   questions about it at any point?  It being the SIB CD.

25   A.    I can't say yes or no.  I mean, it was -- it was on the

1    agenda for every one of our investment committee meetings.

2    Q.   You mentioned the other factor of concerns, reservations,

3    was Tom Espy himself.  Tell me about that.  Why was that a

4    concern or reservation in your mind?

5    A.   I -- I didn't put Tom in the category of a sophisticated

6    investment advisor when he matched up with other investment

7    advisors that I work with, deal with, sit at family office

8    tables with.

9    Q.   How so?

10   A.   He seemed to be lacking the perspective and the judgment

11   that I was familiar with from other advisors.

12   Q.   So he lacked perspective and judgment as compared to

13   other investment advisors that you dealt with?

14   A.   Right.

15   Q.   What else?

16   A.   Well, that was -- I mean, that was enough.

17   Q.   Okay.  Let's talk about perspective.  What perspective

18   did he lack?

19   A.   To put a comparison, I thought he lacked Chuck Wilk's

20   perspective, for example.

21   Q.   Go ahead.

22   A.   And, I mean, you know, we had a lot of debt in the

23   Magness entities for many years.  It was a tension of whether

24   we were going to pay down the debt if we diversified or if we

25   diversified, we always had to pay taxes because it was such a

22

```
 1    low basis in all of the stock.  So that was always a deterrent

 2    about just going out and immediately liquidating.

 3         But there was always this debate as to, you know, should

 4    we -- should we sell stock to pay down debt or should we sell

 5    stock to raise proceeds to make investments in other areas.

 6    Chuck was always fairly strong in saying, Let's pay down the

 7    debt.

 8    Q.   And you thought that was a good idea?

 9    A.   I thought that was a good idea.

10    Q.   What did Gary think?

11    A.   I -- he would start -- I mean, we -- you know, from 2005

12    until the last couple of years, he was -- he was buying

13    into -- and then more recently, he would tell you he'd like to

14    be debt free.  But Chuck was an early advocate of selling

15    stock, using proceeds to pay debt.  Tom was generally on the

16    side of selling stock to buy other investments, and those

17    investments usually were hedge funds, you know, Quanteen (ph)

18    and some of the others that were on the balance sheet.

19    Q.   What else about Chuck Wilk's perspective did Espy lack?

20    A.   Independence, in the sense that Tom always got a

21    commission for everything that he did.  Chuck was just paid on

22    a retainer.

23    Q.   What else did Tom Espy lack that Chuck Wilk had from a

24    perspective point of view?

25    A.   When comparing him to Chuck, I don't -- I don't -- I
```

```
 1   don't know much else.

 2   Q.   So it's -- let's talk about independence you said Tom

 3   Espy always got a commission for everything he did.  Right?

 4   A.   Right.

 5   Q.   And that included anything relating to Stanford?

 6   A.   I didn't know at that time what he was getting from

 7   Stanford.  I just assumed he was getting paid from Stanford.

 8        But, you know, if he would sell stock, for example, Gary

 9   would sell stock from time to time, including in the 2002-2003

10   time frame, he would sell stock, and he would -- I mean, I

11   don't -- there's brokers' parlance for what you get when you

12   sell stock, how many pennies a share or something like that.

13   He'd always get that.

14        And then I was sure that -- well, I knew that on that

15   @Lightspeed, that he had gotten a commission on that.  And

16   then, you know, the hedge funds that he recommended.

17   Q.   Did you know that he got a commission on SIB CDs?

18   A.   I -- I assumed he did.  I didn't know until much later.

19   Q.   How much did you assume he was getting paid on commission

20   for his SIB CDs?

21   A.   I -- I was sure it was probably in the six figures.

22   Q.   Per year?

23   A.   I -- no.  I thought it was a one-time deal.

24   Q.   That was just an assumption you had?

25   A.   Yeah.
```

1   Q.   Okay.

2   A.   Yeah.

3   Q.   And when did you find out otherwise?

4   A.   One time they told me.

5   Q.   This is before the Receiver was appointed?

6   A.   Again, I don't -- I don't recall when it was.

7   Q.   Okay.  And so you said just like other brokers, they get

8   pennies per share that they get.  Is there anything wrong with

9   getting a penny a share or two pennies a share, whatever it

10  is, for selling stocks?

11  A.   No.

12  Q.   So what was it about that and Tom Espy that made you

13  question his independence?

14  A.   It -- you know, it's -- it was just a fact.  It was just

15  a fact that whatever Tom made a recommendation, he got

16  compensated other than on an hourly basis or other than on a

17  retainer basis like Chuck Wilk.

18  Q.   So you just knew that --

19  A.   Yeah.

20  Q.   -- to some extent him getting compensated for pitching

21  these things --

22  A.   Right.

23  Q.   -- he's going to get paid for it --

24  A.   Right.

25  Q.   -- including the SIB CDs --

```
 1    A.    Well --

 2    Q.    -- you assumed?

 3    A.    -- I assumed he had been compensated when they were sold.

 4    Q.    Did -- did you ever raise any issues with Gary Magness or

 5    anybody else in this Magness organization about the

 6    perspective that Tom Espy lacked and the independence issues

 7    that you perceived?

 8    A.    Well, I -- I know I talked to Chuck about it, and I know

 9    I talked to Tonya about it.

10    Q.    Did you talk to Gary about it?

11    A.    I don't think I did.

12    Q.    Why?

13    A.    Because I wasn't really part of the inner circle.

14    Q.    Who's part of the inner circle?

15    A.    Tonya was the inner circle.  Steve was inner circle.  Tom

16    was inner circle for a good bit.  Chuck was closer than me

17    because he dealt with the banking and the investment

18    decisions.

19    Q.    What about Bob Armstrong?  Where does he fit into all

20    this?

21    A.    He is farther out than me.

22    Q.    So you mentioned perspective, which we've talked about.

23    Is there anything about perspective that he lacked that we

24    haven't talked about already?

25    A.    No.
```

1    Q.   Now, what about judgment?  You said that was the other

2    thing that he lacks as compared to other investment advisors.

3    A.   I just -- I just didn't think that he had the background,

4    the credentials, the training that -- that I would expect, you

5    know, to be a significant investment advisor to, you know,

6    somebody that's on the Forbes 400.

7    Q.   So what -- what about his background did you find

8    deficient?

9    A.   I -- I couldn't -- in my mind, it was -- you know, when

10   you're -- I guess in my narrow world, it would be like a small

11   office general practitioner giving legal advice to Gary

12   Magness on sophisticated issues, and my bias is, I think you

13   need a larger firm to handle the array of issues that you're

14   going to be dealing with.

15        And so if I was to look at Tom versus, say, Wilmington or

16   Bessemer or any number of investment bank choices, even

17   Merrill Lynch, even though it's more on the retail side of it,

18   Ryan kind of brought more of a boutique team approach to it.

19   He represents some very high net worth individuals.

20        I just think when you look at the sort of security that

21   you get from -- you know, it's the reason general -- general

22   counsel want to hire firms like Baker Botts, BakerHostetler.

23   You know, if something goes wrong, you can say, at least I

24   hired a name firm.

25        I guess that was sort of my -- my view with Tom, was he

1   was handling a lot of money without really an institutional

2   sort of backbone to what he was doing.

3   Q.   So that was your view with respect to him and the

4   brokerage firm he worked for, Stanford Group Company?

5   A.   I -- I honestly didn't know anything about Stanford Group

6   Company.

7   Q.   Did you just think that Tom Espy was an advisor on his

8   own?

9   A.   I did for -- I -- I did.  In the early years that I knew

10   him, I did think he was on his own.  I didn't know -- well,

11   you know, I think he was with one or two places.  I don't know

12   who they were.

13   Q.   But at what point did you realize he was working with

14   Stanford Group Company?

15   A.   I can't tell you.  It would have been after the CDs, I

16   think.

17   Q.   After what about the CDs?

18   A.   After I learned that the CDs were owned by the trust and

19   by Gary and whatever.

20   Q.   Okay.  Did you know that Tom Espy actually had an office

21   at Magness Investment Group?

22   A.   I did learn that at some point, yes.

23   Q.   Did that impact your view of his independence or any of

24   the other deficiencies that we've talked about?

25   A.   No, I don't think it impacted it.

1  Q.  Was it at all indicative of him being in that inner

2  circle?

3  A.  Well, yeah, his physical presence in the office, yeah.  I

4  mean, I think that --

5  Q.  At what point and why did it get decided the way we set

6  it up needs to change?  Really, you need to be the only person

7  who's formally on the investment committee, Gary.

8  A.  Well, I don't know what point.  You can track it from,

9  you know, the meetings where we had the committee to the

10  meetings where we approved the change in the bylaws.  It

11  hadn't been going on that many years or that -- that many

12  meetings, but it -- you know, it just became, you know, pretty

13  apparent to -- to me that Gary -- you know, buck stops there,

14  he was going to make the decision, and that -- that the more

15  realistic structure was going to let him make the investment

16  decisions.

17  Q.  And the buck stopped there with Gary for Mango Five

18  purposes?

19  A.  I think I'm understanding your question.  You mean making

20  decisions with respect to the trust investments?

21  Q.  Right, yeah.  Uh-huh.

22  A.  Right.

23  Q.  What about with respect to GMAG?

24  A.  Clearly.

25  Q.  What about with respect to the Gary Magness Irrevocable

1  Trust?

2  A.   Well, that -- that is trusteed by Mango.  So --

3  Q.   So yes?

4  A.   Yes.

5  Q.   And then was he also the buck stops here decision guy

6  with Magness Securities?

7  A.   Yes.

8  Q.   And, as a member of the board, committee member of the

9  investment committee, advisor to the investment committee, and

10  member of the distribution committee --

11  A.   Right.

12  Q.   -- you were responsible for doing some amount of due

13  diligence on investments of the trust.  Right?

14  A.   You know, other than to review the -- the holdings of the

15  trust when the trust took over as the trustee, there wasn't

16  much to review.  I mean, the assets were on the balance sheet.

17  Most of the assets on the balance sheet were Liberty-related

18  stocks.

19  Q.   So what other assets were on the balance sheet when you

20  first started with Mango Five?

21  A.   Probably the same that are on there today.  You got

22  ranches, you got the homes.  You got a few more homes now

23  today than you did back then.  Stocks, the data center.

24  Q.   So let's set Stanford off to the side, because that was

25  on the balance sheet, right --

1    A.    Right.

2    Q.    -- at that point?  So for Liberty --

3    A.    Uh-huh.

4    Q.    -- what information did you ask for with respect to

5    Liberty holdings and all of its various iterations?

6    A.    We didn't have to ask for the information.  We had board

7    packets that detailed the holdings of every single issue of

8    stock, what the basis was, you know.  If you sold the stock,

9    you needed to know what was the basis was going to be, and

10   then it was kind of spreadsheeted so you could see what GMAG

11   owned, what Mag Securities owned, what GMIT owned.

12   Q.    And did you have, you know, historical returns from those

13   Liberty investments somewhere in there?

14   A.    Umm --

15   Q.    I'm sorry, returns may be the wrong phrase.  Did you-all

16   have historical value information about those holdings over

17   time?

18   A.    Well, all of us knew that because we -- you know, we were

19   all involved in the estate of Bob Magness, and we filed the

20   estate tax return.  So just from an intuitive sense, I mean,

21   yeah, you knew it was going the right direction.

22   Q.    And it was publicly traded.

23   A.    Right.

24   Q.    Right?  Did you have access to annual reports for Liberty

25   Media?

1    A.    We didn't.  Well, we had access to them --

2    Q.    Uh-huh.

3    A.    -- but Gary and -- and Tonya really followed Liberty, and

4    I think Espy, while he was involved, would track what, you

5    know, John Malone was doing.  And -- I mean, I wasn't much

6    involved in tracking, you know, what spinoffs were going on.

7    Q.    Sure.

8    A.    There were a lot of that kind of stuff, tracking stocks.

9    And, I mean, Liberty is a very complex -- that's one of its,

10   you know, issues with analysts, is it's a very complex company

11   with a lot of transactions going on all the time.  And

12   Gary -- that was something that Gary took a pretty keen

13   interest in following.

14   Q.    But from virtue of your experience with the estate issues

15   and how that all worked out, I mean, you had a pretty good

16   sense of what the Liberty holdings were and what they were all

17   about.  Right?

18   A.    I mean, I knew what Liberty did versus what TCI did.

19   Q.    Uh-huh.

20   A.    I think TCI was the cable pipes, and Liberty was the

21   content, and then Liberty, you know, would be cut up.  There

22   might have been -- well, there are several companies on the

23   balance sheets that were Liberty affiliates.

24   Q.    And so that's -- that's the Liberty holdings.

25   A.    Right.

1    Q.   You also mentioned ranches?

2    A.   Right.

3    Q.   Right?  What information did you have about the ranches?

4    A.   We got a report every -- every meeting.  Tonya would give

5    a report every meeting on -- at that time the ranch was

6    co-owned with Kim's two children, trusts for the two children.

7    So that was Magness Land Holdings, I think.

8         And the ranch was co-owned.  So we'd get a report --

9    Tonya would get the report from the ranch manager.  She'd show

10   us what the projected losses were going to be for the year.

11   There were always losses at the ranch.

12   Q.   And you knew generally what operations they were doing at

13   the ranch?

14   A.   I mean, raising cattle and showing them at the stock

15   show --

16   Q.   Uh-huh.

17   A.   -- was about all I knew.

18   Q.   Okay.

19   A.   I didn't really have much to do with the ranch.  I've

20   only been to the ranch one time.

21   Q.   Who would you say was responsible for due diligence

22   investigation with respect to SIB and its CDs?

23   A.   I would have to say Tom.

24   Q.   What about Chuck Wilk?

25   A.   I think that Chuck -- I don't know at what point Chuck

1    knew about the Stanford investments.

2    Q.   Did you ever receive any compensation for your role as a

3    board member --

4    A.   No.

5    Q.   -- or advisor?

6    A.   No.  I was just paid as my -- my legal hourly rate for

7    attending the meetings.

8    Q.   Did you get paid for being a committee member?

9    A.   No.

10   Q.   And so you got your legal rate for attending the

11   meetings.

12   A.   Right.

13   Q.   But you were there as a board member?

14   A.   Right.

15   Q.   And you were there as an advisor?

16   A.   Right.

17   Q.   You were there as a committee member?

18   A.   Right.

19   Q.   You weren't there as an -- as an attorney necessarily.

20   You just were an attorney.

21   A.   I -- I think that's right.  You know, we all had kind of

22   our bailiwicks.  Steve had the data center.  Chuck, Tom, and

23   Gary pretty much had the investments.  Tonya had the ranch,

24   and I was legal.  So if legal stuff would come up --

25   Q.   Uh-huh.

1    A.   -- you know, then I would talk about the legal stuff.

2    Q.   Okay.  Did you trust Tom Espy?

3    A.   In the sense that I think that he would intentionally

4    take money from Gary or steal from Gary, no, I never thought

5    that.

6    Q.   But other than that, did you trust Tom Espy?

7    A.   I mean, I can't say I distrusted Tom.

8    Q.   You didn't absolutely trust Tom?

9    A.   I wouldn't take investment advice from -- from Tom.

10   Q.   Okay.  So you wouldn't -- well, would you trust

11   investment advice from Tom Espy?

12   A.   No.

13   Q.   When you asked questions about the SIB CDs, did you find

14   that you received satisfactory information in response?

15   A.   Well, I -- I didn't have a history of asking a lot of

16   questions about Espy.  I mean, those were --

17   Q.   About who?  Did you say Espy?

18   A.   About -- about the CDs.  I mean, you know, by the time I

19   got aware of those CDs, I mean, they were done deals.  Gary

20   had invested with them, he said he was sticking with the

21   investments.  I obviously had some concerns about them.  They

22   were kind of growing concerns.

23       I mean, they kind of -- and there was a lot of pressure

24   on the trust.  I mean, there were -- there were -- there were

25   a lot of loans out at the time.  And, you know, we weren't

1   seeing current interest being paid.  I mean, there were --

2   Gary had elected the option to accrue interest, so the

3   interest would accrue on the interest.  But it's almost like,

4   you know, being told, well, look, this is the way it is, I'm

5   not going to change my mind.  So --

6   Q.   You said that you had concerns and the concerns were kind

7   of growing over time.  What caused those concerns to grow over

8   time for you?

9   A.   Well, I think the pressure on the trust.  I mean, it was

10  very -- you know, it was very stressful on the trust with some

11  of the debt that was on there.  We were always near margin

12  calls.  We had far too much debt coming after the close of the

13  estate of Bob Magness.  I don't remember what the number is.

14  The balance sheets will clearly show what debt was there when

15  we closed the estate in 2005.

16       And then when -- when Liberty, which is a volatile stock,

17  I mean, it's -- you know, look, when -- when the estate was

18  settled, I don't know what -- what the estate was worth in

19  2005, but the estate tax return, that's a known starting

20  point.

21       And, I mean, Gary has been well rewarded for his

22  commitment to sticking with Liberty.  For some of us who have

23  more conservative tastes, it was -- it was a ride that would

24  have probably driven me nuts.  I mean, it goes up, and it goes

25  down.  It goes down when the stock market flutters, and then

1  we get margin calls.  You know, it was a very, very volatile,

2  high-risk stock, which you step back and, you know, he was

3  right.  Things were a hit.

4      You know, it's run by John Malone, and Gary knows John

5  Malone from when his father was alive, and he rightly, I

6  think, surmised that there's nobody better to trust your

7  investments to than John Malone, and he's been right.

8  Q.   Let's -- let's talk about the SIB CDs, though.  Let's

9  shift from Liberty.  You said you had growing concerns about

10  the SIB CDs.  What was fueling those concerns?

11  A.   You know, the -- the -- the illiquidity of the CDs, given

12  the times that I had seen that we were getting very close to

13  margin calls.

14  Q.   What do you mean by illiquidity?

15  A.   Well, what I mean is that I -- at some point I became

16  aware that -- that the other banks that were financing these

17  lines of credit wouldn't take the -- the cDs as collateral.

18  Q.   When did you find that out?

19  A.   Well, for sure I found that out in -- gosh, I don't know,

20  is it 2009 when -- in the fall of 2009 for sure.

21  Q.   So just as a reference point, the Receiver was appointed

22  in February of 2009?

23  A.   Okay.  So that would have been the fall of 2008, because

24  the stock market had taken a significant drop in August,

25  September of that year.  We were up against the wall with

1   margin calls.  We were selling stock.  And for sure we -- we

2   went to some of the banks -- not we.  Tonya went to some of

3   the banks and -- and was told that the Stanford CD was not

4   collateralizable asset.

5   Q.   When you got told that, that it was not usable as a

6   collateral to a loan, what -- what did you think?

7   A.   Well, I was pretty much on the outside at that point in

8   time.  When there were margin calls and handling the banks, we

9   weren't involved in that.

10   Q.   Yeah, but what did you think when you got told, hey, none

11   of these banks are going to take this offshore CD as

12   collateral?

13   A.   I mean, I wasn't -- I wasn't surprised.

14   Q.   Why were you not surprised?

15   A.   Because the banking system was under severe pressure, not

16   only in the United States but globally, and I -- I think it

17   would have taken a bank a lot of due diligence to have done

18   it.  They didn't have time to do that.

19   Q.   And at this point -- so that was the fall of '08, you

20   said.  Right?

21   A.   Yeah.

22   Q.   And so at the latest, that meeting with Rodriguez would

23   have been in March of '08.

24   A.   Right.

25   Q.   So at this point your view was, these SIB CDs, they're

1    not fixed income.  Right?

2    A.    Right.

3    Q.    They're not conservative.  Right?

4    A.    Right.

5    Q.    These are kind of like hedge funds issuances.  Right?

6    A.    Well, like mezzanine debt to a hedge fund --

7    Q.    Sure.

8    A.    -- I guess is how I would characterize it.

9    Q.    What kind of influence did Tom Espy have on Gary Magness?

10   A.    I -- I don't know.  I mean, I don't see him on a

11   day-to-day basis, and I didn't have that many conversations

12   with Gary.  I'd see him at the meetings, but my communication

13   was frequent and almost always directly through Tonya.

14   Q.    Okay.  But you were -- you were friendly with Gary?

15   A.    I was very -- yeah, I was friendly with Gary.  It's just

16   that Tonya was -- was, you know, so ingrained and trusted, and

17   she was here in Denver.  And -- and Gary was -- was -- had --

18   had established some distance after going through -- you know,

19   it was a brutal period of time from '97 to 2005.  It was

20   absolutely brutal for him.  And once things got stabilized

21   and -- and, you know, Tonya was in place, we were in place,

22   the accounting firm was in place, he really left the

23   day-to-day stuff largely to Tonya.

24   Q.    What do you mean by 2009, you said?

25   A.    Oh, clearly by 2009.

1    Q.    Oh, I misunderstood.

2    A.    No, she was -- but, I mean, in many respects she was his

3    alter ego.  I mean, she was in constant contact with him, she

4    could relate to him and understand him and then come back and,

5    you know, get the rest of us doing what we were doing.

6    Q.    What she knew he knew and what he knew she knew?

7    A.    Right.  But, you know, our -- our involvement at -- at

8    bakerHostetler declined significantly after 2005.

9    Q.    With respect to Stanford International Bank, what

10   benefits did Gary Magness or any of the Magness parties

11   receive from Stanford International Bank?

12   A.    Other than the interest that was paid on the CDs?

13   Q.    Sure.

14   A.    I -- I'm not aware that any benefit was -- I mean, that

15   was a contractual benefit.  And I think that he -- I know he

16   opted to accrue the interest.  But other than that, I don't

17   know of any benefits.

18   Q.    Now, you're aware that the Magness parties received $88.2

19   million from SIB in October 2008?

20   A.    Yes, I'm aware of that.

21   Q.    Tell me about what you understand those transactions to

22   be.

23   A.    The only thing I understood was that the bank loaned Gary

24   that amount of money, and that Tom Espy quarterbacked that

25   loan arrangement.

1    Q.   And so what is your understanding as to why the money

2    came out in the form of loans instead of payments of interest

3    or redemptions?

4    A.   I had some understanding that some of it was payment of

5    interest, but I could be wrong on that.  The only reason that

6    I had some recollection, not at the time but subsequent to

7    that time, was when we were looking at the tax issues and the

8    tax reporting position on that interest at least a year later.

9    Q.   Okay.

10   A.   We looked at -- you know, from a tax standpoint, we

11   looked at that.  And that's when I saw what was going on

12   there.

13        I think that -- I -- what I recall was that they

14   attempted to redeem the certificates because Gary was getting

15   margin calls, and they attempted to speak to their bankers,

16   principally HSBC, to see if that would be at least accepted as

17   collateral so that the stock wouldn't be sold on the margin.

18        And what I recall hearing, but I can't tell you from

19   whom, it was probably from Tonya, because she's the one that I

20   had the most direct contact with, was that the CDs couldn't be

21   redeemed but Stanford could make a loan through the bank.

22   Q.   Did that make any sense to you?

23   A.   I didn't really care, to be honest with you.

24   Q.   Why didn't you care?

25   A.   I knew -- I mean, we were in crisis mode, I mean,

 1    absolute crisis mode.  We were all handling something.  I

 2    can't recall what I was handling, but, you know, it was crisis

 3    time, and I didn't know if it was the same bank that was going

 4    to make a loan or whatever.  But there was going to be a loan

 5    made.  I mean, I didn't know why you couldn't redeem if you

 6    could make a loan, but that wasn't the point at that -- at

 7    that time.

 8    Q.   Would it be a concern that you have -- I mean, at that

 9    point Gary had accrued around $100 million at SIB.  Right?

10    A.   Had what?

11    Q.   Accrued about a hundred million dollars at SIB?

12    A.   I think that's a round number, yeah.

13    Q.   And for that bank with such a large position to say, you

14    can't redeem your CDs, that's a concern.  Right?

15    A.   You know, I didn't -- I didn't know the laws of the bank

16    of Antigua or Antiguan laws.  I didn't know what might have

17    been the reason for it, in all honesty.  I knew that the money

18    was needed to prevent a wholesale liquidation of some stock

19    positions and the money became available.

20         I also knew nobody went in there and pointed a gun and

21    robbed it.  So when they said it couldn't be redeemed, I

22    didn't ask because to ask would have assumed you're going to

23    have to find out about Antiguan law.

24    Q.   And you just didn't want to go that extra step?

25    A.   I didn't have any reason.  I wasn't engaged, I wasn't

1    authorized, I wasn't asked to look at it.

2    Q.    But from your recollection, Gary and his entities got

3    told, you can't redeem it.  Right?

4    A.    That was my recollection.

5    Q.    But, nonetheless, it was important for Gary to get as

6    much money out of SIB as possible.  Right?

7    A.    Yes.

8    Q.    And so he just did that in the form of loans.

9    A.    Yes.

10   Q.    So Gary got out 88.2 million in loans.  Did you have a

11   comparison between how that amount of loans compared to loans

12   that SIB typically gave to its customers?

13   A.    No.

14   Q.    Did you ask that question?

15   A.    No.

16   Q.    Was that an interesting thing you wish you would have

17   asked?

18   A.    No.

19   Q.    It doesn't matter if his was the biggest ever --

20   A.    No.

21   Q.    -- or the smallest ever?

22   A.    No.

23   Q.    Knowing what you know now, would you have asked that

24   question in the fall of '08?

25   A.    No.

```
 1    Q.   What was your impression of Allen Stanford from what you

 2    had read from him?

 3    A.   I -- I didn't really -- I can't tell you what my

 4    impression was.  It wasn't really on my radar scope.  It was

 5    more of a passing interest.  You know, you connect the fact

 6    that Gary had some Stanford CDs, some large Stanford CDs, and

 7    you read -- but nothing that I was reading that would indicate

 8    that this guy's on the precipice of a major fall.  I didn't

 9    see anything like that.

10    Q.   When the SEC filed its lawsuit against Allen Stanford,

11    SIB, Stanford Group Company, all those in February of 2009 --

12    A.   Uh-huh.

13    Q.   -- you heard about that.  Right?

14    A.   Yes, uh-huh.

15    Q.   When that news broke, were you surprised?

16    A.   Yeah.

17    Q.   Why?

18    A.   Well, I was -- you know, starting back when -- when

19    Madoff broke, I was surprised at Madoff.  I'm still surprised

20    at the magnitude of that fraud.  And I was on the, you know,

21    firm board for many years, and I'd get a monthly report on the

22    Madoff litigation, and it was shocking to me that somebody

23    could pull something like that off with basically a steam room

24    operation that Madoff was running.

25         And -- and Stanford, I mean, appeared to have at least a
```

1    more sophisticated operation than Madoff.  I mean, you know,

2    there was Laura and Jim Davis and Juan Rodriguez.  I mean,

3    with Madoff, it was just Bernie back there running everything,

4    so --

5    Q.   Before Madoff, had you heard of the phrase "Ponzi

6    scheme"?

7    A.   Sure.

8    Q.   What was your understanding of what a Ponzi scheme was

9    generally?

10   A.   You put money in, I get my money out, and the guy in the

11   middle that's promoting it to skims some cream.

12   Q.   Okay.  And so did your understanding as to how a Ponzi

13   scheme worked change after Madoff?

14   A.   You know, the only Ponzi schemes that I have run into in

15   my career were -- there were a couple around here, in the

16   Denver area, that's done some.  But they were small-time

17   operations.  They were 15-, $20 million operations that some

18   prominent people here in town got stung with.

19        When you're talking about the magnitude of a Madoff or a

20   Stanford, that was far beyond.  I mean, you wouldn't -- you

21   wouldn't think with the size of the organizations and the

22   amount of money involved and the amount of people involved and

23   a lot of them sophisticated people, you wouldn't think that's

24   a Ponzi scheme.

25   Q.   Did anything about Madoff make you go, Oh, I need to be

1    starting to think about Stanford?

2    A.    Not -- I mean, no.  I mean, not -- I'm trying to get the

3    timing right.

4    Q.    Uh-huh.

5    A.    So Madoff started December of 2009.

6    Q.    '8?

7    A.    '8.  So our first year of Madoff in the firm was 2009.

8    No.  No.

9    Q.    Did you ever ask anyone, Do you think Stanford's running

10   a Ponzi scheme?

11   A.    No.

12   Q.    Did anyone ever ask you that?

13   A.    I don't recall.

14   Q.    When did any member of Mango Five or its committees or

15   any of its advisors first suspect that something might be

16   going on at Stanford that was not what it seemed to be?

17   A.    Well, I -- you know, going back to our March call with

18   Juan Rodriguez, it was apparent after that call that this was

19   something other than a commonly understood certificate of

20   deposit.

21   Q.    Anything before that March call that made you or anybody

22   else that I mentioned think something might be going on at SIB

23   that wasn't what it seemed to be?

24   A.    There obviously was something that precipitated us

25   arranging a call or Espy arranging a call on that.  Was I

1   aware of anything specific?  I certainly don't have any

2   recollection of anything.

3   Q.   But there was something -- somebody was asking questions

4   that caused that call to even happen?

5   A.   Right.

6   Q.   When was the first time you, anybody on the committee and

7   any advisors, directors, anybody that you knew, thought that

8   SIB might be cash strapped?

9   A.   After the fall, when my recollection was that an attempt

10  was made to redeem the CDs and they were not able to be

11  redeemed.

12  Q.   When was the first time any of those people I just asked

13  about said, Oh, SIB might be insolvent?

14  A.   I don't recall anybody ever saying that.

15  Q.   When was -- when were any of those people saying to you,

16  SIB might not be telling the truth here?

17  A.   The phone call that we had with -- I'll say Laura,

18  because I don't remember who else was on that call.  The only

19  recollection I have at the end of that call was after she, and

20  if there were any other Stanford people on the call, after

21  everybody was off, then whoever was present besides Tonya and

22  Espy and me, Tom made the statement that he thought she was

23  lying.

24  Q.   And this was the December or January call?

25  A.   Yes.

1    Q.    And so Tom said that?

2    A.    Yes.

3    Q.    Did anybody else say, Yeah, me, too?

4    A.    No.  I was a little surprised he said that.  I didn't

5    hear anything that would have led me to say that she was

6    lying.  But I didn't know her either.

7    Q.    Did you ask Tom, why do you think that?

8    A.    If I did, I don't -- I don't recall an answer.  I mean,

9    it wasn't any specifics.  And as I recall, the report was

10   Stanford put more capital in in November and strengthened the

11   bank.

12   Q.    When did anyone you knew first say, Stanford might be

13   running a fraud?

14   A.    It was after the Receiver was appointed.

15   Q.    Okay.  Same question, but when is the first time somebody

16   said, This -- this might be a Ponzi scheme at Stanford?

17   A.    I honestly don't recall anybody ever saying it was a

18   Ponzi scheme, at least in the discussions that I was

19   participating.

20   Q.    So between the time you first heard about Stanford

21   at all --

22   A.    Uh-huh.

23   Q.    -- which I think you said it was around when Mango Five

24   started, up until 2009 and the appointment of the Receiver,

25   from your perspective, what red flags were present with

1    respect to SIB or its CDs?

2    A.    Well, Tom was always a bit of a red flag for me.  I -- I

3    would say the fall, on that October time frame, when I heard

4    that the CDs couldn't be redeemed.  But I didn't know why they

5    couldn't be redeemed, and then it seemed to be solved with a

6    loan, so --

7    Q.    Other than the -- Tom Espy and the inability to redeem

8    the SIB CDs, what other red flags did you see that were

9    present with respect to SIB or the CDs?

10   A.    I -- I didn't -- I mean, I didn't see the red flags.

11   Q.    What about that March call with Juan Rodriguez?

12   A.    Well, that wasn't a red flag in my mind as to Stanford as

13   a viable, solvent entity.  That was a red flag as to the

14   nature of the investment.

15   Q.    Okay.  What about the December '08, January '09 call with

16   Laura Holt?

17   A.    You know, at the time, and then after that call, I was

18   kind of off the radar scope on what -- what went on until the

19   Receiver was appointed.  But at the time, it didn't occur to

20   me as any significant call.  It was her saying that Allen

21   Stanford had put several hundred million dollars of his own

22   assets into the bank in November to satisfy -- I don't know if

23   it was regulation requirements or whatever.  So, I mean, that

24   was the purpose of the -- the call.

25        At the time Gary had the loans outstanding.  He was able

1   to use the proceeds of those loans to stave off margin calls

2   at some of his other lenders, and, you know, from our

3   standpoint, the crisis was over.

4   Q.   What about the transparency issue we talked about

5   earlier?  Was that a red flag for you?

6   A.   It -- it wasn't a red flag for me.  I just -- you know, I

7   just had that experience from the other family office, that

8   they didn't like hedge funds because there was a lack of

9   transparency and -- you know.  A lot of people have made a lot

10  of money with hedge funds even though they're not transparent.

11  It's just, you know, this bias this one office had, and I kind

12  of bought into it.

13  Q.   Do you still have that feeling today about hedge funds?

14  A.   I do as a general standpoint.  I -- I do.

15  Q.   So this is a compilation of one exhibit number, 267,

16  Plaintiff's Exhibit 267.

17  A.   All right.

18  Q.   So are these true and correct copies of your handwritten

19  notes?

20  A.   Yes.

21  Q.   And you created these within the scope of your duties --

22  A.   Yes.

23  Q.   -- and responsibilities as secretary of Mango Five?

24  A.   Yes.

25  Q.   And these are notes that were created at the meetings --

1    A.    Yes.

2    Q.    -- or near the meetings that they record?

3    A.    At the meetings.

4    Q.    And you can confirm that all of this is your handwriting?

5    A.    Yes.

6    Q.    Let's look at the next exhibit in the pile, which is

7    Plaintiff's Exhibit 293.

8    A.    All right.

9    Q.    If you turn to -- it's Article V, Section 3.  It's on

10   Bates label ending 5361.

11   A.    Okay.  All right.

12   Q.    This lists the duties and responsibilities as secretary?

13   A.    Right.

14   Q.    And you've had these duties and responsibilities?

15   A.    Uh-huh.

16   Q.    That included keeping a recording of the minutes of Mango

17   Five and keeping the books and records of Mango Five?

18   A.    Uh-huh.

19   Q.    Yes?

20   A.    Yes.

21   Q.    And you were tasked with taking the minutes from all

22   meetings of Mango Five in whatever form they were?

23   A.    Yes.

24   Q.    And as part of your job in taking minutes, you try to be

25   as accurate as possible.

1    A.    Yes.

2    Q.    Right?  And would you try to correct any errors or

3    omissions in the drafts?

4    A.    I would have to be prompted by, say, Tonya's review of

5    them.  You know, you do the best you can, but you're not

6    nearly as capable as a court reporter, and you've got as many

7    as five or six people talking at the same time --

8    Q.    Sure.

9    A.    -- so sometimes you need a second set of eyes on what was

10   said.

11   Q.    And you would get her review of it and --

12   A.    Right.

13   Q.    -- try to improve it as much as possible, if necessary.

14   A.    Well, try to make it accurate.

15   Q.    Right.

16   A.    Yeah.

17   Q.    And did anyone ever complain about the accuracy of your

18   minutes?

19   A.    No.

20   Q.    To your knowledge, did Chuck Wilk ever recommend buying

21   more SIB CDs?

22   A.    To my knowledge, no, he never recommended.

23   Q.    Did he ever recommend cashing in or redeeming or

24   otherwise taking payments out of the SIB CDs?

25   A.    I don't have any recollection on that, no.

1    Q.   All right.  Let's look at Exhibit 134, which should be

2    the October 1st, 2007 minutes of a regular meeting of the

3    board of directors of Mango Five Family, Inc.  Right?

4    A.   Right.

5    Q.   On the page ending 0538, it's the last page --

6    A.   Okay.

7    Q.   -- the second paragraph says, "Ms. Dokken indicated that

8    she was negotiating with HSBC, U.S. Bank, and Stanford for a

9    new loan facility."  What do you recall about that?

10   A.   Just -- just what's written there.

11   Q.   What was that loan facility?

12   A.   It was always refinancing, you know, existing debt.  I

13   mean, when the estate of Bob closed, there was significant

14   debt.

15   Q.   To this -- in October 1st, 2007, we got this statement

16   from Mr. Knudson.  It's the fourth paragraph down.  It says,

17   "Mr. Knudson noted the ... advantage of borrowing from

18   Stanford would be the possibility for legal offset in the

19   event that the trust's significant investment in certificates

20   of deposit in Antigua were at risk."

21   A.   Right.

22   Q.   What -- what does that mean?

23   A.   We just -- it was just placed in the minutes a statement

24   that Mr. Knudson had made.

25   Q.   So at least as of October 1st, 2007, you had a board of

```
 1  directors meeting.  We've got at least one director saying,

 2  Certificates of deposit in Antigua could be at risk.

 3  A.   Well, he said, in the event of -- of risk.  In the event

 4  that the trust's significant investment in CDs were at risk.

 5  That was just anticipatory planning.

 6  Q.   Was it like him to always wonder, Hmmm, things could be

 7  at risk, let me say that out loud?

 8  A.   Oh, I think that, you know, Steve has been with Gary

 9  significantly longer than Gary's been with me, and that's 20

10  years.  You know, Steve could comment at any time on the

11  concentration of the assets in Liberty or TCI.  This doesn't

12  strike me as anything highly unusual that Steve might say.

13  Q.   Is it your experience with Steve that he would consider

14  that things might be at risk, when you're just kind of

15  gratuitously saying that?  He didn't have any actual belief

16  that they could be at risk?

17  A.   Yeah.

18  Q.   Really?

19  A.   Yeah.

20  Q.   Did that get frustrating at the meetings that he was

21  constantly saying, this might be a risk, this might be a risk?

22  A.   Well, no, he wasn't constantly saying that, but, I mean,

23  you know, he just said, you know, of the lenders on the table

24  that you're looking at, here's a consideration.  I don't think

25  anybody read anything seriously into it.
```

1    Q.   Okay.  Let's look at Plaintiff's Exhibit 133.  We've got

2    an agenda and minutes of the regular meeting of the investment

3    committee of Mango Five on October 1st, 2007.  Right?

4    A.   Right.

5    Q.   All right.  Let's look at page 491.  So this is -- this

6    is the same day that Knudson says, in the event Antigua CDs

7    might -- could be at risk.  Right?

8    A.   Yeah.

9    Q.   Same day.  But this certainly says that Mr. Magness asked

10   for a full report about the CD program in Antigua --

11   A.   Right.

12   Q.   -- and wanted Chuck Wilk to investigate that program?

13   A.   Right.

14   Q.   So at least as of October 1st, 2007, Mr. Magness himself

15   wants more information about this CD.  Right?

16   A.   Yes.

17   Q.   And he wants an investigation to happen.

18   A.   Yes.

19   Q.   And what does this mean by "further investigated"?  Was

20   there an investigation that happened before this?

21   A.   No.

22   Q.   No, or you don't remember?

23   A.   No, he said further requested.

24   Q.   It says, "Could be further investigated" at the bottom.

25   A.   It -- it's -- it's not an implication that there was a

```
 1    prior investigation because there was not a prior

 2    investigation.

 3    Q.   All right.  Let's look at the Plaintiff's Exhibit 73.

 4    And on the second page, which is Bates label ending 7776,

 5    we've got item 6.  Right?

 6    A.   Right.

 7    Q.   It says, "Report on Stanford certificates of deposit."

 8    And it says, "GMIT continues to hold the Stanford certificates

 9    of deposit, and there have been no redemptions of the

10    certificates of deposit during the reporting period."

11    A.   Right.

12    Q.   That's all this document says about Stanford.  Right?

13    A.   Right.

14    Q.   This is mere days before the first 25 million comes out

15    of Stanford.  Right?

16    A.   Right.

17    Q.   And this is the same month the 88.2 million comes out of

18    Stanford.

19    A.   Right.

20    Q.   And all this says is, trust still has CDs?

21    A.   Uh-huh.

22    Q.   And at this point, during this meeting, did you know that

23    SIB was not allowing redemptions of those certificates?

24    A.   No.

25    Q.   I want to turn to your handwritten notes that we looked
```

1   at.  It's 267, was the big --

2   A.   Okay.

3   Q.   -- compilation.  All right.  We've got the 600 page, six

4   zero zero.

5   A.   Right.

6   Q.   And this is October 1st, 2007?

7   A.   Yes.

8   Q.   I will tell you what I think item 8 says, but you correct

9   me, because you know your handwriting better than do -- than I

10  do.

11  A.   Right.

12  Q.   "Miscellaneous.  How investigate Stanford?"

13  A.   Right.

14  Q.   "Can SEC investigate reports?"  Right?

15  A.   Right.

16  Q.   "Stanford International Bank."

17  A.   Right.

18  Q.   R stands for you?  T for Tonya?

19  A.   Yes.

20  Q.   "Directed to contact Chuck and see how we go about

21  investigate this"?

22  A.   Yes.

23  Q.   "Ask Tom to give a report.  Stanford banking --"

24  A.   Yes --

25  Q.   "-- and Stanford International Bank"?

1    A.    Uh-huh.

2    Q.    What is that -- that B or that C, that cents symbol, that

3    underlined thing?

4    A.    And.

5    Q.    "And ask Chuck for a report on how to investigate."

6    A.    Right.

7    Q.    So at this point, according to your contemporaneous

8    minutes, there are reports of SEC investigations on October

9    1st, 2007.

10   A.    I don't -- I don't read it that way.

11   Q.    How do you read it?

12   A.    As a possibility to see if there are SEC reports on this.

13   Q.    Oh.  So you want to make sure that the SEC's not

14   investigating Stanford?

15   A.    It's -- yeah.  It just -- it was just kind of a question.

16   And I didn't put a question mark in there, but I don't think

17   it's saying, in my mind, that there are SEC reports.

18   Q.    Well, let's -- let's look at that, because in the

19   sentence above, you say, "How investigate Stanford," question

20   mark.  So you've just used a question mark.  Right?

21   A.    Right.

22   Q.    And then you say, "Can SEC investigate reports," period.

23   A.    Right.

24   Q.    Okay.  This next document in your set after the slip

25   sheet, just flip a couple of pages.

1    A.    Okay.

2    Q.    It starts at 605.

3    A.    All right.

4    Q.    These are your contemporaneous notes from that March 2008

5    meeting in Vegas where you figured out it was a hedge fund.

6    Right?

7    A.    That was -- you know, that was my conclusion, yeah.

8    Q.    Right.  And so at item 2, we start talking about Stanford

9    and about Juan Rodriguez.  Right?

10   A.    Right.

11   Q.    You had a lot of questions for Juan.  Right?

12   A.    Right.

13   Q.    And you say, Stanford is a, quote, international bank.

14   Right?

15   A.    Right.

16   Q.    And you see that he concedes that that -- as opposed to a

17   commercial bank, that SIB doesn't have loans.  Right?

18   A.    You're a little ahead of me.  "Concedes that as opposed

19   to a commercial bank..."

20   Q.    It's investors, not in loans?

21   A.    Yeah.

22   Q.    Invests not in loans?

23   A.    "It invests not in loans, instead follows the Swiss bank

24   model."

25   Q.    And I haven't --

1    A.    And I earlier said the English merchant bank.  It was a

2    Swiss bank model.

3    Q.    It's kind of odd, Swiss bank model?

4    A.    Swiss bank?  Yeah.

5    Q.    When you think of Swiss bank model, what do you think of?

6    A.    Frankly, I just quoted it, because I have no idea what a

7    Swiss bank model is.

8          MR. SADLER:  Your Honor, we're about to go to the

9    next volume.  Would you like to take the morning break or let

10   it play into the next volume.

11         THE COURT:  Let's go about 15 minutes and break.

12         MR. SADLER:  Fifteen minutes.  Very good.

13         RAYMOND L. SUTTON, JR., BY VIDEOTAPE DEPOSITION,

14   Q.    Now, you're aware that Ralph Janvey was appointed as

15   Receiver for Stanford International Bank as well as the other

16   entities in the Stanford Financial Group?

17   A.    Yes.

18   Q.    And you know that he was appointed by the Court in

19   February 2009?

20   A.    Yes.

21   Q.    You know that a receiver can be appointed when an entity

22   is insolvent.  Right?

23   A.    Yes.

24   Q.    You know a receiver can be appointed when a company turns

25   out to be a fraud?

1   A.   Yes.

2   Q.   Now, you've testified previously that you took accurate

3   minutes at all of those meetings we discussed earlier.  Right?

4   A.   Yes.

5   Q.   And you wouldn't make up something in meeting minutes

6   that wasn't actually said.  Right?

7   A.   I would not.

8   Q.   Especially if you were reporting on something that you

9   yourself said at a meeting?

10  A.   Yes.

11  Q.   So just for reference, in that notebook to your left is

12  Plaintiff's Exhibit 92.  It's a document we looked at before,

13  and I'm going to ask a related question about a newly-produced

14  document.  But I just want you to have that for reference.

15  A.   Okay.

16  Q.   Now, you see that these are the final signed version of

17  the December 5th, 2008 Mango Five investment committee meeting

18  minutes.  Right?

19  A.   Yes.

20  Q.   And you see that last page that you're on has your

21  signature?

22  A.   Yes.

23  Q.   And it's dated April 9th, 2009?

24  A.   Yes.

25  Q.   And at the very bottom footer, you see -- the very bottom

1    of the page, you see all those numbers at the bottom?

2    A.    Yes.

3    Q.    And it says at the end, .3.  Right?

4    A.    .3?

5    Q.    Correct.

6    A.    I see -- okay.  Yes, I see it.

7    Q.    And that indicates that's Version 3.  Correct?

8    A.    Okay.  Yes.

9    Q.    So this is the final signed Version 3.  Right?

10   A.    Yes.

11   Q.    Okay.  So you said that April 9th, 2009, is the date that

12   you signed it?

13   A.    Yes.

14   Q.    Okay.  So that indicates that at the next investment

15   committee meeting, which is on April 9th --

16   A.    Right.

17   Q.    -- 2009, these minutes were approved.

18   A.    Right.

19   Q.    Hand you Plaintiff's Exhibit 384.  And if you'd turn

20   to -- I'm sorry.  If you'd turn to that last page again, you

21   see that this is Version 2.  Right?

22   A.    Yes.

23   Q.    And you created this Version 2 of the December 5th, 2008

24   investment committee meeting minutes in your capacity as

25   secretary, like you testified about before?

1    A.    Yes.

2    Q.    All right.  So this Version 2 says a couple of things in

3    section 4, Report on Stanford Certificates of Deposit, that I

4    want to ask you about.

5    A.    Okay.

6    Q.    Okay?  So let's look at the first paragraph of 4.  That

7    last sentence says, "Mr. Sutton advised that under United

8    States law, if the Bank went into receivership, the loan would

9    not offset the certificates."  You see that.  Right?

10   A.    Yes.

11   Q.    And then on the second page at the top, the last sentence

12   of that top paragraph says, "Mr. Sutton advised that if the

13   Bank went into receivership under United States law, GMIT

14   would likely have to repay the 25 million."  Right?

15   A.    Right.

16   Q.    And GMIT is the Gary Magness Irrevocable Trust?

17   A.    Yes.

18   Q.    And that's a defendant in this lawsuit?

19   A.    It is.

20   Q.    Okay.  And you see earlier, I guess on that first page,

21   "bank" is defined as Stanford International Bank.

22   A.    Okay.

23   Q.    Do you see that?

24   A.    Yes.

25   Q.    Okay.  Now, you wouldn't have said those two things at

1    the December 8 -- December 5th, 2008 meeting if they weren't

2    true.  Right?

3    A.    Let me understand the question.

4    Q.    Sure.

5    A.    I wouldn't have said that -- I wouldn't have made that

6    statement if I didn't believe it was a true statement, or at

7    least, you know, a legal statement.

8    Q.    Okay.  So you believed what you said?

9    A.    Yes.

10   Q.    And you wouldn't have put those two sentences in here if

11   you hadn't actually said that at the December 5th, 2008

12   meeting, would you have?

13   A.    Well, that became a discussion at the April meeting --

14   Q.    Okay.

15   A.    -- because these minutes -- this particular part became a

16   discussion, and the minutes as submitted, which are Version 2,

17   were not approved by the committee --

18   Q.    Okay.

19   A.    -- as not being accurate.

20   Q.    Okay.  So I just want to understand your testimony.  This

21   Version 2 of Plaintiff's Exhibit 384 of the December 5th, 2008

22   meeting minutes for the investment committee, you brought that

23   with you to the April 9th, 2009 meeting?

24   A.    Yes.

25   Q.    And so this was the -- this was the version you thought

1    was accurate and correct.

2    A.    Yes.

3    Q.    And when you presented it at that meeting, someone or

4    some people disagreed.

5    A.    Yes.

6    Q.    Who were those people?

7    A.    I -- you know, I don't -- we had a roomful of people.  I

8    honestly can't tell you who would have been, you know, the

9    initial objector to it.

10   Q.    So you took these minutes, Version 2, there.  They

11   said -- somebody or some people said, take out those two

12   sentences.

13   A.    Right.

14   Q.    With no other modifications.  Right?

15   A.    Right.

16   Q.    So the two sentences that say, it might go into

17   receivership and Gary Magness may owe money to the Receiver,

18   they said take that out?

19   A.    Yes.

20   Q.    Did you agree with that?

21   A.    I did, or I wouldn't have taken it out.

22   Q.    It doesn't change the fact that you actually said that at

23   the December 5th, 2008 meeting, though, does it?

24   A.    I think that there was a difference of opinion as to what

25   was actually said.

1    Q.   Let's take the December 5th, 2008 meeting minutes first.

2         So what is your recollection of what you said at that

3    meeting concerning the two sentences we're discussing today?

4    A.   Jeez, I don't have any specific recollection on what was

5    said.  I mean, it was a general, you know, discussion about,

6    you know, could there be liability on a clawback theory, and I

7    was putting it out there.

8    Q.   Gotcha.  And so your best recollection is what you wrote

9    in Plaintiff's Exhibit 384, because that was closer to the

10   time that the meeting actually occurred.  Right?

11   A.   Yes, it was close to the time.

12   Q.   So I just want to be clear on these December 5th, 2008

13   meeting minutes.  Both of these sentences say, the common

14   clause is, if the bank went into receivership.  Right?

15   A.   Yes.

16   Q.   That's a -- that's an if?

17   A.   Right.

18   Q.   So at this point, a receiver had not been appointed for

19   Stanford International Bank.  Right?

20   A.   Right.

21   Q.   You anticipated that one might be appointed for Stanford

22   International Bank?

23   A.   I was conjecturing that one could be appointed.

24   Q.   Right.  And you didn't need the SEC or anyone else to

25   tell you that that was a possibility, did you?

1    A.    No.

2    Q.    So how did you come to that conclusion, that a receiver

3    might be appointed for SIB?

4    A.    I honestly don't know.  I don't know if I'd heard things

5    up to that point.  I honestly don't know.

6    Q.    Was it something that you came up with at the meeting or

7    is it something that you were prepared to discuss at the

8    meeting?

9    A.    You know, I honestly don't recall.

10   Q.    Okay.  Had anyone, prior to December 5th, 2008, asked you

11   to look into, A, whether a receiver might be appointed for

12   SIB; or, B, if one was, what the liability outcome might be?

13   A.    No.

14   Q.    So your statements about the appointment of a potential

15   receiver in December 2008 came more than two months before a

16   receiver was actually appointed for SIB.  Right?

17   A.    That's correct.

18   Q.    Did you tell anyone else about your conclusion other than

19   the people in the room at this -- at the December meeting?

20   A.    Not that I -- not that I recall.

21   Q.    Did you tell anybody at BakerHostetler?

22   A.    I -- I don't have any recollection.  These minutes would

23   have been dictated a few days before the April meeting.  That

24   was my sort of habit.

25   Q.    Okay.

```
 1   A.    So by then, the receiver had been appointed.

 2   Q.    Right.

 3   A.    And I knew the receiver had been appointed.  And I -- you

 4   know, when I dictated the minutes, I might have, you know, you

 5   take, like, the -- and in -- in the Madoff case, for example,

 6   which I'm very familiar with --

 7   Q.    Uh-huh.

 8   A.    -- which my firm is handling, the -- the person's

 9   position is trustee, not a receiver, so I was familiar with

10   the trustee by April because I think the Madoff trustee was

11   appointed in December of 2008, if my recollection is correct.

12              MR. SADLER:  Is this a good stopping point for the

13   Court?

14              THE COURT:  That's fine.

15        We'll take our morning break and see you-all back in 20

16   minutes.

17                  (Whereupon, the jury left the courtroom.)

18              THE COURT:  Anything else?

19              MR. SADLER:  No, sir.

20              MR. PETRIE:  No, sir.  Thank you.

21              THE COURT:  Okay.  See you in 20 minutes.

22                       (Brief recess.)

23              THE COURT:  All set?

24              MR. SADLER:  Yes, sir.

25              THE COURT:  How much more?
```

 1          MR. SADLER:  It's -- IT'S less than 20 minutes.

 2          MR. PETRIE:  I had a quick question, Your Honor.

 3   After you've read the instruction --

 4          THE COURT:  Uh-huh.

 5          MR. PETRIE:  -- how, mechanically, would you like us

 6   to proceed to march through the corrections?

 7          THE COURT:  You know, I think I would read the

 8   question, the original answer, and the corrected answer.

 9          MR. PETRIE:  And I have, Your Honor, a cut and

10   paste, if that would be helpful to the Court and to counsel,

11   as to how we propose to proceed.   If --

12          THE COURT:  I don't personally feel a need to see

13   it.

14          MR. PETRIE:  Okay.  And mechanically, for example,

15   in some jurisdictions if you have a witness testifying via

16   deposition, so to speak, and you put the person on the stand

17   and you swear them in, are you wanting us to go through that

18   or to just read?

19          THE COURT:  Why don't you just read it.

20          MR. PETRIE:  Okay.  Thank you.

21          (Whereupon, the jury entered the courtroom.)

22          THE COURT:  Be seated.

23      The Receiver may proceed.

24      RAYMOND L. SUTTON, JR., BY VIDEOTAPE DEPOSITION,

25   A.   And so I'm thinking that the use of the word "receiver"

```
 1    that would have been dictated at the time that I was doing the

 2    minutes around the April meeting would have been influenced by

 3    the appointment of the receiver in the Stanford case.

 4         I'm not familiar with bankruptcy law or SEC law as to

 5    what the difference is between a trustee or receiver.  So my

 6    best answer is that the use of the word "receiver" was

 7    probably not used as such in the December meeting.  Something

 8    else was probably used.

 9    Q.   Let me pause you right there.  So at the December

10    meeting, whether you used the word "receiver" or "trustee" or

11    "officer of the court" or any number of appointed persons, the

12    concept was presented at the December 2008 meeting.

13    A.   Yes.

14    Q.   Right?

15    A.   Yes.  That would be a correct statement.

16    Q.   And Plaintiff's Exhibit 384 you said was your best

17    recollection of what you actually said --

18    A.   Right.

19    Q.   -- at the December 5, 2008 meeting.

20    A.   Right.

21    Q.   Right.  And so what you anticipated in December 2008

22    actually came true in February 2009.  Right?

23    A.   Yes.

24    Q.   So you figured out something was up on December 5th,

25    2008, before the Ponzi schemes even hit the news.  Right?
```

```
 1   A.   What we did know at the December meeting, as Mr. Espy had

 2   indicated, was that there had been a substantial infusion of

 3   capital in November of almost a half a billion dollars.  And

 4   certainly in December of 2008, I didn't know the law of

 5   clawbacks or anything like that, although I have had a client

 6   in years before --

 7   Q.   Uh-huh.

 8   A.   -- who was involved in a hedge fund clawback situation in

 9   a New York jurisdiction, and we were involved with that client

10   on a clawback issue.  So that experience would be my only

11   familiarity with the law of clawbacks.

12   Q.   You figured out, at least by December 5th, 2008, that SIB

13   was in trouble, didn't you?

14   A.   No.  What I knew was that SIB had had a substantial

15   infusion of capital.

16   Q.   And that was concerning you?

17   A.   I also knew that SIB had told Mr. Espy that they could

18   not redeem the certificates in October.  Those are the two

19   knowns that I was operating under.

20   Q.   And you've testified before, at least as to the denial of

21   redemption, that that was -- that was a big red flag, wasn't

22   it?

23   A.   Yes.

24   Q.   And then followed on with that, you find out about this

25   nearly half a billion infusion of capital.  Right?
```

1    A.    Right.

2    Q.    And so by December 5th, 2008, you know something is up at

3    SIB.   Right?

4    A.    Well, let's -- you know, that meeting is -- is within 30

5    days of -- of what is stated as a half-a-billion-dollar

6    capital infusion.  So at that point in time, if that was true,

7    it didn't necessarily in my mind mean that we were going to go

8    into receivership, but I was talking generically that under

9    the law of clawbacks, this could be an issue.

10   Q.    But there was a -- A possibility a receiver or other like

11   court-appointed officer being appointed.  Right?

12   A.    I mean, I wouldn't know that short of, you know, the

13   funds getting seized or going into bankruptcy.

14   Q.    But you acknowledged at the December meeting that that

15   certainly was a possibility?

16   A.    Oh, yes.

17   Q.    So let's talk about the substance of these two sentences.

18   The first paragraph is talking about following the denial of

19   redemption, Magness then took out $63 million in loans.

20   Right?

21   A.    Right.

22   Q.    And that those loans were collateralized by Mr. Magness'

23   SIB CDs.

24   A.    Yes.

25   Q.    Right?

1   A.   Right.

2   Q.   And so that being stated, then you said if the bank went

3   into receivership, the loan would not offset the certificates.

4   Right?

5   A.   That was what I put in the minutes.

6   Q.   Right.  And so I just want to understand what that means.

7   Were you stating that, "Even though you got out the money, Mr.

8   Magness, and even though they're so-called backed by the CDs,

9   those CDs may not offset those loans you owe."

10  A.   Yes.  I would -- I would say that is how I would have

11  stated it, more as a may.

12  Q.   And so, you know, you're stating, "Mr. Magness, even

13  though you got out $63 million, you may still owe that $63

14  million back."

15  A.   Yes.

16  Q.   Irrespective of whether they're collateralized by these

17  SIB CDs?

18  A.   Yes.

19  Q.   And then the second paragraph talks about how Mr. Magness

20  received $25 million of interest after the redemption denial.

21  Right?

22  A.   Yes.

23  Q.   And you then say in that -- well, sorry.  Then it's also

24  referencing the capital infusion you talked about earlier.

25  Right?

1    A.    Right.

2    Q.    And then following that context, you said that if the

3    bank went into receivership, GMIT, the trust that got the

4    interest, correct --

5    A.    Right.

6    Q.    -- would likely have to repay the 25 million?

7    A.    Right.

8    Q.    Right.  So is there anything about that sentence that

9    doesn't speak for itself?

10   A.    The -- the sentence, obviously, was not approved in the

11   April meeting, and if I had felt that I was right and the

12   others were wrong on that, the -- the sentence probably could

13   have been kept if that had been asserted more in the -- you

14   know, you might have to repay or you may have to repay or

15   something like that.

16        I would say reading the sentence now, it was

17   inappropriate to say -- because, obviously, you have very two

18   strongly-litigated positions on the issue.  So it -- it -- I

19   had no -- I -- I asserted it more strongly than any lawyer

20   should have asserted it --

21   Q.    Okay.

22   A.    -- at the meeting.

23   Q.    So your issue that we're talking about here is the use of

24   the word "likely."  Right?

25   A.    Right.

1    Q.    Otherwise --

2    A.    And would, could.

3    Q.    So you would change "could have to repay"?  That's a fair

4    revision at this point?

5    A.    Yes.

6    Q.    Okay.  So, in conjunction, these two paragraphs, we've

7    got you observing either at the time likely or now could be

8    liable for $88 million.  Right?

9    A.    Right.

10   Q.    And you're aware that the Receiver is suing the Magness

11   Defendants for $88 million.  Right?

12   A.    Yes.

13   Q.    I think the first thing we should talk about and -- and

14   just go over are your roles and responsibilities as a -- for

15   Mango Five.  And rather than go through them and just asking

16   you discrete questions one by one by one by one, I'd like you

17   to just talk in your own words about how you saw your role for

18   Mango Five.

19   A.    Well, my -- my role prior to formation of the private

20   trust company was always strictly that of an attorney for Mr.

21   Magness and the Magness-related entities.  Mr. Magness in his

22   capacity as the personal representative for his late father's

23   estate was really the beginning of that long-time relationship

24   I had with Mr. Magness, and after the formation of the private

25   trust company, he asked me to be a director of that because I

1    had been designated by Mr. Magness as a successor trustee in

2    the event of his death for the GMIT, which is the Gary Magness

3    Irrevocable Trust.

4        And so when we formed the private trust company, he asked

5    me to be a director, because we wanted to have three

6    directors, and I was -- I was then the secretary of the

7    corporation.  I was an investment committee member and a

8    distribution committee member.

9        And after we amended the bylaws to create advisors for

10   the investment committee while Mr. Magness was alive, I became

11   no longer an investment committee member with a fiduciary

12   duty, but I was an investment advisor to the committee.

13   Q.   And in acting as an advisor, were you tasked with

14   providing legal advice -- I'm sorry, not legal advice, were

15   you tasked with providing investment advice to Mango Five?

16   A.   No, not -- not as such.  Maybe offer an opinion.  I mean,

17   Mr. Magness was well aware that in my practice I represent a

18   fairly significant number of very high net worth family

19   offices that have different levels of investment capability

20   within those offices, something I testified to with Mr. Day in

21   the first deposition.  And so my awareness of best practices

22   followed by other similarly-situated clients was something he

23   was interested in.

24   Q.   And so one of the things that you brought to the table,

25   so to speak, was knowledge about family office best practices.

1    Is that fair?

2    A.   Yes.

3    Q.   And so you -- is it fair to say that you were not an

4    advisor on the investments that the Mango Five entity had?

5    A.   Well, what is fair to say is that -- that, for example,

6    there were some stock trades that Mr. Magness would make.  I

7    was never involved in that.  I was never involved in a

8    decision or a question for advice on purchasing new

9    securities.  I was never involved in purchasing the Stapleton

10   Business Center investment that we talked about earlier this

11   morning.

12       So I didn't -- I didn't weigh in on specific investments

13   that Mr. Magness was making.

14   Q.   In your prior testimony, Mr. Day asked you a series of

15   questions about information that you came in contact with

16   while you were working -- you know, serving as a member of

17   Mango Five, and I just want to touch on a few of these points

18   and ask a few follow-up questions.

19       So one of the things that you testified about during this

20   time period was that you're a pretty well-read, as far as news

21   is concerned, person.  Is that right?

22   A.   Yes.

23   Q.   And I believe you testified that you read three

24   newspapers on a regular basis every day.

25   A.   Right.

1    Q.   And you read a few business magazines a month.  Is that

2    right?

3    A.   Yes.

4    Q.   I think Mr. Day established with you at the beginning of

5    this deposition today that the Stanford receivership was

6    appointed in February of 2009.  Do you remember that?

7    A.   Yes.

8    Q.   And considering just -- or considering that time period,

9    so February 2009, I want you to think of that as the date the

10   Receiver was -- was put into place, in February 2009, and then

11   I want you to think of the time before the Receiver was put in

12   place, so before February 2009.

13   A.   Right.

14   Q.   So are we clear what we're talking about?  Before

15   February of 2009, in all of your reading, had you ever come

16   across a news article about Stanford International Bank that

17   made you think that Stanford International Bank was insolvent?

18   A.   No.

19   Q.   Did you ever in all of your reading before February of

20   2009 ever come across a news article that made you think that

21   Stanford International Bank was a fraud?

22   A.   No.

23   Q.   Did you ever come across a news article before 2009 that

24   made you think Stanford International Bank was a Ponzi scheme?

25   A.   No.

1    Q.   Did anyone bring any news articles to your attention

2    before February of 2009 that they had found that they thought

3    suggested that Stanford International Bank was a fraud?

4    A.   Not that I recall.

5    Q.   And similarly, no one else brought you news articles that

6    they thought suggested Stanford International Bank was a Ponzi

7    scheme before February 2009?

8    A.   Not that I recall.

9    Q.   In serving as a Mango Five representative in your various

10   capacities, did you ever learn about any government --

11   governmental investigation of Stanford International Bank

12   before February of 2009?

13   A.   Not that I recall.

14   Q.   And in any capacity, even outside of Mango Five, did you

15   come across any sort of information about a governmental

16   information of Stanford International Bank before February of

17   2009?

18   A.   No, not that I recall.

19   Q.   Let's take a look at Exhibit 384, and that's in the stack

20   of documents you got today.

21   A.   All righty.

22   Q.   And you recall that Exhibit 384, you testified earlier,

23   was a prior version of the December 5th, 2008 minutes of the

24   annual meeting of the investment committee of Mango Five

25   Family, Inc.

1    A.    That's correct.

2    Q.    And I just want to clarify.  This version that was typed

3    up, what is your best understanding of the time frame in which

4    you would have dictated your written notes and then Linda Key

5    would have transcribed them in relation to the actual date of

6    the meeting, December 5th, 2008?

7    A.    My practice was to dictate the minutes of a meeting

8    within one to two weeks immediately prior to the next

9    scheduled meeting.  So the next scheduled meeting wasn't as

10   faithful as quarterly meetings, which we tried to do, but

11   depending on schedules, at least three months later, sometimes

12   four months after the actual meeting took place, would I

13   dictate the minutes.

14   Q.    And so these December -- the minutes for the December

15   5th, 2008 meeting were not typed up until at least a few

16   months after December 5th, 2008.  Is that right?

17   A.    The actual dictation of these minutes would have taken

18   place more than two months after the meeting itself.

19   Q.    And so the date of the meeting was December 5th, 2008.

20   That's right?

21   A.    Right.

22   Q.    And so two months later would put it -- January 5th is

23   one month.  February 5th, 2008 would be two months later.  Is

24   that right?

25   A.    That would be right.

1    Q.   So that's probably the earliest that they would have been

2    dictated, your minutes.

3    A.   Well, I think the general practice -- and, again, we

4    could -- you'll probably find an exception, but the general

5    practice was that the pending subsequent meeting would prompt

6    me to do the minutes of the prior meeting.

7    Q.   And the next meeting was in April 2009.  Isn't that

8    right?

9    A.   That's correct.

10   Q.   Okay.  So it's possible that these weren't typed up until

11   March of 2009.

12   A.   It's likely they were not typed up until March.

13   Q.   And so -- and do you recall when they were actually typed

14   up?

15   A.   No.

16   Q.   So when you were looking at your notes and making the

17   dictation that led to this particular written draft that we're

18   looking at in Exhibit 384, if that dictation took place in

19   March of 2008 [sic], that dictation happened after the

20   Stanford receivership was put into place.  Is that right?

21   A.   Well, actually, I think I testified -- well, the April

22   meeting followed the appointment of the Receiver.  The fact

23   that I used the Receiver identified as the receivership in

24   these minutes I think strongly supports my recollection these

25   meeting minutes were dictated after the appointment of the

1   Receiver.

2   Q.   And so the fact that the Receiver had been appointed was

3   on your mind at the time you were dictating these minutes.  Is

4   that right?

5   A.   Assuming my recollection is correct, then that's right.

6   Obviously, I would have known that there was a Receiver.

7   Again, in the corollary case, the Madoff case that we were

8   handling, there wasn't a receievership.  It was a trusteeship.

9   So --

10  Q.   You testified earlier today that at some point in time in

11  the past you had represented an entity that got involved with

12  some sort of investment for which a receiver was appointed.

13  Do you remember talking about that?

14  A.   Yes.

15  Q.   And so you had some experience in your professional

16  career with receivership or a receievership.  Is that right?

17  A.   Yes.  I don't know if it was a trusteeship or

18  receievership.  I had an individual client who had made a hedge

19  fund investment in New York and the fund was seized.  My

20  client had gotten money out, and the trustee/receiver asserted

21  a clawback for the money that was gotten out.  So I was

22  familiar with a clawback situation in general.

23  Q.   And so that general experience would have informed your

24  statements in the December 5th, 2008 version of the minutes

25  that we're looking at in Exhibit 384.

1    A.    Yes.

2    Q.    Plaintiff's Exhibit 384, which is one we talked about

3    today.

4    A.    Okay.

5    Q.    So when you -- when you talked with me earlier, when you

6    said that your -- your issue with the last two sentences,

7    right --

8    A.    Right.

9    Q.    -- you advising under U.S. law?

10   A.    Right.

11   Q.    We know what sentences we're talking about?

12   A.    Right.

13   Q.    You said maybe you said it too strongly.  That was your

14   issue number one.  Right?

15   A.    Right.

16   Q.    So it was changing "would not offset to may not offset

17   the certificates" and to "may not offset the certificates."

18   Right?

19   A.    Right.

20   Q.    And it was changing "would likely have to repay" to

21   "could have to repay."  Right?

22   A.    Yes.

23   Q.    That was one issue.  And then the only other issue was

24   you went, "Well, maybe 'receiver' was in my mind when I

25   actually typed these notes up," but --

1    A.    When I dictated them.

2    Q.    When you dictated them, right.  And reviewed them and

3    revised them.  Right?  Right?

4    A.    Right.

5    Q.    But, nonetheless, you recall at the December 5th, 2008

6    meeting raising the point of potential liability for $88

7    million.  Right?

8    A.    Right.

9    Q.    And you remember telling the people at that meeting,

10   whether it was receiver or trustee or other court appointment,

11   someone might be appointed for SIB.  Right?

12   A.    There's a lot in that question that I don't have any

13   recollection of.  I mean, I think the point was raised at the

14   meeting that, you know, those kind -- you know, the

15   transaction could be looked at if something happened to

16   Stanford.

17   Q.    Okay.

18   A.    Going beyond and saying receiver, trustee, I wouldn't

19   have known that.

20   Q.    Okay.  So -- but as you testified earlier, this

21   Plaintiff's Exhibit 384 was your best recollection of what was

22   said at the meeting.

23   A.    Yeah, it was my recollection of what was said at the

24   meeting.

25   Q.    And you created this document, Plaintiff's Exhibit 384,

1    or caused it to be created by Ms. Key much closer to the time

2    of December 5th, 2008 than today.  Right?

3    A.   Yes.  I -- the -- the minutes were probably prepared

4    within a month of the April 2009 meeting.

5    Q.   And Ms. Mentz asked you about the experience you had with

6    a client who part of their interactions were with either a

7    trustee or a receiver.  Right?

8    A.   Right.

9    Q.   And that that informed your experience or understanding

10   of clawback actions.

11   A.   Yes.

12   Q.   Right?  And so that experience with either the receiver

13   or the trustee, did that predate December 5th, 2008?

14   A.   Yes.

15   Q.   When was that?

16   A.   Honestly don't know.

17   Q.   Was it within that year or in a prior year?

18   A.   Probably a prior year.

19   Q.   So even though you said earlier it's possible that a

20   receiver was on your mind when you were actually dictating the

21   minutes, you had heard of the concept of a receiver before

22   dictating the minutes.

23   A.   No.  As I said, I don't -- I am very familiar with the

24   situation the other client was in, and I could not tell you

25   whether it was clawed back by a trustee or a receiver.

1    Q.   Okay.  But the -- the concept of a court-appointed

2    official to claw back funds was something you were familiar

3    with.

4    A.   Yes.

5              MR. SADLER:  Your Honor, that concludes the

6    presentation of Mr. Sutton on behalf of the Receiver.

7              THE COURT:  All right.  I need to give you a very

8    short instruction at this point.

9         On July 14, 2016, Ray Sutton provided the deposition

10   testimony that you have just heard.  After the completion of

11   his deposition, Mr. Sutton had the opportunity to review a

12   written transcript of his deposition.  Following that review,

13   on August 10, 2016, Mr. Sutton submitted written changes to

14   his deposition testimony, including changes to some of the

15   testimony you just heard.  The Magness parties' counsel will

16   now read those changes to you.

17             MS. MENTZ:  Morning.

18        Question:  "So you took these minutes, Version 2 there,

19   they said somebody or some people said take out those two

20   sentences."

21        Original answer:  "Right."

22        Revised answer:  "No.  It was a consensus of opinion

23   those sentences did not belong."

24        Explanation:  "Upon further reflection and after having

25   refreshed my memory regarding the overall timeline of events

1  using the deposition transcript, I realized that there was no

2  discussion at the December 5th, 2008 meeting regarding this

3  issue."

4      Question:  It doesn't change the fact that you actually

5  said that at the December 5th, 2008 meeting, though, does it?"

6      Original answer:  "I think there was a difference of

7  opinion as to what was actually said."

8      Revised answer:  "No.  My comments were not made at the

9  December 5th meeting but rather in a separate discussion

10  several months later."

11      Explanation:  "Upon further reflection and after having

12  refreshed my memory regarding the overall timeline of events

13  using the deposition transcript, I realized that there was no

14  discussion at the December 5th, 2008 meeting regarding this

15  issue."

16      The question:  "So let's take the December 5th, 2008

17  meeting minutes first.  So what is your recollection of what

18  you said at that meeting concerning the two sentences we're

19  discussing today?"

20      Original answer:  "Jeez, I don't have any specific

21  recollection on what was said.  I mean, it was a general, you

22  know, discussion about, you know, could there be liability on

23  a clawback theory, and I was putting it out there."

24      Revised answer:  "There was no discussion at the December

25  5th meeting.  Rather, the discussion occurred several months

1    later."

2        Explanation:  "Upon further recollection and after having

3    refreshed my memory regarding the overall timeline of events

4    using the deposition transcript, I realized that there was no

5    discussion at the December 5th, 2008 meeting regarding this

6    issue."

7        Question:  "So your statements about the appointment of a

8    potential receiver in December 2008 came more than two months

9    before a receiver was actually appointed for SIB.  Right?"

10       Original answer:  "That's correct."

11       Changed answer:  "That's not correct.  My mention of the

12   appointment of a receiver occurred during a subsequent

13   conversation that occurred several months later."

14       Explanation:  "Upon further reflection and after having

15   refreshed my memory regarding the overall timeline of events

16   using the deposition transcript, I realized that there was no

17   discussion at the December 5th, 2008 meeting regarding this

18   issue."

19       Question:  "Let me pause you right there.  So at the

20   December meeting, whether you used the word 'receiver' or

21   'trustee' or 'officer of the court' or any number of appointed

22   persons, the concept was presented at the December 2008

23   meeting?"

24       Answer:  "Yes."

25       Question:  "Right?"

1    Answer:  "Yes, that would be a correct statement."

2    Revised answer:  "No.  The concept of a receiver was not

3    discussed at the December 2008 meeting but rather occurred

4    during a separate conversation that occurred several months

5    later."

6    Explanation:  "Upon further reflection and after having

7    refreshed my memory regarding the overall timeline of events

8    using the deposition transcript, I realized that there was no

9    discussion at the December 5th, 2008 meeting regarding this

10   issue."

11   Question:  "And Plaintiff's Exhibit 384 you said was your

12   best recollection of what you actually said --"

13   Answer:  "Right.

14   Question:  "-- at the December 5th, 2008 meeting."

15   Answer:  "Right.

16   Question:  "So what you anticipated December 2008

17   actually came through this in February 2009?"

18   Answer:  "Yes."

19   Revised answer:  "Incorrect.  The discussion occurred in

20   a subsequent conversation that occurred several months later."

21   Explanation:  "Upon further reflection and after having

22   refreshed my memory regarding the overall timeline of events

23   using the deposition transcript, I realized that there was no

24   discussion at the December 5th 2008 meeting regarding this

25   issue."

1     Question:  "And so by December 5th, 2008, you know

2   something is up at SIB.  Right?"

3     Answer:  "Well, let's -- you know, that meeting is within

4   30 days of what is stated as a half-a-billion-dollar capital

5   infusion.  So at that point in time, if that was true, it

6   didn't necessarily in my mind mean that it was going to be

7   going into a receivership, but I was talking generically that

8   under the law of clawbacks, this could be an issue."

9     Revised answer:  "Talking in a later meeting generically

10   that under the law of clawbacks, this could be an issue."

11     Explanation:  "Upon further reflection and after having

12   refreshed my memory regarding the overall timeline of events

13   using the deposition transcript, I realized that there was no

14   discussion at the December 5th, 2008 meeting regarding this

15   issue."

16     Question:  "But you acknowledged at the December meeting

17   that that certainly was a possibility."

18     Answer:  "Oh, yes."

19     Revised answer:  "No.  That discussion regarding the

20   possibility of a receiver or other like court-appointed

21   officer did not occur until a subsequent conversation that

22   occurred several months later."

23     Explanation:  "Upon further reflection and after having

24   refreshed my memory regarding the overall timeline of events

25   using the deposition transcript, I realized that there was no

1    discussion at the December 5th, 2008 meeting regarding this

2    issue."

3        Question:   "But, nonetheless, you recall at the December

4    5th, 2008 meeting raising the point of potential liability for

5    $88 million.  Right?"

6        Answer:   "Right."

7        Revised answer:  "No.  That discussion regarding the

8    possibility of a receiver or other like court-appointed

9    officer did not occur until a subsequent conversation that

10   occurred several months later."

11       Explanation:  "Upon further reflection and after having

12   refreshed my memory regarding the overall timeline of events

13   using the deposition transcript, I realized that there was no

14   discussion at the December 5th, 2008 meeting regarding this

15   issue."

16       Question:  "And you remember telling the people at that

17   meeting, whether it was receiver or trustee or other court

18   appointment, someone might be appointed for SIB.  Right?"

19       Answer:  "There's a lot in that question that I don't

20   have any recollection of.  I mean, I think the point was

21   raised at the meeting that, you know, those kind -- the

22   transaction could be looked at if something happened to

23   Stanford."

24       Revised answer:  "There's a lot in that question that I

25   don't have any recollection of.  I mean, I think the point was

1    raised at the later meeting that, you know, those kind -- the

2    transaction could be looked at if something happened to

3    Stanford."

4         Explanation:  "Upon further reflection and after having

5    refreshed my memory regarding the overall timeline of events

6    using the deposition transcript, I realized that there was no

7    discussion at the December 5th, 2008 meeting regarding this

8    issue."

9         Question:  "Okay.  But as you testified earlier, this

10   Plaintiff's Exhibit 384 was your best recollection of what was

11   said at the meeting?"

12        Answer:  "It was my recollection of what was said at the

13   meeting."

14        Revised answer:  "Upon further reflection, I realized

15   that there was no discussion at the December 5th, 2008 meeting

16   regarding this issue."

17        Explanation:  "Upon further reflection and after having

18   refreshed my memory regarding the overall timeline of events

19   using the deposition transcript, I realized that there was no

20   discussion at the December 5th, 2008 meeting regarding this

21   issue."

22        Thanks.

23             MR. SADLER:  May we proceed with our next witness?

24             THE COURT:  Please.

25             A PANEL MEMBER:  What she just read, would that be

1    advisable for us to review.

2            THE COURT:  It's treated just like the other

3    deposition testimony.

4            A PANEL MEMBER:  Okay.  Thank you.

5            MR. SADLER:  We call, Your Honor, our final witness,

6    Ms. Karyl Van Tassel.

7        May I proceed, Your Honor?

8            THE COURT:  In just a one second.

9            MR. SADLER:  Yes, sir.

10           THE COURT:  Could you raise your right hand, please?

11           (Whereupon, the oath was administered by the Court.)

12           THE COURT:  You may proceed.

13           MR. SADLER:  Thank you, Your Honor.

14                    KARYL VAN TASSEL, SWORN,

15                    DIRECT EXAMINATION

16   By Mr. Sadler:

17   Q.   Good morning, Ms. Van Tassel.

18   A.   Good morning.

19   Q.   Would you please introduce yourself to the jury?

20   A.   My name is Karyl Van Tassel.

21   Q.   And, Ms. Van Tassel, first, I want to just establish with

22   you there are three -- three general subjects we're going to

23   cover this morning and then -- and then after the lunch break.

24       First is your role in this trial because it's a little

25   different.  But in order to understand your role, we're going

```
 1    to go over your background, your qualifications, your -- your

 2    experience.

 3         And then, finally, the third thing we're going to talk

 4    about is the facts you've uncovered and some opinions you have

 5    here to share with the jury.  And I just want to be sure we're

 6    clear on those are the three things we're going to talk about.

 7    A.   Yes, that's my understanding.

 8    Q.   All right.  Well, let's get going then.

 9         First of all, tell the jury where did you grow up?

10    A.   I was born and raised in Grand Junction, Colorado, but

11    I've lived in Houston, Texas, for the last 17 years.

12    Q.   And tell us a little bit about your family situation down

13    there.

14    A.   I live with my teenage son in a suburb of Houston.

15    Q.   And where do you currently work?

16    A.   I am a managing director with Navigant Consulting.

17    Navigant is a global consulting firm that has expertise in a

18    variety of areas.  One of those is litigation and

19    investigations.

20    Q.   And Navigant a small company, big company?  Just give us

21    a general understanding.

22    A.   Large multinational.  We have 50 offices that are

23    both -- they're all in the U.S., Canada, the Middle East,

24    Asia, and Europe.

25    Q.   All right.  Would you give the jury an overview of
```

1   your -- your education and work experience?  I think we may

2   have a slide that will help us with that, but tell us about

3   that.

4   A.   Well, I graduated with my accounting degree in 1985.  I

5   guess that dates me.  But for the last 30 years then, I have

6   been working in a variety of different accounting areas,

7   including auditing, tax, valuing small businesses, or

8   privately-held businesses at least, also doing consulting

9   of -- of different varieties, including expert witness

10  testimony on economic damage claims, and investigation and

11  forensic accounting.

12  Q.   And -- and prior to Navigant, there are two other firms

13  that you've done similar work for?

14  A.   I have.  Just prior to Navigant, I was a partner with

15  PricewaterCoopers.  PWC is one of the four -- the big four

16  accounting firms that are the largest global accounting firms

17  in the world.  I was a partner there for three years.

18       Prior to that, and that takes me back to the time when I

19  started the Stanford Receivership, I was with FTI Consulting

20  for eight years.  FTI is very similar to Navigant.  It's a

21  large, global, multinational consulting firm, same area of

22  expertise in disputes and investigations.

23  Q.   And -- and what professional licenses do you hold?

24  A.   I am a CPA in the state of Texas.  I belong to the

25  American Institute of CPAs and the Texas Society of CPAs.

1    Q.   And -- and could you tell the jury a little bit more

2    about your experience in this area of investigations and

3    forensic accounting?

4    A.   Well, I've been involved in that area really for a better

5    part of 25 years of my total 30 years of experience.  Those

6    kinds of cases arise when there's some kind of issue relating

7    a financial dispute or some kind of financial impropriety.

8         And so oftentimes we're called upon to come in and look

9    at either recovery of the money or the assets that might be at

10   issue, or to find out just what happened from a financial

11   standpoint.

12        Some of the types of things that I've been involved in

13   have been, from an accounting perspective, accounting fraud

14   where there's misstatement of a financial statements, either

15   the numbers or some of the disclosures that are required;

16   embezzlement, good old-fashioned people taking money; and also

17   in arson cases, where there's been a fire and there's some

18   implication of a financial motive, we go back in and kind of

19   recreate the records and what happened in the business.

20   Q.   Now, this term of "forensic accounting," can you expand

21   on that a little bit and help the jury understand that?

22   A.   Yeah.  Forensic accounting is really going in and looking

23   at, we call it, the real economic substance of what happened.

24   We go through transactions, data, we do interviews, to try to

25   piece as much information together as we can to determine what

1    really happened.

2        Then we compare that to what has been reported maybe to

3    the public or to bankers, whatever that might be, to see if

4    there's a differential and therefore a potential problem.

5    Q.   And over your career, can you tell us about how many

6    different cases or investigations you've worked on that

7    involve some kind of financial fraud, financial impropriety?

8    A.   Well, I -- it would be over a hundred different cases

9    that I've been involved in that involved some kind of

10   financial impropriety.

11   Q.   There's also been some mention of the term "Ponzi scheme"

12   during this trial.  Is Ponzi scheme something you have

13   experience investigating in your career?

14   A.   I have.  I've been involved in three other Ponzi schemes

15   prior to the Stanford receivership.

16   Q.   And can you help us understand, is there something

17   different, is Ponzi scheme different from financial fraud, or

18   help us understand that?

19   A.   Ponzi scheme is really just a type of financial fraud.

20   Financial fraud at its -- it's common base is really that

21   there has been some kind of false statement, and a company has

22   to make that false statement because they're covering up a

23   lie, either that there's assets that don't exist, there's

24   sales that don't exist, maybe inventory, whatever that lie may

25   be.  And from an individual, it's covering up their lie that

1    they took money.

2        So no matter how you look at it, and a Ponzi scheme is

3    the same, it's a coverup of a lie because of something that

4    has happened that's improper.

5    Q.    Now, you were here, were you not, for the testimony we

6    just heard from Mr. Sutton about the meeting minutes and the

7    different versions of the meeting minutes and taking stuff

8    out?  Were you here for that testimony?

9    A.    I was, yes.

10   Q.    So I want to ask you, in your background investigations

11   that you have done in other matters, what kind of examples

12   have you seen of people going in, changing documents, putting

13   things in, taking them out as part of the coverup?

14   A.    Well, that happens a lot.  I mean, I've seen faked bank

15   statements, invoices, all kinds of things.  I had one case

16   actually where we were trying to figure out if there were some

17   sales that had been recorded that weren't real, and we were

18   going to look through trends.  And, finally, we asked a

19   bookkeeper, and she said, Oh, you need to look for the

20   invoices that start with an F; those are the fake invoices.

21       So even they themselves oftentimes have to keep track of

22   what they're actually doing versus, you know, the fake

23   information in their ledgers.

24   Q.    And let's talk about your experience as an expert witness

25   giving testimony as you are here today.  Setting aside the

1   Stanford litigation, how many times have you been qualified as

2   an expert and had to testify?

3   A.   It's probably been about 50 times over my career.

4   Q.   50, five-0?

5   A.   Five-0, yes.

6   Q.   And if we're talking about Stanford-related litigation,

7   and by that, I mean litigation related to the Stanford

8   receivership, about how many times have you testified in

9   matters related to that?

10  A.   Well, I think the count stands now at about 13

11  depositions.  There have been three other trials where I've

12  testified like here in front of a jury, two hearings where we

13  appeared before the Judge, and I think that's it.

14  Q.   And we've seen a lot of deposition testimony that's been

15  presented to us in connection with this case.  Did you sit for

16  a deposition where the lawyers here could ask you questions

17  about the facts and your opinions and so forth?

18  A.   Well, I didn't sit for a deposition.  I've had four

19  depositions in this case.

20  Q.   With regard to your work, again not related to this case,

21  but regard to your other work in Stanford litigation, has your

22  work been cited in court decisions?

23  A.   Well, first of all, I have a team that does the work, so

24  I can't take credit for all of that.  But the conclusions that

25  I've come to and the opinions that I've made have been cited

1  with approval in 15 different court decisions.

2  Q.  All right.  So now we know a little bit about who you are

3  and what kind of work you do.  I now want to talk about the

4  kinds of things that you reviewed to form the opinions, to

5  develop the facts, that you're here to testify about.

6      First of all, let me confirm, have you been here for the

7  entirety of this trial, all last week and this morning?

8  A.  I have.  There were a few hours last Friday that I had to

9  take care of a family matter and I left a little early, but

10  other than that, I've been here.

11  Q.  Okay.  And so you have seen the testimony that's been

12  presented not only from the witness stand but up on the screen

13  as well?

14  A.  Yes, I have.

15  Q.  So I want to ask you about, because we've had a number of

16  witnesses, and I just want to be very clear what you have

17  looked at with respect to these witnesses.  So let's -- let's

18  start with Mr. Magness, obviously.

19      You had a chance to review his testimony that he gave

20  here, I take it?

21  A.  Yes, I was here for that.

22  Q.  Did you, prior to this trial, have the opportunity to

23  review Mr. Magness' deposition that he gave and the documents

24  that he was asked about and so forth?

25  A.  Yes.  The deposition, all the documents, and some written

1  responses in interrogatories.

2  Q.   And then with respect to Mr. Knudson, Mr. Magness'

3  business partner and so forth, were you likewise present for

4  his testimony live here in court?

5  A.   Yes, I was here.

6  Q.   And again, prior to the trial, did you review the

7  deposition he gave, the questions and answers, the documents

8  that he discussed in that deposition?

9  A.   Yes, I have reviewed all of those before my opinions.

10  Q.   And being someone who has testified in matters related to

11  litigation, are you familiar with what discovery is,

12  interrogatories, things such as that?

13  A.   Yes.  I've had to learn that over time.

14  Q.   And give us, just very brief, what are those kinds of

15  materials?

16  A.   Well, those are materials such as the Complaint, which

17  reflects what the issues are in a case, or the Answer, which

18  is how the defendant might answer.  Interrogatories are simply

19  questions put between the parties and -- and answered.

20  Q.   And -- and those kinds of discovery materials, the -- the

21  pleadings like the Complaint and other things,

22  interrogatories, have you reviewed those in connection with

23  your gathering of facts in this case?

24  A.   I have, yes.

25  Q.   And then let's talk about the other witnesses, to be

1   clear.  Ms. Dokken, the CFO for the Magness people, she

2   testified.  And then we had Mr. Espy -- the advisor and

3   friend, racing partner of Mr. Magness.

4        Did you use the same process that you've just described

5   with respect to what you reviewed in connection with their

6   testimony.

7   A.   Yes.  Their testimony was the same:  depositions,

8   everything that went with them, and any statements they made.

9   Q.   All right.  And, likewise, we had some other folks, some

10  lawyers, financial advisors, who worked for Mr. Magness.  I

11  think there was Mr. Bell, Mr. Armstrong, and of course we just

12  saw Mr. Sutton.

13       Did you, again, use the same process--review all of those

14  same materials with respect to their testimony?

15  A.   I have, yes.

16  Q.   And then finally or next to finally, we saw a couple of

17  folks who were a little different.  Mr. James Davis and -- who

18  you are familiar with.  We will talk with him in a moment.

19  And Chuck Wilk, who worked for the Magness folks.  Both of

20  those gentlemen were convicted felons.

21       Did you review, nevertheless, the same kinds of materials

22  related to them?

23  A.   I did, the information that was available from them.

24  Q.   And then with respect to Mr. Davis, did you have an

25  opportunity to review some different kinds of information

1   related to him?

2   A.   Yes.  For Mr. Davis, he had a plea agreement, and I

3   actually read that plea agreement and the hearing transcript

4   that goes along with it.  They have to go to court and tell

5   the judge what they're going to plead to.

6        Additionally, Mr. Stanford was tried in a criminal

7   proceeding for six weeks down in Houston.  So it was kind of

8   fun.  I went and listened to all of Mr. Davis' testimony.

9   Just fun for an accountant.  But I listened to all of Mr.

10  Davis' testimony, which was a big part of that, so I could

11  understand what he had to say, and also all the other

12  witnesses that had to do with accounting and financial

13  matters.  I have the transcript available to me as well.

14  Q.   And then I think--we're almost finished--Mr. Tolentino,

15  you're familiar with who he is.  He's the president of the

16  former bank.

17  A.   I am.

18  Q.   And did you have an opportunity not only to review the

19  portion of the deposition that was played here, but other

20  depositions he's given in Stanford-related litigation where

21  he's had to answer questions about his role in the fraud?

22  A.   Yes, I have reviewed those.

23  Q.   And then, finally finally, we had Mr. Graves.  What did

24  you review of Mr. Graves' work?

25  A.   I think Mr. Graves had two reports and one deposition,

1    and I reviewed those, in addition to being here for his

2    testimony.

3    Q.    All right.  So those are the witnesses.  Those are the

4    materials you have looked at.  I just want to make a couple of

5    things clear if they're not already clear.

6          First of all, with respect to Mr. Janvey, are you a

7    friend, financial advisor, lawyer for Mr. Janvey?

8    A.    No.  None of those.  I've worked in the capacity of the

9    Receiver working as an investigator for the receivership.

10   Q.    And I don't want to pry, but are -- are you a convicted

11   felon?

12   A.    No, I'm not a convicted felon.

13   Q.    All right.  Are you -- are you like Mr. Graves, who we

14   heard from, who was hired by the Magness folks to come in,

15   spend a couple of weeks working on the case, and then come

16   testify?

17   A.    No, I'm -- I'm different than that.  I think Mr. Janvey

18   testified about, you know, how this started, and going into

19   the offices of SIB.  I was there that day, and so I've been

20   involved as overseeing the investigation for almost eight

21   years now.

22   Q.    All right.  Well, let's -- let's talk about your role

23   then in the -- in the whole Stanford receivership, not just

24   this case.

25         Tell the jury a little bit, how did you first come to be

1   involved with the Stanford receivership back in 2009?

2   A.    In 2009, I was then with FTI Consulting.  I received a

3   call from a Baker Botts attorney, and FTI was then engaged the

4   same day that Mr. Janvey was appointed.

5   Q.    And the firm FTI that you worked for, what was to be the

6   role of the firm that you worked for?

7   A.    Broadly, we were to be the lead forensic investigatory

8   firm.

9   Q.    And then your role for FTI for the Receiver, what was

10  that to be at the beginning?

11  A.    My role was just to oversee all the work that we were

12  doing.  We had many, many people, as you might imagine,

13  involved, and I just oversaw what we were doing and how we

14  proceeded with our work.

15  Q.    Were you the lead investigator for the Receiver?

16  A.    I have been, yes.

17  Q.    All right.  Can you -- you guys have done a lot of work

18  over the past several years, but can you tell the jury, just

19  encapsulate it for us, the top biggest sort of three or four

20  categories of work that you did with FTI and then as it

21  continued?

22  A.    Well, you know, first of all, or our most important job

23  in the beginning was to lock down the assets, including the

24  electronic data, to make sure other people couldn't get access

25  to them because that was something that the Receiver needed.

1    I've also been involved in looking at the various

2    Stanford entities--you heard there is 130 of

3    those--understanding how they worked together.  We do that by

4    understanding the flow of funds between them, because we

5    needed to see how the money -- tracing the money, following

6    the money, how it was allocated and disbursed.  So we did that

7    a lot through bank statements, that kind of work.

8    We certainly came to understand that the SIB CDs were key

9    to part of this fraud, so we spent a lot of time understanding

10   those and what was happening about those.

11   Then as time went on, we've been involved in litigation

12   now, and also FTI, at least, is involved in the claims

13   process, where there's a submission by investors who've lost

14   money.

15   Q.   And was it one of the early tasks of you and the others

16   assisting you to identify where Stanford had any money, if he

17   had any money left, and then more importantly, what might be

18   evidence of large payments having gone out in the months and

19   weeks before the Receiver took over?

20   A.   Yes.  That's one of the first things that -- that we do

21   when we come in.  We want to see the money that went out in

22   the last few months before the Receiver.  We're more likely to

23   be able to get that back.  So that was one of the first things

24   that -- that we did.

25   Q.   All right.  And, now, you told us you were with FTI for a

1    very long period of time.  You've now transitioned to -- to

2    Navigant.  In connection with that transition, has -- has your

3    role and your work narrowed in focus?

4    A.    Well, really since I've come to -- well, PWC and then

5    Navigant, I've been involved mostly in litigation at this

6    point.

7    Q.    All right.  Sounds like you've been involved, you and

8    your colleagues, with a lot of work over the years.  Let me

9    ask you, I assume you're not doing this for free, are you?

10   A.    No.  The firm will not allow us to do this for free.

11   Q.    All the firms that you and your colleagues have worked

12   for--FTI, Price, Navigant--those firms charge the Receiver for

13   your time, do they not?

14   A.    Yes.  That and all the people that are involved in it.

15   Q.    Can you help the jury understand just from a process,

16   what is the process your firm goes through in order to be paid

17   for the work that you do?

18   A.    Well, all of the -- all of the people on our team have to

19   submit detailed billings that set out, you know, by person,

20   and we do tenth of minute what we were doing, the kinds of

21   tasks that we were provided -- that we were providing -- the

22   services providing, I guess.

23         Those are then given to Mr. Janvey as the Receiver.  He

24   sometimes has questions.  We answer those questions, and there

25   might be changes or not.

1          Then there is what is called an examiner and the

2     Securities and Exchange Commission.  They both look at the

3     invoices.  Again, questions come back to us, we answer, there

4     might be changes to the invoices.  And then, finally, after

5     all that, the invoices go to Judge Godbey, who finally

6     approves them, and there's payment.

7     Q.   All right.  And with respect to the rates that the firms

8     have charged for your time, including the rate Navigant is

9     charging for your time here today, tell the jury what those

10    rates have been.

11    A.   Originally my rate was $488 an hour.  Currently--I'm not

12    sure when that happened, maybe a year and a half ago--it's now

13    $520 an hour.

14    Q.   And do your firms just to get to set whatever rate they

15    want?

16    A.   No.  Those are negotiated.

17    Q.   And who approves those?

18    A.   It has to be through the receivership, same process,

19    basically Receiver, SEC.

20    Q.   All right.  Now, the jury needs to understand, you know,

21    what all this costs because it's -- it's not -- it's not for

22    free.  Given the eight years of works, all the colleagues that

23    have been working on this, you, the tens of thousands of

24    hours, if we focus just on FTI, how much has the Court

25    approved in payments to FTI to date?

1    A.    The payments to FTI to date are $22 million.

2    Q.    And are those for the fees for the work for all the

3    dozens of professionals, including yourself for the work that

4    you've done for the Receiver, on all the cases, all matters

5    related to the receivership?

6    A.    Yes.  That's correct.

7    Q.    And then with respect to Navigant--that's more

8    recent--about how much has been approved for payment?

9    A.    That's been, I believe, $80,000 -- or, excuse me,

10   $570,000 for all of the work that I've done since I've been

11   there for the receivership.

12   Q.    All right.  Now, that's a very large number for FTI.

13   Within that $22 million, can you again kind of give us maybe

14   the top three or so categories?  What kind of work has the

15   receivership had to pay for?

16   A.    Well, I think the best way to break it down is maybe look

17   at what I think of as general receivership, and that would be

18   when we originally came in and had the investigation, had

19   people fanned out across the country obtaining data, different

20   things like that, as well as helping with the operations of

21   the business, because it has to be wound down.  That was about

22   $11 million of it.

23        Then there's the litigation where we provide the analyses

24   and the testimony, opinions.  That's about $8 million.

25        And then there's, as I talked about, the claims process

```
 1    for the investors who lost money.  That's been about $3

 2    million.

 3    Q.   And with respect to the claims process, that's something

 4    that FTI continues to work on, even though you're now no

 5    longer with FTI?

 6    A.   Yes.  That remains with FTI, and I really haven't been

 7    involved with that.

 8    Q.   And with respect to Navigant and your work on this case,

 9    not all of the other receiverships, but what would have been

10    the fees related to that?

11    A.   I believe we've collected about $80,000 for this case,

12    part of the 570- I talked about before.

13    Q.   Now, you mentioned just a moment ago the -- the

14    claimants, and obviously this -- that has been a -- the fact

15    that there are depositors who lost money, has that been a part

16    of your work in this case, investigating that?

17    A.   No, not the claims themselves.

18    Q.   Right, but investigating the losses by the depositors.

19    A.   Oh, absolutely.  That was really what we were asked to

20    do.  That is the largest part of the investigation.

21    Q.   And -- and how many depositors who still had accounts at

22    the bank have lost money?

23    A.   That's 18,000 investors.

24    Q.   And the approximate amount of the loss?

25    A.   $7 billion.
```

1    Q.    Now, let's now go back just a little bit to some of the

2    testifying you've done because I think there's something else

3    you were involved in that we forgot to tell the jury about.

4         You've obviously testified in receivership litigation,

5    but was there also a proceeding brought by the Securities and

6    Exchange Commission that you had some involvement with?

7    A.    Yes.   The SEC filed claims against four individuals from

8    the Stanford entities for securities fraud, and I testified at

9    their trials.   Three of them had been presidents of SGC, the

10   brokerage, at different points in time.   That was Jason Green

11   and Jay Comeaux and Dan Bogar.   Additionally, there was

12   Bernard Shaw, who was the compliance manager there.

13        So I testified in the administrative proceeding against

14   those four individuals, all of whom were convicted of

15   securities fraud.

16   Q.    Now, unless we have a Stanford person and a famous

17   playwright with the identical name, Bernard Shaw, could it

18   have been Bernie Young, Bernard Young, that was --

19   A.    Yes.

20   Q.    -- involved in that proceeding?

21   A.    Sorry about that.   Yes.   Bernard Young.

22   Q.    Now, with -- and when you testified, were you testifying

23   for the Receiver or who hired you to give testimony in that

24   SEC proceeding?

25   A.    The SEC actually retained me in that case.

1    Q.   Now, in the earlier years, did you have with FTI

2    substantial involvement in working with providing information

3    to the Federal Bureau of Investigation and the Department of

4    Justice?

5    A.   Yes.  At the time that we were doing our investigation,

6    as we came in for the Receiver, the Department of Justice and

7    the FBI were doing their own investigations.  And during that

8    time, to the extent that we had information that they didn't

9    have, we would meet with them, provide them data, provide them

10   information, tell them what we were finding.  So we've worked

11   with them throughout that period of time.

12   Q.   So we've talked about the work you've done, we've talked

13   about some of the materials that you've reviewed, but I want

14   to make sure we have a complete picture.

15        As part of your work for the Receiver, not only in this

16   case but generally, have you had the opportunity to review

17   Stanford internal financial records as well as financial

18   records you obtained from third parties, other banks and other

19   financial institutions?

20   A.   Yes.  That was all part of the investigation that we did.

21   Q.   And, again, with respect to the work you have done, have

22   you had the opportunity to review internal documents, emails,

23   custodial files, financial records, and paper in electronic

24   form?

25   A.   We have, tens of thousands of those.

```
 1    Q.   And in addition to the depositions that you have reviewed

 2    in this case, have you had the benefit of working on,

 3    reviewing depositions given in other receivership litigation?

 4    A.   Yes, I have.

 5    Q.   Now, all of this stuff we have -- we have talked about,

 6    all the records, discovery, depositions, files, all of that,

 7    is that the type of information that people in your field

 8    forensic investigators, forensic accounting, is that the type

 9    of information typically used and relied on when you're going

10    to come to court and testify?

11    A.   It is.  Either for this investigation or others, we have

12    a set of procedures that -- that we follow certainly, and that

13    type of information that was described is the type of

14    information that we rely upon and others in my profession

15    would rely upon based upon practice and methodologies that we

16    follow in the procession.

17    Q.   Now, we talked about the fact that you're a CPA.  Are you

18    familiar with an organization called AICPA?

19    A.   Yes.  That's the American Institute of Certified Public

20    Accountant, and I belong to that.

21    Q.   And does the AICPA have standards of professional conduct

22    that you're subject to that govern your work?

23    A.   Oh, yes; absolutely.

24    Q.   And in connection with that, is one of the standards that

25    you, someone like you doing your work, are required to obtain
```

```
 1    sufficient relevant data to afford a reasonable basis for

 2    conclusions or recommendations in connection with services

 3    such as the testimony you're providing here under oath?

 4    A.   Yes.  That's what the statement says, and why I've chosen

 5    to accumulate so much data and information.

 6    Q.   And have you followed in your work in this case, in fact

 7    in all the receivership cases, have you followed those

 8    standards that I just read to you?

 9    A.   Absolutely, yes.

10    Q.   And in the SEC proceeding, were you subject to this same

11    standard when you were doing the work for the Securities and

12    Exchange Commission?

13    A.   Yes.  In all of my work, actually.

14    Q.   All right.  Let's now turn and focus our attention to

15    this case and some of the important issues that we need to

16    discuss with you.

17         First, so we can understand your testimony, based on your

18    review of all of the evidence that you have described you've

19    looked at, what is your primary conclusion that you're here to

20    testify to here today?

21    A.   My primary conclusion is, at the time that the Magness

22    parties took the $88.2 million, they had information available

23    to them that had suspicious facts and circumstances, and I

24    will refer to those generally as red flags.  Those red flags

25    should have led them to conclude that SIB was making false
```

```
 1    statements to cover up their lie, which is their poor

 2    financial position, and that they were not legitimate.

 3    Q.   And when you say their lie, whose lie are you talking

 4    about?

 5    A.   I'm sorry.  The SIB -- SIB's lie and the Stanford

 6    entities in general.

 7    Q.   And then, more narrowly, with specific regard to these

 8    loans, did you reach a conclusion based on your investigation

 9    that you're here to testify about?

10    A.   Yes.

11    Q.   And what is that conclusion?

12    A.   Well, I would call these loans purported loans, not real

13    loans.  They've been papered as such, but they were really a

14    pretext to get the money out of the bank.

15    Q.   All right.  Now, you said suspicious facts and

16    circumstances.  I heard you say that.  Are you talking about

17    information that was just out -- out to the public that any

18    --anybody might read and find?

19    A.   No.  And that's an important point to distinguish.  This

20    was nonpublic information that was made available to the

21    Magnesses apart from what the general investors would have

22    received.

23    Q.   And -- and this nonpublic private information, is that

24    what you're here to answer questions about today, in part?

25    A.   Yes.
```

1    Q.   All right.  And was there something about this nonpublic,

2    private information that had something to do with SIB's public

3    story?

4    A.   It is.  That private information that they received was

5    inconsistent with the public story.  So it casts doubt on that

6    public story and should have led them to look at those -- the

7    suspicious facts and circumstances.

8    Q.   Now, let's now talk about SIB's public story.  We've had

9    a little bit of information come out, but I'd like us to

10   understand it completely.

11       Can you tell the jury just what was SIB's basic public

12   story?  We may have a document to help us.  So Plaintiff's

13   Exhibit 492, which is already in evidence.

14       And I guess, first, let me ask you--I got ahead of

15   myself--what is Plaintiff's Exhibit 492 that's up on the

16   screen and hopefully on your screen as well?

17   A.   Not on my screen, but I can look.  This is standard

18   marketing material that was given to all investors, would have

19   been given to the Magness parties when they're looking to

20   invest.

21   Q.   All right.  Fair to say this is basic marketing

22   literature that Stanford put out year in, year out over the

23   years?

24   A.   Yes.  They'd update it every year or two, but generally

25   the information was all the same.

1    Q.   All right.

2         MR. SADLER:  I think there's some information on

3    page 5 of this that we should go to directly.  And let's grab

4    all that.  That's fine right there.

5    Q.   (BY MR. SADLER)  So with regard -- we can all read the

6    words on the page, so my -- we see depositor security, we see

7    liquidity.  From your investigation, why was this part of the

8    basic SIB sales pitch to the public?

9    A.   Well, you'll hear liquidity a lot.  That was very

10   important, that there was high liquidity in -- for the bank,

11   and that meant that they either had cash or they could turn

12   the investments into cash in a relatively short period of

13   time.  And when we think of highly liquid, it's within a few

14   days.

15   Q.   Is cash, for example, is that highly liquid?

16   A.   That is highly liquid, yes.

17   Q.   All right.  Now, there's a mention here of a

18   well-diversified portfolio, and I think we've seen that phrase

19   multiple times.  With respect, again, to their basic sales

20   pitch, why was this part of the sales pitch?

21   A.   Well, that was their sales pitch that they had this

22   portfolio, and the way that they would manage it supposedly

23   was that they could manage their market risk.

24   Q.   And with respect to highly marketable, is that related to

25   liquidity?

1    A.   It is.  When something's highly marketable, that's like

2    your Apple stock or whatever stock you might own, that you can

3    go on a public market and therefore be able to turn it into

4    cash fairly quickly.

5    Q.   And you have been investigating this Stanford business

6    for years and years.  My question to you is this:  Depositor

7    security, liquidity, was this part of their sales pitch to

8    investors that, put your money with us and you can have access

9    to it quickly, easily, any time, because it's liquid?

10   A.   Absolutely.  That was an important message to their

11   potential investors.

12   Q.   Let's now look at page 7.  And let's focus right down

13   here.  You already mentioned the word "risk."

14   A.   Uh-huh.

15   Q.   So, again, we can see the words on the paper.  They're

16   talking about minimization of market risk.  How is that part

17   of the sales pitch, an important part of your public sales

18   pitch?

19   A.   It's important because when you hear that phrase --

20   you've heard it many, many times -- that well-diversified,

21   global portfolio, that's what most investment firms would say.

22   What they're trying to say is, we have that portfolio, but

23   we've been able to manage those market risks, so when the

24   market has its ups and downs, we aren't going to have that

25   same kind of -- that same kind of happening in our portfolio.

1    So they're trying to say that they don't have as much

2    risk as the market as a whole.

3    Q.    All right.

4        MR. SADLER:    And let's now look at page 8.    And I

5    want to focus on just that top half there.    I'm sorry, Mr.

6    Jarrett.    I pointed to the wrong spot.    These two paragraphs

7    right here, high interest rates, consistent profitability.

8    Q.    (BY MR. SADLER)    So -- so let's pause, and I want you to

9    help us understand.    High interest rates on the one hand and

10   then consistent profitability on the other hand, again, why

11   was this part of the public sales pitch by Stanford?

12   A.    Well, they were advertising to the public that they could

13   give them higher rates of return.    And what they're saying is,

14   because we get these consistent high rates of return ourself

15   on our portfolio, we can pass that on to you.    So they have to

16   put a message out about that consistency so that, you know,

17   they appear more safe to the investors.

18   Q.    And so let me ask you.    Interest rates here, is this

19   talking about rates that they offer to the depositors on the

20   CDs?

21   A.    Yes.    The interest rates for the CDs were what they were

22   promising to the investors.

23   Q.    But if we focus on profitability, is that -- consistent

24   profitability, is that talking about the bank or is that

25   talking about something to the investors?

1    A.    No.   That's talking -- well, it's talking to investors,

2    but it's talking about the bank's profitability on their

3    investments, not the CD investments, their investments.   So

4    it's referring to that.

5         So they're basically saying, we're going to give you high

6    rates, we're going to give you a stated guaranteed rate, but

7    we're going to have this portfolio that isn't necessarily

8    going to perform the same way.

9    Q.    All right.   I think we have a slide that just helps us

10   understand the rate situation, the -- the CD rate comparison

11   slide.

12        First, if you could just describe for us, this is out

13   of -- of 492.   What exactly are we looking at?   What -- what

14   are we looking at?

15   A.    Well, first of all, starting with the chart on the left,

16   what you see is a comparison that was in their marketing

17   brochure, that the tan bars are the SIB CD rates that they

18   were then quoting to investors.   The green bars are U.S. CD

19   rates.   So that differential, when you look at how much higher

20   the SIB rates are, that's what they were telling them about

21   how high their rates would be.   And some of these were almost

22   three times as high as what the CD rates in the U.S. would be

23   paying.

24   Q.    All right.

25             MR. SADLER:   And, Mr. Jarrett, are you able to

1    enlarge this?  Because I can barely read it, and I bet anybody

2    behind me can't read it.  That's a little bit better.

3    Q.   (BY MR. SADLER)  So just to be clear, when you're saying

4    the tan graph, that's the Stanford International Bank CD rate?

5    A.   That's correct, yes.

6    Q.   And then what people could get on average in the U.S.,

7    that's the darker color?

8    A.   That's correct.

9    Q.   And do we see, for example, that in -- in -- you know,

10   it's never the same, but in some years it's almost twice, some

11   years it's almost three times, and a couple of years it's

12   actually pretty close?

13   A.   Yes.  That's correct.

14   Q.   All right.

15        MR. SADLER:  Let's -- let's go back then to the

16   whole slide.

17   Q.   (BY MR. SADLER)  What then in this information telling us

18   on the right-hand side --

19        MR. SADLER:  And, again, Mr. Jarrett, if you could

20   help us by enlarging that so maybe we can see it a little

21   better.

22   Q.   (BY MR. SADLER)  Tell us what we're looking at.

23   A.   What this is illustrating for investors is it starts at a

24   million dollars.  If you put the million dollars into the U.S.

25   banks at the rates that they have on the other chart, you will

1    have by the end of this period of time roughly $1.5 million.

2         On the other hand, if you put it in the Stanford

3    International Bank over that same period of time, you will

4    have -- oh, gosh, it's hard --

5    Q.   2.1 million?

6    A.   I think it's approximately 2.1 million.  So you will have

7    $600,000 more money over that period of time for investing in

8    SIB.

9    Q.   So was part of their basic sales pitch, give your money

10   to us and you'll get more money in the end?

11   A.   That's correct, yes.

12   Q.   Now, again, I want to be clear.  All this stuff we just

13   talked about, there was nothing private or secret.  This is --

14   this is the sales pitch everybody got, wasn't it?

15   A.   Yes.  This is public to the investors.

16   Q.   All right.

17        MR. SADLER:  I think we can take that down now.

18   Q.   (BY MR. SADLER)  Now, part of what we just saw made me

19   want to ask you this question.  We saw the higher CD rates.

20   Those rates, how are they tied to this well-diversified

21   portfolio?  How are those guaranteed rates tied to a

22   well-diversified portfolio?

23   A.   Well, they tie them in that what they're saying is, We

24   get you these high rates because we're able to make these

25   great investments in this well-diversified portfolio, and

1    we've been able to do that very subtly and therefore we can

2    pay you those rates.

3         The problem is, on the interest rates that they are

4    promising to the investors is a stated rate, We will pay you

5    eight percent, nine percent, whatever that might be.  The

6    portfolio is subject to market risk, so you can't guarantee

7    what that's going to be.  So that's inconsistent.

8    Q.   And -- and I -- I don't want to misstate it, but the idea

9    is, are they offering the public a fixed guaranteed rate, but

10   somehow it's based on a portfolio that is subject to the ups

11   and downs of the market?

12   A.   That's correct, yes.

13   Q.   Now, you were here for Mr. Graves' testimony, I take it.

14   We've talked about that.

15   A.   I was, uh-huh.

16   Q.   And I believe you heard Mr. Graves say, Well, looking at

17   these rates, there's -- you know, there's nothing alarming or

18   red flag about that.  Did you hear that testimony?

19   A.   I did, yes.

20   Q.   Can you explain to the jury why just focusing on the

21   difference in CD rates kind of misses the point?

22   A.   Well, you know, I think it misses the point because it's

23   not just the rate; it's the fact that they are saying, We'll

24   get you that high rate with low risk and liquidity.  Those

25   things are like oil and water.  They don't mix.  Usually if

1   you want a higher rate of return, we all know you get higher

2   risk.  So it's -- it's those combinations of those things

3   that -- that are problematic.

4        Additionally, this consistent profitability that's going

5   to allow us to pay those kinds of rates when it's subject to

6   market risk is another problem that you have to take into

7   consideration when you're looking at the rates that they're

8   paying.

9   Q.   So would it be fair to say that offering that, high

10  rates, guaranteed, but based on a market that can go up and

11  down, that kind of raises a question in your mind, doesn't it?

12            MR. PETRIE:  Objection.  Leading.

13  Q.   (BY MR. SADLER)  Does it raise a question in your mind?

14  A.   It does raise a question, yes.

15  Q.   And would you agree there -- there actually might be a

16  legitimate answer to that question?

17  A.   There might be.  To me, that's a little bit implausible.

18  I know they're saying their minimizing it, but that's hard to

19  do on a guaranteed basis.  So certainly that seems implausible

20  to me.

21  Q.   All right.  Well, let's now talk about some other

22  information that may raise a question to which there may be an

23  answer.

24        You mentioned consistent profitability.  And, again,

25  we're talking about what the bank is telling the world are its

1    profits.  Is that what we're talking about?

2    A.    That's correct, yes.

3    Q.    Okay.  Help the jury understand what is significant about

4    this consistent profitability component as you found from your

5    investigation?

6    A.    Well, I think it's one thing to just think, oh, they're

7    pretty consistent over time.  I think it's stark how

8    consistent they told investors they could be.

9         Just to give you an example, from, let's see, 1997 to

10   2002, from that period of time SIB told its investors that,

11   for each year, they had returns ranging from 14 to 14.9

12   percent.  So in each year, there was no more difference less

13   than one percent.  The market at that time, same period of

14   time, had a swing of down negative 23 percent to up of 30

15   percent.

16        So they have a 53 percent swing in the market, yet

17   Stanford's telling people, we can do that over that period of

18   time and stay within less than one percent, and that same kind

19   of dynamic is true in the next five years as well.

20   Q.    All right.  So you were here for Mr. Bell's testimony.

21   Do you recall some questions were put to Mr. Bell, the

22   financial advisor, to the financial folks, the Merrill Lynch

23   guy, asking him what he thought of these consistent year-in

24   year-out performance rates.  Do you recall that testimony?

25   A.    I do.  He did testify about that.

1    Q.    And I believe the record will reflect that he said that

2    he was skeptical of that and he found it highly improbable.

3    And my question to you is, do you agree with that?

4    A.    Yes.  I think what he was referring to was that in two

5    years they were exactly the same, and he said that that was,

6    you know, highly improbable.  I think that's almost

7    impossible.  So, yes, I do agree with that.

8    Q.    So to be sure we understand, are you saying what Stanford

9    was reporting is he was basically a flat straight-line,

10   year-in, year-out, doing basically the same amount of profit

11   at the time when the market was having these big up and down

12   swings?

13              MR. PETRIE:  Objection.  Leading.

14              THE COURT:  Sustained.

15   Q.    (BY MR. SADLER)  Could you describe for us visually what

16   that depicts, the steady profitability versus what the market

17   was doing?

18   A.    If you looked at that on a graph, what you would see is

19   this steady line, I said, between 14 to 14.9 percent.  So it

20   would barely move.  The market, as I said, would go from

21   negative 23 to a high of 30.  So you would have those kinds of

22   movements in the market, yet very steady for SIB.

23   Q.    All right.  Now, to be clear, from your investigation

24   what you're describing for us this is, again -- is this part

25   of the public information, part of public story that's put out

1 by Stanford?

2 A.   It is part of the public story, the -- the rates and that

3 they -- and the deposit rates, yes.

4 Q.   All right.  In the course of your investigation on -- on

5 this case, did you find evidence, for example, meeting minutes

6 of a phone call that the bank president had with the Magness

7 folks where he was called--he, the bank president--was called

8 upon to explain just exactly how the bank was able to make

9 money in the way they were telling everybody they were?

10 A.   Yes.  There were meeting minutes that reflected what Mr.

11 Tolentino, the bank president, told them at that meeting.

12 Q.   All right.  Now, we've seen this document before, but

13 I've got some -- some different questions for you about it.

14          MR. SADLER:  Let's pull up Plaintiff's Exhibit 62.

15 Q.   (BY MR. SADLER)  And just to be sure we know what we're

16 talking about, these are the minutes of the March 6th Mango

17 Five meeting.  Have you reviewed these as part of the large

18 volume of material you reviewed in this case?

19 A.   Yes, I have.

20 Q.   And is this the record that you found concerning Mr.

21 Tolentino's presentation to the Magness folks about how the

22 bank was able to achieve what they told the public it was

23 achieving?

24 A.   Yes.  This is a record of what he told them and the

25 minutes reflect that.

1   Q.   All right.  So I want to focus on the key terms.  I think

2   we have a slide that just pulls out for us the key terms.

3         And you were here for Mr. Magness' testimony, were you

4   not?

5   A.   I was, yes.

6   Q.   And I think I showed this to Mr. Magness, but I want to

7   focus on this with you.

8         Starting with Swiss bank model, how is it that the bank

9   president, describing what his bank does to achieve these

10  steady returns in this up-and-down market, how is it that

11  Swiss bank model makes any financial sense, if it does?

12  A.   Well, it really doesn't make any financial sense.

13  It's -- it's not a term that you see used.  And, in fact, we

14  heard testimony from several individuals that said they didn't

15  understand what it meant, either.

16  Q.   In any -- and you have looked at a lot of materials.  In

17  any of Stanford's published information to investors, the

18  marketing materials that went out to all investors, did you

19  see anywhere where Stanford International Bank ever described

20  itself as following a Swiss bank model, Swiss bank program,

21  Swiss bank anything?

22  A.   No.  I haven't seen anything in the public information

23  about that.

24  Q.   All right.  Now let's talk about the next two together,

25  because one of the things Mr. Tolentino has reported to have

1    said deals with this portfolio of investments.

2         And would you agree, we do see in the published

3    literature references to diversified portfolio of investments.

4    A.    Yes.  You see this often in their material.

5    Q.    But now let me ask you about this description of leverage

6    the portfolio by a factor of 15 percent.  First of all, let's

7    get clear what leverage is.

8         Tell the jury in this context, if you're talking about

9    leveraging a portfolio, what are you telling people that

10   you're doing?

11   A.    Leverage is really debt.  So what you're -- what you're

12   saying is, I'm going to take on debt for up to 15 percent of

13   this portfolio and I'll take on debt at whatever percentage,

14   three percent, and I will use that to make some other -- some

15   higher percentage.  It's rather like what Mr. Magness himself

16   described as his -- his arbitrage and what he does.  That's

17   what you refer to.

18        But there's no mention of that in any of the literature,

19   SIB's literature, not on their balance sheet, and certainly

20   they say quite the opposite in the literature as a whole.

21   Q.    Let me ask you about that just to be sure we understand.

22        If you're talking about leveraging a portfolio, just in

23   general, are you talking about I'm going -- I have a portfolio

24   and I am going to borrow money against that portfolio and then

25   take that borrowed money and go invest it somewhere else,

1  hoping make a higher return than what I'm having to pay to

2  borrow it?

3  A.   No.  You're talking about leverage on that portfolio, to

4  create for that portfolio.

5  Q.   Right.  And is it borrowing against the portfolio,

6  creating the debt?  Is that what we're talking about?

7  A.   Yes.

8  Q.   And if we're talking about a factor of 15 percent, now,

9  in the context -- you've reviewed the memo, what -- and you

10  reviewed the other documents, what is SIB telling all the

11  investing public in this time frame--we're talking about March

12  2008--what are they telling people publicly is the size of

13  their investment portfolio?

14  A.   At this time, it's approximately $8 billion.  So 15

15  percent of that would be about $1.2 billion worth of debt.

16  Q.   So from your point of view as a financial professional

17  and as an investigator, did you find any evidence in any of

18  SIB's public statements, its financial statements it sent out

19  to the FAs, to the investors, any record that the bank was

20  borrowing up to one point something billion dollars and then

21  using that money to go invest somewhere else?

22  A.   No, you don't see that.  And from my perspective, an

23  accounting perspective, you would see that on the balance

24  sheet.  They would have to reflect that debt.  If they're

25  going to borrow against their portfolio, which is an asset,

1   they have to reflect that debt on their financial statements.

2   They did provide balance sheet information in the public

3   literature, but there was no reflection of any debt.

4        Interesting, they actually are very proud of the fact

5   that they don't have that debt.  They say, you know, we're not

6   a general commercial bank, we're not going to make loans.  The

7   only loans that they said -- the bank says it will make is to

8   investors up to 80 percent of the CD values that they have.

9   Q.   All right.  Let's talk about that, because I think we've

10  got two different concepts.  In the literature that you saw

11  where the bank says, we don't make commercial loans, we only

12  loan to depositors, is that talking about the Stanford BANK

13  lending money to other people who are borrowing from the bank?

14  Is that the concept that's being discussed?

15  A.   Yes.

16  Q.   Now, that's not the same concept here, is it?

17  A.   No.  It's different.

18  Q.   Is the concept here Stanford, as the bank itself, is

19  going somewhere and borrowing money from somebody else?

20  A.   Yes.  That would be outside debt that they would have to

21  get.

22  Q.   And if Stanford bank was doing what Mr. Tolentino said to

23  the Magness folks they were doing up to 15 percent, would

24  you -- what kind of financial institution would be providing

25  up to a billion dollars in borrowing money to the Stanford

1    bank?

2              MR. PETRIE:  Objection.  Foundation.

3              THE COURT:  Overruled.

4              THE WITNESS:  It would have to be a large commercial

5    bank.

6    Q.  (BY MR. SADLER)  Now, let me go to this next one

7    here--hedge fund.

8        First of all, let me ask you, is there something of

9    significance between the idea of saying you're operating like

10   a hedge fund but we're also very liquid?

11   A.   Yes.  Those two things are in opposition of each other.

12   A hedge fund is generally considered where you put your money

13   in and it is a long-term investment.  Oftentimes, you're

14   locked in.  So it is not very liquid and, in fact, it

15   generally has higher risk to it.

16   Q.   Now, with respect, again, to focusing on hedge fund, in

17   all of your review of all the marketing materials that went

18   out to investors, did Stanford International Bank ever

19   describe itself, sell itself, brag about itself, that it was a

20   hedge fund?

21   A.   No.  And, in fact, we heard Mr. Espy say that, as a

22   financial advisor, they were told not to say anything about

23   comparing the bank to a hedge fund, for good reason.  As I

24   said, it's riskier and not very liquid, which would be, again,

25   inconsistent with the public information.

1   Q.   And so to be clear, whether we're talking about Swiss

2   bank model, borrowing money to go invest to the tune of 15

3   percent, we're operating like a hedge fund, were any of those,

4   any of those, part of the public pitch to the other investors

5   who were in the bank?

6   A.   No, they were not.

7   Q.   Well, let me ask you this about these terms.  If Stanford

8   is telling the public, We are able to pay you a guaranteed

9   high rate and we are able to achieve consistent, nice, flat,

10  steady profitability while the rest of the market goes

11  whichever way it goes, from a financial perspective, how does

12  any of that explain that?

13  A.   It doesn't explain it.

14  Q.   Does it make any sense from a financial perspective to

15  you?

16  A.   No.  There's -- a lot of inconsistency that is within

17  this.  As I said, very liquid and hedge fund, those do not go

18  together.  Swiss bank model means nothing.  This really told

19  you very little and certainly nothing that would explain those

20  kinds of stories.

21  Q.   So we have here in front of us an example of things that

22  the Magness defendants are being told in a private phone call

23  with the bank president in contrast to what the public's being

24  told.

25       My question to you is, did you find yet another example

1   of the Magness defendants being told something privately that

2   was different from Stanford's public story?

3   A.    I did, yes.  I noted that Mr. Magness testified about the

4   fact that he had gotten some comfort about SIB and its

5   security because the bank president, I believe Mr. Tolentino,

6   had indicated that it was overseeing that the bank, SIB, was

7   overseen by the SEC.  And, in fact, when he was in Antigua in

8   one of his trips, he saw two individuals he believed to be

9   from the SEC.

10       What's in the public literature, however, is that they're

11  very clear that the SIB is only regulated by the regulatory

12  authority of Antigua and Barbuda.  And so that is very

13  different.  And what we found in our investigation, in fact,

14  is that Mr. Stanford placed that bank in Antigua to keep it

15  outside of the eyes of the SEC regulators, and -- and for good

16  reason.

17  Q.    Well -- and, in fact, you've since had the opportunity to

18  review an enormous amount of material related to Stanford and

19  the goings-on there.  In your entire eight years of work in

20  the receivership, have you ever come across any piece of

21  evidence suggesting that at any point in time the SEC had

22  investigators, regulators, anybody down there checking out

23  that bank?

24  A.    No.  In fact, that was exactly what they did not want,

25  and I am very certain that if they had regulators there, we

1    would have seen some mention of it.

2    Q.   All right.  Let me now ask you to go back to your

3    experience as a forensic investigator and the kinds of cases

4    you worked on, the kinds of circumstances that you have seen.

5         Have you seen examples in your investigative work where

6    you go in and you're presented with conflicting stories:  You

7    have a document that says this or somebody's told you that or

8    maybe two documents conflict with each other?  Have you run

9    across that kind of circumstance?

10   A.   Yes.  Often, actually.

11   Q.   And sometimes is there a legitimate explanation for why

12   this document says this, but, you know, Fred told me that, or

13   some kind of conflict?  Is there sometimes a legitimate

14   explanation for that?

15   A.   Sometimes there is.  Oftentimes, there's not because they

16   just haven't gotten stories straight, or whatever reason.  But

17   there can be these reconciling kinds of differences.

18   Q.   Okay.  Well, then can you help us understand whether this

19   is different?  Is there some logical, legitimate explanation

20   that would reconcile the difference with this story, which is

21   we're a Swiss bank model, we borrow money to make money, we

22   are very liquid but a hedge fund, and we don't see any of that

23   in Stanford's public literature?

24   A.   No.  I mean, those are just very different items, and

25   there's no reconciliation between the two, certainly none that

1    I've seen and no explanation that has been provided in that

2    regard.

3    Q.   And, finally, on this document, and we just have the

4    portion of it here, but you've reviewed the whole memo, have

5    you not?

6    A.   Yes, I have.

7    Q.   In the whole memo, did you see any statements attributed

8    to Mr. Tolentino that you would think was a legitimate

9    explanation for the difference between the public story and

10   this stuff he was explaining?

11   A.   No.  There's nothing in the rest of the documents that I

12   think would explain that.

13           MR. SADLER:  Your Honor, we are about to change

14   topics.  Would this be an appropriate time for the lunch

15   break?

16           THE COURT:  Sure.

17       All right.  Time for lunch.  Let's see you-all back at

18   1:30.  1:30.

19           (Whereupon, the jury left the courtroom.)

20           THE COURT:  Do you-all know how much of Sutton gets

21   charged against the Magness parties?

22           MR. SADLER:  We have those numbers.  They don't

23   include, of course, the errata.

24           THE COURT:  Right.

25           MR. SADLER:  But the numbers that we have, nine

1    minutes for the Magness defendants; and then two hours, 14

2    minutes, or 134 minutes, for the Receiver.

3                THE COURT:  Okay.

4                MR. PETRIE:  Well, excuse me, Your Honor.  Before we

5    part company, the errata shouldn't be charged against the

6    Magness parties.  That's part of the deposition testimony.

7    It's inclusive.  It's not a counterdesignation.  It's part of

8    the testimony.  It would be no different than if we had a

9    transcript.  You start out by having the version as corrected,

10   and then opposing counsel is allowed to comment on the change.

11               MR. SADLER:  It was their idea, Your Honor, to do

12   that.

13               THE COURT:  I don't want to set a precedent, but I

14   am just going to eat that seven minutes instead of argue about

15   it.

16               MR. SADLER:  I understand.

17               THE COURT:  And I show Magness using 198 on Friday

18   for a total of 955, the Receiver using 162 on Friday for a

19   total of 603.

20               MR. SADLER:  Does Your Honor -- have you noted what

21   time remaining or --

22               THE COURT:  Well, it's 1,050 minus whatever that

23   number was.

24          Anything else?

25               MR. SADLER:  No, sir.

```
 1              MR. PETRIE:  No.  Thank you.

 2              THE COURT:  All right.  We'll see you at 1:30.

 3                       (Lunch recess.)

 4              THE COURT:  All set?

 5              MR. SADLER:  Yes, sir.

 6              MR. PETRIE:  Yes, sir.

 7              THE COURT:  How much more do you think?

 8              MR. SADLER:  I'll probably go until a few minutes

 9   past 3:00, somewhere in that time frame.

10              THE COURT:  Then I'll wait to break for lunch until

11   you finish unless it looks like you're going considerably

12   past.

13              MR. SADLER:  The afternoon break, Your Honor?

14              THE COURT:  Yes.

15              MR. SADLER:  Okay.

16              (Whereupon, the jury entered the courtroom.)

17              THE COURT:  Be seated.

18        Good afternoon.  We're going to try and finish the direct

19   of Ms. Van Tassel before we take the afternoon break, so it

20   may run a little past 3:00.  If it gets too much past that, we

21   will go ahead and take a break anyway.  There's nothing magic

22   about that time, but that's what we're going to aim for.

23        So the Receiver may proceed.

24              MR. SADLER:  Thank you, Your Honor.

25   Q.   (BY MR. SADLER)  Ms. Van Tassel, I want to switch topics.
```

1    We were just talking about the difference between the private

2    story the Magness defendants got and the public story.  I want

3    to switch to a different topic, and I want to talk with you a

4    little bit about the basic features of the Stanford financial

5    fraud.

6        And so can you tell the jury from your perspective, all

7    the investigation that you have done, if we could kind of

8    distill it down to maybe three points or so, what are the

9    basic features of Stanford's fraud as it was perpetrated?

10   A.   Well, to bring it down to three, I guess I would say,

11   first of all, is the primary and almost only source of funds

12   for SIB and the other Stanford entities was the sale of these

13   high rate certificates of deposit by SIB.

14       As the money came in from those investors, it was then

15   diverted to waste and fraud, continuing the Ponzi scheme.

16   Some went to Mr. Stanford, so that created the big hole in the

17   balance sheet.

18       So what that required from SIB's part was to cover up the

19   fact that they had this problem with their balance sheet with

20   false claims of profitability, that their balance sheet was

21   strong, that they had a great deal of liquidity.

22       I think that's the three basic points to make.

23   Q.   And -- and to -- to illustrate it for us, this concept of

24   a hole in the balance sheet, problem in the balance sheet, how

25   could you illustrate that for us?  What does that mean?

1   A.    Well, if -- if you look at the fact that we have the

2   assets declining over time, they're going out to other

3   entities or to Mr. Stanford, being wasted in various ways, so

4   those assets are no longer there, but your liabilities stay.

5   So, you know, you continue to have $8 billion of liabilities

6   while the rest of the money is going out of the business.

7   Q.    And in talking just for a moment, to digress about the

8   liabilities, the 8 billion, what exactly is it when you say

9   there was 8 billion in liabilities on the bank's balance

10  sheet?

11  A.    Well, from the bank's perspective, when they take their

12  money in from an investor, it's not an investment to them,

13  they owe the money back to the investor.  So they have an

14  asset that comes in of cash, and they have a liability.

15       What they're supposed to be doing is making investments

16  with that cash that's coming in.  That wasn't happening.  As I

17  said, it gets diverted so that liability to the CD holders

18  continues but the money has been diverted.

19  Q.    If liabilities are up here (indicating), are assets down

20  here (indicating)?

21  A.    Yes.

22  Q.    And in the middle is the hole?

23  A.    The middle is the hole.

24  Q.    So with respect to what Stanford was reporting to the

25  world about his balance sheet, was he reporting that he had

1    this big hole in his balance sheet?

2    A.    Of course not.  Over time they continually talked about

3    and -- and presented, as you saw, in marketing materials and

4    in their annual reports, they would continue to present this

5    picture that they were very strong, profitable, healthy, that

6    they had high liquidity, which they talk about in their

7    materials.  And so they used that and the fake assets that

8    they created to cover what they were actually doing.

9    Q.    All right.  And with respect to the amount that was

10   diverted that created this hole -- and I think we have a slide

11   that will help us here.

12          MR. SADLER:  If we will put that up.

13   Q.    (BY MR. SADLER)  What are these financial figures we're

14   looking at here, Ms. Van Tassel?

15   A.    What you're seeing here in front of you is the amount per

16   year from 2000 to 2008 that was diverted, that is, the

17   investor money taken and used elsewhere.  So over the

18   eight-year period of time, we had just over $2.2 billion that

19   was diverted.

20   Q.    And during this time -- obviously this is going on behind

21   the scenes, but during this time, what is Stanford saying

22   publicly about what his balance sheet looks like?

23   A.    They continued to say publicly throughout this period of

24   time that they're continuing to make money, they're

25   increasing -- their assets are increasing along with their

1   liabilities, and that they're very healthy and very strong.

2   Q.   And what is the significance of the fact that this amount

3   generally was growing year after year over time?

4   A.   Well, that continually growing amount shows that the hole

5   was growing bigger and bigger and bigger every year.

6   Q.   In terms of continuing to run a fraud like this, how

7   important is it to keep quiet about, cover up the fact that

8   you have a balance sheet problem?

9   A.   It's very important.  I mean, what they have to do is be

10  presenting to the public that everything's fine, they create

11  literature that shows that they're doing well, but inside

12  there's something different happening.  And that's kind of the

13  don't-let-them-see-you-sweat kind of mentality.  Behind the

14  scenes something is happening that isn't -- that is not good,

15  but to the public they're presenting a different persona.

16  Q.   And -- and with this -- this large hole in -- in the

17  balance sheet that you talked about, well, during this time

18  frame, where is Stanford getting the money to do things like

19  pay people redemptions when they just want to cash out or pay

20  them interest or -- or give people money for loans?  Where --

21  where is he getting that money?

22  A.   The way it works is that -- in -- in the scheme, was that

23  you had to have this ever-increasing number of people coming

24  in as investors.  So what would happen is the new money coming

25  in from a new investor would pay off somebody requesting a

1    redemption or a loan, whatever that might be.

2        So the new investor money has to keep growing to pay off

3    the existing investors so that they can keep that facade that

4    everything is fine.

5    Q.   All right.

6            MR. SADLER:  We're -- we're through with this slide,

7    Mr. Jarrett.

8    Q.   (BY MR. SADLER)  Okay.  So that's the basic features of

9    the Stanford fraud.

10       If we now focus on the important period of time in this

11   case, October 2008, when these loans came out, what was going

12   on inside Stanford that was changing the way it had been

13   running for years?

14   A.   Well, what happened is in October of 2008, what you start

15   to have is there are more people, entities, wanting to take

16   their money out than there are new investors coming in.  So

17   what you have is this point in time where it's harder for

18   Stanford to continue the scheme.  And that's what I call the

19   tipping point, which is the point at which the investors

20   coming in are far less than the investors that want to take

21   out money in redemptions, interest, loans, and all the money

22   that it requires to continue this Ponzi scheme.

23   Q.   Well -- so a couple of questions about that.  This

24   tipping point that you're talking about, did -- did new

25   investors just stop coming in at this tipping point?

```
 1   A.   No.  It was gradual over time.  In fact, up until the day

 2   before the receivership, there were a couple of investors

 3   still putting their money in.

 4        So people are continuing to look at the public

 5   information and put their money into the bank, but it's just a

 6   lot -- there's a lot less of those than the people who are

 7   choosing to take their money out.

 8   Q.   And then you mentioned having trouble keeping up not only

 9   with making payments to investors for redemptions, loans, and

10   interest, you mentioned expenses.

11        From your investigation in this time period, how much

12   money was Stanford spending just on sort of keeping the lights

13   on, paying the rent, salaries, that kind of thing?

14   A.   Their expenses were about $30 million per month.

15   Q.   All right.  So these things, this tipping point you

16   talked about, did that have an impact on just the amount of

17   cash that the bank had available on its balance sheet to pay

18   redemptions, pay interest, pay loans, pay these $30 million a

19   month in expenses, did this tipping point have an effect on

20   the cash?

21   A.   It did.  We've seen that there has been a depletion of

22   cash during of October of 2008.

23   Q.   All right.  And as part of your investigation, did you

24   look at the -- not only the Stanford records, but the records

25   of the banks where Stanford was keeping the cash that he had
```

1    on hand?

2    A.    Yes.   That's correct.   We received actually directly from

3    the bank information about what was happening in the accounts

4    for SIB.

5            MR. SADLER:   And I think we may have a slide to help

6    us, the declining balances slide, Mr. Jarrett, if you could

7    put that up.

8    Q.    (BY MR. SADLER)   So, Ms. Van Tassel, just describe for us

9    what we have depicted here.   What is the information we're

10   looking at?

11   A.    Well, what you can see is, during the month of October,

12   we have this steep decline in the amount of cash.   This is the

13   net amount.   This is net of money coming in and money going

14   out.   So throughout this period of time there's this continual

15   and, I would say, precipitous dip in the amount of cash over

16   this period of time, but, meanwhile, their assets stay the

17   same.   So that's, again, part of the hole in the balance

18   sheet.

19   Q.    So I want to be clear.   During this time, and we've just

20   illustrated the month of October, so tell us, since it needs

21   to appear on the record, what did Stanford start out with in

22   terms of cash on hand to take care of interest, loans,

23   redemption, paying expenses, what did he start out?

24   A.    Well, they started out with approximately $411 million.

25   Over the month, it decreased by 85 percent to the point at the

1    end, they were only at about $65 million of cash left at the

2    end of the month, October 31st, 2008.

3    Q.   And you mentioned net amount, and I want to be sure that

4    we're clear about this.  So during this period of time is it

5    correct that money is coming in to the Stanford fraud, it's

6    just not coming in as fast as money that's going out?

7    A.   That's right.  As I said, money continued to come in.  It

8    was just at a much slower space than the money that was going

9    out.  So these are net amounts for each day.

10   Q.   And if -- whether we're focusing on what he started the

11   month with, $411 million, or ended up the month with, $65

12   million, in this time frame how did this amount of cash

13   compare to what he owed depositors, that is, the liabilities

14   on the balance sheet?

15   A.   At this point they owed about $8 billion to depositors.

16   Q.   And just so we're not being incomplete, if we're just

17   focusing on October, because that's when the loans were taken

18   out, but if we could extend this graph out into November and

19   December into January, how does it change, if it does?

20   A.   Over that period of time, it just continued to decline to

21   the point where they basically ran out of cash, and that's

22   when the fraud was exposed.

23   Q.   At about the point that they ran out of cash, did the

24   bank make an announcement that they were stopping redemptions,

25   no more redemptions?

1    A.    Yes.   That happened later in 2009.

2    Q.    And from your investigation, approximately how many days

3    from that time to when the government filed a lawsuit and shut

4    it all down?

5    A.    I think just a couple of weeks, if that much.

6    Q.    And to be clear, during this specific period of time,

7    October 2008, what was Stanford telling the public about the

8    status of his balance sheet at his bank?

9    A.    They continued through this time through various

10   communications to put out information showing that they were

11   profitable; that they had been -- they were a strong bank;

12   that although they might be affected a little bit by the

13   market, not much at all.   And so they're basically just saying

14   everything is the same as it's been throughout the period of

15   time.

16   Q.    And you've talked about the liabilities.   What was

17   Stanford reporting in this time frame concerning the assets he

18   claimed to have in his investment portfolio with the bank?

19   A.    The investment portfolio at this time would have been

20   about 8.1, $8.2 million.   So they always had it just above

21   what the depositor liability was.

22   Q.    And -- and I may have misheard.   Is that million or

23   billion?

24   A.    Billions.   I'm sorry.   I slip a decimal sometimes.

25   Q.    So to be clear in this time frame, talking about the

1    public literature, talking about liabilities on the one hand

2    and assets in the form of the bank's investment portfolio, is

3    Mr. Stanford telling the public he's got a balance sheet

4    problem or a hole on his balance sheet?

5    A.    No.  Not to the public, he's not.

6    Q.    All right.

7          MR. SADLER:  We're through with this chart, Mr.

8    Jarrett.

9          Let's now move on to the Magness defendants' CD

10   investments, and I think we have a slide that just gets all

11   the information up there that we need.

12   Q.    (BY MR. SADLER)  And, Ms. Van Tassel, again, so that the

13   record for us will be clear, if -- if you would just tell us

14   and confirm that what the Magness defendants invested was $79

15   million overall.  Is that correct?

16   A.    That's correct, yes.

17   Q.    And then we have a total of, and tell us what the total

18   is.

19   A.    The total, with the interest, was $102.6 million as of

20   October 1st of 2008.

21   Q.    And so in this time frame, we're talking about 2007,

22   2008, was the Magness defendants, were they the largest U.S.

23   investor in the Stanford CD program?

24   A.    They were.  They were -- the 79 million was the highest

25   amount of deposits for CDs for an investor.

1   Q.   And this accrued interest -- we're going to come back to

2   that, but I -- I just want you to explain it now.   We'll come

3   back to it again in a minute.   But what is meant by accrued

4   interest of 23.6 million?

5   A.   Well, the investors could decide over time, they could

6   elect to take the interest out as they went and use that, or

7   they could do what I consider rolling it over, or I think Mr.

8   Magness referred to as letting the interest ride, and keep it

9   in the account.   So this is purported interest that's been

10  accrued over the period of time, which totals about $24

11  million by October 1st of 2008.

12  Q.   Now, I notice that you -- you used the term "purported."

13  That's the same term I heard you use with respect to these

14  loans.   As a forensic accounting investigator, what -- what do

15  you mean by calling that purported interest?

16  A.   I call it purported because the way they should have been

17  able to pay, the bank should have been able to pay, interest

18  would have been by these returns that they were supposed to

19  make on their portfolio.   Because they didn't invest the money

20  and there were no returns, this is really fake interest.   It's

21  not real interest.

22  Q.   Just exists on paper?

23  A.   It does, yes.

24  Q.   All right.   Well, let's stay with the CD program for just

25  a minute because there's a couple of questions I think we need

1    to clear up.  There's been a lot of testimony about taking

2    loans against the CDs, and I want to ask you about that right

3    now.

4        So if we're talking about, as of October 1, 2008, if what

5    Mr. Magness wanted to do, for whatever reason, is just go to

6    the bank and say, I want to borrow the maximum amount I can

7    borrow under the bank's rules against my CDs, how much could

8    he borrow?

9    A.   With 102.6 million, he could borrow just over 82 million.

10   Q.   Okay.  And from your investigation, looking at how the

11   bank handled the loans and the rules about it and the program,

12   was there any requirement for Mr. Magness or any depositor to

13   fill out an application and get a credit check or any kind of

14   approval process to get such a loan?

15   A.   No.  They had to fill out some forms to tell the bank

16   they wanted to do it, but, no, no kind of approval process as

17   far as credit or anything like that.  The CDs were to be the

18   collateral on the loan.

19   Q.   And there was also some testimony about that somehow it

20   was the bank's prerogative to -- to either make a loan or not

21   make a loan.  What is your conclusion about that?

22   A.   I don't think that's true.  When I look at the marketing

23   literature, what they were telling their investors, the

24   information available, basically they could make a request of

25   a loan.  The bank did ask them to give them some paperwork to

1    get the loan accomplished just so they had records of it, and

2    then they had the opportunity to take up to 80 percent of the

3    CD value that they had at that time.

4    Q.    Just for the asking?

5    A.    Yes.

6    Q.    Now, let's talk about redemptions.  Did the bank -- in

7    this time frame, did the bank allow what might be called an

8    early redemption?  That is, somebody has a CD that may not

9    mature for another 6 to 12 months, but they come in and say, I

10   want to pay the penalties and redeem.  Did -- did the bank

11   allow that?

12   A.    Yes, it did.  Oftentimes, they would have people come in.

13   Sometimes there were penalties.  There were penalties that the

14   people, investors, would know about.  Sometimes they had those

15   penalties, and sometimes they did not.  But they certainly

16   offered early withdrawal as needed.

17   Q.    And when you say sometimes they would not have such

18   penalties, what -- what circumstance are you talking about?

19   A.    They could negotiate those with the investors.  There's

20   no set criteria, but we know -- I mean, for instance, I think

21   Ms. Dokken said, I don't think she had a penalty when she had

22   her withdrawal, and I know that was early.  So it really

23   depended upon the circumstances and they -- they could make

24   their request, and then that could be negotiated.

25   Q.    And I believe there was some testimony earlier in the

1    case, please confirm you heard it, that the penalty for early

2    withdrawal was in the nature of three months' interest.  Is --

3    is that accurate?

4    A.   That's -- that's true for most of the CDs.  I know Mr.

5    Magness' CDs, that was true.  It was three months.  And that

6    was true for most of the CDs.

7    Q.   Let's now just take a step back and talk about the sales

8    pitch, the public sales pitch.

9         Was it part of the liquidity depositor sales pitch that

10   if you needed your money, the bank was telling people you can

11   get it quickly, and you can get it quickly either in the form

12   of an 80 percent loan or you can early redeem.  Was that part

13   of the sales pitch?

14   A.   That information, yes, was given publicly to the

15   investors.

16        MR. SADLER:  All right.  We can take that down.

17   Q.   (BY MR. SADLER)  All right.  There's been a fair amount

18   of testimony in the case about how this whole thing started in

19   terms of the Magness defendants going to the bank and asking

20   for money in any form, whether redemption or loan, in October

21   of 2008, and I want to talk to you about that subject.

22        So from your investigation, is the sequence of events --

23   we're going to talk about the details, but my question is, is

24   the sequence of events, as you understand it from your

25   investigation, the first thing that happens is there was a

 1    request for redemption that is refused and then the discussion

 2    turns to loans?  Is that the sequence as you found it in your

 3    investigation?

 4              MR. PETRIE:  Objection.  Leading.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  Yes.  That is the sequence of events.

 7    There's a variety of different pieces of evidence that reflect

 8    that.

 9    Q.   (BY MR. SADLER)  Now, as of the time that the Magness

10    defendants first go to the bank to request a redemption, had

11    the phone conversation, the private phone conversation with

12    Mr. Tolentino where he talked about Swiss model and hedge

13    fund, had that already happened?

14    A.   Yes.  Those -- that meeting was in March of 2008, and

15    we're here in October of 2008 when we're talking about the

16    request for redemption.

17    Q.   And, in fact -- and I think we have a document that may

18    help us with this, but if we're talking about in the lead-up

19    to the fall of 2008, was the bank putting out published

20    statements telling people things like, we're having a record

21    year, we've got thousands of new depositors coming in, and

22    everything's going great?

23    A.   Yes.  That was something it would do regularly, and it

24    certainly happened during that period in 2008.

25    Q.   And -- and if we're talking about that public statement,

1    everything's great, we're going fine, and then the private

2    phone call that the Magness defendants had, focusing on those

3    two events, were those two events significant to you in the

4    conclusion you've already shared with us in this case, those

5    two events?  Were they significant?

6    A.    Yes, they were.

7    Q.    Now then, do you understand that there is a dispute in

8    this case about the circumstances under which the Magness

9    defendants first went to the bank to request a redemption?  Do

10   you understand there's two different stories about that?

11   A.    Yes, I do think there are two different stories.

12   Q.    And as part of looking into all the facts and

13   circumstances of -- of the loans, the redemptions, what was

14   going on in the bank in October 2008, is that one of the

15   issues you examined?

16   A.    I have, yes.

17   Q.    And did you hear testimony during this trial that was

18   consistent with what you found in your investigation that shed

19   light on why the Magness defendants really did go to the bank

20   in the first place to ask for money in the form of a

21   redemption?

22   A.    Yes.  That testimony came from Ms. Dokken.

23   Q.    All right.  And is it your understanding--we're going to

24   look at Ms. Dokken's testimony, but I just need to know--is it

25   your understanding that the story from the Magness defendants

1    is they went to get a redemption because they needed money to

2    pay margin calls?

3    A.    Yes.  I understand that's their story.

4    Q.    Now, with respect to the testimony from Ms. Dokken, what

5    did she say was the reason the Magness defendants first needed

6    to go to the bank to try to redeem to get interest that had

7    been accrued, the $24 million?

8    A.    In her testimony, she referred to the fact that what she

9    needed at that time was, in addition to what was happening on

10   the margin side, there were all kinds of expenses that Mr.

11   Magness had.  She said -- she referred to the movie, I think

12   the cattle ranching, and capital requirements on Fortrust.  So

13   those were separate and aside from the margin calls and

14   expenses that she referred to that needed to be covered, and

15   that's why she requested to Mr. Magness that he ask for the

16   redemption of the interest.

17   Q.    All right.  I believe we have -- and it's Plaintiff's

18   Exhibit 73.

19            MR. SADLER:  Let's pull that up.

20   Q.    (BY MR. SADLER)  And these are the minutes from the Mango

21   meeting October 1, 2008.  Are you able to see those on your

22   screen?

23   A.    I can, yes.

24   Q.    And if we're talking about October 1, 2008, based on your

25   investigation, is this before there is any request for a

1    redemption, before any discussion about loans?

2    A.    This is before the request for redemption or the loans

3    are made.

4    Q.    Okay.  And, again, as I said, there are two stories.

5    They went to get it for margin calls, and then there's another

6    story we're going to visit about in a minute.

7         Is there information in this document, this document,

8    that was significant to you on this issue of why did they go

9    to the bank in the first place to try to get money out in

10   October 2008?

11   A.    Yes.  There's a couple of pieces of information I think

12   that are important to that analysis.

13   Q.    Well, let's look at paragraph 2, because I think this is

14   a paragraph that contains some information about margin calls.

15   And it's been reviewed briefly, but I want to ask you, because

16   you're the investigator testifying, on the subject, on the

17   question of, did they go to the bank because they needed money

18   for margin calls, or did they first go to the bank for some

19   totally unrelated reason, what is it in here in this paragraph

20   that from your point of view sheds light on that?

21   A.    Well, in reading this paragraph, there's a couple of

22   things to note.  They certainly know--and this is, remember,

23   October 1st of 2008--that the margin calls are coming.

24   They refer here, and it's the -- let's see -- third full line

25   up about this, if the stocks -- the trading prices fell below

1   $10 per share --

2   Q.   Excuse me.  Is this (indicating) what you're referring to

3   right here?

4   A.   Yes.

5        MR. SADLER:  Let's highlight that whole sentence

6   just so we're not leaving anything out.

7   Q.   (BY MR. SADLER)  And I apologize for interrupting you.

8   Go ahead.  I just wanted us all to see it.

9   A.   So she's pointing out here, you know, that if this

10  happens, and they're pointing to the fact that they're

11  anticipating it might, that if these stocks trade below $10

12  per share, then there's going to be these calls at these

13  banks.

14       So they are certainly referring to the margin calls.  But

15  what they're referring to to solve that problem is really

16  sales of stock.

17  Q.   Now, Mr. Magness says here, or it's recorded that Mr.

18  Magness said, that at that time he was not a mind to sell any

19  stock.  Do you see where I'm referring to?

20  A.   Yes, I do.

21  Q.   And we're going to talk about it.  But I need to ask you

22  here, again, in the course of your investigation, did you

23  find, not too long after this, documents indicating that, in

24  fact, Mr. Magness was absolutely willing to sell stock to

25  solve his margin call problem?

1    A.   Yes, he did.

2    Q.   All right.  So they know margin calls are coming as of

3    October 1.  Is there something in this document that says

4    anything about what they're doing with the $102 million in

5    Stanford CDs?

6    A.   Well, there is.  It's a separate paragraph, but it's not

7    related to the margin calls at all.

8    Q.   Let's -- let's look at that.  I think that's paragraph 6.

9    A.   Yes.

10   Q.   And we can see the words in this paragraph, but I want to

11   be sure that there isn't something else in this document

12   anywhere.

13        Is there anything in this document that discusses,

14   comments on, intimates that, in light of the margin calls they

15   know are coming, that they're going to look to these CDs as

16   the source of cash to solve their problem.

17   A.   No.  If you look in this document, this is really all you

18   see about the certificates of deposit; basically that they

19   continue to hold them and there have been no redemptions.

20   I've not seen anything else in the documents.

21   Q.   All right.

22        MR. SADLER:  We can take that down.

23   Q.   (BY MR. SADLER)  Now, we started this conversation by,

24   you mentioned that you saw some testimony from Ms. Dokken on

25   the subject of why they went to the bank to try to redeem just

1     to take the interest.

2            MR. SADLER:  Let's take a look at that.  It's in

3     Trial Transcript Volume 3, page 84, and I believe we start at

4     line 21 and then it rolls over into the next page.

5         So let's -- let's grab all that, Mr. Jarrett, so we all

6     can see.

7     Q.    (BY MR. SADLER)  So this is the -- let me just ask you.

8     Is this the testimony from Ms. Dokken that was given at this

9     trial?

10    A.    Yes.  This was provided during the trial testimony.

11    Q.    All right.  So let me first ask you, a question was put

12    to her -- and this was her -- this is from her deposition, is

13    it not?

14    A.    It is, but this is the part played in the trial.

15    Q.    Okay.  So it was played here.

16        The question starts, "So the meeting could have taken

17    place on the 1st."

18        Could you confirm for us what meeting are they talking

19    about?

20    A.    Those are the -- the meeting of the investment committee

21    and the board that we just saw the minutes to.

22    Q.    Same as the document we just saw.

23    A.    That's correct, yes.

24    Q.    Okay.  So we're talking about this same October meeting.

25    And then the question continues, there's a follow-up

1  discussion on the subject of he would take out the interest

2  part of the CD.  Do you see where I'm focusing on?

3  A.    I do, yes.

4  Q.    Now, I want to draw your attention, if we could highlight

5  it, the very first line of her answer, and actually the couple

6  of words on the next page.  She says, "At this time he --"

7       Let me ask you, from your investigation, who is the he

8  she is talking about?

9  A.    She's referring to Mr. Magness.

10  Q.    "-- he had huge, huge expenses other than the margin

11  debt."

12       From all of the information that you have reviewed, the

13  discovery materials and so forth, is that a true statement?

14  A.    It is.  It's consistent with other documents that I've

15  seen.

16  Q.    And she goes on to talk about he was making a movie and

17  had Fortrust capital requirements.  Let me ask you about that.

18       First of all, help us understand, what is Fortrust and

19  what are capital requirements that would cause Mr. Magness to

20  need money to pay capital requirements?

21  A.    Well, Fortrust is the business owned by, as I understand,

22  Mr. Magness.  I believe Mr. Knudson is involved in running it,

23  and that was discussed during testimony.  And the capital

24  requirements were that to continue building and continue the

25  operations, there was more money required from Mr. Magness to

1    continue.

2    Q.   And as part of your conclusion that the reason they went

3    to the bank to redeem the interest in the first place wasn't

4    because of margin calls; it was because of -- of these huge,

5    huge expenses, is this part of the evidence you looked at?

6               MR. PETRIE:  Objection, Your Honor, form.

7               THE COURT:  Overruled.

8               THE WITNESS:  Yes.  This is part of the evidence

9    that I've looked at.

10              MR. SADLER:  We can take that down.

11   Q.   (BY MR. SADLER)  In the course of your investigation, who

12   is the person that the Magness defendants, if I can use the

13   term, "deputized" to go to the bank and make the request for

14   the redemption we were just discussing to get the interest?

15   A.   I believe that was -- that was referred to, and that was

16   Tom Espy.

17   Q.   All right.  From your investigation, did the Magness

18   defendants request that Tom Espy approach the bank and attempt

19   to redeem at least the amount of the accrued interest?

20              MR. PETRIE:  Objection, Your Honor.  This is

21   hearsay.  It's contrary to the evidence in the case.

22              (Discussion at the bench, out of the hearing of the

23              reporter.)

24   Q.   (BY MR. SADLER)  So, Ms. Van Tassel, so getting back to

25   the question I was just asking you, and I'll rephrase it, you

1    mentioned earlier that in terms of understanding the sequence

2    of started with redemption, that was refused, then it turned

3    to loan, that sequence, I think you mentioned you had seen

4    documents that confirmed that.

5    A.    Yes, that's correct.

6    Q.    And is one of those documents these December 5 meeting

7    minutes that, in fact, we just saw extensively here earlier

8    this morning?

9    A.    Yes, that's part of it.  It refers to the request to go

10   get the -- to go -- for Tom Espy to go request the redemption.

11   Q.    Okay.

12          MR. SADLER:  Let's pull up Plaintiff's Exhibit 384,

13   which I believe are the minutes that we looked at this

14   morning.  And if we could blow up paragraph 4.  That's fine.

15   Q.    (BY MR. SADLER)  And I'll direct your attention --

16          MR. SADLER:  And if we could highlight it, the

17   first, I don't know, three, three and a half lines.

18   Q.    (BY MR. SADLER)  Is this the information you were

19   referring to is that Mr. Espy had reported that he had gone to

20   the bank, after the October 1st meeting, asking for a

21   redemption and was told redemption would not be possible?  Is

22   that the information you were referring to?

23   A.    Yes.

24          MR. SADLER:  Let's leave that up there.

25   Q.    (BY MR. SADLER)  Based on your investigation, did you

```
 1    come to a different conclusion about either the sequence or

 2    who started this sequence?

 3    A.   No.  I think this is pretty clear, and it's also in some

 4    signed written statements by Mr. Magness.

 5    Q.   Okay.  Now, I need to ask about -- and going back

 6    to -- it says redemption of the certificates.  We just saw

 7    that testimony by Ms. Dokken where she was talking about

 8    taking the interest out because of these huge, huge expenses.

 9         My question to you is, why do they need to do a

10    redemption just to take out $24 million in interest?

11              MR. PETRIE:  Objection.  No foundation.  Beyond the

12    scope of her expertise.

13              THE COURT:  Overruled.

14              THE WITNESS:  Well, based upon what I've seen in the

15    evidence, as it showed, there was $24 million roughly that was

16    part of the CDs.  Also as part of my investigation, what I

17    understand is when those are -- that interest is baked into

18    the CDs, they can't just pay that interest out.  Instead, what

19    they had to do in this situation was redeem a like amount of

20    CDs so that the interest could be removed.

21    Q.   (BY MR. SADLER)  Okay.  I'm -- I'm not sure I followed

22    that, so forgive me, but I've got to go back to you on that.

23         So Mr. Magness, as we just saw, has $102 million on the

24    books in total CDs.  $24 million of that is this accrued

25    interest that Ms. Dokken was talking about going to get.  Do I
```

1   have the numbers correct?

2   A.   That's correct, yes.

3   Q.   All right.  Now, we had $79 million originally go in.

4   How is it that some of the interest is now part of the

5   principal of the CD?  That's the part I'm not understanding.

6   So if you could help us with that.

7   A.   Sure.  Mr. Magness had elected not to remove the

8   interest, so it continued to accrue over the period of time.

9   He began to buy these in 2004.  So that interest accrues over

10  time.  And when the CD becomes matured, that new amount

11  becomes the CD.

12      And may be best to give you an example.  If you have

13  $100,000 CD at 10 percent interest for one year, at the end of

14  that one year, you'll have $110,000.  $10,000 of that will be

15  interest.  Well, if you decide to roll over your CD, you have

16  a new CD that is now worth $110,000.  So that's the now

17  principal of the new CD, but it has interest in it.

18  Q.   And so under the -- I want to be sure I understood.

19  Under the bank's rules, is it correct that you as a depositor,

20  you can take the interest out monthly in cash if you wanted

21  to?

22  A.   That's correct, yes.

23  Q.   If you, as a depositor, let the interest roll over on

24  your CD, your $100,000 CD became 110-, and the next year it

25  was 120- or whatever.  If at that point you went to the bank

1   and said, well, I want to take out the interest that I've

2   earned over the whole life of the CD, is that what required a

3   redemption versus just taking the cash?

4   A.   That's correct, because it's already kind of, as I call

5   it, baked in there.  There has to be a redemption because that

6   election wasn't made to take it out over time.

7   Q.   And so that -- that starts our sequence--the request for

8   the redemption.

9        I think we have right in front of us, but just so that

10  it's on the record from you the investigator, what did you

11  conclude from your investigation was the bank's response to

12  the request by Mr. Espy for a redemption?

13  A.   Well, as it states here, and I've seen in other evidence,

14  the bank declined the redemption.

15  Q.   And with respect to not the fact that they declined the

16  redemption but the reason why they declined the redemption--by

17  they, I mean the bank--did you find evidence in the discovery

18  materials that you reviewed as part of this case that shed

19  light on the reason the bank gave for saying, no, no

20  redemption at this time?

21  A.   Yes.  I had mentioned, I think, before that there were

22  some written discovery responses by Mr. Magness, and it

23  indicates in there the reason why the request was denied.

24  Q.   And is the reason given by the bank that, in part, due to

25  the general market decline, SIBL, the bank, wanted to keep the

1    asset value of the CDs on its balance sheet?

2    A.    Yes.  That is what they said.

3    Q.    And I think you have it in your book, and so we just need

4    to identify it for the record, if you will.  We're looking at

5    Exhibit 20 in your book.

6    A.    Okay.  I have it.

7    Q.    And would you read just the title of the document?

8    A.    The title is the Magness Defendants' Supplemental

9    Objections and Answers to Receiver's First Set of

10   Interrogatories.

11   Q.    And I think I may have asked you this, but an

12   interrogatory in the context of a lawsuit is just one side

13   gets to ask questions in writing and the other side responds?

14   A.    That's all it is.

15   Q.    And if you would turn to the back page, who signed under

16   penalty of perjury these answers to the Receiver's

17   interrogatories?

18   A.    It is signed by Gary Magness.

19   Q.    And signed on January 15 of 2016?

20   A.    That's correct.  That's the date.

21   Q.    And then with specific respect to this information we

22   just discussed, the reason the bank gave for saying, no,

23   redemption not possible, was there information -- did this

24   come out of these interrogatories?

25   A.    Yes.  This is the source of the information.

1   Q.   And I want you to turn to page 14 of the document, just

2   so we have that in front of us.  The first -- I have to ask

3   you this question.  Going back to your experience, more than

4   100 cases as a forensic investigator, have you ever had a

5   situation where you walked into some allegation of some

6   financial impropriety and had to look through a mountain of

7   information and then you kind of found the needle in the

8   haystack, the diamond in the rough, there was a nugget of

9   information that really shed light on the questions you had?

10  A.   Yes.  I mean, there's -- oftentimes we have so much

11  information.  But, again, this is from an accounting

12  perspective, it's exciting to find one thing that -- that

13  makes a lot of sense and explains a lot of things.

14  Q.   And is that kind of what happened here?

15  A.   It is.

16  Q.   Well, let's look at the statement that attracted your

17  attention as an investigator.  And if -- I paraphrased it, but

18  I want you to read the full sentence.  And if you would just

19  read it for us, starting with, "Mr. Espy."

20  A.   Let me find it first.  Okay.  "Mr. Espy again advised Mr.

21  Magness that redemptions could take time and could result in

22  penalties SIBL would assess, that loan secured by the CDs

23  would be easier and quicker and that, given the general market

24  decline, SIBL wanted to keep the asset value of the CDs on its

25  balance sheet."

1    Q.   So tell us, Ms. Van Tassel, what stood out to you about

2    that statement--given the general market decline, SIBL wanted

3    to keep the asset value on its balance sheet.  Why did that

4    stand out to you?

5    A.   Well, you know, the reason is that we have this public

6    information, and all along this period of time the bank is

7    telling the public, We're strong; we don't have a balance

8    sheet problem; even though the market's down, we're doing

9    fine; we are having a great year.

10       And this is exactly the opposite of that, and this is

11   private information that was given to the Magnesses than I'd

12   ever seen in any other public information.  And it is -- it's

13   inconsistent with what the bank is trying to tell the

14   public--we're not connected to the market.  It is saying, We

15   cannot allow the redemption because we need to keep it on our

16   balance sheet.

17   Q.   All right.  We have two pieces of information clearly in

18   front of us, and I need to ask you about the significance of

19   both of them, but I want to ask about both.

20   A.   Okay.

21   Q.   We have just seen in the records of the meeting minutes

22   and from your testimony as an investigator, that when they

23   went to the bank to get the interest, not for margin calls but

24   for all of those huge expenses, first they were told, no, not

25   possible at this time.  Then, as we've just seen from the

1   statement signed under oath by Mr. Magness, they were told the

2   bank needs to keep the asset on its balance sheet due to the

3   general market decline.

4       And I want you to be very clear with us:  What is the

5   significance of these two pieces of information.

6   A.   Well, you know, I do think it's important to look at it

7   in two pieces.  First of all, it's the fact that they went to

8   the bank, and the bank said, Sorry, you can't redeem.  That

9   would be alarming.  Then when you get to the reason that they

10  won't redeem, because now they know that the bank is subject

11  to these market declines that it's been saying that it's not,

12  that reason is even, from my perspective, even more alarming.

13  Q.   Now, we heard this morning the testimony of Mr. Ray

14  Sutton, a lawyer for the Magness folks, and do you recall he

15  was asked what his reaction was when he was made aware that

16  they couldn't redeem?  Do you recall his testimony?

17  A.   I do.

18  Q.   And I believe Mr. Sutton told us just a couple of hours

19  ago, maybe a little earlier, that to him that was a big red

20  flag.

21      My question to you is, do you agree with that?

22  A.   I do.  I think it is a big red flag.

23  Q.   And tell the jury, it is a big red flag of what?

24  A.   That the bank has been making false statements to cover

25  up the fact that they have financial problems, they don't have

1   a strong balance sheet, they don't have liquidity.

2   Q.   All right.  So we started a little while ago talking

3   about the public story of Stanford and the bank and what the

4   Magness Defendants heard privately.  So now I've got to ask

5   you about these two pieces of information.

6       From all of your work as an investigator in this, what

7   evidence did you ever see that in this time frame, October

8   2008, that publicly, publicly, the bank was telling

9   depositors, Sorry, redemption not possible at this time?

10  A.   They were not telling people that.  In fact, I know

11  during October there were other redemptions that occurred.

12  Q.   From all of the information you have reviewed about what

13  the bank was putting out publicly in this time frame, October

14  2008, were they putting out any information, any information,

15  that people could not make a redemption or that redemptions

16  were capped or that redemptions were going to be handled

17  differently; because of the general market decline, they

18  needed to keep all the CDs on the bank's balance sheet?

19  A.   No.  That was never made public in any way that I've ever

20  seen.

21  Q.   And you told us earlier in your testimony that when there

22  came a time shortly before the government shut down the bank

23  that the bank stopped making redemptions, my question to you

24  is, what effect would it have had on the bank on this time

25  frame, October 2008, if the bank had told everyone publicly

1    what they told the Magness Defendants privately, Sorry, can't

2    redeem, I need your asset on my balance sheet?

3         MR. PETRIE:  Objection.  Speculation.  No

4    foundation.

5         THE COURT:  Overruled.

6         THE WITNESS:  Well, we know what did happen when

7    they made that announcement.  There was a run on the bank.

8    And I think, in October, that would suggest that the exact

9    same thing would happen at that point in time.  It makes sense

10   from the investors' standpoint.

11   Q.   (BY MR. SADLER)  In fact, from your experience in

12   investigating financial frauds of all kinds, including Ponzi

13   schemes, if word gets out that the guy running the investment

14   is a fraud, is not giving people back their money, what effect

15   does that have on how long the fraud continues to go on?

16   A.   That's where the Ponzi scheme will be disclosed.  It's

17   this, you know, tension that they have to keep, that they have

18   to try to pay out as much as they can while still continuing

19   the Ponzi scheme, because they can't let an investor be

20   unhappy and go to the authorities.

21   Q.   All right.  You were here for Mr. Magness' testimony,

22   were you not?

23   A.   I was, yes.

24   Q.   And I believe we've heard testimony that in terms of

25   whether we're talking about redemption or loan, that the

1    communication pipeline was Mr. Magness to Mr. Espy to Mr.

2    Tolentino and then back the other way.

3         My question to you is, from your review of the records,

4    the emails, did you come to any different conclusion?

5    A.    No.  The email communication that I've seen -- and I

6    think we may go through some of that, but that is exactly how

7    it went.  Mr. Tolentino would talk to Mr. Espy, Mr. Espy would

8    talk to Mr. Magness, and that makes sense.  So we know that

9    this communication then went the same way.

10   Q.    And when you say "this communication," are you talking

11   about this information that came from the bank that redemption

12   not possible and because of general market decline we need to

13   keep the CD?

14   A.    Yes.  We saw that in the minutes where Tom Espy comes

15   back and says, you know, I talked to Mr. Tolentino, telling

16   Magness parties, Mr. Magness, this is what the bank said.

17   Q.    So at this point in time, if the public story is

18   everything's fine, you want to redeem, redeem, you want a

19   loan, have a loan, you want interest, have interest, the

20   balance sheet is great, if that's the public story and the

21   private story is you cannot redeem, not possible, we need the

22   asset on our balance sheet, what are those facts setting forth

23   about whether the bank is lying to everybody about its

24   financial condition?

25   A.    Well, it is lying to everybody.  What Tom Espy and the

1    Magness parties now have in front of them is this very

2    specific difference between what they're telling the public

3    and what the bank is telling them privately.  And so that lie

4    is being made to cover up the balance sheet problem.

5    It's -- they told the Magnesses.  The people who don't know

6    are the general investors.

7    Q.   All right.  So now -- so let's focus on Mr. Espy for just

8    a minute because he's in the middle of this communication.

9    We've heard a lot of testimony about Mr. Espy's connections to

10   Mr. Magness.  We don't need to go over all that again.  But I

11   do have two questions.

12       First of all, was it part of your investigation that the

13   Receiver asked you to do in this case to, in fact, examine,

14   look at the connections, the relationships, all of them

15   between Gary Magness, on the one hand, and Tom Espy on the

16   other hand?

17   A.   Yes.  That was part of what I did.

18   Q.   And that was in one of your reports that you put out in

19   this case?

20   A.   It was, yes.

21   Q.   And so if you could tell us, again, maybe how would

22   we -- how would you find or how did you find -- let me ask a

23   much better question.

24       What facts did you find of significance in your

25   investigation concerning the relationship between Tom Espy and

1    Gary Magness?

2    A.   Well, there were a few of them.  I've seen in email and

3    other documentations, they and their families or Tom Espy's

4    girlfriend would travel together, not only to Antigua, but to

5    other places.

6        Mr. Magness actually loaned money to Mr. Espy.  At one

7    point it was as much as a million dollars, because Mr. Espy

8    had problems with loans on his home.  But I think at the end

9    of time, Mr. Espy says that he still owes him more than

10   $100,000.  So, you know, Mr. Espy certainly owed Mr. Magness

11   over this period of time.

12       Additionally, I saw information that Mr. Espy is actually

13   the godfather of one of Mr. Magness' children.

14   Q.   So now focusing on Mr. Espy, did you find in your

15   investigation, again in this time period, the time period

16   where Mr. Espy knows the public story, he's heard the private

17   story from the bank, in this time period did you find evidence

18   that Mr. Espy had other information about what the bank was

19   telling people about its financial wherewithal?

20   A.   Yes.  In fact, it was -- it was October 10th.  There was

21   a meeting in Miami, and it was for Stanford executives and

22   financial advisors.  Mr. Espy was in -- in attendance there,

23   and Mr. Tolentino gave a presentation, which he talked about

24   the bank and that it was still strong, financially solvent,

25   and -- and had plenty of liquidity.

1    Q.    Okay.  And I -- and I believe we have a document that

2    will help us with that.  It's not in evidence yet so let's not

3    put it up on the screen yet.

4         Do you have in front of you in your notebook Defendants'

5    Exhibit 85?  It should be towards the back of the notebook.

6    A.    Yes, I have it.

7    Q.    And let me just help you with the identification.  Is

8    Defendants' Exhibit 85 a cover email from Lula Rodriguez of

9    Stanford, dated October 17, 2008, transmitting to a number of

10   Stanford executives materials concerning the presentations

11   made at this meeting that you just mentioned?

12   A.    That's correct.  That's what this is.

13   Q.    And included with -- in this packet are there, in fact,

14   the written remarks of bank president Juan

15   Rodriguez-Tolentino?

16   A.    Yes.  Those were included in the packet that was sent

17   out.

18   Q.    And did you locate these materials, review, and rely upon

19   them as part of your investigation in this case?

20   A.    I did, yes.

21        MR. SADLER:  And I believe there's no pending

22   objection, but we'll offer Defendants' 85.

23        MR. PETRIE:  There's no objection, Your Honor.

24        THE COURT:  It's admitted.

25        MR. SADLER:  All right.  Let's put that up on the

 1   screen, if we could, just starting with the cover email.  And

 2   if we could, it's still really difficult to see, but let's

 3   just identify what we're looking at.

 4   Q.   (BY MR. SADLER)  So let's first focus on the date, Ms.

 5   Van Tassel.  The date of the email is October 17, but does

 6   this refer to this meeting that has already happened sometime

 7   in the past?

 8   A.   It does.  If you look at the subject line, it's referring

 9   to the meeting that occurred actually on October 10th.

10   Q.   And, in fact, do we see that in the first line --

11           MR. SADLER:  If we could highlight, Mr. Jarrett.

12   Q.   (BY MR. SADLER)  -- Ms. Rodriguez is talking about,

13   pleasure to see all of you last Saturday, or this past

14   Saturday.  Do you see where I'm reading?

15   A.   Yes, I do.

16   Q.   So the previous Saturday would be the 11th of October.

17   A.   That's correct.

18   Q.   So this is right in the middle of when this whole loan

19   process starts.  Right?

20   A.   That's correct.

21   Q.   So let's turn, if we can, to the part of the document,

22   and I believe it's on page 27, that are Mr. Tolentino's

23   remarks.

24           MR. SADLER:  And if we could just be sure who we're

25   talking about.  Let's grab the top part there.

1    Q.   (BY MR. SADLER)  From your investigation, is this the

2    written material Mr. Tolentino presented at this meeting?

3    A.   It is.  Yes, it is.

4    Q.   And does he make specific remarks at this meeting on

5    October 11th with regard to how the bank's doing generally and

6    what the bank's cash position is?

7    A.   Yes.  He specifically refers to the bank's financial

8    position in those ways.

9    Q.   All right.  And let's look at that.  And I think we have

10   a slide that will just help us focus on those remarks.

11              MR. SADLER:  If we could bring that up, Mr. Jarrett.

12   Q.   (BY MR. SADLER)  Okay.  So we're in the same document.

13   Juan Rodriguez-Tolentino.  And just to be clear, is this the

14   same Juan Rodriguez-Tolentino, president of the bank, that Mr.

15   Espy is talking to when it comes to getting a redemption or

16   getting a loan?

17   A.   Yes, it is.

18   Q.   Okay.  So let me ask you about each of these highlighted

19   statements first.  Let me back up.  So I forgot -- who -- who

20   is at this meeting in Miami?  What kind of people?  You know,

21   who's there?

22   A.   From what I could see from the documentation, it was

23   Stanford executives, both in the U.S. and outside of the U.S.,

24   and it was the Stanford financial advisors.

25   Q.   And Stanford financial advisors includes Tom Espy?

1   A.   It does, yes.

2   Q.   Okay.  All right.  So that's who's there.  Mr. Tolentino

3   is making the presentation.  And first he says, We are liquid.

4        Now, that's consistent or is that consistent with the

5   public story that they put out through this whole time period?

6   A.   Yes.  They've always said that that was one of their main

7   features.

8   Q.   All right.  And then he says something about mandate from

9   board of directors; to maintain liquidity, we're sitting on 14

10  percent.

11       Explain to the jury what does that mean--liquidity of 14

12  percent?  What does that mean.

13  A.   Well, when they refer to that, that is as a percentage of

14  their assets.  So at this time they have about $8 billion, as

15  I said, in assets.  A little over that, actually.  So at 14

16  percent, they'd be sitting on over a billion dollars of cash.

17  Q.   Well, let me ask you about both of those figures so that

18  we're absolutely clear.  If we're talking about October of

19  2008 or any time in this time frame, was Stanford

20  International Bank sitting on $8 billion of actual assets?

21  A.   No.  As we saw from the slide that we showed, their cash

22  was going down, and by the end of the month they only had 65

23  million.  At the beginning of the month, they only had 411

24  million.

25  Q.   And with regard to 14 percent of their portfolio in

1   liquidity, was Mr. Juan Rodriguez-Tolentino sitting on more

2   than a billion dollars in cash?

3   A.   No, he was not.

4   Q.   So these were lies?

5   A.   Absolutely they are lies.

6   Q.   And he says, we have cash, cash is king in this market.

7        From your perspective as a forensic investigator, tell us

8   the significance of cash is king in this market.

9   A.   Well, what he's saying is, you know, the bank realizes to

10   weather the storm, they are going to need cash.  It's

11   important for all financial institutions, and he's saying that

12   they continue to be very strong, as they always have been, and

13   have plenty of liquidity.

14   Q.   And, in fact, does he make a comment down below about how

15   much in assets he claims to be sitting on at the bank?

16   A.   He does.  He's saying that about $8.3 billion of -- in

17   total assets.  So I was a little low in my estimate.

18   Q.   Now, I want to direct your attention to this comment.  He

19   says, "We may have a small loss for the first time in many

20   years, but we have the capital to cover that."  Do you see

21   that?

22   A.   I do.

23   Q.   And if Mr. Rodriguez had been telling the truth, he

24   wouldn't be talking about a small loss, would he?

25   A.   He would not be talking about a small loss.

1    Q.    Okay.   At this point is he sitting on a balance sheet

2    that has a multi-billion-dollar hole in it?

3    A.    Yes.

4    Q.    Well, with regard to he says we may have a small loss for

5    the first time in many years, if we now just briefly fast

6    forward, did they later in the year -- this is early October.

7    In December did they, in fact, put out a report that says, Oh,

8    we've had a small loss for the year?

9    A.    They did.   In, I think it was, December of 2008, they put

10   out -- I think Mr. Espy testified to this.   They put out a

11   report that showed that they had a loss of about $110 million.

12   Q.    So to understand this, in this time frame, October 2008,

13   we've had a lot of testimony about stock market was crashing.

14   And my first question is, that's all consistent with both your

15   memory and your investigation, isn't it?

16   A.    That's correct, yes.   That is what was happening during

17   this period of time.

18   Q.    Was any financial institution of any size or repute

19   talking about only a small little loss in this time frame?

20   A.    No.   They were trying to manage how large the loss would

21   be.

22   Q.    Well, so help us understand.   Stanford is saying, while

23   everybody is down double digits or more, we're only operating

24   at a small loss.   What's the significance of that?

25   A.    Well, the significance of that is, you know, the

1    implausibility of that story.  They had said that their

2    balance sheet wasn't connected to the marketplace, and

3    therefore we're not going to make -- we're not going to lose

4    the kind of money other banks have.

5         But now we know that the Magnesses knew that wasn't true.

6    Q.   Now, we're going to see some --

7              MR. PETRIE:  Excuse me, Your Honor.  Move to strike

8    the last comment.  It violates your limine ruling.

9              THE COURT:  The jury will disregard.

10   Q.   (BY MR. SADLER)  With regard to the loans -- and we're

11   going to see some documents in just a moment about that.  With

12   regard to the first loan that was funded, was that

13   funded--that is, the cash moved out of the bank--on or about

14   October the 10th?

15   A.   It was.  The $25 million was districted to the Magnesses

16   on October 10th.

17   Q.   And so from your investigation -- and this meeting

18   happens the very next day, October 11TH, doesn't it?

19   A.   It does.

20   Q.   Okay.  But from your investigation, if we're talking

21   about the conversation between Mr. Espy on the one hand and

22   Mr. Tolentino on the other hand where he hears, Can't do a

23   redemption, need to keep the asset on the balance sheet due to

24   the general market decline, hadn't that conversation already

25   happened by then?

```
 1   A.   Yes, because by the 10th when they're paying out the

 2   first loan, remember the CD or the redemption request and the

 3   denial all happened well before that.

 4   Q.   So, again focusing on Mr. Espy, if we're talking about as

 5   of October the 11th when he is at Miami listening to this

 6   speech about, We have a billion dollars in cash, we're doing

 7   fine, and he's already heard from the same guy, Your client

 8   can't redeem because I need his asset on my balance sheet, my

 9   question to you is, is there any legitimate way to reconcile

10   those two stories that are right in front of Mr. Espy?

11   A.   No.  I mean, you either have a billion dollars of cash or

12   over a billion dollars of cash and you are very liquid or you

13   don't.  And what they told The Magnesses is that they were

14   told that they didn't.  So Mr. Espy has the evidence in front

15   of him that the bank is continuing to tell the story one way

16   to the public and has said another to the Magness Defendants,

17   him delivering that story.

18   Q.   All right.

19          MR. SADLER:  I think we can take that down,

20   Mr. Jarrett.

21   Q.   (BY MR. SADLER)  I want to now focus a little bit more

22   specifically about the loans themselves.  We've talked about

23   the sequence, the chronology.  Now I want to focus on some

24   specific facts on the loans.  So we know from what we've

25   already talked about, they first go to the bank just to redeem
```

1    to get the interest because of the expenses.

2            MR. SADLER:  Let's put up the slide that lists, if

3    we could, the fraudulent transfers just so we have the dates

4    right in front of us.

5    Q.   (BY MR. SADLER)  So, first of all, can you confirm for

6    us, are these, in fact, the dates and the amounts of the

7    fraudulent transfers that went to the Magness Defendants?

8    A.   Yes.  These are the amounts and the dates of the

9    transfers to the Magness Defendants.

10   Q.   And so it's on October 10, $25 million in cash was

11   transferred.  On October 24, $44 million was transferred.

12   October 28 in two different segments a total of $19.2 million

13   was transferred for a total of $88.2.  Is that the totals, the

14   dates, the amounts of the cash that was transferred to the

15   Magness Defendants?

16   A.   Yes.  That is the amount.

17           MR. SADLER:  All right.  So let's leave that up

18   there.

19   Q.   (BY MR. SADLER)  So in connection with the loans, the

20   fraudulent transfers, I want to be real clear.  Did you

21   review, go into the Stanford email files and review the emails

22   going from Juan Rodriguez-Tolentino to Mr. Espy, Mr. Espy

23   going back, did you review those chains of emails, those

24   communications?

25   A.   Yes.  That was part of our investigation.

1    Q.    Now, did you locate in those emails information that was

2    of significance to this idea that although publicly the bank

3    was saying, We've got plenty of cash, that when the Magness

4    Defendants actually went to get the cash it wasn't quite so

5    clear?  Did you find information on that subject?

6    A.    Yes, there is email information that reflects that in the

7    correspondence.

8    Q.    And, in fact, we are going to get to that email in just a

9    second, but I want to put up the declining balances slide

10   again just for a moment.

11        So we looked at this just a minute ago.  But just to line

12   up the dates.  So if we're talking about the first loan --

13   A.    Yes.

14   Q.    October 10th the bank is sitting on now less than $300

15   million in cash.  Am I looking at your chart correctly?

16   A.    That's correct, yes.

17   Q.    So even though the bank started out at the beginning of

18   the month with almost $411 million, we're barely ten days into

19   the month and they're already under $300 million.  Am I

20   understanding your chart correctly?

21   A.    That is correct, yes.

22   Q.    All right.  So now we're going to focus on the time frame

23   of this first loan.  And there looks -- to me it looks like a

24   pretty significant drop in the bank's cash right in this time

25   frame.  Am I interpreting the chart correctly?

1    A.    Yes.

2    Q.    What part, if any, of that drop in the bank's cash is

3    attributable to the Magnesses' first fraudulent transfer of

4    $25 million?

5    A.    Well, in that one day the net outflow from the cash

6    balances was $50 million, so the Magnesses' $25 million was

7    half of the amount that went out that day.

8          MR. SADLER:  All right.  We're through with that.

9    Let's pull up Plaintiff's Exhibit 218, which is one of the

10   emails one of the documents that shows the email back and

11   forth with Mr. Tolentino and Mr. Espy.  Let's blow this up, if

12   we could, so we can all see it nice and big.

13   Q.    (BY MR. SADLER)  So this is an email between Tom Espy,

14   Juan Rodriguez-Tolentino, Thursday October the 9th.

15         My first question, is this one of the emails you found

16   and reviewed in your investigation?

17   A.    Yes, it is.

18   Q.    All right.  I want to draw your attention to a few of the

19   statements in this email and ask you about them.

20         First of all, it says, Mr. Espy talking to his friend

21   Juan, Would it be possible to take out an 18 million dollar

22   loan against our CDs for a week?  Do you see that?

23   A.    Yes.

24   Q.    As you did your investigation, what significance, if any,

25   did you find, first of all, in the request being phrased,

1   Would it be possible to take out an $18 million loan?

2   A.   Well, it's -- the phrasing is asking whether it be

3   possible to take out 18 million when what we know is that

4   Mr. Magness would have been pre-approved for about 80.

5   Q.   So I want to be sure I understand it correctly.  As of

6   this time, if everything's working the way it's supposed to

7   work and the bank has plenty of cash, which we know it

8   doesn't, at this point this time under the bank's rules, is

9   Mr. Magness supposed to be able to just walk in and say, I

10  want 80 something million dollars?

11  A.   Yes.

12  Q.   All right.  So Mr. Espy says, Well, would it be possible

13  to take out 18 million, and then he says, For a week to

14  satisfy a problem at U.S. Bank?  Do you see that?

15  A.   I do, uh-huh.

16  Q.   Let me focus our attention now on this statement about

17  for a week.  Was there any requirement in the bank's rules and

18  policies about these loans that said, Well, we'll only make

19  you a loan if you promise to pay it back in as little as a

20  week?

21        MR. PETRIE:  Objection; hearsay.

22        THE COURT:  Overruled.

23        THE WITNESS:  No., There was no provision that would

24  require a payment in a specific time period; certainly not a

25  week.

1    Q.    (BY MR. SADLER)  And with respect to this $18 million,

2    pay it back in a week, we're going to talk about these, but I

3    want to get it clear up front.  When we talk about the other

4    loans, the other fraudulent transfers, did you find similar

5    statements from the Magness folks talking about, We're taking

6    out a loan, but we're going -- it's only short term; we

7    promise to pay you back very quickly?

8    A.    Yes.  For each of the other three other loans, the $44

9    million, the 17, or the 12 and -- Excuse me.  And the 7, they

10   all had the same kind of provisions--that they would pay them

11   back within a week.

12   Q.    Well, whether it's a week or short term, I need to ask

13   you about that, because were you here for the testimony that's

14   been presented by the Magness side to the effect of all during

15   this time October, margin calls were pouring in, pouring in

16   daily, and they needed all the cash they could get from SIB to

17   handle those?  Have you been here to hear that testimony?

18   A.    Yes, I have.

19   Q.    Well, then I have to ask you to help us understand

20   something.  If the story is, We need all the cash we can get

21   to pay margin calls, we don't want to sell our stock to pay

22   margin calls, there's no requirement that this loan be paid

23   back in a week, help us make sense of this.  How does this

24   make sense in the context of the evidence you've heard?

25   A.    Well, based upon the evidence that we've seen here, the

1    bank would want to get that money back.  And now Mr. Espy

2    knows that the bank needs the money back.  He's been told

3    that, We have a balance sheet problem, we don't want to redeem

4    because we want to keep that on our balance sheet, so it makes

5    sense that the bank would need that money back quickly.  It

6    would not make sense from the Magness parties because, as

7    we've heard, they had the other expenses, the movie, and

8    Fortrust, and those types of expenses, in addition to the

9    margin calls.  So paying back quickly would not be something

10   that would be in the best interests of the Magnesses.  So that

11   kind of demand or request would likely come from the bank.

12   Q.   Well, and if we're talking about borrowing $18 million

13   for a week, I mean, it sounds a little bit like a payday loan.

14   Have you ever heard of such a thing?

15   A.   I have, yes.

16   Q.   Let's come back to that when we look at these other

17   loans, but I've got another question for you about this.

18          MR. SADLER:  Let's look at Plaintiff's 221.  Let's

19   stay with this loan for just a minute.  And if we could blow

20   up this kind of bottom two thirds of that.

21   Q.   (BY MR. SADLER)  Now, is this another exchange of emails

22   the same night, October the 9th, same evening October the 9th,

23   2008, back and forth between Mr. Espy and Mr. Tolentino on the

24   subject of the very first loan?

25   A.   Yes.  This is still in regards to the first loan.

1    Q.   And are these emails that you found by going into the

2    email records of the Stanford businesses?

3    A.   Yes.

4    Q.   Now, one person I need to identify that's a new name

5    there's a fellow named Miguel Pacheco who appears on this.

6    Who is he?

7    A.   I understand he is a vice president of the bank; works

8    with Mr. Tolentino.

9    Q.   Used to.

10   A.   Or used to.

11   Q.   All right.  Let's start from the bottom and work our way

12   to the top.  So we've just seen an email that says, Would it

13   be possible to have an 18 million loan?  Now we see

14   information where Mr. Tolentino, the subject line is now 25mm,

15   and he says, Going back to treasury.  Cannot commit.  I need

16   to ask you about those two things in sequence.

17        First of all, going back to treasury, from your

18   investigation, what did you determine about that?

19   A.   Well, going back to treasury, what that seems to say to

20   me is that Mr. Tolentino, the bank president, doesn't have the

21   authority to make this kind of loan, and, in fact, he says he

22   can't commit.

23   Q.   Well, and let's talk about that in a couple of pieces.

24   So we've already seen that in this time frame Mr. Tolentino,

25   the president of the bank, is seeing his cash balances drop at

1   a rapid rate.  And that's consistent with your findings, is it

2   not?

3   A.    It is.

4   Q.    But he says, Going back to treasury.  So I guess my

5   question is, who is this treasury that's controlling or trying

6   to control the amount of cash that's leaving the bank?

7   A.    By this point in time it's James Davis, the chief

8   financial officer.  He is the one who is overseeing the cash,

9   determining how much to let out, where to let it out.  He has

10  specific control over the cash at that time, because he's not

11  only looking at having to manage it for the bank, but for

12  other entities, and not letting the Ponzi scheme collapse.

13  Q.    And, in fact, when we talk -- when Mr. Tolentino says,

14  Cannot commit, how is that consistent, if it is, with your

15  findings and your investigation that in this time frame

16  Mr. Tolentino is a bank president who can see his cash

17  dropping, but the person actually controlling the cash is the

18  convicted criminal James Davis?

19  A.    Well, what that means is Mr. Tolentino knows that the

20  money, even though they have enough money, that it's going out

21  very quickly, so they're having to maintain cash, so he knows

22  that Mr. Davis is not going to want to let any cash out that

23  he doesn't have to let out.

24  Q.    All right.  Now, there's a response, just -- the times

25  are kind of odd, but there's a response by Mr. Espy where he

1    says, Juan, are we still good on the 18 million?  And then

2    another response, Still good.  Working on 25 million.  Do you

3    see that?

4    A.    I do.

5    Q.    In this time frame, if one believed what the bank was

6    telling everyone, We've got plenty of cash, we're doing fine

7    from a financial point of view, would there be any doubt, any

8    question that an $8 billion bank could find somewhere 18 or

9    $25 million?

10   A.    No.  For a bank that size, and remember just two days

11   later he is -- Mr. Tolentino is telling financial advisors and

12   others that he has over a billion dollars of cash, so at this

13   time 18, $25 million for an investor, your single largest

14   investor who has the ability to request $80 million, should

15   not be a problem.

16   Q.    And, again, focusing on -- the fact is Mr. Espy is

17   getting this information.  And focusing on the time, this is

18   now October the 9th.  From your investigation, the request for

19   the redemption, the denial of the redemption, and the

20   statement, You can't redeem because of the balance sheet

21   problem, that's already happened by this time.  Is that

22   correct?

23   A.    Yes.  The documents would reflect and the testimony would

24   reflect that that is the sequence of events.

25   Q.    All right.  So we've talked about the fact that this

1    uncertainty about the numbers, the availability of cash is one

2    issue, but I need to go back to this issue of Mr. Tolentino as

3    president of a bank that he doesn't appear to control the

4    cash.

5    A.    Right.

6    Q.    You've seen a lot of public literature from the bank that

7    features descriptions and glossy pictures of Mr. Tolentino.

8    I'm sure you've seen those.

9    A.    We have.  I mean, at the beginning of them he would have

10   a statement oftentimes and signed by him as the president of

11   the bank.

12   Q.    Was part of the public story of Stanford Bank that it had

13   a real president of a real bank that had the real kind of

14   power that you would expect a bank president to have?

15   A.    Yes.  That would be the story that they're presenting to

16   the public.

17   Q.    How is that story consistent, if it is, how is that story

18   explainable, if it is, in light of this information right in

19   front of Mr. Espy that he is communicating with the bank

20   president that can't make a commitment between a 25 million,

21   an $18 million loan, and has to go check with somebody else?

22   A.    That's not consistent.  That should be something for a

23   bank president who has access to the cash that they should be

24   able -- that Mr. Tolentino should be able to make that

25   decision.  After all, he is purporting to have plenty of

```
 1    liquidity.  There is -- Mr. Magness has every right to ask for

 2    up to $80 million, so 18 or $25 million should not be an

 3    issue.

 4    Q.   In any of the public materials that were put out to other

 5    investors in this time frame, was there any information, any

 6    suggestion in the published materials that if you need to get

 7    a loan from this bank, don't bother talking to the president

 8    because he's not the one really controlling the cash?

 9    A.   No.  They were representing Mr. Tolentino as the

10    president of the bank.

11    Q.   And in terms of finding the cash and where the cash was,

12    we've seen that the balances were declining rapidly.  When you

13    were here for Mr. Espy's testimony, did you hear him give some

14    testimony about what he was told by Juan Rodriguez-Tolentino

15    in the course of these discussions about getting a loan?

16    A.   I did.  He did mention that in his testimony.

17    Q.   All right.  Well, let's look at Mr. Espy's trial

18    testimony.  It's from Volume 5, page 62.  It starts at line 10

19    and goes to line 20.  This is Mr. Espy's testimony presented

20    here at trial.  Is that your understanding?

21    A.   Yes.  That's correct.

22    Q.   And you were here for that?

23    A.   I was.

24    Q.   So let's -- A question is being put to Mr. Espy that we

25    need to understand.  First, the question is "You" -- that's
```

1    Mr. Espy, I assume.

2    A.    Yes.   That's correct.

3    Q.    "You said he" -- he is who?

4    A.    That would be Mr. Tolentino.

5    Q.    Okay.   So you Espy said that Tolentino said there were

6    some reserves at the bank of Toronto-Dominion.   And then the

7    question is, What would be the relevance of reserves?   Do you

8    see that question?

9    A.    Yes.

10   Q.    Let me stop there.   Okay.   As a financial professional,

11   forensic investigator, what significance is it to you that

12   when the conversation between Mr. Espy and Mr. Tolentino is

13   about, Can we have a loan of, whether it's 18 or 25, he says

14   Mr. Tolentino is talking about going into the bank's reserves

15   for that.   What's the significance of that?

16   A.    That would be another red flag for a bank.   A billion

17   dollar bank, $1.2 billion in cash, they should not have to go

18   to reserves to get 18 to $25 million of money.

19   Q.    Well, let me put the question to you again.   If the

20   public story is, We have eight plus billion in assets, we have

21   a billion plus in cash, if that's the public story, how do you

22   reconcile that, if you can, with what Mr. Espy has been told,

23   which is, We're going to go have to find it in reserves?

24   A.    I have not seen and I really don't understand what the

25   reconciliation could be between those two very different

```
 1   stories.
 2   Q.   And let's --
 3             MR. SADLER:  We're through with that.  We're through
 4   with that.
 5             THE COURT:  Mr. Sadler, how are you looking on time?
 6             MR. SADLER:  Your Honor, I do have a bit to go.
 7   Would this be an okay time for a break?  There is going to be
 8   a little bit more.
 9             THE COURT:  Yeah.  That's what I was wondering.
10        Let's take our afternoon break and we'll see you back in
11   20 minutes.
12             (Whereupon, the jury left the courtroom.)
13             THE COURT:  How much more do you think you have?
14             MR. SADLER:  Probably 30-ish minutes, Your Honor.
15             THE COURT:  How long are you thinking for cross?
16        You can't tell I'm looking at the Magness parties.
17   You're lined up.
18             MR. PETRIE:  I'm thinking probably half an hour to
19   40; 30 to 40 minutes.  Excuse me.
20             THE COURT:  Okay.  That's good.  I'm trying to do
21   mental arithmetic, which I'm already on record as being poor
22   at, but you're maybe starting to eat into your closing
23   argument time if you go much beyond that.
24             MR. PETRIE:  I understand, Your Honor.
25             THE COURT:  Okay.  I just want to be sure you
```

1    understand that.

2                    MR. PETRIE:  Thank you for warning me.

3                    THE COURT:  Anything else we need to take up?

4                    MR. SADLER:  No, sir.

5                    THE COURT:  Okay.  See you in 20.

6                         (Brief recess.)

7                    THE COURT:  All set?

8                    MR. SADLER:  Yes, sir.

9                    MR. PETRIE:  Yes, sir.

10                   (Whereupon, the jury returned to the courtroom.)

11                   THE COURT:  Be seated.

12        The Receiver may proceed.

13                   MR. SADLER:  Thank you, Your Honor.

14   Q.   (BY MR. SADLER)  Ms. Van Tassel, we've been talking about

15   some of the process that led to the $25 million loan, but

16   there are a couple of things about the $25 million, the very

17   first fraudulent transfer that we need to cover.

18        We know that the loan was approved and the cash was

19   funded.  That's -- you understand that, do you not?

20   A.   I do, yes.

21   Q.   All right.  We need to talk about how, then, that loan

22   that you've called a purported loan was paid off.

23                   MR. SADLER:  Let's look at Plaintiff's Exhibit 223.

24   Q.   (BY MR. SADLER)  Now, is this one of the emails -- this

25   email between Tonya Dokken and Beverly Jacobs of Stanford

1    International Bank, is this one of the emails you reviewed

2    among all the papers you looked at in the case?

3    A.    Yes, it is.

4    Q.    And does this email relate to this first loan, first

5    fraudulent transfer, the $25 million one?

6    A.    It does.  It speaks to the pay-down of the loan.

7    Q.    And was it part of the required process of the bank that

8    to get a loan you had to tell the bank the purpose and the

9    source from which the loan would be repaid?  Was that part of

10   the bank's process?

11   A.    That was part of the process, yes; the paperwork that

12   needed to be filed.

13   Q.    Okay.  And so here we see Ms. Dokken on Friday the 10th

14   communicating to the bank that they're going to use the

15   proceeds.

16        Now, I want to be sure, when Ms. Dokken refers to using

17   the proceeds to pay down a loan, what are the proceeds?  What

18   is she talking about?

19   A.    Here she's referring to the $25 million, the first

20   fraudulent transfer.

21   Q.    All right.  And then she says they--presumably the

22   bank--will release the collateral.  They're going to sell the

23   underlying stock and use the proceeds to repay the loan.  Is

24   the loan the $25 million loan that they're about to get from

25   Stanford Bank?

1    A.   It is.  That's what she's referring to.

2    Q.   And if there's any doubt, clear it up.  But from your

3    investigation, did they do any of that that they told the bank

4    they were going to do?

5    A.   No, none of this was done.

6    Q.   And, in fact, have you been present in this case for

7    testimony by the Magness folks saying they didn't want to sell

8    stock during this time frame?

9    A.   Yes.  There's been testimony and documents about that

10   fact.

11   Q.   So if we fast forward to the following Monday, that is

12   Monday the 13th, and talk about that week, what is the process

13   by which the Magness Defendants paid back, if I can use that

14   term, paid back the loan that turned out to be very different

15   than what they were saying here?

16   A.   Well, so on really the next business day, because this is

17   Friday, Monday there is an email that expresses the Magnesses'

18   desire to pay off the $25 million loan by making basically

19   paper transfers so that the interest from the CDs will pay off

20   the $25 million loan, not underlying stock used to pay back

21   the loan.

22   Q.   And from your review of the records, is that what

23   happened--that is, the Magness Defendants got cash on Friday,

24   but by Monday or Tuesday of the following week they had paid

25   back the loan just by trading their paper interest back to the

1    bank?

2    A.   That's correct, yes.

3         MR. SADLER:   Let's look at Plaintiff's Exhibit 232.

4    And I want to focus on this top email.

5    Q.   (BY MR. SADLER)   And my first question is,

6    Ms. Van Tassel, this is now an email from Tom Espy

7    communicating with Ms. Mendes of the bank on October 21st.

8    Do you see that?

9    A.   I do, yes.

10   Q.   Is this one of the emails that you found as part of your

11   investigation and that you reviewed as part of your work in

12   this case?

13   A.   Yes, it is.

14   Q.   And I first want to ask you about, this refers to the

15   7.2 million and the 12 million.  Do you see that?

16   A.   I do, yes.

17   Q.   Are there references later down in the email string that

18   also pick up the $44 million loan?

19   A.   Yes.  I think it's the next page.

20   Q.   Okay.  So we're talking about the next three loans, the

21   next three fraudulent transfers.  There's a reference of the

22   source of repayment will be cash from existing accounts and

23   future sales of securities, and then they also say the loan is

24   short term.

25        My question to you is, from a financial perspective if

1   the Magness Defendants are facing, as they've said, daily

2   margin calls, margin calls pouring in from a financial

3   perspective, how does it make sense to take millions of

4   dollars out of Stanford Bank and then simply pay it back

5   either with cash they already have, or sell stock and use that

6   cash to pay back from a financial perspective?  How does that

7   make sense?

8   A.   Well, it doesn't make sense from a financial or economic

9   perspective.  They're getting cash and then saying they'll pay

10   cash with cash and selling securities that they have indicated

11   they don't want to sell in the first place.

12   Q.   Well, and similar to the loan we just looked at a minute

13   ago where they said on Friday, We're going to pay you back

14   this way, and then next week they did something different,

15   from your investigation looking in the bank's records, were

16   any of the other three loans, the $44 million loan, the $12

17   million loan, the $7.2 million loan, were those ever paid back

18   with cash from existing accounts or cash from selling stock?

19   A.   No., They were never paid back.

20   Q.   Now, you were here for Mr. Bell's testimony where he

21   talked about his company Merrill Lynch received the proceeds

22   of the $12 million loan.  You were here for that testimony?

23   A.   Yes, I was.

24   Q.   And do you recall from his testimony that he understood

25   what happened is the Magness Defendants borrowed $12 million

1   at a little over 11 percent.  And let me just ask you.  The 11

2   percent, that was what was put on the loan paperwork for all

3   four of these loans; that they were borrowing money at 11

4   percent?

5   A.   Yes.  They pay interest at two percent more than they are

6   earning on the CD.

7   Q.   Okay.  So Mr. Bell's testimony was that he received, he

8   and his company Merrill Lynch, received this $12 million that

9   Stanford had borrowed at 11 percent, and he placed it on their

10  behalf in an account that was bearing 1.79 percent interest.

11  Do you recall that testimony?

12  A.   I do, yes.

13  Q.   And like Mr. Bell--the question was put to him--I'll put

14  the same question to you.  From a financial perspective, does

15  it make any sense to borrow money from one bank where you're

16  supposed to have cash at 11 percent and move it to a different

17  bank where you're going to earn less than two percent?  From a

18  financial perspective does that make any sense at all?

19  A.   No, it doesn't.

20  Q.   Well, let me ask you this.  If the situation were you had

21  cash at one bank and they wouldn't let you take it out except

22  by lending it to you, and you had the opportunity to move that

23  cash to another bank, and the first bank was in trouble, the

24  second bank wasn't, from a financial perspective would it make

25  a whole lot of sense to borrow that money at 11 percent and

```
 1    move it some place elsewhere you are only earning 2 percent?

 2              MR. PETRIE:   Objection; no foundation, and this is

 3    not within this witness' report, Your Honor.

 4              (Discussion at the bench, out of the hearing of the

 5              reporter.)

 6    Q.   (BY MR. SADLER)   Let's talk about now all the loans,

 7    including the ones we are talking about here on this document,

 8    so all the loans, all the fraudulent transfers.   Grand total

 9    of $88.2 million.

10         From your review of the record and your investigation,

11    how did the size of that package of loans compare to other

12    loans by the bank in the relevant time period?

13    A.   The Magness loans were much larger.   From the period of

14    2007, beginning of 2007, through the receivership in February

15    of 2009, the next largest loan was about nine, nine and a half

16    million, so their loan was nine times more than the next

17    largest loan.   During just 2008, just that year, the Magness

18    loan was more than 50 percent of all loans in that year.

19              MR. SADLER:   And let's go back to the declining cash

20    balances slide.

21    Q.   (BY MR. SADLER)   And so, to be clear, the source of the

22    cash used to fund these loans, fund these fraudulent

23    transfers, is that part of the in and out that's going on

24    during this time period where the cash balance of the bank is

25    making this dramatic drop?
```

1    A.    Yes.  It is funded from this bank account.

2    Q.    And you told us about the first loan, the 25 million,

3    that that was part of this very large drop.

4          Was the second loan, the second fraudulent transfer, the

5    44 million, is it part of this drop that's going on in this

6    time frame about October 23rd, 24th?

7    A.    Yes.  In fact, it's the entire drop.  The drop is

8    $44 million.

9    Q.    And how, if we talk about the Magness Defendants got

10   $88.2 million in cash in the months of October, how does that

11   compare to the total amount that the entire bank had in cash

12   at the end of the month, same period of time?

13   A.    Well, at the end of the month you can see they had

14   approximately $65 million, so the Magness Defendants received

15   more in that month than was remaining for all of the bank at

16   the end of the month.

17   Q.    Well, I believe you've told us that during this period of

18   time that the bank was fairly desperate for cash.

19         And so my question now is, from your review of all the

20   records, after the cash went out of the bank with the promises

21   to be repaid in the way we've discussed, did you ever see any

22   record, any email, any letter, anything showing that the bank

23   ever demanded that the cash be repaid?

24   A.    No.  I never -- I have not seen any document that the

25   bank requests the repayment of the loan.

1   Q.   Did you hear testimony from Mr. Espy on the subject of

2   the bank contacting him by phone inquiring about repayment of

3   these loans?

4   A.   I do recall that, yes.

5   Q.   Well, let's take a look at that.  That's Volume 5 of the

6   trial transcript at page 110.  And I believe we need to look

7   at line -- we are in the middle of the question, but line 1

8   through about 12, if we could get to 12.

9        Now, this is some of Mr. Espy's testimony that was played

10  for us.  And you were present for that, Ms. Van Tassel?

11  A.   Yes, I was.

12  Q.   And what I want to direct your attention to is this part

13  right here where he says, "I think Juan."  Is Juan Juan

14  Rodriguez-Tolentino?

15  A.   Yes.  That's correct.

16  Q.   He says, Juan had asked me when I was going to pay --

17  when we were going to pay these loans.  I pushed him off.  And

18  he goes on.

19       My question to you is, what significance was it to you,

20  if any, that this Stanford FA was able to push off the bank

21  president when the bank president called asking about the

22  loans?

23  A.   Well, what this reflects is the kind of pressure between

24  the bank and between the Magness parties, or this tension.

25  The bank is trying not to let anymore money go out.  They'd

```
 1    like to get the money back, but they can't run the risk of

 2    angering their largest single depositor.  And that's when the

 3    Ponzi schemes fail is when somebody finds out the money's not

 4    there, goes to the authorities, complains about it, and that's

 5    the end of it.  So the bank and Juan, that's why Tom as a

 6    financial advisor can just kind of put his hand up to the bank

 7    president and say, Sorry, I'm not going to talk to you about

 8    that.

 9    Q.   All right.  So you found no evidence --

10         MR. SADLER:  And we can take that down.

11    Q.   (BY MR. SADLER)  You found no evidence that the bank,

12    having loaned this money on a short-term basis, expecting it

13    to be repaid quickly, as they needed it to be, ever demanded

14    repayment of the loan.

15         Now let's look at the other side.  What records, what

16    documents, what emails did you find in your investigation

17    that -- from the Magness Defendants' side, that after they got

18    the cash they discussed, planned, thought about, were worried

19    about, How are we going repay these loans?  Where's the cash

20    going to come from?  Did you see any documents like that?

21         MR. PETRIE:  Objection; leading and compound.

22         MR. SADLER:  I can rephrase it, Your Honor.

23         THE COURT:  All right.

24    Q.   (BY MR. SADLER)  So we've talked about the bank side.

25    Let's talk about the debtor's side, the Magness Defendants'
```

 1   side.

 2       In your investigation--let's do them one at a time--did

 3   you find any emails the subject of which was the Magness

 4   Defendants discussing or planning how they would ever repay

 5   these loans to the bank?  Did you find any evidence like that?

 6   A.   No, I did not.

 7   Q.   In all of your investigation, and let's include the

 8   meeting minutes -- and we've seen meeting minutes from

 9   December 5, which is the first one after these loans come out.

10   Let's focus on that for a minute.  In that document, the

11   December 5 meeting minutes, is there any discussion in that

12   document about the Magness Defendants saying, Where are we

13   going to get the cash?  How are we going get the cash to pay

14   off these loans?  Anything like that?

15   A.   No.  In those meeting minutes I think they're worried

16   about paying it back, but it's not to SIB.

17   Q.   Well, and let's just -- you looked at that document as

18   part of your investigation, didn't you?

19   A.   I did.

20       MR. SADLER:  Let's look at 384.  And let's look at

21   paragraph 4, the one that rolls off onto both pages.  Now we

22   have both pieces.

23   Q.   (BY MR. SADLER)  Now we can all see the words on the

24   page, but help us if we're missing something.

25       Is there any report in the December 5 meeting minutes,

1    the minutes of the meeting, the first meeting they had after

2    they got the cash, is there any report of any discussion of

3    paying back the loans to the bank as they had promised to do?

4    A.    No., There's nothing in here that refers to that.

5    Q.    Now, there is a reference in the very last sentence--and

6    Mr. Sutton just got through testifying about this--there's a

7    reference to repaying 25 million if the bank went into

8    receivership.  Do you see that?

9    A.    I do, yes.

10   Q.    And just to be clear, since you've been part of this, as

11   of December 5, 2008, was there anything out in the public

12   about Stanford International Bank on the verge of, worried

13   about, might go into receivership, anything like that?

14   A.    No, nothing at that time.

15   Q.    In fact, if there was some testimony in this case about

16   the famous Madoff Ponzi scheme that broke open in December, if

17   we're talking about December 5 when this meeting is taking

18   place, is there anything out in the public about Madoff and

19   Ponzi schemes and trustees and that for the Madoff case?

20   A.    No.  The Madoff case broke December 11th, so it was after

21   this meeting.

22   Q.    So to be clear, whether we're talking about meeting

23   minutes, letters, emails, any kind of Magness Defendant

24   document, were you able to find in your investigation,

25   reviewing all the discovery materials, any document, any

1    document that shed light on the Magness Defendants paying back

2    the bank with cash as they had promised to do?

3    A.    No.   There's nothing that I've seen.

4            MR. SADLER:   Let's take that down.

5    Q.   (BY MR. SADLER)  Now, I now want to understand if there

6    is significance, the significance of the fact that these

7    loans, these fraudulent transfers, came out in kind of two

8    stages.  We had the 25 million followed then by the other

9    three, so that's what I want to focus on now.

10           What was the advantage, if there was one, to structuring

11   the transaction in that way--that is, take out the interest

12   and then take out the other loans?  What was the advantage of

13   doing that?

14   A.    Well, the advantage to the Magness Defendants is -- well,

15   first of all, they get the cash out.  But second of all, if

16   you look at taking one loan, 80 percent of the 102.6, they

17   would have received around $82 million.  By taking out 100

18   percent of the interest, the 25 million, and then 80 percent

19   of the balance, they actually were able to take out $88.2

20   million.  So by doing it in the way that they did it, they

21   were able to remove $6 million more from the bank.

22   Q.    And the facts and circumstances that we have discussed

23   here over the last couple of hours concerning how the

24   redemption started, how the loans started, how they were

25   negotiated, are these the facts that you cite to in support of

1    the conclusion you told us to begin with that these aren't

2    really real loans; they were just pretext?

3    A.   Yes.  All of this information about how they were

4    received, how they structured it, the promises of payment that

5    didn't happen, all of this information is support for that

6    opinion.

7    Q.   And to help us understand, because you've just talked

8    about from the Magness side what the advantage of.  Let's flip

9    it around and talk about from the bank's side.

10       In this time frame, given everything that was going on

11   with the bank, what was the advantage to the bank of

12   structuring it this way if the problem they were having was

13   this, I need to keep the CD on my balance sheet problem?  Help

14   us understand that.

15   A.   Well, from the bank's perspective, if they had done a

16   redemption, $102.6 million would have gone out, they reduced

17   their liability, and they reduced the cash and that's gone.

18   Nothing's coming back.  By doing the loan, they at least have

19   a loan on their books for the amount.  And they've been able

20   to save that 20 percent.  There's 20 percent that still

21   remains in the bank.  So when you're in the kind of cash

22   position that they're in, as you saw, that amount is available

23   to the bank.  So it allowed them to do that, and keep their

24   single largest investor happy so that they do not expose the

25   Ponzi scheme.

1    Q.   All right.  We've talked about a lot of information, some

2    of it public, some of it private, and I want to focus our

3    attention on that for just a moment, and I want to discuss

4    these very specifically, to be absolutely clear.  And all of

5    my questions deal with the time frame that the Magness

6    Defendants were taking out these loans, these fraudulent

7    transfers in October 2008.

8         With respect to that time frame, was there anything out

9    in the public about the fact that the bank was having trouble

10   with its balance sheet and was limiting redemptions in any

11   way?

12   A.   No; quite the opposite.  It was continuing to say that it

13   was healthy and had liquidity, strong financial position.

14   Q.   And with respect to the story that the bank had been

15   telling forever--That the market may be doing, you know, this,

16   we are Steady Eddie, the market may be doing that, we're

17   Steady Eddie--was there any information they put out in the

18   public different from that that said, You know, what?  That

19   diversified portfolio we really are tied to the market.

20   Anything out in the public like that?

21   A.   No.  They did not release anything different than they

22   had done in the past about their globally-diversified

23   portfolio.

24   Q.   Was there any information the bank had put out in the

25   public time frame that it had to dip into reserves to fund

1    loan requests, redemptions, things like that?

2    A.    No.  I have not seen anything that was produced to the

3    public in that regard.

4    Q.    And I want to be absolutely clear about this.  With

5    regard to things that they put out with the public in this

6    October time frame, have they now started telling people, We

7    are just like a hedge fund, we are borrowing money to make

8    money, we're like a Swiss bank model?  Were they telling the

9    public anything like that in this time frame?

10   A.    No, not in October, or actually not at any time frame.

11   Q.    All of this information we've just now talked about, if

12   that information had been made available to the public in this

13   October time frame, what effect would that have had on the

14   operations of the bank?

15            MR. PETRIE:  Objection; foundation, speculation,

16   undisclosed opinion.

17            THE COURT:  Overruled.

18            THE WITNESS:  Well, as I said before, we know what

19   happened when they did start disclosing some items, and I

20   think that there would have been a run on the bank.  Actually

21   Mr. Bell said this--the investors would have head for the exit

22   doors.

23   Q.    (BY MR. SADLER)  All right.  Last topic.  You were here

24   when Mr. Magness testified about the tax returns that he filed

25   and were filed for the trust.  You were here for that

1    testimony?

2    A.    I was, yes.

3              MR. SADLER:  Let's put up Plaintiff's Exhibit 483,

4    if we could.

5              MR. PETRIE:  Excuse me, Your Honor.  There's been no

6    disclosure for this witness on anything having to do with this

7    topic.

8              MR. SADLER:  Your Honor, this is testimony that the

9    witness has observed --

10             MR. PETRIE:  May we approach?

11             (Discussion at the bench, out of the hearing of the

12             reporter.)

13             MR. SADLER:  I think we were about to go to 483.

14   Yes, 483.

15   Q.   (BY MR. SADLER)  Ms. Van Tassel, it may be easier -- you

16   have it on your screen.  But this is the tax document that was

17   discussed in Mr. Magness' testimony, and there's some factual

18   information related to the bank I need to ask you about.

19   A.   Okay.

20             MR. SADLER:  Let's go, just so we know what we're

21   talking about, the next page of this document.  Blow up the

22   top.

23   Q.   (BY MR. SADLER)  So this is Mr. Gary Magness's income tax

24   return for the tax year 2008.  Are you able to see that on

25   your screen?

```
 1   A.   I am, yes.
 2            MR. SADLER:  Okay.  Let's now go to the next page.
 3   Q.   (BY MR. SADLER)  And just confirm this is his client
 4   copy.  Same document.  You were able to see the document when
 5   it was displayed earlier in trial?
 6   A.   Yes.
 7   Q.   Okay.
 8            MR. SADLER:  Now let's go to the next page.  And
 9   here, let's just blow all that up.
10   Q.   (BY MR. SADLER)  This document contains some factual
11   statements related to the bank that I need to ask you about.
12   A.   Okay.
13   Q.   So, first of all, it starts at the top, Taxpayer--in this
14   case Mr. Magness--invested in Stanford CDs in 2004 and 2005.
15   And from your investigation, is that accurate information?
16   A.   Yes.  That's correct.  That's when they invested.
17   Q.   And then it goes on to talk about, The amount of the CDs
18   was 15 million and 9 million.  And, again, from the records
19   you've looked at is that all accurate information?
20   A.   Yes.  For those entities that is the correct amount--$15
21   million for GMAG and $9 million for Magness Securities.
22   Q.   And now it talks about, In October 2008, the taxpayer
23   received funds from Stanford as a loan secured by the CDs.  Is
24   that what we've been talking about today?  Did that happen?
25   A.   Yes.  That's correct.
```

1    Q.   All right.  Let's skip over this next sentence, and we'll

2    come back to it.  It says, then, about these loans, Stanford

3    agreed to apply the outstanding accrued interest of eight plus

4    million to pay off the loan.

5         My question is, when they're talking about applying

6    accrued interest, is that what we talked about just ten

7    minutes ago where on Friday they were going to sell stock and

8    pay it back, but then the next week they said, No, no.  Let's

9    just use the interest?  Is that the same thing?

10   A.   Yes.  This is in regards to that interest portion only,

11   that roughly $25 million, and so that relates to that

12   transaction.

13   Q.   And then it talks here an investigation of Stanford which

14   was active in 2008.  Do you see that?

15   A.   Yes.

16   Q.   Was there an active SEC investigation ongoing in 2008?

17   A.   Yes.

18   Q.   There's a statement that the taxpayer was concerned that

19   his CD principal was in jeopardy.  Do you see that?

20   A.   Yes.  That's correct.

21   Q.   The taxpayer being Mr. Magness.

22   A.   Yes.

23   Q.   From the facts we've discussed today, the information

24   that was presented to the Magness Defendants about the balance

25   sheet, you can't redeem, we can only loan you this amount of

1   money, we can't really explain how we're doing what we're

2   doing, would those facts be of concern to someone in that

3   position?

4          MR. PETRIE:  Same objections, and speculation.

5          THE COURT:  Sustained.

6          MR. SADLER:  All right.  Let's take that document

7   down.  Let's put up Volume 2, page 184, which is Mr. Magness'

8   testimony.  And I want to focus on line 13 to 18.

9   Q.  (BY MR. SADLER)  This was my question to Mr. Magness,

10   Ms. Van Tassel.  Were you here for that?

11   A.  I was, yes.

12   Q.  The question I asked was, "You had no idea anything was

13   wrong."  Wrong meaning about the bank.  And you see his

14   answer?

15   A.  Yes.  "Correct."

16   Q.  And I premised it up until the moment of Madoff.  Madoff

17   was not until December 11th?

18   A.  December 11th, yes.

19   Q.  So did you understand Mr. Magness to be saying that, At

20   least up until December 11th I had no concern about the bank

21   whatsoever?

22   A.  Yes.  That's what that says to me.

23         MR. SADLER:  Let's now put up Mr. Knudson's

24   testimony.  That's at Volume 3, trial transcript, 228.

25   Q.  (BY MR. SADLER)  Mr. Knudson was asked a similar

1    question, but this time zeroing in on October.  And he says,

2    "We didn't have any concerns about Stanford."  Do you see

3    that?

4    A.    I do, yes.

5    Q.    From the facts that you have examined with respect to

6    this case, if we're talking about October 2008, were there

7    suspicious facts and circumstances, red flags, about the bank

8    right in front of the Magness Defendants as of October 2008?

9    A.    Yes.

10   Q.    Do you know of a way -- well, let me ask this.  In your

11   investigation, did you find an explanation, did you find an

12   explanation for how the Magness Defendants were not concerned

13   about Stanford in October 2008, but in a document they said

14   they were concerned about the bank in October 2008?

15          MR. PETRIE:  Object to the form.  There's no

16   foundation.

17          THE COURT:  Overruled.

18          THE WITNESS:  No., I haven't seen anything, and I

19   don't know how you could reconcile those.  It would seem to me

20   that you are either concerned in October or you are not.  And

21   those two are inconsistent.

22   Q.    (BY MR. SADLER)  And very, very last question.  We looked

23   at a word and I asked Mr. Magness about this word.  The word

24   is jeopardy.

25   A.    Yes.

1    Q.    Do you understand what the word jeopardy means?

2    A.    I do.

3    Q.    Tell the jury your understanding of the word jeopardy.

4          MR. PETRIE:  Objection to form, no foundation,

5    undisclosed.

6          THE COURT:  If you can clarify that this is

7    something within the expertise of a forensic accountant.

8          MR. SADLER:  Your Honor, I think -- I think we've

9    had enough.  I will pass the witness.

10         MR. PETRIE:  May I proceed?

11         THE COURT:  Please.

12         MR. PETRIE:  Thank you, Your Honor.

13                    CROSS EXAMINATION

14   By Mr. Petrie:

15   Q.    Ms. Van Tassel, I want to talk to you a little bit about

16   this investigation.  You've been undertaking this

17   investigation in some way, shape, or form since February of

18   '09.  Right?

19   A.    Yes.  February 17th.

20   Q.    And one of the things you've found in your investigation

21   was that Mr. Stanford, Mr. Davis, and Ms. Pendergest-Holt

22   distributed misinformation to the financial advisors.  Right?

23   A.    Yes.

24   Q.    You found that the misinformation they distributed to the

25   financial advisors related to--and I'm going to give you a

1    list one at a time, and if I lose you please let me

2    know--first of all, as regarding Stanford International Bank's

3    financial strength.  They provided misinformation to the FAs

4    about that.  Right?

5    A.    They did.

6    Q.    And they provided misinformation to the FAs about the

7    profitability of the bank.  Correct?

8    A.    Yes.

9    Q.    They provided misinformation to the FAs about the

10   capitalization of the bank.  Right?

11   A.    They did.

12   Q.    They provided misinformation to the FAs about the

13   investment strategy of the bank.  Right?

14   A.    They did.

15   Q.    Provided misinformation to the FAs about the investment

16   allocations of the bank.

17   A.    I think they were fairly clear about what they purported

18   the allocations to be.

19   Q.    Okay.  Why don't you look in--and I apologize--that

20   enormous white binder, so don't pull a rotator cuff moving

21   that.  And if you could, ma'am, would you please look under

22   the tab for the declaration here that's dated May 24th, 2010.

23   And let me know when you found that, if you would.

24   A.    Found it.

25   Q.    Okay.  That's a declaration you submitted to this Court.

1    Is that right?

2    A.   Yes, I did.

3    Q.   You submitted to this Court under penalties of perjury.

4    Correct?

5    A.   Yes.

6    Q.   Now, if you could look at paragraph 11 of your

7    declaration submitted under penalties of perjury, please.

8    Excuse me.   I misrouted you.   If you could look at paragraph

9    16 instead.   I apologize.   Have you got 16 on page 8?

10   A.   I do.

11   Q.   Do you see there's a statement there that you made to

12   this Court about misinformation that was regularly

13   disseminated from Stanford, Davis, Holt, and others?   Do you

14   see that reference?

15   A.   I do.

16   Q.   Do you see that included among that misinformation was

17   investment allocation, second line of paragraph 16?

18   A.   That's true.

19   Q.   Okay.   Among the other -- you can set that aside, or put

20   it away if it's in your way.

21        One of the other things that these three folks

22   misinformed the FAs about was the value of the bank's

23   investment portfolio.   Right?

24   A.   Yes.

25   Q.   And there were other matters, too.   You didn't limit it

1    to just the ones I've ran through.  Correct?  That they

2    misinformed the financial advisors about.

3    A.    I don't know if there were more, but they would be listed

4    in my declaration if they are.

5    Q.    Let's look at the declaration.  Do you still have that

6    handy?

7    A.    Yes.

8    Q.    Why don't you go back to paragraph 16 on page 8, please.

9    Just let me know when you get there.

10   A.    Okay.  I'm here.

11   Q.    Okay.  Paragraph 16, after the list of the items we just

12   went through, you state "and other matters as being things

13   that were regularly disseminated to the financial advisors as

14   misinformation."

15   A.    Yes, that is included in here.

16   Q.    Now, in that context, by the way, when you talk about the

17   and others, you don't include, you do not include Mr. Espy in

18   the and others.  Right?

19   A.    I think I'm talking about matters, not individuals there.

20   Q.    Well, you also say in paragraph 16 that Stanford, Davis,

21   Holt, and others working under them.  Right?

22   A.    So that's a different part of the paragraph?  Is that

23   what you're saying?

24   Q.    It's part of the same paragraph.

25   A.    Okay.

1    Q.    So now we're looking at who's doing the misinformation or

2    spreading the misinformation.  You say Stanford, Davis, Holt,

3    and others.  Correct?

4    A.    That's correct.

5    Q.    The and others does not include Mr. Espy.  Right?

6    A.    Not in this context, no.

7    Q.    Now, you spoke to us some in response to questions from

8    Mr. Sadler about this tipping point concept where

9    essentially--and correct me if I misparaphrase your

10   response--that the amount of money coming in no longer was

11   enough to be -- to cover the amount that was supposed to be

12   going out.

13   A.    That was going out, yes.

14   Q.    Okay.  And that was something that you found was -- that

15   tipping point hit, or was reached I guess maybe is a better

16   way to phrase it, in October of 2008.  Right?

17   A.    Yes.  That point where the amounts that were going out

18   exceeded the amounts coming in from investors.

19   Q.    Okay.  And let's look at your chart that you showed us.

20   Okay?

21   A.    Okay.

22   Q.    And it will come up on your screen, or you can look at

23   the big screen, whatever's the easiest for you.

24         And one of the things you told us was that the burn rate

25   on cash at the bank was $30 million a month.  Right?

1    A.    Generally, yes.

2    Q.    Okay.

3    A.    Well, no.  Just to be clear, that was for all of the

4    entities; just the Stanford entities in general.

5    Q.    The Stanford enterprise in total?

6    A.    Yes.

7    Q.    Okay.  But the source of money for the Stanford

8    enterprise was the CDs.  Correct?

9    A.    For the most part; not completely, but for the most part

10   it was, yes.

11   Q.    But well over 95 percent of the cash coming into that

12   business came from the sales of these CDs.  Correct?

13   A.    That would probably be about right.

14   Q.    Okay.  So let me get out of the way here.

15         I took your number from the start of October and backed

16   out the $30 million, just as a round number, for what the

17   expenses -- as Mr. Sadler said, keeping the lights on,

18   salaries, et cetera.  Right?

19   A.    Okay.

20   Q.    Okay.  And then that same month you also have the

21   deductions for the monies loaned to the Magness Defendants.

22   Right?

23   A.    Yes.

24   Q.    So we back out another 88.2 million.  Correct?

25   A.    That is correct.

1   Q.   So that leaves us $292 million of unaccounted-for

2   withdrawals that you can't peg to being Magness money.  Right?

3   A.   Not to my knowledge, no.

4   Q.   And then what I did here was I backed out the 64 million

5   end-point to look at what the total outflow not attributable

6   to the Magness parties' loans would have been over this month.

7   And do you see it comes out to $227 million?

8   A.   Yes.

9   Q.   Okay.  And that is other people coming in and either

10  doing a redemption, taking a loan, pulling out interest and

11  whatever timing program they were on.  Right?

12  A.   Or other transfers or expenditures that might have

13  occurred during that month, yes.

14  Q.   Okay.  Now, in terms of what's going on in October, your

15  team did not go in on a one-by-one basis and look at the

16  people redeeming money in that month, other than the Magness

17  parties, to attempt to see what the reason was for their

18  redemption.  Right?

19  A.   Not for each one.  We have through our investigation, of

20  course, looked at outflows from October.  As I said, when we

21  start the investigation, we go to those points closest to the

22  time, so we have looked at others.

23  Q.   Okay.  And my question was, you haven't gone through and

24  looked at every redemption that took place in the month of

25  October to attempt to identify what the reason was for that

1    redemption.  Correct?

2    A.    No, I have not.

3    Q.    Okay.  And, likewise, during the same time, to the extent

4    there were other loans in this range, you've not gone through

5    and looked at those other loans and attempted to see how those

6    loans were arranged.  Correct?

7    A.    No, I've not done that.

8    Q.    Okay.  And as to those other loans, you do not know, for

9    example, whether somebody came in and said, I'd like to

10   redeem, but instead ended up getting a loan instead of a

11   redemption.  Correct?

12   A.    No, I don't know that.

13   Q.    Now, you also mentioned in response to Mr. Sadler's

14   question that the loans to the Magness parties were the

15   largest loans.  Right?

16   A.    Yes.

17   Q.    Okay.  And you said the next largest loan was--and

18   correct me if I misheard--9 or 9.2 million, somewhere in that

19   range?

20   A.    And just to be clear, that's over the period of 2007

21   through the Receivership in 2009.  During that period of time,

22   the next largest loan was -- I think it's 9.4, something like

23   that; just over 9.

24   Q.    Okay.  So somewhere between nine and nine and a half.  Is

25   that fair?

1   A.   I believe that is true.

2   Q.   Okay.  And you also told us that the Magness parties were

3   the largest depositor.  Correct?

4   A.   U.S. depositor, yes.

5   Q.   And the next largest U.S. depositor, there's quite a

6   scaling off.  They come down into the 10, $12 million range.

7   Right?

8   A.   I know that there are I think 30 over 10 million, so I

9   don't know what the next dropoff is.

10  Q.   You know that there is nobody is even close in terms of

11  being close to $79 million of deposits.  Right?

12  A.   I don't believe so, no.

13  Q.   Now, you also looked at the marketing brochure that

14  counsel showed you.  And he showed you -- I'll use his number

15  so that I'm not confusing by using the same document with a

16  different number.

17        MR. PETRIE:  Let's look at 492, please.

18  Q.   (BY MR. PETRIE)  You remember discussing this with

19  Mr. Sadler.  Right?

20  A.   Yes, I do.

21  Q.   And one of the things you LOOKED at was the statement on

22  page 5 of this document that talks about liquidity.  Do you

23  recall that?

24  A.   I do.

25  Q.   And you told us--correct me if I'm mistaken--and I'm just

 1    paraphrasing--that these types of statements were things that

 2    are -- were commonly made by banks, at least in this time

 3    frame.

 4    A.    Commonly made by SIB at this time, in these time frames.

 5    Q.    Okay.  And would you agree with me that these are the

 6    types of statements that are frequently made by financial

 7    institutions about the nature of their portfolio?

 8    A.    Are you talking about commercial banks?

 9    Q.    No, I'm talking about financial institutions who invest

10    in the similar types of things, like securities, and saying

11    they have a well-diversified portfolio of highly marketable,

12    blah, blah, blah.  That's a fairly common statement in your

13    experience, is it not?

14    A.    It is.  That kind of representation about, at a very

15    general level, the portfolio, yes.

16    Q.    Now, when you looked at that statement, one of the first

17    things you determined is after reading that statement and the

18    similar statements about -- that appear in other SIB

19    materials, you looked at that and said SIB purported to

20    function like a hedge fund.  Isn't that right?

21    A.    No.

22    Q.    Would you look at your affidavit again, please?  Again,

23    the May 24th one.  If you can find that in the big white

24    binder for us, please.

25    A.    Uh-huh.

1    Q.   And if you would, the affidavit provided to this Court,

2    look at paragraph 12, it begins at page 5.  And it is a fairly

3    lengthy paragraph.

4    A.   Yes.

5    Q.   It carries over to perhaps two thirds of the next page as

6    well.  Do you see that?

7    A.   Yes.

8    Q.   And let's -- looking at this, if you would look at the

9    top of the next page, please, page 6 of the affidavit you

10   provided this Court.

11   A.   That's correct, yes.

12   Q.   And you see it begins and it -- I don't want to take it

13   out of context.  The tail, or maybe it's the nose, on the

14   preceding page says "According to the brochure."  Right?

15   A.   Yes.

16   Q.   The very bottom.  And it goes on to say, "SIB was able to

17   pay high CD rates by investing in, 'a well-diversified

18   portfolio of highly marketable securities issued by stable

19   governments, strong multinational companies, and major

20   international banks.'"

21   A.   Yes.

22   Q.   Right?

23   A.   Uh-huh.

24   Q.   You then go on to say, "As a result, the brochure

25   continues" -- in other words, you are saying this is what the

1   piece of paper says.  Right?

2   A.    Uh-huh.  Yes.

3   Q.    You go on to say, "The brochure continues, 'SIB'"--you

4   inserted that for frame of reference--"'has been consistently

5   profitable since inception.'"  Right?

6   A.    That's what SIB is saying.

7   Q.    Yes.  And then you go on to say -- This is not what SIB

8   is saying.  You say, "In other words"--and I'm quoting--"SIB

9   purported to function like a hedge fund.  But, unlike a hedge

10  fund, it's customers were guaranteed by SIB a specified return

11  regardless of the fund's performance."  That's what you told

12  this Court in May of 2010.  Correct?

13  A.    Correct.  Your question was whether -- what was the first

14  thing I thought of when I said that.  This is in May 24th,

15  2010.  That's why I didn't think about this declaration.

16  Q.    That is what you said May 24th, isn't it, of 2010?

17  A.    It is.  Not the first thing I thought of.

18  Q.    Now, in part of your investigation, you did not look at

19  what returns might be for a hedge fund that was doing business

20  in the same environment.  Correct?

21  A.    No, I did not.

22  Q.    And you were in the courtroom when Mr. Wilk testified.

23  Right?

24  A.    Yes.

25  Q.    And you heard Mr. Wilk's testimony about note products

1    that had a similar structure that was a promissory note from a

2    financial institution and then investments underlying that

3    note?

4    A.   I do.

5    Q.   And you heard him refer specifically to two institutions.

6    Right?

7    A.   I think -- I don't remember the institutions, but I know

8    he did refer to some.

9    Q.   You know he referred to Credit Suisse.  Right?

10   A.   I don't recall the institutions, but I -- that makes

11   sense.

12   Q.   You don't remember hearing that last week?

13   A.   No.  I remember the subject of the testimony.  I don't

14   remember the institutions.

15   Q.   Do you remember that he talked about UBS?

16   A.   That sounds familiar.

17   Q.   And you know UBS is Union Bank of Switzerland.  At least

18   it used to be.  It shortened its name.  Right?

19   A.   It is.

20   Q.   Now, I'm going to bounce around a bit, so I apologize.

21   If I lose you, please sing out.

22   A.   I will.

23   Q.   Thank you.

24        You started out by telling us -- telling Mr. Sadler your

25   background, and I just want to touch on some of these things.

1        You mentioned that--and I think the number you used was

2   15--that you had ban proved or accepted as an expert in 15

3   different court decisions.  Did I have the number right?

4   A.   I believe that's correct.  But those are court decisions

5   that refer to my opinions.  That's what it was referring to.

6   Q.   And those are Stanford-related matters.  Correct?

7   A.   That's correct.

8   Q.   None of those have anything to do with the Magness loans.

9   Correct?

10  A.   I don't know if they did.  At one time Magness was part

11  of another case, and that may be part of this.  I don't know.

12       MR. SADLER:  This is part of Your Honor's order on

13  the limine items.

14       THE COURT:  Overruled.

15  Q.   (BY MR. PETRIE)  You also mentioned that you, in the

16  context of information you looked at, had read Mr. Davis' plea

17  agreement.  Right?

18  A.   I had.

19  Q.   And I believe you told us you had attended his -- a

20  hearing on his plea agreement as well?

21  A.   No.  I read the transcript from the hearing of the plea

22  agreement.

23  Q.   I apologize.  I had that mistaken.

24       You did attend the piece of Mr. Stanford's trial at which

25  Mr. Davis testified.  Correct?

1    A.    I did, yes.

2    Q.    No testimony about Mr. Magness or these loans.  Correct?

3    A.    No.

4    Q.    And in Mr. Stanford's trial there was no testimony about

5    Mr. Magness or these loans.  Correct?

6    A.    No, not that I recall.

7    Q.    Now, we've heard some about their troubles.  You also

8    mentioned, however, that you had testified, and I believe you

9    told us you testified in front of the Securities and Exchange

10   Commission or the SEC with reference to four individuals.  Do

11   I have that right?

12   A.    I don't think it of that that way.  I was actually

13   retained by the SEC to testify at an administrative hearing.

14   Q.    Okay.  And that administrative hearing was before an

15   administrative law judge at the SEC.  Correct?

16   A.    I know it's an administrative law judge.  I don't know

17   the particulars, but yes.

18   Q.    And you know that the result of that proceeding -- that's

19   a civil case.

20   A.    Yes, it is it's not criminal.

21   Q.    Right.  And so there's no convictions that result from

22   that.  Correct?

23   A.    No.  They were just found guilty of securities fraud.

24   Q.    Well, you understand that when you're in a civil

25   proceeding you're not found guilty of anything; you are found

1    liable.  Is that right?

2    A.    Okay.  They were found liable.

3    Q.    Now, in terms --

4            MR. PETRIE:  If we can go back to 492, please.

5    Q.    (BY MR. PETRIE)  You talked with Mr. Sadler about this

6    piece of marketing material as being public information.

7    Correct?

8    A.    That's correct.

9    Q.    You don't have any facts that this specific item was ever

10   provided to any of the Magness parties.  Isn't that right?

11   A.    No, I don't.

12   Q.    Okay.

13   A.    Not that I recall.

14   Q.    Now, in terms of the information that's contained in

15   here, your understanding is that this particular document was

16   used for the set-aside marketing, but for the sale of the SIB

17   certificates.  Right?

18   A.    Yes, that would be how it would be used.

19   Q.    And the sales force for the SIB certificates was the

20   various financial advisors who worked at the Stanford Group

21   Companies.  Right?

22   A.    Only in the U.S.  They had other brokers and companies in

23   other parts of the world.

24   Q.    Well, since we're in the U.S., I'm going the stick in the

25   U.S.

1    A.    Okay.

2    Q.    So in terms of sales to people in the U.S., folks like

3    the Magness parties, the sales force of those financial

4    advisors at SGC.  Right?

5    A.    Yes.  That's correct.

6    Q.    And all of those people, because they work for a

7    broker-dealer in the United States, are monitored, regulated

8    by the Securities and Exchange Commission.  Correct?

9    A.    You know, from a legal perspective I don't know if the

10   brokerage is monitored or each individual.  They certainly are

11   subject to the SEC.

12   Q.    Okay.  The individuals and the brokerage.  Right?

13   A.    I know the brokerage is, and I presume the financial

14   advisors.

15   Q.    And you understand that these types of public materials

16   are things that get reviewed by the SEC.  Correct?

17   A.    I don't know that.

18   Q.    Well, you looked at the Office of Inspector General

19   report that dealt with the SEC activities with respect to

20   Stanford.  Right?

21   A.    I did.  And they did reference marketing materials.

22   Q.    Okay.  And in that very lengthy report is the source of

23   the information you have that the SEC was investigating

24   Stanford for sometime in the late 1990s.  Right?

25   A.    Well, from the 1990s, yes.

1    Q.   Yes, ma'am.  You heard Mr. Janvey testify to that.

2    Right?

3    A.   I did.  Well, actually I read that in the transcript.  I

4    was gone during that period of time.

5    Q.   I see.  That was Friday afternoon after you had had to

6    leave.

7    A.   Yes.

8    Q.   Thank you.

9         And you understood that the SEC didn't take any action to

10   shut Stanford down for at least until this point you've

11   already talked to us about in February of 2009.  Right?

12   A.   That's correct.

13   Q.   Now, in terms of the other information you looked at, you

14   also discussed with Mr. Sadler the two charts that appear in

15   this public piece, the one that showed -- and I'll ask Austin

16   to pull them up, but it's the one that showed, first of all,

17   the comparison of CD rates, and then there's also the one that

18   essentially shows the differing amounts by which your deposit

19   would increase if you put it in different places.  Do you

20   remember that?

21   A.   I do, yes.

22   Q.   Okay.

23   A.   We went through that.

24   Q.   And this is the first chart you went through with

25   Mr. Sadler.  This is the one that says this is what a U.S. CD

1    rate was in any given year compared to what is a Stanford

2    International Bank CD rate was.  Correct?

3    A.    Right.

4    Q.    And these are the face rates; not the yield rates.

5    Right?

6    A.    Yes, these are face rates.

7    Q.    And then the second chart you looked at in this

8    progression here, and we'll blow it up so we don't create

9    eyestrain for everybody, that's the seconds one you discussed

10   with Mr. Sadler that shows if you put it in a U.S. bank you

11   get about a million and a half dollars; if you put it in

12   Stanford International Bank, same term, you get something like

13   2.2.  Right?

14   A.    That's correct, yes.

15   Q.    All of this information was in the public domain.

16   Correct?

17   A.    It was.

18   Q.    All of this information was available to the Securities

19   and Exchange Commission.  Right?

20   A.    I would presume, yes.

21   Q.    I want to jump forward a little bit and talk to you about

22   your testimony about Plaintiff's Exhibit 62, which is the set

23   of minutes from the March '08 investment committee meeting.

24   A.    Okay.

25   Q.    And we'll pull it up on the screen, or it's in your

```
 1   binder.  Whatever's the easiest way for you to look at it?

 2   A.   I'll look at the screen, unless I have any problems with

 3   it.

 4   Q.   Okay.  If you have problems, just sing out.

 5   A.   Okay.

 6   Q.   And what I'd like to do is just focus on the third page

 7   of the document, which is the second page of the minutes, and

 8   look at that paragraph that you were discussing with

 9   Mr. Sadler.  Okay?

10   A.   Yes.

11   Q.   This is the paragraph you discussed with him.  Right?

12   A.   Yes.  This is one of them.

13   Q.   Okay.  And what he did was he then pulled out specific

14   things of which he wanted to look--catch phrases.  Do you

15   recall that?

16   A.   That's correct.

17   Q.   Well, let's look at the full context.  Okay?

18   A.   Sure.

19   Q.   And in particular, let's look at Mr. Rodriguez's comment

20   about the Swiss bank model.

21               MR. PETRIE:  Let's look at the full sentence,

22   please.

23   Q.   (BY MR. PETRIE)  And what he said there--and we've looked

24   at this frequently during the course of the trial--was he was

25   comparing this Swiss bank model to a traditionally United
```

1    States commercial bank that invests in loans.  Right?

2    A.    Yes.

3    Q.    And the public pieces that you've seen from Stanford

4    International Bank touted the fact that the bank did not make

5    commercial loans.  Right?

6    A.    It did, yes.

7    Q.    It touted the fact that the only loans the bank made were

8    these things that they refer to as being cash secured loans.

9    Right?

10   A.    Yes.  That was to be to the CD investors at 80 percent of

11   the CDs.

12   Q.    Okay.  And they said, That's the only loans we make and

13   that's how we manage our credit risk.  Correct?

14   A.    That's correct.

15   Q.    And the bank public materials also made quite clear that

16   with the deposits, because it wasn't making loans, the bank

17   was out investing that in, and then it gave those four

18   categories for investments.  Correct?

19   A.    The globally diversified portfolio, and it went on to

20   list --

21   Q.    And then you remember there's a pie chart that says, We

22   do alternative, we do equities, et cetera?

23   A.    I think there may be more than four parts, but I -- it is

24   a pie chart that shows the allocation of how they invest.

25   Q.    And you saw those types of disclosures repeatedly with

1    public information.  Correct?

2    A.    They are, yes.

3    Q.    Okay.  Then you also discussed with Mr. Sadler this

4    concept in the next paragraph where he talks about this

5    leverage concept.  And Mr. Rodriguez says there that the bank

6    can leverage the portfolio by a factor of 15 percent.  Do you

7    see that reference?

8    A.    I do.

9    Q.    He doesn't, according to this report at least, say the

10   bank has leveraged the portfolio.  Right?

11   A.    That's true.

12   Q.    This is aspirational rather than reporting something

13   that's already happened.  Correct?

14   A.    I guess you can read it that way.  Correct.

15   Q.    Well, there's no way to read that to say the bank has

16   already done that, can you?

17   A.    No.  That's true.

18   Q.    Then you also discussed with Mr. Sadler the next

19   sentence.  And let's focus just on the first clause, please.

20   Remember he pulled out the phrase hedge fund.  Remember that?

21   A.    Yes.

22   Q.    Okay.  What Mr. Rodriguez said was that the investment

23   has some characteristics of a hedge fund.  Right?

24   A.    Yes.  That's what it says.

25   Q.    He doesn't say we are operating like a hedge fund.  He

1    says we have some characteristics that are like a hedge fund.

2    A.    Yes.  That's true.

3    Q.    Okay.  And he also has characteristics then that are not

4    like a hedge fund.  Correct?

5    A.    Well, yes.  And that's what one of my points was.

6    Q.    Your point is it doesn't operate like a hedge fund.

7    A.    Well, no.  My point is, is that it's inconsistent with

8    the very liquid and it's very inconsistent with how it

9    described itself otherwise.

10   Q.    Well, what this provides is that you have a capped

11   investment.  In other words, a hedge fund, somebody hits a

12   home run and you could get some sort of staggering recovery.

13   At least maybe in the old days you could have.

14   A.    Or you can lose everything.

15   Q.    Right.  And here what you have is you have a cap on the

16   upside.  Correct?

17   A.    That's not what this is refers to, but there is a

18   guaranteed rate on the CDs.

19   Q.    Right.  What you refer to as the stated rate.  Right?

20   A.    It is the stated rate.

21   Q.    Okay.  And that's -- no matter what happens, you are

22   never going to get more than that percentage of interest.

23   Correct?

24   A.    Not true.  I mean, when you roll over -- until that

25   matures, they're not going to change it.  Mr. Magness had a

1   different deal, because if somebody else got a higher rate he

2   could get a higher rate.  But for most investors that's true.

3   Q.   And you understood that for most investors if the

4   interest rate went up during the term of their CD, their

5   interest rate would also ratchet up.  Is that right?

6   A.   No.

7   Q.   Let's look, please --

8   A.   They have some that are linked to other CDs or index

9   linked and they can.

10   Q.   Let's look at what the bank told people publicly.  Let's

11   look at 492 again.

12        MR. PETRIE:  And if you could, Austin, please, go to

13   the page towards the back that shows -- it has the chart of

14   the various CD products.  That was it.  It was there

15   momentarily.  Thank you.  And if you could blow up just the

16   top portion that deals with the CDs we're talking about here.

17   Q.   (BY MR. PETRIE)  You understand this is a fixed CD

18   product offered by the bank.  At least the eight CDs that the

19   Magness parties had.  Correct?

20   A.   That's correct, yes.

21   Q.   So when we look at these various discussions of the

22   innovative products--that's the bank's term--that it was

23   offering we're in the right place.  Correct?

24   A.   Yes.  That's correct.

25   Q.   And if you look over in the key benefits, it says if the

1    base rate goes up, eligible balances receive the higher rate.

2    Do you see that?

3    A.   I do.

4    Q.   That's for everybody.  Right?  That's not specific to any

5    particular depositor.

6    A.   It says eligible balances, so it's limited in some way.

7    Q.   Right.  And you don't know what that limitation is.

8    Correct?

9    A.   We can look.  I think they have a footnote there.

10   Q.   Let's look at the footnote, then.  What does the footnote

11   tell you about eligible balances?

12   A.   I can't tell what that number is.

13   Q.   Let me do this.  So you don't strain your eyes, because

14   this will do it, let's see if we can pull up 123 and get a

15   little better copy of this document.

16        You are familiar that this is another one of the

17   marketing pieces from the bank.  Right?

18   A.   It is.  Yes.

19   Q.   You saw this being flashed around during the previous

20   pieces of the trial.  Correct?

21   A.   Yes.

22   Q.   Let's see if we get a little better visual, so-to-speak,

23   on the chart here.  It has the same type of legend.  Right?

24   A.   It does.

25   Q.   We are doing apples to apples on the product.  Correct?

1   A.   Yes.  The fixed CD.

2   Q.   Okay.  And it says if the rate goes up, eligible balances

3   receive the higher rate.  And there's no footnote.  Correct?

4   A.   Yes.  That's correct.

5   Q.   Okay.  Now, you also mentioned this -- you built into

6   your testimony the incident that Mr. Magness related to the

7   jury about having been in Antigua and seeing these two

8   individuals.  You remember that story?

9   A.   Yes.

10  Q.   Okay.  And you recall that Mr. Magness didn't talk to

11  these individuals, whoever they were.  Right?

12  A.   No, he did not.

13  Q.   Right.  All he did was say there were two guys there,

14  they had white shirts, skinny ties, and they looked like CIA

15  guys.  Right?

16  A.   Yes.

17  Q.   And someone at the bank told him that they were SEC

18  people.  Correct?

19  A.   I believe that's true, yes.

20  Q.   In other words, he wasn't making some independent

21  assessment.  That was part of the spiel that the bank was

22  giving them while he was down there.  Right?

23  A.   Yes.  I said that he was told that the SEC was there.

24  Q.   In terms Of your discussion of the loans, you -- remember

25  you pulled up in the materials that Mr. Sadler showed you that

```
 1   interrogatory response?  Remember pulling that up?

 2   A.   Yes.

 3   Q.   And do you still have Exhibit 20, page 14 somewhere

 4   handy?

 5   A.   Is it in your binder, or should I look --

 6   Q.   It would be in his binder.  Sorry.

 7   A.   Not a problem.  Okay.

 8   Q.   And the information there that you read it before has

 9   several pieces to it.  Do you remember the piece you read to

10   us?

11   A.   I do.

12   Q.   And what that said is Mr. Espy's advice back to the

13   Magness parties was that the loan route was, first, faster.

14   Right?

15   A.   Yes, he did say that.

16   Q.   And then he went on to say it's easier.  Correct?

17   A.   Let me find it.  I'm sorry.  It's kind of buried.

18   Q.   Let me know when you find it.

19   A.   I'm sorry.  What's your question now?

20   Q.   It starts out by saying going that loan route is faster.

21   Correct?

22   A.   Easier and quicker.  Yes.

23   Q.   Okay.  It's easier.  Right?

24        And then he goes on to add the bit about, Oh, and let's

25   us keep a loan asset on our balance sheet.  Right?
```

1    A.    That's not what that says.  It says, Given the general

2    market decline, SIB wanted to keep the asset value --

3    Q.    Okay.

4    A.    -- of the CD on the balance sheet.

5    Q.    Okay.  In other words, don't break the CDs.  Keep them on

6    the balance sheet.  Right?  Or redeem them.

7    A.    I'm sorry.  I don't understand your question.

8    Q.    I will ask you a different one, then.

9    A.    Okay.

10   Q.    You understood that there was some time urgency to get

11   that money.

12   A.    Yes.

13   Q.    Okay.  And you saw Mr. Espy's email, the internal email

14   that said, We just got a margin call and we need money by 2:00

15   p.m. tomorrow.  Right?

16   A.    I saw that, yes.

17   Q.    Okay.  And you haven't gone back and looked at the

18   history of the margin calls to make an up or down vote on

19   whether there's documentary support for that or not.  Correct?

20   A.    I think that's the one that refers to the fact of this

21   $10.  I'd have to go back and look, but if that's true, that

22   was known before.

23   Q.    It's not a question of whether it was known.  It was a

24   question of whether it was triggering a need for money.  You

25   haven't gone back and looked at that, have you?

1    A.    I heard Ms. Dokken's testimony.

2    Q.    But you haven't gone back and looked for that, have you?

3    A.    For what?

4    Q.    For the documentation that would show whether there was,

5    in fact, a margin call that needed to be addressed by 2:00

6    p.m. the following day from the day of Mr. Espy's email.

7    A.    No, I have not.

8    Q.    And those emails that you looked at with Mr. Sadler where

9    Mr. Espy is going back and forth either Mr. Pacheco or Mr.

10   Rodriguez-Tolentino -- do you remember looking at those?

11   A.    I do.

12   Q.    You don't have anything that shows those emails being

13   forwarded to anyone of the Magness parties, do you?

14   A.    No.  There's part of the strings of those emails that

15   refers to the fact that Mr. Magness is okay with this, we'll

16   go with the 18.  So there's references to discussions with

17   Mr. Magness with Mr. Espy.

18   Q.    Okay.  And there's no reference in there to Mr. Espy

19   having reported through to any of the Magness parties this

20   business about checking with treasury and dealing with

21   reserves, is there?

22   A.    No.

23   Q.    Now, you were in the courtroom to listen to Mr. Espy's

24   videotaped testimony.  Right?

25   A.    I was, yes.

1    Q.   That wasn't the first time you've had an opportunity to

2    look at the testimony.  You'd seen his deposition transcript,

3    the actual printed binder things previous to that.  Right?

4    A.   I have.  I'd seen those before.

5    Q.   So you had seen Mr. Espy's testimony where -- when

6         Mr. Powers handed him those minutes that dealt with what

7    had gone on in early October, the December 5 minutes.  You

8    remember that?

9    A.   Did I see those?

10   Q.   Do you remember seeing Mr. Espy's testimony where

11   Mr. Powers said, Here's the December 5, 2008 minutes?

12   A.   I don't recall it specifically.

13   Q.   Do you remember seeing it here?

14   A.   Yes, I do.

15   Q.   And you remember Mr. Espy saying, I've never seen these

16   before.

17   A.   I don't recall that, but that may be.

18   Q.   Do you remember Mr. Espy saying, I went in and asked for

19   a loan, irrespective of what that piece of paper says here, is

20   my memory of what happened.  Do you remember that?

21   A.   I don't recall that, no.

22   Q.   Now, you talked some about stock sales?

23   A.   About what?

24   Q.   Stock sales.

25   A.   Yes.

1    Q.    In response to questions from Mr. Sadler.  And you were

2    talking about what the Magness parties were willing to do to

3    sell stock.  Right?

4    A.    Well, as they related to the information on the

5    documents, yes.

6    Q.    And the information on the documents, did you go back and

7    compare when those sales were taking place to look at what the

8    market price of the stock was?

9    A.    Did I do that?

10   Q.    Yeah.

11   A.    No.

12   Q.    Okay.  And so the sales, you are trying to compare sales

13   in October -- you know, the price was down in October of

14   Liberty Media.  Right?

15   A.    I do know that.

16   Q.    Okay.  And you heard Mr. Bell's testimony about

17   essentially if you started selling down in that type of

18   marketplace, you had that three to one need to sell in order

19   to make your recoveries.  Do you remember that?

20   A.    I think he had to correct that later that it wouldn't be

21   quite that much, but yes.

22   Q.    It was roughly -- it was well over two to one.  Right?

23   A.    That's fair.

24   Q.    Okay.  And you understood that that was a tremendous

25   down-side to selling the stock at that point in time, even

1   before we start talking about taxes.  Correct?

2   A.   Yes, because Mr. Magness didn't want to sell it at a

3   lower price.

4   Q.   Now, at the point in time when these loans happened,

5   notwithstanding the back and forth between -- or I should say

6   among Mr. Espy, Mr. Pacheco and Mr. Juan Rodriguez-Tolentino,

7   what we do know is the loans happened; the money went from

8   Stanford International Bank to the Magness parties.  Correct?

9   A.   Yes, they did.

10  Q.   And it went in relatively short order from when the

11  Magness parties submitted the paperwork.  Correct?

12  A.   Within a few days, yes.

13  Q.   And there was no sort of hemming and hawing, at least

14  from the bank to the Magness parties, saying, We don't have

15  the money or we can't give you the money.  Right?

16  A.   Well, yes; as it related to the discussions with  Mr.

17  Espy.

18  Q.   Well, Mr. Espy is an employee of Stanford Group

19  Companies.  Correct?

20  A.   He is, but, as I said, there's information that shows

21  that he was discussing it with Mr. Magness.

22  Q.   Yes.  And the only information you have that he was

23  discussing with Mr. Magness was that Mr. Magness would be good

24  with an $18 million loan.  Right?

25  A.   That is part of the email string, yes.

1    Q.   That's the only information you have that you can say

2    that was definitely shared with Mr. Magness.  Correct?

3    A.   That's true about that string of emails.

4    Q.   Okay.  And that's the only string of emails you have that

5    shows anything being shared with Mr. Magness about these

6    Pacheco, Rodriguez-Tolentino, Espy conversations.  Correct?

7    A.   On that day?

8    Q.   On any day between those three individuals, or among

9    those three individuals.

10   A.   Well, I've only looked at them on that day for this

11   matter, so if there are others I have not seen them.

12   Q.   Okay.  So we'll limit it to that day.  That's the only

13   thing you have.  Right?

14   A.   That's the only -- that's what refers in those documents

15   to Mr. Magness.

16   Q.   Okay.  Now, have you gone back and talked some with

17   Mr. Sadler about October 1 and those set of meeting minutes

18   that have the very terse discussion about the CDs simply--I'm

19   loosely paraphrasing--saying, There have been no redemptions?

20   A.   That's correct.

21   Q.   And have you gone back and looked at what the stock price

22   was on October 1 for the various Liberty stocks?

23   A.   I've seen that at one time, and it was certainly brought

24   up on the screen but I don't recall the exact amount.

25   Q.   Do you recall generally between October 1 and October 10

1    that there is a precipitous decline in the price of those

2    stocks?

3    A.    There is a decline, yes.

4    Q.    Well, there was a precipitous decline, wasn't there?

5    A.    I don't recall the amounts, but there was a significant

6    decline.

7              THE COURT:  I show you at 40 minutes into cross.

8              MR. PETRIE:  Thank you, Your Honor.

9    Q.    (BY MR. PETRIE)  Last topic.  You testified to Mr. Sadler

10   this concept that the loans, and I think the phrase you used

11   was preapproved.  Do you recall that?

12   A.    They are essentially preapproved subject to some

13   paperwork that would have to be done.

14   Q.    There is nothing in the materials provided to the Magness

15   parties that advised them that they were preapproved for any

16   sort of loan from Stanford International Bank, is there?

17   A.    Well, the materials that I've seen indicate that up to 80

18   percent they can have a loan from -- the CD investors can have

19   a loan collateralized by their CD.

20   Q.    Let's go back to my question which is, there's nothing in

21   the paperwork that you've seen that says to the Magness

22   parties, You are preapproved for a loan up to 80 percent of

23   whatever you've deposited in these CDs.

24   A.    I believe that's in the public information that's

25   available to all investors.

1  Q.   You haven't shown us a single piece of paper that says

2  that, have you?

3  A.   No, we did not go through that today.

4         MR. PETRIE:  Thank you, Your Honor.

5         MR. SADLER:  No further questions, Your Honor.

6     May the witness be excused?

7         THE COURT:  Any objection?

8         MR. PETRIE:  No.  Thank you, Your Honor.

9         THE COURT:  Thank you, ma'am.  You may step down.

10        MR. SADLER:  And the Receiver rests.

11        MR. PETRIE:  I have no rebuttal case, Your Honor.

12  No need to.

13        THE COURT:  All right.  The term we frequently use

14  for that is close, so the Magness parties are closed.

15        MR. PETRIE:  Thank you.

16        THE COURT:  And the Receiver of necessity then is

17  also closed.

18     Rest and close.  Those are such happy words down here.

19  That means we're done with the presentation of evidence.

20     I told you we might let you out a little early.  We're

21  not giving you a huge break, but it's a little early.  So get

22  a head start on the traffic, have a very pleasant evening, a

23  safe trip home and back.  We will see you at 9:00 tomorrow,

24  and we will be ready to start with closing arguments then.

25        (Whereupon, the jury left the courtroom.)

1     By my prior experience, it would not surprise me if the

2  Receiver intends to renew his motion for judgment as a matter

3  of law.

4          MR. SADLER:  We do, Your Honor, under Rule 50 renew

5  the motion for the reasons previously stated on the record

6  with regard to the estoppel point and the point that no

7  reasonable jury could find for the Defendants on this

8  evidence.  We do renew that motion at this time.

9          THE COURT:  Okay.  And because it was only a couple

10  of days ago, I recall what you said previously about that and

11  I don't feel any particular need personally for you to

12  reiterate those arguments made orally and in writing.

13          MR. SADLER:  Understood.  And we will follow up with

14  an appropriate filing, if that's permissible with the Court.

15          THE COURT:  That's fine with me.

16      Any objection to that procedure from the Magness parties?

17          MR. PETRIE:  I'm not sure what the procedure I'm

18  being asked to agree to.  Is it a delayed filing on a brief

19  for something that we need to address --

20          THE COURT:  No; that he doesn't have to say

21  everything orally right now; that he can follow it up in

22  writing later today.

23          MR. SADLER:  Yes, sir.  We are simply renewing our

24  Rule 50 motion on the grounds previously stated.  I'm just

25  required to do it at this stage of the proceedings.

```
1          MR. PETRIE:  Well, if we're simply renewing,

2    then there's -- my issue is this, Your Honor.  If we're going

3    to get more stuff, then we need to have an opportunity to

4    address it.

5          THE COURT:  Okay.  Why don't you take a look when

6    they file it and see if you feel a need to say anything

7    further to it.  I'm assuming it's just the same grounds that

8    were raised before.  And, of course, you are limited to those

9    anyway.

10         MR. SADLER:  Understood.  We will be citing evidence

11   that came in in our case, but for the reasons previously

12   stated, those two grounds, there's no additional ground.

13         THE COURT:  Is that okay with the Magness parties to

14   do it that way?

15         MR. PETRIE:  Yes, Your Honor.  As long as I have the

16   opportunity to respond --

17         THE COURT:  Of course.

18         MR. PETRIE:  -- and I hear that I do.  So that's

19   fine.  Thank you.

20         THE COURT:  Okay.  I think probably technically you

21   could insist on him making the motion orally right now in

22   full, and that usually is not helpful for me.

23         MR. PETRIE:  Well, I understand.  And then we start

24   talking about reopening, and it becomes a quagmire.

25         THE COURT:  Okay.  So here's what I suggest.  I
```

1   suggest that we take about a 15-minute break, and then resume

2   off the record to talk about the charge.  Once we're done off

3   the record and I've made whatever changes we agree to or I'm

4   persuaded on, then we'll resume on the record and do the

5   formal charge conference.  Is that an okay schedule for

6   you-all?

7              MR. SADLER:  Yes, sir.

8              MR. PETRIE:  That's fine.  Thank you.

9              THE COURT:  A little procedural issue.  There's a

10  little conference room down here but it's pretty cozy, and I

11  think if we do it down here, probably just need to limit it to

12  maybe two folks per side.  We can go upstairs to 15 and I have

13  a larger conference room, if you want to do that.  It's your

14  pleasure.

15             MR. PETRIE:  Is there any reason why we can't do it

16  off the record in the courtroom where we have a little more

17  space?  Other than you're very distant.

18             THE COURT:  Yeah.  It's just logistically a little

19  harder for me.

20             MR. SADLER:  Perhaps we could convene on 15, Your

21  Honor, and then in the larger room.  Would that be

22  appropriate?

23             THE COURT:  That's fine.  Okay.  We will see you up

24  there at 5:00.

25             MR. SADLER:  Your Honor, is that the hallway just to

1    the left of your courtroom?  Is that where we're going?  Just

2    remind me.

3                   THE COURT:  Yes.  There's a little button there that

4    will alert somebody, and hopefully somebody will let you in.

5                          (Brief recess.)

6                   MR. PETRIE:  We accept the charge as presented, Your

7    Honor.  Thank you.

8                   THE COURT:  Okay.  Good.  And I've seen the written

9    objections.  Have you-filed that?

10                  MR. POWERS:  No, Your Honor.

11                  THE COURT:  Or do you plan to?

12                  MR. POWERS:  Yes, we will.

13                  THE COURT:  Then I don't need to hear those over

14   again.  I'm satisfied, having reviewed the written ones.

15                  MR. POWERS:  Okay.  Thank you, Your Honor.

16                  THE COURT:  And anything else from the Receiver?

17                  MR. POWERS:  Not at this time.

18                  MR. SADLER:  May we have just one moment, Your

19   Honor?

20                  THE COURT:  Uh-huh.

21                  MR. POWERS:  Not at this time, Your Honor.  Thank

22   you.

23                  THE COURT:  Okay.  And I think this is clear.  It is

24   certainly clear to me, but I made one change where I added the

25   Ponzi scheme language in a different question from what you

1   had it, and I am highly confident that you make the same

2   objection to it there as you did in the other place.  And I'll

3   just note, while I certainly agree with you that there are

4   other forms of fraud, I don't think the evidence in this case

5   supports anything other than a Ponzi scheme.  And I understand

6   you disagree with that assessment, and that's fine.

7           MR. SADLER:  May I ask the Court just one matter?

8       So with respect to Question No. 1, reflecting the

9   discussion we had in chambers, an answer to Question No. 1-A

10  "no" means no good faith by the Magness Defendants.  An answer

11  to Question No. 1-A "yes" means yes, they did have good faith.

12          THE COURT:  That's my understanding.

13          MR. SADLER:  All right, sir.

14      Anything else we need to take up on the record at this

15  time?

16          MR. PETRIE:  Not from the Magness parties, Your

17  Honor.  Thank you.

18          MR. SADLER:  No, sir.

19          THE COURT:  Okay.  Let's go off the record for just

20  a moment.  So barring anything else, we'll see you tomorrow at

21  9:00 in the morning.  Have a good evening.

22          (The proceedings were concluded at 5:5 p.m.)

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts                01/17/2016

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX H

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION

3  RALPH S. JANVEY, IN HIS      (   CAUSE NO. 3:15-CV-401-N
   CAPACITY AS COURT-APPOINTED  )
4  RECEIVER FOR THE STANFORD    (
   INTERNATIONAL BANK, LTD.,    )
5  et al.,                      (
            Plaintiff,          )
6                               (
   vs.                          )
7                               (
   GMAG LLC, MAGNESS SECURITIES )
8  LLC, GARY D. MAGNESS, and    (
   MANGO FIVE FAMILY, INC., IN  )
9  ITS CAPACITY AS TRUSTEE FOR  (
   THE GARY D. MAGNESS IRREVOCABLE)  DALLAS, TEXAS
10 TRUST,                       (   JANUARY 18, 2017
            Defendants.        (   9:00 A.M.
11 _____

12

13                       VOLUME 7

14

15 _____

16                  TRIAL ON THE MERITS

17        BEFORE THE HONORABLE DAVID C. GODBEY
            UNITED STATES DISTRICT JUDGE
18                    and a jury
   _____

19

20

21

22        SHAWN M. McROBERTS, RMR, CRR
            1100 COMMERCE STREET, RM. 1654
23          DALLAS, TEXAS  75242
                (214) 753-2349
24

25

```
 1                        A P P E A R A N C E S

 2
        FOR THE PLAINTIFFS:    BAKER BOTTS, LLP
 3                             98 SAN JACINTO BOULEVARD
                               SUITE 1500
 4                             AUSTIN, TEXAS  78701-4039
                               (512) 322-2678
 5                             BY:  MR. KEVIN SADLER
                                    MR. SCOTT POWERS
 6                                  MR. BRENDAN DAY
                                    MS. ASHLEY CARR
 7
        FOR THE DEFENDANTS:    BALLARD SPAHR, LLP
 8                             1225 SEVENTEENTH STREET
                               SUITE 2300
 9                             DENVER, COLORADO 80202-5596
                               (303) 292-2400
10                             BY:  MR. ANDREW PETRIE
                                    MS. RACHEL MENTZ
11
                               DYKEMA COX SMITH
12                             1201 ELM STREET, SUITE 3300
                               DALLAS, TEXAS  75270
13                             (214) 698-7800
                               BY:  MR. DAVID BRYANT
14
        OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
15                             1100 COMMERCE STREET, RM. 1654
                               DALLAS, TEXAS  75242
16                             (214) 753-2349

17

18

19

20

21

22

23

24

25
```

## INDEX

**Closing Arguments**

| **Closing Arguments** | **Page** |
|---|---|
| MR. PETRIE | 18 |
| MR. SADLER | 42 |
| MR. PETRIE | 62 |

## Charge Read

| **Charge Read** | **Page** |
|---|---|
| | 8 |

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
 1                 THE COURT:  Be seated.

 2            Mr. Sadler.

 3                 MR. SADLER:  Yes, sir.  I just wanted to make sure

 4       the record is clear.  We did file our objections last night to

 5       Your Honor's proposed questions and instructions, and we just

 6       ask for a ruling on the record with regard to those

 7       objections.

 8                 THE COURT:  Except for the ones where I changed it,

 9       they're overruled.

10                 MR. SADLER:  Thank you, Your Honor.

11                 THE COURT:  That wasn't too bad.

12            They're not quite ready back there, but they will be in

13       just a moment, so we'll get rolling.

14            I think after the Magness parties' opening, we will

15       probably take a short break, because otherwise they've got to

16       sit there for almost two hours, and I think that's a little

17       bit long.  So that will break it up a little bit right in the

18       middle.

19                 (Whereupon, the jury entered the courtroom.)

20                 THE COURT:  Be seated.

21            Good morning.  How are you-all doing?

22                 SEVERAL JURORS:  Good.

23                 THE COURT:  Good.  We are ready to get rolling here.

24            Before I start, I want to say a couple of things, not too

25       much because I'm trying to save my voice.  I hope I can get
```

1    through all this.  I've taken every symptom reliever I know

2    how to take.  So we just hope they work.

3        First thing I want to say is, I know you aren't

4    volunteers.  I know you're draftees.  You didn't really have

5    much of a choice about whether or not you'd be on the jury.

6    So I do appreciate your service, and I thank you for that, but

7    that really wasn't your choice.

8        What was your choice, though, is your attitude as you

9    went about your service here with us.  And you could have

10   chosen to be grumpy and fussy, or you could, and did, in fact,

11   choose to be engaged and have a good attitude, and that makes

12   such a difference.  If you-all are grumpy and fussy, the whole

13   courtroom is grumpy and fussy.  But when you have a good

14   cheerful attitude about your work, the whole courtroom has a

15   good cheerful attitude.  And as I say, that's something that

16   you had a choice about, and you chose to do your service in a

17   very positive way.  And I really appreciate that.

18       I want to say just briefly--and I'll keep this really

19   short--these are pretty good lawyers.  You guys are not down

20   here all the time.  These are the A-team lawyers.  They're

21   better than average.  And they've done a good job of --

22   obviously they have disagreements, and they fuss about stuff

23   where they've got good legitimate disagreements, but they

24   don't waste a bunch of your time on trivial things.  There

25   were relatively few objections in the trial, and that speaks

1   well for them.

2        It shows that they respect your time and are trying to

3   make good use of it, and I certainly appreciate that and I

4   suspect you-all do.  And I just wanted to acknowledge that for

5   them.

6        So our game plan is I've prepared a document -- do they

7   have the copies?

8        Okay.  You'll just have to listen and follow along.  But

9   when you go back to deliberate, we'll give each of you your

10  own copy of the charge.  And it has some general instructions

11  that apply pretty much in every case and then some specific

12  instructions and questions that apply to this case.

13       And it's relatively short.  It's relatively short.  There

14  basically are three questions, 1-A, 1-B, and 2.  And you may

15  not have to answer 2 depending on how you answer 1-A and B.

16  So it's not a very complicated charge, which is good.

17       I'm in an odd circumstance here where I think pretty much

18  all of the lawyers don't like the way I submitted 1-A and 1-B.

19  They think it's confusing.  And I understand that.  I

20  acknowledge that.

21       But when I was a baby judge many years ago at baby judge

22  school, they said, always submit the questions so that the

23  party with the burden of proof is looking for a yes.  And here

24  the party with the burden of proof are the Magness parties, so

25  they are look for yeses.  And I offer this to you just as a

7

```
 1    navigational aid.  If you get lost in double or triple

 2    negatives, always remember they're looking for a yes and the

 3    Receiver is looking for a no.

 4         Now, I'm not saying decide which side you like the best

 5    and then answer the questions that way.  In fact, I instruct

 6    you just the opposite of that.  I say answer each question

 7    based on the evidence.  Don't decide who you think should win

 8    and then answer the questions accordingly.

 9         But I'm just offering this as a navigational aid.  If you

10    get tangled up in the negatives, always remember the Magness

11    parties with the burden of proof are looking for a yes, and

12    the Receiver is looking for a no.

13         So what we're going to do is, I'm going to read the

14    charge to you, then the lawyers will make their closing

15    arguments.  The Magness parties go first because they have the

16    burden of proof, then the Receiver, and then the Magness

17    parties get the last word of all in rebuttal.

18         It's probably going to take me about 15 or 20 minutes to

19    read this to you.  And, I'm sorry, I usually try to bring the

20    copies for you-all down.  And we're a little bit

21    discombobulated so I didn't get them down here for you to

22    follow along while I'm reading it to you.

23         If my voice gives out, I've asked one of my law clerks,

24    who's sitting in the back there, to be on standby to step in

25    and finish reading if I can't finish it.  But I'll read it to
```

1    you, then the Magness parties, then the Receiver, then the

2    Magness parties again.

3         They have a total of 45 minutes per side.  So I think,

4    given the length of that, once they finish their -- the

5    Magness parties finish their openings, we'll take a short

6    break, probably just only about ten minutes or so, but so that

7    you don't have to sit there for two hours at a stretch.

8         So I think, without any further commentary, I'll proceed

9    now to the Court's charge to the jury.

10        Members of the Jury:

11        It is my duty and responsibility to instruct you on the

12   law you are to apply in this case.  The law contained in these

13   instructions is the only law you may follow.  It is your duty

14   to follow what I instruct you the law is regardless of any

15   opinion that you might have as to what the law ought to be.

16        If I have given you the impression during the trial that

17   I favor either party, you must disregard that impression.  If

18   I have given you the impression during the trial that I have

19   an opinion about the facts of this case, you must disregard

20   that impression.  You are the sole judges of the facts of this

21   case.  Other than my instructions to you on the law, you

22   should disregard anything I may have said or done during the

23   trial in arriving at your verdict.

24        You should consider all of the instructions about the law

25   as a whole and regard each instruction in light of the others

1    without isolating a particular statement or paragraph.

2        The testimony of the witnesses and other exhibits

3    introduced by the parties constitute the evidence.  The

4    statements of counsel are not evidence; they are only

5    arguments.  It is important for you to distinguish between the

6    arguments of counsel and the evidence on which those arguments

7    rest.

8        What the lawyers say or do is not evidence.  You may,

9    however, consider their arguments in light of the evidence

10   that has been admitted and determine whether the evidence

11   admitted in this trial supports the arguments.

12       You must determine the facts from all the testimony that

13   you have heard and the other evidence submitted.  You are the

14   judges of the facts, but in finding those facts, you must

15   apply the law as I instruct you.

16       Do not let bias, prejudice or sympathy play any part in

17   your deliberations.  This case should be considered and

18   decided by you as an action between persons of equal standing

19   in the community and holding the same or similar stations in

20   life.  The law does not give special treatment to any person.

21   The Receiver and the Magness parties are equal before the law

22   and must be treated as equals in a court of justice.

23       Defendants have the burden of proving their defense by a

24   preponderance of the evidence.  To establish by a

25   preponderance of the evidence means to prove something is more

1    likely so than not so.

2         Great.  Yeah.  Let's go ahead and pass those out.

3              (Whereupon, a copy of the Court's Charge to the Jury

4              was given to each juror.)

5         Good.  So I am down to the last paragraph on page 2.  In

6    fact, I'll repeat the next to the last paragraph so that

7    you-all can catch up.

8         Defendants have the burden of proving their defense by a

9    preponderance of the evidence.  To establish by a

10   preponderance of the evidence means to prove something is more

11   likely so than not so.

12        In determining whether any fact in issue has been proved

13   by a preponderance of the evidence, you may consider the

14   testimony of all the witnesses, regardless of who may have

15   called them, and all the exhibits received in evidence,

16   regardless of who may have produced them.

17        The evidence you are to consider consists of the

18   testimony of the witnesses, the documents and other exhibits

19   admitted into evidence, and any fair inferences and reasonable

20   conclusions you can draw from the facts and circumstances that

21   have been proven.

22        Generally speaking, there are two types of evidence.  One

23   is direct evidence, such as testimony of an eyewitness.  The

24   other is indirect or circumstantial evidence.  Circumstantial

25   evidence is evidence that proves a fact from which you can

1    logically conclude another fact exists.  As a general rule,

2    the law makes no distinction between direct and circumstantial

3    evidence, but simply requires that you find the facts from a

4    preponderance of all the evidence, both direct and

5    circumstantial.

6         You are the sole judges of the credibility or

7    believability of each witness and the weight or significance

8    to be given to the witness's testimony.  In weighing the

9    testimony of a witness, you should consider the witness's

10   relationship to a particular party; the witness's interest, if

11   any, in the outcome of the case; the witness's manner of

12   testifying; the witness's opportunity to observe or acquire

13   knowledge concerning the facts about which the witness

14   testified; the witness's candor, fairness, and intelligence;

15   and the extent to which the witness's testimony has been

16   supported or contradicted by other credible evidence.  You

17   may, in short, accept or reject the testimony of any witness,

18   in whole or in part.

19        Even though a witness may be a party to the action, and

20   therefore interested in its outcome, the testimony may be

21   accepted if it is not contradicted by direct evidence or by

22   any inference that may be drawn from the evidence if you

23   believe the testimony.

24        You are not to decide this case by counting the number of

25   witnesses who have testified on the opposing sides.  Witness

1    testimony is weighed; witnesses are not counted.  The test is

2    not the relative number of witnesses, but the relative

3    convincing force of the evidence.  The testimony of a single

4    witness is sufficient to prove any fact, even if a greater

5    number of witnesses testify to the contrary, if after

6    considering all of the other evidence, you believe that

7    witness.

8          A witness may be "impeached" or discredited by

9    contradictory evidence, by a showing that the witness

10   testified falsely concerning a material matter, or by evidence

11   that at some other time the witness said or did something, or

12   failed to say or do something, that is inconsistent with the

13   witness's present testimony.  If you believe that any witness

14   has been so impeached, it is your exclusive right to give the

15   testimony of that witness whatever credibility or weight, if

16   any, as you think it deserves.

17         A simple mistake by a witness does not necessarily mean

18   that the witness did not tell the truth as he or she remembers

19   it.  People may forget some things or remember other things

20   inaccurately.  If a witness made a misstatement, consider

21   whether that misstatement was an intentional falsehood or

22   simply an innocent mistake.  The significance of that may

23   depend on whether it has to do with an important fact or with

24   only an unimportant detail.

25         When knowledge of technical subject matter may be helpful

1    to the jury, a person who has special training or experience

2    in that technical field is permitted to state his or her

3    opinion on those technical matters.  However, you are not

4    required to accept that opinion.  As with any other witness,

5    it is up to you to decide whether to rely on it.

6         Remember that the lawyers' statements, objections, or

7    arguments--whether made during the trial or during their

8    opening and closing statements--are not evidence in the case.

9    The function of the lawyers is to point out those things that

10   are most significant or most helpful to their side of the case

11   and, in so doing, to call your attention to certain facts or

12   inferences that might otherwise escape your notice.  However,

13   it is your own recollection and interpretation of the evidence

14   that controls in the case.

15        What the lawyers say is not binding upon you.  If an

16   attorney's question assumes that some fact is true and the

17   witness did not agree with that assumption, the question

18   itself is not evidence that the assumed fact is true.  You

19   should not consider or be influenced by the fact that during

20   the trial of this case counsel have made objections to the

21   testimony, as it is their duty to do so, and it is my duty to

22   rule on those objections in accordance with the law.

23        The fact that a person brought a lawsuit and is in court

24   seeking damages creates no inference that the person is

25   entitled to a judgment.  Anyone may make a claim and file a

1   lawsuit.  The act of making a claim in a lawsuit, by itself,

2   does not in any way tend to establish that claim and is not

3   evidence.

4        Answer each question from the facts as you find them.  Do

5   not decide who you think should win and then answer the

6   questions accordingly.  Your answers and your verdict must be

7   unanimous.

8        "Stanford" means R. Allen Stanford and his associated

9   entities, including Stanford International Bank, Ltd.,

10  Stanford Group Company, and other related entities.  The Court

11  has previously determined that Stanford operated a Ponzi

12  scheme.

13       The "Magness Parties" means GMAG, LLC, Magness

14  Securities, LLC, Gary D. Magness, and Mango Five Family, Inc.,

15  in its capacity as trustee for the Gary D. Magness Irrevocable

16  Trust.

17       Question No. 1:

18       Did the Magness parties act in good faith when they

19  received the transfers from Stanford in October 2008?

20       Answer "yes" or "no" for:

21       a.  no actual notice

22       b.  no inquiry notice

23       Instructions for Question No. 1:

24       The Magness parties have the burden to prove good faith

25  by a preponderance of the evidence.

1          The Magness parties acted in good faith if they did not

2     have actual notice or inquiry notice in October 2008 that

3     Stanford was engaged in a Ponzi scheme.

4          Actual notice is based on what one actually knows.  It

5     also includes the knowledge of agents acting within the scope

6     of their agency.  An agent is a person who is authorized to

7     act on behalf of another.  Examples of agents include

8     officers, directors, employees, and attorneys.  A person has

9     actual notice if the person has actually reached the

10    conclusion that Stanford was engaged in a Ponzi scheme or if

11    the person has knowledge of facts that would have led a

12    reasonable person to reach that conclusion.

13         Inquiry notice is knowledge of facts relating to the

14    transaction at issue that would have excited the suspicions of

15    a reasonable person and led that person to investigate.

16    Inquiry notice can be based on both facts that one actually

17    knows and facts known by agents acting within the scope of

18    their agency.

19         If your answer to Question No. 1-A is "yes" and your

20    answer to Question No. 1-B is "no," then answer the following

21    question.  Otherwise do not answer the following question.

22         Question No. 2:

23         Would an investigation have been futile?

24         Answer "yes" or "no."

25         Instructions for Question No. 2:

1    The Magness parties have the burden to prove futility by

2  a preponderance of the evidence.

3    An investigation would be futile if a diligent inquiry

4  would not have revealed to a reasonable person that Stanford

5  was running a Ponzi scheme.

6    To establish futility, the Magness parties are not

7  required to prove that they actually conducted a diligent

8  inquiry.

9    Jury Deliberations.

10    It will shortly be your duty to deliberate and to consult

11  with one another in an effort to reach a verdict.  Your

12  verdict must be unanimous.  Each of you must decide the case

13  for yourself, but only after an impartial consideration of the

14  evidence with your fellow jurors.

15    During your deliberations, do not hesitate to re-examine

16  your own opinions and change your mind if you are convinced

17  that you were wrong.  But do not give up on your honest

18  beliefs because the other jurors think differently or just to

19  finish the case.  Remember at all times, you are the judges of

20  the facts.

21    You have been allowed to take notes during this trial.

22  Any notes that you took during this trial are only aids to

23  memory.  If your memory differs from your notes, you should

24  rely on your memory and not the notes.  The notes are not

25  evidence.  If you did not take notes, rely on your independent

1  reason of the evidence and do not be unduly influenced by the

2  notes of other jurors.  Notes are not entitled to greater

3  weight than the recollection or impression of each juror about

4  the testimony.

5      Even though the court reporter is making stenographic

6  notes of everything that is said, a typewritten copy of the

7  evidence will not be available for your use during

8  deliberations.

9      The fact that I have given you in this charge

10  instructions about a particular claim or defense, or that I

11  have not so instructed you, should not be interpreted in any

12  way as an indication that I believe a particular party should,

13  or should not, prevail in this case.

14      When you go into the jury room to deliberate, you may

15  take with you a copy of this charge, the exhibits that I have

16  admitted into evidence, and your notes.  You must select a

17  presiding juror to guide you in your deliberations and to

18  speak for you here in the courtroom.  After you have reached a

19  unanimous verdict, your presiding juror must fill out the

20  answers to the written questions on the verdict form and sign

21  and date it.

22      Do not deliberate unless all members of the jury are

23  present in the jury room.  For example, if one or more of you

24  go to lunch together or are together outside the jury room, do

25  not discuss the case.

1    During your deliberations, I will honor any reasonable

2    work schedule you may set and will honor your reasonable

3    requests regarding how frequently you wish to recess and for

4    how long.

5    After you have concluded your service and I have

6    discharged the jury, you are not required to talk with anyone

7    about the case.  If you need to communicate with me during

8    your deliberations, the presiding juror should write the

9    inquiry and give it to the court security officer.  After

10   consulting with the attorneys, I will respond either in

11   writing or by meeting with you in the courtroom.  Keep in

12   mind, however, that you must never disclose to anyone, not

13   even to me, your numerical division on any question.

14   Which concludes the Court's charge.

15       THE COURT:  Are the Magness parties ready to proceed

16   with closing?

17       MR. PETRIE:  Yes, sir.

18       THE COURT:  All right.  You may proceed.

19       MR. PETRIE:  Ladies and gentlemen of the jury, I

20   first want to echo what the Judge has said and thank you on

21   behalf of Mr. Magness and the three Magness companies for your

22   service and for the diligence you've shown in what are some

23   issues that have a lot of numbers and can be complicated.

24   And as the Judge has said, there is no dispute that --

25   and I'm going to use Stanford generically for all 130

1  companies and Mr. Stanford -- that Stanford was a Ponzi

2  scheme, that Stanford was operated to defraud all of the

3  people who deposited money into the Stanford International

4  Bank, including the three Magness companies and Mr. Magness,

5  their owner.

6      So I'd like to start by running through some things that

7  I think we've proved to you.

8      And the first thing, of course, we have the CDs.  You-all

9  have -- you'll have them back -- you'll have copies of them

10  back in the room.  You've seen them from time to time.  As you

11  go on, you know the litany of the eight CDs and the schedule

12  and the dollar amounts.  So I'm not going to we labor those

13  points.  But we've shown that the Magness parties deposited

14  $79.2 million into the bank and got these pieces of paper

15  back.

16      At the time we did that, we didn't know that this was a

17  Ponzi scheme.  The Magness parties had no reason to know this

18  was a Ponzi scheme at the time the money went into the bank

19  over that range from '04 to '06.

20      The Magness parties, right at the front end, made the

21  decision that rather than get the interest that was accruing

22  on the CDs out periodically as was an option under the program

23  that the bank established, said keep the interest in the CDs,

24  let the interest continue to accrue and compound.

25      And as we know, by the time we get to the October 2008

1    time frame, which is the time frame at which we need to look,

2    that those CDs -- the accrued interest on those CDs, as the

3    bank booked it because it wasn't paying it to us, was roughly

4    $24.2 million.

5        And the evidence has been that the Magness parties

6    invested in these CDs just like everybody else, that they were

7    promised a better return than they could get on a United

8    States CD; and just like the 17,000 or 30,000, depending on

9    which number we look at, other depositors, that's the basis on

10   which we proceeded.

11       We then jump forward, and we have the loan transactions

12   in October of 2008.  And, again, you've heard a lot about

13   them.  I'm not going to belabor them.  But what we've shown is

14   they went, the Magness parties, in 2008 came to the bank and

15   borrowed then against the monies they had deposited and taking

16   the four loans that have been discussed at some length.

17       As you also know, that, as to that first loan, the bank

18   said, We're not going to make a second until you pay off the

19   first.  And to pay off the first, the Magness parties said,

20   Take the interest that we've been accruing on your books and

21   that you owe to us, use that to pay down; we'll give you

22   roughly another $750,000 cash; that will zero out the first

23   set; we'll be cleared to borrow the next three loans.

24       And there are three loans, of course, because they are

25   based on the three parties' groupings of CDs.

1          Against that, we have to look at the backdrop of what was

2    happening at the time.  And you've heard a lot of testimony,

3    and you'll see documents when you're back in the

4    deliberations, that talk about what was going on economically

5    at the time.  And I just picked some of the flag posts we

6    talked about.

7          And we start, as you know, the mortgage meltdown started

8    in '07, the economy started going south.  We have the large

9    investment bank, Bear Stearns, fail in March of '08.  Then the

10   economy continues to fall away, and we get to September, right

11   before the loans, when the enormous financial institutions in

12   our economy start to fail, and we lose the companies, like

13   Wachovia, the large bank.  We have companies like Goldman

14   Sachs, who need to go to the government and say, Please give

15   us billions of dollars to rescue us.  All of that starts --

16   really starts steamrolling in late September.

17         You have a company like AIG, an insurance company that

18   was in all sorts of financial areas, in addition to doing

19   insurance, and AIG had to go to the government and get

20   billions and billions of dollars to stay afloat.

21         And what we know and what we've proved is, all of those

22   companies, with their differing financial problems but all

23   coming to a head at the same time, none are frauds.  None of

24   them were Ponzi schemes.  And as the witnesses have told you,

25   just because a big company goes upside down doesn't mean that

1    the first thing you say is, oh, my gosh, this is a fraud.

2    This was the economic environment in which we were operating.

3         We now call that time period, when we look back on it, I

4    don't know we necessarily called at the time yet testimony is

5    that's what we refer to as the Great Recession, starting in

6    '07, carrying through '09.  And as you can see, the big dip

7    here is right in the '08 time frame that we're talking about

8    if you look at the Dow Jones industrial average.

9         But, of course, you heard the Magness parties were not

10   invested broadly in the Dow Jones industrial average, but

11   rather had what we talked about as being these concentrated

12   holdings in the Liberty Media entities.  And so I think it's

13   helpful to look at LINTA, which is one of the Liberty Media

14   entities that we've been using as the sort of bellwether stock

15   of what was going on with all of these cable and media-related

16   entities.

17        And as you can see, what I've depicted here is the

18   history of the LINTA stock over time.  And I flagged two

19   things here for your attention.  You can see, first of all,

20   when it's up in the 20s, that's the 2007 time frame.  And

21   you'll recall from all the minutes we looked at, that in '07,

22   that was when the Magness parties were making voluntary

23   decisions that it made sense to sell stock, that it made sense

24   to pay down debt, that the market supported that kind of

25   activity.

1        And I've also flagged for you what things looked like in

2    October of '08 when everything has fallen away, we've gone off

3    that cliff that you heard about, and all of the sudden the

4    stock is worth far, far less and it no longer is the type of

5    thing where you can sell it and pay your way out of debt.

6        There's also something going on with the stock that's

7    another important trigger, another important backdrop to

8    understand what's going on in the fall of '08, and that is,

9    what happens when we break $10.

10       You recall the testimony about both HSBC and U.S. Bank

11   had this $10 floor.  So as soon as the stock went under $10 in

12   value, it was as if it didn't exist anymore and the banks

13   called the loans.  And that was one of the pressure points

14   that was operating on the Magnesses.

15       So you can see when the stock in October drops below

16   that, we're in trouble.  Magness parties came in, borrowed $25

17   million to try and clean things up with U.S. Bank, went out

18   and thought they'd taken care of that, and within days the

19   market continued to plummet, they needed more money, we drop

20   below $10, and all of the sudden we had these big loans coming

21   due and went back in and borrowed the 62-and-a-half million

22   that you've heard so much about.

23       This is Ms. Dokken's tally of what was done to try and

24   address these margin calls.  This is a summary she prepared at

25   the time.  It's part of the business records of the Magness

 1    parties.  And I know it's tough to read.  The good news is

 2    you'll have a full-sized copy back in the jury room.

 3         But what this tells you and what her testimony told you

 4    was that there were two sources used to pay down over $150

 5    million of margin debt in October, as all of these economic

 6    things crashed down on the Magness parties.

 7         The first was the loans.  $81 million of the loans

 8    immediately went out the door and went out the door to pay

 9    margin loans.  The other thing that happened was there were

10    stock sales.  And you heard, these weren't voluntary sales.

11    The financial institutions came to the Magness parties and

12    said, You need to sell stock, or the banks are requiring you

13    to sell stock.  You have a choice.  You go out and sell it and

14    do the best you can.  If you don't do it, we will.

15         And so you have $77 million of forced sales of stock, all

16    done to try and meet these margin calls.  And that's just the

17    month of October.  It's not leading forward into November.

18         Now, there's -- and this is -- you saw this chart in

19    opening.  I've taken some of the other material out of it, but

20    this shows how the margin debt was paid down over time.

21         And it shows the shifts in the lenders because, you'll

22    recall, you see U.S. Bank in the first stack, well, it

23    disappears because that's the assets that got transferred to

24    Merrill Lynch.  When we paid off U.S. Bank, you could get the

25    stock out, move it to Merrill Lynch because, as Mr. Magness

1    told you and Ms. Dokken told you, Merrill Lynch had better

2    terms, would allow us to borrow more and allow us to continue

3    to fight these margin calls.

4         So other things about which there's no dispute we've

5    proved, Mr. Janvey, who now comes before you as the Receiver,

6    he's not a financial advisor.  He has never been a financial

7    advisor and, as a matter of fact, when he was -- he talked to

8    you about the -- when he was at the Dallas Bar Association and

9    was appointed as a receiver, he'd never heard of Stanford.

10        You have his lawyers.  They aren't financial advisors.

11   They're coming late to the scene and representing Mr. Janvey.

12        You have Ms. Van Tassel from Navigant.  She's not a

13   financial advisor.  You heard she's a forensic accountant.

14        None of these people were present at the time when the

15   events were happening.  They are all coming late to the scene

16   and taking the knowledge they have today and looking back in

17   time and trying to assess what was going on back in time.

18        Now, as I mentioned, there's no dispute that this was a

19   Ponzi scheme, but you've heard how complicated this was.  This

20   was not a simple operation that was easily divined in terms of

21   what's going on.  You heard of how there were 130 companies,

22   over 3,000 employees.  You heard they were doing business in

23   13 countries.  You saw the touts, or you will see the touts,

24   from the company that as of December of '08, say, we have over

25   $8 billion of assets; that the bank has over 30,000

1    depositors.

2        You have Mr. Janvey telling you, but by the time he gets

3    in in mid February, it's about $7.2 billion and down to

4    roughly 17,000 depositors, but a large number of folks

5    involved in this very complicated scheme.

6        We also know the evidence ranging from Ms. Van Tassel to

7    Mr. Janvey is that only a handful of people knew that this was

8    a Ponzi scheme.  And it is quite literally a handful.  It is

9    Mr. Stanford; Mr. Davis; Ms. Pendergest-Holt, sometimes

10   referred to as Ms. Holt; Mr. Kurtz, who we didn't hear a lot

11   about; and Mr. Lopez.  Those are the five individuals who knew

12   what was going on.

13       And you heard Ms. Van Tassel tell you that their entire

14   job was to conceal from the people on the front lines, the

15   financial advisors, what was actually going on with this

16   scheme, and they were very successful at it.

17       This scheme in particular, Mr. Davis is more the money

18   guy, as you recall, was run by people who per their own mouth

19   will tell you and did tell you that they were the best bunch

20   of liars you could hire.  And, again, here's what Mr. Davis

21   said.

22   Question:  "You were involved from an operational standpoint

23   more of the -- the day-to-day operations of the money flow

24   through this company.  Correct?"

25   Answer:  "Yes.  Plus, I was the best liar that you could have

1    ever hired."

2         Now, who is underneath the best liar?  Who is directly

3    hearing all those lies?  We heard from Juan

4    Rodriguez-Tolentino, the principal contact at the bank.  He

5    was the bank president.  You heard him say how he was always

6    available, everybody had his direct dial, everybody had his

7    cell phone.  If things got elevated or you wanted to elevate

8    it, he was available.  He was the person you could speak to.

9         You also heard Mr. Janvey and Ms. Van Tassel confirm that

10   he was a figurehead.  He was the guy who did the

11   meet-and-greets, did the tours, but wasn't the guy who knew

12   anything about the investments or the real operations of the

13   bank.

14        You also know that he wasn't involved at all in the

15   investments, not just a question of not having knowledge.

16   That was done somewhere else.  That was Mr. Davis.  So

17   anything he's talking about investments is part of the lies

18   that he's been told and because he's the meet-and-greet guy,

19   the presentation guy.  He's repackaging them and spinning them

20   out to his audience.

21        And we know that he testified he didn't know anything

22   about the Ponzi scheme, and there's no evidence that he knew

23   anything about the Ponzi scheme or could have shared anything

24   with the Magness parties about the Ponzi scheme.

25        Now, we also know that Mr. Janvey was appointed as the

1    Receiver, and you heard what his job was, but he was appointed

2    at the request of the United States Securities and Exchange

3    Commission.  And the SEC came into this court, not Judge

4    Godbey but another judge, and said, We want to have a Receiver

5    appointed; and came into this court and said, There are not

6    only companies over which we want a Receiver appointed, but

7    there are individual -- the individual people are also subject

8    to the Receivership.

9        And as you can see from the list of individuals, this is

10   the first page of the order appointing Receiver, that list

11   excludes Mr. Tolentino.  Mr. Tolentino was not targeted as

12   being one of the persons with knowledge or the kingpins, as it

13   were, in this scheme.  And, of course, you also heard that

14   he's never been the subject of any sort of criminal

15   proceeding.  That's more than Mr. Stanford, Mr. Davis, and Ms.

16   Pendergest-Holt can say, because they've all been convicted

17   and have gone to prison in various ways.

18       We've also talked some, and looking beyond this scheme,

19   to what was going on more generally with the SEC, the

20   regulatory environment, and what was going on in our economy

21   through the fall of 2008 and into 2009.  And what we also

22   talked about was how the SEC was also tasked, when it looks at

23   broker-dealers, with monitoring Mr. Madoff, who ultimately had

24   a $50 billion Ponzi scheme.

25       And you'll recall that Mr. Bell, one of the brokers from

 1    Merrill Lynch, came in and testified that a lot of people

 2    thought that Mr. Madoff's deal was too good to be true.  But

 3    he continued to operate.  And it was only when the crisis hit

 4    and the SEC stepped in, that his $50 billion Ponzi scheme was

 5    revealed.

 6         You have a parallel thing going on with Mr. Stanford.

 7    There's no dispute that the SEC started looking at Stanford,

 8    using that generically, in the late 1990s, and that the SEC

 9    took no action to shut down this fraud until two decades

10    later, 20 years later.

11         So that all the people who invested in the scheme, all

12    those people who are supposed to be protected by the

13    Securities and Exchange Commission, including the Magness

14    parties, invested on the SEC's watch while it was

15    investigating and lost their money on the SEC's watch while it

16    was investigating but before it took any action.

17         And we also know that this is not something that's unique

18    to Antigua or to some sort of bank doing business offshore

19    because, as Mr. Wilk pointed out, Madoff happened right in

20    Manhattan, midtown Manhattan.  So this is not something that

21    happens only in other countries.  It happens here.

22         So with that broad background, let's talk about what the

23    Receiver's challenge is and what our proof is.

24         Now we are eight years later.  The Receiver is appointed

25    in '09.  We're almost in the anniversary coming up in the

 1   early part of '17.  The Receiver, now looking back in time

 2   with the benefit of eight years of rooting around in all those

 3   records, and you saw the part of the Receivership Order that

 4   gave him powers and authorities that we never had, the ability

 5   to gather up all those records, the ability to subpoena

 6   records, the ability to subpoena testimony, he comes in and

 7   says, Oh, Magness parties, you had actual notice in October of

 8   2008 that Mr. Stanford was engaged in a Ponzi scheme.

 9        The second thing he contends is, you, the Magness

10   parties, had knowledge of facts that would cause a reasonable

11   person, somebody out here with those facts in their head, to

12   say, I need to look at this further; and, lastly, saying, that

13   if that reasonable person with those facts had looked further,

14   they would have been able to uncover that this was, in fact, a

15   Ponzi scheme.

16        And the Receiver testified that, based on that, he's

17   trying to recover the $79 million that was the money we

18   deposited.  So it's not money we made off the deal.  This is

19   the money we deposited into the bank.

20        Let's start with actual knowledge.  This is our proof

21   that nobody had actual knowledge in October of 2008 that

22   Stanford was a Ponzi scheme, and let's see who we heard from.

23        You saw five people who were more directly affiliated

24   with the Magness parties, in other words, you have Mr. Magness

25   obviously, and you have the three people on the investment

1    committee, and then you have Ms. Dokken, who's the CFO.  And

2    each one of those people came into court and testified that

3    they didn't have any actual notice that this was a Ponzi

4    scheme.  They didn't have any actual notice that this was a

5    fraud of some sort.  They didn't have actual notice until the

6    Receiver was appointed.

7         And it might be helpful to think about what their

8    background is.  Ms. Dokken is retired.  Remember she's the one

9    who said, I didn't want to die on the job because it was so

10   stressful?  She has no dog in this fight.

11        You have Mr. Magness and Mr. Knudson.  They're the ones

12   who kept their money in all the way until the end.  They

13   got -- certainly the Magness parties got some of it out, but

14   they had still that 20 percent, the $16 million we saw that

15   was in at the end, and Mr. Knudson had his big CD in at the

16   end.

17        And then you have the two -- the other two lawyers, Mr.

18   Armstrong and Mr. Sutton, who both said that, We had no idea

19   that this was a Ponzi scheme at all.

20        Then let's look at the second contention, which is, that

21   we had enough facts, the Magness parties knew enough, that

22   they should have had their suspicions raised and should have

23   asked more questions.

24        Well, first of all, you've seen -- again, we look at the

25   same five people -- that they did ask questions; that when

1    they had questions about what was going on, and, for example,

2    you heard Mr. Sutton, that when he found out that, hmm, this

3    isn't like a United States CD, this is something a little

4    different, that he asked questions; that Ms. Dokken, when the

5    economy was going into the slide and the mortgage market was

6    cratering, said, We ought to find out if these folks have any

7    investments in mortgages.  They tell us that their investments

8    are the secret sauce and they won't tell us specifics, but at

9    least we'll find out if that bad category of stuff is somehow

10   contained.

11       I've pulled up this document, because this is when

12   anybody who had anything to do with the Magness parties had

13   inquiry notice.

14       This is the December 23rd Juan Rodriguez-Tolentino email

15   to all the internal people at Stanford.  And this email is the

16   one that contained the public little glossy sheet that was a

17   monthly update.  And in that sheet, you'll recall--and you'll

18   be able to look at it when you're in back--Mr. Espy said

19   sometime in December or January he got worried because he

20   looked and said, They only have a $110 million loss.  The bank

21   only has $110 million loss, and the economy's going like this

22   (indicating).

23       And what he said to Mr. Magness was, I need to

24   investigate this.  I need to go get my questions answered

25   because this just doesn't make sense to me.  Mr. Magness was

1    talking to him about paying back the loans, and Mr. Espy said,

2    No, no, no, don't pay back the loans right now; I need to go

3    investigate this.  And that's what he did.

4        Now, I bring up the email, because everyone's testimony

5    that you heard has been a little bit loose in terms of what

6    the time frame was--it's December, it's January, we're not

7    quite sure of a specific date.  But because Mr. Espy has that

8    $110 million figure, we can peg the specific date, and that's

9    because that figure was made public December 23 of 2008.

10       Then the next question is, when we have questions, what

11   do we do to get them answered?  Who do we talk to?  Where do

12   we get information?

13       Well, you heard the first place is we can go to Stanford.

14   Well, we have Mr. Stanford and Mr. Davis.  They're the crooks.

15   They're not going to tell us anything.  They're not going to

16   say, Okay, you're right, we are running a huge Ponzi scheme,

17   sorry.  We just know that's not realistic.

18       You have Mr. Tolentino.  He's the figurehead.  He doesn't

19   know anything.  He's the guy who goes out and feeds the party

20   line to the customers, whether they're existing or

21   prospective, and just repeats what he's been told to repeat.

22       Well, we also know that you had two layers of regulation.

23   You had the SEC that monitored the sales force.  Remember I

24   talked with Mr. Janvey and Ms. Van Tassel about how the way

25   these CDs were sold were through the U.S. broker-dealer

1    regulated by the SEC watching all of this going on for two

2    decades and not doing anything.  So you have the SEC at one

3    level.

4         But we also know that the bank was real upfront with

5    everybody.  You'll see in the marketing materials, We're not

6    regulated by anybody in the United States.  Instead, what we

7    have is an Antiguan-Barbadan regulatory agency that supervises

8    us.  And it was true that they did have that agency

9    supervising them.

10        What we didn't know, what nobody knew, was that the head

11   of that agency was on the take.  And you heard Mr. Janvey

12   describe that he was only able to divine that once he had his

13   arms around all the books and records of the Stanford entities

14   and could track that money through a Swiss bank account down

15   to Mr. King at the island of Antigua.

16             THE COURT:  Five minutes.

17             MR. PETRIE:  Thank you, Your Honor.

18        So we have one set of regulators not doing anything and

19   the other ones on the take.

20        And the last thing we've heard a little about is

21   auditors.  And you heard from Mr. Graves how auditors, as a

22   general matter, don't talk to people who aren't their clients.

23   Investors can't call up company auditors and get information.

24   And you heard more specifically that the auditors here just

25   didn't get involved.

1    So October of 2008, you've seen a lot of paper, some of

2    it numerous times, so I'm not going to belabor it here.  I'm

3    going to go through it very, very quickly, and I'm going to do

4    that because you have seen it and you'll have it back in the

5    room with you.

6    But I want to look at this from the standpoint of two

7    perspectives.  The first is, what do we know before October of

8    2008?  What are the facts that the Magness parties had?  And

9    then after 2008 when people's reflections have been changed by

10   events that have since happened, what are they doing with

11   those facts?

12   And I've picked some of these signpost events here.  In

13   October of 2007, we have the two board meetings, the regular

14   board meeting, investment committee meeting.  You've seen

15   those at length.  This is when the investment committee starts

16   saying, Hey, we know more about these other assets.  Let's

17   find out more about what's going on with these certificates of

18   deposit about which we know relatively little in comparison.

19   Let's have Mr. Espy make a presentation.  Let's ask Mr. Wilk

20   to see what he can dig up.

21   And you recall also in October, this is the same time

22   when, in the context of talking about replacing the margin

23   loan lender, or lenders, as Mr. Magness said, they'd like to

24   have more than one, that Mr. Knudson says, Well, at least an

25   advantage to Stanford, because we have both a deposit and

1   we're talking about a loan, is that hypothetically we have a

2   right of offset.

3       We also know that, as the mortgage meltdown started in

4   February of 2008, Ms. Dokken in advance of an investment

5   committee meeting sent a note out to Mr. Espy saying, Tell

6   me -- let's have a conference with the bank.  Let's figure out

7   whether the bank is invested in mortgages.  Let's have a

8   presentation about that at our next meeting.

9       And, of course, the next meeting, about which you've

10  heard so much, is the March 2008 meeting.  And that's the

11  meeting where everyone for the first time got a clear

12  impression that what we're talking about here is not a

13  certificate of deposit as would exist with a U.S. bank.  We

14  have a little different beast here.  What we have is not the

15  bank taking the money and making loans to the nail salon down

16  the street or to the folks running the business at your corner

17  grocery, but instead what we have is a structure where the

18  bank is lending money and is not -- lending money only to

19  depositors and is taking money and investing it in the stock

20  market and other investment activities.

21      This is the thing, as you recall, Mr. Wilk said -- he

22  referred to it as being a note structure.  He said, This is

23  something that existed in the marketplace, Union Bank of

24  Switzerland, or UBS, did it; Credit Suisse did it, et cetera.

25      Well, Mr. Tolentino comes to the meeting -- remember,

1     he's the figurehead; he's just been told what to say -- he

2     said, this is a Swiss bank model, it doesn't operate like a

3     U.S. bank.

4          That was true.  That was widely advertised that they

5     didn't make loans like that.  Their only loans were those

6     cash-secured loans to depositors.

7          He also said it had some resemblance to a hedge fund, had

8     some characteristics of a hedge fund.  And you heard, for

9     example, Mr. Wilk point that out; you heard Mr. Espy point

10    that out; you heard Mr. Sutton point that out; and then you

11    heard Ms. Van Tassel, when she first looked at it, relatively

12    speaking.  In May of 2010, she looked at it, and her opinion

13    was, based upon the advertising, they're really operating more

14    like a hedge fund.

15         So this is no surprise to anyone that, when presented

16    with those facts, you say, this is a hedge fund.

17         This is something that I discussed in opening.  It's in

18    the evidence packet.  This is the July 2008 article in

19    Bloomberg, published the afternoon before the 4th of July

20    holiday.  I throw that out for your consideration, because

21    what it says is, if you ask the SEC what they're doing, they

22    won't tell you anything.  As a matter of fact, they won't even

23    tell you if they're doing anything, much less what they're

24    doing.  So that's what we knew as of October of 2008.

25         Then what you've looked at is, after 2008, people looking

1    back and trying to describe what was going on.

2         THE COURT:  You're at 30.

3         MR. PETRIE:  Thank you, Your Honor.

4         You have Mr. Sutton, who's preparing board notes in April

5    of 2009, and he puts in a statement -- puts in two statements

6    that, if you look at the handwritten notes the people at that

7    meeting, doesn't appear.  The word "receiver" doesn't appear.

8    The word "bankruptcy" doesn't appear.  The word "trustee"

9    doesn't appear.  There's nothing in the people's handwritten

10   notes at the time that says there was any consideration of any

11   treatment of the $25 million.  And because he made a mistake,

12   those provisions got crossed out of the minutes.

13        You also have the minutes after the fact talking in

14   December about what happened at the previous meeting.  And

15   this is where the people talked about what had happened with

16   the loans.

17        You'll recall that Mr. Espy, when presented with this

18   document, something he saw for the first time in his

19   deposition, said, I don't care watt the piece of paper says.

20   Here's what I remember happened:  We went to the bank, we

21   asked for loans, we got the loans.

22        And you heard all of the witnesses through the Magness

23   parties say, whatever we were thinking about the bank at the

24   time, when the bank ponied up this money, ponied it up

25   quickly, no delay, no fuss, no stalling, no equivocating about

1    whether we could get the money, that reassured us that

2    everything was on the up and up.

3        So we then have events that take place postMadoff.  And

4    you heard Mr. Bell tell you that, after Madoff, everything

5    changed.  Everybody put on their sharp glasses and said, We

6    need to start looking at our investments more carefully

7    because if this guy can sneak one by us, every one of us needs

8    to look at transparency and see what's going on in our

9    investments.

10       And you'll see the Mango Five letter.  We talked about it

11   some during the course of the trial.  But that letter, in

12   particular, talks about Madoff types of things, and ultimately

13   asks the question, where are we.

14       And the last event that happens afterwards is, in the

15   fall of '09, the Magness parties prepare their tax returns.

16   And what they say is the fact, as was pointed out with Ms. Van

17   Tassel, that in October of 2008, we got money, and then at

18   some point in 2008 we commenced an investigation and became

19   concerned.  And that was Mr. Espy's investigation.

20       So we have both the facts we knew before, and people

21   looking back in time to see what the facts are.

22       You're going to have all these documents in the back with

23   you, as the Judge said.  That's why I skimmed over them fairly

24   quickly.

25       You're also going to have a verdict form, so I wanted to

1    talk to you about how we think the evidence would be relayed

2    onto that verdict form.  As I said, you'll have this back

3    there.

4        As the Judge said, we want you to answer "yes."  The

5    questions are phrased in such a way, though, so it's, did the

6    Magness parties act in good faith when they received the

7    transfers from Stanford in October of 2008?  And so the first

8    question really is, is it correct that the Magness parties had

9    no actual notice?  We say the answer to that is "yes," we

10   acted in good faith.  That's what the evidence shows.

11       The second part of that, similarly phrased, is, is it

12   correct that the Magness parties had no inquiry notice?  I

13   think the answer to that based on the evidence is "yes," we

14   acted in good faith.

15       And then, as the Judge said, there's a second question

16   that follows parts A and B of this one.  If you get to the

17   second question, which is, would an investigation have been

18   futile, would we have been able to find anything if we

19   conducted this investigation, once again, we think the answer

20   to that question based on the evidence at trial is "yes."

21       Thank you very much for your time.

22       Thank you, Your Honor.

23           THE COURT:  All right.  Let's take a short 10-minute

24   break, and then we'll come back with the Receiver.

25           (Whereupon, the jury left the courtroom.)

 1            MR. SADLER:  Just some courtroom logistics I wanted

 2   to clear with, Your Honor.  I'm going to have a couple of

 3   documents, and we're going to set them on A-frames.  Just

 4   wanted to be sure that was okay with the Court.

 5            THE COURT:  Whatever you need to do.

 6            MR. SADLER:  Yes, sir.  Okay.

 7            THE COURT:  And I show you as four minutes over, so

 8   11 minutes remaining.

 9            MR. PETRIE:  Thank you.

10            THE COURT:  Okay.  We'll see you back in ten

11   minutes.

12                      (Brief recess.)

13            THE COURT:  All set?

14            MR. SADLER:  All set.

15            THE COURT:  All right.  Let's bring them in.

16            (Whereupon, the jury entered the courtroom.)

17            THE COURT:  Be seated.

18       The Receiver may proceed.

19            MR. SADLER:  Thank you, Your Honor.

20       Good morning.  It's good to see you again.  This is the

21   third time that I've been able to speak to you directly.  We

22   started way back in the jury selection process that seems like

23   it was about six months ago.

24       I do want to thank you for your service, but I want to

25   get right to it.

```
 1        Do you remember we talked in jury selection, I said -- I

 2   asked some questions, and I asked about a couple of things.

 3   Remember I talked about how you can tell people are not

 4   telling you the truth, they're lying, telling different

 5   stories?  Remember I asked you about that?

 6        And then I asked about, you know, another way people --

 7   you might be able to tell they're lying to you is they say one

 8   thing, but then there's something in writing that contradicts

 9   that?  Remember we talked about that?

10        And then the other thing that we talked about, remember I

11   asked for a show of hands of people watching "Law and Order,"

12   "CSI," who watched those shows?  And I said, Any of you ever

13   had the feeling that after you sat through about five minutes

14   of the show, you kind of know what's happened, you kind of got

15   it figured out?

16        That's what I think this case is.  I've been ready to

17   argue this case for days, and I think you've got it figured

18   out.  I absolutely think you've got it figured out.

19        You have been patient, you've been attentive, and I know

20   you have seen through, you have seen through, the story that

21   these people have been trying to sell you.

22        Now, let me just say, there's going to be some strong

23   words coming, but it's backed up by the evidence.  We're going

24   to talk about lies versus the truth.  We're going to talk

25   about what they brought you.  And let's just pause there for a
```

1  minute.

2      You saw some of their pictures up there.  We brought you

3  the Receiver, who has a court-ordered job to be here.  We

4  brought you the investigator, and she told you all about her

5  experience, her credentials, her qualifications, what she's

6  been doing.

7      That's the reason we're here.  That's the reason Mr.

8  Janvey's here.

9      They've got 88.2 million reasons to be here.  We just

10  have one.  And who did they bring?  Who did they bring besides

11  Mr. Magness, of course, who has to show up?  Who did they

12  bring?  Everybody on the payroll and some crooks.  Those are

13  the witnesses they brought you.

14      And what did they do, the people on the payroll and the

15  crooks?  And remember, we have crooks who were presented to

16  you as witnesses on their behalf, not just James Davis.  How

17  about Chuck Wilk, his financial advisor?  Remember that?  We

18  brought you the evidence Mr. Wilk went to prison for tax

19  fraud.  He's their witness.  That's the kind of people they

20  brought you.

21      They brought these people to tell--and I'm going to have

22  to read it, I couldn't memorize it for you--a whole laundry

23  list of lies, of stories, of stories that don't match up the

24  evidence.  And we're going to talk about that.

25      Why would they do that?  They have something to cover up.

1    They have something to cover up.  And you saw evidence of that

2    just yesterday.  Why do you think we brought you Mr. Sutton's

3    testimony, one of his lawyers?  Oh, to talk about that

4    document.  Yeah, the one they changed after the fact, when

5    they got together at the Wynn casino and said, oh, this might

6    not look so good if we leave these sentences in the minutes,

7    we got to take those out.

8         Yeah, cover up.  What are they covering up?  What are

9    they covering up?  They're covering up that they knew when

10   they took these fraudulent transfers, that's what the Court

11   has found, these so-called loans, they knew this bank was a

12   fraud.  They knew it.  That's why they got the money out.

13        Let's talk about that.  Let's talk about that.  You know,

14   the questions are there.  You've got them in the charge.  Did

15   they prove to you good faith.  Really?  Honestly?  Good faith.

16   Let's just pause for a moment about good faith.

17        Remember I talked to Mr. Magness about his tax return?

18   Remember I really asked him to explain.  Your story is, Mr.

19   Magness, you had no idea anything was wrong with this bank in

20   2008.  Well, then why, oh, why did you tell the Internal

21   Revenue Service you were so concerned about your CD investment

22   in 2008, in October 2008, that that's why you took the loans?

23   Because you thought your CD was in jeopardy.

24        I know what jeopardy means.  You know what jeopardy

25   means.  Imminent risk of loss, something really terrible is

1   about to happen.  Yeah, right.  Once you know the investment's

2   in a Ponzi scheme, yeah, you know it's in jeopardy.

3       And they came here to trial, and you remember Mr.

4   Magness' testimony.  It was just incoherent.  He couldn't even

5   explain this.  He was -- I think he tried to suggest there was

6   a typo in it or something.  And what you just heard, the

7   explanation for this document, it's what I talked about with

8   Ms. Van Tassel, explanations that make no sense.  They say one

9   thing, here's another thing in writing, they're totally

10   different, and the explanation that they give you makes no

11   sense.

12       Are you concerned or are you not concerned?  Is your

13   investment in jeopardy in 2008 or is it not in jeopardy?  Are

14   you lying to the IRS or are you lying to this jury?

15       I think I know what happened.  I think I -- they told the

16   IRS what they needed to tell the IRS to be sure they didn't

17   have to pay taxes on that money.  Yes, they were concerned.

18   Yes, they knew in October 2008, not months later, in October

19   2008, the taxpayer received the loans.  That's what we're

20   talking about.  We're not talking about in 1999, the SEC this,

21   or, you know, we're -- yeah.  October 2008.  That's what they

22   told the IRS.

23       So one of the things you have to decide as a jury, do you

24   think they lied to the IRS or do you think they lied to you?

25   Do they have reasons to lie to you?  I don't know.  I think

1   they have about 88.2 reasons to lie to you.

2       I told you at the beginning you were just going to be up

3   to your waistline in margin call and the history of the fall

4   of the stock market and all of that stuff, and I said, we

5   aren't disputing that, that's not what this case is about.

6   It's a nice cover story.  It's a nice stocking horse to walk

7   behind.  Oh, there's these terrible crises, that's why we had

8   to take the money.

9       But, remember, we just proved to you yesterday that's not

10  true.  We proved to you yesterday, and I didn't hear a whisper

11  about it from him, how this whole thing started, Ms. Dokken

12  saying, oh, Mr. Magness has huge, huge expenses besides the

13  margin call.  Remember that testimony?  We put it up.  Besides

14  the margin call.  There's a movie going on and there's this

15  Fortrust thing.  We need to go get some money from the bank.

16      Well, what happened to the margin call story?  Oh, kind

17  of went out the window.  Kind of went out the window on that.

18      They knew Stanford was running a fraud.  That's why they

19  yanked the money in this weird way, and we proved that to you.

20  You know, if this was all legit, if he thought this was all

21  legit, all he has to do is walk into the bank and say, I've

22  got a hundred million on deposit, give me 80.  Is that the

23  evidence of what happened?  No.

24      What's the evidence of what happened?  First, they were

25  told no.  Then they were told why no, which is now a totally

1    different story than the public knew.  Then we go to the

2    loans.  And, really, loans?  Has anybody in this room ever

3    gotten a loan that looked anything like what they did?  No, of

4    course not.

5        Oh, on Friday they say, give us the money.  Well, we're

6    going to sell stock and pay you back.  And then Monday it's

7    all, no, we're not going to do that, we're just going to call

8    it even-steven with the fake interest on paper.  But don't

9    worry, we'll pay you back.  Does that -- I mean, does that

10   sound like people of good faith engaging in an honest

11   transaction, or people cooking up a story to get money out of

12   the bank?

13       I think I know the answer.  And we know we got money out

14   of the bank, unlike the 18,000 people who were left holding

15   the bag when it shut down, you know, three, three-and-a-half

16   months later.  88 million reasons to come in here and tell you

17   a story.  88 million.

18       You have to understand who has been talking to you.  And

19   you've just -- you've seen all sorts of evidence.  And with

20   the videotape, it's -- it's hard -- it's hard for me to keep

21   up.  But along the way, these people told you who they are.

22   Who they are.

23       Let's look at, for example, Ms. Dokken's testimony.

24   Volume 3 of the trial transcript, page 24, line 14, starting

25   at line 14, going all the way down to the bottom.  Remember

1    Ms. Dokken was testifying -- you know, she is as close to this

2    as Mr. Magness.  Close as this.  If anybody knows him, the

3    real him, she does.  And she was fussing at him about this

4    Stanford investment.

5         And the question was, Do you recall what he said?

6         Yeah.  Screw you, I can do whatever I want.

7         Wow, that's a little bit of a window into somebody's

8    thinking and what they can get away with:  Screw you, I can

9    get whatever I want.  Huh.

10        Is there something else that was presented to you that

11   gave you a window on this group of people that came in--Espy,

12   Magness, Knudson, and then all the hired help?  Yeah.  And we

13   found it in Mr. Espy's testimony, a -- a liar on par with

14   anyone.  Let's look at that.  Volume 5, trial transcript, page

15   119, line 7.  And let's go down 7 to 12.  Wow, it is right

16   there for all of us to see.

17        This is Mr. Espy talking about Mr. Magness' access to the

18   bank.  Well, what does he say?  Well, we live in a world where

19   the most important people, the wealthiest people, they get

20   access that other people don't.  That's Mr. Espy, godfather of

21   his kid, long-time friend, owes him money, maybe has a reason

22   to come in here and tell you a story.  Yeah, they get access.

23        And didn't I tell you at the beginning of this case, this

24   was about they knew things about the bank the public didn't.

25   How and why?  Because of that pipeline of communication, that

1    access, and we proved it.  We proved it.

2         There's an inner circle of people.  You heard that from

3    Mr. Sutton.  Who's in the inner circle?  Gary, Tommy, and

4    Tonya, and Steve Knudson, of course.

5         Mr. Espy, working both sides.  Yeah, he gets a paycheck

6    from Stanford, courtesy of the CDs that are funneling him

7    money, but he's working for Mr. Magness.  He is the pipeline

8    into the bank so that they know things that the public does

9    not.

10        So you heard from Mr. Magness.  You heard from Mr. Espy.

11        This thing about his financial advisor, Chuck Wilk, the

12   admitted felon that they presented his evidence to you, that's

13   a guy who knows a thing or two about falsifying records.  If

14   you're a convicted tax cheat, one thing you know about is

15   falsifying records.  Who does he work for?  Mr. Magness.  And

16   we'll come back to that.  We'll come back to that.

17        We heard from the lawyers.  Okay.  Mr. Armstrong came

18   down here, $525 an hour, to testify for his client.  Do you

19   think he's going to come down here and say, Well, actually we

20   knew it was a Ponzi scheme?  No, of course not.  He's going to

21   come down and say, No, we didn't know anything.

22        Yeah.  But I'm going to show you a bit of his testimony

23   in a minute, remind you of it, where, you know, he actually

24   kind of slipped.  Again, sometimes you have to wade through

25   all the junk and you find the little nugget, and he left us a

1    nugget.

2        Mr. Sutton, author of the two different version of those

3    notes, one version highly incriminating, the signed version

4    wouldn't -- you wouldn't know that conversation ever happened.

5        And remember I asked Ms. Van Tassel, In your hundreds of

6    investigations, have you ever run across a situation where

7    people, after the fact, doctor things up, put something in,

8    take something out, to try to hide the -- well, you have an

9    example right in front of you with Mr. Sutton.

10       Remember the testimony?  He goes to the meeting, and they

11   say, oh, no, take that out.  But, remember, nobody would fess

12   up to it.  I asked Mr. Magness on that witness stand, remember

13   I went down, one by one, everybody who was at the meeting, did

14   they say take it out, did they say take -- I never could get a

15   -- never could get a confession, whose idea was it?  Mr.

16   Sutton's testimony, same thing, Oh, it was a roomful of

17   people; I couldn't remember who told me to take it out.

18       Well, they're all in on it.  Who cares?  They took it

19   out.  But we brought that evidence to you.  We didn't try to

20   hide it from you.  Oh, and the explanation now is, oh, he's

21   just kind of all messed up in his chronology.  He -- he -- he

22   really wrote it down in April and got April confused with

23   December.

24       Well, the man must be on medication or something because

25   if they're suggesting to you that Mr. Sutton wrote these words

1   in April of 2009, well, that doesn't make any sense either,

2   does it?  Why?  Because by April 2009, we already have a

3   Receiver.  So, again, it's one of the -- they're telling you

4   two stories, and they don't even offer you an explanation that

5   makes any sense.  Why?  Because they're lying to you.  They're

6   lying to you.

7        But they needed Mr. Sutton at that meeting because he's

8   the guy that did the legal stuff.  And it may have gone by

9   really quickly in his testimony, but in his testimony he said,

10  Oh, you know what?  I had a case, I had a client in a hedge

11  fund that got seized, and the money he took out, a Receiver

12  came after him for it.

13       Well, that is the perfect guy to have at your December 5

14  meeting before the you-know-what storm goes public to say,

15  Hmm, we got 88 million out of this thing, we know it's about

16  to fall apart, what's going to happen next?  And Mr. Sutton

17  said, This is what's going to happen next.  But they took that

18  out of the minutes.  They didn't want you to see it.

19       This thing about putting James Davis, convicted liar, up

20  there to bolster your story, I mean, wow!  And then, to make

21  it worse, you know, the old saying is, you know, if you find

22  yourself in a hole, the first thing you ought to do is put the

23  shovel down.  No.  They got out the steam shovel, and they

24  brought out the president of the fake bank, Juan

25  Rodriguez-Tolentino.  Remember the testimony about him,

1    Executive A in the plea agreement, Mr. Davis' plea agreement

2    where Mr. Davis said Mr. Tolentino was in on the cover-up.

3    And they bring those two guys in here to somehow bolster their

4    story?

5        So we got three -- you know, two convicted felons, the

6    president of the fake bank.  Really?  These are the kind of

7    people they bring you to tell their story.  It's -- it's

8    amazing.

9        But let's -- and -- and you've got the documents.

10   Plaintiff's Exhibit 467, that's the Davis plea agreement.

11   SIBL Executive A, that's Mr. Tolentino, if you care to look.

12       Let's just talk about the top ten list, and there's too

13   many to go over in the limited time I have.

14       The first one is the one -- I keep coming back to it

15   because they've never offered you an explanation that makes

16   any sense because there isn't one.  Again, they're either

17   lying to the IRS or they're lying to you.  You know, you lie

18   to the IRS, you go to jail.  They know that.  Mr. Wilk knows

19   that because he went to jail for lying for tax reasons.  But I

20   guess they think they can come in here, 88 million reasons,

21   lie to you, see if they can get away with it.

22       They said they first went to the bank because of this

23   margin call stuff.  But we showed you yesterday on October 1,

24   Plaintiff's Exhibit 73, the meeting minutes.  They're just

25   sitting there, saying, We're almost at the $10 mark.  We're

1    not -- you know, this isn't any surprise.

2         And what happens after the meeting?  We showed you with

3    Ms. Dokken's testimony.  She's worried about how to pay the

4    expenses for the movie.  So the whole margin call thing starts

5    off as a lie.  Did they have margin calls?  Yes.  Nobody has

6    suggested anything different.  Was that the reason they yanked

7    the cash?  No.  And we proved it with their own people's

8    testimony and their own documents.

9         This is the one that is -- again, where is the

10   explanation that is consistent with your common sense?  You go

11   down to the bank, you try to make a withdrawal.  They say,

12   talk to the hand, not possible, we need your money on our

13   balance sheet, but, hey, we got a great deal going for you,

14   we'll loan you back 80 percent of it.

15        Their story is, we didn't have any idea that this bank

16   was in trouble, illegitimate, anything.  And yet they admit

17   they went down, they walked in the door, asked for redemption,

18   were told, no, can't have it, not possible, we'll only loan

19   you 80 percent of it.  Where is the explanation that that

20   would make sense?  Oh, well, they got us the money real quick.

21        Well, would you feel reassured, going down to your bank,

22   they tell you, no, we need to keep the money on our balance

23   sheet, but we'll loan it to you.  And you say, Well, as long

24   as you can loan it to me real quick, I'm cool with that.  Oh,

25   come on.

1    You know, and this -- the bank was run by a bunch of

2   really smart people and, you know, we just believed them?  Is

3   that the evidence you heard?

4    The evidence you heard is that when the president of the

5   fake bank tried to explain to them the magic formula for how

6   they were doing, you know, the market's this but they're that,

7   it was nonsense.  Ms. Van Tassel pointed out it's nonsense.

8   Their own people testified, you know, we didn't really

9   understand what he was talking about.

10    So where's the explanation, you know?  They thought

11   everything was fine, but the president of the bank couldn't

12   even make sense to them when he talked to them.  You know,

13   it's a fake story they're coming up with.

14    The thing about Bernie Madoff, you know, they put his

15   picture up there, and I'm glad they did.  Oh, we weren't

16   worried until Bernie Madoff, you know, hit the newspapers on

17   December 11th and then the whole world changed.  BS.

18    December 5, before Madoff, they're already talking about

19   this bank going over the cliff.  The meeting minutes say, We

20   went to get our money.  They said no.  So we had to do this

21   whole loan thing, promising them we'd pay it right back, and,

22   you know, not paying it back.  So what does Bernie Madoff have

23   to do with anything?  Nothing.  It's part of their made-up

24   story.  They already knew by that time.  They already knew.

25    The margin calls pouring in daily, you never saw that.

1    You saw something -- they're so proud of Plaintiff's Exhibit

2    90, and I want you to look at it when you go back there

3    because you're going to see something interesting in it.  Oh,

4    look at all the margin calls.  Did you hear anybody actually

5    testify and show you a document?  I think you saw about three

6    margin calls that don't total to anywhere near $88 million.

7        If we can put Plaintiff's Exhibit 90 up there for just a

8    second.

9        I think counsel told you, Oh, Ms. Dokken created this at

10   the time this was going on.

11       Huh.  That's interesting.  Let's look at the footer of

12   the document.  There's a date there.  020810.  February 8,

13   2010.  Another created-after-the-fact document.  And it's

14   right there staring us in the face.  Unbelievable.

15   Unbelievable.

16       Oh we -- but wait.  Hold on.  We needed cash to pay the

17   margin calls.

18       We can take that down.

19       But what about Mr. Bell's testimony that they parked 12

20   million at Merrill Lynch and just let it sit there?  Wait a

21   minute.  I thought the story was you needed all this for

22   margin calls.  I can't keep it straight.  You needed it for

23   margin calls, you didn't need it for margin calls, what's

24   going on?  It's a lie a minute.  It's a lie a minute.

25       These loans, Ms. Van Tassel testified to you these were

 1    fake loans, a pretext, purported paper loans.  Did he even

 2    touch that on cross-examination?  No, because it's

 3    radioactive.  They got no story.  They borrowed this money in

 4    this convoluted way, got more out of the bank than if it were

 5    just the straight-up 80 percent loan.

 6         Oh, made these weird promises to pay it back real quick,

 7    you know, in a week or so.  Never did.

 8         Oh, I thought we were going to sell stock to pay.

 9         Well, I thought the story was you're not selling stock.

10    I thought Mr. Magness didn't want to sell stock.  He was in

11    love with his stock.

12         Well, I showed you two emails where they're promising the

13    bank, Oh, don't worry, we're going to pay raise the cash to

14    pay these loans back by what?  Selling stock.

15         Okay.  I cannot keep it straight.  Is the story you don't

16    want to sell your stock, or is the story you're selling your

17    stock, and what's the explanation between the two different

18    stories?  There isn't one.  There isn't one because it's a

19    lie.

20         Mom walks into the kitchen.  Little Johnny has his hand

21    in the cookie jar.  And she says, Get your hand out of the

22    cookie jar.  And he says, Oh, Mom, I was going to clean the

23    kitchen.  I thought this is where you kept the cleaning

24    supplies.

25         Come on.  That is the level of lie that's being -- it's

1   not even a sophisticated lie.  It's insulting.  It's

2   insulting.

3       And I just got to ask, come on.  Do they think you're not

4   paying attention?  Do they think that you don't notice when

5   they're talking out of both sides of their mouth?  Really?  I

6   mean, is that a way to treat people with respect and trust--to

7   come in here and -- and tell these BS stories with no

8   explanation and talk about, oh, it must be the SEC's fault.

9   You know, they were messing around since 1999.  So what?

10  What's the SEC got to do with anything?  We're talking about

11  what these people knew in October 2008.  That's what we're

12  here to talk about.  Who cares?  We want to know what they

13  knew.  Remember, I asked Mr. Magness, this whole case is about

14  what you knew and when you knew it.  And we proved through his

15  own tax returns, yeah, he knew.  Of course he knew.

16      You know, I got to tell you, when, when did we get to a

17  point where I have to lie to you to prove my good faith?  When

18  did the world get turned so upside down, that that's good

19  faith--telling lies to prove that -- when does good faith and

20  lying go hand in hand?  I just can barely get my mind around

21  it.

22      And you know what?  Outside, fake news, BS on all manner

23  of publications, social media, that's great.  You can say

24  anything, do anything, doesn't have to be true.  We are in a

25  court of law.  Truth is supposed to count here, not telling

1    people lies.  It's unbelievable.  It truly is.  It truly is.

2        I want to come back to the advisor, the investment

3    advisor to Mr. Magness, the famous Chuck Wilk, convicted tax

4    felon.  Look at the minutes of the December meeting where Mr.

5    Sutton was giving a warning, Mr. Wilk's not there.  You look

6    at the minutes of the April meeting, the very next one where

7    they had the big hubbub about taking this out, guess who

8    showed up for that meeting?  Look at the minutes.  Chuck Wilk.

9    Again, I bet I know who has some experience taking stuff out

10   of documents, swapping things out, phonying up the paperwork.

11   He was at that meeting.  He was at that meeting.

12       Okay.  I understand the motivation to take out the

13   incriminating statements and come up with this crazy story

14   about, well, you know, he must have gotten the dates mixed up.

15   They knew, they knew, that if there was a document that says

16   they were sitting around at the Wynn casino in December

17   already talking about what's going to happen when a receiver

18   comes to get this money, they don't have a good faith story.

19   Right?  They don't have a good faith story.  So they took it

20   out.  But we brought it to you.  We brought it to you.

21       They knew.  Mr. Espy testified.  Remember?  He was asked

22   what was his kind of state of mind following that March

23   meeting?  Oh, things got a little dicey after that.  That's a

24   quote from his testimony.  Things got a little dicey after

25   that.  You remember that statement.  He knew Juan

1   Rodriguez-Tolentino's Swiss bank model hedge fund BS didn't

2   make any sense.

3        And now let's come back to Mr. Armstrong.  And I need to

4   show you this, because, you know, he came down here at $525 an

5   hour to testify for his client, but he left something

6   interesting for us.  We've got a slide for his testimony at

7   Trial Volume 3, page 142 and 181.

8        During your several decades of law practice, you've seen

9   Ponzi schemes?

10        Sure.

11        So you got specific facts at a specific point in time

12   that made you concerned about the CDs.

13        I think that's correct.

14        So the Stanford CDs started to look like those real

15   estate investments in Nevada that turned out to be frauds.

16        Ultimately, yeah.

17        Huh.  Mr. Armstrong, who was not on the inner circle but

18   who had experience in Ponzi schemes?  He saw it.  Mr. Bell saw

19   it.  Mr. Bell talked about he told Tonya Dokken, too good to

20   be true, people are going to hit the exit door, time to get

21   out.  And there was some suggestion about, well, maybe he told

22   that, you know, later.  Huh.  Later?

23        Well, I think the evidence we presented to you -- and

24   let's just look at it.  Trial Volume 3, page 96, at line 16

25   through 20.  This is from Tonya Dokken's testimony, talking

1    about visiting with Mr. Bell.

2        Did Mr. Bell, prior to February 12th, tell you that

3    Stanford might be too good to be true.

4        Oh, certainly when they wouldn't give us our money back.

5        Sounds like no redemption time.  We know that happened in

6    October.

7        He was very involved in the loan process because he was

8    the recipient of a lot of the proceeds.

9        When was the loan process?  October 2008.

10       When did he receive that 12 million they just parked at

11   Merrill Lynch?

12       October 2008.  October 2008.  They knew this thing was a

13   fraud.

14       And they got, I'll admit, good advice from Mr. Sutton,

15   because he'd had a client with the same problem.  Perfect guy

16   to have a meeting like that.  And he said, Look, this is

17   coming.  And, sure enough, sure enough, the Court appointed

18   somebody to go after and recover for the victims money that

19   never should have left this bank.

20       The answers to the two good faith questions, and you've

21   got them right there, it's page 7 of the charge -- I would

22   like you to look at page 7 of the charge.  No.  The answer's

23   "no."  No good faith.  No good faith, no good faith, no, no,

24   no, unless, unless, it's okay to come in here and lie.  Then

25   kind of all bets are off.  We may as well be out on the

1   street.  We don't even need to be in a courtroom.

2       But we are in a courtroom.  We're in a courtroom where

3   the truth counts.  Ms. Van Tassel told you her conclusion the

4   Magness Defendants had right in front of them the facts to

5   tell them this bank was a fraud.  Did they attack that in her

6   cross-examination?  Nope.  Never even touched that conclusion.

7   Why?  Because it's radioactive, and they don't have a story.

8       Where's their expert?  Where's their expert?  That guy

9   Graves they brought in, who said, oh, I think I worked a

10  couple of weeks on the case?

11      Come on.  And she told you the loans were a sham.

12      You've got to say this stuff is wrong.  This is wrong

13  what they have done.  This is not good faith.  This is wrong

14  what they have done.  And it's wrong to come in here and tell

15  you a whole bunch of stories, and they've got 88.2 million

16  reasons to do it.

17      And when you see something that's wrong, we all have an

18  obligation to say, no, no, this is wrong.  I don't go along

19  with this.  I don't go along with doctoring up the official

20  minutes.  I don't go along with telling the Internal Revenue

21  Service one thing and then telling a jury another thing.  I

22  don't go along with that.  That's not good faith.  Answer the

23  questions "no."

24      And I'll leave you with this thought.  I trust your

25  judgment, absolutely, a hundred percent.  I trust your

 1   judgment.  You know the difference between a lie and the

 2   truth.  You know the difference.  You know the difference

 3   between right and wrong.  Answer the questions "no."  Answer

 4   the questions "no."

 5       I appreciate it.

 6           MR. PETRIE:  Thanks, Austin.

 7           THE COURT:  Eleven minutes.

 8           MR. PETRIE:  Yes.  Thank you, Your Honor.  Will you

 9   give me a five-minute?

10           THE COURT:  Yes.

11           MR. PETRIE:  Thank you very much.  Thank you.

12       Ladies and gentlemen of the jury, I'm not going to yell

13   at you, but I am going to tell you something about stories.

14   I'm really glad he wants to pursue this line about stories,

15   because I'm going to ask you to think about everything that

16   you've seen in this trial and say, what's missing?  And that

17   is, why October?  Why did the Magness parties need money in

18   October?

19       If the story is that they knew all this stuff beforehand,

20   as Mr. Sadler would have you believe, why would they sit there

21   and leave their money, since we're measuring from March when

22   Juan Rodriguez-Tolentino speaks to us, why would they leave it

23   for seven months?

24       There's nothing that happens in that time frame that

25   explains why, if you say, in March, according to Mr. Sadler,

1   we've heard all this, to use his phrase, BS, from Mr.

2   Tolentino, why would we leave it in there for seven months?

3   Because we thought, the Magness parties thought, it was a

4   legitimate bank.  It was structured not like a U.S. bank, but

5   it was nonetheless a legitimate bank.

6       Now, the Receiver doesn't have anybody who can tell you

7   what was going on at the time, so we have to bring those

8   people in.  Is Mr. Wilk a perfect human being?  No.  You heard

9   various people, Mr. Sutton, for example, say, yeah, I -- I

10  respect his judgment as an investment guy.  Did he make some

11  bad decisions?  Sure.  He sure did.  But they have nothing to

12  do with us.  Nothing to do with us.  We didn't even talk to

13  him about tax shelters.

14      You heard Mr. Sutton say, yeah, that was -- he went off

15  and did something else and his company, and he -- Quellos got

16  into trouble, but they never even talked to us about that

17  stuff.  Now, when he started to get in trouble, he disclosed

18  it to us.  But in terms of trying to sell us on these

19  investments, it never happened.

20      Instead, what you have is the people who are on the

21  ground, so to speak, at the time telling you, here's what was

22  going on.  Here's what we were doing at the time, and here's

23  why.

24      And I encourage you to think about on simple things, like

25  what did Ms. Dokken say.  Yeah, she said we had a lot of

 1    expenses.  She didn't say she took any of the money and spent

 2    it on those expenses.  She was simply acknowledging the fact

 3    that there is a lot of money going out the door.

 4         But the money here went out the door to pay down the

 5    margin loans.  Those were -- that's the only thing going on in

 6    October of 2008 that explains why we were in talking to the

 7    bank.  And what you do is you look at that history.  And, yes,

 8    we didn't come in and give you paper by paper by paper all the

 9    margin loans, nor did they, just like when Ms. Van Tassel gets

10    on the stand and talks to you about bank policies, the $22

11    million woman doesn't show you anything, any lickstick piece

12    of paper, about a bank policy.  She just says, it is.

13         And for $22 million, do you think she's going to veer

14    from the program the Receiver wants?  Not so.  Not so.  She

15    came in here, she wants to be the expert on everything and

16    tell you what everybody's thinking.  But she wasn't there.

17    She doesn't know.  She's looking at pieces of paper in a

18    vacuum.

19         You have to look at the pieces of paper, look at the

20    dates on the pieces of paper, and then look what's going on in

21    the background, why are people acting the way they're acting.

22    It's because we're getting hammered by these margin calls.

23    You're talking about people having to gather up millions of

24    dollars in the span of a day and then are so relieved when

25    they actually have a bank that says, yeah, we can do that,

1    we'll give you the money.  Everyone wipes the sweat off their

2    brow and goes, gee whiz, we ducked a bullet there.

3        Well, they didn't.  The market kept going down again.

4    Kept going down.  And that's what put the Magness parties in

5    the position of having to go back to the source of cash that

6    they had, and they borrow the money.  And then they spent the

7    money.  They spent the money on the margin calls and then

8    some, because there's another 75-, $77 million just in the

9    month of October from the forced stock sales.

10       These people are not liars.  They didn't come in here and

11   take the oath and tell you a bunch of fairy tales that they

12   made up.  They're not telling you a story.  They're coming in

13   and telling you, we were there, here's what we did while we

14   were there, here's the pieces of paper we looked at while we

15   were there, here's what we intended and thought we did those

16   pieces of paper.

17       And you have people even going so far as Mr. Sutton, who

18   retired, he doesn't work for Mr. Magness anymore, remember he

19   said, the fun factor, he wanted to go do other things in his

20   retirement.  And good for him.  But he came in and said, I'm

21   not working for them anymore.  But, nonetheless, he went back

22   and looked at his testimony and said, You know, I made a

23   mistake.  I arranged this thing all on a continuum, and I was

24   messed up.  When I put that down on these drafts, that wasn't

25   what was happening.  I was taking today's thoughts and moving

1    them back in the past; just like Ms. Van Tassel is doing,

2    taking today's thoughts, moving them back in the past; just

3    like Mr. Janvey, What do I know today?  Let me graft that over

4    what happened eight years ago.

5         But what he did was he said, I made a mistake.  I'll come

6    in and correct that because I don't want the jury to have a

7    misimpression.  I don't want the jury to be under an

8    impression that there's some nefarious plot to change our

9    internal minutes --

10             THE COURT:  Five minutes.

11             MR. PETRIE:  Thank you, Your Honor.

12        -- which, by the way, were not prepared for you; they

13   were prepared for the company.  You heard everyone talk about

14   how the minutes were just sort of a summary of what had gone

15   on at the meeting so there'd be some record for it.

16        So it wasn't that this is, oh, well, this might see the

17   light of day some day in the future.  It was, we need to make

18   sure this is accurate; Ray, you're messed up, you're taking

19   your thoughts from April of '09 and writing them down as if

20   they happened in '05, and they didn't.  They never did.

21        Similarly, if you look through all the pieces of paper,

22   consider all the testimony you've heard, I encourage you, go

23   back and look and say, what was going on between, pick a date,

24   whether it's October of '07 when you have those two board

25   meetings, whether it's February of '08 with Ms. Dokken's

1    email, whether it's March of '08 with Mr. Juan

2    Rodriguez-Tolentino's presentation.  Look and see what

3    happened after that, why did the Magness parties go to the

4    bank.  We believe you'll find the only reason is they had

5    these margin calls and they were in crisis.  It's not a story.

6    It's the fact.  It's what was going on at the time.  It's what

7    these people were thinking.

8         Thank you.

9         Thank you, Your Honor.

10        THE COURT:  All right.  In just a minute I'm going

11   to ask you to go back to the jury room and begin your

12   deliberations.  Before I do, I want to remind you of an

13   instruction that's tucked away at the back of the charge, and

14   basically it says you're pretty much in charge of your own

15   schedule from here on out.  So if it gets toward lunchtime and

16   you're starting to feel hungry and want to take a lunch break,

17   give yourselves a lunch break.  If it's in the afternoon and

18   you want to take an afternoon break, give yourselves an

19   afternoon break.

20        The only thing that I ask is please keep our court

21   security officer advised of your schedule so that we can be

22   sure we're around and available whenever you-all are

23   deliberating in case you should need some assistance from us.

24        But at this time, please retire to the jury room and

25   begin your deliberations.

```
 1                  (Whereupon, the jury left the courtroom.)

 2                  THE COURT:  Anything else we need to take up at this

 3      time?

 4                  MR. SADLER:  No, Your Honor.

 5                  MR. PETRIE:  No, Your Honor.  Thank you.

 6                  THE COURT:  Okay.  Don't wander too far away in case

 7      they send us a note.

 8          So we'll stand in recess pending word from the jury.

 9          Also, if you could help us gather the admitted exhibits

10      together so we can send them back, we would appreciate your

11      help.

12                  MR. SADLER:  It's already done.

13                  THE COURT:  It's all right there?

14                  MR. SADLER:  Yes, sir.

15                  THE COURT:  Okay.  Perfect.  Thank you.

16                       (Jury deliberates.)

17

18

19

20

21

22

23

24

25
```

```
 1                      V E R D I C T

 2            THE COURT:  Are we ready for the panel?

 3            MR. SADLER:  Yes, sir.

 4            MR. PETRIE:  Yes, sir.

 5            (Whereupon, the jury entered the courtroom.)

 6            THE COURT:  Be seated.

 7        Good afternoon.  The Court security officers have

 8    returned your verdict to me, and although I think everyone in

 9    the courtroom is aware of the contents of it, it's so short

10    I'm just going to recite the answers in the record.

11        The jury has returned a verdict answering Question 1-A,

12    "yes" and 1-B, "no."  And then has correctly proceeded to

13    Question 2, which is answered, "Yes."

14        I'm going to do something that I do in every case

15    actually.  So I'm not just picking on you-all; I do it all the

16    time.  I trust your presiding juror.  Don't get me wrong.  I

17    do trust your presiding juror, but I like the record

18    affirmatively to show that the verdict is unanimous, or if

19    it's not, show that.

20        So I'm going to ask you-all to do what is called a poll

21    of the jury.  And we will start in the front and go down, and

22    all I need for you to do is to state your name and tell us

23    either, yes, this is your verdict, or if it's not, tell us,

24    no.

25        So if we could start with you, please, ma'am.
```

1          THE PANEL MEMBER:  Lois Bass.  Yes, this is my

2     verdict.

3          THE PANEL MEMBER:  Jorge Hernandez.  This is my

4     verdict.

5          THE PANEL MEMBER:  Carrie Welty.  This is my

6     verdict.

7          THE PANEL MEMBER:  Jana Slade.  This is my verdict.

8          THE PANEL MEMBER:  Marca Mason Hall.  This is my

9     verdict.

10          THE PANEL MEMBER:  Sue Sweeney.  Yes, this is my

11     verdict.

12          THE PANEL MEMBER:  Shawn Phillips.  Yes, this is my

13     verdict.

14          THE COURT:  Very good.  Thank you-all.

15     I'm going to say just a couple of things to you, not very

16     long.  The most important thing, again, is to tell you thank

17     you for your service.  I think you understand better now than

18     you did last Monday that this was a case that was very

19     important to all of the folks involved, and I know they very

20     much appreciate your service.

21     I also am of the opinion that every time the system works

22     and we bring a case to a conclusion through the verdict of a

23     jury, we've shown that our justice system works and is vital

24     and is important, and you-all have been a significant part of

25     showing us that.  So we really appreciate your service.

1        And as I indicated earlier today, again, I also

2   appreciate your attitude as you went through your service.

3   That means a lot to us, and we thank you.

4        So in just a second, I'm going to release you.  I'm going

5   to ask you to do one more thing for us before you leave, and

6   that's to stop by the Jury Services Office on the first floor

7   and tell them that you've been discharged.  If you need

8   paperwork for an employer or anything of that nature, they can

9   help you with that down there.

10       So, again, thank you for your service.  At this time you

11   are released and discharged.

12            (Whereupon, the jury left the courtroom.)

13            THE COURT:  Anything else we need to take up on the

14   record at this time?

15            MR. PETRIE:  No.  Thank you, Your Honor.

16            MR. SADLER:  No.

17            THE COURT:  You-all did a good job, and for those of

18   you from far-away places, have safe travels home, and we'll

19   proceed to enter a judgment here in the next few days.

20       The Court will stand in recess.

21            (The proceedings were concluded at 3:10 p.m.)

22

23

24

25

1                          I HEREBY CERTIFY THAT THE FOREGOING IS A

2                          CORRECT TRANSCRIPT FROM THE RECORD OF

3                          PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4                          I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5                          FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6                          COURT AND THE JUDICIAL CONFERENCE OF THE

7                          UNITED STATES.

8

9                          S/Shawn McRoberts           01/18/2017

10                   _____DATE_____

                      SHAWN McROBERTS, RMR, CRR

11                   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# APPENDIX I

# GARY MAGNESS IRREVOCABLE TRUST

**Year Ended December 31, 2008**
**Federal and State**
**Income Tax Returns**



Confidential

MAGNESS008918



**EKS&H**
EHRHARDT · KEEFE
STEINER · HOTTMAN PC
CERTIFIED PUBLIC ACCOUNTANTS AND ADVISORS

7979 E. Tufts Avenue, Suite 400
Denver, Colorado 80237-2843
P: 303-740-9400 F: 303-740-9009

Mr. Gary D. Magness
Gary Magness Irrevocable Trust
1200 17th Street, Suite 660
Denver, CO 80202

Dear Gary:

Enclosed are the original and one copy of your income tax returns for the period ended December 31, 2008 for:

Gary Magness Irrevocable Trust as follows...

2008 1041 U.S. Income Tax Return for Estates and Trusts
2008 Arizona Fiduciary Income Tax Return
2008 Colorado Fiduciary Income Tax Return
2009 Pennsylvania Fiduciary Estimated Tax Vouchers
2008 Pennsylvania Fiduciary Income Tax Return

Each original should be dated, signed and filed in accordance with the filing instructions. The copy should be retained for your files.

Each beneficiary is to report on their 2008 personal income tax return their pro rata share of the beneficiary's income or loss, etc. as set forth on each beneficiary's copy of Schedule K-1. Each beneficiary's copy of Schedule K-1 should therefore be forwarded to them.

We sincerely appreciate this opportunity to serve you. Please contact us if you have questions concerning the returns or if we may be of further assistance.

Sincerely,

Ehrhardt Keefe Steiner & Hottman PC

Confidential

MAGNESS008919

**Form 1041**

Department of the Treasury - Internal Revenue Service
**U.S. Income Tax Return for Estates and Trusts**

**2008**

OMB No. 1545-0092

For calendar year 2008 or fiscal year beginning _____ , 2008, and ending _____

**A Type of entity** (see instr.)

- Decedent's estate
- Simple trust
- X Complex trust
- Qualified disability trust
- ESBT (S portion only)
- Grantor type trust
- Bankruptcy estate-Ch. 7
- Bankruptcy estate-Ch. 11
- Pooled income fund

Name of estate or trust (If a grantor type trust, see page 14 of the instructions.)

GARY MAGNESS IRREVOCABLE TRUST

Name and title of fiduciary

MANGO FIVE FAMILY, INC.
TRUSTEE

Number, street, and room or suite no. (If a P.O. box, see page 15 of the instructions.)

100 WEST LIBERTY STREET, TENTH FLOOR

City or town, state, and ZIP code

RENO, NV 89501

**C Employer identification number**

**D Date entity created** 03/29/1996

**E** Nonexempt charitable and split-interest trusts, check applicable boxes (see page 16 of the instr.):
- Described in sec. 4947(a)(1)
- Not a private foundation
- Described in sec. 4947(a)(2)

**B Number of Schedules K-1 attached (see instructions)** ▶ 1

**F Check applicable boxes:**
- Initial return
- Final return
- Amended return
- Change in trust's name
- Change in fiduciary
- Change in fiduciary's name
- Change in trust's address

**G** Check here if the estate or filing trust made a section 645 election . . . . . . . ▶

**Income**

| | | | |
|---|---|---|---|
| 1 | Interest income . . . . . . . . . . . . . . . . . . . SEE STATEMENT 1 | **1** | 2,329,864. |
| 2a | Total ordinary dividends . . . . . . . . . . . . . . . SEE STATEMENT 1 | **2a** | 2,836,911. |
| b | Qualified dividends allocable to: (1) Beneficiaries _____ (2) Estate or trust 1,905,965. | | |
| 3 | Business income or (loss). Attach Schedule C or C-EZ (Form 1040) | **3** | |
| 4 | Capital gain or (loss). Attach Schedule D (Form 1041) | **4** | 4,132,929. |
| 5 | Rents, royalties, partnerships, other estates and trusts, etc. Attach Schedule E (Form 1040) | **5** | -8,429,676. |
| 6 | Farm income or (loss). Attach Schedule F (Form 1040) | **6** | |
| 7 | Ordinary gain or (loss). Attach Form 4797 | **7** | |
| 8 | Other income. List type and amount _____ SEE STATEMENT 2 | **8** | -31,042. |
| 9 | **Total income.** Combine lines 1, 2a, and 3 through 8 . . . . . . . . . . . . . . . . . . . . . | **9** | 838,986. |

**Deductions**

| | | | |
|---|---|---|---|
| 10 | Interest. Check if Form 4952 is attached ▶ X . . . . . . . SEE STATEMENT 2 | **10** | 4,303,680. |
| 11 | Taxes . . . . . . . . . . . . . . . . . . . . . . . . SEE STATEMENT 2 | **11** | 97. |
| 12 | Fiduciary fees . . . . . . . . . . . . . PORTION SUBJ. TO ALLOC: 837,800. | **12** | 837,394. |
| 13 | Charitable deduction (from Schedule A, line 7) | **13** | 1,722. |
| 14 | Attorney, accountant, and return preparer fees | **14** | 65,850. |
| 15a | Other deductions not subject to the 2% floor (attach schedule) | **15a** | |
| b | Allowable miscellaneous itemized deductions subject to the 2% floor . SEE STATEMENT 3 | **15b** | 1,126,705. |
| 16 | Add lines 10 through 15b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **16** | 6,335,448. |
| 17 | Adjusted total income or (loss). Subtract line 16 from line 9 . . . . . . . . . . | 17 | -5,496,462. | | |
| 18 | Income distribution deduction (from Schedule B, line 15). Attach Schedules K-1 (Form 1041) | **18** | |
| 19 | Estate tax deduction including certain generation-skipping taxes (attach computation) . . . . . . | **19** | |
| 20 | Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **20** | 100. |
| 21 | Add lines 18 through 20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | **21** | 100. |
| 22 | Taxable income. Subtract line 21 from line 17. If a loss, see page 23 of the instructions | **22** | -5,496,562. |
| 23 | **Total tax** (from Schedule G, line 7) | **23** | NONE |

**Tax and Payments**

| | | | |
|---|---|---|---|
| 24 | Payments: a 2008 estimated tax payments and amount applied from 2007 return | **24a** | 2,637,164. |
| b | Estimated tax payments allocated to beneficiaries (from Form 1041-T) | **24b** | |
| c | Subtract line 24b from line 24a . . . . . . . . . . . . . . . . . . . . . . . . . . | **24c** | 2,637,164. |
| d | Tax paid with Form 7004 (see page 24 of the instructions) . . . . . . . . . . . . . . . | **24d** | NONE |
| e | Federal income tax withheld. If any is from Form(s) 1099, check ▶ | **24e** | 2,080. |
| | Other payments: f Form 2439 _____ ; g Form 4136 _____ ; Total ▶ | **24h** | |
| 25 | **Total payments.** Add lines 24c through 24e, and 24h . . . . . . . . . . . . . . . ▶ | **25** | 2,639,244. |
| 26 | Estimated tax penalty (see page 24 of the instructions) . . . . . . . . . . . . . . . . | **26** | |
| 27 | **Tax due.** If line 25 is smaller than the total of lines 23 and 26, enter amount owed . . . . . . | **27** | NONE |
| 28 | **Overpayment.** If line 25 is larger than the total of lines 23 and 26, enter amount overpaid . . . . . . . . . . | **28** | 2,639,244. |
| 29 | Amount of line 28 to be: a **Credited to 2009 estimated tax** ▶ 2,639,244. ; b **Refunded** ▶ | **29** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

CLIENT COPY

Signature of fiduciary or officer representing fiduciary          Date          EIN of fiduciary if a financial institution

May the IRS discuss this return with the preparer shown below (see instr.)? X Yes ☐ No

**Paid Preparer Use Only**

| | |
|---|---|
| Preparer's signature | Yvonne Z. Hergett   Date 9-9-09   Check if self-employed   Preparer's SSN or PTIN P00349513 |
| Firm's name (or yours if self-employed), address, and ZIP code | EHRHARDT KEEFE STEINER & HOTTMAN PC   EIN   7979 E. TUFTS AVENUE, SUITE 400   Phone no. 303-740-9400   DENVER, CO   80237-2843 |

For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.          JSA   8F1010 2.000          Form **1041** (2008)

Confidential          MAGNESS008923



| Form **8275** | **Disclosure Statement** | OMB No. 1545-0889 |
|---|---|---|
| (Rev. August 2008) | Do not use this form to disclose items or positions that are contrary to Treasury regulations. Instead, use Form 8275-R, Regulation Disclosure Statement. See separate instructions. | |
| Department of the Treasury Internal Revenue Service | ► Attach to your tax return. | Attachment Sequence No. **92** |

| Name(s) shown on return | Identifying number shown on return |
|---|---|
| **Gary Magness Irrevocable Trust** | |

**Part I**   General Information (see instructions)

| (a) Rev. Rul., Rev. Proc., etc. | (b) Item or Group of Items | (c) Detailed Description of Items | (d) Form or Schedule | (e) Line No. | (f) Amount |
|---|---|---|---|---|---|
| **1 N/A** | Cash | Cash received from Stanford International Bank | N/A | N/A | $15,491,442.93 |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |

**Part II**   Detailed Explanation (see instructions)

1 See Part IV.

2

3

4

5

6

**Part III**   Information About Pass-Through Entity. To be completed by partners, shareholders, beneficiaries, or residual interest holders.

Complete this part only if you are making adequate disclosure for a pass-through item.

Note: A pass-through entity is a partnership, S corporation, estate, trust, regulated investment company (RIC), real estate investment trust (REIT), or real estate mortgage investment conduit (REMIC).

| 1  Name, address, and ZIP code of pass-through entity | 2  Identifying number of pass-through entity |
|---|---|
| | 3  Tax year of pass-through entity      /    /        to    /    / |
| | 4  Internal Revenue Service Center where the pass-through entity filed its return |

For Paperwork Reduction Act Notice, see separate instructions.          Cat. No. 61935M          Form **8275** (Rev. 8-2008)

Confidential          MAGNESS008950

Form 8275 (Rev. 8-2008)                                                                    Page **2**

**Part IV    Explanations** (continued from Parts I and/or II)

**Explanation of Item 1:**

Taxpayer invested in Stanford International Bank CDs in 2005 and 2006. The face amount of the CDs totaled $55 million.

In October 2008, the Taxpayer received funds from Stanford as a loan secured by the CDs. Due to the investigation of

Stanford which was active in 2008, the Taxpayer was concerned that his CD principal was in jeopardy.

Stanford agreed to apply outstanding accrued CD interest of $15,491,442.93 to pay off the loan. The cash received is a

return of principal and not interest for the following reasons:

1.  The funds received are a return of principal under the theories set forth in Liftkin v. Comm'r, 36 T.C. 909 (1961),

    Electric Controls and Serv. Co. v. Comm'r, T.C. Memo 1996-486 (1996), Underhill v. Comm'r, 45 T.C. 489 (1966),

    and Corn Exchange Bank v. U.S., 37 F.2d 34 (2d Cir. 1930).

2.  In the compliant filed by the SEC in SEC v. Stanford International Bank, et al, N.D. Texas, Docket No. 3-09-CV-0724-N

    the purported interest received by Stanford investors was not truly interest because it was not money generated

    by a return on their investment. Therefore, the funds are subject to substantial risk of forfeiture.

3.  The funds received are subject to a substantial risk of forfeiture because the receiver has asserted that the Taxpayer

    is a relief defendant and that the funds received should be put into a constructive trust for all Stanford investors.

Form **8275** (Rev. 8-2008)

Confidential

MAGNESS008951

# APPENDIX J



**EKS&H**
EHRHARDT · KEEFE
STEINER · HOTTMAN PC

7979 E. Tufts Avenue, Suite 400
Denver, Colorado 80237-2843
P: 303-740-9400 F: 303-740-9009

Gary Magness and Sarah Siegel
1200 17th Street  Suite 660
Denver, CO 80202

Dear Gary & Sarah:

Enclosed are the original and one copy of your 2008 income tax returns as follows...

    2008 1040 U.S. Individual Income Tax Return
    8865 Information Return for Certain Foreign Partnerships
    2008 California Income Tax Return
    California e-file Signature
    2008 Colorado Income Tax Return
    2008 Colorado Declaration for Electronic Filing
    2008 New Mexico Income Tax Return
    2008 New York Income Tax Return

Attached to your copy of each return is an instruction sheet for completing, signing and filing the return and payment of taxes due.

This letter and copies of the returns are for your records and should be retained for at least three years after the filing date.

We sincerely appreciate this opportunity to serve you.  Please contact us if you have any questions or if we may be of further assistance.

Sincerely,

*Ehrhardt Keefe Steiner + Hottman PC*

Ehrhardt Keefe Steiner & Hottman PC

* DENVER * FORT COLLINS * BOULDER *
www.EKSH.com

Page 1431

MAGNESS019102

**Form 1040**

Department of the Treasury - Internal Revenue Service
**U.S. Individual Income Tax Return** **2008** (99) IRS Use Only - Do not write or staple in this space.

For the year Jan. 1-Dec. 31, 2008, or other tax year beginning , 2008, ending . OMB No. 1545-0074

| Label | | | | |
|---|---|---|---|---|
| (See instructions on page 14.) | Your first name and initial **GARY D** | Last name **MAGNESS** | | Your social security number |
| Use the IRS label. | If a joint return, spouse's first name and initial **SARAH F** | Last name **SIEGEL** | | Spouse's social security number |
| Otherwise, please print or type. | Home address (number and street). If you have a P.O. box, see page 14. **1200 17TH STREET   SUITE 660** | | Apt. no. | You **must** enter your SSN(s) above. |
| | City, town or post office, state, and ZIP code. If you have a foreign address, see page 14. **DENVER                    CO         80202** | | | Checking a box below will not change your tax or refund. |

**Presidential Election Campaign** ▶ Check here if you, or your spouse if filing jointly, want $3 to go to this fund (see page 14) ▶ [ ] You [ ] Spouse

**Filing Status**
Check only one box.

1 [ ] Single
2 [X] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above and full name here. ▶
4 [ ] Head of household (with qualifying person). (See page 15.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 [ ] Qualifying widow(er) with dependent child (see page 16)

**Exemptions**

6a [X] Yourself. If someone can claim you as a dependent, **do not** check box 6a . . . . . . . . .
b [X] Spouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
c Dependents:

| (1) First name     Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 17) |
|---|---|---|---|
| C       B.  M | | CHILD | X |
| C       B.  M | | CHILD | X |
| C       B. | | CHILD | |

If more than four dependents, see page 17.

Boxes checked on 6a and 6b: **2**
No. of children on 6c who:
● lived with you **3**
● did not live with you due to divorce or separation (see page 18)
Dependents on 6c not entered above
Add numbers on lines above ▶ **5**

d Total number of exemptions claimed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see page 21.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . . . STMT 1 | 7 | 35,596. |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . . . . . . | 8a | 936,501. |
| b | Tax-exempt interest. Do not include on line 8a . STMT 1 | 8b | 136. | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . . . . . | 9a | 1,606,695. |
| b | Qualified dividends (see page 21) . . . . . . . STMT 2 | 9b | 1,518,767. | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 22) STMT 4 | 10 | NONE |
| 11 | Alimony received . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . . . | 12 | -1,050,525. |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | 13 | 4,825,466. |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . . . . . . . . | 14 | |
| 15a | IRA distributions . . . | 15a | b Taxable amount (see page 23) | 15b | |
| 16a | Pensions and annuities . . . | 16a | b Taxable amount (see page 24) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | -5,912,967. |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . . . . . . . . | 18 | -241,242. |
| 19 | Unemployment compensation . . . . . . . . . . . . . . . . . . . . . . | 19 | |
| 20a | Social security benefits . . . | 20a | b Taxable amount (see page 26) | 20b | |
| 21 | Other income. List type and amount (see page 28) SEE STATEMENT 2 | 21 | 902. |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 200,426. |

**Adjusted Gross Income**

| | | | | |
|---|---|---|---|---|
| 23 | Educator expenses (see page 28) . . . . . . . . . . . . . . . . | 23 | | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ . . | 24 | | |
| 25 | Health savings account deduction. Attach Form 8889 . . . . . . | 25 | | |
| 26 | Moving expenses. Attach Form 3903 . . . . . . . . . . . . | 26 | | |
| 27 | One-half of self-employment tax. Attach Schedule SE . . . . . | 27 | 11,455. | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . . . . . . | 28 | | |
| 29 | Self-employed health insurance deduction (see page 29) . . . . | 29 | | |
| 30 | Penalty on early withdrawal of savings . . . . . . . . . . . | 30 | | |
| 31a | Alimony paid b Recipient's SSN ▶ | 31a | | |
| 32 | IRA deduction (see page 30) . . . . . . . . . . . . . . . | 32 | | |
| 33 | Student loan interest deduction (see page 33) . . . . . . . | 33 | | |
| 34 | Tuition and fees deduction. Attach Form 8917. . . . . . . . | 34 | | |
| 35 | Domestic production activities deduction. Attach Form 8903 . . | 35 | 11,338. | |
| 36 | Add lines 23 through 31a and 32 through 35 . . . . . . . . . . . . . . . . . . . . . . . | 36 | 22,793. |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . . . . . . . ▶ | 37 | 177,633. |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 88.** Form **1040** (2008)

JSA
RS TW4691 N752

8A1210 2.000

GTS 2526-13

Page 1432

MAGNESS019108

Form 1040 (2008) GARY D MAGNESS & SARAH F SIEGEL — Page **2**

| | | | |
|---|---|---|---|
| **Tax and Credits** | 38 Amount from line 37 (adjusted gross income) | 38 | 177,633. |
| | 39a Check { You were born before January 2, 1944, ☐ Blind. } Total boxes checked 39a | | |
| | if: { Spouse was born before January 2, 1944, ☐ Blind. } ▶ 39a | | |
| | b If your spouse itemizes on a separate return or you were a dual-status alien, see page 34 and check here ▶ 39b | | |
| Standard Deduction for – | c Check if standard deduction includes real estate taxes or disaster loss (see page 34) ▶ 39c | | |
| | 40 Itemized deductions (from Schedule A) or your standard deduction (see left margin) | 40 | 5,107,604. |
| | 41 Subtract line 40 from line 38 | 41 | -4,929,971. |
| People who checked any box on line 39a, 39b or 39c or who can be claimed as a dependent, see page 34. | 42 If line 38 is over $119,975 or you provided housing to a Midwestern displaced individual, see page 36. Otherwise, multiply $3,500 by the total number of exemptions claimed on line 6d | 42 | 17,500. |
| | 43 Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | 43 | |
| | 44 Tax (see page 36). Check if any tax is from: a ☐ Form(s) 8814  b ☐ Form 4972 | 44 | NONE |
| All others: | 45 Alternative minimum tax (see page 39). Attach Form 6251 | 45 | NONE |
| Single or Married filing separately, $5,450 | 46 Add lines 44 and 45 ▶ | 46 | NONE |
| | 47 Foreign tax credit. Attach Form 1116 if required | 47 | |
| | 48 Credit for child and dependent care expenses. Attach Form 2441 | 48 | |
| Married filing jointly or Qualifying widow(er), $10,900 | 49 Credit for the elderly or the disabled. Attach Schedule R | 49 | |
| | 50 Education credits. Attach Form 8863 | 50 | |
| | 51 Retirement savings contributions credit. Attach Form 8880 | 51 | |
| | 52 Child tax credit (see page 42). Attach Form 8901 if required | 52 | |
| Head of household, $8,000 | 53 Credits from Form: a ☐ 8396 b ☐ 8839 c ☐ 5695 | 53 | |
| | 54 Other credits form Form: a ☐ 3800 b ☐ 8801 c ☐ | 54 | |
| | 55 Add lines 47 through 54. These are your total credits | 55 | |
| | 56 Subtract line 55 from line 46. If line 55 is more than line 46, enter -0- ▶ | 56 | NONE |
| **Other Taxes** | 57 Self-employment tax. Attach Schedule SE | 57 | 22,909. |
| | 58 Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | 58 | |
| | 59 Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 59 | |
| | 60 Additional taxes: a ☐ AEIC payment b ☐ Household employment taxes. Attach Schedule H | 60 | |
| | 61 Add lines 56 through 60. This is your total tax ▶ | 61 | 22,909. |
| **Payments** | 62 Federal income tax withheld from Forms W-2 and 1099 | 62 2,008. | |
| | 63 2008 estimated tax payments and amount applied from 2007 return | 63 698,335. | |
| If you have a qualifying child, attach Schedule EIC. | 64a Earned income credit (EIC) | 64a | |
| | b Nontaxable combat pay election ☐ 64b | | |
| | 65 Excess social security and tier 1 RRTA tax withheld (see page 61) | 65 | |
| | 66 Additional child tax credit. Attach Form 8812 | 66 | |
| | 67 Amount paid with request for extension to file (see page 61) | 67 NONE | |
| | 68 Credits from Form: a ☐ 2439 b ☐ 4136 c ☐ 8801 d ☐ 8885 | 68 | |
| | 69 First-time homebuyer credit. Attach Form 5405 | 69 | |
| | 70 Recovery rebate credit (see worksheet on pages 62 and 63) | 70 | |
| | 71 Add lines 62 through 70. These are your total payments ▶ | 71 | 700,343. |
| **Refund** | 72 If line 71 is more than line 61, subtract line 61 from line 71. This is the amount you overpaid | 72 | 677,387. |
| Direct deposit? See page 63 and fill in 73b, 73c, and 73d, or Form 8888. | 73a Amount of line 72 you want refunded to you. If Form 8888 is attached, check here ☐ | 73a | |
| | ▶ b Routing number ▶ c Type: ☐ Checking ☐ Savings | | |
| | ▶ d Account number | | |
| | 74 Amount of line 72 you want applied to your 2009 estimated tax ▶ 74 677,387. | | |
| **Amount You Owe** | 75 Amount you owe. Subtract line 71 from line 61. For details on how to pay, see page 65 ▶ | 75 | |
| | 76 Estimated tax penalty (see page 65) 76 | | 47. |
| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see page 66)? ☒ Yes. Complete the following. ☐ No | | |
| | Designee's name ▶ PREPARER   Phone no. ▶   Personal identification number (PIN) ▶ | | |

**Sign Here**
Joint return? See page 15. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature  CLIENT COPY   Date   Your occupation RANCH MANAGER   Daytime phone number

Spouse's signature. If a joint return, both must sign.   Date   Spouse's occupation INVESTOR

**Paid Preparer's Use Only**
Preparer's signature ▶ Yvonne Z. Hagett   Date 10/13/2009   Check if self-employed ☐   Preparer's SSN or PTIN P00349513
Firm's name (or yours if self-employed), address, and ZIP code ▶ EHRHARDT KEEFE STEINER & HOTTMAN PC   EIN
7979 E. TUFTS AVENUE, SUITE 400   Phone no. 303-740-9400
DENVER   CO   80237-2843

Form **1040** (2008)

JSA
8A1220 2.000
TW4691 N752   GTS 2526-13

CONFIDENTIAL   MAGNESS019110

Form **8275**

(Rev. August 2008)

Department of the Treasury
Internal Revenue Service

## Disclosure Statement

Do not use this form to disclose items or positions that are contrary to Treasury regulations. Instead, use Form 8275-R, Regulation Disclosure Statement. See separate instructions.

▶ Attach to your tax return.

OMB No. 1545-0889

Attachment
Sequence No. **92**

Name(s) shown on return

**Gary Magness**

Identifying number shown on return

| Part I | General Information (see instructions) |

| (a)<br>Rev. Rul., Rev. Proc., etc. | (b)<br>Item or Group<br>of Items | (c)<br>Detailed Description<br>of Items | (d)<br>Form or<br>Schedule | (e)<br>Line<br>No. | (f)<br>Amount |
|---|---|---|---|---|---|
| 1  N/A | Cash | Cash received from Stanford International Bank Ltd. | N/A | N/A | $8,824,514.21 |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |

| Part II | Detailed Explanation (see instructions) |

1  See Part IV.

2

3

4

5

6

| Part III | Information About Pass-Through Entity. To be completed by partners, shareholders, beneficiaries, or residual interest holders. |

**Complete this part only if you are making adequate disclosure for a pass-through item.**

**Note:** *A pass-through entity is a partnership, S corporation, estate, trust, regulated investment company (RIC), real estate investment trust (REIT), or real estate mortgage investment conduit (REMIC).*

| 1  Name, address, and ZIP code of pass-through entity | 2  Identifying number of pass-through entity |
|---|---|
| | 3  Tax year of pass-through entity<br>       /      /              to      /      / |
| | 4  Internal Revenue Service Center where the pass-through entity filed its return |

**For Paperwork Reduction Act Notice, see separate instructions.**        Cat. No. 61935M        Form **8275** (Rev. 8-2008)

Page 1434

CONFIDENTIAL

MAGNESS019197

| **Part IV** | **Explanations** *(continued from Parts I and/or II)* |
|---|---|

**Explanation of Item 1:**

Taxpayer, through his disregarded single member LLCs, GMAG, LLC  (EIN ▓▓▓▓▓ and Magness Securities, LLC

(EIN ▓▓▓▓▓▓), invested in Stanford International Bank CDs in 2004 and 2005.  The face amount of the GMAG CDs was

$15 million and the face amount of the Magness Securities CDs was $9 million.  In October 2008, the Taxpayer received

funds from Stanford as a loan secured by the CDs.  Due to the investigation of Stanford which was active in 2008, the

Taxpayer was concerned that his CD principal was in jeopardy.  Stanford agreed to apply outstanding accrued

CD interest of $8,824,514.21 to pay off the loan.  The cash received is a return of principal and not interest for the

following reasons:

1.    The funds received are a return of principal, under the theories set forth in Liftkin v. Comm'r, 36 T.C. 909 (1961),

      Electric Controls and Serv. Co. v. Comm'r, T.C. Memo 1996-486 (1996), Underhill v. Comm'r, 45 T.C. 489 (1966),

      and Corn Exchange Bank v. U.S., 37 F.2d 34 (2d Cir. 1930).

2.    In the compliant filed by the SEC in SEC v. Stanford International Bank, et al, N.D. Texas, Docket No. 3-09-CV-0724-N

      the purported interest received by Stanford investors was not truly interest because it was not money generated

      by a return on their investment.  Therefore, the funds are subject to substantial risk of forfeiture.

3.    The funds received are subject to a substantial risk of forfeiture because the receiver has asserted that the Taxpayer

      is a relief defendant and that the funds received should be put into a constructive trust for all Stanford investors.

Form **8275** (Rev. 8-2008)

CONFIDENTIAL

MAGNESS019198

# APPENDIX K

 *The* **Magness** *Investment Group, LLC*

One Tabor Center
1200 Seventeenth Street Suite 660
Denver, Colorado 80202-5835
303-572-6400 tele
303-572-6464 fax

Date: October 14, 2008

Stanford International Bank Ltd.
2000 Airport Boulevard
St. John's, Antigua
West Indies

RE:  CD Account #140392, N/O, Magness Securities, LLC
     CD Account #140403, N/O, Magness Securities, LLC

To whom it may concern;

Regarding the Stanford International Bank CD Accounts referenced above, please transfer all of the accrued interest to date on the CD's noted above to the Magness Loan Account (#386384).

If you have any questions or require additional information, please contact my representative, Mr. Thomas Espy at 303-398-1988.

Thank you.

Gary D. Magness
Magness Securities, LLC

Plaintiff's
Exhibit

81



The *Magness* Investment Group, LLC

*One Tabor Center*
*1200 Seventeenth Street Suite 660*
*Denver, Colorado 80202-5835*
*303-572-6400 tele*
*303-572-6464 fax*

Date: October 14, 2008

Stanford International Bank Ltd.
2000 Airport Boulevard
St. John's, Antigua
West Indies

RE:  CD Account #126028, N/O GMAG, LLC
     CD Account #126029, N/O GMAG, LLC

To whom it may concern;

Regarding the Stanford International Bank CD Accounts referenced above, please transfer all of the accrued interest to date on the CD's noted above to the Magness Loan Account (#386384).

If you have any questions or require additional information, please contact my representative, Mr. Thomas Espy at 303-398-1988.

Thank you.

Gary D. Magness, Manager
GMAG, LLC

000024

The _____ Investment Group, LLC

Date: October 14, 2008

One Tabor Center
1200 Seventeenth Street Suite 660
Denver, Colorado 80202-5835
303-572-6400 tele
303-572-6464 fax

Stanford International Bank Ltd.
2000 Airport Boulevard
St. John's, Antigua
West Indies

RE: CD Account #129187, N/O, Gary D. Magness Irrevocable Trust
CD Account #133200, N/O, Gary D. Magness Irrevocable Trust
CD Account #154864, N/O, Gary D. Magness Irrevocable Trust
CD Account #154866, N/O, Gary D. Magness Irrevocable Trust
CD Account #155014, N/O, Gary D. Magness Irrevocable Trust

To Whom It May Concern:

Regarding the Stanford International Bank CD Accounts referenced above, please transfer all of the accrued interest to date on the CD's noted above to the Magness Loan Account (#386384).

If you have any questions or require additional information, please contact my representative, Mr. Thomas Espy at 303-398-1988.

Thank you.

Gary D. Magness
Gary D. Magness Irrevocable Trust

000025

# APPENDIX L

## Tonya Dokken

**From:** Tonya Dokken
**Sent:** Tuesday, October 21, 2008 3:21 PM
**To:** Meghan St. Clair
**Subject:** FW: Stanford International Bank Interest Figures

FYI - for the financials.

Also, I drew $761,336 from Gary ML to pay off this balance plus accrued interest. We had to pay off the total $25 million before we could draw the $44 million.

Tonya Dokken
Chief Financial Officer
Magness Investment Group
1200 17th Street, Suite 660
Denver, Colorado 80202
(303) 572-6400 (phone)
(303) 572-6464 (fax)
email - tonya@magness.net

**From:** McGowan, Pamela [mailto:PMcgowan@StanfordEagle.com]
**Sent:** Tuesday, October 21, 2008 11:08 AM
**To:** Tonya Dokken
**Cc:** Espy, Tom
**Subject:** RE: Stanford International Bank Interest Figures

Tonya-

The following are the interest amounts that were moved from the various Stanford CD accounts on Monday, October 20, 2008 to pay down loan amount:

**GMAG, LLC CD Accounts**

CD# 126028  $2,040,283.10
CD# 126029  $4,104,516.81

**Magness Securities, LLC CD Account**

CD# 140392  $2,679,734.30

**Gary D. Magness Trust CD Accounts**

CD# 129187  $7,748,185.10
CD# 133200  $1,775,212.89
CD# 154864  $1,989,347.93
CD# 154866  $1,989,347.93
CD# 155014  $1,989,349.08

The current loan balance after these interest amounts have been applied is $760,836.67.

Thanks
Pam

CONFIDENTIAL

Plaintiff's
Exhibit

**93**

MAGNESS002320

Any information or data provided in this message has been obtained from sources we believe to be reliable, but we do not guarantee its accuracy or completeness. Such information reflects current market conditions, is subject to change without notice and should not be relied upon for tax purposes. Any transactional details are provided at your request and do not supersede your normal trade confirmations or monthly statements. Any product recommended is subject to prior sale. Stanford Group Company, its affiliated companies, and/or officers, directors or employees, may at times have a position in or make a market in any security described above, and/or may act as an investment banker or advisor to any company referenced. Stanford Group Company reserves the right to monitor and review the content of all e-mail communications sent and/or received by its employees. Stanford Group Company does not accept time-sensitive transactional messages, including orders to buy and sell securities, via e-mail. This information is intended to be confidential and solely for the use of Stanford Group Company and those persons or entities to whom it is directed. It is not to be reproduced, retransmitted, or in any other manner redistributed. If you received this message in error, please contact Stanford Group Company immediately at 800-958-0009.

CONFIDENTIAL

MAGNESS002321

# APPENDIX M

SEC Investigating Stanford Group Offshore CDs, Investments
2008-07-03 19:27:32.90 GMT


By Alison Fitzgerald
    July 3 (Bloomberg) -- The U.S. Securities and Exchange Commission is
investigating sales of certificates of deposit by Stanford Group Company in its
affiliated Antigua-based offshore bank.
    The SEC issued subpoenas yesterday to two former Stanford Group employees
asking for information about the CD sales by its offshore bank, Stanford
International Bank Ltd. The subpoenas also demanded sales-training materials for
the CDs and so-called mutual fund wrap programs, which are portfolios of
diversified mutual funds. The companies are owned by billionaire R. Allen
Stanford.
    The subpoenas were provided to Bloomberg News by Mike O'Brien, the Houston-
based attorney for two former employees, Charles Rawl and Mark Tidwell. They are
both suing Houston-based Stanford Group, accusing the company of forcing them to
resign because they did not want to participate in illegal activities that they
say Stanford Group was requiring them to carry out.
    Stanford Group spokeswoman Lula Rodriguez said the company is ``not aware of
any formal actions by the SEC related to either Mr. Tidwell or Mr. Rawl or
connected to any of our clients.''
    Rodriguez said the allegations ``have been made by disgruntled employees and
are totally without merit.''
    SEC spokesman John Nester said the agency does not confirm or deny the
existence of an investigation. Rawl and Tidwell were both investment advisers for
Stanford Group in Houston.

                      `Leave That Place'

    ``All we wanted to do was leave that place, get out of there and get our
clients out safe and sound,'' Rawl said in an interview.
    In the lawsuit, Rawl and Tidwell claim that the company failed to file forms
to the U.S. Treasury Department disclosing its clients' offshore holdings and did
not advise its clients to file those forms.
    The lawsuit also alleges that Stanford Group purged files and destroyed
documents as early as last year related to what Tidwell and Rawl claim is an
ongoing SEC investigation regarding the CD sales practices. The lawsuit alleges
that the company gave clients false historical performance data for its
securities.
    In court papers, Stanford Group said it had fired Tidwell and Rawl and that
the two owe the company repayment of loans made to them.
    Rawl said he owes Stanford Group $579,441. He said the company paid him a
bonus upon his hiring in 2005 that would vest over time and that he was required
to pay back when he left the company early. Tidwell owes the company $155,598,
according to court papers filed by Stanford Group.
    R. Allen Stanford was ranked the 605th-richest person in the world by Forbes
Magazine this year, with an estimated net worth of $2.0 billion. Stanford
International Bank had $6 billion in assets as of July, 2007, the company said on
its Web site.

--Editors: Michael Forsythe, Otis Bilodeau

STAN INVSTR GENL_058542

To contact the reporter on this story:
Alison Fitzgerald in Washington at +1-202-624-1846 or Afitzgerald2@bloomberg.net

To contact the editor responsible for this story:
Michael Forsythe +1-202-624-1840 or mforsythe@bloomberg.net

STAN INVSTR GENL_058543

# APPENDIX N

# STANFORD
# INTERNATIONAL BANK, LTD.

*Quarterly Update*

STANFORD INTERNATIONAL BANK, LTD.   •   11 Pavilion Drive   •   P.O. Box 3300   •   St. John's Antigua, West Indies   •   Telephone: (268) 480-3700

*April 1, 2008 – June 30, 2008*

# MARKET RECAP & OUTLOOK

## MARKET RECAP

### United States/Canada

The second quarter of 2008 continued to exhibit the large volatility experienced during the first quarter. The first half of the second quarter saw stocks rally 14.66% off of the low set in mid-March, but from mid-May through the end of the quarter, equities sank back to the lowest levels of the year. The market volatility can be attributed to the continuation, and expansion in some cases, of the credit crunch. Credit conditions have worsened, and the market participants simply do not know how to react to the potential meltdown. As a result, financial stocks have been slammed and have taken the market down with them. Compounding the problem is the continued surge in crude oil prices. Crude oil futures prices were up nearly 40% in the second quarter alone. This large gain comes on the heels of an already extreme move, taking oil above $145 per barrel. Economic conditions have continued to flounder and inflation figures have reached very high levels. The Federal Reserve seems to be stuck between an economy that has massive headwinds to growth and inflation figures that risk spiraling out of control. As a result, the actions of the Federal Open Market Committee have become much more difficult to anticipate. The downside risks to economic growth currently seem to outweigh inflation prospects, but the impact on the markets will continue to linger from both sides.

### Western Europe

The main development within Western Europe in the last quarter appears to be the combination of persistent high inflation in the region with divergence between individual economies while the regional economy as a whole has shown resiliency. The second estimate of first-quarter GDP came out better than expected at 0.8%. Exports and investment recorded gains from the previous quarter, and the main disappointment came from household spending growth (up by only 0.2%). The past improvements in the labor market have been expected to support consumer spending, but for now, domestic spending has not been able to offset the overall slowing external demand. Recent unemployment reports suggest that the improvements in the labor market over the last three years is finally coming to an end. The number of unemployed posted its first monthly increase in April since January 2006. Portugal's economy contracted during the first quarter and Spain's growth was the slowest since Q3 of 1995. Italy's economy only expanded by 0.2% year-over-year in the same quarter. At the same time, economic growth in Germany, which is Europe's largest economy, expanded the most in 12 years during the same time period. Regarding inflation, prices increased at an annual rate of 3.7% in May, a 16-year high, and investors' inflation expectations continue to rise. European food prices rose 6% in April year-over-year, while energy costs soared 10.8%. As a result, expectations for official interest rates in the region dramatically changed in June. There has been a complete readjustment on the expected future course of monetary policies in the region. The European Central Bank (ECB) left rates unchanged at 4% in June, but indicated that policymakers may raise rates in July due to higher inflation expectations. Western European equities have continued to underperform this year, as expected. The Dow Jones STOXX 600 index (SXXP), the benchmark for Western European stocks, was down more than 20% year-to-date as of June 30. Yield curves have become much flatter with higher inflation expectations. Western European sovereigns have underperformed U.S. Treasuries thus far this year. The euro (EUR) was basically flat for the quarter, but it fluctuated in a range from about 1.53 to about 1.60.

### Eastern Europe

All Eastern European markets were in negative territory for the second quarter except for Russia's, which was up 8.7% even after a 9.9% decline from its highest level in the middle of May. The biggest gains were sustained by agricultural chemical companies as food shortages, particularly in the biggest metropolitan areas, significantly increased food prices and contributed to strong inflation. Russia's inflation actually reached 15% in May, the highest rate in 5.5 years. To combat inflation the central bank has increased bank reserve requirements and raised the benchmark interest rate by 75 basis points this year. The next best second-quarter performers in Russia's equity market were steel and energy companies. A major causative factor for this quarter's significant increase in oil company values was that in April the government reduced oil extraction taxes amounting to $4 billion to help finance exploration and development of new fields as an incentive to maintain output. However, not all oil companies will benefit from this tax break because it only applies to proceeds from oil fields that are remote or otherwise difficult to exploit. With regard to other countries in the region, the sell-off was influenced by liquidity constraints and fear of the U.S. economy sliding into a recession. The Austrian stock market had a very strong rebound in the first half of the quarter followed by a significant sell-off consistent with the U.S. market decline. U.S. investors represent the largest portion of Austria's institutional investors at 27.8%, while Austrian institutional investors represent only 8.5%. This

**What's Inside**

1
Market Recap

2
Market Outlook

4
Portfolio Adjustments

Allocations

Financial & Economic Highlights



STAN INVSTR MAGNG_05054

STANFORD INTERNATIONAL BANK, LTD.

partially explains the Austrian market's high correlation with the U.S. market. The Czech equity market declined into negative territory even after adjustment for the stellar performance of the koruna, which made market losses significantly less in dollar terms. The Turkish, Hungarian, and Polish equity markets continued to perform poorly, sustaining new losses. The Czech Republic and Poland experienced increased political tension with Russia. Because of Turkey's increased political uncertainty, high correlation with troubled Western economies, and dependence on short-term financing, its financial markets were especially vulnerable in the second quarter. Consequently, Turkey's market experienced the highest losses.

### Asia Pacific

In the second quarter, Asia Pacific (APAC) equities again tracked the performance of U.S. equities, rebounding first and then losing steam toward the end of the second quarter. The MSCI Asia Pacific Index (MXAP) was down 13.3% in the first half of 2008, compared to the 12.8% loss of the S&P 500 Index (SPX). The key risk for APAC equities continues to be the U.S. slowdown. Sentiment in Asia is still dominated by the concerns that a U.S. slowdown is going to impact revenue and earnings growth in the region. At the same time, rising inflation is limiting the ability of many Asian governments to cut interest rates to boost growth. While all major benchmark indexes in Asia Pacific are negative for the year, strong local currencies in some countries have offset some of the losses in the equity markets for U.S. dollar-based portfolios. This has been the case in Japan, Australia, Taiwan, and Singapore. On the other hand, some Asian currencies have depreciated against the U.S. dollar so far this year. For example, the Indian rupee (INR) is hurt by the poor equity performance as foreign investors sold Indian stocks. Among APAC countries, there have been fairly strong mean-reverting performances in APAC equity markets so far this year. Markets that performed the best in the past couple of years, such as China, India, and Vietnam, have been the worst performers so far this year. On the other hand, previous losers, such as Japan, have taken a much smaller hit this year thanks to lower valuations and lower expectations.

### Latin America

Latin American markets, as a whole, were one of the few bright spots in the world during the second quarter as solid profits, a buoyant economy, improved creditworthiness, and sky-rocketing commodity prices all converged to push up major equity indices, while currencies continued their strengthening trend against the U.S. dollar (USD). Indeed, the major regional equity benchmark gained more than 6% in the quarter, although it was significantly off from highs recorded in May. Brazil especially has benefited from very favorable domestic and global fundamentals, as the country was awarded investment grade by two agencies in the second quarter, while oil and other commodities improved the bottom lines of the heaviest-weighted stocks in the Bovespa index. Nevertheless, the markets were very volatile and subject to both internal factors (specifically inflation and monetary policy, but also a peak in economic activity growth) and external concerns, mostly from the liquidity crunch in the United States and its impact on global commodity demand. As for the other regional giant, Mexico, the economy showed signs of resilience, albeit below regional average results, in the wake of continued uncertainties north of the border. Equity markets focused on the negative situation in the United States, as well as external supply shocks that have crimped the bottom line of many Mexican industrial manufacturers. Monetary policymakers in the region exercised increased independence in the face of a mounting inflationary threat in most major countries, continuing the tightening cycle begun last year or early this year. Brazil raised rates by 100 basis points to cool domestic demand, while authorities in Colombia, Mexico, Chile, and Peru also found it prudent to bring CPI back into the target range (which exceeds the target substantially in all of those countries). Local bond yields rose in response, especially on the short end, but sovereign spreads for global bonds remained tight, pointing to a secular change in the economic structure and sustainability during these trying times for the higher-rated sovereigns, although not for the lesser-rated ones. Overall, the region once again proved resilient even as uncertainties mounted abroad.

### Middle East/Africa

Middle Eastern markets continued to perform fairly well during the second quarter, despite the global economic weakness that has negatively affected markets throughout other regions. The economic fundamentals that drive the Middle East markets remained solid throughout the quarter as most of its economies do not carry any significant correlation with the Western economies. Therefore, the region continued to experience attractive growth in key economies despite ongoing inflation woes. Inflation continued to increase in most Gulf Cooperation Council (GCC) countries, but was most pronounced in Qatar and the United Arab Emirates (UAE), where consumer price growth is well in excess of 10%. Pricing pressures have been generated from a variety of sources. Additionally, concerns remained centered around the weakness in the U.S. dollar (USD) for the entire quarter, which created pressure for countries such as Qatar and Bahrain where the weak USD has contributed to imported inflation. Due to the region's dramatic increase in wealth as a result of high and sustained oil prices, regions such as the Gulf Cooperation Council (GCC) continued to contend with worrisome high inflation throughout the quarter as result of increased price pressures in housing, food, rent, and currency pegs to the ailing dollar, which has driven up import costs. Nonetheless, investment opportunities into this region have continued to grow with projects worth more than $931 billion currently underway. Additionally, some of the indexes in the region have also experienced exceptional growth within the first half of 2008; however, risk aversion remains high.

## MARKET OUTLOOK

### United States/Canada

Equity markets have plunged in the first two quarters of the year, but the outlook carries a much more upbeat tone. Valuations are low by historical standards, and psychological indicators are providing evidence that a bottom may be forming. From a contrarian point of view, several data points indicate the bad news for the market as of late should be good news for the longer-term health of equities. For example, consumer confidence has hit a historical low, and contrarian studies show that very low confidence points to above-average equity returns for the coming 12 months. Additionally, the jump in unemployment in recent months also carries high correlation with positive equity market returns. Economic variables tend to lag equity market conditions. If the economy is expected to find its footing in the first half of next year, the stock market should begin to signal that turnaround in the coming quarter. The Federal Reserve is likely on hold from an interest rate standpoint, which should allow previous rate cuts to permeate the monetary system. If some pressure from oil prices can be relieved, the market could get a spark for an extended rally to ensue for the next several quarters. The primary caveat remains the credit crisis. As long as banks continue to close their doors, both by going out of business or simply by not lending, the headlines may prove to be too large a weight for stocks to carry.

### Western Europe

Current GDP fan charts in the region are negatively skewed to the downside, while inflation forecasts are skewed to the upside. The U.K. and Spanish economies especially appear to be at risk. The region, as a whole, is still expected to grow by about 1.7% this year. Producer price inflation increased from 5.8% to 6.1% in April, which leaves a gloomy picture for core consumer price inflation going forward. The European Central Bank (ECB) is very concerned about second-round effects and will act to avoid them if necessary. The ECB will also closely monitor wage negotiations and price-setting behavior in the euro area. The central bank will therefore be data dependent when adjusting monetary policy going forward. In the central bank's view the economic fundamentals are currently sound, and according to the bank, an un-anchoring of inflation expectations would lead to a financial environment that would be adverse to growth and job creation. The current economic slowdown in the region has thus far not led the ECB to consider lowering rates. The ECB is no longer expected to start an easing cycle in the foreseeable future. Rates will likely go up in July by 25 basis points to 4.25%,

STAN INVSTR MAGNG_05055

but may remain unchanged for the rest of the year. It will likely be hard to justify a second rate hike with slowing economic activity. With everything else being equal, recent news will support the euro currency, but going forward, the global environment should favor the U.S. dollar (USD). In the near term, the delay of starting an easing cycle from the ECB could holdup a trend reversal for the USD. Additional tightening from the ECB may limit EUR weakness for the time being, but the probability of the market focusing on the future course of interest rate differentials versus specific levels is quite high, which favors the dollar. Regarding bonds, yields in the short-end of the yield curve have dramatically increased due to concern about the outlook on inflation and monetary policy, especially after hawkish comments from the ECB. The recent decline has actually caused an inverted yield curve with yields on 2-year notes above those on 10-year bonds as investors have priced in potential rate hikes. Going forward, yields may not increase much more. Resistance is visible around 4.75% and is expected to hold. Current expectations of 2 to 3 rate hikes from the ECB going forward appear exaggerated. An adjustment is therefore likely, which is leaving room for a short-term opportunity in the short-end of the yield curve. Regarding equities, sentiment is expected to remain low due to continued concern over the liquidity crisis and commodity price induced inflation hurting profit margins. While upside potential for stocks in the region appears limited going forward, the downside risk appears limited as well. Valuations in the region are looking quite attractive, but the lack of a catalyst has thus far hindered a trend reversal from the experienced losses year-to-date.

### Eastern Europe

Russia is the most attractive of all of the Eastern European countries; it has higher upside potential and lower downside risk. However, it must be noted that Russia is failing to control inflation. To protect exporters, mainly oil companies, the central bank has artificially kept the ruble undervalued. By the end of the year, inflation could reach 25% if the central bank refrains from setting policy that would allow the ruble to strengthen. However, soaring import prices, food prices in particular, cause widespread economic hardship, particularly for the large low-income segment of the population. So, soaring imported inflation may force the government to increase the value of the ruble.

Increased political tension between the Czech Republic and Poland with Russia will likely have a negative impact on the financial markets in all three countries. However, such strife will certainly hurt Poland and the Czech Republic the most. Russia has reduced its oil deliveries to the Czech Republic by almost 50% since the Czech government agreed to provide radar sites for the U.S. missile defense system. Czech officials have issued reassurances that this reduction will not derail the Czech economy, but a significant disruption with an associated trend in the equity market is expected. Poland is also negotiating an agreement to locate a missile-defense system on its territory, which makes it very vulnerable to similar treatment as it receives about 90% of its oil and almost 50% of its natural gas from Russia. Therefore, due to increased political turmoil in Poland, the Czech Republic, Hungary, and Turkey, and higher chances of the global economy sliding into recession, the financial markets in these countries are likely to remain volatile. Any strong rebound of their equity markets is unlikely in the short term. Of the economies in the region, Russia will likely be able to tolerate the global slowdown the best; its economy and equities will continue to be supported by high commodity prices since commodities represent the biggest segment of the Russian Trading Index (RTSI$).

### Asia Pacific

For the remainder of 2008, Asia Pacific's (APAC) outlook is clouded by the health of the U.S. economy, accelerating inflation in many APAC countries, and soaring energy and commodity prices. From a fundamental basis, favorable and unfavorable factors co-exist in the region. Strong economic growth and moderate valuations should support APAC equities, but earnings contraction is a major risk in the region. Asian equities are feeling the squeeze from multiple factors, including weakening demand due to a U.S. slowdown, high commodity prices, higher borrowing costs, and high inflation, which paralyzes major central banks. From a technical standpoint, snap-back rallies in APAC equities could occur given the oversold condition. However, the previous uptrend has been broken. A downward shift in the Relative Strength Index (RSI) range could also indicate declining momentum in the region. Most importantly, external factors could easily over-power internal factors in the short term. The region's equity markets most likely will continue to be driven by U.S. equity movement in the short term. If oil prices decline from the current level or if U.S. inflation concerns subside, the U.S. equity markets could have a nice rebound, triggering an impressive rally in APAC equities. On the other hand, any further weakness in U.S. equities could send APAC equities down significantly. Finally, it is still attractive to use themes such as infrastructure, commodities, water, and agriculture as ways to play the secular Asia Pacific growth.

### Latin America

Going into the second half of the year, from a medium- to long-term perspective, Latin America continues to be in a very strong position to capitalize on the changing dynamics of the global economy and its domestic market as well. Nevertheless, our short-term outlook has become more cautious due to a wide array of factors that could combine to create a formidable headwind for the next few months. First, and perhaps most importantly, the renewed worries in the global financial markets in June remind us that the problems in the credit market have not been laid to rest. Although Latin America has been relatively immune to contagion over the past year, it will likely be increasingly more difficult for the region to remain so and decouple if the situation is prolonged. The current round of credit fears will also inject more volatility, especially in Brazil, which has high international investor exposure. On a related issue, the extreme volatility of energy prices in the second quarter, attentive to demand globally, will likely continue into the third, which will have a profound effect on Brazil. Strangely, in the second quarter, in days that oil fell and U.S. stocks rose on the news, Brazilian indexes lost ground. Therefore, a correction in oil could pose a significant short-term risk. Secondly, economic activity for the region as a whole, although not declining, does not appear to be gaining any steam either, limiting earnings growth for this year as well. Finally, inflation has become the number one concern for policymakers in the region, and tightening will likely continue in most if not all major countries. Monetary stability is extremely positive for regional long-term valuations, but higher rates do create some resistance for the equity market, especially in the banking and retail sectors, while local bond prices will also erode. If prices do not show signs of cooling by the end of the third quarter, the tightening campaign will likely continue into 2009, further deteriorating local bond prices and potentially stocks as well. However, strong solvency ratios and ample amounts of liquidity make global bonds more attractive from a fundamental level, and further credit ratings upgrades are likely by year-end. Overall, our short-term outlook is for caution, but our positive long-term view remains solidly intact.

### Middle East

The fundamentals in the Middle East reveal a basis for good investment activity throughout the remainder of this year. Therefore, most markets should continue to experience positive growth as economic development increases in both public and private sectors. The region continues to display a good amount of resilience capped by massive liquidity that gives government officials and policymakers significant flexibility to manipulate the markets and policy in order to withstand external shocks and stimulate growth. The region currently has a combined nominal GDP of approximately $1.2 trillion, which is approximately 2.6 % of global GDP. The financial power that comes as a result of energy profits due to world demand continues to give the Middle East a huge coffer from which to draw. Therefore, high growth expectations are anticipated for a number of years due to elevated crude oil prices boosting staggering revenues, which ultimately creates huge fiscal and current account surpluses in oil-producing countries.

S T A N F O R D   I N T E R N A T I O N A L   B A N K ,   L T D .

3

**STAN INVSTR MAGING_05056**

## PORTFOLIO ADJUSTMENTS

Financials were by far the worst performer for the second quarter. A defensive strategy was utilized by focusing on preferred issues and non-U.S. banks. Financials may be volatile for the next quarter or two, so we lowered the exposure to this group to see if we could pick up better opportunities later. Energy was by far our strongest performer for the quarter, helping to neutralize the portfolio's exposure to financials. Longer-term, this group should continue to be a strong performer due to above-average growth from India and China. From a valuation standpoint, most of the energy related stocks are trading as if oil was at $70 a barrel. This valuation gap should close going forward. Technology exposure rose slightly during the quarter. Firms specializing in solar cells look attractive at current levels and offer above-average returns going forward. We slightly lowered our Healthcare allocation due to rebalancing. However, this area still remains one of our favorites going forward due to attractive valuations and improving demographics. No changes occurred to Retail as we are becoming increasingly bearish on the group. It will be hard for consumers to make unnecessary purchases with oil at more than $130 per barrel. The Service allocation slightly decreased during the quarter due to several stocks hitting our profit targets.

The proceeds from these were redirected to areas we felt offered better value. Exposure was increased to the Cyclical & Defense area. This group is producing strong free cash flow, and it would not be surprising to see some merger and acquisition activity within the group. The portfolio's exposure to Staples was also increased as more of a defensive play due to slowing growth in the United States and abroad. The "Other" allocation slightly decreased during the quarter. As for Currency allocations, we increased exposure to the U.S. dollar (USD). The USD is extremely oversold at this juncture, and if the European Central Bank (ECB) gives any hints to a rate reduction in Europe, a new bull market for the USD could develop. The Metals allocation preformed well during the quarter; however, there was some disappointment overall. This group should have performed even better due to tension in the Middle East. Alternatives were a strong performer during the quarter, especially the funds that took up short positions in the markets earlier in the year. Overall, the portfolio performed considerably well based on market conditions. The portfolio's cash position is strong, and we plan to put this money to work as the year unfolds. Energy, Agriculture, Basic Materials, and Healthcare remain our favorite themes for the year.



**Product Allocations**
- Equity 51%
- Fixed Income 17%
- Metals 7%
- Alt. Investments 15%
- Cash/Equivalents 10%

**Currency Allocations**
- British Pound 2%
- Yen 3%
- Other 5%
- Euro 12%
- Swiss Franc 4%
- Australian Dollar 3%
- U.S. Dollar 71%

**Sector Allocations**
- Utilities 2%
- Other 11%
- Financials 17%
- Energy 15%
- Tech 11%
- Health 14%
- Retail 4%
- Services 8%
- Cyclical/Def 11%
- Staples 7%

**Alternative Investment Strategies**
- Futures & Derivatives Arbitrage 4%
- Long-Short Equity 29%
- Other 5%
- Global Macro 35%
- Event-Driven 12%
- Fixed Income Arbitrage 5%
- Convertible Arbitrage 10%

## FINANCIAL & ECONOMIC HIGHLIGHTS

**Treasury Bond Yields (6/30/08)**

| | |
|---|---|
| 2 yr. | 2.620% |
| 5 yr. | 3.329% |
| 10 yr. | 3.971% |
| 30 yr. | 4.525% |

**Index Returns (Percent Change YTD as of 6/30/08)**

| | |
|---|---|
| Dow Jones Industrial Average | -14.4353% |
| Dow Jones Stoxx 50 (Europe) | -21.1025% |
| NASDAQ 100 Stock Index | -11.8872% |
| S&P 500 | -12.8279% |

**SIBL Flex CD Rates (as of 6/30/08) (Based Upon $100,000 Deposits)**

| | |
|---|---|
| 3M. | 2.250% |
| 6M. | 3.250% |
| 1yr. | 4.500% |
| 3yr. | 5.375% |

**\*SIBL Data (6/30/08)**

| | |
|---|---|
| Total Assets | $8,102,870,766 |
| Total Net Worth | $406,076,250 |
| Year-to-Date Earnings | $16,154,489 |
| Investment Portfolio | $8,002,584,751 |

**Interest Rates (6/30/08)**

| | |
|---|---|
| 3M. LIBOR Fixed | 2.783% |
| 6M. LIBOR Fixed | 3.109% |
| 1yr. LIBOR Fixed | 3.311% |
| Prime Rate | 5.000% |

\* Unaudited figures are subject to adjustment.

— DISCLAIMER FOR RESEARCH —

The views expressed herein represent the individual author's personal opinions and are not and should not be construed as the opinions of Stanford International Bank, Limited, its agents, officers, directors or shareholders or any one of its affiliated companies. The authors have relied on sources, which are generally reliable; however, no representations or assurances can be made as to their validity.

Any opinion stated herein does not necessarily reflect the opinions and investment strategy of Stanford International Bank, Limited. There is no guarantee that any positions, investments or strategies set forth herein will remain the same after the date of this publication. In addition, past performance is not a guarantee of future results.

4

STANFORD INTERNATIONAL BANK, LTD.

# APPENDIX O



### INTERNATIONAL PRIVATE BANKING

STANFORD INTERNATIONAL BANK LTD.

Plaintiff's
Exhibit

492

STAN INVSTR GENL_032562

### STANFORD FINANCIAL GROUP

*Stanford Financial Group is a privately held, wholly owned global group of independent financial services companies founded in 1932 by Lodis B. Stanford, grandfather to the current sole shareholder Sir Allen Stanford. Stanford's core businesses are private wealth management and investment banking for institutions and emerging growth companies. Stanford provides private and institutional investors with global expertise in asset allocation strategies, investment advisory services, equity research, international private banking and trust administration, commercial banking, investment banking, merchant banking, institutional sales and trading, real estate investment and insurance. Stanford serves clients from over 100 countries on six continents.*

*Stanford International Bank is a member of Stanford Financial Group.*

**STAN INVSTR GENL_032563**



STAN INVSTR GENL_032564

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.



Stanford International Bank Ltd. conducts business with the world from its headquarters in Antigua. As a member of the Stanford Financial Group, the Bank adheres to business principles grounded in 75 years of proven financial success. Today, Stanford International Bank serves a worldwide community of affluent individuals and their families. Our unique private banking business model provides for the preservation of capital in an atmosphere of professionalism and trust.

Stanford International Bank offers the following advantages:

- Depositor security

- Higher interest rates on deposits

- Secure electronic account access

- Ancillary services

- Five-star personal service

- Innovative products

2

STAN INVSTR GENL_032565



## DEPOSITOR SECURITY

Our investment philosophy is anchored in time-proven conservative criteria, promoting stability in our certificate of deposit products. Our prudent approach and methodology translate into deposit security for our customers.

Key components of Stanford International Bank's investment criteria include:

Liquidity. We focus on maintaining the highest degree of liquidity as a protective factor for our depositors. The Bank's assets are invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks.

Investment Time Horizons. By continuously matching investment time horizons against terms of deposits we are able to ensure adequate liquidity to meet all customers' requirements.

3

STAN INVSTR GENL_032566



STAN INVSTR GENL_032567

### STANFORD INTERNATIONAL BANK LTD.

**Global Investment Strategy.***  Stanford International Bank's global investment strategy minimizes exposure to any one regional market by broadly distributing our investments across many geographic areas.

**No Credit Risk.***  Stanford International Bank does not expose its customers to the risks associated with commercial loans. Our only form of lending is done on a cash-secured basis solely to existing customers.

**Insurance.**  Stanford International Bank maintains a comprehensive insurance program with the following coverages:

- A depository insolvency policy insuring funds held in correspondent financial institutions
- A bankers' blanket bond
- A directors' and officers' liability policy

**Minimization of Currency and Market Risk.***  While the values of international investments can be affected by changes in currency rates and market risk, we minimize these risks by adhering to our investment philosophy.



*"Stanford International Bank's global investment strategy minimizes exposure to any one regional market..."*

\* Investing in securities issued by international governments and corporations involves considerations and risks not typically associated with investing in obligations issued by the U.S. Government and U.S corporations. The values of international investments can be affected by changes in currency rates or exchange control regulations, application of international tax laws, changes in governmental administration or economic or monetary policy, or changed circumstances in dealings between nations. Forces of supply and demand on the foreign exchange markets determine international currency change rates. These forces are themselves affected by the international balance of payments and other economic and financial conditions, government intervention, speculation and other factors. Moreover, foreign currency exchange rates may be affected by the regulatory control of the exchanges in which the currencies trade. Investments in foreign markets can be affected by factors such as expropriation, confiscation, taxation, lack of uniform accounting and auditing standards. and potential difficulties in enforcing contractual obligations and investment policies, and may be affected by extended settlement periods.

\*\* Conservation of principal and interest rates on the CD deposits are dependent upon returns in our investment portfolios. Depending upon the climate in global investment markets, we utilize various investment strategies for the Bank's portfolios, which may include fixed income, equities and currencies. The returns on the Index-Linked CD will also be affected by the Market Index you choose. If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD.

5

STAN INVSTR GENL_032568

STANFORD INTERNATIONAL BANK LTD.

# HIGHER INTEREST RATES ON DEPOSITS

Stanford International Bank pays higher interest rates to depositors for the following reasons:



Consistent Profitability. Stanford International Bank has been consistently profitable since inception. Rather than pay dividends to shareholders on earnings, our business model was designed to use these resources to enhance interest rates to depositors.

Global Investments.* Diversified global investments, not loans, are the primary source of Bank earnings. Interest rates paid to depositors are based on reasonable investment return expectations and are reviewed quarterly by the board of directors.

*"Interest rates paid to depositors are based on reasonable investment return expectations..."*

Low Overhead. We minimize operational costs and streamline administrative processes by staying true to our core competency—private banking. The Bank also benefits through operational synergies already in place within the Stanford Financial Group.

* Investing in securities issued by international governments and corporations involves considerations and risks not typically associated with investing in obligations issued by the U.S. Government and U.S. corporations. The values of international investments can be affected by changes in currency rates or exchange control regulations, application of international tax laws, changes in governmental administration or economic or monetary policy, or changed circumstances in dealings between nations. Forces of supply and demand on the foreign exchange markets determine international currency exchange rates. These forces are themselves affected by the international balance of payments and other economic and financial conditions, government intervention, speculation and other factors. Moreover, foreign currency exchange rates may be affected by the regulatory control of the exchanges in which the currencies trade. Investments in foreign markets can be affected by factors such as expropriation, confiscation, taxation, lack of uniform accounting and auditing standards, and potential difficulties in enforcing contractual obligations and investment policies, and may be affected by extended settlement periods.

6

STAN INVSTR GENL_032569

S T A N F O R D   I N T E R N A T I O N A L   

**Zero Tax Jurisdiction.** Our domicile does not tax earnings. This results in more available profit for reinvestment and the enhancement of depositor yields.

**No Loan Losses.** By making only cash-secured loans to its existing customers, the Bank eliminates credit risks and the negative impact on earnings due to loan losses.

**Greater Investable Assets.** More than 90% of the Bank's own equity position supplements investable assets, improving our income-producing capabilities.

\* Conservation of principal and interest rate on the CD deposits are dependent upon returns in our investment portfolio. Depending upon the climate in global investment markets, we utilize various investment strategies for the Bank's portfolios, which may include fixed income, equities and currencies. The returns on the Index-Linked CD will also be affected by the Market Index you choose. If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD.

7

56

STAN INVSTR GENL_032570

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

### INTEREST RATES 1997 – 2006



| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%)* | 10.73 | 9.25 | 8.71 | 9.65 | 8.73 | 7.77 | 6.39 | 6.91 | 6.57 | 7.13 |
| U.S. Yield (%)** | 5.11 | 5.3 | 4.3 | 5.85 | 3.56 | 1.85 | 1.30 | 1.7 | 4.4% | 5.08 |

Source: Bloomberg L.P.

<span style="background:#e8dcb0">▮</span> **Stanford International Bank CDs*** (not FDIC Insured)

<span style="background:#6b6b3a">▮</span> **U.S. Bank CD Averages*** (FDIC-Insured)

*Over the past decade,*
*Stanford International Bank*
*CDs have outperformed*
*U.S. bank CDs by an*
*average of 3.9%*

### PERFORMANCE 1997 – 2006



The above graphics are based on a $1,000,000 deposit invested for 12 months and renewed annually. The information herein has been obtained from sources we believe to be reliable, but we do not offer guarantees as to its accuracy or completeness. Past performance is not a guarantee of future results. All information is subject to change without notice.

* Stanford International Bank Limited CDs are not FDIC-Insured and are not subject to regulation or oversight of any agency of the U.S. government, nor are they subject to any restrictions on how portfolios are invested.

** U.S. Bank CDs are FDIC-Insured and are subject to regulation by an agency of the U.S. government.

8

57

STAN INVSTR GENL_032571

STANFORD INTERNATIONAL BANK LTD.

## SECURE ELECTRONIC ACCOUNT ACCESS

Stanford International Bank offers customers access to their account information 24 hours a day, 365 days a year through our private, password-protected website. We continue to work toward making customer access easier, while maintaining the optimum level of privacy and security.

Our customer-only site will always utilize the most advanced firewall software and encryption technologies available in the financial services industry. This helps ensure the privacy upon which Stanford International Bank has built its reputation. We invite both existing and prospective customers to visit our public website **stanfordinternationalbank.com**.



## ANCILLARY SERVICES

Our high-performance accounts and respect for customer privacy are supplemented by a range of ancillary services available to depositors. These include hold-mail and automatic bill paying, available upon request.

The Bank also issues some of the world's most respected payment instruments: American Express® Gold Card*, Visa® Gold Card and Gold MasterCard.*

*"... access to account information 24 hours a day, 365 days a year ..."*

* Offered only to non-U.S. residents.

9

STAN INVSTR GENL_032572

STANFORD   INTERNATIONAL   BANK   LTD.



*"Your Stanford private wealth manager can help you diversify into a range of wealth management strategies..."*

## FIVE-STAR PERSONAL SERVICE

Our Bank was established with a personal service perspective from the very beginning. Individualized attention and a true commitment to depositor needs are standard operating procedure at Stanford International Bank.

Integrity defines our environment, and a firm adherence to an elevated code of values is built into our customer service initiatives. Our private wealth managers speak your language, understand your concerns and discreetly execute your instructions.

Your Stanford private wealth manager can help you diversify into a range of wealth management strategies through our affiliation with the Stanford Financial Group. Expert planning is available in brokerage and investment advisory services, trust administration and insurance.

We invite you to contact us by calling (268) 480-3700.

10

STAN INVSTR GENL_032573

STANFORD INTERNATIONAL BANK LTD.

# INNOVATIVE PRODUCTS

| ACCOUNT[1] | CURRENCY | WITHDRAWALS | ADDITIONAL DEPOSITS | KEY BENEFITS |
|---|---|---|---|---|
| **FIXEDCD**[SM (2,4)]<br>*fixed-rate term deposit*<br><br>3 months<br>6 months<br>12 months<br>18 months<br>24 months<br>36 months<br>48 months<br>60 months | U.S. dollars<br>Euros<br>Other international currencies | None allowed. Interest accumulates and is paid upon maturity[8]<br><br>Interest may be withdrawn[8] | None allowed | Attractive CD rates<br><br>If base rate goes up, eligible balances[7] receive the higher rate<br><br>If base rate goes down, clients receive the original base rate until maturity<br><br>Interest compounded daily<br><br>Automatic rollover |
| **FLEXCD**[SM (2,4)]<br>*fixed-rate term deposit*<br><br>3 months<br>6 months<br>12 months<br>18 months<br>24 months<br>36 months<br>48 months<br>60 months | U.S. dollars<br>Euros<br>Other international currencies | Up to 25% of principal with 5 banking days' notice, with a maximum of 4 withdrawals per calendar year[6] | Allowed (minimum amount required) | Attractive CD rates with added level of flexibility<br><br>If base rate goes up, eligible balances[7] receive the higher rate<br><br>If base rate goes down, clients receive the original base rate until maturity<br><br>Interest compounded daily<br><br>Automatic rollover |
| **INDEX-LINKED CD**[SM (2,9)]<br><br>3 years<br>4 years<br>5 years | U.S. dollars only | Not allowed for the first 12 months; thereafter, withdrawals allowed subject to penalties[5] | None allowed | Fixed attractive minimum return on investment[8]<br><br>High growth potential[9]<br><br>Preservation of capital |
| **PERFORMANCE**[SM]<br>*adjustable-rate*<br>*open-term account* | U.S. dollars<br>Euros<br>Other international currencies | Any amount<br>Requires 15 calendar days' notice | Any amount, at any time | Adjustable rate of return with easy access to funds<br><br>Interest compounded daily |
| **PREMIUM**[SM]<br>*adjustable-rate*<br>*open-term account* | U.S. dollars only | Any amount<br>Requires 15 calendar days' notice | Any amount, at any time | Adjustable rate of return with easy access to funds<br><br>Offers yields equivalent to the performance of selected U.S. Treasury bills and notes<br><br>Interest compounded daily |
| **EXPRESS**[SM]<br>*adjustable market-rate*<br>*open-term account (offered*<br>*as a supplementary*<br>*account to Stanford*<br>*International Bank clients)* | U.S. dollars<br>Euros<br>Other international currencies | Any amount<br>Within 24 hours of notification during regular banking days | Any amount, at any time | 24-hour access<br><br>Market-rate interest on qualifying balances[10]<br><br>Interest compounded daily |

(1)  This information should not be considered an offer. Please contact your Stanford International Bank representative for current account terms and conditions.

(2)  For the U.S. Accredited Investor Program, a minimum opening balance of $50,000 is required.

(3)  These CD deposits are subject to restrictions on transferability and resale and, in the U.S., may not be transferred or resold except as permitted under the Securities Act of 1933, as amended, and the applicable state securities laws, pursuant to registration or exemption therefrom. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.

(4)  For the U.S. Accredited Investor Program, early withdrawal penalties can range from one to three month's interest, depending on the term of the CD. For the FlexCD, penalties will be assessed on withdrawals greater than 25%.

(5)  For the U.S. Accredited Investor Program, the redemption price is the current market value of the investment index calculation less a penalty of 10%.

(6)  Minimum balance required.

(7)  For the U.S. Accredited Investor Program, eligibility is based on a minimum balance of $250,000.

(8)  Interest is paid only at maturity, but may be subject to income taxes in the year it was earned but not received, depending on the tax laws in your jurisdiction.

(9)  Returns will be affected by the Market Index you choose and its volatility.

(10)  Or currency equivalent.

11

STAN INVSTR GENL_032574

STAN INVSTR GENL_032575

*Stanford International Bank Limited ("SIB") is a private financial institution chartered under the laws of Antigua and Barbuda whose deposits are not covered by deposit insurance protection provided by the U.S. Federal Deposit Insurance Corporation.*

*SIB's products are ordinary bank deposit obligations and are not securities under U.S. federal or any state law. Therefore, they are not subject to the reporting requirements of any jurisdiction outside of Antigua and Barbuda, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation or the bonding requirements thereunder. There is no guarantee investors will receive interest distributions or the return of their principal.*

*Stanford Group Company may offer SIB CDs to its clients and receive a referral fee from SIB. Referral fees paid do not reduce the principal amount of any CD deposits or any interest earned therein. Investors who are residents of the U.S. must be accredited investors and may receive this material only when preceded or accompanied by the Disclosure Statement for SIB's U.S. Accredited Investor Certificate of Deposit Program which fully discloses the potential benefits and risks of the investment.*



**Stanford International Bank Ltd.**
A member of the Stanford Financial Group.

**Stanford Group Company**
Member FINRA and a member of the Stanford Financial Group.

STAN INVSTR GENL_032576



Stanford International Bank Ltd.
No. 11 Pavilion Drive • St. John's, Antigua, West Indies
Tel. 208.480.3700 • Fax 268.480.3737

Stanford Group Company
Member FINRA
5050 Westheimer • Houston, Texas 77056
713.964.8300

stanfordfinancialgroup.com

Members of the Stanford Financial Group.

STAN INVSTR GENL_032577

# APPENDIX P

**From:** Espy, Tom [TEspy@StanfordEagle.com]
**Sent:** Sunday, July 27, 2008 6:17 PM
**To:** Tonya Dokken; Brian Kaufman
**Subject:** FW: SIBL Notice / Comunicado de SIBL

FYI, Tom

**Thomas P Espy**
**Managing Director**
Stanford Group Company
1700 Lincoln St. # 3000
Denver, CO, 80203
303-378-1988

---

**From:** SIBTrainingCenter
**Sent:** Friday, July 25, 2008 12:17 PM
**To:** Cespedes, Monica A.; Financial Advisors Caribbean; Financial Advisors Europe; Financial Advisors Latin America; Financial Advisors North America; Gonzalez, Scarlett; Khouly, Maya; Rocha, Nancy; Rodriguez-Tolentino, Juan; Roman, Jennifer; Tonarelli, Oreste; Belizaire, Patricia; Davis, Sonia; Harris, Kevin; Jacobs, Beverly; Lindsay, Joycelyn; Matthew, Eloise; Persaud, Bhanoo; Roberts, Ditchie; Rodriguez, Pedro; Sheppard, Lornette
**Subject:** SIBL Notice / Comunicado de SIBL

On behalf of the Chairman and the Board of Directors of the Stanford International Bank, I am extremely pleased to inform you that the Bank has sustained the largest half year growth in its history.

In the midst of turbulent world economic conditions, falling markets and unending news of collapsing financial institutions, Stanford International Bank Ltd has reached total of $8.1 billion in assets as of June 30, 2008.  The $1 billion increase over the past six months represent a 14.8% increase in total assets and met our most optimistic expectations.  Additionally, more than 4,000 new accounts have been opened during that period, totaling a growth of $989 million, another milestone for Stanford International Bank.  The commitment of the shareholder to our bank's growth and continued stability was evidenced by an injection of $35 million in capital in February 2008. Our earnings for the first six months of the year totaled $16.2 million.  Looking forward to the second half of 2008, we remain confident and optimistic that we will achieve our financial targets.

This record setting six month period serves as a testament to the visionary business strategy of our Chairman and Board of Directors and the phenomenal expertise and professionalism of the Stanford International Bank team. Our motto of "hard work, clear vision, and value for the client" is alive and well at the SIB. As we strive for world-class performance across every aspect of our operations, I remain optimistic about the continued success of our business during the rest of the year and beyond and look forward to meeting the new challenges ahead.

*Please find attached SIBL's mid year Statement of Condition, which is also available on the bank's Internet page and on our Intranet.  The SIBL Quarterly Update as of June 30, 2008 will be available very soon.*

En nombre del Presidente y de la Junta Directiva de Stanford International Bank, me complace enormemente informarles que el banco ha alcanzado el crecimiento más grande semestral de su historia.

En medio de una turbulenta situación económica mundial, desplome de mercados e interminables noticias de instituciones financieras en dificultades, Stanford International Bank Ltd ha alcanzado un total de $8.1 mil millones de activos a junio 30 de 2008.  El incremento de $1,000 millones en los últimos 6 meses representa un aumento del 14.8% de activos totales, el cual alcanzó nuestras expectativas mas optimistas. Adicionalmente, durante este periodo se abrieron más de 4,000 cuentas nuevas, dando un total de $989 millones en crecimiento, lo cual representa aun otro triunfo para Stanford International Bank. El compromiso de los accionistas en cuanto al crecimiento y a la continua estabilidad del Banco, fue confirmado con la inyección de $ 35 millones de capital en Febrero 2008. Nuestras utilidades durante el primer semestre del año han alcanzado $ 16.2 millones. Mirando hacia el segundo semestre del 2008, nos sentimos confiados y optimistas de poder alcanzar nuestras metas financieras.

Este récord semestral sirve como testamento de la visionaria estrategia de negocios de nuestro Presidente y de la Junta Directiva, además de la extraordinaria experiencia y profesionalismo del grupo de Stanford International Bank.  Nuestro lema de "dedicación al trabajo, visión clara y aprecio hacia el cliente" está vivo y rebosante en SIB.  En nuestro afán por un desempeño de primera clase en todos los aspectos

operativos, me mantengo optimista en cuanto a nuestro continuo éxito del Banco durante el resto del año y en el futuro, y estoy preparado para enfrentar nuevos desafíos.

*Sírvanse encontrar en el anexo el Balance de SIBL a medio año, el cual también está disponible en la pagina de Internet del banco y en nuestro Intranet. El Reporte de Actualización Trimestral de SIBL a Junio 30 de 2008 estará disponible muy pronto.*

Regards,

JRT

Any information or data provided in this message has been obtained from sources we believe to be reliable, but we do not guarantee its accuracy or completeness. Such information reflects current market conditions, is subject to change without notice and should not be relied upon for tax purposes. Any transactional details are provided at your request and do not supersede your normal trade confirmations or monthly statements. Any product recommended is subject to prior sale. Stanford Group Company, its affiliated companies, and/or officers, directors or employees, may at times have a position in or make a market in any security described above, and/or may act as an investment banker or advisor to any company referenced. Stanford Group Company reserves the right to monitor and review the content of all e-mail communications sent and/or received by its employees. Stanford Group Company does not accept time-sensitive transactional messages, including orders to buy and sell securities, via e-mail. This information is intended to be confidential and solely for the use of Stanford Group Company and those persons or entities to whom it is directed. It is not to be reproduced, retransmitted, or in any other manner redistributed. If you received this message in error, please contact Stanford Group Company immediately at 800-958-0009.

2008

STANFORD INTERNATIONAL BANK
FINANCIAL STATEMENTS
STATEMENT OF CONDITION

STANFORD

STANFORD BRYANT 002570

Hard work. Clear vision. Value for the client.

STANFORD BRYANT 002571

# FINANCIAL HIGHLIGHTS

*(Expressed in United States dollars)*

| | June 2008 | December 2007 |
|---|---|---|
| **ASSETS** | | |
| Cash and Balances with Other Banks | $   778,850,728 | $   627,822,483 |
| Financial Assets at Fair Value | 7,223,734,023 | 6,347,631,574 |
| Loans and Advances to Clients | 88,709,460 | 69,732,601 |
| Property and Equipment | 7,220,418 | 6,910,778 |
| Other Assets | 4,356,137 | 5,785,277 |
| TOTAL ASSETS (see Figure 1) | $ 8,102,870,766 | $ 7,057,882,713 |
| | | |
| **LIABILITIES AND SHAREHOLDER'S EQUITY** | | |
| Deposits from Clients | 7,678,769,572 | 6,689,964,303 |
| Other Liabilities and Provisions | 18,024,944 | 12,996,649 |
| TOTAL LIABILITIES | $ 7,696,794,516 | $ 6,702,960,952 |
| | | |
| Share Capital | 10,000,000 | 10,000,000 |
| Share Premium | 138,500,000 | 103,500,000 |
| Retained Earnings | 257,576,250 | 241,421,761 |
| TOTAL SHAREHOLDER'S EQUITY (see Figure 2) | $   406,076,250 | $   354,921,761 |
| | | |
| TOTAL LIABILITIES AND SHAREHOLDER'S EQUITY | $ 8,102,870,766 | $ 7,057,882,713 |

**Figure 1 TOTAL ASSETS**
Dollars (in billions)

| DEC 2006 | JUN 2007 | DEC 2007 | JUN 2008 |
|---|---|---|---|
| 5.3 | 6.2 | 7.1 | 8.1 |

**Figure 2 SHAREHOLDER'S EQUITY**
Dollars (in millions)

| DEC 2006 | JUN 2007 | DEC 2007 | JUN 2008 |
|---|---|---|---|
| 311 | 333 | 355 | 406 |

STANFORD BRYANT 002572

## STANFORD
### STANFORD INTERNATIONAL BANK LTD.
A MEMBER OF THE STANFORD FINANCIAL GROUP

**BOARD OF DIRECTORS:**

**Sir Allen Stanford**
Chairman of the Board

**James A. Stanford**
Chairman Emeritus

**Sir Courtney N. Blackman, Ph.D.**
Vice Chairman

**James M. Davis**
Chief Financial Officer

**O. Y. Goswick**
Investments

**Kenneth O. Allen, Q.C.**
Secretary and Treasurer

**Robert S. Winter**
Insurance

**BANK MANAGEMENT:**

**Juan Rodriguez Tolentino**
President

**Miguel Pacheco**
Senior Vice President

**Eugene Kipper**
Vice President

**Beverly M. Jacobs**
Vice President

**Bhanoo P. Perssaud, ACCA**
Accounting/Finance

**SENIOR OFFICER:**

**Pedro E. Rodriguez, LRCM**
Vice President,
Senior Compliance Officer

**BANK REPRESENTATIVE OFFICE:**

**Alam Lapointe**
Senior Vice President

**AUDITORS:**

**C. A. S. Hewlett & Co. Ltd.**
Chartered Accountants
St. John's Street, St. John's, Antigua

**BARRISTERS AND SOLICITORS:**

**Bowen, Miolette & Britt, Inc.**
P.O. Box 922622
Houston, Texas 77090

**Wells Limited**
London, United Kingdom

**Hunton & Williams**
Miami, Florida 33131

No. 11 Pavilions Drive, P.O. Box 55045 | St. John's, Antigua, West Indies | Phone 268.480.3700 | STANFORDINTLBANK@STANFORDEAGLE.COM

# APPENDIX Q

**AGENDA**

**Annual Meeting of the**
**Investment Committee**
**Of**
**Mango Five Family, Inc.**

Date:        December 5, 2008
Location:   Las Vegas, Nevada
Time:        Following Meeting of Board of Directors

1.    Approval of minutes of October 1, 2008 meeting.

2.    Report on diversification of Liberty and affiliates.

3.    Report on pay-down of debt.

4.    Report on investment of diversification proceeds.

5.    Report on Stanford Certificates of Deposit.

6.    Report on material receipts and disbursements.

7.    Report on Fortrust.

8.    Report on significant fiduciary activities from October 1, 2008 through November 30, 2008 (the "Reporting Period).

9.    Report on ranch operations.

10.   Miscellaneous items.

11.   Adjournment.

102568539.1

CONFIDENTIAL

MAGNESS002836

MINUTES OF THE ANNUAL MEETING
OF THE INVESTMENT COMMITTEE
OF MANGO FIVE FAMILY, INC.
December 5, 2008

The annual meeting Investment Committee for all of the trusts administered by Mango Five Family, Inc., a Nevada corporation (the "Corporation") was held in Las Vegas, Nevada, commencing at 9:30 a.m. Pacific Standard Time ("PST") on December 5, 2008. Present and in person were member, Gary Magness, and advisors, Raymond L. Sutton, Jr. and Steven Knudson; Tonya Dokken, Chief Financial Officer of Magness Investment Group, LLC; and Thomas Espy, investment advisor also attended. Participating by telephone was Mr. Robert E. Armstrong, President of the Corporation and an advisor, who participated from the Corporation's offices located at 100 West Liberty Street, 10th Floor, Reno, Nevada.

There being a quorum present, the meeting was called to order at 9:30 a.m. PST.

1.    Approval of Minutes of October 1, 2008. Motion to approve the minutes of the regular meeting of the Investment Committee of October 1, 2008 was seconded and approved.

2.    Report on Diversification of Liberty and Affiliates. Mr. Magness reported that there had been no significant sales of the stock of Liberty Media and its affiliates, since October 1, 2008 due to the severe decline in prices.

3.    Report on Pay Down of Debt. Ms. Dokken reported that due to the lack of sales of the stock of Liberty Media and its affiliates, there had been no significant pay down of debt attributable to GMIT and Mr. Magness' personal debt.

4.    Report of Stanford Certificates of Deposit. Mr. Espy reported that he had approached Stanford International Bank ("Bank") after the October 1st meeting regarding the redemption of Mr. Magness' and GMIT's certificate of deposits and that redemption would not be possible at this time. Mr. Magness inquired how his risk could be reduced to the exposure of these certificates of deposit. Mr. Espy responded that after the Bank advised that redemption would not be possible at this time, GMIT borrowed from the Bank against these certificates in the approximate amount of 80% of their face value or $63,000,000. Mr. Magness indicated that he would continue working with Mr. Espy to investigate on how to reduce GMIT's risk from these certificates of deposit.

Mr. Espy then gave a report on his due diligence of Stanford International Bank. He reported that Mr. Magness had received $25 million of interest after the October 1st meeting in addition to the borrowing against the certificates. He reported that the Bank

CONFIDENTIAL

MAGNESS002837

received a significant infusion of capital in the amount of $480 million from Mr. Allan Stanford in November.

5.  Report on Other Investments.  Mr. Espy reported that he had recommended to Mr. Magness other investments for GMIT's purchase, and that GMIT had invested in Quinlan and Axiom – Asia Funds.  Both of these investments required additional capital contributions.  Ms Dokken reported that GMIT was almost to capacity with its borrowings, and that obtaining additional capital for these investments might not be possible.  Ms. Dokken also reported that GMIT would soon receive a capital call for the Magness Ranches in the approximate amount of $1.4 million.  Mr. Magness requested that Mr. Sutton and Ms. Dokken participate on a telephone conference with Mr. Espy and representatives of Quinlan to see if that capital call could be deferred and to present him with his best options.  Mr. Espy indicated that the call would be set for the following week.

6.  Report on Asset Allocation.  Mr. Espy reported that at the present time, it was impractical to recommend an asset allocation plan until the GMIT debt had been further paid down.  He indicated that the only practical way to prepare an asset allocation model would be to diversify the concentration of Liberty and its affiliates stock; but given current market conditions, that was not acceptable to Mr. Magness.  Mr. Sutton and Ms. Dokken recommended at this point that there be no further reinvestments of proceeds of any liquidation until GMIT's debt was fully paid off.  This recommendation was agreed to by all.

7.  Report on Fortrust.  Mr. Knudson gave an optimistic report on Fortrust's operations.  Mr. Knudson reported that Phase IV had obtained its certificate of occupancy at the end of August, but at the present time, none of the space had been leased.  He indicated that approximately 8,442 square feet had been leased or 20% of the available space under the first four phases.  He believed the operational cash flow would be close to break even by the end of 2009, but that Fortrust would lose approximately $2 million for 2008.  No additional capital will be necessary in 2009 if the revenue growth continues at the 2008 pace.  Mr. Knudson's optimism is based upon reports that he has received that demand for the data centers will grow by 14%, with space increasing only by 6% in 2009.  He is confident that by the end of 2010, all of Fortrust's space will be leased.

Mr. Magness and Mr. Espy discussed the possibility of taking a line of credit against the data center, but Ms. Dokken and Mr. Knudson reported that that would be impractical, given the property is not producing any positive income.  Mr. Magness requested that Mr. Knudson do a market assessment to determine the salability of the data center on an "as is" basis, and to give a report at the next meeting.

8.  Report on Ranch Operations.  Ms. Dokken gave a report on the ranch operations for the reporting period of October 1, 2008 through today's meeting.  She indicated that the ranch will make a capital call upon its members of $2.8 million, and

2

CONFIDENTIAL

that GMIT will owe $1.4 million of that. She indicated that the ranch continues to cut costs and that she does not anticipate asking Renee Magness and her children's trusts for additional capital.

There being no further business, the meeting of the Investment Committee was adjourned at 11:30 a.m. PST.

Respectfully submitted,

4 . 9 . 0 7

Date                                    Raymond L. Sutton, Jr., Secretary

102702731.3

3

CONFIDENTIAL

MAGNESS002839

# APPENDIX R

**From:**       Tonya Dokken [tonya@magness.net]
**Sent:**       Thursday, February 12, 2009 8:09 PM
**To:**         Espy, Tom
**Subject:**    FW: (BN) Billionaire Stanford's Firm Said to Face U.S. Probe of CD Sales

FYI, Ryan just forwarded this to me. Bloomberg is writing about SIB now...


Tonya Dokken

Chief Financial Officer

Magness Investment Group

1200 17th Street, Suite 660

Denver, Colorado 80202

(303) 572-6400 (phone)

(303) 572-6464 (fax)

email - tonya@magness.net

-----

From: Bell, Ryan (PBIG Dallas, Tx) [mailto:ryan_bell@ml.com]
Sent: Thursday, February 12, 2009 12:58 PM
To: Tonya Dokken
Subject: Fw: (BN) Billionaire Stanford's Firm Said to Face U.S. Probe of CD Sales


Just got to Mexico and my hotel, but saw this email and wanted to forward. I think we all had
this fear unfortunately.  I hope it wasn't a ponzi scheme and hopefully the money is
somewhere.

--------------------------
Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: sands.chipman@barclayswealth.com <sands.chipman@barclayswealth.com>
To: Bell, Ryan (PBIG Dallas, Tx)
Sent: Thu Feb 12 13:58:05 2009
Subject: Fw: (BN) Billionaire Stanford's Firm Said to Face U.S. Probe of CD Sales

Forward to Mike...  We just talked about this.


----- Original Message -----
From: Zulick, Richard: Barclays Wealth
To: Griffin, William: Barclays Wealth; Chipman, Sands: Barclays Wealth
Cc: Connally, Mark M: Barclays Wealth
Sent: Thu Feb 12 13:53:20 2009
Subject: FW: (BN) Billionaire Stanford's Firm Said to Face U.S. Probe of CD Sales

**Plaintiff's Exhibit**

**109**

STANFORD BRYANT 004038

Uh Oh

-----Original Message-----
From: RICHARD L ZULICK, BARCLAYS CAPITAL INC [mailto:rzulick@bloomberg.net]
Sent: Thursday, February 12, 2009 12:53 PM
To: Zulick, Richard: Barclays Wealth
Subject: (BN) Billionaire Stanford's Firm Said to Face U.S. Probe of CD Sales


--------------------------------------------------------------------------
-------

This message is intended only for the personal, confidential use of the designated recipient
(s) named above. If not the intended recipient you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly prohibited. This
communication is for information purposes only and may not be regarded as an offer to sell or
a solicitation of an offer to buy any financial product, an official confirmation of any
transaction, or an official statement of Barclays Capital. All information is subject to
change without notice.
It may not be complete or accurate nor should it be relied upon as such, and its transmission
is not guaranteed secure or error-free.

+-------------------------------------------------------------------------
-------+


Billionaire Stanford's Firm Said to Face U.S. Probe of CD Sales
2009-02-12 05:01:00.24 GMT


By Alison Fitzgerald
     Feb. 12 (Bloomberg) -- Stanford Group Co., a Houston-based investment firm led by
billionaire R. Allen Stanford, is under investigation by U.S. securities regulators over
sales of certificates of deposit in its affiliated offshore bank and the consistent, above-
average returns those investments pay.
     Investigators from the Financial Industry Regulatory Authority visited six Stanford
Group offices last month, downloaded information from computer hard drives and looked through
files, people familiar with the events said. Two former Stanford financial advisers were
questioned last month by the Securities and Exchange Commission, according to the people, who
declined to be identified because they didn't want to put their current jobs at risk.
     The agencies are investigating Stanford's sales of certificates of deposit issued by its
Antigua-based affiliate, Stanford International Bank Ltd., according to the former employees.
The agency has asked former employees about the bank's stated returns on investment, between
10.3 and 15.1 percent every year from 1995 until last year, according to documents and annual
reports on the bank's Web site. SIB has $8.5 billion in assets and 30,000 clients, according
to the site.
     "That type of return ignores the business cycle," said L.
Burke Files, principal of Financial Examinations & Evaluations Inc., a Tempe, Arizona-based
financial investigation firm. "His returns fall outside the bell curve of probability."

                    'Routine Exam'

     The visits by Finra and the SEC were part of a "routine exam," said Brian Bertsch, a
spokesman for Stanford. Finra spokesman Herb Perone said the agency doesn't confirm or deny
investigations.
     Kevin Edmundson, an SEC investigator in Ft. Worth, Texas, said, "I can't even confirm
the existence of the investigation." The agency issued subpoenas last July to at least two
former Stanford employees.
     The SEC has stepped up probes after being accused of failing to heed warnings that

STANFORD BRYANT 004039

Bernard Madoff's investment returns were too good to be true. Madoff was arrested Dec. 11 after allegedly telling his sons that his business was a $50 billion Ponzi scheme. The SEC has since announced unrelated lawsuits against at least seven money managers for allegedly inflating profits or siphoning off client money.

Finra in November 2007 fined Stanford Group Co. $20,000 for failing to adequately state the risks involved in the CD investments and to disclose that an affiliation between the broker-dealer and the bank could pose a conflict of interest.

Stanford consented to the sanctions without admitting or denying wrongdoing, according to a file on the Finra web site.

The Stanford Financial companies, including Stanford Group, Stanford International Bank and Stanford Trust, were founded by R. Allen Stanford, who is their chairman. The Texas native was listed by Forbes Magazine as the 605th-richest man in the world with an estimated net worth of $2 billion.

## No Madoff Exposure

Allen Stanford is a citizen of the U.S. and of Antigua & Barbuda after being naturalized in that country 10 years ago, according to a biography on the company's Web site. He was knighted by the Antiguan government in 2006 and now uses the title "Sir." Stanford Group Co. has 19 offices in the U.S. and more than $43 billion under management or advisement, according to its Web site.

Stanford International Bank said in a Dec. 17 letter to clients, posted on its Web site, that it didn't have any exposure to Madoff's investment funds.

Stanford's one-year, $100,000 CD paid 4.5 percent annual yield as of Nov. 28, according a posting the Web site yesterday.

A one-year, $10,000 CD purchased at JPMorgan Chase & Co. would earn 1.5 percent, according to its consumer banking Web site.

Stanford International Bank describes the CDs in its disclosure statement as traditional bank deposits. The bank says it doesn't lend proceeds and instead invests in a mix of equities, metals, currencies and derivatives, according to its Web site and CD disclosures.

## Returns 'Incredible'

"Those returns are just incredible, in the sense that I don't believe them," said Alex Dalmady, an independent financial analyst based in Weston, Florida, who has examined Stanford's investment strategy and published an article in VenEconomia Monthly, published by Caracas-based economic consulting firm VenEconomia.

The company "obviously disagrees with his conclusions," Stanford's Bertsch said.

"The most important opinion for us is that of our clients, some of whom have been with us for over 20 years and have maintained their confidence in Stanford International Bank through the years," he said in an e-mail response to questions.

Dalmady and Files say the financial information published by Stanford International Bank makes them doubt its authenticity.

## 'Subtle Clues'

"There are just a whole lot of subtle clues at Stanford that when you look at it tell you to run away," Files said in an interview. He cited the consistent investment returns and the use of an Antigua-based auditor.

Stanford International Bank lists C.A.S. Hewlett & Co., based in St. John's, Antigua, as its auditor. The firm reports offices in Antigua and London on its web site. No one answered the telephone yesterday at either number.

"If you have $8 billion in assets, and you're taking deposits from all over the world, you would really like to have someone signing those balance sheets that someone has heard of," Dalmady said.

Four former investment advisers interviewed by Bloomberg said the Stanford Group offers

STANFORD BRYANT 004040

incentives for those who steer their clients' money into the bank CDs. The company paid a 1 percent fee to the advisers, held contests and offered trips and bonuses of up to $125,000, based on how much money went into Stanford International Bank, according to the former employees and e-mails provided to Bloomberg News. Those incentives weren't paid for investments in other securities, they said.

### 'Carte Blanche'

The bank said in a December report that it has a loss of $110 million last year. The S&P 500 index fell 39 percent last year.

The bank discloses broad investment categories in marketing materials and on its web site. In 2006, it reported that 57.4 percent of its portfolio was in equities, 21.9 percent in Treasuries and corporate bonds, 13 percent in metals and 7 percent in alternatives, according to a disclosure statement related to the CD offering. The rest was in cash, mostly dollars.

"They have carte blanche to invest in anything they want," said Scott MacKillop, president and chief compliance officer at Frontier Asset Management in Denver, who reviewed the CD offering documents. "You don't really know what your risk is, and you're getting a limited return."

For Related News and Information:
Financial writedowns and losses: WDCI <GO> Certificate of Deposit Rates: PGM <GO> Global financial crisis stories and video: EXTRA <GO> Top financial news: FTOP <GO> Caribbean News: NI CARIB <GO>

--With reporting by Michael Forsythe in Washington, David Scheer in New York and Steven Bodzin in Caracas. Editors: Robert Simison, William Glasgall

To contact the reporter on this story:
Alison Fitzgerald in Washington at +1-202-624-1846 or Afitzgerald2@bloomberg.net

To contact the editor responsible for this story:
William Glasgall at +1-212-617-3023
or wglasgall@ @bloomberg.net

Barclays Wealth is the wealth management division of Barclays Bank PLC, including Barclays Capital Inc. in the United States. This email may relate to or be sent from other members of the Barclays Group.
This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of The Barclays Group.  The availability of products and services may be limited by the applicable laws and regulations in certain jurisdictions. The Barclays Group does not normally accept or offer business instructions via internet email. Any action that you might take upon this message might be at your own risk. This email and any attachments are confidential and intended solely for the addressee and may also be privileged or exempt from disclosure under applicable law. If you are not the addressee, or have received this email in error, please notify the sender immediately, delete it from your system and do not copy, distribute, disclose or otherwise act upon any part of this email or its attachments.
Internet communications are not guaranteed to be secure or without viruses. The Barclays Group does not accept responsibility for any loss arising from unauthorised access to, or interference with, any Internet communications by any third party, or from the transmission of any viruses. This email and replies to this email may be monitored and archived by the Barclays Group.
Any opinion or other information in this email or its attachments that does not relate to the business of the Barclays Group is personal to the sender and is not given or endorsed by the

STANFORD BRYANT 004041

Barclays Group. The Barclays Group has no obligation to update its opinions or the
information in this material.
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication
(including any attachments) is not intended or written to be used and cannot be used for the
purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.
Barclays Bank PLC. Registered in England and Wales (registered no. 1026167). Registered
Office: 1 Churchill Place, London, E14 5HP, United Kingdom. Barclays Bank PLC is authorised
and regulated by the Financial Services Authority. The registered office of Barclays Capital
Inc. is 200 Park Avenue, New York, NY 10166. (c) 2008 Barclays Bank PLC. All rights reserved.
Barclays and Barclays Wealth are trademarks of Barclays Bank PLC and its affiliates.


———

CAUTION:  electronic mail sent through the Internet is not secure and could be intercepted by
a third party. For your protection, avoid sending identifying information such as account,
Social Security, or card numbers to us or others.  Further, do not send time-sensitive,
action-oriented messages such as transaction orders, fund transfer instructions or check stop
payments, as it is our policy not to accept such items electronically.


This message w/attachments (message) may be privileged, confidential or proprietary, and if
you are not an intended recipient, please notify the sender, do not use or share it and
delete it. Unless specifically indicated, this message is not an offer to sell or a
solicitation of any investment products or other financial product or service, an official
confirmation of any transaction, or an official statement of Merrill Lynch.  Subject to
applicable law, Merrill Lynch may monitor, review and retain e-communications (EC) traveling
through its networks/systems. The laws of the country of each sender/recipient may impact the
handling of EC, and EC may be archived, supervised and produced in countries other than the
country in which you are located. This message cannot be guaranteed to be secure or error-
free.  References to "Merrill Lynch" are references to any company in the Merrill Lynch &
Co., Inc. group of companies, which are wholly-owned by Bank of America Corporation.
Securities and Insurance Products: * Are Not FDIC Insured  * Are Not Bank Guaranteed  *  May
Lose Value  *  Are Not a Bank Deposit * Are Not a Condition to Any Banking Service or
Activity * Are Not Insured by Any Federal Government Agency.  Attachments that are part of
this E-communication may have additional important disclosures and disclaimers, which you
should read. This message is subject to terms available at the following link:
<http://www.ml.com/e-communications_terms/> http://www.ml.com/e-communications_terms/.  By
messaging with Merrill Lynch you consent to the foregoing.


———

STANFORD BRYANT 004042